# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

```
- - - - - - - - - - - - - - - - - - - - - - - - - X
BABY DOE, A CITIZEN OF AFGHANISTAN       :
CURRENTLY RESIDING IN NORTH              :
CAROLINA, BY AND THROUGH NEXT            :      CIVIL ACTION NO. 3: 22-cv - 49
FRIENDS, JOHN AND JANE DOE; AND JOHN     :
AND JANE DOE, CITIZENS OF AFGHANISTAN:
AND LEGAL GUARDIANS OF BABY DOE,         :      COMPLAINT

        Plaintiffs,                      :

                                         :      JURY TRIAL DEMANDED
v.                                       :

JOSHUA MAST, STEPHANIE MAST, RICHARD:
MAST, KIMBERLEY MOTLEY, AND AHMAD  :
OSMANI,                                  :
                                                CLERK'S OFFICE U.S. DISTRICT. COURT
        Defendants,                      :            AT CHARLOTTESVILLE, VA
                                                             FILED
                                         :
and                                      :             SEP 0 2 2022
                                         :
UNITED STATES SECRETARY OF STATE  :            LAURA A. AUSTIN, CLERK
ANTONY BLINKEN AND UNITED STATES  :         BY: _____
SECRETARY OF DEFENSE GENERAL      :                 DEPUTY CLERK
LLOYD AUSTIN,                            :
                                         :
        Nominal Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - X
```

Plaintiffs Baby Doe and John and Jane Doe file this Complaint against Defendants Joshua

Mast, Stephanie Mast, Richard Mast, Kimberley Motley and Ahmad Osmani (collectively,

"Defendants") and allege as follows:

## INTRODUCTION

1.      This action for conspiracy, tortious interference with parental rights, assault, fraud,

intentional infliction of emotional distress, and false imprisonment arises from a U.S. Marine Corp

Judge Advocate's unlawful abduction of Baby Doe, an Afghan war orphan, from her biological family and legal guardians, Plaintiffs John and Jane Doe. Plaintiffs seek a declaratory judgment and compensatory and punitive damages.

2.     Defendants collectively engaged in a fraudulent scheme over the course of more than a year to accomplish the abduction of Baby Doe for the purpose of "adoption" by Defendants Joshua and Stephanie Mast.

3.     On September 6, 2019, Baby Doe's parents and five siblings were killed in a U.S. military operation in rural Afghanistan. She survived and U.S. forces transported her to a military hospital for emergency medical treatment. Baby Doe, then only two months old, was seriously injured in the battle.

4.     In November 2019, while Baby Doe was recovering from her injuries in a U.S. military hospital in Afghanistan, Defendants Joshua and Stephanie Mast, represented by Defendant Richard Mast (a member of the Virginia Bar), fraudulently obtained a custody order and an interlocutory order of adoption over Baby Doe from Virginia courts that they knew, or reasonably should have known, lacked personal and subject matter jurisdiction over Baby Doe, a citizen of Afghanistan who had biological family in Afghanistan and had no legal or physical connection to the United States (the "Fraudulent Custody and Adoption Orders").[1]

5.     Notwithstanding the Fraudulent Custody and Adoption Orders, the U.S. government in Afghanistan refused to release Baby Doe to Joshua and Stephanie Mast. Instead, the U.S. government honored its unambiguous federal and international legal obligations to release her to be reunited with her next of kin in Afghanistan. Pursuant to Afghan law, Baby Doe's first

---

[1] The Fraudulent Custody and Adoption Orders include a final order of adoption that the Masts later obtained.

cousin (John Doe) and his wife (Jane Doe) assumed permanent guardianship over her, loved her, and welcomed her as their first child.

6.     Undeterred, Joshua and Stephanie Mast engaged the services of Kimberley Motley to search for and communicate with John and Jane Doe. Motley was aware that Joshua and Stephanie Mast had obtained the Fraudulent Custody and Adoption Orders for Baby Doe and was aware from the outset that Joshua and Stephanie Mast wanted to take physical custody of her in the United States. In coordination with Joshua and Stephanie Mast, however, Motley did not disclose the Masts' true intentions to the Does.

7.     Instead, Motley told the Does only that an American family wanted to help Baby Doe with her continuing medical needs. Joshua and Stephanie Mast's primary and undisclosed intention, however, was to induce John and Jane Doe to bring Baby Doe to the United States to enable them (one way or another) to acquire physical custody of Baby Doe based on the "authority" of the Fraudulent Custody and Adoption Orders.

8.     Despite communicating with John and Jane Doe for more than a year, first through Kimberley Motley, and eventually both directly and through Ahmad Osmani, Joshua and Stephanie Mast never revealed to them the Fraudulent Custody and Adoption Orders. Instead, through their omissions and misrepresentations, Joshua and Stephanie Mast deceived John and Jane Doe into believing that the Masts' only interest was in helping Baby Doe access medical care that was not available in Afghanistan.  In reality, however, the Masts' chief interest was in consummating their illicit scheme to take Baby Doe from her lawful Afghan parents.

9.     In August 2021, as a result of this long-running and coordinated fraudulent scheme, John and Jane Doe brought Baby Doe to the United States for medical care, only to have Joshua and Stephanie Mast tear her away from the only parents she had known for most of her life.

3

10.     Defendants have caused irreversible harm to an innocent toddler and Plaintiffs John and Jane Doe. As her true family and legal guardians, they raised Baby Doe for 18 months before the abduction and love her as their own child. Though this lawsuit can never make them whole, Defendants must be held accountable for their unconscionable conduct.

## PARTIES

11.     Baby Doe is a three-year-old Afghan citizen whose biological parents died in 2019. She currently is being held in North Carolina by Joshua and Stephanie Mast.

12.     John and Jane Doe, citizens of Afghanistan, are a married couple and the legal guardians of Baby Doe under the laws of Afghanistan. John Doe is the paternal first cousin[2] of Baby Doe. John and Jane Doe currently reside in Texas.

13.     Joshua and Stephanie Mast are a married couple, and are United States citizens claiming domicile in Palmyra, Virginia, but currently residing in North Carolina, where Joshua Mast is stationed in the United States Marine Corps. Joshua Mast is a Major in the Marine Corps, a Judge Advocate, and an attorney admitted to the bar of the Commonwealth of Virginia.

14.     Upon information and belief, Richard Mast is a United States citizen domiciled and residing in Forest, Virginia. Richard Mast is Joshua Mast's brother and is also an attorney admitted to the bar of the Commonwealth of Virginia. Richard Mast is affiliated with an entity named "Liberty Counsel."

15.     Upon information and belief, Kimberley Motley is a United States citizen domiciled and residing in North Carolina. Upon information and belief, Motley is an attorney admitted to the bar of the state of Wisconsin and has periodically worked in Afghanistan since

---

[2] John Doe and Baby Doe share a grandparent.

2008. Upon information and belief, Motley is the general counsel of Women for Afghan Women, which has a Community Center in Alexandria, Virginia.

16.    Upon information and belief, Ahmad Osmani is an Afghan national permanently residing in Tennessee. Upon information and belief, Osmani is married to Natalie Osmani, a U.S. citizen.

17.    United States Secretary of State Antony Blinken and United States Secretary of Defense General Lloyd Austin are named as nominal defendants, in their official capacities, as parties who are necessary to this proceeding. Plaintiffs are seeking no relief from them in this action.

### JURISDICTION & VENUE

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are completely diverse in citizenship, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.

19.    Defendants are subject to personal jurisdiction in Virginia under Virginia Code §§ 8.01-328.1(A)(1) and (3), because the causes of action asserted in this Complaint arise from their having transacted business in Virginia and/or having caused tortious injury by an act or omission in Virginia.

20.    Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of Defendants' wrongful conduct occurred in this district.

### FACTUAL ALLEGATIONS

I.    **BABY DOE'S ORPHANED PAST**

21.    Baby Doe's biological parents and five of her siblings were killed on September 6, 2019, in Afghanistan, in a joint United States and Afghan military operation in the course of which

their home was destroyed. Baby Doe sustained serious injuries, including a fractured skull and femur, and second-degree burns. U.S. military forces discovered Baby Doe in the rubble and immediately transported her to a nearby U.S. military hospital for urgent surgical and medical care. She was then transferred to ███████████ on September 25, 2019, at which time her condition stabilized.

