## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| BABY DOE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-49-NKM |
| | ) | |
| JOSHUA MAST, *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES SECRETARY OF | ) | |
| STATE ANTONY BLINKEN, *et al.*, | ) | |
| | ) | |
| *Nominal Defendants*. | ) | |
| | ) | |

## DEFENDANTS JOSHUA AND STEPHANIE MAST'S
## MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS
## THE COMPLAINT UNDER RULES 12(B)(1) AND 12(B)(6)

Baby Doe is an orphan of war and a victim of terrorism, rescued under tragic circumstances

from the battlefield. Joshua and Stephanie Mast have done nothing but ensure she receives the

medical care she requires, at great personal expense and sacrifice, and provide her a loving home.

John and Jane Doe not only challenge the Masts' custody of Baby Doe but level outrageous,

unmerited attacks on their integrity, claiming they concocted a "scheme" to "abduct" her. The

Masts vehemently deny these allegations and have litigated them against the Does ███████████

███████. This federal action is an improper end run around those state-court proceedings, and

the Court should promptly dismiss it.

Almost a year ago, the Does petitioned █████████████████████ (the "Circuit

Court") to reopen and vacate its Adoption Order. When that petition was dismissed, they filed a

new one the same day to collaterally attack the adoption. In that sealed proceeding,[1] the Does allege ████████████████████████████████████████████████████████ ████. That proceeding is still ongoing, ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████. Apparently unsatisfied with those sealed state-court proceedings, the Does filed this Complaint, making public the accusations they made in the Circuit Court and asking this Court to issue declarations they can use to attempt to circumvent the Circuit Court proceedings.

Federal courts have long held that they cannot award such relief. This Court should dismiss the Complaint because it lacks jurisdiction for several reasons. *First*, the Does have no authority to assert claims on behalf of Baby Doe. *Second*, the domestic-relations exception to federal jurisdiction precludes their claims. *Third*, the Court should abstain under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). And even if the Court did have jurisdiction, it would need to dismiss the Complaint because the Does have failed to state a claim upon which relief can be granted.

## **BACKGROUND**

1.      Baby Doe was recovered off the battlefield at approximately 6–8 weeks old ████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████



---

[1] The Circuit Court is aware of this proceeding and has entered an order allowing the parties to submit record materials to this Court provided they submit them under seal, Ex. 1 (Oct. 12, 2022 Order), which Defendants Joshua and Stephanie Mast are doing pursuant to a separate motion filed simultaneously with this Motion.

██████████████████████████████████[2] ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

At the time Baby Doe was rescued ██████████████████████████████

███████████████████████████████, Major Joshua Mast (then Captain) was deployed in

Afghanistan where he served as a Marine Corps Judge Advocate. Compl. ¶ 25. He grew concerned

that Baby Doe, ████████████████████████████████████████████████

██████████████████████ would not have access to the medical care required to treat her injuries.

Compl. ¶ 25; ████████████████████████████████

2.      It was apparent to Major Mast that Baby Doe had no living relatives, ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[2] The Court may consider ████████████████ at this stage, including under Rule 12(b)(6), because it is "explicitly incorporated into the complaint by reference," *see* Compl. ¶¶ 60–61, and it is "integral" to understanding the Does' claims. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

███████████████████. He subsequently pursued adoption proceedings in the Circuit Court to be able to bring Baby Doe to the United States. *Id.*

Major Mast believed at the time and continues to believe, with the hindsight of approximately a year of litigation and the testimony of eyewitnesses and Afghan law experts, ████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████.[3] Major Mast raised these concerns with appropriate authorities, █████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████.

But at least one official from the State Department—██████████████████████

████████████████████—took the contrary view that Baby Doe should be handed over to the custody of the then-extant Afghan Government. ██████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████.

---

[3] Of course, for purposes of Rule 12(b)(6), the Court must take the plaintiffs' well-pleaded factual allegations as true, *see, e.g.*, *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 930 (4th Cir. 2022), but this factual dispute—which is one of many being actively litigating in state court—is relevant context for the jurisdictional and abstention issues presented here.

Major Mast remained concerned for the dangerous situation facing Baby Doe  It was clear to Major Mast that Baby Doe would not receive adequate medical care in Afghanistan, . Thus, he and his wife, Stephanie, filed the transfer of custody went forward. Compl. ¶ 67. According to the Complaint, after Baby Doe left DoD custody, she was placed with John Doe's father, who purports to be her half "paternal uncle" and who in turn left her with the Does. Compl. ¶¶ 56, 69–70.

3.      After receiving reports that Baby Doe was experiencing medical complications, the Masts continued to be concerned that Baby Doe would not receive the medical care she needed in Afghanistan and that it was not a safe place for her. They proceeded with finalizing their adoption of Baby Doe in the United States. Compl. ¶¶ 80–82; *see also* Ex. 4 (Adoption Order). As the Taliban campaign swept over Afghanistan in the late summer of 2021, Major Mast established contact with John Doe and requested he bring Baby Doe to Kabul to fly to the United States before the country collapsed. Compl. ¶¶ 78, 83–84.

