**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| BABY DOE, *et al.*, | ) |
| | ) |
|         *Plaintiffs*, | ) |
| | ) |
| v. | )   Case No. 3:22-cv-00049-NKM |
| | ) |
| JOSHUA MAST, *et al.*, | ) |
| | ) |
|         *Defendants*, | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES SECRETARY OF | ) |
| STATE ANTONY BLINKEN, *et al.*, | ) |
| | ) |
|         *Nominal Defendants*. | ) |
| | ) |

**KIMBERLEY MOTLEY'S MEMORANDUM IN
SUPPORT OF HER MOTION TO DISMISS THE COMPLAINT**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 4

LEGAL STANDARD.......................................................................................... 8

ARGUMENT ...................................................................................................... 9

    I.     MS. MOTLEY IS NOT SUBJECT TO PERSONAL JURISDICTION
            IN VIRGINIA................................................................................... 9

        A. Ms. Motley is not subject to jurisdiction under Virginia's long-
        arm statute................................................................................... 10

        B. Ms. Motley does not have the minimum contacts with Virginia
        necessary to satisfy federal due process ...................................... 11

    II.    THE COMPLAINT FAILS TO ALLEGE FACTS SUPPORTING
           ANY CLAIM AGAINST MS. MOTLEY ....................................... 14

        A. The Does do not plausibly allege a claim for tortious interference
        with parental rights...................................................................... 14

        B. The Does do not plausibly allege a fraud claim ..................... 16

        C. The Does do not plausibly allege intentional infliction of
        emotional distress........................................................................ 17

        D. The Does do not plausibly allege a civil-conspiracy claim .................... 19

CONCLUSION................................................................................................. 20

## INTRODUCTION

Defendant Kim Motley is an international human-rights lawyer who lives in North Carolina (not Virginia), who is licensed to practice law in Wisconsin (not Virginia), and whose work since 2008 has been mostly in Afghanistan (and never in Virginia). Through her connections in Afghanistan, Ms. Motley learned about an orphaned infant—referred to in this case as "Baby Doe"—with serious medical issues living on a U.S. military base. After the U.S. Government removed Baby Doe from the military base and released her to people believed to be her relatives, Defendant Joshua Mast (a Marine Corps Judge Advocate) sought Ms. Motley's help in finding the baby so that he and his wife, Stephanie, could help with the baby's medical care.

Ms. Motley located Baby Doe in the custody of an elderly Afghan man (purportedly Baby Doe's paternal uncle). A few weeks later, Ms. Motley contacted Plaintiff John Doe, the elderly man's son, who by then had custody of Baby Doe. Over the course of about a year, Ms. Motley offered multiple times to help with Baby Doe's medical care. Eventually, Ms. Motley arranged for the Does to speak directly with Joshua Mast by phone. For that, the Does accuse Ms. Motley of engaging in a "fraudulent scheme" and "conspiring" to "abduct" Baby Doe. But they offer only labels, conclusions, and baseless attacks, not facts that—even if true—would amount to any claim against Ms. Motley.

As explained well in the briefs supporting Joshua and Stephanie Mast's motion to dismiss (Dkt. 51) and Richard Mast's motion to dismiss (Dkt. 53), this lawsuit is an attempted end-run around pending state-court proceedings relating to Baby Doe's

adoption. For the reasons set forth in the Masts' briefs, the Court should dismiss the Complaint for lack of subject-matter jurisdiction.[1]

In any event, the Court has no personal jurisdiction over Ms. Motley. That's clear from the Complaint's face: The Does allege that Ms. Motley lives in *North Carolina*, is licensed to practice law in *Wisconsin*, and has worked in *Afghanistan*. The Virginia connection? There's a single boilerplate allegation about personal jurisdiction directed at all Defendants: The Does allege that "Defendants" (undifferentiated) "transacted business in Virginia *and/or*… caused tortious injury by an act or omission in Virginia." Compl. ¶ 19 (emphasis added). The Complaint is silent about what "business" Ms. Motley allegedly transacted *in Virginia* or what act or omission she might have committed there.

