# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

BABY DOE, *et al.*,                                  )
                                   )
         *Plaintiffs*,                        )
                                   )
v.                                                  )    Case No. 3:22-cv-00049-NKM
                                   )
JOSHUA MAST, *et al.*,                               )
                                   )
         *Defendants*,                       )
                                   )
and                                                 )
                                   )
UNITED STATES SECRETARY OF                          )
STATE ANTONY BLINKEN, *et al.*,                      )
                                   )
         *Nominal Defendants.*                )
_____ )

## KIMBERLEY MOTLEY'S MEMORANDUM IN SUPPORT
## <u>OF HER MOTION TO DISMISS THE AMENDED COMPLAINT</u>

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................... 1

BACKGROUND ...................................................................................... 4

LEGAL STANDARD ............................................................................... 9

ARGUMENT ......................................................................................... 10

    I.    MS. MOTLEY IS NOT SUBJECT TO PERSONAL
        JURISDICTION IN VIRGINIA .................................................. 10

        A.    Ms. Motley is not subject to jurisdiction under Virginia's
            long-arm statute .......................................................... 11

        B.    Ms. Motley does not have the minimum contacts with
            Virginia necessary to satisfy federal due process. ...................... 13

        C.    The Masts' alleged forum contacts do not support the
            Court's exercise of personal jurisdiction over Ms. Motley. ........... 16

            1.    In *Walden*, the U.S. Supreme Court rejected the
                conspiracy-jurisdiction doctrine. ...................................... 16

            2.    Insofar as the conspiracy-jurisdiction doctrine still
                exists, the Does' allegations do not support its
                application against Ms. Motley. ....................................... 18

    II.    THE AMENDED COMPLAINT FAILS TO ALLEGE FACTS
        SUPPORTING ANY CLAIM AGAINST MS. MOTLEY. ...................... 19

        A.    The Does do not plausibly allege a claim for tortious
            interference with parental rights. ................................... 20

        B.    The Does do not plausibly allege a fraud claim. ........................ 21

        C.    The Does do not plausibly allege intentional infliction of
            emotional distress. ....................................................... 23

        D.    The Does do not plausibly allege a civil-conspiracy claim. ............ 24

CONCLUSION ...................................................................................... 25

## INTRODUCTION

Defendant Kim Motley is an international human-rights lawyer who lives in North Carolina (not Virginia), who is licensed to practice law in Wisconsin (not Virginia), and whose work since 2008 has been mostly in Afghanistan (and never in Virginia). Ms. Motley has no suit-related contacts with Virginia—she is not alleged to have done *anything* in Virginia. John and Jane Doe are attempting to manufacture personal jurisdiction over her by relying on so-called "conspiracy jurisdiction." But that doctrine is no longer viable after the Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014). In any case, it does not apply here because the Does fail to plausibly allege facts establishing that Ms. Motley participated in a conspiracy.

Based on her work in Afghanistan, several concerned people contacted Ms. Motley in late 2019 about an orphaned infant—referred to in this case as "Baby Doe"—with serious medical issues living on a U.S. military base. After the U.S. Government removed Baby Doe from the military base and released her to people believed to be her relatives, Defendant Joshua Mast (a Marine Corps Judge Advocate) sought Ms. Motley's help in finding the baby so that he and his wife, Stephanie, could help with the baby's medical care.

Ms. Motley located Baby Doe in the custody of an elderly Afghan man (purportedly Baby Doe's paternal uncle). A few weeks later, Plaintiff John Doe (the elderly man's son), who by then had custody of Baby Doe, contacted Ms. Motley. Ms. Motley told John and Jane Doe of an American family interested in helping with the baby. Over the course of about a year, Ms. Motley periodically offered to help Baby Doe get medical care *in Kabul*. Eventually, Ms. Motley arranged for the Does to speak

directly with Joshua Mast by phone. And that's where her role in this case ended (the Does don't allege otherwise). But the Does now accuse Ms. Motley of engaging in a "fraudulent scheme" and "conspiring" to "abduct" Baby Doe. Yet they offer only labels, conclusions, and baseless attacks, not facts that—even if true—would amount to any claim against Ms. Motley.

As a threshold matter, the Court has no personal jurisdiction over Ms. Motley. That's clear from the Amended Complaint's face: The Does allege that Ms. Motley lives in *North Carolina*, is licensed to practice law in *Wisconsin*, and has worked in *Afghanistan*. The Virginia connection? There's a boilerplate allegation about personal jurisdiction directed at all Defendants: The Does allege that "Defendants" (undifferentiated) "transacted business in Virginia *and/or*… caused tortious injury by an act or omission in Virginia." Am. Compl. ¶ 19 (emphasis added). The Amended Complaint is silent about what "business" Ms. Motley allegedly transacted *in Virginia* or what act or omission she might have committed there.

So the Does try to use the Masts' contacts with Virginia to drag Ms. Motley into a Virginia court, claiming that "Defendants Motley and Osmani are also subject to personal jurisdiction in Virginia as alleged co-conspirators with Joshua and Stephanie Mast and Richard Mast" because "Motley and Osmani are liable for the Mast defendants' acts and omissions in Virginia… in furtherance of the conspiracy to enable Joshua and Stephanie Mast to abduct Baby Doe." Am. Compl. ¶ 20. There are two problems with that claim.

