**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BABY DOE, A CITIZEN OF AFGHANISTAN   :
CURRENTLY RESIDING IN NORTH   :
CAROLINA, BY AND THROUGH NEXT   :   CIVIL ACTION NO.  3:22-CV-49
FRIENDS, JOHN AND JANE DOE; AND JOHN   :
AND JANE DOE, CITIZENS OF AFGHANISTAN:
AND LEGAL GUARDIANS OF BABY DOE,   :
   :
     Plaintiffs,   :
   :
v.   :
   :
JOSHUA MAST, STEPHANIE MAST, RICHARD :
MAST, KIMBERLEY MOTLEY, AND AHMAD   :
OSMANI,   :
   :
     Defendants,   :
   :
and   :
   :
UNITED STATES SECRETARY OF STATE   :
ANTONY BLINKEN AND UNITED STATES   :
SECRETARY OF DEFENSE GENERAL   :
LLOYD AUSTIN,   :
   :
     Nominal Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**TABLE OF CONTENTS**

Page

I    INTRODUCTION ...................................................................................................1

II    ARGUMENT ........................................................................................................2

    A.    Defendants' 12(b)(1) Arguments Should Be Rejected. ............................................2

        1.    The Domestic Relations Exception Does Not Apply. ................................3

            a.    The domestic relations exception does not apply because Plaintiffs do not seek a determination on the entitlement to a divorce, alimony or child custody .................................................3

            b.    The domestic relations exception does not apply to cases asserting federal question jurisdiction. .............................................9

        2.    Neither *Burford* Abstention nor *Colorado River* Abstention Apply. ........12

            a.    Burford Abstention ........................................................................12

            b.    Colorado River Abstention ...........................................................15

        3.    Plaintiffs John and Jane Doe Were Not Required to Register a Foreign Order to Obtain Standing ...............................................................20

        4.    Complete Diversity Exists. ........................................................................21

    B.    Defendants Motley and Osmani's 12(b)(2) Arguments Should Be Rejected ...........................................................................................................23

        1.    This Court Has Personal Jurisdiction Over Kimberley Motley. ...............26

        2.    This Court Has Personal Jurisdiction Over Ahmad Osmani. ...................29

    C.    Defendants' 12(b)(6) Arguments Should Be Rejected ...........................................32

        1.    Count I – Tortious Interference with Parental Rights ...............................32

        2.    Count II – Fraud ........................................................................................36

        3.    Count III – Conspiracy ..............................................................................38

            a.    Plaintiffs plead conspiracy with sufficient particularity. ..............38

            b.    Richard Mast's status as Joshua and Stephanie Mast's lawyer does not make him immune from liability for conspiracy. ............40

        4.    Count IV – Intentional Infliction of Emotional Distress .........................42

        5.    Count V – False Imprisonment .................................................................46

        6.    Plaintiffs Sufficiently Plead Facts Against Defendant Stephanie Mast ..........................................................................................................47

III    CONCLUSION ....................................................................................................48

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Abood ex rel. Al-Abood v. El-Shamari*,
    217 F.3d 225 (4th Cir. 2000) ............................................................16, 17

*Alton v. Wang*,
    941 F. Supp. 66 (W.D. Va. 1996) ..............................................................28

*Anderson v. Canaday*,
    37 Okla. 697 (1913) ...................................................................................41

*Ankenbrandt v. Richards*,
    504 U.S. 689 (1992) ................................................................................3, 9

*B2Gold Corp. v. Christopher*,
    2019 WL 4015890 (E.D. Va. Aug. 26, 2019) ...........................................25

*Barker v. Washburn*,
    200 N.Y. 280 (1911) .................................................................................47

*BeoCare Group, Inc. v. Morrissey*,
    124 F. Supp. 3d 696 (W.D. N.C. 2015) ....................................................25

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ..................................................................................24

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
    334 F.3d 390 (4th Cir. 2003) .........................................................23, 24, 25

*CFA Inst. v. Inst. of Chartered Fin. Analysts of India*,
    551 F.3d 285 (4th Cir. 2009) ....................................................................23

*Chase Brexton Health Servs., Inc. v. Maryland¸*
    411 F.3d 457 (4th Cir. 2005) ..............................................................16, 19

*Coastal Labs., Inc. v. Jolly*,
    502 F. Supp. 3d 1003 (D. Md. 2020) ........................................................25

*Cole v. Cole*,
    633 F.2d 1083 (4th Cir. 1980) ....................................................................8

*Colo. River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976)....................................................................... *passim*

*Combs v. Bakker*,
  886 F.2d 673 (4th Cir.1989) ........................................................................25, 26, 27

*Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc.*,
  249 Va. 39 (1995) .................................................................................................38

*Community Bank v. Wright*,
  221 Va. 172 (1980) ...............................................................................................36

*Deakins v. Monaghan*,
  383 U.S. 193 (1988).................................................................................................2

*Delaware, L. & W.R. Co. v. Petrowsky*,
  250 F. 554 (2d Cir. 1918) .....................................................................................21

*DeSantis v. Hafner Creations, Inc.*,
  949 F. Supp. 419 (E.D. Va. 1996) ........................................................................28

*Dill v. Kroger Ltd. P'ship I*,
  300 Va. 99 (2021) .............................................................................................46, 47

*Doe v. Charleston Area Med. Ctr., Inc.*,
  529 F.2d 638 (4th Cir. 1975) ................................................................................25

*Elk Grove Unified School Dist. v. Newdow*,
  542 U.S. 1 (2004)..................................................................................................7-8

*Elliott v. Shore Stop, Inc.*,
  238 Va. 237 (1989) ...............................................................................................37

*Forrester v. White*,
  484 U.S. 219 (1988)...............................................................................................41

*Franchise Tax Bd. of California v. Construction Laborers Vacation Trust for
  Southern California*,
  463 U.S. 1 (1983)...................................................................................................10

*Gannett Co. v. Clark Const. Group, Inc.*,
  286 F.3d 737 (4th Cir. 2002) ................................................................................17

*Gilmore v. Jones*,
  370 F. Supp. 3d 630 (W.D. Va. 2019) .............................................................22, 23

*Glass v. Glass*,
  228 Va. 39 (1984) .................................................................................................38

*Grable & Sons Metal Prod. Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005)................................................................................................9

*Great Am. Ins. Co. v. Gross*,
    468 F.3d 199 (4th Cir. 2006) ................................................................16

*Griessel v. Mobley*,
    544 F. Supp. 2d 597 (M.D. N.C. 2008) ...................................................8

*Gunn v. Minton*,
    568 U.S. 251 (2013)................................................................9, 10, 11

*Harris v. Kruetzer*,
    271 Va. 188 (2006) ........................................................................43, 46

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999) ................................................................37

*Historic Green Springs, Inc. v. U.S. E.P.A.*,
    742 F. Supp. 2d 837 (W.D. Va. 2010) .............................................16, 19

*Independent Living Center of Southern California v. Kent*,
    909 F.3d 272 (9th Cir. 2018) ................................................................11

*Int'l Shoe Co. v. Wash.*,
    326 U.S. 310 (1945)..............................................................................24

*Jien v. Purdue Farms, Inc.*,
    2022 WL 2818950 (D. Md. July 19, 2022)...........................................25

*Jordan v. Shands*,
    255 Va. 492 (1998) ..............................................................................45

*Kajtazi v. Kajtazi*,
    488 F. Supp. 15 (E.D.N.Y. 1978) ........................................................47

*Kessel v. Leavitt*,
    204 W. Va. 95 (1998) ............................................................................8

*Lamar v. Micou*,
    114 U.S. 218 (1885)..............................................................................21

*Loubser v. Thacker*,
    440 F.3d 439 (7th Cir. 2006) ................................................................11

*Lynchburg Range & Training v. Northam*,
    455 F. Supp. 3d 238 (W.D. Va. 2020) ...................................................9

*Mansell v. Mansell*,
    490 U.S. 581 (1989)................................................................................7

*Martin v. Equity One Consumer Discount Co., Inc.*,
   194 F. Supp. 2d 469 (W.D. Va. 2002) ............................................................32, 35

*Martin v. Stewart*,
   499 F.3d 360 (4th Cir. 2007) ...................................................3, 12, 13, 14

*In re Mercury Constr. Corp.*,
   656 F.2d 933 (4th Cir. 1981) .....................................................................13

*Michigan Mut. Ins. Co. v. Smoot*,
   128 F. Supp. 2d 917 (E.D. Va. 2000) ........................................................41

*Minot v. Eckardt-Minot*,
   13 F.3d 590 (2d Cir. 1994)..........................................................................15

*Mitrano v. Hawes*,
   377 F.3d 402 (4th Cir. 2004) .....................................................................26

*MLC Automotive, LLC v. Town of Southern Pines*,
   532 F.3d 252 (2008).....................................................................................2

*Montgomery Ward & Co. v. Wickline*,
   188 Va. 485 (1948) .....................................................................................47

*Moore v. Sims*,
   442 U.S. 415 (1979).....................................................................................7

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) .......................................................................................17

*NASDAQ OMX Group, Inc. v. UBS Securities, LLC*,
   770 F.3d 1010 (2d Cir. 2014).....................................................................10

*New Beckley Min. Corp. v. Int'l Union, United Mine Workers of Am.*,
   946 F.2d 1072 (4th Cir. 1991) ...................................................................17

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
   491 U.S. 350 (1989).................................................................................3, 12

*New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*,
   416 F.3d 290 (4th Cir. 2005) ...................................................25, 26, 27, 30

*Nicoleau v. Brookhaven Mem'l Hosp. Ctr.*,
   181 A.D.2d 815 (N.Y. App. Dept. 1992)...................................................41

*Ormet Corp. v. Ohio Power Co.*,
   98 F.3d 799 (4th Cir. 1996) .......................................................................10

*Parker v. Austin*,
    105 F. Supp. 3d 592 (W.D. Va. 2015) .........................................................46

*Peninsula Cruise, Inc.* v. *New River Yacht Sales, Inc.*,
    257 Va. 315 (1999) ....................................................................................23

*Perdue Foods LLC v. BRF S.A.*,
    814 F.3d 185 (4th Cir. 2016) .................................................................24, 25

*Perk v. Vector Res. Grp.*, Ltd.,
    253 Va. 310  (1997) ...................................................................................41

*Pinney v. Nokia, Inc.*,
    402 F.3d 430 (4th Cir. 2005) ......................................................................10

*Quackenbush v. Allstate Ins. Co.*,
    517 U.S. 706 (1996).............................................................................12, 15

*Rambus Inc. v. Infineon Techs. Ag*,
    318 F.3d 1081 (Fed. Cir. 2003)..............................................................37, 38

*Rambus, Inc. v Infineon Techs. AG*,
    164 F. Supp. 2d 743 (E.D. Va. 2001), *aff'd in part, vacated in part, rev'd in part*, 318 F.3d 1081 (Fed. Cir. 2003) ........................................................36

*Robinson v. Volkswagenwerk AG*,
    940 F.2d 1369 (10th Cir. 1991) .............................................................41, 42

*Rogers v. Dow Agrosciences, LLC*,
    2006 WL 2975725 (W.D. Va. Oct. 16, 2006)................................................17

*Sauk-Suiattle Indian Tribe v. City of Seattle*,
    2021 WL 5200173 (W.D. Wa. Nov. 9, 2021)................................................11

*Soulsby v. Soulsby*,
    2017 WL 2539806 (W.D. Va. June 12, 2017) ................................................8

*Stogsdill v. Azar*,
    765 Fed. App'x 783 (4th Cir. 2019) .............................................................12

*Stratton by and through Stratton v. North Carolina*,
    2021 WL 328884 (W.D. N.C. Feb. 1, 2021) ..................................................8

*Talley v. Danek Medical, Inc.*,
    179 F.3d 154 (4th Cir. 1999) ......................................................................46

*Terry v. SunTrust Banks, Inc.*,
    493 F. App'x 345 (4th Cir. 2012) ...........................................................39, 40

*Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd.*,
    682 F.3d 292 (4th Cir. 2012) ........................................................................23, 28

*Town of Nags Head v. Toloczko*,
    728 F.3d 391 (4th Cir. 2013) .......................................................................3, 12, 13

*Travelers Health Assn. v. Virginia*,
    339 U.S. 643 (1950)..............................................................................................24

*UMG Recordings, Inc. v. Kurbanov*,
    963 F.3d 344 (4th Cir. 2020) ...............................................................................23

*Unidyne Corp. v. Aerolineas Argentinas*,
    590 F. Supp. 391 (E.D. Va. 1984) .......................................................................28

*United States v. Hill*,
    776 F.3d 243 (4th Cir. 2015) ...............................................................................24

*United States v. Johnson*,
    114 F.3d 476 (4th Cir.1997) ............................................................................9, 12

*United States v. SCM Corp.*,
    615 F. Supp. 411 (D. Md. 1985) .........................................................................17

*Unspam Techs., Inc. v. Chernuk*,
    716 F.3d 322 (4th Cir. 2013) .....................................................................25, 28, 29

*Vulcan Chem. Techs., Inc. v. Barker*,
    297 F.3d 332 (4th Cir. 2002) ...............................................................................16

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014).........................................................................................25

