# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BABY DOE, *et al.*, | ) |
| *Plaintiffs,* | ) ) ) |
| v. | ) Case No. 3:22-cv-00049-NKM |
| JOSHUA MAST, *et al.*, | ) ) ) |
| *Defendants,* | ) ) |
| and | ) ) |
| UNITED STATES SECRETARY OF STATE ANTONY BLINKEN, *et al.*, | ) ) ) |
| *Nominal Defendants.* | ) ) |

## KIMBERLEY MOTLEY'S REPLY IN SUPPORT OF HER MOTION TO DISMISS THE AMENDED COMPLAINT

Like their Amended Complaint, John and Jane Doe's opposition brief has very little to do with Kim Motley. The Does devote almost half of it to combatting the other Defendants' Rule 12(b)(1) motions to dismiss. *See* Opp. at 2–23. But Ms. Motley neither challenged the Court's subject-matter jurisdiction nor argued for abstention. And Ms. Motley didn't adopt or incorporate any portion of any other Defendant's brief. To obscure those differences, the Does simply lump Ms. Motley in with the other Defendants throughout their brief—presumably to bolster their misguided conspiracy theory.[1] But in deciding Ms. Motley's motion to dismiss, the Court must consider (a) the Amended Complaint's *actual allegations* about Ms. Motley (not the unpleaded claims sprinkled throughout the Does' opposition) and (b) Ms. Motley's *actual arguments* in support of *her* motion.

The Does accuse Ms. Motley, a renowned human rights lawyer, not only of joining a years-long conspiracy with four *total strangers* to abduct a child—but also of doing so in exchange for $4,500. *See* Opp. at 27 ("Motley received thousands of dollars from Joshua Mast for her critical role in the conspiracy.") (citing Am. Compl. ¶¶ 87, 88). Their case against Ms. Motley is absurd on its face. And their central narrative doesn't become *more* plausible if one accepts as true the so-called "detailed

---

[1] *See, e.g.*, Opp. at 1 ("*Defendants* were unable to resist the urge to put forward what they regard the truth to be.") (emphasis added); *id.* at 3 ("*Defendants* urge the Court to abstain from hearing this case under either the domestic relations exception, the *Burford* abstention doctrine, or the *Colorado River* abstention doctrine.") (emphasis added). The Does bury the fact that Ms. Motley didn't raise those arguments. *See* Opp. at fns. 2, 7, 10. Those footnotes hardly mitigate the misleading effect. Why else would they state that "Defendants Joshua Mast, Stephanie Mast, Richard Mast, and Ahmad Osmani raise…" instead of simply that "Defendant Motley did *not* raise…"?

allegations" (Opp. at 28) against her—it becomes *less* plausible. If the Court scours their 46-page, 202-paragraph Amended Complaint searching for the specific representations that Ms. Motley allegedly made to the Does as part of her "critical role" (*id.* at 27) in the conspiracy to "lure" them (*id.* at 26) to the United States to facilitate an "abduct[ion]" (*id.*), the Court will find exactly *two* statements:

**Paragraph 85:** In March 2020, "Motley advised Jane Doe that she understood Baby Doe had serious medical issues and that Motley knew an American family who wanted to help her."

**Paragraph 98:** "On July 10, 2021, Motley offered for the first time to introduce John and Jane Doe to the American family supposedly interested in providing medical care for Baby Doe. Motley then facilitated a telephone conversation between John and Jane Doe and Joshua Mast, during which Ahmad Osmani provided interpretation."

What "repeated[] lie[s]" (Opp. at 27) did Ms. Motley tell the Does during the 16 months between March 2020 and July 2021 that were so compelling that the Does relied on *Ms. Motley* when they fled the Taliban[2] on August 24, 2021? The Amended Complaint doesn't say: All it asserts is that "Motley continued to communicate with and befriend John and Jane Doe on behalf of the Masts over the course of more than a year, making multiple offers to assist with Baby Doe's medical care and occasionally asking for photographs of Baby Doe." Am. Compl. ¶ 88. That doesn't stop the Does from reimagining their allegations: For example, the Does claim (only in their brief) that Ms. Motley "continued… encouraging them to trust [the Masts]" (Opp. at 44)— even though there's no allegation of that in their Amended Complaint (much less one that would satisfy Rule 9(b)).

---

[2] The Does acknowledge that they "fle[d] Afghanistan during the collapse of its government." *See* Opp. at 20, fn. 11.

