**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| BABY DOE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-49-NKM |
| | ) | |
| JOSHUA MAST, *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES SECRETARY OF | ) | |
| STATE ANTONY BLINKEN, *et al.*, | ) | |
| | ) | |
| *Nominal Defendants*. | ) | |

**DEFENDANTS JOSHUA AND STEPHANIE MAST'S MOTION TO
MODIFY THE COURT'S PROTECTIVE ORDER**

Defendants Joshua and Stephanie Mast hereby move the Court to modify its protective

order. *See* ECF No. 26. Recent developments, including Plaintiffs' own actions, undermine their

original claims made in support of the protective order, make it inequitable for Plaintiffs to

maintain asymmetrical anonymity in this proceeding, and likely moot the basis for the protective

order in any event. Plaintiffs appear happy to disclose their identities to the media when it suits

them by seeking public criticism and condemnation of the Masts, *see infra* pp. 5–7—even

prompting an official statement by the Taliban condemning the Masts. *See* Islamic Emirate of

Afghanistan, Ministry of Foreign Affairs (Oct. 23, 2022), https://mfa.gov.af/en/according-to-

information-from-reliable-sources-a-marine-officer-joshua-mast-has-forcibly-taken-the-only-

remaining-child-of-a-family-martyred-in-their-bombardment-in-afghanistan-from-her-relatives-

in/ ("Taliban Statement").[1] But they maintain that this Court should shield them (and only them) from public scrutiny or criticism. Their conduct, however, undermines the claims they made in support of the protective order and show that it would be wholly inequitable to leave the pseudonyms and protective order in place. Moreover, the Supreme Court of Virginia in the parallel state proceeding recently rejected Plaintiffs' effort to keep their identities sealed. *See* Ex. 1, Order, *[Doe] v. Mast*, No. 220674 (Dec. 1, 2022).[2] Their real names can thus be found on that court's public website, making their need for pseudonyms in this proceeding likely moot and, in any event, less compelling.

The Masts are not asking, however, for the Court simply to unseal everything. While Plaintiffs have made it exceedingly difficult to protect the privacy of their adoptive daughter, the Masts submit that, consistent with Federal Rule of Civil Procedure 5.2(a)(3), "Baby Doe" should continue to be protected through the substitution of her initials in place of the pseudonym.

Moreover, the Court may reasonably allow the filings from the parallel Circuit Court proceeding to remain provisionally under seal pending a further ruling from that court on the sealing issue. The Supreme Court of Virginia recently ordered the Circuit Court in that proceeding to "(i) provide notice to the public, (ii) permit members of the press or other qualified parties to intervene in support of or in opposition to any proposed sealing or closing orders, and (iii) thereafter enter a final sealing or closing order with specific findings required by *Daily Press,*

---

[1] The Taliban Statement has since been taken down from the government website but is still available online at https://web.archive.org/web/20221023115051/https://mfa.gov.af/en/according-to-information-from-reliable-sources-a-marine-officer-joshua-mast-has-forcibly-taken-the-only-remaining-child-of-a-family-martyred-in-their-bombardment-in-afghanistan-from-her-relatives-in/.

[2] The Supreme Court of Virginia uses John and Jane Doe's real names in its caption and on its public docket. Pending the Court's ruling on this motion, however, the Masts will not publicly use their real names here and will redact them from the Exhibit. If the Court grants the relief requested herein, that will not be necessary.

*LLC v. Commonwealth*, __ Va. at __, 878 S.E.2d at 396–404." Order, *[Doe] v. Mast*, No. 220674 (Dec. 1, 2022) at 2. The Masts submit that, while the court implements those steps, it is reasonable for Circuit Court records filed under seal here to remain provisionally sealed. This Court may revisit the issue once the Circuit Court implements the order.

The Masts therefore ask this Court to enter an order (1) denying leave for Plaintiffs John and Jane Doe to proceed under pseudonyms; (2) removing any restrictions on the parties' use of John and Jane Doe's real names; (3) maintaining the privacy of Baby Doe (to the extent still possible) through the use of her initials; and (4) allowing filings from the parallel Circuit Court proceeding to remain provisionally under seal pending a further ruling from that court. The Masts have conferred with opposing counsel and understand that John and Jane Doe oppose the motion.

