Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1                    UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
2                     CHARLOTTESVILLE DIVISION

3  ************************************************************

4   BABY DOE, ET AL,           CIVIL CASE NO.:  3:22CV49
                               FEBRUARY 8, 2023, 2:00 P.M.
5                              MOTIONS HEARING BY VIDEOCONFERENCE
            Plaintiffs,        **REDACTED**
6  vs.

7  JOSHUA MAST, ET AL.,        Before:
                               HONORABLE NORMAN K. MOON
8                              UNITED STATES DISTRICT JUDGE
            Defendants.        WESTERN DISTRICT OF VIRGINIA
9
   ************************************************************
10
   APPEARANCES:
11

12 For the Plaintiffs:         MAYA MIRIAM ECKSTEIN, ESQUIRE
                               LEWIS FRANKLIN POWELL, III, ESQUIRE
13                             Hunton & Williams LLP
                               Riverfront Plaza, East Tower
14                             951 East Byrd Street
                               Richmond, VA 23219
15                             804-788-8788

16

17 For Defendants Joshua and Stephanie Mast:
                               JOHN SAVAGE MORAN, ESQUIRE
18                             McGuireWoods LLP
                               888 16th St. N.W., Suite 500
19                             Washington, DC 20006
                               202-525-0356
20

21

22 Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                    255 West Main Street, Suite 304
23                  Charlottesville, Virginia  22902
                    434.296.9284
24

           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25 TRANSCRIPT PRODUCED BY COMPUTER.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    APPEARANCES CONTINUED:

2    For Defendant Richard Mast:

3                              DAVID ELIEZER YERUSHALMI, ESQUIRE
                               American Freedom Law Center
                               2020 Pennsylvania Avenue NW
4                              Suite 189
                               Washington, DC 20006
5                              646-262-0500

6    For Defendant Kimberley Motley:

7                              MICHAEL ROGER HOERNLEIN, ESQUIRE
                               Alston & Bird LLP
                               101 S. Tryon Street, Ste. 4000
8                              Charlotte, NC 28280
                               704-444-1041

9

10   For Defendant Ahmad Osmani:

11                             BRENNAN TYLER BROOKS, ESQUIRE
                               Law Office of B. Tyler Brooks, PLLC
                               P.O. Box 10767
12                             Greensboro, NC 27204
                               336-707-8855

13
                               RICHARD DEAN BOYER, ESQUIRE
14                             Boyer Law Firm, PLLC
                               P.O. Box 10953
15                             Lynchburg, VA 24506
                               434-401-2093

16

17   For Nominal Defendants United States Secretary of State Anthony
     Blinken and United States Secretary of Defense General Lloyd
18   Austin:

19                             KATHRYN L. WYER, ESQUIRE
                               United States Department of Justice
20                             Civil Division
                               1100 L Street, NW, Room 12014
21                             Washington, DC 20005
                               202-616-8475

22

23

24

25

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1                          INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE DEFENDANTS:              PAGE

3    JOSHUA MAST

4     Direct Examination by Mr. Moran                    98
      Examination by the Court                          102
5     Cross-Examination by Ms. Eckstein                 104

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  (Proceedings commenced, 2:00 p.m.)

2          THE COURT:  If all the parties are present you

3  expect, you may call the case.

4          THE CLERK:  I believe everyone is on.

5          The case is Baby Doe and others versus Joshua Mast

6  and others, Civil Action Number 3:22cv49.

7          THE COURT:  Are the plaintiffs ready?

8          MS. ECKSTEIN:  Yes, sir, Your Honor, the plaintiff is

9  ready.

10          THE COURT:  Defendants ready?

11          MR. MORAN:  Yes, sir, for defendants Joshua and

12  Stephanie Mast.

13          MR. YERUSHALMI:  And yes, Your Honor, for defendant

14  Richard Mast, David Yerushalmi.

15          MR. HOERNLEIN:  Mike Hoernlein for defendant Kim

16  Motley.

17          MR. BROOKS:  Yes, Your Honor.  Tyler Brooks for

18  defendant Ahmad Osmani.

19          THE COURT:  Okay.  Before we begin, I will remind any

20  members of the public that under Standing Order 2020-12 of the

21  United States District Court for the Western District of

22  Virginia, the Court's prohibition against recording and

23  broadcasting court proceedings remains in force.  Attorneys,

24  staff, and members of the public accessing this hearing today

25  may not record or broadcast it.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1           We're here today on several motions to discuss

2    plaintiffs' amended complaint, motions to dismiss plaintiffs'

3    amended complaint, as well as two motions filed by the

4    plaintiff requesting that the Court find defendant Mast in

5    contempt for asserted violations of the Court's protective

6    order.

7           We will proceed in the following order for argument:

8    First we'll hear from counsel for defendants Joshua and

9    Stephanie Mast on their motion to dismiss.  Then we will hear

10   from counsel for the co-defendants to raise any specific issues

11   covered in their motions to dismiss already addressed.  And

12   we'll hear from them in the order in which they're listed on

13   the complaint.  Next we will hear from plaintiffs to respond to

14   defendants' arguments on all motions to dismiss.  And defense

15   counsel will then have the last brief word in reply to their

16   motions.  Finally, the Court will take up argument on

17   plaintiffs' motions for sanctions.  Plaintiffs' counsel shall

18   argue first on that motion.  Counsel for defendants Joshua and

19   Stephanie Mast shall respond on that motion.  Plaintiffs'

20   counsel will have the last word in reply.

21           All right.  We'll hear from the Masts' attorney.

22           MR. MORAN:  Thank you, Judge Moon.  John Moran from

23   McGuireWoods for defendants Joshua and Stephanie Mast.

24           As the Court has already noted, there are many issues

25   presented in this case, but we do not think the Court needs to

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   address many of them.  The Court should dismiss the amended

2   complaint under the domestic relations exception in federal

3   jurisdiction.  The irreducible core of plaintiffs' claims is

4   the alleged invalidity of a final order of adoption entered by

5   a Virginia circuit court.  Under longstanding federal

6   precedent, the validity of that adoption order must be

7   litigated in state court, and it will be.  The circuit court

8   has set plaintiffs' challenges to the adoption order for trial

9   in less than three months from today.  Dismissal of this

10  duplicative action is not only compelled as a matter of subject

11  matter jurisdiction, it will also spare the Court and the

12  parties an unnecessary waste of resources and will avoid

13  interference with important matters of state policy.

14          Plaintiffs attempt to end run the domestic relations

15  exception when none of their arguments is convincing.  First,

16  there is no international adoption proviso to the domestic

17  relations exception.  This case is *sui generis*.  There is no

18  disputing that.  But none of its unique features take it

19  outside the scope of domestic relations law because it turns on

20  the validity of a Virginia adoption order.  Plaintiffs cannot

21  get around the domestic relations exception by raising federal

22  preemption arguments that allegedly rebut the Masts' defenses

23  to their federal claim -- or to their state law claims.  It is

24  black letter law under the well-pleaded complaint rule that

25  such arguments did not -- do not give rise to federal question

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   jurisdiction.  Plaintiffs also cannot evade the domestic

2   relations exception on the grounds that they have not included

3   a custody or adoption order in their prayer for relief.

4   Whether we focus on the elements of plaintiffs' substantive

5   core claims or whether we focus on their artfully pleaded

6   request for declaratory relief, the same conclusion follows:

7   They have no claim that does not involve the alleged invalidity

8   of the Virginia adoption order.  Even if the domestic relations

9   exception did not squarely apply, moreover, federal doctrines

10  of abstention would lead to substantially the same result.  If

11  plaintiffs' claims do not fail on their face, then they at

12  least raise novel questions of Virginia law, and their

13  adjudication in this forum would unduly interfere, A, with

14  ongoing proceedings in the Virginia circuit court; and B, with

15  important matters of state domestic relations law that are

16  committed to Virginia's General Assembly and to its state

17  courts for interpretation.

18          So with respect, we submit that the Court should

19  dismiss the amended complaint for, one, of jurisdiction and

20  enter a final judgment to that effect.  I'd be happy to address

21  the Court's questions, but we think those are the two issues --

22          THE COURT:  Well, what is -- it seems that the Fourth

23  Circuit has -- it's rare that they so find that the court does

24  not have jurisdiction.  I mean, what is your best case saying

25  there's no jurisdiction?

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1          MR. MORAN:  Well, Your Honor, we think we have

2    several good cases that say there is no jurisdiction under the

3    domestic relations exemption.  The Supreme Court has

4    articulated a number of cases.  *Newdow* summarizes many of those

5    *ex parte* --

6          THE COURT:  But this case has many more issues in it

7    than just the custody issue.

8          MR. MORAN:  Well, Your Honor, with respect, you know,

9    *Newdow* I think is a perfect example where the case itself was

10   actually about a federal constitutional issue, about prayer in

11   schools.  And the person who brought the case --

12         THE COURT:  Yeah, but there are plenty of cases

13   having to do with custody.  We don't need to go outside of that

14   issue.

15         MR. MORAN:  Well, Your Honor, again, I'd be happy to

16   walk through their claims, but I think --

17         THE COURT:  Well, okay.  I understand your argument,

18   and I think it's covered well in -- covered completely in your

19   motion and argument, written material on the motion.  But I

20   didn't come away with the feeling that the Fourth Circuit

21   looked favorably upon dismissing cases such as this, a finding

22   that there was no jurisdiction.

23         MR. MORAN:  Well, Your Honor, again, admittedly the

24   domestic relations cases are not abundant.  We think that's

25   precisely because the parties recognize that when they have a

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  claim like this one, that it should be brought in state court.

2  And that's, in fact, where the plaintiffs brought these claims

3  initially.

4          THE COURT:  Okay.

5          MR. MORAN:  They filed it in state court.

6          THE COURT:  Okay.  I understand that issue.  Go

7  ahead.

8          MR. MORAN:  So again, the very related doctrine that

9  addresses the balance of the case is -- are the abstention

10 doctrines.  And they are motivated by similar but distinct

11 considerations.  And they counsel that the Court should either

12 dismiss -- depending on the nature of the relief sought -- or

13 should stay the case when proceeding would intrude on sensitive

14 areas that are committed to the state court.  And as I said in

15 opening, I think there are two factors here that counsel in

16 favor of that approach at a minimum.

17          The first is that we already have an ongoing state

18 court proceeding that's addressing the underlying issues that

19 are motivating the dispute among the parties in this case, and

20 that for this Court to exercise jurisdiction at least at this

21 time, and to proceed into discovery and summary judgment and

22 eventual trial would, again, divert party resources back and

23 forth between state and federal court, and would interfere with

24 what the circuit court has expressed as a clear desire to move

25 quickly to a final resolution of that matter.  And this is the

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   unusual case where often if you have parallel state and federal

2   proceedings, it's because one party wants to proceed in state

3   court and the other party wants to proceed in federal court.

4   And here you have both actions that are brought by the same --

5   by the same plaintiffs.  And so it is candidly an unusual

6   situation, but we think that *a fortiori*, counsel is in favor of

7   abstention, if not outright dismissal, because it would

8   interfere with the forum that is precisely where the plaintiffs

9   chose to bring their case.

10          THE COURT:  Okay.  But you would agree that the

11   plaintiffs cannot get complete relief in the case in the state

12   court?

13          MR. MORAN:  I don't know if I would agree with that,

14   Your Honor.  It certainly depends on what they construe to be

15   complete relief.  And I think one of the problems here is that

16   we have a complete mismatch of remedies and alleged substantive

17   claims.  So their substantive claims are state tort law claims

18   where they claim to be seeking $20 million in damages, and they

19   allege, you know, tortious interference with parental rights

20   and other state law claims.  But then they separately plead an

21   entitlement to declaratory relief for a number of piecemeal

22   issues, none of which themselves would provide them with

23   relief.  And I think it's fairly obvious what they want those

24   to do, which is to take them back to the state court proceeding

25   and use them to preempt what it is that the state court may

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  decide on their claims, because if not, if they don't intend to

2  do that, then there is no readily apparent reason for the Court

3  to give declaratory relief.  They would be impermissible

4  advisory opinions for the Court simply to rule on discrete

5  legal and factual issues or mixed questions of law and fact

6  without actually providing final relief.

7           And if the Court does think that they've stated a

8  claim on the merits for monetary damages -- which I'm happy to

9  get into the particulars of that and why we don't think that's

10 the case -- but even if the Court did, there's no reason not to

11 stay the case now, because that entitlement to monetary damages

12 would not be going anywhere.  You know, it's static.  It either

13 exists or it doesn't, and they're not losing anything by

14 waiting on the money damages.

15          THE COURT:  Well, the interference took place over a

16 long period of time at some time after the Masts had proceeded

17 with the earlier adoption in Fluvanna.  They allegedly led --

18 deceived the Does about what was going on, that they didn't

19 mention that they had adopted the child, but proceeded to have

20 them do all sorts of things to help under the guise of getting

21 the child back to the United States for medical treatment,

22 knowing that the Does had a recognizable interest in the child

23 themselves.

24          Why wouldn't that support some action -- a cause of

25 action?

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1          MR. MORAN:  Well, Your Honor, those are certainly

2     their allegations.  And again, those are being actively and

3     currently litigated in state court.  The last point you raised

4     about their alleged interest in the child, that's an issue that

5     was ruled on by the circuit court and then certified for

6     interlocutory appeal because the circuit court recognized that

7     it was contrary to or at least a departure from existing

8     federal and Virginia precedent on the issue, and that the court

9     was breaking new ground by making that ruling.  So that issue

10    is currently pending before the Court of Appeals of Virginia.

11         And as to the broader allegations of fraud, that they

12    were misrepresented, of course our clients vigorously dispute

13    that and believe that they have already proven in the state

14    court that those allegations are false.  But again, those

15    allegations are being actively and currently litigated in state

16    court and factor to be a prominent feature of the May -- the

17    May trial date in circuit court.

18         THE COURT:  Is there any effect of this Court's order

19    in the previous case brought by the Masts in this Court for a

20    TRO when this Court ruled that the child should stay in

21    Pakistan?

22         MR. MORAN:  Well, Your Honor, with respect, I don't

23    believe that the Court -- well, I would say two things:  One,

24    to the extent if there is any effect, I believe it's very

25    limited; and secondly, with respect, I don't think it's correct

13

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   to characterize the Court as having ruled that the child should

2   stay in Afghanistan, not in Pakistan, but that --

3              THE COURT:  All right.  I maybe misspoke.  Go ahead.

4              MR. MORAN:  That's okay.

5              But that the Court denied a TRO.  As we know, a TRO

6   is subject to a high standard.  It's done in an emergency

7   posture, and it's -- you know, it is subject to a particularly

8   high burden.  The fact that our clients sought and failed to

9   obtain a TRO does not mean that they're now liable for $20

10  million in tort damages.

11             And the second thing that I would say is that under

12  plaintiffs' position -- and I would expect that if we hear from

13  the United States, the United States would echo this position

14  because they have done it elsewhere -- you know, that was

15  once-and-for-all decision, that once the TRO was denied and

16  once Baby Doe was transferred out of DOD custody, that that was

17  a decision once and for all and forever that she would remain

18  in Afghanistan.  And frankly, that's not what the decision was.

19  The decision was that she would be transferred from DOD custody

20  to the government of Afghanistan.  That actually did take

21  place.  She was placed with a family, and then my clients

22  finalized the adoption, spoke with the family, she came to the

23  United States and --

24             THE COURT:  Well, is there any dispute but that

25  counsel for the Masts denied in that proceeding that they

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  intended to adopt the child when, in fact, they had already

2  filed adoption proceedings?

3      MR. MORAN:  There have been questions raised, Your

4  Honor, about the timing -- the precise timing and the

5  representations.  And I will confess that I don't have an

6  outline of those here in front of me today.  I can certainly --

7  I can certainly do that.  My --

8      THE COURT:  You know that they had filed for

9  adoption before they came to this Court for a TRO.

10     MR. MORAN:  Yes.  And my understanding of the

11  succinct response to Your Honor's question is that at the time

12  that that representation was made, that they did not expect or

13  anticipate that they would be seeking to finalize the adoption,

14  but that subsequently --

15     THE COURT:  Well, he didn't say anything.  I asked

16  was there any intent to -- he said oh, no, the intention was to

17  seek medical care.

18     MR. MORAN:  Yes, Your Honor.  Well, I can say two

19  things.  Again, I don't have in front of me the precise

20  timeline dispute to that particular representation.  But as to

21  the broader question of the intent to seek medical care, that

22  has always been an inextricable component of our clients'

23  desire for their adoptive daughter, was that she could get the

24  medical care that she needed.

25     THE COURT:  All right.  You can go ahead.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1          MR. MORAN:  So Your Honor, again, for the sake of

2     completeness, we have addressed the domestic relations

3     exception.  We talked about the abstention doctrines.

