# EXHIBIT 20



**UNITED STATES MARINE CORPS**
MARINE RAIDER SUPPORT GROUP
MARINE FORCES SPECIAL OPERATIONS COMMAND
PSC BOX 20117
CAMP LEJEUNE NC 28542-0117

IN REPLY REFER TO:
5800
JKM
**JUN 0 7 2022**

From:  Major Joshua Mast, USMC
To:    Commander, Marine Forces Special Operations Command or his designee

Subj:  RENEWED REQUEST TO TESTIFY IN RESPONSE TO RESCINDED TOUHY OF 7 JUNE 2022

Ref:   (a) DoDD 5405.2
       (b) SECNAVINST 5820.8A
       (c) Approved Touhy Request of 18 May
       (d) Touhy Recission of 7 June 2022

Encl:  (1) Photographs of Major Mast's Touhey's Taken by Opposing Counsel and Provided to the DoJ and DoD OGC.
       (2) Email Traffic directing coordination with DoD OGC on Touhy request prior to request for rescission of the 18 may Touhy
       (3) Specific Risk of Harm Letter with Enclosures
       (4) NCIS Phone Call
       (5) National Unique Identifying Number for Terrorist Screening Center's Tide Database for    John Doe    (Plaintiff)

1.  Pursuant to the references, I am requesting to testify on my daughter's behalf in a civil proceeding. Reference (c) is hereby incorporated into my request by reference, and supplemented by the following information in order to address facially neutral concerns from the Department of Justice (DoJ) and the Office of General Counsel, Department of Defense (DoD):

    a. I understand that the U.S. Government reserves the right to have a representative present in the Fluvanna County, Virginia Circuit Court, Case Number CL22000186-00. All other requirements under the references were provided in my previous request.

    b. I understand the U.S. Government has an interest in official information in state court proceedings, and my attorneys have already coordinated with Ms. Katheryne Wyer, U.S. Department of Justice (DoJ), and offered to meet to address any concerns about official information.

    c. On 19 May 2022, opposing counsel filed a motion in limine to "exclude official and classified information, absent express written authorization." Presumably, this relates to official information regarding my daughter's non-Afghan origin from an Al Qaeda foreign fighter compound circa 2019, and the Plaintiff in the case being

detained and questioned in my presence due to a biometric match to the Terrorist Screening Center's Terrorist Identity Data Environment (TIDE).

d. On 24 May 2022, the Judge overruled the motion, and opposing counsel was provided my approved Touhy request dated 18 May 2022.

e. At approximately midnight on 26 May, 2022, the night before I was originally scheduled to testify, Ms. Wyer informed the court of a "Notice by the United Sates Concerning Potential Participation and Request to Continue the May 26, 2022 Hearing, or in the Alternative to Exclude Purported Government Information."

f. Opposing counsel provided Ms. Wyer photographs of my approved request from MARFORSOC to provide relevant unclassified factual information in the above captioned case. This can be independently confirmed by Ms. Wyer at katheryne.wyer@usdoj.gov. (Enclsoure (1)).

g. On 7 June 2022, this Command revoked my permission to testify on my daughter's behalf at a hearing scheduled for 8 June 2022 at 1000 at the request of DoJ via OGC.

h. There is no apparent lawful purpose for opposing counsel to request the government limit previously approved official information that I am permitted to submit in my defense in a case involving the custody of my daughter. Such information is encouraged by DoD policy.

i. It is disturbing that concerns have arisen that mirror the motion to exclude otherwise relevant evidence filed by a private litigant in a civil matter where the only possible source of the DoJ's knowledge of the matter is ex parte communications with an adversarial party.

j. I do not intend to discuss classified material in the proceeding. I have attempted to provide information to designated coordination POCs to address any concerns.

k. As the proceeding involves a determination as to the best interest of a child, DoD Policy encouraging the provision of factual information for the court's decision seems particularly appropriate in this case. I request that all official information relevant to the best interests of my daughter be provided to the court. This includes factual, non-expert testimony and unclassified, non-privileged information to include:

i.     Information about my Daughter's origin that was declassified and prepared for release to both the International Committee of the Red Cross and Afghan social workers in 2019, and submitted to U.S. Citizenship and Immigration Services by the Assistant Secretary of Defense, Special Operations and Low Intensity Conflict for the Agency Initiated Parole visa he requested on my

daughter's behalf in February, 2020. I was the financial sponsor for this visa request.

    ii.  The fact that I was present when the Plaintiff was detained and questioned regarding a weapons and explosive use in 2014, and that I subsequently reported this to NCIS who referred it to the FBI.

    iii. Unclassified knowledge of how Plaintiff's family, my interpreter's three minor siblings, and my daughter were evacuated from Afghanistan.

  k.  These issues are relevant to the hearing for reasons that include:

    i.  The Plaintiff has the burden of proof to demonstrate, as he claims despite refusing DNA tests, he is a biological half-cousin of my daughter.

    ii. The Plaintiff has sworn under oath that neither he or any member of his family are affiliated with either the Taliban, any armed group, or the terrorist network in control of western Redacted, including a purported relative that was targeted and killed by U.S. forces. These records demonstrate that the Plaintiff has lied under oath about either his terrorist affiliations, his biological relationship, or both to a U.S. court, as my daughter was recovered from an Al Qaeda compound with multiple barricaded shooters.

    iii.  The Plaintiff currently has an Asylum petition in which he claims he cannot return to Afghanistan based on a credible fear of the Taliban. The requested information is relevant to the credibility of this witnesses' statements made under oath to various U.S. government entities.

    iv. The risk of harm if my daughter is turned over to a non-relative, terrorist affiliated person who has previously indicated to me the intent to return to Afghanistan is significant.

    a.  The Taliban has restricted the right of women to leave their homes without a male relative.

    b.  Female children have been restricted from attending school past sixth grade.

    c.  All women are again required by the Taliban to completely cover their face.

    d.  Economic conditions in Afghanistan have resulted in the majority of the population experiencing food insecurity and living below the U.N's global poverty index of approximately $1.96 per day.

   e.   L y speaks perfect English, and is completely integrated with her four brothers. She is unlikely to be able to understand the language or restrictions she would face in Afghanistan.

   v. The DoD Inspector General, in its report DODIG 2022-065 "Evaluation of the Screening of Displaced Persons from Afghanistan" has examined how otherwise ineligible persons meeting the "known or reasonably suspected" standard for a TIDE entry were improperly admitted to the United Sates under humanitarian parole. Evidence regarding terrorist affiliations are relevant to proceedings regarding the best interests of a child.

2.   This request is consistent with DoN policy "to make factual official information, both testimonial and documentary, reasonably available for use…in state courts…" as per paragraph 4(a) of reference (b). Enclosure (3) was previously released by the DoD to ICRC, Afghan social workers, and to USCIS for my daughter's Agency Initiated visa application. Enclosure (5) was received in my personal capacity, while I was in a leave or liberty status. I subsequently reported the incident to this command via the NCIS Liaison. See enclosure (4).

3.   In lieu of the proposed revocation of my previously approved Touhy, I respectfully request that this supplement, and a standing invitation to address additional concerns, be approved as sufficient to allow me to successfully defend against these baseless claims at the hearing set for 1000 on 8 June 2022, and future hearings that may be ordered by the court.

4.   If the Government provides all information relevant to my daughter's best interest, the Plaintiff's case will be dismissed. This is why they are attempting to invoke the power of the government to suppress relevant evidence from the Judge charged with making decisions regarding my daughter's best interests.

5. The U.S. Government does not have the authority to pick winners and losers in custody disputes. I respectfully request that otherwise lawful administrative processes not be utilized to deny my family the opportunity to win our case.

6. I respect and appreciate this Command and will continue to attempt to coordinate with relevant stakeholders to address any concerns that are serving as a barrier to protecting my daughter. I respectfully request that this be processed with the appropriate diligence due to a precious two-year old that has suffered enough in life already.

7.   The point of contact for this matter is Major Joshua K. Mast, at (910) Redacted .

                              J. K. MAST

4

 Gmail

**Request for Depositon Testimony - Brigadier General** Redacted

NORTON, ANDREW R Lt Col USAF AMC 375 AMW STAFF/375 AMW/JA          Mon, May 23, 2022 at 6:51
Redacted     @us.af.mil>                                                                            PM
To:    Redacted    !@gmail.com" <I Redacted !@gmail.com>
Cc:    Redacted     Col USAF AMC AMC/HQ AMC/JA" <I     Redacted         Redacted      Maj
USAF AMC 375 AMW/JA" <sara.rathgeber.2@us.af.mil>

Good evening Mr. Redacted

We have reviewed your request and referenced our applicable regulations to ensure no conflict exists with granting
your request. As the release authority for this request, we do not have issue with Brigadier General      Redacted
providing testimony at the hearing you indicated. Please feel free to reach out to coordinate the testimony to best
meet your timelines as well as Brigadier General Redacted's.

Please feel free to reach out if you have any questions. My POC for this matter is Maj     Redacted   (CC'd).

V/R

Lt Col Redacted

Redacted   Lt Col, USAF

Staff Judge Advocate
Redacted
      Air Mobility Wing

Redacted

Scott Air Force Base, IL 62225

RedactedLegal Office Front Desk:          Redacted

SJA Office:     Redacted
SJA Cell Redacted

# RAKNESS & WRIGHT PLC
ATTORNEYS AT LAW

May 13, 2022

Office of the Staff Judge Advocate
Attn: Colonel Redacted USAF
Air Mobility Command (AMC/JA)
709 Ward Drive, Bldg 1990
Scott AFB, Il, 62225

Re: Request for Testimony – Brigadier General Redacted

Dear Colonel Redacted

Thank you for your letter of May 12 and let this letter serve as our request for under *Touhy v. Ragen*, 340 U.S. 462 (1951) and your controlling statutes and DoD regulations.

