**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| BABY DOE, *et al*., | |
| Plaintiffs, | |
| -v.- | CIVIL NO: 3:22-cv-00049-NKM-JCH |
| JOSHUA MAST, *et al*., | |
| Defendants, | |
| and | |
| UNITED SECRETARY OF STATE ANTONY BLINKEN, *et al.* | |
| Nominal Defendants. | |

**DEFENDANT RICHARD MAST'S MOTION TO VACATE PROTECTIVE ORDER**

Defendant Richard Mast hereby moves the Court to vacate its protective order (Dkt. No. 26) ("Order") pursuant to Rule 11(c)(3) of the Local Rules of the U.S. District Court for the Western District of Virginia.  W.D. Va. Civ. R. 11(c)(3).  The "copy-and-paste"[1] *ex parte* Order is patently unconstitutional, transparently biased and asymmetrical, illogical in the extreme, and manifestly an abuse of this Court's discretionary authority to manage the case before it.  While the movant herein does not have an objection to preserving the minor child Baby Doe's anonymity in this Court's public filings, he most certainly objects to, and hereby moves to vacate, the Order's requirement to shield John and Jane Doe's identity by the use of pseudonyms and the Order's unilateral gag order applied only against Defendants preventing any identification of Plaintiffs or their families without first obtaining a vague non-disclosure agreement.

The importance of this motion was demonstrated in abject relief at the most recent hearing

---

[1] The Order is copied word-for-word from Plaintiffs' proposed order filed along with Plaintiffs' *ex parte* motion for protective order.

i

in this matter.  Specifically, Plaintiffs made clear that they were seeking an order of contempt and sanctions against Defendants Joshua and Stephanie Mast for merely noting that a picture of Baby Doe obtained by a reporter from a non-party was Joshua's favorite picture of his adopted daughter. What makes matters worse, is that based upon this Court's questioning of Joshua Mast's counsel, the Court appeared to take that claim seriously in spite of the fact that Baby Doe is lawfully in Joshua and Stephanie Mast's legal custody as their adoptive daughter.

To spell this out so there is no misunderstanding: there is an extant Virginia court order of adoption that provides Joshua and Stephanie Mast exclusive parental rights over Baby Doe.  While Plaintiffs are challenging that order of adoption in state court, the court order of adoption remains in place.  Further, a one-sided amended complaint in this Court does absolutely nothing legally to undermine that order of adoption.[2]

The absurd result of this Court's illegal Order is on display for all but the most biased to see. In view of the tenor of the aforementioned hearing on the motion for contempt, we beg the Court's indulgence to reference but one absurd consequence here.  The Order by its own terms prevents the court-ordered adoptive parents of a child of whom they have legal custody and care from identifying that child to third parties without a non-disclosure agreement, which in turn would apparently require the signatories of such a non-disclosure agreement to require any individual to whom they identified the child to sign a similar non-disclosure agreement *ad infinitum*.  Thus, per the Order, when Joshua and Stephanie register their child in pre-kindergarten, the administrators, the teachers, the members of the PTA, all would be required to sign a non-disclosure agreement.  The same Order would require

---

[2] At the last hearing and while addressing Defendants' respective motions to dismiss, Plaintiffs' counsel actually took the position that this federal lawsuit seeks only monetary compensation for the alleged torts and does not seek to challenge the state court adoption order.  That position, while technically true, is disingenuous in the extreme insofar as Plaintiffs also seek a slew of declaratory judgments quite explicitly attacking the validity of the adoption order.  Their obvious ploy is to obtain those declarations and challenge any adverse state court adoption-related ruling directly or collaterally.

Defendant Richard Mast to obtain non-disclosure agreements from his wife and other family members and friends before identifying Baby Doe as his niece—the daughter of his brother. This is especially the case given the attendant publicity that John and Jane Doe, and their legal counsel, have sought for this case purposefully identifying Joshua and Stephanie Mast as the adoptive parents of Baby Doe and articulating for the world, including for the Taliban back home (and for those Afghanis sympathetic to the Taliban that arrived here in the U.S. government's chaotic evacuation of Afghanistan), their version of the circumstances that brought them to the U.S. and the details of the state and federal litigation that they and their counsel have waged. By doing so, of course, they have painted targets on the backs of Joshua and Stephanie Mast and necessarily their children, including Baby Doe.

The rather brutish reality of this Order is that Plaintiffs are free to disclose whatever facts they wish, including their own identities and the identity of Baby Doe, either directly or indirectly, to the media, to the Taliban, to friends and foe alike (and, as noted, they have quite obviously done so). When the Mast Defendants simply note that a picture of Baby Doe is one of their favorites, they are hauled before a federal judge and threatened with a contempt order. That such an outcome is even possible suggests a judicial process needing serious realignment with the First Amendment, commonsense, and rudimentary fairness.

As such, Defendant Richard Mast respectfully asks this Court to vacate the Order in its entirety and, to the extent that the Court considers it necessary, issue a new order requiring the parties to use the pseudonym Baby Doe to identify the minor child of Joshua and Stephanie Mast.

The undersigned has communicated with opposing counsel and understands that John and Jane Doe oppose this motion.

