UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

BABY DOE, et al.,

        *Plaintiffs*,

v.

JOSHUA MAST, et al.,

        *Defendants*.

Civil Action No. 3:22-cv-00049-NKM-JCH

## DECLARATION OF DENA DISARRO
## ON BEHALF OF NON-PARTY
## PIPE HITTER FOUNDATION INC.

Non-Party Pipe Hitter Foundation, Inc. ("Pipe Hitter") hereby offers the Declaration of Dena Disarro:

I, Dena Disarro, declare as follows:

1. I am over the age of 18 and competent to testify in this matter.

2. All of the statements contained in this declaration are based on my personal knowledge, except where stated otherwise. If called to testify at a deposition, I would provide the same testimony.

3. I currently reside in San Diego, California and have been a California resident for over twenty years.

4. I am a graduate of North Carolina State University and received a Bachelor of Arts degree in Public Relations and Communications.

5. I am currently employed as a consultant who fundraises on behalf of political and nonprofit organizations.

1

6. I also currently serve as the Executive Director of Pipe Hitter Foundation, Inc. ("Pipe Hitter") and have been in this role for three years.

7. Pipe Hitter is organized as a 501(c)(3) non-profit organization and is incorporated in Maryland.

8. The mission of Pipe Hitter is to serve and defend the rights and freedoms of service members, first responders, and their families.

9. This goal is accomplished through financial support, legal defense grants, advocacy efforts, and public affairs outreach and education.

10. Legal defense grants awarded by Pipe Hitter are intended to help selected grantees pay for legal costs previously incurred or expected to be incurred in relation to court cases.

11. It is not uncommon for a grantee to already have a legal team assembled, but not have the funding necessary to pay the attorneys.

12. Pipe Hitter helps raise funds to allow grantees to offset legal costs that will continue to be incurred in defending against a matter, either by helping the grantee recover costs previously expended or helping the grantee raise additional funds to pay for continuing legal expenses.

13. Pipe Hitter relies on donations from the general public and contributors to provide financial support to selected legal defense grant recipients.

14. The average value of an awarded legal defense grant varies widely and can be impacted by how long the cases remain pending and at what stage of litigation that particular matter is at when Pipe Hitter provides the grant.

15. The funds that are provided through a legal defense grant offered by Pipe Hitter come from public awareness and fundraising campaigns that are undertaken on behalf of grant recipients.

16. Public awareness efforts are conducted in conjunction with Pipe Hitter's public relations team, Vought Strategies, LLC.

17. Specifically, Vought Strategies, LLC works on behalf of Pipe Hitter grantees to pitch grantees' stories to TV news networks, media networks, radio programs, and podcasts to increase public awareness about grantees' stories and encourage the public to provide financial support.

18. Part of my responsibilities as Executive Director includes reviewing potential cases brought to the attention of our organization for support and providing information on those potential cases to the Board of Directors for consideration.

19. I first learned about the legal case pending against Joshua Mast and Stephanie Mast related to the adoption of Baby Doe in early January 2023.

20. Pipe Hitter was first introduced to Joshua Mast via email by Brian Ferguson, an attorney Pipe Hitter has previously partnered with on unrelated matters, on January 4, 2023. See Document Binder 00 at 1-3.

21. Brian Ferguson does not serve as counsel to or represent Pipe Hitter and did not represent Pipe Hitter at the time this introduction occurred.

22. My understanding is that Brian Ferguson believed the Mast case would be of interest to Pipe Hitter given one of Pipe Hitter's main objectives is supporting men and women in uniform who are defending themselves against legal proceedings.

23. At no time during this introduction did Brian Ferguson mention the existence of a "gag order" in relation to the Mast case.

24. After the initial introduction by Brian Ferguson, Joshua Mast then provided an emailed summary of the matter on January 7, 2023 to Andrea Gallagher, President of Pipe Hitter, and myself and attached related documents. See Document Binder 00 at 1-2, 6-25.

25. The email from Joshua Mast also included a Google link to a number of photographs of Baby Doe. I do not recall the exact amount of photographs that were available through the Google link. See Document Binder 00 at 2.

