IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BABY DOE, *et al.*,<br><br>      Plaintiffs,<br><br>  -v.-<br><br>JOSHUA MAST, *et al.*,<br><br>      Defendants,<br><br>and<br><br>UNITED SECRETARY OF STATE ANTONY BLINKEN, *et al.*<br><br>      Nominal Defendants.[1] | CIVIL NO: 3:22-cv-00049-NKM-JCH |

**REPLY BRIEF IN SUPPORT OF SUPPLEMENTAL MOTION TO COMPEL**

**I.    PREFATORY NOTE ON STYLE**

Plaintiffs announce to the Court that Defendant Mast's Supplemental Motion to Compel ("Motion") (Dkt. No. 291) "is long on overheated rhetoric and short on the facts." (Pls.' Opp'n Br. [Dkt. No. 296] at 1). And, in a transparent effort to gain some leverage with the Court, Plaintiffs pronounce that "[t]his is not the first time RMast has resorted to unsubstantiated and conclusory *ad hominem* attacks on Plaintiffs' counsel. They do not move the case forward. Instead, they are a distraction."[2] (*Id*. at 2). To begin, there is nothing *ad hominem* about the motion or the discussion

---

[1] We note for the record that while the government "nominal defendants" are no longer parties to this litigation, the Court has yet to notify the parties of a change to the caption.

[2] This quote and reference to "not the first time" is an obvious attempt to leverage the Court's criticism of language in Defendant Mast's opposition brief to Plaintiffs' requested discovery protective order. (Order [Dkt. No. 223] at 2 n.3. While the undersigned is willing to accept all constructive criticism from the Court, a sensitivity to context will work to even the playing field given the scandalous allegations raised by Plaintiffs throughout this litigation, and even more so their claims regurgitated blindly in the media—all while obtaining an *ex parte*, asymmetrical gag order. Indeed, Plaintiffs apparently feel free enough to ascribe bad motives to Defendant Mast by characterizing his arguments in the Motion as "feigned" (Pls.' Opp'n at 6)—meaning fictitious, not genuine or real. (Miriam Webster at https://www.merriam-webster.com/dictionary/feigned).

1

of Plaintiffs approach to discovery requests and their counsels' discovery tactics.³ Indeed, Plaintiffs now effectively admit and expose the fact that they did indeed attempt to hide documents behind a claim of privilege that they should never have advanced. They of course deny wrongdoing and characterize their refusal to produce the documents as "Plaintiffs' counsel reasonably designat[ing] documents relating to Ms. Velazquez and Ms. Jenkins as privileged." (*Id*. at 5). As discussed below, there was nothing reasonable about their claim of privilege. It is worth noting, Plaintiffs also refused to disclose these documents in the parallel state case going back more than a year (*i.e.*, the history of improper discovery tactics) and they were only made available in this litigation as a result of Defendant Mast's third-party subpoena to the USCCB.⁴

And, there is a readily available explanation for this effort to hide these documents behind a privilege claim. The USCCB documents include a factual narrative provided to USCCB staff member Martha Jenkins by Jane Doe titled as a "Report" and dated November 6, 2021. (Ex. E [filed under seal] to Pls.' Opp'n). In that narrative, Jane Doe informs Jenkins that John Doe's family turned to the Taliban for permission to take Baby Doe to the U.S., but the Taliban refused permission. ("[John Doe]'s family asked permission from the Taliban to take the child to the US, but they refused. Ultimately, [John and Jane Doe] chose to disobey the Taliban's order and take [Baby Doe] to the US

---

³ An *ad hominem* argument or criticism is inappropriate (*i.e.*, the *ad hominem* fallacy) when one is engaged in a critique of ideas, philosophies, and the like. In litigation, and notably in discovery motions dealing with inappropriate discovery tactics, the person, often a lawyer, is allegedly engaging in behavior that the moving party considers to be a violation of the rules. Invariably and necessarily, the behavior of **the person** engaging in the rules violation will be criticized. That is neither *ad hominem* nor inappropriate. *See, e.g.*, Dept. of Philosophy, *Ad Hominem* at https://www.txst.edu/philosophy/resources/fallacy-definitions/Ad-Hominem.html.

