1                    UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
2                       CHARLOTTESVILLE DIVISION

3    ****************************************************************

4    BABY DOE, ET AL,              CIVIL CASE NO.:  3:22CV49
                                   OCTOBER 11, 2023, 11:03 A.M.
5                                  TELEPHONIC MOTIONS HEARING
            Plaintiffs,
6    vs.

7    JOSHUA MAST, ET AL.,          Before:
                                   HONORABLE JOEL C. HOPPE
8                                  UNITED STATES MAGISTRATE JUDGE
            Defendants.            WESTERN DISTRICT OF VIRGINIA
9
     ****************************************************************
10
     APPEARANCES:
11

12   For the Plaintiffs:          MAYA MIRIAM ECKSTEIN, ESQUIRE
                                  LEWIS FRANKLIN POWELL, III, ESQUIRE
13                                Hunton & Williams LLP
                                  Riverfront Plaza, East Tower
14                                951 East Byrd Street
                                  Richmond, VA 23219
15                                804-788-8788

16

17   For Defendants Joshua and Stephanie Mast:
                                  MICHAEL LEE FRANCISCO, ESQUIRE
18                                McGuireWoods LLP
                                  888 16th St. N.W., Suite 500
19                                Washington, DC 20006
                                  202-525-0356
20

21

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                       255 West Main Street, Suite 304
23                     Charlottesville, Virginia  22902
                       434.296.9284
24

           PROCEEDINGS RECORDED BY ELECTRONIC RECORDING;
25   TRANSCRIPT PRODUCED BY COMPUTER.

```
 1   APPEARANCES CONTINUED:

 2   For Defendant Richard Mast:
                           DAVID ELIEZER YERUSHALMI, ESQUIRE
 3                         American Freedom Law Center
                           2020 Pennsylvania Avenue NW
 4                         Suite 189
                           Washington, DC 20006
 5                         646-262-0500

 6   For Defendant Kimberley Motley:
                           MICHAEL ROGER HOERNLEIN, ESQUIRE
 7                         SAMANTHA LYNN VAN WINTER, ESQUIRE
                           SIDNEY WEBB, ESQUIRE
 8                         Alston & Bird LLP
                           101 S. Tryon Street, Ste. 4000
 9                         Charlotte, NC 28280
                           704-444-1041
10

11   For Defendant Ahmad Osmani:
                           BRENNAN TYLER BROOKS, ESQUIRE
12                         Law Office of B. Tyler Brooks, PLLC
                           P.O. Box 10767
13                         Greensboro, NC 27204
                           336-707-8855
14
                           RICHARD DEAN BOYER, ESQUIRE
15                         Boyer Law Firm, PLLC
                           P.O. Box 10953
16                         Lynchburg, VA 24506
                           434-401-2093
17

18   On behalf of Pipe Hitter Foundation, Inc.:
                           CAITLIN PARRY CONTESTABLE, ESQUIRE
19                         DAN BACKER, ESQUIRE
                           Chalmers, Adams, Backer & Kaufman,
20                         LLC
                           441 N. Lee Street, Suite 300
21                         Alexandria, VA  22314
                           678-940-1050
22

23

24

25
```

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  (Proceedings commenced, 11:03 a.m.)

2          THE COURT:  Good morning.  This is Joel Hoppe.

3          Would the clerk please call the case?

4          THE CLERK:  Yes, Your Honor.

5          This is Civil Action Number 3:22cv49, Baby Doe, et

6  al. versus Joshua Mast, et al.

7          THE COURT:  Who is on the line for the plaintiffs?

8          MS. ECKSTEIN:  Good morning, Your Honor.  This is

9  Maya Eckstein.  I am joined here with my colleague, Lewis

10 Powell.  He and I will be handling the arguments this morning.

11         Also joined in the conference room is Kevin Elliker,

12 and there may be other counsel of record on the line as well on

13 behalf of plaintiffs.

14         THE COURT:  Who is on the line for Joshua and

15 Stephanie Mast?

16         MR. FRANCISCO:  Good morning, Your Honor.  Michael

17 Francisco for Joshua and Stephanie Mast, and I'll be handling

18 the argument this morning.  On the other line with me is my

19 partner, John [inaudible], as well as Stephen Tagert and Carson

20 Bartlett.

21         THE COURT:  And who is on the line for Richard Mast?

22         MR. YERUSHALMI:  Good morning, Your Honor.  This is

23 David Yerushalmi.  And I will be appearing for my client,

24 Richard Mast.

25         THE COURT:  And how about for Kimberley Motley?

1          MR. HOERNLEIN:  Good morning, Your Honor, this is

2     Mike Hoernlein on behalf of Ms. Motley.  I have on the line

3     with me as well Sidney Webb and Samantha Van Winter.

4          MR. BROOKS:  Good morning, Your Honor.  This is Tyler

5     Brooks.  I believe Mr. Boyer is also on the line as well.  We

6     are here for Mr. Osmani.  So we don't anticipate participating

7     in any motions unless Your Honor has some questions for us, but

8     we have no plans to actually argue on any issues.

9          THE COURT:  And how about for Pipe Hitter Foundation?

10         MS. CONTESTABLE:  Good morning, Your Honor.  This is

11    Caitlin Contestable from Chalmers, Adams, Backer & Kaufman.

12    Also on the line is my partner, Dan Backer.

13         THE COURT:  Anybody else on the line who would have

14    any arguments today?

15         Okay.  Well, we are here for four different motions.

16    We have the plaintiffs' motion to compel as to Joshua and

17    Stephanie Mast.  That's at ECF 230.  We also have Joshua and

18    Stephanie Mast's motion to stay discovery at ECF 237, and Pipe

19    Hitter Foundation's motion to quash the subpoena.  That's at

20    ECF 256.  Then we have Richard Mast's supplemental motion to

21    compel, which is ECF 289.

22         I'd like to start off with Joshua and Stephanie

23    Mast's motion to stay discovery.  Mr. Francisco, that is your

24    motion.  So I'll hear from you first.

25         MR. FRANCISCO:  Good morning, Your Honor.  And I'm

1  glad that the Court started with the motion to stay discovery

2  because we think it's the most sensible resolution, frankly, to

3  all these pending motions, as well as the two other motions to

4  compel that have already been filed that aren't even set for

5  today's hearing.

6          Notably, in addition to the reasons in the briefing,

7  I would like to let Your Honor know that the Court of Appeals

8  in Virginia has now scheduled oral argument in the appeal of

9  the parallel state case.  That case has been fully briefed, and

10  argument is set for November 14th.  There was some disagreement

11  in the briefing about whether the state case would be

12  proceeding quickly or not.  But from our view, Your Honor, all

13  of these discovery fights are premature.  This case hasn't been

14  moving forward on the merits.  It's almost a year ago that the

15  complainants filed.  We filed a motion to dismiss that we think

16  has merit, and the Court simply hasn't taken action on that.

17  And the parties have willingly bumped the trial date twice I

18  believe in recognition that this case should not be moving

19  forward until the important legal questions about who Baby

20  Doe's legal parents are under Virginia law and the related

21  issues are fully resolved.  Those are obviously hotly disputed

22  in the state court case.  I won't bore you with the details of

23  it, but suffice it to say that the ultimate outcome of that

24  state court litigation is clearly going to be dispositive of,

25  and argue every issue in this case.  And even if it weren't

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  dispositive of every single issue, it would certainly

2  materially change the case.  Just as a simple example, if the

3  court case ultimately holds in Virginia as a matter of Virginia

4  law the Masts are the legal parents of Baby Doe, you can't

5  falsely imprison your own daughter, just as one simple example.

6       So we think that there is solid basis.  There is

7  clear legal case law supporting the reason that this Court has

8  discretion to stay discovery at this time.  While we think the

9  stay should be contingent on the ultimate outcome of the state

10 court litigation, if nothing else, Your Honor, I think the stay

11 could be of a specific duration that would allow us to get past

12 the Court of Appeals process in state court, and then it could

13 obviously be reassessed depending on the outcome of that and

14 which direction it's going.  But we think it's a waste of

15 judicial resources for anybody to be litigating all of these

16 issues when there's already been a 19,000-page record produced

17 in the state case.  That doesn't even include all the

18 discovery.  So it's not as if the plaintiffs here don't have

19 the key documents and understanding of what's going on.  This

20 is purely derivative.

21       THE COURT:  Anything else, Mr. Francisco?

22       MR. FRANCISCO:  I also intended to mention the

23 prejudice factors I think weigh particularly strongly in favor

24 of a stay.  And if you look at the plaintiffs' response on

25 prejudice, they offer nothing about documents being lost or the

1  need to proceed with the merits of this case.  They invoke

2  concepts of custody, which frankly are inappropriate in this

3  tort lawsuit.  And there's nothing in the prejudice factor that

4  would weigh against providing a stay of discovery of all these

5  matters.

6              THE COURT:  All right.  Thank you.

7              Ms. Eckstein or Mr. Powell, would you like to address

8  this motion?

9              MS. ECKSTEIN:  Yes.  Thank you, Judge Hoppe.  This is

10 Maya Eckstein.

11             Your Honor, we would of course urge you not to enter

12 a stay in this case.  We have been down this road before.  The

13 arguments that Mr. Francisco and Joshua and Stephanie Mast make

14 in support of the stay are duplicative of the arguments that

15 they made in their motion to dismiss, arguing that the case

16 should be dismissed or stayed in favor of the state court case.

17 But Judge Moon has that issue before him, and he has not

18 dismissed or stayed the case in favor of the state court case.

19 Instead, we have been proceeding with a case.  And contrary to

20 Mr. Francisco's assertion, there has been significant activity

21 in the case.  Every single party, including Joshua and

22 Stephanie Mast, have participated in discovery to some extent.

23 Every party, except for them, has produced documents, with one

24 small exception regarding the Pipe Hitter situation where

25 Joshua and Stephanie Mast produced I believe 11 pages of

1  documents. Every party has responded to interrogatories, and

2  several parties have also responded to requests for admissions.

3  So activity has occurred in the case.

4          To the extent that continuances have been asked for

5  in this case and entered, from plaintiffs' perspective, that

6  has been because of two things: One, we recognize that we need

7  a ruling from Judge Moon on the motion to dismiss to be able to

8  proceed to trial; but second, we can't take depositions without

9  having received all the documents. And because Joshua and

10 Stephanie Mast have absolutely refused to respond to our first

11 request for production of documents, we can't proceed with

12 depositions. And so that has also occasioned the request for

13 continuances.

14         Turning back to the state court case, the idea that

15 we need to wait until there's a decision in that case is

16 elusory for one significant factor: The state court has ruled

17 in that case. The state court -- on May 3rd, the circuit court

18 issued an order that declared the adoption order that Joshua

19 and Stephanie Mast obtained for Baby Doe, declared it void *ab*

20 *initio*. And the court made specific findings. It found that

21 John and Dane Doe, quote, "were de facto parents," end quote,

22 of Baby Doe, and that the relationship they had with her was,

23 quote, "effectively an adoption under Afghan law," end quote.

24         So we have a ruling from the state court. There is

25 no need to wait for anything more from the state court. Now,

1  Joshua and Stephanie Mast, of course they don't like that

2  ruling, so they filed an appeal.  And the Court of Appeals will

3  hear that appeal shortly.  I think it's November 15th, but it

4  may be November 14th, as Mr. Francisco said.  But whoever loses

5  that appeal is likely to appeal further to the Supreme Court of

6  Virginia and possibly beyond that.  So what they seem to be

7  asking for is actually a year's long stay.  And there's no

8  rational basis for that.

9        And while Mr. Francisco is correct, we haven't

10 suggested that documents may be lost or the like, but the case

11 nonetheless needs to move forward.  John and Jane Doe's child

12 was, in their view, abducted more than two years ago.  The

13 state court has already found the adoption order void *ab initio*

14 based on extrinsic fraud committed by the Masts and the

15 violation of our client's due process rights.  So we're still

16 fighting to get her back.  The devastation that our clients

17 feel is palpable.  Joshua and Stephanie Mast and the other

18 defendants need to be held to account for their conduct.  There

19 is no logical basis for delaying this process.

20       In addition, as we argued in our motion to dismiss

21 briefing, this case and the state court case, while related,

22 they are not the same.  This case has different parties,

23 different claims, and seeks different relief than the state

24 court case.  Again, we addressed all of this in our motion to

25 dismiss briefing.  This Court is not being asked to make a

1  custody determination.  No ruling here can conflict with

2  anything stated or held by state court.  And I believe

3  Mr. Francisco said that a resolution in the state court -- the

4  ultimate outcome in the state court case will be dispositive of

5  every issue here.  That is simply not the case.  The fraud and

6  conspiracy allegations claims that we have here, they go far

7  beyond the Masts' fraud in the Fluvanna court.  They go to the

8  fraud committed on the Does themselves.  The Masts obtained

9  physical custody of Baby Doe only because the Masts and their

10  cohorts fraudulently induced the Does to bring her to the

11  United States without ever mentioning the existence of that

12  adoption order.  Had the Does known of it, they would have

13  never set foot on that plane.  And that's alleged squarely in

14  our complaint for both fraud and conspiracy, of course, which

15  is derivative of that claim and others, Paragraphs 162, 163,

16  etc. within that fraud claim -- fraud count.

