IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BABY DOE, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 3:22-cv-49-NKM-JCH |
| ) | |
| JOSHUA MAST, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

**DEFENDANTS JOSHUA AND STEPHANIE MAST'S
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS**

The Masts have acted in good faith to comply with their discovery obligations under the Rules of Civil Procedure and this Court's order denying the Masts motion to stay discovery, dated November 9, 2023 (ECF No. 322). In particular, in responding to the Doe's extensive requests for production of documents, the Masts have spent more than 600 attorney and staff hours collecting and reviewing tens of thousands of documents, producing 352 responsive documents to the Does and providing another 2,176 to the Department of Justice for authorization to produce. The Masts have fully complied with their discovery obligations.

Nonetheless, John and Jane Doe moved for sanctions, ECF No. 336, without any conferral, without identifying any deficiency, and without first filing a motion to compel. The Motion alleges the Masts' production efforts violate this Court's November 28, 2023 order and should be sanctioned. As an initial matter, the Motion is procedurally deficient for failure to confer and should simply be denied on that basis. *See Awe v. Clarke*, No. 7:13-cv-00143, 2014 WL 948880, at *2 n.2 (W.D. Va. Mar. 11, 2014) (denying motion to compel because "Plaintiff did not certify that he 'has in good faith conferred or attempted to confer with the person . . . failing to make

disclosure or discovery in an effort to obtain it without court action.'" (quoting Fed. R. Civ. P. 37(a)(1))); *Howard v. CGI Long Distance Serv.*, No. 96-2287, 1997 WL 122584, at *2 (D. Kan. Mar. 13, 1997) ("By the express terms of [Rule 37(a)], the court will not impose sanctions without finding appropriate efforts to confer about the matters in dispute."). In the event this Court excuses the refusal to confer, however, this Court should deny the motion because the Masts have fully complied with discovery obligations, and any dispute over timeliness fails to rise to the level of contemptuous conduct. In addition, the Does cannot establish any prejudice from the now-complete production. Procedurally and substantively, the Motion should be denied.

Conferral is not a mere formality or optional exercise. Had the parties conferred, the Masts could have alleviated many of the concerns the Does raise in their motion—including the timing of the Masts' privilege log and the procedures for producing documents requiring government approval pursuant to *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). Instead, the Does skipped straight to the extraordinary measure of moving this Court to find the Masts in contempt.[1] The Masts remain ready willing and able to confer on any perceived deficiency in the production of documents. *See Awe*, 2014 WL 948880, at *2 n.2. The Motion should be denied.

I.  **The Masts Responded to the Does' Requests for Production Completely and in Good Faith.**

The Masts have worked diligently to comply with their discovery obligations. Immediately after the Court issued its order denying the Masts' motion to stay and compelled the production of documents, the Masts expeditiously worked to collect additional documents, identify duplicate

---

[1] The Does' motion, while termed a Motion for Sanctions, is in substance nothing more than a motion to compel, which indisputably has a conferral obligation. However, to the extent there is any ambiguity about a conferral requirement for a Rule 37 contempt motion, the Does should not be able to avoid the meet and confer requirement of Rule 37(a) by labeling their motion as a motion for sanctions under Rule 37(b).

2

documents already produced to the Does in the state court litigation, review all potentially responsive documents within the Masts' custody and control, and produce those documents.

Far from acting in bad faith or disregarding this Court's November 28, 2023 order, the Masts worked through the holidays to collect and review over 46,000 documents from five email accounts, three cell phones, two personal computers, an external hard drive, two cloud storage accounts, several messaging applications, and paper documents in the Masts' possession to ensure that all potentially responsive documents were identified. *See* Ex. A (Declaration of Michael L. Francisco). In total, the Masts collected over 186 gigabytes of data and spent more than 600 attorney and staff hours reviewing these documents to ensure all responsive documents were properly produced. This is certainly not the type of "knowing disregard for [a party's] obligations to comply with court orders" required for a finding of bad faith. *See Gilmore v. Jones*, No. 3:18-cv-00017, 2021 WL 5280970, at *7 (W.D. Va. Nov. 12, 2021) (finding bad faith when a party repeatedly refused to produce any documents despite a court order and represented to the court that such documents "no longer exist").

