**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

BABY DOE, *et al.*,

       *Plaintiffs*,

v.                                                                         Case No. 3:22-cv-49-NKM-JCH

JOSHUA MAST, *et al.*,

       *Defendants.*

**PLAINTIFFS' MEMORANDUM: (A) IN OPPOSITION TO MOTIONS TO QUASH**
**AND FOR PROTECTIVE ORDER, AND**
**(B) IN SUPPORT OF CROSS MOTION TO COMPEL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     **INTRODUCTION**......................................................................................................**1**

II.    **PROCEDURAL HISTORY**.....................................................................................**2**

III.   **FACTUAL BACKGROUND**..................................................................................**5**

     A.    The Rules Governing LU's Email System.......................................................5

     B.    The Mast Defendants' Protestations..............................................................7

          1.    Richard Mast's Effort to Escape the LU Rules..............................7

          2.    Joshua Mast's Alternative Email Reality....................................10

IV.   **ARGUMENT**.........................................................................................................**12**

     A.    No Disputed Emails Are Protected by the Attorney-Client Privilege or Marital Privilege. ....................................................................................12

     B.    The Disputed Emails Are Not Protected by the Work-Product Doctrine.............17

          1.    Disputed Emails Prepared in Connection With the Custody and Adoption Proceedings Are Not Entitled to Work-Product Protection ...............................................................................17

          2.    The Mast Defendants' Conduct Was Sufficient to Waive Work-Product Protection Over *All* Disputed Emails ...........................19

     C.    The Mast Defendants' Additional Arguments Against Production are Without Merit........................................................................................21

V.    **CONCLUSION** ....................................................................................................**24**

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Asia Global Crossing,*
    322 B.R. 247 (S.D.N.Y. Mar. 21, 2005)................................................................13, 14, 15, 16

*Banks v. Mario Indus. of Va., Inc.,*
    274 Va. 438 (2007) ...........................................................................................................14, 23

*Bethune-Hill v. Virginia State Bd. of Elections,*
    114 F.Supp.3d 323 (E.D. Va. 2015) ........................................................................................13

*Bhattacharya v. Murray,*
    2022 WL 875032 (W.D. Va. Mar. 23, 2022)...........................................................................19

*Brown-Criscuolo v. Wolfe,*
    601 F.Supp.2d 441 (D. Conn. 2009) ........................................................................................13

*Connick v. Thompson,*
    563 U.S. 51 (2011)...................................................................................................................17

*Convertino v. U.S. Dept. of Justice,*
    674 F.Supp.2d 97 (D.D.C. 2009).............................................................................................13

*Doe 1 v. George Washington Univ.,*
    480 F.Supp.3d 224 (D.D.C. 2020) ..............................................................................13, 14, 15, 23

*Doe v. United States,*
    662 F.2d 1073 (4th Cir. 1981) .................................................................................................20

*Dunplan Corp. v. Deering Milliken, Inc.,*
    540 F.2d 1215 (4th Cir. 1976) .................................................................................................20

*Hanson v. First Nat. Bank,*
    2011 WL 5201430 (S.D.W.V. Oct. 31, 2011) ...................................................................14, 15

*Hawkins v. Stables,*
    148 F.3d 379 (4th Cir. 1998) ...................................................................................................12

*Martin Marietta Corp. v. Pollard,*
    856 F.2d 619 (4th Cir. 1988) ...................................................................................................20

*Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.,*
    967 F.2d 980 (4th Cir. 1992) ...................................................................................................18

*In re Rsrv. Fund Sec. and Derivative Litig.*,
 275 F.R.D. 154 (S.D.N.Y.) ...............................................................................13, 15

*Sprenger v. Rector and Bd. of Visitors of Va. Tech*,
 Civ. No. 7:07cv502, 2008 WL 2465236 (W.D. Va. June 17, 2008) ................................12, 13

*United States v. Broome*,
 732 F.2d 363 (4th Cir. 1984) ........................................................................................12

*United States v. Finazzo*,
 2013 WL 619572 (E.D.N.Y. 2013)..................................................................................16

*United States v. Jones*,
 696 F.2d 1069 (4th Cir. 1982) ......................................................................................12

*United States v. Mosby*, No. 3:08-CR-127, 2008 WL 2961316 (E.D. Va. July 25,
 2008) .......................................................................................................................16

*United States v. Simons*,
 206 F.3d 392 (4th Cir. 2000). .......................................................................................16

*Wolfle v. United States*,
 291 U.S. 7 (1934).........................................................................................................12

**Statutes**

Stored Communications Act, 18 U.S.C. § 2702 ........................................................................22

**Other Authorities**

ABA Comm. on Ethics and Prof 1 Responsibility, Formal Op. 11-459 (2011) at 1
 (available at
 https://www.americanbar.org/content/dam/aba/publications/YourABA/11-
 459.authcheckdam.pdf) ...........................................................................................1

Kerr, Orin, *A User's Guide to the Stored Communications Act, and A Legislator's
 Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1226 (2004) American
 Bar Association................................................................................................22

Edna Selan Epstein, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT
 DOCTRINE, 123–25 (Am. Bar Ass'n., 4th ed. Supplement, 2004) ............................................18

Fed. R. Civ. P. 45(d) .......................................................................................................21

# I.      INTRODUCTION

This is a dispute involving Defendants' tortious interference with Plaintiffs' parental rights. After fraudulently and secretly obtaining a now-vacated adoption order, Defendants Joshua and Stephanie Mast, with the aid of their co-conspirators (including Joshua's brother, Defendant Richard Mast), fraudulently induced Plaintiffs John and Jane Doe to travel to the United States with Baby Doe under the pretense of offering them medical assistance for Baby Doe. Once they arrived, Joshua and Stephanie Mast abducted Baby Doe under the guise of the now-vacated adoption order.

