# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BABY DOE, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Case No. 3:22-cv-49-NKM-JCH |
| | ) |
| JOSHUA MAST, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**DEFENDANTS JOSHUA AND STEPHANIE MAST'S (1)
REPLY IN SUPPORT OF MOTION TO QUASH PLAINTIFFS' SUBPOENA
AND FOR A PROTECTIVE ORDER, AND
<u>(2) OPPOSITION TO PLAINTIFFS' CROSS MOTION TO COMPEL</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................................ 1
ARGUMENT .................................................................................................................................. 2
I. The Masts' Communications Are Protected from Disclosure under the Attorney-Client and Marital Privileges. ................................................................................ 2
    A. The Asia Global factors weigh heavily in favor of nondisclosure ......................... 3
II. The Masts' Communications Are Protected from Disclosure under the Work Product Doctrine. ....................................................................................................... 12
    A. The Masts' materials prepared in connection with Baby Does's adoption proceedings are protected by the work product doctrine ...................................... 13
    B. The Masts did not otherwise waive work product protection ............................... 14
III. Conclusion. ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ahlan Indus., Inc.*,
   No. BG 18-04650, 2020 WL 3620332 (Bankr. W.D. Mich. July 2, 2020) ..............................8

*Alabama Aircraft Indus., Inc. v. Boeing Co.*,
   No. 2:11-cv-03577-RDP, 2016 WL 7745029 (N.D. Ala. Dec. 2, 2016) .............................6, 8

*In re Asia Global Crossing, Ltd.*,
   322 B.R. 247 (Bankr. S.D.N.Y. 2005) ............................................................................. *passim*

*Banks v. Mario Indus. of Va., Inc.*,
   274 Va. 438 (2007) .......................................................................................................................6

*Bhattacharya v. Murray*,
   No. 3:19-cv-00054, 2022 WL 875032 (W.D. Va. Mar. 23, 2022) .........................................13

*Brown-Criscuolo v. Wolfe*,
   601 F. Supp. 2d 441 (D. Conn. 2009) ......................................................................................8

*Doe 1 v. George Washington University*,
   480 F. Supp. 3d 224 (D.D.C. 2020) .....................................................................................5, 7

*In re Doe*,
   662 F.2d 1073 (4th Cir. 1981) ................................................................................................14

*Flatworld Interactives v. Apple Inc.*,
   No. 12-cv01956-JSW-EDL, 2013 WL 11319071 (N.D. Cal. Dec. 24, 2013) ........................8

*Hanson v. First Nat. Bank*,
   No. 5:10-cv-00906, 2011 WL 5201430 (S.D. W. Va. Oct. 31, 2011) ......................................7

*In re High-Tech Employee Antitrust Litig.*,
   No. 11-cv-2509-LHK-PSG, 2013 WL 772668 (N.D. Cal. Feb. 28, 2013) ..........................8, 12

*In re Info. Mgmt. Servs., Inc. Derivative Litig.*,
   81 A.3d 278 (Del. Ch. 2013) ..........................................................................................4, 8, 12

*O'Connor v. Ortega*,
   480 U.S. 709 (1987) ....................................................................................................................4

*In re Reserve Fund Sec. & Derivative Litig.*,
   275 F.R.D. 154 (S.D.N.Y. 2011) ..............................................................................3, 4, 9

*Sprenger v. Rector & Bd. of Visitors of Virginia Tech*,
    No. 7:07-cv-00502, 2008 WL 2465236 (W.D. Va. June 17, 2008) .................................3, 4, 12

*Twitter, Inc. v. Musk*,
    No. 2022-0613-KSJM, 2022 WL 4140502 (Del. Ch. Sept. 13, 2022) ............................7, 8, 10

*United States v. Am. Tel. & Tel. Co.*,
    86 F.R.D. 603 (D.D.C. 1979) ....................................................................................................13

*United States v. Hatfield*,
    No. 06-cr-00550-JS, 2009 WL 3806300 (E.D.N.Y. Nov. 13, 2009) ..........................................8

*United States v. Mosby*,
    No. 3:08-CR-127, 2008 WL 2961316 (E.D. Va. July 25, 2008) ..............................................11

*United States v. Simons*,
    206 F.3d 392 (4th Cir. 2000) ....................................................................................................11

**Statutes**

Va. Code § 16.1-266 ............................................................................................................................13

Va. Code § 20-146.12 ..........................................................................................................................13

Va. Code § 63.2-1201 ..........................................................................................................................13

## INTRODUCTION

Defendants Joshua and Stephanie Mast hereby reply (1) in support of their earlier Motion to Quash Plaintiffs' Subpoena of Nonparty Liberty University and for A Protective Order (ECF No. 347), and (2) in opposition to Plaintiffs' Cross Motion to Compel (ECF No. 358). Joshua and Stephanie Mast also join Defendant Richard Mast's Motion to Quash (ECF No. 345) and reply in support of that motion (ECF No. 369).

