IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

BABY DOE, *et al.*,

    *Plaintiffs*,

v.

JOSHUA MAST, *et al.*,

    *Defendants*.

Case No. 3:22-cv-49-NKM-JCH

**PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF CROSS MOTION TO COMPEL AS TO RICHARD MAST**

**I.    INTRODUCTION AND SUMMARY**

The Masts elected to use an email system they neither owned nor had any ability to control. From the instant they began using the email system owned by Liberty University ("LU"), they extinguished whatever expectation of privacy they may have thought they had. The Masts' decision bound them inextricably to the "LU Rules"—which clearly and repeatedly communicated to them, each time they logged in, that they were giving up possession of those emails, along with possession any expectation of privacy in those emails. Attorneys Richard and Joshua Mast in particular were aware of the necessity of maintaining confidentiality in any privileged email communications.[1] The Masts chose to use an email system that expressly allowed third-party LU to read the emails and disclose them and their contents to others. Meanwhile, many of the Masts' emails at issue related not to any litigation or adversarial proceeding, but rather to an adoption

---

[1] *Rule 1.6 - Confidentiality of Information*, Va. R. Sup. Ct. 1.6, Comment 20 ("Lawyers have an ethical obligation to implement reasonable information security practices to protect the confidentiality of client data.")

process that the Masts themselves insisted was non-adversarial, and that proceeded entirely (albeit fraudulently) on that basis.

These are, to say the least, challenging circumstances in which to justify claims of attorney-client privilege, marital privilege, or work-product protection. As his reply and opposition brief demonstrate ("RMast Opp."), attorney Richard Mast ("RMast") is manifestly unable to do so. RMast asserts that it is difficult to "imagine in what world the Masts' expectation of confidentiality would not be reasonable."[2] But in fact no imagination is needed. The Masts affirmatively chose to use an email system in which their expectation of privacy was unreasonable.

## II. ARGUMENT

### A. The Latest LU Declaration Establishes the Masts Had No Expectation of Privacy

RMast—effectively conceding the irrelevance of the Gauger Declaration, which he filed in connection with his motion to quash[3]—tries again, offering a declaration from a different LU employee. This time around, LU's Senior Counsel J. Court Shipman[4] describes a "procedure and practice" of LU that, according to RMast, somehow establishes that the Masts had a reasonable expectation of privacy when they used LU's email system. To the contrary, Shipman's carefully worded testimony ultimately demonstrates just the opposite is true.

#### 1. What Mr. Shipman Says

As the Court will recall, one reason Gauger's declaration was irrelevant was because he had nothing to say about LU's policies with respect to privilege claims involving third party users

---

[2] Defendant Richard Mast's Reply in Support of His Motion to Quash/Modify Subpoena and Motion for Protective Order and Response to Plaintiffs' Motion to Compel ) ("RMast Opp.") (ECF No. 369) at 3.

[3] Declaration of John M. Gauger ("Gauger Dec.") (ECF No. 345-5).

[4] Declaration of J. Court Shipman ("Shipman Dec.") (ECF No. 369-1).

2

like the Masts.[5] Shipman does at least speak about that issue:

> With regard to third-party and non-party subpoenas issued in legal actions that do not involve Liberty University or any of its affiliates as a party, the procedure and practice of the University is to respect and preserve confidentiality and privileges relating to attorney-client communications and work-product doctrine ("Legal Privilege(s)"), once a person asserts any of the Legal Privileges to Liberty University, by delaying production a reasonable amount of time to allow that person time to seek a protective order.[6]

But this statement amounts to nothing; Shipman does not advance the Masts' argument in the slightest. The policy described by Shipman is simply a procedure for allowing third-parties' privilege claims to be resolved; *it is not a promise to maintain the privacy of third parties' emails.* Only the latter, of course, could be relevant to whether the Masts had a reasonable expectation of privacy. The "procedure and practice" described by Shipman, which was already apparent from the face of the record, is no different from what the Masts might expect from *any* third party in possession of allegedly privileged materials, or indeed from a reviewing court asked to decide a privilege controversy. The fact that courts generally have a procedure for reviewing disputed materials *in camera* does not itself confer any expectation of privacy; it merely makes it possible to decide a privilege claim without disclosure rendering the issue a foregone conclusion. That is all that Shipman's policy accomplishes here; LU's claimed procedure does not in any way go to, much less decide, the *merits* of the Masts' privilege claim.[7]

---

[5] Plaintiffs' Memorandum: (A) In Opposition To Motions To Quash And For Protective Order, And (B) In Support Of Cross Motion To Compel ("Pl. Opp. Memo") (ECF No. 359) at 10.

