**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

BABY DOE, *et al.*,

        Plaintiffs,

v.

JOSHUA MAST, *et al.*,

        Defendants.

CIVIL NO: 3:22-cv-00049-NKM-JCH

**DEFENDANTS JOSHUA AND STEPHANIE MAST'S REPLY
IN SUPPORT OF THEIR MOTION TO COMPEL**

Plaintiffs John and Jane Doe fail to explain why they continue to refuse to fully respond to Joshua and Stephane Mast's Interrogatories Nos. 13 and 14, instead invoking an inapplicable federal rule about business records, arguing the information sought is not itself relevant evidence, and suggesting the Masts can wait to take a deposition to seek the information targeted by the interrogatories. None of the Does' justifications align with the Federal Rules of Civil Procedure, and this Court should compel them to meaningfully respond to those interrogatories.

**BACKGROUND**

In Interrogatories Nos. 13 and 14, the Masts request the Does to provide all available information known to them regarding a video and the video's surrounding circumstances that John Doe referenced in his sworn declaration to the U.S. Citizenship and Immigration Services ("USCIS") in support of his asylum application. *See* Ex. A to Masts' Motion to Compel (ECF No. 356-1). In August 2023, John Doe wrote, signed, and submitted a Declaration to USCIS in pursuit of asylum. *See* Ex. C to Mast's Motion to Compel (ECF No. 356-3) ("Declaration"). The Declaration provides information to establish the Does' basis for why they "cannot return to

Afghanistan given current conditions in the country." Declaration at 15. Among those conditions, John Doe cites multiple legal disputes over the custody of the Child. *Id.* at 13.

The Declaration also describes two separate "legal dispute[s]"—the first pertains to the litigation related to the Masts' adoption of the Child, *id.* at 9–11, and the second pertains to an unnamed Afghan family's alleged claim to the Child, *id.* at 11–13. Specifically, in Paragraphs 55–69, John Doe describes an incident involving the Child's brother, her maternal uncle, and a third, unnamed individual that explained "that there was another family in Helmand that was saying [the Child] was their daughter" and "wanted the child to *return* to them." *Id.* at 11–13 (emphasis added). After recounting these legal disputes, John Doe states, "[a]s a result of these incidents, multiple people in Afghanistan now know that there is a legal dispute over our child. This is very dangerous for our families." *Id.* at 13.

In response to the Masts motion to compel, the Does assert that this video is insignificant and that, implausibly, they know nothing about the video or the circumstances surrounding it beyond what John Doe included in his carefully crafted Declaration. See Plaintiffs' Opposition to Joshua and Stephanie Mast's Motion to Compel (ECF No. 359) at 8 ("Opposition"). The Does also invoke an evidentiary concern by argue that the video contains triple-hearsay. *Id.* at 5.

## ARGUMENT

The Masts are allowed to obtain all discovery that could lead to relevant evidence and any information pertaining to possible claims or defenses, including here, information about a video John Doe voluntarily described in a government filing that reveals the existence of a family in Afghanistan with a competing claim to the Child. Without question, the Does status as family in Afghanistan is central to this legal dispute. The Masts are entitled to the information sought in Interrogatories Nos. 13 and 14 because John Doe's sworn statement indicates that there is a

competing claim to the Child in Afghanistan and that would dramatically undermine the Does'

claim in this litigation to be the Child's parents. The Court should require the Does to provide full

answers to the Masts' Interrogatories Nos. 13 and 14. As explained below, none of the Does

counterarguments have merit.

### A. The Does' assertion they do not know any of the information requested by the Masts contradicts the importance John Doe placed on the video in his USCIS declaration.

According to John Doe, "someone claiming to be a representative of the International

Committee of the Red Cross" came to the location where John Doe's brother and the Child's

maternal uncle live. Declaration at 12. This "supposed ICRC man" met with the Child's brother

and maternal uncle, telling them that "there was a case about this child in which [John Doe] was

in conflict with another person, and that there was another family in Helmand that was saying that

she was their daughter." *Id.* at 13. According to John Doe, the three individuals walked up a

mountain, where "the ICRC man told them to make statements on video." *Id.* As John Doe

describes, the Child's brother and maternal uncle recorded a video in which they said "that there

was a conflict over the child between me, [John Doe], and another family in Helmand, that [the

Child's maternal uncle] and [the Child's brother] wanted the child to return to them, and that the

Taliban was helping them with this, and that the family also needed money." *Id.*

These statements partly serve as the basis for John Doe's asylum claim by establishing his

fear of returning to Afghanistan, but the Does now seek to minimize these statements, claiming

that John Doe's Declaration includes "no such statement" admitting that another Afghan family

claims custody of the Child. Opposition at 5. Yet Paragraphs 55–69 relate to the circumstances in

which John Doe learned of the custody dispute over the Child with another Afghan family.

Declaration at 11–13. John Doe's Declaration was clear—the video at issue suggests "there [is]

another family in Helmand that was saying that [the Child] was their daughter," and this custody

dispute makes it too dangerous for the Does to return to Afghanistan. *Id.* John Doe signed his Declaration, attesting to its truth, and submitted it USCIS. Given John Doe's explicit acknowledgement of this separate custody dispute as a basis for asylum, the Does cannot plausibly now suggest he never made such a statement.

Attempting to justify their refusal to respond to the Masts' Interrogatories, the Does seize on a single sentence in the Declaration to assert that no such video exists because it may not have been a *recorded* video. Opposition at 4. To be sure, John Doe says in his declaration that "[i]t is not clear to me based on my conversation with [John Doe's brother] whether this man had them say these things on a video call with another person, or whether he was simply videorecording them as they made these statements." Declaration at 13. The Masts appreciate this possibility, which is why the Masts purposefully drafted broad interrogatories so that John Doe could explain exactly what he knows about the video, the circumstances surrounding it, and all individuals who could have information regarding the video or the alleged other family.

