**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| BABY DOE, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 3:22-cv-49-NKM-JCH |
| JOSHUA MAST, *et al.*, | |
| *Defendants.* | |

**PLAINTIFFS' PRE-HEARING BRIEF IN SUPPORT OF MOTION TO SHOW CAUSE
WHY DEFENDANT JOSHUA MAST AND HIS THIRD-PARTY REPRESENTATIVE
JONATHAN MAST SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING THE
COURT'S PROTECTIVE ORDER**

## INTRODUCTION

In late January 2023, Joshua and Stephanie Mast ("J&S Mast") violated the Protective Order (ECF No. 26) when they went on national television and displayed identifying images of Baby Doe. Two weeks later, they were before the Court on Plaintiffs' show-cause motion seeking to hold them in contempt for that violation (ECF No. 141). Soon after that hearing, Joshua Mast enlisted his younger brother, Jonathan Mast, as his surrogate in dealing with an organization called the Pipe Hitter Foundation ("PHF"), which Joshua Mast hoped would raise money for J&S Mast's legal expenses. Discovery later revealed this sequence to be what common sense suggested: Joshua Mast tapped Jonathan Mast to be his representative because Joshua knew the Protective Order prohibited him from engaging in the publicity blitz he desired from PHF.

Jonathan Mast followed through on his brother's wishes. As a direct result of Jonathan Mast's months-long interactions, PHF posted identifying photographs of Baby Doe on its website

and social media accounts in support of PHF's solicitation of funds for J&S Mast. That fundraising

was enabled by a contract Jonathan signed on behalf of his brother and sister-in-law.

PHF also arranged for Jonathan Mast to be interviewed by One America News Network

("OANN"), during which multiple identifying photographs of Baby Doe were displayed. Jonathan

Mast has admitted that he gave the photos to OANN. That interview remains available today on

OANN's website.

Just like J&S Mast's display of Baby Doe's photographs on national television violated the

Protective Order, so too did the dissemination of Baby Doe's photographs through PHF and

OANN. The difference here is that, in the wake of the first show-cause motion hearing, Joshua

Mast tried to skirt the Protective Order by working through his brother Jonathan Mast. But this

Court's Protective Order is not so easily evaded. As detailed below, Plaintiffs respectfully ask that

the Court hold Joshua Mast in contempt for violating the Protective Order and Jonathan Mast in

contempt for aiding and abetting his brother's violation.[1]

## FACTUAL BACKGROUND

**I.   The Court's Protective Order (ECF No. 26)**

This Court entered a Protective Order prohibiting the disclosure of Plaintiffs' identifying

information because such disclosure "would pose a substantial risk to the physical safety of

Plaintiffs and other innocent non-parties." ECF No. 26 (Protective Order) at 2. The Protective

Order forbids "***Defendants*** and their counsel ***and representatives*** . . . from disclosing any

---

[1]   Plaintiffs withdraw their request that Stephanie Mast be held in contempt, because
discovery revealed no evidence that she was actively involved in Joshua Mast's scheme. Discovery
further suggested that PHF was an innocent pawn in this travesty. Once informed by Plaintiffs'
counsel of the Protective Order, PHF acted promptly to pull down the social media posts.
Accordingly, Plaintiffs also withdraw their request that PHF be held in contempt for aiding and
abetting Joshua Mast's violation of the Protective Order.

information that directly or indirectly identifies Plaintiffs or their family members to any person . . . unless that person first executes a non-disclosure agreement enforceable through the contempt sanction." *Id.* at 2 (emphasis added). The Protective Order applies to "minor Plaintiff Baby Doe" as well as Plaintiffs John and Jane Doe. *Id.* at 3.

## II.     What Plaintiffs Knew When They Filed the Motion to Show Cause

When Plaintiffs filed the Motion to Show Cause, they knew only what was publicly available – information that strongly pointed to violations of the Protective Order. Since then, Plaintiffs have taken discovery confirming that Joshua Mast knowingly violated the Protective Order and that his brother Jonathan Mast knowingly aided and abetted him in doing so.

Plaintiffs filed the Motion to Show Cause on June 14, 2023, shortly after learning that PHF was soliciting financial support for J&S Mast for this litigation by (among other things) publishing identifying photos of Baby Doe and her personal information on its website and social media accounts to nearly 400,000 followers. *See* ECF No. 231-1 (screenshots of the offending website and social media posts with Baby Doe's face redacted by Plaintiffs' counsel) and Exh. A (same as ECF No. 231-1 but as-published without redactions).

In May 2023, PHF published identifying photos of Baby Doe on its website and social media channels to solicit donations to a legal fund for J&S Mast. PHF's main website landing page prominently identified "The Mast Family" among those "Who We Support" and displayed an identifying photograph of Baby Doe with Joshua Mast. Exh. A at 1. The link beneath that image navigated users to a page titled "The Mast Family," which displayed the same identifying photograph of Baby Doe, along with three additional photographs of her, including an identifying photograph showing her sitting next to Stephanie Mast in September of 2021, mere days after she left Afghanistan. *Id.* at 1-2.

3

PHF's "Mast Family" page urged donations by providing a one-sided account of the Masts' quest "to create a path to safety and care . . . for the baby girl, code named 'Starfish,'" asserted that she has "al-Qaeda origins," and accused Plaintiffs of having "terrorist ties." Exh. B at 1. PHF declared that it "is joining the Masts in their righteous fight" by "stepping up to support this brave Marine and his family." *Id.* To that end, supporters were directed to a "Donate" link, which led to a fundraising page titled "Help the Masts." Exh. A at 3. The fundraising page again displayed the identifying photo of Baby Doe siting next to Stephanie Mast. *Id.*

PHF and its founders published more identifying photographs of Baby Doe on their social media accounts. On May 11, PHF posted on its Instagram account (@pipe_hitter_foundation) a more recent photograph of Baby Doe – with her face "censored" by a digital sticker in the shape of a starfish (an apparent homage to Baby Doe's supposed "code name"). Exh. A at 4. PHF's Instagram account has more than 52,000 followers. Exh. C. PHF posted the same photograph of Baby Doe as a "highlight" on its Instagram account with the text "Help the Mast Family!" Exh. 1 at 5. It also posted the photo on its Facebook account, which has 10,000 followers, where it was shared and re-posted at least 28 times by other users. *Id.* at 6; Exh. D.

