# EXHIBIT F

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF VIRGINIA

3    _____

4    BABY DOE, et al.,

5                         Plaintiffs,

6    v.                         Civil Action No.

7                               3:22cv00049-NKM-JCH

8    JOSHUA MAST, et al.,

9                         Defendants.

     _____

10

11

12

13

14            Video-recorded Deposition of

15                  JONATHAN MAST

16            Monday, July 17, 2023

17                    9:33 a.m.

18            Charlottesville, Virginia

19

20

21

22

23

24         Reported by:  Mark E. Brown, RPR

25

Page 27

```
 1          Q     Do you have any automatic delete settings
 2     activated on your Signal account?
 3          A     Currently, no.
 4          Q     Have you previously?
 5          A     I have.
 6          Q     Give me the details on that, please.
 7          A     Well, Signal is an app that allows you to
 8     have automatic deleting stuff and so I've had that as
 9     a routine on most of -- most of my messages that I
10     use on Signal, I've had that as a normal thing.
11          Q     Is that feature activated now?
12          A     No, sir.  Once I got this I stopped them.
13          Q     You anticipated my question.  So before you
14     got the cease and desist letter, am I understanding
15     you to say that your Signal account had activated the
16     auto delete function?
17          A     Many of them, yes.
18          Q     Did you do it on an email-by-email basis or
19     did you just activate the setting and then it
20     operates automatically?
21          A     In Signal?
22          Q     Yes.
23          A     I operated the setting and it operated
24     automatically.
25          Q     So you just toggle it on or toggle it off
```

1    and once you turn it on it's on for all incoming and

2    outgoing messages?

3         A     For a particular thread.  I think you can

4    select like certain threads.  If I had a message with

5    Elliott, for instance, I can syphon that one to

6    retain stuff and other ones not to.

7         Q     So then because the auto delete function on

8    your Signal account was active before you received

9    the cease and desist letter, there would be a number

10   of communications from you and to you on Signal that

11   are no longer available; isn't that right?

12        A     That would be correct, yes, sir.

13        Q     Can you -- would these include

14   communications with your brother Joshua?

15        A     Yeah.

16        Q     And Richard?

17        A     Yeah.

18        Q     How about Stephanie?

19        A     No.  I don't think I've ever sent anything

20   to Stephanie on Signal.

21        Q     Would these communications with Joshua and

22   Richard that are no longer available because of the

23   auto delete function, were they relating to this

24   case?

25        A     No.  Not as far as -- as far as the case,

```
                                                      Page 30
```

1          A      Correct.

2          Q      Did you communicate over Signal with your

3     brother this year regarding his communication with

4     the Pipe Hitter Foundation?

5          A      I don't think so.  Not written anyway.  I

6     might have called him on Signal because you can call

7     as well.  I might have called him on Signal but I

8     don't think I wrote anything about that.

9          Q      So when you place a call over Signal how is

10    that stored?

11         A      I don't know if it is.  Just like a regular

12    phone, I think.  I don't know if it is stored or not.

13    It's just a call.

14         Q      Is there any record of the calls having

15    been made?

16         A      The dates show up when you like -- I'm not

17    an expert on Signal but when you go back into the app

18    and open it up, you can see like the date that you

19    called like you would with a regular phone.

20         Q      The same way on your outgoing calls on an

21    iPhone?

22         A      Yes.

23         Q      Your recent calls, incoming and outgoing?

24         A      I believe so.

25         Q      But does Signal capture the content of the

Page 32

1      A      Well, gmail is an email, Signal is like a

2   text, so typically it's just easier to send a text

3   than to send an email.

4      Q      So with Mr. Elliker's cease and desist

5   letter, the protective order was attached, was it

6   not?  You will see it as an attachment to Exhibit 2.

7      A      Yes, sir.

8              MR. POWELL:  Let's mark this number 3,

9   please.

10             (Mast Deposition Exhibit No. 3 was marked

11             for identification and attached to the

12             transcript.)

13  BY MR. POWELL:

14     Q      Mr. Mast, the court reporter has just

15  handed you a copy of Exhibit 3 for your deposition.

16  I will just identify it for the record.  It's a copy

17  of the protective order that Judge Moon entered in

18  this case on September the 13th of last year.

19             Did you see that when you received Mr.

20  Elliker's letter?

21     A      I did.

22     Q      Did you read it?

23     A      I did.

24     Q      Did you understand it?

25     A      I believe so.  Yes, sir.

Page 33

1      Q     Did you understand that the purpose of

2  Judge Moon's protective order was to protect the

3  identity of John Doe, Jane Doe and Baby Doe?

4      A     Yes, sir.

5      Q     Had you ever seen the protective order

6  before you received it from Mr. Elliker?

7      A     I believe I may have stumbled across it

8  when I was looking through documents regarding the

9  case online, yes.

10     Q     Do you recall how it came into your

11  possession?

12     A     Yeah.  I went to Google and I was trying to

13  find information regarding the case and I eventually

14  found CourtListener which is -- I'm not exactly sure

15  how that exists or what it's relation is to the

16  actual case files but I found a lot of the

17  information on there.

18     Q     Including the protective order?

19     A     I think so.

20     Q     Why would you go to Google or CourtListener

21  to learn about what had been filed in the case rather

22  than going to your brother Joshua?

23     A     Well, I was looking for the actual

24  hard-copies to try to be -- basically to try to see

25  the actual evidence myself.

1    fact -- I knew they did the CBS interviews and I knew

2    there was -- like the judge had asked them not to

3    talk to the media anymore but I didn't know there was

4    a motion to hold them in contempt of court or

5    whatever that proper term is.