22.     The International Committee of the Red Cross ("ICRC") is the organization authorized to care for children who are orphaned during wartime and to assist with family reunifications under the Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949 ("The Fourth Geneva Convention"). The U.S. military informed ICRC that Baby Doe was in its custody, and ICRC began searching for her family.

23.     The ICRC has worked for over one hundred years in conflict areas and humanitarian disasters to reunite separated family members through its "Restoring Family Links Program." ICRC and the national Red Cross and Red Crescent societies are universally recognized as experts in family tracing and reunification. *See https://www.brookings.edu/wpcontent/uploads/2016/06/0119_internal_displacement_complete.pdf, p, 332.*

24.     By October 25, 2019, ICRC made contact with Baby Doe's uncle, who requested ICRC's assistance in reuniting her with her family.

II.   **JOSHUA AND STEPHANIE MAST, WITH THE HELP OF THEIR ATTORNEY, RICHARD MAST, TOOK STEPS TO BLOCK BABY DOE'S REUNIFICATION WITH HER BIOLOGICAL FAMILY IN AFGHANISTAN AND TO ADOPT HER.**

A. **Through fraud and misrepresentation, Joshua and Stephanie Mast and Richard Mast obtained an Order of Custody and Interlocutory Order of Adoption over Baby Doe from Virginia courts.**

25.     Through his employment as an attorney in the United States Marine Corps deployed in Afghanistan, Joshua Mast learned of Baby Doe while she was in the custody of the Department of Defense (the "DoD") and under the care of the Military Health System,.

26.     Upon information and belief, Joshua and Stephanie Mast and Richard Mast were aware that ICRC would be searching for Baby Doe's biological family in Afghanistan.

27.     In spite of this knowledge, the Masts began taking steps to remove Baby Doe to the United States.

28.     Joshua Mast is an attorney, barred in Virginia, who served at the Center for Law and Military Operations, and whose responsibilities in Afghanistan included collection and analysis of data on targeting, collateral damage estimation, and civilian casualty response in an active combat zone. As an attorney and member of the United States' Armed Forces in Afghanistan, it was his professional responsibility to be aware of Afghanistan's status as a sovereign nation, and of the Security and Defense Cooperation Agreement Between the Islamic Republic of Afghanistan and the United States of America (the "Bilateral Agreement") that governed U.S. military operations in Afghanistan.

29.     As a U.S. military attorney, Joshua Mast knew, or should have known, that the Bilateral Agreement governed the U.S. military presence in Afghanistan, and that all U.S. military operations in Afghanistan were conducted under its auspices. Moreover, he was aware the Bilateral Agreement specifically recognized Afghan sovereignty and limited the Afghan Government's

jurisdiction *only* over active-duty U.S. Armed Forces and DoD civilian employees; the Bilateral Agreement did not limit Afghanistan's jurisdiction over Afghan nationals in Afghanistan.

30.     As a U.S. military attorney, Joshua Mast knew, or should have known, that all obligations of the United States and Afghanistan under the Bilateral Agreement were "without prejudice to Afghan sovereignty over its territory," and that U.S. Armed Forces personnel and DoD civilian employees were obligated to "respect the Constitution and laws of Afghanistan." Bilateral Agreement, Articles 3:1, 3:2.

31.     As a U.S. military attorney, Joshua Mast knew, or should have known, that U.S. military bases under the Bilateral Agreement are not U.S. territory. Indeed, the Bilateral Agreement is explicit that "Afghanistan has full sovereignty over its airspace, territory, and waters." Bilateral Agreement, Article 10:1. Joshua Mast was also aware that even if Baby Doe's identity was unknown, her nationality would be determined under Afghan law. Accordingly, he knew, or should have known, that Baby Doe, as a civilian in Afghanistan, was subject solely to the sovereign jurisdiction of Afghanistan for the entire time she was in the care of U.S. military hospitals.

32.     As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should have known, that under Article 12 of Afghanistan's law on citizenship, if a child is found in the territory of Afghanistan and "his/her parents' documents proving their citizenship are not available," the child is considered a citizen of Afghanistan. *See* United Nations High Commission for Refugees, Law on Citizenship of the Islamic Emirate of Afghanistan (English Translation), Article 12 (June 24, 2000), available at http://www.refworld.org/pdfid/404c988d4.pdf; *see also* Athayi, Abdullah, *Report on Citizenship Law: Afghanistan*, Robert Schuman Centre for Advanced

8

Studies, European University Institute (March 2017), at p. 9, available at
https://cadmus.eui.eu/bitstream/handle/1814/45933/GLOBALCIT_CR_2017_09.pdf

33.     As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should
have known, that regardless of where in Afghanistan Baby Doe was recovered, all territory within
the internationally recognized borders of Afghanistan was subject to the jurisdiction of the laws of
Afghanistan. Bilateral Agreement, Article 10:1.

34.     On information and belief, these basic, uncontroversial principles of national
sovereignty were not only known to Joshua Mast but were core obligations of his practice while
serving as an attorney in the U.S. Marines in Afghanistan.

35.     On information and belief, Joshua Mast also knew that the ICRC was actively
searching for Baby Doe's family, and he knew that, as Baby Doe was recovered from a remote
area of Afghanistan, this process would be labor- and time-intensive.

36.     Virginia-barred lawyers like Joshua Mast and Richard Mast are expected to
"conform to the requirements of the law, both in the professional service to clients and in the
lawyer's business and personal affairs." Virginia Rules of Professional Conduct, Preamble.
Virginia-barred lawyers also are expected to "use the law's procedures only for legitimate purposes
and not to harass or intimidate others." *Id.* Further, lawyers are expected to "provide competent
representation to a client," which "requires the legal knowledge, skill, thoroughness and
preparation reasonably necessary for the representation." Virginia Rules of Professional Conduct,
1.1.

37.     A myriad of national and state laws governs international adoptions in the United
States. In the case of an orphaned child in Afghanistan sought to be adopted in Virginia, the laws

of the United States and Virginia require that prospective adoptive parents follow the laws of the Government of Afghanistan.

38.     As Virginia attorneys, Joshua Mast and Richard Mast knew, or should have known, that they would need to comply with the applicable laws of Afghanistan, the United States, and Virginia.

39.     As such, U.S. law requires that, before a child in Afghanistan can be adopted by someone in the United States, legal guardianship or custody must be obtained over the child in Afghanistan.[3]

40.     Afghanistan's laws, however, expressly prohibit the guardianship or custody of Muslim Afghan children by non-Afghan non-Muslims.

41.     Joshua and Stephanie Mast are not Muslim and are not Afghan nationals.

42.     Despite lacking any legitimate legal basis for doing so, in October 2019 Joshua and Stephanie Mast initiated custody and adoption proceedings for Baby Doe in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "Juvenile Court") and adoption proceedings in the Fluvanna Circuit Court (the "Circuit Court"), despite the fact that Baby Doe had never

---

[3] U.S. Department of State, Adoption of Children from Countries in which Islamic Shari'a Law is Observed (last updated October 30, 2018), available at https://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/how-to-adopt/adoption-of-children-from-countries-sharia-law.html; https://web.archive.org/web/20171203170646/https://travel.state.gov/content/travel/en/Intercountry-Adoption/Intercountry-Adoption-Country-Information/Afghanistan.html. *See also* 8 C.F.R. § 204.3(d)(1)(iv) (international adoption cannot proceed without "[e]vidence of adoption abroad or that the prospective adoptive parents have . . . custody of the orphan for emigration and adoption in accordance with the laws of the foreign-sending country"); Va. Code Ann. § 63.2-1200.1 (applying the law of the Commonwealth to recognize foreign adoptions which were "finalized pursuant to the laws of the country from which the child was adopted" pending admission to the United States and issuance of a visa by USCIS). 8 C.F.R. § 204.3(b) defines a "foreign-sending country" as the "country of the orphan's citizenship, or if he or she is not permanently residing in the country of citizenship, the country of the orphan's habitual residence."

stepped foot on Virginia soil and remained in Afghanistan. Richard Mast represented Joshua and Stephanie Mast in these proceedings.