When the Afghan Government collapsed on August 15, 2021, and the evacuation began, Major Mast again contacted John Doe about bringing Baby Doe to U.S. forces, extremely concerned that they may not get another chance—a belief that John Doe shared. Compl. ¶ 90. Through the efforts of Major Mast and other U.S. military personnel, and based on the legal identity of Baby Doe under the Adoption Order, John and Jane Doe were able to flee Afghanistan,

notwithstanding the chaos of the U.S. withdrawal, by bringing Baby Doe to U.S. Forces. Compl. ¶¶ 92, 95–97. Soon after they entered the United States, on September 3, 2021, the Masts took custody of Baby Doe. Compl. ¶¶ 118–19.

4.      In November 2021, John and Jane Doe filed a petition seeking to set aside the Adoption Order ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████. (Under Virginia law, adoption proceedings are sealed to protect the privacy and other interests of the child, Va. Code Ann. § 63.2-1246; as set forth in a separate motion, Defendants are submitting materials from those proceedings under seal.) ████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████ Virginia law provides that "[a]fter the expiration of six months from the date of entry of any final order of adoption from which no appeal has been taken to the Court of Appeals, the validity thereof shall not be subject to attack in any proceedings, collateral or direct, for any reason, including but not limited to fraud, duress, failure to give any required notice, failure of any procedural requirement, or lack of jurisdiction over any person, and such order shall be final for all purposes." Va. Code Ann. § 63.2-1216. Virginia courts have recognized a narrow exception, allowing a parent with an "actual relationship of parental responsibility," not just a "mere biological relationship," to contest an adoption if he proves extrinsic fraud by clear and convincing evidence that prevented filing within the six-month period. *See McCallum v. Salazar*, 49 Va. App. 51, 57 (2006) (quoting *F.E. v. G.F.M.*, 35 Va. App. 648, 661 (2001)). In March 2022, █████████ ████████████████████████████████████ the Does repleaded the petition, █████████ █████████████████████████████████████████████████████████████



6

██████████████████████████████████████████████████████████

████████

    The allegations in the Petition are virtually identical to those in the Complaint here. For

example, the Does allege ███████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████. The Petition asks the

Circuit Court to vacate the Adoption Order and to grant the Does full physical and legal custody

of Baby Doe. *Id.* at p.10. That proceeding has been ongoing for almost 11 months. ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████

    The Does, apparently dissatisfied with the Circuit Court proceedings, have recently

pursued several other avenues to challenge the Adoption Order. First, on August 26, 2022, ███

██████████████████████████████████████████████████████████

██████████████████████████████████ On September 2, 2022, the Does

filed this lawsuit. Their Complaint, though ostensibly a damages action under a variety of tort

theories, asks the Court to issue 12 declarations that would undermine the Circuit Court and its

Adoption Order. Specifically, the Does ask the Court to declare:

    (i) under the Supremacy Clause of the United States Constitution, the decisions of
the United States to recognize Baby Doe's legal status as an Afghan citizen, and to
recognize the Government of Afghanistan's jurisdiction over her, are binding and
cannot be overridden or contradicted by a state court;

    (ii) at the time that Joshua and Stephanie Mast obtained a custody order for her
from the Juvenile Court, Baby Doe was not "stateless," but was an Afghan citizen;

7

(iii) at the time that Joshua and Stephanie Mast obtained an adoption order for her from the Circuit Court, Baby Doe was not "stateless," but was an Afghan citizen;

(iv) the Government of Afghanistan never waived jurisdiction over Baby Doe for the purpose of her custody or adoption by Joshua and Stephanie Mast in the United States;

(v) Baby Doe had no connection, let alone a significant connection, to the Commonwealth of Virginia at the time that Joshua and Stephanie Mast obtained a custody order for her from the Juvenile Court;

(vi) Baby Doe had no connection, let alone a significant connection, to the Commonwealth of Virginia at the time that Joshua and Stephanie Mast obtained an adoption order for her from the Circuit Court;

(vii) neither Baby Doe's biological parents, nor Jane and John Doe, had a significant connection with the Commonwealth of Virginia at the time that Joshua and Stephanie Mast obtained a custody order for her from the Juvenile Court;

(viii) at the time that Joshua and Stephanie Mast obtained the custody order for Baby Doe, she was in the physical custody of the United States military in Afghanistan and, therefore, was beyond the jurisdiction of the Juvenile Court or any court of this Commonwealth of Virginia;

(ix) at the time that Joshua and Stephanie Mast obtained an adoption order for her from the Circuit Court, Baby Doe was not living in their home but was in Afghanistan;

(x) under the Supremacy Clause of the United States Constitution, the decision of the United States to exercise its foreign affairs powers by allowing Baby Doe's transfer to the Government of Afghanistan for family reunification supersedes and nullifies any conflicting state court action;

(xi) under the Supremacy Clause of the United States Constitution, a state court lacks authority to override the Executive Branch's foreign policy decision to allow Baby Doe's transfer to the Government of Afghanistan for family reunification; and

(xii) the decision of the United States to transfer Baby Doe to the Government of Afghanistan for family reunification was an exercise of the Executive's foreign affairs power that is binding on state courts.