The Does offer a half-hearted attempt to tie Ms. Motley to the State, alleging "[u]pon information and belief" that she's affiliated with Women for Afghan Women— a *New York* not-for-profit corporation (Ex. A[2]) that has "a Community Center in Alexandria, Virginia."[3] *Id.* The Does don't allege that the connection gives the Court *general* personal jurisdiction over Ms. Motley—nor could they. And they fail to

---

[1] Ms. Motley joins in the Masts' motions to dismiss under Rule 12(b)(1) (Dkt. 49; Dkt. 53) for the reasons stated in their supporting briefs (Dkt. 51; Dkt. 53).

[2] The Court can take judicial notice of New York Secretary of State records. *See Gerald v. Virginia*, 2019 U.S. Dist. LEXIS 69513 at *1 (W.D. Va. Apr. 24, 2019) (citing *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Whitaker v. Hyundai Motor Co.,* 2018 U.S. Dist. LEXIS 174362, *30 n. 5 (W.D. Va. Oct. 9, 2018) (taking judicial notice of trademark registrations as public documents).

[3] There's no allegation that the Alexandria location was open during the relevant period (because it wasn't) or that Ms. Motley worked there (because she didn't).

explain what the community center has to do with this case: None of the Complaint's allegations relate in any way to that charitable organization, never mind its Virginia location or Ms. Motley's connection to it.

The upshot is that the Does offer no factual allegations—*none*—establishing that Ms. Motley has any *suit-related* contacts with Virginia, much less suit-related contacts creating the required "substantial connection" with the State that federal due process requires. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1031–32 (2021). Neither Virginia's long-arm statute nor the Due Process Clause permits the Court to exercise jurisdiction over Ms. Motley.

But even if the Court had personal jurisdiction over Ms. Motley (it doesn't), the Complaint fails to plausibly state any claim against her. Stripped of all insinuation and nefarious labels, the allegations against Ms. Motley boil down to this: Ms. Motley introduced a couple from the United States to a couple from Afghanistan by phone to help an injured baby get medical care. That's it. The rest of the allegations about Ms. Motley amount to speculation about her motives and about her knowledge of Virginia state-court proceedings, in which she's neither a party nor any party's lawyer. And those conclusory allegations simply don't add up to any plausible cause of action against Ms. Motley under any theory of liability.

As the Masts explain, the Court should dismiss the entire case under Federal Rule of Civil Procedure 12(b)(1). At a minimum, though, the Court should dismiss the claims against Ms. Motley under Rules 12(b)(2) and 12(b)(6).

## BACKGROUND[4]

On September 6, 2019, during a joint U.S. and Afghan military operation in Afghanistan, U.S. military forces discovered Baby Doe, an injured infant, and immediately transported her to a U.S. military hospital for medical care. Compl. ¶ 21. Baby Doe's biological parents had been killed in the operation. *Id.*

On September 25, 2019, the military transferred Baby Doe to a U.S. base. *Id.* While Baby Doe was on the base under the military's care, Marine Corps attorney Joshua Mast learned about her situation. *Id.* ¶ 25.

In October 2019, Joshua and Stephanie Mast initiated custody and adoption proceedings for Baby Doe in the Juvenile and Domestic Relations Court of Fluvanna, Virginia and adoption proceedings in the Fluvanna Circuit Court. *Id.* ¶ 42. There's no allegation that Ms. Motley was involved in those proceedings.

Meanwhile, on October 24, 2019, Baby Doe's maternal uncle submitted a request to the International Committee of the Red Cross for help in returning Baby Doe to her extended family. *Id.* ¶ 54.

On November 6, 2019, the Juvenile Court granted the Masts temporary custody of Baby Doe. *Id.* ¶ 48. On November 8, 2019, the Fluvanna Circuit Court entered an Interlocutory Order of Adoption for Baby Doe in favor of Joshua and Stephanie Mast. *Id.* ¶ 52. Two days later, the Circuit Court issued a Certificate of

---

[4] Solely for purposes of this motion, the Court must accept as true the *well-pleaded* factual allegations in the Complaint. *See, e.g.*, *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 930 (4th Cir. 2022).

Foreign Birth for Baby Doe, listing Joshua and Stephanie Mast as her parents. *Id.* ¶ 53.