*First*, the U.S. Supreme Court made clear in *Walden* that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction" and that a defendant must have "*his own affiliation* with the State." 571 U.S. at 286 (emphasis added). Although some courts have continued to recognize conspiracy jurisdiction after *Walden*, this Court should not do so.

*Second*, even if this Court were to apply the pre-*Walden* Fourth Circuit law recognizing "conspiracy jurisdiction" (*see Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th 2013)), the Does have not adequately alleged that Ms. Motley participated in a conspiracy. They make conclusory allegations about a "conspiracy to enable Joshua and Stephanie Mast to abduct Baby Doe" (*see, e.g.*, Am. Compl. ¶ 20), but they do not plausibly allege facts showing that Ms. Motley shared any common purpose with the Masts—beyond finding Baby Doe and trying to help with her medical care, which are not unlawful purposes. The Does' "allegations of conspiracy are conclusory and speculative and do not satisfy the requirements for establishing a conspiracy theory of personal jurisdiction." *Unspam Techs.*, 716 F.3d at 330.

The upshot is that the Does offer no factual allegations—*none*—establishing that Ms. Motley herself has any *suit-related* contacts with Virginia, much less suit-related contacts creating the required "substantial connection" with the State that federal due process requires. *Walden*, 571 U.S. at 284; *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1031–32 (2021). Neither Virginia's long-arm

statute nor the Due Process Clause permits the Court to exercise jurisdiction over Ms. Motley, whether the Court embraces "conspiracy jurisdiction" or not.

But even if the Court had personal jurisdiction over Ms. Motley (it doesn't), the Does fail to plausibly state any claim against her. Stripped of all insinuation, speculation, and nefarious labels, the allegations against Ms. Motley boil down to this: Ms. Motley introduced a couple from Afghanistan to a couple from the United States by phone to help an injured baby get medical care. That's it. The Does' conclusory allegations about Ms. Motley simply don't add up to any plausible cause of action under any theory of liability.

The Court should dismiss the claims against Ms. Motley under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

## BACKGROUND[1]

On September 6, 2019, during a joint U.S. and Afghan military operation in Afghanistan, U.S. military forces discovered Baby Doe, an infant with "serious injuries, including a fractured skull and femur, and second-degree burns," and transported her to a U.S. military hospital for "urgent" medical care. Am. Compl. ¶ 22. Baby Doe's biological parents had been killed in the operation. *Id.*

On September 25, 2019, the military transferred Baby Doe to a U.S. base. Am. Compl. ¶ 22. While Baby Doe was on the base under the military's care, Marine Corps attorney Joshua Mast learned about her situation. *Id.* ¶ 26.

---

[1] Solely for purposes of this motion, the Court must accept as true the *well-pleaded* factual allegations in the Amended Complaint. *See, e.g.*, *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 930 (4th Cir. 2022).

In October 2019, Joshua and Stephanie Mast initiated custody and adoption proceedings for Baby Doe in the Juvenile and Domestic Relations Court of Fluvanna, Virginia and adoption proceedings in the Fluvanna Circuit Court. Am. Compl. ¶ 43. There's no allegation that Ms. Motley was involved in those proceedings.

Meanwhile, on October 24, 2019, Baby Doe's maternal uncle submitted a request to the International Committee of the Red Cross for help in returning Baby Doe to her extended family. Am. Compl. ¶ 56.

On November 6, 2019, the Juvenile Court granted the Masts temporary custody of Baby Doe. Am. Compl. ¶ 49. On November 8, 2019, the Fluvanna Circuit Court "issued an Order directing the State Registrar of Virginia to issue a Certificate of Foreign Birth for Baby Doe on an expedited basis." *Id.* ¶ 53.  On November 10, 2019, the court entered an Interlocutory Order of Adoption for Baby Doe in favor of Joshua and Stephanie Mast. *Id.* ¶ 54. The court also issued a Certificate of Foreign Birth for Baby Doe, listing Joshua and Stephanie Mast as her parents. *Id.* ¶ 55.

On February 26, 2020, the Masts filed a Complaint and Petition for a Temporary Restraining Order in this Court, seeking to enjoin the U.S. Government from releasing Baby Doe from its custody to the Government of Afghanistan. Am. Compl. ¶¶ 62–63. The Court denied the TRO petition. *Id.* ¶ 69. There's no allegation that Ms. Motley was involved in that proceeding.

On February 27, 2020, the U.S. Department of Justice notified the Court that Baby Doe had been released from U.S. custody and placed in the care of her paternal

uncle, John Doe's father. Am. Compl. ¶¶ 70–71. Baby Doe's paternal uncle then transferred Baby Doe to John and Jane Doe. *Id.* ¶ 72.

After Baby Doe was removed from the U.S. military base, Joshua Mast sought assistance from Ms. Motley—a U.S. citizen and international human-rights attorney who had worked in Afghanistan for over a decade—in locating and contacting the people who had custody of Baby Doe. Am. Compl. ¶¶ 79, 82.

The Does' core factual allegations about what Ms. Motley allegedly *did* in furtherance of the purported conspiracy to abduct Baby Doe take up a few short paragraphs of the Amended Complaint:

(1)   "On or about March 6, 2020,… Motley called John Doe for the first time, pursuant to her agreement with, and at the direction of Joshua and Stephanie Mast." Am. Compl. ¶ 83.