*Wasserman v. Wasserman*,
    671 F.2d 832 (4th Cir. 1982) .................................................................................4

*Womack v. Eldridge*,
    215 Va. 338 (1974) .............................................................................................45

*Wyatt v. McDermott*,
    283 Va. 685 (2012) ...................................................................................... *passim*

*Young v. New Haven Advocate*,
    315 F.3d 256 (4th Cir. 2002) ...............................................................................23

**Constitution**

U.S. Const., art VI, cl. 2 ................................................................................................11

U.S. Const. amend. XIV ................................................................................................21

**Rules and Statutes**

Fed. R. Civ. P. 9(b) .......................................................................................................38

Fed. R. Civ. P. 12(b) ...............................................................................1, 9, 32, 35, 36

Va. Code § 20-146.26 ....................................................................................................20

Va. Code § 63.2-1200.1 .................................................................................................20

Va. Code § 63.2-1216 ....................................................................................................19

**Other Authorities**

7 Am. Jur. 2d Attorneys at Law § 235 ..........................................................................41

32A Am. Jur. 2d Federal Courts § 650 ..........................................................................21

Athayi, Abdullah, *Report on Citizenship Law: Afghanistan*, Robert Schuman
    Centre for Advanced Studies, European University Institute (March 2017)...........22

Hearing and Oral Decision, *Baby L v. Esper* 3:20-cv-00009, July 2, 2020.................42

Restatement (Third) of Torts Phys & Emot. Harm, § 42 (2012) ............................46, 47

United Nations High Commission for Refugees, Law on Citizenship of the
    Islamic Emirate of Afghanistan (English Translation), Article 12 (June 24,
    2000) ......................................................................................................................22

# I       INTRODUCTION

Defendants' motions to dismiss[1] suffer from a host of infirmities. Rather than addressing the detailed factual allegations set forth in the Amended Complaint – as required by Fed. R. Civ. P. 12(b)(6) – Defendants proffer their preferred version of the facts, apparently forgetting that now is not the time to assert them. The motions also founder on well-settled legal principles of jurisdiction (both subject matter and personal) and abstention. And they misconstrue Virginia law regarding the five counts asserted in the Amended Complaint.

*First*, it is impossible to reconcile Defendants' incomplete and twisted renditions of the Amended Complaint's well-pleaded allegations with their actual content, which fills 153 paragraphs and 35 pages. But it is not just their quantity that matters. More importantly, they comprise a robust bill of particulars that describes in extensive detail a multifaceted conspiracy – spanning nearly two years – with the singular purpose of enabling Joshua and Stephanie Mast to kidnap Baby Doe, in contravention of the laws of the United States, Afghanistan, and Virginia.

*Second*, Defendants were unable to resist the urge to put forward what they regard the truth to be. Defendants Joshua and Stephanie Mast and Richard Mast, in particular, present an alternate – and inaccurate – version of events, citing to documents, transcripts and other materials outside the Amended Complaint. Joshua and Stephanie Mast even go so far as to rely on the allegations they made in ***their*** Complaint and Petition for Temporary Restraining Order (the "TRO Petition"), which they filed in this Court on February 26, 2020 and the allegations that this Court deemed insufficient to stop the reunification of Baby Doe with her Afghan family. While the Masts assert

---

[1] *See* Joshua and Stephanie Mast's Motion to Dismiss (ECF Nos. 85, 86) ("J&S Mast Br."); Richard Mast's Motion to Dismiss (ECF No. 88) ("R. Mast Br."); Kimberley Motley's Motion to Dismiss (ECF Nos. 90, 91) ("K. Motley Br."); Ahmad Osmani's Motion to Dismiss (ECF No. 92) ("A. Osmani Br.").

that their TRO Petition was "explicitly incorporated into the [Amended Complaint] by reference" in Paragraphs 62-65, J&S Mast Br. at n. 3, no one familiar with the English language could possibly interpret those paragraphs as *endorsing* the allegations of the Masts' TRO Petition. Instead, all they do is highlight the Masts' unsuccessful efforts, in furtherance of their conspiracy, to trick this Court into interfering with the U.S. government's sovereign and exclusive exercise of its foreign policy authority.

*Third*, as set forth more fully below, the domestic relations exception to diversity jurisdiction does not "fit" this case – and, even if it did, that exception has no application in cases (such as this one) that also rely on federal question jurisdiction.

As for abstention doctrines, neither *Burford* nor *Colorado River* applies here. The Defendants' abstention arguments fall far short of overcoming the strong presumption in favor of a federal court hearing a case in which its subject matter jurisdiction is properly invoked.

Defendants Motley and Osmani assert that they are not subject to personal jurisdiction in a court sitting in Virginia. But that defense is doomed by their participation with the Masts in a conspiracy in which a substantial portion of the overt acts took place in Virginia.

*Finally*, Defendants' challenges to the legal sufficiency of the Amended Complaint's five counts fall flat. All five torts are viable in Virginia and supported by the allegations of the Amended Complaint. The cases Defendants cite are inapposite to the facts that support each count.

Accordingly, Defendants' motions to dismiss should be denied.

## II    ARGUMENT

### A.    Defendants' 12(b)(1) Arguments Should Be Rejected.

Federal courts ordinarily have an "'unflagging obligation to exercise their jurisdiction.'" *MLC Automotive, LLC v. Town of Southern Pines,* 532 F.3d 252, 280 (2008) (quoting *Deakins v. Monaghan*, 383 U.S. 193, 203 (1988)). As a result, abstention is "the exception, not the rule." *Id*.

(quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989)) Indeed, "abnegation of federal jurisdiction is a serious measure to be taken only under 'extraordinary and narrow' circumstances[.]" *Town of Nags Head v. Toloczko*, 728 F.3d 391, 393 (4th Cir. 2013) (quoting *Martin v. Steward*, 499 F.3d 360, 370 (4th Cir. 2007)).

Despite this strong judicial policy against abstention, Defendants urge the Court to abstain from hearing this case under either the domestic relations exception, the *Burford* abstention doctrine, or the *Colorado River* abstention doctrine. None of them applies here.

### 1.   The Domestic Relations Exception Does Not Apply.

Defendants' reliance on the domestic relations exception to federal jurisdiction should be rejected for at least two reasons:[2] (1) the domestic relations exception applies only to cases seeking a determination of divorce, alimony or child custody, which this case does not do, and (2) the exception does not apply in cases with federal question jurisdiction.

a.   *The domestic relations exception does not apply because Plaintiffs do not seek a determination on the entitlement to a divorce, alimony or child custody.*

"[T]he domestic relations exception encompasses only cases involving the issuance of a divorce, alimony, or child custody decree." *Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992). Federal courts "lack power to issue these types of decrees because of the special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of such decrees." *Id*.

Cases that do not seek such relief do not fall within the domestic relations exception. *Raftery v. Scott* is instructive. 756 F.2d 335 (4th Cir. 1985). There, the Fourth Circuit rejected

---

[2] Defendants Joshua Mast, Stephanie Mast, Richard Mast, and Ahmad Osmani raise arguments relating to the domestic relations exception.

application of the domestic relations exception when a father sued the mother of their child for intentional infliction of emotional distress after she deprived him of contact with the child for several years. *Id*. at 337. The case was tried to a jury, who found in the father's favor and awarded damages. *Id*. On appeal, the mother argued that the lawsuit should have been dismissed under the domestic relations exception. The Fourth Circuit disagreed, explaining:

> [T]he suit concerns not the establishment and implementation of visitation rights but, rather, seeks an award of damages precisely because of acts by the former wife to frustrate whatever domestic relations aspects remained of her relationship with her former husband. If someone who had never been married to Raftery, a family member such as an aunt, a cousin or a grandparent or even a nonrelative such as a child nurse or babysitter, had set about destroying the relationship between the father and his son, any cause of action arising out of such behavior would not be foreclosed from a hearing in federal court because it partook of some intra-family aspects.

*Id*. at 337-38. As the Court concluded, "[a] decision by a federal court not requiring the adjustment of family status or establishing familial duties or determining the existence of a breach of such duties, does not contravene the domestic relations exception to federal diversity jurisdiction." *Id*. at 338 (citation omitted); *see also Wasserman v. Wasserman*, 671 F.2d 832, 834-35 (4th Cir. 1982) ("[T]he torts of child enticement and intentional infliction of emotional distress are in no way dependent on a present or prior family relationship . . . . Most importantly, appellant is not seeking a determination of entitlement to custody or any other adjustment of family status . . . .").

The same reasoning applies here. Defendants – who were strangers to Baby Doe, not even her family members "such as an aunt, a cousin or a grandparent" and not "even a nonrelative such as a child nurse or babysitter" – "set about destroying the relationship between" John and Jane Doe and Baby Doe. *See id*. at 337. Moreover, Plaintiffs do not ask this Court to "adjust family status," "establish familial duties," or establish that Defendants "breached such duties." *See id*. at 338. Plaintiffs ask primarily for an award of damages for Defendants' tortious acts of interfering with

4

the Does' parental rights, fraud, intentional infliction of emotional distress, conspiracy, and false imprisonment.

Defendants' argument is rooted in their false assertions that "[t]he Does ask the Court to grant them custody of Baby Doe" and "an unwinding of the Adoption Order and a grant of custody in their favor." J&S Mast Br. (ECF No. 86) at 13, 15. Tellingly, Defendants offer no citations to the Amended Complaint supporting these assertions – because nowhere in the Amended Complaint do the Does make such requests. Rather, as noted, the Amended Complaint primarily seeks damages for Defendants' various torts. *See* Am. Compl. (ECF No. 68) at p. 45. While the Does also seek a declaratory judgment – primarily regarding the effect of the foreign-policy decision of the United States Government to recognize Baby Doe as an Afghan citizen, recognize Afghanistan's jurisdiction over her, and transfer her physical custody to the Afghan government for family reunification – nowhere do the Does ask for a declaration voiding the Adoption Order.[3]

Similarly, Defendants contend that "each" of the Does' tort claims "is premised on the alleged invalidity of the Virginia Adoption Order." J&S Mast Br. at 14. Not so. The Does' claims of fraud, conspiracy, intentional infliction of emotional distress and false imprisonment stand even if the Adoption Order were not void. Most notably, the Does' fraud claim does not require that the Does show that Defendants defrauded ***the Virginia circuit court*** (though Defendants surely did); it requires the Does to show that Defendants defrauded ***them***. As the Amended Complaint explains,

---

[3] *See* Am. Compl. at pp. 44-45. In a brief footnote, Defendants Joshua and Stephanie Mast assert that the Court should dismiss Plaintiffs' request for declaratory relief because "these declarations can have no legal effect without further proceedings[.]" J&S Mast Br. at n. 9. But the declaratory judgment Plaintiffs seek is directly tied to Count I of Plaintiffs' Amended Complaint, which asserts tortious interference with parental rights and requires Plaintiffs to establish that they "ha[ve] a right to establish or maintain a parental or custodial relationship with" Baby Doe. *Wyatt v. McDermott*, 283 Va. 685, 699 (2012). The declaratory relief that Plaintiffs seek goes directly to that element of the claim: that Plaintiffs had a right to maintain a parental or custodial relationship with Baby Doe.

the fraud claim is based on "Joshua and Stephanie Mast and Kimberly Motley intentionally ma[king] misleading and false statements and/or material omissions to John and Jane Doe to perpetrate the abduction of Baby Doe." Am. Compl. at ¶ 162; *see also e.g. id*. at ¶ 163 ("Joshua and Stephanie Mast engaged the services of Motley, who acted as their agent, to, *inter alia,* contact John and Jane Doe and lure them into facilitating Baby Doe's travel to the United States, purportedly for the sole purpose of obtaining medical treatment for her, through false and misleading statements and material omissions."); ¶ 165 ("John and Jane Doe relied on Motley's misrepresentations, which she made at the direction of Joshua and Stephanie Mast, when they communicated with her, sent her photographs of Baby Doe, and agreed to travel to the United States for the purpose of obtaining medical treatment for Baby Doe."); ¶ 167 ("It was as a direct result of John and Jane Doe's reliance on Joshua and Stephanie Mast's prevarications, made through Motley, that Joshua and Stephanie Mast were able to lure Plaintiffs to the United States and unlawfully obtain physical custody of Baby Doe."); ¶ 173 ("As a result of repeated material misrepresentations by the Masts and Motley, John and Jane Doe and Baby Doe traveled to the United States and subjected themselves to the controlled environment of a military base that Joshua Mast manipulated to his advantage to abduct Baby Doe in broad daylight."); ¶ 174 ("In reliance on the representation that they were only traveling to the United States for two to three months to obtain medical care for Baby Doe, after which they would return with Baby Doe to Afghanistan, John and Jane Doe left their homeland, to which they cannot yet return, and may never be able to return, because of the circumstances surrounding their departure."); ¶ 175 ("Had John and Jane Doe been aware that the purpose of the communications initiated by Joshua and Stephanie Mast and Motley was to facilitate the Masts' abduction of Baby Doe, they never would have

communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.").