The Does offer some facts of which Ms. Motley was purportedly aware but that they claim she never provided to them. *See, e.g.,* Am. Compl. ¶¶ 85, 89. But they don't identify so much as a single affirmative statement *by Ms. Motley* on which they relied (whether made in person or by email, text message, conventional mail, phone, fax, or telegraph) during the entire **16-month period** after their initial exchange—never mind identify them with the specificity that Rule 9(b) requires. Even beyond the "where," "when," and "how" (which are clearly absent)—the Amended Complaint doesn't even provide the "what." For example, while she was "communicating with and befriend[ing] John and Jane Doe" (Am. Compl. ¶ 88), was Ms. Motley (1) trying to convince them to travel to Virginia or (2) responding to repeated requests for money to buy food and diapers (or pay for the Does' planned wedding)? The Amended Complaint is completely silent.

And that silence is deafening: If the Does had *any* details to offer about Ms. Motley's alleged "lies" on which they say they relied when they fled Afghanistan, they would have included them (if not in their initial Complaint, then in their Amended Complaint).[3] Instead, they merely repeat the general allegation that Ms. Motley "lied" to them to "lure" them to Virginia. And like the allegations at issue in *Twombly* and *Iqbal*, "[i]t is the conclusory nature of [the Does'] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."

---

[3] The Court should dismiss the Amended Complaint with prejudice; repleading would be futile. At this point, if the Does were to get a third bite at this apple, any new allegations about Ms. Motley's purported representations to them would be highly suspect.

3

*Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Does' opposition brief does nothing to address that fundamental deficiency, which infects the Does' entire case against Ms. Motley.

That really should end the matter as to Ms. Motley. But there are several specific points and legal errors in the Does' brief that warrant a brief reply:

*First*, although the Does make sweeping and dramatic conspiracy claims, the only "agreement" that they allege that Ms. Motley entered is an agreement "to work with the Masts as they implemented their plan." Am. Compl. ¶ 81.[4] But "[m]ere conclusory language is insufficient to state a cause of action for civil conspiracy under Virginia law." *Chistoni v. HSBC Bank USA, N.A.,* No. 17-cv-00315, 2017 U.S. Dist. LEXIS 72568, at *9–10 (E.D. Va. May 11, 2017) (internal citations omitted). To survive a motion to dismiss, the Does must plead the requisite concert of action and *unity of purpose* in more than "mere conclusory language." *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499–500 (E.D. Va. 2003) (dismissing conspiracy claim).

Agreeing to work with the Masts, for example, by locating the Does, communicating with them, and introducing them to the Masts, is not the same as agreeing to "abduct" a baby. Indeed, the Does allege that "Joshua and Stephanie Mast engaged the services of Kimberley Motley to search for and communicate with John

---

[4] Paragraphs 76, 77, and 78 of the Amended Complaint relate to conversations that Ms. Motley had with Joshua Mast in October 2019—while Baby Doe was still in the custody of the U.S. military and *before* anyone had even heard of John and Jane Doe.

4

and Jane Doe." Am. Compl. ¶ 6. If that was the agreement, then it wasn't a conspiracy.

Although the Does make other allegations about things that Ms. Motley purportedly knew, there's a big difference between the agreement that they allege Ms. Motley entered and their conclusory statements that Ms. Motley was part of a conspiracy to "abduct" Baby Doe. "Where, as here, there are only vague, conclusory allegations of conspiracy, the claim fails at the threshold." *O'Connor v. Sand Canyon Corp.*, No. 14-cv-00024, 2014 U.S. Dist. LEXIS 142069, at *14 (W.D. Va. Oct. 6, 2014) (dismissing conspiracy claim alleging that defendants conspired to dispossess plaintiff of property rights). That failure would also doom the Does' reliance on "conspiracy jurisdiction"—if it still existed.

*Second*, because their claims against Ms. Motley are fraud-based, the Does must comply with Rule 9(b)'s heightened pleading standard, but the Does misapprehend what Rule 9(b) demands of them. They cite *Terry v. SunTrust Banks, Inc.*, 493 F. App'x 345, 358 (4th Cir. 2012), for the proposition that they don't need to plead with specificity the Defendants' "knowledge as to the true facts and intent to deceive." Opp. at 39. That's true enough—at least as far as it goes. But—as *Terry* also makes clear—Rule 9(b) requires a plaintiff to specifically plead "the circumstances of the fraud," including "the time, place, and contents of the false representations." *Id.* The Does cannot satisfy Rule 9(b) by simply making the same *general* claim—*e.g.*, that Ms. Motley lied to them and tricked them into travelling to the United States as part of a conspiracy to abduct Baby Doe—over and over and over.