## **BACKGROUND**

Together with their complaint, Plaintiffs John and Jane Doe filed a Motion for Leave to Proceed Under Pseudonyms and for Entry of a Protective Order. *See* ECF No. 3. In support of that motion, Plaintiffs asserted "fear . . . that they will be hurt or killed if they return to Afghanistan." ECF. No. 4, at 3. Specifically, they expressed concern that they would be "perceived as having worked with the U.S.," *id.* at 4, or "that others in Afghanistan may . . . believe that they intentionally gave or sold Baby Doe to an American family in exchange for the opportunity to live in the United States," *id.* at 5. They tied those fears to concerns about media attention, asserting that they "have taken care not to reveal their whereabouts or circumstances to their communities in Afghanistan," but worrying that "this case has the potential to attract media attention" and that "[a]nybody seeing a news story about this case would be likely to talk about it to other Afghans, both in the U.S. and abroad." *Id.* at 5. Plaintiffs further argued that their families in Afghanistan

"face the same risk of violence and reprisals that Plaintiffs do, either as their proxies or to punish Plaintiffs by harming their families." *Id.* at 7.[3]

The Court granted the motion on September 13, 2022. *See* ECF No. 26. At that point the Court had only the benefit of Plaintiffs' presentation because no Defendant had yet entered an appearance. The Court found, based on Plaintiffs' presentation, that they had "established grounds to proceed by pseudonym and for entry of . . . a protective order." *Id.* at 2. The Court found that Plaintiffs John and Jane Doe had "demonstrated that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties, in view of the age of minor Plaintiff Baby Doe." *Id*. The Court entered a protective order with five components:

> 1.  The Defendants and their counsel and representatives are prohibited from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction. This applies to any disclosure in the course of any investigation undertaken by the Defendants, their counsel, or their other agents or representatives.
>
> 2.  All papers filed with this Court or disseminated to any person who has not executed a non-disclosure agreement enforceable through the contempt sanction shall use the "John Doe", "Jane Doe", or "Baby Doe" pseudonyms to refer to the Plaintiffs.
>
> 3.  Any papers that identify any Plaintiff either directly or indirectly shall be filed under seal, with redacted copies placed in the public files.
>
> 4.  Defendants shall disclose to Plaintiffs' counsel any person to whom Defendants, their counsel or representatives, have disclosed Plaintiffs' identities,

---

[3] Plaintiffs also argued that they sought to protect Baby Doe's privacy. *See id.* at 7–8. As noted above, the Masts also seek to protect their daughter's privacy to the greatest extent possible. But Plaintiffs have made that extremely difficult by publicly naming her adoptive parents, the Masts, and providing great detail about their location and Joshua Mast's employment. Their version of Baby Doe's privacy is entirely self-serving: it makes sense only if they gain custody and take her back to Afghanistan. Because she remains with the Masts, the Does' tactics have only served to *undermine* her privacy and the privacy of her adoptive family.

and shall provide Plaintiffs with copies of the executed non-disclosure agreements required by this Order.

5.   The parties shall be permitted to notice depositions and depose witnesses and conduct other discovery using the "John Doe", "Jane Doe", and "Baby Doe" pseudonyms. In deposing any witnesses who are unacquainted with the Plaintiffs, the Doe pseudonyms shall be used. In deposing any witnesses already acquainted with the Plaintiffs, actual names may be used, but the Doe pseudonyms must be used in any transcript of those depositions.

*Id.* at 2–3.

On October 20, 2022, the Associated Press published an article regarding this case. *See* Juliet Linderman et al., *Afghan couple accuse US Marine of abducting their baby*, Associated Press (Oct. 20, 2022), *available at* https://apnews.com/article/afghan-baby-us-marine-custody-battle-b157557538b84b288a0a8415735e24ab. In that article, Plaintiffs and their attorneys provided their version of the facts while naming the Masts (including several contentions that they have never put in any court filing). Notably, Sehla Ashai and Maya Eckstein—two of Plaintiffs' attorneys in this case—were quoted in the article. On November 10, 2022, the New York Times published an article about the case that again named the Masts, and the author of that article said that she visited Plaintiffs at their home for them to share their version of the facts. Rozina Ali, *How Did This Man Think He Had the Right to Adopt This Baby?*, The New York Times (Nov. 20, 2022), *available at* https://www.nytimes.com/2022/11/10/magazine/afghanistan-orphan-baby-l.html.        When requesting comment from the Masts, the author used Plaintiffs' names and Baby Doe's legal name given to her by the Masts and asked for the Masts to comment because "this is an article that will be published in the *New York Times* Magazine, which means it would be fairly easy for anyone looking to find it now, or years down the line. When [Baby Doe] gets older, and if she searches for your or your wife's name, she will likely come across this article about her adoption, and she