4          I think the other two buckets of issues are, one, the

5     issue of standing to raise a claim on behalf of Baby Doe

6     herself.  Now, we -- in both the opening complaint and in the

7     amended complaint, John and Jane Doe purported to bring a claim

8     on behalf of Baby Doe.  In our motion to dismiss we pointed out

9     that they do not have standing in order to assert a claim on

10    her behalf, particularly against her own adoptive parents, and

11    that -- and they did not respond to that in opposing the motion

12    to dismiss, and we believe under straightforward procedural

13    rules have therefore waived any claims that they purport to

14    bring on behalf of Baby Doe.  Now, I will concede in their

15    reply brief to the motion for an order of show cause they have

16    attempted to resurrect -- to rehabilitate that issue, and have

17    added some argument.  But A, we think that's too late as a

18    procedural matter to recover from the waiver that they had

19    already made; and second, substantively, we don't think those

20    cases give them standing as an alleged next friend to assert --

21    you know, again, to take a step back, the notion of -- that a 3

22    year-old child asserting a $20 million tort claim against her

23    adoptive parents that's brought by third parties, you know, it

24    defies both the law and common sense.  And so as to that piece,

25    at a minimum, we would ask the Court to dismiss Baby Doe as a

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  plaintiff in the case, and to dismiss the claims that are

2  purportedly brought on behalf of Baby Doe.

3          You know, again, most of our arguments about why they

4  failed to state a claim on the merits under their tort theories

5  are tied up in the notion that there is for now, at a minimum,

6  there is a Virginia final adoption order that states that

7  Joshua and Stephanie Mast are the parents of this child.  And

8  we don't think there is any basis under Virginia law to assert

9  any of the tort claims that they've asserted in that type of

10 position; for example, tortious interference with parental

11 rights.  The idea that any party could sue the adoptive parents

12 of a child for tortious interference with parental rights has

13 certainly no basis in Virginia precedent.  We don't think there

14 is any way to support it.  And if the Court had any doubt on

15 that point, we think that would just further counsel in favor

16 of abstention, or, at a minimum, of certification of those

17 issues to the Virginia Supreme Court because the Court would be

18 breaking new ground by recognizing a supposed tort for a -- you

19 know, for non -- for alleged family members to assert a claim

20 of tortious interference with parental rights against the

21 adoptive parents of the very child in question.

22          And then the final piece would just be that, you

23 know, as stated in our briefing, we don't believe that even if

24 plaintiffs have --

25          THE COURT:  So you don't contend at this point that

17

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   the rights of the Masts are established in the Virginia courts,

2   do you?

3          MR. MORAN:  We absolutely do, Your Honor.  They have

4   a final and valid order of adoption from the Virginia --

5          THE COURT:  Well, I mean, you're saying there's no

6   question about whether that was secured by fraud?

7          MR. MORAN:  Well, to the extent there is a question,

8   it is being litigated in --

9          THE COURT:  Okay.

10         MR. MORAN:  -- circuit court, and it's --

11         THE COURT:  Okay.  But it's still in litigation.

12  It's still up in the air.  So the child is -- I mean, I don't

13  see why the Does couldn't file a suit any more than -- they

14  would have it would seem at this point the right to file a

15  suit, as well as maybe the Masts do, asserting their claim.  I

16  mean, you're asking the Court to go ahead -- I mean, if I

17  should rule that the Masts have no right to do it, that's

18  deciding the case on the merits right now, isn't it?

19         MR. MORAN:  Well, no, Your Honor, it's not.  It's

20  deciding the merits of their -- of their federal claim that

21  we've pleaded here, but that would not have -- dismissing the

22  case for lack of jurisdiction or standing under the abstention

23  doctrines would not in any way prejudice the plaintiffs from

24  their ability to prosecute their claims in the circuit court

25  proceeding; and, you know, if they were to prevail there, you

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    know, to execute on whatever judgment they might obtain there.

2    What they're trying to do is jump ahead of the state court

3    proceeding and ask this Court to adjudicate the validity of the

4    order so that they can then take that back to the state court

5    and tell the state court that it doesn't have jurisdiction

6    and/or that it has to defer to the ruling of this Court.  We

7    think that's exactly backwards under both the abstention

8    doctrines and the domestic relations exception.

9              THE COURT:  All right.  Go ahead.

10             MR. MORAN:  With that, Your Honor, I believe I've --

11    I've at least attempted to address Your Honor's questions and

12    cover the matters before us.

13             I think at a minimum, again, if the Court felt that

14    their pending circuit court action preserved a live question

15    about whether their tort claims might be viable at some time in

16    the future, then I think, again, the correct answer would be to

17    stay this proceeding pending that proceeding.  And then either

18    one of two things would happen:  Either they would prevail in

19    the circuit court and set aside the final order of adoption, in

20    which case they could come back to this Court and we could

21    argue about the effect of that judgment and what it might mean

22    for their tort claims; or they would lose in the state court

23    proceeding, the Court would reject their challenges to the

24    adoption, and the Masts would remain as they are today, the

25    legally adoptive parents of Baby Doe.  And again, I suspect in

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  that situation we would also be back here in this Court and

2  arguing about the effect of that judgment on their tort claims.

3  But what we think would be disruptive and a waste of party and

4  judicial resources would be to attempt to litigate these cases

5  in parallel, especially given that we have a May 1 trial date

6  that's been set in the circuit court.

7           THE COURT:  Okay.  Well, you've covered that I think

8  sufficiently.  Just a minute.

9           I think this is the case of *vonRosenberg versus*

10 *Lawrence,* I believe.  And the Fourth Circuit rejected the

11 dismissal in that case.

12          Are you familiar with that case?

13          MR. MORAN:  I'm taking advantage of the electronic

14 situation and attempting to make sure that I am, but I'll

15 confess that it's not coming to mind.

16          THE COURT:  Well, they say, We have strictly

17 construed the requirements of parallel federal and state suits

18 requiring that the parties involved be almost identical.  And

19 then you have different issues.  You have different parties,

20 different issues.  And they discuss the Colorado River

21 abstention and --

22          MR. MORAN:  Sure, Your Honor.  I'll confess I'm just

23 looking at it now.  But I think the two most important factors

24 that the Court highlighted there are, one, that the parties in

25 both actions are identical; and two, that the state action, the

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   state case will completely and promptly resolve the issues

2   between the parties.  And I think that's absolutely met here.

3   There's no dispute that --

4           THE COURT:  Well --

5           MR. MORAN:  -- John Doe and Jane Doe are the

6   petitioners in the parallel state court proceeding, that

7   they've proceeded against Joshua and Stephanie Mast.  Now, they

8   have claims against other defendants here.  But I would point

9   out, A, that those claims have their own issues which I'll

10  allow their counsel to raise; and two, that the identity of

11  those -- you know, who are those additional defendants?

12  They're one of the lawyers that represented the Masts -- and

13  are still representing the Masts -- in the state court

14  proceeding, and two of their most substantive witnesses in that

15  case.  And so to allow them to sue a party's attorney and their

16  witnesses in order to end run abstention doctrine would create

17  wildly perverse incentives.

18          The other thing I would say -- so again, we have --

19  and certainly as to the claims against my clients, Joshua and

20  Stephanie Mast, we have an identity of the parties and we have

21  very good assurances that the state court will promptly resolve

22  the matters.  In fact, the only reason that the trial is taking

23  place in early May rather than later this month or even already

24  is because the circuit court was willing to accommodate

25  counsel's schedules and find a date that was mutually

21

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  agreeable.  The Court had expressed that it wanted to have a

2  final trial and final decision on the merits this month

3  initially.  Again, I think even under that case, we would move

4  ahead.

5          THE COURT:  Okay.  Thank you.

6          Counsel for Richard Mast?

7          MR. YERUSHALMI:  Thank you, Your Honor.  David

8  Yerushalmi from the American Freedom Law Center on behalf of

9  Richard Mast.

10         I would like to address first the question that Your

11 Honor raised with regard to the TRO, because I understand

12 that's of some concern to the Court.  But before I do so, let

13 me just underscore the fact that we're here on motions to

14 dismiss.  And so in that context, *Twombly/Iqbal* apply.  And in

15 those cases it's very clear that alternative explanations for

16 conclusory allegations effectively prevent the claim that

17 they've raised plausible allegations.

18         Now, if I return back to the Court's question of the

19 TRO, as a factual matter -- and it's really not relevant to

20 this proceeding -- my client will set out very clearly, once

21 the facts are at issue -- and it certainly has been done at the

22 state level -- that the representations to this Court at the

23 time of the TRO were truthful; that the proceedings, whatever

24 they were and whatever nomenclature was used, was for the

25 purpose of getting the young girl to this country for medical

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  attention.  At the present time of that TRO, my client did not

2  understand there was any motivation to formally and fully adopt

3  this child.  That's --

4        THE COURT:  Okay.  Well, look, I more or less agree

5  with you.  It's not going to determine these issues.

6        But just to get it straight, my question was to

7  Mr. Mast:  "Your client is not asking to adopt the child?"

8        Answer:  "No, sir.  He wants to get her medical

9  treatment in the United States because we dispute that this is

10 a family member."

11       So I mean, how can you parse that and say that that

12 was a truthful statement?  I don't want to go into it, except

13 that you insist on saying it was truthful.  It's sort of

14 bothersome --

15       MR. YERUSHALMI:  Right.  I understand that, Your

16 Honor, and I appreciate that.  I'm late in the game here and

17 doing my best for catch-up.

18       But what I will say is this:  That when the facts are

19 laid out, when the understanding of that question is put in the

20 proper context, I believe the Court will have a better view of

21 the matter; however, even assuming that was not the case, and

22 even assuming it was somehow a mistake in representation, the

23 reality is, that's not an issue here because the Court denied

24 the TRO.  There was no effect of whatever Richard Mast said or

25 did not say in representing his client.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    Now moving on to the basis of the 12(b)(6) motion to
2    dismiss.  While the allegations are accepted as true -- and we
3    all understand that to be the case -- conclusory allegations,
4    especially when it comes to fraud, do not suffice.  And indeed,
5    under Rule 9, allegations of fraud have to be particularized.
6    They have to establish exactly who, what, when, and where.  In
7    this particular instance, if you look at the specific counts --
8    and we have to treat Richard Mast very carefully as counsel for
9    Joshua Mast in the state court proceedings -- we have Count One
10   of tortious interference with parental relations in which he is
11   named as a primary party.  We have Count Two, which is fraud,
12   in which he's not named at all.  Count Three, conspiracy, which
13   is kind of an omnibus claim that relates to all defendants and
14   purportedly has purposes of secondary liability, conspiracy.
15   It applies against all counts.  We have Count Four, intentional
16   infliction of emotional distress in which my client is named
17   there as a defendant in that cause of action.  And then we have
18   false imprisonment in which my client is not named.  I want to
19   separate this discussion because it is important at the motion
20   to dismiss stage between allegations of primary wrongdoing and
21   secondary or conspiratorial wrongdoing because they're going to
22   be different in the analysis.
23       Under the tortious interference claim -- and this was
24   established as a newly adopted tort in the state of Virginia
25   under *Wyatt v. McDermott,* 725 S.E.2d 555 Virginia Supreme Court

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  2012 -- the court made clear that this is an intentional tort.

2  And it's an intentional tort to interfere with the parental

3  relations.  So one has to, one, intend to interfere, and intend

4  to interfere with parental relations.  Now, the claim here --

5  and in fact throughout this complaint, which reads a lot like

6  the *New York Times* article that the plaintiffs put out, the AP

7  articles, as kind of a narrative to paint all the defendants in

8  the worst possible light.  But the reality is the only

9  allegations that really speak to Richard Mast's involvement in

10  the so-called conspiracy and in the intentional interference in

11  parental relations is paragraphs 185 and 93.  And those

12  paragraphs essentially say that Richard Mast filed documents in

13  the court that were not true.  But what, in fact -- and we're

14  talking about the circuit court here in order to get the

15  adoption order.  But what were those facts that they allege he

16  didn't properly disclose to the court?  Essentially they're

17  legal conclusions that the Afghan government had taken

18  jurisdiction.  That's a legal conclusion.  That's not an actual

19  fact.  The facts underscoring that are what letters were

20  produced, what court proceedings took place.  But the reality

21  is the conclusion that these individuals have some kind of

22  parental rights is entirely legal.  You have to conclude as a

23  legal matter that the government actually took jurisdiction.

24  You have to conclude as a legal matter that it was a proper

25  action.  You have to conclude that the father of John Doe was,

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  in fact, legally determined to be a relative all the way down

2  the stream of allegations.  The fact is, these are legal

3  conclusions.  They're not underlying factual

4  misrepresentations.

5          THE COURT:  Well, what about the allegation that the

6  birth country was unknown?  That's a fact, isn't it?

7          MR. YERUSHALMI:  No, sir, it is not.  In fact, there

8  is no actual evidence -- other factual evidence -- that this

9  child was born in Afghanistan.  There is legal conclusions that

10 the Afghans had taken jurisdiction because she was the daughter

11 of supposedly foreign fighters, and they were killed in action,

12 and therefore she was found on Afghan soil.  And the plaintiffs

13 then cite to an unauthenticated, ambiguous statement about what

14 Shariah law is or what the Afghan government's law was at the

15 time, which is birthright jurisdiction.  And the fact is, is

16 that none of that is factually in the record either in the

17 state court proceeding or in this proceeding or in the

18 allegations.  The fact is these are all --

19         THE COURT:  Well, you -- according to your theory, it

20 would have been okay for him to say that unless there was

21 someone who could actually testify they saw this child come

22 from the womb?

23         MR. YERUSHALMI:  Well, if it's going to be a factual

24 misrepresentation, one can determine -- this Court could

25 determine, or maybe more properly in our view the circuit court

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  could determine -- that the conclusion that this child was a

2  citizen of Afghanistan or under their jurisdiction or born in

3  Afghanistan, they might conclude that after looking at all the

4  evidence.  But that is not a misrepresentation of fact at the

5  time -- and especially at the time they concede -- that in what

6  way, shape, or form would the Masts have -- certainly Richard

7  Mast as the attorney for Joshua Mast -- have known at the time

8  of the circuit court proceedings, the original guardianship

9  proceeding in the family court and subsequently at the circuit

10  court for the interlocutory adoption proceedings, that this

11  child was, in fact, not stateless.  All indications were that

12  she was.  But there is nothing, again --

13        THE COURT:  The indications were that the child was

14  stateless?

15        MR. YERUSHALMI:  Your Honor, yes, but again, because

16  we're at a motion to dismiss, those kind of ultimate factual

17  determinations can be made.  But the fact is, is they're being

18  litigated in the circuit court.  There is no way in the world

19  that Richard Mast or Joshua Mast, given all of the evidence

20  that's being introduced down there -- live testimony,

21  documentary evidence, a hearing is going to be held in May --

22  that they could have known factually, not some legal

23  determination, factually, that this child was not stateless.

24  That's just improbable.  And under *Twombly-Iqbal* when you have

25  alternative innocent explanations, you don't have plausibility.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  In this case, Richard Mast --

2          THE COURT:  Well, we get back to that's sort of like:

3  No, we're not intending to adopt the child.

4          MR. YERUSHALMI:  But again, Your Honor, that

5  particular statement, again, dealing with the motion to

6  dismiss, is actually irrelevant to this proceeding.  We will

7  address that factual question.  We will address it with the

8  timetable and specificity when and if that becomes at issue.

9  But Your Honor denied the TRO.  It did nothing to further the

10  so-called conspiracy.  That's ultimately the conclusion with

11  regard to the TRO.  The TRO hearing is a red herring.  I know

12  it's important to the judge and this Court for the obvious

13  reasons, and we will address that.  But with regard to a motion

14  to dismiss at this stage in the proceedings, it had no

15  consequence.  If the Court had granted the TRO, then that might

16  make -- might be an argument, but it did not.

17          The same holds true with the rest of the allegations,

18  Your Honor, whether it's the false imprisonment, the

19  conspiratorial aspects of the false imprisonment.  But I want

20  to address the second direct liability claim, which is

21  intentional interference with -- intentional infliction of

22  emotional distress.

23          Again, the only allegations in the complaint are

24  actually they're conspiratorial.  Now, they've named the

25  defendant.  Paragraph 192 of the amended complaint says in

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   furtherance of the scheme.  Well, that's a secondary liability
2   argument.  That's not direct.  My client had no direct
3   communication or contact with the plaintiffs up until the time
4   that they arrived in the United States and the child was
5   already in the custody of Joshua Mast.  The reality is, they
6   did not -- the only claims that the amended complaint make
7   against the defendant Richard Mast as the attorney for Joshua
8   is that in his filings in court, he did not make true
9   representations.  But again, when you look at those
10  allegations, what were those representations?  That he -- they
11  mentioned that the child was stateless.  They mentioned that
12  they believed -- underscored -- believed that the government of
13  Afghanistan at the time was going to waive jurisdiction.
14  Again, at the time that's not a factual statement.  They were
15  articulating their belief about what was going to take place.
16  And indeed when the final order of adoption came down, the
17  Court recognized itself that that had not been forthcoming as
18  of the time.  So the reality is there are no factual
19  representations --
20          THE COURT:  Okay.  Let me ask you.  There's one other
21  one you didn't mention under paragraph 112.  On August 20, '21
22  in an email to USCIS, Richard Mast falsely wrote, quote, "John
23  and Jane Doe are helping" -- or maybe that's in parens, I don't
24  know -- "are helping USDOD at great risk to themselves, and
25  have cared for the minor DOD dependent child, Baby Doe, who has

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    serious medical needs."

2          And I think in other places it says we find that it's

3    questionable or that the child was not in DOD custody at the

4    time.

5          MR. YERUSHALMI:  Again, Your Honor, the question

6    there is one of a legal opinion.  Whether or not the DOD had

7    custody or not ultimately is not -- in other words, if we're

8    talking about physical custody at the time, that would have

9    been false, but we're not talking just as well about legal

10   custody.  The fact is, is that's what that form typically

11   applies to, not physical custody.  In fact, the form itself

12   states that these individuals were taking care of this child

13   who was in DOD custody.  That's a legal conclusion about who

14   should have proper custody.