I represent Major Joshua Mast, USMC, and his wife, Stephanie Mast, in a Virginia state court proceeding to defend their 2020 adoption of a child that was orphaned in Afghanistan. The case is in the Fluvanna County Circuit Court. Neither the Department of Defense or any other government entity, state or federal, is a party to this litigation.

I understand from my clients that Brigadier General Redacted USAF, was present at or near the time their minor child came into his hospital at Bagram, Afghanistan, in approximately September 2019, while she was treated there, and when she was released in February of 2020. I believe General Redacted will be able to inform the Fluvanna County Circuit Court judge about the facts, circumstances and conditions of her being brought to the hospital, her treatment, and the facts, circumstances, and conditions surrounding her release from the hospital. The testimony will be relevant to the defense of the adoption, the Masts' actions, and the absence of fraud.

There is an evidentiary hearing on May 24 and 26 in this case. I understand General Redacted will be unavailable to testify on those dates. I am requesting he be available for a video deposition. I anticipate his deposition testimony, including cross-examination, would take three hours or less. I am not asking for any expert opinion. However, I will likely ask about the child's examination and treatment while under his care. Enclosed is an authorization from the child's adoptive father for this testimony. I can provide a subpoena once an agreeable date is arranged.

Thank you for your attention to this matter. I look forward to hearing from you.

Respectfully,

*Hannon Wright*

Hannon E. Wright

Enclosure
Phone: 434-284-7746          1540 Insurance Lane, Charlottesville, VA 22911          Fax: 540-301-0021

hannonwright@gmail.com          ryanrakness@gmail.com

6025 18

CONTROLLED when filled

# AUTHORIZATION FOR DISCLOSURE OF MEDICAL OR DENTAL INFORMATION

## PRIVACY ACT STATEMENT

h the Privacy Act of 1974 (Public Law 93-579), the notice informs you of the purpose of the form and howit will be used. Please read it

ublic Law 104-191, E.O. 9397 (SSAN); DoD 6025.18-R.

RPOSE(S): This form is to provide the Military Treatment Facility/Dental Treatment Facility/TRICARE Health Plan with a means to request the ssue of an individual's protected health information.

S): To any third party or the individual upon authorization for the disclosure from the individual for: personal use; insurance; continued medical al, retirement/separation, or other reasons.

Voluntary. Failure to sign the authorization form will result in the non-release of the protected health information.

at be used for the authorization to disclose alcohol or drug abuse patient information from medical records or for authorization to disclose
a records of an alcohol or drug abuse treatment program. In addition, any use as an authorization to use or disclose psychotherapy notes may
d with another authorization except one to use or disclose psychotherapy notes.

### SECTION I - PATIENT DATA

| 1. First, Middle Initial) | 2. DATE OF BIRTH *(YYYYMMDD)* | 3. SOCIAL SECURITY NUMBER |
|---|---|---|
| t I | 20190724 | Redacted |

F TREATMENT: FROM - TO *(YYYYMMDD)*
20190906 - 20190227

**5. TYPE OF TREATMENT** *(X one)*

| OUTPATIENT | INPATIENT | BOTH |
|---|---|---|

### SECTION II - DISCLOSURE

RIZE   Brigadier General   Redacted

*(Name of Facility/TRICARE Health Plan)*

**TO RELEASE MY PATIENT INFORMATION TO:**

F PERSON OR ORGANIZATION TO RECEIVE MY
L INFORMATION
County Circuit Court Proceeding

**b. ADDRESS** *(Street, City, State and ZIP Code)*
70 Main Street, Palmyra, VA 22963

HONE *(Include Area C* Redacted

**d. FAX** *(Include Area Code)*

IN FOR REQUEST/USE OF MEDICAL INFORMATION *(X as applicable)*

| SONAL USE | CONTINUED MEDICAL CARE | SCHOOL | OTHER *(Specify)* |
|---|---|---|---|
| RANCE | RETIREMENT/SEPARATION | LEGAL | |

RMATION TO BE RELEASED
any regarding Redacted injuries/medical care and related events from her time as a patient at the Craig Joint Theatre Hospital and Task
Medical - Afghanistan.

| HORIZATION START DATE *(YYYYMMDD)* | 10. AUTHORIZATION EXPIRATION | | |
|---|---|---|---|
| 20220513 | ☒ DATE *(YYYYMMDD)* 20220526 | | ACTION COMPLETED |

### SECTION III - RELEASE AUTHORIZATION

arstand that

ave the right to revoke this authorization at any time. My revocation must be in writing and provided to the facility where my medical records are kept or to the TMA Privacy
er if this is an authorization for information possessed by the
CARE Health Plan rather than an MTF or DTF. I am aware that if I later revoke this authorization, the person(s) I herein name will have used and/or disclosed my protected
mation on the basis of this authorization.
I authorize my protected health information to be disclosed to someone who is not required to comply with federal privacy protection regulations, then such information may be re-
losed and would no longer be protected.
have a right to inspect and receive a copy of my own protected health information to be used or disclosed, in accordance with the requirements of the federal privacy protection
ulations found in the Privacy Act and 45 CFR  164.524 ss.
the Military Health System (which includes the TRICARE Health Plan) may not condition treatment in MTFs/DTFs, payment by the TRICARE Health Plan, enrollment in the
RICARE Health Plan or eligibility for TRICARE Health Plan benefits on failure to
turn this authorization.
quest and authorize the named provider/treatment facility/TRICARE Health Plan to release the information described above to the named individual/organization indicated

| SIGNATURE OF PATIENT/PARENT/LEGAL REPRESENTATIVE | 12. RELATIONSHIP TO PATIENT *(if applicable)* | 13. DATE *(YYYYMMDD)* |
|---|---|---|
| ANT JOSHUA KENNETH B95425  Digitally signed by MAST JOSHUA KENNETH 1195425 Date: 2022 05 13 10:41:29 -0700 | Father | 20220513 |

### SECTION IV - FOR STAFF USE ONLY *(To be completed only upon receipt of written revocation)*

| 4. X IF APPLICABLE: | 15. REVOCATION COMPLETED BY | 16. DATE *(YYYYMMDD)* |
|---|---|---|
| AUTHORIZATION REVOKED | | |

17. IMPRINT OF PATIENT IDENTIFICATION PLATE WHEN AVAILABLE

| SPONSOR NAME: | Joshua K. Mast |
|---|---|
| SPONSOR RANK: | Major |
| FMP/SPONSOR SSN: | Redacted |
| BRANCH OF SERVICE: | USMC |
| PHONE NUMBER: | Redacted |

8270 DEC 2003

Reset



UNITED STATES MARINE CORPS
MARINE FORCES SPECIAL OPERATIONS COMMAND
PSC BOX 20116
CAMP LEJEUNE NC 28542-0116

IN REPLY REFER TO:
5800
COS
18 MAY 2022

FIRST ENDORSEMENT on Maj Mast's ltr 5800 JKM of 17 May 2022

From: Chief of Staff, Marine Forces Special Operations Command
To:   Major Joshua Mast, USMC

Subj: PERMISSION TO TESTIFY ON MY DAUGHTER'S BEHALF IN A VIRGINIA
      STATE PROCEEDING

1. As per the references, I have reviewed the attached request and believe
approving it furthers DoN policy to make official information reasonably
available for civilian court proceedings.

2. As per reference (b), I have been delegated the authority to approve this
request.

3. Your request to utilize official information and relevant unclassified
documents is approved.

# Redacted

By Direction

3

Enclosure (1)
Page 4 of 7



# UNITED STATES MARINE CORPS
MARINE RAIDER SUPPORT GROUP
MARINE FORCES SPECIAL OPERATIONS COMMAND
PSC BOX 20117
CAMP LEJEUNE NC 28542-0117

IN REPLY REFER TO:
5800
JKM
MAY 1 7 2022

From:  Major Joshua Mast, USMC

To:    Commander, Marine Forces Special Operations Command or his Designee

Subj:  PERMISSION TO TESTIFY ON MY DAUGHTER'S BEHALF IN A VIRGINIA STATE PROCEEDING

Ref:   (a) DoDD 5405.2
       (b) SECNAVINST 5820.8A

1.  Out of an abundance of caution, pursuant to the references, request approval to testify on my daughter's behalf in a Virginia Circuit Court proceeding in defense of her adoption on 24-26 May 2022.

2.  Reference (a) governs "Touhey" requests for Active-Duty personnel who testify in civilian proceedings. Reference (b) is the DoN's implementing instruction. Per enclosure (3), paragraph (4)(a)(1) of reference (b), the first General Court Martial Convening Authority (GCMCA) in my chain of command is the approval authority for this request.

3.  My testimony is likely exempt from the requirements of the references pursuant to paragraph 5(a)(7)(f) of reference (b). However, Reference (b) is a lawful general order, and I am formally requesting permission to ensure I am in compliance with the order.