## TABLE OF CONTENTS

Page

DEFENDANT RICHARD MAST'S MOTION TO VACATE PROTECTIVE ORDER .............. i

TABLE OF CONTENTS....................................................................................................... iv

TABLE OF AUTHORITIES ...........................................................................................v-vi

BRIEF IN SUPPORT OF THE MOTION.........................................................................1

I.      BACKGROUND ......................................................................................................1

II.     LEGAL STANDARD...............................................................................................6

        A.      The Use of Pseudonyms Is a Rare Dispensation ....................................7

        B.      Gag Orders Are Presumptively Unconstitutional ...................................7

III.    ARGUMENT ............................................................................................................8

        A.      The Court Should Vacate Its Order Because It Is Facially Unconstitutional and a Patent Abuse of the Court's Discretion...............................................................8

        B.      The Court Should Vacate Its Gag Order Because It Fails to Satisfy Any of the Requirements Set Forth in *In re Murphy-Brown, LLC* ..........................................11

                1.      The Facts Do Not Establish a Compelling State Interest...........................11

                2.      The Order Does Not Further a Compelling State Interest ........................11

                3.      The Order Is Not the Least Restrictive Method to Safeguard the Compelling State Interest.............................................................................13

                4.      The Order Is Not Narrowly Tailored to Serve Its Intended Purpose and Is Overbroad........................................................................................13

                5.      The Order Is Unconstitutionally Vague .....................................................17

        C.      The Court Should Vacate Its Order Requiring the Use of Pseudonyms Because the Decision Underlying the Order Was an Abuse of Discretion ..........................18

CONCLUSION.......................................................................................................................19

CERTIFICATE OF SERVICE .......................................................................................20

# TABLE OF AUTHORITIES

Cases                                                                                          Page

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)............................................................................................................16

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993)............................................................................................................12

*Citizens United v. FEC*,
558 U.S. 310 (2010)............................................................................................................17

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994)..............................................................................................................12

*Conn. Magazine, Div. of Arc Commc'ns, Inc. v. Moraghan*,
676 F. Supp. 38 (D. Conn. 1987)........................................................................................16

*Gentile v. State Bar of Nevada*,
501 U.S. 1030 (1991)..........................................................................................................17

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)....................................................................................................... 15-16

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981)................................................................................................................3

*Hickman v. Tay*lor,
329 U.S. 495 (1947)............................................................................................................15

*Hirschkop v. Snead*,
594 F.2d 356 (4th Cir. 1979) ..............................................................................................17

*In re Doe*,
662 F.2d 1073 (4th Cir. 1981) ....................................................................................... 14-15

*In re Grand Jury Subpoena*,
870 F.3d 312 (4th Cir. 2017) ..............................................................................................15

*In re Knight Pub. Co.*,
743 F.2d 231 (4th Cir. 1984) ................................................................................................7

*In re Morrissey*,
168 F.3d 134 (4th Cir. 1999) ..............................................................................................16

*In re Murphy-Brown, LLC*,
907 F.3d 788 (4th Cir. 2018) ...................................................................................... *passim*

*James v. Jacobson,*
6 F.3d 233 (4th Cir. 1993) ..................................................................................3, 7, 18

*Lewis v. New Orleans,*
415 U.S. 130 (1974)....................................................................................................16

*Minn. Voters Alliance v. Mansky,*
138 S. Ct. 1876 (2018) ...............................................................................................17

*Nat'l Inst. of Family and Life Advocates v. Becerra,*
138 S. Ct. 2361 (2018) .................................................................................................7

*Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.,*
464 U.S. 501 (1984).......................................................................................................7

*Reed v. Town of Gilbert, Ariz.,*
576 U.S. 155 (2015) .......................................................................................................7

*United States v. James Daniel Good Real Prop.,*
510 U.S. 43, 114 S. Ct. 492 (1993).............................................................................8

*United States v. Under Seal (In re Search Warrant Issued June 13, 2019)*
942 F.3d 159 (4th Cir. 2019) ....................................................................................*15*

*Yellowbear v. Lampert,*
741 F.3d 48 (10th Cir. 2014) .....................................................................................13

**Rules**

8 Wigmore, Evidence § 2318 .....................................................................................15

Fed. R. Civ. P. 10.........................................................................................................7

Fed. R. Civ. P. 26(b)(3)...............................................................................................15

W.D. Va. Civ. R. 11(c) ..............................................................................................i-1

**Other**

CTC Sᴇɴᴛɪɴᴇʟ at https://tinyurl.com/2p8hdhws ...................................................9

Hague Convention at https://tinyurl.com/33fvczpm..................................................5

# BRIEF IN SUPPORT OF THE MOTION

## I.    BACKGROUND[3]

Immediately upon filing their original complaint and prior to service of process on any of the named Defendants, Plaintiffs John and Jane Doe filed a Motion for Leave to Proceed Under Pseudonyms and for Entry of a Protective Order ("PO Motion").  (Dkt. Nos. 3-4).  In support of the PO Motion, Plaintiffs asserted "fear . . . that they will be hurt or killed if they return to Afghanistan." (Dkt. No. 4, at 3).  Specifically, they expressed concern that they would be "perceived as having worked with the U.S." (*id.* at 4), or "that others in Afghanistan may . . . believe that they intentionally gave or sold Baby Doe to an American family in exchange for the opportunity to live in the United States."  (*Id.* at 5).  They tied those fears to concerns about media attention, asserting that they "have taken care not to reveal their whereabouts or circumstances to their communities in Afghanistan," but worrying that "this case has the potential to attract media attention" and that "[a]nybody seeing a news story about this case would be likely to talk about it to other Afghans, both in the U.S. and abroad."  (*Id.* at 5).  Plaintiffs further argued that their families in Afghanistan "face the same risk of violence and reprisals that Plaintiffs do, either as their proxies or to punish Plaintiffs by harming their families."  (*Id.* at 7).

The Court granted the *ex parte* PO Motion on September 13, 2022.  (Dkt. No. 26).  It is important to note that the Court granted the motion before any of the Defendants had entered an appearance and prior to the 14-day period granted to parties to oppose motions.[4]  At that point the

---

[3] This "Background" section is taken largely from the Motion to Amend Protective Order (Dkt. No. 130) filed by Defendants Joshua and Stephanie Mast.

[4] Plaintiffs filed and served the PO Motion on Defendant Richard Mast on September 2, 2022.  (Dkt. No. 3).  The Local Rules of this Court provide that a party has 14 days to oppose a motion and that a Court may only rule prior to such opposition in the case of "procedural" motions (such as an "enlargement of time").  W.D. Va. Civ. R. 11(c)(1) and (c)(3).  Apparently considering the PO

Court had only the benefit of Plaintiffs' presentation because no Defendant had yet entered an appearance. The Court adopted Plaintiffs' proposed order word-for-word. It states, based on Plaintiffs' *ex parte* presentation, that Plaintiffs had "established grounds to proceed by pseudonym and for entry of . . . a protective order." (*Id.* at 2). The Court's protective order further states that Plaintiffs John and Jane Doe had "demonstrated that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties, in view of the age of minor Plaintiff Baby Doe." (*Id.*). The Court entered a protective order with five components:

1. The Defendants and their counsel and representatives are prohibited from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction. This applies to any disclosure in the course of any investigation undertaken by the Defendants, their counsel, or their other agents or representatives.