26. I viewed the photographs available through the Google link sent by Joshua Mast, but do not recall the specific dates when I accessed the photos or the number of times that I did so.

27. To the best of my recollection, there may have been one or two photographs available through this Google link that were subsequently used by Pipe Hitter.

28. The email from Joshua Mast on January 7, 2023 did not contain any mention of a "gag order" in relation to the pending case. See Document Binder 00 at 1-2.

29. I recall speaking with Joshua Mast on the telephone once after this initial email introduction to discuss the status of his case before information was presented to the Board of Directors, but do not recall the date on which this call occurred.

30. With the background information provided by Joshua Mast through this email and telephone call, I prepared a general case summary for Pipe Hitter's internal review purposes. See Document Binder 00 at 30.

31. I provided this general case summary to Pipe Hitter's Board of Directors via email on February 19, 2023. See Document Binder 00 at 26, 30.

32. The images I included in the Pipe Hitter-created summary were obtained through the Google link emailed to Pipe Hitter by Joshua Mast on January 7, 2023. See Document Binder 00 at 1-2, 30.

33. I then gave a brief introduction to the Mast case during the Board of Directors meeting held on February 20, 2023.

34. The information that I presented was based on the information provided by Joshua Mast in his introductory email on January 7, 2023 and my subsequent telephone call with him referenced in Para. 29.

35. The Board of Directors considered the matter and a vote was conducted via email beginning on February 22, 2023. See Document Binder 00 at 26-29.

36. A majority of the Board of Directors voted to offer Joshua Mast and Stephanie Mast a legal defense grant. See Document Binder 00 at 26-29.

37. While the Board approved moving forward with a legal defense grant for Joshua Mast and Stephanie Mast in February 2023, the actual legal defense grant agreement was not presented to Joshua Mast until May 5, 2023. See Document Binder 00 at 26-29, 37.

38. To the best of my recollection, I began communicating with Joshua Mast at his request using an application called Signal after the Board approved the legal defense grant for Joshua Mast and Stephanie Mast.

39. While this was the first time a Pipe Hitter legal defense grantee had used Signal to communicate with me, I am generally familiar with Signal as I have used it professionally with clients.

40. From approximately late February 2023 or early March 2023 through early May 2023, Signal was my primary method of communication with Joshua Mast.

41. I am generally aware that Signal allows users to implement settings that cause messages to automatically delete after a specified period of time.

42. My understanding of the application is that either party to a communication made through Signal may automatically configure the program to completely erase that communication from both the sender's and the receiver's device after a specified period of time, thereby preventing

5

the other party from retrieving that communication after that date, even if the other party had not authorized such automatic deletion.

43. I typically do not have the Signal settings enabled such that my text message conversations are automatically deleted.

44. While I do not have any of the text messages exchanged with Joshua Mast on Signal, I am able to currently see on the application that Joshua Mast has the automatic deletion set to occur after one week, a timeframe that reconciles with my recollection of when the content of our text messages would delete.

45. I am unable to recall the exact date, but soon after the Board approved the Mast legal defense grant, I created a Signal text message group with Joshua Mast, Sean Gallagher (Director, Pipe Hitter Board of Directors), and myself so we could communicate about how to effectively and clearly communicate the facts of the Mast case.

46. The case was complex and it was difficult at times to decipher the implications of the legal updates provided by Joshua Mast.

47. After the group text was created on Signal, I recall that Joshua Mast provided Sean Gallagher and myself with approximately two or three general updates on the progression of the legal case from late February 2023 through April or early May 2023.

48. These updates were all sent via Signal and those conversations no longer exist, but the updates and contacts with Joshua Mast were not frequent.

49. My recollection of the updates from Joshua Mast is that they were typed texts that consisted of a few paragraphs at most.

50. I do not recall that he ever sent any files or photographs through Signal, but he may have sent a hyperlink to the CBS news story on the Mast case via Signal.