⁴ Even here, Plaintiffs complain that, although Defendant Mast issued the subpoena and served proper and timely notice per the Rules, had their mailed notice not arrived after the documents were produced, they would have had the opportunity to object to the subpoena. (*Id*. at 5; see also Exs. 9-10, 12-13 to Motion). But what exactly would have been their objection? They've now conceded that they have improperly withheld the USCCB documents because the claim of privilege was bogus. (Plaintiffs conveniently ignore the fact that the undersigned *sua sponte* sequestered the documents per Virginia Bar ethics opinions and in accordance with the discovery protective order in place here until the matter was clarified.)

to receive the treatment Joshua was offering to help facilitate." (This is separately noteworthy insofar as Jenkins' Report indicates that this took place in July 2021, prior to the U.S. withdrawal and the Taliban takeover. [See *Timeline of U.S. Withdrawal from Afghanistan,* FactCheck.Org at https://www.factcheck.org/2021/08/timeline-of-u-s-withdrawal-from-afghanistan.]).

This admission of a direct connection between John Doe's family and the Taliban occurs as an unfiltered admission by John Doe and Jane Doe prior to the Does lawyering up. In the state case, after the international law firms join the Doe legal team, John Doe testifies that no such outreach to the Taliban occurred as part of the narrative asserting the Does' innocence in all things. Moreover, the Jenkins narrative provided separate corroboration of what Plaintiffs' counsel and Department of Justice counsel have sought to suppress[5]: the unclassified computer terminal screenshot of John Doe's entry on the Biometrically Enabled Terror Watch List (BEWL) provided to Major Mast by a concerned Customs and Border Patrol agent; Major Mast's testimony about that identification and interrogation of John Doe in his presence at Dulles; and John Doe's meeting of a military aged male friend from his village likewise detained for additional interrogation. It is not surprising that a baby saved from Al Qaeda foreign fighter parents (whose mother blew herself and the baby up with an IED) would end up with a non-relative man with many Taliban contacts in his phone before he came to American lines; and who was subsequently identified on the BEWL. It is very understandable that Plaintiffs did not want Defendants to see this Report.[6] We turn now to the specific arguments

---

[5] Pls.' Bates No. 4439 is an email from Rowen Zachary from Latham & Watkins to several State Department personnel claiming that Joshua Mast was improperly using the BEWL to malign his client, John Doe, and seeking to prevent Joshua's testimony in the state case regarding John Doe's terrorist ties.

[6] This is not the only occasion on which John and Jane Doe have shaded the truth in sworn or verified court filings. For example, John and Jane Doe had alleged in their original and refiled verified petitions in the state court case that Joshua Mast assaulted John Doe at the time of Baby Doe's transfer to the Masts. This claim is also made in the Jenkins Report. ("… after which Joshua stomped on [John Doe]'s foot and threw him back with his arm.") In the original complaint in this matter, the same was alleged. (Compl. [Dkt. No. 1] at ¶ 121). After the State Department official who oversaw the transfer at the airport provided a written declaration in the state court case that no such assault

3

raised in Plaintiffs' opposition.

## II. THE CLAIMS OF PRIVILEGE ASSERTED IN THE PRIVILEGE LOG WERE MANIFESTLY UNREASONABLE.

Plaintiffs assert that their listing of the USCCB documents as privileged attorney-client communications or work product was reasonable. They make that statement without providing any legal authority. The Fourth Circuit Court of Appeals, however, has made clear that a party asserting privilege bears the burden to establish the bases for such a claim at the time it is asserted in the privilege log. Specifically, the Fourth Circuit requires:

> A party asserting privilege has the burden of demonstrating its applicability. *See United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (per curiam). In claiming the attorney-client privilege, a party must satisfy procedural and substantive criteria. Procedurally, the party must "expressly make the claim" and "describe the nature of the documents . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(a)(5)(A). Substantively, a party must show that:
>
> > (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or is his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.
>
> *Jones*, 696 F.2d at 1072 (quoting *United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950)). And in claiming the work-product privilege, the party must demonstrate that the documents in question were created "in preparation for litigation." *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994) (citing *Hickman v. Taylor*, 329 U.S. 495, 509-14, 67 S. Ct. 385, 91 L. Ed. 451 (1947)). When a party relies on a privilege log to assert these privileges, the log must "as to each document . . . set[ ] forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed." *Bowne, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 474 (S.D.N.Y. 1993).

*NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 501-02 (4th Cir. 2011).

---

occurred, the allegation repeated to the media and in prior filings disappears from the Amended Complaint filed here.

Plaintiffs received the documents from the USCCB through their general counsel, exactly as Defendant Mast did. Plaintiffs' assertion of reasonableness is not credible for any number of reasons. **First**, the USCCB did not require a waiver from a "client" before providing the documents. If in fact the USCCB and its staff were acting as lawyers and in possession of privileged material, they would have been obligated to obtain such a waiver. That fact alone should have been a red flag to Plaintiffs' counsel—all very sophisticated "Big Law" lawyers. **Second**, after receiving the documents, neither Plaintiffs nor the counsel bothered to inform the USCCB that they considered these documents privileged and USCCB should not produce them to any other party. **Third**, Plaintiffs' counsel did not bother to even inquire of USCCB's general counsel if a claim of privilege was appropriate—at least not until the bogus claim of privilege was unearthed by Defendant Mast. **Fourth**, Plaintiffs' counsel did not reach out to Jenkins or Vasquez to determine if they were acting as counsel. Fifth, Vazquez is not a lawyer and never held herself out as a lawyer. At the time, she was a social worker employed by USCCB.[7]

Moreover, even after it was obvious to Plaintiffs' counsel that the privilege claim was inappropriate, they provided a revised log a day before the filing of this Motion which still included a privilege claim with regard to three documents sent to Jenkins by Jane Doe. Only after this Motion was filed did Plaintiffs remove those documents from the list. Fed. R. Civ. P. 37(a)(5)(A) ("If the motion is granted—*or if the disclosure or requested discovery is provided after the motion was*

---

[7] Plaintiffs' footnote (Pls.' Opp'n at 4 n.3) that Jenkins is in fact a licensed attorney ignores the fact that she is only licensed in Wyoming. She is unlicensed in Virginia. All of the communications cited as privileged occurred in Virginia. If Jenkins was in fact acting as counsel to give rise to a privilege, she was engaged in the unauthorized practice of law in Virginia. Rules of S. Ct. of Virginia, Unauthorized Practice Rules, Rule 1 ("No non-lawyer shall engage in the practice of law in the Commonwealth of Virginia or in any manner hold himself or herself out as authorized or qualified to practice law in the Commonwealth of Virginia except as may be authorized by rule or statute. The term 'non-lawyer' means any person, firm, association or corporation not duly licensed or authorized to practice law in the Commonwealth of Virginia. Any person or entity who practices law without being licensed or otherwise authorized to practice law shall be guilty of a Class 1 misdemeanor. Va. Code § 54.1-3904.")

5

*filed*—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.") (emphasis added). Indeed, even today, Plaintiffs include a document titled "Draft of court filing" that was provided to, and disclosed by, USCCB, which has made clear that it has no attorney-client, or other "legal," relationship to Plaintiffs or their counsel. Plaintiffs do not explain how the privilege claim has not been waived.

### III. FAILURE TO PROVIDE DOCUMENTS OR TO ENGAGE IN MEANINGFUL MEET-AND-CONFER PROCESS

Plaintiffs claim that the Motion presents no facts about Plaintiffs' failure to disclose or to disclose in a timely fashion. Let's begin with the Rules:

> For each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons. The responding party may state that it will produce copies of documents or of electronically stored information instead of permitting inspection. The production must then be completed no later than the time for inspection specified in the request or another reasonable time specified in the response.