17          Our claim for intentional infliction of emotional

18  distress also it alleges that our clients cared for Baby Doe

19  for 18 months as their daughter, and that Joshua and Stephanie

20  Mast and the other defendants' fraudulent conduct led them to

21  travel to the United States where they were able to take Baby

22  Doe away from our clients.  No finding by the state court

23  regarding the future custody of Baby Doe impacts that claim.

24  The court's decision in our favor already certainly supports --

25  adds to the support for our claim, but no decision from the

1   state court is actually dispositive of that claim or any claim.

2           And the same goes for the tortious interference of

3   parental rights.  A decision holding otherwise does not fail --

4   it doesn't erase the facts pled by the plaintiffs that they had

5   custodial rights to Baby Doe in Afghanistan up until the moment

6   they arrived at the United States, which is when the defendants

7   interfered with that right.  And that right has been recognized

8   by the United States government.

9           And I will add also that at the Virginia Court of

10  Appeals, the Masts' primary argument is a statute of

11  limitations argument; that the Does cannot attack, cannot

12  challenge the adoption because of the statute of limitations.

13  If the Court of Appeals accepts the Masts' argument -- which

14  they should not and the circuit court did not -- that does not

15  render them her lawful parents.  Maybe they have an adoption

16  order, but that doesn't change the underlying fact regarding

17  how they obtained it, what they did to get it, and what they

18  did to the Does to lead to Baby Doe being in their custody.

19          So, Your Honor, we strongly urge you not to stay the

20  case.  I'll add:  We served the first request for production in

21  this case ten months ago on December 22nd, 2022.  We haven't

22  received a single document from Joshua and Stephanie Mast in

23  response to those requests for production.  They seem to demand

24  more documents from the plaintiff, going so far as to file a

25  motion to compel against us last week, but they apparently

1  don't think the rules apply to them.  We ask you to deny their

2  motion to stay and compel them to proceed with discovery.

3         THE COURT:  Mr. Francisco, anything in reply?

4         MR. FRANCISCO:  Yeah, Your Honor, I'll try not to be

5  overly redundant of what's in the briefs, but I couldn't help

6  but notice that the argument at the end there I think just

7  belied the inability of this federal court proceeding to go

8  forward without interfering and rely on the state court

9  proceedings.  She said there in the argument that whatever

10  happens in the state court case does not render my client, the

11  Masts, lawful parents.  I wrote down the quote as we may have

12  an adoption order, but that doesn't change the underlying facts

13  of who's parents.  And Your Honor, that I think is clearly

14  wrong.  If you have a valid state adoption order, you have the

15  full lawful right as parents, period, full stop.  You can't be

16  held to a $20 million tort case for taking actions to protect

17  your lawful child with a valid adoption order.  I think their

18  attempt to run away from the core of the dispute here

19  completely fails, and that it would be impossible for the

20  federal court to interfere with that state court proceeding.

21         As to the May 3rd order, I think it's worth

22  clarifying -- if it may not be obvious -- that yes, there's a

23  summary judgment ruling on May 3rd, the Fluvanna County

24  collateral attack on the adoption.  We are contesting that on

25  appeal.  But at the same time, the plaintiffs have asked that

 1  court to also -- [inaudible] -- the custody order under

 2  Virginia law, as well as the interim adoption order under

 3  Virginia law, and they have asked for actual custody.  And

 4  they've been rejected on all three of those fronts.  So as it

 5  stands right now, there's ongoing litigation about whether that

 6  final adoption order would be void, and then thus would have to

 7  be reopened or litigated.  But nothing has decided that the

 8  Does have any sort of parental right under Virginia law.  And

 9  obviously when that appeal is pending, we believe we're going

10  to succeed on appeal, and that the adoption order is going to

11  be fully recognized as having been valid from the get-go.

12          I think all of this just highlights the lack of need

13  for discovery at this time.  It's not as if the plaintiffs

14  don't know what the documents are or what my clients said or

15  did.  They've deposed both of my clients.  My clients testified

16  for multiple days of cross-examination, and we've given them

17  virtually every document that's related to this issue of what

18  happened to get Baby Doe adopted by my clients.  And I don't

19  think any of the arguments have changed those facts.

20          THE COURT:  And Mr. Francisco, the production that

21  you're referring to, was that in the state court case?

22          MR. FRANCISCO:  Yes.  And Your Honor, we were -- we

23  believe it's understood from the conferral process that the

24  plaintiffs did not want us to reproduce the exact same set of

25  documents.  And so I think it's a little bit of semantics to

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  say we haven't produced a single document.  We've produced 1.3

2  gigabytes of documents through the state court case.  And if it

3  would satisfy somebody to re-Bates stamp them, it would be an

4  entire waste of time, but I suppose we could do it.  It's just

5  not true to say we haven't produced the documents.  We've

6  produced voluminous documents, and I thought the understanding

7  from conferral was we didn't need to add any Bates label for it

8  to be counted for this case.

9          THE COURT:  I think that's getting into the

10  plaintiffs' motion to compel.  Why don't we address that next.

11          Counsel, I am going to issue written opinions and

12  orders on these motions, but I will tell you that I am going to

13  deny the motion to stay.  I do think that discovery needs to go

14  forward in this case.  Something that I'm concerned about is

15  just how long the stay could possibly be.  Plaintiffs' counsel

16  mentions that there is an appeal.  There could be further

17  appeals in the state court.  It just seems like this case could

18  be stayed for years.  And I do think that that would work a

19  prejudice to the plaintiffs just from the length of the delay.

20  And all the parties are engaged in discovery at this point.  So

21  I am going to deny the motion to stay, and I'll elaborate on

22  the reasons in a written opinion.

23          I would like to move on to the plaintiffs' motion to

24  compel Joshua and Stephanie Mast's discovery responses.

25          Ms. Eckstein, are you going to address that motion?

1        MS. ECKSTEIN:  I am, Your Honor.  Thank you.

2        So with respect to our motion to compel, as I said

3    earlier, we served those requests for production back in

4    December, and we still have not received any documents in

5    response.  Joshua and Stephanie Mast make three arguments in

6    opposition to our motion to compel.  First they argue that

7    we've received enough discovery in the state court case.

8    You've heard that from Mr. Francisco today.  And they also

9    argue that we've -- that our requests for production in this

10   case are duplicative of those from the state court case.  And

11   then finally they argue that the case should be stayed anyway,

12   as we've discussed, not just pending the state court case but

13   also pending resolution of the motion to dismiss.

14       Again, their position, we find it curious.  They

15   apparently don't think they have an obligation to produce

16   documents, but they expect the plaintiff to meet all of their

17   discovery obligations.  They have yet to articulate a legal

18   basis for the special treatment they apparently think they

19   deserve.  But let me respond to each of those three arguments.

20       So first they argue that the plaintiffs have received

21   enough discovery in the state court case.  The argument is

22   baseless for several reasons.  Number one, it just isn't true.

23   Before the circuit court issued its ruling voiding the Masts'

24   adoption order, we, on behalf of the Does, had at least two

25   motions to compel pending against the Masts.  Those are

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1   attached as Exhibits 1 and 2 to our reply brief at ECF 245.

2   The circuit court did not rule on those motions because it had

3   essentially reached the ultimate legal issue and issued a

4   summary judgment ruling.  But the first motion to compel asks

5   the Masts to be compelled to produce documents or

6   communications regarding Baby Doe, John Doe, or Jane Doe that

7   were shared with third parties, including the U.S. government,

8   the Commonwealth of Virginia, or the Afghan government.  Those

9   types of documents are also covered by the requests for

10  production that we served in this case, Numbers 3 through 9,

11  though some of those requests target different types of such

12  documents, or may be broader than what was requested in the

13  state case.

14         The second motion to compel that remains pending asks

15  for responsive communications between Richard Mast -- who is a

16  defendant here and was counsel for Joshua and Stephanie Mast

17  below -- so communications between him and third parties

18  regarding Baby Doe.  Those types of documents are covered by

19  the requests for production that we served here specifically,

20  request Numbers 3 through 17.  And again, those requests are

21  worded differently than in the state court documents.

22         The motions to compel that were pending in the state

23  court case also ask the court to order the Masts to produce a

24  privilege log -- an appropriate privilege log -- identifying

25  each document they were withholding or redacting, and providing

1  the standard details expected of a privilege log.  The one that

2  they had served in the state court case did not meet those

3  standards.  Of course, they have yet to serve any privilege log

4  in this case.  So there can be no question that plaintiffs did

5  not receive, quote unquote, enough discovery in the circuit

6  court case to satisfy the needs of this case.

7          In addition, we know from third party production that

8  there are responsive documents in the Masts' possession,

9  custody, or control -- or that should be in their possession,

10 custody, or control -- that they have yet to produce.  We

11 noticed in the production that we would see from Liberty

12 University which produced emails, evidence, and communications

13 that neither Joshua nor Stephanie Mast ever produced in the

14 state court case.  And we noticed, of course, in the production

15 of the Pipe Hitter Foundation, that situation postdated the

16 state court case, so obviously that information was not

17 produced in the state court case.  And I mention that about

18 documents that should be in the Masts' possession, custody, and

19 control because we do have a concern about the destruction of

20 documents.  As you know from reviewing the papers regarding the

21 Pipe Hitter Foundation motion, we have significant concerns

22 about the destruction of documents, deletion of emails, and the

23 like.  But regardless, plaintiffs certainly have not received

24 enough discovery in the state court case to satisfy the needs

25 of this case.

1    So with respect to the second argument that Joshua

2 and Stephanie Mast make, that plaintiffs' requests for

3 production are duplicative of those from the state court case,

4 that also is not true for several reasons.  First, we served

5 several requests for production that are different from or

6 broader than those served in the state court case.  There are

7 at least nine requests for production that we served that have

8 no state court analog.  That's Numbers 12, 13, 18, 19, and 24

9 through 28.  And there are at least six requests for production

10 that we served in this case that ask for a broader set of

11 documents than those in the state case.  And those are requests

12 for production Numbers 5 through 9.

13    Second, if the state court production of Joshua and

14 Stephanie Mast satisfied their obligations to respond to

15 requests for production that we served in this Court, they

16 would say so and represent that they fulfilled their discovery

17 obligations.  They have not done that, and it's because they

18 cannot do that.  In fact, on page 2 of their opposition brief

19 at ECF Number 236, they admit that there is still, quote

20 unquote, extensive discovery to be had.  So they have not

21 fulfilled their discovery obligation in this case.  Our RFPs --

22 requests for production -- are not nearly duplicative of what

23 was served in the state court case.  And we have not received,

24 quote unquote, enough discovery from the state court for the

25 needs of this case.

1          With respect to their third argument regarding

2    discovery being stayed, we've already addressed the issue as to

3    the state court action.  I think we've already addressed the

4    issue as to -- [inaudible] -- as well.  As this Court is well

5    aware, a party doesn't get to just ignore discovery absent a

6    stay of discovery issued by the Court.  The pendency of a

7    motion to dismiss does not relieve a party of its obligation to

8    participate in discovery.  And Judge Moon heard arguments on

9    the motions to dismiss in February, almost eight months ago.

10   The subject of the stay was discussed at that hearing.  If

11   Judge Moon thought a stay was appropriate, I would assume he

12   would have entered one by now.  He has not.

13         So in short, Your Honor, we would ask the motion to

14   compel Joshua and Stephanie Mast to respond to our requests for

15   production that have been pending for more than ten months.

16         Thank you.

17         THE COURT:  Ms. Eckstein, as to any documents that

18   Joshua and Stephanie Mast did produce in the state court case,

19   does your agreement stand that they would not need to

20   re-produce those in this case?

21         MS. ECKSTEIN:  Yeah.  Yes, Your Honor, our agreement

22   was that they do not need to re-produce them in this case

23   unless we identified specific documents that we need

24   re-produced.  And I mention that because in the state court

25   case, documents were produced without metadata.  And there may

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  be some specific documents for which we would like the

2  metadata, but those are not going to be extensive.  It would be

3  few.

4  THE COURT:  Okay.  All right.  Thank you.

5  Mr. Francisco, are you going to address this motion

6  for your clients?

7  MR. FRANCISCO:  Yes, Your Honor.

8  Your Honor, the difficulty with this motion to compel

9  is they haven't identified anything specific that they need or

10  want that they don't have.  They have just generally said that

11  you should enter an order telling us to comply with discovery.