Along with the staffing challenges that naturally arise over the holidays, the Masts also encountered significant technical difficulties that interfered with their ability to efficiently collect and review data. Specifically, technical problems delayed the Masts' remote collection of certain cell phone data, and the processing of 186 gigabytes of data for review proved to be a lengthy process. Nonetheless, the Masts diligently worked to produce all relevant documents as expeditiously as possible. Despite these challenges, the Masts collected and reviewed all relevant material and ensured their productions were complete and accurate.

Ultimately, the Masts produced substantially all responsive documents by December 28, 2023 and worked to complete the remaining production from sources with challenging collection

logistics soon thereafter. In their production cover letter, the Masts indicated that their review efforts were ongoing and that they would make further productions on a rolling basis, consistent with how the Does have themselves frequently used rolling productions to discovery requests. *See, e.g.*, ECF No. 310 (October 11, 2023 Hearing Tr.) at 34–35 (counsel for the Does stating in October that the Does "continue to produce additional documents on a rolling basis" after making an "initial production back in I believe May or June"); *id.* at 40 ("We will continue to make the rolling production."). The Masts continued thoroughly reviewing documents, making minor follow-up productions to the Does on January 8 and 26, that were final and complete with the only exception being continued quality control and review of documents marked as privileged. The Masts then made a final production of responsive documents from the set of privileged documents on February 9, including producing redacted documents where appropriate.

To be specific, substantially all responsive documents were produced in the December 28 production (~ 204 documents totaling 800 pages), and the two January follow-up productions were necessitated by cell phone data that was not available to be processed before December 28, and which were expected not to include many, or any, responsive documents. Ultimately, the January 8 production (~ 14 documents, totaling 20 pages) and January 28 production (~ 24 documents, 70 pages), as anticipated, did not materially add to the universe of responsive, produced documents. The February 9 production (~ 110 documents) was only for documents previously reviewed and identified as privileged. To say that the Masts ignored or "flout[ed] this Court's authority," *see* Motion at 4, is not accurate.

To the extent that the Does suggest the Masts failed to comply with the Court's order by not producing all responsive documents by December 28, 2023, such non-compliance is not material and belied by the production efforts detailed above. The Masts at all times acted in good

4

faith, doing everything in their power to review tens of thousands of documents, processes many gigabytes of data, and make accurate productions as expeditiously as possible during the narrow time directed. During the October 11, 2023 hearing, the Masts candidly notified the Does and this Court that complying with the broad production would be "a very burdensome process," which would require "reviewing a vast amount of data." *See* ECF No. 310 (October 11, 2023 Hearing Tr.) at 22.[2] The Masts also noted that this production effort would likely produce a limited set of documents when compared the overwhelming bulk of responsive documents that had long-ago been produced to the Does in the state litigation, which this Court determined need not be re-produced in this litigation.

      Complaints about the timeliness of discovery production miss the mark. It is undisputed that the Does took more than *six months* to respond to the Masts' discovery requests (and still have deficiencies, as the parties continue to discuss). In contrast, the Masts made a timely production in substantial compliance with the Court's order, within 30 days, and then supplemented that production over the course of the following weeks with a small handful of additional documents from data sources with technical challenges. More than a month after the primary production, after the Masts indicated the production was "complete," the Does filed this motion for sanctions without first notifying the Masts of an apparent deficiency or requesting to confer. The Does' complaint about timeliness of producing all responsive documents is overshadowed by the fact that the Masts have in fact already produced *everything* there was to produce. If this were a motion to compel, in other words, it would be moot.