Via a third-party subpoena, Plaintiffs seek production from Liberty University ("LU") of the Mast Defendants' email communications regarding Baby Doe. These communications regarding Baby Doe are plainly relevant to this case, and the Mast Defendants do not claim otherwise. Instead, they seek to quash the subpoena on the grounds of marital privilege, attorney-client privilege, and/or the work-product doctrine.[1]

Unfortunately for the Masts, none of these privileges survived contact with LU's email system. More than a decade ago, the American Bar Association Standing Committee on Ethics and Professional Responsibility issued an opinion finding that an attorney "ordinarily must warn the client about the risk of sending or receiving electronic communications using a computer or other device, ***or email account***, where there is a significant risk that a third party may gain access."[2] The ABA warned, for example, that if an employee's email system could be monitored by the

---

[1] *See* Defendant Richard Mast's Motion to Quash/Modify Subpoena and Motion for Protective Order ("RMast's Motion") (ECF No. 345); Defendants Joshua and Stephanie Mast's Motion to Quash Plaintiffs' Subpoena of Nonparty Liberty University and for a Protective Order ("J&S Mast's Motion") (ECF No. 347).

[2] ABA Comm. on Ethics and Prof 1 Responsibility, Formal Op. 11-459 (2011) at 1 (available at https://www.americanbar.org/content/dam/aba/publications/YourABA/11-459.authcheckdam.pdf) (emphasis added).

1

employer, "other third parties may be able to obtain access to an employee's electronic communications by issuing a subpoena to the employer…."[3]

Joshua Mast and Richard Mast, themselves attorneys, failed to heed that warning, and given clear Fourth Circuit precedent, the risk noted by the ABA has now turned into reality. The Masts' communications using the LU email system were governed by the same rules applicable to LU employees—rules that are wholly incompatible with maintaining confidentiality of the communications. Indeed, the LU rules governing email accounts preclude the assertion of precisely the kinds of privilege claims now advanced by the Masts. The Mast Defendants' motions to quash Plaintiffs' subpoena to LU should therefore be denied. For the same reasons, the Court should compel production from Joshua and Stephanie Mast and Richard Mast of any and all emails from the LU system that are in Defendants' possession.

## II.    PROCEDURAL HISTORY

The current dispute involves (a) certain discovery requests to the Mast Defendants, and (b) two subpoenas served on LU.

Plaintiffs served their First Set of Requests for Production on all defendants, including Joshua and Stephanie Mast ("J&S Mast") and Richard Mast (collectively, the "Mast Defendants"), on December 22, 2022.[4] Plaintiffs' requests ("RFPs") generally sought documents relating to Defendants' conduct underlying the Amended Complaint. For example, Plaintiffs' RFP No. 3 sought, "[a]ll non-privileged Documents relating to the efforts of Joshua and/or Stephanie Mast to

---

[3] *Id.*

[4] *See* Plaintiffs' First Set of Requests for Production to Defendants Joshua Mast, Stephanie Mast, Richard Mast, Kimberly Motely, and Ahmad Osmani (attached as Exh. 1).

obtain custody and/or adoption orders for Baby Doe."[5] For nearly a year, J&S Mast refused to produce any documents, and did so only when compelled by the Court.[6]

In the midst of J&S Mast's obstinate refusal to produce any documents, Plaintiffs served their first subpoena on Liberty University on March 24, 2023, seeking documents and communications relating to Baby Doe.[7] The parties agreed that LU need not produce certain emails claimed as privileged by J&S Mast.[8] Notably, though, in addition to producing hundreds of communications sent or received by Joshua Mast, Stephanie Mast, and/or Richard Mast in response to the First Subpoena, LU itself did not object to the First Subpoena on the basis of any privilege; nor did it demand any protective order preserving any asserted confidentiality of any document or user.[9]

On November 28, 2023, the Court ordered J&S Mast to comply with their discovery obligations and produce *all* non-privileged responsive documents by December 28. Order at 12. However, J&S Mast failed to provide Plaintiffs with a privilege log until January 31, 2024. J&S Mast provided an updated privilege log on February 9, 2024, withdrawing privilege claims over hundreds of documents. Yet even in this more recent iteration of their privilege log, J&S Mast improperly claimed as privileged – and on that basis withheld – 114 communications that Joshua

---

[5] *Id.* at 6–7.

[6] November 28, 2023 Memorandum Op. & Order (ECF No. 326) at 12 ("Order"). Even then, J&S Mast have yet to produce all responsive documents. *See* ECF No. 336.

[7] *See* 3/24/23 Subpoena to Liberty University ("First Subpoena") (attached as Exh. 2) at 6.

[8] *See* 4/6/2023 Email from R. Jenkins to M. Eckstein (attached as Exh. 3).

[9] *See* 3/17/23 Email from J. Shipman to J. King (attached as Exh. 4).

Mast sent or received using his LU email account.[10] Attached as Exh. 5 is a listing of the documents on J&S Mast's privilege log that Joshua Mast sent or received using his LU email account.

Similarly, Richard Mast, who also used an LU email account, claims as privileged 65 communications on the same grounds. Attached as Exh. 6 is a listing of the documents on Richard Mast's privilege log that were sent or received using either Richard Mast's or Joshua Mast's LU email account.[11]

After reviewing LU's policy regarding the use of its email system, Plaintiffs served a second subpoena on LU, seeking the LU emails that previously were withheld based on J&S Mast's assertion that they were privileged.[12] Specifically, the Second Subpoena sought two categories of documents: (1) all communications relating to Baby Doe sent or received by Joshua or Stephanie Mast on their LU email accounts from any of 19 email addresses that they previously identified should be withheld on the basis of privilege, and (2) all communications relating to Baby Doe sent between J&S Mast.[13] The Mast Defendants filed motions to quash the Second Subpoena, but, once again LU posed no objection to production. In particular, LU has never objected to

---

[10] J&S Mast's privilege log also includes 15 entries that they describe as attachments "withheld pursuant to marital communications privilege" but fail to provide corresponding email addresses. *See* Exh. 5 (rows 117–131). To the extent that any of these attachments were sent using Joshua Mast's LU email address, they also are improperly withheld. Additionally, J&S Mast's privilege log includes 12 entries that are described as email chains, but contain names of "other participants" without corresponding email addresses, including Jonathan Mast, an employee of LU. *Id.* (rows 132–139; 141–44). If any of these communications used an LU email address, they likewise are improperly withheld for the reasons explained in this Memorandum.