In their response, Plaintiffs stake out an extraordinary position. Plaintiffs argue that generic language in Liberty University's Acceptable Use Policy (the "Policy")—ubiquitous to all such policies in the modern technological world—means the Masts have no expectation of privacy in email accounts hosted by the University. They point to several aspects of the Policy to support this assertion: (1) restrictions on objectionable use, (2) user consent to the Policy, (3) a reservation of the University's right to monitor or restrict access, (4) the University's ownership of the server and its contents, and (5) the University's reservation of the right to disclose information in response to misconduct or criminal activity. In their telling, these provisions destroy the Masts' assertions of privilege notwithstanding any facts to the contrary supporting that Liberty University protects its students' and faculty's privileged documents and communications. If this Court finds such boilerplate reservations vitiate privilege and confidentiality claims by a user, then all otherwise privileged documents and communications on university or company accounts are at risk of being discovered.

That sweeping position is not the law. The widely accepted test for assessing whether an individual possesses an expectation of privacy in emails sent or received through a third-party provider, *In re Asia Global Crossing, Ltd.*, 322 B.R. 247 (Bankr. S.D.N.Y. 2005), considers

numerous factors that are highly fact dependent. If it were enough to point to generalized policies, then courts have been wasting their time. What matters is whether the facts and circumstances here gave rise to a reasonable expectation of privacy.

When the facts of this case are measured against that standard, it is clear the Masts had a reasonable expectation of privacy in the University email accounts that overcomes Plaintiffs' claim to entitlement. The University's general counsel's office says that the University has and "continues to respect the assertion of the Masts' Legal Privileges." ECF No. 369-1 (Shipman Declaration). The University's Chief Information Officer responsible for enforcing the Policy indicates that Plaintiffs misread the Policy and that the University "has a standard practice of not actively monitoring or accessing the emails of students, alumni or employees unless the University is required by law to access the emails or the University is investigating a potential violation of University policy." ECF No. 345-5 (Gauger Declaration). And both Joshua and Richard Mast have explained why they reasonably (and rightly) believed they had an expectation of privacy in their communications. ECF No. 345-3 (Richard Mast Declaration); Exhibit 1 (Joshua Mast Declaration, attached). Against all this evidence, Plaintiffs can point only to their strained interpretation of the Policy that is at odds with how the University interprets and applies the Policy. Their own suspicion and skepticism about the reality on the ground does not overcome the objective facts.

Accordingly, this Court should grant Joshua and Stephanie Mast's Motion to Quash and deny Plaintiffs' Motion to Compel.

## ARGUMENT

I. **The Masts' Communications Are Protected from Disclosure under the Attorney-Client and Marital Privileges.**

The Masts had a reasonable expectation of privacy when communicating on their Liberty University alumni email accounts. Plaintiffs do not dispute that all the documents at issue qualify

2

for protection under the attorney-client and marital privileges. Plaintiffs' sole argument is that those privileges were purportedly waived because the communications were sent or received through Joshua Mast's Liberty University alumni email account and thereby disclosed to a third party. *See* ECF No. 359, at 12-17. But Plaintiffs' argument rests on a tendentious reading of a standard-issue acceptable use policy and their own skepticism rather than the facts. That is to say, Plaintiffs construct a hypothetical scenario about how the Policy *should* apply to the Masts while ignoring what the evidence actually shows about how the Policy *does* apply and gives rise to the Masts' reasonable expectation of privacy in the content of their communications. Theirs is a fruitless endeavor because cases involving waiver of privilege "turn on the very specific factual situations unique to each case." *Sprenger v. Rector & Bd. of Visitors of Virginia Tech*, No. 7:07-cv-00502, 2008 WL 2465236, at *4 (W.D. Va. June 17, 2008). And the facts in this case lead to one conclusion: the Masts had a reasonable expectation of privacy in communications sent and received through the University email accounts.