[6] Shipman Dec. ¶ 6, PageID 4727.

[7] Interestingly, Shipman does not say this policy has ever been communicated to anyone before today. Perhaps that is why Gauger apparently had never heard of the policy when he submitted his own Declaration, which did not mention it. Nor does RMast claim that he was aware of this policy *at the only relevant time*, *i.e.*, when he used the LU e-mail system, and his expectation of privacy (if any) was formed.

3

## 2. What Mr. Shipman Does Not Say

Turning to those merits, the Shipman declaration actually confirms that the Masts had no reasonable expectation of privacy. The Court need only consider what Shipman (or Gauger) *might* have said in support of the Masts. They might have said that, in practice, LU has never reviewed or disclosed, and will never review or disclose, its users' emails—and that LU communicates that fact to users. They might have said that, as a matter of "procedure and practice," the Masts therefore had a reasonable expectation of privacy (despite the fact that the LU Rules say precisely the opposite). And they might have told this Court that, if a user of the system tells LU that his or her emails are privileged, LU's "procedure and practice" would be to:

(a) relinquish its ownership of the materials;

(b) destroy any copies in its possession;

(c) forswear any right to read them and to disclose them to third parties; and

(d) object on grounds of all applicable privileges, to any subpoena seeking their disclosure.

But neither Shipman nor Gauger says any of these things. Meanwhile LU's institutional actions—or more precisely, its inaction—speaks as loudly as its declarants' words. LU promulgated and communicated the LU Rules, and disclosed no inclination to change them. And again, LU *itself* is not before the Court, because it lodged no objection to the subpoena.

Why do Shipman, Gauger, and LU offer the Masts so little real assistance? Why is LU willing to offer the Masts repeated access to high-level employees, yet unwilling to provide testimony that will actually go to the relevant issue, *i.e.*, its users' expectation of privacy? The answer is simple: LU wants the LU Rules, and their devastating effect on any assertions of privilege, to continue to apply whenever *LU itself* is engaged in investigations of students or staff who use the LU email system. Thus, when the LU Rules prove to be an inconvenience to alumni

users who operate under those same rules, LU's assistance can only go so far.

And thanks to Messrs. Gauger and Shipman, we now know exactly how far. Apparently LU will offer alumni careful statements that do not support a finding of reasonably expected privacy, and that do not undercut the LU Rules in any way, either implicitly or explicitly. Note that it is unlikely that anything said in the Gauger or Shipman declarations, and no action by LU here, could ever be cited in any future case to prevent LU from relying on the LU Rules. Whatever this Court's decision on this matter, LU will remain free to use those Rules to deny a reasonable expectation of privacy, to read its users' emails when it wishes to do so, to disclose them to whomever it wants, and to foreclose any claim of privilege. In short, by providing the Gauger and Shipman declarations, LU only ***confirms***, albeit inferentially, what the LU Rules say expressly: ***no one*** who uses the LU email system has a reasonable expectation of privacy with respect to what they write in emails owned by LU. All that Plaintiffs ask of this Court is to apply the LU Rules, and the law of this Circuit, just as LU itself still intends to do.

Plaintiffs turn now to the fact that, under the LU Rules—which remain the foundational basis for the Masts' claimed expectation of privacy—the Masts cannot establish the existence of any privilege or work-product protection for the Disputed Emails.

    **B.**    **Under the Law of the Fourth Circuit, Any Attorney-Client or Marital Privilege Was Waived When The Masts Used LU's Email System**

RMast claims that "Plaintiffs' cited case law . . . does not support their position."[8] In fact, he fails to point to a ***single case***—cited by Plaintiffs or otherwise—that does ***not*** support Plaintiffs' argument that the Masts had no reasonable expectation of privacy in their email communications on LU's information system.

---

[8] RMast Opp. at 2.