Far from presupposing the existence of a recorded video, as the Does argue, the Masts' interrogatories asked for the Does to "[i]dentify all persons with knowledge of, or information relevant to, the video referred to by John Doe in [his Declaration]" and to "[d]escribe in detail how you learned about the video described by John Doe in [his Declaration] and all details you know about the video, including who provided you with this information." *See* Ex. A to Masts' Motion to Compel. These Interrogatories hardly presuppose the existence of a recorded video and were written to be inclusive of all types of possible video creation scenarios.

Simply put, this possible custody dispute with another Afghan family was significant enough for John Doe to include in his Declaration, and it directly implicates this lawsuit as a key issue is whether the Does can factually and legally claim to be the Child's lawful parents under

Afghan law. If there are facts demonstrating that is not the case, or information that could reasonably lead to the discovery of other evidence on point, the Masts are entitled to that information. The Does cannot plead ignorance to avoid answering Interrogatories that may undermine their claims, particularly after invoking the existence of the recording to bolster their own immigration filing.

**B.  Rule 33(d) governs business records and thus does not apply to these Interrogatories.**

The Does repeatedly cite Federal Rule of Civil Procedure 33(d) as a basis for refusing to answer the Masts' Interrogatories. But Rule 33(d) only applies to interrogatories that may be answered by "examining, auditing, compiling, abstracting, or summarizing a party's *business records*." Fed. R. Civ. P. 33(d) (emphasis added). Rule 33(d) can only be used for business records and "does not encompass . . . discovery materials generally." *United States ex rel. Landis v. Tailwind Sports Corp.*, 317 F.R.D. 592, 595 (D.D.C. 2016). A "business record" is "[a] report, memorandum, or other record made in the ordinary course of business." Black's Law Dictionary (11th ed. 2019). And Rule 33(d) applies only when "neither side has clear superiority of knowledge or familiarity with the documents." *Ayers v. Cont'l Cas. Co.*, 240 F.R.D. 216, 226 (N.D. W.Va. 2007) (quoting *United Oil Co. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 419 (D. Md. 2005)).

This Rule does not encompass a declaration made by a party and attached to an asylum application submitted to USCIS—John Doe clearly has superior knowledge about a document he drafted. Worse, this justification contradicts their repeated assertions that the Does have no knowledge of the video John Doe referenced in his declaration or the circumstances surrounding it or the people who would have knowledge about it, despite using it as support that he feared for his life in Afghanistan. *See* Declaration at 11–13 (describing how the video created a situation "very dangerous for our families"). But now, when asked to provide all known information about

this video, the Does attempt to invoke an inapplicable rule of procedure and claim to know nothing about this purportedly benign video. *See* Opposition at 5 (downplaying the significance of the video as containing "three levels of hearsay").

The Does ask "what else, exactly, J&S Mast would have the Court order Plaintiffs to do." Opposition at 8. The Masts would have the Court order Plaintiffs provide a full answer to their interrogatories without evasively citing Rule 33(d) as a basis to refuse to provide an answer.

### C. The Does' assertion that the Masts can obtain the information they seek through depositions is improper.

The Does' contention that the Masts can wait until John Doe's deposition to obtain additional information about the video in question is likewise unavailing. "A party may not defer answering or refuse to answer an interrogatory by suggesting that the information may be forthcoming during a deposition to be taken at a later date." *See, e.g.*, *Oleson v. Kmart Corp.*, 175 F.R.D. 570, 572 (D. Kan. 1997); *see also Miller v. Joaquin*, 431 F. Supp. 3d 906, 922 (E.D. Mich. 2019) ("[A] party may not defer answering or refuse to answer . . . by suggesting that the information may be forthcoming."). Parties cannot delay answering questions raised in interrogatories until depositions because "[a]nswers to interrogatories may be useful in developing later depositions." *Rogers v. Tri-State Materials Corp.*, 51 F.R.D. 234, 241 (N.D. W.Va. 1970); *see also May v. Baltimore & O.R. Co.*, 17 F.R.D. 288, 290 (D. Md. 1955) (acknowledging that "one of the principal purposes of interrogatories is to ascertain the contentions of the adverse party"). Indeed, one of the very purposes of interrogatories is to allow parties to know what deposition topics they should focus upon. *See PCS Phosphate Co. v. Norfolk S. Corp.*, 238 F.R.D. 555, 559 (E.D.N.C. 2006) ("Depositions provide a useful, if not essential, means to inquire further about information obtained through interrogatories.").

Here, the Does explicitly refused to provide a full answer to the Masts' interrogatories, arguing that "[i]f J&S Mast depose the Does, that will be their opportunity to cross-examine them about the Declaration and their answers to the interrogatories." Opposition at 8. The Does' refusal is improper, and in fact, it prevents the Masts from using the interrogatories to prepare for future depositions, including by preventing the Masts from deciding which witnesses to depose and what topics are necessary. If this excuse were given credence, then it is hard to see why any party would answer a difficult interrogatory if one could simply tell the opposing party to wait and take a deposition.

## CONCLUSION

For the foregoing reasons, the Court should order the Does to fully answer the Masts' Interrogatories No. 13 and 14.

Dated: March 28, 2024                    Respectfully submitted,

<div style="margin-left:50%">

*/s/ Michael Francisco*
John S. Moran (VSB No. 84326)
Michael L. Francisco (*pro hac vice*)
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of March 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing

to all CM/ECF participants.


Dated: March 28, 2024                              Respectfully submitted,

                                                  */s/ Michael Francisco*