In addition, Eddie Gallagher, PHF's founder, shared and re-posted the image on his own Facebook account, Exh. A at 7, on which he has 113,000 followers, Exh. E. And Eddie Gallagher and his wife posted the same photo – this time ***without*** the starfish sticker and thus revealing Baby Doe's face – on their personal Instagram accounts (@eddie_gallagher and @andrea_gallagher). Exh. A at 8. Each of these posts included captions like PHF's "Mast Family" page and directed viewers to PHF's website for donations. *Id.* at 4-8.

Plaintiffs also learned in June 2023 that Jonathan Mast solicited donations for the PHF-litigation defense fund earmarked for J&S Mast by appearing on the One America News Network

("OANN"). During his interview on OANN, the network published five photographs of Baby Doe at various points in her life (both in Afghanistan and the United States), including three showing her face.[2]

## III. Discovery Confirmed Joshua Mast and Jonathan Mast's Violations of the Protective Order

The deposition of Jonathan Mast, documents produced by Jonathan Mast and PHF, a declaration provided by PHF's Executive Director, Dena (Cruden) Disarro ("Disarro"), and Joshua Mast's own declaration establish that Joshua Mast knowingly violated the Protective Order and that Jonathan Mast knowingly aided and abetted him in doing so.

The evidence shows that Joshua Mast interacted with PHF as early as January 7, 2023, when he "provided an emailed summary of the matter" to Disarro and Andrea Gallagher, PHF's President, along with "related documents." ECF No. 257-2 (Disarro Decl.) at ¶ 24; PHF 00001-0025[3]; *see also* ECF No. 239-1 (Declaration of Joshua Mast ("J Mast Decl.") at ¶ 4 ("In approximately late January or early February 2023, a military member introduced me to the Pipe Hitter Foundation . . . ."). Joshua Mast "inquired about a grant" to address the "significant expenses" resulting from "this lawsuit and others . . . bought by [] John and Jane Doe." J Mast Decl. at ¶ 5-6.

Joshua Mast was concerned, though, about the Court's Protective Order, telling Disarro about the so-called "gag order" at least by March 2023. ECF No. 257-2 (Disarro Decl.) at ¶ 55 ("I

---

[2] The interview remains available for viewing today. *See* One America News Network, *Brother Of Marine Major Describes The Fight To Protect Afghan Girl Orphaned After Foreign Fighter Detonated Explosive Vest* (June 6, 2023 4:46 PM), https://www.oann.com/video/oan-contribution/brother-of-marine-major-describes-the-fight-to-protect-afghan-girl-orphaned-after-foreign-fighter-detonated-explosive-vest/.

[3] J&S Mast have stipulated to the authenticity of all documents produced by PHF. ECF No. 378 (Mem. Op. & Order) at 9, 11.

was told about a 'gag order' by Joshua Mast during a telephone call that occurred, to the best of my recollection, sometime in March 2023"); *see also* J Mast Decl. at ¶ 6 ("When I inquired about a grant, I . . . explained to the [PHF] that due to the Court's gag order and its restrictions on identifying [Baby Doe] in this suit, we were essentially unable to defend ourselves" in public); ¶ 9 ("Stephanie and I knew about this Court's gag order"). As a result, Joshua Mast told Disarro that "neither he nor Stephanie Mast would be permitted to speak publicly about the case or Baby Doe." ECF No. 257-2 (Disarro Decl.) at ¶¶ 55-56. Joshua Mast's concerns about the Protective Order arose again in his conversations with Disarro in April 2023, when he texted her "that the 'gag order' would prohibit both him and Stephanie Mast from serving in a public-facing capacity in support of the public awareness and legal defense fundraising campaign."[4] *Id.* at ¶ 60. As a result, "Joshua Mast then stated sometime in either late March 2023 or early April 2023, through Signal text, that he believed his brother, Jonathan Mast, could serve in a public-facing capacity to talk about the Mast case." *Id.* at ¶ 62.

Jonathan Mast confirmed that he interacted with PHF at Joshua Mast's request[5]:

> Q:     . . . . Did I understand you to say earlier that you became aware at some point in early 2023 that your brother Joshua was in touch with an outfit called the Pipe Hitter Foundation?
>
> A:     Yes, sir.
>
> Q:     How did you learn of this?
>
> A:     Let's see. I received a call from Dena [Disarro], . . . and she informed me she talked to my brother Joshua and it went on from there.

---

[4] Despite acknowledging his concerns about violating the Court's Protective Order, Joshua Mast never provided a copy of that Order to PHF. ECF No. 257-2 (Disarro Decl.) at ¶ 110.

[5] The parties have agreed that they will not challenge the admissibility of Jonathan Mast's deposition testimony on the basis of hearsay.

* * *

> Q:    And tell me about the conversation with Joshua about his
> expectation that Dena [Disarro] was going to contact you.
>
> A:    . . . . I think he called and basically said that he had – I don't
> remember the term he used but like had made contact or had been
> contacted by Pipe Hitter Foundation, told me that they help vets and
> first responders raise funds for legal defenses but that he couldn't
> work with them and that he had given them my number to see if I
> wanted to.

Dep. of Jonathan Mast ("Jon. Mast Dep.") at 49:15-24; 50:14-25.[6] Joshua Mast advised Jonathan

Mast that PHF intended to contact him:

> Q:    Joshua said you were going to be contacted by someone from
> the Pipe Hitter Foundation, right?
>
> A:    Yes, sir.
>
> Q:    And did he identify Dena [Disarro] by name?
>
> A:    By first name, I think.
>
> Q:    And then very soon after that conversation with Joshua you
> received a text message from Dena [Disarro], right?
>
> A:    It was either a text or a call.
>
> Q:    Asking for your cooperation, right?
>
> A:    No, not asking for my cooperation. I think she asked if I
> would be willing to share some of the story.
>
> Q:    And what did you say?
>
> A:    I said I would be willing to.

---

[6] All excerpts to Jonathan Mast's deposition are attached as Exh. F.

*Id.* at 56:15-57:4; *see also id.*at 76:16-77:20 (PHF's Disarro reached out to Jonathan Mast by text, stating that PHF "ha[s] been speaking with your brother Joshua"); Jon. Mast Dep., Exh. 7 at PHF 00630-631 (attached as Exh. G).