6         Q    So your testimony is that your brother

7    Joshua and his wife Stephanie having been asked by us

8    to be held in contempt by the court, they didn't

9    share that with you, is that your testimony?

10        A    If they shared it with me, I definitely

11   don't remember hearing that but I don't believe they

12   did.

13        Q    I think we've established this, Mr. Mast,

14   but let's go back to it.

15             Did I understand you to say earlier that

16   you became aware at some point in early 2023 that

17   your brother Joshua was in touch with an outfit

18   called the Pipe Hitter Foundation?

19        A    Yes, sir.

20        Q    How did you learn of this?

21        A    Let's see.  I received a call from Dena

22   Cruden, I think is how you say her last name,

23   C-r-u-d-a-n (sic), and she informed me she talked to

24   my brother Joshua and it went on from there.

25        Q    Am I understanding you to say that you were

Page 50

1      unaware of your brother Joshua's contacts with the

2      Pipe Hitter Foundation until you received a call from

3      Dena Cruden?

4           A    No, sir.  To clarify, my brother Joshua had

5      -- I think he had called me and said that I might get

6      a call from someone named Dena Cruden and that was

7      about it.

8           Q    Do you recall how far in advance of your

9      contact from Dena Cruden that you learned this from

10     your brother?

11          A    A day maybe.

12          Q    That close?

13          A    Yes, sir.

14          Q    And tell me about the conversation with

15     Joshua about his expectation that Dena Cruden was

16     going to contact you.

17          A    This was a while ago.  I think I was

18     actually fishing when I got the call.  As far as the

19     details go, I think he called and basically said that

20     he had -- I don't remember what term he used but like

21     had made contact or had been contacted by Pipe Hitter

22     Foundation, told me that they help vets and first

23     responders raise funds for legal defenses but that he

24     couldn't work with them and that he had given them my

25     number to see if I wanted to.

Page 54

```
 1              MR. HARDING:  Objection.  Calls --
 2              MR. POWELL:  Let me finish my question,
 3       please.
 4       BY MR. POWELL:
 5          Q     Didn't he tell you that we had moved for
 6       contempt because of Joshua and Stephanie's interview
 7       on CBS?
 8          A     Absolutely not.
 9          Q     He said nothing to you about the contempt
10       motion that we filed in January, is that your
11       testimony?
12          A     Yes, sir.
13          Q     Did Joshua say anything to you about a gag
14       order that he thought he might be subject to?  Again,
15       this is before you had any contact with the Pipe
16       Hitter Foundation.
17          A     And state the question again.
18          Q     When you spoke to Joshua before you spoke
19       to Dena Cruden or had contact with Dena Cruden, did
20       Joshua say that he thought he was subject to a gag
21       order?
22          A     To be more specific, he didn't mention on
23       the call about -- well, he had mentioned at some
24       point that there was a gag order in effect and so
25       that he wasn't -- I didn't know the specifics of what
```

Page 55

1      that meant but he had mentioned at some point before,

2      I'm not sure if it was that call or prior to that,

3      but there was a gag order in effect for at least one

4      of the court cases.

5          Q    Are those the words he used, gag order?

6          A    We have used that and protective order

7      interchangeably, yeah.

8          Q    So when is the first time you heard

9      Jonathan (sic) -- I'm sorry -- Joshua talk about a

10     protective order?

11         A    I don't know.

12         Q    Was it before or after this call you had

13     from him that he was going to hear from the Pipe

14     Hitter Foundation?

15         A    The first time that I heard about it was it

16     before that call?  Probably before, yeah.

17         Q    That there was a protective order in place,

18     you heard that from Joshua before he asked you to

19     speak to the Pipe Hitter Foundation?

20              MR. HARDING:  I'm going to object to the

21     framing of the question.  He didn't state that he was

22     told to talk to Pipe Hitter.  He stated that he would

23     receive a call from the Pipe Hitter Foundation.

24     BY MR. POWELL:

25         Q    When Joshua advised you that you were going

Page 56

1      to be contacted by the Pipe Hitter Foundation, you

2      could have declined, right?

3           A     Sure.

4           Q     Why did you not?

5           A     Didn't want to.

6           Q     Why?  I know that you didn't want to

7      because you did have contact with them, but why did

8      you not decline Joshua's request?

9                 MR. HARDING:  Objection to Joshua having

10     made a request for him to speak.  The testimony was

11     that he was notified that he may receive a call from

12     the Pipe Hitter Foundation.

13                MR. POWELL:  That's a fair objection.

14     BY MR. POWELL:

15          Q     Joshua said you were going to be contacted

16     by someone from the Pipe Hitter Foundation, right?

17          A     Yes, sir.

18          Q     And did he identify Dena Cruden by name?

19          A     By first name, I think.

20          Q     And then very soon after that conversation

21     with Joshua you received a text message from Dena

22     Cruden, right?

23          A     It was either text or a call.

24          Q     Asking for your cooperation, right?

25          A     No, not asking for my cooperation.  I think

Page 57

1    she asked if I would be willing to share some of the

2    story.

3        Q     And what did you say?

4        A     I said I would be willing to.

5              MR. POWELL:  Let's mark this next, please.

6              (Mast Deposition Exhibit No. 5 was marked

7              for identification and attached to the

8              transcript.)

9    BY MR. POWELL:

10       Q     Mr. Mast, you've been handed Exhibit 5

11   which I will identify as being a May 9, 2023 email

12   from Dena Cruden at Pipe Hitter Foundation to you.

13   The header is "Pipe Hitter Foundation: Fundraising

14   Campaign Implementation."  Do you see that?

15       A     Yes, sir.

16       Q     Do you recall receiving this from

17   Ms. Cruden on or about that day, May the 9th?

18       A     I do.

19       Q     And attached to her email is the Pipe

20   Hitter Foundation grant agreement, correct?

21       A     Uh-huh.

22       Q     And if you look to the last page of the

23   grant agreement, which is the third page of the

24   exhibit, that's your signature, right?