43.     Joshua and Stephanie Mast initiated these proceedings in their county of residence, even though: (a) they had not obtained legal guardianship of Baby Doe in Afghanistan; (b) Baby Doe had lived her entire life in Afghanistan; (c) Afghanistan had sole and exclusive jurisdiction over Baby Doe; and (d) Baby Doe had no connection with the United States or Virginia.

44.     By failing to serve notice of the custody and adoption proceedings on the DoD, which was Baby Doe's "physical" and "legal" custodian at the time, the Masts violated Virginia law.[4]

45.     Joshua and Stephanie Mast, through Richard Mast as counsel, advised both the Juvenile Court and the Circuit Court that they expected the Government of Afghanistan to waive its jurisdiction over Baby Doe. In fact, the Government of Afghanistan explicitly asserted its jurisdiction over the child and requested her release from the U.S. military facility.

46.     The Masts also falsely claimed to both the Juvenile Court and the Circuit Court that Baby Doe's birth country and nationality were unknown, that she was a "stateless minor," and that she, therefore, was subject to the Virginia courts' jurisdiction because no other court would have jurisdiction. The Masts knew or should have known these claims were untrue.

---

[4] DoD had physical custody of Baby Doe at the time of the custody proceeding and the initiation of the adoption proceeding, requiring Joshua and Stephanie Mast and their lawyer, Richard Mast, to provide DoD notice of those proceedings. Va. Code Ann. § 20-146.16 ("Before a child's custody determination is made under this act, notice and an opportunity to be heard in accordance with the standards of § 20-146.7 must be given to . . . *any person having physical custody of the child*.") (emphasis added); *see also* Va. Code Ann. § 63.2-1202(L) ("*A legal custodian of a child* being placed for adoption . . . shall be entitled to proper notice of any adoption proceeding and an opportunity to be heard." (emphasis added)).

47.     At the same time, they asked the Government of Afghanistan to waive jurisdiction over Baby Doe, thereby acknowledging Afghanistan's jurisdiction in the first place. In fact, Baby Doe was never stateless. Under the laws of Afghanistan, any child found in the territory of Afghanistan whose parents' nationality is unknown is considered a citizen of Afghanistan.[5] Baby Doe was found in Afghanistan, and, to the extent her deceased parents' nationality could not be proven, she was deemed under the laws of Afghanistan to be an Afghan citizen. The Masts knew, or should have known, that Baby Doe's nationality was Afghan under Afghan law.

48.     On November 6, 2019, relying on the factual and legal misrepresentations made by the Masts, and without serving the requisite process on the DoD , the Juvenile Court mistakenly concluded that it had jurisdiction over the case under Virginia Code §§ 20-146.12(A)(2) and (4) and granted the Masts temporary custody of Baby Doe.

49.     To reach this conclusion under subsection (A)(2), the Court was required to have found that a court of the home state of the child had declined jurisdiction. As discussed above, the Government of Afghanistan had jurisdiction, and had explicitly asserted jurisdiction over Baby Doe for reunification with her real family.

50.     Also under subsection (A)(2), the Court was required to have found that *both* the child *and* a person acting as a parent had a significant connection to the Commonwealth of Virginia. Yet, Baby Doe had no connection to Virginia and Joshua Mast was a stranger to her. He had no caretaking responsibilities, rights, or bonds of affection that would constitute a parent-child relationship. Only misrepresentations by the Masts could have led the Court to conclude otherwise.

---

[5] Law on Citizenship of the Islamic Emirate of Afghanistan, 24 June 2000, https://www.refworld.org/docid/404c988d4.html, accessed March 27, 2022 ("Article Twelve: If a child is found in the territory of the IEA [Afghanistan] and his/her parents' documents proving their citizenship are not available, the child would be considered citizen of the IEA.")

51.     Finally, under subsection (2), the Court was required to have found that substantial evidence was available in this Commonwealth concerning the child's care, protection, training, and personal relationships. The Masts knew or should have known that such evidence would be in Afghanistan and made available to ICRC and the Afghan government's Ministry of Labor and Social Affairs, not the Masts.

52.     On November 8, 2019, and relying on these same, and additional, factual and legal misrepresentations by the Masts, the Circuit Court entered an Interlocutory Order of Adoption for Baby Doe in favor of Joshua and Stephanie Mast.

53.     Two days later, and relying on these same, and additional, factual and legal misrepresentations by the Masts, the Circuit Court issued a Certificate of Foreign Birth for Baby Doe, listing Joshua and Stephanie Mast as her parents.

**B.  Relying on their fraudulently obtained Virginia state court orders, the Masts sought to prevent the United States from releasing Baby Doe to her biological family.**

54.     On October 24, 2019, Baby Doe's maternal uncle submitted a request to the ICRC through its Restoring Family Links Program for assistance in returning Baby Doe to her extended family.

55.     On November 17, 2019, the Afghan Ministry of Labor and Social Affairs documented its official involvement in the search for Baby Doe's biological family.

56.     The ICRC worked to verify the family's relationship with Baby Doe and facilitated the family's contact with the Afghan government. The ICRC's efforts to reunite Baby Doe with her biological family came to fruition when it located her paternal uncle, John Doe's father. Under the laws of Afghanistan (like the laws in many other Muslim countries), legal guardianship of an

orphan is transferred to the child's paternal uncle (in the absence of a paternal grandfather or a brother).

57.     In late December 2019 or early January 2020, the Afghan Deputy Minister of Social Affairs met with U.S. State Department's Assistant Chief of Mission in Kabul, Donna Welton, and informed her that the Afghan government had identified Baby Doe's family.

58.     On January 5, 2020, Ms. Welton wrote an email to the Deputy Minister stating: "We stand ready to transfer custody of the infant following an official request from the Afghan government. This is a high priority for our government and we would kindly request that the Ministry of Labor and Social Affairs expedite this official request so that the infant can be reunited with her family members as soon as possible" (emphasis added).

59.     In February 2020, Afghanistan's Acting Minister of Labor and Social Affairs informed the Director of Social Security within the Ministry of Labor and Social Affairs, Directorate of ███████, that Baby Doe was to be "reintegrated into her family."

60.     Upon learning of Baby Doe's impending release on February 26, 2020, to her biological family in Afghanistan, the Masts filed a pseudonymous Complaint and Petition for a Temporary Restraining Order (the "TRO Petition") in this Court, the United States District Court for the Western District of Virginia, naming as defendants the DoD, the U.S. Department of State (the "DoS"), the Assistant Chief of Mission of the United States Embassy-Kabul, and various unknown persons. Richard Mast's signature block on the TRO Petition identifies his employer as "Liberty Counsel."

61.     In the TRO Petition, the Masts sought to enjoin the United States government from releasing Baby Doe from its custody to the Government of Afghanistan for reunification with her

biological family, relying on their fraudulently obtained Juvenile Court custody order as a basis for this request.

62.     Within hours of docketing the TRO Petition, U.S. District Judge Norman K. Moon convened a hearing at which Richard Mast represented Joshua and Stephanie Mast, and the U.S. Department of Justice (the "DOJ") represented the DoD and the DoS.

63.     During the hearing, Richard Mast falsely represented to the Court that Joshua and Stephanie Mast were *not seeking to adopt* Baby Doe, but instead were interested only in bringing her to the United States for the purposes of medical treatment. Having just represented Joshua and Stephanie Mast in the Fluvanna Circuit Court to obtain an interlocutory order of adoption, Richard Mast knew that his representation to Judge Moon was false. So, too, did Joshua and Stephanie Mast. On information and belief, neither Joshua Mast, Stephanie Mast, nor Richard Mast informed this Court or the United States government of the pending adoption proceedings.

64.     For their part, the DOJ attorneys described the Juvenile Court custody order as "unlawful," "deeply flawed and incorrect," and apprised Judge Moon that the Masts had failed to serve the DoD and the DoS with notice of the custody proceedings.