Compl., Prayer for Relief. After this case was filed, the Does also filed ██████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

## **LEGAL STANDARD**

Under Rule 12(b)(1), once a defendant challenges jurisdiction, the plaintiff bears the burden to establish subject matter jurisdiction, *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999), and "must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The Court should dismiss under Rule 12(b)(1) when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* The Court may go beyond the allegations of the complaint and consider additional evidence necessary to determine if there is in fact jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Courts must accept all factual allegations in the complaint as true, but need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

When a plaintiff alleges conspiracy, the "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of

Rule 8(a)(2) that the 'plain statement' possess enough heft 'to sho[w] that the pleader is entitled to relief.'" *Twombly*, 550 U.S. at 557 (alteration in original) (quoting Fed. R. Civ. P. 8). Under Rule 9(b), allegations of fraud, *see, e.g.*, Compl. ¶ 2, require pleading with particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1297, at 590 (2d ed. 1990)); *Murray v. Liberty Univ., Inc.*, No. 6:22-CV-00025, 2022 WL 4082483, at *4 (W.D. Va. Sept. 6, 2022). The Court may also take judicial notice of matters of public record, such as judicial records, in a Rule 12(b)(6) motion without converting the motion to one for summary judgment. *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## ARGUMENT

I.     **This Court Lacks Subject Matter Jurisdiction Over This Case.**

A.     **The Does Do Not Have Standing to Assert Claims for Baby Doe.**

The Court should dismiss the claims purportedly brought on behalf of Baby Doe because John and Jane Doe do not have standing to assert those claims on her behalf. Baby Doe is legally and physically under the care of the Masts. *See* Compl. ¶ 11; Adoption Order. ██████████ ████████████████████████████████████████ Only Joshua and Stephanie Mast have standing to bring claims on Baby Doe's behalf.

John and Jane Doe, by contrast, have no legal right to represent Baby Doe. In Virginia, children cannot sue, *see* Fed. R. Civ. P. 17(c); Va. Code Ann. § 8.01-8, but a child's "next friend" or guardian *ad litem* can sue on her behalf. *See* Fed. R. Civ. P. 17(c)(2); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 8 (2004), *abrogated in part on other grounds by Lexmark Int'l, Inc.*

*v. Static Control Components, Inc.*, 572 U.S. 118 (2014). A parent may sue on behalf of a minor as her next friend under Virginia law, Va. Code Ann. § 8.01-8, but other interested parties may not.

The Virginia Adoption Order is entitled to "full faith and credit" in this Court, 28 U.S.C. § 1738, and it precludes the Does' attempt to bring claims on Baby Doe's behalf even if John Doe's allegations of being a biological half cousin or legal guardian under any theory were true. *See Newdow*, 542 U.S. at 17. In *Newdow*, the Supreme Court held that the plaintiff could not bring claims on behalf of his biological daughter as her "next friend" to enjoin her school from requiring the pledge of allegiance. *See id.* at 8, 17. The daughter's mother intervened, established her exclusive legal custody based on a state-court order, and asked the Court to dismiss her daughter because, in her view, the lawsuit did not benefit the child's interests. *Id.* at 9–10. The Court found the mother's status as sole legal parent determinative and held that, because a state court deprived the man of his legal status as his daughter's next friend, he could not sue on her behalf. *Id.* at 17.

This Court should likewise dismiss all claims purportedly made on Baby Doe's behalf.

### B.   The Federal Courts Lack Jurisdiction Over This Child Custody Matter Under the "Domestic Relations" Exception.

The Court should dismiss the Complaint under the domestic-relations exception to diversity jurisdiction, which prevents this Court from granting what the Does seek: child custody over Baby Doe.[4] The crux of the Complaint is the Does' dispute against the Masts over the custody of Baby Doe—all of their causes of action, and all 12 declarations they seek, are premised on the theory that the Adoption Order is invalid and that Baby Doe should be in the their custody.

---

[4] At a minimum, the Court should stay this federal action while the Circuit Court proceedings play out, which the Court has inherent authority to do. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

Generally, "federal courts . . . leave delicate issues of domestic relations to the state courts." *Newdow*, 542 U.S. at 13. The Supreme Court of the United States has held that "'[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.'" *Id.* at 12 (quoting *Ex parte Burrus*, 136 U.S. 586, 593-94 (1890)); *see also Mansell* v. *Mansell*, 490 U.S. 581, 587 (1989) ("[D]omestic relations are preeminently matters of state law . . . ."); *Moore v. Sims*, 442 U.S. 415, 435 (1979) ("Family relations are a traditional area of state concern."). "So strong is [the Court's] deference to state law in this area that [the Court has] recognized a 'domestic relations exception' that 'divests the federal courts of power to issue divorce, alimony, and child custody decrees.'" *Newdow*, 542 U.S. at 12 (quoting *Ankenbrandt* v. *Richards*, 504 U.S. 689, 703 (1992)).