On February 26, 2020, the Masts filed a Complaint and Petition for a Temporary Restraining Order in this Court, seeking to enjoin the U.S. Government from releasing Baby Doe from its custody to the Government of Afghanistan. *Id.* ¶¶ 60–61. The Court denied the TRO petition. *Id.* ¶ 62. There's no allegation that Ms. Motley was involved in that proceeding.

On February 27, 2020, the U.S. Department of Justice notified the Court that Baby Doe had been released from U.S. custody and placed in the care of her paternal uncle, John Doe's father. *Id.* ¶¶ 68–69. Baby Doe's paternal uncle then transferred Baby Doe to John and Jane Doe. *Id.* ¶ 70.

After Baby Doe was removed from the U.S. military base, Joshua Mast sought assistance from Ms. Motley—a U.S. citizen and international human-rights attorney who had worked in Afghanistan for over a decade—in locating and contacting the people who had custody of Baby Doe. *Id.* ¶ 74.

On or about March 6, 2020, Ms. Motley called John Doe. *Id.* ¶ 75. In a later conversation that day, Ms. Motley told Jane Doe that she understood Baby Doe had serious medical issues and that Ms. Motley knew an American family who wanted to help her. *Id.* ¶ 76. Over the next year, Ms. Motley had other conversations with John and Jane Doe offering to help with Baby Doe's medical care. *Id.* ¶ 78. On July 30, 2020, Jane Doe sent Ms. Motley photos of Baby Doe. *Id.* ¶ 79.

On December 3, 2020, the Fluvanna Circuit Court entered a final order of adoption for Joshua and Stephanie Mast, finding that Baby Doe "remains up to this point in time an orphaned, undocumented, stateless minor" and therefore "has the legal identity granted by order of this Court as constituting her sole legal identity." *Id.* ¶ 82.

In July 2021, Ms. Motley facilitated a telephone conversation between John and Jane Doe and Joshua Mast. *Id.* ¶ 83. Major Mast told the Does that he was familiar with Baby Doe's medical needs and recommended that she receive medical care in the United States. *Id.*

The Complaint alleges that Ms. Motley's outreach to John and Jane Doe was "pursuant to" an "agreement" with the Masts and "at the direction of" the Masts. *See, e.g., id.* ¶ 75; *see also id.* ¶ 76 ("[p]ursuant to her understanding with Joshua and Stephanie Mast…"), ¶ 78 ("…at the direction of Joshua and Stephanie Mast…"), ¶ 80 ("at the behest of Joshua and Stephanie Mast…"). In addition, the Complaint alleges that in her discussions with the Does, Ms. Motley hid the Masts' identity (until July 2021) and didn't disclose the Masts' interest in adopting Baby Doe. *Id.* ¶¶ 76, 78.

In August 2021, U.S. troops withdrew from Afghanistan, and the Taliban began to retake the country. *Id.* ¶ 90. Joshua and Stephanie Mast reached out to John and Jane Doe suggesting that they bring Baby Doe to the United States for medical treatment. *Id.* John and Jane Doe advised Joshua Mast that they were considering his proposal, but "were concerned that they would not be able to return to Afghanistan." *Id.*

Ultimately, John and Jane Doe voluntarily agreed to travel to the United States to obtain medical care for Baby Doe. *Id.* ¶ 92. The Does traveled to Kabul on August 23, 2021. *Id.* ¶ 101. The next morning, the Does went to Hamid Karzai International Airport for evacuation. *Id.* Between August 24 and 26, 2021, John and Jane Doe traveled from Afghanistan to the United States through Qatar and Germany. *Id.* ¶ 102. The Does arrived at Dulles International Airport on August 29, 2021. *Id.* ¶ 109.

When the Does presented their identity documents, Joshua Mast handed to the inspecting officer an Afghan passport for Baby Doe. *Id.* ¶ 111. The child's last name on the passport was "Mast," and the photo appeared to be the picture that Jane Doe had sent to Ms. Motley on July 30, 2020, but with alterations. *Id.*

The Does were sent to refugee housing at Fort Pickett in Blackstone, Virginia. *Id.* ¶ 115. On September 3, 2021, a social worker removed Baby Doe from John and Jane Doe and informed them that the Masts had adopted the child. *Id.* ¶ 118.