(2)   "In a subsequent conversation that same day, Motley advised Jane Doe that she understood Baby Doe had serious medical issues and that Motley knew an American family who wanted to help her." *Id.* ¶ 85.

(3)   "Motley continued to communicate with and befriend John and Jane Doe on behalf of the Masts over the course of more than a year, making multiple offers to assist with Baby Doe's medical care[2] and occasionally asking for photographs of Baby Doe. Motley did so at the direction of Joshua and Stephanie Mast and received thousands of dollars to do so." *Id.* ¶ 88.

In July 2021, Ms. Motley facilitated a telephone conversation between the Does and Joshua Mast. Am. Compl. ¶ 98. During that call, Joshua Mast told the Does that he was familiar with Baby Doe's medical needs and recommended that she receive medical care in the United States. *Id.*

---

[2] There's no allegation that Ms. Motley tried to convince the Does to leave Afghanistan.

The Amended Complaint alleges that Ms. Motley's outreach to John and Jane Doe was "pursuant to" an "agreement" with the Masts and "at the direction of" the Masts. *See, e.g.*, Am. Compl. ¶ 83; *see also id.* ¶ 85 ("[p]ursuant to her agreement with Joshua and Stephanie Mast…"), ¶ 88 ("…at the direction of Joshua and Stephanie Mast…"), ¶ 91 ("at the behest of Joshua and Stephanie Mast…"). And the Does allege that on March 22, 2020, Joshua Mast wired $4,500 to Ms. Motley. *Id.* ¶ 87. In addition, the Amended Complaint alleges that in her discussions with the Does, Ms. Motley did not disclose the Masts' identity (until July 2021) or that the Masts were interested in adopting Baby Doe. *Id.* ¶¶ 85, 89.

Despite their allegation that Ms. Motley "communicate[d]" with them for well over a year after that initial exchange—from March 2020 until July 2021—as part of a conspiracy to abduct Baby Doe, there's *not a single allegation* about anything that Ms. Motley said to them (by text message or otherwise) to "lure" them to the United States. They claim only that she made "multiple offers to assist with Baby Doe's medical care and occasionally ask[ed] for photographs of Baby Doe." Am. Compl. ¶ 88.

In August 2021, U.S. troops withdrew from Afghanistan, and the Taliban began to retake the country. Am. Compl. ¶ 105. Joshua and Stephanie Mast reached out to John and Jane Doe suggesting that they bring Baby Doe to the United States for medical treatment. *Id.* John and Jane Doe advised Joshua Mast that they were considering his proposal, but "were concerned that they would not be able to return to Afghanistan." *Id.*

Ultimately, John and Jane Doe agreed to travel to the United States to obtain medical care for Baby Doe. Am. Compl. ¶ 107. The Does traveled to Kabul on August 23, 2021. *Id.* ¶ 116. The next morning, the Does went to Hamid Karzai International Airport for evacuation. *Id.* Between August 24 and 26, 2021, they traveled from Afghanistan to the United States through Qatar and Germany. *Id.* ¶ 117. They arrived at Dulles International Airport on August 29, 2021. *Id.* ¶ 125.

When the Does presented their identity documents, Joshua Mast handed to the inspecting officer an Afghan passport for Baby Doe. Am. Compl. ¶ 127. The child's last name on the passport was "Mast," and the photo appeared to be the picture that Jane Doe had sent to Ms. Motley on July 30, 2020, but with alterations. *Id.* ¶¶ 127, 130.

The Does were sent to refugee housing at Fort Pickett in Blackstone, Virginia. Am. Compl. ¶ 133. On September 3, 2021, a social worker removed Baby Doe from John and Jane Doe and informed them that the Masts had adopted the child. *Id.* ¶ 136.

After the July 2021 phone call that Ms. Motley arranged between the Does (who were in Afghanistan) and Joshua Mast (Am. Compl. ¶ 98), there's not a single factual allegation about Ms. Motley—other than that she failed to respond to a text message from Jane Doe in November 2021. *Id.* ¶ 149. There's no allegation that Ms. Motley was involved in getting the Does out of Afghanistan, getting the Does to Qatar, getting the Does to Germany, getting the Does into the United States, or transferring Baby Doe from John and Jane Doe to Joshua and Stephanie Mast once the Does were

in this country. And the Does don't identify anything that Ms. Motley allegedly said to them to "lure" them to the United States. Indeed, they claim that they agreed to travel to the United States with Baby Doe "[i]n reliance on Joshua Mast's misrepresentations" and "Osmani's reassurances." *Id.* ¶ 107.

On September 2, 2022, John and Jane Doe filed their original Complaint (on their own behalf and Baby Doe's behalf) against Joshua and Stephanie Mast, Richard Mast (Joshua's brother who assisted with the custody and adoption proceedings), Ahmad Osmani (an Afghan translator living in Tennessee), and Kim Motley seeking declaratory relief relating to Baby Doe's adoption plus compensatory and punitive damages of $35 million dollars.

Ms. Motley moved to dismiss the Complaint on October 17, 2022 for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. The Does then filed an Amended Complaint on October 28, 2022. Ms. Motley now files this motion to dismiss the Amended Complaint.