Nor do the Does' claims for intentional infliction of emotional distress and false imprisonment require a finding that the Adoption Order is void. *See, e.g. id.* at ¶ 190 ("Since 2019, the conduct of Joshua and Stephanie Mast has shown a consistent pattern of reckless disregard for the very real possibility of causing extreme emotional distress to John and Jane Doe. . . . It is implausible that someone would be unaware of the extreme trauma that would be inflicted on parents when their child is ripped from their arms by someone who had for months been claiming that all he wanted was to help them."); ¶ 192 ("Richard Mast knowingly furthered this scheme through his fraudulent in-court misrepresentations, by procuring the custody and adoption orders for Joshua and Stephanie Mast, and by submitting a deceptive immigration application for John Doe."); ¶ 193 ("Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly facilitated the plan to abduct Baby Doe by misrepresenting their intentions to John and Jane Doe when persuading them to have Baby Doe travel to the United States to obtain medical treatment."); ¶ 198 ("Joshua Mast physically removed Baby Doe from the custody of her lawful guardians without their permission or consent, restricting her movement and confining her to the care of himself and Stephanie Mast"); ¶ 199 ("Since September 3, 2021, Joshua and Stephanie Mast have continued to keep Baby Doe captive, without the permission or consent of her lawful guardians"). And the analysis is the same for the conspiracy count, as it rests at least in part on the fraud count.[4] *See id.* at ¶¶ 180-188.

---

[4] Many of the cases cited by Defendants are inapposite. Some did not directly involve the domestic relations exception at all. *See, e.g.*, *Mansell v. Mansell*, 490 U.S. 581 (1989) (addressing whether military retirement pay that was waived by a former husband in order to receive veterans' disability benefit was community property divisible upon divorce); *Moore v. Sims*, 442 U.S. 415 (1979) (challenging Texas child abuse laws and applying *Younger* abstention doctrine); *Elk Grove Unified*

And as to the Does' claim for tortious interference with parental rights, John and Jane Doe allege that they have parental or custodial rights today to Baby Doe by virtue of the Afghan law that conferred those rights upon them and by virtue of the United States government's recognition of those rights. *See, e.g.*, Am. Compl. at ¶¶ 5, 10, 74, 153. It is only through Defendants' actions that they were deprived of those rights once they arrived in Virginia. "[B]ut for the tortious interference, the [Does] would be able to exercise some measure of control over [their] child's care, rearing, safety, well-being, etc." *Wyatt v. McDermott*, 283 Va. 685, 698 (2012) (quoting *Kessel v. Leavitt*, 204 W. Va. 95, n. 44 (1998)); *see also id.* (comparing the tort of tortious interference with parental rights with that of alienation of affection; the former asserts that "the complaining parent has been deprived of his/her parental or custodial rights", while the latter "connotes only that the parent is not able to enjoy the company of his/her child").

---

*School Dist. v. Newdow*, 542 U.S. 1 (2004) (in suit challenging constitutionality of school district's policy requiring recitation of Pledge of Allegiance, Court found father lacked prudential standing because state court order gave mother sole legal custody; concurrence explained that domestic relations exception did not apply because "[t]his case does not involve diversity jurisdiction, and respondent does not ask this Court to issue a divorce, alimony, or child custody decree") (Rehnquist, J. concurring)). Others did involve the exception, but were clear cases for its application, seeking modifications of child custody and support decrees or arrangements. *See, e.g.*, *Soulsby v. Soulsby*, 2017 WL 2539806 (W.D. Va. June 12, 2017) (plaintiff asked federal court to modify his child support obligation and a child custody arrangement set by a state court decree); *Stratton by and through Stratton v. North Carolina*, 2021 WL 328884 (W.D. N.C. Feb. 1, 2021) (habeas corpus petition to release the petitioner from his guardianship, which was imposed by state court order); *Griessel v. Mobley*, 544 F. Supp. 2d 597 (M.D. N.C. 2008) (claim seeking change in custody arrangement and court-ordered child support). Yet others refused to apply the exception. *See, e.g.*, *Cole v. Cole*, 633 F.2d 1083 (4th Cir. 1980) ("Even though the parties have been marriage partners, where alleged breaches . . . are of a duty which does not arise solely from family relations law, a federal district court may not deny jurisdiction simply on the grounds of the supposed etiology of the emotions underlying either the alleged breach by the defendant or the decision by the plaintiff to bring suit").

b.     *The domestic relations exception does not apply to cases asserting federal question jurisdiction.*

The domestic relations exception also does not apply here because Plaintiffs invoke federal question jurisdiction in addition to diversity jurisdiction. As the Supreme Court explained in *Ankenbrandt v. Richards,* the domestic relations exception "is statutory, not constitutional, in nature, and derives from construction of the diversity jurisdiction statute." 504 U.S. 689, 700-1 (1992). Thus, the exception "is applied only as a judicially implied limitation on the diversity jurisdiction; it has no generally recognized application as a limitation on federal question jurisdiction." *United States v. Johnson,* 114 F.3d 476, 481 (4th Cir.1997).

Defendants cursorily argue that "[t]here is no federal-question jurisdiction here" because "[n]othing in the Does' well-pleaded complaint requires this Court to examine federal law"[5] and they "chose to bring only state-law claims." J&S Mast Br. at 15. But a complaint asserting only state law claims nonetheless can invoke federal question jurisdiction if a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). The analysis "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Lynchburg Range & Training v. Northam*, 455 F. Supp. 3d 238, 242 (W.D. Va. 2020) (Moon, J.) (quoting *Grable & Sons Metal Prod. Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)).

---

[5] Defendants' concession that the Amended Complaint is "well-pleaded" lays bare their assertions (addressed below) that it should be dismissed under Fed. R. Civ. P. 12(b)(6).

9

Each of the *Gunn* elements is met here. First, a federal issue is "necessarily raised" if "it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims[.]" *Franchise Tax Bd. of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 13 (1983). Conversely, "[i]f a plaintiff can establish, without the resolution of an issue of federal law, all of the essential elements of his state law claim, then the claim does not necessarily depend on a question of federal law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 442 (4th Cir. 2005) (citation omitted)).

This Court's decision in *Harper v. Massey Coal Serv.* is illustrative of this point. 2011 WL 322558, *4 (W.D. Va. Feb. 2, 2011). There, the Court held that a federal issue was necessarily raised in a suit asserting only state law claims because the claims turned on the definition of "employer," which required the plaintiff to show that 80% of the persons employed by the defendant were not subject to the Fair Labor Standards Act. *Id*. Similarly, here, a federal issue is a necessary element of Count I for tortious interference with parental rights (as well as the derivative claim for conspiracy in Count III) because the declaratory relief that Plaintiffs John and Jane Doe seek – which raises questions under the U.S. Constitution's Supremacy Clause – will establish that they had a right to maintain a parental or custodial relationship with Baby Doe.

Second, it is obvious that the issue of whether John and Jane Doe have parental rights is "actually disputed." *Gunn*, 568 U.S. at 258. The gravamen of Plaintiffs' Amended Complaint is that Defendants interfered with the Does' parental rights.

Third, to show that the federal issue is "substantial," courts look to the "importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260; *see also Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 807 (4th Cir. 1996) (finding that federal question jurisdiction existed in state action that raised disputed federal issue of whether the defendant was a part "owner" as

defined by the Clean Air Act); *see also NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1023-24 (2d Cir. 2014) (finding that federal question jurisdiction existed in declaratory judgment action involving state claims that raised issues relating to federal securities litigation). The Supremacy Clause,[6] of course, is of critical importance to the federal system as a whole. *See, e.g.*, *Independent Living Center of Southern California v. Kent*, 909 F.3d 272, 279 (9th Cir. 2018) (finding federal question jurisdiction in case asserting only state law claims in part because "the role of the Supremacy Clause in this case invoked the essence of the 'federal-state balance'" (citation omitted)); *Sauk-Suiattle Indian Tribe v. City of Seattle*, 2021 WL 5200173, *3 (W.D. Wa. Nov. 9, 2021) (finding that federal question jurisdiction existed in case asserting only state law claims because "the Supremacy Clause claim raises a substantial and disputed federal issue sufficient to establish this Court's jurisdiction").

Finally, the issue presented here is "capable of resolution in federal court without disrupting the federal-state balance ***approved by Congress***." *Gunn*, 568 U.S. at 258 (emphasis added). There is no question that domestic relations is one area in which states have special responsibilities, as recognized by the domestic relations exception. But, not only does that exception not apply here (as explained above), but the domestic relations exception is ***judge made***; it is not "approved by Congress." *See, e.g.*, *Loubser v. Thacker*, 440 F.3d 439, 440 (7th Cir. 2006) (describing the domestic relations exception as a "judge-made doctrine").

---

[6] The Supremacy Clause of the U.S. Constitution declares that: "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . , any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const., art VI, cl. 2. The clause is designed to ensure that states do not "retard, impede, burden, or in any manner control" the execution of federal law. *McCulloch v. Maryland*, 17 Y.S. (4 Wheat.) 316, 436 (1819).

Accordingly, federal question jurisdiction exists, and the domestic relations exception does not apply. All of Defendants' arguments regarding the domestic relations exception should be rejected.

**2.     Neither *Burford* Abstention nor *Colorado River* Abstention Apply.**

a.     *Burford Abstention*

The *Burford* abstention doctrine allows a court only "rarely" to refrain from exercising jurisdiction.[7] *Stogsdill v. Azar*, 765 Fed. App'x 783 (4th Cir. 2019) (citing *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007)). *Burford* abstention is allowed only "when an adjudication may undermine the 'independence of state action' on issues that are local and important to a state's sovereignty." *Town of Nags Head*, 728 F.3d at 395 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996)). Specifically, it is allowed only "(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Martin*, 499 F.3d at 363 (quoting *New Orleans Pub. Serv., Inc*, 491 U.S. at 361 (internal quotations omitted)).

Defendants argue that the Court should abstain under *Burford* "because adoption is a core state power, and this proceeding would intrude on the Circuit Court's proceeding." J&S Mast Br. at 17, 18 (citing *Johnson*, 199 F.3d at 723, for the proposition that the "Fourth Circuit has endorsed abstaining under *Burford* in cases where the regulation "lies at the heart of the state's police

---

[7] Defendants Joshua Mast, Stephanie Mast, Richard Mast, and Ahmad Osmani raise *Burford* abstention arguments.

12

power"). Defendants even go so far as to assert that "the Does seek a determination on child custody here." *Id*. at 17.

Not so. Nowhere does the Amended Complaint ask this Court to decide child custody. Moreover, Plaintiffs are not challenging Virginia's rules and procedures governing adoption. Rather, as it relates to Baby Doe's adoption, Plaintiffs argue that a decision by the United States government in its exercise of its exclusive authority over foreign affairs – to accede to a request by a foreign government to recognize a child as a citizen of that foreign country and to transfer her physical custody to individuals that foreign government deemed her legal guardians under that country's laws – cannot be contravened by a decision of any state court (whether in Virginia or in any other state). This is not a question of state law – it is a question of federal law, pursuant to the Supremacy Clause.

*Martin v. Stewart* is instructive. 499 F.3d 360 (4th Cir. 2007). There, the Fourth Circuit reversed the district court's decision to abstain under *Burford* in a case asserting federal constitutional challenges to two South Carolina statutes regulating video poker. As the Court explained, the claims "present no difficult questions of state law whose importance outweighs the federal interest in adjudicating Martin's constitutional case. Nor do these claims threaten a state interest in uniform regulation that outweighs the federal interest in adjudicating the case." *Id*. at 366.

Similarly, in *Town of Nags Head*, the Fourth Circuit reversed a district court's decision to abstain under *Burford* because "[w]hile the claims asserted here do involve a sensitive area of North Carolina public policy, resolving them is not sufficiently difficult or disruptive of that policy to free the district court form its 'unflagging obligation to exercise its jurisdiction.'" 728 F.3d at 393 (quoting *In re Mercury Constr. Corp.*, 656 F.2d 933, 943 (4th Cir. 1981) (internal quotation

marks omitted)).  The case concerned a town's authority to enforce the "public trust doctrine," which the state court of appeals previously declared was held only by the State; thus, "[i]n light of this clear statement of North Carolina law, the instant counterclaims neither present "difficult questions of state law' . . . nor 'disrupt [] . . . state efforts to establish a coherent policy" relating to state law. *Id*. (quoting *NOPSI*, 491 U.S. at 361).  "Nor would deciding this case in federal court disrupt 'state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Id*. at 397 (quoting *NOPSI*, 491 U.S. at 36).

The same analysis applies here. While the case involves adoption, it does not raise difficult issues of state law. The only state law issues it raises relate to established torts long recognized under Virginia law. It also raises an issue of federal law regarding the role of the Supremacy Clause in decisions regarding foreign affairs. It does not "threaten a state interest in uniform regulation."[8] *Martin*, 499 F.3d at 365-66.