5

Both the Amended Complaint and the Does' opposition brief are chock-full of *general* references to Ms. Motley's supposed "misrepresentations" and "lies." But, as explained above, despite allegedly communicating with Ms. Motley for 16 months, the Does meaningfully identify only representations from their first exchange (*see* Am. Compl. ¶ 85) and their last exchange (*see id.* ¶ 98). Otherwise, they don't provide a single specific instance of any of Ms. Motley's statements, much less *mis*statements designed to "lure" the Does to the United States so that the Masts could kidnap Baby Doe. Rule 9(b) requires more.

*Third*, the Does try to dispose of one of Ms. Motley's central personal-jurisdiction arguments—that the Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014), forecloses this Court's application of "conspiracy jurisdiction"—in a footnote. *See* Opp. at 25, fn. 16. The Does claim that the authorities that Ms. Motley cites are "inapposite." *Id.* But as the Does concede, if the Supreme Court has implicitly overruled (as Ms. Motley argues it has) the Fourth Circuit's decision in *Unspam Technologies, Inc. v. Chernuk*, 716 F.3d 322 (4th Cir. 2013), then this Court is bound to follow the Supreme Court's decision and not the older Fourth Circuit decision. *See* Opp. at 25, fn. 16. If this Court opts to recognize the continued viability of "conspiracy jurisdiction" in theory notwithstanding *Walden*—at least until either the Fourth Circuit or the Supreme Court confirms its demise—applying it in this case would fly in the face of Due Process for all the reasons that Ms. Motley has already explained in her opening brief and in this reply.

6

*Fourth*, in claiming—also in footnotes—that a biological or adoptive relationship is unnecessary to bring a claim for tortious interference with *parental* rights under Virginia law (Opp. at fns. 22, 23), the Does misconstrue *Wyatt v. McDermott*, 283 Va. 685 (2012). According to the Does, *Wyatt* "explicitly allows" a tortious interference claim "to be brought on behalf of *individuals* with a 'parental or custodial relationship' to the child at issue." *See* Opp. at 34, fn. 22 (emphasis added).[5] That is wrong. In quoting from *Wyatt*, the Does omit a critical word—"parent." The relevant language states that "the complaining *parent* has a right to establish or maintain a parental or custodial relationship with his / her minor child." *Wyatt*, 283 Va. at 699 (emphasis added). It does not say "someone" who has "custodial rights" can bring this action. And the Does don't cite to any other case applying the cause of action to "individuals" other than parents (whether biological or adoptive).

## CONCLUSION

The Court should dismiss all claims against Ms. Motley with prejudice. Nothing in the Does' opposition brief changes that.

Dated: December 5, 2022                    Respectfully submitted,

*/s/ Thomas W. Davison*
Thomas W. Davison
(VSB No. 94387)
Samantha Van Winter
(VSB No. 97268)
ALSTON & BIRD LLP

---

[5] Similarly, in footnote 23, the Does claim that "*someone* with a 'parental **or** custodial relationship' may assert a claim for tortious interference with parental rights." (emphasis of "someone" added; emphasis of "or" in original).

7

950 F Street, N.W.
Washington, DC 20004-1404
Tel.: (202) 756-3300
Fax: (202) 654-3333
tom.davison@alston.com
samantha.vanwinter@alston.com

Michael R. Hoernlein
(*pro hac vice*)
ALSTON & BIRD LLP
101 South Tryon Street, Suite 4000
Charlotte, NC 28280-4000
Tel.: (704) 444-1000
Fax: (704) 444-1111
michael.hoernlein@alston.com

Sidney Webb
(*pro hac vice*)
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
Tel.: (214) 922-3400
Fax: (214) 922-3899
sidney.webb@alston.com

*Counsel for Defendant Kimberley Motley*

8

## CERTIFICATE OF SERVICE

I certify that on December 5, 2022, I filed this Memorandum using the Court's CM/ECF system, which will provide service to all counsel of record.

*/s/ Thomas W. Davison*
Thomas W. Davison