may wonder about the absence of her parents' voice in the story." Ex. 2 (email from Rozina Ali requesting comment from the Masts).[4]

After the first Associated Press article was published, the Taliban issued a statement. The Taliban stated that, "[a]ccording to information from reliable sources, a Marine officer Joshua Mast, [sic] has forcibly taken the only remaining child of a family martyred in their bombardment in Afghanistan from her relatives in Virginia and registered her as his own family member." *See* Taliban Statement.[5]

On December 1, 2022, after Plaintiffs unsuccessfully sought an interlocutory appeal, the Supreme Court of Virginia issued an order on Plaintiffs' motion to seal in which the Supreme Court stated that the Circuit Court must: "(i) provide notice to the public, (ii) permit members of the press or other qualified parties to intervene in support of or in opposition to any proposed sealing or closing orders, and (iii) thereafter enter a final sealing or closing order with specific findings required by *Daily Press, LLC v. Commonwealth*, __ Va. at __, 878 S.E.2d at 396–404." Order, *[Doe] v. Mast*, No. 220674 (Dec. 1, 2022) at 2. The Supreme Court also chided Plaintiffs for failing to acknowledge the constitutional and common-law presumption of public access to judicial records in that proceeding and for requesting the court to delete all references to the case because Plaintiffs' names were on the docket. *Id.* at 3. This order is public, and it includes John Doe's name in the caption. *Id.* at 1.

---

[4] Ali also somehow learned of Stephanie Mast's personal phone number and sent her a text using Baby Doe's legal name requesting her to comment.

[5] The statement also criticized the United States for rescuing many Afghan families after the collapse of the Islamic Republic of Afghanistan, saying, "It is worth mentioning that hundreds of thousands of Afghans, including dozens of children, who were inappropriately taken out of the country by the US and its allies, are now kept in various camps in a state of legal limbo and deprived of basic human rights." *Id.*

And, just a few days ago, on December 31, 2022, the Associated Press published another article in which Plaintiffs made clear that their purpose in speaking to the media is to affect this litigation and the state-court litigation. *See* Martha Mendoza et al., *Afghan war orphan remains with Marine accused of abduction*, Associated Press (Dec. 31, 2022), *available at* https://apnews.com/article/afghanistan-politics-united-states-government-virginia-children-97a4e2f4c38925d50e5511a3232974f0. In it, Jane Doe specifies that she thought that after the first Associated Press article was published and once the White House "publicly weighed in on her family's case," she and John Doe "thought within one week [Baby Doe]'d be back to us." *Id.* Jane Doe called for the U.S. government to do more, saying it "is not doing their [sic] job as they should, . . . [a]nd in this process, we are suffering." *Id.* Somehow—whether from Plaintiffs, their attorneys, or otherwise—the Associated Press also learned that the U.S. Department of Justice moved to intervene in the Fluvanna County Circuit Court proceedings, that the court denied that motion, and that the court found that Plaintiffs had standing to proceed further in the case, despite those filings being under seal. *Id.*

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 10 provides that "[t]he title of the complaint must name all the parties." Although federal courts may sometimes grant the "rare dispensation" for a party to proceed pseudonymously, "the general presumption of openness of judicial proceedings applies to party anonymity as a limited form of closure." *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). There is also "a strong presumption" favoring open courts, which "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *In re Knight Pub. Co.*, 743 F.2d 231, 234 (4th Cir. 1984) (quoting *Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 464 U.S. 501, 510 (1984)).

Even if there are "findings adequate to support closure, the trial court must consider alternatives before the courtroom can be closed constitutionally." *Id.* (citing *Press Enter. Co.*, 464 U.S. at 511).