15         Putting that aside, true or not true, legal opinion

16   or factual statement, the reality is that had nothing to do

17   with ultimately the fraud.  The Does wanted to come to America

18   for medical attention for their child.  That's in the

19   complaint.  Now, they like to dress it up and say, well, we

20   were convinced the child was sick from afar.  But the reality

21   is the amended complaint makes it clear, and it would be

22   implausible to conclude that they did not want medical

23   attention for that child.  So they came to the United States.

24   That document helped get them here.  It wasn't part of the

25   ultimate fraud that they're claiming as against Richard Mast or

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  even the conspiracy element.  They sought admission to the

2  United States.  We were dealing with a time of war.  We were

3  dealing with exigencies.  We were dealing with the evacuation.

4  One would be hard pressed to examine that form as a fraudulent

5  statement that gave -- that was in furtherance of or

6  participated in a conspiracy that has been essentially crafted

7  out of whole cloth.

8          Unless the Court has any further questions, Your

9  Honor, that's our position with regard to the 12(b)(6) motion,

10  that the allegations against Richard Mast -- and we're talking

11  about Richard Mast as the attorney in the brief that was filed

12  prior to my entry -- makes the point -- and I think cogently,

13  and I'm not going to go through all of that -- that as the

14  attorney for a principal, Mr. Mast cannot be held liable.  In

15  the opposition papers plaintiffs cite to various cases, but

16  those cases are inapposite.  And the reason they're inapposite

17  is because in those cases the attorney was doing something

18  other than litigating on behalf of the client.  There was some

19  other involvement.  And in this case, that is clearly the

20  reality.

21          With that, Your Honor, we would ask the Court to

22  dismiss Richard Mast for the reasons set forth in the other

23  motions to dismiss with regard to abstention and domestic

24  relations, but principally on 12(b)(6) grounds.

25          Thank you.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1        THE COURT:  Okay.  We'll hear from counsel for

2   Kimberley Motley.

3        MR. HOERNLEIN:  Yes, Your Honor.  Thank you.  This is

4   Mike Hoernlein with Alston & Bird on behalf of Ms. Motley.  I'm

5   joined by my colleague, Tom Davison, as well.

6        Your Honor, I don't think there is much of a risk

7   that I'll repeat any of the arguments that the other defense

8   counsel have made so far.  Ms. Motley doesn't belong in this

9   case at all, and I'd like to speak a little bit about the

10   allegations about Ms. Motley specifically.  And just to refresh

11   Your Honor's recollection, we moved for dismissal on the

12   grounds of lack of personal jurisdiction under 12(b)(2), as

13   well as failure to state a claim under 12(b)(6).  We did not

14   challenge jurisdiction, and so I'll be speaking about personal

15   jurisdiction and a little bit about 12(b)(6).  But I don't

16   think there's much more to say about that.

17        Your Honor, the main issue here as it relates to the

18   allegations against Ms. Motley is that they have -- the Does

19   here have a fundamental plausibility issue, and that infects

20   the entire case.  It infects their claim of personal

21   jurisdiction, and it infects their conspiracy theory, and it

22   infects their substantive causes of action as well.

23        Your Honor, Ms. Motley is an internationally known

24   human rights lawyer.  And Your Honor can take judicial notice,

25   if you'd like, of very many news stories about Ms. Motley's

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  work in Afghanistan and around the world.  But it's against

2  that backdrop that the Does allege that Ms. Motley entered into

3  a years' long conspiracy with four total strangers to kidnap a

4  little girl.  And what do they say that she gained by entering

5  into this conspiracy and putting at risk her reputation and her

6  livelihood?  They say it was for a few thousand dollars.  Now,

7  Your Honor, it's absurd on its face, but when you --

8          THE COURT:  You know, I can't decide that.  That's a

9  factual issue.  At this stage, I have to accept that as true.

10          MR. HOERNLEIN:  Your Honor, that's -- well --

11          THE COURT:  An allegation of fact.

12          MR. HOERNLEIN:  The allegation of fact about a few

13  thousand dollars, sure.  The allegation of fact about the

14  communication that Ms. Motley had with her, to the extent it

15  satisfies 9(b), that's absolutely right, Your Honor.

16          My point is that the narrative doesn't make sense.

17  But when you dig into the actual allegations in the complaint,

18  not the unpleaded ones in the opposition brief, but the actual

19  allegations about Ms. Motley, not the conclusory ones that say

20  she was in a conspiracy, but the ones that target what they say

21  she actually did, especially given that Rule 9(b), since this

22  is a fraud-based claim and a fraud-based conspiracy, they have

23  to satisfy heightened requirements of Rule 9(b).  So they say,

24  Your Honor, that Ms. Motley was a pivotal, critical part of

25  this years' long conspiracy.  She was crucial to it.  And so,

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   again, they have a lot of allegations throughout the complaint
2   that say conclusorily she engaged in this conspiracy with the
3   Masts to kidnap a baby.  But you don't have to take that as
4   true.  That's a conclusion.  The things that you need to take
5   as true are things like she said X, Y, and Z on such-and-such
6   date, you know, and where -- the who, what, when, and where,
7   those are the things that Your Honor needs to take as true.

8        And so, you know, let's look at what those things
9   are.  It really comes down, Your Honor, to just two paragraphs.
10  If Your Honor wants to know what Ms. Motley is alleged to have
11  said to the Does as part of this vast conspiracy that lasted,
12  you know, two years and culminated in the abduction of a little
13  girl, read paragraph 85 and paragraph 98.  Paragraph 85 says in
14  March of 2020, quote, "Motley advised Jane Doe that she
15  understood Baby Doe had serious medical issues and that Motley
16  knew an American family who wanted to help her," closed quote.
17  Okay.  So March 2020 Ms. Motley allegedly says that to Jane
18  Doe.

19       And then paragraph 98 says, quote, "On July 10th,
20  2021, Motley offered for the first time to introduce John and
21  Jane Doe to the American family supposedly interested in
22  providing medical care for Baby Doe.  Motley then facilitated a
23  telephone conversation between John and Jane Doe and Joshua
24  Mast during which Ahmad Osmani provided interpretation," closed
25  quote.  Okay.  Your Honor, March 2020 and July 10th, 2021,

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  that's by my count about 16 months.  So during this vast

2  conspiracy that Ms. Motley was a crucial part of, what

3  exactly --

4          THE COURT:  Wait, she didn't have -- she could do one

5  act legally and be in -- no matter if the conspiracy lasted ten

6  years if she knew about it, joined it, and all that.  It

7  doesn't -- no matter how long it lasted, if they allege that

8  she did something that legally would make her a conspirator,

9  that's -- that's a fact.  I mean, that's -- you have to deal

10 with it.  The length of the conspiracy is not a reason for the

11 Court to dismiss the case.

12         MR. HOERNLEIN:  Well, Your Honor, I agree.  But if

13 they had alleged that a taxi driver in Kabul had driven them to

14 the airport and they said that was part of the conspiracy, Your

15 Honor, that would be absurd.  So --

16         THE COURT:  Okay.  It would be because it doesn't

17 allege any wrongdoing, and so stick to whatever they allege

18 factually.

19         MR. HOERNLEIN:  Well, Your Honor --

20         THE COURT:  You know, she got paid $4,500.  You say

21 it was $2,500, but anyway, for something.

22         Did she have anything to do with obtaining the

23 passport?

24         MR. HOERNLEIN:  So Your Honor, the allegation is that

25 Ms. Motley asked the Does for a picture, and that that picture

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   was forwarded on to the Masts.  Now, there is no allegation

2   besides that forwarding a picture that Ms. Motley had anything

3   to do with obtaining any documents for anyone, making any

4   representations in connection with any documents.  There is no

5   allegation.  It's just innuendo and suggestion that they try to

6   make it look like she passed along a picture as part of a

7   conspiracy.  And look, they -- that's their allegation.

8          But what do they not do?  They don't say, when

9   Ms. Motley asks for the picture on July 2nd or whatever it is,

10  that she told Jane Doe X, Y, and Z.  They do not do that.  And

11  that's what Rule 9(b) requires.  So all they say, Your Honor,

12  if I could quote from paragraph 88 of the amended complaint, it

13  says, "Motley continued to communicate with and befriend John

14  and Jane Doe on behalf of the Masts over the course of more

15  than a year, making multiple offers to assist with Baby Doe's

16  medical care and occasionally asking for photographs of Baby

17  Doe."  So again, Your Honor, this goes to plausibility.  Your

18  Honor does not have to check common sense at the door under

19  *Twombly* and *Iqbal* --

20          THE COURT:  Well, that's what you tell the jury.

21          MR. HOERNLEIN:  But Your Honor -- I apologize.

22          THE COURT:  No, go ahead.

23          MR. HOERNLEIN:  Well, Your Honor, *Twombly* and *Iqbal*

24  are pretty clear that the Court needs to take well-pleaded

25  factual allegations as true, but does not need to accept legal

36

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   conclusions or labels.  And the Court is perfectly entitled to

2   apply its experience and common sense.  And all I'm suggesting,

3   Your Honor, is if the Does had any affirmative statements or

4   misrepresentations to put in the complaint beyond the two that

5   they include in paragraphs 85 and 98, Your Honor, I would bet

6   that at least one of the lawyers representing the Does would

7   have said:  Let's put that in the complaint.  But they didn't.

8   And so they put in the complaint the best instances that they

9   could point to of what they say are the misrepresentations.

10          Now, it's true they do point to some omissions.

11  Well, Ms. Motley didn't say X, Y, or Z.  You know, they don't

12  have to have the same level of specificity about things she

13  didn't say.  But I guess, Your Honor, what I'm suggesting is

14  that if this -- if their conspiracy theory were true and you

15  had a group of people who were working for two years to pull a

16  fast one, and Ms. Motley were some part of that, their

17  paragraph 88 wouldn't just say for more than a year she

18  communicated with them.  They would say:  On this date she said

19  this; on that date, she said that.  They don't do that.  And

20  Your Honor, what I'm suggesting is that while you can take

21  paragraph 85 and 98 as true for purposes of a motion to

22  dismiss, you do not have to take as true that that amounted to

23  wrongful conduct or somehow in the 9(b) sense spells out a

24  fraud.  I mean, there is not one example from the time between

25  March 2020 and July 10th of 2021.  And if she were spending all

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  that time befriending them and trying to tell them what a great

2  guy Josh Mast is and how he just wants to help, if she did that

3  for a year and a half, Your Honor, surely they would muster up

4  at least one example of that -- one.  And there is not one

5  example.  And Your Honor, I submit that that tells you what you

6  need to know about the allegations against Ms. Motley.

7          And by the way, the Does have had access to discovery

8  already in the state court.  We have not, because Ms. Motley is

9  not a party to that action, is not anyone's lawyer in that

10  action.  And so, they have served subpoenas.  They have deposed

11  people.  And after all that, and after their first attempt at

12  the original complaint, we filed a motion to dismiss.  They

13  tried to fix some of the deficiencies.  And the best they could

14  come up with was these two allegations in 85 and 98.

15          So Your Honor, I submit to you that it's not just an

16  absurd narrative, but take the actual allegations in the actual

17  complaint that are concrete about Ms. Motley, and you will not

18  come up with a cause of action.  And you will certainly not

19  come up with participation in a conspiracy that would give this

20  Court the ability to exercise jurisdiction over a nonresident

21  who has no connection -- no alleged connection to the state of

22  Virginia.  The Court does not have personal jurisdiction over

23  Ms. Motley.

24          THE COURT:  Well, if she were in the conspiracy,

25  doesn't Virginia still recognize that?

                38

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED


 1          MR. HOERNLEIN:  So Your Honor, look, I -- it's our

 2   position that after *Walden*, the Supreme Court has made clear

 3   that a defendant's own connections --

 4          THE COURT:  Okay.  But the Fourth Circuit has not

 5   adopted that.

 6          MR. HOERNLEIN:  Well, Your Honor --

 7          THE COURT:  This Court has to follow what the Fourth

 8   Circuit has done until the Fourth Circuit tells me otherwise,

 9   right?

10          MR. HOERNLEIN:  So Your Honor, that's correct.  And

11   the Fourth Circuit case that is commonly cited, the *Unspam*

12   case, is from pre *Walden*.  And I don't think the Fourth Circuit

13   has addressed this since *Walden*.  But it's fair to say, Your

14   Honor, that there's a circuit split, that other courts in the

15   Fourth Circuit have adopted conspiracy jurisdiction even after

16   *Walden*; and, in fact -- and I have to bring this to the Court's

17   attention -- I understand from preparing for today that Judge

18   Urbanski in one case appears to have done it as well in 2014 in

19   a *DirectTV* case.

20          But what I would say about -- so we are not hanging

21   our hats on a decision that conspiracy jurisdiction doesn't

22   exist anymore.  What we would say is that if you look at the

23   cases that apply conspiracy jurisdiction, it's clear that it's

24   not an exception to due process.  It's not like --

25          THE COURT:  Well -- okay.  Go ahead.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1      MR. HOERNLEIN:  Your Honor, it's a way that some

2  courts find of satisfying due process, and typically it

3  involves an out-of-state party who is working through people in

4  the state to accomplish objectives in the state.  And so, yes,

5  there is an allegation of conspiracy, but there is essentially

6  a heightened pleading requirement that most courts apply.  And

7  you'll find that a lot of courts might recognize it, but they

8  don't actual apply it.  And so if Your Honor applies conspiracy

9  jurisdiction here under these circumstances, given the

10  plausibility issues that I've outlined where the allegations of

11  what Ms. Motley actually did as part of this conspiracy are so

12  thin and the actual allegations of an agreement, Your Honor --

13  not the conclusory ones that say she was in a conspiracy to

14  kidnap a baby, but the actual individual concrete allegations

15  about what the agreement was -- it's not exactly clear what she

16  was agreeing to do.  Was she just agreeing to locate and

17  communicate with the Does?  Because that's what their first

18  complaint said.  And that's very different, Your Honor, from

19  saying she agreed to --

20      THE COURT:  Well, one fact I think is alleged here,

21  that she asked the Does for a photograph on behalf of the

22  Masts.  And I don't know why you need an international civil

23  rights lawyer to ask for a photograph of your adoptive child --

24      MR. HOERNLEIN:  Well, Your Honor --

25      THE COURT:  -- from somebody else.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1         MR. HOERNLEIN:  Your Honor, it's --

2         THE COURT:  And that photograph, according to the

3  allegations, is -- was put on what is alleged to be a

4  fraudulently obtained passport.

5         MR. HOERNLEIN:  Your Honor --

6         THE COURT:  So if it be true, that would be enough

7  with regard to obtaining that passport, which was the key thing

8  in this child coming to the United States where the Masts had

9  an opportunity to take over the child.

10        MR. HOERNLEIN:  Your Honor, there is no allegation

11 that Ms. Motley was involved or knew what the photo was going

12 to be used for, or was involved in any way in getting the

13 document.  So while yes, it's true that that's how it played

14 out --

15        THE COURT:  Okay.  Okay.  But look, you know, we're

16 at the pleading stage, and the Court has to accept everything

17 as true.  You know, I'm sure Ms. Motley is everything you say,

18 her reputation.  But the Court has -- on those allegations, she

19 is a key player in obtaining a fraudulent passport.  Now, she

20 can say, hey, I didn't know what it was for.  But that comes at

21 summary judgment or trial down the road.  It doesn't -- the

22 Court can't decide that here on a motion to dismiss for failure

23 to plead.  That's enough.

24        MR. HOERNLEIN:  Well, Your Honor, understood.  I

25 guess I'm asking that you just look at their allegation, not --

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    THE COURT:  Well, is what I said about the passport
2  not true insofar as the allegations?
3    MR. HOERNLEIN:  Your Honor, the allegation is that
4  Ms. Motley asked the Does for a picture, and that she -- and
5  that she passed that picture on to Joshua Mast.  There is no
6  allegation that -- first of all, that's equally as consistent
7  with her passing on the picture because they wanted to get the
8  girl medical treatment.  But there is -- again, just looking at
9  their allegations, it would be one thing if they had said
10  Ms. Motley, you know, knew that they were going to obtain
11  this -- these documents.  They don't do that.
12    And, Your Honor, if I could just address your
13  question about why they would need someone like Ms. Motley to
14  locate the Does, again, this isn't in the complaint, but if I
15  could respond, Ms. Motley -- well, it does say that she worked
16  in Afghanistan for a long time.  Your Honor, there aren't that
17  many westerners who have spent that much time working in
18  Afghanistan.  So it's not --
19    THE COURT:  Look, sir, I've tried now I don't know
20  how many conspiracy cases.  And this may be thin, and the jury
21  may well not believe that there was any, you know, untoward
22  action on the part of Ms. Motley in obtaining the photograph,
23  that she didn't know it would be used to obtain a fraudulent
24  passport.  But at this point it's beyond -- it's gone beyond
25  that.  So let's move on.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1        MR. HOERNLEIN:  Yes, Your Honor.

2        Your Honor, so again, I would just say as to due

3   process, due process still requires minimum contacts, even if

4   conspiracy jurisdiction applies.  Courts do tend to look at the

5   nature of the conspiracy allegations carefully in applying it.

6   I would say, Your Honor, that the nature of the allegations

7   against Ms. Motley struggle with plausibility.