4.  The information required by the references are provided as follows:

    a.  The United States is not reasonably anticipated to become a party to the proceeding;

    b.  The proceeding is in the Fluvanna County, Virginia Circuit Court, Case Number CL22000186-00;

    c.  Counsel representing the parties are Rakness and Wright, PLC (1540 Insurance Lane, Charlottesville, VA 22911, 434-284-7746) and Graham Law Firm, PLLC (116 Edwards Ferry Road, Leesburg, VA 20176, 703-443-9360);

    d.  I was present in Afghanistan when my daughter was orphaned, I am familiar with the circumstance of her being orphaned, her origin, various physical custodians, her entry into the United States, and information related to her best interests.

e.  Factual testimony and unclassified documentation relating to my daughter's skull fracture, fractured femur, and 2nd degree burns to her face and neck, TriCare treatment, DoD dependency approval, DoD Dependent ID card, entry into the U.S., medical treatment in a DoD facility, origin, and anything affecting her best interests are relevant to the defense of her adoption. I know or have the information relating to the above.

f.  The proceeding is currently scheduled for 24-26 May 2022, I will be in a leave status, and there will be no cost to the government.

5.  I believe this request is both routine and consistent with DoN policy "to make factual official information, both testimonial and documentary, reasonably availably for use…in state courts…" as per paragraph 4(a) of reference (b).

6.  The point of contact for this matter is Major Joshua K. Mast, at (910) 440-0925.

J. K. MAST

DEPARTMENT OF THE NAVY
Office of the Secretary
Washington, DC  20350-1000

SECNAVINST 5820.8A
JAG 34
27 August 1991

SECNAV INSTRUCTION 5820.8A

From: Secretary of the Navy
To:   All Ships and Stations

Subj: RELEASE OF OFFICIAL
      INFORMATION FOR LITIGATION
      PURPOSES AND TESTIMONY BY
      DEPARTMENT OF THE NAVY (DON)
      PERSONNEL

Ref:  (a) DOD Directive 5405.2 of
          23 Jul 1985, 50 Fed. Reg. 32056,
          8 Aug 1985, 32 C.F.R. pt. 97,
          Release of Official Information in
          Litigation and Testimony by DOD
          Personnel as Witnesses
      (b) 5 U.S.C. § 301 (1988)
      (c) 10 U.S.C. § 113 (1988)
      (d) 10 U.S.C. § 5013 (1988)
      (e) United States ex rel. Touhy v.
          Ragen, 340 U.S. 462 (1951)
      (f) 5 U.S.C. §§ 552, 552a (1988)
      (g) Manual of the Judge Advocate
          General
      (h) DOD Instruction 7230.7 of
          25 Jan 1985, User Charges
          (codified at 32 C.F.R. pt. 289)

Encl: (1) Definitions
      (2) Authority to Act
      (3) Authority to Determine and
          Respond
      (4) Contents of a Proper Request or
          Demand
      (5) Considerations in Determining to
          Grant or Deny a Request
      (6) Action to Grant or Deny a Request
      (7) Response to Requests or Demands
          in Conflict with this Instruction
      (8) Fees and Expenses
      (9) Sample Letters in Response to
          Litigation Requests

1. Purpose.  To implement reference (a)
regarding release of official information for
litigation purposes and provision of testimony by
Department of the Navy (DON) personnel for

litigation purposes, and to prescribe conduct of
DON personnel in response to a litigation request
or demand.

2. Cancellation.  SECNAVINST 5820.8 of
11 Aug 87.

3. Authority.  Reference (a) establishes
Department of Defense (DOD) policy, assigns
responsibilities, and prescribes procedures for
releasing official DOD information for litigation
purposes and providing testimony by DOD per-
sonnel for litigation purposes.  References (b),
(c), (d) and (e) are authority for reference (a).

4. Policy

   a. General.  It is DON policy to make
factual official information, both testimonial and
documentary, reasonably available for use in
Federal courts, state courts, foreign courts, and
other governmental proceedings unless that
information is classified, privileged, or otherwise
protected from public disclosure.  DON person-
nel (as defined in enclosure (1), paragraph 2),
however, shall not provide such official infor-
mation, testimony, or documents, submit to
interview, or permit a view or visit, without the
authorization required by enclosures (2) through
(7) of this instruction.

   b. Opinion and Expert Testimony.  DON
personnel (as defined in enclosure (1), para-
graph 2) shall not provide, with or without
compensation, opinion or expert testimony
concerning official DOD information, subjects,
personnel, or activities, except on behalf of the
United States or a party represented by the
Department of Justice, or with the written special
authorization required by his instruction.  Upon
a showing by a requester of exceptional need or
unique circumstances, and that the anticipated
testimony will not be adverse to DOD interests or
the United States, the General Counsel of the
Navy, the Judge Advocate General or their
or their respective delegates may, in their sole
discretion, grant such written special authori-
zation for DON personnel to appear and testify

0579LD0556480

**Mast, Joshua K MAJ USMC USSOCOM MARSOC (USA)**

| | |
|---|---|
| **From:** | ███████ LTCOL USMC USSOCOM MARSOC (USA) |
| **Sent:** | Tuesday, May 31, 2022 3:42 PM |
| **To:** | ███████ Col USMC HQMC (USA); Mast, Joshua K MAJ USMC USSOCOM MARSOC (USA); ███████ Lt Col USAF AF-JA (USA) |
| **Cc:** | ███████ Col USMC STAFF JA TO THE CMC (USA); ███████ CIV USMC STAFF JA TO THE CMC (USA); ███████ LtCol USMC STAFF JA TO THE CMC (USA) |
| **Subject:** | RE: Release of Official Information in Pending Adoption Proceeding |
| **Signed By:** | ███████ mil@socom.mil |

Sir,

We understand and will comply.

V/R,
Phill

███████

LtCol, USMC
███████ Marine Forces Special Operations Command
O: ███████
Cell: ███████

ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT: The information contained in this e-mail and accompanying attachments is UNCLASSIFIED BUT SENSITIVE INFORMATION which may be legally privileged. This information is intended solely for the use of the recipient identified above. If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is STRICTLY PROHIBITED. The sender has not waived any applicable privilege by sending the accompanying transmission. If you received this e-mail in error or you have any questions, please notify me immediately by return e-mail or by calling ███████ ███████ Thank you.

| | |
|---|---|
| **From:** | ███ Col ███████ |
| **Date:** | Tuesday, May 31, 2022, 14:02 |
| **To:** | ███████ LTCOL USMC USSOCOM MARSOC (USA ███████ >, Mast, Joshua K MAJ USMC USSOCOM MARSOC (USA) <joshua.k.mast1.mil@socom.mil>, ███████ Lt Col USAF AF-JA (USA) ███████ @us.af.mil> |
| **Cc:** | ███████ Col USMC STAFF JA TO THE CMC (USA) ███████ @usmc.mil>, ███████ CIV USMC STAFF JA TO THE CMC (USA) ███████ @usmc.mil>, ███████ LtCol USMC STAFF JA TO THE CMC (USA) ███████ @usmc.mil> |
| **Subject:** | FW: Release of Official Information in Pending Adoption Proceeding |

Gents,

Pls see note below from DoD General Counsel. They have directed "all requests or demands for release of information (testimony or documents) in connection with <sup>Redacted</sup>, v. Mast, No. CL22000186-00 (Va. Cir. Ct., Fluvanna County), or any

1

other legal proceeding in any venue concerning the adoption at issue in <sup>Redacted</sup>, are to be coordinated with the DoD Office of General Counsel. "

r/s
Col ▮▮▮

Colonel ▮▮▮▮
Deputy SJA to CMC
Comm:
Mobile:
SVOIP:
SVTC:
NIPR ▮▮▮ @usmc.mil
SIPR: ▮▮▮ @usmc.smil.mil

From: ▮▮▮▮ CIV (USA) ▮▮▮▮ .civ@us.navy.mil>
Sent: Tuesday, May 31, 2022 10:04 AM
To: ▮▮▮ Col ▮▮▮▮ @usmc.mil>; ▮▮▮ LtCol ▮▮▮▮ @usmc.mil>
Subject: FW: Release of Official Information in Pending Adoption Proceeding

Good morning Col ▮▮▮ and LtCol ▮▮▮ ,

I hope this email finds you well. For your awareness, please see the email below from Mr. ▮▮▮▮ regarding the Touhy request in connection with <sup>Redacted</sup> v. Mast.

V/r
▮▮▮

▮▮▮
Legal Administrative Specialist
Office of the Judge Advocate General
General Litigation Division (Code 14)
1322 Patterson Ave. SE, Ste. 3000
Washington Navy Yard, DC 20374

From: ▮▮▮▮ CIV USN (USA) ▮▮▮▮ @us.navy.mil>
Sent: Tuesday, May 31, 2022 9:33 AM
To: ▮▮▮ SES OSD OGC (USA) ▮▮▮▮ .civ@mail.mil>; ▮▮▮▮ CDR USN
NAVCIVLAWSUPPACT DC (USA) ▮▮▮▮ .mil@us.navy.mil>
Cc: ▮▮▮ SES (USA) ▮▮▮ .civ@mail.mil>; ▮▮▮▮ L CIV OSD OGC (USA)
▮▮▮ civ@mail.mil>; ▮▮▮▮ CIV OSD OGC (USA) ▮▮▮▮ .civ@mail.mil>; ▮▮▮▮
LCDR USN NAVCIVLAWSUPPACT DC (USA) ▮▮▮▮ .mil@us.navy.mil>; ▮▮▮ CIV N68323, CODE 14
▮▮▮ @navy.mil>
Subject: RE: Release of Official Information in Pending Adoption Proceeding

▮▮▮

Thanks. I've provided to our Touhy Branch.