2. All papers filed with this Court or disseminated to any person who has not executed a non-disclosure agreement enforceable through the contempt sanction shall use the "John Doe", "Jane Doe", or "Baby Doe" pseudonyms to refer to the Plaintiffs.

3. Any papers that identify any Plaintiff either directly or indirectly shall be filed under seal, with redacted copies placed in the public files.

4. Defendants shall disclose to Plaintiffs' counsel any person to whom Defendants, their counsel or representatives, have disclosed Plaintiffs' identities, and shall provide Plaintiffs with copies of the executed non-disclosure agreements required by this Order.

5. The parties shall be permitted to notice depositions and depose witnesses and conduct other discovery using the "John Doe", "Jane Doe", and "Baby Doe" pseudonyms. In deposing any witnesses who are unacquainted with the Plaintiffs,

---

Motion to be "procedural" within the context of the Local Rules, the Court granted the PO Motion on September 13, 2022 (Dkt. No. 26), 11 days after service on Defendant Richard Mast (Dkt. No. 18), before any appearance of Defendants' counsel (Dkt. Nos. 30, 35, 37, 40), and prior to any opportunity for Defendants to file a response in opposition to the PO Motion. Pursuant to the Local Rules, Defendant Richard Mast has the right to challenge the Court's grant of the PO Motion and does so here. (Local Rules, Rule 11(c)(3)(". . . any party adversely affected by such action may request reconsideration, vacation, or modification of such action).

the Doe pseudonyms shall be used.  In deposing any witnesses already acquainted with the Plaintiffs, actual names may be used, but the Doe pseudonyms must be used in any transcript of those depositions.

*Id.* at 2–3.

The factual predicate[5] on which the Court issued its Order is a one-sided, self-serving declaration filed by Plaintiff John Doe and an untested, unverified complaint.  (*See* Compl. [Dkt. No. 1] and Ex. A to PO Motion [Dkt. No. 4-1 (filed under seal)]).

On October 20, 2022, the *Associated Press* published an article regarding this case.  *See* Juliet Linderman et al., *Afghan couple accuse US Marine of abducting their baby*, ASSOCIATED PRESS (Oct. 20, 2022), *available at* shorturl.at/grCDU ("AP Article #1").  In that article, Plaintiffs and their attorneys provided their version of the facts while naming the Masts (including several contentions that they have never put in any court filing).  Notably, Sehla Ashai and Maya Eckstein—two of Plaintiffs' attorneys in this case—were quoted in the article as to facts that, if true, most certainly would provide the Taliban and any others who might do harm to Plaintiffs and their family in Afghanistan (the so-called "innocent parties" referenced in the PO Motion) a clear path to discover Plaintiffs' identities and the identities of their family members.[6]

---

[5] For a trial court to order the use of pseudonyms and *a fortiori* to issue a "gag order" limiting speech outside the courtroom about the case (or, as in this case, precluding Defendants from identifying Plaintiffs and Baby Doe outside the courtroom without first obtaining a signed non-disclosure agreement) requires a serious factual determination and factual finding by the court.  *See, e.g., Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102-03 (1981) (explaining that a protective order limiting speech outside the courtroom requires a "careful weighing of competing factors"); *James v. Jacobson*, 6 F.3d 233, 242 (4th Cir. 1993) (holding that it is an abuse of discretion for a trial court not to conduct a careful balancing of the facts before issuing an order requiring parties utilize pseudonyms).

[6] Specifically, all of the Army Ranger reports emanating from U.S. soldiers who were participants in the operation that led to the death of Baby Doe's parents, clearly describe Baby Doe's parents as enemy combatants along with the East Turkistan Islamic Party (ETIP), Al Qaeda foreign fighters targeted in the operation.  (Decl. Richard Mast at ¶¶ 8-36, attached hereto as Exhibit I).  The *Associated Press* article identifies the specific day of the operation ("On Sept. 6, 2019, the U.S. attacked a remote compound.") and Plaintiffs' counsel are paraphrased as claiming that Baby Doe's parents were not enemy combatants who engaged the U.S. forces, but rather innocent farmers unaffiliated with any terrorist groups.  Neither Plaintiffs nor their counsel could possibly know that Baby Doe's parents were not affiliated with enemy combatants (especially given the fact that Baby

3

On November 10, 2022, *The New York Times Magazine* published an article about the case that again named the Masts, and the author of that article said that she visited Plaintiffs at their home for them to share their version of the facts.  Rozina Ali, *How Did This Man Think He Had the Right to Adopt This Baby?*, THE NEW YORK TIMES MAGAZINE (Nov. 20, 2022), *available at* shorturl.at/aSWY1 ("*The NYT Magazine* Article").  Following *The New York Times Magazine* piece, the *Associated Press* published yet another story in the style of tabloid media essentially stating as fact the false allegations of John and Jane Doe.  *See* Martha Mendoza et al., *Afghan war orphan remains with Marine accused of abduction*, Associated Press (Dec. 31, 2022), *available at* shorturl.at/fhH39.