6

51. In preparation for beginning the public awareness and legal defense grant fundraising campaign, my main focus was determining a way to synthesize an extremely complicated matter into a digestible story that Pipe Hitter could share with the public.

52. Sean Gallagher and I used the information previously provided by Joshua Mast to draft a summary of the case that could then be used in furtherance of the public awareness and legal defense grant fundraising campaign. See Document Binder 00 at 31-36.

53. The summary that Sean Gallagher and I prepared together was then condensed into the version that was ultimately posted on Pipe Hitter's website and served as the basis for the fundraising communication that was disseminated to solicit contributions. See Document Binder 00 at 34-36, 60-63.

54. I did not learn that there was a "gag order" until after the Board of Directors had approved the legal defense grant for Joshua Mast.

55. I was told about the "gag order" by Joshua Mast during a telephone call that occurred, to the best of my recollection, sometime in March 2023.

56. As explained to me by Joshua Mast during this telephone call, neither he nor Stephanie Mast would be permitted to speak publicly about the case or Baby Doe.

57. I did not understand the "gag order" to mean, and Joshua Mast did not suggest that the "gag order" meant, that Joshua Mast was prohibited from speaking with me or anyone at Pipe Hitter about the legal case or Baby Doe, or that I or anyone at Pipe Hitter was prohibited from communicating to the public about these topics.

58. With this understanding in mind, I worked with the Pipe Hitter communications team, which consists of Active Engagement (email marketing), Vought Strategies, LLC (public relations

7

firm), and Tanya Corriveau (social media and administrative support), to prepare to launch the public awareness and legal defense grant fundraising campaign.

59. In early April 2023, Sean Gallagher and I provided the Mast matter summary that we drafted to Vought Strategies, LLC, so they could use the information to prepare media pitches about the Mast case. See Document Binder 00 at 31-33.

60. Also in early April, I texted with Joshua Mast via Signal and he again stated that the "gag order" would prohibit both him and Stephanie Mast from serving in a public-facing capacity in support of the public awareness and legal defense fundraising campaign.

61. My understanding from this Signal text exchange was that Joshua Mast would and could continue to speak with Pipe Hitter about the matter privately and that these private conversations were not prohibited by the "gag order".

62. My recollection is that Joshua Mast then stated sometime in either late March 2023 or early April 2023, through Signal text, that he believed his brother, Jonathan Mast, could serve in a public-facing capacity to talk about the Mast case.

63. He further stated during this text conversation that he was confirming Jonathan Mast could serve in this role, but I have no knowledge as to whom Joshua Mast spoke to in an effort to confirm whether his brother was permitted to publicly speak about the case.

64. While I am unsure of the date, I do know that I received confirmation from Joshua Mast that Jonathan Mast was permitted to speak publicly about the case before I sent the legal defense grant agreement on May 5, 2023.

65. Jonathan Mast also explicitly told me during a telephone call that he was permitted to speak publicly about this case.

66. As these text exchanges with Joshua Mast all took place over Signal, I do not have copies of these communications.

67. I advised the communications team that Jonathan Mast would be the point of contact. See Document Binder 00 at 31-33.

68. I texted Jonathan Mast on April 10, 2023 to introduce myself and schedule a time to speak with him and we did speak that day. See Document Binder 02 at 9-10.

69. From April 10, 2023 until early May 2023, I continued operating with the understanding that I could speak with Joshua Mast about the public awareness and legal defense grant fundraising campaign privately but that Jonathan Mast would need to serve in the public-facing capacity.

70. Before the public awareness and legal defense grant fundraising campaigns could launch, I needed Joshua Mast to execute the Pipe Hitter legal defense grant agreement.

71. Joshua Mast was provided with our standard legal defense grant agreement, which outlines our fundraising goal (here, $100,000), permissible and impermissible uses of any provided funds, and how funds would be distributed. See Document Binder 00 at 58-59.

72. I emailed Joshua Mast on May 5, 2023 and outlined the final things that I needed in order to launch the public awareness and legal defense grant fundraising efforts. See Document Binder 00 at 37.