Fed. R. Civ. P. 34(b)(2)(b).

Now we turn to the Plaintiffs' assertion of compliance. **First**, nowhere and at no time have Plaintiffs informed Defendant Mast that they will utilize a "rolling production" to comply with the Rules (at least not until after the Motion was filed). In fact, as the Motion notes, Plaintiffs informed the Court that they would produce all responsive documents immediately once the Court entered its discovery protection order. That never happened.

**Second**, the "rolling production" defense is cloaked in complaints about the 68 production requests. Plaintiffs have alleged a lengthy global conspiracy and seek tens of millions of dollars in emotional distress damages. Sixty-eight document requests are hardly overkill. Moreover, during the meet-and-confer process, the parties agreed on documents Plaintiff would produce, documents they need not produce, and documents Plaintiffs would not produce over Defendant Mast's

6

objections. The Motion on this point is about a meaningful meet-and-confer process confirming that all presently existing, responsive, non-privileged documents identified in the July 15 email have in fact been produced. Plaintiffs have quite simply not responded to the July 15 email—at least not until they filed their opposition to the Motion. This is not treating the meet-and-confer process in good faith. Fed. R. Civ. P. 37(a)(1).

**Third**, the "rolling production" defense ignores the fact that the documents produced in "rolling" fashion long after the Court entered the discovery protection order have been in Plaintiffs' counsel's possession for months, and in some cases, a year or more. Examples abound. For example, the first document produced just a day before this Motion was filed is an undated text exchange between Plaintiffs' counsel Sehla Ashai and a witness Plaintiffs utilized in the state case to authenticate documents. That dates back to sometime mid-2022. (*See* Pls.' Bates 7021, attached hereto as Ex. 1). Similarly, on July 15, 2023, more than a month after Plaintiffs had informed the Court that their production would immediately follow the entry of the discovery protective order, Plaintiffs produced an email between two of Plaintiffs' lawyers and Rozina Ali, the New York Times Magazine reporter Plaintiffs had enlisted to begin the information warfare campaign against Defendants. This email thread's earliest emails date back to July 2022. It is hard to imagine how the army of lawyers from two international law firms need to engage in rolling productions of their own documents.

**Fourth**, Plaintiffs' explanation for completely ignoring Defendant Mast's detailed effort in the July 15 email appears to be that it is "mind-numbing." Yet, they immediately complain that the Motion does not set out documents that are actually missing. (Pls.' Opp'n at 11). Now, only after the filing of the Motion, Plaintiffs assert that the July 15 email is wrong in that it claims missing documents that were not missing. Well, that kind of misses the point of a good faith meet-and-confer effort. Plaintiffs had two months to make the point they made in their opposition two weeks

7

following the filing of the Motion. Moreover, even their very selective five bullet points about the July 15 email's accuracy are themselves inaccurate. For example, in the very first bullet point, Plaintiffs list three documents (Pls.' Bates 3806, 3812, and 3816) they claim are responsive to an RFP requesting documents to and from the Federal Government. Those three documents are between one of Plaintiffs' lawyers and the so-called "Embassy of Afghanistan in Canada," operating as a putative embassy in exile. (*See, e.g.*, Pls.' Bates No. 3812, attached hereto as Ex. 2). Last we checked, the Islamic Republic of Afghanistan was not and is not part of the U.S. Federal Government. As we note in the Motion, Plaintiffs' efforts in its belatedly produced spreadsheet to actually match production to the relevant production request were sloppy (*see* below for further discussion of this point).

The very fact that Plaintiffs were still producing documents the day before the Motion was filed demonstrates that the July 15 email was not off-base. This is demonstrated yet further by Plaintiffs' second bullet point and their assertion that they have produced documents from the Behavior Health records in response to RFP No. 3. (Pls.' Opp'n at 10). The documents Plaintiffs cite to are communications relating to Plaintiffs' requests for the behavioral health records. But, nowhere can we find the actual health records. And, of course, these documents are critical to this case insofar as Jane Doe claims that she was suicidal after Baby Doe was transferred to the Masts and she sought mental and physical healthcare. Her claim for damages in large part arises from that allegation. (*See, e.g.*, Am. Compl. at ¶ 148). Now it might very well be that no documents were provided to Plaintiffs. While that is unlikely given they are Jane Doe's medical records, we cannot know if they did in fact receive these documents because they ignored the July 15 email until now, post-Motion.