12  And I think that's for good reason.  They have virtually all

13  the documents that relate to the key disputed facts in this

14  case.

15  For example, she relies upon the never-decided,

16  taken-under-advisement motions to compel in the state case

17  related to discovery with third parties for Richard Mast's

18  communication with third parties.  Your Honor, there were many,

19  many documents with third parties that were produced already.

20  That motion to compel was not well received largely because it

21  wasn't specific.  And our position was that we had produced the

22  communications with third parties, everything from Liberty

23  University to the Virginia Attorney General's Office, to Ted

24  Cruz's office, other congressional offices, the vice

25  president's office.  I mean, there were many, many, many

1  communications with third parties that were produced.  And my

2  understanding of the gist of the motion was that they weren't

3  sure we had produced everything, but that's different than

4  saying we haven't produced documents with third parties.  And

5  we have asked them in the conferral process to just identify

6  for us what it is they think we have that we haven't given

7  them.  And we just haven't been able to get anything specific,

8  and their motion doesn't have it.

9          I would note on the Pipe Hitter's matter, Your

10  Honor --

11          THE COURT:  Before you move on to that,

12  Mr. Francisco, it may be that it's difficult for the plaintiffs

13  to identify specifically what you haven't provided because your

14  objections are kind of general and you haven't said

15  specifically what you're withholding.

16          So it's -- I agree there needs to be sort of more

17  work done by both parties to make sure that the discovery is

18  being produced.  And the plaintiffs have said that you don't

19  need to re-produce discovery that's already been provided in

20  the state court case.  I think it's really incumbent upon you

21  to identify what you're withholding pursuant to any objections,

22  or to produce the discovery now that the stay has been denied

23  or will be denied in the written order.

24          MR. FRANCISCO:  Well, I think I'd like to say two

25  things to that, Your Honor.

1          Number one, it really is not as if there is a simple
2    button I can switch on and off to produce everything in the
3    universe.  And really what we're talking about, just to be
4    clear, is a very burdensome process of re-producing and
5    reviewing a vast amount of data and looking at phones to see if
6    maybe a few documents here and there were missed in the
7    production.  We don't believe they were, but I'm not going to
8    certify to a court that I guarantee that there is not one or
9    two emails that might have been missed at first production.  We
10   don't think they would be material at this point if they were.
11   But if that's what the Court is going to order, then obviously
12   we'll have to endeavor to do that.

13          But I also want to note that I don't think this is
14   ready for an order to produce along those lines.  For example,
15   she lists just in broad numbers specific requests they don't
16   think overlap with the state case, but many of those, our
17   objections are entirely valid and appropriate.  They asked us
18   to produce all the files related to the JDR -- the juvenile and
19   domestic relations court matter -- as well as the adoption
20   court matter in the state case.  But Your Honor, they well know
21   that by statute those are confidential and sealed; and, in
22   fact, they filed a motion to intervene in that adoption case
23   itself and have been denied access to the records.  So that's
24   not even a good faith request.  We can't possibly give them
25   those documents.  That's just an example of some of the things

1  that they're identifying as being outside the Fluvanna County

2  collateral attack proceeding.  And they're just not categories

3  that even legally could be produced.

4         THE COURT:  Well, I'll tell you something that would

5  help me in resolving really the substance of this discovery

6  dispute; if there are any legal arguments, like the one you

7  just made about whether your clients can be required to produce

8  documents from the adoption or JDR, is to really focus in on

9  those arguments.  We can I think dispense with some of the

10 other broader ones related to the motion to stay.  But what I

11 really want to know from the plaintiffs and from you,

12 Mr. Francisco, what are the -- what are some of the specific

13 objections to particular requests so that I can resolve those,

14 if necessary.  I don't think that we have that at this point.

15 So really I would -- I would want you all to kind of confer

16 further.  I want to think about how to fashion this in an

17 order, but I do think that there needs to be something by way

18 of supplemental responses from you to the discovery requests so

19 that we can really narrow some of the issues, because right now

20 it's just kind of a wholesale objection to all of the requests,

21 as I understand it.

22        MR. FRANCISCO:  Your Honor, I think we have some

23 specific requests.  I don't disagree that in light of the

24 Court's ruling that some further refinement may be in order,

25 but I do want to point out that I think the refinement needs to

1  be on both ends.

2          For example, we do have a specific objection to many

3  of these requests that it's duplicative and ultimately

4  burdensome and cumulative.  Just one point of that, their

5  second request is just a blanket request for all documents from

6  any person or any entity relating in any way to the circuit

7  court matter.  I mean, that's more than 20,000 pages plus in

8  the universe, and we believe they already have most of it.  And

9  I think that's the type of broad request that is appropriately

10  under Rule 26 cumulative and duplicative of what they already

11  have.

12          I think they -- if the requests were more pointedly

13  refined, it would be much easier for us to respond and assess

14  the burden of what might potentially be out there.  And then,

15  of course, we could make the specific objections from that

16  point.

17          THE COURT:  I think your point is well taken as to

18  that request.

19          MS. ECKSTEIN:  Your Honor --

20          THE COURT:  Yes, Ms. Eckstein, go ahead.

21          MS. ECKSTEIN:  I just wanted to respond to two points

22  that Mr. Francisco made.

23          Mr. Francisco first said there's not a button he can

24  switch on or off to produce everything, or something to that

25  effect, and referenced a burden to re-produce everything and

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  re-review phones.  I want to make it clear; that's exactly what

2  the plaintiffs have done.  We have what we call a refresh where

3  we've refreshed our collection of our clients' phones, and we

4  refreshed our collection altogether to ensure that it was

5  complete.  And it was burdensome.  It continues to be

6  burdensome.  But we're doing it because that's what's needed

7  for this litigation.

8          And second, Mr. Francisco said that we do not have

9  access to the adoption file.  That is absolutely incorrect.

10  The Court granted us access to the adoption file.  We have the

11  complete adoption file.  To the extent that his clients have

12  additional documents relating to that adoption file, that is

13  covered by the various requests for production.  We don't need

14  him to re-produce the adoption file itself that we already

15  have, but other requests for production touch on the adoption

16  file itself.

17          THE COURT:  Okay.  Well, as to this motion, you know,

18  I'm going to grant it.  And I'll work this out in an order, but

19  I'm going to -- really am going to want you all to confer as to

20  the production, and I'll provide some further guidance in a

21  written order on this motion.

22          All right.  The next one I'd like to take up is

23  Richard Mast's supplemental motion to compel.

24          Mr. Yerushalmi?

25          MR. YERUSHALMI:  Yes, Your Honor.  David Yerushalmi

1  for defendant Richard Mast.

2          The supplemental or renewed motion to compel --

3  however it's nominated -- doesn't have the problems with the

4  motion to compel filed by the plaintiffs that I've just

5  listened to in terms of the back and forth.  Our motion on the

6  one hand is very reserved.  It simply asks that, one, the

7  plaintiffs actually engage in the meet and confer process by

8  going through our July email where we took the time to go

9  through their production and indicate where we thought the

10 documents were missing.  Now, this was back in July.  The

11 plaintiffs did not respond to that at all.  On two occasions --

12 once by phone and once by email -- we were told, well, there's

13 a lot there; we're going through it.  Two months, with all

14 plaintiffs' counsel involved, they could not respond

15 substantively.

16          Two weeks following the filing of the motion they

17 responded with five bullet points saying, Well, it's mind

18 numbing.  Well, of course.  That's what meet and confers are.

19 You go through details, as the Court just indicated to the

20 plaintiffs and to defendant Joshua Mast's counsel.  That's what

21 meet and confers do.  And those five bullet points that they

22 indicated, we point out that even their documents that they

23 claim were responsive were not accurate.  We point that out in

24 detail in our reply brief.  So all we're asking for in the

25 motion to compel as to this point is simply for plaintiffs to

1  do what they should have done sometime during the 60 days

2  preceding the filing of the motion, and what they attempted to

3  do in some small minuscule fashion after the filing of the

4  motion.

5          The second issue that we've sought is to simply

6  organize the documents in some way that identifies what

7  documents respond to what request.  Now, I think this matter

8  has been properly briefed, but just to review, initially

9  plaintiffs took the position that the Does could simply produce

10  the documents in the usual course of --

11          THE COURT:  Mr. Yerushalmi, it seems like the

12  plaintiffs have said that they agreed to do this pairing that

13  you suggest, that they have provided it.

14          Is there any further argument on this that gives you

15  any relief or have you already gotten what you've asked for?

16          MR. YERUSHALMI:  Well, we haven't gotten what we

17  asked for, as we made very clear, Your Honor, in the reply and

18  in the actual motion.  They provided me spreadsheets and we've

19  provided an exhibit, again, as part of the meet and confer

20  process, at which we point out that the spreadsheet itself was

21  not accurate.  It didn't actually address the documents that

22  were responsive to the request in many instances.  Now, I note,

23  Your Honor, that in their opposition brief they didn't take up

24  at all the issue of the inaccuracy in their so-called

25  spreadsheet.  So that very much remains before the Court

1 without any opposition about the so-called spreadsheet that

2 identifies the requests for production of documents and the

3 documents provided.  And that's the second issue.

4 　　　　　The third issue, which is the privilege log -- again,

5 I think this has been laid out before the Court, especially in

6 the reply brief where we point out the claim of reasonableness

7 to have hidden these documents from the U.S. council of

8 Catholic bishops -- Conference of Catholic Bishops -- that

9 those documents were improperly hidden from plaintiffs.

10 They've been improperly hidden from the state court matter as

11 well.  They were only --

12 　　　　　THE COURT:  Did you --

13 　　　　　MR. YERUSHALMI:  I'm sorry, Your Honor?

14 　　　　　THE COURT:  Have those now -- [inaudible].

15 　　　　　MR. YERUSHALMI:  I'm sorry, I just didn't hear that.

16 　　　　　THE COURT:  Sure.  Have you received those documents

17 from the plaintiff?

18 　　　　　MR. YERUSHALMI:  Well, no, we did not receive them

19 from the plaintiffs, Your Honor.  We only received them from

20 the subpoena that we issued on the U.S. -- [inaudible].  They

21 remained on the privilege log until the day before we filed the

22 motion.  And even after that -- after the filing of the motion,

23 at that point there were still three of those documents.  They

24 weren't removed until after the filing of the motion.  And even

25 then they left the document on, which they claim as work

1  product.  But that came from USCCB without any attorney-client

2  relationship whatsoever.  They don't bother to explain how

3  that's not either a waiver or nonexistent work product.  That's

4  certainly a waiver issue.  But they don't bother, in their

5  opposition brief, to take that issue up.  They just simply say,

6  well, it' a draft of --

7          THE COURT:  Mr. --

8          MR. YERUSHALMI:  I'm sorry, go ahead.

9          THE COURT:  Mr. Yerushalmi, are there documents that

10 are still listed on the privilege log that you have not

11 received either from the plaintiff or from a third party?

12         MR. YERUSHALMI:  No.  I have received those

13 documents, Your Honor.

14         THE COURT:  Okay.  Then, I mean, it seems like this

15 issue has been resolved.

16         MR. YERUSHALMI:  Well, no, it hasn't, Your Honor,

17 because we've sought sanctions because this was clearly

18 intentional conduct, and it was not reasonable under the basis

19 that we've indicated.  And the rules state clearly that the

20 Court must issue sanctions when the issue was, quote unquote,

21 resolved only after the motion is filed.

22         THE COURT:  Okay.

23         MR. YERUSHALMI:  I would like to make another point,

24 Your Honor.  And it includes also -- [inaudible] -- and that is

25 at no point in time with all of the documents that we've

1    identified -- and we went through and actually noted some

2    additional documents in the reply brief regarding attachments

3    that appear to be missing, Behavioral Health Services documents

4    that appear to be missing which were referenced but not

5    produced.  There has never been a point in time, except after

6    the motion was filed, that plaintiffs in fact abided by the

7    rules which require that to identify a time -- a reasonable

8    period of time to produce the documents.  We were told early on

9    before the original motion to compel that they would produce

10   the documents on May 5, not a rolling production.  They would

11   just produce the documents.  On May 4th, as the motion -- the

12   original motion to compel set out, we were told, Well, we're

13   ready to produce the documents.  And that was the only time

14   that they've actually mentioned rolling production.  I think I

15   indicated in my reply brief that we hadn't been told of a

16   rolling production.  In preparation for this hearing I saw that

17   email, and it reminded me.  That was the first time, but they

18   don't indicate when they're going to actually conclude their

19   rolling production.  They said to the Court in their filing on

20   our motion to compel they would produce those documents

21   immediately upon the Court's entry of the discovery protective

22   order.  That never happened.  And indeed, we're now told, only

23   after the filing of our motion to compel, that, Well, Gee, Your

24   Honor, we can conclude the rolling production within 60 to 90

25   days.  Our request for production was served on the plaintiffs

1  on March 14th, and now we're told that we're going to get some

2  additional documents.  Now, we don't know whether those are

3  going to be newly created documents, which the motion

4  doesn't -- [inaudible].  When those documents are produced, if

5  they're newly created, we'll deal with those.  That's standard.