---

[2] The Does suggested in the October 2023 hearing the Masts should be able to press a button and re-review their documents. But unlike the Does, who have been represented by at least three Am Law 100 firms at varying times, the Masts were initially represented for discovery by one attorney from a small Charlottesville firm who handled the state court discovery without sophisticated document review software and databases commonly used by larger law firms. The Masts could not simply press a button to produce documents.

## II. The Masts Have Produced All Documents They Can Without Violating Federal or State Law.

Separate from questions about timing, the Does complain about two categories of documents that the Masts cannot, as a matter of law, produce as they are not under the Masts' legal custody and control. Both federal and state law prohibit the Masts from producing two categories of documents: (1) documents requiring *Touhy* approval from the federal government, which is required under federal law; and (2) documents classified as confidential juvenile court records under Virginia Code § 16.1-305, which require a state court order for a party to produce. "If the record establishes that there in fact is a present inability to comply with a production order, the 'civil [contempt] inquiry is at an end' insofar as the court may coerce compliance because obedience to the order is no longer within the contemnor's power." *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 (9th Cir. 1983) (quoting *Maggio v. Zeitz*, 333 U.S. 56, 74 (1948)); s*ee also  Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503 (4th Cir. 1977) (noting that a court lacks the discretion to impose sanctions under Rule 37(b) when a party's "failure to comply has been due to inability"). As the Masts informed the Does before the Motion was filed, the Masts have produced *all* responsive documents that the Masts can legally provide and have not included two categories of documents from their productions over which they lack legal custody and control. The Masts' inability to produce these categories of documents was objectively reasonable—indeed, it was required by state and federal law—so the Does have no basis to ask this Court to find the Masts in contempt over these categories.

### A. The Masts have not produced documents requiring *Touhy* approval because those documents must be, and are currently being, reviewed by the United States.

The Masts are prohibited from producing documents that are ultimately owned by the federal government, pursuant to *United States ex rel. Touhy v. Ragen*, *supra*, and litigants seeking

6

to use information belonging to the United States must obtain the approval of the federal government before using that information in a proceeding where the United States is not a party. *See, e.g.*, 32 C.F.R. § 97 (Department of Defense *Touhy* regulations). As the Does note in their Complaint, Major Joshua Mast learned about the Child's status as a helpless, injured orphan while stationed in Afghanistan as a member of the U.S. military. *See* Am. Compl. ¶ 26. Many documents are ultimately owned by the federal government because of Major Mast's position—many relate to his and other servicemembers' efforts to ensure that the Child was not left to die or be sold into slavery while those members served in Afghanistan. The Does have frequently communicated with the Department of Justice throughout these proceedings about *Touhy* requests. During the Masts' extensive collection and review of documents responsive to the Does' requests for production, the Masts identified 2,176 documents as potentially containing official information and requiring the approval of a federal agency under applicable *Touhy* regulations.[3]

Such a high volume of *Touhy* documents is hardly surprising—Defendant Joshua Mast is a U.S. Marine who adopted Baby Doe following her recovery from an Afghan battlefield. Indeed, the Does have made independent *Touhy* requests relating to this and the state case and have received extensive documentation consistent with the Masts having numerous *Touhy* covered document in their possession (but not legal control). Many of the subsequent documents related to the Masts' adoption of Baby Doe contain information about United States military activities, communication with military personnel, emails sent to and from Joshua Mast's official email account, and other sensitive government information the Masts only knew by virtue of Joshua Mast's position in the Marines. Under the United States' expansive view of *Touhy* as it applies to

---

[3] The Masts noted the inability to produce *Touhy* documents in each production cover letter sent to the Does. The Does never responded or objected to the Masts' identification of such documents.

this case, *see* Ex. B (Jan. 2, 2024 email from K. Wyer), the Masts are prohibited from producing these documents without proper approval from the appropriate federal agencies. As such, the Masts are currently unable to produce any documents identified as potentially requiring *Touhy* approval. To be clear, the Masts provided 2,176 documents to the Department of Justice and sought approval to produce to the Does; the Masts will produce any document the Department of Justice decides may be produced.[4] The Does have known this to be the case, and the documents they attach to the Motion demonstrate that the Masts have consistently stated that they would produce documents consistent with an assessment of their *Touhy* obligations. *See* ECF No. 336-1 at 1; ECF No. 336-5 at 1.