[11] A handful of the communications withheld by Richard Mast involve an LU email account belonging to a third party, such as Richard Mast's law clerk (hwbradburn@liberty.edu). *See* Exh. 6.

[12] *See* 2/19/24 Subpoena to Liberty University ("Second Subpoena") (attached as Exh. 7).

[13] *Id.* Both requests limited the requested documents to those "relating to (1) a child located at any time in Afghanistan and/or the child's relatives or caregivers, (2) a child purportedly adopted by Joshua Mast and Stephanie Mast, and/or (3) court proceedings initiated by or filed against Joshua Mast and/or Stephanie Mast relating to the custody and/or adoption of a child[.]"

production on the basis of the attorney-client privilege, the marital privilege, or the work-product doctrine; nor has LU demanded a protective order to preserve the purported confidentiality of any document or user.

## III.     FACTUAL BACKGROUND

### A.     The Rules Governing LU's Email System

The email communications at issue (the "Disputed Emails") were sent and received by the Mast Defendants using LU accounts that were governed by LU's "Acceptable Use Policy" (the "LU Rules").[14] The LU Rules, which apply to LU employees, students, and alumni users like the Masts, include a number of relevant provisions regarding objectionable use, consent to the Rules, monitoring of users' emails, ownership of users' emails, and disclosure.

**Restrictions on Objectionable Use**. To begin with, the LU email system is an environment that LU polices to prevent abuse. The Rules provide that "[e]mail accounts assigned to a user by LU are a privilege and should not be misused."[15] Moreover, "[b]ehavior of all users on the network must be consistent with all applicable University policies including the University's Mission and Doctrinal Position . . . ."[16] LU thus "reserves the right to reject from the network or block electronic communications and content deemed not to be in compliance with policies governing use of University Information Systems."[17]

**User Consent to the LU Rules.** Users of LU email accounts assent to, and agree to comply with, the LU Rules by "clicking through" a usage agreement when they sign on.[18] Even if that

---

[14] RMast's Motion (ECF No. 345) at 4. The LU Rules are attached as Exhibit 4 to RMast's Motion.

[15] LU Rules, ECF No. 345-4 at PageID 4431.

[16] *Id.* at PageID 4430.

[17] *Id.* at PageID 4435.

[18] *Id.* at PageID 4429.

were not the case, the very act of using the system is deemed to be consent to the "monitoring" of users' emails by LU.[19]

**Monitoring of Users' Emails.** The LU Rules inform users that LU "reserves the right with or without notice, to monitor, record, limit or restrict any user account, access and/or usage of [the user's] account."[20] The LU Rules also provide that LU "may also monitor, record, inspect, copy, remove or otherwise alter any data, file or system resources in its sole discretion."[21] The LU Rules note that monitoring and inspection are not some remote possibility, and indeed the Rules warn users that LU actually ***intends to engage in this practice***:

> All electronic communications, files and content presented to and/or passed on the Liberty network, including those to, from or through Internet connection(s) may be monitored, examined, saved, read, transcribed, stored or retransmitted by an authorized employee or agent of the University, in its sole discretion, with or without prior notice to the user. ***The University reserves and intends to exercise the right to do so.*** Electronic communications and content may also be examined by automated means.[22]

**Ownership and Privacy of Users' Emails.** One of the reasons LU has the right to examine users' emails is because LU ***owns*** them. As the LU Rules note, LU "owns all University email accounts and data transmitted or stored using the University email account,"[23] and LU "also retains access rights to all files and electronic mail on its Information Systems."[24] If that were not sufficiently clear, the LU Rules further provide that:

> University Information Systems and the messages, e-mail, files attachments, graphics and Internet traffic generated through or within these systems are the property of the University. They are not the private property of any University

---

[19] *Id.* at PageID 4434.

[20] *Id.* at PageID 4434.

[21] *Id.* at PageID 4434.

[22] *Id.* at PageID 4436 (emphasis added).

[23] *Id.* at PageID 4431.

[24] *Id.* at PageID 4434.

employee, faculty, staff, contractor, student or any other person. ***No user of the Information Systems should have an expectation of privacy in their electronic communications***.[25]

**Disclosure of Users' Emails.** Consistent with the Rules' denial of any user's ownership or privacy rights, LU may do ***whatever it wishes*** with emails in its system, including disclosing them to whomever it wants. Specifically, the LU Rules provide that LU "may disclose information, including pursuant to an internal or external investigation of alleged misconduct or wrongdoing, and may provide information to third parties, including law enforcement."[26] By merely using their email accounts, users give LU permission to engage in each of these operations.[27] And even the curious declaration submitted by LU's John Gauger[28] concedes that LU ***does in fact access*** users' emails when LU is "required by law" to do so.[29] LU already exercised this right and accessed the Masts' email at least once, when LU produced emails in response to the First Subpoena.

### B. The Mast Defendants' Protestations

In an effort to avoid the clear dictates of the LU Rules—and their devastating effect on confidentiality/privilege claims for the Disputed Emails, detailed below—the Mast Defendants now contend that they somehow used their LU accounts based on ***different*** rules.

#### 1. Richard Mast's Effort to Escape the LU Rules

Richard Mast, a lawyer and member of the Virginia State Bar, concedes that all emails he sent or received using LU email accounts were in fact governed by the LU Rules.[30] Yet he

---

[25] *Id.* at PageID 4436 (emphasis added).

[26] *Id.* at PageID 4435.

[27] *Id.*

[28] Discussed *infra* at 8–10.

[29] Declaration of John Gauger ("Gauger Dec.) (ECF No. 345-5) at 2 (emphasis added). A Rule 45 subpoena does, of course, impose "by law" a duty to produce responsive materials.

[30] RMast Motion at 4.

nevertheless maintains that he has somehow been operating, in practice, under rules ***directly***

***contrary*** to those published by LU. Specifically, Richard Mast claims he has, from at least 2008

to the present, "known and understood that Liberty University's email policy as practiced was to

preserve confidentiality, privacy, and privileges relating to legal representation, including

attorney-client privilege and attorney work-product doctrine."[31]

In an effort to substantiate this alternative universe, Richard Mast offers the Declaration of

John M. Gauger, LU's Chief Information Officer and Executive Vice President of Analytics.[32]

Gauger's declaration is, at the outset, a curious one. Gauger disclaims any status as a party,[33] and

he does not aver that he actually speaks on behalf of LU, or even that he is authorized to do so. On

that point, note that LU's own policies required Gauger to consult with LU's counsel and "receive

instructions" before submitting a declaration in this case[34]—but he does not state that he did so.