    **A.    The Asia Global factors weigh heavily in favor of nondisclosure.**

Federal courts have "widely adopted" the considerations identified in *Asia Global* for determining whether emails transmitted over and maintained on a third-party server are privileged. *In re Reserve Fund Sec. & Derivative Litig.*, 275 F.R.D. 154, 159 n.9 (S.D.N.Y. 2011). Those factors are whether: (1) a company maintains a policy banning personal or objectionable use, (2) a company monitors the use of the employee's computer or e-mail, (3) third parties have a right of access to the computer or e-mails, and (4) a company notifies the employee, or was the employee aware, of the use and monitoring policies. *Asia Global*, 322 B.R. at 257.

"In light of the variety of work environments, whether the employee has a reasonable expectation of privacy must be decided on a case-by-case basis." *Asia Global*, 322 B.R. at 257;

3

*see Sprenger*, 2008 WL 2465236, at *4 ("These cases turn on the very specific factual situations unique to each case."); *In re Rsrv. Fund Sec. & Derivative Litig.*, 275 F.R.D. at 160 (same). Thus, courts consider evidence of the policy itself (if any), whether and how the policy was actually enforced, and an employee's knowledge of the policy. *See, e.g.*, *Asia Global*, 322 B.R. at 259–61 (discussing all three); *Sprenger*, 2008 WL 2465236, at *4 (same).

The *Asia Global* test acknowledges that "[a]lthough e-mail communication, like any other form of communication, carries the risk of unauthorized disclosure, the prevailing view is that lawyers and clients may communicate confidential information through unencrypted e-mail with a reasonable expectation of confidentiality." 322 B.R. at 257. That is because, "[i]n the ordinary course of business, employees who send communications within the company over the employer's email system can reasonably expect that outsiders will not be able to access the system." *In re Info. Mgmt. Servs., Inc. Derivative Litig.*, 81 A.3d 278, 286 (Del. Ch. 2013) (citing *Asia Global*, 322 B.R. at 257). Thus, "[a]ssuming a communication is otherwise privileged, the use of the company's e-mail system does not, without more, destroy the privilege." *Id.* (citing *Asia Global*, 322 B.R. at 251).

It bears mentioning at the outset that almost all cases applying *Asia Global* involve an employer–employee relationship and the four factors are designed for application in that context. *See Asia Global*, 322 B.R. at 257 (explaining that the presumption of privacy in one's "office, desk and files 'may be reduced by virtue of actual office practices and procedures, or by legitimate regulation'" (quoting *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987)). That stands to reason because employers have an interest in protecting their business interest and proprietary information against misuse, and employees act as agents of the company. An employer will naturally wish to reserve its rights to monitor employees' use of its electronic systems to prevent misconduct or

4

illegality. And an employer can terminate an employee for misuse of its electronic systems. That dynamic is far more attenuated here given Joshua Masts' alumni status. The Policy does not appear at all designed with alumni in mind. See, e.g. ECF No. 345-4 at 9 (discipline for violations of the Policy extend to "students," "faculty," and "staff"); id. at 12 (listing "All University Students, Faculty, Staff and Alumni" as parties affected by the Policy). That is not surprising because Joshua Mast is using only his alumni email account. He is not an employee of the University and therefore does not act in the name of the University or have access to their internal systems and information. By the same token, the University has almost no reason to monitor his email activity. These realities only increase his expectation of privacy at the outset of the *Asia Global* analysis.

In any event, Plaintiffs are wrong to contend that the Liberty University Policy overcomes the *Asia Global* presumption that a party has a reasonable expectation of privacy while using a third-party email provider. Plaintiffs strain to read between the lines of the Policy to posit how the Policy could operate under the facts of this case. But the Policy on its face does not support their application of the *Asia Global* factors. More importantly, *Asia Global* demands more than an abstract exercise of interpretation to assess whether a party had a reasonable expectation of privacy in the use of email. The proper analysis depends on concrete facts. And those facts weigh heavily in favor of preserving the Masts' privilege claims under *Asia Global*.

***First factor: whether the University maintains "a policy banning personal or other objectionable use."*** Plaintiffs acknowledge that the Policy placed no limitation on personal use but nevertheless maintain that this factor weighs against the Masts because the Policy cautioned its users that they "should [not] have an expectation of privacy in their electronic communications." Plaintiffs' Mem., ECF No. 359, at 18-19 (quoting Policy, ECF. No. 345-4 at 2). Plaintiffs principally rely on *Doe 1 v. George Washington University*, 480 F. Supp. 3d 224 (D.D.C.