RMast begins by citing *Asia Global Crossing*, acknowledging that "most courts" apply the four-factor test set out therein to analyze whether a person had an objectively reasonable expectation of privacy in his email communications.[9] As RMast correctly points out, that case held that, generally, "lawyers and clients may communicate confidential information" over email with a reasonable expectation of privacy.[10] Yet RMast cites that principle as though it disposes of the issue, failing to appreciate that it is a default rule subject to exceptions where a person will ***not*** have a reasonable expectation of privacy for emails sent to or received from his or her lawyer.[11] The Masts did not waive otherwise applicable privileges merely because they communicated over email. Rather, their communications are not protected because the Masts had no reasonable expectation of privacy in their emails sent or received on LU's information system, as evinced through straightforward application of *Asia Global Crossing's* four-factor test.[12]

Moreover, RMast seems to have misunderstood the court's rationale in *Asia Global Crossing* when he states that the court "examin[ed] written policies that would satisfy the four-factor test but were inconsistently applied and [therefore] f[ound] no waiver of privilege."[13] The issue in that case was not that there was a clear policy that was "inconsistently applied." Rather, because the four-factor test was not satisfied, the court was "unable to conclude as a matter of law" that the party at issue's use of Asia Global's email system to communicate with their attorney

---

[9] *Id.*

[10] *In re: Asia Global Crossing, Ltd., et al.*, 322 B.R. 247, 256 (Bankr. S.D.N.Y. 2005).

[11] *See id.* at 257 (delineating a four-factor test to determine whether an employee had a reasonable expectation of privacy in emails on his workplace account).

[12] *See* Pl. Opp. Memo at 14–17.

[13] RMast Opp. at 3.

waived attorney client privilege.[14] Asia Global argued that it "did not have a formal policy in place," contending that the policy cited belonged to another entity.[15] On top of that, the party at issue argued that "they did not know of . . . an Asia Global email policy."[16] In contrast, neither LU nor RMast claim that LU did not have a formal policy in place. In fact, RMast acknowledges as much in the first sentence of his brief.[17] Nor can the Masts credibly assert that "they did not know of" LU's Rules, considering they had to assent to it *every time* they logged into, or used, LU's email system.[18]

RMast would have the Court conclude that LU's Policy is not an "actual policy," but is instead a "generalized policy statement," and therefore the *Asia Global Crossing* factors do not apply.[19] Wishing that were so does not make it so. There is no basis (at least not in the English language) on which to find that LU's Rules, titled "Acceptable Use Policy," is anything short of a "policy" governing the acceptable use of LU's information systems.[20]

RMast's Opposition proceeds by attempting, unpersuasively, to mine support from those cases in which a court held that a user had a reasonable expectation of privacy in email communications sent or received on an employer's information system. For example, RMast points out that in *Convertino v. U.S. Dept. of Justice,* the court held that "no waiver [of privilege]

---

[14] *Asia Global Crossing*, 322 B.R. at 247, 259 ("The evidence is equivocal regarding the existence of notice of corporate policies banning certain uses or monitoring employee e-mails.").

[15] *Id.* at 260.

[16] *Id.*

[17] RMast Opp. at 1 ("the University has a written Acceptable Use Policy").

[18] *See* LU Rules, ECF No. 345-4 at PageID 4429.

[19] RMast Opp. at 3.

[20] Gauger Decl. at 1 ("The University has in place an Acceptable Use Policy ("IT Policy") for all of its information systems, including, but not limited to, its recognized email system.").

exists if (1) the disclosure is inadvertent; and (2) the holder of the privilege or protection took reasonable steps to prevent disclosure."[21] Yet RMast does not argue that the Masts' use of the LU email system was inadvertent or that they took reasonable steps to prevent disclosure of their emails. Unlike in *Convertino*, where the employee "was unaware that [the employer] would be regularly accessing and saving e-mails from his account,"[22] the Masts were on crystal clear notice that "[n]o user of the Information Systems should have an expectation of privacy in their electronic communications."[23]

RMast similarly fails to show how the other cases support his position. In *Doe 1 v. George Washington Univ.*, the court held that Jane Doe 1 had a reasonable expectation of privacy in her email communications because it was unclear "whether Jane Doe 1 agreed to [the University's] e-mail policy, and if she did, what the terms of the policy were when that occurred."[24] In contrast, users of the LU information system are deemed to assent to LU's Acceptable Use Policy by using the system—including LU's email platform—and are reminded of the Policy when they "click[] through" the "usage agreement during sign-on to any University system."[25] Similarly, in *Sprenger v. Rector and Bd. of Visitors of Va. Tech.*, the court noted that "[t]hese cases turn on the very specific factual situations unique to each case."[26] In that case, there was no "showing that Mr. or Mrs. Sprenger were notified of the Policy by a log-on banner, flash screen, or employee handbook

---

[21] 674 F.2d 97, 109 (D.D.C. 2009).