Joshua Mast also discussed the Protective Order with Jonathan Mast, again referring to it as a "gag order":

> Q:   When you spoke to Joshua before you spoke to Dena [Disarro] or had contact with Dena [Disarro], did Joshua say that he thought he was subject to a gag order?
>
> A:   To be more specific, he didn't mention on the call about – well, he had mentioned at some point that there was a gag order in effect and so that he wasn't – I didn't know the specifics of what that meant but he had mentioned at some point before, I'm not sure if it was that call or prior to that, but there was a gag order in effect for at least one of the court cases.
>
> Q:   Are those the words he used, gag order?
>
> A:   We have used that and protective order interchangeably, yeah.
>
> Q:   So when is the first time you heard . . . Joshua talk about a protective order?
>
> A:   I don't know.
>
> Q:   Was it before or after this call you had from him that he was going to hear from the Pipe Hitter Foundation?
>
> A:   The first time that I heard about it was it before that call? Probably before, yeah.

*Id.* at 54:18-55:16.

Jonathan Mast admitted that he had seen the Protective Order and that he "underst[ood] the purpose of Judge Moon's protective order was to protect the identity of John Doe, Jane Doe and Baby Doe." *Id.* at 32:8-33:19; *see also* Jon. Mast Dep., Exh. 3 (attached as Exh. H). As a result, after PHF posted identifying photos of Baby Doe, he asked Disarro to blur Baby Doe's face in

certain photos because he "basically decided that I probably shouldn't have used any recent photos of Starfish for two reasons." Jon. Mast Dep., Exh. 20 (JONMAST000102-000108) at JONMAST000104-105[7] (attached as Exh. I); *see also* Jon. Mast Dep. at 168:15-169:7. One of the two reasons was so as "to not give the opposition a reason to screech that I'm breaking the protective order, even though I don't believe I am because I don't believe it applies to me[.]" Exh. I at JONMAST000105; *see also* Jon. Mast Dep. at 169:4-7.

Joshua Mast knew that Jonathan Mast had agreed to interact with PHF:

> Q:      So during this time frame, April and May of 2023, Joshua knew you were in touch with the Pipe Hitter Foundation, correct?
>
> A:      Yeah, I had told him that I had decided to touch base with them and partner with them.

Jon. Mast Dep. at 145:3-7.

Jonathan Mast's testimony stands in stark contrast to the assertion in J&S Mast's Opposition Brief that they "had no knowledge that Jonathan Mast was speaking with the Pipe Hitter Foundation . . . until after Jonathan had already done so." ECF No. 239 (Defendants Joshua and Stephanie Mast's Memorandum in Opposition to Plaintiffs' Motion to Show Cause ("J&S Mast Opp.")) at 3.  Jonathan Mast tacitly conceded that assertion wasn't true:

> Q:      The sentence reads, 'Joshua and Stephanie Mast had no knowledge that Jonathan Mast was speaking with the Pipe Hitter Foundation.' Do you see that?
>
> A:      I do.
>
> Q:      That's not true, is it?
>
> A:      I believe speaking is referencing the stuff published on social media, the website, et cetera, et cetera. They knew that I made contact with Pipe Hitter Foundation – at least I think they did.

---

[7] *See also* Jon. Mast Dep. at 165:5-167:7.

> Q:      Well, you testified just a few minutes ago that you were –
> that Joshua was aware in April and May that you were in contact
> with the Pipe Hitter Foundation, right?
>
> A:      I did say that, yes.
>
> Q:      So this language from this memorandum in support that I
> just read to you is not true, is it?
>
> A:      I would say it needs to be clarified.

Jon. Mast Dep. at 147:9-148:1; *see also id.* at 149:5-25 (admitting that Joshua Mast knew in April and May that Jonathan Mast was in contact with PHF). Indeed, despite the assertion in their Opposition Brief, Joshua Mast admits that he learned as early as "late February or early March 2023 . . . that my brother, Jonathan Mast, had coordinated with the Pipe Hitter Foundation to raise money for our expense[s]," ECF No. 239-1 (J Mast Decl.) at ¶ 10, and it is undisputed that PHF did not begin its fundraising campaign (during which it published identifying photographs of Baby Doe) for the Masts until May 2023. *Id.* at ¶¶ 37, 72, 87, 89.

And even after Joshua Mast referred PHF to his brother Jonathan, PHF continued to communicate directly with Joshua Mast. Disarro "continued operating with the understanding that I could speak with Joshua Mast about the public awareness and legal defense grant fundraising campaign privately but that Jonathan Mast would need to serve in the public-facing capacity." ECF No. 257-2 (Disarro Decl.) at ¶ 69. As a result, Disarro sent to Joshua Mast in May 2023 PHF's "legal defense grant agreement" so that PHF could "launch the campaign." Jon. Mast Dep., Exh. 11 (PHF 00037-48) (attached as Exh. J); *see also* ECF No. 257-2 (Disarro Decl.) at ¶ 71 ("Joshua Mast was provided with our standard legal defense grant agreement"); ¶¶ 72-73 (stating that she emailed Joshua Mast in May 2023 asking him to sign the agreement). In a subsequent telephone call with Disarro, though, Joshua Mast "indicated he could not sign the legal defense agreement

due to the 'gag order.'" ECF No. 257-2 (Disarro Decl.) at ¶ 74. Instead, Joshua Mast "told [Disarro] to speak with Jonathan Mast about the agreement." *Id.* at ¶ 75.

As a result, PHF presented the grant agreement to Jonathan Mast. *See* Jon. Mast Dep. at 57:5-58:3; Jon. Mast Dep., Exh. 5 (PHF 00057-59) (attached as Exh. K); *see also* 257-2 (Disarro Decl.) at ¶ 78 ("I sent Jonathan Mast a text message via Signal in early 2023 and indicated that Pipe Hitter needed him to execute the grant agreement for the benefit of Joshua Mast in order to move forward with the public awareness and legal defense grant fundraising campaign"). The grant agreement states that PHF "is implementing a fundraising campaign in support of Joshua Mast and his family ('Grantees')" and that "[t]he purpose of the funds raised are to provide Grantees financial support for legal defense. . . ." Exh. K at PHF 00058. The grant agreement set a "fundraising goal" of $100,000, and specifically refers to the "legal fees of Joshua Mast." *Id.* Jonathan Mast signed the grant agreement as "Grantee," even though the grant agreement defined "Joshua Mast and his family" as "Grantees." *Id.* at PHF00058-59. Jonathan Mast acknowledged that "the purpose of this grant agreement . . . was to enable the [PHF] to provide financial assistance to [his] brother Joshua[.]" Jon. Mast Dep. at 60:25-61:4; *see also id.* at 63:8-15.