25       A     It is.

Page 58

```
1          Q    And you signed this contract on May the
2     10th of 2023?
3          A    Yes, sir.
4          Q    By this point in time did you understand
5     that Ms. Cruden, as represented on the email, was the
6     executive director of the Pipe Hitter Foundation?
7          A    I couldn't tell you her direct title but
8     yes.
9          Q    And you see there that's the way she
10    identified herself in the email, right?
11         A    Yes, sir.
12         Q    You don't have any reason to disagree with
13    that?
14         A    No, I do not.
15         Q    By then you had already been in
16    intermittent contact with her since her first contact
17    with you, right?
18         A    Yes, sir, intermittently.
19         Q    Before you signed this grant agreement, did
20    you send it to Joshua?
21         A    I don't think so.
22         Q    Were you aware of whether the Pipe Hitter
23    Foundation had shared it with Joshua before you were
24    asked to sign it?
25         A    No, I don't believe so.
```

Page 60

1          A     Yes, I understand that.

2          Q     It identifies the grantees as Joshua Mast

3     and his family, right?

4          A     Sure.

5          Q     And you signed on their behalf, correct?

6                MR. FRANCISCO:  Objection.  Calls for legal

7     conclusion.

8                MR. YERUSHALMI:  David Yerushalmi.  I join

9     the objection.

10               MR. HARDING:  I'm joining that as well.

11               MR. POWELL:  For the benefit of the record,

12    counsel in the room and online, I like

13    Mr. Francisco's proposal that you need not adopt an

14    objection posed by either the witness's lawyer or any

15    of the other Defendants' lawyers.  I think we can --

16    the record can reflect that I have heard the

17    objection and I will deem it as having been raised by

18    all of you, not just whoever speaks.  Fair enough,

19    everybody?  Any objection to that?

20               MR. HARDING:  No.

21               MR. YERUSHALMI:  None from David

22    Yerushalmi.

23               MR. HOERNLEIN:  No objection.

24    BY MR. POWELL:

25         Q     So the purpose of this grant agreement, as

Page 61

1      you understood it, Mr. Mast, was to enable the Pipe

2      Hitter Foundation to provide financial assistance to

3      your brother Joshua, right?

4          A      That's accurate.

5          Q      And you signed on his behalf in order to

6      facilitate that arrangement, right?

7          A      Well, if I can change my wording or to

8      clarify the question before I say yes or no, I didn't

9      look at it as signing on his behalf.  I was going to

10     partner with Pipe Hitter Foundation to raise funds

11     and then distribute that to my brother, so signing

12     this on his behalf, that's what I mean by that.

13         Q      Sure.  Because the money wasn't going to

14     come for your benefit, was it?

15         A      No.

16         Q      Or your family's benefit, right?

17         A      Correct.

18         Q      It was going to be for the benefit of the

19     people identified on the first page of this document

20     as the grantees, right?

21             MR. HARDING:  I'm going to object.  I think

22     the document speaks for itself.  It says the grantees

23     are Mr. Mast and his family.  My client is part of

24     his family.

25     BY MR. POWELL:

1      Q    Who did you -- look at the first and second

2    line of this contract, please, Mr. Mast.

3      A    Sure.

4      Q    The first sentence says, "The Pipe Hitter

5    Foundation is implementing a fundraising campaign in

6    support of Joshua Mast and his family, paren,

7    grantees, close paren, under the PHF's hardship and

8    legal defense grant program, paren/close paren."  Do

9    you see that?

10     A    Yes, sir.

11     Q    Did you expect that any money raised

12   pursuant to this agreement would go to anybody other

13   than Joshua Mast and his immediate family?

14     A    To be accurate, all the money came to me

15   and then they entrusted me to distribute that.

16     Q    Understood.  Did you understand that this

17   agreement allowed you to distribute the funds to

18   anybody other than Joshua Mast and his immediate

19   family?

20     A    Did I understand that this agreement

21   allowed me to distribute the funds to anyone other

22   than Joshua Mast and his family.  That is my

23   understanding.

24     Q    And of the funds that came to you did you

25   distribute all of them to Joshua?

1          A      I did.

2          Q      Did you keep any of them?

3          A      Well, no essentially.  I forwarded my

4     brother once during a particular month that he was

5     having a hard time keeping up with something and I

6     loaned him a thousand and then reimbursed myself a

7     thousand from Pipe Hitter after that.

8          Q      To be clear, you didn't send any of the

9     Pipe Hitter Foundation's money to anybody other than

10    Joshua and his immediate family, right?

11         A      That is accurate.

12         Q      And you understood that was the purpose

13    when you signed this document -- this contract on May

14    the 10th, correct?

15         A      Yes, sir.

16         Q      And you were acting as Joshua's and his

17    family's representative when you signed this

18    document, right?

19              MR. FRANCISCO:  Objection.  Calls for a

20    legal conclusion.

21              MR. YERUSHALMI:  Objection.

22    BY MR. POWELL:

23         Q      Go ahead.  You can answer.

24         A      By representative I don't mean like legal

25    representative or that he had authorized me to or had

Page 65

1    argumentative.  Go ahead.

2              THE WITNESS:  Well, I will finish what I

3    was saying.  I just want him to know what I believe

4    is the truth and that's exactly what I just said.

5              I signed this document for myself and they

6    were entrusting me with the funds to distribute to my

7    brother for help regarding legal fees, immediate

8    needs and stuff like that.