65.     The DOJ attorneys also advised Judge Moon that, while Baby Doe was in the physical custody of the U.S. government to receive emergency medical care, she remained subject to the jurisdiction of the Government of Afghanistan, which had "determined that it's not going to waive jurisdiction because it has located that relative."

66.     Furthermore, the DOJ attorneys noted that "if the United States had been involved in th[e custody] proceeding as it should have been since it had custody . . . we would have been able to correct some of the factual errors that were happening there."

15

67.     Unsurprisingly, Judge Moon denied the request for a TRO that same day, finding that Joshua and Stephanie Mast were unlikely to prevail on the underlying cause of action. In so doing, Judge Moon observed that: (a) the Juvenile Court orders were "foundational to plaintiffs' asserted authority to care" for Baby Doe, but they "reflect an assumption" that the Government of Afghanistan would issue a waiver of jurisdiction, which it did not do; (b) as custodian of Baby Doe, the DoD "should have been formally served with and provided notice of the proceedings"; and (c) the Masts had failed to "proceed through proper channels," including obtaining the consent of the Afghan government and obtaining a visa for Baby Doe to enter the United States.

68.     The next day, February 27, 2020, the DOJ filed a notice with the federal court advising that Baby Doe had been released from U.S. custody for reunification with her "next of kin."

69.     At that time, Baby Doe was placed in the care of her paternal uncle, John Doe's father.

70.     Concerned that Baby Doe would require ongoing medical care, Baby Doe's paternal uncle transferred his guardianship of Baby Doe, pursuant to his authority under the laws of Afghanistan, to his son and daughter-in-law, John and Jane Doe. Baby Doe's paternal uncle believed that John and Jane Doe were best suited to care for Baby Doe because they were a young, educated couple who lived in a larger, more cosmopolitan area, with better access to doctors and hospitals than the rural region of Afghanistan where he lived.

71.     Though they themselves were young newlyweds who had not yet had biological children, John and Jane Doe agreed to welcome Baby Doe into their family and raise her as their own child.

16

72.     John and Jane Doe provided everything for Baby Doe that a parent would provide, including food, milk, diapers, and arranging medical care. Most importantly, they loved Baby Doe like they would love their own biological child. After more than five months of living in a medical institution on a military base, Baby Doe was finally surrounded by the love of a family, with grandparents and young aunts and uncles who also adored her. Plaintiffs John and Jane Doe continued to raise Baby Doe as their first child, until the very moment of her abduction on September 3, 2021.

III.    **DEFENDANTS LURED PLAINTIFFS TO THE UNITED STATES UNDER FALSE PRETENSES.**

      A.    **Joshua and Stephanie Mast engaged Kimberley Motley to locate and contact John and Jane Doe in Afghanistan under the guise of offering medical care for Baby Doe in the United States, failing to disclose to the Does the custody and adoption orders the Masts had fraudulently obtained.**

73.     Having failed to prevent Baby Doe's reunification with her biological family in Afghanistan, and having failed thus far to obtain physical custody of Baby Doe, Joshua and Stephanie Mast pursued a new strategy: convince Baby Doe's family to let her travel to the United States, where Joshua and Stephanie Mast could abduct her.

74.     In early 2020, Joshua and Stephanie Mast hired Kimberley Motley, a U.S. citizen and attorney who had worked in Afghanistan, to locate and contact Baby Doe's family in Afghanistan.

75.     On or about March 6, 2020, Motley called John Doe for the first time, pursuant to her agreement with, and at the direction of, Joshua and Stephanie Mast.

76.     In a subsequent conversation that same day, Motley advised Jane Doe that she understood Baby Doe had serious medical issues and that Motley knew an American family who wanted to help her. Pursuant to her understanding with Joshua and Stephanie Mast, Motley did not

disclose the Masts' custody order and interlocutory adoption order for Baby Doe, and did not

disclose the Masts' intention to adopt Baby Doe.

77.     Five days later, the Masts filed a brief relating to their rejected TRO Petition, but

did not disclose to the Court that they were in contact with John and Jane Doe through Motley or

that Baby Doe was with her biological family and legal guardians in Afghanistan.

78.     Motley continued to communicate with and befriend John and Jane Doe on behalf

of the Masts over the course of more than a year, making multiple offers to assist with Baby Doe's

medical care and occasionally asking for photographs of Baby Doe. Motley did so at the direction

of Joshua and Stephanie Mast and received thousands of dollars to do so. Motley also continued

to hide the identity of the person or people purportedly willing to help Baby Doe, or that Joshua

and Stephanie Mast had obtained a custody order and an interlocutory adoption order for Baby

Doe.

79.     On July 30, 2020 and in response to one of Motley's requests for photos, Jane Doe

sent her photographs of Baby Doe in swim trunks in a small wading pool.

**B. The Masts made additional misrepresentations to the Circuit Court to obtain a Final Order of Adoption of Baby Doe.**

80.     At the same time Motley was communicating with and befriending John and Jane

Doe at the behest of Joshua and Stephanie Mast, the Masts continued pursuing a final order of

adoption in the Circuit Court.

81.     The Masts did so despite knowing that: (a) Baby Doe was in the custody of

individuals determined by the Government of Afghanistan and ICRC to be her biological family

and legal guardians under the laws of Afghanistan; (b) Joshua and Stephanie Mast had not obtained

an order of custody or guardianship over Baby Doe in Afghanistan; (c) the Afghan government

had asserted jurisdiction over Baby Doe; (d) this Court, the United States District Court for the

Western District of Virginia, had characterized the Juvenile Court custody order as falsely premised upon the existence of a waiver of jurisdiction by the Afghan government; and (e) the DoD (Baby Doe's former custodian and Joshua Mast's employer) and the DoS (the agency that oversees intercountry adoptions) regarded the state court orders as "unlawful." Upon information and belief, the Masts intentionally failed to advise the Circuit Court of any of these facts.

82.     On December 3, 2020, and as a direct result of the Masts' omissions and misrepresentations, the Circuit Court entered a final order of adoption for Joshua and Stephanie Mast, incorrectly finding that Baby Doe "remains up to this point in time an orphaned, undocumented, stateless minor," and therefore "has the legal identity granted by order of this Court as constituting her sole legal identity."

### C. Joshua Mast builds a fraudulent relationship of trust with John and Jane Doe, offering to help obtain medical care in the United States for Baby Doe but never disclosing the Fraudulent Custody and Adoption Orders.

83.     On July 10, 2021, Motley for the first time informed John and Jane Doe that Joshua Mast was the person interested in providing medical care for Baby Doe. Motley then facilitated a telephone conversation between John and Jane Doe and Mast, during which Ahmad Osmani provided translation. Mast told John and Jane Doe that he was familiar with Baby Doe's medical needs and warned them that, if Baby Doe did not receive medical care in the United States, she could be blind, brain damaged, and/or permanently physically disabled.

84.     John Doe, who trained as a nurse in Afghanistan, was not aware of the medical issues that Mast described. But John and Jane Doe were concerned about the scarring on Baby Doe's face from the burns she sustained, Baby Doe's irregular gait due to the leg injury she sustained, and the severe allergic reactions of unknown origin that she seemed to periodically suffer.

85.     Mast insisted that Baby Doe would suffer serious, permanent harm if she were not brought to the United States for special treatment. In that initial conversation and in numerous other subsequent conversations, Mast asked John and Jane Doe to send Baby Doe to the United States for medical treatment. They declined because they did not want to be separated from their daughter.

86.     By July 2021, Jane Doe was in the third trimester of pregnancy and concerned about traveling to the United States. As a result, John and Jane Doe asked Mast if he would be willing to facilitate their taking Baby Doe to India or Pakistan for medical care, where he could pay doctors or hospitals directly, without providing any money to John and Jane Doe. Mast declined, insisting that hospitals in India and Pakistan did not have the specialists required to help Baby Doe.