Under the domestic-relations exception, federal courts have no power to exercise jurisdiction in "purely custodial case[s] between private parties." *Doe v. Doe*, 660 F.2d 101, 106 (4th Cir. 1981). The Court "must be alert to keep genuinely domestic matters such as 'child custody,' out of the federal courts." *Id.* at 105 (citation omitted). A federal district court cannot grant custody of a minor child to a party, *Ankenbrandt*, 504 U.S. at 703; *Cole v. Cole*, 633 F.2d 1083, 1087 (4th Cir. 1980), and it must be alert to when a party "actually seek[s] a declaration of present or future rights as to custody" of a child. *Wasserman v. Wasserman*, 671 F.2d 832, 835 (4th Cir. 1982); *see Soulsby v. Soulsby*, No. 5:17-CV-0056, 2017 WL 2539806, at *2 (W.D. Va. June 12, 2017) ("[W]here, as here, a party is 'seek[ing] a declaration of present or future rights as to custody or visitation,' a federal court should decline to exercise jurisdiction." (alteration in original) (quoting *Wasserman*, 671 F.2d at 835)).

Whether a case is precluded by the domestic-relations exception depends on whether the duty allegedly violated is independent of family relations law. *See Cole*, 633 F.2d at 1088–89

12

(District courts "must consider the exact nature of the rights asserted or of the breaches alleged."). A duty is independent of family relations law if it does not "arise out of or require . . . a present or prior family relation," and examples of independent duties include abstaining from malicious prosecution, abuse of process, arson, and conversion. *Id.* In other words, "the claims asserted could have arisen between strangers." *Id.* at 1089.

In contrast, a duty is intertwined with family relations law when the federal court's decision will "adjust[] . . . family status or establish[] familial duties or determin[e] the existence of a breach of such duties." *See Raftery v. Scott*, 756 F.2d 335, 338 (4th Cir. 1985). In other words, "[i]f the federal court must determine which parent should receive custody, what rights the noncustodial parent should have, how much child support should be paid and under what conditions, or whether a previous court's determination on these matters should be modified, then the court should dismiss the case." *Rykers v. Alford*, 832 F.2d 895, 900 (5th Cir. 1987).

Federal courts regularly dismiss or stay cases under the domestic-relations exception when plaintiffs ask them to make a determination about child custody. *See, e.g.*, *Stratton by & through Stratton v. North Carolina*, No. 3:20-CV-00455-MR, 2021 WL 328884, at *3 (W.D.N.C. Feb. 1, 2021) (dismissing case where plaintiff requested termination of his legal guardianship), *appeal dismissed*, No. 21-6184, 2022 WL 2764420 (4th Cir. July 15, 2022); *Griessel v. Mobley*, 554 F. Supp. 2d 597, 603 (M.D.N.C. 2008) (dismissing a case where "there [wa]s an ongoing controversy relating to child custody and visitation"); *Acord v. Parsons*, 551 F. Supp. 115, 119 (W.D. Va. 1982) (staying a case until a state court finally adjudicated a child's custody).

Here, the Does' claims relate to issues of child custody and should likewise be dismissed for lack of subject-matter jurisdiction. The Does ask the Court to grant them custody of Baby Doe while there is an ongoing controversy in state court and to determine that the Masts obtained

13

"fraudulent" custody and adoption orders. While the Does ostensibly bring tort claims for damages, each claim is premised on the alleged invalidity of the Virginia Adoption Order.[5] This Court has no power to change or set aside the Circuit Court's Adoption Order or to issue a separate custody order of its own; the Does' remedy lies in the Circuit Court (if anywhere)—where they first filed their challenge nearly a year ago.

The declarations the Does seek make it even clearer they want to circumvent the Circuit Court proceedings and obtain a *de facto* custody order. Among other declarations, they seek orders that the Circuit Court had no jurisdiction, that Baby Doe did not live in Virginia, and that the United States authoritatively granted delegable custody to the Does' relative. *See* Compl. ¶¶ 38–40. These declarations would have no effect absent the Does' using them to unwind the adoption.[6] The Does further acknowledged in their brief opposing the Masts' request for an extension of time that this federal action is about obtaining custody. They argued against an extension because "Jane and John Doe have been deprived of access to their daughter for more than a year, and Baby Doe has been forced to live with strangers. Every day that passes is another day of trauma for all of

---

[5] *See, e.g.*, Compl. ¶¶ 132, 135 (tortious interference claim alleges the Does have "a fundamental right" to a parental relationship with Baby Doe and that the Masts used "fraudulent means" to prevent that relationship); *id.* ¶¶ 144, 153 (fraud claim that the Masts "fraudulently obtained" the adoption and custody orders and "unlawfully obtain[ed] physical custody of Baby Doe" through that adoption); *id.* ¶ 160 (common law conspiracy claim that the Masts "defraud[ed] John and Jane Doe" when they "abduct[ed] and unlawfully restrain[ed] Baby Doe"); *id.* ¶¶ 168, 170 (alleging the Masts intentionally inflicted emotional distress upon the Does by making misrepresentations to Virginia state and federal courts and by separating the Does and Baby Doe); *id.* ¶¶ 175, 177 (alleging false imprisonment because the Masts "physically removed Baby Doe from the custody of her lawful guardians" and "unlawfully restrain[ed]" Baby Doe by "confining her to the[ir] care . . . without the permission or consent of her lawful guardians").