After the July 2021 phone call that Ms. Motley arranged between the Does (who were in Afghanistan) and Joshua Mast (*id.* ¶ 83), there's not a single factual allegation in the Complaint about Ms. Motley—other than that she failed to respond to a text message from Jane Doe in November 2021. *Id.* ¶ 128. There's no allegation that Ms. Motley was involved in getting the Does out of Afghanistan, getting the Does to Qatar, getting the Does to Germany, getting the Does into the United States, or transferring Baby Doe from John and Jane Doe to Joshua and Stephanie Mast once the Does were in this country.

On September 2, 2022, John and Jane Doe filed this lawsuit (on their own behalf and Baby Doe's behalf) against Joshua and Stephanie Mast, Richard Mast (Joshua's brother who assisted with the custody and adoption proceedings), Ahmad Osmani (an Afghan translator living in Tennessee), and Kim Motley seeking declaratory relief relating to Baby Doe's adoption and compensatory and punitive damages of $35 million dollars. Ms. Motley now moves to dismiss the Complaint.

## LEGAL STANDARD

The Does bear the burden of establishing personal jurisdiction over Ms. Motley. *Micropicture Int'l, Inc. v. Kickartz*, No. 05-CV-00034, 2006 U.S. Dist. LEXIS 3714 at *4 (W.D. Va. Jan. 17, 2006). To be subject to specific jurisdiction in Virginia, a nonresident defendant must be subject to Virginia's long-arm statute, and the exercise of jurisdiction must be consistent with federal due process. *Orion Capital, LLC v. Promier Prods.,* No. 21-cv-00015, 2021 U.S. Dist. LEXIS 204139, at *5–6 (W.D. Va. Oct. 22, 2021). Federal due process requires that "the defendant's *suit-related conduct*… create a substantial connection with the forum State." *Walden*, 571 U.S. at 284 (emphasis added).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. A complaint must contain more than labels and conclusions or a recitation of the elements of the cause of action to withstand a motion to dismiss. *Twombly*, 550 U.S. at 555.

8

## ARGUMENT

The Court lacks personal jurisdiction over Ms. Motley because she has no suit-related contacts with Virginia, much less suit-related contacts that create a substantial connection with the State. But even if the Court had jurisdiction over Ms. Motley, the Complaint's sparse allegations about Ms. Motley fail to allege facts to support a claim against her under any of the legal theories presented.

## I.     MS. MOTLEY IS NOT SUBJECT TO PERSONAL JURISDICTION IN VIRGINIA.

The Complaint alleges that "Defendants are subject to personal jurisdiction in Virginia under Virginia Code §§ 8.01-328.1(A)(1) and (3), because the causes of action asserted in this Complaint arise from their having transacted business in Virginia and/or having caused tortious injury by an act or omission in Virginia." Compl. ¶ 19. For a court to exercise specific jurisdiction over a nonresident defendant, the defendant must be subject to Virginia's long arm statute, and the exercise of jurisdiction must be consistent with due process. *Orion Capital,* 2021 U.S. Dist. LEXIS 204139, at *5. Virginia's long-arm statute extends personal jurisdiction to the extent permissible under the Due Process Clause. *Id.* at *5-6. The key question is whether the defendant has sufficient minimum contacts with the forum state, such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at *6–7 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

This Court's exercise of jurisdiction over Ms. Motley would violate both the Virginia long-arm statute and federal due process.

## A.   Ms. Motley is not subject to jurisdiction under Virginia's long-arm statute.

The allegations in the Complaint don't satisfy Virginia's long-arm statute under either provision that the Does cite.

Under Virginia Code Ann. § 8.01-328.1(A)(1), a Virginia court may exercise jurisdiction over a person who "acts directly or by an agent, as to a cause of action arising from the person's transacting any business in this Commonwealth."

The Complaint is silent on what "business" Ms. Motley purportedly transacted in Virginia or what acts or omissions she took in Virginia that purportedly caused injury. In fact, there are virtually no factual allegations in the Complaint establishing that Ms. Motley has any contacts with Virginia, much less *suit-related* contacts creating a substantial connection with the State. The Does offer up a single allegation purporting to connect Ms. Motley to Virginia: The Does allege—based only on "information and belief"—that "Motley is the general counsel of Women for Afghan Women, which has a Community Center in Alexandria, Virginia." Compl. ¶ 15. But the Does don't try to connect that non-profit organization to any of the Does' claims or to any of the conduct alleged in the Complaint.