## LEGAL STANDARD

The Does bear the burden of establishing personal jurisdiction over Ms. Motley. *Micropicture Int'l, Inc. v. Kickartz*, No. 05-CV-00034, 2006 U.S. Dist. LEXIS 3714 at *4 (W.D. Va. Jan. 17, 2006). To be subject to specific jurisdiction in Virginia, a nonresident defendant must be subject to Virginia's long-arm statute, and the exercise of jurisdiction must be consistent with federal due process. *Orion Cap., LLC v. Promier Prods.,* No. 21-cv-00015, 2021 U.S. Dist. LEXIS 204139, at *5–6 (W.D. Va. Oct. 22, 2021). Federal due process requires that "the defendant's *suit-related*

*conduct*… create a substantial connection with the forum State." *Walden*, 571 U.S. at 284 (emphasis added).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. A complaint must contain more than labels and conclusions or a recitation of the elements of the cause of action to withstand a motion to dismiss. *Twombly*, 550 U.S. at 555.

## ARGUMENT

The Court lacks personal jurisdiction over Ms. Motley because she has no suit-related contacts with Virginia, much less suit-related contacts that create a substantial connection with the State. The Does cannot rely on so-called "conspiracy jurisdiction," which is no longer valid after the Supreme Court's *Walden* decision. In any event, the Does do not adequately allege that Ms. Motley was part of any conspiracy. But even if the Court had jurisdiction over Ms. Motley, the Does' sparse allegations about her fail to include facts to support a claim under any of the legal theories presented.

## I.   MS. MOTLEY IS NOT SUBJECT TO PERSONAL JURISDICTION IN VIRGINIA.

The Does allege that "Defendants are subject to personal jurisdiction in Virginia under Virginia Code §§ 8.01-328.1(A)(1) and (3), because the causes of action asserted in this Complaint arise from their having transacted business in Virginia

and/or having caused tortious injury by an act or omission in Virginia." Am. Compl. ¶ 20. For a court to exercise specific jurisdiction over a nonresident defendant, the defendant must be subject to Virginia's long-arm statute, and the exercise of jurisdiction must be consistent with due process. *Orion Capital,* 2021 U.S. Dist. LEXIS 204139, at *5. Virginia's long-arm statute extends personal jurisdiction to the extent permissible under the Due Process Clause. *Id.* at *5–6. The key question is whether the defendant has sufficient minimum contacts with the forum state, such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at *6–7 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

This Court's exercise of jurisdiction over Ms. Motley would violate both the Virginia long-arm statute and federal due process.

## A.   Ms. Motley is not subject to jurisdiction under Virginia's long-arm statute.

The allegations in the Amended Complaint don't satisfy Virginia's long-arm statute under either provision that the Does cite.

*First,* under Virginia Code Ann. § 8.01-328.1(A)(1), a Virginia court may exercise jurisdiction over a person who "acts directly or by an agent, as to a cause of action arising from the person's transacting any business in this Commonwealth."

The Amended Complaint is silent on what "business" Ms. Motley purportedly transacted in Virginia or what acts or omissions she took in Virginia that purportedly caused injury. In fact, there are virtually no factual allegations in the Amended Complaint establishing that Ms. Motley has any contacts with Virginia, much less

*suit-related* contacts creating a substantial connection with the State. The Does offer up a single allegation purporting to connect Ms. Motley to Virginia: The Does allege—based only on "information and belief"—that "Motley is the general counsel of Women for Afghan Women," a *New York* not-for-profit corporation (Ex. A[3]) with "a Community Center in Alexandria, Virginia."[4] Am. Compl. ¶ 15. The Does don't allege that the connection gives the Court *general* personal jurisdiction over Ms. Motley—nor could they. And they fail to explain what the community center has to do with this case: None of their allegations relate in any way to that charitable organization, never mind its Virginia location or Ms. Motley's connection to it.

Ms. Motley's only alleged suit-related conduct involved her correspondence with the Does and with Joshua Mast. *See* Am. Compl. ¶¶ 79–90. But the Does allege that their interactions with Ms. Motley took place entirely in Afghanistan. And the Does never allege that she met Joshua Mast in person or traveled to Virginia for any reason related to the conduct at issue in the litigation. Mere "emails and telephone calls directed at Virginia do not amount to transacting business." *Nathan v. Takeda Pharms. Am., Inc.*, 83 Va. Cir. 216, 226 (2011); *see also Unidyne Corp. v. Aerolineas Argentinas,* 590 F. Supp. 391, 396 (E.D. Va. 1984) ("[m]ere telephone conversations,

---

[3] The Court can take judicial notice of New York Secretary of State records. *See Gerald v. Virginia*, 2019 U.S. Dist. LEXIS 69513 at *1 (W.D. Va. Apr. 24, 2019) (citing *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Whitaker v. Hyundai Motor Co.,* No. 17-cv-00055, 2018 U.S. Dist. LEXIS 174362, at *30 n.5 (W.D. Va. Oct. 9, 2018) (taking judicial notice of trademark registrations as public documents).

[4] There's no allegation that the Alexandria location was open during the relevant period (because it wasn't) or that Ms. Motley worked there (because she didn't).

telex messages and letters" to negotiate do not constitute transacting business); *Idexcel, Inc. v. Lieto*, No. CL-2011-10159, 2012 Va. Cir. LEXIS 13, at *8–9 (Jan. 24, 2012) (several phone conversations and emails with plaintiff's employees did not amount to transacting business).