For the same reason, *Johnson v. Collins Entertainment Co.*, cited by Defendants, is inapposite, as it concerned a challenge by habitual gamblers to a state's regulatory scheme regarding gambling. 199 F.3d 710, 723 (4th Cir. 1999). There, the Fourth Circuit held that the district court should have abstained under *Burford* because "[t]he regulation of gambling enterprises lies at the heart of the state's police power" and the case "attempt[ed] to answer disputed questions of state gaming law[.]" *Id*. at 720. Here, on the other hand, Plaintiffs do not

---

[8] Nor does this case involve any sort of traditional balance of responsibilities between state and federal courts. The Commonwealth of Virginia has no special interest in, nor do its courts have any special expertise regarding, the treatment of orphans found on a wartime battlefield. That is a question of international law, and a quintessential matter of foreign policy. The Constitution vests exclusive control over foreign affairs in the federal government, not any state court in Virginia or any other State.

14

challenge Virginia's system of adoption and there are no disputed questions of state law regarding adoption.

Defendants also argue that *Minot v. Eckardt-Minot*, 13 F.3d 590 (2d Cir. 1994) is "similar to this" case. J&S Mast Br. at 18. But, there, a father sued his child's mother in New York state court, seeking tort damages for the mother's alleged violations of the father's New York state court child custody orders and "recovery on theories akin to what has been called a 'tort of custodial interference.'" *Id*. at 594. The mother removed the case to federal court. The Court considered the case a "paradigmatic example of a case presenting 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the results in the case . . . at bar" because New York had not yet recognized such claims. *Id*. (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). "The recognition and delineation of such a tort is clearly a difficult matter of great public import for New York law" and "[a] state court should lead the way in developing its law in this area[.]" *Id*. at 594.

No such "difficult questions of state law" arise here. Virginia has long recognized the torts asserted by Plaintiffs, including the tort of tortious interference with parental rights since at least 2012. *See Wyatt v. McDermott*, 283 Va. 685 (2012). None of the factors supporting *Burford* abstention exist, and the Court should reject Defendants' argument.[9]

    b. *Colorado River Abstention*

*Colorado River* abstention is permitted only for "a *duplicative* federal action when '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive

---

[9] Finally, while abstention clearly is not appropriate here, dismissal of Plaintiffs' Amended Complaint would be inappropriate even if it were. The Supreme Court has held that a federal court may not dismiss an action on *Burford* grounds where the plaintiff seeks damages; rather, it may only stay the proceedings to await the conclusion of the state court proceeding. *Quackenbush*, 517 U.S. at 728-31.

disposition of litigation,' clearly favors abstention."[10] *Historic Green Springs, Inc. v. U.S. E.P.A.*, 742 F. Supp. 2d 837, 846 (W.D. Va. 2010) (Moon, J.) (quoting *Chase Brexton Health Servs., Inc. v. Maryland¸* 411 F.3d 457, 463 (4th Cir. 2005) (emphasis in original)). The circumstances in which a federal court may refrain from exercising jurisdiction to avoid duplicative state court litigation "are considerably more limited than the circumstances appropriate for [other types of] abstention." *Colo. River*, 424 U.S. at 814-18. The *Colorado River* abstention doctrine must be "applied parsimoniously," and courts must "remain mindful that this form of abstention is an extraordinary and narrow exception to the duty of a district court to adjudicate a controversy properly before it." *Chase Brexton Health Servs., Inc.*, 411 F.3d at 463. A court should abstain only "where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Historic Green Springs*, 742 F. Supp. 2d at 846 (quoting *Great Am. Ins. Co. v. Gross¸* 468 F.3d 199, 207 (4th Cir. 2006) (citation omitted)).

"The threshold question in deciding whether *Colorado River* abstention is appropriate is whether there are parallel suits." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 232 (4th Cir. 2000). ***Only*** if a duplicative state court action exists must the Court then consider a six-factor test for *Colorado River* abstention. *Vulcan Chem. Techs., Inc. v. Barker*, 297 F.3d 332, 341 (4th Cir. 2002) ("The court must first make a determination of whether a parallel state court action exists. If not, the court may not abstain."). Moreover, "it would be a serious abuse of discretion" for a court to stay or dismiss an action under *Colorado River* "[i]f there is any substantial doubt as to" whether the "parallel state-court litigation will be an adequate vehicle for the complete and

---

[10] Defendants Joshua Mast, Stephanie Mast, Richard Mast, and Ahmad Osmani raise *Colorado River* abstention arguments.

prompt resolution of the issues between the parties." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983)).

Here, the Court need not entertain the six-factor test for abstention because there is no duplicative, parallel state court proceeding. Suits are considered parallel for *Colorado River* purposes "if substantially the same parties litigate substantially the same issues in different forums." *Al-Abood*, 217 F.3d at 232 (quoting *New Beckley Min. Corp. v. Int'l Union, United Mine Workers of Am.*, 946 F.2d 1072, 1073 (4th Cir. 1991)). Cases will not be considered parallel if they "involve different issues with different requisites of proof" or "seek different remedies." *Gannett Co. v. Clark Const. Group, Inc.*, 286 F.3d 737, 742-743 (4th Cir. 2002). *Colorado River* "does not give federal courts *carte blanche* to decline to hear cases within their jurisdiction merely because issues or factual disputes in those cases may be addressed in past or pending proceedings before state tribunals." *New Beckley Mining Corp.*, 946 F.2d at 1073 (quoting *United States v. SCM Corp.*, 615 F. Supp. 411, 417 (D. Md. 1985)).

In *Gannett*, the Fourth Circuit refused to abstain under *Colorado River* in part because the state and federal proceedings at issue pursued different claims and different remedies: the state court action sought a lien and foreclosure on property while the federal court action sought compensatory damages for breach of contract. 286 F.3d at 743. "Because the issues and the sought-after relief in the [federal action and the state action] are not substantially the same, the actions are not parallel proceedings." *Id*. (citing *Al-Abood*, 217 F.3d at 232-33). Similarly, in *Al-Abood*, the Court refused to abstain under *Colorado River* because, even though the parties in the federal and state proceedings were "substantially the same, the issues [were] not." *Al-Abood*, 217 F.3d at 232. While the "two proceedings ha[d] certain facts and arguments in common, the legal issues [were] not substantially the same." *Id*. at 233. *See also Rogers v. Dow Agrosciences, LLC*, 2006 WL

17

2975725 (W.D. Va. Oct. 16, 2006) (rejecting *Colorado River* abstention even though the parties were substantially the same and "the cases will likely overlap in considering the same witnesses, the same documents . . . , the same evidence, and consideration of the same facts" because the remedies and requisites of proof were different).

Here, there are significant differences between this action and the state court proceeding. There are different parties, different claims, and different requisites of proof. The state court proceeding was filed by John and Jane Doe only against Joshua and Stephanie Mast and seeks only vacatur of the Adoption Order. This federal court action, on the other hand was filed by John and Jane Doe, and on behalf of Baby Doe, against Joshua and Stephanie Mast, Richard Mast, Kimberley Motley, and Ahmad Osmani, asserting claims not raised in the state action: tortious interference with parental rights, fraud, conspiracy, intentional infliction of emotional distress and false imprisonment. In addition, the United States is represented by the nominal defendants as a necessary party to this federal court action; the Circuit Court denied the United States' motion to intervene in the state court proceeding. While there is a pending state court proceeding with some overlap in facts and parties, it is not duplicative. *See also Colo. River*, 426 U.S. at 816 ( "the mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction").

Because the federal and state court actions are not parallel for purposes of *Colorado River* abstention, the Court need not consider the six-factor test for abstention under that doctrine. But, even if it did, abstention would be inappropriate. As this Court has explained, if parallel proceedings exist in state and federal court, the Court will consider the following factors in deciding whether to abstain:

> (1) whether the subject matter of the litigation involves property
> where the first court may assume *in rem* jurisdiction to the exclusion

> of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights.

*Historic Green Springs, Inc. v. U.S. E.P.A.*, 742 F. Supp. 2d at 847 (quoting *Chase Brexton*, 411 F.3d at 463-64).

As Defendants concede, the first and second factors are either inapplicable or do not weigh in favor or against abstention. J&S Mast Br. at 20. Defendants argue that the third factor weighs in favor of abstention because "[t]he issues in the Circuit Court are identical to the issues in this case[.]" *Id.* Not so – the key issues in the Circuit Court include whether Virginia Code § 63.2-1216 shields the unlawful adoption order and whether Defendants Joshua and Stephanie Mast committed fraud on that court. The issues here, on the other hand, include whether Joshua and Stephanie Mast defrauded John and Jane Doe, interfered with their parental rights, conspired with three other defendants in doing so, and falsely imprisoned Baby Doe. Stated more simply, the issues in the Circuit Court relate to whether the final adoption order was void at the time it was entered, while the issues here relate to the conspirators' concurrent and subsequent actions using that order to harm Plaintiffs.

The fourth factor is inapposite because, while the state court proceeding preceded the filing of this litigation, the proceedings address different issues with different parties. Nor does the fifth factor favor abstention because (as explained above) federal law is critical to resolution of this litigation. Finally, the sixth factor does not favor abstention because the state court action cannot provide Plaintiffs the damages they seek here.

Accordingly, the Court should reject Defendants' request to abstain based on *Colorado River*. Its application is inappropriate because the state court proceeding does not parallel this proceeding, and because the six-factor test does not favor abstention.

### 3. Plaintiffs John and Jane Doe Were Not Required to Register a Foreign Order to Obtain Standing.

Defendant Richard Mast argues that Plaintiffs lack standing because they have not registered a foreign custody or adoption order, citing Va. Code §§ 20-146.26 and 63.2-1200.1. But neither statute ***requires*** the registration of such an order for a party with a parental or custodial relationship to sue for tortious interference with parental rights, *see Wyatt*, 283 Va. at 699 (tort allows parties who had "a right to establish or maintain a parental or custodial relationship with" a child to recover against those who "intentionally interfered with" that relationship), or to sue for any of the other torts alleged by Plaintiffs. Nor does Richard Mast identify any other authority purportedly requiring the registration of such an order.[11] Accordingly, his argument must be rejected.[12]

---

[11] In effect, Richard Mast asks this Court to dismiss Plaintiffs' suit because Plaintiffs failed to take the time to obtain a foreign custody or adoption order while they were in the process of ***fleeing*** Afghanistan ***during the collapse of its government*** – when they had no reason to expect that they would ever need such an order because they did not know that the Masts were conspiring to steal their child once they arrived in the United States. In other words, Richard Mast asks the Court to reward Defendants for their duplicity. It is no wonder that no other Defendant advances this argument.

[12] Richard Mast further argues that the Circuit Court "held that the Does did not present evidence that they were Baby Doe's biological family or legal guardians under Afghan law, and that they had not established any fraud on the Circuit Court or by the Masts to the Does." R. Mast Br. at 8. This misrepresents the Circuit Court's ruling; in fact, the Circuit Court reached the exact opposite conclusions. *See* Exhibit 1 at 21, 31.

### 4.      Complete Diversity Exists.

Defendant Richard Mast argues that diversity jurisdiction is lacking because Baby Doe purportedly is domiciled in North Carolina.[13] But Baby Doe's presence in North Carolina does not divest this Court of diversity jurisdiction.[14] And, even if it did, the Court has federal question jurisdiction.

The domicile of a child is determined by their place of birth. 32A Am. Jur. 2d Federal Courts § 650. "Upon the death of both parents, the minor child retains the domicile of the last surviving parent until that domicile is properly changed." *Id*. In the case of an orphan, the child's domicile may be changed by those standing in the place of parents. § 2:353 Citizenship of children, 1 Cyc. of Federal Proc. § 2:353 (3d ed.) ("Traditionally, the state citizenship of a child is that of its father, if living with the child and not emancipated, or of the mother, if illegitimate, or if custody has been awarded by a divorce decree, or of grandparents ***or other persons standing in place of the parents*** where both are dead" (emphasis added)) (citing *Delaware, L. & W.R. Co. v. Petrowsky*, 250 F. 554 (2d Cir. 1918); *Lamar v. Micou*, 114 U.S. 218 (1885)). If parental responsibility has been held by multiple parties in succession, whether the child's citizenship follows the current parties purporting to stand in the place of parents turns on whether such responsibility was knowingly and intentionally delegated by the former guardian. *Petrowsky*, 250 F. at 559 ("If in most instances the father can change the infant's domicile, there must be instances when he cannot, although perhaps another may. And if the child's domicile of origin can be changed by the act of

---

[13] Only Defendant Richard Mast argues that there is a lack of complete diversity.

[14] If accepted, Richard Masts' argument would mean that there could never be federal diversity jurisdiction over any case asserting claims on behalf of an abducted child, so long as the child remained in the custody of the abductors and thus within the same state. Such claims could only be brought once the child was returned to her proper (and diverse) guardians. Congress surely did not intend to exclude diversity claims against successful kidnappers, but allow diversity claims against those whose abductions had been foiled.

one on whom the child is dependent, it would seem that if the parents relinquish to another the care, custody, and control of the child during his minority the one who assumes the custody and control and agrees to care for and maintain him to the same extent as his parents would have a right to change his domicile.").

Moreover, to be a citizen of a state for diversity purposes, "a person must be both a citizen *of the United States* and a domiciliary of that State." *Gilmore v. Jones*, 370 F. Supp. 3d 630, 646 (W.D. Va. 2019) (Moon, J.) (quoting *Johnson v. Advance Am.*, 549 F.3d 932, 937 n.2 (4th Cir. 2008) (emphasis added)).