Federal courts are severely restricted in their authority to issue "gag orders"—*i.e.*, orders that restrict a party from discussing the case or other parties. *See, e.g.*, *In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018). "[G]ag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions." *Id.* at 796–97. Such orders are "presumptively unconstitutional," *id.* at 797 (citing *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018)), and "must survive strict scrutiny," *id.* (citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 162 (2015)).

## ARGUMENT

### I.     The Court Should Lift Its Order Allowing Plaintiffs to Proceed Under Pseudonyms.

The Court should lift its protective order allowing Plaintiffs to proceed by pseudonyms (ECF No. 26), because Plaintiffs have failed to demonstrate that their use is justified. Plaintiffs' actions in speaking to the press themselves—to tell *their* side of the story—undermines their claimed fear of publicity and illustrates the fundamental unfairness of allowing Plaintiffs' asymmetrical anonymity. The open-courts presumption, and the First Amendment principles it protects, should therefore prevail.

The public has a right of access to judicial proceedings, and pseudonymous litigation undermines that right. *See Doe v. Public Citizen*, 749 F.3d 246, 273 (4th Cir. 2014). The use of pseudonyms is a "rare disposition" appropriate only in "exceptional circumstances" when there are "compelling concerns relating to personal privacy or confidentiality [that] warrant some degree of anonymity in judicial proceedings." *Id.* The Court "has an independent obligation to ensure that extraordinary circumstances support such a request by balancing the party's stated interest in anonymity against the public's interest in openness and any prejudice that anonymity would pose

to the opposing party." *Id.* at 274. It is now clear that Plaintiffs' one-sided presentation of their interests at the outset of this case substantially overstated their interest in anonymity and ignored the prejudice that it would cause to their opposing parties.[6]

A balancing of the non-exclusive factors that the Fourth Circuit has identified also favors lifting the order that allows Plaintiffs to proceed under pseudonyms. Those factors, enumerated in *Doe v. Public Citizen*, include:

> (1) Whether the requesting party seeks the order "merely to avoid the annoyance and criticism that may attend any litigation or [] to preserve privacy in a matter of sensitive and highly personal nature";
>
> (2) Whether identification of the requesting party "poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent nonparties";
>
> (3) The age of the requesting party;
>
> (4) Whether the requesting party brought an action against the government or a private party; and
>
> (5) The "risk of unfairness to the opposing party" if the person is allowed to proceed anonymously.

749 F.3d at 274 (quoting *James*, 6 F.3d at 238). Those factors weigh in favor of lifting the order.

First, it is clear that Plaintiffs do not view the subject matter of this dispute as "sensitive and highly personal." They are content to discuss it with the media and to have their attorneys discuss it on the record with the media.

Second, Plaintiffs can no longer credibly maintain that their identities should be shielded to protect against "retaliatory physical or mental harm" to them or to innocent nonparties. Their willingness to speak to the news media entirely undermines their prior representation to this Court

---

[6] Defendants Joshua and Stephanie Mast focus here on the prejudice caused to them by Plaintiffs' one-sided dealings with the press. But there can be little doubt that their tactics have also prejudiced other defendants—for instance, Mr. Osmani, who like Plaintiffs still has family in Afghanistan and yet has not been afforded the same courtesy of anonymity that Plaintiffs claimed for themselves.

that they fear the consequences of media coverage about the case. And their tactics have shown an utter disregard for the safety or security of others, including the Masts, Baby Doe, other named defendants, and their families.

Third, Plaintiffs are adults. The Masts are not seeking to lift anonymity for their daughter, Baby Doe, though they do believe—consistent with Rule 5.2—that use of her initials is a preferable approach. (Among other things, the pseudonym "Baby Doe" falsely and unfairly implies that the Masts' adoptive daughter is not related to them but is instead related to Plaintiffs—contrary to the recent findings in the state court proceeding.)

Fourth, the identities of the Defendants further warrants lifting the order. Plaintiffs have chosen to name two federal cabinet officials as "Nominal Defendants,"[7] which bolsters the public interest in the matter and strengthens the First Amendment interests in keeping the courts "open." This is also not a case where the plaintiffs have sought bilateral pseudonymity to protect *both sides* in a private dispute. *Cf. James*, 6 F.3d at 238 (citing *Doe v. A Corp.*, 709 F.2d 1043, 1044 n. 1 (5th Cir. 1983), where the "anonymity of both parties [was] warranted to protect attorney client confidentiality privilege"). Instead, Plaintiffs are using their pseudonymity to shield themselves while publicly attacking the Masts.