8        And to just talk briefly about failure to state a

9   claim, you know, the allegations of her specific conduct,

10  again, are exceedingly limited, and fail to make out the

11  elements as to her conduct.  And again, the Does are seeming to

12  place all of their eggs in the basket of conspiracy.  And

13  again, for a two-year conspiracy, there is really just -- I

14  think thin is charitable, Your Honor.  We would ask you to --

15  unless you have more questions for me, Your Honor, we would ask

16  you to dismiss all the claims against Ms. Motley.

17       THE COURT:  All right.  Thank you, sir.

18       Okay.  Counsel for Osmani?

19       MR. BROOKS:  Thank you.  May it please the Court.

20  Tyler Brooks as counsel for Mr. Ahmad Osmani, also appearing

21  with Richard Boyer.

22       We believe at this point all of the points have been

23  sufficiently raised, and we join all of the arguments raised by

24  counsel for the co-defendants.  And we intend to rest on our

25  pleadings and the arguments raised by co-counsel, unless Your

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  Honor has a specific question for us.  But we believe that our

2  pleadings and the other arguments of counsel are sufficient.

3          THE COURT:  All right.

4          MR. BROOKS:  We don't want to take up more of the

5  Court's time.

6          THE COURT:  Thank you, sir.

7          MR. BROOKS:  I'm sorry, Your Honor.  There was one

8  request.

9          There has been some question about the appearance of

10  Mr. Osmani in state court.  And we did want to ask leave to

11  file under seal the subpoena under which Mr. Osmani did appear

12  at circuit court, if we could, after these proceedings.  If we

13  could have leave to do that, Your Honor, we would be

14  appreciative.

15          THE COURT:  Well, I don't quite understand if it has

16  to do with the state court, but anyway.

17          MR. BROOKS:  I'm sorry, Your Honor.  As it exists as

18  an exhibit, there was some back and forth in the -- on our

19  motion to dismiss as to Mr. Osmani appearing in the circuit

20  court, and whether that was a voluntary appearance or whether

21  it was an appearance pursuant to subpoena, and thus the effect

22  that it would have on jurisdiction by the state of Virginia,

23  because we contend that if it was a subpoena, then it would be

24  privileged and would not be a waiver of jurisdiction.  And so

25  we just wanted to file that subpoena as a copy to just prove

44

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    that it was pursuant to a subpoena.

2              THE COURT:  Oh, okay.  Well, you may do so.

3              MR. BROOKS:  Thank you, Your Honor.

4              THE COURT:  All right.  Counsel for the Does?

5              MS. ECKSTEIN:  Good afternoon, Your Honor.  May it

6    please the Court.

7              And just for clarity in terms of how we're splitting

8    things up on our side, I will address the 12(b)(1) arguments;

9    and my colleague, Mr. Powell, intends to address the 12(b)(2)

10   and 12(b)(6) arguments.

11             THE COURT:  Okay.

12             MS. ECKSTEIN:  Thank you.

13             So with respect to the 12(b)(1) arguments, I would

14   like to start with a fundamental principle, one which I know

15   this Court is well aware of, and that is that federal courts

16   have an unflagging obligation to exercise jurisdiction.  As a

17   result, abstention is the exception.  It is not the rule.  And

18   it should occur only in extraordinary and narrow circumstances.

19             So with that fundamental principle, I'll turn first

20   to the domestic relations exception.  It doesn't apply here for

21   the simple reason -- and I think you addressed as well -- the

22   complaint does not ask the Court to make a determination about

23   divorce, alimony, or child custody.  The Supreme Court in the

24   *Ankenbrandt* case made it very clear that, quote, "The domestic

25   relations exception encompasses only cases involving the

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  issuance of a divorce, alimony, or a child custody decree," end

2  quote.

3      The Fourth Circuit cases on this issue also have made

4  that clear.  Interestingly, most of them actually predated

5  *Ankenbrandt*, but they all essentially reach the same

6  conclusion.  In *Raftery versus Scott* decided by the Fourth

7  Circuit in 1985, the Court made clear that the domestic

8  relations exception did not apply to that suit because the suit

9  concerns not the establishment and implementation of visitation

10  rights, but rather seeks an award of damages.  And the court

11  continued, If someone who had never been married to the

12  plaintiff had set about destroying the relationship between the

13  father and son, any cause of action arising out of such

14  behavior could not be foreclosed from a hearing in federal

15  court because it partook of some intra-family aspects.  The

16  Fourth Circuit reached a similar decision in *Cole versus Cole.*

17  There it explicitly explained that with respect to torts such

18  as malicious prosecution, abuse of process, etc., the duty to

19  abstain from that conduct does not arise out of or required in

20  order to give rise to the duty in present or prior family

21  relation.  And as a result, the domestic relations exception

22  did not apply.  And the same, of course, in *Wasserman versus*

23  *Wasserman* at the Fourth Circuit.  There the torts were child

24  enticement and intentional infliction of emotional distress,

25  and the Court explained they are in no way dependent on the

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   present or prior family relationship.

2          Importantly, Your Honor, the plaintiffs here are not

3   asking for a child custody decree.  We are not even asking for

4   this Court to unwind the adoption order from the circuit court.

5   Nowhere in the amended complaint do the plaintiffs ask for

6   that.  And in fact, all of the plaintiffs' claims are viable

7   without any change whatsoever to the adoption order.

8          The fraud claim -- as an example, the fraud claim,

9   the fraud claim is based on the Does -- sorry, the fraud the

10  defendants committed on the Does -- not on the circuit court,

11  but the fraud they committed on the Does, the

12  misrepresentations to get them to bring Baby Doe to the United

13  States so they could then take Baby Doe.  It doesn't matter

14  what happens in the circuit court.  That claim stands on its

15  own.

16         Intentional infliction of emotional distress is

17  another example.  Again, it's based on that same conduct of

18  getting the Does to the United States and taking Baby Doe from

19  them.

20         The tortious interference of parental rights claim,

21  that does allege that plaintiffs have right today by virtue of

22  Afghan law and the United States government's recognition of

23  those rights, but that does not require a voiding of the

24  adoption order.  And if there were any doubt about that, the

25  Supreme Court of Virginia made the point clear in *Wyatt versus*

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  *McDermott*.  That is the case in which the Supreme Court of

2  Virginia recognized for the first time the tort of tortious

3  interference of parental rights.  And it said on page 559 of

4  that decision, the court expressly stated that quote, "It

5  acknowledged that the most direct and proper remedy, the return

6  of the child and restoration of the parent/child relationship,

7  may never be achieved in a tort action."  And then it drove the

8  point home in footnote 2 of that opinion where it said,

9  "Neither are we persuaded by the argument that since an action

10 for tortious interference with parental rights requires a

11 threshold element of establishing parental rights, the cause of

12 action cannot lie because that determination cannot be made in

13 tort.  The finding of parental rights in tort would not dictate

14 the outcome of a custody proceeding or adoption, although

15 custody determination or adoption could provide evidence of

16 parental rights in a tort proceeding."  So the Supreme Court of

17 Virginia expressly recognized that the tort itself does not ask

18 for a custody decree or any other change in the familial

19 structure.  And it's interesting that *Wyatt*, in fact, was a

20 decision from a certified question from a federal court.  If

21 the Supreme Court of Virginia thought that the tort, when heard

22 by a federal court, would -- additional rule regarding domestic

23 relations, one would think it would have said so.  It did not.

24 The plaintiffs here are not asking the Court to adjust family

25 status or establish familial duties.  With all of their claims,

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

 1  plaintiffs seek to recover for the defendants' tortious acts

 2  that led to the harm they are suffering today.

 3          Mr. Moran raised the *Elk Grove versus Newdow* case.

 4  Essentially the argument that the defendants are making there

 5  is that *Newdow* somehow neutered *Ankenbrandt* holding that the

 6  domestic relations exception encompasses only cases involving

 7  the issuance of divorce, alimony, or a child custody decree.

 8  That is not the case.  The decision in *Newdow* that the case

 9  should be dismissed did not rest on a domestic relations

10  exception.  The concurring opinion in *Newdow*, in fact, made

11  that abundantly clear stating, quote, "Our holding does not

12  rest on either the domestic relations exception or the

13  abstention doctrine," unquote.  Instead, the decision in *Newdow*

14  rested on considerations of prudential standing, and

15  specifically the zone of interest test.  But the Supreme Court

16  expressly abrogated that analysis in a later opinion, the

17  *Lexmark International versus Static Control Components* case at

18  572 US 118.  In addition, there are vastly different facts in

19  *Newdow*.  *Newdow* addressed whether a parent could pursue a claim

20  concerning a child's educational and religious upbringing.

21  Here the claims focus on the defendants' fraudulent conduct

22  that resulted in the Does losing contact with their child.

23  *Newdow* was seeking input into the child's current upbringing.

24  The Does are seeking damages for the defendants' conduct, not

25  input into her current upbringing.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1          Now, Your Honor, with respect to the domestic

2     relations exception, there is a second reason that it doesn't

3     apply here.  It does not apply to federal question

4     jurisdiction.  That was not addressed by Mr. Moran.  I can

5     address it or not, depending on Your Honor's preference.

6          THE COURT:  Well, my question really has to do:  If

7     the Court does not abstain, won't the Court be running the risk

8     of making findings of fact that will be at odds with the

9     findings of fact by the Circuit Court of Fluvanna County?

10         MS. ECKSTEIN:  No, Your Honor.  The Circuit Court in

11    Fluvanna County is addressing whether to vacate the adoption

12    proceeding -- the adoption order, excuse me.  It's about

13    whether fraud was committed on that court.  It's about whether

14    that court has subject matter jurisdiction to issue that

15    ruling.

16         The issues here are very different.  They're about

17    fraud that was committed on the Does.  Frankly, it's about what

18    happened after the adoption order was obtained.  After that

19    adoption order was obtained, that is when the defendants

20    started actively pursuing getting the Does to come to the

21    United States, tricking them into believing that it was only

22    for the purpose of obtaining medical care for Baby Doe.

23         THE COURT:  Well, what if the state court should

24    ultimately decide that the adoption was valid?

25         MS. ECKSTEIN:  Even if the state court decides that

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   the adoption is valid, that does not affect any of the claims.

2   Had the Does known that the Masts had an adoption order, valid

3   or not, they would never have stepped foot on that plane to

4   come to the United States and risk losing their daughter -- the

5   daughter they had cared for, for 18 months in Afghanistan.  The

6   only thing that got them to step foot on that plane and come to

7   the United States is the fraudulent misrepresentations that

8   were made to them by the Masts and their co-conspirators.

9          So whatever happens in the circuit court, it's

10  irrelevant.  And with respect to the tortious interference of

11  parental rights claim, the *Wyatt* court made it explicitly

12  clear:  You don't have to have an invalid adoption order to

13  bring that claim.  That claim rests on its own.

14         THE COURT:  Well, if the state court is going to

15  decide this in the next few months, what's wrong with the

16  federal court waiting until it has made its decision and then

17  proceeding with the issues in this case?

18         MS. ECKSTEIN:  This case is scheduled for trial in

19  October, Your Honor, as you know.  We want to go to trial in

20  October.  There is no basis on which to stay the case,

21  certainly not under the domestic relations exception and

22  certainly not under any of the abstention doctrines, which I'll

23  address as well.  There is no basis to do that and now not

24  allow the parties to proceed with discovery because the issues

25  are so different.  The parties are different.  The issues are

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  different.  The remedies being sought are different.  There is

2  no basis of which to stay the case on abstention grounds while

3  the circuit court does its thing, holds a trial, decides the

4  case -- that case in May or even earlier, which the circuit

5  court has suggested.  It may even be at the very next hearing

6  that the circuit court decides the case.  There is simply no

7  basis to do it.

8       With respect to the abstention grounds -- let me

9  start with *Burford* abstention.  The case law is clear that it

10 should be applied only rarely.  It can be applied only in two

11 circumstances:  When there are difficult questions of state law

12 bearing on policy problems of substantial public import whose

13 importance transcends the results in the case at bar, or when

14 exercise of federal review would be disruptive to state efforts

15 to establish a coherent policy with respect to matters of

16 substantial public concern.

17      The defendants focus their argument on the state's

18 power over adoption processes and again argue that the Does

19 seek a custody determination in this case, but that is not so.

20 We are not challenging Virginia's rules or procedures for

21 adoption, and nowhere does the amended complaint ask for a

22 custody determination, nor is it needed for any of plaintiffs'

23 claims.  This case largely raises questions of state law under

24 torts that are long established in Virginia -- tortious

25 interference, fraud, intentional infliction of emotional

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  distress, conspiracy, false imprisonment.

2          Defendants' argument that plaintiffs are asking for

3  the claims to be applied in a novel way because they're

4  bringing them against adoptive parents and say, well, that

5  raises issue -- novel issues of state law, but these are not

6  novel claims.  These torts have long been recognized in

7  Virginia.  And *Wyatt versus McDermott* was a case against

8  supposedly adoptive parents.  These claims pose no threat to

9  the state interest in uniform regulation of adoption, and

10  *Burford* abstention does not apply.

11          Neither does *Colorado River* abstention, as Your Honor

12  has noted.  *Colorado River* abstention requires two things:  You

13  must have parallel proceedings and then you must have

14  exceptional circumstances as determined by a weighing of six

15  factors.  The defendants' argument falls at the first steps --

16  first step here.

17          THE COURT:  The name of the case escapes me right

18  now, but Judge Dalton had a case in which he just waited until

19  the state proceedings were over before he proceeded.  I'm not

20  sure what abstention doctrine he may have relied upon, if any,

21  but I think his actions were upheld by the Fourth Circuit.

22          MS. ECKSTEIN:  I have a vague recollection of that

23  case.  I admit that I don't remember the name of the case, but

24  I do remember reading one from Judge Dalton.  But there he

25  found --

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1          THE COURT:  Well, he was the law unto himself,

2    but he -- so --

3          MS. ECKSTEIN:  But there an abstention doctrine

4    applied.  It doesn't apply here.  Here we don't have parallel

5    proceedings.  *Colorado River* cannot apply for that reason

6    alone.  The parties are different.  In the state case you have

7    John Doe and Jane Doe; you have Joshua and Stephanie Mast.

8    Here you have John Doe, Jane Doe, Baby Doe; and you have Joshua

9    Mast, Stephanie Mast, Richard Mast, Kimberley Motley, Ahmad

10   Osmani, and the nominal U.S. government defendants.  The claims

11   are different.  In the state case, the only claim is for

12   vacating the adoption order.  Here we have claims for tortious

13   interference, fraud, conspiracy, intentional infliction of

14   emotional distress, and false imprisonment.  The remedies are

15   different.  In the state case the only remedy being sought at

16   this point is the vacating of the adoption order, the only

17   remedy.  Here, on the other hand, we're seeking damages and a

18   declaratory judgment.

19          The Fourth Circuit has applied the same analysis to

20   arguments for *Colorado River* abstention in numerous cases.  The

21   *Gannett Company versus Clark Construction Group* case, as an

22   example, the Court held:  Refused to abstain because federal

23   and state cases had different claims and different remedies.

24   the *Al-Abood* case from 1982, the Fourth Circuit refused to

25   abstain because even though the same parties were at issue,

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  they were not the same -- the same issues were not at issue in

2  the proceedings.

3       There can be a core set of facts that are common to

4  both proceedings; but if the parties, the claims, the remedies

5  are different, then you do not have parallel proceedings, and

6  *Colorado River* abstention cannot apply.  But even if we had

7  parallel proceedings here, there are no exceptional

8  circumstances.  To determine if exceptional circumstances

9  exist, you look at the six-factor test that you have to balance

10 under *Colorado River*.  The defendants have conceded that the

11 first and second factors are not relevant here.  The third

12 factor is the desirability --

13       THE COURT:  Well, I'll agree it doesn't fit well with

14 any abstention doctrine.  I mean, I think that your brief

15 pretty well covers that.  But just as a matter -- I just

16 question why -- given the fact that it might be -- it may be

17 over by October.  The state court proceedings apparently are

18 going to be over before October.

19       MS. ECKSTEIN:  That is correct, Your Honor.  They are

20 likely to be over by October, except for the appeals of those

21 proceedings.  There is no question that whoever wins that

22 proceeding --

23       THE COURT:  Okay.

24       MS. ECKSTEIN:  -- will appeal.  We cannot stay this

25 case forever on some -- particularly when there is no

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  abstention doctrine that applies.  The domestic relations

2  exception doesn't apply.  This case needs to proceed with

3  discovery so we can proceed to trial in October, and

4  particularly because none of the claims rest on what happens in

5  the circuit court.

6          THE COURT:  All right.  Thank you.

7          MS. ECKSTEIN:  Thank you.

8          One other argument that's been made with respect to

9  12(b)(1), if I could address it, and that was made by Mr. Moran

10 that the defendants -- sorry, the Does lack standing to assert

11 a claim for Baby Doe because of the adoption order and they

12 can't be next friend.  The Fourth Circuit applies a three-part

13 test to determine who can sue on behalf of a minor.  The next

14 friend must provide adequate explanation as to why the real

15 party of interest cannot bring this suit himself.  Baby Doe is

16 a minor, the next friend has to be dedicated to representing

17 the party's best interest, and the next friend must have a

18 significant relationship with the representative party.  As to

19 those two factors, John and Jane Doe are dedicated to

20 representing her interest.  They acted as her parents for 18

21 months.  The U.S. government recognizes them as her family and

22 legal guardians.  That's in paragraph 10 of the U.S.