V/r

2

Enclsoure (2)
Page 2 of 3

**From:** ███████ SES OSD OGC (USA) ███████ .civ@mail.mil>
**Sent:** Friday, May 27, 2022 4:26 PM
**To:** ███████ CIV USN (USA) ███████ .civ@us.navy.mil>; ███████ CDR USN NAVCIVLAWSUPPACT DC (USA) ███████ .mil@us.navy.mil>
**Cc:** ███████ SES (USA) ███████ civ@mail.mil>; ███████ CIV OSD OGC (USA) ███████ civ@mail.mil>; ███████ CIV OSD OGC (USA) ███████ .civ@mail.mil>
**Subject:** Release of Official Information in Pending Adoption Proceeding

Sean and Eric,

    Pursuant to the DoD *Touhy* regulation, 32 C.F.R. Part 97 (Release of Official Information in Litigation and Testimony by DoD Personnel as Witnesses), all requests or demands for release of information (testimony or documents) in connection with ^Redacted^ *v. Mast*, No. CL22000186-00 (Va. Cir. Ct., Fluvanna County), or any other legal proceeding in any venue concerning the adoption at issue in ^Redacted^ are to be coordinated with the DoD Office of General Counsel. 32 C.F.R. § 97.6(a)(3). Any such request or demand received by a DoD component should be forwarded immediately to the point of contact below, and coordination is required prior to a final determination on any release of information. In addition, please forward to the point of contact below all past requests pursuant to 32 C.F.R. § 97.6(a)(3) or any Military Department implementing regulation regarding the adoption at issue in ^Redacted^, as well as any responses.

    Please provide this instruction to all offices likely to receive such a request. The point of contact for this matter is ███████████████████████████, ███████████).

    Thank you for your assistance.

R/ ███

**Phone:** ███████
███, Office of Litigation Counsel
Office of General Counsel, Department of Defense, 1600 Defense Pentagon, Washington, DC 20301-1600
**NIPR:** ███████ .civ@mail.mil
**SIPR:** ███████ .civ@mail.smil.mil
**JWICS** ███████ @osdj.ic.gov

Note: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege. Do not disseminate without approval from the Office of the DoD General Counsel.

3

Enclsoure (2)
Page 3 of 3



**UNITED STATES FORCES – AFGHANISTAN**
**Task Force Medical – Afghanistan**
**BAGRAM, AFGHANISTAN**
**APO AE 09354**

4 November 2019

MEMORANDUM OF RISK OF HARM

SUBJECT: Specific Risk of Harm in the Case of "Baby L.

1.   On 5-6 September 2019, U.S. forces recovered a female infant approximately 1-2 months old from an Al Qaeda foreign fighter facility. The infant was the only individual to survive a large secondary explosion initiated by a wall charge and fragmentation grenades employed by U.S. forces as they dealt with a barricaded shooter wearing a suicide vest. See enclosure (a).

2.   Due to the nature and extent of the infant's injuries, and the lack of remaining human presence in the targeted facilities, U.S. forces recovered the infant from the objective. Since her evacuation, the infant has been treated by U.S. medical personnel for "multiple injuries including an open left femur fracture, right closed skull fracture, and second degree burns to the forehead, eyebrows, bridge of nose, and neck." See enclosure (b). The infant has been referenced as "Baby L. ' by U.S. medical personnel.

3.   Due to Baby L. ; tender age, gender, non-Afghan national origin, status as an orphan, affiliation with an anti-government element, need for medical care, and physical deformity of her skull, baby L. ' faces an imminent and severe risk of harm if she does not receive a parole visa. This harm will likely include all or portions of the following: physical abuse, neglect, and being sold or otherwise trafficked for child labor or commercial sexual exploitation.

4.   Essentially, Baby L. is extremely vulnerable as a foreign born infant in a tribal society, and subject to persecution or retribution based on her status as a family member of an anti- government element. Thus, her risk of abuse, neglect, and being trafficked is significantly higher than the already high risk associated with a typical Afghan orphan.

5.   As per multiple meetings with the Afghan government, orphanages in Afghanistan cannot accept children in need of regular medical attention. Even if an Afghan facility could accept Baby L. these facilities are not equipped with heat, and are rife with abuse and neglect, and have been known to traffic and sexually abuse children. With the onset of winter in the next few weeks, Baby L. ' will not be housed in a facility that can ensure her health or survival to the spring. See enclosure (c).

6.   Currently, Baby L. is living in a military hospital on Bagram Air Field in a combat zone. This Air Field receives indirect fire in the form of rockets and mortar rounds on a routine basis. In addition, the Craig Joint Theater Hospital Commander, Col Norman West, has indicated that there is a serious risk of infection and disease in a military hospital due to the war wounds and diseased patients being treated there. This living situation is still far safer that any alternative available to Baby, L. as both the U.S. Military and Afghan government have agreed it is safer for her in the military hospital, and illustrates the danger Baby Lily faces if she remains in Afghanistan.

7.   Due to Baby L. ; ongoing medical needs and the lack of any Afghan facilities that can adequately house her through the winter, care for her, and treat her medical needs, access to the United States for follow on care is appropriate given the circumstances.

Enclosure (3)

TF MED-A
SUBJECT: Specific Risk of Harm in the Case of "Baby   L.

8.   Baby   L.   was orphaned in a lawful combat operation against Al Qaeda terrorists. We have a responsibility to ensure her well-being. Currently she is in a foreign country with no caretakers and in a country that already struggles with abuse, neglect, and lack of access to medical care, The U.S. Government cannot ensure her safety or well-being if she remains in Afghanistan. Without access to the United States, Baby   L.   faces a very high risk of neglect, abuse, and life threatening conditions. See enclosure(d).

9.   The point of contact for this memorandum is the undersigned at   Redacted   @mail.mil, or DSN at:   Redacted

## Redacted

Redacted          Col, USAF, BSC
Commander, Task Force Medical-Afghanistan

Encl:

(a) Declassified Mission Summary
(b) Comprehensive Health Assessment
(c) U.S. Department of State, Excerpts from Trafficking in Persons Report
(d) Save the Children, Excerpts from Knowledge, Attitudes, Practices on Violence and Harmful Practices Against Children in Afghanistan: A Baseline Study, August 2017

UNCLASSIFIED//FOUO



**HEADQUARTERS**
**Resolute Support/**
**United States Forces -**
**Afghanistan Kabul,**
**Afghanistan**
**APO AE 09356**



**BLUF:** A review of all information available regarding the 5-6 September operation in Uruzgan Province, Afghanistan indicates that the female infant recovered from that event is from an Al Qaeda (AQ) Turkmen foreign fighter family who entered Afghanistan via Turkmenistan. Therefore, she is most likely ethnically Turkmen or a Uighur from Turkmenistan.

**Background:** This report details the circumstances and results of a partnered U.S. Special Forces operation on 5-6 September 2019 in Redacted Province, Afghanistan. The information contained within this report is derived from unclassified public data as well as over 140 pages of classified documents related to this mission. In addition, information from follow on Requests for Information (RFIs) to the unit involved regarding the kinetic impacts on the female infant recovered on scene, the origin of her wounds, and medical treatment and evaluation by U.S. medical personnel contributed to this report.

**Pre-Strike:** For general context, as early as two years prior to the operation in question, open source reporting revealed that hundreds of AQ affiliated foreign fighter families from Turkmenistan were moving into Afghanistan. The purpose of this migration was for the foreign fighters to engage in jihad, with support from AQ. These foreign fighter families are concentrated primarily in Helmand and Redacted provinces. The tactics, techniques, and procedures (TTPs) of these Turkmen fighters include: moving to unoccupied compounds on a monthly basis, posting a guard at night in every compound, hiding in favorable terrain if aircraft or drones (AC) are detected in the daytime. The AQ fighters are also known to patrol the area around their compounds at night.

These foreign fighters are known to local Afghans as "the black flag people." They do not associate with the locals, and speak Turkmen or Farsi and do not understand Pashtu or Dari. These "black flag people" were protected by the Taliban, but were not Taliban.

**Mission Objectives:** The mission of the operation on 5-6 September was to capture/kill three individuals in order to disrupt AQ operations in the area. The targeted individuals were known AQ-affiliated Foreign Fighters operating in Eastern Afghanistan. One of the targeted individuals was a Uighur from Turkmenistan associated with the China-based militant group Eastern Turkistan Islamic Party (ETIP) and AQ, and the others were Turkmen.

**Conduct of the Mission:** On the night in question, U.S. and partner nation personnel inserted via helicopter around the Compounds of Interest (COI)s. Once the COIs were isolated, a "call out" was initiated to give the foreign fighters an opportunity to surrender. Only one fighter responded to a call out, and was detained.

Upon initiating a call out, the Assault Force (AF) received sustained contact from a barricaded

**ENCLOSURE (a)**

UNCLASSIFIED//FOUO

shooter, resulting in 1x Enemy Killed in Action (EKIA). After the AF eliminated the initial barricaded shooter, they again received sustained contact from small arms fire and grenades from multiple barricaded shooters further. To address the barricaded shooters, the AF initiated a wall charge, used grenades, and inadvertently set off a secondary explosion resulting in the structure being destroyed. This explosion was assessed to be from the suicide vest(s) worn by the shooters and/or other explosive stored within the structure. This engagement, and dealing with an additional barricaded shooter, resulted in 4x EKIA, including 1x female combatant KIA.