Indeed, after the first Associated Press article was published, the Taliban issued a formal statement published on the Taliban government website that made clear that the Taliban know all about Baby Doe and the circumstances of her parents' death: "According to information from reliable sources, a Marine [sic] officer Joshua Mast has forcibly taken the only remaining child of a family martyred in their bombardment in Afghanistan from her relatives in Virginia and registered her as his own family member."  *See* Islamic Emirate of Afghanistan, Ministry of Foreign Affairs (Oct. 23, 2022),       https://mfa.gov.af/en/according-to-information-from-reliable-sources-a-marine-officer-joshua-mast-has-forcibly-taken-the-only-remaining-child-of-a-family-martyred-in-their-

---

Doe's parents were quite obviously staying in and around a walled compound along with foreign fighters and not residing in the more urban environment in which Plaintiffs' claim to reside ["In late 2019, Afghan officials told the U.S. Embassy that the baby's paternal uncle had been identified, and he decided his son and daughter-in-law were best suited to take her, according to court records.  They were young, educated newlyweds with no children yet of their own, and lived in a city with access to hospitals."  (AP Article #1).]).  However, if Plaintiffs' version were true (which patently it is not), they and their attorneys would have effectively informed the Taliban and other violent actors in Afghanistan, of which there are plenty, that the husband and wife who took Baby Doe to the U.S. are farmers who lived among foreign fighters "in a remote compound" and were attacked by U.S. forces "[o]n September 6, 2019."  That information alone would have been sufficient for the Taliban to identify Baby Doe and John and Jane Doe's respective family members.

bombardment-in-afghanistan-from-her-relatives-in/ ("Taliban Statement").[7]

In *The New York Times Magazine* piece, all 22,800 plus words, the writer makes explicit her biases (being an expert on "Islamophobia" and wondering aloud in the article how a "Christian" couple could possibly adopt a "Muslim" child[8]) and demonstrates the absurdity of Plaintiffs' claims that the disclosure of their identities threatens their families back in Afghanistan. To this point, the article makes clear that anyone with any connections to Afghanistan either already knows all of the relevant players claiming a relationship to John and Jane Doe or most certainly has easy access to that information. Thus, the article states:

> From a satellite view, R.'s [Baby Doe's] village, along a river in central Afghanistan, emerges from lush green and blue, beyond which the land is brown and flat until it fades into the mountains. Reaching it from the district capital requires a day of driving on unpaved, craggy road. By 2019, the Ghani government had lost effective control over the area to the Taliban, Al Qaeda and insurgent groups. Around the country, the United States was redoubling counterterrorism efforts in a last bid to force the Taliban into a negotiating position for a political settlement.
>
> That summer, a group of foreigners moved into the village, women living among them. Locals noticed that they all kept to themselves and didn't speak their language, Pashto. The military operation in September lasted more than four hours. After the forces left, when dawn broke, a few men from the village rushed to one of the houses, now only half standing. They knew it well. It belonged to a man who worked in the fields nearby, who was born in that house and raised his 11 children there. The villagers shouted his name. Near the door, they saw two partly charred bodies. But they recognized them, a man and a woman.
>
> Suddenly, they heard muffled yells and started digging. For hours, the men pulled out bodies, one by one, trying to ascertain who was alive, who was dead. In the final tally, five children were killed, two boys and three girls. The youngest was a girl of 11. The eldest boy was 15. "He still didn't have any facial hair," one of the men told me over the phone.

***

---

[7] The Taliban Statement has since been taken down from the government website but is still available online at shorturl.at/esB24.

[8] It is worth noting here that *The New York Times Magazine* writer apparently dispenses with any concern over the "best interests of the child" doctrine applicable in all U.S. state jurisdictions dealing with child custody issues, including the Commonwealth of Virginia (and inferentially also included within the Hague Convention [*see, e.g.*, Articles 12, 13(b), and 20 available at https://tinyurl.com/33fvczpm]).

R. [Baby Doe] had siblings who survived the attack that night.  I briefly spoke with one of them, her 9-year-old brother.  He seemed withdrawn and spoke haltingly. He and several of his siblings had been sleeping when they heard a loud boom, the boy recalled to me over the phone.  His parents were in the other room with the baby.  "It was a lot of bombs," he told me.  There was other noise too: the sound of gunfire, his parents yelling from behind the wall to sit down.

*The NYT Magazine* Article, *supra*.

Thus, according to Plaintiffs, the Order was absolutely necessary to protect themselves and their family members notwithstanding the fact that a writer based in New York City[9] and simply armed with a telephone was able to identify the village and specific compound under attack by Army Rangers and had sufficient information to locate and to speak by telephone with the locals who claimed to have discovered the bodies of Baby Doe's family members.[10]  All of these "locals" now join the Taliban as "people-in-the-know" with regard to John and Jane Doe's identity and their family members.  From whom, exactly, is the Court's *ex parte* Order shielding John and Jane Doe's identity and from whom is it protecting the Does' family members?  It certainly is not from the Taliban.  It apparently is not from all of the witnesses to the U.S. operation that resulted in the death of Baby Doe's parents.  And, it certainly is not from other family members.

## II.    LEGAL STANDARD

This motion to vacate the Court's Order addresses two different but related aspects of the Order.  The first is the Order's requirement to utilize pseudonyms for John and Jane Doe.  The second is the effective "gag order" unilaterally preventing Defendants from disclosing "directly or indirectly" the identities of Plaintiffs and their family members, or their respective residences or

---

[9] The writer of *The New York Times Magazine* article maintains a website describing herself as "a journalist based in New York City."  (Rozina Ali web page available at https://www.rozina-ali.com/about-me).

[10] The writer also tells the world that she spoke to a nine-year old sibling of Baby Doe, a fact apparently either unknown even to John and Jane Doe or a fact of no interest to them.  Evidently, the more you speak to John and Jane Doe family members, the more "new" family members materialize, which hearkens to the lasting quote, "Oh what a tangled web we weave when first we practice to deceive."  Sir Walter Scott, *Marmion*, Canto vi. Stanza 17 (1808) (often falsely attributed to William Shakespeare).

places of birth.  (Order at 2).  We address the legal standards applicable to each in turn.

### A.      The Use of Pseudonyms Is a Rare Dispensation.

The Federal Rules of Civil Procedure provide that "[t]he title of the complaint must name all the parties."  Fed. R. Civ. P. 10.  Although federal courts may sometimes grant the "rare dispensation" for a party to proceed pseudonymously, "the general presumption of openness of judicial proceedings applies to party anonymity as a limited form of closure."  *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993).  There is also "a strong presumption" favoring open courts, which "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *In re Knight Pub. Co.*, 743 F.2d 231, 234 (4th Cir. 1984) (quoting *Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 464 U.S. 501, 510 (1984)).  Even if there are "findings adequate to support closure, the trial court must consider alternatives before the courtroom can be closed constitutionally."  *Id.* (citing *Press Enter. Co.*, 464 U.S. at 511).