73. Specifically, I needed Joshua Mast to sign Pipe Hitter's legal defense grant agreement and to approve the initial public awareness and legal defense fundraising email that Pipe Hitter intended to send to solicit contributions. See Document Binder 00 at 37.

74. After I sent this email to Joshua Mast, I later spoke with him over the telephone and he indicated he could not sign the legal defense grant agreement due to the "gag order".

9

75. My recollection is that Joshua Mast told me to speak with Jonathan Mast about the agreement.

76. That was my final conversation with Joshua Mast and I have not spoken or otherwise communicated through any medium with him since.

77. I have never spoken with or otherwise communicated through any medium with Stephanie Mast.

78. I sent Jonathan Mast a text message via Signal in early May 2023 and indicated that Pipe Hitter needed him to execute the grant agreement for the benefit of Joshua Mast in order to move forward with the public awareness and legal defense grant fundraising campaign. See Document Binder 02 at 11-13.

79. Jonathan Mast did not have his Signal settings set to automatically delete text message conversations and neither did I. See Document Binder 02 at 11-13.

80. I also advised the communications team that Jonathan Mast would be the point of contact moving forward for the Mast matter. See Document Binder 00 at 52.

81. Jonathan Mast texted me a few revisions to the legal defense grant agreement and, once the changes were made, I emailed him the legal defense grant agreement on May 9, 2023 and he subsequently executed the contract on May 10, 2023. See Document Binder 00 at 57-59; Document Binder 02 at 11-13.

82. I also emailed Jonathan Mast the fundraising email that Pipe Hitter intended to send to supporters and potential contributors for his review and approval on May 9, 2023. See Document Binder 00 at 37-38.

83. After the grant agreement was signed, Jonathan Mast sent me additional pictures of Baby Doe. See Document Binder 00 at 38-48.

84. I do not know how or under what circumstances Jonathan Mast came to be in possession of those images.

85. While I do believe there was some overlap in the images provided to me initially by Joshua Mast through the Google link and those images subsequently provided by Jonathan Mast, I am unable to recall the exact number that were newly provided by Jonathan Mast or the number that were repeats of those images previously provided by Joshua Mast.

86. Jonathan Mast was emailed a proof of the legal defense grant fundraising email that Pipe Hitter intended to disseminate to supporters and potential contributors on May 10, 2023. See Document Binder 00 at 60-64.

87. Jonathan Mast provided some content edits and stated the "photos look great". See Document Binder 00 at 63.

88. The legal defense fundraising email was then emailed to supporters on Pipe Hitter's email distribution list and potential contributors.

89. After the fundraising email was sent, I received a telephone call from Jonathan Mast on or about May 11, 2023 and he told me that there needed to be a change in the way photographs of Baby Doe were handled.

90. My recollection is that he told me that, due to the "gag order", only images that were featured in the CBS news story could be utilized without blurring Baby Doe's face.

91. He provided me with copies of those images for our use. See Document Binder 00 at 64-65.

92. I then emailed the Pipe Hitter's communications team (Active Engagement, Vought Strategies, LLC, and Tanya Corriveau) and advised them of this change in the handling of Baby Doe's photos. See Document Binder 03 at 1.

11

93. Specifically, I asked Tanya to blur Baby Doe's face on the website and asked that she only use the provided images moving forward or that Baby Doe's face be blurred if another image were used. See Document Binder 03 at 1.

94. I asked that our representative at Active Engagement undertake the same process, including on the Donorbox donation webpage. See Document Binder 03 at 1.

95. I have since learned following receipt of and through the Cease and Desist letter from plaintiffs' counsel that photos that had not previously been published by third parties, such as news networks, were not blurred as I requested after my conversation with Jonathan Mast. I immediately contacted the communications team upon learning this information and requested that all images of Baby Doe be removed.

96. In early June 2023, Vought Strategies, LLC began pitching Jonathan Mast for appearances on various television programs, radio programs, and podcasts. See Document Binder 01 at 1-18.