As to the Motion's reference to non-disclosed attachments noted in emails produced, again examples abound. One such example is Plaintiffs' Bates No. 4810. In an effort to enlist the Virginia

Office of the Children's Ombudsman to take some action on Plaintiffs' behalf, Geri Greenspan, a Hunton lawyer, writes to Eric Reynolds, the Ombudsman, and informs him that he is "attaching several documents" to establish Plaintiffs' claim as "guardians." There are no such documents attached in that "rolling production" and we can locate them nowhere else. (It is important to note that Greenspan falsely claims in the email that "[b]ecause the family law system in Afghanistan is very different than ours, and relies on both Islamic taw and civil law, there is nothing akin to a custody order or guardianship order as we would expect to see from our courts." That was not the law of the Islamic Republic of Afghanistan at the time. For custody/guardianship to transfer to John Doe's father and separately from John Doe's father to John Doe, a court order would have been required. As we get into the merits of this case, this legal fact will be borne out.)

## IV. PLAINTIFFS HAVE NOT COMPLIED WITH THE DISCOVERY RULES REQUIRING DOCUMENTS PRODUCED BE ORGANIZED

Rule 34 states: "A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request." Fed. R. Civ. P. 34(b)(2)(E)(i). Plaintiffs claim compliance. First, they throw in a single court case where a minor Plaintiff had sued the District of Columbia for sexual abuse. In the magistrate judge's opinion, he simply notes that if Plaintiff had complied with the Rules by organizing the documents in the ordinary course, he would be in compliance. *Doe v. District of Columbia*, 231 F.R.D. 27, 36 (D.D.C. 2005). But the opinion does not say what Plaintiffs claim. There is no holding that the documents were in fact organized in such fashion and that he was in compliance. It is unclear from the opinion how that issue turned out.

Moreover, this ignores the plethora of case law that hold either that an individual may not organize non-business documents in the usual course of business, or, if a non-business party asserts such an organization, the producing party must identity that production and bears the burden of explaining the organizational structure. As set out in Exhibit 3 to the Motion, and as provided to

9

Plaintiffs during Defendant Richard Mast's efforts at a good faith meet-and-confer, the law is fairly clear:

> Specifically, the option of producing records as "they are kept in the usual course of business" is only available to (1) commercial enterprises or entities that function in the manner of commercial enterprises and (2) records resulting from "regularly conducted activity." *See SEC v. Collins & Aikman Corp.*, 256 F.R.D. 403, 412 (S.D.N.Y. 2009). "Where a producing party's activities are not 'routine and repetitive' such as to require a well-organized record-keeping system—in other words when the records do not result from an 'ordinary course of business'—the party must produce documents according to the sole remaining option under Rule 34: 'organized and label[ed] . . . to correspond to the categories in the request.'" *Id.* at 412-413. Thus, it is not clear that the Plaintiffs, as individuals, keep documents in the usual course of business within the meaning of the rule. *See id.; Nationwide Mut. Ins. Co. v. Spinal Imaging, Inc.*, No. 2008-11073-DPW, 2012 U.S. Dist. LEXIS 2308, 2012 WL 73303, at *2 (D. Mass. Jan. 9, 2012) (". . . the option of producing documents 'as they are kept in the usual course of business' under Rule 34 . . . is available to commercial enterprises or entities that function in the manner of commercial enterprises.") (citation omitted).
>
> *Traverse v. Gutierrez Co.*, Civil Action No. 18-10175-DJC, 2019 U.S. Dist. LEXIS 238304, at *2-3 (D. Mass. Aug. 15, 2019); *see also Enargy Power (Shenzhen) Co. v. Wang*, Civil Action No. 13-11348-DJC, 2014 U.S. Dist. LEXIS 130997, at *11 (D. Mass. Sep. 17, 2014) ("it is not clear that the Defendants, as individuals, keep documents in the usual course of business within the meaning of the rule."); *Simon v. State Farm Lloyds*, No. 7:14-CV-251, 2015 U.S. Dist. LEXIS 193379, at *13 (S.D. Tex. Apr. 9, 2015) ("Plaintiff claims that this is how his records are kept in the ordinary course of business, as 'business records,' but the Court finds this argument nonsensical since Plaintiff is an individual, not a business. Federal Rule of Civil Procedure 34(b)(2)(E)(i) states that '[a] party must produce documents as they are kept in the usual course of business or must organize them to correspond to the categories in the request.' Thus, the Court instructs Plaintiff to produce the documents in a way that corresponds to the categories in the request."); *Gipson v. Sw. Bell Tel. Co.*, Civil Action No. 08-2017-EFM-DJW, 2009 U.S. Dist. LEXIS 25457, at *19-21 n.40 (D. Kan. Mar. 24, 2009) ("If the answering party is not engaged in a business, it would appear unlikely that it would have 'business records.'").
>
> Even still, "a party who chooses the Rule 34(b) option to produce documents as they are kept in the ordinary course of business bears the burden of showing that the documents were in fact produced in that manner and that a mere assertion that they were so produced is not sufficient to carry that burden." *DE Techs., Inc. v. Dell Inc.*, 238 F.R.D. 561, 566 (W.D. Va. 2006); *Johnson v. Kraft Foods N. Am., Inc.*, 236 F.R.D. 535, 540-41 (D. Kan. 2006); *Pass & Seymour, Inc. v. Hubbell, Inc.*, 255 F.R.D. 331, 334 (N.D.N.Y. 2008) ("A party selecting the [usual course of business] method of production bears the burden of demonstrating that the documents made available were in fact produced consistent with that mandate. To carry this burden, a party must do more than merely represent to the court and the requesting party that the documents have been produced as they are maintained.") (internal citations omitted).
>
> As the court explained in *Cardenas* (approvingly cited by *DE Techs., Inc. v. Dell Inc.*, 238 F.R.D. 561, 566 (W.D. Va. 2006)):
>
>> Federal Rule of Civil Procedure 34 governs requests for production of documents. Subsection (b) provides that a party who produces documents for

inspection "shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." This provision was added to Rule 34(b) to prevent parties from "deliberately . . . mixing critical documents with others in the hope of obscuring significance."

In light of Rule 34(b), the question before the Court is whether the documents previously produced by DJG as part of its initial Rule 26(a)(1) disclosures were produced "as they are kept in the usual course of business." Certainly, when DJG provided the documents to Plaintiffs in March 2005 DJG did not indicate that they were being produced to Plaintiffs as they are kept in the ordinary course of business. The March 4, 2005 transmittal letter merely indicates that there are twelve categories of documents being produced and provides the Bates Stamp Numbers for the documents in each of the categories. The fact that DJG did not expressly state in the transmittal letter that the documents were being provided as there were kept in the ordinary course of business is not determinative, however. Rather, the Court must decide, based on the information now provided by the parties, whether the documents previously provided by DJG were produced as they were kept in the usual course of business.

The documents DJG previously produced consist of 18,000 or more documents. DJG produced them in nine "bankers' boxes." DJG asserts in its response to the Motion to Compel that the documents were produced as they were kept in the usual course of business "as reflected in its transmittal letter expressly identifying the categories of documents . . . it was producing." The transmittal letter describes twelve different categories of documents: Touriva Design Drawings and Patents, Instructions/Labels, Catalog Pages, Touriva Model Files, S. Saxton Product Development Committee Meeting Notes, Product Development Committee Meeting Minutes, Sales Report, Touriva Internal Testing, Touriva External Testing, E-mails, Consumer Log/Complaints/Claim letters, and Insurance Policies. As noted above, each of these twelve categories is identified by Bates Stamp Numbers.