6  You supplement your production as new documents are created.

7  But we're not talking about new documents.  They've produced

8  documents in their rolling production, including up until and

9  after the motion to compel, that were in the attorneys'

10 possession because they were their own emails for over a year

11 without any explanation why those documents were not produced.

12         Your Honor, this is not simply a case of plaintiffs

13 being overburdened.  We had extensive meet and confers.  They

14 had objected to -- [inaudible] -- documents on 37 of our

15 requests.  We resolved 35 of those, either that they would

16 produce, they would produce a limited version of our request

17 for production, or they would not produce over our objection.

18 But we had those extensive discussions, but they came to naught

19 because the plaintiffs, when they did produce documents,

20 produced them as a document dump.

21         I just want to address the metadata argument.  I

22 think we pointed out the metadata can be very useful, and in

23 some cases can be all that's needed, but certainly not in this

24 case because we don't know all the parties.  We don't know all

25 the custodians.  We don't know what keywords they searched.

1  What we also know is that even with their own metadata, they

2  have not been able to accurately place documents for request

3  for production, at least to this point.

4          So we renew our request for an order to compel that

5  plaintiffs go through the email, and to confirm or deny that

6  there's documents.  If there's no documents, tell us.

7          THE COURT:  Mr. Yerushalmi, you just mentioned that

8  during an extensive meet and conferral process that you worked

9  out 35 of 37 issues with the plaintiffs, and that they produced

10 documents.  I understand that you argue it was a document dump.

11 I also understand that that was part of the meet and conferral

12 process that you raised that, and the plaintiffs provided a

13 spreadsheet that you have some issues with, but that was part

14 of it.

15          Is this -- is resolving the 35 of 37 issues, were

16 some of those raised in your July 14th email?

17          MR. YERUSHALMI:  Yes, Your Honor, because the

18 documents --

19          THE COURT:  How can you argue that they haven't

20 responded to your email in any way when you describe that an

21 extensive meet and confer process resolved almost all the

22 issues?  They produced a spreadsheet.  It seems like you're

23 arguing they haven't done anything or have never responded to

24 your July 14th email.  It seems like they have, perhaps not in

25 the way you wanted them to, but the conferral process doesn't

1  say that you have to respond to bullet points on -- to any

2  email that was sent.  I mean, there has been a meaningful

3  conferral process here.

4           MR. YERUSHALMI:  Your Honor, I have to say I'm

5  confused by that.  And I'm confused because the briefing on

6  this motion sets out very clearly the timing.  The conferral

7  process was relatively early on.  It was concluded.  Then as we

8  went through -- before any documents were produced, then they

9  began a production.  When we went through their production, we

10 saw that there were lots of documents that were obvious to us

11 were not produced, which they said they would produce.  So what

12 did we do?  We did what the rules required.  We produced a meet

13 and confer email and sought conference on those issues.  Then

14 they proceeded for 60 days to ignore that.  Now, if that's not

15 a violation of the discovery rules, I don't know what is.

16 That's not a reasonable or good faith response.  And this has

17 all been laid out in the briefing on this motion, Your Honor.

18          And in addition, I would add that the responses by

19 Your Honor to the defendants Joshua and Stephanie Mast on the

20 motion to compel by plaintiffs indicates that, indeed -- and,

21 of course, the rules require -- that, indeed, the responding

22 party does have a duty -- and a good faith duty -- to respond

23 to the meet and confer process where we took enormous amount of

24 time to identify documents that we thought were missing.  And

25 all we asked for was confirmation, yay or nay, do those

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  documents exist?

2         And I come back to the so-called spreadsheet that

3  Your Honor mentioned.  It is inaccurate.  We indicated that in

4  an email during the process prior to filing a motion, and they

5  simply did not respond to it.  And, indeed, even in their

6  opposition brief, they have not responded to the inaccuracy of

7  that spreadsheet.  That argument by them would be waived in any

8  other situation.  I'm not sure why it wouldn't be here.

9         So again, Your Honor, this is not reasonableness.

10  This is a matter that requires a sanction and certainly an

11  order requiring them to respond to the July 14th email, and to

12  tell us, yes or no, we've produced those documents; or to say,

13  well, your bullet points 1 through 15 are simply inaccurate,

14  and here's why.  I'm willing to live with that, but they

15  haven't done any of that.

16         Thank you, Your Honor.

17         THE COURT:  All right.  I'll hear from plaintiffs'

18  counsel.

19         MS. ECKSTEIN:  Thank you, Your Honor.  Maya Eckstein

20  again.

21         Your Honor, plaintiffs have conducted themselves

22  appropriately in all respects with discovery.  We have produced

23  more than 1,400 documents, the majority of which were produced

24  in our initial production back in I believe May or June.  We

25  continue to review and produce additional documents on a

1  rolling basis.  We also produced a privilege log, which was

2  quite small.  I believe it had only 13 documents logged on it.

3  And when we learned that information was otherwise not

4  privileged, we produced those documents -- removed them from

5  the log and produced those documents.  Our privilege log today

6  has only three documents on it.  We have not refused to produce

7  any document relevant to our parties' claim or defense in

8  litigation.

9          So let me address the specific arguments made by

10  Mr. Yerushalmi.  Number one --

11          THE COURT:  Ms. Eckstein, before you do that, are

12  there any documents that you're withholding at this time or

13  areas that you just haven't been able to get through yet to

14  make a production?

15          MS. ECKSTEIN:  We have additional documents that are

16  responsive that need to be produced, and we're preparing those

17  production.  But we are not -- to answer your question more

18  directly, we are not withholding documents that -- other than

19  what we have said in our objections that we will not produce

20  documents.  There are a few -- there are some RFP -- requests

21  for production -- where we said we will not respond, but the

22  majority of them we said we are going to produce.

23          THE COURT:  All right.  And when do you anticipate

24  making this additional production?

25          MS. ECKSTEIN:  As we said in the brief, it will be

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1    made within 30 to 60 days at the most, at the latest.  And the

2    reason I say that is because with the re-collection of our

3    clients' mobile phones, we have a lot of documents that are in

4    a foreign language, and those simply take more time to produce

5    and -- more resources to review and then produce, I should say.

6           THE COURT:  Have you told Mr. Yerushalmi which -- if

7    you know -- which requests that these productions would be

8    responsive to?

9           MS. ECKSTEIN:  I believe we have given him some of

10   that information.  I don't know if we've given him all of that

11   information.

12          THE COURT:  Okay.  Go ahead.

13          MS. ECKSTEIN:  So -- and again, we took the position

14   that we produce documents as they're maintained in the ordinary

15   course of business.  But separate and apart from that, we did

16   more than that.  As you noted, we produced a chart on

17   August 3rd that paired each document that by then had been

18   produced -- that's more than 1,200 documents -- with one or

19   more of Mr. Mast's -- Richard Mast's -- requests for

20   production.  That's attached as Exhibit D to our opposition

21   brief.  Mr. Yerushalmi identified a handful of instances -- out

22   of thousands -- a handful of instances in which he believes

23   that our documents weren't properly paired.  We don't dispute

24   that we may have gotten a few pairings wrong, but that is not

25   the basis for a motion to compel.

1           In addition to that, we produced searchable

2    metadata -- fully searchable metadata, various fields -- to,

3    from, cc, subject, accept date, receive date, custodian,

4    others -- are fully searchable in the metadata.  Mr. Yerushalmi

5    complains that he doesn't know what to search for in the

6    metadata.  I have to say that strains credulity.  His client,

7    Richard Mast, has been involved in this situation since 2019.

8    He knows the key players, the key names, the key officials, the

9    key government actors, the keywords to search for.

10          In addition to that, we offered to re-produce our

11   entire production as fully searchable TIFFs.  That's actually

12   how Mr. Mast's requests for production asked for the documents

13   to be produced.  So we were prepared to do that.  But

14   Mr. Yerushalmi asked us to instead produce them as PDFs, and so

15   we did.  But nonetheless, to resolve this dispute, we offered

16   to re-produce everything as fully searchable TIFFs.  He

17   declined.  He cannot now claim prejudice for his own refusal to

18   accept fully searchable documents.  And the Court has held that

19   the production of fully searchable documents satisfies Rule 34,

20   and that's in the *DE Tech case versus Dell* that we cited in our

21   brief.

22          With respect to supposed failure to produce documents

23   in the July 14th email, Mr. Yerushalmi ignores that he told

24   us -- as reflected in Exhibit D to our opposition brief -- that

25   if we, quote unquote, paired our document production with his

1  requests for production, we would resolve, as he said, most of

2  the issues.  And so we did that.  I recognize he isn't happy

3  with our pairing of documents by identifying a small handful of

4  documents he thinks are inappropriately paired, but there are

5  1,200-some documents on that pairing chart.

6          And in addition, to the extent that he continues to

7  complain that we have withheld documents, he does so without

8  specificity, which documents and on what basis.  In his reply

9  brief he identifies only one, a document he asserts should have

10 been attached to our Bates Number 4810.  Now that he's given us

11 that information, we will look for it; and if we have it, we

12 will produce it.  If he identifies with specificity what else

13 he believes is missing, we'll respond, but we can't do it in

14 the ether.

15         And as to the July 14th email, it does not provide

16 specificity.  It's a jumble of references to statements made

17 elsewhere, but it does not identify the documents that

18 Mr. Yerushalmi believes are missing; or to the extent that it

19 does to some extent it is often wrong, as we showed in our

20 opposition brief.  Mr. Yerushalmi identifies a couple of

21 documents with respect to the first bullet point in our brief

22 about his July 14th email that we may have misidentified.  But

23 we identified many others in that opposition brief as to other

24 RFPs -- requests for production -- as well.

25         Now, with respect to the privilege log issue, Your

1   Honor, we explained in our brief the reasonable basis on which

2   we make decisions regarding privilege as they apply -- or we

3   understood them to apply to Martha Jenkins and Carolina

4   Velazquez.  We did that based on the content of the documents,

5   as well as discussions with our clients and discussions with

6   Ms. Jenkins herself.  Once we learned from USCCB -- the U.S.

7   Conference of Catholic Bishops -- that they did not view the

8   documents as privileged -- that they did not view as privileged

9   documents prepared by those individuals while they volunteered

10  for USCCB, we withdrew the privilege assertion and we produced

11  the documents.  So I think, as you have noticed, that issue is

12  resolved.  There are no documents on our privilege log today

13  that have not been -- that he claims should be produced.  And

14  I'll just note for the record he claims that we were hiding

15  these documents.  We logged the documents on a privilege log.

16  They were not hidden.  They were logged.

17          In addition, Your Honor -- let me just look at my

18  notes really quick and make sure there's nothing else I need to

19  add -- with respect to the request for sanctions, Mr. Mast has

20  not even attempted to make the showing required to be entitled.

21  Under Rule 37, our conduct has been substantially justified and

22  in good faith, and fees in this situation certainly would be

23  unjust.  We produced a chart pairing thousands of documents to

24  Richard Mast in requests for production.  We produced

25  searchable metadata.  We offered to re-produce fully searchable

1  TIFF images of our entire production, and Mr. Mast declined.

2  And we made privilege assertions in good faith, and we withdrew

3  them after -- [inaudible] -- otherwise.  There simply is no

4  basis for fees.

5          And I'll add, as Mr. Yerushalmi has noticed, we had

6  hours of meet and confers with Mr. Yerushalmi on these issues.

7  And I'll say he specifically said that we ignored his July 14th

8  email for 60 days.  That simply is not true.  There are

9  numerous email correspondences back and forth after that email

10 about that email.  We responded to that email.  He simply did

11 not like our response.  I get it.  I understand, but that's not

12 a basis to say that we ignored the email.

13         And finally, Your Honor -- and particularly as it

14 goes to the issue of sanctions, what is the prejudice here?

15 How has Mr. Richard Mast been harmed by the manner and pace of

16 our document production?  He has not identified any prejudice.

17 As I said, we've produced 1,400 documents.  We will continue to

18 make the rolling production.  And as you know -- I think we're

19 going to talk about that today as well -- we don't have an

20 active schedule in the case.  We moved for continuances; again,

21 largely because we couldn't take depositions without documents.

22 Hopefully that's going to be resolved soon.  And when the Court

23 sets a new schedule, the parties hopefully will proceed

24 accordingly.

25         So with that, Your Honor, we ask you to deny the

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  motion to compel.

2         THE COURT:  All right.  Mr. Yerushalmi, anything

3  else?