Two such *Touhy* documents highlighted by the Does warrant discussion. The Motion accuses the Masts of improperly withholding "email correspondence in which Joshua Mast asks Captain Michael J. Pence (son of former Vice President Mike Pence) to contact his father and intervene 'to bring [Baby Doe] home'" and "email correspondence between Joshua Mast and Jay Knolls, Pastor of Calvary Baptist, in which Joshua Mast asks Knolls to pray 'that [Baby Doe's] current custodians agree to give her up.'" Motion at 10.[5]

Contrary to the Does' assertions, the Masts did not improperly withhold these or other documents. Both documents specifically identified by the Does in their motion contain government information that Major Mast learned in his official capacity as a U.S. Marine, and therefore require

---

[4] By providing these documents to the United States for approval, the Masts do not waive their objections and concerns regarding how *Touhy* has been applied in this and related cases, including to these documents in question.

[5] The Masts would note the lack of prejudice in particular for a prayer request email. Even if this document is properly responsive to a request, it lacks any material use in this litigation. The Does could not use a private religious expression to prove any disputed material fact in the case, and the Masts' religious expressions and desire to see to Baby Doe's safety and security is well established; numerous produced documents, live testimony, and deposition time has been spent noting that Joshua Mast prayed for Baby Doe's welfare and encouraged others to do so. The Masts are at loss for understanding why one more religious expression email would be material to any claim in this case.

approval under the United States' interpretation of *Touhy*.[6] In fact, the email between Joshua Mast and Captain Pence is the quintessential example of a document requiring *Touhy* approval—a communication between two military officers, sent between official military emails, containing information relating to their official positions.[7] *See* 32 C.F.R. § 97.3 (broadly defining official information as "[a]ll information of any kind and however stored that is in the custody and control of the DoD, relates to information in the custody and control of the DoD, or was acquired by DoD personnel due to their official duties or status"). The Masts have provided these two documents—along with 2,174 others—to the Department of Justice for approval to produce. No approval has been provided at this time. As the Masts have repeatedly indicated, these and other responsive *Touhy* documents will be produced to the Does if and when the federal government grants the Masts permission to do so.

      **B.**    **The Masts have not produced documents from the Virginia Juvenile & Domestic Relations Court because doing so would violate state law—something the Does have long understood.**

The Masts are prohibited by Virginia law from releasing records from the Juvenile & Domestic Relations ("J&DR") court without an order from that court granting the Does access to those records. Virginia Code § 16.1-305. Code § 16.1-305 provides: "All juvenile case files . . . shall be open for inspection only to" parties to the proceedings and various Commonwealth agencies. As the Does know—given their several attempts to access the same records from the Virginia J&DR court—these records are protected by Virginia law. Third parties who were not

---

[6] The Does also apparently have these documents already from unknown source(s), which negates any inference that they have been prejudiced.

[7] That the Does have already obtained these documents through third-party discovery does not excuse the Masts of their obligations under *Touhy*, which apply only to government officers and not to private individuals or entities. *See* 32 C.F.R. § 97.2(a) (Department of Defense *Touhy* regulation) (noting that the regulation applies only to the Department of Defense and components thereof).

involved in juvenile proceedings—such as the Does—are prohibited from accessing J&DR court records without the proper state court order. By providing the Does with access to documents from the J&DR proceeding without a court order from the J&DR court, the Masts would be violating Code § 16.1-305, which can be prosecuted as a Class 3 misdemeanor.[8] *See* Code § 16.1-309(A).