But even if Gauger were speaking on behalf of LU, under instructions from its attorneys,

it would not matter—because to the extent Gauger says anything relevant, it supports Plaintiffs'

position. Gauger never contradicts the LU Rules in any respect, does not concede that they are

ignored in practice (much less that users have an "expectation of privacy"), and does not

---

[31] Declaration of Richard Mast ("RMast Dec.") (ECF No. 345-3) at 1.

[32] Declaration of John M. Gauger ("Gauger Dec.") (ECF No. 345-5) at 1.

[33] *Id.*

[34] Liberty University, Polices and Procedures, Subpoenas and Summons ("All employees must immediately contact the Office of Legal Affairs by telephone and receive instructions before taking any action regarding any subpoena from any court or government authority, which document may require … the production of University documents, an inspection by an outside attorney, party or government official of University controlled property or items, or require an employee to give a deposition in a matter involving the University or one of its affiliates."). Available at https://www.liberty.edu/legal-affairs/policies-procedures/.

substantiate Richard Mast's categorical claim that LU "preserve[s] confidentiality, privacy, and privileges relating to legal representation."[35]

Instead, Gauger avers first that emails on the LU email system "must be treated as confidential *by other students or employees* and accessed only by the intended recipients."[36] This observation is both unremarkable and irrelevant. Gauger does not claim, contrary to the LU Rules, that *LU itself* must treat users' emails as confidential and refrain from accessing them—indeed, in the very next sentence he states, entirely consistent with the LU Rules, that LU owns the emails and "has the right to audit and/or monitor this data . . . ."[37]

Gauger next observes that LU has a "standard practice of not actively monitoring or accessing the emails of students, alumni, or employees . . . ."[38] Even if that observation is true (and given the volume of email on LU's email system, presumably it is), it is irrelevant. As explained below, the dispositive point is not whether LU has a "practice" of monitoring or accessing emails ("actively" or otherwise), but rather whether LU *retains the right to do so*. And it plainly does. Indeed, Gauger concedes in the very same sentence that LU possesses *and* exercises this right. According to Gauger, the "standard practice" of "not actively monitoring" applies "unless the University is required by law to access the e-mails . . . ."[39] Put another way, when LU receives a subpoena seeking users' emails, as it has here, LU does indeed access users' emails on its system (as it did when it responded to the First Subpoena).

---

[35] RMast Dec. (ECF No. 345-3) at 1.

[36] Gauger Dec. (ECF No. 345-5) at 1-2 (emphasis added).

[37] *Id.* at 2.

[38] *Id.* Even if this practice were sufficient to create a reasonable expectation of privacy among users, there is no evidence of reliance: Gauger does not identify any instance in which this "standard practice" has ever been communicated to any user, much less to the Mast Defendants.

[39] *Id.* (emphasis added).

Gauger's final observation is that, consistent with Richard Mast's own experience, LU generally recognizes and protects the confidentiality and privilege associated with the legal work done by the lawyers LU employs in its School of Law, including when they represent third parties.[40] But the obvious limit of this (again, unremarkable) observation proves Plaintiffs' point. While LU may recognize and protect the confidentiality of communications sent by lawyers **employed by** LU, Gauger does not say that LU recognizes and protects confidentiality and privilege claimed by **third-party lawyers** who are representing third parties.

And, of course, Gauger could not possibly make that claim consistent with the LU Rules, or given this record. Indeed, we now know that LU in fact takes **no** steps to preserve the confidentiality or privilege of third-party attorneys using the LU email system. In response to the two subpoenas it received in this case—subpoenas seeking emails sent and received by third-party attorneys—LU has never once objected to production on grounds of confidentiality or privilege.

### 2.  Joshua Mast's Alternative Email Reality

Joshua Mast, who also is an attorney and member of the Virginia State Bar, adopts a slightly different strategy in his effort to evade the plain import of the LU Rules. He simply denies reality. First, although Joshua concedes he made "hundreds of communications to the Masts' own counsel and between Joshua and Stephanie" using his LU email account,[41] presumably logging on to the system scores of times, he pleads total ignorance of the terms and conditions on which he did so—claiming that his use of his LU email account "has never been accompanied by University

---

[40] *Id.*

[41] Defendants Joshua and Stephanie Mast's Memorandum in Support of Motion to Quash Plaintiffs' Subpoena of Nonparty Liberty University and For a Protective Order ("J&S Mast Mem.") (ECF No. 347-1) at 2.

warnings" that his personal communications might be disclosed.[42] Joshua provides no declaration supporting this assertion – possibly because the evidence provided by his own brother, Richard Mast, is directly to the contrary. As noted above, Richard attaches to his motion the LU Rules, which explicitly state that users of LU email accounts agree to comply with the Rules by "clicking through" a usage agreement when they sign on, and simply by using the system.[43]

Similarly, Joshua states that he and his wife "have a reasonable expectation of privacy in the communications sent or received by Joshua's" LU email account,[44] whistling past the rather unhelpful provision of the LU Rules proclaiming that "***no user***" of the system "***should have an expectation of privacy in their electronic communications***."[45] He also claims, again without any sworn testimony, that his use of the LU email system "has never been accompanied by University warnings that personal communications [sic] or that such communications could be monitored or disclosed,"[46] without mentioning that in fact, the LU Rules warn (a) that LU not only ***can*** monitor his emails, but that LU actually ***intends*** to do so,[47] and (b) that LU is free to disclose his emails to any "third parties."[48] Finally, like Richard, Joshua relies on the Gauger Dec. for a claim that LU "does not monitor alumni use of their e-mail accounts,"[49] but as noted above, Mr. Gauger actually confirmed that LU ***does*** access users' emails in situations exactly like this one.

---

[42] *Id.* at 2-3.

[43] LU Rules (ECF No. 345-4) at PageID 4429.