5

2020). To be sure, *Doe 1* held that the first *Asia Global* factor was satisfied when a computer use policy states that users should not have an expectation of privacy. *Id.* at 227. But *Doe I* is an outlier.[1]

The weight of authority points the other direction. Courts look beyond a policy's assertion that a user lacks an expectation of privacy and weigh that statement against actual practices. This makes sense for many email policies generically state there is no expectation of privacy but, in fact, are operated in a way reasonably protecting private communications nonetheless. For example, in *Alabama Aircraft Industries, Inc. v. Boeing Co.*, the court acknowledged that the company's policies expressly "reserve[d] an unfettered right of review for the company" but held that the first *Asia Global* factor was not satisfied because those reservations "seem primarily concerned with rooting out improper personal use" and the company limited its own monitoring practices. No. 2:11-cv-03577-RDP, 2016 WL 7745029, at *8 (N.D. Ala. Dec. 2, 2016), *report and recommendation adopted*, No. 2:11-cv-03577-RDP, 2017 WL 134764 (N.D. Ala. Jan. 13, 2017). Likewise, the first factor has weighed in favor of preserving privilege where, despite policies warning users that they have "no expectation of privacy or confidentiality" and "reserve[] the right to review all emails, text messages and other communications that are sent or received on [a company's] equipment," a company's *actual monitoring practices* were "securing the approval of the Legal and Human Resources departments, and only where necessary to investigate an issue or conduct business" "suggest[ing] that an employee might expect privacy over personal

---

[1] Plaintiffs also rely on *Banks v. Mario Indus. of Va., Inc.*, 274 Va. 438 (2007), for the same proposition. *Banks* applied Virginia's traditional standard for waiver of attorney-client privilege and not *Asia Global*. *Id.* at 453–54. Moreover, its analysis of waiver rested primarily on other considerations, including that the party asserting privilege used his former employer's computers and hard drives in the employer's office to prepare a memorandum that was later recovered from the hard drive. *Id.*

6

communications unless the employee is acting contrary to company guidelines." *Twitter, Inc. v. Musk*, No. 2022-0613-KSJM, 2022 WL 4140502, at *5–6 (Del. Ch. Sept. 13, 2022). The better reasoned decisions focus on the substance of email privacy, not abstract boilerplate from use agreements.

So too here. The Policy provides that potential disclosure is limited "to an internal or external investigation of alleged misconduct or wrongdoing, and may provide information to third parties, including law enforcement." ECF No. 345-4 at 8. That limitation is confirmed by the University's "standard practice of not actively monitoring or accessing the emails of students, alumni or employees unless the University is required by law to access the emails or the University is investigating a potential violation of University policy."[2] ECF No. 345-5 (Declaration of John M. Gauger). Thus, the University's generic warning that users lacked an expectation of privacy—a surely ubiquitous provision in virtually all acceptable use policies—is informed and tempered by its modest practices. And here, there is no such investigation relevant to the Policy. Under *Asia Global* and its progeny, this factor favors the Masts.

***Second factor: whether the University "monitors the use of the employee's computer or e-mail."*** Plaintiffs argue this factor is satisfied because they found two cases holding that a mere reservation of "the right with or without notice, to monitor, record, limit or restrict any user account, access and/or usage of [the user's] account" satisfies this factor. Plaintiffs' Mem., ECF No. 359, at 19 (quoting Policy, ECF. No. 345-4 at 7). Plaintiffs rely again on *Doe 1*, 480 F. Supp. 3d at 227, and a case that *Doe 1* relies on *Hanson v. First Nat. Bank*, No. 5:10-cv-00906, 2011 WL 5201430, at *6 (S.D. W. Va. Oct. 31, 2011). Neither case provides the best reading of *Asia Global*.

---

[2] Plaintiffs' only apparent rebuttal to this evidence is to label the declaration "curious." Plaintiffs' Mem., ECF No. 359, at 11.