[22] *Id.* at 110,

[23] LU Rules at 9.

[24] 480 F.Supp.3d 224, 229 (D.D.C. 2020).

[25] LU Rules at 1.

[26] No. 7:07cv502, 2008 WL 2465236, at *4 (W.D. Va. 2008).

and whether Mr. or Mrs. Sprenger were ever actually aware of the Policy."[27] In stark contrast, the Masts *were* notified of the LU Rules by a log-on banner. All of these cases support Plaintiffs' assertion that, under the applicable law, the Masts waived any attorney-client or marital privilege over communications sent or received using LU's email system.

        C.        **The Disputed Emails Are Not Entitled to Protection Under the Work-Product Doctrine**

                1.        **Emails Relating to the Ex Parte Custody and Adoption Proceedings**

To justify work-product protection for the Disputed Emails dated before December 8, 2021, *i.e.*, before the fraudulent adoption was contested in the parallel state court proceeding (the "Ex Parte Emails"), the Masts must show that those emails were prepared "in anticipation of litigation or trial." Fed. R. Civ. P. 26(b)(3)(A). RMast claims they were, simply because they were associated with the adoption proceedings. In his view, literally *any* "actual court proceedings" (his phrase) qualify as "litigation" for purposes of invoking the doctrine—in part because (again in his view) such proceedings always involve some potential for future litigation (or as he puts it, "challenges and appeals" are "available and very real possibilities….").[28] But RMast cites no case in support of this expansive formulation of the work-product doctrine. In fact, the law is otherwise.

To begin with, the Federal Rules do not define "litigation" for purposes of the work-product doctrine. But the case law establishes that, for purposes of the doctrine, "litigation" means an *adversarial* proceeding. This is because, as the D.C. Circuit has noted, the very purpose of the work-product doctrine

> is to encourage effective legal representation **within the framework of the adversary system** by removing counsel's fears that his thoughts and information will be invaded **by his adversary**. In other words, the privilege focuses on the

---

[27] *Id.*

[28] RMast Opp. at 7.

integrity of the *adversary trial process* itself . . . .²⁹

The doctrine therefore protects information "against *opposing parties*, rather than against all others outside a particular confidential relationship, in order to encourage effective trial preparation."³⁰

Thus, in a number of contexts—including "actual court proceedings"—the availability of work-product protection turns upon whether the proceedings that purportedly generated the protection were sufficiently adversarial. In criminal sentencings in federal courts, for example, the "need to protect Defense counsel's work product during a guilty plea proceeding is significantly diminished because, while the adversarial proceeding is ongoing, the adversarial *nature* of such proceeding is diminished at the guilty plea stage of the case."³¹ Similarly, the doctrine is unavailable in administrative proceedings unless "one party has a claim against another party," thus rendering the process adversarial.³² As Magistrate Judge Sargent has noted, where "the proceedings are not adversarial but mostly *ex parte*, this ... ***does not constitute litigation for purposes of the application of the work-product doctrine***."³³

Although RMast tries to wave away consideration of patent work-product cases, they are equally relevant on this point, because they similarly demonstrate that the availability of work-product protection turns on whether a proceeding was adversarial. Thus, in the patent arena, work-product protection does not ordinarily apply to materials associated with non-adversarial, *ex parte*

---

²⁹ *Jordan v. U.S. Dep't of Just.*, 591 F.2d 753, 775 (D.C. Cir. 1978) (emphasis added), *disapproved of on other grounds by Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C. Cir. 1981).

³⁰ *United States v. Frostman*, 221 F. Supp. 3d 718, 738 (E.D. Va. 2016) (citation omitted) (emphasis added).

³¹ *Id.* at 739 (emphasis in original) (citation omitted).

³² *Adair v. EQT Prod. Co.*, 294 F.R.D. 1, 6 (W.D. Va. 2013).