Moreover, when PHF forwarded funds to Jonathan Mast under the grant agreement, he forwarded the money to Joshua Mast:

> Q:    Did you expect that any money raised pursuant to this agreement would go to anybody other than Joshua Mast and his immediate family?
>
> A:    To be accurate, all the money came to me and then they entrusted me to distribute that.
>
> * * *
>
> Q:    And of the funds that came to you did you distribute all of them to Joshua?
>
> A:    I did.

11

* * *

Q.    To be clear, you didn't send any of the Pipe Hitter Foundation's money to anybody other than Joshua and his immediate family, correct?

A.    Yes, sir.

* * *

Q:    Did you receive $5,000 from the Pipe Hitter Foundation on or after May the 19th?

A:    After, yes, sir.

* * *

Q:    And what did you do with the $5,000?

A:    I forwarded it to my brother.

*Id.* at 62:11-15; 62:24-63:1; 63:8-11; 69:4-6; 70:7-8.[8]

As a part of its fundraising appeal, PHF posted numerous identifying photographs of Baby Doe. Those photos came from both Joshua Mast and Jonathan Mast. Disarro explained that she received an "email from Joshua Mast [that] included a Google link to a number of photographs of Baby Doe." ECF No. 257-2 (Disarro Decl.) at ¶ 25. Jonathan Mast shared the same Google photo album with Disarro. Jon. Mast Dep. at 84:7-18; 86:5-9; Jon. Mast Dep., Exh. 8 (attached as Exh. L). The Google photo album was set up "[t]o share photos with . . . Joshua and Steph's family, with the rest of us." Jon. Mast Dep. at 85:15-19. It has hundreds of identifying photos of Baby Doe. Exh. L. Jonathan Mast "understood that [PHF] was going to use those [photos] in support of the fundraising campaign." Jon. Mast Dep. at 114:2-11. Numerous individuals have access to the

---

[8] Despite the evidence establishing that Jonathan Mast entered into the grant agreement with PHF on behalf of Joshua Mast, Jonathan Mast insisted at deposition that he "signed this document [the grant agreement] for myself and they were entrusting me with the funds to distribute to my brother for help regarding legal fees, immediate needs and stuff like that." *Id.* at 65:5-8.

Google photo album, including many whose names Jonathan Mast did not recognize. Jon. Mast Dep. at 87:18-88:10; 88:16-90:21; 93:5-8; Jon. Mast Dep., Exh. 9 (attached as Exh. M).

Jonathan Mast also sent Disarro other identifying photographs of Baby Doe. Exh. J at PHF 00038-00048. On May 10, 2023, for example, he sent her three emails containing identifying photos. *Id.* Jonathan Mast sent those photos to Disarro because they "were appropriate for the website and fundraising." Jon. Mast Dep. at 111:10-14.

Incredibly, Jonathan Mast highlighted to Disarro "the photos . . . that were used in the CBS news story," Jon. Mast Dep., Exh. 12 (PHF 00060-65) at PHF 00064-00065 (attached as Exh. N); Jon. Mast Dep. at 122:3-123:15, referring to the two-day CBS Mornings broadcast interview of J&S Mast that also displayed identifying photographs of Baby Doe and was the subject of Plaintiffs' first motion to show cause. *See* ECF No. 141 (Plaintiffs' Expedited Motion to Show Cause Why Defendants Joshua and Stephanie Mast Should Not Be Held in Contempt for Violating the Court's Protective Order). Jonathan Mast told Disarro that "They are [] fine to share since they are already public. . . ." Exh. N at PHF 00064; Jon. Mast Dep. at 122:3-123:15. As to "[a]nything else," he told Disarro "just please blur out for now as discussed." *Id.*; Jon. Mast Dep. at 124:7-18; *see also* ECF No. 257-2 (Disarro Decl.) at ¶ 90 ("My recollection is that [Jonathan Mast] told me that, due to the 'gag order', only images that were featured in the CBS news story could be utilized without blurring Baby Doe's face").

On top of arranging the fundraising campaign for J&S Mast, PHF helped Jonathan Mast make several media appearances to publicize that campaign. Jonathan Mast testified that "the media team" for PHF arranged his interview with OANN, through an individual named Mary Vought. Jon. Mast Dep. at 139-41; Jon. Mast Dep Exh. 10 (JONMAST000094-98) at JONMAST00098 (attached as Exh. O) (text exchange between Jonathan Mast and Disarro

identifying Mary Vought as PHF's "PR Agency").[9] In the broadcast interview on OANN, OANN displayed identifying photographs of Baby Doe, which Jonathan Mast admitted he provided OANN:

> Q:    How did the One America News outfit get those photos?
>
> A:    I think that I sent them to the fellow who did the interview on One America News Network.

Jon. Mast Dep. at 139:25-140:3. Indeed, Jonathan Mast believes he shared the entire Google photo album with OANN. *Id.* at 86:10-87:7. Jonathan Mast confirmed that, at the end of the broadcast interview, he directed viewers to the PHF website to donate to help Joshua Mast in his "legal battle." *Id.* Jonathan Mast's interview, along with the identifying photos of Baby Doe, remain available on the OANN website.[10]

* * *

The above evidence establishes that Joshua Mast knowingly violated the Protective Order and that Jonathan Mast knowingly aided and abetted him in doing so. Yet there likely exists other evidence that Joshua Mast spoliated. Disarro has explained that, at Joshua Mast's request, she and Joshua Mast communicated using the Signal messaging application. ECF No. 257-2 (Disarro Decl.) at ¶¶ 38, 40. In fact, that was the "primary method of communication" between PHF and Joshua Mast between late February or early March 2023 and early May 2023. *Id.* at ¶ 40.

---

[9] *See also* Jon. Mast Dep. at 96:25-97:15 (authenticating text exchange); ECF No. 257-2 (Disarro Decl.) at ¶ 16 ("Public awareness efforts are conducted in conjunction with Pipe Hitter's public relations team, Vought Strategies, LLC"); ¶ 17 ("Specifically, Vought Strategies, LLC works on behalf of Pipe Hitter grantees to pitch grantees' stories to TV news networks, media networks, radio programs, and podcasts to increase public awareness about grantees' stories and encourage the public to provide financial support").