9    BY MR. POWELL:

10       Q    You were expecting to be the intermediary

11   then between the Pipe Hitter Foundation and Joshua

12   Mast and his family for the money, correct?

13       A    For distributing the funds, correct.

14       Q    And in effect, you were acting as an agent

15   for the purpose of transmitting the money that you

16   got from the Pipe Hitter Foundation to the grantees,

17   right?

18              MR. HARDING:  Objection.  Calls for a legal

19   conclusion.

20              MR. YERUSHALMI:  Object.

21              MR. POWELL:  Let's take a break.

22              THE VIDEOGRAPHER:  We are now off the

23   record.  The time is 10:39 a.m.

24              (Recess, 10:39 a.m. - 10:54 a.m.)

25              THE VIDEOGRAPHER:  We are now on the

Page 69

1    today please send 5K via ACH to Jonathan Mast."  Do

2    you see that?

3         A     Yes, sir.

4         Q     Did you receive $5,000 from the Pipe Hitter

5    Foundation on or after May the 19th?

6         A     After, yes, sir.

7         Q     Do you recall when the money came in?

8         A     I think it was about five or six days.

9         Q     So May the 19th was a Friday.  Would it

10   have been some time in the following week?

11        A     Yes, sir, I think that's right.  There was

12   a small delay where I had to follow up and they said

13   that there was some kind of error on their end but I

14   think that's about right.

15        Q     And do you identify that account

16   information on Exhibit 6 to be for your personal bank

17   account?

18        A     I believe it is.  I don't have the numbers

19   memorized but I believe it is.

20        Q     I looked up the routing number.  It is for

21   the First National Bank in Altavista.  Is that where

22   you bank?

23        A     That's me.

24        Q     Is that account in your name only?

25        A     Me and my wife.

Page 70

```
 1          Q     And you understood that the money was
 2     coming to you and to your First National Bank account
 3     from the Pipe Hitter Foundation in furtherance of the
 4     grant agreement that you had signed on May the 10th,
 5     right?
 6          A     Yes, sir.
 7          Q     And what did you do with the $5,000?
 8          A     I forwarded it to my brother.
 9          Q     How did you do that?
10          A     Check.
11          Q     Same day?  Soon after you got the money?
12          A     Soon after.
13          Q     You send all $5,000 to your brother?
14          A     No.  I -- this is the instance where I had
15     reimbursed myself a thousand because I had loaned him
16     a thousand.
17          Q     You had advanced him a thousand so then you
18     kept a thousand of the five?
19          A     Uh-huh.
20          Q     And sent the four to him?
21          A     Correct.
22          Q     Has the Pipe Hitter Foundation sent more
23     money to you since this initial installment of
24     $5,000?
25          A     No, sir.
```

1      A     Yes, sir, I think that's right.

2      Q     And am I understanding you to say that she

3      said they were going to put a pause on it and not

4      send the money to you?

5      A     Yes, sir.

6      Q     Do you know whether the Pipe Hitter

7      Foundation is continuing to try to raise money for

8      your brother and his immediate family one way or the

9      other, do you know?

10     A     I don't know for sure but to my

11     understanding every indication was that they were not

12     for now.

13     Q     Let's go back, Mr. Mast, to your first --

14     what I think is your first communication with Dena

15     Cruden.

16            MR. POWELL:  Let's mark this as Exhibit 7.

17            (Mast Deposition Exhibit No. 7 was marked

18             for identification and attached to the

19             transcript.)

20     BY MR. POWELL:

21     Q     So, Mr. Mast, you've been handed Exhibit 7

22     which is a two-page text string starting on April the

23     10th.  I think they are all on April the 10th.  Do

24     you have that in front of you?

25     A     I do.

Page 77

1          Q     And it starts off -- this is a text from
2    Dena Cruden to you and she says, "Good morning
3    Jonathan.  My name is Dena Cruden and I am the
4    executive director for the Pipe Hitter Foundation."
5    Do you see that?
6          A     Yes, sir.
7          Q     And then she continues and says, "May I
8    call you today at 10 p.m. Pacific Standard Time as we
9    have been speaking with your brother Joshua.  Thank
10   you, Dena."  Do you see that?
11         A     Yes, sir.
12         Q     Would this be your first contact with
13   anybody from the Pipe Hitter Foundation, to the best
14   of your recollection?
15         A     That's got to be right.  Yeah, I think so.
16         Q     So this would have come not long after your
17   brother Joshua had advised you that you were going to
18   be receiving a contact from the Pipe Hitter
19   Foundation, right?
20         A     Yeah, he informed me of that, yeah.
21         Q     So when she says that she had been speaking
22   with your brother Joshua, did you learn from her when
23   that conversation began between Joshua and the Pipe
24   Hitter Foundation?
25         A     No, I did not ask.

Page 84

1      Foundation payroll?

2          A     I didn't know but I kind of presumed that.

3      I didn't know if they were a partner or -- all I knew

4      is the terminology that we used is our media partner.

5          Q     And that's what you heard from Dena Cruden?

6          A     Uh-huh.

7                MR. POWELL:  Let's mark this 8.

8                (Mast Deposition Exhibit No. 8 was marked

9                for identification and attached to the

10               transcript.)

11     BY MR. POWELL:

12         Q     Mr. Mast, you've been handed Deposition

13     Exhibit 8.  You've seen this photo album before,

14     haven't you?

15         A     Many times, yes, sir.

16         Q     And this is a photo album available through

17     Google, correct?

18         A     Yes, sir.

19         Q     And there near the top of the first page,

20     this is one of those instances we talked about at the

21     top of the deposition, you see the name ███████████

22     ███████████ right?

23         A     Yes, sir.

24         Q     And that's the Americanized name that your

25     brother Joshua and Stephanie use for Baby Doe, right?