87.     Over time and over the course of numerous telephone conversations and written communications, Ahmad Osmani helped Joshua and Stephanie Mast foster a relationship of trust with John and Jane Doe. Osmani also had numerous conversations with the Does on other occasions in which the Masts did not participate. John and Jane Doe trusted Osmani, an Afghan who spoke their native language, when he told them that the Masts were trustworthy people with no ulterior motives who just wanted to help Baby Doe receive medical care. Upon information and belief, Osmani maintained contact with John and Jane Doe and reported back to Joshua Mast at his direction about his conversations with the Does. Upon information and belief, Osmani knew that the Masts intended to take Baby Doe from her biological family.

88.     Joshua Mast repeatedly referred to John Doe as his "brother" and insisted he only wanted to help Baby Doe obtain needed medical care. Based on the repeated warnings of Joshua and Stephanie Mast about Baby Doe's medical needs, and based on the repeated assurances by Osmani that the Masts were honest people who just wanted to help Baby Doe, John and Jane Doe

began to fear that she would suffer long-term consequences if they did not obtain specialist care for her.

89.     Neither Joshua Mast, Stephanie Mast, Motley, nor Osmani disclosed to John and Jane Doe at this time that the Masts had (unsuccessfully) filed a legal action in the United States to prevent Baby Doe's reunification with her biological family and legal guardians in Afghanistan, or that the Masts had obtained an order of adoption for Baby Doe in a Virginia court. Instead, Joshua and Stephanie Mast misrepresented that they wanted to bring Baby Doe to the United States solely so that she could receive medical treatment and for the sake of doing something good.

**D. As Afghanistan fell to the Taliban, John and Jane Doe believed that they might never have another chance to obtain necessary medical care for Baby Doe.**

90.     In August 2021, as U.S. troops withdrew and the Taliban began to retake Afghanistan, Joshua and Stephanie Mast again reached out to John and Jane Doe to convince them to bring Baby Doe to the United States for medical treatment. Given the political situation in Afghanistan and the Taliban's advances, John and Jane Doe believed this could be their last and only chance to obtain medical care for Baby Doe. As a result, they advised Joshua Mast that they were considering his proposal, but were concerned that they would not be able to return to Afghanistan.

91.     Joshua Mast and Ahmad Osmani assured them that they would need to be in the United States for Baby Doe's medical care for only two or three months and that they would then be able to re-enter Afghanistan without issue. Again, Joshua Mast and Ahmad Osmani failed to inform John and Jane Doe about the adoption order he and his wife and brother had fraudulently obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, Mast and Osmani continued

to misrepresent that the Masts merely wanted to bring Baby Doe to the United States solely to provide her with medical care.

92.     In reliance on Joshua Mast's misrepresentations regarding the purpose and duration of their travel, as well as their ability to return to Afghanistan, ignorant of Mast's and his wife's true intentions, and in reliance on Osmani's reassurances, John and Jane Doe agreed to travel to the United States for the purpose of obtaining medical care for Baby Doe.

### E. Joshua Mast and Richard Mast file a fraudulent immigration application for John Doe and make false statements to the USCIS, without John Doe's knowledge or consent.

93.     Joshua Mast informed John and Jane Doe that he would prepare immigration paperwork for them and Baby Doe to permit them to enter the United States for the purpose and duration of Baby Doe's medical care.

94.     In fact, Mast did not file the appropriate immigration paperwork for John and Jane Doe and Baby Doe for the purpose of having them visit the United States for a short duration to obtain medical care for Baby Doe. Instead, on August 20, 2021 and unbeknownst to John and Jane Doe, Richard Mast emailed U.S. Citizenship and Immigration Services ("USCIS") a Form I-360 Petition for Plaintiff John Doe. Upon information and belief, the form was prepared at the direction of Joshua and Stephanie Mast by Natalie Osmani, Ahmad Osmani's wife. Ms. Osmani signed the petition as its preparer, but listed Defendant Joshua Mast as the person acting on behalf of the petitioner, and provided Mast's North Carolina home address as a mailing address.

95.     In addition, Ms. Osmani wrote by hand the following visa category: "Special Immigrant Afghanistan national escorting military dependent." Not only does no such visa category exist, but it was false to claim that John Doe would be escorting a U.S. "military dependent" when the United States had by this time represented to this Court that it did not recognize any custodial relationship between Joshua Mast, Stephanie Mast and Baby Doe.

96.     Upon information and belief, John and Jane Doe nonetheless were placed on a list of potential evacuees with pending Special Immigrant Visa Applications as a result of the petition.[6]

97.     In his August 20, 2021, email to the USCIS, Richard Mast falsely wrote: "[John and Jane Doe] are helping US DoD at great risk to themselves, and have cared for a minor DoD dependent child ([Baby Doe]) who has serious medical needs."

98.     Of course, by then Baby Doe was not a "minor DoD dependent child," because she had been returned to her family in the exercise of the Government of Afghanistan's jurisdiction. Instead, John and Jane Doe were by then Baby Doe's legal guardians, raising her as their own child; they were not "caring" for her on behalf of Joshua and Stephanie Mast, the DoD, or anyone else. Nor were they doing so as a "service to the US Government."

99.     In another email to USCIS seeking the evacuation of translator Ahmad Osmani's siblings to the United States, Richard Mast wrote that Osmani's siblings were the "family of an Afghan pastor" who had been "very instrumental to helping a US Marine" represented by Liberty Counsel "adopt an Afghan child." Upon information and belief, the reference to a "US Marine" is a reference to Joshua Mast, and the reference to "an Afghan child" is a reference to Baby Doe.

100.     John and Jane Doe were not aware of the misrepresentations being made by Richard Mast, on behalf of Joshua and Stephanie Mast, about them and Baby Doe.

101.     The Does traveled to Kabul on August 23, 2021, to spend the night there with Osmani's parents and siblings, at the direction of Joshua Mast and Osmani. The next morning, the

---

[6] On November 10, 2021, the USCIS mailed a Notice of Intent to deny the Petition to Joshua Mast at his North Carolina address, with a response deadline of December 10, 2021. Mast never advised John and Jane Doe of the Petition or the Notice of Intent to deny. John and Jane Doe learned these facts only as a result of filing requests for personal records with USCIS.

Does traveled to Hamid Karzai International Airport with Mr. Osmani's siblings as part of the evacuation efforts under Operation Allies Refuge.

102.    Between August 24 and August 26, 2021, Joshua Mast and Osmani continued to communicate with John and Jane Doe over WhatsApp as they transited from Afghanistan to the United States through Qatar and Germany.

103.    Again, Joshua Mast and Osmani failed to inform John and Jane Doe about the adoption order that Joshua and Stephanie Mast had obtained from a Virginia court or his previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, they continued to misrepresent that the Masts wanted to bring Baby Doe to the United States only to provide her with medical care.

**F.  Joshua Mast tells John and Jane Doe he is their lawyer and facilitates their entry into the United States.**

104.    On August 26, 2021, as Plaintiffs were in transit to the United States, Joshua Mast sent a WhatsApp voice note to Jane Doe, instructing her to tell anyone who asks that he was their lawyer. He also sent her a text stating:

> If anyone asks to talk about your documents, show them this text: I am Major Joshua Mast, USMC. I am a Judge Advocate with MARSOC, and I am here at Ramstein to provide this group of 6 pax with their original documents and escort them through the process. MARSOC coordinated a JSOC operation to extract them to Kabul airport three days ago, and I am tracking them down for the above purpose.

105.    At approximately the same time, Mast left John Doe a voice message, assuring him he would get them to the United States, and stating:

> [I]f someone tries to talk about documents, we want to come and show them all the forms that we filed for you all to get to America instead of staying here in Germany. So before you talk to them about it, say "we have a lawyer here to talk with you about that for us" and that's me. Just show them the text and have them call me.

24

106.    When Plaintiffs landed at Ramstein Airforce Base in Germany, Joshua and Stephanie Mast met them. During their brief stop in Germany, Joshua and Stephanie Mast visited Plaintiffs' room three times, repeatedly trying to convince John and Jane Doe to allow Baby Doe to travel separately with the Masts, insisting that it would be easier for the toddler to enter the United States that way. John and Jane Doe repeatedly refused, as they did not want to leave Baby Doe in anyone else's care. Osmani provided translation over the telephone.