[6] Since these declarations can have no legal effect without further proceedings, this Court should dismiss them anyway, because they ask for impermissible advisory opinions that the Court lacks constitutional authority to grant. *See Johnson v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 20 F.4th 835, 842 (4th Cir. 2021) ("Federal courts are prohibited from issuing advisory opinions and from deciding issues that will not affect the rights of the parties to the case.").

them." Opposition to Motion for Extension (Dkt. 32) at 7. That argument makes sense only if this federal action is designed to unwind Baby Doe's adoption.

The Court lacks subject-matter jurisdiction under the domestic-relations exception because the Does seek what this Court cannot provide: an unwinding of the Adoption Order and a grant of custody in their favor. This effort to "accelerate the disposition of the custody determination," which they may believe is taking too long in state court (and not going their way), "is exactly what the domestic relations exception to diversity jurisdiction prevents this court from sanctioning." *Acord*, 551 F. Supp. at 119. The Court should therefore dismiss the Complaint outright or, at a minimum, should stay the case until the Circuit Court proceeding concludes.

### C.   The Court Should Abstain from Hearing This Dispute, Which Properly Belongs in State Court.

The Court should also abstain—at least until the Circuit Court proceedings conclude—because the state proceedings address the same issues (including ███████████████████ ████████████████████████████████████████████████ ) and because proceeding in this Court would intrude on Virginia's comprehensive process for deciding issues of adoption and child custody. While abstention "is the exception, not the rule, its importance in our system of dual sovereignty cannot be underestimated." *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 719 (4th Cir. 1999) (citation omitted). "Abstention enables the federal courts to respect state wishes to 'prevent the confusion of multiple review of the same general issues.'" *Id.* at 725 (quoting *Burford*, 319 U.S. at 326). It also prevents "federal judicial intrusions into areas of core state prerogative" and avoids "interferences with a state's administration of its own affairs." *Id.* at 719.

"Federal courts abstain out of deference to the paramount interests of another sovereign." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996). Federal courts should abstain from deciding cases presenting "difficult questions of state law bearing on policy problems of

substantial public import whose importance transcends the result in the case then at bar," or when adjudication in a federal forum "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *First Penn-Pac. Life Ins. Co. v. Evans*, 304 F.3d 345, 348 (4th Cir. 2002) (citation omitted). They should exercise their discretion to abstain when the federal proceeding would "supplant[] the legislative, administrative, and judicial processes" of a State or would "arbitrate matters of state law and regulatory policy that are best left to resolution by state bodies." *Johnson*, 199 F.3d at 719–20.

Even if the domestic-relations exception to federal jurisdiction did not apply, this matter still presents a textbook case for abstention. Therefore, if the Court does not dismiss for want of jurisdiction, it should abstain to avoid disrupting the ongoing parallel Circuit Court proceeding. There, just like here, the Does have asked ███████████████████████████████████ ████████████████████████████████████████ This Court should abstain from hearing the case until that proceeding is completed, based on the principles set out by the Supreme Court in *Burford* and *Colorado River*. *See Quackenbush*, 517 U.S. at 719, 721.

### i. Burford *Abstention*

The Court should abstain under *Burford* because adoption is a core state power, and this proceeding would intrude on the Circuit Court's proceeding. Federal courts invoke *Burford* abstention when "principles of federalism and comity" support exercising their discretion to abstain. *First Penn-Pac.*, 304 F.3d at 348 (quoting *Quackenbush*, 517 U.S. at 728). These principles are "constitutional commitments" that "require federal courts to 'exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy.'" *Id.* (quoting *Burford*, 319 U.S. at 318). Though the Does seek a determination on child custody here, *see supra* Part I.B, the Supreme Court has recognized that

*Burford*'s abstention principles are relevant in some cases "involving elements of the domestic relationship even when the parties do not seek divorce, alimony, or child custody." *Ankenbrandt*, 504 U.S. at 705.

*Burford* abstention isn't a "rigid pigeonhole into which federal courts must try to fit cases." *Johnson*, 199 F.3d at 728 (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 n.9 (1987)). The Court must carefully balance the federal interests in retaining jurisdiction of a dispute against competing concerns supporting the "independence of state action," such as whether "the State's interests are paramount" and whether the "dispute would best be adjudicated in a state forum." *Quackenbush*, 517 U.S. at 728 (quoting *Burford*, 319 U.S. at 334). Among other reasons, this decision helps ensure that States have local control over "difficult questions of state law bearing on policy problems of substantial public import," including the Best Interests of the Child analysis present in this case. *Id.* (citation omitted). "The adequacy of state court review diminishes plaintiffs' interest in a federal forum." *Johnson*, 199 F.3d at 723.