Ms. Motley's only alleged suit-related conduct were her phone calls and emails with the Does (with the last call occurring in July 2021) and with Joshua Mast. *See* Compl. ¶¶ 74–78. But the Does allege that their interactions with Ms. Motley took place entirely in Afghanistan. And the Does never allege that she met Joshua Mast in person or traveled to Virginia for any reason related to the conduct at issue in the litigation. Mere "emails and telephone calls directed at Virginia do not amount to

10

transacting business." *Nathan v. Takeda Pharms. Am., Inc.*, 83 Va. Cir. 216, 226 (2011); *see also Unidyne Corp. v. Aerolineas Argentinas,* 590 F. Supp. 391, 396 (E.D. Va. 1984) ("[m]ere telephone conversations, telex messages and letters" to negotiate do not constitute transacting business); *Idexcel, Inc. v. Lieto*, No. CL-2011-10159, 2012 Va. Cir. LEXIS 13, at *8–9 (Jan. 24, 2012) (several phone conversations and emails with plaintiff's employees did not amount to transacting business).

Under Virginia Code § 8.01-328.1(A)(3), a Virginia court can assert long-arm jurisdiction over a non-resident if the resident "caused tortious injury by an act or omission" in Virginia. But that rule only applies to a nonresident defendant who is "physically present" in Virginia while "committing the act or omission." *DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419, 425–26 (E.D. Va. 1996); *see also Alton v. Wang*, 941 F. Supp. 66, 67-68 (W.D. Va. 1996) (construing long-arm statute as requiring physical presence). There's no allegation that Ms. Motley has ever even been to Virginia, much less committed any torts against the Does while physically in the State.

The Complaint fails to allege facts that give rise to personal jurisdiction over Ms. Motley under Virginia's long-arm statute.

### B.   Ms. Motley does not have the minimum contacts with Virginia necessary to satisfy federal due process.

In any event, exercising personal jurisdiction over Ms. Motley would violate the Due Process Clause. Courts in the Fourth Circuit apply a three-part test to determine if jurisdiction comports with due process: "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the

State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Babiak v. Mizuho Bank, Ltd.*, No. 18-cv-352, 2018 U.S. Dist. LEXIS 159696, at *6 (E.D. Va. Sept. 17, 2018).

Courts consider eight factors in assessing purposeful availment: (1) maintenance of offices or agents in the State; (2) ownership of property in the State; (3) reaching into the State to solicit or initiate business; (4) deliberate engagement in significant or long-term business activities in the State; (5) contractual choice-of-law clauses selecting the State's law; (6) in-person contacts with State residents regarding the business relationship; (7) contractual requirements of performance in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted. *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198–99 (4th Cir. 2018).

All of those factors weigh against personal jurisdiction over Ms. Motley. During the relevant time, Ms. Motley was domiciled in North Carolina and worked in Afghanistan. Most of the allegations against Ms. Motley relate to her outreach to the Does in Afghanistan—not in Virginia—to offer assistance. Compl. ¶ 78. There's no allegation that she even set foot in Virginia for any purpose, much less a purpose related to the Does' claims.

There's also no allegation that Ms. Motley directed any activities toward the State. As for the limited contact that Ms. Motley had with Virginia, the Does allege that Joshua Mast "hired" Ms. Motley to "convince Baby Doe's family to let her travel

to the United States." Compl. ¶ 74. But the Does allege that Joshua Mast reached out to Ms. Motley, not that Ms. Motley reached out to him. *Id.*; *see Babiak*, 2018 U.S. Dist. LEXIS 159696, at *7 (no personal jurisdiction where defendant had no offices or agents in Virginia, did not own property in Virginia, and did not "reach into Virginia to solicit or initiate business"—Virginians reached out to defendant); *Putz v. Golden*, No. 09-CV-00003, 2009 U.S. Dist. LEXIS 121556, at *16 (W.D. Va. Dec. 31, 2009) (giving "special weight" to fact that Virginia plaintiffs initiated contact with defendant in holding no jurisdiction); *Delta-T Corp. v. Harris Thermal Transfer Prods., Inc.*, No. 09CV321-HEH, 2009 U.S. Dist. LEXIS 80647, at *9 (E.D. Va. Sept. 4, 2009) (visiting Virginia twice for unrelated contracts didn't create personal jurisdiction).