*Second,* under Virginia Code § 8.01-328.1(A)(3), a Virginia court can assert long-arm jurisdiction over a non-resident if the resident "caused tortious injury by an act or omission" in Virginia. But that rule only applies to a nonresident defendant who is "physically present" in Virginia while "committing the act or omission." *DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419, 425–26 (E.D. Va. 1996); *see also Alton v. Wang*, 941 F. Supp. 66, 67–68 (W.D. Va. 1996) (construing long-arm statute as requiring physical presence). There's no allegation that Ms. Motley has ever even been to Virginia, much less committed any torts against the Does while physically in the State.

Accordingly, the Amended Complaint fails to allege facts that give rise to personal jurisdiction over Ms. Motley under Virginia's long-arm statute.

### B. Ms. Motley does not have the minimum contacts with Virginia necessary to satisfy federal due process.

In any event, exercising personal jurisdiction over Ms. Motley would violate the Due Process Clause. Courts in the Fourth Circuit apply a three-part test to determine if jurisdiction comports with due process: "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally

'reasonable.'" *Babiak v. Mizuho Bank, Ltd.*, No. 18-cv-352, 2018 U.S. Dist. LEXIS 159696, at *6 (E.D. Va. Sept. 17, 2018).

Courts consider eight factors in assessing purposeful availment: (1) maintenance of offices or agents in the State; (2) ownership of property in the State; (3) reaching into the State to solicit or initiate business; (4) deliberate engagement in significant or long-term business activities in the State; (5) contractual choice-of-law clauses selecting the State's law; (6) in-person contacts with State residents regarding the business relationship; (7) contractual requirements of performance in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted. *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198–99 (4th Cir. 2018).

All of those factors weigh against asserting personal jurisdiction over Ms. Motley. During the relevant time, Ms. Motley was domiciled in North Carolina and worked in Afghanistan. Most of the allegations against Ms. Motley relate to her outreach to the Does to offer assistance in Afghanistan—not Virginia. There's no allegation that she even set foot in Virginia for any purpose, much less a purpose related to the Does' claims.

There's also no allegation that Ms. Motley directed any activities toward the State. As for the limited contact that Ms. Motley had with Virginia, the Does allege that Joshua Mast "reached out" to Ms. Motley, not that Ms. Motley reached out to him. Am. Compl. ¶ 76; *see Babiak*, 2018 U.S. Dist. LEXIS 159696, at *7 (no personal jurisdiction where defendant had no offices or agents in Virginia, did not own

14

property in Virginia, and did not "reach into Virginia to solicit or initiate business"—Virginians reached out to defendant); *Putz v. Golden*,  No. 09-CV-00003, 2009 U.S. Dist. LEXIS 121556, at *16 (W.D. Va. Dec. 31, 2009) (giving "special weight" to fact that Virginia plaintiffs initiated contact with defendant in holding no jurisdiction); *Delta-T Corp. v. Harris Thermal Transfer Prods., Inc.*, No. 09CV321-HEH, 2009 U.S. Dist. LEXIS 80647, at *9 (E.D. Va. Sept. 4, 2009) (visiting Virginia twice for unrelated contracts didn't create personal jurisdiction).

Ms. Motley's communications with Joshua Mast do not rise to the level of purposeful activity. *Hegedus v. Ross,* No. 11cv00018, 2011 U.S. Dist. LEXIS 79684, at *13 (W.D. Va. July 21, 2011) ("it is well settled that mere telephone calls and electronic communications in furtherance of a transaction are *insufficient to constitute purposeful activity*") (emphasis added) (citation omitted) (quoting *Eagle Paper Int'l, Inc. v. Expolink, LTD*, No. 2:07cv160, 2008 U.S. Dist. LEXIS 4003, at *13 (E.D. Va. Jan. 17, 2008)); *Consulting Eng'rs, Inc. v. Geometric Software Sols.*, No. 06cv956 (JCC), 2007 U.S. Dist. LEXIS 25150, at *17–18 (E.D. Va. Apr. 3, 2007) (series of emails and phone calls from India were not purposeful activity), *aff'd*, 561 F.3d 273 (4th Cir. 2009).

The Amended Complaint's offhand mention of Women for Afghan Women, a New York-based not-for-profit corporation, is also insufficient. Even if Ms. Motley were deemed to be an agent of that organization and even if that organization had a Virginia location during the relevant time (it didn't), Ms. Motley would still need to have her own contacts with Virginia to be subject to personal jurisdiction there. In

general, a company's contacts to a State "are not attributed to a corporate agent for jurisdictional purposes." *See Thousand Oaks Barrel Co. v. Deep S. Barrels LLC*, 241 F. Supp. 3d 708, 718 (E.D. Va. 2017) (quoting *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 177 (4th Cir. 2002)). Again, there's no allegation that Ms. Motley did anything in Virginia on that organization's behalf (or otherwise) relating to this case (or otherwise).

### C.   The Masts' alleged forum contacts do not support the Court's exercise of personal jurisdiction over Ms. Motley.

The Does try to plead around Ms. Motley's lack of contacts with Virginia by claiming in their Amended Complaint that the Court should exercise "conspiracy jurisdiction" over Ms. Motley. Am. Compl. ¶ 20. But that effort fails.