Baby Doe is properly considered an Afghan citizen. *See* Am. Compl. at ¶¶ 11, 22, 32-34. She was found in Afghanistan after her parents' death. *Id*. at ¶¶ 3, 22. Pursuant to the laws of Afghanistan, an orphan found in Afghanistan whose parentage has not conclusively been proven to be non-Afghan, is an Afghan citizen. *See id*. at ¶ 33.[15] Moreover, Plaintiffs John and Jane Doe stood in the place of Baby Doe's parents in Afghanistan for 18 months immediately before Baby Doe's abduction by Defendants Joshua and Stephanie Mast. Importantly, the Does did not knowingly or willingly relinquish Baby Doe to the care of the Masts; to the contrary, she was (figuratively) ripped from their arms. Indeed, Joshua and Stephanie Mast themselves procured a passport for Baby Doe identifying her as an ***Afghan citizen***. Am. Compl. at ¶ 130. Thus, Baby Doe retains her Afghan domicile/citizenship for diversity purposes.

---

[15] *See also* United Nations High Commission for Refugees, Law on Citizenship of the Islamic Emirate of Afghanistan (English Translation), Article 12 (June 24, 2000), available at http://www.refworld.org/pdfid/404c988d4.pdf; *see also* Athayi, Abdullah, *Report on Citizenship Law: Afghanistan*, Robert Schuman Centre for Advanced Studies, European University Institute (March 2017), at p. 9, available at https://cadmus.eui.eu/bitstream/handle/1814/45933/GLOBALCIT CR 2017_09. pdf.

John and Jane Doe – Afghan citizens themselves – cared for Baby Doe as their child for 18 months in Afghanistan. *Id*. at ¶¶ 10, 74, 125. Moreover, no one claiming custodial or parental rights to Baby Doe is a citizen of North Carolina – Plaintiffs alleged that Defendants Joshua and Stephanie Mast are domiciled in Virginia, *id*. at ¶ 13, which they do not dispute. Nor has Baby Doe regularly resided in Virginia; her only connection to Virginia is through her abductors, Defendants Joshua and Stephanie Mast. She is a citizen of Afghanistan. *Id*. at ¶ 11.

### B.      Defendants Motley and Osmani's 12(b)(2) Arguments Should Be Rejected.

For a court to "assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: "(1) the exercise of jurisdiction must be authorized under the state's long-arm statute, and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Gilmore v. Jones*, 370 F. Supp. 3d at 650-51 (citing *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003)). State and federal courts have construed Virginia's long-arm statute as extending personal jurisdiction over nonresident defendants to the "full extent" permitted by Fourteenth Amendment. *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009) (citing *Peninsula Cruise, Inc.* v. *New River Yacht Sales, Inc.*, 257 Va. 315 (1999); *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002)). Accordingly, in Virginia, the two-prong test collapses into a single inquiry. *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 301 (4th Cir. 2012) (citing *CFA Inst.*, 551 F.3d at 293); *see also UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350-51 (4th Cir. 2020) (internal citation omitted)). A Virginia court thus has jurisdiction over a nonresident defendant if the exercise of such jurisdiction is consonant with the strictures of due process. *Tire Eng'g*, 682 F.3d at 301.

"A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to

23

defend its interests in the state 'does not offend the traditional notions of fair play and substantial justice.'" *Carefirst*, 334 F.3d at 397 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)). The standard for determining personal jurisdiction over a nonresident defendant depends on "whether the defendant's contacts with the forum state also provide the basis for the suit." *Id.* If a defendant's contacts form the basis for the suit, those contacts may establish "specific jurisdiction." *Id*.

To warrant the exercise of specific personal jurisdiction, a "defendant must have purposefully established minimum contacts in the forum State such that [it] should reasonably anticipate being haled into court there." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016). The Fourth Circuit uses "a three-part test to determine whether the exercise of specific personal jurisdiction over a nonresident defendant" comports with due process, examining "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Universal Leather*, 773 F.3d 553, 559 (4th Cir. 2014).

The "purposeful availment" requirement prevents a defendant from being haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts or as a result of the "unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, (1985) (internal citations omitted). Where a defendant has created "continuing obligations" between himself and residents of the forum, he has availed himself of the privilege of conducting business there. *Burger King Corp.*, 471 U.S. at 476 (citing *Travelers Health Assn. v. Virginia*, 339 U.S. at 648). Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. *Burger King Corp.*, 471 U.S. at  476.

In deciding whether it can exercise specific personal jurisdiction over a defendant, "a court must weigh the totality of the facts before it." *Perdue Foods*, 814 F.3d at 189. The court "should not merely . . . count [a defendant's] contacts [with the forum state] and quantitatively compare this case to other preceding cases." *Carefirst*, 334 F.3d at 397. "Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of fair play and substantial justice is not thereby offended." *Id*.

The Fourth Circuit also recognizes a "conspiracy theory of jurisdiction." To succeed on this theory, there must be a plausible claim (1) that a conspiracy existed; (2) that defendants participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia. *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013).[16]

Finally, when a court addresses a motion to dismiss for personal jurisdiction only on the basis of legal memoranda and the allegations of a complaint, "the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989); *see also New Wellington Fin.*

---

[16] Defendant Motley argues that *Walden v. Fiore,* 134 S. Ct. 1115 (2014) abrogated *Unspam Techs.*, but cites to inapposite authority to support this conclusion. Moreover, unless clearly abrogated by a Supreme Court decision, *Unspam Techs.* remains the law of the Fourth Circuit and, thus, is binding on this Court. *See, e.g., United States v. Hill,* 776 F.3d 243, 248 (4th Cir. 2015) ("unless intervening case law" from the Fourth Circuit "sitting en banc or the Supreme Court has explicitly or implicitly overruled" a Fourth Circuit opinion, the opinion continues to control); *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F. 2d 638, 642 (4th Cir. 1975) ("[A] decision [of this Court] is binding, not only upon the district court, but also upon another panel of this court – unless and until it is reconsidered en banc"). Indeed, as Defendants concede, courts within the Fourth Circuit have repeatedly recognized the conspiracy theory of personal jurisdiction since the issuance of Walden. *See, e.g., Coastal Labs., Inc. v. Jolly*, 502 F. Supp. 3d 1003 (D. Md. 2020); *Jien v. Purdue Farms, Inc.*, 2022 WL 2818950 (D. Md. July 19, 2022); *B2Gold Corp. v. Christopher*, 2019 WL 4015890 (E.D. Va. Aug. 26, 2019); *BeoCare Group, Inc. v. Morrissey*, 124 F. Supp. 3d 696 (W.D. N.C. 2015).

*Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). In those circumstances, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *New Wellington Fin. Corp.*, 416 F. 3d at 294 (*citing Combs*, 886 F.2d at 676; *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004)). A court may consider declarations submitted regarding personal jurisdiction, but must continue to "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676.

### 1.    This Court Has Personal Jurisdiction Over Kimberley Motley.

The Does' Amended Complaint alleges facts sufficient to sustain a *prima facie* determination that the Court has specific personal jurisdiction over Motley. They allege that Motley entered into an agreement with Virginia residents to bring an Afghan baby to Virginia so that the Virginia residents could abduct her in Virginia after they obtained an (invalid) Virginia adoption order:

- Virginia residents Joshua Mast and Stephanie Mast contacted Motley in the fall of 2019 to seek her assistance in their efforts to bring Baby Doe to the United States. Am. Compl. at ¶ 76.

- Motley became aware that Virginia residents Joshua and Stephanie Mast obtained custody and adoption orders for Baby Doe, that they wanted to take physical custody of Baby Doe, and that they intended to adopt her. In coordination with Joshua and Stephanie Mast, however, Motley never disclosed the Masts' true intentions to the Does. *Id.* at ¶ 6.

- Motley agreed to help Joshua and Stephanie Mast. *Id.* at ¶ 81.

- Motley intentionally made misleading and false statements and/or material omissions to John and Jane Doe to perpetrate the abduction of Baby Doe. *Id.* at ¶ 162.

- Motley acted on behalf of Joshua and Stephanie Mast when she contacted John and Jane Doe, luring them into facilitating Baby Doe's travel to the United States (specifically, Virginia), through false and misleading statements and material omissions. *Id.* at ¶ 165.

26

- Motley repeatedly lied to the Does to convince them to bring Baby Doe here and concealed the fact that Joshua and Stephanie Mast intended to take Baby Doe away from them once Baby Doe left Afghanistan. *Id.* at ¶¶ 85, 88, 89.

- Motley induced the Does to share photographs of Baby Doe that she then shared with the Masts, without the Does' knowledge or consent. The Masts and Defendant Ahmad Osmani used at least one of these photographs to fraudulently obtain government documentation for Baby Doe. *Id.* at ¶¶ 88, 90, 95, 96.

- Motley received thousands of dollars from Joshua Mast for her critical role in the conspiracy. *Id.* at ¶¶ 87, 88.

Motley established minimum contacts with Virginia through her frequent communications with Virginia-resident Joshua Mast pursuant to her agreement with him, which culminated in the Masts' abduction of Baby Doe after she arrived in Virginia, such that Motley could reasonably expect to be "haled" into a Virginia court. Motley engaged in a consistent pattern of communication with Virginia residents, pursuant to a mutual agreement that involved thousands of dollars in remuneration to Motley, to effectuate an abduction that occurred in Virginia, enabled by (invalid) Virginia court orders. By entering into the conspiracy with the Masts, Motley created "continuing obligations" between herself and the Masts, and availed herself of the privilege of conducting business there. Fair play and substantial justice require that Motley be subject to the jurisdiction of this Court to answer for her pivotal role in this scheme.

While Motley may dispute Plaintiffs' allegations, her factual claims to the contrary are irrelevant to the determination of personal jurisdiction. *See, e.g.*, *New Wellington Fin. Corp.*, 416 F. 3d at 294. At this stage of the litigation, the Court must "draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676. Plaintiffs have alleged that the tortious conduct of taking the child occurred in Virginia, that Ms. Motley worked on behalf of and in close coordination with a resident of Virginia who obtained unlawful court orders from a Virginia court, and that the orders were key elements to executing the child's abduction and several of the torts alleged.

Motley makes two arguments challenging this Court's exercise of personal jurisdiction based on Virginia's long-arm statute. First, she argues that she did not "transact business" in Virginia.[17] Second, she claims that the Virginia long-arm statute requires her physical presence in Virginia while committing any alleged tort against the Does.[18] As set forth above, Virginia's long-arm statute extends personal jurisdiction beyond Motley's strained description of it. *Tire Eng'g*, 682 F.3d at 301. The relevant inquiry is the constitutional question of whether the exercise of jurisdiction comports with the Due Process Clause. As set forth above, this Court's exercise of personal jurisdiction would not offend traditional notions of fair play or substantial justice.

Finally, under *Unspam Techs.*, the Does have alleged sufficient facts for the assertion of personal jurisdiction over a non-resident co-conspirator. Motley's argument that the Does' allegations of conspiracy are "conclusory" or "speculative" are flatly contradicted by the Amended Complaints' detailed allegations. *See* Am. Compl. at ¶¶ 6, 76, 81, 85, 87, 88, 89, 90, 95, 96, 162,

---

[17] The cases Motley cites for this proposition are inapposite. For example, in *Unidyne Corp. v. Aerolineas Argentinas*, 590 F. Supp. 391 (E.D. Va. 1984), no tortious conduct was alleged to have occurred in Virginia, and the court found that correspondence ***negotiating*** the terms of a transaction could not be considered "transacting business." Here, Motley's correspondence with Virginia-resident Joshua Mast ***was*** the business that Motley conducted. She received communications from Joshua Mast to convey to the Does (*i.e.*, false promises of providing medical care with no mention of stealing the child and "adopting her"). Motley then provided updates and photographs to Joshua Mast, as per their agreement. Motley's frequent correspondence with Joshua Mast over numerous channels was a key part of her paid role in convincing the Does to leave Afghanistan with Baby Doe so that Joshua and Stephanie Mast could take her away from them. The Does' claims therefore arise out of her communications with and collaboration with Joshua Mast.

[18] Here, Motley relies on *DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419 (E.D. Va. 1996) and *Alton v. Wang*, 941 F. Supp. 66 (W.D. Va. 1996), two opinions that bear no resemblance to the facts here. In *DeSantis*, an inventor of a gun holster in Virginia sued a seller in Florida for patent infringement, arguing that the Virginia court had personal jurisdiction over the Florida seller because it sold and shipped one gun holster to a buyer in Virginia. Similarly, *Alton* involved no alleged tortious conduct in Virginia. Here, on the other hand, Motley was a key player in a scheme with Virginia residents to induce the Does to bring Baby Doe to the United States for the purpose of enabling the Virginia residents to abduct her in Virginia.

165. Unlike the plaintiffs in *Unspam Techs.*, the Does more than adequately allege the conspiracy and the overt acts that Motley took in furtherance of that conspiracy. Accordingly, this Court has personal jurisdiction over Motley.