Finally, the allowance for Plaintiffs to proceed under pseudonyms is highly prejudicial to the Masts. Plaintiffs have shared their false and defamatory accusations against the Masts with the media and indeed the world. Their speaking to the media has resulted in false statements being

---

[7] The Masts respectfully submit that there is no basis for Plaintiffs to name federal officials as "nominal defendants" in this proceeding against whom they assert no substantive claims; the federal defendants should be dismissed. But Plaintiffs are the masters of their complaint and the ones arguing (wrongly as a matter of subject-matter jurisdiction, *see* ECF No. 120, at 7–12) that their claims raise important federal questions. They thus cannot credibly claim that their case does not raise strong First Amendment interests in favor of open courts.

proliferated on social media, *see* @AP, Twitter (Dec. 31, 2022, 12:31 p.m.), *available at* https://mobile.twitter.com/AP/status/1609240747697475586, in requests for the federal government to intervene, *see, e.g.*, @zaidashai, Twitter (Jan. 1, 2023, 7:38 a.m.), *available at* https://mobile.twitter.com/zaidashai/status/1609529507802644481, and in false accusations that Joshua Mast committed a "war crime" and killed his adopted daughter's parents and then took her away—when, in fact, he was not part of the operation in which her parents died, *see, e.g.*, @sashayub, Twitter (Dec. 31, 2022, 1:11 p.m.), *available at* https://mobile.twitter.com/sashayub/status/1609250988526796800. Plaintiffs' speaking to the media has also resulted in pictures of the Masts' other children being widely disseminated and in disclosing the town in which the Masts live. *See* Jennifer Smith et al., *PICTURED: Marine and his wife accused of stealing Afghan orphan, three, by luring her to the US with her cousins when the Taliban took over then 'snatching her from refugee camp'*, Daily Mail (Oct. 20, 2022). Plaintiffs, on the other hand, continue to enjoy the cloak of pseudonymity, while using it to try to sway public opinion in their favor. *See* Martha Mendoza et al., *Afghan war orphan remains with Marine accused of abduction*, Associated Press (Dec. 31, 2022), *available at* https://apnews.com/article/afghanistan-politics-united-states-government-virginia-children-97a4e2f4c38925d50e5511a3232974f0 (Jane Doe stating that "[t]he government is not doing their [sic] job as they should, . . . [a]nd in this process, we are suffering."). Indeed, it appears that the point of going to the media was to affect this case—Jane Doe said that once there was public media attention, she and John Doe expected to have custody of Baby Doe within a week. *See id.* The Court should not allow that fundamental unfairness to persist.

Plaintiffs bear the burden to show a compelling need for the use of pseudonyms. They have failed to do so, and the Court should lift the order on pseudonyms.

II.     **Whether or Not Plaintiffs Proceed Under Pseudonyms, The Court Must Lift Any Restrictions on Discussion of Plaintiffs or the Matter.**

The Court should lift the use of pseudonyms, but even if it does not, it should lift any restrictions that would require parties to: (1) have other people execute non-disclosure agreements enforceable through the contempt sanction for "any investigation undertaken by the Defendants, their counsel, or their other agents or representatives," ECF No. 26 at 2, (2) "disclose to Plaintiffs' counsel any person to whom Defendants, their counsel or representatives, have disclosed Plaintiffs' identities," *id.* at 3; and (3) "provide Plaintiffs with copies of the executed non-disclosure agreements required by this Order." *Id.* This order, which functions as a gag order, violates the First Amendment.

"Even among First Amendment claims, gag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions." *In re Murphy-Brown*, 907 F.3d at 796–97. Gag orders are prior restraints that "bear 'a heavy presumption against [their] constitutional validity.'" *Id.* at 797 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). They are also "presumptively unconstitutional because they are content based." *Id.* Gag orders must therefore survive strict scrutiny, meaning a court must make specific findings that a gag order is the least restrictive means of furthering a compelling state interest. *See id.* at 798–99.