23 government's answer in this case.  That's ECF Number 131.  And

24 the state court has acknowledged that the Does have a

25 constitutionally protected relationship with Baby Doe.  So they

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  can proceed as next friend here.  There is no requirement that

2  next friend be a parent or a guardian ad litem.  That's not

3  present in either Federal Rule of Civil Procedure 17 or

4  Virginia Code Section 8.01-8 to the extent it applies in

5  federal court at all, nor is this argument waived.  While it

6  was not addressed in our opposition brief, that is correct, but

7  frankly, we had a kitchen sink's worth of arguments thrown at

8  us across the four motions to dismiss, and we tried to address

9  them all.  But it certainly was addressed when Joshua Mast and

10  Stephanie Mast raised the issue again in defense to the motion

11  to show cause.  And we're certainly addressing it now.  It has

12  not been waived.

13        Now, Your Honor, Richard Mast has raised a couple of

14  other 12(b)(1) arguments in his brief.  He did not raise them

15  today -- argue them today, so I will not address them unless

16  the Court would prefer that I do.  Otherwise, I will pass the

17  baton to my colleague, Mr. Powell, and ask this Court to reject

18  the 12(b)(1) arguments.

19        Before -- actually, excuse me, before I sit down, I

20  do want to address a couple of points that were made in

21  Mr. Moran's argument.  I apologize.

22        Mr. Moran argued that the declaratory judgment that

23  we are asking for would be advisory, nothing more than an

24  advisory opinion.  That is not the case.  That declaratory

25  judgment relief that we're seeking goes directly to the first

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  element of Count One.  We allege that in paragraphs 155 and 156

2  of the amended complaint which are in Count One.  It's not

3  advisory.

4       With respect to the TRO and the effect of -- I think

5  you asked this question -- the effect of the ruling that you

6  made on the TRO, that was a TRO rule.  Absolutely.  But it was

7  an issue of law on the supremacy clause issue that we're

8  talking about.  So the U.S. government, Ms. Wyer, in fact,

9  provided the government's position to this Court about the

10 executive branch's exclusive authority over foreign affairs.

11 And that position has not changed, as has been made obvious by

12 the government's answer, as well as the statement of interest

13 that is attached to our amended complaint.

14      Now, finally with respect to the representation of

15 Mr. Mast to this Court in the Baby Doe litigation, Your Honor

16 is absolutely correct.  That was a blatant misrepresentation to

17 this Court.  I'll leave it at that.

18      Thank you, Your Honor.

19      THE COURT:  Okay.  Let's take about a ten-minute

20 recess before Mr. Powell argues.  So I've got 3:29.  We'll be

21 back about 3:40.

22      (Recess.)

23      THE COURT:  I believe all counsel are on?

24      THE CLERK:  Yes, it looks like it.

25      THE COURT:  All right.  Mr. Powell, you may proceed.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1        MR. POWELL:  Good afternoon, Your Honor, and may it

2   please the Court.  Thank you.

3            Judge, given the amount of ink that was spilled in

4   support of Defendant Motley's and Osmani's 12(b)(2) motions to

5   dismiss for lack of personal jurisdiction, I came to the

6   hearing today prepared to engage those arguments as forcefully

7   as I could, talking about the pre-existing Fourth Circuit law,

8   the fact that the Supreme Court's *Walden* decision did not

9   disturb that case even a little bit, but my sense was that my

10  able adversaries, they haven't abandoned their 12(b)(2)

11  argument, but they didn't really emphasize it today.  And I

12  sense from Your Honor's comments that you understand very well

13  that whatever *Walden* did, it was limited to the facts of that

14  case.  It was a single-defendant case; there were no conspiracy

15  allegations in the case; and it had no effect on the Fourth

16  Circuit's pre-existing law, which has since been applied on

17  multiple occasions by various district courts in this circuit.

18           So unless Your Honor has any questions about the

19  12(b)(2) arguments that you'd like for me to address, I'm

20  inclined to rest on what we have in our brief, particularly the

21  argument on page 25 of our opposition and footnote 16.

22           THE COURT:  All right.  I have no questions.

23           MR. POWELL:  All right.  Thank you, Your Honor.

24           Let me turn to the 12(b)(6) component of the case.

25  Similarly, Judge, I was prepared to go into that in

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  considerable detail.

2          Can I back up, Judge, to one point on the 12(b)(2).

3  It has to do with the Osmani subpoena.  Forgive me for jumping

4  back, Judge.

5          We have no objection to the subpoena being filed

6  under seal.  What I'm about to say is not in the complaint, but

7  if Mr. Osmani's lawyer thinks I've misstated anything when he

8  gets up in a few minutes, I would invite him to correct it.

9  Mr. Osmani came to Virginia in May voluntarily prepared to

10  testify on behalf of the Masts at their request.  There was no

11  subpoena in May.  He did not get to testify in May because the

12  case didn't go very quickly.  He came back in October and did

13  testify.  The night before he showed up to testify in October,

14  the Masts' lawyer sent to our team a subpoena, a Virginia

15  subpoena for Mr. Osmani to testify the next day.  That subpoena

16  had not been domesticated in Tennessee, so it had no legal

17  effect.  It's clear that the transmission of the subpoena to us

18  the night before Mr. Osmani had come back to Virginia to

19  testify was a fig leaf.  It doesn't matter, however, Your

20  Honor, because Mr. Osmani, even if he did come to Virginia

21  under a subpoena to testify, he's as susceptible to personal

22  jurisdiction under the conspiracy theory for every bit the same

23  reasons as Ms. Motley is.  But I just thought I should fill out

24  the rest of the story about the Osmani subpoena for the Court's

25  benefit.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1          THE COURT:  All right.

2          MR. POWELL:  Thank you, Judge.

3          Now, 12(b)(6), similar to the argument I prepared for

4     the 12(b)(2) side of the case, I was prepared to engage in some

5     level of detail the arguments made by all of the defendants,

6     sometimes collectively, sometimes individually, attacking the

7     legal sufficiency of our five counts.  I'm not sure that's

8     necessary at this point, Your Honor based on the colloquy

9     between you and counsel for the defendants, but I do want to

10    make a few sort of summary comments, Your Honor, which I think

11    nonetheless apply to your analysis of the 12(b)(6) side of

12    this.

13         I'd like to start with a short reprise of what I

14    would call the editorial commentary that is sprinkled

15    throughout the defendants' briefs.  These comments come in two

16    flavors:  Some of them are self-congratulatory; some of them

17    are attacks on John and Jane Doe.  None of them is relevant,

18    which makes the question:  Why waste time and space and ink

19    with this not-relevant commentary?  I think the answer is

20    clear, Your Honor.  That is that the defendants, the able

21    counsel on the other side of the case -- and they're doing a

22    great job for their clients, the best they can under the

23    circumstances -- I don't think they have a lot of confidence in

24    their substantive 12(b)(6) arguments.

25              So let's look at some of the editorial comments.  It

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  starts with Joshua and Stephanie Mast, page 1 of their

2  memorandum in opposition.  "Joshua and Stephanie Mast have done

3  nothing but ensure Baby Doe receives the medical care she

4  requires at great personal expense and sacrifice, and they've

5  provided her a loving home.  John and Jane Doe not only

6  challenge the Masts' custody of Baby Doe, but leveled

7  outrageous, unmerited attacks on their integrity, claiming they

8  concocted a scheme to abduct her."

9       Richard Mast starts his opening brief in a similar

10 self-congratulatory tone, attempting to lead the Court far

11 afield of the allegations in the amended complaint.

12      In her reply brief, Ms. Motley, not to be outdone by

13 what the Masts have said, she says on page 2 of her reply, "The

14 Does accuse Ms. Motley, a renowned human rights lawyer, not

15 only of joining a years-long conspiracy with four total

16 strangers to abduct a child, but of doing so in exchange or

17 $4,500.  The case of Ms. Motley is absurd on its face."

18      Mr. Osmani complains in his brief in support of his

19 motion to dismiss that he acted as a mere interpreter.  That

20 phrase appears at least three times, I think, in his papers.

21 Of course, as the Court has recognized, Mr. Osmani was a whole

22 lot more than a mere interpreter.  He took a doctored

23 photograph of Baby Doe that came into his possession through

24 some of the complicit activity of Ms. Motley, and he used that

25 to procure a false Afghan passport for Baby Doe that the Masts

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   had in their possession when the Does arrived at Dulles Airport

2   after their evacuation from Afghanistan.

3        So these, as I call them, editorial comments by all

4   five of the defendants are nothing more than an effort to

5   divert the Court's attention from the robust allegations in the

6   complaint.  For example, Ms. Motley's lawyer doesn't want to

7   talk about the 15 detailed allegations that appear in

8   paragraphs 74 through 90 describing what she did from the

9   beginning of the conspiracy all the way until right before the

10  Does came to this country.

11       They accuse -- they characterize our amended

12  complaint as being full of conclusory allegations that are not

13  plausible.  Their arguments for the most part, Judge, are jury

14  arguments.  As I think the Court has come to appreciate,

15  because you've obviously read the amended complaint, it's 202

16  paragraphs of robust description of this multi-year conspiracy

17  launched by the Masts in the fall of 2019, the purpose of which

18  was to enable them by hook or by crook to take this child into

19  their own care.  The conspiracy was waged on multi fronts.  It

20  was waged in Afghanistan.  It was waged in the Department of

21  Defense.  It was waged in Germany.  It was waged in Dulles

22  Airport.  It culminated in Virginia at Fort Pickett in

23  September of 2021 when Joshua Mast walked out of the building

24  with Baby Doe, and her Afghan guardians have not seen her since

25  then.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1          For all the reasons, Judge, that we lay out in our

2    opposition to their motions to dismiss, and I think for the

3    obvious reason, Judge, that you seem to completely understand

4    because you've been doing this for a long time, we don't have

5    to come forth with a document, a written agreement among these

6    co-conspirators agreeing to do the conspiracy.  We don't have

7    to prove that Ms. Motley made A, B, C, D, E, and F

8    misstatements to the Does to lure them into bringing their

9    child over here.  It's not so much what she said; it's what she

10   didn't say and it's what she did do that cement her position in

11   the central part of this conspiracy.  And all of this is laid

12   out in, I think it's fair to say, considerable and defensible

13   and supportable detail in our amended complaint.

14          I get it that the defendants take issue with the

15   facts.  That's fine.  That's for another day.  That's what we

16   have a jury trial for.  But I look forward, Your Honor, to

17   presenting our case to a jury in October, and let the jury

18   decide whether what they did was outrageous, let the jury

19   decide whether what they did was trick the Does into bringing

20   their baby girl over here, thinking they were bringing her here

21   for medical treatment when from the beginning the Masts wanted

22   to take her away forever.  We'll have our day in court, Your

23   Honor, and I'll look forward to that.

24          And unless you have questions about the 12(b)(6) side

25   of the case, I'll sit down.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1        THE COURT:  No, I have no further questions.

2        All right.  Counsel for the Masts wish to respond?

3        MR. MORAN:  Sure.  Briefly, Your Honor.  You know,

4   this is not my first hearing, and I can see that the Court has

5   looked at the issues and has some views on where it's inclined

6   to go.  We obviously stand on the arguments we've raised in our

7   briefs.

8        I do think the Court has expressed an openness to the

9   concept of a stay, and I'd like to reiterate why that, I do

10  think, is important.  One, as we said, we have this upcoming

11  hearing in May.  It would have been sooner, but for the fact

12  that the circuit court was willing to accommodate counsels'

13  schedules, which I think shows that we have active litigation

14  and busy lawyers on both sides, and this is nevertheless going

15  to come to a conclusion very soon as far as the circuit court

16  is concerned.

17        And I would note that contrary to Ms. Eckstein's

18  suggestion, it's black letter law that a state court judgment

19  has collateral effect when it's entered by the trial court.  So

20  while the parties -- the losing party may very well choose to

21  pursue an appeal as it would have a right to do, that doesn't

22  stop -- that doesn't change the fact that if we get a ruling as

23  indicated in May from the circuit court, that that will have at

24  least some measure of estoppel effect or collateral effect --

25  and we don't know until we see what the order is -- that would

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   apply in these proceedings.  And so whether it's done as a

2   matter of abstention -- as we've raised in our brief, we don't

3   think the Court needs to rely on abstention.  The Court has the

4   inherent authority to control its docket.  And the Court could

5   invoke that authority to say it's in the best interest of the

6   Court and the parties to briefly stay this matter to allow the

7   circuit court proceedings to play out.  The Court could do that

8   either before ruling on the pending motions to dismiss, or it

9   could issue its ruling on the pending motions to dismiss and

10  then it could stay further proceedings until the circuit court

11  has issued a decision.

12          If I may, just a few other small pieces that I think

13  may be worth addressing.  So one as to the -- what Mr. Powell

14  described as the editorial commentary, I think that's best left

15  until we turn our attention to the motion to show cause because

16  that's an area where A, it's particularly relevant; and B,

17  where the principle that plaintiffs are entitled to rely on

18  their allegations does not apply in that context.  So I'd

19  prefer to address that there.

20          Number two, you know, we heard the explanation for

21  the forfeiture or waiver of the issue on standing to raise a

22  claim on behalf of Baby Doe was that there was a lot of -- a

23  lot of issues raised in the case.  And I would just note for

24  the Court that the lack of standing to raise a claim for Baby

25  Doe is the very first argument in our motion to dismiss under

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

 1  the heading "argument."  It's Argument 1-A.  It's right there

 2  at the front.  So I don't think that provides a very

 3  satisfactory explanation or an excuse for a forfeiture or a

 4  waiver that they're now trying to unwind.

 5          And then finally, Ms. Eckstein raised the TRO

 6  proceeding and suggested that this Court may have made a ruling

 7  of law based on representations by the United States that would

 8  somehow be binding in this case.  And I would just note simply

 9  that plaintiffs have utterly failed to satisfy the elements of

10  collateral estoppel to show that any ruling from -- that the

11  Court may or may not have entered in the TRO proceeding would

12  be binding as a matter of issue preclusion or collateral

13  estoppel here.

14          So with that, again, you know, we briefed the merits

15  of our arguments on the motion to dismiss.  I hear the Court's

16  concerns and questions.  We do nevertheless think it is in the

17  best interest of the Court and the parties to have a modest

18  stay while the state court proceedings continue to play out,

19  even though, of course, we continue to stand on the arguments

20  that we've raised for why the case should be dismissed.

21          THE COURT:  All right.  I think it is your position

22  that if the state court should rule in favor of the Masts, then

23  this case goes away?

24          MR. MORAN:  Well, Your Honor, I think in large part

25  it certainly would.  Now, I imagine the other side may

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  disagree.  And we would welcome the ability to address whatever

2  arguments they may raise for why that is.

3       And I guess that does bring to mind one other point

4  of what I heard from the other side, which was the suggestion

5  that the issues in the two cases were totally different because

6  this case involves an alleged fraud on the Does, whereas the

7  state court case involves an alleged fraud only on the court.

8  And I think that's simply not borne out by the state court

9  record.  I recognize that that record is not fully before this

10  Court, but one of the issues that they have raised there is

11  notice, and the allegation that they were, A, entitled to

12  notice; and B, that sort of wrapped up in their claim of a

13  constitutionally protected relationship that at some time

14  before they arrive in the United States, they should have

15  received notice.  And as part and parcel of those claims, the

16  circuit court has heard extensive evidence about their

17  allegations that they were deceived by the Masts and others, as

18  well as very strong and we believe compelling evidence that

19  they were not deceived, and that they were fully informed of

20  the fact that the Masts were intending to have custody of and

21  be the adoptive parents of Baby Doe.

22       Now, again, recognizing the limitations the Court has

23  on a motion to dismiss, I'm not suggesting that this Court

24  needs to litigate those issues, but I do think -- at this

25  stage -- but I do think it goes to the question of whether a

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  stay is appropriate.

2          THE COURT:  All right.  Thank you, sir.

3          Okay.  Counsel for Ms. Motley -- oh, Richard Mast,

4  I'm sorry.

5          MR. YERUSHALMI:  Thank you, Your Honor.  Just two

6  brief points.

7          The first is the argument that there should be --

8  there is no prudential or abstention doctrine applicable here

9  just doesn't -- isn't borne out by the literal allegations or

10  the claims for relief of the amended complaint.  There are 12

11  separate requests for declaratory relief that all go to

12  underpin, undermine, challenge the adoption order, every one of

13  them.  Now, Ms. Eckstein argued expressly that, well, in the

14  circuit court we're arguing fraud on the court and *vacatur* of

15  the adoption order.  But what would happen if that adoption

16  order was, in fact, valid from the beginning?  Well, then there

17  can be no fraud or intentional interference because they were

18  parents and they had the right to do whatever they did do.  The

19  entire amended complaint, even though it's dressed up as a

20  monetary compensatory --

21          THE COURT:  Well, just a minute.  Just getting to the

22  infliction of emotional harm, do you believe that even if

23  they're the natural parents and they had a child in another

24  country, that you could deceive people there to make them

25  travel to the United States thinking that they were not going

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   to lose custody of their child?  That's the allegation.

2            MR. YERUSHALMI:  No, but their allegation is that the

3   Masts were not properly adoptive parents.  If they were proper

4   legal parents of this child, then could they engage in

5   deception to get that child back to the United States?