**CIVCAS Incident:** After securing the COIs, the AF cleared the buildings. They discovered a wounded female with gunshot and fragmentation wounds (the female EKIA) who was treated but succumbed to her wounds on scene. Next to the female and one of the barricaded shooters, the AF discovered a wounded 1-2 month old female infant under the rubble from the wall breach. This infant was assessed to be the daughter of the female fighter and one of the barricaded shooters whose suicide vest had detonated, due to the proximity and layout of the COI. The infant suffered a fragmentation wound to the lower extremity which had fractured her hip, and she sustained a fractured skull and 2nd degree burns from the wall charge, grenade, and suicide vest/secondary explosions. U.S. personnel determined her age and medical needs necessitated her evacuation. The female infant was the only person who survived the explosions in the COI. The location were the female infant was recovered was the precise location of the Turkman target of the raid was residing.

**Results:** Multiple photos recovered from the scene included pictures of Turkmen Uighur foreign fighters, weapons, and AQ flags. The detainee who responded to the call out indicated that the neighboring compounds were occupied by Chinese Uighur fighter from Turkmenistan. This detainee identified the pictures of foreign fighters as those of the residents of the compounds were the barricaded shooters engaged the AF. An additional detainee detained on the same night at a nearby COI also indicated that the COIs struck on 5-6 September were occupied by Turkmen foreign fighters and their families.

**TTPS:** The experience of the AF with multiple barricaded shooters in COIs wearing suicide vests is consistent with the known TTPs of the Turkmen foreign fighters posting guards in each of their compounds at night. The suicide vests and fighting to the death even when given an opportunity to surrender are consistent with AQ foreign fighter practices, and are atypical for Afghan Taliban fighters.

**Conclusion:** The infant recovered on the objective is assessed to be the orphaned daughter of an AQ foreign fighter who entered Afghanistan via Turkmenistan. She is most likely ethnically Turkmen or a Uighur from Turkmenistan. Overall information suggests that the female infant was the sole survivor of an AQ Turkmen foreign fighter family compound.

UNCLASSIFIED//FOUO



((U//FOUO) Image recovered from COI of a Turkmen foreign fighter residing in the COIs.



(U//FOUO) Image recovered from COI of a Turkmen foreign fighter residing in the COIs.

ENCLOSURE (a)
Enclosure (3)
Page 5 of 20

UNCLASSIFIED//FOUO



(U//FOUO) Image recovered from COI of a Turkmen foreign fighter residing in the COIs.



((U//FOUO) Image recovered from COI of a Turkmen foreign fighter residing in the COIs.

ENCLOSURE (a)
Enclosure (3)
Page 6 of 20

UNCLASSIFIED FOR

@ 05 SEP 19: **AF** conducted an explosive breach and initiated callout.

© SEP 19: AF conducted a callout that resulted in 1x Detainee.

© 05 SEP 19: AF received sustained contact 1x EKIA

© 05 SEP 19: AF eliminated initial barricaded shooters (4x EKIA, includ ing 1x female combatant KIA) An additional barricaded shooter engaged AF resulting in 1x EKLA.

05 2023z SEP 19: AF received contact. The compo und wall collapsed as a result of an internal explosion.

@ 05 SEP 19: AF received contact.



UNCLASSIFIED//FOUO

During clearance of the 10 series, an enemy barricaded shooter engaged friendly forces with small-arms fire. The ensuing engagement resulted in 1x EKIA, 1x civilian woman wounded, and 1x child wounded. The Assault Force (AF) applied medical treatment to both civilian casualties; however, the woman later expired from her wounds.

## SEQUENCE OF EVENTS

**1**
05 SEP 19
The Ground Force CDRr reported troops in contact from barricaded shooter.

**2**
05 SEP 19
Friendly forces conducted an explosive breach.

**3**
05 SEP 19
The Assault Force (AF) continued to receive enemy fire and reported 1x EKIA

**4**
05 SEP 19
During clearing actions, the AF discovered a wounded civilian woman and child. The AF applied medical treatment to both casualties; however, the woman later expired from her wounds.





**DEPARTMENT OF THE AIR FORCE**
**455TH EXPEDITIONARY MEDICAL GROUP**
**BAGRAM AIRFIELD, AFGHANISTAN**
**APO AE 09354**

26 October 2019

MEMORANDUM FOR RECORD

SUBJECT: Comprehensive Health Assessment for Patient " Redacted ' (Baby L.

1. Patient Summary
   a. Estimated 3 month old female, admitted to CJTH via KAF following an IED blast occurring on 6 September 2019 with multiple injuries including an open left femur fracture, right closed skull fracture, and second degree burns to the forehead, eyebrows, bridge of nose, and neck. Femur fracture was surgically fixed with an intramedullary rod and the remainder of her injuries were medically managed. The rod has been removed with near complete healing of the fracture.
   b. Surgical specialists and Family Medicine teams were consulted for long term comprehensive health care assessment.

2. Medical History
   a. Details regarding her birth and prior to her admission are not known and can have immunization and health screening implications. She is currently exclusively formula fed and has not started solid foods.

   b. Immunizations
      i. The following immunizations have been given
         1. 9/27/19: HiB (1), IPV (1)
         2. 9/29/19: PCV13 (1)
         3. 10/25/19: HiB (2), IPV (2), PCV13 (2)
      ii. The following immunizations are required: Hepatitis B series, Rotavirus series, DTaP series.
      iii. Failure to provide and maintain lifelong appropriate immunizations, especially in endemic regions, has future potential life threatening implications.

   c. Growth and Development Assessment
      i. Ages and Stages Questionnaire (ASQ) was completed. It is a validated screening tool for developmental delay.
      ii. Expected developmental abilities of an infant 3mo 0 days through 4mo 30 days of age were assessed and scored.

| Category | ASQ Score | Conclusion |
| --- | --- | --- |
| Gross Motor | 30 | Developmentally delayed |
| Fine Motor | 15 | Developmentally delayed |
| Problem Solving | 30 | Developmentally delayed |

    iii.  Growth developmental: Her weight is on the lower end of the WHO growth curve (25%ile) as is her height (5%ile)

    iv.  Recommendations to address identified concerns:

        1.  Developmental delays – close monitoring and repeat ASQ assessments in 4 week intervals as needed. If developmental milestones are not met, specialty referral to a developmental pediatrician and/or an early intervention program is needed. Such interventions should continue until she meets developmentally appropriate milestones for her age to ensure normal childhood development. Basic interventions have been initiated now, with specialty assessment recommended once available.

        2.  Weight - requires close monitoring. If she fails to gain the appropriate amount of weight, calorie-enriched formula will be required.

    v.  Assessing Specialists: Redacted , MD, Capt, USAF, MC (25 Oct 2019).

  d.  Traumatic Injuries Sustained and Long Term Risks

    i.  Subacute Closed Right Temporoparietal Skull Fracture

        1.  Needs frequent medical assessment and evaluation beyond standard wellness checks for repeat imaging or seizure prophylaxis as indicated if she develops new fluid accumulation due to failed skull fracture healing or delayed onset of seizures that are life threatening.

        2.  Assessing Neurosurgeon: Redacted, MD, Maj, USAF, MC (24 Oct 2019).

    ii.  Open Left Femur Fracture

        1.  Needs frequent medical assessment and evaluation beyond standard wellness checks with repeat imaging to evaluate for femur growth mismatch and future gait and mobility difficulties. If growth mismatch occurs, surgical correction will be required to prevent gait dysfunction, mobility delays, and hip and knee over-correction issues that will lead to lifelong disability.

        2.  Assessing Orthopedic Surgeon Redacted , MD, Lt Col, USAF, MC (24 Oct 2019).

    iii.  2nd Degree Burns (Face/forehead, nape of neck)

        1.  Needs frequent monitoring and evaluation beyond standard wellness checks for evaluation of burn scar progression and lifelong evaluation for increased risk for squamous cell carcinoma and skin contracture. Contractures will need surgical management or else will lead to deformity and lifelong disability.

        2.  Assessing Burn Surgeon:    Redacted  ;, MD, Maj, USAF, MC (24 Oct 2019).

3. Long Term Primary Care Requirements - The following is a non-inclusive list of her anticipated requirements.

a. Long-term healthcare maintenance is required to ensure appropriate childhood development.
b. Regular well child exams by a physician at 4-, 6-, 9-, 12-, 15-, 18-, and 24- months, as well as annual physicals thereafter to monitor and intervene as necessary to ensure developmental milestones are reached and the aforementioned concerns are monitored. Each exam must include an assessment of her growth and developmental staging; assessment for food safety and personal safety; and a complete physical exam with a close evaluation regarding her traumatic injuries.
c. Vaccines
    i. She is not up to date on her vaccinations and must be caught up.
    ii. The following vaccines are mandatory by 18 months of age:
        1. Hepatitis B: 3 total doses.
        2. Rotavirus: 2 doses prior to 6 months of age.
        3. Diphtheria, tetanus, and acellular pertussis (DTaP): 4 total doses.
        4. Haemophilus Influenza (Hib): 4 total doses.
        5. Pneumococcal conjugate (PCV): 4 total doses.
        6. Inactivated Poliovirus (IPV): 3 total doses.
        7. Influenza (Flu): 1 dose at 6 months of age, and one subsequent dose 4 weeks later. Will require an annual flu vaccine thereafter.
        8. Measles, Mumps, and Rubella (MMR): 1 starting at 12 months of age.
        9. Varicella: 1 starting at 12 months of age.
        10. Hepatitis A: 1 starting at 12 months of age and a second at 18 months of age.
    iii. Between the ages of 18 months and 18 years of age, additional follow-up immunizations are required to maintain immunization benefit, to include:
        1. A 5th DTap, 4th IPV, 2nd MMR, 2nd Varicella.
        2. A 2-shot series of Meningococcal vaccine.
        3. It is recommended to receive a 2-dose series of the Human Papilloma Virus (HPV) vaccine starting at age 9, to prevent cervical cancer later in life.
d. Hearing and Vision Screening: Requires annual hearing screening between the ages of 4 and 21, along with vision screening every 2 to 3 years starting at age 4.
e. Nutrition: In addition to the aforementioned growth concerns, a minimum of 24 oz of iron-fortified formula daily is needed for normal growth. As her developmental delays improve, introduction of solids into her diet can begin. Failure to maintain her weight will require specialty formula/foods to correct. She will require laboratory assessment for iron status at 12 months of age.
f. Dental Care: Oral fluoride supplementation beginning at 6 months of age and an oral health assessment starting at 12 months of age and continuing every 6 months is required.
g. Latent Tuberculosis: screening for latent TB exposure at 6, 12, and 24 months and annually thereafter are needed. Results indicating possible exposure mandate additional testing and a several-months long course of medication if confirmed.
h. Neonatal Testing: Recommend screening for Sickle Cell Trait, as well as other newborn screens as medically indicated.