### B.      Gag Orders Are Presumptively Unconstitutional.

Federal courts are severely restricted in their authority to issue "gag orders"—*i.e.*, orders that restrict a party from discussing the case or other parties.  *See, e.g.*, *In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018).  "[G]ag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions."  *Id.* at 796–97.  Such orders are "presumptively unconstitutional," *id.* at 797 (citing *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018)), and "must survive strict scrutiny," *id.* (citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 162 (2015)).  As the Fourth Circuit has made clear, before a court may issue a gag order, it must conduct a serious factual analysis (utilizing a "strict scrutiny" / "rigorous scrutiny") to determine (1) that there is indeed a "compelling state interest"; (2) that its order furthers the compelling state interest by "actually operate[ing] to prevent the threatened danger"; (3) that the order is "the least restrictive means to

7

further" the compelling state interest; (4) that the order be "narrowly tailored to serve its intended purpose and not suffer from 'overbreadth'"; and finally (5) that the order is not "unconstitutionally vague because it force[s] individuals to guess at its contours." *In re Murphy-Brown, LLC*, 907 F.3d at 796-800 (cleaned up).

## III.   ARGUMENT

### A. The Court Should Vacate Its Order Because It Is Facially Unconstitutional and a Patent Abuse of the Court's Discretion.

Given the genesis of the Court's Order and the Order itself, there is simply no room for the argument that the Order is anything but unconstitutional.  First, the Court issued the Order *ex parte*. At the time, the only facts at bar were contained in an unverified complaint and a demonstrably self-serving, speculative, and conclusory declaration by John Doe.  The Court issued its Order without waiting to hear from any Defendant.  Nor did the Court issue a temporary order requiring Plaintiffs to notify Defendants to file counter briefing by a given date or set an evidentiary hearing to test any of Plaintiffs' claims.  By its very nature, an *ex parte* ruling is suspect in the extreme.  Our judicial system, both criminal and civil, is adversarial and based upon all of the parties presenting their own evidence and having a fair opportunity to challenge their opponents' evidence.  As the Supreme Court has explained: "Fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.  No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it."  *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55-56, 114 S. Ct. 492, 502 (1993) (cleaned up).

In the instant case, this is true in spades.  Putting aside the unverified complaint, the only competent evidence before the Court prior to issuing the Order was John Doe's declaration.  But even an *ex parte* cursory examination of the declaration should have raised serious concerns for the Court before proceeding to utilize the declaration as **the** predicate for its Order restricting the First Amendment free speech rights of the parties, their counsel, and everyone else required to sign some

non-descript non-disclosure agreement.  For example, John Doe claims that the mortal danger that he, his wife, and their family members in Afghanistan face arises from two fears.  The first is the fact that he and his wife came to the United States.  The specific fear here is that the Taliban kills individuals who work with the U.S. government and, if the Taliban find out that John and Jane Doe left during the chaotic evacuation of U.S. troops from Afghanistan, they might be targeted as spies for death if they return and that their families might be targeted in the interim as well.  (John Doe Decl. at ¶¶ 7-8).  The second fear set out by John Doe is that local Afghanis and the Taliban might believe that John and Jane Doe traded Baby Doe to a non-Muslim for freedom in the United States.  (Id. at ¶¶ 9-10).  Believe it or not, that is it.  That is the entire predicate for the Order.

What the declaration does **not** say is that the Taliban were at the time **unaware** of Baby Doe or John Doe's father's involvement in gaining physical custody of Baby Doe and then handing her off to John and Jane Doe.  Indeed, given the Taliban's website statement, and given the ease by which *The New York Times Magazine* obtained access to local "witnesses" and even a putative nine-year old sibling, it would have been farcical to have made such a perjurious claim.  Like the journalist, the Taliban quite obviously knew all about the U.S. Army attack on the terrorist compound and all about John and Jane Doe and their families.

So what exactly is the big secret that underlies the "compelling state interest"?  The big secret was that John and Jane Doe snuck out of Afghanistan during the collapse of a rather feeble Afghan government[11] and somehow lost custody of a Muslim child.  If in fact those were ever actually secrets, and we will come back to this point momentarily, the moment the complaint was filed in this matter, even with pseudonyms, the Taliban regime had at least as much access to all the information available to *The New York Times Magazine* writer, and just like her, had access to all of the local

---

[11] The current Taliban government goes by the title, The Islamic Emirate of Afghanistan.  Its predecessor, which allied itself with the U.S. government, was formally named The Islamic Republic of Afghanistan.  *See generally* Andrew Watkins, *An Assessment of Taliban Rule at Three Months*, CTC SENTINEL (Nov. 2021) available at https://tinyurl.com/2p8hdhws.

"witnesses" and Doe family members.  So, we ask again: what is the secret and the compelling state interest that formed the basis for the Court's Order that trespassed on the First Amendment and the free speech rights of Defendants and their counsel?  In fact, the Taliban have joined hands with John and Jane Doe, emoting about the dastardly acts of Joshua Mast *et al*. following the media campaign fed by John and Jane Doe and their counsel.  The John Doe declaration is a farce.

The unfortunate reality facing Defendants, and indeed Joshua and Stephanie Mast given the pending motion for contempt sanctions, is the fact that the Court did not make any assessment of the declaration or subject it to any scrutiny whatsoever, at least not on the record.

We return just briefly to the assertion by John Doe that the Taliban and their families' potentially violent neighbors back in Afghanistan were unaware that John and Jane Doe had escaped the collapse and fled to the United States.  The very same declaration tells us that John Doe's whereabouts were in fact known to his parents, his three brothers, his wife's parents, and some unknown number of his wife's siblings.  Did all of these individuals swear themselves to secrecy?  Or, possibly, might they have talked about their fortunate son and daughter, brother and sister, who escaped the cruel and terroristic reign of the Taliban?  Interestingly, but not surprisingly, the declaration does not even say that these family members had agreed to keep the matter a secret or that they would in fact do so.