97. I am generally aware of the public relations efforts that Vought Strategies, LLC undertakes in support of Pipe Hitter legal defense fund grantees, but I do not actively participate in selecting which television programs, media networks, radio programs, or podcasts to pitch stories to, nor do I coordinate with Vought Strategies, LLC in those efforts.

98. Often, I am not aware that a legal defense grantee has been booked to appear on a particular network until after the appearance schedule and time has been finalized.

99. Here, I did not participate in, coordinate, or have any involvement in the media pitches that featured Jonathan Mast or his subsequent appearance on any particular networks or shows, including his appearance on OANN.

100. I am generally aware that as part of preparing for media pitches or to prepare legal defense fund grantees for interviews, Vought Strategies, LLC works with grantees and/or their representatives to better understand their story and the legal case.

101. I am aware that Jonathan Mast provided records and documents to Vought Strategies, LLC about the Mast case. See Document Binder 00 at 67-247; 01 at 19-374.

102. I am without knowledge as to the source of these records and documents or how Jonathan Mast came to be in possession of them.

103. On June 16, 2023, I learned about the Cease and Desist letter sent by plaintiffs' counsel from Pipe Hitter's accountant, Pam Tedesco.

104. After consulting with Pipe Hitter's legal counsel on June 19, 2023, I worked to have all mentions of the Mast case and pictures of Baby Doe removed from all Pipe Hitter platforms.

105. Specifically, I called the members of the communications team and requested that they immediately remove all posts and images from the Pipe Hitter website, Pipe Hitter social media platforms (including from those personal profiles of Eddie and Andrea Gallagher), and that the fundraising page and any fundraising links be immediately disabled.

106. I have always worked in good faith to comply with the demands of the Cease and Desist letter, and moved quickly to remove links and/or posts that were accidentally overlooked initially after learning the information was still available online from Plaintiffs' counsel. My actions to correct the identified issues included immediately calling members of the communications team and telling them these posts needed to be deleted immediately.

107. I also called Jonathan Mast and told him that Pipe Hitter was unable to continue working with him and that all public awareness and legal defense fundraising efforts related to Joshua Mast and Stephanie Mast would immediately cease.

108. Pipe Hitter only disseminated the one fundraising email described above in relation to the Mast matter.

109. Pipe Hitter's fundraising efforts raised a total of $2,269, but Pipe Hitter directed its accountant, Pam Tedesco, to transfer $5,000 to Jonathan Mast on May 19, 2023. See Document Binder 00 at 66.

110. Neither I, nor any other Pipe Hitter directors, officers, or employees, received or obtained a copy of the "gag order" from anyone—including Plaintiffs' counsel, Joshua Mast, or Jonathan Mast—prior to receiving the Cease and Desist letter from Plaintiffs' counsel.

111. Neither I, nor any other Pipe Hitter directors, officers, or employees, possessed or viewed a copy of the "gag order" prior to receiving the Cease and Desist letter from Plaintiffs' counsel. The first time I ever saw a copy of the court's Protective Order was when Pipe Hitter received the Cease and Desist letter.

112. Neither I, nor any other Pipe Hitter directors, officers, or employees knew the contents of the "gag order" in this case, beyond the fact that it prohibited Joshua Mast or Stephanie Mast from making public statements about the case or Baby Doe.

113. Neither Joshua Mast nor Jonathan Mast ever indicated to me or any other Pipe Hitter director, officer, or employee that the "gag order" could or did apply to statements by anyone other than Joshua Mast or Stephanie Mast.

114. Neither I, nor any other Pipe Hitter director, officer, or employee ever knowingly or willfully violated, or authorized the violation, of the "gag order."

115. Neither Pipe Hitter nor any of its directors, officers, or employees have ever been a Representative or agent of Joshua Mast, Jonathan Mast, or Stephanie Mast. Neither Pipe Hitter nor any of its directors, officers, or employees have ever been subject to the direction or control of Joshua Mast, Jonathan Mast, or Stephanie Mast.

*SIGNATURE PAGE FOLLOWS*

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Dated July 18, 2023

Dena Disarro, on behalf of Non-Party Pipe Hitter Foundation, Inc.