DJG provides no additional information about these documents. It does not explain the origin of any of these twelve categories of documents, i.e. where these documents were maintained or who maintained them, and whether the documents in each category came from one single source or file or from multiple sources or files. In short, DJG does not provide the Court with any information, let alone evidentiary proof, to establish that the documents were produced as kept in the ordinary course of business. Rather, DJG merely makes the unsupported assertion that they were produced in that manner. While DJG did group the documents into twelve different categories, the Court does not find that such categorization satisfies the "usual course of business" criterion.

Rule 34 does not explain what it means to produce documents "as they are kept in the usual course of business," and there is very little case law to guide the Court in making this determination. In the absence of such guidance, the Court holds that a party who chooses the Rule 34(b) option to produce documents as they are kept in the ordinary course of business bears the burden of showing that the documents were in fact produced in that manner. A mere assertion that they were so produced is not sufficient to carry that burden. In addition, merely categorizing the documents produced does not, without some further

> explanation, satisfy the requirement that they be produced as kept in the usual course of business.
>
> In light of the foregoing, the Court holds that DJG has not met its burden to establish that it produced these documents "as they are kept in the usual course of business." Because DJG did not produce them as kept in the usual course of business, it should have organized and labeled them to correspond with the categories in each request, as required by Rule 34(b). 23 Since the documents have already been provided to Plaintiffs, the easiest way for DJG to comply with the "organize and label" requirement would be for DJG to identify, by the Bates Numbers the DJG lawyers have already stamped on the documents, which documents are responsive to each of the document requests, as Plaintiffs have requested.

*Cardenas v. Dorel Juvenile Grp., Inc.*, 230 F.R.D. 611, 617-19 (D. Kan. 2005).

Further, "The usual course of business alternative . . . is only available when the documents' natural organization makes finding critical documents reasonably possible." *Enargy Power (Shenzhen) Co. v. Wang*, Civil Action No. 13-11348-DJC, 2014 U.S. Dist. LEXIS 130997, at *11 (D. Mass. Sep. 17, 2014). "As its plain language reflects, the rule contemplates that a party selecting this option disclose information to the requesting party regarding how the documents are organized in the party's ordinary course of business." *Pass & Seymour, Inc. v. Hubbell, Inc.*, 255 F.R.D. 331, 335 (N.D.N.Y. 2008). "A party demonstrates that it has produced documents in the usual course by revealing information about where the documents were maintained, who maintained them, and whether the documents came from one single source or file or multiple sources or files." *Traverse v. Gutierrez Co.*, Civil Action No. 18-10175-DJC, 2019 U.S. Dist. LEXIS 238304, at *2 (D. Mass. Aug. 15, 2019).

There is simply no basis for Plaintiffs' defense that they produced the documents in the usual course of business.

Plaintiffs' second line of defense is metadata. Unfortunately, Plaintiffs' assertion that metadata is the be-all and end-all of compliance is wrong in theory and in *praxis*. For example, theoretically the metadata categories Plaintiffs allude to are indeed useful if we know in advance who the custodian, sender, or receiver might be. Thus, if we want to pull out all documents to/from Afghan government agencies or officials, unless we know who these agencies or officials are in advance and their respective email suffixes, metadata will not assist us unless we somehow predict a keyword used in the email. Similarly, with regard to communications to/from the media or state and local officials. Unless we know in advance which agencies and in which locale, we will be searching by guesswork. The same is true of communications to/from family members.

At the level of *praxis*, we see this problem in Plaintiffs' assertion that even though they need not organize the documents, they provided a spreadsheet doing so. As noted in the Motion, Plaintiffs' spreadsheet claiming to label their document production to align with the specific RFPs was sloppy and far from accurate. (Mot. at 4). Indeed, the Motion points to another attempt by Defendant Richard Mast to resolve this issue via the meet-and-confer process. Exhibit 6 to the Motion is an email from Defendant Mast's counsel to Plaintiffs' counsel providing specific examples of how the spreadsheet failed to remedy the document dump. (We noted the same problem above in Plaintiffs' opposition "bullet points" claiming certain documents were produced when in fact the documents referenced were non-responsive.)