4         MR. YERUSHALMI:  Yes, Your Honor.  I would just like

5  to respond at a relatively high altitude to what I've just

6  heard from plaintiffs' counsel; and that is, number one, there

7  was an extensive meet and confer.  But following our July email

8  where we laid out documents that we had good reason --

9  reasonable basis to believe had not been produced, there has

10 been no substantive meet and confer.  Ms. Eckstein references

11 emails back and forth.  There was an email or two that said,

12 Well, Gee, it's a lot of work.  You know, we'll get to it when

13 we get to it.  We had a phone call to the same effect.  There

14 has never been any substantive discussion of that email.

15         Number two, Ms. Eckstein references this notion that

16 we haven't identified with specificity documents that were

17 missing.  Well, we can't know what's missing until they respond

18 to the evidence that we bring forth that indicates by

19 implication and inference that documents have not been

20 produced.  And all they had to say was:  We've given you

21 everything.  But we now know, of course, because they claim

22 that there's this rolling production.  Your Honor asked

23 Ms. Eckstein directly:  Well, have you identified what requests

24 for production are still going to be substantive in this

25 rolling production?  Ms. Eckstein gave some kind of ambiguous

1  answer, as I understood it.  But I will be absolutely clear on

2  this point.  Nothing has been said about what requests, only --

3  and the only indication of this rolling production in 60 to 90

4  days, the only indication -- there's no email, there's no

5  indication other than that May 4th letter from Mr. Elliker --

6  except what Your Honor can read in the opposition brief.

7  That's all I know about the rolling production in 60 to 90

8  days.

9              And then finally I want to just address -- well,

10 actually, there's two more issues -- the issue of identifying

11 of the documents.  Ms. Eckstein seems to suggest that I should

12 go to all of the work, after we went through a good number, and

13 the first ones that we went through were simply inaccurate.

14 And Your Honor doesn't have to go through that spreadsheet to

15 see that.  Your Honor can look at our reply brief that as we

16 point out in their five bullet points, there are ultimate

17 examples of why our July 14th email was inaccurate.  The

18 documents that they claim were responsive -- and they cite to

19 them -- aren't responsive, and we explain exactly why in our

20 reply brief.

21             Finally, I want to just come to this privilege log

22 issue, because this is certainly sanctionable; and that is the

23 claim that this was reasonable behavior.  They got these

24 documents from a third party through their general counsel, an

25 attorney.  They, when they received these documents, said, Oh,

1  Gee, these are privileged attorney-client communications.  They

2  didn't bother to recognize that the USCCB never asked for a

3  waiver.  If the general counsel had any understanding that

4  these were privileged, of course that's what he would have done

5  from them; before I can produce them to you and your client, I

6  need your client to give me a waiver.  He didn't do that.  That

7  would have been a huge red flag to any responsible lawyer.

8        The second thing, when they received these documents,

9  they didn't bother to pick up the phone or write a letter and

10 say, Gee, general counsel, you better not produce these to

11 anyone else because we consider them privileged.  And they were

12 hidden because they were never produced.  And they were never

13 put on a privilege log, as I understand it, in the state case.

14 It was only in this case, and only to our agitation did we get

15 them on a privilege log, because their first privilege log

16 didn't include anything.  Then they -- in addition to not

17 contacting USCCB and asking them to not produce these documents

18 to any third party because they consider them privileged, they

19 didn't bother to call the general counsel and say, Why did you

20 produce these?  Aren't they privileged documents?  They didn't

21 bother to do that.

22        Now we're told -- by the way, in their opposition

23 brief, we weren't told anything about a conversation with

24 Ms. Jenkins, the client.  Ms. Eckstein now adds only here at

25 the oral argument, not in the opposition brief, Oh, and by the

1  way, we even talked to Ms. Jenkins and our client.  Well, what

2  did they say?  Did Ms. Jenkins -- a Wyoming licensed lawyer and

3  not a Virginia Commonwealth lawyer -- did she say, Yeah, I was

4  acting as a lawyer.  We had an attorney-client relationship.

5  Did Ms. Velazquez -- who was a social worker for the USCCB --

6  indicate, well, you know, I was in on all these conversations

7  because I'm employed separately by Ms. Jenkins as a lawyer.

8  That was not the case.  And of course, they didn't speak to

9  Ms. Velazquez.  Again, if that is reasonable behavior to

10 identify -- as the Fourth Circuit points out, if you're going

11 to claim a privilege, you have the burden to establish those

12 prima facie elements set out in the reply brief.  If what the

13 plaintiffs' counsel did in this case is reasonable behavior,

14 then I've missed something for the past 40 years.

15         Thank you, Your Honor.

16         MS. ECKSTEIN:  Your Honor, may I respond briefly to

17 two points with respect to the privilege log issues?

18         THE COURT:  Yes.

19         MS. ECKSTEIN:  Thank you.

20         With respect to the receipt of the documents from the

21 USCCB, in the state case we subpoenaed the USCCB, and they

22 produced the documents to us; in other words, USCCB produced

23 the documents to the privilege holder, or what are we thought

24 was the privilege at that point.  There was no waiver issue as

25 a result of the USCCB giving those documents to us as we were

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  what we understood to be the privilege holder.

2          And second, my last point is Mr. Yerushalmi just said

3  these documents were not on the privilege log in the state

4  case.  That is absolutely wrong.  They are absolutely on the

5  privilege log produced in the state case.

6          THE COURT:  Mr. Yerushalmi, it is your motion.  So if

7  there is anything you want to say on those last two points, you

8  may.

9          MR. YERUSHALMI:  Okay.  Since you've invited me, Your

10  Honor, I shall, and only on one of the points.  And that is, if

11  the general counsel of the USCCB was going to produce

12  documents, it didn't matter whether it was the plaintiff and

13  his client herself or himself; he would still be required

14  before he produced those documents under subpoena to ask for a

15  waiver because he doesn't know what the client has agreed new

16  counsel should see or not see.  He doesn't know who else they

17  might represent.  The fact remains is that would have required

18  a waiver.  But at the very least, when they saw that he was

19  producing documents pursuant to a third-party subpoena and they

20  considered those privileged, and he didn't identify them as

21  privileged, he just produced them, they would have responded

22  back to him as responsible lawyers and said, Hey, we appreciate

23  this, but in the future, these are privileged.  They are not

24  subject to production precisely because they're privileged.

25  They didn't, because, in my view, they understood they weren't

1  privileged.  But we'll leave that for the Court to decide.

2          Thank you, Your Honor.

3          THE COURT:  All right.  Thank you.  I will address

4  this motion in a written order as well.

5          All right.  That brings us to the final motion.  And

6  this is Pipe Hitter's motion to quash.  I do want to hear from

7  Joshua and Stephanie Mast's counsel about what seems to be the

8  proposal that's on the table about that there's been some

9  suggestion that would moot this motion; and that is that if the

10  Masts would agree that the declaration in the documents would

11  be admissible and authentic for use at the evidentiary hearing

12  in front of Judge Moon.

13          Mr. Francisco, is that something that you can

14  address?

15          (Pause.)

16          Mr. Francisco, are you still there?

17          MR. FRANCISCO:  I am on mute, Your Honor.  My

18  apologies for that.

19          We have, I believe, stated our position to the

20  plaintiffs before on this.  The documents are largely

21  self-authenticating.  I don't anticipate there is any dispute

22  about these -- [inaudible] -- document.  You know, they could

23  be sought to be used for evidence.  It's just a matter of

24  evidence.

25          As to the declaration, no, we can't agree to that.

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1    We have a right to cross-examination.  There is facts and

2    statements in the declaration that are without any personal

3    knowledge.  It would be highly inappropriate to agree that's

4    somehow admissible as evidence in the hearing.  We don't think

5    the motion itself is particularly necessary; and that if they

6    want to proceed, that's obviously up to the plaintiffs and what

7    they can prove.  But we don't see any reason why we should be

8    asked to agree to hearsay statements being admissible evidence.

9         THE COURT:  But as to the documents, is that

10   something that you can stipulate that the documents produced

11   are authentic and can be admitted into evidence at the

12   evidentiary hearing?

13        MR. FRANCISCO:  I don't have any problem, Your Honor,

14   with authenticity, but I'm not going to make a blanket

15   agreement that they all are admissible because there's

16   relevance considerations and completeness and other evidentiary

17   matters that may come up from these documents.  We're talking

18   600 pages.  If they have specific ones to ask about ahead of

19   the hearing, I'm happy to consider them reasonably.  But I

20   don't think I can make a blanket agreement, particularly when

21   they're talking about sanctions and we think they've got a lot

22   of the facts wrong.  But authenticity is not an issue.

23        THE COURT:  Why don't we go ahead and move into the

24   motion.  It is Pipe Hitter Foundation's motion.

25        Ms. Contestable, are you going to address that?

1      MS. CONTESTABLE:  I am, Your Honor.

2      Pipe Hitter is before the Court today, as you

3  recognized, on its motion to quash or for an entry of a

4  protective order.  Pipe Hitter's has raised a few different

5  bases for having that motion granted, but the focus for today's

6  motion is going to be on the rules of evidence related to the

7  documents and particularly the depositions.

8      As it relates to the depositions, Pipe Hitter's

9  position is that it imposes an undue burden on Pipe Hitter, who

10  is a nonparty to this litigation.  And that nonparty status

11  entitles Pipe Hitter to special protection under the rules.  As

12  articulated in the -- [inaudible] -- versus American

13  International Industries case, a district court's inquiry into

14  the propriety of discovery for nonparties is even more

15  demanding and sensitive than the ones governing discovery

16  generally.

17      And in the *Virginia Department of Corrections versus*

18  *Jordan* case, which is a Fourth Circuit case in 2019, the

19  inquiry is that the requesting party should be able to explain

20  why it cannot get the same information or comparable

21  information that would also satisfy its needs from one of the

22  parties to the litigation.  And here that's exactly what we

23  have.  Pipe Hitter, over the course of a one-month period, put

24  some posts on its website about the Mast matter and undertook

25  fundraising efforts by -- [inaudible] -- and disseminating a

1  few social media -- [inaudible].  The efforts in total raised

2  $2,200, and the Pipe Hitter Foundation contributed a little bit

3  more to give a total of $5,000 to Jonathan Mast on behalf of

4  his brother, Joshua Mast.  As soon as the Pipe Hitter

5  Foundation received the cease and desist letter from plaintiffs

6  and learned about the protective order, it immediately took

7  efforts to comply with the plaintiffs' requests, and stayed in

8  regular communication with plaintiffs' counsel about its

9  actions and its compliance efforts.  It turned over records.

10 And then it created with Dena Disarro, who is the individual

11 for Pipe Hitter Foundation with knowledge of the Mast matter, a

12 115-page -- or a 115-paragraph, 15-page declaration outlining

13 the interactions in chronological order with specific citations

14 to the records that were produced in the document binders.

15 Ms. Disarro also swore that the information contained in the

16 declaration is accurate and truthful to her recollection of the

17 events.  And under this heightened standard, the Court then has

18 to ask whether or not this deposition is necessary.  And our

19 position is that it is not.  In the Virginia Department of

20 Corrections --

21         THE COURT:  You heard the Masts' counsel say that

22 they challenge the accuracy of the declaration, right?

23         MS. CONTESTABLE:  I did, yes, Your Honor; however --

24         THE COURT:  Why wouldn't it be necessary to have --

25 to have a deposition or to have the parties be able to question

1   Ms. Disarro?

2           MS. CONTESTABLE:  Because the plaintiffs can get the

3   information in order for their motion to show cause by using

4   the information provided by Pipe Hitter in a deposition with

5   the Masts.  And the Masts can clarify, based upon the records

6   in the declaration, what information or is not correct.  And

7   the information that is provided by Pipe Hitter is not being

8   offered for the truth of the matter asserted, which is to be

9   raised in a hearsay concern.  It is that the record -- it is

10  that the information -- [inaudible].  And that does not require

11  cross-examination.

12          In the United States versus -- [inaudible] -- case,

13  which is a Fourth Circuit case from 1995, the Court said the

14  letter's physical appearance and contents were sufficient to

15  establish its authenticity.  The authenticity again goes to

16  something that the Court can consider and look at, and the

17  parties can decide and the Court can look at whether or not it

18  wants to move forward.

19          And finally, the Disarro declaration, like I said

20  earlier, she already swore under penalty of perjury that the

21  information that was contained in the declaration is truthful

22  and accurate.  If the Masts disagree with her recitation and

23  her information, they can explain that fact during a deposition

24  where these documents and declarations are used to question

25  that.

1      The -- Your Honor, were you trying to say something?

2      THE COURT:  No.  Go ahead.

3      MS. CONTESTABLE:  Sorry.  There was some feedback

4  there.  I didn't know if that was you.