This sanctions request is an improper attempt to circumvent ongoing state court litigation. The Does have long understood that they can only access the J&DR court records from the J&DR court, not from the Masts. In fact, the J&DR court has already denied the Does access to the records that they seek through discovery here at least three times.[9] The Does are appealing the J&DR court's denial of access—the Does have sought and were repeatedly denied access to the J&DR court records they seek here. To bypass the J&DR court and state law restricting access to juvenile court records, the Does attempt to use this court to do something it cannot—to overturn and appeal the J&DR court's denial of access to its records and issue an order requiring the Masts to violate state law. *Cf. Jordahl v. Democratic Party of Virginia*, 122 F.3d 192, 199 (4th Cir. 1997) (the *Rooker-Feldman* "doctrine prohibits the United States District Courts, with the exception of habeas corpus actions, from 'sit[ting] in direct review of state court decisions.'" (quoting *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 483 n.16 (1983))).

The Masts strenuously object to any discovery order in this case that would put them in a double bind of liability: they must either (1) risk committing a Class 3 misdemeanor under Virginia law for wrongfully allowing access to confidential J&DR records, Code § 16.1-309; or (2) risk sanction in this Court for refusing to produce those documents. The Masts do not wish to violate

---

[8] Code § 16.1-305 allows parties to child custody and adoption proceedings, such as the Masts, to access juvenile case records and make copies of those records. Code § 16.1-305(B). Any copies remain subject to the provisions of Code § 16.1-305 and other restrictions that the court may impose. *See* Code § 16.1-305(A1).

[9] The Fluvanna County Circuit Court, in fact, will hear an appeal relating to denying the Does' access once again on February 23, 2024.

10

any law, including this clear command of state law. At a minimum, this attempt to follow both this Court's orders and the orders of the J&DR court negates any inference of bad faith.

The ongoing state court litigation is the proper channel for the Does to gain access to these records, not by seeking civil contempt sanctions against the Masts in federal court.

### III.     The Does' Argument that the Defendants Have Not Produced a Privilege Log is Moot.

The Masts have provided a full privilege log within a reasonable time after production. The Does further allege that the Masts have failed to produce a privilege log to support their assertions of privilege. But this argument is moot because the Masts provided the Does with an initial privilege log on January 31, 2024—the same day the Does filed this Motion. Moreover, while the Masts were completing final quality control work on aspects of the privilege production, the Does never complained about the timing of the privilege log after receiving the two productions on December 28, 2023, and January 8, 2024. The Motion was the first indication the Masts had that the Does were anxious to receive a privilege log, so the Masts worked to diligently provide the log that same day and to quickly finalize the few remaining aspects of privilege review to provide a final log on February 9. Thus, the Masts provided a privilege log only five days after the Masts completed their production, which contrasts with the many months the Does waited to produce any privilege log for their responses. As one example, the Does most recently waited seven days before updating their privilege log. In any event, there is no prejudice from the timing of the privilege log.

The timing and production of a privilege log was also no surprise to the Does. The Masts repeatedly stated they would provide the Does with a privilege log once all responsive documents had been identified and produced. Thus, the Does' objection to the Masts' provision of a privilege log was premature. A privilege log does not need to be produced at the same time as discoverable

information. *See A1 Procurement, LLC v. Thermcor, Inc.*, No. 2:15-cv-15, 2015 WL 13856283, at *4-5 (E.D. Va. July 27, 2015) (rejecting plaintiffs' argument that privilege was waived when a privilege log was not produced at the time of discovery). Rather, assertions of privilege must only be identified to the other party within a reasonable. *See, e.g.*, *Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 240 F.R.D. 44, 48 (D. Conn. 2007) (acknowledging that "[a] delay of a few days is normally excusable"). The Does implicitly concede this point—following their recent production to the Masts, they waited seven days to provide the Masts with a privilege log. Here, the Masts provided their privilege log to the Does after only five days.

Had the Does conferred with the Masts, their concerns over the Masts' production of a privilege log would have been alleviated. Indeed, the Masts have done exactly what they said they would do—produce a privilege log reflecting withheld documents in short order.