[44] J&S Mast Mem. (ECF No. 347-1) at 2.

[45] LU Rules (ECF No. 345-4) at PageID 443644 (emphasis added).

[46] J&S Mast Mem. (ECF No. 347-1) at 2-3.

[47] LU Rules (ECF No. 345-4) at PageID 4436.

[48] *Id.* at PageID 4435.

[49] J&S Mast Mem. (ECF No. 347-1) at 8.

## IV.      ARGUMENT

This Court should deny the Mast Defendants' respective motions to quash Plaintiffs'

Second Subpoena to LU and grant Plaintiffs' cross-motion to compel related documents from the

Mast Defendants. The Disputed Emails are not protected by the attorney-client or marital privilege

because the Mast Defendants lacked any reasonable expectation of privacy in the contents of those

communications. The work product doctrine does not shield the Disputed Emails from production

either. Emails associated with the custody and adoption proceedings were not prepared "in

anticipation of litigation" and, regardless, the Masts' use of the LU email system waived work-

product protection for all the Disputed Emails.

### A.      No Disputed Emails Are Protected by the Attorney-Client Privilege or Marital Privilege.

The Fourth Circuit requires those who claim attorney-client privilege to demonstrate: "(1)

the asserted holder of the privilege is or sought to become a client; (2) the person to whom the

communication was made is a member of the bar of a court, or his subordinate and in connection

with this communication is acting as a lawyer; (3) the communication relates to a fact of which

the attorney was informed by his client[,] without the presence of strangers[, and] for the purpose

of securing primarily either an opinion on law[,] or legal services[,] or assistance in some legal

proceeding, and not for the purpose of committing a crime or tort; and (4) the privilege has been

claimed and not waived by the client."[50] Fundamentally, attorney-client privilege applies only to

confidential communications.[51]

---

[50] *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (numbering simplified).

[51] *Hawkins v. Stables*, 148 F.3d 379, 383-84 (4th Cir. 1998).

Marital privilege similarly protects "those marital communications made in confidence and intended to be confidential."[52] When a communication between spouses "because of its nature or the circumstances under which it was made, was obviously not intended to be confidential, it is not a privileged communication."[53] When such communications are "made in the presence of a third party, such communications are usually regarded as not privileged[.]"[54] Indeed, this privilege does not extend to communications between spouses transmitted "through a third party intermediary."[55]

A document is not privileged merely because a litigant wills it to be. Rather, "the question of privilege comes down to whether the intent to communicate in confidence was objectively reasonable."[56] Along the same lines, communications between an attorney and her client are not automatically protected by attorney-client privilege. "[F]or documents sent through e-mail to be protected by the attorney-client privilege there must be a subjective expectation of confidentiality that is found to be objectively reasonable."[57] Whether there was a reasonable expectation of privacy in communications between spouses is similarly essential to determining whether marital privilege applies.[58]

Federal courts routinely consider four factors in determining whether employees have an expectation of privacy in emails sent and received on their employer's domain: (1) whether the

---

[52] *United States v. Broome*, 732 F.2d 363, 364 (4th Cir. 1984).

[53] *Wolfle v. United States*, 291 U.S. 7, 14 (1934) (cited in *Sprenger v. Rector and Bd. of Visitors of Va. Tech*, Civ. No. 7:07cv502, 2008 WL 2465236, at *2 (W.D. Va. June 17, 2008)).

[54] *Id.*

[55] *Id.* at 15.

[56] *In re Asia Global Crossing*, 322 B.R. 247, 258 (S.D.N.Y. Mar. 21, 2005).

[57] *Convertino v. U.S. Dept. of Justice*, 674 F.Supp.2d 97, 110 (D.D.C. 2009).

[58] *See In re Rsrv. Fund Sec. and Derivative Litig.*, 275 F.R.D. 154, 159 (S.D.N.Y. 2011).

corporation maintains a policy banning personal or other objectionable use; (2) whether the corporation monitors the use of the employee's computer or email; (3) whether third parties have a right to access the computer or email; and (4) whether the corporation notified the employee, or the employee was aware, of the use and monitoring polices.[59] Analyzing these four factors in the context of LU's Rules (which apply to LU employees, students, and alumni users like the Masts), it is clear that there was no reasonable expectation of privacy in emails sent to or received on any LU email account.

First, LU's Rules ban "objectionable use," *see In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 257 (S.D.N.Y. Mar. 21, 2005), stating that "[a]ny unauthorized, inappropriate, illegal or illegitimate use of the University's Information Systems . . . will constitute a violation of University policy[.]"[60] The Rules further advise that "[e]mail accounts assigned to a user by LU are a privilege and should not be misused"[61] and that LU "reserves the right to reject from the network or block electronic communications and content deemed not to be in compliance with policies governing use of University Information Systems."[62] Federal courts, along with the Virginia Supreme Court, have held that, even when an employer's policy placed no prohibition on an employee's personal use of the employer's email domain, an email policy cautioning employees that they have no right of personal privacy as to their emails is sufficient to satisfy the first *Asia*

---

[59] *See, e.g., In re Asia Global Crossing, Ltd.*, 322 B.R. at 257; *Doe 1 v. George Washington Univ.*, 480 F.Supp.3d 224, 226 (D.D.C. 2020); *Convertino v. U.S. Dept. of Justice*, 674 F.Supp.2d 97, 110 (D.D.C. 2009); *Bethune-Hill v. Virginia State Bd. of Elections*, 114 F.Supp.3d 323, 346-47 (E.D. Va. 2015); *Brown-Criscuolo v. Wolfe*, 601 F.Supp.2d 441, 449 (D. Conn. 2009); *Sprenger*, 2008 WL 2465236, at *3; *Hanson v. First Nat. Bank*, 2011 WL 5201430, at * 5-6 (S.D.W.V. Oct. 31, 2011).

[60] LU Rules (ECF No. 345-4) at PageID 4436.

[61] LU Rules (ECF No. 345-4) at PageID 4431.

[62] *Id.* at PageID 4435.