7

"The second Asia Global factor *looks to the email sponsor's historical practice* of monitoring employee emails in accordance with its policies." *Twitter, Inc.*, 2022 WL 4140502, at *7 (emphasis added); *In re Info. Mgmt. Servs., Inc. Derivative Litig.*, 81 A.3d at 289 ("This factor has been refined to focus on the extent to which the employer adheres to or enforces its policies and the employee's knowledge of or reliance on deviations from the policy."). Courts will find that this factor weighs against disclosure when it is a company's practice not to monitor the sort of communications at issue. *See, e.g.*, *Alabama Aircraft Indus., Inc.*, 2016 WL 7745029, at *9 (second factor not met "it was TCP's practice to avoid monitoring the substance of business-related communications like the Disputed Documents"). Again, the weight of the caselaw correctly concludes that actual, historical practice is relevant to the second *Asia Global* factor.[3]

This case is a prime example of why a written reservation of rights to monitor says little about the fact-intensive inquiry of whether a party had a reasonable expectation of privacy in email communications. *See Twitter, Inc.*, 2022 WL 4140502, at *7 (explaining that one reason for looking to "historical practice" is to consider "the employer has made specific representations or taken specific actions inconsistent with the monitoring policy and the employee can show detrimental reliance"). Here, the Policy "reserves the right with or without notice, to monitor, record, limit or restrict any user account, access and/or usage of account." ECF No. 345-4 at 7. But the individual tasked with enforcing that very Policy has told this Court that "the University has **a standard practice of not actively monitoring** or accessing the emails of students, alumni

---

[3] *See, e.g.*, *In re Ahlan Indus., Inc.*, No. BG 18-04650, 2020 WL 3620332, at *10 (Bankr. W.D. Mich. July 2, 2020); *Flatworld Interactives v. Apple Inc.*, No. 12-cv01956-JSW-EDL, 2013 WL 11319071, at *1 (N.D. Cal. Dec. 24, 2013); *In re High-Tech Employee Antitrust Litig.*, No. 11-cv-2509-LHK-PSG, 2013 WL 772668, at *7 (N.D. Cal. Feb. 28, 2013); *United States v. Hatfield*, No. 06-cr-00550-JS, 2009 WL 3806300, at *9 (E.D.N.Y. Nov. 13, 2009); *Brown-Criscuolo v. Wolfe*, 601 F. Supp. 2d 441, 450 (D. Conn. 2009).

or employees unless the University is required by law to access the emails or the University is investigating a potential violation of University policy." ECF No. 345-5 at 3 (emphasis added). Thus, in reality, the University's monitoring practices differ from those described by Plaintiffs and further supports the Masts' assertion that they had a reasonable expectation of privacy. Other than abstract boilerplate language, Plaintiffs have no facts to support their contention and instead present nothing but speculation. Plaintiffs can speculate about how the Policy works, but the Masts have presented facts that undermine Plaintiffs' narrative. This factor favors the Masts.

***Third factor: whether "third parties have a right of access to the computer or e-mails."*** Plaintiffs meekly contend that this factor favors disclosure because a solitary case held as much when "a policy warns users that their emails are subject to disclosure." Plaintiffs' Mem., ECF No. 359, at 19. That one case is readily distinguishable. Plaintiffs point to *In re Reserve Fund Securities and Derivative Litigation*, where employees were expressly warned "that client/public e-mail communications received by and sent from [the company] are automatically saved regardless of content" and "may be subject to disclosure to regulatory agencies or the courts." 275 F.R.D. 154, 164 (S.D.N.Y. 2011). The company in that case was one of the biggest money market funds before the 2008 Financial Crisis and regulated under the Investment Company Act. It is thus entirely unremarkable that the court found this factor to weigh in favor of disclosure in those circumstances because "the heavily regulated industry in which RMCI operates—in which companies are required by law to preserve email communications for later use by regulators or other interested parties—it is not reasonable for those using a company's email system to believe that their emails sent over that system are private." *Id.* It almost goes without saying that the Policy here does not remotely dictate the same conclusion because the University is not subject to the same onerous regulatory disclosure requirements.

9

Unsurprisingly, the caselaw shows how this third factor broadly favors the Masts. "[T]his factor largely duplicates the first and second factors, because by definition the employer has the technical ability to access the employee's work email account." *Twitter, Inc.*, 2022 WL 4140502, at *8 (quotation omitted). But, as explained, the first and second factors already weigh in favor of the Masts given the University's policies and practices against monitoring and access of email addresses. *See* ECF No. 345-5 at 3 (Gauger Declaration). The Masts' expectation of privacy is even stronger in light of Declaration of J. Court Shipman, Senior Counsel in the University's Office of Legal Affairs. ECF No. 369-1. Although the University has the "technical ability" to access the Masts' communications, "the procedure and practice of the University is to respect and preserve confidentiality and privileges relating to attorney-client communications and work-product doctrine" when they are asserted. *Id.* at 3; Exhibit 1 at 2-3 (Mast Declaration describing the University's recognition and accommodation of the Masts' assertion of legal privileges).