³³ *Id.* at 5–6 (citation and quotation marks omitted) (emphasis added).

patent prosecutions,[34] while it generally does apply to (for example) a reexamination. The reason is that a reexamination "is nowhere nearly as non-adversarial and as *ex parte* as is a typical application for initial issuance of a patent."[35]

Meanwhile, where the work-product doctrine is invoked, as here, based on the prospect of *future* adversarial proceedings, the mere possibility of later "challenges and appeals" is not enough. Instead, to be protected under the work-product doctrine, a document "must be prepared under the '***substantial and imminent***' or '***fairly foreseeable***' threat of litigation."[36] RMast identifies nothing close to that.

To prevail in their assertion of work-product protection for the Ex Parte Emails, the Masts cannot merely point to the fact that the documents were prepared in connection with "actual court proceedings." Nor can they rely on some imagined possibility of future litigation. Instead, they must show that the Ex Parte Emails were prepared (a) in connection with existing ***adversarial*** proceedings, and/or (b) under the "substantial and imminent" or "fairly foreseeable" threat of *future* adversarial proceedings. RMast does not make either showing, and the materials are therefore discoverable.[37]

---

[34] *Progress Solar Sols., LLC v. Fire Prot., Inc.*, No. 5:17-CV-152-D, 2019 WL 4463302, at *6 (E.D.N.C. Sept. 17, 2019) (citing *Burroughs Wellcome Co. v. Barr Labs., Inc*., 143 F.R.D. 611, 617 (E.D.N.C. 1992)).

[35] *Hewlett–Packard Company v. Bausch & Lomb Inc*., 4 U.S.P.Q.2d 1676, 1684 (N.D.Cal.1987).

[36] *Kidwiler v. Progressive Paloverde Ins. Co*., 192 F.R.D. 536, 542 (N.D.W.Va. 2000) (footnotes omitted) (emphasis added) (citing *National Union Fire Ins. Co. of Pittsburgh, PA. v. Murray Sheet Metal Co., Inc.,* 967 F.2d 980, 984 (4th Cir.1992); *State Farm Fire and Cas. Co. v. Perrigan*, 102 F.R.D. 235, 238–39 (W.D.Va.1984)).

[37] Ironically, because they pursued and procured a fraudulent adoption, and with all the benefit of hindsight, the Masts probably should have feared that a firestorm of adversarial litigation might well result (as it now has). But they cannot admit that uncomfortable truth because the crime/fraud exception would then vitiate any privilege. Plaintiffs reserve their right to contend that the crime/fraud exception compels production of discovery materials in this case.

Indeed, the Masts cannot make either showing on this record, because they have already staked out exactly the opposite position. As Plaintiffs noted in their previous brief, the *ex parte* adoption proceedings were based on the Masts' representations that there were in fact **no current or threatened adversarial interests** relevant to those proceedings.[38] For example, as the Fluvanna County Circuit Court pointed out in entering the interlocutory order of adoption, the Masts had given that court "representations" that "Afghanistan had expressed no objections and a formal waiver [of Afghan jurisdiction] was anticipated."[39] Similarly, that court proceeded on a misunderstanding, again relying on the Masts, that "[d]iligent efforts . . . to identify living family members" of Baby Doe had been unsuccessful.[40]

It is true that neither Plaintiffs nor the Masts have identified a case discussing whether the work-product protection applies to *ex parte* adoption proceedings specifically. Presumably that is because fraudulent *ex parte* adoptions like this one are (fortunately) rare. But Plaintiffs suggest it is at least as rare for litigants to assert work-product protection over documents that, like the Ex Parte Emails here, were created in connection with a proceeding that the **litigants themselves** repeatedly insisted was, and would always be, non-adversarial. The Masts should be compelled to produce the Ex Parte Emails.

### 2. Waiver of Work-Product Protection With Respect to All Disputed Emails

Indeed, given the Masts' relinquishment of all their rights in the Disputed Emails, all of those materials should be denied work-product protection.

RMast argues that there can be no wholesale waiver with respect to the Disputed Emails

---

[38] Pl. Opp. Memo 18–19.

[39] Exh. 9 to Pl. Opp. Memo at ¶¶ (E), (F) & (G).

[40] *Id.* at ¶ (E).

because "we have neither a voluntary nor an inadvertent disclosure of WPD to an adversary by either the attorney or the client."[41] But this alleged test remains the "straw man,"[42] because disclosure to an adversary (inadvertently or otherwise) is ***not*** required to waive work-product protection.