[10] https://www.oann.com/video/oan-contribution/brother-of-marine-major-describes-the-fight-to-protect-afghan-girl-orphaned-after-foreign-fighter-detonated-explosive-vest/

14

Signal is a communication application with a "disappearing message" feature, which users must manually enable. When enabled, this feature permanently deletes all messages in a chat from the devices of all the chat's participants within a timeframe set by the user who enables the feature. *See* Signal Support, https://support.signal.org/hc/en-us/articles/360007320771-Set-and-manage-disappearing-messages. Users can see whether other users with whom they exchange messages have the "disappearing message" feature enabled.

Despite the pendency of this litigation, and despite that he was communicating with PHF about this very litigation, Joshua Mast set his Signal account to automatically delete messages after one week.[11] ECF No. 257-2 (Disarro Decl.) at ¶ 44. Because his Signal account was set to automatically delete messages, PHF could not produce to Plaintiffs certain communications, including "two or three general updates on the progression of the legal case from late February 2023 through April or early May 2023." *Id.* at ¶ 47; *see also id.* at ¶ 48 ("These updates were all sent via Signal and those conversations no longer exist"). Nor did Joshua Mast or PHF produce (a) Joshua Mast's Signal texts to Disarro stating "that the 'gag order' would prohibit both him and Stephanie Mast from serving in a public-facing capacity in support of the public awareness and legal defense fundraising campaign" (ECF No. 257-2 (Disarro Decl.) at ¶ 60); or (b) Joshua Mast's Signal texts to Disarro stating "that he believed his brother, Jonathan Mast, could serve in a public-facing capacity to talk about the Mast case" (*id.* at ¶¶ 62-63). Disarro explained, "As these text exchanges with Joshua Mast all took place over Signal, I do not have copies of these communications."[12] *Id.* at ¶ 66.

---

[11] Disarro averred that she did not have her Signal settings set to automatically delete messages. ECF No. 257-2 (Disarro Decl.) at ¶ 79.

[12] Jonathan Mast also used Signal to communicate with Joshua Mast, and also had auto-delete settings activated on his Signal account. Jon. Mast Dep. at 27:1-16. He acknowledged that, because he had the auto-delete setting activated, "there would be a number of communications

Plaintiffs' counsel repeatedly has asked J&S Mast's counsel to confirm that Joshua Mast has since changed his Signal settings to preserve his Signal messages, and to confirm when he changed those settings. J&S Mast's counsel repeatedly refused to respond to this request, instead assuring Plaintiffs' counsel only that J&S Mast were "well aware of the legal discovery obligations" and "are in compliance with all applicable obligations." Nov. 17, 2023 Letter from M. Francisco to M. Eckstein (attached as Exh. P). As a result, Plaintiffs served Joshua Mast with requests for admission ("RFAs") that, among other things, asked him to admit (a) that he "ha[s] not retained all messages Regarding Litigation Relating to Baby Doe that [he] sent or received using the messaging application Signal" (RFA No. 34); (b) that he "deleted at least one message Regarding Litigation Relating to Baby Doe that [he] sent or received using the messaging application Signal" (RFA No. 36); (c) that, since December 8, 2021, his "Signal account was set to auto-delete messages sent or received by [him]" (RFA No. 37); and that, on or after September 2, 2022 (the date this lawsuit was filed), "at least one message Regarding Litigation Relating to Baby Doe that [he] sent or received using the messaging application Signal, was deleted by an auto-delete setting" (RFA No. 39). Defendant Joshua Mast's Revised Objections and Answers to Plaintiffs' Discovery Styled "Second Requests for Admission" (relevant pages attached as Exh. Q). In response to each of these RFAs, Joshua Mast provided a multi-page narrative response that failed to meet the dictates of Fed. R. Civ. P. 36, *id.*, and will be the subject of a motion to compel.

## LEGAL STANDARD

"To ensure compliance with its orders, a district court has the inherent authority to hold parties in civil contempt." *Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 610,

---

from [him] and to [him] on Signal that are no longer available," including communications with Joshua Mast. *Id.* at 28:7-14. He claimed, though, that he did not communicate on Signal with Joshua Mast about PHF. *Id.* at 30:2-8.

617 (4th Cir. 2018). A party moving for civil contempt must show four elements by clear and convincing evidence:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's 'favor'; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (cleaned up). The alleged contemnor's state of mind in violating a court's order is not relevant to the analysis. *Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship*, 608 F. App'x 130, 131 (4th Cir. 2015) ("Willfulness is not an element of civil contempt."); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("[I]t matters not with what intent the defendant did the prohibited act.").

Court orders are valid decrees. *Schwartz v. Rent-A-Wreck of Am.*, 261 F.Supp.3d 607, 613 (D. Md. 2017) (finding that a court order "was unquestionably a valid decree"). And a decree is in a movant's favor when "it exclusively prohibit[s] [the opposing party]" from engaging in certain conduct. *Elec. Guard Dog, LLC v. Fence Hawk, Inc.*, 627 F.Supp.3d 548, 551 (W.D.N.C. 2022). A single violation of a court order is sufficient for a finding of civil contempt. *Rainbow Sch., Inc,* 887 F.3d at 618 (holding that "a single violation of the injunction is sufficient to support a finding of contempt").

As to the harm, there is no prescription regarding the type of a harm a movant must show to support a finding of civil contempt. *De Simone v. VSL Pharmaceuticals, Inc.*, 36 F.4th 518, 534 (4th Cir. 2022) (finding that informational harm such as customer confusion constitutes harm sufficient for civil contempt); *Young Again Products, Inc. v. Acord*, 549 F. App'x 294, 306 (4th Cir. 2011) (finding that defendant harmed plaintiff in part by delaying court proceedings). The Fourth Circuit has explained that "actual harm" need not be shown. *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 466 (4th Cir. 2020) (rejecting defendant's argument that "violations caused

no concrete harm" and holding that "informational harm" was "legally sufficient"). Rather, a movant can show harm resulting from a violation of a court's order even when the harm is difficult to quantify. *See Schwartz,* 261 F.Supp.3d at 615.

Once a movant shows by clear and convincing evidence the four elements set forth in *Ashcraft*, the burden shifts to the other party "to demonstrate that she made in good faith all reasonable efforts to comply with the [decree]." *De Simone*, 36 F.4th at 529. "Substantial compliance is found where ***all reasonable steps*** have been taken to ensure compliance: inadvertent omissions are excused only if such steps were taken." *Id.* at 530 (quoting *United States v. Darwin Constr. Co.*, 873 F.2d 750, 755 (4th Cir. 1989) (emphasis added). It is insufficient to merely make "some effort" at compliance, rather than "all reasonable efforts." *United v. Ali*, 874 F.3d 825, 833 (4th Cir. 2017) (quoting *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984)).