Page 85

```
 1        A      Correct.

 2        Q      When did you first have access to this

 3   Google photo album?

 4        A      The email I'm sure would tell me.  I think

 5   it was either 2020 or 2021.

 6        Q      Do you know who set it up?

 7        A      No.  Probably one of my -- probably one of

 8   my brothers or my sisters-in-law.

 9        Q      Do you know when it was first set up?

10        A      No.

11        Q      Do you recall when you first had access to

12   it?

13        A      As soon as it was sent to me in 2020 or

14   2021.

15        Q      Do you know for what purpose it was

16   established?

17        A      To share photos with my brother's family,

18   particularly Joshua and Steph's family, with the rest

19   of us.

20        Q      Have you ever added photos to it?

21        A      No.

22        Q      Do you have that ability?

23        A      I've never tried.

24        Q      Have you ever downloaded photos from the

25   Google photo album?
```

Page 86

1          A      Yeah.

2          Q      For what purpose?

3          A      To have photos of my family on like

4      devices.

5          Q      Have you downloaded photos from the Google

6      photo album and shared them with someone other than

7      your family and friends?

8          A      Yeah.  I sent some photos from this to Pipe

9      Hitter Foundation.

10         Q      Anybody else?  And when I say anybody else,

11     I mean other than your immediate family and friends.

12     You have said the Pipe Hitter Foundation is someone

13     outside of that group to whom you have forwarded

14     photos, right?

15         A      If memory serves correctly, I think I

16     sent -- I can't remember if it was me who forwarded

17     these to Pipe Hitter and then they sent them on to

18     OANN or if I sent them directly to OANN but they had

19     some photos as well.

20         Q      So by OANN you mean the One America News

21     Network where you gave an interview in June, right?

22         A      Yes, sir.

23         Q      So you were aware that One America News had

24     photos from the Google photo app before your

25     interview took place?

Page 88

1    any reason to disagree with that?

2         A    What is it?

3         Q    Well, if you look at the first page of

4    Exhibit 8 right under the name ████ will see a

5    bunch of small --

6         A    Oh.  It's the people who have access to the

7    album.

8         Q    That's what I'm asking you.

9         A    Sure.  I don't have any reason to disagree

10   with that.

11        Q    Okay.  So the list of names and email

12   addresses on Exhibit 9, from your understanding, is

13   those people who are identified on the photo album

14   itself?

15        A    I never checked it, but sure.

16        Q    So I don't want to spend too much time on

17   this but let's just run down the list.  I assume you

18   obviously know the third name on the list is

19   Stephanie Mast, your sister-in-law?

20        A    Uh-huh.

21        Q    Then Joshua Mast, your brother.  Who is

22   Fran Mast?

23        A    My great aunt.

24        Q    Do you know who Jennifer Brothers is?

25        A    Who?

Page 89

1          Q      Jennifer Brothers at the top.

2          A      I do not.

3          Q      How about Ashley Delgado?

4          A      No.

5          Q      Down below Fran Mast is Flavio and

6     Jacqueline Porta.  Do you know who they are?

7          A      I don't.

8          Q      Who is Bridget Mast?

9          A      I think that is my cousin.

10         Q      Next is Lauren Mast Hershey.  Is that

11    another cousin?

12         A      Yes.  Aunt.

13         Q      Below her name is Anna White.  Who is she?

14         A      No idea.

15         Q      How about Dillon Throckmorton?

16         A      Also no idea.

17         Q      How about Cindy Beyer?

18         A      Huh-uh.

19         Q      Next is Emily Holmes.

20         A      No.

21         Q      Next is Eric Macrush.  Do you know who he

22    is?

23         A      I don't.

24         Q      How about Liliana Balcazar?

25         A      I don't.

Page 90

1          Q      How about Georgia Pine K9?

2          A      I don't know who that is.  Kacy Labuda is

3     my cousin.

4          Q      Beneath Kacy Labuda is an email address.

5     Do you recognize that email address?

6          A      Huh-uh.

7          Q      That would be a no?  Sorry.

8          A      No, sir.  Sorry.

9          Q      That was one of the instructions I didn't

10    give you is uh-huh and huh-uh don't do very well on

11    the record.

12         A      Sorry.

13         Q      It's fine.  You've been doing great.  So

14    the next one is an email address bentaplace.  Do you

15    recognize that?

16         A      Bentheplacedesign?  No, sir.

17         Q      Beneath that is battleshowers@gmail.com?

18         A      Bertieshowers.  That is my great aunt.

19         Q      Great aunt.  The next email is

20    firechuck@gmail.  Do you recognize that?

21         A      I do not.

22         Q      The next is hannonwright@gmail.  Do you

23    know who that is?

24         A      I don't.

25         Q      Do you not know that Mr. Wright represents

Page 91

1    your brother and sister-in-law in the state court

2    case?

3         A    Well, I don't recognize the email but that

4    name rings a bell.

5         Q    But you know that Hannon Wright is one of

6    the lawyers representing Joshua and Stephanie?

7         A    Well, I get the cases confused sometimes so

8    I thought it was John Moran.

9         Q    Mr. Moran is with McGuire Woods.  He

10   represents your brother and sister-in-law in the

11   federal case which is the case we're talking about

12   here.  So beneath Mr. Wright's email do you recognize

13   the next email?

14        A    No.

15        Q    How about the next one?

16        A    No.

17        Q    I expect you to recognize the one below

18   that.

19        A    That's mine.

20        Q    That's your gmail address, correct?

21        A    Yes, sir.

22        Q    The one you identified at the top of the

23   deposition.  Beneath your email who is that person,

24   if you know?

25        A    I don't know that person or...  My mom is

Page 93

 1         A     That's correct.

 2         Q     And the two emails beneath your mother's

 3    email, do you recognize those?