107.    Before leaving Germany, John Doe informed Joshua and Stephanie Mast of a promise John Doe had made to Jane Doe: that Baby Doe would never leave her side while they were in the United States. There can be no doubt that Joshua and Stephanie Mast were aware that John and Jane Doe understood they would have control over Baby Doe's location and custody while in the United States, and that they intended to continue to care for her as their daughter.

108.    Again, the Masts and Osmani failed to fully inform John and Jane Doe about the adoption order that the Masts obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, the Masts and Osmani continued to misrepresent that they primarily wanted to bring Baby Doe to the United States to provide her with medical care.

### G. Without John and Jane Doe's knowledge, Joshua and Stephanie Mast fraudulently obtained an Afghan passport for Baby Doe – despite repeatedly representing to Virginia and federal courts that she was not Afghan and had no nationality.

109.    After several days of grueling travel, which were especially hard on Jane Doe, who was eight months pregnant, the Does and the Osmani siblings arrived at Dulles International Airport on August 29, 2021. Joshua Mast met the families while they waited in line for inspection,

pulled them out of the line, and took them directly to an inspecting officer. There, they presented their identity documents.

110.    John Doe presented his Afghan passport to the inspecting officer, and Jane Doe presented her Afghan ID. They then explained to the inspecting officer that Baby Doe had not yet received an identification document, as it was customary in Afghanistan to procure one only when the child was old enough to attend school. At the time, Baby Doe was two years old.

111.    To their surprise – and despite his representations to multiple courts that Baby Doe was not Afghan and had no nationality – Joshua Mast then handed an Afghan passport for Baby Doe to the inspecting officer. John and Jane Doe had never before seen this passport and did not procure it themselves. When the officer returned the passport to John and Jane Doe, they were shocked to see that the photograph in the passport appeared to be the same photograph that Jane Doe sent to Motley via WhatsApp on July 30, 2020, of Baby Doe in swim trunks in a small wading pool, but it had obviously been altered.

**Original Photo**              **Passport Photo**

112.    The altered picture had a different background, a shirt covering Baby Doe's shoulders and chest, and eliminated some stray hairs so it was less obvious that her hair was wet. Upon information and belief, the alteration of the photograph and the creation of the passport occurred at the direction of Joshua and Stephanie Mast.

113.    John and Jane Doe were stunned to see that the name on the passport was "███ Mast."

114.    When John and Jane Doe asked Joshua Mast why the name on the passport was incorrect, he told them to keep quiet and that it was just to make it easier to get medical care for Baby Doe.

115.    After screening at the airport, Plaintiffs were paroled into the United States, which permits them to lawfully remain in the United States through August 28, 2023. They ultimately were transported to refugee housing at Fort Pickett, in Blackstone, Virginia, the location that Joshua Mast instructed them to request.

**H. Joshua and Stephanie Mast abducted Baby Doe.**

116.    Five days later, on September 3, 2021, John and Jane Doe were instructed that they would be moving to another housing unit on the base. They were escorted to a van, in which a woman sat in the last row with an infant car seat next to her. Baby Doe was placed in the infant car seat.

117.    But the Does were not transported to another housing unit on the base. Instead, they were taken to a building where the woman in the car picked up Baby Doe and held her while instructing John and Jane Doe to walk to the front of the building. There, they met another unknown woman who later informed them she was a social worker from the DoS.

118.    Inside the building, they were met by the social worker, a Pashto interpreter, and the woman from the car, who continued to hold Baby Doe. The social worker then informed John and Jane Doe that they were not Baby Doe's lawful guardians and that Joshua Mast had adopted the child.

119.    John and Jane Doe did not understand what "adoption" meant, as guardianship and kinship care in Afghanistan are not understood in the same way as adoption in the U.S. legal

system. John and Jane Doe did understand, though, that Baby Doe would not be permitted to return to their housing unit with them, but that Joshua Mast would be taking her with him.

120.    When Joshua Mast entered the room, Jane Doe, who was more than eight months pregnant, fell to the ground crying and begging for him not to take Baby Doe. The woman holding Baby Doe removed her from the room, against John and Jane Doe's objections.

121.    John Doe pleaded with Joshua Mast to act like the "brother" that he had promised to be to them. In response, Joshua Mast stomped on John Doe's foot, shoved him, and left the room. Joshua Mast then returned and took Baby Doe to his car, where Stephanie Mast was waiting for him, and together they abducted Baby Doe. John and Jane Doe have not seen their daughter since then.

### I.  John and Jane Doe suffer severe emotional distress as a result of the trauma of having Baby Doe taken from them.

122.    Bewildered and in despair, John and Jane Doe returned to their housing unit on the base. The next day, they contacted Joshua Mast and asked why he had taken their child. Mast responded that he had been instructed to pick up Baby Doe or she would be sent to an orphanage. He did not say who instructed him or mention the adoption order he and his wife had fraudulently obtained more than a year before.

123.    Over the next few weeks, John and Jane Doe attempted to maintain a connection with Joshua Mast over WhatsApp, hoping that he might allow them to see Baby Doe. Additionally, however, John and Jane Doe were afraid of Mast, as he appeared to have lied to numerous government agencies about Baby Doe and gotten away with it. Mast abducted their child in broad daylight but appeared to face no consequences. They were afraid of angering him, believing that, if he could steal their child and get away with it, he could harm them, too.

28

124.    Ahmad Osmani maintained frequent contact with the Does, who pleaded with him to help them get their child back. Osmani warned the Does that they must not seek legal help, that lawyers will defraud them, that this issue must be resolved directly with the Masts and that, regardless, no court would return the child to them because the court would see that the Masts had more money than them. Knowing that Mast had adopted the child, Osmani suggested that if the Does kept in contact with the Masts, they might be willing to return the child after the Does left the military base. Upon information and belief, Osmani attempted to dissuade the Does from seeking legal recourse at the direction of Joshua Mast, and reported his conversations back to Joshua Mast.

125.    John Doe continuously sought help from various agencies at Fort Pickett to help retrieve Baby Doe. Eventually, on September 18, 2021, an interpreter on the base with whom John and Jane Doe shared their story explained the meaning of "adoption" to them. This was the first time John and Jane Doe understood that Joshua and Stephanie Mast had been lying to them all the time and had no intention of returning Baby Doe to them.

126.    As a direct result of the decline of Jane Doe's mental health and the traumatic experience of losing Baby Doe, John Doe was afraid to leave Jane Doe alone in their room. He often asked other women in their building to keep an eye on her if he needed to be out of the room. Despite being in the ninth month of her pregnancy, Jane Doe no longer wanted to eat or drink, and she could not sleep. Both she and her husband were devastated and depressed.

127.    Jane Doe delivered her baby on October 1, 2021. Unfortunately, despite the joy of bringing a new child into this world, Jane Doe's depression deepened as it became increasingly clear that Joshua and Stephanie Mast would never voluntarily return Baby Doe to them. By

November 5, 2021, Jane Doe had become suicidal and was taken to the Stress Clinic on Fort Pickett for treatment.

128.    In November 2021, Jane Doe messaged Kimberley Motley to inform her that the Masts, whom Motley had introduced to the Does, had abducted Baby Doe, and pleaded with Motley to help her. Motley did not respond.

129.    As a direct result of Joshua and Stephanie Mast's intentional and forcible removal of Baby Doe, John and Jane Doe have been unable to exercise their parental rights as Baby Doe's biological family and legal guardians.

130.    As a result of Joshua and Stephanie Mast's intentional and outrageous conduct, namely the abduction of Baby Doe in their presence and Joshua Mast's battery of John Doe, John and Jane Doe have experienced extreme emotional distress.