The Fourth Circuit has endorsed abstaining under *Burford* in cases where the regulation "lies at the heart of the state's police power." *See id.* at 720; *see also id.* (*Burford* abstention applied because "[i]ssues of state law and state public policy have dominated this action from day one."). Highly regulated state processes are matters of substantial public concern that call for *Burford* abstention. *See First Penn-Pac.*, 304 F.3d at 349. The Fourth Circuit has abstained when a federal court judgment would have interfered with a state receivership proceeding, *id.*, and when a federal court injunction would have regulated a state's gambling industry. *Johnson*, 199 F.3d at 720.

As discussed *supra*, domestic-relations law governing parent–child relationships "belongs to the laws of the States and not to the laws of the United States." *Newdow*, 542 U.S. at 12 (citation omitted). Virginia, like other states, has an intricate system for deciding issues of child custody

and adoption. *See* Va. Code Ann. § 63.2-1200 *et seq.* Virginia's adoption laws include provisions that govern final orders of adoption, *id.* § 63.2-1213; the legal effects of adoption, *id.* § 63.2-1215; when final adoption orders can be collaterally attacked, *id.* § 63.2-1216; and the consequences of providing false information in an adoption proceeding, *id.* § 63.2-1217. This comprehensive scheme ensures that there is uniform treatment over Virginia's administration of adoption affairs. *Cf. Johnson*, 199 F.3d at 719.

In a case similar to this one, the Second Circuit abstained under *Burford*. In *Minot v. Eckardt-Minot*, a man alleged that his former wife fraudulently obtained a custody order of their child and asserted torts of intentional infliction of emotional distress, damage to family relationship, and other claims. 13 F.3d 590, 592 (2d Cir. 1994). The wife removed the case to federal court, but the district court remanded the case to state court. *Id.* It concluded that, although the domestic-relations exception did not apply, the family law nature of the dispute made *Burford* abstention appropriate. *Id.* The Second Circuit affirmed. In its view, *Burford* abstention was appropriate because the man's theory for relief—akin to a "tort of custodial interference"—was an important issue of state law and because there were pending issues in state court concerning the child's custody status. *Id.* at 594; *see also Begum v. Miner*, 213 F.3d 639, at *3 (5th Cir. 2000) (Table) (applying *Burford* abstention when plaintiffs would "have to establish that the termination of their parental rights and the adoption were invalid under state law to obtain the relief they seek" and when there was an "earlier-filed state family court action").

Here, the Does' lawsuit challenges whether Virginia rightfully allowed the Masts to adopt Baby Doe. Adoption is a core state power. None of the Does' claims for relief involve a federal interest—all are state common law claims. And this parallel proceeding risks upending the ██████████ proceeding—it appears that the reason for this proceeding is to do just that, as

the Does ask this Court to declare Baby Doe's adoption invalid and to declare that the state court did not have jurisdiction to enter that order. As such, this Court should abstain to allow the Virginia proceeding to play out before deciding whether any torts were committed.

### ii.    Colorado River *Abstention*

The Court should also abstain on *Colorado River* grounds because the Circuit Court's litigation is "an adequate vehicle for the complete and prompt resolution of the issues between the parties." *See Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 464 (4th Cir. 2005) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983)).

The Court must consider, first, whether there are "parallel proceedings in [state and] federal court." *See New Beckley Min. Corp. v. Int'l Union, United Mine Workers of Am.*, 946 F.2d 1072, 1073 (4th Cir. 1991); *Sto Corp. v. Lancaster Homes, Inc*, 11 F. App'x 182, 186 (4th Cir. 2001). Here, there is no question the suits are parallel. The claims in the Does' state-court petition are the same as this case. *Compare, e.g.*, March 2022 Petition ¶¶ 3, 42, *with* Compl. ¶ 153. And both cases relate to the same subject matter—whether the Masts fraudulently obtained the Adoption Order. So, the first requirement of *Colorado River* is satisfied.

When there are parallel proceedings, as here, the Court next considers whether exceptional circumstances justify abstention. The Fourth Circuit has laid out several non-exclusive factors for whether exceptional circumstances exist. *See Chase Brexton*, 411 F.3d at 463–64 (citing *Moses H. Cone*, 460 U.S. at 15–16, 19–27; *Colorado River*, 424 U.S. at 818–19). Though the Court normally presumes there is jurisdiction, the Court should abstain because all applicable factors weigh in favor of abstention here:

(1)    The first factor—"whether the subject matter of the litigation involves property where the first court may assume *in rem* jurisdiction to the exclusion of others," *id.* at 463—is inapplicable here.

(2)     The second factor—"whether the federal forum is an inconvenient one," *id.*—is similarly inapplicable because ████████████████████████████
████████████████████████████.

(3)     The third factor—"the desirability of avoiding piecemeal litigation," *id.*—favors abstention. The issues in the Circuit Court are identical to the issues in this case, and even if the Does were to succeed here in obtaining the declarations they seek, they would still need to take them back to state court to pursue the true relief they seek.