Ms. Motley's communications with the Masts do not rise to the level of purposeful activity. *Hegedus v. Ross,* No. 11cv00018, 2011 U.S. Dist. LEXIS 79684, at *12 (W.D. Va. July 21, 2011) ("it is well settled that mere telephone calls and electronic communications in furtherance of a transaction are *insufficient to constitute purposeful activity*") (quoting *Eagle Paper Int'l, Inc. v. Expolink, LTD*, No. 2:07cv160, 2008 U.S. Dist. LEXIS 4003, at *13 (E.D. Va. Jan. 17, 2008) (citation omitted) (emphasis added)); *Consulting Eng'rs, Inc. v. Geometric Software Sols.*, No. 06cv956 (JCC), 2007 U.S. Dist. LEXIS 25150, at *17–18 (E.D. Va. Apr. 3, 2007) (series of emails and phone calls from India were not purposeful activity), *aff'd*, 561 F.3d 273 (4th Cir. 2009).

The Complaint's offhand mention of Women for Afghan Women, a New York-based not-for-profit corporation, is also insufficient. Even if Ms. Motley were deemed to be an agent of that organization and even if that organization had a Virginia location during the relevant time (it didn't), Ms. Motley would still need to have her own contacts with Virginia to be subject to personal jurisdiction there. In general, a company's contacts to a State "are not attributed to a corporate agent for jurisdictional purposes." *See Thousand Oaks Barrel Co. v. Deep S. Barrels LLC*, 241 F. Supp. 3d 708, 718 (E.D. Va. 2017) (quoting *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 177 (4th Cir. 2002)). Again, there's no allegation that Ms. Motley did anything in Virginia on that organization's behalf (or otherwise) relating to this case (or otherwise).

\*       \*       \*

Neither of the cited long-arm provisions applies to Motley. And subjecting Ms. Motley to jurisdiction in Virginia would violate federal due process. The Court should dismiss the Complaint against Ms. Motley for lack of personal jurisdiction.

## II.  THE COMPLAINT FAILS TO ALLEGE FACTS SUPPORTING ANY CLAIM AGAINST MS. MOTLEY.

This is a custody case masquerading as a tort action for damages. The Does don't plausibly allege facts that make out any claim for relief—against Ms. Motley or anyone else—under any of the liability theories offered.

### A.  The Does do not plausibly allege a claim for tortious interference with parental rights.

To state a claim for tortious interference with parental rights, a plaintiff must plead facts sufficient to show that, among other things, "the complaining *parent* has

a right to establish or maintain a parental or custodial relationship with his/her minor child" and that the defendant intentionally interfered with those rights. *Padula-Wilson v. Landry*, 298 Va. 565, 575 (2020). The alleged "interference" with parental rights must be "*tortious*"—not just any interference will do. *Id.*; *see also Nelson v. Green*, 965 F. Supp. 2d. 732, 753–54 (W.D. Va. 2013).

The Does concede that they are not Baby Doe's parents—they are purportedly Baby Doe's "biological family and legal guardians." Compl. at 30 ¶ 132. The Does claim that their alleged relationship to Baby Doe gives them "parental rights" to her. *Id.* Not so.

In the custody context, although Virginia law doesn't expressly define "parent," the term "contemplates a relationship to a child based upon either the contribution of genetic material through biological insemination or by means of legal adoption." *Hawkins v. Grese*, 68 Va. App. 462, 472 (2018) (former same-sex partner of child's biological mother was not a parent because she was not a biological parent and hadn't adopted the child). There's also a difference between a "parent" and a "person with a legitimate interest," which includes a "party *other than a parent* who may seek custody and visitation—including but not limited to 'grandparents, stepgrandparents, stepparents, former stepparents, *blood relatives and family members.*'" *Id.* at 473 (emphasis added) (citing VA. CODE § 20-124.1).