#### 1.   In *Walden*, the U.S. Supreme Court rejected the conspiracy-jurisdiction doctrine.

State and federal courts are divided over whether the conspiracy-jurisdiction doctrine comports with due process. Courts that have applied conspiracy jurisdiction have used it to exercise personal jurisdiction over nonresident defendants who lack suit-related contacts with the forum by imputing forum contacts of alleged co-conspirators.

In 2013, the Fourth Circuit recognized the existence of "conspiracy jurisdiction." *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013). But the doctrine is no longer viable after the U.S. Supreme Court's 2014 decision in *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014). In *Walden,* the Court held that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction . . . . Due process requires that a defendant be haled

16

into court in a forum State based *on his own affiliation* with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the state." *Id.*

"Many courts that have considered the viability of vicarious conspiracy jurisdiction post-Walden have rejected it, holding that participation in a conspiracy cannot 'provide a standalone basis for jurisdiction.'" *Martin v. Eide Bailly LLP*, No. 1:15-cv-1202, 2016 U.S. Dist. LEXIS 112062, at *8 (S.D. Ind. Aug. 23, 2016) (collecting cases). Others have limited its impact and imposed heightened pleading requirements for it. *See, e.g.*, *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 186 (D.D.C. 2018) ("[I]f any conspiratorial jurisdiction survives *Walden*, a plaintiff pursuing such a theory must allege that the defendant knew of the co-conspirator's acts in the forum. Furthermore, at the very least, a plaintiff needs to meet [a] strict particularity requirement to comport with due process.").

To be sure, some courts—including other district courts in the Fourth Circuit—continue to consider conspiracy jurisdiction to comport with due process (at least in theory). *See, e.g.*, *Indep. Printers Worldwide, Inc. v. Cole*, No. 15-cv-185-JAG, 2015 U.S. Dist. LEXIS 103600, at *26–28 (E.D. Va. Aug. 6, 2015) (recognizing conspiracy jurisdiction but holding that allegations failed to support it); *B2Gold Corp. v. Christopher*, No. 18-cv-1202, 2019 U.S. Dist. LEXIS 145207 (E.D. Va. Aug. 26, 2019) (same); *Southstar Fin., LLC v. T-Zone Health, Inc.*, No. 21-cv-02511-DCN, 2021 U.S. Dist. LEXIS 217697 (D.S.C. Nov. 10, 2021) (same). But neither this Court nor the Court of Appeals for the Fourth Circuit has addressed conspiracy jurisdiction since

*Walden.* And this Court should decline to assert personal jurisdiction over Ms. Motley based on a conspiracy-jurisdiction theory because doing so would flout Supreme Court precedent.

> **2.    Insofar as the conspiracy-jurisdiction doctrine still exists, the Does' allegations do not support its application against Ms. Motley.**

To establish personal jurisdiction based only on an alleged conspiracy, a plaintiff would have to "make a plausible claim (1) that a conspiracy existed; (2) that the [] defendants participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia." *Unspam Techs.*, 716 F.3d at 329. Even in courts that continue to recognize conspiracy jurisdiction, "bare allegations, facts amounting to only a 'logical possibility,' or a theory of conspiracy that is 'based on inferences that are not fairly and justly drawn from the facts alleged,' are not sufficient." *See, e.g., FireClean, LLC v. Tuohy*, No. 16-cv-0294, 2016 U.S. Dist. LEXIS 96294, at *27 (E.D. Va. July 21, 2016) (internal quotation marks and citations omitted).

Even if this Court were to conclude that conspiracy jurisdiction could—in theory—comport with due process, the Does' allegations do not support its application against Ms. Motley. The Does have not offered plausible factual allegations showing that Ms. Motley joined a conspiracy to "lure" the Does to the United States to allow the Masts to "abduct" Baby Doe. They don't plausibly allege that Ms. Motley entered into an agreement to do anything other than to locate Baby Doe and establish contact

with John and Jane Doe about helping with medical care. And there's nothing remotely unlawful or improper about that.

They make conclusory allegations about a "conspiracy to enable Joshua and Stephanie Mast to abduct Baby Doe" (*see, e.g.*, Am. Compl. ¶ 20). And they claim that "Motley agreed to work with the Masts as they implemented *their* plan." *Id.* ¶ 81 (emphasis added). But the Does do not allege facts to show that Ms. Motley agreed to help the Masts "abduct" Baby Doe. And the Does don't identify anything that Ms. Motley allegedly said to "lure" them to the United States as part of a conspiracy. Indeed, they claim that they agreed to travel to the United States with Baby Doe "[i]n reliance on Joshua Mast's misrepresentations" and "Osmani's reassurances." *Id.* ¶ 107. Accordingly, the Does' "allegations of conspiracy are conclusory and speculative and do not satisfy the requirements for establishing a conspiracy theory of personal jurisdiction." *Unspam Techs.*, 716 F.3d at 330.

*   *   *

Neither of the cited long-arm provisions applies to Ms. Motley. And subjecting Ms. Motley to jurisdiction in Virginia—even under a "conspiracy jurisdiction" theory—would violate federal due process. The Court should dismiss the Amended Complaint against Ms. Motley for lack of personal jurisdiction.