### 2.  This Court Has Personal Jurisdiction Over Ahmad Osmani.

Contrary to Osmani's assertions, the conspiracy alleged by the Does between Osmani and the Masts is neither "threadbare" nor "nebulous." Osmani Br. at 7, 9. Far from a perfunctory recitation of legal elements required to establish a civil conspiracy, the Does' detailed allegations lay out Osmani's pivotal role in Defendants' conspiracy to defraud the Does, interfere with their parental relationship by kidnapping their child, and cause them and Baby Doe to suffer serious harm.

The Does have alleged facts sufficient for this Court to assert specific personal jurisdiction over Osmani. As with Motley, Plaintiffs allege that Osmani entered into an agreement with Virginia residents to bring an Afghan baby to Virginia so that the Virginia residents could abduct her in Virginia after they obtained an (invalid) Virginia adoption order:

- After Joshua Mast met Osmani in 2021 through a WhatsApp Bible study group, Osmani offered to help Joshua and Stephanie Mast bring Baby Doe to the United States so that they may raise her as their daughter. Am. Compl. at ¶ 94.

- Joshua Mast forwarded Stephanie Mast's email and the photo she altered to Osmani for him to convey to his contact in the Afghan passport office for the purpose of procuring an Afghan passport for Baby Doe. *Id*. at ¶ 95.

- In March 2021, Osmani assisted Joshua and Stephanie Mast in obtaining the Afghan passport for Baby Doe. Joshua and Stephanie Mast wired more than $1,000 to Osmani, who then wired those funds to his contact for the procurement of the Afghan passport with a fake Americanized name. *Id*. at ¶ 96.

- Osmani knew that Baby Doe was living with her biological family in Afghanistan. In fact, during his first encounter with Osmani and Joshua Mast, John Doe told Osmani and Joshua Mast that John Doe was Baby Doe's cousin. Osmani identified John Doe as the child's cousin in the contact information Osmani stored in his phone for John Doe. *Id*. at ¶ 97.

- Over time and over the course of other telephone conversations and written communications, Osmani helped Joshua and Stephanie Mast foster a relationship of trust with John and Jane Doe. John and Jane Doe trusted Osmani, an Afghan who spoke their native language, when he told them that the Masts were trustworthy people with no ulterior motives who merely wanted to help Baby Doe receive medical care. Osmani reported back to Joshua Mast about these conversations with the Does. Osmani knew that the Masts intended to take Baby Doe from her biological family, and Osmani helped them do so. *Id.* at ¶ 102.

- In the days after Baby Doe's abduction, John and Jane Doe repeatedly asked Osmani to help them find a lawyer or contact public officials for help in getting Baby Doe back. In furtherance of the conspiracy, Osmani warned the Does against seeking legal help, instead advising that they should attempt to resolve the issue only with the Masts; he even advised them that no court would return the child to them because the Masts had more money than them. Osmani's efforts to dissuade the Does from seeking legal recourse occurred at the direction of Joshua Mast, and Osmani reported his conversations back to Joshua Mast. *Id.* at ¶ 144.

- Osmani voluntarily appeared in Virginia to testify on the Masts' behalf in the proceeding filed by John and Jane Doe in the Circuit Court of Fluvanna County to vacate that court's Adoption Order. *Id.* at ¶ 20.

Osmani argues that the Virginia long-arm statute does not reach him and relies in part on a declaration attached to his motion to support this claim.[19] *See* ECF 92-1. The declaration, though, largely ignores the allegations made against Osmani in the Amended Complaint, which assert that he entered into an agreement with Virginia residents to bring an Afghan baby to Virginia so that the Virginia residents could abduct her in Virginia after they obtained an (invalid) Virginia adoption order. Those allegations must be construed in the light most favorable to Plaintiffs. *See, e.g.*, *New Wellington Fin. Corp.*, 416 F. 3d at 294. The only statement in the declaration that directly relates to the allegations of the Amended Complaint ***supports*** a finding of personal jurisdiction: Osmani admits that he traveled to Virginia to testify in a Virginia court in a related

---

[19] Plaintiffs dispute many of the statements made in Osmani's declaration. Among others, they dispute that they have done anything to "intimidate" or "influence" Osmani's testimony. *See* 92-1 at ¶ 8.

matter involving Baby Doe and Joshua and Stephanie Mast, *id.* at ¶ 5, which he did voluntarily. Am. Compl. at ¶ 20.

Ultimately, the relevant inquiry is whether the exercise of jurisdiction over Osmani comports with the Due Process Clause such that this Court's exercise of personal jurisdiction would not offend traditional notions of fair play or substantial justice. Through his knowing and intentional participation in the conspiracy to bring Baby Doe to the United States so the Masts, who are domiciled in Virginia, *id.* at ¶ 13, could raise her as their daughter, *id.* at ¶ 94, Osmani purposefully availed himself of the laws of Virginia through the acts of his co-conspirators that took place in Virginia. Furthermore, Osmani received $1,000 from Virginians Joshua and Stephanie Mast to procure an Afghan passport for Baby Doe on the Masts' behalf, *id.* at ¶¶ 95-96, 130, and benefited from the conspiracy through Joshua and Richard Mast applying for Osmani's relatives to be evacuated from Afghanistan with paperwork stating that they were "family of an Afghan pastor" who was "very instrumental to helping a US Marine…adopt an Afghan Child." *Id.* at ¶ 114. While Plaintiffs do not allege that Osmani entered into a formal contract with the Masts to create ongoing obligations, he has continued to honor his side of this *quid pro quo*, voluntarily testifying in the state court proceedings in further aide of his co-conspirators. *Id.* at ¶ 20.

Osmani was not only aware of the possibility that he could be "haled" into court but contemplated the possibility so seriously that he took pains to dissuade the Does from suing to recover their child. And when the Does finally did secure legal counsel despite Osmani's ministrations, Osmani voluntarily appeared in a Virginia court (numerous times) without a subpoena to testify at the request of Joshua and Stephanie Mast. *Id.* at ¶ 20; *see also* ECF No. 92-1 at ¶ 5. It is disingenuous for Osmani to now argue surprise that another Virginia court could exercise personal jurisdiction over him in a matter related to the same child. Nor can Osmani argue

that the Court's exercise of jurisdiction over him would offend traditional notions of fair play or substantial justice – Osmani had no such complaint when he voluntarily appeared as a witness in support of his co-conspirators, Joshua and Stephanie Mast, in a Virginia state court. It would, however, offend traditional notions of fair play to permit Osmani to now pivot 180 degrees and claim that no Virginia court can exercise jurisdiction over him in a related matter. Furthermore, substantial justice would be served, not frustrated, by exercising personal jurisdiction over Osmani. As the Does allege, Osmani played a key role in the conspiracy hatched by Joshua and Stephanie Mast to tear Baby Doe away from her family.

Accordingly, this Court has personal jurisdiction over Osmani.

### C.    Defendants' 12(b)(6) Arguments Should Be Rejected

A court addressing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) "must consider all facts and reasonable inferences which may be drawn from the face of the plaintiffs' complaint to determine whether all of the required elements of the claim are present." *Martin v. Equity One Consumer Discount Co., Inc.*, 194 F. Supp. 2d 469, 471 (W.D. Va. 2002) (Moon, J.) (citations omitted). As a result, "all factual allegations in the plaintiffs' complaint must be accepted as true," and "should be construed liberally." *Id.* (citations omitted). A complaint may not be dismissed "unless it is apparent that the plaintiffs would not be entitled to relief." *Id.*

### 1.    Count I – Tortious Interference with Parental Rights

Defendants' arguments for the dismissal of John and Jane Doe's claim in Count I for tortious interference with parental rights should be rejected.[20] First, their reliance on *Padula-Wilson v. Landry* is misplaced. *See, e.g.*, J&S Mast Br. at 22. In *Padula-Wilson*, the plaintiff filed

---

[20] Defendants Joshua Mast, Stephanie Mast, Kimberley Motley, and Ahmad Osmani seek dismissal of Count I.

suit following adverse rulings in a standard custody dispute in which she had the opportunity to, and did, participate. 298 Va. 565, 576 (2020). As the *Padula-Wilson* court recognized, the plaintiff in *Wyatt v. McDermott*, 283 Va. 685 (2012), faced a very different situation: he ***did not have the opportunity*** to participate in the state court proceedings that resulted in his child's adoption, but repeatedly was lied to by adoption attorneys and the child's mother about her intention to place the baby for adoption. *Id*. at 576. As a result, a claim for tortious interference with parental rights was considered the *Wyatt* plaintiff's "sole recourse."[21] *Id*. at 576. Unlike Defendants' characterization of the case, *Padula-Wilson* did not turn on the existence of other proceedings, but rather on whether the plaintiff was afforded due process protections in the relevant underlying proceedings. Because she had received those protections in the underlying proceedings, the claim was dismissed.

As in *Wyatt*, Plaintiffs John and Jane Doe had no opportunity to participate in the adoption proceeding of Baby Doe. Am. Compl. at ¶¶ 85, 93. They received no notice of it and, indeed, were unaware of it until nine months after entry of the Adoption Order – ***after*** Joshua and Stephanie Mast abducted Baby Doe. *Id*. at ¶ 139. Indeed, Joshua and Stephanie Mast failed to notify even the United States Government of their custody and adoption proceedings, even though Baby Doe was in the government's physical custody during the first four months of their pendency. *Id*. at ¶¶ 45, 65-66. *Padula-Wilson* offers Defendants no support in a situation like this, where Joshua and

---

[21] Indeed, the "sole recourse" language of *Padula-Wilson* on which Defendants rely was merely the court's description of the clandestine nature of the adoption in *Wyatt* – a description that applies equally here. *See Padula-Wilson*, 298 Va. at 576 ("[U]nlike the facts in Wyatt, where tortious interference with a father's rights was the sole recourse for the wrong done to a father's parental rights, the backdrop of Padula-Wilson's claim is a custody and visitation proceeding. During the course of that proceeding, she was afforded ample due process"). *Cf. Wyatt*, 283 Va. at 693 ("When a parent has been unduly separated from a child by a third party for a substantial period of time without due process of law . . . legitimate harms may be suffered that are properly recoverable in tort").

Stephanie Mast kept other relevant parties in the dark about proceedings in which their interests were directly implicated and, thus, they failed to receive "ample due process." *Padula-Wilson*, 298 Va. at 576.

Defendants' argument that they cannot be liable for tortiously interfering with the Does' parental rights because Joshua and Stephanie Mast purportedly have "equal rights, or substantially equal rights…to establish or maintain a parental or custodial relationship with [the] child" also lacks merit. *See, e.g.*, J&S Mast Br. at 22. When Joshua and Stephanie Mast pursued custody and adoption proceedings, they ***had no right*** to establish or maintain a parental or custodial relationship with Baby Doe – they were complete strangers to her and her Afghan relatives (John and Jane Doe) had become her legal guardians under Afghan law. Am. Compl. at ¶¶ 71-74. Defendants turn the tort of tortious interference with parental rights on its head, asserting that someone who successfully, but unlawfully, obtains parental rights by interfering with another's parental or custodial rights can preclude the other from any recovery. But the tort specifically contemplates that situation, allowing parties who had "a right to establish or maintain a parental or custodial relationship with" a child to recover against those who "intentionally interfered with" that relationship "by removing or detaining" the child "or by otherwise preventing" her guardians "from exercising [their] parental or custodial rights."[22] *Wyatt*, 283 Va. at 699.

Defendants' argument also ignores that Defendants' final acts of interference with the Does' parental or custodial rights occurred not when Defendants Joshua and Stephanie Mast obtained the Adoption Order, but when they lured (with the aid of Richard Mast, Kimberley

---

[22] Defendant Motley also argues that a biological relationship is required for a plaintiff to assert a claim for tortious interference with parental rights. K. Motley Br. at 20. But *Wyatt* explicitly allows such claims to be brought on behalf of individuals with a "parental or custodial relationship" to the child at issue. 283 Va. at 699.

Motley and Ahmad Osmani) John and Jane Doe and Baby Doe to the United States under false pretenses and then abducted Baby Doe. *See, e.g.*, Am. Compl. at ¶¶ 106, 174. This occurred ***after*** Defendants knew that John and Jane Doe had been caring for Baby Doe for 18 months in Afghanistan. *See, e.g.*, *id*. ¶¶ 74, 80, 83-84.). Following the death of her biological parents and until her abduction, the Does were the only "parents" that Baby Doe had, establishing that they had a "parental or custodial relationship" with Baby Doe.[23]  *Wyatt*,  283 Va. at 699.

The Court also should reject Defendants' irrelevant and implausible argument that Count I should be dismissed because Defendant Joshua Mast "had a good faith basis for his actions." J&S Mast Br. at 22. Not only is such an assertion improper in support of a Rule 12(b)(6) motion, *see, e.g.*, *Martin*, 194 F. Supp. 2d at 471 (court must construe all allegations in a complaint in the plaintiff's favor), but the assertion strains credulity. Defendant Joshua Mast is a Virginia-barred attorney and a Judge Advocate in the U.S. Armed Forces who knew (or should have known) that he was required to comply with the laws of the United States, Afghanistan and Virginia with regard to Baby Doe, but did not do so. *See* Am. Compl. at ¶¶ 29-39.