The Protective Order here cannot survive strict scrutiny. First, Plaintiffs have not provided a compelling state interest for why the Masts must comply with the Protective Order. These restrictions are not designed to protect the integrity of the judicial process—the way a gag order might be necessary in extraordinary circumstances to protect against contamination of the jury pool, *Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, 606 F. Supp. 2d 617, 625–26 (E.D. Va. 2008), or to insulate jurors from improper influence once seated, *see, e.g., Cap. Cities Media, Inc. v. Toole*,

12

463 U.S. 1303, 1306 (Brennan, Circuit Justice, 1983) (describing "the State's interest is in shielding jurors from pressure during the course of the trial, so as to ensure the defendant a fair trial"). And Plaintiffs have not even purported to show that they otherwise advance a compelling state interest. Indeed, Plaintiffs' motion in support of the protective order focuses almost entirely on justifying the use of pseudonyms rather than the additional restrictions included in their proposed order. *See* ECF No. 4.

Second, Plaintiffs have not shown, and cannot show, that the Protective Order is the least restrictive means of furthering any compelling state interest there might be. The restrictions are not narrowly tailored at all. On their face, they do not contain any limitations or carve-outs. They could be construed to apply, for instance, to the Masts' ongoing participation in the parallel state court proceedings where Plaintiffs filed suit *without pseudonyms*, and thus where their real names are regularly used by all parties and the Court.[8] Nor have Plaintiffs offered any explanation why they should be entitled to notice of anyone to whom a party might identify them.

Gag orders are exceedingly rare and sparingly granted. They are certainly not a means for a party in litigation to help themselves to a one-sided media blitz. The Court should lift any restrictions in the Protective Order on parties' discussion of Plaintiffs' identities or of the underlying facts of the case.

---

[8] In the wake of the recent order from the Supreme Court of Virginia on unsealing, Plaintiffs have filed an emergency motion—one year into the case—to proceed under pseudonyms in the Circuit Court proceeding. The Masts have opposed that motion.

III.   **Baby Doe Should Continue to Be Protected Through the Use of Her Initials, Consistent with Civil Rule 5.2.**

Baby Doe's identity should be protected—on that both Plaintiffs and the Masts agree. But the Federal Rules of Civil Procedure already provide a method for that protection. Rule 5.2(a)(3) says that filings should include only a "minor's initials." That affords Baby Doe just as much protection as calling her Baby Doe. It also eliminates the misleading and unfair "Baby Doe" label, which wrongly suggests that she is related to Plaintiffs and not to the Masts (and if nothing else prejudges the merits of Plaintiffs' claims).

IV.   **Record Materials from the Parallel State Court Proceeding May Remain Provisionally Sealed Pending Further Ruling from the State Court.**

At this time, the Masts are not seeking an order from this Court disclosing the sealed records from the Circuit Court proceeding that have been submitted under seal as exhibits in this case—though it may soon be appropriate for the Court to revisit those sealings as well. The Supreme Court of Virginia has ordered the Circuit Court to "(i) provide notice to the public, (ii) permit members of the press or other qualified parties to intervene in support of or in opposition to any proposed sealing or closing orders, and (iii) thereafter enter a final sealing or closing order with specific findings required by *Daily Press, LLC v. Commonwealth*, __ Va. at __, 878 S.E.2d at 396–404." Order, *[Doe] v. Mast*, No. 220674 (Dec. 1, 2022) at 2. The Associated Press has already filed a motion to intervene and unseal the Circuit Court records, and once the Circuit Court implements the Supreme Court's order, there may well be additional interested parties who file in support of unsealing. The Masts are not asking this Court to preempt that process by unsealing Circuit Court records on its own now; they submit that those records may reasonably remain provisionally sealed pending a further decision from the state courts—just as the Supreme Court of Virginia allowed the parties' briefs and the appendix to remain provisionally sealed. But once

14

the Circuit Court has implemented the Supreme Court's order, the Masts may seek to revisit the sealing of the Circuit Court records in *this* proceeding.

Dated: January 5, 2023                              Respectfully submitted,

*/s/ John S. Moran*
John S. Moran
MCGUIREWOODS LLP
888 16th St. N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com