6   Absolutely, because the --

7            THE COURT:  Well --

8            MR. YERUSHALMI:  If I may, the underlying claim is

9   that they suffered intentional infliction of emotional distress

10  as a result of the bad acts.  Now, if they're legal parents, if

11  that adoption order is valid -- and that's an if, but that's

12  what we have to assume here because that parallels the claims

13  in this case with the circuit court case.

14           THE COURT:  Are you saying the Masts, then, should be

15  treated like criminals, and that they took the child from

16  kidnappers -- I'm sorry, that the Does should be treated like

17  they had kidnapped the child and were holding it from its

18  parents, the Masts?

19           MR. YERUSHALMI:  Well, that's the argument made on

20  the reverse side.  And the answer to that is if, in fact, the

21  Masts' claim in the circuit court case -- and ultimately it

22  would be here if it's not stayed pending the resolution of the

23  circuit court case -- that this entire claim of family

24  relationship and legal guardianship is a fraud.  And when

25  that -- those facts are laid out clearly -- and you have

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   credibility issues from A to Z on the side of the plaintiffs

2   and the allegations they've made --

3           THE COURT:  Okay.

4           MR. YERUSHALMI:  -- those will be spelled out in the

5   factual record in the circuit court case.

6           The other point I just want to make quickly is that

7   the claim that the passport was fraudulent and that was part of

8   the conspiracy, the passport doesn't even show up until

9   everybody is over here in the United States at Dulles Airport.

10  It had nothing to do with the parents and the child coming

11  here.  They didn't -- according to the amended complaint there

12  is no --

13          THE COURT:  Well, you know, sir, I mean, we have this

14  argument that they have all these alleged lies, and they all

15  seem to go -- as I understand it, the Court should construe

16  everything as a misunderstanding of the defendants in the case,

17  that there is -- that the Court should infer that there was no

18  attempt to deceive the Does about the adoption, that it was all

19  a misunderstanding, that no one -- no one did or deliberately

20  omitted to do or say something that would have deceived the

21  Does.

22          MR. YERUSHALMI:  Again, Your Honor, if that's the

23  impression the Court had, I would apologize if that comes from

24  me.  You recall that I represent Richard Mast, the attorney.

25  And there the Court does have to look at the specific

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  allegations.  We don't have to get to the inferences yet.  We

2  can talk about what reasonable inferences are from plausibly

3  alleged facts.

4          THE COURT:  Okay.  I'm sorry.  I interrupted you.  Go

5  ahead.

6          MR. YERUSHALMI:  So the point being, is that if the

7  claim is that the passport somehow operated as part of this

8  conspiracy, it doesn't even show up until afterward.  And it's

9  not -- again, I want to get to the underlying --

10          THE COURT:  Well, let me tell you, what little I know

11  about conspiracies -- and I have been trying them now for about

12  50 years -- there would be no way, if there was a conspiracy,

13  that was not an overt act.

14          MR. YERUSHALMI:  Well, other than --

15          THE COURT:  I know you don't agree with me.

16          MR. YERUSHALMI:  Your Honor, I would agree --

17          THE COURT:  But go ahead.

18          MR. YERUSHALMI:  Your Honor, I would actually agree

19  that it was an overt act, but the requirement is it be -- and

20  I've been litigating these matters for not quite 50 years, 40

21  years -- is that it has to be in furtherance of the conspiracy.

22  The passport -- and again, this is where the Court has to

23  really look at the allegations.  As I mentioned earlier and as

24  co-counsel have mentioned, this is a claim of fraud, which has

25  the Rule 9 particularity requirements.  The allegations simply

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  say there was this fake passport, and it showed up after

2  they're in Dulles Airport.  It didn't get them to Dulles

3  Airport.  There is no allegation that it was used as part of

4  the conspiracy.  Under the plain language of the amended

5  complaint, it's not in furtherance of the conspiracy.

6          THE COURT:  Well, it was intended in furtherance of

7  getting the child to the United States when it was obtained,

8  wasn't it?

9          MR. YERUSHALMI:  It was never used for that purpose.

10         THE COURT:  That's not my question, sir.

11         Was it obtained to enable the child to come to the

12 United States when it was obtained?

13         MR. YERUSHALMI:  All I can respond to that -- I have

14 a lot to say on that issue as a factual argument --

15         THE COURT:  Well, I don't want -- I mean, we're just

16 like ships passing in the night on that issue.  There is no way

17 you're going to convince me that that's above board if the

18 facts are true.  So -- and had nothing to do with an action in

19 this case.  So I'm just telling you that.

20         MR. YERUSHALMI:  Well, one of the advantages of

21 having practiced for 40 plus years, Your Honor, is to know when

22 to quit.  So I will do so now.

23         THE COURT:  Okay.  Thank you, sir.  I don't mean to

24 get irritated.  Let's go ahead.

25         Who's next?

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1          MR. HOERNLEIN:  Your Honor, I'd just like to respond

2     to one point that Mr. Powell made.  I'm not sure I heard him

3     right, but I believe he said he doesn't need to allege that

4     Ms. Motley said X, Y, and Z in establishing his claims.  If

5     that's what he said, I just want to point out to the Court that

6     obviously, as co-counsel just mentioned, Rule 9(b) does apply

7     in a fraud-based case, which this obviously is.  They allege a

8     fraudulent conspiracy.  And throughout the complaint, Your

9     Honor, they say that Ms. Motley lied.  And I would just ask

10    you, as you look at the paragraphs that Mr. Powell pointed out,

11    to ask yourself:  What are those lies, and do they allege in a

12    way that satisfies Rule 9(b) what the substance of those were?

13          That's all, Your Honor.  Thank you.

14          THE COURT:  All right.  Thank you, sir.

15          All right.  Mr. Brooks?

16          MR. BROOKS:  Yes, Your Honor.  Thank you.  May it

17    please the Court.

18          I just wanted to ask that should the Court deny our

19    motion to dismiss, if the Court is considering a stay, really

20    just as a matter of case management or just as a prudential

21    matter, we would essentially like to ask the Court that -- or

22    note for the Court that Mr. Osmani is in west Tennessee.  He's

23    in the Memphis area, and is going to be a significant witness

24    for the proceedings to take place in May in circuit court.

25    That's a significant commitment for him.  He is not a wealthy

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   man.  And it's going to require him to be away from work and

2   require a lot of travel.  He is not represented by an army of

3   lawyers like the plaintiffs are.  So putting off trial past

4   that and giving us a delay would be very helpful for him as a

5   matter of case management, and would be helpful at least for

6   him as a party.  I don't know how it affects the other

7   parties -- as well as for his *pro bono* representation.  So we

8   would offer that as a matter as you consider the equities for

9   the parties.  We offer that to Your Honor.

10          Thank you very much.

11          THE COURT:  All right, sir.  Thank you.

12          All right.  I believe that's all on these issues.

13  Okay.  I'll hear from -- I guess the DOJ does not need to say

14  anything on these issues; is that correct?

15          I think you're muted.

16          MS. WYER:  Sorry, Your Honor.

17          If Your Honor has any questions about the United

18  States' position, we're happy to answer them.  The statement of

19  interest expresses our position.

20          THE COURT:  All right.  I have no questions.  Thank

21  you.

22          All right.  We'll hear from the plaintiffs' counsel

23  regarding the show cause.

24          MS. ECKSTEIN:  Thank you, Your Honor.

25          With respect to the show cause motion, I'd like to

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  start with a set of undisputed facts.  These are facts that

2  cannot be disputed.  The Court entered a protective order, ECF

3  Number 26.  It prohibits the defendants, quote, "from

4  disclosing any information that directly or indirectly

5  identifies plaintiffs or their family members to any person."

6  And Baby Doe is defined as a plaintiff in that order.

7         Number two:  The *CBS Mornings* show aired two

8  segments, January 24th and 25th, both of which featured

9  interviews with Joshua and Stephanie Mast.

10        Number three:  CBS broadcast various photographs of

11 Baby Doe that showed her face in its entirety.

12        Number 4:  In the January 24th segment, for example,

13 at three minutes and 41 seconds, you see a photograph of Baby

14 Doe; again, showing her face in its entirety.  In that

15 photograph, Baby Doe appears to be at a hospital in Afghanistan

16 with an American flag behind her.  At the same time that this

17 photograph of Baby Doe appears on the screen, the reporter

18 states, "this photo shared with the Masts is from a nurses

19 station."  Then, with that image of Baby Doe still on the

20 screen, the viewer hears Joshua Mast state, "I would say that's

21 one of my favorite photos of her." The video then cuts to

22 Joshua and Stephanie Mast seated next to each other.  And

23 Joshua Mast finishes his sentence on camera describing the

24 photograph stating behind her there is a combat trauma center

25 and a real military hospital.  So Joshua Mast appeared on

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  camera and directly identified Baby Doe to the CBS reporter and

2  to the entire viewing audience of *CBS Mornings.*  In addition,

3  Stephanie Mast referred to a distinctive scar on Baby Doe's

4  leg, further identifying her.

5        Also undisputed is that *CBS Mornings* has millions of

6  viewers across its television and YouTube channels, and that

7  hundreds of thousands of people have viewed the two segments

8  just on CBS's YouTube channel alone.

9        These facts establish a violation of the protective

10  order.  We have a valid decree of which the Masts were aware

11  that was clearly in the Does favor that the Masts violated

12  through their conduct and have harmed the Does as a result,

13  meeting the test for contempt under the Fourth Circuit's

14  decision in *De Simone versus VSL Pharmaceutical.*  With respect

15  to that last factor, harm, the Does and their family members

16  are now vulnerable to persecution from the Taliban.  The

17  exposure is the harm, as well as the emotional distress that

18  they have suffered since the CBS segment ran feared for their

19  family members.  Death, extortion, imprisonment, violence,

20  those should not be required to find that a violation of the

21  protective order harmed the Does.

22        Now, the Masts raise several defenses to our motion.

23  First they argue that -- the Masts' brief argues that they

24  never provided any, quote unquote, identifying photos to CBS.

25  First, this is really beside the point.  Joshua Mast directly

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  identified Baby Doe to CBS and its millions of viewers when he

2  identified her in that photo in the hospital.  But second,

3  let's drill down on that assertion.  The assertion is made in

4  the brief.  It is not made in Mr. Mast's declaration, nor does

5  the declaration say that the Masts did not provide any photos

6  at all to CBS, whether identifying or not, however they define

7  that term.  And maybe that is because -- why is this missing

8  from the declaration of Mr. Mast?  We know that the Masts were

9  in possession of many, if not all, of the photographs that were

10 displayed by CBS, including the photo of Stephanie Mast and

11 Baby Doe in Germany, again showing her full face, that was

12 taken by Joshua Mast.  That photo was taken by Joshua Mast.

13 That is shown at five minutes and 55 seconds in the January

14 24th segment.  There is also a photo of Joshua Mast holding

15 Baby Doe in the hospital.  That's at four minutes, six seconds

16 in the January 24th segment.

17         And let me go back for a second to that photo of

18 Stephanie Mast and Baby Doe in Germany.  That photo taken by

19 Joshua Mast was taken just moments after they had fled

20 Afghanistan, meaning that anyone who knew them in Afghanistan

21 and who sees these segments, that photograph, is going to

22 recognize her and know who was involved in this lawsuit.  So

23 these photos, as well as others, we know that the Masts had in

24 their possession.  Stephanie Mast testified in the circuit

25 court proceeding that they have hundreds of photos from her

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  time at the hospital.  So maybe that is why the Masts have not

2  denied that they provided photographs of Baby Doe to CBS, and

3  did not put in Mr. Mast's declaration that they did not provide

4  identifying photographs of Baby Doe to CBS, however that term

5  is defined.

6          Now, third, our motion argued that CBS could have

7  obtained the photographs only from the Masts or with their

8  explicit permission.  That's at page 2 of our motion.  Also

9  absent, not found in Mr. Mast's declaration -- or the brief,

10  for that matter -- is any denial that the Masts gave permission

11  to any third party to provide photos of Baby Doe to CBS.  And

12  also not present in either the declaration or the brief is any

13  denial that they confirmed to CBS that the photographs that CBS

14  supposedly obtained from third parties showed Baby Doe.  It

15  seems unlikely that CBS would display photographs of a little

16  girl without knowing if she was the little girl that was the

17  subject of the story, but the Masts don't deny whether they

18  gave confirmation.  So the argument that the Masts cannot be

19  held in contempt because they did not provide identifying

20  photos to CBS does not get them very far.  And it doesn't

21  address the fact that I mentioned at the beginning, that Joshua

22  Mast directly identified Baby Doe to CBS and its viewers when

23  he referred to that photo of her in the hospital as his

24  favorite photograph of her.

25          The next argument that the defendants raise to our

79

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  motion is that the defendants [sic] lack standing.  That's also

2  irrelevant.  I've addressed that already with respect to the

3  12(b)(1) arguments.  John and Jane Doe have standing to sue on

4  behalf of Baby Doe.  But even if they didn't, Joshua Mast

5  directly identified Baby Doe.  She's covered by the protective

6  order itself.  And by doing so, he identified Jane and John

7  Doe, who are known to their community in Afghanistan as Baby

8  Doe's family.

9         Next the Masts argument that the protective order is

10  invalid, so it can't be enforced.  That's based on the motion

11  they filed to amend the protective order.  As this Court knows,

12  you have not yet ruled on that motion.  The protective order

13  remains in effect and it has to be complied with.  You don't

14  get to decide not to comply with an order of the Court just

15  because you disagree with it, even if you have filed a motion

16  in that respect.

17         Now, with respect to that motion, the *James versus*

18  *Jacobson* factors for allowing pseudonyms in litigation, the

19  Court found back in September that they were met then, and they

20  continue to be met today.  The Does still fear for the safety

21  of themselves and their family, and even more now because of

22  the Masts' conduct with respect to CBS.

23         The only argument that the Masts -- that the Does --

24  excuse me.  The only argument that the Masts make really with

25  respect to the pseudonyms is that they shouldn't be used here

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    because the Does spoke to *AP* -- *Associated Press* -- and the *New*
2    *York Times*.  And that's true; the Does did speak to the *AP* and
3    the *New York Times* on the condition of anonymity, and a
4    condition that both respected media organizations guaranteed
5    and complied with.  The Does have received -- or their lawyers
6    have received multiple calls from multiple media entities about
7    this case.  This story was going to be covered.  They decided
8    to speak with two entities that they trusted in an effort to
9    have a say in what was reported, but they did so only on the
10   condition of anonymity.  Neither their names nor their
11   photographs have appeared in either of the *AP* or *New York Times*
12   pieces.  The plaintiffs did not violate the protective order in
13   doing so because it did not give identifying information to
14   either.  What it comes down to is that the Masts are simply
15   unhappy with those media organizations reporting on a case, but
16   their unhappiness does not a protective violation make; their
17   directly identifying Baby Doe on national television does.
18          Now, the Masts also argue that the protective order
19   is invalid because it is a gag order that does not meet the
20   strict scrutiny test.  It is not a gag order.  The parties can
21   speak.  And according to this Court -- set aside what the
22   circuit court has ruled -- according to this Court, the parties
23   can speak with the public or the press.  The order, ECF Number
24   26, the protective order, only precludes the identification of
25   plaintiffs.  And that's consistent with an order on pseudonyms.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  As we said in our brief, what good would a pseudonym order be

2  if the parties were allowed to tell the world the parties'

3  identities?  And while it is true that gag orders are measured

4  under strict scrutiny, again, this is not a gag order.

5  Pseudonyms are measured under the five-factor test of *James*

6  *versus Jacobson.*  And even if strict scrutiny applied, I would

7  argue that it passes the test here.  We have a compelling

8  public interest of protecting parties and innocent nonparties

9  from potential harm in a court proceeding in the least

10 restrictive means possible.  Not ordering the parties not to

11 talk to the public or the press, but simply ordering the use of

12 pseudonyms, and that the parties not disclose the plaintiffs'

13 identities.

14         Now, in their opposition brief, the Masts also made a

15 new argument as to why the protective order is invalid; and

16 that is that the protective order is supposedly vague because

17 they do not understand what it means to indirectly identify

18 someone.  Nobody denies that there is nothing vague about a

19 prohibition of direct identification, which indisputably

20 occurred here.  And it's also difficult to understand that

21 directly identifying Baby Doe -- excuse me, it's not difficult

22 to understand that directly identifying Baby Doe would

23 indirectly identify John and Jane Doe.  There is nothing

24 ambiguous about the protective order.  And frankly, if the

25 Masts were concerned about an ambiguity, the proper thing to do

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  would be to ask this Court for clarification, not to risk

2  violating it.  But yet, they did not do that.

3      The Masts also argue in defense that they have

4  nonetheless substantially complied with the protective order.

5  Substantial compliance requires that all reasonable steps be

6  taken to comply with the order.  That's in *U.S. versus Darwin*

7  *Construction* from the Fourth Circuit.  The Masts did not take

8  all reasonable steps to comply when they went on national

9  television and directly identified Baby Doe.

10      Accordingly, Your Honor, we ask that Joshua and

11  Stephanie Mast be held in contempt.  They should be required to

12  advise the Court and plaintiffs to whom else they identified

13  any plaintiff, advise the Court and plaintiffs whether they

14  obtained NDAs from those persons or entities, provide the NDAs

15  to the Court and plaintiffs, produce to the Court and

16  plaintiffs whatever materials they provided to CBS, and they

17  should be required to pay our attorneys' fees in addressing

18  this issue.