4. Health History and Implication Summary
   a. Due to injuries sustained and developmental delays that have occurred, close monitoring and frequent evaluations by a qualified physician certified in the care of children is necessary.
   b. Proper immunizations now and in the future provide the best opportunity to have a healthy future and prevent life threatening diseases.
   c. With close monitoring, appropriate medical and rehabilitation efforts being provided, a healthy and meaningful development can be optimized.
   d. If complications resulting from her traumatic injuries do manifest, access to subspecialty pediatric care, including pediatric orthopedics, plastic surgery, dermatology, and neurology, will be needed.

Redacted. Digitally signed by
Redacted
Date: 2019.10.27 11:42:51 +04'30'

//SIGNED//
   Redacted      Col, USAF, MC
Deputy Commander Clinical Services (DCCS)
TF MED-A/455 EMDG Craig Joint Theater Hospital
Bagram AF, Afghanistan

*"QUAERIMUS ET PERDIMUS"*



TRAFFICKING IN PERSONS REPORT

JUNE 2019

# AFGHANISTAN: TIER 2 WATCH LIST

The Government of Afghanistan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included investigating some allegations of official complicity in trafficking, establishing five new Child Protection Units (CPUs) to prevent the recruitment of children into the Afghan National Police (ANP), and partnering with an international organization to finalize and publish standard operating procedures (SOPs) for victim identification and referral to care. However, the government did not demonstrate overall increasing efforts compared to the previous reporting period. Afghan security forces continued to unlawfully recruit and use child soldiers and exploit boys in *bacha bazi* with impunity. Members of the Afghan National Army (ANA) and Afghan Local Police (ALP) reportedly recruited boys specifically for *bacha bazi* by enticing them and by promising food and money. Authorities continued to refer the majority of trafficking cases to mediation in lieu of criminal prosecution and penalized sex trafficking victims for "moral crimes." Sex trafficking victims reported prosecutors and judges solicited sexual favors from them while investigating their cases. Officials conflated trafficking and smuggling, could not confidently identify trafficking victims, and relied on NGOs and foreign donors for nearly all victim assistance. Therefore Afghanistan was downgraded to Tier 2 Watch List.



AFGHANISTAN TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Cease the unlawful recruitment and use of children by Afghan security forces and demobilize children from all armed groups with adequate protection and reintegration support. • Issue a directive to law enforcement to pursue criminal investigations in cases of human trafficking, including *bacha bazi*. • Increase criminal investigations and prosecutions of trafficking—especially of law enforcement and military officials allegedly complicit in trafficking—and convict and adequately sentence perpetrators. • Cease support to non-state armed groups that recruit and use child soldiers. • Cease penalization of victims for unlawful acts their traffickers forced them to commit, including "moral crimes." • Significantly increase training for judicial officials on the anti-trafficking provisions in the new penal code, the prohibition on mediation to settle sex trafficking cases per the 2009 Elimination of Violence Against Women Act, and ensure judges have sufficient copies of the penal code. • Disseminate, and conduct widespread training on, the SOPs for victim identification and referral to services. • Strengthen law enforcement's capacity to address trafficking, including increased training and resources for the Ministry of Interior (MOI)'s provincial anti-trafficking/smuggling units. • Dedicate resources for trafficking victim shelters and services, including for male victims. • Amend Chapter 5 of the penal code to increase the penalties for *bacha bazi* in line with penalties prescribed for other forms of trafficking. • Raise awareness of trafficking at the local level, including its definition, law enforcement and

social service resources available, and community prevention efforts. • Ensure all ministries support the High Commission for Combating Crimes of Abduction and Human Trafficking/Smuggling (high commission) and its sub-committee and contribute to data collection efforts.

## PROSECUTION

The government maintained minimal law enforcement efforts and overall efforts—especially prosecution of allegedly complicit officials—remained negligible, allowing traffickers to operate with impunity. The 2017 Law to Combat Crimes of Trafficking in Persons and Smuggling of Migrants criminalized sex trafficking and labor trafficking, including *bacha bazi*. The law prescribed penalties between five and eight years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes. Aggravating factors increased the maximum sentence to between 10 and 15 years and the imposition of the death penalty if exploitation for armed fighting resulted in the victim's death. Article 510 of the new 2018 criminal code criminalized sex trafficking and labor trafficking, including *bacha bazi*. Article 511 prescribed penalties of five to 10 years' imprisonment for trafficking offenses involving adult male victims, and 10 to 16 years' imprisonment if the victim was a woman or child, or exploited in *bacha bazi*. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape. Article 512 outlined aggravating factors and increased penalties to 16 to 20 years' imprisonment for sex trafficking or forced armed fighting and between 20 to 30 years if the victim forced to fight died while subjected to trafficking. While the 2018 penal code also specifically criminalized more crimes related to *bacha bazi*, some of which would constitute trafficking offenses, it also prescribed lower penalties for certain acts constituting *bacha bazi* than those prescribed under Article 510. Most of these penalties were not sufficiently stringent, nor commensurate with the penalties prescribed for other serious crimes, such as rape. The government also used the 2009 Law on the Elimination of Violence Against Women (EVAW) to prosecute and convict sex traffickers. NGOs continued to express concern over the limited enforcement of anti-trafficking laws, citing both lack of resources and lack of political will to hold perpetrators accountable. The absence of a strong judiciary disproportionately affected female trafficking victims' access to justice; in rural areas outside of the formal legal system, male community leaders often settled both criminal and civil disputes, which often penalized female sex trafficking victims for "moral crimes." In urban areas, if judges or prosecutors assessed that no clearly defined legal statute applied or they were unaware of the statutory law, then they enforced customary law, which often resulted in outcomes that discriminated against women. While the EVAW law expressly prohibited the use of mediation and other Afghan laws neither permit nor prescribe mediation in criminal cases, police and judges often referred trafficking victims to mediation.

The government did not provide comprehensive data on anti-trafficking law enforcement efforts. While some ministries provided data, the statistics appeared to contradict one another in some areas, making it difficult to draw conclusions and compare to previous years. Data demonstrated investigation of 138 alleged traffickers, prosecution of 64 suspects, and conviction of 34 traffickers under the anti-trafficking and EVAW laws, including six convictions for attempted human trafficking. This is compared to investigation of 132 alleged traffickers, prosecution of 73, and conviction of 33, including four for attempted trafficking, in the previous reporting period.

ENCLOSURE (c)

58

The 138 investigations included investigations initiated by the ANA into 13 officers for *bacha bazi*, including witnessing and failure to report *bacha bazi*. Military authorities sentenced one perpetrator of *bacha bazi* to four months' imprisonment; the government did not report the status of the other 12 *bacha bazi* investigations.

Law enforcement and judicial officials continued to have a limited understanding of trafficking. While the 2017 law used separate terms and definitions for trafficking and smuggling, Dari, the most widely spoken language in Afghanistan, historically used the same word for human trafficking and migrant smuggling. Training to ensure officials understood the distinction was limited, especially at the local and provincial levels. MOI continued to operate dedicated trafficking/smuggling units in each of the 34 provinces and in Kabul, with two officers in each province. The National Directorate of Security (NDS) and the Afghan Border Police (ABP) also had mandates to address human trafficking. While ABP's anti-trafficking unit had the lead for transnational trafficking cases, the unit did not receive training on trafficking. During the reporting period, the government and INTERPOL established an additional anti-trafficking unit within MOI, funded by international donors, with nationwide jurisdiction. Officials acknowledged personnel, resources, and knowledge of trafficking remained inadequate in all units. NGOs and international organizations, with in-kind assistance from the government, conducted 91 capacity-building workshops in 2018 for more than 1,850 members of the public, government officials, and civil society, including religious leaders and lawyers.