Moreover, John Doe informs us in his declaration that many other Afghanis (including quite obviously the Taliban ruling junta) know that John and Jane Doe have left Afghanistan but are told by Doe family members that the Afghan couple (presumably with baby in tow) are in Qatar or somewhere in the Middle East.  (John Doe Decl. at ¶ 6).  Once again, it is interesting, but hardly surprising, that there is no explanation how publicizing the allegations of the complaint does not provide the requisite facts for everyone in Afghanistan who cares about this matter to know exactly what John and Jane Doe are up to—at least their version of what they are up to.  We are also informed that John and Jane Doe must keep secret even from their family members that Baby Doe is no longer

in their custody and that if they or their friends were to learn otherwise, they would likely suffer fatal consequences. (*Id.* at ¶ 9). Well, given the filing of the complaint (and certainly with its follow-on media campaign), the world, including the Taliban, is fully briefed.

Quite obviously, what we are engaged in here in this analysis of the evidentiary shortcomings of John Doe's declaration is a kind of cross-examination at a distance and removed in time. This is being done at a distance and removed in time precisely because the Court chose not to and instead issued its Order *ex parte* without any "strict" or "rigorous" scrutiny. On this basis alone, the Court should vacate its Order immediately.

**B. The Court Should Vacate Its Gag Order Because It Fails to Satisfy Any of the Requirements Set Forth in *In re Murphy-Brown, LLC.***

As noted above, the Court's Order fails to engage in any scrutiny, much less a strict or rigorous one. But beyond this obviously fatal flaw, the facts as presented in John Doe's declaration fail to satisfy any of the other requirements of the First Amendment as set out in *In re Murphy-Brown, LLC.* We address each in turn immediately below.

**1. The Facts Do Not Establish a Compelling State Interest.**

Presumably, the compelling state interest is the protection of John and Jane Doe and their respective families from the physically violent and life-threatening reaction of the Taliban and their neighbors should it become known that John and Jane Doe escaped to the United States and no longer have custody of Baby Doe. But that is only a compelling state interest if there is any truth to the factually suspect, self-serving, speculative, and conclusory assertions set out in John Doe's declaration. As detailed above, John Doe's flawed declaration quite simply does not create a compelling state interest, and certainly not one that justifies the demolition of the First Amendment.

**2. The Order Does Not Further a Compelling State Interest.**

Even were we to assume a rigorous scrutiny by the Court of John Doe's declaration (an assumption that would be made in a vacuum given that the Court provided no analysis on the record),

and even were we to assume a compelling state interest to protect the life and limb of the Does and their families back in Afghanistan, the Order fails to "actually operate to prevent the threatened danger." *In re Murphy-Brown, LLC*, 907 F.3d at 798 (cleaned up). As noted above, and even putting aside the Does' media campaign, the complaint itself provides all of the information for the Taliban and other hostile parties in Afghanistan to discover all of the nitty-gritty details of John and Jane Doe's families—in exactly the same fashion that it was all the information needed for *The New York Times Magazine* writer to obtain telephone numbers of local "witnesses" and family in a hostile Taliban environment. If the Order did nothing to protect the big secret from a U.S.-based journalist, it could hardly work to keep the big secret from the Taliban and the neighbors who know personally about the attack on the compound and who, according to John Doe, might seek mortal vengeance on the family of a Muslim couple who gave away, traded away, or lost a Muslim baby to a Christian couple.

Moreover, the Order requires Defendants, but not Plaintiffs, to obtain signed non-disclosure agreements from anyone with whom Defendants or their counsel might "directly or indirectly" disclose the Doe family members' identities, residences, or places of birth. Yet, Plaintiffs and their counsel are free to discuss these matters without any such non-disclosure agreement with impunity. But that provides for a universe of individuals who are let in on the big secret but without the requisite non-disclosure agreement. The very asymmetrical nature of the Order demonstrates that the Order is not furthering a compelling state interest. *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place."). And, as further stated by the Supreme Court, "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993) (internal citations omitted);

*Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (Gorsuch, J.) ("A law's underinclusiveness—its failure to cover significant tracts of conduct implicating the law's animating and putatively compelling interest—can raise with it the inference that the government's claimed interest isn't actually so compelling after all.").

### 3. The Order Is Not the Least Restrictive Method to Safeguard the Compelling State Interest.

Beyond its other shortcomings, the Court Order is not the least restrictive means available to accomplish what it purports to accomplish.  For example, the Order provides no carve-outs or exceptions to its disclosure prohibition.  This means that if the undersigned wishes to interview witnesses and others who already know of the Doe family identities and places of residence (such as the Army Rangers who were eye-witnesses to the relevant events and in-country covert U.S. operatives who know of the Doe family members and their connections to Taliban fighters), Defendants would be required to obtain signed non-disclosure agreements without any carve-outs.  Witnesses typically do not sign such documents, are not inclined to do so, and most certainly would not do so if they consulted any competent attorney.

### 4. The Order Is Not Narrowly Tailored to Serve Its Intended Purpose and Is Overbroad.

As the Fourth Circuit made clear in applying strict scrutiny to the facts before it in *In Re Murphy-Brown, LLC*:

> Strict scrutiny also demands that First Amendment restraints be "narrowly tailored" to serve their intended purpose.  Each restriction must be no "greater than necessary."   The overbreadth doctrine permits litigants to challenge First Amendment restrictions even so far as they also impinge others' First Amendment rights, and we thus consider whether this gag order was narrowly tailored as it applies to all covered parties.
>
> The gag order was not narrowly tailored.  It included no findings specific to the various individuals it restricted.  It treated lawyers no differently from parties, who in turn were treated the same as potential witnesses.  It assumed all covered individuals were identically situated vis-à-vis pending and future litigation.  Moreover, the gag order applied blanket restrictions to more than twenty cases that

13

will be tried over a period of years. Participants in any given trial appear to remain restricted until the resolution of the final case.