What should stand out here of course is the fact that Plaintiffs did not competently comply with the Rules in their "organizing" spreadsheet even though they had all of the metadata they now assert satisfies compliance. If Plaintiffs could not properly organize the documents, it is hard to understand how Defendant Mast is expected to.

Further, the courts are not univocal on this subject with the majority of courts requiring ESI to comply with Rule 34(b)(2)(E)(i)'s requirement of labeling, irrespective of metadata. *Anderson Living Tr. v. WPX Energy Prod., LLC*, 298 F.R.D. 514, 524 (D.N.M. 2014) ("The vast majority of courts have treated (E)(i) and (E)(ii) as supplementary rather than alternative, applying (E)(i)'s organized production requirement to ESI the same way they had before the 2006 amendments, and adding the (E)(ii) form requirement on top of the requirements of (E)(i)."). This district and the Fourth Circuit have not addressed the issue.

## V.     CONCLUSION[8]

---

[8] We provide here a bit of clean-up relative to some rather strange comments in Plaintiffs' opposition. First, Plaintiffs seem to want to equate their document dumps with the 113 documents produced in response to Plaintiffs' 28 RFPs. (Opp'n at 3 n.2). Many of those RFPs were simply seeking duplicates of documents in the state court case and already in Plaintiffs' possession, documents about which the parties came to an agreement during Plaintiffs' requested meet-and-confer. That Defendant Mast's production was full and complete is reflected in the fact that Plaintiffs have neither

13

Plaintiffs and their counsel have failed to abide by the Rules relating to discovery. The Motion and its exhibits, together with this reply brief demonstrate this across all extant issues. The Motion is reasonable. It simply asks the Court to order Plaintiffs to respond properly to the meet-and-confer email of July 15 and simply to confirm that all presently existing documents have been produced. Plaintiffs' red herring argument that documents continue to be created, searched for, and produced downstream quite obviously has nothing to do with the Motion. The Motion clearly addresses existing documents. Not future documents or future documents discovered in a "refreshed" search (whatever that means). The Motion also asks this Court to have Plaintiffs organize their documents in a competent fashion. The metadata has not provided Plaintiffs with this ability to date; it most certainly does not provide Defendant Mast with an organizing structure. Finally, as to the privilege log, Plaintiffs have conceded their error but only after the filing of the Motion. If this tactic works to avoid sanctions then so be it, but bad behavior rewarded is bad behavior reinforced.

---

filed a motion to compel nor even suggested that they would. That production was completed months ago. Second, Plaintiffs appear to criticize Defendant Mast's Motion to Compel based upon the fact that other Defendants have not produced any documents to date. (Opp'n at 9 n.7). We're still trying to figure out the relevance of that comment. And, third, Plaintiffs attempt to deflect the point of the Motion by claiming that it is "nonsensical" to expect Plaintiffs to confirm that all currently existing and responsive documents have been produced because, well . . . you know. . . there might very well be future documents created that might be responsive. And, to show how upstanding Plaintiffs are, they note they recently produced additional newly created documents and then veer off completely and claim that Joshua Mast, not Richard Mast, the movant here, allows the Signal application to disappear messages. And, that is relevant how? (Opp'n at 11-12).

14

Dated: October 6, 2023                    Respectfully submitted,

*/s/David Yerushalmi*
David Yerushalmi, Esq.*
American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20006
(*Admitted *pro hac vice*)

E. Scott Lloyd
Lloyd Law Group, PLLC
Va. Bar # 76989
20 E. 8th Street, Suite 3
Front Royal, VA 22630
Office: (540) 823-1110
Cell: (540) 631-4081
Fax: (540) 583-4279
scott@lloydlg.com

*Counsel for Defendant Richard Mast*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

                                                           */s/David Yerushalmi*
                                                           David Yerushalmi, Esq.