5      Additionally, I think it's important to recognize

6  that the Federal Rules of Evidence, Rule 1101, applicability of

7  the rules, provides that the Federal Rules of Evidence do not

8  apply in miscellaneous proceedings.  And an example of a

9  miscellaneous proceeding is a preliminary example in a criminal

10  case.  And while this is not a criminal -- certainly not a

11  criminal case, I think that is an instructive example that

12  could be applied here.

13      In the United States -- [inaudible] -- case, which is

14  from the U.S. District Court for the Eastern District of North

15  Carolina, the court -- [inaudible] -- Rule 1101(c)(3) are not

16  an exhaustive list.  To determine whether 1101 encompasses --

17  [inaudible] -- miscellaneous proceeding, you can look at

18  other -- you can analogize -- [inaudible] -- proceedings to a

19  specifically included one.  Here, the preliminary examination

20  of a criminal case is instructive.  It is a review of the fact

21  to determine whether or not to move forward.  And under that

22  circumstance, the rules of evidence would not apply.

23      Here, the circumstance and the posture of the case

24  with this motion matters.  This is a motion for an order to

25  show cause.  It's a motion to begin the process of determining

1  whether or not to initiate contempt proceedings.  That is the

2  exact type of motion that could be construed as a miscellaneous

3  proceeding, and therefore not subject to the rules of evidence

4  that are -- that have been brought up by the plaintiff.

5          And finally, in our motion we raised a number of

6  other jurisdictional grounds that are central to the issue of

7  whether or not the subpoena is valid.  In *United States*

8  *Catholic Conference versus Abortion Rights Mobilization*, a

9  Supreme Court case, the court indicated there that the subpoena

10  power of the court cannot be more extensive than it should.

11  While we're not going to go through the -- all of the subject

12  matter jurisdiction arguments today -- we'll rely on the

13  brief -- I do want to bring up that matter and point the

14  Court's direction to it in deciding whether or not to grant the

15  motion to quash.

16          THE COURT:  Thank you, Ms. Contestable.

17          Ms. Eckstein, are you --

18          MS. ECKSTEIN:  Mr. Powell will.  Thank you.

19          THE COURT:  Mr. Powell?

20          MR. POWELL:  Yes, sir, Your Honor, good afternoon.

21  Lewis Powell for the plaintiffs in response to the Pipe Hitter

22  Foundation's motion to quash.

23          With Your Honor's indulgence, I'd like to back up

24  just a little bit to understand what's really going on here.

25  Let's focus first on what we knew when we filed our second

1  motion to show cause on June 14th, and also on what we did not

2  know when we filed that motion.  After setting the table a bit,

3  I will address the specific arguments advanced by the Pipe

4  Hitter Foundation and one defendant, Mr. Osmani -- the only

5  one, interestingly, to have filed a brief in support of the

6  Pipe Hitter Foundation's motion to prevent us from taking a

7  very focused and very limited deposition regarding its

8  complicity in Jonathan and Stephanie Mast's second violation of

9  the protective order.  Whether that complicity was knowing or

10  unknowing is, for now at least, an open question.  It can only

11  be reliably answered if we are allowed to depose the Pipe

12  Hitter Foundation.

13       Your Honor, as you know, Judge Moon entered a

14  protective order last fall, the specific purpose of which was

15  to protect the identity of Baby Doe for her own and her Afghan

16  parents' protection, and for the protection of their extended

17  family back home in Afghanistan.  Upon learning in early June

18  of this year that Joshua and maybe Stephanie Mast had once

19  again violated the protective order, we promptly moved on June

20  14 for the Masts to show cause why they should not be held in

21  contempt for this second violation.

22       We based our motion on what we then knew.  We knew

23  that an outfit called the Pipe Hitter Foundation had agreed to

24  help the Masts raise money for their defense against the

25  pending state and federal court actions filed by John and Jane

1  Doe, the Afghan parents of Baby Doe.  In the state court

2  action, as you know, John and Jane Doe are seeking to vindicate

3  their parental rights and regain custody of Baby Doe.  In the

4  federal court case here, the Does are seeking specific

5  declaratory relief and substantial money damages.  As

6  Ms. Eckstein noted earlier, different relief, different case.

7        We also knew because on June 6, Joshua Mast's younger

8  brother, Jonathan, had given an on-air interview with One

9  America News Network, during which images of Baby Doe were

10  displayed.  In that interview, Jonathan specifically asked for

11  money to be sent to the Pipe Hitter Foundation to help his

12  brother and sister-in-law.  That interview can still be viewed

13  today via the One America News Network's website.

14        We also knew when we filed the motion for sanctions

15  because the Pipe Hitter Foundation and two of its principals

16  had posted on the Internet what they called the Mast story, all

17  in support of the fundraising.  These postings, like the One

18  American News interview with Jonathan Mast, also included

19  photos of Baby Doe.

20        What we did not know when we filed the motion to show

21  cause, but what we reasonably suspected, was that Joshua and

22  Stephanie Mast were responsible for all of this.  After all,

23  who else would have had the motive to support this publicity

24  and fundraising campaign?  And who else would have had access

25  to all of the photos of Baby Doe that were spread across the

1  Internet by the Pipe Hitter Foundation and One American News?

2  Given the Masts' first violation of the protective order in

3  January when they gave extensive on-air interviews with CBS

4  *This Morning* on two successive days, during which photos of

5  Baby Doe were displayed, the answer to this question seemed

6  obvious.  But we concluded that we needed to take limited

7  discovery to confirm our suspicions.  So we undertook to take

8  such limited discovery from Jonathan Mast and from the Pipe

9  Hitter Foundation.  Jonathan agreed to produce documents and to

10 be deposed.  On July 14th, he produced 39 documents.  Three

11 days later, I took his deposition.

12       We also served a subpoena on the Pipe Hitter

13 Foundation with five specific requests for documents and a

14 demand to depose the Pipe Hitter Foundation regarding seven

15 narrowly tailored topics.  On July 9, the Pipe Hitter

16 Foundation produced 639 pages of documents, but it refused a

17 deposition.  Instead, it provided to us a declaration from its

18 executive director, Dena Disarro.  This declaration is 15 pages

19 long and contains 115 separately numbered paragraphs.  It

20 confirms all of our suspicions regarding the Masts' second

21 violation of the protective order.  Judge, I hope you have read

22 it.  It is Exhibit 2 to the Pipe Hitter Foundation's motion to

23 quash.  While we appreciated Ms. Contestable's effort to avoid

24 the necessity of a deposition, we were concerned -- rightly so,

25 I think -- about the admissibility of the declaration.  After

1  all, it is hearsay.  In particular, counsel for the Masts have

2  had no opportunity to cross-examine Ms. Disarro.  We asked them

3  if they would agree to the truthfulness of the facts set forth

4  in the declaration -- similar to the question you posed

5  earlier, Judge -- and if they would agree to the admissibility

6  of the Pipe Hitter Foundation's documents.  They declined.  We

7  have no quarrel with that decision, but it left us with no

8  alternative but to insist on the deposition.  On July 18, the

9  Pipe Hitter Foundation filed the motion to quash that we are

10 addressing today.

11        Meanwhile, Judge -- and importantly, I think, for

12 context -- by the time the Pipe Hitter Foundation filed its

13 motion to quash, the Masts had responded to our motion to show

14 cause.  Incredibly, on page 6 of their opposition, they said

15 this, quote, "Without proof, John and Jane Doe argue that

16 Joshua and Stephanie Mast must have used Jonathan as their

17 agent and must have provided information to the Pipe Hitter

18 Foundation, but there is no factual support for that

19 proposition," closed quote.  Now, of course, Judge, there is

20 abundant factual support for a motion to show cause.  It lies

21 in three places:  The Disarro declaration, the Pipe Hitter

22 Foundation's documents, and Jonathan Mast's deposition

23 testimony.

24        Now, in its motion to quash, specifically its Rule 45

25 argument, the Pipe Hitter Foundation argues on page 4, quote,

1  "Requiring Pipe Hitter to provide live deposition testimony

2  would be unduly burdensome, expensive, cumulative,

3  disproportionate to the needs of the plaintiffs' motion to show

4  cause, and otherwise improper under Rules 26 and 45," closed

5  quote.

6          Really?  These conclusive assertions are entirely

7  unpersuasive.  We have assured Ms. Contestable that our

8  examination would not exceed four hours.  I suspect it will be

9  much shorter than that.  After all, we already have the lengthy

10  declaration.  So the witness has obviously been thoroughly

11  prepared already.  Any additional expense would be minimal,

12  especially compared to whatever it has cost the Pipe Hitter

13  Foundation to resist the deposition.  While the deposition I

14  suppose would arguably be cumulative of the declaration, that

15  does not solve the hearsay problem.  I fail to understand how

16  the nominal time and money, quote unquote, burdens of this

17  particular deposition could possibly be disproportionate to the

18  needs of our motion to show cause.  As we noted in the very

19  first sentence of our opposition to the motion to show cause,

20  quote, "The Pipe Hitter Foundation played an indispensable role

21  in facilitating Joshua and Stephanie Mast's second violation of

22  this Court's protective order."  This is why we argued on page

23  3 that, quote, "It is difficult to imagine a more fitting

24  deployment of Rule 45," closed quote.

25          No doubt we suspect, recognizing the weaknesses of

1    its Rule 26 and Rule 45 arguments, the Pipe Hitter Foundation

2    resorted to what I guess can only charitably describe as a Hail

3    Mary.  It argues that our entire case should be dismissed for

4    lack of subject matter jurisdiction.  The Pipe Hitter

5    Foundation says there is neither federal question nor diversity

6    jurisdiction.  Both arguments fail.  Your Honor,

7    Ms. Contestable didn't spend much, if any, time on these

8    arguments.  I'm prepared to get into them in great detail

9    because both she and counsel for Mr. Osmani argue them in their

10   briefs.  I'm happy to go through them.  It won't take me very

11   long, but I think it's important for me to address them if Your

12   Honor wants me to.

13          THE COURT:  Mr. Powell, if there's anything that you

14   want to point out from the briefs, or if there's anything

15   additional, then we can certainly use that time to do that on

16   the jurisdictional arguments.  Otherwise, if you'd like to rely

17   on your briefing, you can do that.

18          MR. POWELL:  It won't take me very long, Your Honor.

19   It's a little bit complicated because it's a five-count

20   complaint, and not every defendant is named in each of the

21   counts.  There is a correction that Mr. Osmani made regarding

22   his citizenship that I think is important for me to

23   acknowledge.

24          THE COURT:  All right.  Go ahead.

25          MR. POWELL:  In summary, Judge, there is federal

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  question jurisdiction over all of the defendants for Counts One

2  and Three.  Count One is for intentional interference with the

3  Does' parental rights.  Count Three is for conspiracy.  Part of

4  the conspiracy, obviously, identifies as overt acts the conduct

5  of the defendants that constitutes intentional interference

6  with the Does' parental rights.  With one exception, there is

7  diversity jurisdiction over all of the defendants for the

8  remaining three counts:  Count Two is for fraud; Count Four is

9  for intentional infliction of emotional distress; Count Five is

10  for false imprisonment.  The exception has to do with Defendant

11  Osmani in Count Four.  He is not named in Counts Two and Five.

12  On August the 1st, he filed a brief in support of the Pipe

13  Hitter Foundation's argument.

14       Let's address the diversity jurisdiction question

15  first.  The Pipe Hitter Foundation and Osmani say there is no

16  jurisdiction because he is a citizen of Afghanistan; and, thus,

17  is not diverse as to the Does, who are also Afghan citizens.

18  Osmani filed a declaration in support of this argument.  Until

19  we received that declaration on August 1, we were operating

20  under the assumption that Osmani was a U.S. citizen, as his own

21  lawyer had represented to the Fluvanna Circuit Court last

22  October the 4th.  Evidently, however --

23       (Overlapping speakers.)

24       MR. BROOKS:  Your Honor -- (inaudible).

25       THE COURT:  Mr. Brooks, please don't interrupt.  I

1    know you said that you didn't want to participate, but I'll

2    give you an opportunity to after Mr. Powell is finished.

3            MR. POWELL:  Judge, evidently either Mr. Brooks

4    misspoke, or the court reporter misheard him or misunderstood

5    him.  In any event, as we said in our brief in response to

6    Mr. Osmani's motion, we have no reason not to believe his

7    declaration that he was, and remains today, an Afghan citizen.

8    Does the fact that there is no diversity jurisdiction as to him

9    for one count require dismissal of our entire case?  Of course

10   not.  Of the five counts in our amended complaint, Osmani is

11   named in only three of them:  Count One, tortious interference

12   with parental rights; Count Two, conspiracy; and Count Four,

13   intentional infliction of emotional distress.  Importantly,

14   however, there is a federal question jurisdiction as to Counts

15   One and Two.  More about that in a moment.

16           So Osmani would still be a defendant, even if we had

17   not included Count Four at all, or had not named him in that

18   count.  At most, therefore, because of the diversity question

19   he has fairly raised, he should be let off the hook for Count

20   Four; or, more appropriately in our judgment, the Court should

21   assert supplemental jurisdiction over him for Count Four.  That

22   would serve the interest of judicial economy because then all

23   of the Does' claims against all of the defendants would be

24   resolved in this case.