### IV. The Does Have Failed to Demonstrate that Sanctions—Including the Sanction of Civil Contempt—Are Warranted.

The Does seek a serious sanction—contempt of court—for reasonable, good faith discovery conduct. The Court should deny their request.

As an initial matter, sanctions are only appropriate if a court determines that a party violated a discovery order. *See Bhattacharya v. Murray*, No. 3:19-cv-00054, 2022 WL 10424491, at *3 (W.D. Va. Oct. 18, 2022). If no violation of a court order occurred, "Rule 37(b)(2) does not authorize any sanctions." *Id.* The Court should make the threshold determination that the Masts did not violate its November 28, 2023 order. At a minimum, the Masts substantially complied with the discovery by December 28, 2023, as the only additional documents produced later were a handful of documents necessitated by the source and timing of data processing. The Masts have collected and reviewed more than 46,000 documents related to the subject matter of this case, produced hundreds of documents responsive to the Does' requests, and the production is complete.

Because the Masts have provided the Does with the documents in their possession that are responsive to the Does' requests and have apprised the Does of the only categories of documents they are withholding from production for privilege, or because the document categories are not legally in the custody and control of the Masts (*e.g.*, *Touhy* regulations or Virginia Code § 16.1-305), the Masts have not violated this Court's order and sanctions are not authorized.

Regardless, the sanctions sought by the Does would still not be appropriate given the realities of this production effort. Civil contempt is a severe sanction reserved for only the most unreasonable abuses of discovery. Courts find parties in contempt only in rare circumstances, such as when a party "has not diligently attempted in a reasonable manner to comply" with a court's order. *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 175 F. Supp. 2d 562, 565 (S.D.N.Y. 2001); *see also, e.g.*, *In re Taggart*, 980 F.3d 1340, 1347 (9th Cir. 2020) ("Civil contempt is a 'severe remedy' and, correspondingly, the Supreme Court has set a significantly high hurdle for when it is imposed." (citing *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019))).

The Does have provided no facts supporting their request for civil contempt, offering mere hypothetical questions and speculation. *See, e.g.*, Motion at 1 (alleging the Masts "doubled down on [] intransigence" by responding to the Does' requests). Nothing in the Does' motion shows the Masts acted in bad faith. The undisputed facts are that the Masts collected 186 gigabytes of data from more than fifteen sources, reviewed 46,000 pages of material, resulting in a near complete production of 204 responsive documents on December 28, a supplemental production of 14 additional documents on January 8, a final production of 24 additional documents on January 26, and a supplemental production of privilege review material (downgrades) on February 9. The Masts and their legal team invested substantial time and resources to make this timely production and did not seek to delay the production, even though this litigation is still early in the discovery

13

process and not a single deposition has been noticed and trial is set for September 2024. At most, due in part to routine technical challenges in collecting and reviewing disparate sources of material, the Masts provided a handful of documents days after the initial substantially complete production. That delay has not prejudiced the Does in any meaningful sense, and if there was an urgent need for the production to be processed faster, the Does never communicated that to the Masts.

The Does' request falls short of the legal standard for seeking the sanction of contempt. Two standards govern the imposition of sanctions under Rule 37(b)(2): "First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Bhattacharya*, 2022 WL 10424491, at *3 (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982)). Applying the Fourth Circuit's four-factor test for determining whether sanctions are warranted, *see Sines v. Kessler*, 339 F.R.D. 96, 99-100 (W.D. Va. 2021), the sanctions sought by the Does are not in the interest of justice and would be disproportionate to the modest delay in closing out a challenging and broad review and production of documents.

*First*, sanctions are not appropriate because the Masts acted in good faith when responding to the Does' requests for production. As explained *supra*, the Masts worked expeditiously over the holidays to collect and review responsive documents immediately upon entry of the Court's November 28 order compelling discovery. In fact, the Masts anticipated the need to produce documents prior to this Court's order and had already undertaken substantial collection efforts. Altogether, the Masts spent over 600 attorney and staff hours collecting, processing, and reviewing over 46,000 documents totaling 186 gigabytes of data. Such an in-depth document collection and review is the opposite of callous disregard of the Court's order. Rather, the Masts acted reasonably

and with due diligence, responding fully and accurately to the Does' requests for production and providing the substantially complete set of responsive documents by December 28, 2023.