*Global Crossing* factor.[63] LU's Rules certainly caution employees, students, and alumni that "[n]o user of the Information Systems [which includes emails] should have an expectation of privacy in their electronic communications."[64]

Second, LU monitors the users' email accounts. Courts have found this factor satisfied when a policy provides that an employer "may search, review, monitor, or copy any e-mail sent to or from a [company] e-mail account."[65] The LU Rules are explicit that LU "reserves the right with or without notice, to monitor, record, limit or restrict any user account, access and/or usage of [the user's] account."[66] "Respecting the second factor . . . most Courts have not required evidence that the employer actually did so. Rather, ***the employer's reservation of the right to do so has sufficed*** as a basis for concluding that employees had no reasonable expectations of privacy."[67]

Third, LU's Rules give third parties a right to access a user's LU email communications. Courts have held this factor satisfied when, as here, a policy warns users that their emails are subject to disclosure.[68] Here, the LU Rules, which apply to employees, students, and alumni users alike, state that "[t]he University may disclose information, including pursuant to an internal or

---

[63] *See Doe 1 v. George Washington Univ.*, 480 F.Supp.3d at 227; *see also Banks v. Mario Indus. of Va., Inc.*, 274 Va. 438, 454 (2007) (holding that employee waived attorney-client privilege for document created on employer's computer where system could be used for personal business, but where policy advised employee he had "no expectation of privacy"). Thus, the analysis of the Mast Defendants' waiver of attorney-client and marital communication privileges leads to the same result regardless of whether the Court applies Fourth Circuit law or Virginia law.

[64] *Id.* at PageID 4436.

[65] *Doe 1 v. George Washington Univ.*, 480 F.Supp.3d at 227.

[66] *Id.* at PageID 4434.

[67] *Hanson*, 2011 WL 5201430, at *6 (emphasis added).

[68] *In re Rsrv. Fund Securities and Derivative Litigation*, 275 F.R.D. at 158-59 (finding factor satisfied when policy stated "[e]mployees are reminded that . . . e-mail communications received by and sent from Reserve . . . may be subject to disclosure to regulatory agencies or the courts").

external investigation of alleged misconduct or wrongdoing, and may provide information to third parties, including law enforcement." Thus, this factor is satisfied.

Fourth, LU notified its information system users of its use and monitoring polices. Courts have held the fourth *Asia Global Crossing* factor satisfied when an employer's policy put an employee "on notice" that "it would be overseeing his Internet use."[69] This factor weighs "heavily against" employees when employees are repeatedly "required to acknowledge that [they] had read the policy."[70] Additionally, a court in this Circuit has held that an employee had no reasonable expectation of privacy in his email communications when his employer displayed a banner upon login "clearly inform[ing] the employee that he has no expectation of privacy and stat[ing] that the computer is monitored . . . ."[71] Here, LU's Rules explicitly put the Mast Defendants on notice of the use and monitoring rules, stating that "[u]sers of the University's Information Systems are expected to review, understand, and comply to this Policy and its associated standards."[72] They further state that "[a]nyone using these systems expressly consents to such monitoring,"[73] and that users have no expectation of privacy.[74] As in *Finazzo*, users here are expected to review and comply with the Rules, and are reminded of the Rules upon every login to their LU email account.

Because all four *Asia Global Crossing* factors are satisfied—indeed, because the LU Rules appear to have been crafted with the *Asia Global Crossing* factors in mind—the Mast Defendants

---

[69] *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000).

[70] *United States v. Finazzo*, No. 10-CR-457 (RRM)(RML), 2013 WL 619572, at *10 (E.D.N.Y. 2013).

[71] *See United States v. Mosby*, No. 3:08-CR-127, 2008 WL 2961316, at *5 (E.D. Va. July 25, 2008).

[72] *Id.* at PageID 4429.

[73] *Id.* at PageID 4434.

[74] *Id.* at PageID 4436.

had no reasonable expectation of privacy in their email communications sent or received on their LU email accounts. As a result, they cannot claim that such communications are protected by the attorney-client or marital communications privileges. That is especially true here, where Joshua Mast and Richard Mast are Virginia-barred attorneys who should understand the importance of maintaining the confidentiality of their communications.[75] The Court should deny their respective motions to quash and order that they immediately produce all such communications.

### B.     The Disputed Emails Are Not Protected by the Work-Product Doctrine

The Mast Defendants assert that a number of the Disputed Emails are protected against disclosure by the work-product doctrine—and that no waiver occurred when those emails were sent using LU email addresses, because the Masts did not "knowingly provide [the] work product to someone adverse to" their interests.[76] The Mast Defendants err in two respects. First, the work-product doctrine plainly does not cover any Disputed Emails associated only with the custody and adoption proceedings prior to December 8, 2021. Second, the circumstances here are in fact sufficient to result in waiver of the doctrine with respect to all the Disputed Emails.

### 1.     Disputed Emails Prepared in Connection With the Custody and Adoption Proceedings Are Not Entitled to Work-Product Protection

The Masts concede that it is their burden, when seeking work-product protection for Disputed Emails, to show that the emails in question were "prepared in anticipation of litigation."[77] They claim that three proceedings count as "litigation" here for purposes of the doctrine: (1) Baby Doe's custody and adoption proceedings, (2) what the Mast Defendants call the "parallel state

---

[75] *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 64 (2011) ("Attorneys are trained in the law and equipped with the tools to interpret and apply legal principles, . . . and exercise legal judgment").

[76] *See, e.g.,* RMast's Motion (ECF No. 345) at 10 (citations omitted).

[77] J&S Mast Mem. (ECF No. 347-1) at 10 (citation omitted); RMast's Motion (ECF No. 345) at 6 (citation omitted).

court litigation," and (3) "this litigation."[78] But with respect to the first category, they are wrong: the custody and adoption proceedings were not "litigation" for purposes of the work-product doctrine, and documents prepared in connection with those proceedings thus are entitled to no work-product protection.