These statements are consistent with the Policy. The very language that Plaintiffs point to limits potential third party disclosure if the University needs to conduct "an internal or external investigation of alleged misconduct or wrongdoing and may provide information to third parties, including law enforcement." ECF No. 345-4 at 8. Joshua and Stephanie Mast are not employed by the University, so there is no prospect of this disclosure provision affecting them. *See also id.* at 9 (providing for discipline for violation of the Policy that includes "students," "faculty," and "staff"—but not alumni). And those who administer the Policy have already indicated that they intend to zealously protect legal privileges absent compulsory legal process. ECF No. 369-1 at 4 (Shipman Declaration) (explaining that the University has and "continues to recognize and respect the assertion of the Masts' Legal Privileges as to such communications, subject of course to any

10

contrary court ruling or order"). In short, in the absence of a court order, the Masts communications were never going to be disclosed to anyone. Thus, this factor also favors the Masts.

***Fourth factor: whether the University "company notifies the employee, or was the employee aware, of the use and monitoring policies."*** Plaintiffs assert that this factor weighs against the Masts because the University "notified its information system users of its use and monitoring polices." Plaintiffs' Mem. ECF No. 359, at 20. This argument rings hollow given the University's declarations that it has an active policy against monitoring alumni email addresses.

Their suggestion that *United States v. Simons*, 206 F.3d 392 (4th Cir. 2000), lends support fares no better. The defendant in *Simons* lacked a reasonable expectation of privacy in his internet usage on a work computer where he accessed child pornography because his employer "notified him that it would be overseeing his Internet use." *Id.* at 398. And the employer, a division of the CIA, actively monitored its employees' internet use. *Id.* Here, the University does neither, and it has not—and cannot—monitor the Masts' internet usage.

Finally, Plaintiffs point out that "a court in this Circuit has held that an employee had no reasonable expectation of privacy in his email communications when his employer displayed a banner upon login 'clearly inform[ing] the employee that he has no expectation of privacy and stat[ing] that the computer is monitored.'" Plaintiffs' Mem., ECF No. 359, at 20 (quoting *United States v. Mosby*, No. 3:08-CR-127, 2008 WL 2961316, at *5 (E.D. Va. July 25, 2008)). The Policy does not speak to a login banner, and Joshua Mast has never seen such a banner while logging into his alumni account. Exhibit 1 at 2 (Declaration of Joshua K. Mast). Again, it is worth noting that the Policy is not an ideal starting point for assessing the privacy claims of an alumni user because the Policy does not appear to be designed with alumni in mind. *See* p. 3, *supra*. In any event, Plaintiffs provide no facts supporting their contentions.

11

Although it is true that an employee should generally be familiar with his employer's electronic use policies, courts will not impute knowledge to such a person absent some indication that the person had sufficient seniority or was aware of the policy in question. *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-2509-LHK-PSG, 2013 WL 772668, at *7 (N.D. Cal. Feb. 28, 2013) (imputing "constructive knowledge" to "one of the highest level executives" "and because he admits familiarity with the policies"); *In re Info. Mgmt. Servs., Inc. Derivative Litig.*, 81 A.3d at 292 ("Decisions have readily imputed knowledge of an employer's policy to officers and senior employees.").

\*　　\*　　\*

In sum, all four factors favor the Masts, and this Court should quash Plaintiffs subpoena to the extent it seeks materials protected by the Masts' assertions of attorney-client and marital privileges. Plaintiffs have not disputed the merits of those assertions but, rather, that the Masts waived them. As explained, the Masts have not waived any privileges. "While the Policy was tendered to the court," Plaintiffs have provided "no affidavit or other evidence . . . as to knowledge, implementation, or enforcement of the Policy." *Sprenger*, 2008 WL 2465236, at *4. Thus, Plaintiffs have not met their burden to compel production of the privileged communications. The same cannot be said for the Masts who have collectively provided their own declarations and declarations from those responsible for implementing the Policy at the University. Plaintiffs' suspicion and cynicism is no rebuttal.