Lest there be any doubt about what the test actually is for work-product waiver in the Fourth Circuit, Magistrate Judge Sargent summarized it at some length in 2017:

> The Fourth Circuit has recognized that the inadvertent disclosure of attorney work product, even opinion work product, can result in a waiver of its protected status. The Fourth Circuit has held, however, that a waiver should occur only when an attorney's or client's actions are consistent with a conscious disregard of the advantage that is otherwise protected by the work product rule. In general, this occurs only when ***the disclosure occurs under circumstances that substantially increase the possibility that an opposing party will obtain the protected information.*** Nevertheless, the Fourth Circuit has held that "***release of otherwise protected material without an intent to limit its future disposition might forfeit work product protection***.... [T]o effect a forfeiture of work product protection by waiver, disclosure must occur in circumstances in which ***the attorney cannot reasonably expect to limit the future use of the otherwise protected material***.[43]

Applying these principles, it is apparent that the Masts' handling of the Disputed Emails resulted in wholesale waiver of any work-product protection. When the Masts chose to use LU's email system, thereby acknowledging that the Disputed Emails belonged to LU, the Masts "substantially increased the possibility that an opposing party [would] obtain the protected information"—and evinced no "intent to limit … future disposition" of the protected information.

---

[41] RMast Opp. at 11 (emphasis added).

[42] *Id*. at 10–11.

[43] *Harleysville Ins. Co. v. Holding Funeral Home, Inc.*, No. 1:15CV00057, 2017 WL 1041600, at *5 (W.D. Va. Feb. 9, 2017), *objections sustained in part and overruled in part*, No. 1:15CV00057, 2017 WL 4368617 (W.D. Va. Oct. 2, 2017) (emphasis added) (internal citations omitted); *citing Martin Marietta Corp. v. Pollard*, 856 F.2d 619, 626 (4th Cir. 1988); *Doe v. United States*, 662 F.2d 1073, 1081 (4th Cir. 1981); *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1223 (4th Cir. 1976); *Continental Cas. Co. v. Under Armour, Inc.*, 537 F. Supp. 2d 761, 772-73 (D. Md. 2008).

That was so because, under the LU Rules (which were made known to the Masts in advance), LU (a) offered no expectation of privacy, (b) was under no obligation to keep the materials secret, and (c) could be subpoenaed at any time by adverse parties such as Plaintiffs here. Thus, as the ABA long ago warned, an attorney submitting the Disputed Emails to an entity like LU, under rules like the LU Rules, could not in fact "reasonably expect to limit the future use of the otherwise protected materials."[44]

### III.     CONCLUSION

The Masts should be compelled to produce the Disputed Emails in their possession, just as the Masts' motions to quash the LU subpoena should be rejected. When the Masts agreed to the LU Rules, any attorney-client privilege, marital privilege, or work-product protection was destroyed—and the Ex Parte Emails were never "work product" in the first place.

Dated: March 25, 2024                    Respectfully submitted,

/s/ *Maya Eckstein*
Maya M. Eckstein (VSB No. 41413)
Lewis F. Powell III (VSB No. 18266)
HUNTON ANDREWS KURTH LLP
951 E Byrd St
Richmond, VA 23219
Telephone: (804) 788-8200
Fax: (804) 788-8218
Email:
Email:  lpowell@HuntonAK.com

---

[44] *Harleysville*, 2017 WL 1041600, at *5.

14

Jeremy C. King (*admitted pro hac vice*)
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 309-1000
Fax: (212) 309-1100
Email:  jking@HuntonAK.com

Sehla Ashai (*admitted pro hac vice*)
ELBIALLY LAW, PLLC
704 East 15th Street
Suite 204
Plano, TX 75074
Telephone: (312) 659-0154
Email: ashai@elbiallylaw.com

Blair Connelly (*admitted pro hac vice*)
Zachary L. Rowen (admitted pro hac vice)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: Blair.Connelly@lw.com
Email: Zachary.Rowen@lw.com

Ehson Kashfipour (*admitted pro hac vice*)
Damon R. Porter (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W. Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: Ehson.Kashfipour@lw.com
Email: Damon.Porter@lw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of March, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

By: <u>*/s/ Maya M. Eckstein*</u>
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Plaintiffs*