When a court finds civil contempt, the appropriate remedy is within the court's "broad discretion." *In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995). Sanctions pursuant to a finding of civil contempt "may . . . be employed for either or both of two purposes[:] to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *De Simone*, 36 F.4th at 536. "An award of 'attorney's fees incurred because of the misconduct at issue' is compensatory." *Id.* (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). The court may assess attorney's fees regardless of whether the contemnor acted in "willful disobedience" of its orders. *De Simone*, 36 F.4th at 536 ("We've never required district courts to find a party's willful disobedience before awarding attorneys' fees. And we decline to impose that requirement here.").

The Court may likewise impose sanctions on nonparties who knowingly aid and abet a party in violating a court order. *See, e.g., Tattoo Art, Inc. v. Tat Int'l, LLC*, No. 2:10CV323, 2012

WL 3912572, at *3 (E.D. Va. Sept. 7, 2012) (recognizing that a federal district court's "jurisdiction is properly extended when nonparties with actual notice of the court's order actively aid and abet a party in violating that order"); *JTH Tax, Inc. v. Lee*, 540 F. Supp. 2d 642, 647-48 (E.D. Va. 2007) (finding non-party liable for violating injunction); *see also Cap. Source Finance, LLC v. Delco Oil, Inc.*, 520 F.Supp.2d 684, 688 (D. Md. 2007) (holding that a district court has the authority to hold nonparties in civil contempt when they "actively aid and abet a party in violating [an] order"); 17 Am. Jur. 2d. Contempt § 47 ("A nonparty, although not directly bound by a prior order of the court, may be held in civil contempt if the nonparty knowingly aids or abets a party in violating an order, such as relatives, governmental entities[, etc.]"). To determine whether a nonparty possessed actual knowledge, the Court looks "to the facts surrounding the immediately involved violation[] [and] considers as well the history and context the litigation between the parties." *Williams v. Ests. LLC*, No. 1:19-CV-1076, 2023 WL 2974078, at *5 (M.D.N.C. Apr. 17, 2023) (quoting *Schwartz v. Rent-A-Wreck of Am.*, 261 F. Supp. 3d 607, 614 (D. Md. 2017)). When the moving party shows by clear and convincing evidence such notice, the Court analyzes the aider-and-abettor's conduct under the same analysis described above. *See id.*

## **ARGUMENT**

The evidence obtained by Plaintiffs establishes that Joshua Mast knowingly violated the Protective Order with the knowing assistance of his brother Jonathan Mast. To the extent the Court believes it necessary, Plaintiffs will augment this evidence through the testimony of Joshua Mast at the May 29 evidentiary hearing. Joshua Mast and Jonathan Mast should be held in contempt.[13]

---

[13] J&S Mast raised two substantive defenses against a finding of civil contempt. First, they argue that Plaintiffs did not suffer "actual harm," and, second, they argue that they "took all reasonable efforts" to comply with the Protective Order. ECF No. 239 (J&S Mast Opp.) at 9-11. Plaintiffs addressed both arguments in their reply brief, ECF No. 244 (Plaintiffs' Reply in Support of Motion to Show Cause ("Pls' Reply")) at 4-6, and further address them here.

I.   **Plaintiffs Have Satisfied the Four Elements for Civil Contempt for Joshua Mast's and Jonathan Mast's Violations of the Protective Order.**

*First*, it is indisputable that the Court's Protective Order is a valid decree of which Joshua Mast had actual knowledge. He discussed the so-called "gag order" with PHF, telling Disarro that, because of the Protective Order, "neither he nor Stephanie Mast would be permitted to speak publicly about the case or Baby Doe." ECF No. 257-2 (Disarro Decl.) at ¶¶ 55-56, 60. The Protective Order led Joshua Mast to suggest that PHF work with his brother, Jonathan Mast. *Id.* at ¶ 62. Joshua Mast also discussed the Protective Order with Jonathan Mast, who "underst[ood]" that it was entered "to protect the identify of John Doe, Jane Doe and Baby Doe." Jon. Mast Dep. at 32:8-33:19. J&S Mast previously moved to modify the Protective Order, so they doubtless know it remains in effect. Their displeasure with the Court's directive does not justify finding a workaround. It remains a valid Order by which the parties are expected to abide.

*Second*, the Protective Order was in Plaintiffs' favor. The Court entered the Protective Order to protect Plaintiffs – John Doe, Jane Doe, and Baby Do – and their families in Afghanistan. The Court found "that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties[.]" ECF No. 26 (Protective Order) at 2. The Court thus prohibited "Defendants and their counsel and representatives" from "disclosing any information that directly or indirectly identifies Plaintiffs or

---

In their Opposition Brief, J&S Mast also argued that the Protective Order should never have been entered anyway, and that Plaintiffs lack "standing" to raise arguments relating to Baby Doe. As noted above, J&S Mast's disagreement with the Court's Protective Order does not render it "invalid" for purposes of the civil contempt analysis. *See City of Aurora, Colo. v. PS Sys., Inc.*, No 07-cv-02371-PAB-BNB, 2010 WL 2670819, at *1 (D. Colo. July 2, 2010) (a court order is not invalid because "because one or more of the parties . . . finds that order inconvenient."). As to their standing argument, not only are J&S Mast wrong, *see* ECF No. 244 (Pls' Reply) at 7-8, but the argument ignores that Plaintiffs John and Jane Doe and their families were placed at risk by Joshua and Jonathan Mast's violations of the Protective Order.

their family members to any person . . . unless that person first executes a non-disclosure agreement enforceable through the contempt sanction." *Id.*

*Third*, Joshua Mast knowingly violated the Protective Order, and Jonathan Mast aided and abetted him in doing so. Despite the Protective Order's dictates, Joshua Mast gave PHF access to a Google photo album containing hundreds of identifying photographs of Baby Doe for PHF to use in its fundraising campaign. ECF No. 257-2 (Disarro Decl.) at ¶ 25. Jonathan Mast also shared the Google photo album with Disarro, Jon. Mast Dep. at 84:7-18; 86:5-9; Exh. L, and "understood that [PHF] was going to use those [photos] in support of the fundraising campaign." Jon. Mast Dep. at 114:2-11. Jonathan Mast even sent PHF additional identifying photographs of Baby Doe that he deemed "appropriate for the website and fundraising," Jon. Mast Dep. at 111:10-14, and later instructed her to "blur out" any photos not previously used in the CBS broadcast. Exh. N at PHF 00064; Jon. Mast Dep. at 122:3-123:15; 124:7-18; *see also* ECF No. 257-2 (Disarro Decl.) at ¶ 90 ("My recollection is that [Jonathan Mast] told me that, due to the 'gag order', only images that were featured in the CBS news story could be utilized without blurring Baby Doe's face"). As a result, PHF published multiple identifying photographs of Baby Doe, asking its hundreds of thousands of followers to donate money to J&S Mast. Exh. A.