 4         A     I do not.

 5         Q     And so do you understand that the people

 6    whose names are listed on Exhibit 9 have the same

 7    access to the Google photo album that you enjoy?

 8         A     I do, yeah.

 9         Q     If you look back at the previous exhibit,

10    Exhibit 8, I'm asking you to confirm what I think is

11    obvious.  These photos are meant to be in

12    chronological order; is that correct?

13         A     I don't know.  I think so, yeah.

14         Q     And the first several pages of Baby Doe are

15    before she left Afghanistan, can you agree with that?

16         A     I agree with that.

17         Q     If you turn all the way to page nine, do

18    you have that?

19         A     I do.

20         Q     And in the third row you will see a

21    picture.  That's your sister-in-law Stephanie with

22    Baby Doe, correct?

23         A     That's correct.

24         Q     And do you understand that to be a

25    photograph taken of the two of them in the Ramstein

Page 111

1      Q     May the 9th or May the 10th you learned

2    what the number was?

3      A     Yes.

4      Q     So turn to the second page please of

5    Exhibit 11.  So right there is you're sending to Dena

6    some photos in chronological order of, as you say in

7    this email█      when she first came into American

8    custody, right?

9      A     Yes.

10     Q     Why were you sending these to Dena?  Did

11   she ask for them?

12     A     This was in reference to our text

13   conversation earlier about photos that were

14   appropriate for the website and fundraising.

15     Q     So this is just a continuation of that

16   conversation, you are now actually initiating on

17   sending photos to her?

18     A     Uh-huh.

19     Q     And these are photos that you selected?

20     A     I think so, yeah.

21     Q     From the Google photo album?

22     A     Yes.

23     Q     Did she give you any criteria for selecting

24   the photographs?

25     A     She did not.  Just I think that all we said

Page 114

1          A      Yep.

2          Q      And so those were additional photos that

3      you selected from the Google photo album to send to

4      Dena?

5          A      That's right.

6          Q      For her consideration and use with the Pipe

7      Hitter Foundation website posting?

8          A      Yes, sir.

9          Q      So you understood that she was going to use

10     those in support of the fundraising campaign?

11         A      Yes, sir.

12                MR. POWELL:  12, please.

13                (Mast Deposition Exhibit No. 12 was marked

14                for identification and attached to the

15                transcript.)

16     BY MR. POWELL:

17         Q      Mr. Mast, you have been handed Deposition

18     Exhibit 12 which is a series of emails between you

19     and Dena starting on the morning of Wednesday, May

20     the 10th and running to Thursday, May the 11th.  Do

21     you see that?

22         A      Yes, sir.

23         Q      And there in the middle of the first page,

24     there's an email, I don't see your name on it but

25     it's to Dena from someone named Benjamin Nichols and

Page 122

```
 1        A     Are these additional or just -- I think

 2     they are, yes.

 3        Q     So you say in your email at 11:51 a.m. on

 4     the morning of May 11, you said to Dena, "Here are

 5     the photos that I was able to locate that were used

 6     in the CBS news story."  Do you see that?

 7        A     Yes.

 8        Q     And so did you pull those photos off of the

 9     Google photo album?

10        A     I think I did.  Yes, I think I did.

11        Q     But you knew because you had seen the CBS

12     Morning News story that those photos had been used by

13     CBS?

14        A     Correct.

15        Q     And so in your text to Dena you say that

16     they, quote, "They are, quote, fine to share since

17     they are already public," close quote.  Do you see

18     that?

19        A     I do.

20        Q     What was your basis for saying that in your

21     email to Dena?

22        A     I started thinking about it after I had

23     sent all those photos over to her and they have a lot

24     of -- my first instinct was just like these would be

25     good for fundraising because it shows his family and
```

Page 123

1    all that stuff, but I started thinking about it more

2    and I was like, well, it's already got -- basically I

3    had a second thought where I had seen a lot of photos

4    of my family get shown in news articles that were,

5    shall we say, not friendly towards the story of --

6    and my brother, and I was like, well, some of those

7    are already circulating anyway, why don't I not share

8    anything that has my other nephews, as little as my

9    family as possible except for Joshua and Steph and I

10   will try to stick with ones that are already in what

11   I consider to be public domain because presumably

12   hundreds of thousands of people had already seen

13   these CBS interviews, I don't know what the extent

14   is, so I was like, well, they should be fine because

15   these are already public.

16        Q    Did you get any advice from anyone on your

17   opinion that because they had already been aired on

18   CBS they were fine to share?

19        A    My wife.

20        Q    Did you confer with any lawyer on that

21   question?

22        A    No.

23        Q    You didn't confer with Joshua about it?

24        A    No.

25        Q    Or Richard?

Page 124

1          A      Huh-uh.

2          Q      Or any of Joshua's lawyers?

3          A      No.

4          Q      Or Richard's lawyer?

5          A      No.  Again, never spoken to Richard or

6     Josh's lawyers.

7          Q      The next sentence you say -- and this is in

8     your email to Dena on May 11, same exhibit we have

9     been looking at, you say, quote, "Anything else, just

10    please blur out for now as discussed," close quote.

11    Do you see that?

12         A      I remember saying that.  Yeah, I see it.

13         Q      What did you mean by that?

14         A      Just like if she was older, like anything

15    that wasn't on the CBS interview, maybe blur out her

16    face just so it would be -- so that photos that

17    weren't already in public domain wouldn't be

18    broadcasted.

19         Q      And the last clause of that sentence says

20    "as discussed."  So had you had a conversation with

21    Dena about how to handle these photos?

22         A      Yeah.  I remember wrestling with the

23    concept of it and like whether I should basically

24    change my mind after I had already sent her all the

25    photos and I decided I did.  I asked her if I could

Page 139

1    call."  The "we" you're referring to is you and Dena?