## CLAIMS FOR RELIEF

## COUNT I

### TORTIOUS INTERFERENCE WITH PARENTAL RIGHTS
### (AGAINST DEFENDANTS JOSHUA MAST, STEPHANIE MAST, RICHARD MAST, KIMBERLEY MOTLEY, AND AHMAD OSMANI)

131.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

132.    As the biological family and legal guardians of Baby Doe, John and Jane Doe have parental rights to and in their relationship with Baby Doe. The right of parents or guardians to develop and to maintain a relationship with their child is a fundamental right recognized by the United States Supreme Court and federal law. Further, the U.S. government recognized that the Does' parental and custodial rights to Baby Doe fell under the jurisdiction of Afghanistan and are recognized under the laws of Afghanistan.

133.   This Court concurred with the DOJ that sole jurisdiction over the custody of Baby Doe was a matter for the courts and Government of Afghanistan, which had expressly asserted its jurisdiction over Baby Doe.

134.   Upon information and belief, each of the Defendants was aware that John and Jane Doe were the lawful guardians of Baby Doe as determined by the Government of Afghanistan. Each of the Defendants was aware John and Jane Doe had maintained physical custody of Baby Doe.

135.   Notwithstanding this knowledge, each of the Defendants intentionally and willfully used improper, unethical and fraudulent means to preclude John and Jane Doe from continuing their parental relationship with Baby Doe and interfered with their parental rights, permanently depriving them of those rights.

136.   Defendants' actions as set forth above have resulted in the violation of these rights, causing John and Jane Doe harm for which they seek compensation.

137.   Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.

## COUNT II

### FRAUD
### (AGAINST DEFENDANTS JOSHUA AND STEPHANIE MAST AND KIMBERLEY MOTLEY)

138.   Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

139.   Joshua and Stephanie Mast and Kimberley Motley intentionally made misleading and false statements and/or material omissions to John and Jane Doe to perpetrate the abduction of Baby Doe.

140.    Joshua and Stephanie Mast engaged the services of Motley, who acted as their agent, to, *inter alia*, contact John and Jane Doe and lure them into facilitating Baby Doe's travel to the United States, purportedly for the sole purpose of obtaining medical treatment for her, through false and misleading statements and material omissions.

141.    Upon information and belief, Joshua and Stephanie Mast, through their agent Motley, procured the identities and location of John and Jane Doe, as well as photographs of Baby Doe procured from John and Jane Doe via WhatsApp.

142.    John and Jane Doe relied on Motley's misrepresentations, which she made at the direction of Joshua and Stephanie Mast, when they communicated with her, sent her photographs of Baby Doe, and agreed to travel to the United States for the purpose of obtaining medical treatment for Baby Doe.

143.    One of the photographs that Joshua and Stephanie Mast obtained from John and Jane Doe through Motley, under false pretenses, was digitally altered to create the fraudulently obtained identification documents used to bring Baby Doe into the United States.

144.    It was as a direct result of John and Jane Doe's reliance on Joshua and Stephanie Mast's prevarications, made through Motley, that Joshua and Stephanie Mast were able to lure Plaintiffs to the United States and unlawfully obtain physical custody of Baby Doe.

145.    On July 10, 2021, as well as in subsequent conversations, Joshua and Stephanie Mast, with the assistance of Motley, intentionally misrepresented to John and Jane Doe that their sole intention was to procure medical assistance for Baby Doe, and that it was in the Does' best interest to send Baby Doe to the United States. Joshua and Stephanie Mast also intentionally withheld from John and Jane Doe any information or notice of the court proceedings they had initiated for Baby Doe in Virginia.

146.    On August 26, 2021, and in furtherance of the Masts' unlawful scheme to take Baby Doe from John and Jane Doe, Joshua Mast represented to John and Jane Doe that he was their attorney.

147.    Shortly thereafter, while John and Jane Doe were in Germany awaiting their final flights to the United States, Joshua and Stephanie Mast came to their room three times and again made misrepresentations to them, reiterating that they wanted to take Baby Doe to the United States for the sole purpose of obtaining medical treatment for her. Further, Joshua and Stephanie Mast falsely stated that Baby Doe should travel with them, separately from the Does, because they were simply trying to make it easier for Baby Doe to enter the United States. Instead, their true intention was to unlawfully and permanently take physical custody of Baby Doe.

148.    On September 3, 2021, Joshua Mast arranged for John and Jane Doe and Baby Doe to be moved to another building at Fort Pickett and revealed to John and Jane Doe for the first time that he had adopted Baby Doe. He then utilized this opportunity to remove Baby Doe from their custody.

149.    John and Jane Does' reasonable reliance on this pattern of deception allowed Joshua and Stephanie Mast, through their agent Motley, to obtain the photographs necessary to procure fraudulently obtained identification documents, travel permissions, and erroneously granted custodial and adoption decisions necessary to effect this abduction.

150.    As a result of repeated material misrepresentations by the Masts and Motley, John and Jane Doe and Baby Doe traveled to the United States and subjected themselves to the controlled environment of a military base that Joshua Mast manipulated to his advantage to abduct Baby Doe in broad daylight.

151.    In reliance on the representation that they were only traveling to the United States for two to three months to obtain medical care for Baby Doe, after which they would return with Baby Doe to Afghanistan, John and Jane Doe left their homeland, to which they cannot yet return, and may never be able to return, because of the circumstances surrounding their departure. Specifically, John and Jane Doe fear that the current Afghanistan government will be quick to assume they are U.S. military collaborators – consequently, they fear they or their family will be shunned or targeted by the government, or by others in their community.

152.    Had John and Jane Doe been aware that the purpose of the communications initiated by Joshua and Stephanie Mast and Motley was to facilitate the Masts' abduction of Baby Doe, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.

153.    Had John and Jane Doe been aware that Joshua and Stephanie Mast had fraudulently obtained orders of custody and adoption for Baby Doe, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.

154.    Had John and Jane Doe been aware that Joshua and Stephanie Mast had filed an action in a U.S. federal court to prevent Baby Doe's reunification with her biological family and legal guardians, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.

155.    John and Jane Doe have suffered and will continue to suffer what they regard as the worst tragedy they have experienced, having their child unjustly ripped from their lives.

156.    Accordingly, Joshua and Stephanie Mast and Motley are jointly and severally liable for the harm suffered by Plaintiffs as articulated above.

34

## COUNT III
## COMMON LAW CONSPIRACY
## (AGAINST DEFENDANTS JOSHUA MAST, STEPHANIE MAST, RICHARD MAST, KIMBERLEY MOTLEY, AND AHMAD OSMANI)

157.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

158.    Each of the Defendants acted in concert, agreed, associated, mutually undertook and combined together to intentionally and purposely commit the wrongful and tortious acts against all of the Plaintiffs as set forth above. The concerted and purposeful actions of each Defendant have denied John and Jane Doe their parental rights and wrongfully interfered with their ability to establish and assert those rights; and denied Baby Doe her right to know and be raised in the natural home of her biological family and legal guardians.

159.    Each of the conspirators is fully responsible for the acts of each other. The total effect of the conspiracy not only is tortious, but, indeed, also is a criminal act tantamount to child abduction under §§ 18.2-47(a) and 18.2-49 of the Code of Virginia. The actions of the conspirators violate federal statutes, laws and regulations of the Commonwealth of Virginia, and the laws of Afghanistan.

160.    Each Defendant acted in furtherance of this conspiracy to defraud John and Jane Doe and to abduct and unlawfully restrain Baby Doe.

161.    Joshua and Stephanie Mast, *inter alia*, fraudulently induced John and Jane Doe, through their agent Motley, to share photographs of Baby Doe, which they used to unlawfully obtain an Afghan passport for Baby Doe without the knowledge or consent of her biological family and legal guardians. Joshua and Stephanie Mast fraudulently misrepresented their intentions, both directly and through their agent Motley, to John and Jane Doe when persuading them to have Baby Doe travel to the United States purportedly to obtain medical treatment. Joshua and Stephanie

Mast abducted Baby Doe and have continued to deprive John and Jane Doe of any contact with her. Joshua and Stephanie Mast procured fraudulently obtained documents to effect her abduction.

162.    Richard Mast, *inter alia*, at the direction of and on behalf of Joshua and Stephanie Mast, fraudulently misrepresented material facts, and made numerous omissions of fact, to multiple courts to unlawfully obtain custody and adoption orders that would facilitate the abduction by Joshua and Stephanie Mast of Baby Doe, as well material misrepresentations to this Court and USCIS in furtherance of the same. Richard Mast and Joshua and Stephanie Mast knew these statements to be false and the omissions to be material.