(4)     The fourth factor—"the relevant order in which the courts obtained jurisdiction and the progress achieved in each action," *id.* at 464—heavily favors abstention. The Circuit Court proceeding ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████ This case, on the other hand, is at its earliest stage.

(5)     The fifth factor—"whether state law or federal law provides the rule of decision on the merits," *id.*—similarly heavily favors abstention. All alleged causes of action are under state law, and the key issue is whether a state adoption order is valid.

(6)     The final factor—"the adequacy of the state proceeding to protect the parties' rights," *id.*—also favors abstention. The key issue for the Does is whether the Masts' adoption of Baby Doe was valid or whether it was fraudulently obtained. The Circuit Court ████████████████████████
████████████████████████████████████████████████
The Does' rights will be protected by that proceeding, and this Court should stay hearing any claims until after that proceeding concludes if it does not dismiss the Complaint outright.

\*          \*          \*

This dispute falls squarely within the province of the state courts—which have already been adjudicating it for a year—and outside the jurisdiction of this Court. The Court should therefore dismiss the Complaint for lack of subject-matter jurisdiction, or at a minimum, stay all proceedings until the Circuit Court proceedings have concluded.

II.      **In Any Event, the Complaint Fails to State a Claim.**

    **A.  The Complaint Fails to State a Claim Under Every Theory Espoused by the Does.**

In addition to dismissing the Complaint due to a lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), this Court should also dismiss the Complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

    *i.*    ***The Masts are Baby Doe's lawful parents, so they could not tortiously interfere with the Does' parental rights.***

The Does fail to state a tortious-interference-with-parental-rights claim because the Masts have exclusive rights to parent Baby Doe and because the Does have other avenues to challenge the adoption. The Supreme Court of Virginia has held that a claim of tortious interference is available only when the claim is "the sole recourse" for the harm done to the plaintiff's parental rights. *Padula-Wilson v. Landry*, 298 Va. 565, 576 (2020). When the backdrop of the claim is "a custody and visitation proceeding" which "afford[s] ample due process," a claim of tortious interference with parental rights is unavailable and cannot survive a motion to dismiss. *Id.*

Here, there is a parallel proceeding right now in the Circuit Court in which the Does are afforded ample due process. The Does have had ██████████████████████ ████████████████████████████████████████████████████████ ██████. This tort suit is far from the "sole recourse" available to the Does.

They also fail to state a claim because parents with "equal rights, or substantially equal rights . . . to establish or maintain a parental or custodial relationship with [their] child" cannot tortiously interfere. *Wyatt v. McDermott*, 283 Va. 685, 699 (2012). The Masts have more than "equal rights" to maintain a relationship with Baby Doe; they have the exclusive right to do so. The Masts are Baby Doe's lawful parents according to the adoption and custody orders issued by

the Virginia courts. *See* Adoption Order; Ex. 7 (Custody Order). So, the Masts cannot be sued for a claim of tortious interference with parental rights. *See id*.

Even if a tortious interference claim could otherwise survive, the Does have not overcome the reasonable inference that Major Mast had a good faith basis for his actions. A tortious-interference claim cannot survive if the defendant believes that the plaintiff did not have a right to maintain a parental relationship or if he possessed a reasonable, good faith belief that interference was necessary to protect the child from physical, mental or emotional harm. *See Wyatt*, 283 Va. at 702. The Masts had facially valid custody and adoption orders from state courts. These orders gave reasonable and good faith reasons to believe that the Does lacked the right to establish a parental relationship with Baby Doe. Major Mast also reasonably and justifiably believed that the Does were not related to Baby Doe. The Masts were further justified in believing that having Baby Doe in their custody would protect her from ongoing physical harm. *See* Compl. ¶ 83 ("[Major] Mast told [the Does] . . . that, if Baby Doe did not receive medical care in the United States, she could be blind, brain damaged, and/or permanently physically disabled."). For these reasons, the Does cannot assert a successful claim of tortious interference with parental rights against the Masts.

### ii.    *The Does fail to state a claim for fraud.*

The Does fail to state a fraud claim because they fail to allege with particularity, as required under Rule 9(b), not only the "'the time, place, and contents of the false representations,'" but also "the identity of the person making the misrepresentation and *what he obtained thereby*,'" *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d at 784 (emphasis added) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1297, at 590 (2d ed. 1990)). In Virginia, fraud usually involves some loss of finances or property, so "[t]he usual remedy in an action for fraud is to restore the defrauded party to the position they held prior to the fraud." *Murray v. Hadid*, 238 Va. 722, 731 (1989). The Does have not explained what property they lost

22

or what damages were proximately caused by the Masts' actions, so they have failed to plead a claim for fraud. *See id.* And to the extent their fraud claim turns on the adoption and custody orders, *see* Compl. ¶ 146 (alleging the Masts sought "to take Baby Doe"), it plainly lies outside this Court's jurisdiction. *See supra* Part I. This Court has no ability to grant custody of Baby Doe to the Does.