Not only are John and Jane Doe not Baby Doe's parents under Virginia law, but the Complaint also fails to allege facts sufficient to show that Ms. Motley intentionally interfered with any of the Does' rights. The allegations against Ms.

Motley are that she introduced the Does to Joshua Mast. That does not amount to "interfer[ing] with parental rights with knowledge that the parent does not consent." *Coward v. Wellmont Health Sys.,* 295 Va. 351, 361 (2018) (affirming trial court's granting of demurrers) (citing RESTATEMENT (SECOND) OF TORTS § 700) (1977) (emphasis added). The Does willingly spoke with Joshua Mast. And as Taliban forces overtook Afghanistan in the wake of the U.S. withdrawal, the Does voluntarily escaped the country with Baby Doe. Nothing Ms. Motley is alleged to have done interfered with any of the Does' rights. Indeed, there's not a single factual allegation about Ms. Motley's involvement in any events that allegedly took place after John and Jane Doe spoke with Joshua Mast.

The Court should dismiss with prejudice the Does' claim against Ms. Motley for tortious interference with parental rights.

### B.     The Does do not plausibly allege a fraud claim.

The fraud claim against Ms. Motley fails because the Complaint doesn't satisfy Rule 9(b)'s heightened pleading standard. *William v. AES Corp.*, 28 F. Supp. 3d 553, 573 (E.D. Va. 2014). The Does don't allege any details of the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation." *Id.*; *see also Levinson v. Mass. Mut. Life Ins. Co.*, No. 06cv086, 2006 U.S. Dist. LEXIS 83397, at *20–21 (E.D. Va. Nov. 9, 2006) (allegations that defendants engaged in a "fraudulent scheme . . . consist[ing] of numerous telephone calls" through agents and "engaged in further fraudulent and deceitful sales practices through its agent" did not satisfy Rule 9(b) because they failed to offer specific facts regarding time, place, or specific conduct of the "misleading" communications). Rule

9(b) is a "stringent pleading standard" designed to put the defendant on notice of the conduct complained of. *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 197 (4th Cir. 2018).

The Does broadly state that Motley first communicated with the Does on March 6, 2020, continued communicating with them for more than a year, "making multiple offers to assist with Baby Doe's medical care and occasionally asking for photographs of Baby Doe" and telling them that Motley "knew about an American family to help out Baby Doe" without disclosing certain information about the Virginia court case. Compl. ¶¶ 75–78. Those broad factual allegations fall far short of the type of notice required about what "fraudulent" activity she supposedly engaged in. The Complaint does not include sufficient time, place, or content allegations against Ms. Motley: They amount to little more than conclusory allegations. *Iqbal*, 556 U.S. at 678.

The Court should dismiss with prejudice the Does' fraud claim against Ms. Motley.

## C.    The Does do not plausibly allege intentional infliction of emotional distress.

Claims for intentional infliction of emotional distress are disfavored in Virginia. *Harris v. Kreutzer,* 271 Va. 188, 203–04 (2006). It's not enough to allege that a defendant acted with tortious or even criminal intent. *Id.* at 204 (citing *Russo v. White*, 241 Va. 23, 28 (1991)). To state a claim for intentional infliction of emotional distress, a plaintiff must allege conduct that is "so outrageous in character" and "so extreme in degree" that it goes "beyond all possible bounds of decency," is "atrocious,"

17

and is "utterly intolerable in a civilized community." *Harris*, 271 Va. at 203–04 (emphasis added) (internal citations omitted). There's not a single allegation against Ms. Motley that comes close to that threshold.

The thrust of the Does' claim is that they suffered emotional distress because of Baby Doe's removal from their care in Virginia. Compl. ¶ 130. The Complaint does not plead facts sufficient to show that, in reaching out to the Does, Ms. Motley acted for the specific purpose of causing the Does emotional distress or that she acted with knowing disregard to that risk. *See Almy v. Grisham*, 273 Va. 68, 77–78 (2007). Aside from the unfounded claim that Ms. Motley was acting as the Masts' purported "agent" in "facilitating the plan to abduct Baby Doe" (Compl. ¶ 170), the Complaint outlines no facts to support any intentional or reckless conduct on Ms. Motley's part.