## II.   THE AMENDED COMPLAINT FAILS TO ALLEGE FACTS SUPPORTING ANY CLAIM AGAINST MS. MOTLEY.

This dispute is an extension of a contested state-court custody case—in which Ms. Motley is neither a party nor anyone's counsel. It is not a viable tort action

against Ms. Motley for damages. The Does don't plausibly allege facts that make out any claim for relief against Ms. Motley under any of the liability theories offered.

### A.    The Does do not plausibly allege a claim for tortious interference with parental rights.

To state a claim for tortious interference with parental rights, a plaintiff must plead facts sufficient to show that, among other things, "the complaining *parent* has a right to establish or maintain a parental or custodial relationship with his/her minor child" and that the defendant intentionally interfered with that right. *Padula-Wilson v. Landry*, 298 Va. 565, 575 (2020) (emphasis added). The alleged "interference" with parental rights must be "*tortious*"—not just any interference will do. *Id.*; *see also Nelson v. Green*, 965 F. Supp. 2d 732, 753–54 (W.D. Va. 2013).

The Does concede that they are not Baby Doe's parents—they claim to be Baby Doe's "biological family and legal guardians." Am. Compl. ¶ 155. The Does assert that their relationship to Baby Doe gives them "parental rights." *Id.* Not so.

In the custody context, although Virginia law doesn't expressly define "parent," the term "contemplates a relationship to a child based upon either the contribution of genetic material through biological insemination or by means of legal adoption." *Hawkins v. Grese*, 68 Va. App. 462, 472 (2018) (former same-sex partner of child's biological mother was not a parent because she was not a biological parent and hadn't adopted the child). There's also a difference between a "parent" and a "person with a legitimate interest," which includes a "party *other than a parent* who may seek custody and visitation—including but not limited to 'grandparents, step

grandparents, stepparents, former stepparents, *blood relatives and family members*.'" *Id.* at 473 (emphasis added) (citing Va. Code § 20-124.1).

Not only are John and Jane Doe not Baby Doe's parents under Virginia law, but, even if the Does were Baby Doe's parents, the Amended Complaint fails to allege facts sufficient to show that Ms. Motley intentionally interfered with the Does' parental rights. The allegations against Ms. Motley are that she introduced the Does to Joshua Mast without disclosing certain information. That does not amount to "interfer[ing] with parental rights *with knowledge* that the parent *does not consent*." *Coward v. Wellmont Health Sys.,* 295 Va. 351, 361 (2018) (affirming trial court's granting of demurrers) (citing RESTATEMENT (SECOND) OF TORTS § 700) (1977)).

The Does willingly spoke with Joshua Mast. And as Taliban forces overtook Afghanistan in the wake of the U.S. withdrawal, the Does voluntarily escaped the country with Baby Doe. Nothing Ms. Motley is alleged to have said or done interfered with any of the Does' rights. Indeed, there's not a single factual allegation about Ms. Motley's involvement in any events that took place after John and Jane Doe spoke with Joshua Mast.

The Court should dismiss with prejudice the Does' claim against Ms. Motley for tortious interference with parental rights.

### B.    The Does do not plausibly allege a fraud claim.

The fraud claim against Ms. Motley fails because the Amended Complaint doesn't satisfy Rule 9(b)'s heightened pleading standard. *William v. AES Corp.*, 28 F. Supp. 3d 553, 573 (E.D. Va. 2014). The Does don't allege any details of the "time, place, and contents of the false representations, as well as the identity of the person

making the misrepresentation." *Id.*; *see also Levinson v. Mass. Mut. Life Ins. Co.*, No. 06cv086, 2006 U.S. Dist. LEXIS 83397, at *20–21 (E.D. Va. Nov. 9, 2006) (allegations that defendants engaged in a "fraudulent scheme . . . consist[ing] of numerous telephone calls" through agents and "engaged in further fraudulent and deceitful sales practices through its agent" did not satisfy Rule 9(b) because they failed to offer specific facts regarding time, place, or specific conduct of the "misleading" communications). Rule 9(b) is a "stringent pleading standard" designed to put the defendant on notice of the conduct complained of. *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 197 (4th Cir. 2018).

The Does broadly state that Ms. Motley first communicated with the Does on March 6, 2020, continued communicating with them for more than a year, "making multiple offers to assist with Baby Doe's medical care and occasionally asking for photographs of Baby Doe," and telling them that Motley "knew about an American family to help out Baby Doe" without disclosing certain information about the Virginia court case or the Masts' intentions. Am. Compl. ¶¶ 83–90. Those broad factual allegations fall far short of the type of notice required about what "fraudulent" activity Mt. Motley supposedly engaged in. The Amended Complaint does not include sufficient time, place, or content allegations against Ms. Motley: They amount to little more than conclusory allegations. *Iqbal*, 556 U.S. at 678.

The Court should dismiss with prejudice the Does' fraud claim against Ms. Motley.

### C.   The Does do not plausibly allege intentional infliction of emotional distress.

Claims for intentional infliction of emotional distress are disfavored in Virginia. *Harris v. Kreutzer,* 271 Va. 188, 203–04 (2006). It's not enough to allege that a defendant acted with tortious or even criminal intent. *Id.* at 204 (citing *Russo v. White*, 241 Va. 23, 28 (1991)). To state a claim for intentional infliction of emotional distress, a plaintiff must allege conduct that is "so outrageous in character" and "so extreme in degree" that it goes "beyond all possible bounds of decency," is "atrocious," and is "utterly intolerable in a civilized community." *Id.* at 203–04. There's not a single factual allegation against Ms. Motley that comes close to that threshold.