Finally, contrary to their assertions otherwise, the Amended Complaint contains sufficient allegations regarding Defendants Kimberley Motley and Ahmad Osmani's conduct as it relates to Count I. *See* K. Motley Br. at 21; A. Osmani Br. at 12. Plaintiffs allege that Defendant Motley was aware that the Masts' custody order and interlocutory adoption orders were void (Am. Compl. at ¶ 80), that the government of Afghanistan had determined the Does to be Baby Doe's family (*id*. at ¶¶ 80, 82-83), that the Does were standing in the place of parents to Baby Doe (*id*. at ¶ 84), and

---

[23] The recognition in *Wyatt* that someone with a "parental *or* custodial relationship" may assert a claim for tortious interference with parental rights puts to rest Defendant Motley's argument that the claim should be dismissed because John and Jane Doe purportedly were not Baby Doe's "parents." *See* K. Motley Br. at 20-21.

that Motley nonetheless assisted Defendants Joshua and Stephanie Mast in establishing contact with the Does for the purposes of taking Baby Doe from them. *Id.* at ¶¶ 76, 80, 85, 89, 104. Similarly, Plaintiffs allege that Defendant Osmani knew the Masts intended to bring Baby Doe to the United States so that they could raise her as their daughter (*id.* at ¶ 94), used bribery to procure for the Masts an Afghan passport for Baby Doe in a name not her own, to be used to traffic her from Afghanistan to the United States (*id.* at ¶ 96), and nonetheless continuously represented to the Does that the Masts' sole motivation was to help Baby Doe receive medical care. *Id.* at ¶ 102. Plaintiffs further allege that Defendants Osmani and Joshua Mast jointly assured the Does that they wanted them to travel to the United States for only a few months and that they would then be able to re-enter Afghanistan without issue. *Id.* at ¶ 106. The simple and grim truth is that, but for the actions of Defendants Motley and Osmani, the Does would not have traveled to the United States and would not have lost their daughter.

### 2.    Count II – Fraud

Defendants Joshua and Stephanie Mast urge the dismissal of the Does' fraud count on the spurious assertion that fraud claims lie only where "finances or property" are gained by the wrongdoer.[24] J&S Mast Br. at 23. But no such requirement exists. Rather, "if the complaining party can show that he has been put in a worse position, even if that injury is not quantified in terms of dollars, a claim for fraud can be supported." *Rambus, Inc. v Infineon Techs. AG*, 164 F. Supp. 2d 743 (E.D. Va. 2001), *aff'd in part, vacated in part, rev'd in part*, 318 F.3d 1081 (Fed. Cir. 2003) (citing *Community Bank v. Wright*, 221 Va. 172 (1980)).  As the Federal Circuit noted on appeal, "misrepresentations about a party's present *intentions* also may give rise to fraud."

---

[24] Defendants Joshua and Stephanie Mast and Kimberley Motley seek dismissal of the fraud claim, which is asserted only against those defendants.

*Rambus Inc. v. Infineon Techs. Ag*, 318 F.3d 1081, 1096 (Fed. Cir. 2003) (citing *Elliott v. Shore Stop, Inc.*, 238 Va. 237 (1989)) (emphasis added).

Moreover, neither case cited by Defendants for the proposition that fraud claims require an allegation of pecuniary gain actually stands for that proposition. Indeed, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) held that the government **need not** prove financial loss under the False Claims Act. And the court in *Murray v. Hadid* merely noted that "[t]he usual remedy in an action for fraud is to 'restore the defrauded party to the position they held prior to the fraud.'" 238 Va. 722, 731 (1989). Plaintiffs agree with this general statement and, but for the Masts' and Motley's knowing misrepresentations, the Does would not have traveled to the United States, subjected themselves to the controlled environment of a military base selected by Joshua Mast, and placed themselves in a position where Baby Doe could be abducted. *See* Am. Compl. at ¶¶ 133-139. While this Court cannot "restore" the Does to Afghanistan along with Baby Doe, it can compensate John and Jane Doe for Defendants' fraudulent conduct.

Defendant Kimberley Motley also argues that the allegations made against her "fall far short of the type of notice required" for fraud claims. *See* K. Motley Br. at 22. But the Amended Complaint alleges that Defendant Motley was aware of the Masts' intention to adopt Baby Doe (Am. Compl. at ¶ 76), that the Masts had a custody order that she knew to be void because it was dependent on a waiver she knew did not issue (*Id*. at ¶ 80), that the government of Afghanistan had placed Baby Doe with her next of kin (*Id*.), but nonetheless represented the Masts' intentions solely as being to provide medical care for Baby Doe, without disclosing either the Masts' custody order or intention to adopt Baby Doe or that the Masts had attempted to prevent the reunification of the Does and Baby Doe. *Id*. at ¶¶ 85, 89, 104. But for Defendant Motley's material omissions and misrepresentations, the Does would still have Baby Doe. At a minimum, Defendant Motley

misrepresented her and the Masts' intentions and thereby harmed the Does – allegations that are sufficient to state a claim for fraud. *Rambus*, 318 F.3d at 1096. These allegations sufficiently state the time, place, and contents of the fraudulent representations so as to put Defendant Motley on notice as to the basis for the claim of fraud.

### 3. Count III – Conspiracy

#### a. *Plaintiffs plead conspiracy with sufficient particularity.*

Plaintiffs have pleaded sufficient facts to allege conspiracy against the moving Defendants.[25] Conspiracy requires 1) a combination of two or more persons; 2) to accomplish, by some concerted action; 3) some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means; and 4) resultant damage caused by the defendant's acts committed in furtherance of the conspiracy. *Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 249 Va. 39 (1995); *Glass v. Glass*, 228 Va. 39 (1984). Here, Plaintiffs' Amended Complaint alleges that 1) five individuals who, 2) through their combined efforts, committed acts resulting in Baby Doe's abduction by Joshua and Stephanie Mast, by 3) fraudulently inducing the Does to travel to the United States with Baby Doe, scheming to obtain a false passport for Baby Doe, filing false immigration documents for the Does, and fraudulently obtaining the Adoption Order, which 4) caused the Does to be damaged through their separation, including by causing extreme emotional distress. Am. Compl. at ¶¶ 79-90, 94-96, 109, 112, 114, 184-186.

Defendants' contention that Plaintiffs have not pleaded sufficient facts to put them on notice as to the specifics of the conspiracy claim cannot be reconciled with the Amended Complaint's robust recitation of their misdeeds. While allegations of fraud, as made here, are subject to Fed. R. Civ. P. 9(b), the rule serves to put Defendants on sufficient notice, not to preclude

---

[25] All Defendants seek dismissal of the conspiracy count.

Plaintiffs from asserting claims because they do not have knowledge of all the specifics uniquely within Defendants' knowledge or control; a defendant's "knowledge as to the true facts and intent to deceive may be pled generally" so long as the complaint "nonetheless show[s] that the defendants' knowledge and/or intent, where relevant, plausibly entitles the plaintiff to relief." *Terry v. SunTrust Banks, Inc.*, 493 F. App'x 345, 358 (4th Cir. 2012) (quotations and citations omitted).

Plaintiffs allege that all Defendants, in various combinations, with knowledge and through each other's mutual aid, made numerous false representations to Plaintiffs John and Jane Doe, failed to inform them of critical facts, and improperly obtained various documents in furtherance of their scheme. *See, e.g.*, Am. Compl. at ¶ 184 ("Joshua and Stephanie Mast, inter alia, fraudulently induced John and Jane Doe, through their agent Motley, to share photographs of Baby Doe, which they used to unlawfully obtain an Afghan passport for Baby Doe without the knowledge or consent of her biological family and legal guardians. Joshua and Stephanie Mast fraudulently misrepresented their intentions, both directly and through their agent Motley and through Osmani, to John and Jane Doe when persuading them to bring Baby Doe to the United States for the sole purpose of obtaining medical treatment. Joshua and Stephanie Mast abducted Baby Doe and have continued to deprive John and Jane Doe of any contact with her. Joshua and Stephanie Mast procured fraudulently obtained documents to affect her abduction."); *id*. at ¶ 185 ("Richard Mast, inter alia, at the direction of and on behalf of Joshua and Stephanie Mast, fraudulently misrepresented material facts, and made numerous omissions of fact, to multiple courts to unlawfully obtain custody and adoption orders that would facilitate the abduction by Joshua and Stephanie Mast of Baby Doe, as well material misrepresentations to this Court and USCIS in furtherance of the same. He did so in violation of his ethical rules of professional

responsibility as an attorney licensed in the Commonwealth of Virginia. Richard Mast and Joshua and Stephanie Mast knew these statements to be false and the omissions to be material."); *id*. at ¶ 186 ("Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly made false representations to John and Jane Doe when persuading them to have Baby Doe travel to the United States to obtain medical treatment."). That each meeting or conversation between the co-conspirators is not enumerated is irrelevant to whether the complaint "show[s] that the defendants' knowledge and/or intent…plausibly entitles the plaintiff to relief." *Terry v. SunTrust Banks, Inc.*, 493 F. App'x at 358; *see also* Am. Compl. at ¶¶ 104, 106, 118 (Defendants Joshua Mast and Osmani failed to inform John and Jane Doe about the adoption order on numerous occasions); *id*. at ¶¶ 85, 89, 104 (Defendant Motley, with full knowledge that the Masts had void adoption and custody orders, knowingly omitted telling John and Jane Doe that the Masts intended to raise Baby Doe as their own daughter).

Plaintiffs' 202-paragraph Amended Complaint alleges a plethora of facts that sufficiently place Defendants on notice of the conduct they are alleged to have undertaken in furtherance of their scheme to abduct Baby Doe. The Court should reject Defendants' arguments otherwise.

> b. *Richard Mast's status as Joshua and Stephanie Mast's lawyer does not make him immune from liability for conspiracy.*

Acting as Joshua and Stephanie Mast's attorney in furtherance of their conspiracy does not exempt Richard Mast from liability for conspiracy.[26] The fact that he committed numerous acts in furtherance of the conspiracy in a courtroom does not immunize him from liability. The Supreme Court has recognized that "immunity is justified and defined by the *functions* it protects and serves,

---

[26]   Richard Mast was not merely an attorney that the Masts picked out of the phone book to represent them; he is Joshua Mast's brother and, therefore, has entirely personal reasons for assisting in the Masts' scheme.

not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988) (discussing the rationale behind judicial immunity) (emphasis in original).

The cases Richard Mast cites in support of dismissal are inapposite, as they stand for the unremarkable proposition that a principal and agent cannot be found liable for conspiracy. *See, e.g.*, *Perk v. Vector Res. Grp., Ltd.*,[27] 253 Va. 310, 317 (1997); *Michigan Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917 (E.D. Va. 2000). But as other courts have noted, attorneys may be held liable to third-parties upon "a showing of fraud or collusion, or a malicious or tortious act[.]" *Nicoleau v. Brookhaven Mem'l Hosp. Ctr.*, 181 A.D.2d 815, 816 (N.Y. App. Dept. 1992). It is a bedrock principle of our legal system that liability attaches where an attorney commences a suit knowing that there is no cause of action, "dishonestly and with some . . . ill purpose which the law calls malicious[.]" *Stockley v. Harnidge*, 34 Eng. C. L. R. 276; *See also Anderson v. Canaday*, 37 Okla. 697, 700 (1913) (explaining that immunizing attorneys from liability for bringing suits for an improper purpose "would be authorizing those who are the most capable of mischief to commit the grossest wrong and oppression").

Moreover, a client's motives may be ascribed to an attorney. *Robinson v. Volkswagenwerk AG*, 940 F.2d 1369, 1371 (10th Cir. 1991) ("Concerning suits by litigants other than an attorney's own client, the general rule is that: [i]f an attorney is actuated by malicious motives **or shares the illegal motives of his client**, he may be personally liable with the client for damage suffered by a third person as a result of the attorney's actions.") (emphasis added)); *see also* 7 Am. Jur. 2d Attorneys at Law § 235 at 275 (1980 & 1991 Supp.).

---

[27] This case is incorrectly cited in Defendant Richard Mast's Motion. The correct parallel citation is *Perk v. Vector Res. Grp.*, Ltd., 253 Va. 310, 317, 485 S.E.2d 140, 144 (1997).

As set forth in the Amended Complaint, Richard Mast shared Joshua and Stephanie Mast's motives for pursuing the adoption of Baby Doe, even though all of them knew or should have known that no legal basis existed for that adoption. *See, e.g.*, Am. Compl. at ¶¶ 37-39, 92-93. Indeed, this very Court placed Richard Mast on notice that his conduct in pursuing Baby Doe was improper. *See, e.g.*, Hearing and Oral Decision, *Baby L v. Esper* 3:20-cv-00009, July 2, 2020 Hr'ng Tr, at 42:17-22 ("Plaintiffs' counsel[, Richard Mast,] suggested that if only the State Department would, quote, get out of the way, end quote, everything would proceed in an orderly fashion. . . [b]ut it is the role of the State Department and not private litigants or the Court to determine the foreign policy interest of the United States."). The Court issued that ruling after Richard Mast lied when he advised the Court that Joshua and Stephanie Mast did not intend to adopt Baby Doe. Am. Compl. at ¶¶ 65, 69. Richard Mast knew that barely more than three months earlier, he had induced the Fluvanna Circuit Court to enter an interlocutory order of adoption, and that on behalf of Joshua and Stephanie Mast he was still in the process of seeking a final order of adoption. *Id*. at ¶ 54. And, despite that ruling, Richard Mast continued in his efforts to help Joshua and Stephanie Mast abduct Baby Doe. Thus, Defendant Richard Mast is liable for conspiracy both because of his own illegal motives and by virtue of "sharing the illegal motives of his client." *Robinson*, 940 F.2d at 1371.[28]

### 4.      Count IV – Intentional Infliction of Emotional Distress

Defendants make the remarkable argument that the Amended Complaint fails to allege conduct that is "outrageous," "atrocious" or "utterly intolerable in a civilized community."[29] *See* J&S Mast Br. at 23-24; K, Motley Br. at 23. It is hard to imagine a more appropriate case for a

---

[28] Joshua and Stephanie Mast, Kimberley Motley and Ahmad Osmani also urge dismissal of the conspiracy claim based on their arguments for dismissal of the other claims. Because the other claims should not be dismissed, neither should the conspiracy claim.