19      Unless the Court has any questions, thank you, Your

20  Honor.

21      THE COURT:  All right.  Thank you.

22      MR. BOYER:  This may be a little bit out of order,

23  but my understanding is Mr. Osmani is not the subject of any of

24  the show causes.  My co-counsel, Mr. Brooks, is available.

25  Would the Court be willing to consider excusing me from the

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  remainder of the proceedings given that the issues involving

2  Mr. Brooks have been argued at this point?  If needed, I can

3  stay, but I thought I would request.

4          THE COURT:  All right.  And who are you representing?

5          MR. BOYER:  I'm co-counsel with Mr. Brooks for

6  Mr. Osmani.

7          THE COURT:  Okay.  You're excused as far as I'm

8  concerned.  Go ahead.

9          MR. BOYER:  Thank you, Your Honor.

10         THE COURT:  All right.  Counsel for the Masts?

11         MR. MORAN:  Thank you, Your Honor.

12         So as I said, I wanted to address some of the issues

13  on the dueling narratives of this case in this context, because

14  unlike the discussion that we just had on the motion to

15  dismiss, on plaintiffs' motion for an order to show cause, the

16  Court is not entitled to take their allegations as true.  The

17  Court is not -- or not required to or entitled to, but there is

18  no need to accept as true their version of events.  And

19  frankly, as the Court might expect, the Masts have a very

20  different view of how all of this played out, that they very

21  candidly and selflessly worked openly with this couple to bring

22  Baby Doe to the United States on the mutual understanding that

23  John Doe knew from the beginning, that the entire plan was that

24  she would come and live with the Masts and she would be their

25  adoptive child.  And of course, again, these issues are being

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  actively and hotly litigated in the circuit court proceeding,

2  but I think that's important context for the order of show

3  cause that we're considering right now.

4         This has been an incredibly challenging episode for

5  the Masts where they have -- their family has been attacked,

6  both threatened legally as whether or not it continued to

7  exist, and also maligned in the press.  And we've heard

8  plaintiffs' counsel acknowledge candidly -- as they have no

9  choice but to do -- that they are responsible for that

10 maligning in the press, that they have gone to reporters, that

11 they have criticized the Masts, that they've leveled their

12 accusations publicly against them by name; and that they

13 themselves have, under their theory, identified Baby Doe.

14 Anyone who walks into the Masts' home and meets their adoptive

15 daughter would meet her, identify her, understand what her name

16 is; and, by their view, would be irreparably threatening harm

17 to her and to John and Jane Doe.  And candidly, that is not how

18 my clients, or me, or I would submit anyone making a reasonable

19 effort to read the protective order, would understand it to

20 work.  As a result of the intense media scrutiny that

21 plaintiffs themselves goaded on and secured through a series of

22 damning stories that culminated in a public condemnation of

23 Joshua Mast by the Taliban, as a result of that, the Masts

24 concluded that they had no choice but to speak to the press

25 themselves and tell their side of the story.  But in doing so,

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   they took great pains to ensure that they never named John or

2   Jane Doe, and that they did not name Baby Doe either,

3   recognizing that this Court had a protective order in place.

4           Again, plaintiffs have articulated what they now view

5   as a theory under which she was directly identified because

6   Joshua acknowledged, when shown a photograph of her, that that

7   was indeed her, and that they indirectly identified her again

8   by discussing and reviewing photos.  But with respect, that's

9   simply not a reasonable reading of the protective order, we

10  submit, and certainly not something that they intentionally set

11  about to do in violation --

12          THE COURT:  Well, just on the program he did identify

13  a photograph when he said it's my favorite photograph, or words

14  to that effect.  And why wouldn't that be in direct violation

15  of the protective order?

16          MR. MORAN:  Well, Your Honor, I guess my question

17  would be she was not named --

18          THE COURT:  I'd rather an answer than a question.

19          MR. MORAN:  What's that, Your Honor?

20          THE COURT:  I said, I'd prefer an answer to my

21  question than a question to my question.

22          MR. MORAN:  No.  No.  No.  I understand.  I

23  apologize, Your Honor.

24          My answer is that Baby Doe -- who under the

25  protective order she may be referred to as "Baby Doe" -- and

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    this litigation identifies Baby Doe as the adopted daughter of

2    Joshua and Stephanie Mast.  They did no more than confirm that

3    the child who lives in their house with them is, indeed, Baby

4    Doe without naming her.  They did not disclose her name.  My

5    understanding of what a pseudonym is, is that the Court

6    provides a false name that is to be used in place of the

7    party's actual name.  And at no point during the aired segment

8    or during the unaired portion segment did they say:  Here is

9    her name, here is who Baby Doe is.  The only -- the reason it's

10   obvious and easy to connect the dots is because plaintiffs

11   themselves are the ones who filed a lawsuit of Baby Doe versus

12   Joshua and Stephanie Mast that draws an unmistakable link

13   between Baby Doe and Joshua and Stephanie Mast.  And so by

14   their -- by their argument, any -- walking around with her in

15   public, taking her to school, taking her to the playground is

16   identifying her because there is public information about the

17   fact that they have a girl from Afghanistan who is their

18   adopted daughter.  Her name is Baby Doe.  But if you see her

19   and you're able to connect those dots, you've now indirectly

20   violated her in violation of the protective order.

21          THE COURT:  Okay.  Look, you say that they were

22   taking pains to not violate the protective order.  How could

23   they not be violating the protective order if on national

24   television they show a picture and identify her?  I don't

25   understand the pains to adhere to the protective order.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1      MR. MORAN:  So Your Honor, they ensured that any

2   current photograph that would be recognizably identified as her

3   were not taken or aired, that they --

4      THE COURT:  Where did those pictures come from that

5   the child was out in the yard with other children?

6      MR. MORAN:  So I want to be careful because I don't

7   want to misstate -- I don't -- I could go back and verify that

8   for Your Honor.  And I guess where I'm going with this is what

9   I would propose is that if the Court deems it necessary to make

10  some of these factual judgments about -- and it would have to,

11  I believe, before entering an order of contempt -- both as to

12  our clients' at a minimum good faith effort to comply with the

13  protective order, but I would also submit that there is still a

14  pending factual question about the actual harm that's alleged

15  by the plaintiffs, that the Court would hold an in-person

16  hearing.  We'd be happy to come to Lynchburg, if that's

17  preferable to Charlottesville.

18     THE COURT:  I mean, you know, we set this for a

19  hearing today on the show cause.  That's generally when I hear

20  evidence on this sort of thing, if there would be evidence.

21     MR. MORAN:  Well, I'm happy to see if my --

22     THE COURT:  You filed an affidavit on behalf of your

23  client, but I don't think he specifically denies that he did

24  anything.

25     MR. MORAN:  With the Court's indulgence, I would

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  bring Mr. Mast on.  I'd have to send him the link for this

2  outside the public docket.  I would bring him in.  He can

3  testify to you himself.

4         But I think before we get to that, I think there are

5  at least two reasons why the Court doesn't need to get to the

6  factual questions at this stage.  One, as we said, these

7  plaintiffs do not have standing to assert claims on behalf of

8  Baby Doe.  They do not allege -- other than just now in an

9  attempt to rehabilitate their claim -- their motion to show

10 cause was not based on the notion that John and Jane Doe had

11 been identified.  It was that Baby Doe had been identified.

12 And as we've stated, they don't have standing to bring claims

13 on behalf of Baby Doe or to allege actual harm on behalf of

14 Baby Doe.  And I would add that their theory of secondary harm

15 to themselves is entirely predicated on the notion that they

16 are going to succeed in their effort to set aside the adoption

17 order, that they're going to take her back to Afghanistan and

18 raise her there, and they will then some time at that point

19 suffer harm at that stage.

20        And the second is:  If the Court construes -- and

21 again, we did not at the time have more than the protective

22 order itself, which said direct or indirect identification --

23 if the Court construes that to mean that the Masts are

24 prohibited, without getting a signed NDA providing notice to

25 plaintiffs' counsel, if they are prohibited from acknowledging

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  their daughter to any human -- because there is nothing in the

2  protective order that says this applies differently to a CBS

3  reporter than it does to a family friend at the grocery store.

4  So under their theory, if Stephanie Mast took Baby Doe with her

5  to the grocery store and somebody said, oh, is that your

6  daughter?  She'd have to pull out an NDA and say, excuse me,

7  could you sign this, please, and then let me send an email to

8  plaintiffs' counsel to let them know that I'm about to identify

9  my adoptive daughter.  And frankly, we submit that that's not a

10 reasonable interpretation of the protective order.  But again,

11 even if it were, it would be an unconstitutional gag order.

12 And it would not be enforceable by contempt because it is a

13 restriction on speech that is not just --

14         THE COURT:  Well, if they are trying so hard to

15 adhere to the protective order and they thought it was -- they

16 didn't have to, they were just doing it out of the goodness of

17 their heart, I mean, why couldn't they come to the Court and

18 ask the Court to lift it, because in the previous litigation

19 the Court sealed permanently the photos of Baby Doe.

20         MR. MORAN:  Well, Your Honor, we did ask the Court to

21 lift it entirely, and that was already pending in front of the

22 Court.  And I'm not suggesting that the Masts engaged in

23 self-help.  What I'm saying is, as their attorney, this is my

24 alternative argument that they took efforts to comply with the

25 protective order.  They believed that they were complying with

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  the protective order.  At the same time, we believe --

2          THE COURT:  Well, how were they complying?  I mean,

3  if -- apparently CBS had these pictures of the children playing

4  in the yard, and didn't they have to give permission to CBS to

5  show any pictures of the child?

6          MR. MORAN:  So as laid out in the declaration, they

7  did not allow them to take any photographs that would include

8  her face, and they put her in a long-sleeved dress that would

9  cover what plaintiffs themselves describe --

10          THE COURT:  What about the photograph of her face

11  that he identified as being his favorite photo?

12          MR. MORAN:  That photograph had been obtained from a

13  third party, and it was shown to Mr. Mast by CBS.  And yes, he

14  said, that is my favorite photo.  And I suppose --

15          THE COURT:  Okay.

16          MR. MORAN:  I suppose there is an argument -- I'm not

17  claiming to not understand the argument that could be construed

18  to be --

19          THE COURT:  You say it was subpoenaed from a third

20  party?

21          MR. MORAN:  No, obtained.  Just obtained.

22          THE COURT:  Who was the third party?

23          MR. MORAN:  I don't know that, sitting here today.

24          THE COURT:  You all don't know much.  I mean,

25  everything seems -- I've never been in a case where there's

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  alleged so much misunderstanding and no one knows anything

2  about things that ought to be pretty important in the case.

3           MR. MORAN:  Well, Your Honor, again, I'd be happy --

4  I just don't -- sitting here today, I don't know the answer to

5  who provided that particular photo to CBS News.

6           THE COURT:  Well, if it's -- well, look, you know, if

7  your defense is your client didn't do it, it looks like it

8  would be pretty easy to ask him:  Well, who did you give the

9  photo to?

10          MR. MORAN:  Sure.  There are many -- there are many

11  members of the United States military who have photographs of

12  Baby Doe, including that photograph.  And we know from the

13  segment itself that CBS News, separately from their interview

14  of our clients, interviewed members of U.S. Special Forces who

15  were involved in rescuing her from the battlefield in

16  Afghanistan.  And I believe -- this part I can't say I'm 100

17  percent sure -- but I believe that those United States military

18  members whom CBS News contacted had access to these same

19  photographs.  So I can't say for sure that that's where CBS

20  News got them, but I think it's very likely that CBS obtained

21  those from other members of the U.S. military; and then in

22  preparing for an interview with the Masts, decided they would

23  show that photo and ask them about it.

24          And, you know, again, the Masts did not seek out the

25  public limelight.  They were content for a year to litigate

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  this without speaking to the press.  And it was --

2        THE COURT:  Well, you know, I saw -- I saw a tape or

3  something of the CBS interview, and he was asked, why did

4  you -- why are you coming forward now?  And certainly from

5  CBS's standpoint it sounded as if Mr. Mast was the initiator of

6  the public discussion about the child.

7        MR. MORAN:  With respect, Your Honor, absolutely not.

8  The record is indisputable that the public -- the public

9  scrutiny of this case, the public interest in Baby Doe and the

10  story of how she came to the United States was --

11        THE COURT:  Well, okay.  But do you dispute that the

12  question was asked something to the effect:  Why do you come

13  forward now?  And he said -- gave the answer because the Does

14  had slandered his family or words to that effect?

15        MR. MORAN:  No, absolutely, I don't dispute that.

16        THE COURT:  Okay.  Well, it was no accident.

17        MR. MORAN:  No.  No.  No.  I'm sorry, Your Honor.  I

18  didn't mean to suggest it was an accident.

19        My point was that they were content to -- we had a

20  state court proceeding for almost a year that had been pending

21  under pseudonyms and under -- or not under pseudonyms, rather

22  under seal in the state court proceeding.  And then in late

23  summer into the fall and the end of 2022 we had two sets of

24  things happen:  One, the plaintiffs filed this case, which for

25  the first time publicly named Joshua and Stephanie Mast and

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  made all of their allegations which had been litigated under

2  seal privately in the circuit court, they chose to make those

3  public by filing this case and by not using -- they sought to

4  use pseudonyms for themselves to obtain a one-sided protective

5  order *ex parte*, and then to publicly name and shame the Masts;

6  at the same time, they spoke to reporters.  They claim that

7  there was a relentless -- you know, relentless pressure.  There

8  had been zero reporting on this before they decided to give

9  interviews, their lawyers decided to give interviews.  Their

10  lawyers are quoted directly in the cases themselves.  And it

11  was only in the wake of that, as the Masts continued to receive

12  continued inquiries from the media, and the Taliban put out a

13  statement publicly condemning Joshua Mast based on in reaction

14  to those stories, that they concluded it was untenable, unfair,

15  and unworkable for their family to continue --

16          THE COURT:  So why did -- look, before -- why did

17  they move to lift the order?

18          MR. MORAN:  Why did we move to lift the order?

19  Because we believed --

20          THE COURT:  Okay.  But you did it after the -- after

21  you had already appeared on TV, right?

22          MR. MORAN:  No, Your Honor.

23          THE COURT:  Well, okay.  You filed the order.  Do you

24  take the position that your client, by filing an order, that he

25  could go ahead and do what he wants to do?

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1              MR. MORAN:  No, Your Honor.

2              THE COURT:  Okay.

3              MR. MORAN:  As I said, this is not an argument from

4    self-help.  This is an argument that, as an alternative -- our

5    principle argument and the way that the Masts conducted

6    themselves -- and I've confirmed that Mr. Mast would be happy,

7    if the Court would like him to dial into this version, that the

8    Court can ask him himself.  Mr. Mast believed -- and perhaps --

9    in view of the Court's apparent interpretation -- perhaps

10   erroneously, but he believed that the critical issue under the

11   protective order was whether or not he identified the names of

12   John Doe, Jane Doe, and Baby Doe, and perhaps by extension, you

13   know, gave sufficiently concrete details that would lead

14   somebody else to be able to determine their identity, which is

15   at least one import of the term indirectly.

16              The argument that's being made here today by the

17   plaintiffs is that by acknowledging that the baby -- that the

18   child who lives in their house, their adoptive daughter, by

19   acknowledging that she is their adoptive daughter, that they

20   indirectly identified her.  And again, if the Court has that

21   view today, then so be it.  That was not the view -- that was

22   not the understanding under which the Masts proceeded.  It was

23   not the basis on which they took what they believed were good

24   faith steps to comply with the Court's order while also doing

25   this interview.  And again, this is me as their attorney

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   zealously advocating for my client.  I firmly believe that if

2   the Court construes the order to say that they cannot -- if

3   they are presented with a photograph of their own daughter and

4   someone says, is this your daughter, that they are prohibited

5   by law, by order of the Court from saying, oh, yes, that's my

6   daughter, I love that photo of her, if that's the meaning of

7   the Court's order, then it is unconstitutional, and it would be

8   unconstitutional to order contempt against the Masts on that

9   basis.  And if the Court disagrees, then we'll proceed as we

10  need to, but that is me arguing as their advocate.  That is not

11  the theory on which they undertook to do the interview.  They

12  believed that they were complying, and they took what they

13  believed to be reasonable steps to comply with their

14  understanding of the order.

15          THE COURT:  All right.  Get him on the phone.

16          MR. MORAN:  Okay.  I will work on it.

17          MS. ECKSTEIN:  Your Honor, I can wait, if you want to

18  hear from Mr. Mast first.

19          THE COURT:  Okay.  You may respond while they're

20  trying to reach him.

21          MS. ECKSTEIN:  I have a few brief points, Your Honor.

22          Mr. Moran made the argument that the plaintiffs have

23  goaded on the press and pursued the press.  I just want the

24  record to be clear here.  The press -- numerous media entities

25  reached out to the Does and their lawyers.  This story was

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  going to be told no matter what.  The Does did not pursue

2  them -- the press at all.

3      Mr. Moran made the argument that the Masts thought

4  that so long as they didn't provide the plaintiffs' names, they

5  were not violating the order, the protective order.  I give him

6  points for creativity.  The protective order says that the

7  plaintiffs, which include Baby Doe, cannot be directly or

8  indirectly identified.  The court order didn't say directly or

9  indirectly identified by name.  It said directly or indirectly

10 identified.  That has happened here.

11     Mr. Moran argued that the Does haven't proven harm

12 because they haven't gone back to Afghanistan and been

13 persecuted yet.  Let's remember the protective order also

14 protects innocent nonparties, their family members.  Their

15 family members are in Afghanistan now and now fear for their

16 lives.