Widespread disregard for the rule of law and official impunity for trafficking remained serious concerns. While the government reportedly initiated some investigations into *bacha bazi* and sentenced one perpetrator, the government did not consistently or effectively prosecute officials for this crime and acknowledged the pervasive lack of accountability. Afghan security forces, in particular the ANP and ALP, reportedly exploited boys in *bacha bazi* in every province of the country, and NGOs reported Afghan security forces and pro-government militias—some of whom may have received direct financial support from the government—recruited boys specifically for use in *bacha bazi*. In some instances, ANA officials reportedly used promises of food and money to entice boys into *bacha bazi*. Despite these credible reports, the government did not take action to investigate the alleged perpetrators or execute arrest warrants in the vast majority of cases. Observers noted perpetrators of *bacha bazi* often paid bribes to, or had relationships with, law enforcement, prosecutors, or judges that protected them from prosecution. During the reporting period, an international organization verified three cases of *bacha bazi* by the ANP and ALP and reported three additional credible allegations, involving a total of 10 suspected perpetrators from ANP and ALP. Police did not arrest any of the 10 alleged sex traffickers by the close of the reporting period. In February 2017, police arrested a district chief of police and six members of the security forces for allegedly participating in a *bacha bazi* gathering; the district chief of police was fired from his position in early 2018, and the investigation remained pending at the close of the reporting period. A public health official who conducted forensic exams for criminal cases reported state prosecutors pressured him not to report confirmed evidence of abuse, including in cases of *bacha bazi*.

The UN verified the continued use of children in combat and non-combat roles by the Afghan security forces, including at least two verified cases of recruitment by the ANP, five by the

ALP, and credible allegations of one by the NDS. ANA soldiers as young as thirteen were killed, wounded, and captured by Taliban insurgents. Pro-government militias that may have received direct financial support from the Afghan government reportedly recruited and used child soldiers, primarily in non-combat roles. Some officials accepted bribes to produce identity documents for boys stating they were at least 18 years old. Many female sex trafficking victims detained during the judicial process alleged prosecutors and judicial officials sought sexual favors while investigating their cases. During the reporting period, a religious official allegedly coerced into sex trafficking women who sought his spiritual advice; one police officer allegedly facilitated the sex trafficking and a second officer allegedly obtained sexual services from the victim. Authorities arrested both officers.

## PROTECTION

The government decreased victim identification and protection efforts and continued to penalize sex trafficking victims. The government did not compile comprehensive victim identification, referral, and assistance statistics. The high commission reported identifying 434 potential trafficking victims in 2018, compared to 476 identified in 2017; NGOs expressed concern about the accuracy of those figures. The government did not use systematic victim identification procedures during the reporting period. District and provincial-level officials continued to conflate trafficking and smuggling, and the vast majority of officials could not confidently identify or protect trafficking victims. In partnership with an international organization, the high commission published a training manual for law enforcement, NGOs, and community leaders on trafficking victim identification. With international assistance, the high commission also finalized and published a national referral mechanism for victim care and began to implement an online database to register trafficking victims for assistance. The organization began training officials and NGO staff on the manual, referral mechanism, and database.

NGOs operated, and international donors funded, approximately 27 women's shelters in 20 provinces that provided protection, legal, medical, and social services to female victims of violence, including trafficking. A few women's shelters closed during the reporting period due primarily to security challenges and a lack of donor funds. The shelters did not report how many trafficking victims they assisted during the reporting period. The Ministry of Women's Affairs monitored all women's shelters for compliance with national regulations. Family guidance centers in 19 provinces provided non-residential legal and social services for women and children, including trafficking victims. The government acknowledged the dearth of shelters and government resources impeded victim protection. Police referred trafficking victims to shelters on an ad hoc basis. The Child Protection Action Network (CPAN), a conglomerate of NGOs, civil society, and government entities overseen by the Ministry of Labor and Social Affairs (MoLSA), remained active in 151 districts and could provide shelter and some services to child victims of crime; in the previous reporting period, CPAN operated in all 185 districts. CPAN was the only entity that addressed child protection issues, including child trafficking, outside of Kabul. NGOs operated two shelters for boy victims of crime that could assist boy trafficking victims younger than 18. No government or NGO shelter could accommodate adult male trafficking victims. At times, the government placed child trafficking victims in orphanages, and some orphanages subjected children to trafficking. Afghans continued to both voluntarily return and be deported from Iran and Pakistan,

**ENCLOSURE (c)**

AFGHANISTAN

**AFGHANISTAN**

and traffickers had exploited some of the returnees in Iran and Pakistan. While international organizations noted that traffickers specifically targeted these returnees for forced labor upon return to Afghanistan, the government did not screen returnees for trafficking or refer them to services. In cases of parental complicity in child trafficking, authorities often returned children to their parents without sufficient efforts to ensure parents would not subject their children to trafficking again. The government did not encourage victims to participate in investigations; it did not provide adequate support or security for victims to safely do so. Afghan law allows trafficking victims to seek restitution; there were no reports any victims did so. Afghan law allows foreign victims to remain in Afghanistan for at least six months. Authorities reportedly identified some foreign victims in Afghanistan but did not report if they received this benefit.

The penal code provides that authorities shall not prosecute trafficking victims for unlawful acts their traffickers compelled them to commit, including "moral crimes" and the possession or use of fraudulent travel documents. Nonetheless, officials continued to arrest, imprison, or otherwise punish sex trafficking victims for prostitution or sex outside of marriage. Authorities referred some male sex trafficking victims to juvenile rehabilitation centers on criminal charges. Officials sometimes prosecuted victims for possessing forged identity documents. The government did not demobilize child soldiers associated with governmental or nongovernmental armed groups or refer such children to reintegration support. It arrested, detained, and prosecuted for terrorism-related crimes some children younger than 12 years old that non-state armed groups had forcibly recruited. Authorities sometimes placed male and female victims in prison if they could not accommodate them in shelters. NGOs reported authorities housed some child trafficking victims in juvenile detention centers, sometimes for several years. NGOs reported authorities within the MOI, MoLSA, and the Ministry of Justice (MOJ) demonstrated reluctance to pursue justice and provide care for victims of *bacha bazi*. In some cases, police sexually abused *bacha bazi* victims who tried to report their exploitation and then treated them as criminals. Fear of law enforcement, threats of retaliation from traffickers and one's community, and the stigma associated with trafficking prevented many victims from bringing cases forward to law enforcement or seeking care, especially those involving *bacha bazi*.

PREVENTION
The government maintained modest efforts to prevent trafficking. The high commission, an autonomous government office under MOJ scheduled to meet quarterly, only met once in 2018 with limited attendance, compared to three meetings in 2017. The commission's working-level technical committee, held 11 meetings in 2018, compared to eight meetings in 2017. NGOs reported the high commission did not devote significant attention or political will to anti-trafficking efforts, especially data collection; members continued to conflate trafficking with smuggling; and activities relied on individual members' commitment. The sub-committee lacked resources and influence over member ministries and relied heavily on NGOs for funding and technical assistance to implement the commission's policies. The high commission had 33 provincial commissions to implement national anti-trafficking policy at the local level, although the majority of commissions did not meet or conduct activities. The government's anti-trafficking national action plan expired in April 2018, and the high commission reportedly extended the action plan to cover 2018-2021. During the previous reporting period, the high commission, in partnership

with an international organization, published its first annual national report on human trafficking. The government disputed the report's findings, however, and did not produce a second iteration during the reporting period. The high commission, in partnership with international organizations and NGOs, continued public awareness programs. The government attended a regional forum that promoted the use of a common trafficking victim referral mechanism and signed a memorandum of understanding with three countries to address transnational trafficking.

MOI opened five new CPUs throughout the country, for a total of 27, to prevent the recruitment of children into the ANP. According to an international organization, the CPUs prevented the recruitment of 30 children from October through December 2018. In addition, some of the high commission's awareness raising events addressed child recruitment by armed groups. Nevertheless, recruitment of children continued, and contacts noted the CPUs did not oversee ALP recruitment centers, which also recruited children. The government did not have a sufficient referral pathway for children identified by CPUs and prevented from joining the security forces to provide shelter, services, and family reintegration; thus, the children remained highly vulnerable to other forms of forced labor. The government utilized a policy and action plan for the reintegration of Afghan returnees and internally displaced persons (IDPs), in partnership with the UN; however, the government's ability to assist vulnerable persons, including more than 820,000 new returnees from Iran and Pakistan in 2018, remained limited, and it relied on the international community for assistance. The government made efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training for diplomatic personnel.

TRAFFICKING PROFILE
As reported over the past five years, human traffickers exploit domestic and foreign victims in Afghanistan, and traffickers exploit victims from Afghanistan abroad. Internal trafficking is more prevalent than transnational trafficking. NGOs report an increase in human trafficking within Afghanistan. Traffickers exploit men, women, and children in bonded labor—a form of forced labor by which the traffickers offer loans to vulnerable people and manipulate the debts to coerce the workers into continued employment. At times, traffickers exploit one worker's initial debt to entrap other family members, sometimes for multiple generations. There are entire Afghan families trapped in bonded labor in the brick-making industry, predominately in eastern Afghanistan and in carpet weaving countrywide. Most Afghan trafficking victims are children exploited in carpet making, brick kilns, domestic servitude, commercial sex, begging, poppy cultivation and harvesting, salt mining, transnational drug smuggling, and assistant truck driving. NGOs assessed significant internal displacement exacerbated organized criminal groups' exploitation of children in forced begging. Some members of the *Shia Hazara* minority group are victims of forced labor. Some Afghan families force their children into labor with physical violence or knowingly sell their children into sex trafficking, including *bacha bazi*. Opium-farming families sometimes sell their children to settle debts with opium traffickers, and some drug-addicted parents subject their children to sex trafficking or force them into labor, including begging. There were allegations some orphanages run by NGOs and overseen by the government subjected children to trafficking. Police and education officials acknowledged some teachers coerce male students to perform commercial sex acts to pass exams. During the reporting period, authorities reported

ALBANIA

a religious official and two police officers coerced women seeking spiritual advice into sex trafficking. Members of the Afghan national women's soccer team reported Afghan Football Federation officials forced them to have sex in exchange for a spot on the team.