What is more, the unclear yet extraordinary reach of the phrase "potential witness" could include almost anyone who is knowledgeable or conversant about the issues in these cases. This breadth alone cannot help but impair legitimate news gathering activities that in and of themselves underlie the proper functioning of the First Amendment. The gag order's blanket restrictions thus exceed what would be "essential to the preservation of a fair trial."

Gag orders should be a last resort, not a first impulse. The skimpy findings supporting the gag order here frustrate the sort of fulsome, substantive appellate review that shields First Amendment freedoms from unjustifiable restraints. The lack of narrow tailoring and the availability of less-restrictive alternatives are among the further defects that accompanied the imposition of the challenged order in this case.

*In re Murphy-Brown, LLC*, 907 F.3d at 799-800 (citations omitted).

The Order at issue here suffers the same overbreadth flaw, and this is demonstrated by the Order's rather notorious asymmetry. To begin, and as noted above, the Order leaves Plaintiffs free to play with their media comrades at will. Further, Plaintiffs need not bother with non-disclosure agreements as they conduct witness interviews and prepare for trial.

More egregiously, the Order unbelievably requires Defendants to disclose to Plaintiffs the identities of any person to whom they might have disclosed Plaintiffs' identities prior to the issuance of the Order and further requires Defendants to effectively provide Plaintiffs with a road map of Defendants' counsels' attorney work-product by requiring Defendants to provide copies of the non-disclosure agreements obtained by Defendants pursuant to the Order post-issuance. (Order at 3). This provision is manifestly overbroad insofar as it requires no such disclosure of Plaintiffs and literally robs Defendants of the attorney work product doctrine protections. The Fourth Circuit recognizes the importance of both fact and opinion work product:

An attorney must be free to advise clients and prepare their cases for trial without undue interference from the opposition or the government. This concept, inherent in the extraordinary "work product" rule, is a critical attribute of our adversary judicial system. There are exceptions to the rule, but simply stated, an attorney is not required to divulge, by discovery or otherwise, facts developed by his efforts in preparation of the case or opinions he has formed about any phase of the litigation, even if they have been reduced to writing. This has been an historic

14

> common law rule of evidence, 8 Wigmore, Evidence § 2318 (McNaughton rev. 1961), and federal courts for three decades have been guided in applying the work product doctrine by the Supreme Court's decision in *Hickman v. Tay*lor, 329 U.S. 495 (1947).  There the Court said: Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of any attorney.

*In re Doe*, 662 F.2d 1073, 1076 (4th Cir. 1981) (cleaned up).

The identity of individuals interviewed and spoken to about this case in the course of factual investigation or in the process of developing litigation strategy, whether discussions encompassing Plaintiffs' identities or the whereabouts of Plaintiffs' families, is most certainly attorney work product.  *See* Fed. R. Civ. P. 26(b)(3); *see also United States v. Under Seal (In re Search Warrant Issued June 13, 2019)*, 942 F.3d 159, 174 (4th Cir. 2019) ("There are two types of attorney work product that are within the ambit of the doctrine: (1) fact work product, which is a 'transaction of the factual events involved,' and (2) opinion work product, which 'represents the actual thoughts and impressions of the attorney.'") (quoting *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017)).  Moreover, the Court Order, which forcefully requires Defendants to turn over signed non-disclosure agreements provides Plaintiffs with a road map of Defendants' litigation strategy and potential fact sources.  This is an intrusion into both fact work product and opinion work product.  That the Court's Order gives this improper advantage to Plaintiffs but not to Defendants demonstrates not only a failure of fundamental fairness (what we lawyers call due process), but also the Order's overbreadth.

A court order that goes beyond permissible regulation of speech and tips the scales of justice by intruding upon otherwise protected speech (*i.e.*, forcing one side of the adversarial process to divulge sources while leaving the other side unaffected to roam and speak freely) falls squarely within the overbreadth doctrine.  *Grayned v. City of Rockford*, 408 U.S. 104, 114-15 (1972) ("A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct. . . .  The crucial question, then, is whether the ordinance sweeps within its

prohibitions what may not be punished under the First and Fourteenth Amendments."): *Lewis v. New Orleans*, 415 U.S. 130, 134 (1974) (stating that because the challenged ordinance "is susceptible of application to protected speech, the section is constitutionally overbroad and therefore is facially invalid").  Thus, an ordinance or court order is overbroad if it prohibits constitutionally protected activity, in addition to activity that may be prohibited without offending constitutional rights. *Grayned*, 408 U.S. at 114.  As we noted at the outset of this motion, the Order on its face prohibits Defendants Joshua and Stephanie Mast from identifying their own child to school officials or anyone else (like teacher's aides, fellow students, and the like) without first obtaining a non-disclosure agreement that in turn would require these individuals to obtain non-disclosure agreements from yet others *ad infinitum*.  If that does not smack of overbreadth, nothing does.

Moreover, this requirement to turn over the signed non-disclosure agreements to Plaintiffs would most certainly chill the protected speech of any U.S. citizens otherwise willing to provide sensitive information about Plaintiffs and their families.  *In re Murphy-Brown, LLC*, 907 F.3d at 799 ("Strict scrutiny also demands that First Amendment restraints be 'narrowly tailored' to serve their intended purpose.  Each restriction must be no 'greater than necessary.'"); *In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999).  The overbreadth doctrine permits litigants to challenge First Amendment restrictions even so far as they also impinge others' First Amendment rights.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 611-13, (1973) (cleaned up); *see also Conn. Magazine, Div. of Arc Commc'ns, Inc. v. Moraghan*, 676 F. Supp. 38, 43-44 (D. Conn. 1987) (holding a state court gag order unconstitutionally overbroad because it reached speech that could otherwise not be proscribed). In the instant case, as in *In re Murphy-Brown, LLC*, the Court's Order provides no specifics and makes no distinction between disclosing the prohibited speech content to someone who already has the information legally from another source and one who does not.  *In re Murphy-Brown, LLC*, 907 F.3d at 799-800 ("The gag order was not narrowly tailored.  It included no findings specific to the various individuals it restricted.  It treated lawyers no differently from parties, who in turn were

16

treated the same as potential witnesses.  It assumed all covered individuals were identically situated vis-à-vis pending and future litigation. . . .What is more, the unclear yet extraordinary reach of the phrase 'potential witness' could include almost anyone who is knowledgeable or conversant about the issues in these cases.").  The Order at issue here is no less constitutionally infirm.