25           Now let's turn to whether there is federal question

1  jurisdiction as to Counts One and Three.  The answer is clearly

2  yes.  As the parties agree, the controlling precedent is the

3  Supreme Court's 2013 decision in *Gunn v. Minton.*  *Gunn* sets

4  forth a four-part test for whether a state common law claim

5  can, quote unquote, arise under the constitutional laws or

6  treaties of the United States, as set forth in 28 U.S.C.

7  Section 1331.  Under *Gunn*, the asserted federal issue must be,

8  first, necessarily raised; second, actually disputed; third,

9  substantial; and fourth, it must be capable of resolution in

10 federal court without disrupting the federal state bounds.  The

11 Pipe Hitter Foundation and Mr. Osmani argue that we fail the

12 *Gunn* test.  Of course, we disagree.

13         First, a federal issue is necessarily raised here

14 because the entire foundation of the Does' claim to be Baby

15 Doe's parents rest on the U.S. government's exercise of its

16 exclusive foreign policy responsibilities when it transferred

17 custody of Baby Doe to the Afghan government so that she could

18 be united with members of her extended family.  The declaratory

19 relief that we seek spells this out in great detail.

20         Second, there can be no question -- and I don't think

21 there is one here -- that the Masts vigorously contest the

22 Does' claim to be Baby Doe's parents.  The Pipe Hitter

23 Foundation and Osmani do not argue otherwise, as best I can

24 recall.

25         Third, it is similarly clear that the federal issue

1   is, quote unquote, substantial.  While it may arguably be true,

2   as the Pipe Hitter Foundation and Osmani suggest, that the

3   specific facts of our case are unlikely to be repeated, that

4   does not mean that the federal issue is not substantial.  If

5   the Court has any doubt about that, I encourage you to read --

6   if you have not already done so, which seems to me unlikely --

7   the U.S. government's statement of interest which it filed in

8   the state court action on August 22nd of last year.  That

9   statement of interest is Exhibit 1 to our amended complaint.

10  It's 21 pages long.  It is a resounding explanation of, and

11  defense of, the federal government's position on the legality

12  of the Does' parental rights.  Judge, it is essential to the

13  preservation of our entire system of federal-state balance to

14  confirm that whenever our federal government makes a foreign

15  policy decision, no state court can act in any way that

16  interferes with or undermines that decision.  The declaratory

17  relief we seek is entirely line with the U.S. government's

18  position.

19          Fourth -- and finally, Your Honor -- our case can be

20  resolved in this Court without disrupting the state balance --

21  the federal-state balance, excuse me.  The family law exception

22  that has been briefed simply does not apply to federal question

23  cases.  The Fourth Circuit so held in its 1997 decision in *U.S.*

24  *against Johnson* at 114 F.3d 476, specifically at page 481 where

25  the court said that this exception applies, quote, "only as a

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  judicially imposed limitation on diversity jurisdiction."

2          The U.S. Supreme Court's decision just four months

3  ago in the *Haaland against Brackeen* case is in line with this.

4  There the court brushed aside the plaintiff's argument that

5  family law is wholly exempt from federal regulation, calling

6  that argument a, quote, "nonstarter."  The citation for that,

7  Your Honor, is at 143 Supreme Court Reporter.  The first page

8  is 476.  The language I just quoted is found at page 481.

9          Moreover, Judge, and notwithstanding defendants'

10 stubborn mischaracterization -- if you don't mind me calling it

11 that -- of our amended complaint, we are not asking this Court

12 to resolve the adoption and custody issues that the parties are

13 litigating in the Virginia state court system.  Instead, as I

14 have already noted, and as Ms. Eckstein has mentioned, our case

15 here seeks only declaratory relief and substantial money

16 damages.  We have different parties and different claims than

17 in state court.

18         Finally, Judge, even if the Court were to agree that

19 there is no federal question jurisdiction, it is crystal clear

20 that we have diversity jurisdiction as to all of the defendants

21 other than Osmani.  For that reason, dismissal of our entire

22 case would not be supportable.

23         Let me wrap up, Judge.  Let me start by responding to

24 two points that Ms. Contestable made.  She suggested that we

25 can get all of the information we need from the Masts.  I have

1    to say in response to that:  Really?  I'm not quite sure how to

2    respond to that, Judge, other than to say that Joshua Mast in

3    particular had extensive communications with Ms. Disarro at the

4    Pipe Hitter Foundation lasting over several months, all of

5    which led inexorably to the One American News network interview

6    of Joshua Mast's brother, and all of which led inexorably to

7    the Pipe Hitter Foundation's own conduct that, knowingly or

8    unknowingly, was a violation of the Court's protective order.

9    We must be allowed to take the deposition of the Pipe Hitter

10   Foundation, period, hard stop.

11          Ms. Contestable also raised -- as she had in her

12   brief -- the argument that somehow this is a miscellaneous

13   proceeding to which the Federal Rules of Evidence do not apply.

14   I confess I just do not understand that argument.  I don't

15   think the cases that she cites are applicable.  Our motion to

16   show cause is hardly miscellaneous.  I don't mean to presume to

17   know how Judge Moon would rule on these evidentiary issues, but

18   I find it hard to believe that he would suspend the rules of

19   evidence during our motion to show cause.

20          THE COURT:  And your motion to show cause is to have

21   the Masts found in contempt by the Court?

22          MR. POWELL:  Correct.  So it seems to be whatever our

23   motion to show cause is, it is not a miscellaneous proceeding,

24   whatever a miscellaneous proceeding is.

25          Judge, to be clear, I think -- I hope the Court

1  understands this -- we're seeking a limited and focused

2  deposition of the Pipe Hitter Foundation.  It is hardly a

3  stranger to this dispute.  Even if it is true, as the Pipe

4  Hitter Foundation asserts, that it was unaware of this Court's

5  protective order when it agreed to help the Masts, that should

6  not insulate it from a deposition.  Moreover, as we noted, the

7  declaration is hearsay, and that necessitates our being able to

8  take her deposition to avoid the problem and to have her

9  authenticate the Pipe Hitter Foundation's documents.  I

10  appreciate what Mr. Francisco said.  But if, as I hope will be

11  the case, you're going to allow us to take her deposition,

12  we're likely going to want to ask her questions that will

13  further support the admissibility in the hearing on the motion

14  to show cause of the Pipe Hitter Foundation's documents.

15          Together, we think her deposition and the Pipe Hitter

16  Foundation documents will prove beyond any shadow of a doubt

17  that the Masts intentionally violated the protective order, and

18  that Joshua Mast tried to cover his tracks by using a signal to

19  communicate with the Pipe Hitter Foundation, and by enlisting

20  his brother -- if I said Joshua a moment ago, Judge, I should

21  have said Joshua, not Jonathan -- Joshua Mast not only used

22  signal to try to cover his tracks with his communications with

23  the Pipe Hitter Foundation, he enlisted his brother Jonathan to

24  participate in the scheme by being the family's spokesperson.

25          THE COURT:  As to the deposition, you would agree to

1  limit it to four hours and to train the subjects on the

2  declaration that's already been provided and the documents that

3  were produced?

4          MR. POWELL:  Yes, Judge, four hours for us on direct.

5  I don't know -- I cannot predict how many questions might be

6  asked by counsel for the other parties that might justify

7  redirect on our part.  But again, this is not an all-day

8  deposition -- not in my imagination, at least, Your Honor.

9  And, of course, the focus of the deposition will be on the

10 declaration and having the witness embrace the factual

11 assertions in her declaration.  I don't think it will be

12 necessary to go through each and every one of the 115

13 paragraphs.  I think summary testimony by her should suffice,

14 but there are questions that occur to us from the content of

15 the declaration that only she can answer.  We cannot get from

16 anybody but her what may have been said by Joshua Mast to her,

17 what conversations she may have had internally about the Pipe

18 Hitter Foundation's decision-making to try to help the Masts

19 raise money and to get publicity for what they consider their

20 side of the story here.

21         I noted earlier, Your Honor, that our -- I'm sorry,

22 Judge, I didn't mean to --

23         THE COURT:  That wasn't me.  Go ahead, Mr. Powell.

24         MR. POWELL:  Yeah, so our subpoena identifies only I

25 think seven deposition topics.  They're all directly related to

1  what we believe we can prove is at least Joshua Mast's -- and

2  perhaps Stephanie Mast's also -- second violation of the

3  protective order.

4           MR. FRANCISCO:  Your Honor, this is Michael Francisco

5  for the Masts.  I would like an opportunity to be heard, if

6  appropriate, on this motion.

7           THE COURT:  That's fine.

8           And Mr. Powell, do you agree that the deposition

9  could be conducted remotely?

10          MR. POWELL:  Yes, sir.  And we've made that clear

11 from the get-go.

12          THE COURT:  Okay.  All right.  I know several other

13 people would like to weigh in on this motion.  Let's see.

14 Ms. Contestable, I'll circle back to you at the end, but I'll

15 hear from Mr. Brooks for Osmani.

16          MR. BROOKS:  Thank you, Your Honor.  I apologize for

17 my objection.  I just wanted to -- we're willing to rest on our

18 pleadings and on the pleadings of the Pipe Hitter Foundation on

19 the jurisdictional issue.  So I won't argue those here.

20          But I did just want to make clear that what drew us

21 into this motion was actually the use of my own words by the

22 plaintiffs, which I find hard to believe that they relied on

23 because those alleged words -- I don't believe I actually said

24 it; I think it was the court reporter's error -- but occurred

25 before the filing of the amended complaint where they again

1   identify Mr. Osmani as an alien as opposed to a citizen.  So I

2   don't think anyone in this case has ever actually been confused

3   as to whetter Mr. Osmani is a citizen, especially because I

4   also told counsel for the plaintiffs in a meet and confer that

5   we had that he is not a citizen.  But to the extent that there

6   has been some suggestion that I made an intentional

7   misrepresentation, or even a very bad error, I just wish to

8   push back on that and state that for the record.

9           Thank you, Your Honor.

10          THE COURT:  And Mr. Brooks, I don't hear Mr. Powell

11  saying that there was any intentional misrepresentation or any

12  misconduct on your part.

13          All right.  Mr. Francisco?

14          MR. FRANCISCO:  Yes, Your Honor.  I think it's

15  appropriate to address some of the issues Mr. Powell raised in

16  setting the table for this motion and to clarify we don't

17  think -- we certainly agree that Pipe Hitter should not be

18  deposed in this matter, and that it's unduly burdensome and in

19  violation of the rules.  And if -- [inaudible] -- suggest

20  certain parts of the declaration that are not hearsay be

21  considered, then we'll of course consider those, but a

22  deposition is not going to fix the hearsay issue.  There is

23  still going to be hearsay even if there is a deposition.  But

24  our position is that if they think they've got sanctionable

25  conduct, then let's have a hearing on it.  They've had

1    discovery on it.  They've taken a six-hour deposition of

2    Jonathan Mast, Your Honor.  They have all the Pipe Hitter's

3    documents.  They have all Jonathan Mast's documents.  They had

4    a six-hour deposition when they could ask him as many times as

5    they wanted:  Did Josh Mast violate the protective order, and

6    every form of that question.  And the answer was always

7    consistently no.  And now we hear that, Well, Your Honor, we

8    need to do one more deposition of a third party because that

9    maybe is going to confirm our suspicion that there was a grand

10   conspiracy by my client, Joshua Mast, to violate the protective

11   order.  We're confident on the merits there was no violation of

12   the protective order.  We're talking a couple of emails and a

13   handful of pictures and press reporting that Joshua Mast is

14   under oath saying that he conducted on his own.  This is just

15   not something that needs to be made into a giant discovery

16   battle.  They've already had extensive discovery on it, and

17   that's our position.  If they think they can show something,

18   then we should move forward.  But having another four-hour,

19   third-party deposition to a nonparty so maybe this time they

20   can find the evidence that's not there we think is highly

21   inappropriate.

22          MR. POWELL:  Your Honor, I don't mean to get between

23   you and Ms. Contestable, but I would like to respond briefly to

24   what Mr. Francisco just said.

25          THE COURT:  Yeah, I would like to hear your response,

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1    Mr. Powell, and especially about whether the Pipe Hitter

2    Foundation representative would need to be -- would need to

3    appear at the evidentiary hearing.

4            MR. POWELL:  I don't think so, Your Honor, provided

5    we've had an opportunity to take her deposition, which, of

6    course, would be attended by any other lawyers who want to

7    participate, and they will have ample opportunity to take her

8    deposition and to ask her questions.