**Second**, the Does suffered no prejudice because the Masts have provided all responsive documents in their possession. In fact, the Motion undermines their argument of prejudice. The Does assert that there are "likely" more documents in the Masts' custody and control that have not been produced, Motion at 12, but they do not explain why that is "likely"; the Masts provided all documents responsive to their requests, making it so there is no prejudice. The more appropriate mechanism for determining a discovery dispute would be to follow the routine deficiency, conferral, and motion to compel process. Skipping over these steps, the Does seek a sanction for contempt. Yet that request, at most, draws upon speculation that (unknown) documents may exist. The conferral and deficiency process should be used to mete out this speculation. This is not a proper basis for the severe sanction of civil contempt. *See, e.g.*, *Conley v. United States*, No. 2:10-CV-444, 2011 WL 5326133, at *2 (S.D. Ohio Nov. 4, 2011) ("A party may not move to compel discovery on the basis of a mere suspicion that the producing party has additional information that it failed to disclose."); *Harris v. Koenig*, 271 F.R.D. 356, 370 (D.D.C. 2010) ("I cannot compel what does not exist. If plaintiffs are speculating that documents responsive to these requests do exist, there must be a reasonable deduction that that is true, and not a mere hunch.").

To be clear, the Masts contend that no additional responsive documents exist. If the Does have reason to believe otherwise, the Masts remain ready willing and able to confer about any potential deficiency.

**Third**, there is no need for a sanction for deterrence purposes because the Masts fully complied with their discovery obligations in good faith. While civil contempt sanctions might deter parties from brazenly defying court orders, such sanctions will not affect parties like the Masts—

15

parties who undertook a good faith effort to collect and produce all documents in their possession that are responsive to a discovery request. Further, when imposing a sanction for its deterrent effect, a court must take care to "avoid pointless exaction[s] of retribution." *Hildebrandt v. Vilsack*, 287 F.R.D. 88, 96 (D.D.C. 2012) (quotation omitted) (citing *Bonds v. Dist. of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996)). Deterrence sanctions are warranted when a party's behavior constitutes "persistent obstructionism" arising from "a series of discovery abuses." *Tunnell v. Ford Motor Co.*, No. 4:03-CV-00074, 2006 WL 1788233, at *6 (W.D. Va. June 26, 2006) (noting that previous sanctions did not deter Ford's ongoing pattern of noncompliance). The Masts have not abused the discovery process in any way, let alone persistently or willfully.

**Fourth**, the Does have failed to establish why any sanction, including attorneys fees—much less civil contempt—is appropriate under these circumstances. Civil contempt is a *severe* sanction that "should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct." *Taggart*, 139 S. Ct. at 1801. The standard is objective—if a party reasonably attempts to comply with a court order, courts cannot order a civil contempt sanction. *Id.* at 1802. The Masts acted in objective good faith and fully complied with the Court's November 28, 2023 order compelling the production of documents responsive to the Does' requests for production.

**V.   Conclusion.**

For the foregoing reasons, Defendants Joshua and Stephanie Mast respectfully request that the Court deny Plaintiffs John and Jane Doe's motion. While the Masts would welcome any opportunity to argue this motion before the Court, given the procedural lack of required conferral and substantive shortcoming of the motion, the Masts respectfully request the Motion be denied without need to prolong this dispute with a hearing.

Dated: February 14, 2024                    Respectfully submitted,

*/s/ Michael Francisco*
John S. Moran (VSB No. 84326)
Michael L. Francisco (*pro hac vice*)
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of February 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

/s/ *Michael Francisco*
John S. Moran (VSB No. 84326)
Michael L. Francisco (*pro hac vice*)
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com