"Litigation," for purposes of applying the work product doctrine, is an "adversary proceeding," *i.e.*, "a proceeding in court or administrative tribunal in which the parties have the right to cross-examine witnesses or to subject an opposing party's presentation of proof to equivalent disputation."[79] This definition corresponds to the work-product doctrine's purpose of protecting the special place of the attorney in the adversarial process,[80] precisely the concern identified by the Mast Defendants in their briefing, and by the Fourth Circuit.[81]

The custody and adoption proceedings for Baby Doe were, though, not adversarial—they were instead *ex parte* proceedings. The Masts sought custody and then adoption with no opposition – no surprise given their failure to provide notice of those proceedings to others with interest. Because of that knowing failure, both the Juvenile & Domestic Relations Court and the Circuit Court made factual findings—based on objectively false information provided by the Mast Defendants—that Baby Doe was not Afghan, without relatives, and that the government of

---

[78] J&S Mem. at 11.

[79] *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 625 (D.D.C. 1979) (adopting guidelines relating to the law of privilege); *see also* Edna Selan Epstein, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE, 123–25 (Am. Bar Ass'n., 4th ed. Supplement, 2004) (relevant pages attached as Exh. 8).

[80] *Id.*

[81] RMast's Motion (ECF No. 345) at 5-6; *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 983-84 (4th Cir. 1992) ("our ***adversary system*** depends on the effective assistance of lawyers, fostered by the privacy of communications between lawyer and client and the privacy in development of legal theories, opinions, and strategies for the client") (emphasis added)).

Afghanistan intended to waive jurisdiction over her.[82] While none of that was true—as was established by the Circuit Court's order vacating the adoption—those misrepresentations caused the custody and adoption proceedings to be non-adversarial.[83]

Nor do the Mast Defendants identify any "triggering event" relating to the custody and adoption proceedings that led them to anticipate litigation.[84] Accordingly, no work product protection could attach to documents prepared in connection with those activities. There is no reason to protect the adversarial process when there is no adversary.[85] There was no "litigation" here, and thus no basis for claiming any work-product protection, before December 8, 2021, the date Plaintiffs sought to vacate the adoption order in the parallel state court litigation.

> **2.    The Mast Defendants' Conduct Was Sufficient to Waive Work-Product Protection Over *All* Disputed Emails**

But even if the Disputed Emails all were prepared in anticipation of litigation, any work-product doctrine protection was waived. The Mast Defendants seem to think that waiver of the

---

[82] *See, e.g.*, Nov. 6, 2019 J&DR Order (attached as Exh. 9) at ¶¶ 3(E), (F) & (G); Nov. 10, 2019 Interlocutory Order of Adoption (attached as Exh. 10) at ¶ 2; Dec. 3, 2020 Adoption Order (attached as Exh. 11) at ¶ A.

[83] May 3, 2023 Order (attached as Exh. 12). Surely, the Mast Defendants will argue that they did not knowingly provide any false information to the state courts. That, though, is irrelevant—what is relevant, and indisputable, is that the information they provided the state courts rendered the custody and adoption proceedings non-adversarial.

[84] *See, e.g.*, *Bhattacharya v. Murray*, No. 3:19cv00054, 2022 WL 875032, *4 (W.D. Va. Mar. 23, 2022) (Hoppe, J.) (discussing triggering event).

[85] *See generally In re Grand Jury Subpoenas dated Mar. 9, 2001*, 179 F.Supp. 2d 270, 288 (S.D.N.Y. 2001) (work product doctrine did not protect defendant's attorneys' communications created in process of seeking Presidential pardon: process was *ex parte*, not adversarial, especially since attorneys did not give notice of proceeding to United States Attorney or to Pardon Attorney at Department of Justice. "Under these circumstances, the rationales underlying the work product doctrine do not apply. Application of the work product doctrine here would not promote the fair and efficient functioning of the adversarial system of justice."); *Application of Minebea Co., Ltd.*, 143 F.R.D. 494, 499 (S.D.N.Y. 1992) (work done in connection with non-adversarial, *ex parte* proceeding is not "in anticipation of" or "concerning" litigation for purposes of the work-product doctrine).

work-product doctrine can occur only if the materials in question are knowingly provided to an adversary.[86] But that is not the law. In fact, the Fourth Circuit has recognized that even the inadvertent disclosure of attorney work product can result in a waiver.[87]

Generally, waiver occurs if the litigant's conduct with respect to the materials in question is "consistent with a conscious disregard of the advantage that is otherwise protected by the work product rule."[88] And that, in turn, is the case when work-product materials are disclosed under circumstances that substantially increase the possibility that an opposing party will obtain the protected information.[89] Specifically, "release of otherwise protected material without an intent to limit its future disposition might forfeit work product protection . . . . [T]o effect a forfeiture of work product protection by waiver, disclosure must occur in circumstances in which the attorney cannot reasonably expect to limit the future use of the otherwise protected material."[90]

And that is precisely what has happened here. Just as the ABA warned, by disclosing the Disputed Emails to LU via the LU email system, the Mast Defendants "substantially increased the possibility" that an opposing party could obtain the materials. Far from evincing an "intent to limit" future disposition of the materials, the Mast Defendants literally **granted ownership of the materials to LU, and expressly gave LU permission to disclose the materials to third parties**. Thus, the Masts—particularly Joshua Mast and Richard Mast, who are lawyers and presumed to

---

[86] *See, e.g.,* RMast's Motion (ECF No. 345) at 10.

[87] *See In re Martin Marietta Corp. v. Pollard*, 856 F.2d 619, 626 (4th Cir. 1988); *Doe v. United States*, 662 F.2d 1073, 1081 (4th Cir. 1981); *Dunplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1223 (4th Cir. 1976).

[88] *Doe*, 662 F.2d at 1081.

[89] *See Continental Cas. Co.*, 537 F.Supp. 2d at 772-73.

[90] *Doe*, 662 F.2d at 1081.

understand the law—could never have "reasonably" expected LU to limit future use of the Disputed Emails, whatever their subjective beliefs and assumptions may have been.

Tellingly, the Mast Defendants have never asked LU to surrender any of the Disputed Emails; nor do they now ask the Court to issue any order requiring LU to return, sequester, or destroy them. The Mast Defendants know they ***cannot*** seek that relief, as they long ago gave LU complete control of the materials and, thus, plainly waived any work-product protection.[91]

### C.   The Mast Defendants' Additional Arguments Against Production are Without Merit

J&S Mast make several additional arguments against production of the Disputed Emails. None is coherent or convincing.