## II.     The Masts' Communications Are Protected from Disclosure under the Work Product Doctrine.

Plaintiffs raise two arguments in opposition to the Masts' assertion of the work product doctrine. Both lack merit.

12

### A. The Masts' materials prepared in connection with Baby Does's adoption proceedings are protected by the work product doctrine.

First, Plaintiffs maintain that emails and other material prepared for Baby Doe's adoption proceedings were not in anticipation of "litigation" because they were "*ex parte*" proceedings. Plaintiffs offer no support for this novel claim. Plaintiffs' Mem., ECF No. 359, at 17–19.

Surely Plaintiffs are not suggesting that a custody or adoption petition does not initiate litigation. The Virginia Code confers jurisdiction on its courts for such proceedings. Va. Code § 20-146.12 (initial child custody jurisdiction); Va. Code § 63.2-1201 (adoption). These proceedings call for the involvement of other parties to the proceeding, most notably a guardian ad litem, Va. Code § 16.1-266. Indeed, Virginia's child custody and adoption codes are entirely creatures of statute that confer power on the Virginia courts to determine legal parentage and adjudicate rights and obligations between parties. What Plaintiffs apparently mean to say is that *they* were not a party to the adoption proceedings, but that does not mean that the proceedings were non-adversarial.

The few cases that Plaintiffs cite do not support their argument. They either stand for mundane propositions or are classic examples of nonjudicial proceedings that do not qualify as "litigation." *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603 (D.D.C. 1979), was a case about defining what types of agency adjudications counted as "litigation," which did not include non-adversarial regulatory or administrative procedures. *Bhattacharya v. Murray*, No. 3:19-cv-00054, 2022 WL 875032 (W.D. Va. Mar. 23, 2022), is not even a case about the work product doctrine but discusses a "triggering event" requiring a party to preserve evidence. The last two cases also do not qualify as litigation because they related to patent prosecutions or communications attempting to seek a pardon from the President. *See In re Grand Jury Subpoenas dated Mar. 9, 2001*, 179 F. Supp. 2d 270 (S.D.N.Y. 2001) (communications in furtherance of seeking a

13

Presidential pardon); *Application of Minebea Co., Ltd.*, 143 F.R.D. 494 (S.D.N.Y. 1992) (patent prosecutions). None of these cases suggest that a legal proceeding before the Virginia courts with jurisdiction to adjudicate child custody and adoption proceedings are somehow non-adversarial or non-litigation.

### B.    The Masts did not otherwise waive work product protection.

Finally, Plaintiffs maintain that the Masts acted with "conscious disregard" in sharing work product communications via Joshua's University email address. Plaintiffs' Mem., ECF No. 359, at 19–21. They assert that the Masts "granted ownership of the materials to" the University, thereby "substantially increase[ing] the possibility that an opposing party will obtain the protected information." *Id.* at 20. These assertions are as wrong as they are overwrought.

The Masts' use of an email service provider available to University alumni was neither a "conscious disregard" of the advantage conferred by the work product doctrine or a voluntary disclosure. *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981). For substantially the same reasons explained applying the *Asia Global* factors, the Masts did not act with a conscious disregard by sending communications through University email in which they have a reasonable expectation of privacy.  Nor have the Masts "freely and voluntarily disclose[d] the contents of otherwise protected work product to someone with interests adverse to [theirs]." *Id.* Even if the University exercises some control over the electronic communications, the University is not adverse to the Masts. To the contrary, "the University continues to recognize and respect" the Masts' assertions of privilege and work product protection. ECF No. 369-1 at 4 (Shipman Declaration); Exhibit 1 at 2-3 (Mast Declaration).

## CONCLUSION

Defendants Joshua and Stephanie Mast respectfully request that the Court: (1) quash Plaintiffs John and Jane Doe's subpoena to Liberty University, or (2) issue a protective order to prevent disclosure of communications identified on Defendants Joshua and Stephanie Mast's privilege log, and (3) deny Plaintiffs Motion to Compel.

Dated: March 25, 2024

Respectfully submitted,

*/s/ Michael Francisco*
John S. Moran (VSB No. 84326)
Michael L. Francisco (*pro hac vice*)
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of March 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

Dated: March 25, 2024          Respectfully submitted,

*/s/ Michael Francisco*
Michael L. Francisco (*pro hac vice*)
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
mfrancisco@mcguirewoods.com