*Fourth*, Plaintiffs have been harmed by these violations. J&S Mast argue that Plaintiffs must prove "**actual** harm" for a finding of civil contempt. ECF No. 239 (J&S Mast Opp.) at 9 (citing *Ashcraft*, 218 F.3d at 301) (emphasis added). That is simply not what the law requires. Nowhere in *Ashcraft* did the Fourth Circuit hold there must be "actual" harm; all that is required is "that [the] movant suffered harm." *Ashcraft*, 218 F.3d at 301; *see also Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 466 (4th Cir. 2020) (rejecting defendant's argument that "violations caused no concrete harm" and holding that "informational harm" was "legally

sufficient"); *De Simone*, 36 F.4th at 535 (contemnors "cite no authority requiring [movants] to prove that consumers saw the statements"); *see also Rowe v. General Motors Corp.*, 586 F.Supp. 365, 368 (N.D. Ga. 1984) ("[T]he court presumes that some members of the class suffered harm from General Motors' failure to post this information, even though it is impossible to say who was harmed and how much.").

In any event, Plaintiffs suffered harm from Joshua Mast's and Jonathan Mast's violations of the Protective Order. By disclosing information identifying Baby Doe, Joshua and Jonathan Mast put at risk the physical safety of Plaintiffs' family members in Afghanistan. The publication of photographs of Baby Doe's face on the internet and on a national news platform elevates the risk that she will be recognized by people in Afghanistan who could associate her with members of Plaintiffs' family still living in Afghanistan. As Plaintiffs have explained, because those in Afghanistan may believe that Plaintiffs gave or sold Baby Doe to the Masts, the risk of harm to members of Plaintiffs' family in Afghanistan is great. Indeed, that was the entire point of the Protective Order, which the Court validated. *See* ECF No. 26 at 2 ("the Court **finds** that Plaintiffs have demonstrated that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties" (emphasis in original)). This harm alone satisfies the fourth prong of *Ashcraft* and supplies a sufficient basis for a finding of civil contempt.

Plaintiffs also suffered harm from delay in court proceedings and expenditure of resources. Courts within this circuit have found harm sufficient for civil contempt when a party's violation of a court order resulted in "substantial delay associated with discovering" relevant information "and unnecessary legal fees associated with attempting to obtain this information." *Devine v. Smith*, No. 3:23-cv-00001-FDW, 2024 WL 948308, *4 (W.D.N.C. Mar. 5, 2024); *see also XL*

*Specialty Ins. Co. v. Bighorn Constr. & Reclamation, LLC*, No. 21-3068-CDA, 2024 WL 216704, *2 (D. Md. Jan. 18, 2024) (defendant's violation of court order warranted civil contempt because it "harmed Plaintiff by . . . causing it to incur additional attorney's fees"). Due to Joshua and Jonathan Mast's actions, Plaintiffs must expend time and resources litigating repeated violations of the Protective Order instead of the merits of the case. *See Young Again Products, Inc. v. Acord*, 459 F. App'x at 306 (finding civil contempt appropriate where defendant harmed plaintiff "both by delaying payment and by continuing to delay the proceedings"). Indeed, their violation of the Protective Order harms not only Plaintiffs, but also the judicial system, which must expend unnecessary resources dealing with further motions practice. *Tattoo Art Inc.*, 2012 WL 3912572, at *5 (holding that "because this is an action for contempt of court, not only the Plaintiff but also the judicial system suffers harm as a result of non-compliance").

Contrary to what J&S Mast seem to suggest, Plaintiffs are not required to "show that someone in Afghanistan had identified them" as a result of Joshua Mast and Jonathan Mast's violation of the Protective Order. J&S Mast Opp. at 9. That position not only defies the law of this Circuit but confounds the very purpose of the Protective Order. J&S Mast would have this Court excuse knowing violations of the Protective Order unless the very harms it was intended to prevent come to fruition. Plaintiffs are not required to wait until a family member is physically harmed, or worse, to seek relief from this Court for violations of the Protective Order meant to protect against such events. Plaintiffs have suffered harm that is legally sufficient for the imposition of civil contempt against Joshua Mast and Jonathan Mast.

## II.     Joshua Mast and Jonathan Mast Did Not Take "All Reasonable Efforts to Comply" with the Court's Protective Order

J&S Mast argue that they "took all reasonable efforts to comply" with the Court's Protective Order by taking "careful steps to avoid violating" it. J&S Mast Opp. at 11. Specifically, they contend that:

- "[B]ecause of this Court's Order," they "did not engage the Pipe Hitter Foundation to help pay their significant fees[.]" *Id.*

- They "did not ask Jonathan Mast to speak to anyone on their behalf[.]" *Id.*

- They "did not provide [Jonathan Mast] with any information he did not already have for the purpose of reaching out to any third party." *Id.*

- They "did not even know if Jonathan Mast provided any information to the Pipe Hitter Foundation or that he was going to speak publicly about the case." *Id.*

The evidence undermines these contentions.

Joshua Mast asked Jonathan Mast to speak to PHF on his behalf. ECF No. 257-2 (Disarro Decl.) at ¶ 62 ("Joshua Mast then stated sometime in either late March 2023 or early April 2023, through Signal text, that he believed his brother, Jonathan Mast, could serve in a public-facing capacity to talk about the Mast case."); Jon. Mast Dep. at 50:14-25 (Joshua Mast told Jonathan Mast that "he couldn't work with [PHF] and that he had given them my number to see if I wanted to"). Joshua Mast may not have signed the PHF grant agreement, but he asked Jonathan Mast to interface with PHF and Jonathan Mast signed the agreement on Joshua Mast's behalf. ECF No. 257-2 (Disarro Decl.) at ¶¶ 62, 71-75; Jon. Mast Dep. at 49:15-24; 50:14-25; 56:15-57:4; 60:25-61:4; 63:8-15; 145:3-7; Exh. J. In fact, Joshua Mast "told [PHF's Disarro] to speak with Jonathan Mast about the agreement." ECF No. 257-2 (Disarro Decl.) at ¶¶ 75. The grant agreement explicitly identifies "Joshua Mast and his family" as "Grantees" and sets a fundraising goal to help pay the

24

"legal fees of Joshua Mast." Exh. K at PHF 00058-59. And when PHF sent funds to Jonathan Mast pursuant to the grant agreement, he forwarded the money to Joshua Mast. Jon. Mast Dep. at 62:11-15; 62:24-63:1; 63:8-11; 69:4-6; 70:7-8.