2         A     Dena.

3         Q     We talked a little bit earlier, Mr. Mast,

4    about the One America News interview.

5         A     Yes, sir.

6         Q     It's correct that you gave an interview to

7    One America News on June 11th?

8         A     Yes, I think that was the date.

9         Q     Who arranged that?  Sorry.  Did counsel on

10   the phone -- I don't want to interrupt an objection.

11              Who arranged the interview with One America

12   News?

13        A     That would be what I refer to as the media

14   team for Pipe Hitter Foundation but it would be Mary

15   Vought.

16        Q     Vought, V-o-u-g-h-t.

17        A     So Mary and she has a couple of other team

18   members that I am in communication with and I don't

19   know which one specifically had reached out to OANN

20   but it was them.

21        Q     And it's true, isn't it, that several

22   images of Baby Doe are displayed during your

23   interview, correct?

24        A     That is correct.

25        Q     How did the One America News outfit get

Page 140

1     those photos?

2          A     I think that I sent them to the fellow who

3     did the interview on One America News Network.

4          Q     When you did that did you provide to One

5     America News a copy of the protective order or were

6     you then still not aware of the protective order?

7          A     I did not provide one and I was not aware

8     yet.

9          Q     So just to be clear, I think I have this in

10    the chronology of your testimony.  You said that you

11    didn't become aware of the protective order until you

12    got it from Mr. Elliker and the cease and desist

13    letter?

14         A     No.  I knew that one existed but I didn't

15    have a physical copy of one until then.  I don't

16    think I read the actual protective order.

17         Q     Until you received it from Mr. Elliker in

18    the cease and desist letter?

19         A     Correct.

20         Q     So the photos that showed up in the

21    interview that you gave, they originate in the Google

22    photo album, correct?

23         A     That's right.

24         Q     Whether they came from you or from Mary

25    Vought, that's where they started and someone

Page 145

1      A     Yes.  Most of the information came from him

2      at the time that it occurred, correct.

3      Q     So during this time frame, April and May of

4      2023, Joshua knew you were in touch with the Pipe

5      Hitter Foundation, correct?

6      A     Yeah, I had told him that I had decided to

7      touch base with them and partner with them.

8      Q     Did he know in advance that you were going

9      to be interviewed by One America News?

10      A     No, he did not.

11      Q     Why didn't you tell him?

12      A     I purposely didn't tell anyone in my family

13      because there has been a lot of, oh, politely put,

14      negative media coverage of my family and I didn't

15      want any repercussions to go to anybody else but me.

16      Q     Were you aware on June 28th Joshua and

17      Stephanie's lawyers filed in the federal court case

18      something called a memorandum in opposition to

19      Plaintiffs' motion to show cause?

20      A     Yes, I think so.  Is that where the cease

21      and desist letter gets filed with the complaint, my

22      brother's attorney filed their response to that?

23      Q     Let's back up a little bit.  This is not a

24      memory quiz for you and I'm not asking you to

25      recreate what's in the court file.

Page 147

1    is document number 239.  It's the memorandum in

2    opposition that McGuire Woods filed on behalf of

3    Joshua and Stephanie on June the 28th.

4              So turn to the third page, please, Mr.

5    Mast.  Looking down to the last sentence of the long

6    paragraph that begins above the middle of the page.

7    Are you with me?

8        A    I am.

9        Q    The sentence reads, "Joshua and Stephanie

10   Mast had no knowledge that Jonathan Mast was speaking

11   with the Pipe Hitter Foundation."  Do you see that?

12       A    I do.

13       Q    That's not true, is it?

14       A    I believe speaking is referencing the stuff

15   published on social media, the website, et cetera.

16   So they didn't know that, what I had said, et cetera,

17   et cetera.  They knew that I made contact with Pipe

18   Hitter Foundation -- at least I think they did.

19       Q    Well, you testified just a few minutes ago

20   that you were -- that Joshua was aware in April and

21   May that you were in contact with the Pipe Hitter

22   Foundation, right?

23       A    I did say that, yes.

24       Q    So this language from this memorandum in

25   support that I just read to you is not true, is it?

Page 148

1       A      I would say it needs to be clarified.

2       Q      Who is going to clarify it?  This is

3    something filed with the court.

4       A      That's not for me to know.  Well, it also

5    goes on to say "until he had already done so," and

6    that is correct.

7       Q      Well, that's with reference to the One

8    America News interview which you just said he didn't

9    know about that until after the fact.

10           MR. FRANCISCO:  Objection.  Argumentative.

11           THE WITNESS:  Well, to clarify, just to be

12   as clear as I can, the sentence itself, if you take

13   the whole thing in context, Joshua and Stephanie Mast

14   had no knowledge that Jonathan Mast was speaking with

15   the Pipe Hitter Foundation or that he would speak

16   with One America News Network until after Jonathan

17   had already done so, and that is correct.

18           MR. HARDING:  He testified to that.

19           THE WITNESS:  I talked with them first and

20   then informed Joshua of that.

21   BY MR. POWELL:

22      Q      So let's parse that sentence which is what

23   I think you've just undertaken to do.  Do you

24   interpret the phrase at the end "until after Jonathan

25   had already done so" to refer to the whole sentence?

Page 149

1              MR. FRANCISCO:  Objection.  This document

2      speaks for itself.  It's a legal pleading not by

3      Jonathan.

4      BY MR. POWELL:

5          Q    Let me ask it another way.  You testified

6      just a few minutes ago that Joshua knew you were in

7      touch with the Pipe Hitter Foundation in April and

8      May of this year, correct?

9          A    Well, yeah, because he had to know how I

10     was sending him $5,000 or $4,000.