163.    Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly made false representations to John and Jane Doe when persuading them to have Baby Doe travel to the United States to obtain medical treatment.

164.    As set forth above, the Defendants' overt acts and omissions in furtherance of their conspiracy have harmed and will continue to harm each Plaintiff.

165.    Accordingly, the Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DEFENDANTS JOSHUA MAST, STEPHANIE MAST, RICHARD MAST, KIMBERLEY MOTLEY, AND AHMAD OSMANI)

166.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

167.    Since 2019, the conduct of Joshua and Stephanie Mast has shown a consistent pattern of reckless disregard for the very real possibility of causing extreme emotional distress to John and Jane Doe. As set forth above, the Masts conspired to separate Baby Doe unlawfully from

the only family she had ever known for the vast majority of her short life. It is implausible that someone would be unaware of the extreme trauma that would be inflicted on parents when their child is ripped from their arms by someone who had for months been claiming that all he wanted was to help them.

168.    As alleged above, the conduct of Joshua and Stephanie Mast was both deceitful and criminal, violating the laws of Afghanistan, Virginia, and the United States. They were aware that Baby Doe had been reunited with her biological family and legal guardians, and chose to conceal this from Virginia state and federal courts. They continued to mispresent to the Virginia courts that Baby Doe was a stateless, unaccompanied orphan. Neither the government of Afghanistan nor the United States agreed with this determination. Nonetheless, to carry out their scheme, Joshua and Stephanie Mast consistently violated laws meant to safeguard not only the wellbeing of vulnerable children, but the foreign policy interests of the United States.

169.    Richard Mast knowingly furthered this scheme through his fraudulent in-court misrepresentations, by procuring the custody and adoption orders for Joshua and Stephanie Mast, and by submitting a deceptive immigration application for John Doe.

170.    Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly facilitated the plan to abduct Baby Doe by misrepresenting their intentions to John and Jane Doe when persuading them to have Baby Doe travel to the United States to obtain medical treatment.

171.    These actions would be considered extreme, outrageous, and intolerable by any reasonable person.

172.    As a direct result of the extreme, outrageous, and intolerable conduct of all four Defendants, Plaintiffs have suffered extreme emotional distress. The lives of all three Plaintiffs have been forever altered in fundamental ways that no individual should be expected to endure.

173.    Accordingly, Defendants are jointly and severally liable to Plaintiffs for all of their harm suffered at the hands of the Defendants, as set forth above.

## COUNT V

### FALSE IMPRISONMENT
### (AGAINST DEFENDANTS JOSHUA AND STEPHANIE MAST)

174.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

175.    On September 3, 2021, Joshua Mast physically removed Baby Doe from the custody of her lawful guardians without their consent, restricting her movement and confining her to the care of himself and Stephanie Mast, without the permission or consent of her lawful guardians.

176.    Since September 3, 2021, Joshua and Stephanie Mast have continued to keep Baby Doe captive, without the permission or consent of her lawful guardians.

177.    On September 3, 2021, Baby Doe began crying when the woman assisting Joshua Mast would not return her to Jane Doe, indicating Baby Doe's awareness of this restraint. John and Jane Doe, in their capacity as Baby Doe's legal guardians, were and are aware of and vehemently opposed to this unlawful restraint.

178.    As a result of this unlawful restraint, Baby Doe, John Doe and Jane Doe have been injured by this family separation since September 3, 2021.

179.    Accordingly, Joshua and Stephanie Mast are jointly and severally liable to Plaintiffs for all of the harm they have endured, as set forth above.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiffs pray for relief and judgment against Defendants including:

a.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, a declaration that:

(i)  under the Supremacy Clause of the United States Constitution, the decisions of the United States to recognize Baby Doe's legal status as an Afghan citizen, and to recognize the Government of Afghanistan's jurisdiction over her, are binding and cannot be overridden or contradicted by a state court;

(ii)  at the time that Joshua and Stephanie Mast obtained a custody order for her from the Juvenile Court, Baby Doe was not "stateless," but was an Afghan citizen;

(iii)  at the time that Joshua and Stephanie Mast obtained an adoption order for her from the Circuit Court, Baby Doe was not "stateless," but was an Afghan citizen;

(iv)  the Government of Afghanistan never waived jurisdiction over Baby Doe for the purpose of her custody or adoption by Joshua and Stephanie Mast in the United States;

(v)  Baby Doe had no connection, let alone a significant connection, to the Commonwealth of Virginia at the time that Joshua and Stephanie Mast obtained a custody order for her from the Juvenile Court;

(vi)  Baby Doe had no connection, let alone a significant connection, to the Commonwealth of Virginia at the time that Joshua and Stephanie Mast obtained an adoption order for her from the Circuit Court;

(vii)  neither Baby Doe's biological parents, nor Jane and John Doe, had a significant connection with the Commonwealth of Virginia at the time that Joshua and Stephanie Mast obtained a custody order for her from the Juvenile Court;

(viii)  at the time that Joshua and Stephanie Mast obtained the custody order for Baby Doe, she was in the physical custody of the United States military in Afghanistan and, therefore, was beyond the jurisdiction of the Juvenile Court or any court of this Commonwealth of Virginia;

(ix)  at the time that Joshua and Stephanie Mast obtained an adoption order for her from the Circuit Court, Baby Doe was not living in their home but was in Afghanistan;

(x)  under the Supremacy Clause of the United States Constitution, the decision of the United States to exercise its foreign affairs powers by allowing Baby Doe's transfer to the Government of Afghanistan for family reunification supersedes and nullifies any conflicting state court action;

(xi)  under the Supremacy Clause of the United States Constitution, a state court lacks authority to override the Executive Branch's foreign policy decision to allow Baby Doe's transfer to the Government of Afghanistan for family reunification; and

(xii) the decision of the United States to transfer Baby Doe to the Government of Afghanistan for family reunification was an exercise of the Executive's foreign affairs power that is binding on state courts.

b.  John Doe seeks ten million dollars ($10,000,000) in compensatory damages, jointly and severally, against each of the named Defendants for the harm set forth in the causes of action stated above;

c.  Jane Doe seeks ten million dollars ($10,000,000) in compensatory damages, jointly and severally, against each of the named Defendants for the harm set forth in the causes of action stated above;

d.  Baby Doe seeks ten million dollars ($10,000,000) in compensatory damages, jointly and severally, against each of the named Defendants for the harm set forth in the causes of action stated above;

e.  John Doe, Jane Doe, and Baby Doe each seek five million dollars ($5,000,000) in punitive damages or the maximum allowed under Virginia law against each of the Defendants for their wrongful actions as set forth above;

f.  Pre- and post-judgment interest on all such sums, in the amount allowed by law;

g.  All costs of Court that Plaintiffs have incurred as a result of this matter; and

h.  Any further relief this Court deems just and proper.


## **JURY DEMAND**

Plaintiffs demand a jury trial on all triable issues within this Complaint.

Dated: September 2, 2022          Respectfully submitted,

                                  /s/ *Maya Eckstein*
                                  Maya M. Eckstein (VSB No. 41413)
                                  Lewis F. Powell III (VSB No. 18266)
                                  HUNTON ANDREWS KURTH LLP
                                  951 E. Byrd St
                                  Richmond, VA 23219
                                  Telephone: (804) 788-8200
                                  Fax: (804) 788-8218
                                  Email: meckstein@HuntonAK.com
                                  Email: lpowell@HuntonAK.com

                                  Sherli M. Furst (*pro hac vice forthcoming*)
                                  Jeremy C. King (*pro hac vice forthcoming*)
                                  HUNTON ANDREWS KURTH LLP
                                  200 Park Avenue
                                  New York, NY 10166
                                  Telephone: (212) 309-1000
                                  Fax: (212) 309-1100
                                  Email: sfurst@HuntonAK.com
                                  Email: jking@HuntonAK.com

                                  *Attorneys for Plaintiffs*