### iii.   There are no facts to support the Does' intentional infliction of emotional distress claim.

The Masts have acted admirably—not "outrageously"—so there is no basis for the Does' intentional infliction of emotional distress (IIED) claim. And while the Does' well-pleaded allegations should be taken as true at this stage, the Complaint still does not state a claim for IIED. In Virginia, IIED is "not favored" because its "outrageous and intolerable" element is not objective. *Russo v. White*, 241 Va. 23, 26 (1991). The Virginia Supreme Court has nevertheless clarified that this element is "aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." *Harris v. Kruetzer*, 271 Va. 188, 204 (2006) (citation omitted). It is satisfied only when the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted). Examples of outrageous conduct include when a hospital failed to inform a patient that she may have been exposed to HIV after a psychiatric patient sexually assaulted her, *Delk v. Columbia/HCA Healthcare Corp.,* 259 Va. 125, 137 (2000), and when a defendant broke into a person's home and took a picture of the plaintiff for use in a child molestation case that was completely unconnected to the plaintiff, *see Womack v. Eldridge*, 215 Va. 338, 342 (1974). Examples of conduct that Virginia courts said was *not* outrageous include when a clinical psychologist demeaned a brain-injury patient, called her a "faker" and a "malingerer," and accused her of "putting on a show," *Harris*, 271 Va. at 204, and when a mother cut off visitation rights to a man who had wrongly

believed he was the father of her child, *see Ruth v. Fletcher*, 237 Va. 366, 373 (1989). The Complaint fails to clear this exceedingly high bar, so the Court should dismiss the IIED claim.

### iv.    *Baby Doe is legally within the Masts' custody, not "falsely imprisoned."*

The Does' false-imprisonment claim fails because the Masts are Baby Doe's adoptive parents. False imprisonment requires intentional restriction of a person's freedom of movement without legal right. *See, e.g.*, *Zayre of Va., Inc. v. Gowdy*, 207 Va. 47 (1966). As Baby Doe's adoptive parents, the Masts have the legal right to her physical custody. There is also generally no liability for false imprisonment unless the plaintiff knows of or is harmed by the confinement. *See Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 114 (2021) (plaintiff must "fear to disregard" the person's actions and be "under a reasonable apprehension" of use of force); Restatement (Third) of Torts: Phys. & Emot. Harm, § 42 (2012). The Does' cursory allegation that Baby Doe cried—which plausibly could have happened for any number of reasons—does not satisfy this requirement.

### v.    *There is no claim for conspiracy because there is no underlying tort.*

The Court should dismiss the Does' claim for common law conspiracy because the Does fail to allege an underlying tort. *Almy v. Grisham*, 273 Va. 68, 81 (2007). Further, because the Does allege a *fraudulent* conspiracy, they must allege it with particularity. *Terry v. SunTrust Banks, Inc.*, 493 F. App'x 345, 358 (4th Cir. 2012); *see also Harrison*, 176 F.3d at 784. The Does fail to plead the particulars of the alleged conspiracy. They do not recount any particular meetings or communications between the Defendants, nor do they recount what in particular was allegedly said during these communications. Their claim of fraudulent conspiracy thus fails.

### B.  Plaintiffs Fail to Allege Specific Facts Against Stephanie.

At a minimum, the Court should dismiss Stephanie Mast from this case because the Complaint fails to allege facts supporting that she committed any tort. Most allegations against her

are conclusory legal allegations (*see, e.g.*, ¶¶ 4, 163, 167) that this Court must ignore. *See Iqbal*, 556 U.S. at 678. And though the Does allege a few specific facts about Stephanie, none relates to their claims for relief. For example, they allege that Stephanie and Major Mast hired Kimberley Motley to locate Baby Doe and communicate with the Does. *See, e.g.*, Compl. ¶¶ 6, 74–78. But seeking information about Baby Doe is not tortious, nor do the Does allege that Stephanie ever contacted them while they were in Afghanistan. The only specific contact alleged is that Stephanie spoke with the Does during their brief stop in Germany after the Does fled Afghanistan with Major Mast's help. *See id.* ¶ 106. All other communications were made by Major Mast or others. *See id.* ¶¶ 91, 93, 104–05. Other alleged facts—such as Stephanie being with her husband when he took custody of Baby Doe (*see* ¶ 121) and her supposedly directing someone to alter a photograph of her own daughter (*see* ¶ 112)—are unconnected to the Does' substantive claims. Because the Complaint fails to state a claim against Stephanie, the Court should dismiss her from this case.[7]

Dated: October 14, 2022                    Respectfully submitted,

                                           */s/ John S. Moran*
                                           John S. Moran
                                           MCGUIREWOODS LLP
                                           888 16th St. N.W., Suite 500
                                           Black Lives Matter Plaza
                                           Washington, DC 20006
                                           T: (202) 828-2817
                                           F: (202) 828-3327
                                           jmoran@mcguirewoods.com

                                           *Counsel for Defendants Joshua and*
                                           *Stephanie Mast*

---

[7] Defendants would also urge the Court, pursuant to Rule 54(b), to enter a separate final judgment in favor of Stephanie Mast if it does not dismiss the remaining claims (or simply stay the case).