The Complaint also fails to tie any of Ms. Motley's conduct (which was limited to having conversations with the Does when they were in Afghanistan) to the actual cause of the alleged emotional distress. There's no allegation that Ms. Motley played any role in John and Jane Doe's life after they voluntarily left Afghanistan on August 24, 2021. Compl. ¶ 102; *see Almy*, 639 S.E.2d at 187–88. Not responding to Jane Doe's November 2021 text message (Compl. ¶ 128) does not rise to the level of "extreme and outrageous" conduct required to support a claim for intentional infliction of emotional distress. *See Sirleaf v. Doe*, No. 21cv00237, 2021 U.S. Dist. LEXIS 145048, at *5–6 (W.D. Va. Aug. 3, 2021) (finding that inaction through failure to report child abuse is not outrageously unacceptable).

The Court should dismiss the claim for intentional infliction of emotional distress against Ms. Motley.

### D.      The Does do not plausibly allege a civil-conspiracy claim.

To make out a claim for common law civil conspiracy under Virginia law, a plaintiff must show "(i) an *agreement* between two or more persons (ii) to accomplish an *unlawful purpose* or to accomplish a lawful purpose by *unlawful means*, which (iii) results in damage to plaintiff" through an overt action done in furtherance of the agreement. *Bhattacharya v. Murray*, No. 19cv00054, 2021 U.S. Dist. LEXIS 222993, at 21 (W.D. Va. Nov. 12, 2021); *see also William*, 28 F. Supp. 3d at 574; *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 618 (E.D. Va. 2009). Conspiracy isn't a stand-alone cause of action—there must be an underlying tort. *William*, 28 F. Supp. 3d at 574 ("Where a plaintiff has no actionable claim for the underlying alleged wrong, an action for conspiracy based on that wrong will not lie."). In addition, "the Complaint must plead facts showing that each member of the alleged conspiracy shared the same unlawful objective." *Bhattacharya*, 2021 U.S. Dist. LEXIS 222993, at 22 (finding different objectives defeated conspiracy claim). To survive a motion to dismiss, a plaintiff must "plead the requisite concert of action and unity of purpose in more than mere conclusory language." *William,* 28 F. Supp. 3d at 574 (internal citations omitted).

The Does fail right out of the gate. The Complaint doesn't allege any agreement to do anything unlawful or improper. The Complaint alleges that the Masts "hired Kimberley Motley … to locate and contact Baby Doe's family in Afghanistan." Compl. ¶ 74. Even if it were true that the Masts "hired" Ms. Motley (it isn't), the Does fail to

make any factual allegation demonstrating that locating and contacting them was somehow unlawful or improper. Instead, the Complaint offers only smears and legal conclusions.

In addition, because the Complaint fails to state a claim for an underlying tort, the conspiracy claim also fails. *William*, 28 F. Supp. 3d at 574. The Court should dismiss the claim for common law conspiracy against Ms. Motley.

## **CONCLUSION**

The Court should dismiss the Complaint in its entirety. At a minimum, the Court should dismiss all claims against Ms. Motley with prejudice.

Dated: October 17, 2022.                     Respectfully submitted,

*/s/ Thomas W. Davison*
Thomas W. Davison
(VSB No. 94387)
Samantha Van Winter
(VSB No. 97268)
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC  20004-1404
Tel.:  (202) 756-3300
Fax:  (202) 654-3333
tom.davison@alston.com
samantha.vanwinter@alston.com

Michael R. Hoernlein
(*pro hac vice*)
ALSTON & BIRD LLP
101 South Tryon Street, Suite 4000
Charlotte, NC 28280-4000
Tel.: (704) 444-1000
Fax: (704) 444-1111
michael.hoernlein@alston.com

Sidney Webb
(*pro hac vice forthcoming*)
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
Tel.: (214) 922-3400
Fax: (214) 922-3899
sidney.webb@alston.com

*Counsel for Defendant Kimberley*
*Motley*

## CERTIFICATE OF SERVICE

I certify that on October 17, 2022, I filed this Memorandum using the Court's

CM/ECF system, which will provide service to all counsel of record.

*/s/ Thomas W. Davison*
Thomas W. Davison