The thrust of the Does' claim is that they suffered emotional distress because of Baby Doe's removal from their care in Virginia. Am. Compl. ¶ 147. The Amended Complaint does not plead facts sufficient to show that, in reaching out to the Does, Ms. Motley acted for the specific purpose of causing the Does emotional distress or that she acted with knowing disregard to that risk. *See Almy v. Grisham*, 273 Va. 68, 77–78 (2007). Aside from the unfounded claim that Ms. Motley was acting as the Masts' purported "agent" in "knowingly facilitating the plan to abduct Baby Doe" (Am. Compl. ¶ 193), the Amended Complaint outlines no facts to support any intentional or reckless conduct on Ms. Motley's part.

The Does also fail to tie any of Ms. Motley's conduct (which was limited to having conversations with the Does when they were in Afghanistan) to the actual cause of the alleged emotional distress. There's no allegation that Ms. Motley played any role in John and Jane Doe's life after they left Afghanistan on August 24, 2021.

Am. Compl. ¶ 117; *see Almy*, 639 S.E.2d at 187–88. Not responding to Jane Doe's November 2021 text message (Am. Compl. ¶ 149) does not rise to the level of "extreme and outrageous" conduct required to support a claim for intentional infliction of emotional distress. *See Sirleaf v. Doe*, No. 21cv00237, 2021 U.S. Dist. LEXIS 145048, at *5–6 (W.D. Va. Aug. 3, 2021) (finding that inaction through failure to report child abuse is not outrageously unacceptable).

The Court should dismiss the claim for intentional infliction of emotional distress against Ms. Motley.

### D. The Does do not plausibly allege a civil-conspiracy claim.

To make out a claim for common law civil conspiracy under Virginia law, a plaintiff must show "(i) an *agreement* between two or more persons (ii) to accomplish an *unlawful purpose* or to accomplish a lawful purpose by *unlawful means*, which (iii) results in damage to plaintiff" through an overt action done in furtherance of the agreement. *Bhattacharya v. Murray*, No. 19cv00054, 2021 U.S. Dist. LEXIS 222993, at 21 (W.D. Va. Nov. 12, 2021) (emphasis added) (citation and internal quotation marks omitted); *see also William*, 28 F. Supp. 3d at 574; *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 618 (E.D. Va. 2009). Conspiracy isn't a stand-alone cause of action—there must be an underlying tort. *William*, 28 F. Supp. 3d at 574 ("Where a plaintiff has no actionable claim for the underlying alleged wrong, an action for conspiracy based on that wrong will not lie."). In addition, "the Complaint must plead facts showing that each member of the alleged conspiracy shared the same unlawful objective." *Bhattacharya*, 2021 U.S. Dist. LEXIS 222993, at *22 (finding different objectives defeated conspiracy claim). To survive a motion to dismiss, a

plaintiff must "plead the requisite concert of action and unity of purpose in more than mere conclusory language." *William,* 28 F. Supp. 3d at 574 (internal quotation marks omitted).

As discussed earlier, the Does don't plausibly allege facts showing that Ms. Motley joined any conspiracy. They make conclusory allegations about a "conspiracy to enable Joshua and Stephanie Mast to abduct Baby Doe" (*see, e.g.,* Am. Compl. ¶ 20). And they claim that "Motley agreed to work with the Masts as they implemented *their* plan." *Id.* ¶ 81 (emphasis added). But the Does do not allege facts to show that Ms. Motley agreed to help the Masts "abduct" Baby Doe. And there's nothing unlawful about locating the Does and offering to help with medical needs.

In addition, because the Amended Complaint fails to state a claim for an underlying tort, the conspiracy claim also fails. *William*, 28 F. Supp. 3d at 574. Accordingly, the Court should dismiss the Does' claim for common law conspiracy against Ms. Motley.

## CONCLUSION

The Court should dismiss all claims against Ms. Motley with prejudice.


Dated: November 14, 2022.                Respectfully submitted,


                                         */s/ Thomas W. Davison*
                                         Thomas W. Davison
                                         (VSB No. 94387)
                                         Samantha Van Winter
                                         (VSB No. 97268)
                                         ALSTON & BIRD LLP
                                         950 F Street, N.W.

Washington, DC  20004-1404
Tel.:  (202) 756-3300
Fax:  (202) 654-3333
tom.davison@alston.com
samantha.vanwinter@alston.com

Michael R. Hoernlein
(*pro hac vice*)
ALSTON & BIRD LLP
101 South Tryon Street, Suite 4000
Charlotte, NC 28280-4000
Tel.: (704) 444-1000
Fax: (704) 444-1111
michael.hoernlein@alston.com

Sidney Webb
(*pro hac vice*)
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
Tel.: (214) 922-3400
Fax: (214) 922-3899
sidney.webb@alston.com

*Counsel for Defendant Kimberley Motley*

## CERTIFICATE OF SERVICE

I certify that on November 14, 2022, I filed this Memorandum using the Court's

CM/ECF system, which will provide service to all counsel of record.

/s/ Thomas W. Davison
Thomas W. Davison