[29] Defendants Joshua Mast, Stephanie Mast, Kimberley Motley and Ahmad Osmani move to dismiss the claim for intentional infliction of emotional distress.

claim of intentional infliction of emotional distress.  This is not a case of "bad manners and mere hurt feelings[.]" J&S Mast Br. at 24 (quoting *Harris v. Kruetzer*, 271 Va. 188, 204 (2006)). Plaintiffs allege that Defendants engaged in a scheme to abduct their child – the child they had been lovingly raising for 18 months – and succeeded in doing so. Am. Compl. at ¶¶ 74, 154-58. Surely child abduction is "outrageous," "atrocious," and "utterly intolerable in a civilized community." *Harris*, 271 Va. at 204.

This case has striking similarities to *Kunz v. Deitch*, in which a father sued a child's grandparents for intentional infliction of emotional distress after they engaged in a plot to place the child for adoption after the child's mother passed away. 660 F. Supp. 2d 679 (N.D. Ill. 1987). The father alleged that the grandparents "intentionally refused him access to and custody of his infant daughter" for seven months; "instituted an industrious effort to permanently separate" him from his daughter "by seeking married couples interested in adopting" the child; and "fraudulently inform[ing]" married couples interested in adopting the child that the father "had no contact with the child since birth and his whereabouts are unknown," which resulted in the filing of a petition for the child's adoption. *Id*. at 683. Based on those allegations, the court denied a motion to dismiss the claim for intentional infliction of emotional distress, holding that "the foregoing facts indicate a pattern of conduct which is so outrageous in character, and extreme in degree that it transcends all possible bounds of decency[.]" *Id*. The court concluded that "[t]his case does not involve a simple custody battle between two parents, but a malicious attempt by third parties to separate an infant from her only surviving parent." *Id*. at 684.

So, too, here. As alleged in the Amended Complaint, Defendants engaged in a scheme to deprive John and Jane Doe of the child they had accepted and raised as their daughter (and over whom they were awarded guardianship under Afghan law). *See* Am. Compl. at ¶¶ 71-75. They

43

fraudulently induced John Doe, Jane Doe and Baby Doe to travel from their Afghan home to the United States supposedly for the sole purpose of obtaining medical care, when in fact they intended to abduct her. *Id.* at ¶¶ 75, 83-85, 88-90, 94-107. The pattern of conduct alleged by Plaintiffs is "outrageous in character" and "transcends all possible bounds of decency." *Kunz*, 660 F. Supp. at 683. And the Amended Complaint explicitly alleges examples of the emotional harm suffered by Plaintiffs as a result of Defendants' conduct. Am. Compl. at ¶ 147 (Jane Doe stopped eating and sleeping, despite being nine months pregnant); *id.* (John Doe feared leaving Jane Doe alone due to her inconsolable emotional state); *id.* at ¶ 148 (Jane Doe became despondent and suicidal and had to be treated at the Fort Pickett Stress Clinic).

Defendants Motley and Osmani also assert that Plaintiffs have not asserted sufficient facts against them that are "outrageous or intolerable." A. Osmani Br. at 15; K. Motley Br. at 23. But the Amended Complaint alleges that Defendant Motley reached out to the Does for the specific purpose of assisting Joshua and Stephanie Mast with removing Baby Doe to their custody. Am. Compl. at ¶¶ 79-90. Defendant Motley, through her communications with the Does, knew that the Does stood in the place of parents for Baby Doe. *Id.* at ¶ 84. Nonetheless, Defendant Motley continued asking virtual strangers for photographs of their child and encouraging them to trust a family she knew to be attempting to take their child and raise her as their own. *Id.* at ¶¶ 83-90. This behavior is outrageous when rightly considered in context: these actions were in furtherance of setting up the ambush in which the Masts took Baby Doe from those standing in the place of her deceased parents.

Similarly, the Amended Complaint alleges that Defendant Osmani intentionally misrepresented the Masts' motives, thereby profoundly changing the Does' understanding of their communications (*id.* at ¶¶ 102-04, 106-07), intentionally (and fraudulently) obtained a passport

for Baby Doe on behalf of the Masts to assist them in trafficking her to the United States (*id*. at ¶¶ 95-96, 130), and intentionally instructed the Does not to pursue the vindication of their legal rights in response to the Masts' abduction of Baby Doe. *Id*. at ¶ 144. All allegations against Defendant Osmani involve his knowledge that his actions, if successful, would deprive John and Jane Doe of continued custody of Baby Doe. Thus, his intentional actions displayed, at a minimum, reckless disregard for the possibility of causing emotional distress.

Moreover, Defendant Motley mistakes the intentionality element in a claim for intentional infliction of emotional distress, arguing that the Amended Complaint "does not plead facts sufficient to show that, in reaching out to the Does, [she] acted with knowing disregard to that risk." K. Motley Br. at 23. In Virginia, the intentionality element of such a claim requires that the defendant's ***conduct*** be intentional, not that the defendant intended to cause emotional distress. *Jordan v. Shands*, 255 Va. 492, 498 (1998) (the intentionality element of an IIED claim "is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress ***or where he intended his specific conduct and knew or should have known that emotional distress would likely result***") (quoting *Womack v. Eldridge,* 215 Va. 338, 342 (1974)) (emphasis added). Defendant Motley does not dispute that she acted intentionally. It is beyond peradventure that, at some point over the course of 18 months of communication with a couple about the child they were raising, any reasonable person would know, or should know, that permanently separating that couple from the child would cause emotional distress. *See* Amended Compl. at ¶¶ 193-95. At a minimum, her intentional acts were reckless regarding the possibility that they would cause the Does emotional distress.

Defendant Motley also argues that, aside from the allegations that she knowingly facilitated the plan to abduct Baby Doe, no other allegations are made against her. K. Motley Br. at 23.

However, but for Motley's communications with the Does, they would still be in Afghanistan with Baby Doe. Even if Motley was not present when Defendant Joshua Mast abducted Baby Doe from John and Jane Doe at Fort Pickett, her pivotal involvement in the scheme that led to that abduction is more than sufficient to support a claim for intentional infliction of emotional distress.

Finally, Defendant Osmani argues that he cannot be liable for intentional infliction of emotional distress because he owed no duty to tell Plaintiffs John and Jane Doe the truth about the true intentions of Defendant Joshua Mast. Osmani Br. at 15. But "duty" is a requirement for claims asserting negligence. *See e.g.*, *Talley v. Danek Medical, Inc.*, 179 F.3d 154, 157 (4th Cir. 1999) (one of the "essential elements of a negligence claims in Virginia" is "the identification of a legal duty of the defendant to the plaintiff"). Plaintiffs, though, accuse Defendant Osmani of intentional conduct, not negligence – and "duty" is not an element of intentional infliction of emotional distress. *See Harris*, 271 Va. at 203 (setting forth elements of IIED claim).

### 5.   Count V – False Imprisonment

Defendants Joshua and Stephanie Mast make two arguments for the dismissal of the false imprisonment claim asserted against them. J&S Mast Br. at 24-25. First, they argue that they cannot be liable for false imprisonment because they "are adoptive parents." *Id*. at 24. Second, they argue that no liability exists for false imprisonment if the person being confined does not know of the confinement or is not harmed by it. *Id*. at 24 (citing *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 114 (2021) and Restatement (Third) of Torts; Phys & Emot. Harm, § 42 (2012)). Both arguments are easily disposed of.

As to the first argument, the fact that Joshua and Stephanie Mast possess an adoption order does not preclude the false imprisonment claim, which may be based on "the unlawful execution of lawful process." *Parker v. Austin*, 105 F. Supp. 3d 592, 605 (W.D. Va. 2015) (false imprisonment "is the imprisonment of a person without lawful process, or the unlawful execution

46

of lawful process"). Indeed, "[t]here is no requirement that a defendant act with malice, ill will or the slightest wrongful intention, and neither the good faith of a defendant nor that of his employee will defeat a plaintiff's right to recover for false imprisonment." *Id*.

As to the second argument, the citations Defendants provide do not support the proposition asserted. *Dill* makes no mention of the imprisoned person's knowledge of the confinement. Rather, *Dill* explains that a plaintiff asserting false imprisonment need prove only "that her liberty was restrained, either by words or acts that she would fear to disregard, and that there was no sufficient legal excuse to justify the restraint." 300 Va. at 114 (quoting *Montgomery Ward & Co. v. Wickline*, 188 Va. 485, 489 (1948)). And the referenced section of the Restatement (Third) of Torts does not refer to false imprisonment.[30] Moreover, Plaintiffs allege that Baby Doe cried at the moment she was taken from John and Jane Doe, *see* Am. Compl. at ¶ 200, thereby communicating her awareness that she was being taken from the Does. Finally, it is preposterous for Defendants to argue for dismissal because Plaintiffs are unable to identify other examples of Baby Doe's awareness, given that Joshua and Stephanie Mast abducted her and have kept her from John and Jane Doe for the past 14 months.

### 6.    Plaintiffs Sufficiently Plead Facts Against Defendant Stephanie Mast

Remarkably, Defendant Stephanie Mast argues that all claims against her should be dismissed "because the Amended Complaint fails to allege facts supporting a claim against her." J&S Mast Br. at 25. In fact, the Amended Complaint makes numerous factual allegations against

---

[30] Moreover, states in which knowledge of confinement is an enumerated element of a false imprisonment claim have held that "where a person by incompetency or infancy has no such will as enables him to exercise intelligent and legal volition as to his custody, the action may be predicated upon his restraint or removal against the will of the party having his legal custody." *Kajtazi v. Kajtazi*, 488 F. Supp. 15, 18 (E.D.N.Y. 1978) (citing *Barker v. Washburn*, 200 N.Y. 280, 284 (1911)). Plaintiffs allege that Joshua Mast removed Baby Doe from John and Jane Doe's custody against their will. Am. Compl. at ¶¶ 134-139.

Stephanie Mast. *See, e.g.*, Am. Compl. at ¶¶ 4, 6, 7, 8, 9, 27, 44, 46, 53, 54, 55, 65, 75, 76, 83, 85, 88, 91, 93, 95, 96, 103, 104, 105, 109, 115, 138, 139. These are not "conclusory" allegations, *see* J&S Mast Br. at 25, but specific, explicit factual allegations about Stephanie Mast's participation in the scheme to abduct Baby Doe. Nor can Defendant Stephanie Mast avoid liability by asserting that individual facts, standing alone, cannot establish liability. *See id*. and n. 11. Each of the Counts alleged against Stephanie Mast are premised on the numerous, combined factual allegations made against her. *See, e.g.*, Am. Compl. at ¶¶ 154, 161, 180, 189, 197.

## III    CONCLUSION

Accordingly, Plaintiffs respectfully ask this Court to deny Defendants' motions to dismiss.

Dated: November 28, 2022          Respectfully submitted,

/s/ *Maya Eckstein*
Maya M. Eckstein (VSB No. 41413)
Lewis F. Powell III (VSB No. 18266)
HUNTON ANDREWS KURTH LLP
951 E Byrd St
Richmond, VA 23219
Telephone: (804) 788-8200
Fax: (804) 788-8218
Email:  meckstein@HuntonAK.com
Email:  lpowell@HuntonAK.com

Sherli M. Furst (*admitted pro hac vice*)
Jeremy C. King (*admitted pro hac vice*)
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 309-1000
Fax: (212) 309-1100
Email:  sfurst@HuntonAK.com
Email:  jking@HuntonAK.com

Sehla Ashai (*admitted pro hac vice*)
ELBIALLY LAW, PLLC
704 East 15th Street
Suite 204
Plano, TX 75074
Telephone: (312) 659-0154

48

Email: ashai@elbiallylaw.com

Blair Connelly (*admitted pro hac vice*)
Zachary Rowen (*admitted pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10029
Telephone: (212) 906-1200
Email: blair.connelly@lw.com
Email: Zachary.rowen@lw.com

Damon Porter (*admitted pro hac vice*)
Ehson Kashfipour (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004-1304
Telephone: (202) 637-2001
Email:  damon.porter@lw.com
Email: ehson.kashfipour@lw.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of November 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

By:     */s/ Maya M. Eckstein*
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Plaintiffs*

50