17     Mr. Moran argued that the protective order is vague

18 and ambiguous if it prevents Stephanie Mast from walking a

19 child to school and being asked -- and answering affirmatively

20 when asked if that is her daughter.  There is a huge difference

21 between doing that and going on national television and

22 identifying Baby Doe directly.  No one is saying that Stephanie

23 Mast can't do that.

24     And you asked about the timing of the motion to lift

25 the protective order.  I want to make sure the record is clear

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   here.  The Masts spoke or interviewed by CBS on January 3rd.

2   The motion to lift the protective order was filed on January

3   5th, two days later.  So they spoke with CBS, were interviewed

4   by CBS before they filed the motion.

5        I did have a point to make about the evidence before

6   you, but if we're getting Mr. Mast on the phone, I would like

7   to reserve that for later.

8        THE COURT:  All right.  Do you have Mr. Mast?

9        MR. MORAN:  Your Honor, I don't believe yet.  I

10  believe we'd see him pop in.

11       If I may just address that one last point, Your

12  Honor, about the timing.  I do believe I may have misspoken.  I

13  didn't mean to.

14       THE COURT:  That's all right.

15       MR. MORAN:  The interview took place on January 3rd.

16  Our motion was filed on the morning of January 5th.  The reason

17  I answered as I did was twofold:  One, I -- we had begun -- we

18  had prepared our motion and begun the process to meet and

19  confer with opposing counsel and intended to lift the --

20  intended to seek to lift the protective order prior to -- prior

21  to that point; and secondly, that I personally filed the motion

22  before I was aware of the interview.

23       So I apologize.  That was the reason for my

24  misstatement.  I just wanted to clarify.

25       THE COURT:  Carmen --

Mast - Direct

 1          THE CLERK:  He's coming in the waiting room right

 2   now.

 3          THE COURT:  I'll ask the clerk to swear in Mr. Mast.

 4          JOSHUA MAST, CALLED BY THE DEFENDANTS, SWORN

 5                      DIRECT EXAMINATION

 6          THE COURT:  Mr. Moran, do you care to question him?

 7          MR. MORAN:  Yeah, I'd be happy to.  I'd be happy to,

 8   Your Honor.

 9    BY MR. MORAN:

10   Q    So Joshua, why don't you just tell the Court how the

11   interview with CBS News came about.

12   A    Yes, sir.  So the interview with CBS News -- we had

13   declined to do any interviews at all for a year because the

14   state court judge didn't want us to make it public, and so we

15   declined multiple interviews from *New York Times* and the *AP*.

16   And then one of the rangers who was basically called a murderer

17   by the *New York Times* wanted to set the record straight about

18   the Al-Qaeda terrorists they were targeting that night, sir.

19   And so they asked me -- they told me they had talked to CBS,

20   and that this reporter was fair, and that they would like me to

21   basically help them set the record straight.  And so we agreed

22   to do that mostly because the *New York Times* article basically

23   called them murderers.

24          MS. ECKSTEIN:  Your Honor, I'd like to object on

25   hearsay grounds.

Mast - Direct

 1          MR. MORAN:  It goes to the state of mind of Mr. Mast,

 2   not to the truth of the matter asserted.

 3          THE COURT:  All right.  I didn't understand the

 4   objection.

 5          MS. ECKSTEIN:  The objection was hearsay, Your Honor.

 6   He's testifying --

 7          THE COURT:  Oh, okay.

 8          All right.  Overrule the objection.  It doesn't go to

 9   the truth.  Go ahead.

10    BY MR. MORAN:

11   Q    You mentioned the state court protective order.

12          Were you aware that the federal court had entered a

13   protective order?

14   A    So yes, sir, I was aware that the federal court had done

15   an initial protective order for the case.  And so we tried to

16   stick with the -- like the intent of that protective order.

17   That's why we didn't talk about them at all.  We didn't name

18   them.  We didn't talk about where they're from in Afghanistan,

19   that type of thing.  We steered clear from that, and we were

20   really not trying to respond to their kind of salacious

21   allegations.  We were trying to tell the real story.  So that

22   was our intent with talking to them is because, you know, we're

23   ███████  parents.  We've made that really clear from the

24   beginning.  I've told it to everybody for two years --

25   Q    I'll just advise you to use "Baby Doe" for purposes of

Mast - Direct

1  this --

2  A    Oh.

3  Q    -- of this proceeding.

4  A    I apologize, Your Honor.  Eighteen months with your

5  daughter will make that slip your mind.

6       So that was our intent with talking to CBS after they had

7  done like three months' worth of research and came to us with a

8  lot of information.  And so because of that personal request by

9  one of the rangers to participate, we decided to do that.  And

10 I'm thankful we did.

11 Q    And what steps, if any, did you take regarding Baby Doe's

12 identity and whether you could disclose it to CBS?

13 A    Sure.  So after ████ got -- after the child got out of

14 Afghanistan with the Special Forces team, Your Honor, we -- we

15 basically let some of the doctors and nurses who had raised her

16 like from the bomb blast, from the suicide blast, we had let

17 them know of that.  So they provided a whole bunch of video and

18 photos from her time, you know, recovering from the suicide

19 blast.  So we -- we basically -- they came to us with a lot of

20 questions and had a lot of those images already from I'm

21 assuming the rangers, but they wouldn't tell me who exactly

22 they got those from.  So it was either the doctors and nurses

23 or some of the rangers who had access to those photos, and they

24 were actually some of the folks who provided them to us

25 originally.

Mast - Direct

1      So they asked us stuff like:  Do we have the rights to

2   these?  And we had said no.  And then the specific one -- I'm

3   not sure where they got the one in Germany specifically, but

4   they didn't ask us to comment on that.  My wife was kind of

5   describing the moment for that one.  The only one that I was

6   aware of was her baby photo from when she was like sitting

7   outside of the combat trauma center.  So that was the only one

8   that they specifically asked me about.  And then everything

9   else we did we were real careful not to show any of our kids'

10   faces or reveal their identities, because, you know, we're

11   trying to I guess respond to this, you know -- I don't know, I

12   don't want to be flippant, but some of these more salacious

13   allegations.

14         THE COURT:  What were the salacious allegations

15   toward you?

16         THE WITNESS:  Oh, well, that we didn't tell the

17   plaintiffs that we were legally responsible in the U.S., I

18   mean, because the other court already found that we did tell

19   them that.  So, I mean, we were just --

20         MS. ECKSTEIN:  And Your Honor --

21         (Overlapping speakers.)

22         MS. ECKSTEIN:  Objection.

23         MR. MORAN:  Objection, Your Honor.  Opposing counsel

24   can put on their own witnesses, if they'd like.

25         THE COURT:  Right.  Overruled.

Mast - Examination by the Court

1            MS. ECKSTEIN:  Objection to what the circuit court

2     said.

3            THE COURT:  Well, that --

4            MR. MORAN:  This is factual testimony.

5            THE COURT:  Right.  Okay.

6            MR. MORAN:  They can rebut it, if they want to.

7            THE WITNESS:  I was present for that, Your Honor.  So

8     the Court already found that we were more credible than the

9     plaintiffs in every issue that --

10           THE COURT:  All right.  Aren't you a lawyer?

11           THE WITNESS:  No, I'm just telling you what his

12    ruling was, sir.

13           THE COURT:  Well, okay.  No one asked you about his

14    ruling.

15           THE WITNESS:  Okay.  So I guess we were trying to

16    combat what we already combated for a year in court and the

17    public opinion that didn't have access to those court records.

18           THE COURT:  Okay.  Anything else you want to ask him,

19    Mr. Moran?

20           MR. MORAN:  No, Your Honor.

21           THE COURT:  Did CBS ask you for permission to show

22    photographs of the baby?

23           THE WITNESS:  Yeah.  We told them that we did not

24    authorize anything that showed her face.

25           THE COURT:  And they did it despite your denial?

103

Mast - Examination by the Court

1        THE WITNESS:  They didn't get those from us.  So they
2    did those anyway.
3        THE COURT:  CBS didn't need to get permission of you
4    to show anyone's picture?
5        THE WITNESS:  Well, I mean, they -- we only provided
6    them those photos and only authorized the ones that didn't show
7    her face.  Stuff they already had, I didn't provide to them.
8    So I did not believe that I was required to prevent them from
9    doing that, if they had those already.
10       THE COURT:  Well, did they ask you for permission to
11   show photographs of your child -- of the child?
12       THE WITNESS:  No, they did not.
13       THE COURT:  Okay.
14       THE WITNESS:  We declined to do that.  We only
15   allowed them to take the photos that --
16       THE COURT:  Well, why did you decline if you weren't
17   asked?
18       THE WITNESS:  Because I was required to do that by
19   the protective order.  I could not identify her to other
20   people.  So my understanding was I couldn't do that.  If they
21   had that independently, they're free to do whatever they want
22   in the country.
23       THE COURT:  Okay.  Any other questions, Mr. Moran?
24       MR. MORAN:  No, Your Honor.
25       THE COURT:  All right.  Counsel for the Does, any

Mast - Cross

1  questions?

2          MS. ECKSTEIN:  Just a few, Your Honor.

3                  CROSS-EXAMINATION

4   BY MS. ECKSTEIN:

5  Q    Mr. Mast, if I understand your testimony correctly, you

6  declined to respond to CBS's questions about photographs of

7  Baby Doe that they received from third parties; is that

8  correct?

9  A    Sure.  I have no problem with them seeing photos of her,

10 because honestly, baby photos seemed pretty innocuous to me.

11 So I felt like I was required to decline permission for

12 anything that would identify her, what she looks like now.  So

13 I declined to provide those.  So if they had other ones

14 independently, I didn't think that had anything to do with me.

15     So do I have a problem with her being seen?  I mean, the

16 Taliban already put my name on their website.  So what's the

17 difference at this point?  We're trying to protect her.

18 Q    So do I understand correctly that you see a distinction in

19 the protective order between showing pictures of Baby Doe when

20 she was an infant versus today; is that what you're telling

21 this Court?

22 A    No.  I'm telling him that there is a difference between me

23 authorizing them and encouraging them to show pictures of her

24 currently, or providing things that identify her and them

25 getting that from independent sources.  So my understanding is

Mast - Cross

1  they can get it from independent sources and show it if they

2  want to.  It's a free media.

3  Q    Did CBS ask you to confirm Baby Doe's identity in any of

4  the photographs that CBS allegedly obtained from third parties?

5  A    No.  They already knew who she was because there's a whole

6  bunch of us that know who she is.

7             THE COURT:  Well, the answer:  Did CBS ask you to

8  confirm?

9             THE WITNESS:  No.  I mean, they knew who the child --

10             THE COURT:  Okay.  We know they knew, but did they

11  ask you to confirm?  That was the question.

12             THE WITNESS:  I don't think so, like, because it was

13  assumed in everything that we were doing with speaking to them.

14  Like, they came to us with a pretty good grasp of the story.

15  So we were just articulating our perspective.

16             THE COURT:  Okay.  Did you give CBS any photos of

17  Baby Doe?

18             THE WITNESS:  So I went over some of the photos that

19  we had with them, and I did not authorize them to use any of

20  the photos that showed her identity.

21             THE COURT:  So you gave no photos to CBS?

22             THE WITNESS:  So no, I mean, I -- I showed the

23  reporter some photos, Your Honor.  We were --

24             THE COURT:  Did you give -- the answer is -- the

25  question is:  Did you give CBS any photos?

Mast - Cross

1          THE WITNESS:  So yes, Your Honor.  I mean, we gave

2    them all the ones --

3          THE COURT:  All right.  The ones that showed her body

4    and so forth from -- some showed a part of her face and other

5    parts?

6          THE WITNESS:  No.

7          THE COURT:  She's in the backyard with a long dress.

8          THE WITNESS:  So the one from -- so the photo from

9    the rear, sir?  So we gave them photos that did not show her

10   identity.  So we absolutely did that.  I don't want to -- we

11   selected photos that did not reveal her identity and provided

12   them to CBS because of the protective order.

13         THE COURT:  You don't think anybody that watched CBS

14   would -- seeing those photographs -- would be able to pick her

15   out?

16         THE WITNESS:  With my family, I think anybody who

17   sees my family and knows who I am would be able to pick her out

18   because I have four boys and one girl.

19         THE COURT:  Well, but it takes somebody that knows

20   you, I mean -- right?

21         THE WITNESS:  Well, Your Honor, I mean, this has been

22   open for two years.  So yes, there's a lot of people.

23         THE COURT:  Okay.  But you didn't think it was

24   necessary to get the protective order changed until after you

25   had given the interview?

Mast - Cross

1          THE WITNESS:  No.  I believe we had been planning to

2   appeal it anyway because it's inhibiting some of our

3   investigative stuff.  But no, we were trying to comply with the

4   protective order.

5          THE COURT:  Okay.  All right.  I'm sorry, Counsel.  I

6   interrupted you.  Any other questions?

7          MS. ECKSTEIN:  Just a few, Your Honor.  Thank you.

8    BY MS. ECKSTEIN:

9   Q    Mr. Mast, you testified that you did give CBS some photos.

10  How many photos did you give to CBS?

11  A    I'm not sure.  They showed I think all of the ones that we

12  had given to them.

13  Q    So CBS showed, in its two segments, all the photographs

14  that were provided by you and your wife; is that correct?

15  A    I believe so.  They might have left out one or two that

16  I'm not recalling off the top of my head, but I believe that

17  they showed the ones that we had picked that wouldn't show her

18  face.

19  Q    Now, you also testified that you showed CBS -- didn't

20  give, but you showed CBS -- other photos.

21         Did those photographs show Baby Doe's face?

22  A    As a baby, I believe.

23  Q    So the answer is yes?

24  A    Yes.  It was photos that were in the -- some of the

25  rangers and other doctors that had sent to us.

Mast - Cross

1  Q    And I believe you testified that CBS asked you and

2  Stephanie Mast if you had rights to some photographs, and you

3  said no; is that correct?

4  A    Yes.

5  Q    So CBS asked you about the photographs that they were

6  planning to show; is that right --

7  A    No.

8  Q    -- including showing her face?

9  A    They asked if I had the rights to I believe the one of her

10  in the hospital, but none of those I had taken.  So I did not

11  have the rights.

12  Q    And you claim that third parties gave permission to CBS,

13  or provided CBS with photographs of Baby Doe that showed her

14  full face.

15      Did any of those third parties ask you or Stephanie Mast

16  whether that was okay for them to share the photographs with

17  CBS?

18  A    No, ma'am.  So the other people participated under

19  anonymity with CBS so that they wouldn't even tell us who had

20  given them.  I assume it was some of the rangers.

21  Q    And you knew that the rangers and others -- the doctors --

22  had photographs of Baby Doe, including her full face.

23      And yet you did not let them know that they should not

24  share those with CBS; is that correct?

25  A    Sure.  I don't have anything to do with that.  So I

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023

1 wouldn't even tell them to do that if I could.

2 Q    Now, the photograph of Stephanie Mast with Baby Doe at

3 Ransteim Air Force base, you took that, correct?

4 A    Yes, I did.

5 Q    And it's your testimony that that photograph, neither you

6 nor Stephanie Mast provided it to CBS?

7 A    Correct.  We specifically did not.

8 Q    With how many people have you shared that photograph,

9 Mr. Mast?

10 A    I would estimate dozens to a hundred.

11          MS. ECKSTEIN:  Thank you, Your Honor.

12          THE COURT:  All right.  Thank you.

13          Mr. Moran, any other questions?

14          MR. MORAN:  No, no redirect unless the Court has

15 anything further.

16          THE COURT:  I have no questions.

17          Okay.  Anything else to be said about this?

18          Does anyone else have any other issue the Court has

19 not addressed?

20          MR. YERUSHALMI:  Yes, Your Honor.  David

21 Mr. Yerushalmi again.

22          Depending upon how the Court rules on the motion and

23 depending upon how the Court rules on the motion to lift the

24 protective order -- neither of which my client joined in -- I

25 have a question just from the reading of the protective order.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023

1  On its face it seems to suggest that attorneys, including

2  myself, are required to sign an NDA.  Before I violate a

3  protective order and be the subject of an order to show cause,

4  I would like clarity.

5          In addition, the protective order --

6          THE COURT:  File a motion asking your question; and

7  if it's necessary, I'll respond to it.

8          MR. YERUSHALMI:  Okay.  Thank you.

9          THE COURT:  Because Judge Hoppe has before him

10  whether to lift the stay -- I mean, lift the order, not the

11  stay order, but the protective order.

12          All right.  Anything else?

13          Okay.  I'll take these matters under advisement.

14  Thank you.  We'll recess now.

15  (Proceedings adjourned, 5:02 p.m.)

16

17

18

19

20

21

22

23

24

25

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023

1                         C E R T I F I C A T E

2          I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3     the United States District Court for the Western District of

4     Virginia, appointed pursuant to the provisions of Title 28,

5     United States Code, Section 753, do hereby certify that the

6     foregoing is a correct transcript of the proceedings reported

7     by me using the stenotype reporting method in conjunction

8     with computer-aided transcription, and that same is a

9     true and correct transcript to the best of my ability and

10    understanding.

11         I further certify that the transcript fees and format

12    comply with those prescribed by the Court and the Judicial

13    Conference of the United States.

14         /s/ Lisa M. Blair                Date: February 21, 2023

15

16

17

18

19

20

21

22

23

24

25