Afghan security forces and non-state armed groups continue to unlawfully recruit and use children in combat and non-combat roles with impunity. Non-state armed groups, primarily the Taliban and the Islamic State in Khorasan Province (ISIL-KP) account for most child recruitment and use and used children younger than age 12 during the reporting period. Insurgent groups increasingly use children as suicide bombers. Some families receive cash payments or protection in exchange for sending their children to the Taliban-run schools for military and religious indoctrination. Children from impoverished and rural areas, particularly those under Taliban control, are particularly vulnerable to recruitment. ANP and ALP use children in combat and non-combat roles, including as personal servants, support staff, and bodyguards. ANA, NDS, and ABP also recruit and use children in both combat and non-combat roles, although to a lesser extent. ANA soldiers as young as thirteen were killed, wounded, and captured by Taliban insurgents. Pro-government militias that may receive direct financial support from the government reportedly recruited and used child soldiers, primarily in support roles. Traffickers, including government and military officials, continued to exploit children in sex trafficking through *bacha bazi* in every province of the country. An NGO interviewed many survivors of *bacha bazi* whose testimonies noted an "overwhelming understanding that *bacha bazi* is committed by the powerful," including military commanders and community leaders. International organizations reported cases of *bacha bazi*, by nearly all groups, including the ANA, ANP, ALP, pro-government militias, and the Taliban, and stated cases are widely underreported. ALP officials and pro-government militias reportedly recruited children specifically for *bacha bazi*, and ANA officials reportedly lured boys into *bacha bazi* with promises of food and money. Some traffickers, including military officials, abduct children or promise fake jobs to lure them into *bacha bazi*. While the vast majority of *bacha bazi* cases involve boys and young men, government officials have exploited children as young as 12 years old in *bacha bazi* and at least one girl. Perpetrators of *bacha bazi* sometimes offer bribes or use their relationships with law enforcement officials, prosecutors, and judges to evade punishment.

Afghan returnees from Pakistan and Iran and internally displaced Afghans are vulnerable to labor and sex trafficking. During the reporting period, Afghanistan received more than 805,850 undocumented returnees from Iran and Pakistan, many of them unaccompanied minors. An international organization estimated it assisted only four percent of the more than 773,000 of the Afghans undocumented or deported from Iran, and traffickers specifically targeted the unassisted returnees in Herat, Nangarhar, Badakhshan, and Nimroz provinces for forced labor in agriculture, brick kilns, and carpet weaving. Afghans residing in Pakistan—including 1.4 million Afghan Proof of Registration card holders, 878,000 Afghan Citizen Card holders, and an unknown number of undocumented Afghans—continued, to varying degrees, to lack access to education, social services, and basic assistance, and be vulnerable to deportation, all of which increased vulnerability to trafficking. A severe drought and the continued internal conflict created more than 600,000 new IDPs within Afghanistan during the reporting period. International organizations documented an increase in IDPs selling their children to local shopkeepers in servitude to repay debts; between July and September 2018,

one organization reported 161 cases of IDPs selling children into either marriage or servitude. NGOs reported some corrupt shopkeepers exploit IDPs' debts by increasing their prices. Some traffickers targeted indebted IDPs and sold them into forced labor and sex trafficking.

Afghan men, women, and children pay intermediaries to assist them in finding employment, primarily in Iran, Pakistan, India, Europe, or North America; some intermediaries force Afghans into labor or sex trafficking. Afghan women and girls are subjected to sex trafficking and domestic servitude primarily in Afghanistan, Pakistan, Iran, and India, including through forced marriage. Afghan boys and men are subjected to forced labor and debt bondage in agriculture and construction, primarily in Iran, Pakistan, Greece, Turkey, and the Gulf states. Traffickers in Iran, including Iranian criminal groups, exploit Afghan children in forced labor as beggars and street vendors and forced criminality, including drug trafficking and smuggling of fuel and tobacco. The Iranian government and the Islamic Revolutionary Guards Corps continue to force and coerce Afghan migrants, including children as young as 12 years old, to fight in Iranian-led and -funded Shia militias deployed to Syria by threatening them with arrest and deportation to Afghanistan. Trafficking networks smuggle Afghan nationals living in Iran to Europe and force them to work in restaurants to pay off debts incurred by smuggling fees. Some Afghan boys are subjected to sex trafficking in Greece after paying high fees to be smuggled into the country. Some Afghan traffickers subjected Afghan boys to *bacha bazi* in Germany, Hungary, Macedonia, and Serbia. Traffickers have subjected women and girls from China, Iran, Pakistan, Philippines, Sri Lanka, and Tajikistan to sex trafficking in Afghanistan. Under the pretense of high-paying employment opportunities, some labor recruiting agencies lure foreign workers to Afghanistan, including from Sri Lanka, Nepal, India, Iran, Pakistan, and Tajikistan and subject them to forced labor after arrival.

## ALBANIA: TIER 2

The Government of Albania does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period; therefore Albania remained on Tier 2. These efforts included updating standard operating procedures (SOPs) for victim identification and referral, allocating funding for victim coordinators in every prosecution office starting in 2019, and institutionalizing training on trafficking within the Border and Migration Police (BMP). The government also doubled the budget for the Office of the National Anti-Trafficking Coordinator (ONAC) and adopted the 2018-2020 national action plan. However, the government did not meet the minimum standards in several key areas. The government continued to investigate, prosecute, and convict fewer cases, leading to the lowest level of reported law enforcement actions in four years. Additionally, the government lacked proactive identification efforts and law enforcement, in particular, did not consistently participate in mobile victim identification units or consistently screen vulnerable populations. The government continued to delay funding for NGO-run shelters and did not consistently apply victim-centered approaches to investigations and prosecutions.

**EXCERPTS FROM:**
**KNOWLEDGE, ATTITUDES AND PRACTICES**
**ON VIOLENCE AND HARMFUL PRACTICES**
**AGAINST CHILDREN IN AFGHANISTAN**
**A BASELINE STUDY**
Save the Children, 2017

**VIOLENCE**
Physical violence remains high where the worst forms of violence include kicking (40%); hitting with objects (approximately 40%); beating (34%); choking to be prevented from breathing (21%); burning or branding (15%). 15% of children were also given drugs. P 1

**SEXUAL ABUSE**
Despite answers on sexual abuse are very likely underreported, sexual abuse at home is high with 11% of children reporting being forced to watch videos or pictures with people with no or little clothes on; 7% admitted that they had to look at adult's private parts or adults looked at theirs; 7% reported being touched on their private parts in a sexual way or being forced to touch other's private parts; and 4.7% were forced into sexual intercourse. Sexual abuse at community level was reported in considerably higher percentages, especially by girls. P 1

**TRAFFICKING**

Violence against children in schools by teachers, adult children, and at home by parents is widespread in Afghanistan. Physical and humiliating punishment (PHP) is common in both schools and at home with verbal and emotional abuse being the most prevalent. There are also many other harmful practices that continue to plague both girls and boys, such as early child marriage, child labour including recruitment into armed groups, and sexual abuse. P 7

**CHILD LABOR**
The International Labour Organization (ILO) defines child work as work that deprives children of their childhood, their potential and their dignity, and that is harmful to children's physical and mental development. P7

Based on ALCS, in 2013-14, of a total population of 10.3 million children between 5 and 17 years of age, 2.7 million children or 27% were in child labour with 4% of all children in this age group were working children, while slightly more than two thirds were not working. Nearly half of all children in child labour (46%) were between 5 and 11 years of age. P 8

Children living in the poorest households (30%) are twice as likely to be involved in child labour than children living in the wealthiest households (15%). P 8

**FORCED MARRIAGE**
Based on AMICS findings, 15% of women aged 15-49 years were married before the age of 15, while 46% were married before the age of 18. Girls forced marriages research undertaken by AIHRC shows that most of the respondents were married at the age of 14 or earlier. Around 40% of the respondents were married at an age between 10-13 years, 32.5% at 14 and 27.5% at 15.15 Up to 80 % of marriages were forced marriages on girls. P 9

## NEGLECT

Slightly less than 30% of children experienced at least one form of neglect. A closer look at each item of the neglect scale revealed: 23% did not get enough to eat or went to bed hungry74 with 19% of adults reporting it for their children.75 32% had to wear clothes that were dirty, torn, or inappropriate for the season76 with 38% of adults reporting it;77 33% were not taken care when they were sick or injured78 with much higher percentages of adults reporting it about their children (43%).79 34% did not feel cared for where adults were not administered the same question.80 34% of children were made feel unimportant81 with 36% of parents refusing to talk for their children.82 64% of adults think that they were not always able to provide a safe place to live for their children. p 23

## SEXUAL ABUSE

### Types of Sexual Abuse Reported by Boys and Girls at Community Level



Forcing children into sexual relations was reported by 12% of children and 59% of adults. Sexual harassment was reported by 17% of children and 69% of adults. Bacha bazi or keeping of boys was reported by 22% of children and 68% of adults. Children also reported baad (37%) and abductions (28%). Adults also think that showing children magazines and movies with nude scenes and telling children dirty stories and jokes is high in the communities, mentioned by 54% and 59% of respondents, respectively. On average, girls more often reported the presence of a type of sexual abuse in the community if compared to boys (with differences being statistically significant), which indicates, how girls might be disproportionately affected by sexual abuse, in

line with levels of sexual and gender-based violence experienced by girls (and women) in Afghanistan. p 27