### 5.  The Order Is Unconstitutionally Vague.

In addition to all of its other infirmities, the Court's Order is impermissibly vague.  The Order forbids "directly or indirectly" disclosing the prohibited information without first obtaining a signed non-disclosure agreement.  And, as we learned rather incredibly at the last hearing at which Plaintiffs sought to have the Court sanction Joshua Mast for merely indicating that a picture of his adopted child was one of his favorite pictures, the Court actually entertained this proposition seriously and one worth soliciting live testimony from Joshua Mast himself.  There is little to be said here other than pointing out the absurdity that a legal, adoptive parent could be called to testify at a contempt hearing based on the proposition that he has "indirectly" disclosed his child's identity by acknowledging his fondness of a picture of the child.  In *In re Murphy-Brown, LLC*, the Fourth Circuit had this to say about a similarly vague gag order:

> In *Hirschkop* (*Hirschkop v. Snead*, 594 F.2d 356, 370-71 (4th Cir. 1979) this court held, in the company of many others, that vague restrictions on speech "offend" the First Amendment.  For that reason, restraints on speech must include "some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1888 (2018).  Speakers deserve to know.  This core requirement of clarity avoids twin problems.  For one, "[t]he interpretive process itself would create an inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable." *Citizens United v. FEC*, 558 U.S. 310, 327 (2010).  Vague restraints also pose the risk of discriminatory or arbitrary enforcement. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991).  This gag order was unconstitutionally vague because it forced individuals to "guess at its contours."

*In re Murphy-Brown, LLC*, 907 F.3d at 800 (cleaned up).  The Court's Order here is no less vague than the gag order struck down by the Court of Appeals in *In re Murphy-Brown, LLC*.

For all the reasons set forth above, the Court should vacate that aspect of the Order that

operates as a gag by forbidding speech that identifies Plaintiffs and their families and requires a non-disclosure agreement.

### C. The Court Should Vacate Its Order Requiring the Use of Pseudonyms Because the Decision Underlying the Order Was an Abuse of Discretion.

The Fourth Circuit has made clear that pseudonymous identification of parties in federal litigation is a rare dispensation, but clearly within the trial court's discretion. However, the appellate court has also made clear that a determination to permit or to deny anonymity is an abuse of discretion if it is not made based upon a careful consideration of the facts of the particular case. Thus, the Court of Appeals has explained:

> The decision whether to permit parties to proceed anonymously at trial is one of many involving management of the trial process that for obvious reasons are committed in the first instance to trial court discretion. This implies, among other things, that though the general presumption of openness of judicial proceedings applies to party anonymity as a limited form of closure, it operates only as a presumption and not as an absolute, unreviewable license to deny. The rule rather is that under appropriate circumstances anonymity may, as a matter of discretion, be permitted. This simply recognizes that privacy or confidentiality concerns are sometimes sufficiently critical that parties or witnesses should be allowed this rare dispensation. *A necessary corollary is that there is a judicial duty to inquire into the circumstances of particular cases to determine whether the dispensation is warranted.*

*James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993) (emphasis added) (cleaned up). Failure to carefully consider the judicial and factual contours that guide the trial court's discretion amounts to an abuse of that discretion:

> In summary. Federal courts traditionally have recognized that in some cases the general presumption of open trials--including identification of parties and witnesses by their real names--should yield in deference to sufficiently pressing needs for party or witness anonymity. Whether the circumstances warrant anonymity in particular cases is committed in the first instance to trial court discretion, which is then subject to appellate review only for "abuse". This means that there is no legal right in parties either to be allowed anonymity or to avoid it, and that *trial courts correspondingly have no unreviewable license either to grant or deny anonymity on general principles, but power only to grant or deny it on the basis of an "informed" discretion*. Discretion in this matter is guided, made "informed"--hence constrained--by certain judicially recognized factors that should be taken into account in ruling on anonymity requests. *Failure to take relevant factors into account or acting on the basis of legal or factual*

*misapprehensions respecting those factors makes an exercise of discretion not "informed", hence potentially an abuse of discretion.*

*Id*. at 242 (emphasis added).

As articulated at the outset of this motion, the Court's Order was issued *ex parte,* without any factual analysis whatsoever, and apparently based upon a declaration by Plaintiff John Doe that is manifestly devoid of competent, relevant facts to support a claim for anonymity.   Whatever discretion was applied by the Court in permitting Plaintiffs to proceed anonymously, it was most certainly not "informed," and the Court should vacate this aspect of the Order on this basis alone.

## IV.   CONCLUSION

For all the foregoing reasons, Defendant Richard Mast respectfully requests that the Court vacate in its entirety the Order.

Dated: March 3, 2023                  Respectfully submitted,


                                        */s/David Yerushalmi*
                                        David Yerushalmi, Esq.*
                                        American Freedom Law Center
                                        2020 Pennsylvania Avenue NW, Suite 189
                                        Washington, D.C. 20006
                                        (*Admitted *pro hac vice*)

                                        E. Scott Lloyd
                                        Lloyd Law Group, PLLC
                                        Va. Bar # 76989
                                        20 E. 8th Street, Suite 3
                                        Front Royal, VA 22630
                                        Office: (540) 823-1110
                                        Cell: (540) 631-4081
                                        Fax: (540) 583-4279
                                        scott@lloydlg.com

                                        *Counsel for Defendant Richard Mast*

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

*/s/David Yerushalmi*
David Yerushalmi, Esq.