9            I understood Mr. Francisco to say first that the Pipe

10   Hitter Foundation should not be deposed, but that even if it

11   were to be deposed, that would not solve the hearsay question.

12   I think I understand him to be saying that won't necessarily

13   solve the question whether the declaration itself is hearsay,

14   but whichever one of my members of our team takes the

15   deposition, I think you can be sure that the question will be

16   asked of the witness whether she affirms the truth of the facts

17   asserted in the deposition.  I think she's going to say that

18   she does.  I think the hearsay question is going to be resolved

19   through the deposition, and her deposition testimony will then

20   be admissible in the hearing on the motion to show cause, just

21   as any witness beyond the subpoena power of the Court, any

22   deposition testimony by such a witness would be admissible as

23   though the witness were there testifying live.

24           So all this causes me to wonder why do the Masts not

25   want us to take the Pipe Hitter Foundation's deposition?

1   Forgive me for being suspicious of their motive, but I must be.

2           THE COURT:  Thank you, Mr. Powell.

3           Ms. Contestable?

4           MS. CONTESTABLE:  Yes, Your Honor.  Sorry.  I was on

5   mute.

6           Pipe Hitter Foundation -- [inaudible] -- the

7   truthfulness of the information that was in the declaration.  I

8   think I have produced over 600 documents.  Ms. Disarro is being

9   asked to sit for a Rule 30(b)(6) deposition, and it's

10  unreasonably cumulative or duplicative based upon substantial

11  substantive information that we've already provided, and the

12  fact that a Rule 30(b)(6) deponent is likely going to repeat

13  the information in testimonial form, which is exactly what

14  would happen here.  The declaration was prepared thoughtfully

15  and intentionally for this purpose, to retract all of the

16  concerns that were outlined and inferred from the documents and

17  subpoena requests.  And we conferred with plaintiffs' counsel

18  and advised them that if they wanted -- [inaudible] -- expanded

19  upon or clarified, that we were willing to do so.  We have

20  cooperated.  We have acted in good faith from the very

21  beginning, and we have not hidden the ball.  We've asserted no

22  privileges.  We have, as a nonparty, been cooperative and

23  compliant.  Requiring Pipe Hitter to sit for a deposition --

24  which, according to plaintiffs, is going to be four hours on

25  their part, plus any other cross-examination -- is not an

1  insubstantial amount of time or an insubstantial burden, or an

2  insubstantial burden on our client.  They are small nonprofit

3  that has already incurred expensive legal fees battling over

4  this matter.

5          Additionally, I want to quickly address the

6  jurisdictional argument as it relates to Defendant Osmani.  The

7  plaintiffs seem to gloss over the fact that it is a critical

8  issue as to diversity.  It either exists at the time of filing

9  or it doesn't.  And where it does not, the Court then has to

10  conduct a very thoughtful, careful analysis as to whether or

11  not to dismiss the entire action or to dismiss just Osmani.

12  And the plaintiffs' response to our motion only addresses this

13  matter in a footnote of I believe three or four sentences, and

14  fails to advance any substantive legal arguments or principles

15  to support the conclusions that the proper remedy to correct

16  the issues of diversity jurisdiction is to just excuse Osmani

17  and move forward.

18          I'm just checking my notes for a second.

19          I think that's all the items that we wanted to

20  respond to here.  Actually, sorry, one more note, Your Honor,

21  if I may.

22          THE COURT:  Sure.

23          MS. CONTESTABLE:  Pipe Hitter, as I was saying, has

24  fully responded and complied with plaintiffs, and worked in a

25  cooperative manner.  If there are issues that need to be worked

1  out as to the documents that were produced and interactions of

2  that relationship, those are matters that should be taken up

3  with the Masts, not with Pipe Hitter.

4              And that's it for us, Your Honor.

5              MR. YERUSHALMI:  Your Honor, I apologize for jumping

6  in.

7              THE COURT:  Hold on a second.  I'm happy to hear from

8  anybody who wants to say something, but why don't you go ahead

9  and let's do this orderly.  Just identify yourself and then go

10 ahead.

11             MR. YERUSHALMI:  Your Honor, David Yerushalmi.  I'd

12 like to be heard for literally a sentence on this matter.

13             THE COURT:  Go ahead.

14             MR. YERUSHALMI:  I'm sorry, Your Honor?

15             THE COURT:  Go ahead, please.

16             MR. YERUSHALMI:  Okay.  Thank you.

17             Mr. Powell had indicated that the other parties -- or

18 my client -- had not responded on the jurisdictional question

19 were outside the scope of the deposition itself.  We considered

20 the briefing fairly well briefed; however, to the extent that

21 the Court is going to order the deposition, it seems to me by

22 implication that it has ruled on the jurisdictional question.

23 Insofar as that is a dispositive issue, our intention was,

24 under Rule 72, when the Court issues what I think would be a

25 report and recommendation to the judge, to respond at that

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  time.

2          Thank you, Your Honor.

3          THE COURT:  Did somebody else want to say something?

4          MR. FRANCISCO:  Your Honor, Michael Francisco briefly

5  again for Joshua and Stephanie Mast.

6          I just want to highlight that the plaintiffs aren't

7  identifying what information they think they can learn in a

8  four-hour deposition that's not already revealed in the

9  documents or the deposition of Jonathan Mast.  The documents

10  show frankly two emails, maybe, and a handful of [inaudible]

11  messages that have already been produced.  I don't think

12  there's any reason to think there were phone calls of any

13  substance -- I'm not even sure there were any -- between the

14  Pipe Hitter and my client that target a sanctions motion.  And

15  then everything indicates in the documents and the deposition

16  that's already occurred that Josh Mast had no contact.

17  Everything was handled by Jonathan Mast, who has been deposed.

18  And then there was a couple of emails about:  Could you please

19  take down a picture after the story went up.  But I'm really at

20  a loss to see how a deposition is even supposed to get any

21  information that could be useful for the plaintiffs' motion

22  that hasn't already been covered by the document discovery and

23  by the six-hour deposition.

24          THE COURT:  I'll take that into consideration.  I

25  will issue a written opinion on that motion as well.

1       I think that's everything for the motions.  The trial

2  date, I think I indicated that we could discuss the schedule

3  and the resetting of the trial date today as well.  In the

4  motion to modify the pretrial order, the parties had different

5  proposals about expert disclosure deadlines and then also the

6  trial date.

7       Are those still your positions, Mr. Francisco?  Is it

8  still your position that -- as to the May deadlines for expert

9  disclosures, September 2024 trial date?

10       MR. FRANCISCO:  Yes, Your Honor.

11       THE COURT:  And Ms. Eckstein or Mr. Powell, are you

12  still sticking to your dates in that motion?

13       MS. ECKSTEIN:  Yes, Your Honor.  Thank you.

14       THE COURT:  Is there anything further that anybody

15  wants to say as to the grounds for choosing one trial date over

16  the other?  It looks like that's the main issue, and the expert

17  disclosure deadline would go off of that trial date.

18       Mr. Yerushalmi, I'm happy to hear your input there,

19  and Mr. Brooks, and then Mr. Hoernlein as well.

20       MR. YERUSHALMI:  Yes, Your Honor.  David Yerushalmi.

21  The September date was actually the date that we initially

22  proposed, and the other defendants agreed, and the plaintiffs

23  disagreed and wanted an earlier date.  Given where we are

24  today, I would say it's fairly obvious that even the September

25  date is premature.  Now, obviously the Court can set it as a

1   kind of marker in the ground, but the reality is the motions to

2   dismiss are still pending, and I don't know when they're going

3   to be decided.  When they are decided, if they're decided in

4   the negative, then there is most certainly going to be -- at

5   least from my client -- a counterclaim, at least that's our

6   present intention.  I don't want to be misunderstood.  That's

7   our present intention.  So that's going to engender more

8   motions to dismiss.  It's going to engender more discovery.  We

9   have submitted our request for production on March 14th.  We're

10  now October, and plaintiffs are telling the Court another 60 to

11  90 days before we get all their documents.  So that's going

12  to --

13          THE COURT:  I think they said 30 to 60 is my

14  recollection.

15          MR. YERUSHALMI:  No, Your Honor.  I think they said

16  60 to 90 --

17          THE COURT:  Well, the record will --

18          MR. YERUSHALMI:  -- in the opposition brief.  Yes,

19  Your Honor.

20          So -- and even if it's 30 to 60, that takes us -- but

21  it's not -- that takes us past the end of the year.  And so

22  there is just no way in the world this case is going to be

23  ready for trial in September.  There is just -- we haven't even

24  started the depositions.  And when we take depositions, we

25  might find out a whole slew of additional information, as is

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1  typically the case.  So I would actually argue that setting a

2  trial date in September is premature, unless it's simply a

3  marker.  Certainly May is -- using a term that the plaintiffs

4  used -- nonsensical.  I don't understand that at all.

5          Thank you.

6          THE COURT:  All right.

7          MS. ECKSTEIN:  Yes, Your Honor.

8          THE COURT:  Ms. Eckstein?

9          MS. ECKSTEIN:  Yes, I can respond briefly.  Thank

10  you.  Just really briefly, first of all, you are correct.  It

11  was 30 to 60 days.

12          The idea that we can't be ready for trial in

13  September -- let alone June -- baffles me.  Maybe that's

14  because I often litigate in the Eastern District of Virginia,

15  which is considered a rocket docket.  Cases go to trial in six

16  to nine months.  We will be ready in May or June, or whatever

17  the -- I think it was June, excuse me, June that we put in the

18  motion.  We will be ready in June.

19          THE COURT:  All right.  Mr. Francisco, is there

20  anything else that you would want to say as to the --

21          MR. FRANCISCO:  Your Honor, we're docket number 300.

22  Our motion to dismiss has been pending for almost a year.

23  Their motion to show cause -- which was argued in January, I

24  recall -- still has never even been decided.  I mean, sure, I

25  could pound the table and say we'll be ready for trial in June

1  if that's what the Court says, but my experience tells me that

2  September is a more realistic date.  We're just getting started

3  in discovery in this case.

4          THE COURT:  Mr. Brooks, anything?

5          MR. BROOKS:  Thank you, Your Honor.  I would agree

6  with Mr. Yerushalmi.  We, likewise, are in the position that we

7  very well may file a counterclaim if we get a ruling on the

8  motions to dismiss and Mr. Osmani is still in the case.  We

9  feel like that would change the dynamic.  So I agree with

10  Mr. Yerushalmi.

11          Thank you, Your Honor.

12          MR. YERUSHALMI:  Your Honor, this is David

13  Mr. Yerushalmi.  I just wanted to apologize and say yes, I

14  looked at the opposition brief.  Apparently my 68 year-old

15  memory wasn't as good as I thought.  It's 30 to 60 days.

16          THE COURT:  Mr. Hoernlein, anything about the trial

17  date?

18          MR. HOERNLEIN:  Your Honor, generally no, although I

19  would just say for Ms. Motley, if Ms. Motley isn't dismissed

20  from the case, she will also likely assert counterclaims

21  against the Does.  And so, May/June might be a little

22  aggressive, but we're not taking any strong position on it.

23  We'll be ready to try the case if we're still in it when the

24  Court sets the date.

25          THE COURT:  Well, given the number of motions that

1  are still outstanding and the amount of work that seems like is

2  going to be necessary in this case to bring it to trial, I'd

3  rather try and set the September date as a firm one, and really

4  push to make sure that that date holds and make sure that the

5  other deadlines remain in place.  The June one, I think it

6  would be hard to get this case ready for trial by then.  So

7  what I will do is set the trial date for September 9th through

8  the 20th in front of Judge Moon, with the plaintiffs' initial

9  disclosures on May 1st and the defendants' on May 16th.

10        All right.  Is there anything else?

11        MR. YERUSHALMI:  Yes, Your Honor.  This is David

12  Yerushalmi.  I just wanted to ask for clarification.  When you

13  say a firm date, given that we don't even have the motion to

14  dismiss resolved, and given that there is going to be

15  additional discovery, and given that there is going to be

16  dispositive Rule 56 motions, when you say a firm date, I'm just

17  trying to understand what that means in context.

18        THE COURT:  Well, plan on that being the trial date,

19  Mr. Yerushalmi.

20        All right.  Is there anything else that we need to

21  take up today?

22        MS. ECKSTEIN:  Not from plaintiffs.  Thank you, Your

23  Honor.

24        THE COURT:  All right.  Thank you all.  Then that

25  brings this hearing to a close.

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1   (Proceedings adjourned, 1:13 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Baby Doe, et al. v. Mast, et al., 3:22cv49, 10/11/2023

1                    C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11       I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14       /s/ Lisa M. Blair              Date: October 17, 2023

15

16

17

18

19

20

21

22

23

24

25