First, they offer a procedural objection, claiming that the Second Subpoena to LU should be quashed because if "a party wishes to seek production of . . . privileged matter, the proper vehicle is a motion to compel—not a third-party subpoena."[92] They cite Rule 45(d)(2)(B)(i) for that proposition. But that Rule requires a "motion to compel" only where the "person commanded to produce documents or tangible things" (*i.e.*, the recipient of the subpoena) serves an objection to the subpoena. Fed. R. Civ. P. 45(d)(2)(B)(i). That rule does not apply here because LU (the entity "commanded to produce") has not objected to production. For persons who claim to be

---

[91] Despite being aware that the confidentiality of their attorney-client, marital, and work product communications is in peril, J&S Mast, and their counsel, have ***continued*** their privilege-waiving conduct. For example, Richard Mast recently filed a supplement to his motion to quash advising the Court that he wanted to "claw back" 32 documents produced by LU in response to the First Subpoena. Defendant Richard Mast's Notice of Supplemental Filing in Support of Motion for Protective Order (ECF No. 353). Only five of those "clawed back" documents, however, actually were sent by or received by Richard Mast. The remaining 27 documents were sent by or received by Joshua Mast—***who has not sought to claw them back***.

[92] J&S Mem. at 5.

"affected" by a subpoena to a third party, like the Masts here, their proper course is to do what they did here—file a motion to quash (however baseless). Fed. R. Civ. P. 45(d)(3).

Similarly, the Masts claim that the Second Subpoena is somehow an "impermissible attempt to circumvent the discovery process in this case by seeking discovery from non-party Liberty University that [Plaintiffs have] already received from the Masts . . . ."[93] But the Masts cite no Rule requiring Plaintiffs to obtain information only from them when it is also held by a third-party. Nor do they cite any case recognizing, much less enforcing, such an objection to a Rule 45 subpoena. It is of course entirely normal and proper for Plaintiffs to obtain discovery of relevant documents from *every* available source, if only to ensure that a complete collection is made.

J&S Mast next offer a parade of horribles: failure to quash the subpoena, they urge, would "completely undermine the objectively reasonable expectations of privacy of clients using a Gmail or Yahoo e-mail account or law firms' extensive reliance on cloud storage and third-party vendors for confidential and privileged materials."[94] This is nonsense.

First, users of Gmail and Yahoo can continue to expect a large degree of privacy regardless of the outcome here. Google and Yahoo are internet service providers providing services to the public and, thus, are subject to the Stored Communications Act—which prohibits them from

---

[93] *Id.* at 6.

[94] *Id.* at 9.

disclosing emails in response to subpoenas in civil matters.[95] The Act does not cover private universities that, like LU, provide email services to students, employees, and alumni.[96]

Second, the Mast Defendants' concerns regarding law firms actually make Plaintiffs' point. It is difficult to imagine any law firm turning over *ownership* of confidential client communications to a "cloud storage or third-party vendor" and giving that vendor express permission not only to review the material, but also *to disclose it to whomever the vendor wishes*. If any law firm engaged in such bizarre and reckless conduct with respect to its clients' files and work product, it presumably would get precisely what it deserved: the loss of any claimed privilege or work-product protection for the stored materials.

In fact, the real parade of horribles marches in the other direction. If the Court agrees with the Mast Defendants, and quashes the subpoena on the basis of the Masts' privilege claims, that precedent cannot be contained. In the wake of such a ruling, LU students and employees facing investigations or disciplinary proceedings—and who are subject to the same LU Rules as the Mast Defendants—might conjure privilege and work-product objections to prevent LU from accessing their email. By quashing the subpoena here, the Court would be creating for *all* users of the LU email system—and similar email systems offered by universities and other private entities—a troubling and unworkable expectation of privacy that the LU Rules *expressly disclaim*. That result

---

[95] 18 U.S.C. § 2702; *see also In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d 606, 608-12 (E.D. Va. 2008) ("[T]he plain language of the [Act] prohibits AOL form producing the Rigsby's e-mail, and the issuance of a civil discovery subpoena is not an exception to the provisions of the [Act] that would allow an internet service provider to disclose the communications at issue here").

[96] Kerr, Orin, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1226 (2004) (relevant portions attached as Exh. 13).

would be contrary to decisions rendered by the courts in this Circuit (and elsewhere) and by the Supreme Court of Virginia.[97]

## V.       CONCLUSION

Accordingly, Plaintiffs respectfully ask the Court to deny the Mast Defendants' respective motions to quash the Second Subpoena to LU and to grant Plaintiffs' motion to compel.[98]

Dated: March 11, 2024                    Respectfully submitted,

/s/ *Maya Eckstein*
Maya M. Eckstein (VSB No. 41413)
Lewis F. Powell III (VSB No. 18266)
HUNTON ANDREWS KURTH LLP
951 E Byrd St
Richmond, VA 23219
Telephone: (804) 788-8200
Fax: (804) 788-8218
Email:  meckstein@HuntonAK.com
Email:  lpowell@HuntonAK.com
Jeremy C. King (*admitted pro hac vice*)
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 309-1000
Fax: (212) 309-1100
Email:  jking@HuntonAK.com

Sehla Ashai (*admitted pro hac vice*)
ELBIALLY LAW, PLLC
704 East 15th Street
Suite 204
Plano, TX 75074
Telephone: (312) 659-0154
Email: ashai@elbiallylaw.com

Blair Connelly (*admitted pro hac vice*)

---

[97] *See, e.g.*, *Doe 1*, 480 F.Supp.3d at 227; *Banks, Inc.*, 274 Va. at 454.

[98] Plaintiffs reserve the right to challenge the Mast Defendants' claims of privilege and work product based on other bases, including the crime-fraud exception.

24

Zachary L. Rowen (admitted pro hac vice)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: Blair.Connelly@lw.com
Email: Zachary.Rowen@lw.com

Ehson Kashfipour (*admitted pro hac vice*)
Damon R. Porter (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W. Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: Ehson.Kashfipour@lw.com
Email: Damon.Porter@lw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of March, 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing

to all CM/ECF participants.

By:   */s/ Maya M. Eckstein*
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Plaintiffs*