Joshua Mast invokes the "head-in-the-sand" defense by asserting that he did not give Jonathan Mast "any information he did not already have for the purpose of reaching out to any third party" and did not know if Jonathan Mast "provided any information to [PHF] or that he was going to speak publicly about the case." But Joshua Mast admits that PHF "informed me of their process for providing grants." ECF No. 239-1 (J Mast Decl.) at ¶ 7. And a simple review of PHF's website makes clear that its fundraising campaigns include publishing photos and information. https://pipehitterfoundation.org/who-we-support/. Joshua Mast himself sent identifying photographs to PHF, and knew that his brother had access to the Google photo album, as Jonathan Mast's name is listed among the many individuals with full access to it. Exh. M; Jon. Mast Dep. at 91:17-21. Joshua Mast also knew that Jonathan Mast decided to "partner" with PHF, Jon. Mast Dep. at 145:3-7, and that Jonathan Mast was coordinating with PHF "to raise money for our expenses." ECF No. 239-1 (J Mast Decl.) at ¶ 10.

Joshua Mast's asserted willful ignorance of Jonathan Mast's actions are no defense. *See, e.g.*, *In re: Marcus v. Purdy, et al.*, No. 19-04614-5-DMW, 2023 WL 2938052, *6 (E.D.N.C. April 13, 2023) (entering order precluding debtor from filing subsequent petitions; his "apparent willful ignorance" of his wife's violations of a court order, "especially when he had full knowledge" of the court order, warranted the sanction); *Mister Softee, Inc. v. Tsirkos*, No. 14CV1975-LTS-RLE, 2014 WL 2971106, *2 (S.D.N.Y. July 2, 2014) (entering finding of contempt despite defendant's claimed "willful ignorance"). "A logical extension" of Joshua Mast's "argument would encourage willful ignorance by those subjected to similar" orders. *McHenry Software, Inc. v. Aras 360 Tech.,*

*Inc.*, No. 5:12-cv-277-BO, 2013 WL 12290834, *2 (E.D.N.C. May 22, 2013) (entering finding of contempt after defendant violated preliminary injunction); *OmniGen Research, LLC v. Wang*, No. 6:16-cv-268-MC, 2018 WL 11512767, *4 (D. Or. Nov. 6, 2018) (entering finding of contempt; holding that defendant's "willful ignorance . . . fall[s] short of his obligation to take 'all reasonable steps' to ensure compliance with this Court's orders").

Joshua Mast's ostrich defense also ignores that *he* provided information directly to PHF and had multiple interactions with Disarro between January and May 2023 – long after entry of the protective order and even *after* he purportedly ceded responsibility for communicating with PHF to Jonathan Mast. ECF No. 257-2 (Disarro Decl.) at ¶ 24 (Joshua Mast provided Disarro "an emailed summary of the matter" along with "related documents"); Exh. R (PHF 00001-0025) (email summary and related documents); ECF No. 257-2 (Disarro Decl.) at ¶ 69 (Disarro "continued operating with the understanding that I could speak with Joshua Mast about the public awareness and legal defense grant fundraising campaign privately but that Jonathan Mast would need to serve in the public-facing capacity"); Exh. J (Disarro sent to Joshua Mast in May 2023 PHF's "legal defense grant agreement" so that PHF could "launch the campaign"); ECF No. 257-2 (Disarro Decl.) at ¶ 71 ("Joshua Mast was provided with our standard legal defense grant agreement"); *id.* at ¶¶ 72-73 (Disarro emailed Joshua Mast in May 2023 asking him to sign the agreement).

As J&S Mast concede, to avoid sanctions, Joshua Mast must show that he made "*all* reasonable efforts to comply" with the Court's Protective Order. *De Simone*, 36 F.4th at 529. Joshua Mast – an attorney himself – could have taken any number of reasonable steps to avoid a violation of the Court's Protective Order. He could have provided PHF with a copy of the Protective Order. He could have not provided PHF with a link to the Google photo album that

contained hundreds of identifying photos of Baby Doe, and instead provided PHF with only non-identifying photographs. He could have asked Jonathan Mast not to provide PHF with any identifying photographs of Baby Doe. He could have directed PHF not to use any identifying photos of Baby Doe. After PHF published her identifying photos, he could have directed PHF to remove them. He apparently did none of these things.

## CONCULSION

Plaintiffs respectfully ask the Court to find Joshua Mast and Jonathan Mast in contempt, and order the payment of Plaintiffs' attorney's fees related to the prosecution of this motion.

Dated: May 15, 2024                    Respectfully submitted,

/s/ *Maya Eckstein*
Maya M. Eckstein (VSB No. 41413)
Lewis F. Powell III (VSB No. 18266)
Kevin S. Elliker (VSB No. 87498)
HUNTON ANDREWS KURTH LLP
951 E Byrd St
Richmond, VA 23219
Telephone: (804) 788-8200
Fax: (804) 788-8218
Email:  meckstein@HuntonAK.com
Email:  lpowell@HuntonAK.com
Email:  kelliker@HuntonAK.com

Sehla Ashai (*admitted pro hac vice*)
ELBIALLY LAW, PLLC
704 East 15th Street
Suite 204
Plano, TX 75074
Telephone: (312) 659-0154
Email: ashai@elbiallylaw.com

Blair Connelly (*admitted pro hac vice*)
Zachary Rowen (*admitted pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas

New York, NY 10029
Telephone: (212) 906-1200
Email: blair.connelly@lw.com
Email: Zachary.rowen@lw.com

Damon Porter (*admitted pro hac vice*)
Ehson Kashfipour (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004-1304
Telephone: (202) 637-2001
Email: damon.porter@lw.com
Email: ehson.kashfipour@lw.com

*Counsel for Plaintiffs*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15 day of May, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

By:     /s/ Maya M. Eckstein
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Plaintiffs*

29