11         Q    And you knew that he was in touch with the

12     Pipe Hitter Foundation because he told you that

13     someone from the Pipe Hitter Foundation was going to

14     reach out to you.  That's the text message that you

15     had the initial contact with Dena on April the 9th.

16         A    Sure.  And I believe somewhere in this

17     document says he had been put in touch with the Pipe

18     Hitter and told them he couldn't work with them and

19     that's why he directed them to another member of the

20     family.

21         Q    Right.  So you were then in contact

22     intermittently in April and May with the Pipe Hitter

23     Foundation and Jonathan (sic) knew about that, didn't

24     he?

25         A    Joshua.  Yes.

Page 165

1      words, "Hi Dena, got a rather sensitive issue to

2      discuss as soon as you get a brief moment."  Do you

3      remember that?

4          A     Yes, I think so.

5                 (Mast Deposition Exhibit No. 20 was marked

6                 for identification and attached to the

7                 transcript.)

8      BY MR. POWELL:

9          Q     Mr. Mast, you've just been handed

10     Deposition Exhibit 20 by the court reporter.  It's a

11     multi-page text exchange between you and Dena Cruden

12     starting on June the 14th and running until June the

13     15th.  Do you have that in front of you?

14         A     I do.

15         Q     So there at the top, the first thing you

16     say is, "Hi, hi Dena, got a rather sensitive issue to

17     discuss as soon as you get a brief moment."  And then

18     it refers something on Instagram that he says Eddie

19     may have shared.  That would be Eddie Gallagher, you

20     believe?

21         A     Yes, sir.

22         Q     Without reference to the text message, do

23     you remember what it was that caused you to initiate

24     this text conversation with Dena on June the 14th?

25         A     The initial cease and desist letter I

Page 166

1       received.

2           Q     The one from Mr. Elliker that we marked as

3       an exhibit early on in the deposition?

4           A     That's correct.

5           Q     And what was it about Mr. Elliker's letter

6       that made you want to reach out to Dena Cruden?

7           A     As previously stated, I don't have a lot of

8       social media platforms and so when I received the

9       letter, it included a lot of exhibits which was --

10      Instagram was one of them, and so on the Instagram

11      handle, I read -- I think that's where I saw that it

12      was Eddie's Instagram handle and so that's where I

13      presume that was.  Hence, the text came from that.

14          Q     And you reference the cease and desist

15      letter there on the first page, right?

16          A     Yeah.

17          Q     And then skipping down in the text, you say

18      quote, "Seeing as how that photo came from me and

19      wasn't one of the ones that aired on CBS, thus

20      already in the public domain, I think it would

21      behoove us to take precaution to blur it out like the

22      one on the Pipe Hitter's Instagram account."  Do you

23      see that?

24          A     Yes.

25          Q     So was it your intention in this text

Page 167

 1    message then to share your concern with Ms. Cruden

 2    and to have her take steps to blur out what you had

 3    seen on Mr. Gallagher's Instagram?

 4         A    Correct.

 5         Q    And that was one of the photos that you

 6    provided?

 7         A    Yes.

 8         Q    Did she do what you asked her to do?

 9         A    I think she went a step beyond and just had

10    them remove the post altogether.

11         Q    So if you turn to the next page of the

12    exhibit, you will see it looks like you and she spoke

13    that day, right?

14         A    Yes.

15         Q    And you've got embedded in the second page

16    of the exhibit, are those the photos that caused your

17    concern?

18         A    No, not these ones.  These were the ones

19    that were on CBS, to the best of my recollection.  It

20    was one where she was standing on a box that is in a

21    different message maybe.

22         Q    So it wasn't one of these three on the

23    second page, it was another one?

24         A    Yeah.  My thought process was any of the

25    ones where she was younger in Afghanistan and

Page 168

1      whatnot, those were fine, and anything that aired on

2      CBS was fine, but the ones that I provided from my

3      family access album we should probably have blurred

4      out if we could do that.

5           Q    And consistent with your testimony down at

6      the bottom of the second page of this exhibit, she

7      says, "FYI, we deleted it just to be safe," right?

8           A    Right.

9           Q    And you said "thank you."

10          A    Uh-huh.

11          Q    And then continuing on, continuing the text

12     conversation with Dena about checking every photo,

13     right?

14          A    Yes.

15          Q    And then down at the bottom of the third

16     page you say, "Dena, I have one more photo edit

17     request to make, I'm sorry."  Do you see that?

18          A    Yes.

19          Q    And you go on to say, "I basically decided

20     that I probably shouldn't have used any recent photos

21     of Starfish for two reasons," right?

22          A    Uh-huh.

23          Q    And the first one you say is retaliation

24     and then the second one, which goes over onto the

25     next page is, "to not give the opposition a reason to

Page 169

1     screech that I'm breaking the protective order."  Do

2     you see that?

3          A     Yes.

4          Q     And you go on in that sentence to say,

5     "even though I don't believe I am because I don't

6     believe it applies to me."  Do you see that?

7          A     I do.

8          Q     And so did she follow your request?

9          A     To blur out the photos?

10         Q     Yes.

11         A     Again, she -- I think she did with

12    everything.  At some point they removed the whole

13    page from their website, Instagram, et cetera, just

14    as a safety precaution.

15         Q     Where you say on the fourth page of Exhibit

16    20, there in the middle of the page where you refer

17    to the protective order and you say, quote, "even

18    though I don't believe I am," and by that meant you

19    didn't believe you were subject to the protective

20    order?

21         A     Correct.

22         Q     What's the basis for you're having said

23    that to Dena?

24         A     Well, I wasn't an expert on the protective

25    order, I just read it from when it was sent to me,