**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| BABY DOE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-49-NKM-JCH |
| | ) | |
| JOSHUA MAST, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |

**DEFENDANTS JOSHUA AND STEPHANIE MAST'S PRE-HEARING BRIEF IN
OPPOSITION TO PLAINTIFF'S MOTION TO SHOW CAUSE AND FOR SANCTIONS**

Defendants Joshua and Stephanie Mast ("the Masts") have acted and will continue to act in good faith to comply with this Court's Protective Order (ECF No. 26) (the "Protective Order"), entered *ex parte* on September 13, 2022. That is not always a simple task because Plaintiffs have taken a very broad view of what it means to "identify" them, and several motions bear on the scope of the Protective Order which remain pending. *See* Defendants' Motion to Amend Protective Order (ECF No. 130); Plaintiffs' Emergency Motion to Show Cause (ECF No. 141).[1] The Masts have nevertheless gone out of their way to avoid identifying Plaintiffs, to the detriment of their own defense. There can be no question that the Masts' compliance with the one-sided Protective Order—which restricts the Masts but leaves Plaintiffs John and Jane Doe ("the Does") free to speak with anyone they choose, including the press, about the issues in this litigation—has materially affected the Masts' ability to defend themselves here.

---

[1] Defendants' motions to dismiss for lack of jurisdiction and on other grounds also remain pending. *See* ECF No. 85; ECF No. 88; ECF No. 90; ECF No. 92.

This motion is a case in point. Plaintiffs filed this motion in response to efforts by Joshua Mast's brother, Jonathan, and a third-party organization, the Pipe Hitter Foundation, to raise money in support of the Masts' legal defense. The mere filing of Plaintiff's motion led the Pipe Hitter Foundation to stop that effort and ensured that the Masts would not receive their financial support. Now, the Masts are forced to defend against the accusation that they used Jonathan as an agent to circumvent the Protective Order, even though their allegations defy the evidence presented in Jonathan Mast's deposition and have no basis in fact. Specifically, the Does allege the Masts asked Jonathan to help the Pipe Hitter Foundation "engag[e] in [a] publicity blitz." *See* Plaintiffs' Pre-Hearing Brief in Support of Motion to Show Cause (ECF No. 403) at 1. But they have no evidence to support that *ipse dixit* assertion, which both Jonathan and Joshua have denied under oath. That lack of evidence, however, has not stopped Plaintiffs from continuing to use the *ex parte* Protective Order as a both a sword to bludgeon the Masts and a shield to prevent inquiry into relevant facts about the Does and their purported relationship to the Child.

The Does' show-cause motion fails for several reasons. To begin with, the Court should lift the Protective Order because it is unconstitutional *ab initio* and facts that have come out in discovery further undermine its constitutionality and validity. Specifically, several facts that have emerged in discovery confirm that the Does are not in any danger from identification, and that their families are already known by the Taliban through the Does' own actions. These facts, at minimum, demonstrate that the Does were not entirely forthright with the Court when obtaining the *ex parte* Protective Order.

The evidentiary record also demonstrates that the Masts did not violate the Protective Order. The Does alleged a flimsy conspiracy to circumvent the Protective Order, despite failing to bring to the Court's attention the many times where Jonathan Mast made clear that he was not

2

acting at Joshua's behest in his dealings with the Pipe Hitter Foundation. *See* Jon. Mast Dep. at 170:16–25 ("Q. Is it your testimony that you were not authorized by Joshua to act on his behalf? A. That is correct. Q. Is it your testimony that you were acting entirely on your own in sharing photos with the Pipe Hitter Foundation and sharing photos with anyone else, that this was just you, Jonathan Mast, acting on your own? A. Yes, that is correct.").

Much less have the Does established any *knowing* violation of the Protective Order. Instead, all evidence demonstrates the Masts acted in good faith to comply with the Protective Order, to their own detriment, even while they asked this Court to lift the unconstitutional restraint. Nor have the Does suffered any harm, actual or otherwise, and do not even try to point to any harm. Instead, they say that the Masts' purported violation of the Protective Order "*elevates the risk*" of harm to the Does because people in Afghanistan "*may*" recognize Baby Doe. *See* Plaintiff's Pre-Hearing Brief at 22 (emphasis added).

Regardless of the means the Court chooses, the result is clear: the Court cannot sanction the Masts for violating the Protective Order based on the actions of third parties Jonathan Mast and the Pipe Hitter Foundation.

## FACTUAL BACKGROUND

### I.     The Court Enters the Protective Order *Ex Parte*

On September 13, 2022, this Court entered a Protective Order that precluded the Masts from "directly or indirectly identif[ying] Plaintiffs or their family members to any person[,]" and permitted the Does to proceed under the protection of pseudonyms. ECF No. 26 at 2. The Court entered the Protective Order upon finding that the Does had "demonstrated that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties, in view of the age of minor Plaintiff Baby Doe." *Id.* The Court made no other factual findings. The Protective Order provides that:

1. The Defendants and their counsel and representatives are prohibited from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction. This applies to any disclosure in the course of any investigation undertaken by the Defendants, their counsel, or their other agents or representatives.

2. All papers filed with this Court or disseminated to any person who has not executed a non-disclosure agreement enforceable through the contempt sanction shall use the "John Doe", "Jane Doe", or "Baby Doe" pseudonyms to refer to the Plaintiffs.

3. Any papers that identify any Plaintiff either directly or indirectly shall be filed under seal, with redacted copies placed in the public files.

4. Defendants shall disclose to Plaintiffs' counsel any person to whom Defendants, their counsel or representatives, have disclosed Plaintiffs' identities, and shall provide Plaintiffs with copies of the executed non-disclosure agreements required by this Order.

5. The parties shall be permitted to notice depositions and depose witnesses and conduct other discovery using the "John Doe", "Jane Doe", and "Baby Doe" pseudonyms. In deposing any witnesses who are unacquainted with the Plaintiffs, the Doe pseudonyms shall be used. In deposing any witnesses who are already acquainted with the Plaintiffs, actual names may be used, but the Doe pseudonyms must be used in the transcript of those depositions.

*Id.* at 2–3. This Court entered the Protective Order *ex parte*, as no Defendant had yet entered an appearance, based entirely on the Does' presentation of the facts. The Court never solicited any defendant's arguments regarding its factual findings.

## II.    The Masts Move to Modify the Protective Order

Subsequent actions by the Does and documents produced in discovery fundamentally undermine the stated purpose of the Protective Order. On January 5, 2023, the Masts moved to modify the Protective Order, citing efforts by the Does to publicize their case in national media stories that go against the Order's purpose. *See* Defendants' Motion to Amend Protective Order

(ECF No. 130). The Masts noted that the Does' efforts clearly demonstrated they were using the Protective Order as both a sword and shield—arguing they could say whatever they wanted about the Masts to the media while threatening sanctions if the Masts mentioned any information about their adopted daughter's past life in Afghanistan.

The Masts pointed to the Does' many public statements about the case that were driven by their willing engagement with the media. Most prominently, Jane Doe expressed that she was speaking to the media for the specific purpose of affecting this litigation. Specifically, she said that she "thought within one week" after the first Associated Press article was published "[the Child]'d be back to us," especially after the White House had "publicly weighed in on her family's case." *See* Martha Mendoza et al., *Afghan war orphan remains with Marine accused of abduction*, Associated Press (Dec. 31, 2022), available at https://apnews.com/article/afghanistan-politics-united-states-government-virginia-children-97a4e2f4c38925d50e5511a3232974f0. In that same article, Jane Doe called for the U.S. government to do more, saying it "is not doing their [sic] job as they should, . . . [a]nd in this process, we are suffering." *Id.* Somehow—whether from the Does, their attorneys, or otherwise—the Associated Press also learned that the U.S. Department of Justice moved to intervene in the Fluvanna County Circuit Court proceedings, that the court denied that motion, and that the court found that the Does had standing to proceed further in the case, despite those filings being under seal. *Id.*

The Masts also pointed to several other articles including:

- An article where the Does and two of their attorneys provided a version of the facts that has never appeared in any court filing in almost 3 years of litigation while publicly naming the Masts. *See* Juliet Linderman et al., *Afghan couple accuse US Marine of abducting their baby*, Associated Press (Oct. 20, 2022), available at https://apnews.com/article/afghan-baby-us-marine-custody-battle-b157557538b84b288a0a8415735e24ab.

- A statement by the Taliban weighing in on the matter and condemning Joshua Mast *See* Islamic Emirate of Afghanistan, Ministry of Foreign Affairs (Oct. 23, 2022), https://mfa.gov.af/en/according-to-information-from-reliable-sources-a-marine-officer-joshua-mast-has-forcibly-taken-the-only-remaining-child-of-a-family-martyred-in-their-bombardment-in-afghanistan-from-her-relatives-in/ ("Taliban Statement").[2] The Taliban stated that "[a]ccording to information from reliable sources, a Marine officer Joshua Mast, [sic] has forcibly taken the only remaining child of a family martyred in their bombardment in Afghanistan from her relatives in Virginia and registered her as his own family member." *See* Taliban Statement. The Taliban also said it "w[ould] seriously pursue this issue with American authorities so that the said child is returned to her relatives." *Id.*

- An article that made it clear the journalist had personally visited the Does (that again named the Masts). *See* Rozina Ali, *How Did This Man Think He Had the Right to Adopt This Baby?*, The New York Times (Nov. 20, 2022), available at https://www.nytimes.com/2022/11/10/magazine/afghanistan-orphan-baby-l.html. When requesting comment from the Masts, the author used the Does' names and Baby Doe's legal name given to her by the Masts and asked for the Masts to comment because "this is an article that will be published in the New York Times Magazine, which means it would be fairly easy for anyone looking to find it now, or years down the line. When [Baby Doe] gets older, and if she searches for your or your wife's name, she will likely come across this article about her adoption, and she may wonder about the absence of her parents' voice in the story." Ex. A (Email from Rozina Ali requesting comment from the Masts).[3]

The Does' repeated public statements to national media organizations directly contradict their stated claim of requiring anonymity to ensure their safety. The Does' public statements drew the attention of the Taliban to their case. Yet, the Does continued to engage the national news media expressly to influence public opinion of the case, despite seeking to prohibit the Masts from speaking publicly about the case.

---

[2] The Taliban Statement has since been taken down from the government website but is still available online at https://web.archive.org/web/20221023115051/https://mfa.gov.af/en/according-to-information-from-reliable-sources-a-marine-officer-joshua-mast-has-forcibly-taken-the-only-remaining-child-of-a-family-martyred-in-their-bombardment-in-afghanistan-from-her-relatives-in/.

[3] Ali also somehow learned of Stephanie Mast's personal phone number and sent her a text using Baby Doe's legal name requesting her to comment.

### III.      Plaintiffs' First "Emergency" Motion to Show Cause

On January 24, 2023, the Does sought an "Emergency" Motion to Show Cause in response to a CBS segment that provided the Masts an opportunity to counter the Does' false narrative of Baby Doe's adoption by the Masts. *See* Plaintiffs' Emergency Motion to Show Cause (ECF No. 141). The Does expressed concern that CBS published: photographs of Baby Doe purportedly provided by the Masts, recorded footage of Baby Doe playing with the Masts in view, images of the compound in Afghanistan from which Baby Doe was rescued, and footage of Stephanie Mast discussing distinctive scarring on Baby Doe's leg. ECF No. 141 at 4. The Does argued that the CBS segment amounted to an intentional violation of the Protective Order and sought to hold the Masts in civil contempt.

But the Masts had diligently worked to engage with CBS while still abiding the requirements of the Protective Order. During the segment, Stephanie Mast did not identify the Does directly or indirectly. *See* Defendants' Response to Emergency Motion to Show Cause (ECF No. 154) at 1. Furthermore, Stephanie Mast did not improperly identify Baby Doe—Baby Doe was not named and her face was obscured. *Id.* Additionally, the pictures CBS obtained for use during the segment originated from third parties, not the Masts. *Id.* at 2.

Immediately following a months-long effort to engage with the national news media, the Does' prognostications of a "substantial risk of harm" stemming from the CBS segment appeared to try to control the national media narrative of the case. ECF No. 141 at 3.

The parties fully briefed that first motion, and the Court heard argument—as well as testimony from Joshua Mast—on February 8, 2023. The Court has not ruled on that order to date.

IV.     **Plaintiffs' Second "Emergency" Motion to Show Cause**

Despite their own undermining of the Protective Order, on June 14, 2023, the Does filed the present Emergency Motion for Order to Show Cause why the Masts should not be held in contempt of court based on an alleged violation of the Protective Order. *See* Plaintiffs' Emergency Motion to Show Cause (ECF No. 231). In that motion, the Does accuse the Masts of violating the Protective Order by sharing photographs of Baby Doe with the Pipe Hitter Foundation to raise money to support their adoption efforts. *See id.* at 4–7 (describing the Pipe Hitter Foundation's distribution of material relating to Baby Doe). But these challenged actions were independently taken by *Jonathan* Mast without direction from Joshua or Stephanie Mast. *See* Jon. Mast Dep. at 170:16–25 ("Q. Is it your testimony that you were not authorized by Joshua to act on his behalf? A. That is correct. Q. Is it your testimony that you were acting entirely on your own in sharing photos with the Pipe Hitter Foundation and sharing photos with anyone else, that this was just you, Jonathan Mast, acting on your own? A. Yes, that is correct.").

V.     **Plaintiffs Produced Documents Undermining Their Representations to this Court Used to Obtain the Protective Order**

On July 20, 2023, the Court granted a continuance so the parties could conduct additional discovery relevant to the Masts' alleged violation of the Protective Order. *See* ECF No. 263. Since the filing of this "emergency" motion nearly one year ago, the Masts have learned additional facts that undermine the Does' asserted basis for the necessity of the Protective Order.

*First*, John and Jane Doe disclosed they have been granted asylum in the United States and have no plans to return to Afghanistan. Ex. B (Does' Notice of Supplemental Authority to the Virginia Court of Appeals) (filed under seal).[4] This status undercuts the Does' claim that any

---

[4] It is undisputed that the Does would not be in the United States today—and thus able to benefit from the asylum process—had the Masts not helped them escape Afghanistan and ensured they went to the United States rather than be sent to other parts of the world.

publication of their names in connection to this case presents a "substantial risk of harm[.]" Plaintiffs' Emergency Motion to Show Cause (ECF No. 141) at 3. Thus, even if the Does previously faced a risk of harm from returning to Afghanistan after publicized litigation, it is now clear that they no longer intend to return and have the legal ability not to do so.

But even if the Does still intended to return to Afghanistan in anonymity, it is now clear that would be impossible—not because of anything the Masts have done, but because of the Does' own actions. Their public pronouncements on the case via the October 20, 2022 Associated Press article drew an official statement by the Taliban into the matter of Baby Doe's adoption in which the Taliban refer to "Josh Mast" by name and describe Baby Doe as "the only remaining child of a family martyred in their bombardment in Afghanistan from her relatives in Virginia and registered her as his own family member." *See* Taliban Statement. The Taliban appears to have a precise understanding of the parties involved here, and the Associated Press published photos of Taliban fighters escorting AP journalists interviewing the Does' purported relatives. The Does no longer have any anonymity to protect.

***Second***, it is now clear from documents recently disclosed by the Does that their family in Afghanistan are already known to the Taliban. John Doe made this plain in his declaration to United States Citizenship and Immigration Services ("USCIS Declaration"). In his USCIS Declaration, John Doe references one among the litany of Associated Press articles that have been published about the case, stating that the article ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████ Ex. C (John Doe's USCIS Declaration) (filed under seal) at ¶ 74. The referenced article also includes the name and picture of the villager

that lived in the house next to where Baby Doe was found. *See* Riazat Butt, et al., *A baby was found in the rubble of a US raid in Afghanistan. But who exactly was killed and why?*, Associated Press (August 4, 2023), available at https://apnews.com/article/afghanistan-raid-marine-orphan-custody-1e73bba608994a53fca37b904dfd9a81. The article even includes a picture of a man with a rifle slung across his back, crouching down and looking into a destroyed structure, with a caption that reads, "A Taliban fighter looks at a home that was destroyed during a Sept. 5, 2019, night raid by U.S. forces in a remote region of Afghanistan, on Friday, Feb. 24. 2023. U.S. Soldiers picked up an infant in the rubble after the raid; she's now at the center of a bitter, international custody dispute." *Id.*

Additionally, during the state court proceeding, the Masts received a memo created by the United States Conference of Catholic Bishops ("USCCB Report") on November 6, 2021, during the time the USCCB provided support the Does and other people recently evacuated from Afghanistan. The USCCB Report stated, ███████████████████████████████████████ ████████████████████████████████ USCCB Report at 2.  The Does improperly withheld the memo from discovery in the state court proceeding, and the Masts only learned of its existence during discovery in this case. The Masts received the USCCB Report on June 4, 2022. Just days later, John Doe lied to the court to try to hide his family's communications with the Taliban, stating, ████████████████████████████████████████ Tr. of June 8, 2022 Hearing at 886, *Redacted v. Redacted* (Va. Cir. Ct. No. CL22000186).[5] This testimony directly contradicts the USCCB Report. On November 14, 2023 the state trial court found that the Does had failed to comply with the rules of discovery by withholding this memo

---

[5] The State court has ordered the use of the parties' initials, but to avoid the potential for identifying the Does, the Masts are omitting those initials from this filing.

from the Masts, and on December 4, 2023, that court sanctioned the Does for their discovery violation. The sanction order has been appealed. Pet'rs' Certificate of Obj. to Ord. Entered December 4, 2023, *Redacted v. Redacted* (Va. Cir. Ct. No. CL22000186).

Ultimately, John, Jane, and Baby Doe are all known to the Taliban at least in part because of their own actions rather than any actions by the Masts. With all pseudonymous parties known to the Taliban, as well as their family in Afghanistan, the Protective Order serves no purpose other than to unconstitutionally restrain the Masts' speech about their daughter.

### VI.   Jonathan Mast's Communications with the Pipe Hitter Foundation and His Deposition Establish Jonathan Mast Acted on His Own

Jonathan Mast, wanting to help his brother, spoke with the Pipe Hitter Foundation once Joshua Mast determined it was best for him not to do so because of the Protective Order. *See* ECF No. 239-1 (Declaration of Joshua Mast ("Joshua Mast Decl.")) at ¶¶ 6–7. Joshua told Jonathan that someone from the Pipe Hitter Foundation would reach out to Jonathan about raising money for the Masts to cover the costs of litigation. *See* Jon. Mast Dep. at 56:4 – 57:4 (Jonathan explaining that Joshua said Jonathan would be contacted by the Pipe Hitter Foundation and denying that Joshua asked for Jonathan to act on Joshua's behalf).[6] Afterward, Joshua never spoke with Jonathan about the matter again.

During his conversations with the Pipe Hitter Foundation, Jonathan acted entirely on his own behalf. Jonathan was deposed for five hours and asked many times whether he acted on Joshua's behalf. Each time, he denied it. To take a few examples:

- Jonathan denied signing an agreement with the Pipe Hitter Foundation on Joshua's behalf. *See* Jon. Mast Dep. at 59:14–24 ("Q. . . . Did Joshua know you were going to sign this grant agreement? A. Specifically I don't think so because I don't remember talking about this with him. . . . Q. Well, you were signing on his behalf,

---

[6] The full transcript of Jonathan Mast's deposition is attached as Ex. D.

11

were you not? A. No, I was signing on my behalf."); *id.* at 61:5–13 (clarifying that he signed to get money for Joshua but signed the agreement on his own initiative).

- Jonathan made clear that all money went to him only to distribute to Joshua. *See* Jon. Mast Dep. at 62:11–63:1 ("Q. Did you expect any money raised pursuant to this agreement would go to anybody other than Joshua Mast and his immediate family? A. To be accurate, all the money came to me and then they entrusted me to distribute that. . . . Q. And of the funds that came to you did you distribute all of them to Joshua? A. I did.").

- Jonathan denied that he acted as Joshua's legal representative or that Joshua authorized him to do anything. *See* Jon. Mast Dep. at 63:16–64:3 ("Q. And you were acting as Joshua's and his family's representative when you signed this document, right? . . . A. By representative I don't mean like legal representative or that he had authorized me to or had even discussed it with me, but representing as I'm telling the story because that's part of my family, sure.").

- When the Does' counsel invoked the Court's name, asking whether Jonathan wanted the Court to "believe that [he] w[as] not acting on Joshua's behalf," Jonathan said he wanted the Court to "believe the truth" that he signed for himself. *See* Jon. Mast Dep. at 64:18–65:8.

- Jonathan testified that he kept $1,000 of the Pipe Hitter Foundation's funds to satisfy a loan between he and Joshua. *See* Jon. Mast Dep. at 70:13–25 ("Q. You send all $5,000 to your brother? A. No. I – this is the instance where I had reimbursed myself a thousand because I had loaned him a thousand. Q. You had advanced him a thousand so then you kept a thousand of the five? A. Uh-huh.").

- Jonathan testified that the language used for a newsletter "absolutely came from [him]" and was not from Joshua at all. *See* Jon. Mast Dep. at 118:4–15 ("Isn't is true, Mr. Mast, that the language that you proposed that be substituted into the newsletter came from Joshua not from you? . . . A. How I know about the story came from Joshua because I was involved with that at the time. I remember being up late at night knowing that they were going to go out and try to acquire her and couldn't sleep thinking about it. But as far as the terminology, that absolutely came from me.").

- Jonathan further testified that Joshua had no idea about any interview and that all directions for people to donate came exclusively from Jonathan. *See* Jon. Mast Dep. at 141:3–14 ("Q. At the end of the interview, . . . you directed viewers to the Pipe Hitter Foundation website if they wanted to donate and help in the legal battle, correct? A. I did. Q. Who asked you to do that? A. Nobody. I mean, myself, Dena and Mary talked. The conversation was an instruction of like, 'How do I do this?' And they're like, 'Just direct them back to the website and we will have everything there.'"); *id.* at 145:3–15 ("Q. So during this time frame, April and May of 2023, Joshua knew you were in touch with the Pipe Hitter Foundation, correct? A. Yeah, I had told him that I decided to touch base with them and partner with them. Q. Did

he know in advance that you were going to be interviewed by One America News? A. No, he did not. Q. Why didn't you tell him? A. I purposefully didn't tell anyone in my family because there has been a lot of . . . negative media coverage of my family and I didn't want any repercussions to go to anybody else but me.").

- Jonathan also testified that he acted entirely on his own in his communications with the Pipe Hitter Foundation and that he was not authorized by Joshua to act on his behalf. *See* Jon. Mast Dep. at 170:16–25 ("Q. Is it your testimony that you were not authorized by Joshua to act on his behalf? A. That is correct. Q. Is it your testimony that you were acting entirely on your own in sharing photos with the Pipe Hitter Foundation and sharing photos with anyone else, that this was just you, Jonathan Mast, acting on your own? A. Yes, that is correct."); *id.* at 171:8–10 ("Q. Didn't [Joshua] know that you were sharing photographs? A. He did not."). He did this because he didn't want Joshua to bear any burden for his actions. *See* Jon. Mast Dep. at 199:8–17 ("Q. . . . Why would you not have kept your brother and sister-in-law up to speed on your efforts to tell their story? A. . . . [T]here has been a lot of negative media attention directed towards me and my family and I was trying to keep it all with just me in case something went south and that way I could be the only one that bears repercussions for it.").

Even when he received the subpoena related to testifying about this matter, Jonathan did not speak with Joshua about the subpoena or its substance other than to tell Joshua he received one. *See* Jon. Mast Dep. at 19:3–8 (Jonathan answering that he did not speak with Joshua about complying with the subpoena); *id.* at 23:7–16 (Jonathan stating he did not get advice relating to the subpoena from Joshua); *id.* at 112:13–16 ("I did not receive any advice from Josh or Stephanie or Richard or anybody really. I just looked at the Google drive myself and pulled certain photos and sent those over."). And even though he was not bound by the Protective Order, Jonathan still tried to protect the Child's privacy and comply with the Order by asking for the Pipe Hitter Foundation to cover her face. Jon. Mast Dep. at 168:15–23 (Jonathan Mast explaining why he asked the pipe Hitter Foundation to blur Baby Doe's face in photos); *id.* at 169:4–14 (Jonathan Mast saying he asked the Pipe Hitter Foundation to blur photos of Baby Doe even though he did not believe the Protective Order applied to him).

13

**ARGUMENT**

**I.      The Court Should Lift the Protective Order.**

The Masts incorporate by reference all arguments in their Motion to Modify the Court's Protective Order (ECF No. 130). Though the Protective Order never was constitutional, new facts learned in discovery further undermine its constitutionality and validity; it never was, and certainly is not now, the least restrictive means in furthering any compelling interest in protecting the Does or their family.

***First***, on August 22, 2023, John Doe submitted a declaration under penalty of perjury to the U.S. Citizenship and Immigration Services in support of his application for asylum. *See* Ex. C (filed under seal). This declaration was discovered to the Masts on October 20, 2023. In this declaration, John Doe states that the Associated Press published an article based on an independent investigation that ███████████████████████████████████████████████████ ████████████████████████████ *Id.* ¶ 74. John and Jane Doe cooperated with the Associated Press and agreed to be interviewed for the story, which includes multiple photographs identifying both the Does' relatives and their Afghan village.

***Second***, in that same USCIS Declaration, John Doe describes a video in which a maternal uncle of Baby Doe made statements on video saying, █████████████████████████████ ████████████████████████████████ demanding the return of Baby Doe to Afghanistan. *Id.* ¶ 66.

***Third***, on June 4, 2022, the Masts obtained a memorandum produced by the USCCB that had previously been improperly  withheld by the Does as privileged. *See* Ex. E (USCCB Memo) (filed under seal). This memorandum showed he had told the USCCB that John Doe's ████ ██████████████████████████████████████████████████████████ ████████████████████████ USCCB Report at 2.  This directly contradicts John

14

Doe's June 2022, testimony in which he stated, ███████████████████████████
███████████████████████ Tr. of June 8, 2022 Hearing at 886, *Redacted v. Redacted* (Va.
Cir. Ct. No. CL22000186).

These newly discovered facts, along with the facts discussed in the Masts' Motion to
Amend the Protective Order (ECF No. 130), defeat the Does' assertion that the Protective Order
is necessary to protect their identities and to protect their family members in Afghanistan from
harm, because the facts establish that anyone in Afghanistan can readily discern who the Does and
the child in this case are.[7]

## II.   The Does Have Failed to Demonstrate that Any Sanction Is Warranted, Much Less the Sanction of Civil Contempt.

Civil contempt is a severe sanction reserved for only the most unreasonable violations of
judicial orders. Courts find parties in contempt only in rare circumstances, such as when a party
"has not diligently attempted in a reasonable manner to comply" with a court's order. *Chere Amie,
Inc. v. Windstar Apparel Corp.*, 175 F. Supp. 2d 562, 565 (S.D.N.Y. 2001); *see also, e.g.*, *In re
Taggart*, 980 F.3d 1340, 1347 (9th Cir. 2020) ("Civil contempt is a 'severe remedy' and,
correspondingly, the Supreme Court has set a significantly high hurdle for when it is imposed."
(citing *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019))).

As explained above, the Protective Order is invalid as an unconstitutional violation of the
Masts' First Amendment rights. But regardless, the Does have failed to establish that any purported
violation of the Protective Order warrants the sanction of civil contempt. Reflecting the seriousness
of a civil contempt sanction, a party seeking such a sanction must establish four elements by *clear
and convincing evidence*—not speculation:

---

[7] The Masts requested the Does to make John Doe available for this hearing to testify to these
facts, but the Does unilaterally refused to make him available.

(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000). "To be clear and convincing, evidence must place in the ultimate factfinder an abiding conviction that the truth of [the party's] factual contentions are highly probable." *Cannon v. Peck*, 36 F.4th 547, 566 (4th Cir. 2022). Because the Does have failed to clearly and convincingly establish (1) that the Protective Order is valid; (2) that the Masts knowingly violated that Order; and (3) harm resulting from that purported violation, civil contempt sanctions are not warranted.

### A. The Protective Order is Not Valid Because it Violates the Masts' First Amendment Rights.

The Protective Order, which prohibits the Masts from "disclosing any information that directly or indirectly identifies Plaintiffs or their family members," *see* ECF No. 26 at 2, functions as a gag order and is invalid as a violation of the Masts' First Amendment Rights. "[G]ag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions." *In re Murphy Brown, LLC*, 907 F.3d 788, 796–97 (4th Cir. 2018). Gag orders are prior restraints that "bear 'a heavy presumption against [their] constitutional validity.'" *Id.* at 797 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). They are also "presumptively unconstitutional because they are content based." *Id.* Gag orders must therefore survive strict scrutiny, meaning a court must make specific findings that a gag order is the least restrictive means of furthering a compelling state interest. *See id.* at 798–99.

The Does have not provided a compelling state interest for why the Masts must comply with the Protective Order. These restrictions are not designed to protect the integrity of the judicial

16

process—the way a gag order might be necessary in extraordinary circumstances to protect against contamination of the jury pool, *Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, 606 F. Supp. 2d 617, 625–26 (E.D. Va. 2008), or to insulate jurors from improper influence once seated, *see, e.g.*, *Cap. Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1306 (Brennan, Circuit Justice, 1983) (describing "the State's interest is in shielding jurors from pressure during the course of the trial, so as to ensure the defendant a fair trial"). And the Does have not even purported to show that they otherwise advance a compelling state interest. Indeed, the Does' motion in support of the Protective Order focuses almost entirely on justifying the use of pseudonyms rather than the new restrictions included in their proposed order. *See* Plaintiffs' Memorandum in Support of Motion to Proceed Under Pseudonyms and for Entry of a Protective Order (ECF No. 4).

Nor have the Does shown that the Protective Order is the least restrictive means of furthering any compelling state interest there might be. The restrictions are not narrowly tailored at all. On their face, they do not contain any limitations or carve-outs. They could be construed to apply, for instance, to the Masts' ongoing participation in the parallel state court proceedings where the Does filed suit without pseudonyms, and thus where their real names are regularly used by all parties and the Court. Nor have the Does offered any explanation why they should be entitled to provide notice of anyone to whom a party might identify them.

Without proving that the Protective Order is narrowly tailored to a compelling state interest, the Does have failed to prove by clear and convincing evidence the validity of the Protective Order.

### B. The Evidence Shows That Joshua Mast Did Not Violate the Protective Order, and Certainly Did Not Do So Knowingly.

The plain language of the Protective Order prohibits "[t]he Defendants and their counsel and representatives from disclosing any information that directly or indirectly identifies Plaintiffs

or their family to any person[.]" *See* ECF No. 26 at 2. Joshua and Jonathan Mast will testify, under oath, that there was never a violation of this Order.

As the Does appear to recognize, it was *Jonathan* Mast—not Joshua—that provided the Pipe Hitter Foundation with photographs of Baby Doe. *See* Plaintiffs' Pre-Hearing Brief at 21 ("Jonathan Mast [] sent PHF additional identifying photos of Baby Doe that he deemed 'appropriate for the website and fundraising.'"). The only evidence shows that Joshua told Jonathan about the Pipe Hitter Foundation contacting him, which, without more, does not violate the Protective Order. *See* Jon. Mast Dep. at 50:4–7 ("[M]y brother Joshua had . . . called me and said that I might get a call from someone named Dena Cruden and that was about it.").

Jonathan Mast repeatedly stated he acted on his own accord and was not directed or asked to provide photos of Baby Doe to PHF by Joshua Mast. *See* Jon. Mast Dep. at 170:12–24 (Jonathan Mast's testimony that he was "acting entirely on [his] own in sharing photos with the Pipe Hitter Foundation"). In fact, Jonathan repeatedly testified that he did not speak with Joshua or Stephanie about his communications with the Pipe Hitter Foundation because he was trying to avoid creating an agency relationship that could result in Joshua violating the Protective Order. *See, e.g.*, Jon. Mast Dep. at 199:8–17 ("Q. . . . Why would you not have kept your brother and sister-in-law up to speed on your efforts to tell their story? A. . . . [T]here has been a lot of negative media attention directed towards me and my family and I was trying to keep it all with just me in case something went south and that way I could be the only one that bears repercussions for it.").

Thus, the Does' allegations that Joshua Mast sought to circumvent the Protective Order by using Jonathan Mast to communicate with the Pipe Hitter Foundation are unsupported by facts— all the evidence suggests Jonathan Mast was acting on his own initiative, and that Joshua had no knowledge Jonathan was communicating with the Pipe Hitter Foundation. Furthermore, the Mast's

adoptive daughter's identity cannot be revealed, by definition, to anyone who already knows who she is. Anyone who sees the Mast's adoptive daughter living life with her family knows her identity by virtue of the Does' media blitz publicly naming the Masts. The Masts have five children and only one daughter. It is impossible to "reveal" their daughter's identity to anyone not already aware of this case and who she is by virtue of her *living with her parents, the Masts.*

Because the Masts were not involved in Jonathan Mast's decision to share photos of Baby Doe with the Pipe Hitter Foundation, and because anyone recognizing Baby Doe from those photos *per se* could not have learned her identity through those photos, the Masts did not violate the Protective Order and cannot be held in contempt.

### C. The Does Suffered No Harm Resulting from Joshua Mast's Purported Violation of the Protective Order.

Contempt sanctions are not appropriate because the Does cannot show by clear and convincing evidence that they suffered harm as a result of the Masts' purported violation of the Protective Order. *See Ashcraft*, 218 F.3d at 301. The Does appear to acknowledge they have suffered no actual harm by the purported violation of the Protective Order, instead asserting that any form of harm is sufficient. *See* Plaintiff's Pre-Hearing Brief at 21–22 (arguing that actual harm is not required). But the Does offer no evidence suggesting they have suffered any harm—actual or otherwise—based on the Masts' conduct. Rather, they suggest only that "[t]he publication of Baby Doe's face on the internet and on a national news platform *elevates the risk* that she will be recognized by people in Afghanistan" and that those people "*may* believe that Plaintiffs gave or sold Baby Doe to the Masts." Plaintiff's Pre-Hearing Brief at 22 (emphasis added).[8]

---

[8] This argument is also not credible as the Does seemingly believe that someone in Afghanistan will recognize the Child—who is now almost five years old—based on their memory of a two-year-old child several years ago.

Simply put, it is impossible to "reveal" Baby Doe's identity to a person who already knows who she is. The Protective Order certainly requires no one to hide Baby Doe from persons who already know her. The Does offer no evidence showing that these purported harms occurred or will occur imminently. No evidence suggests that someone in Afghanistan has in fact identified Baby Doe based solely on a photograph of her, or that members of the Does' family in Afghanistan are at risk of harm if they had. Speculation that such harm *may* occur because of an *elevated risk* cannot meet the Does' burden of establishing the "abiding conviction that the truth of [the party's] factual contentions are highly probable" required to prove harm by clear and convincing evidence. *Cannon*, 36 F.4th at 566.

Even if the Does could show that someone in Afghanistan had identified them—which they have not—they have offered no evidence showing that any such identification resulted from Joshua Mast's violation of the Protective Order. As the Does acknowledge, any of the purported harms they allege arose as a result of *Jonathan* Mast's conduct. *See* Plaintiffs' Pre-Hearing Brief at 9–13 (describing the actions taken by *Jonathan* Mast). Thus, by the Does' own admission, even if they suffered a concrete, actual harm, Joshua Mast cannot be held in contempt because these alleged harms were not caused by his breach of the Protective Order.

### III.    Joshua Mast Took All Reasonable Steps to Comply with the Protective Order.

Contempt sanctions are also unwarranted because the Masts made a good-faith effort to comply with the Protective Order. Even if the Does have made a clear and convincing showing on all four factors necessary for civil contempt (which they have not), a party may avoid sanction if it shows "substantial compliance" with the Court's Order. *United States v. Darwin Constr. Co., Inc.*, 873 F.2d 750, 754–55 (4th Cir. 1989). *See also De Simone v. VSL Pharms., Inc.*, 36 F. 4th 518, 530 (4th Cir. 2022) ("Substantial compliance is a defense to civil contempt."). A party

substantially complies with a court order when it "in good faith" takes "all reasonable steps" toward compliance. *Darwin Constr. Co.*, 873 F.2d at 755.

The Masts substantially complied with the Court's Protective Order—a complete defense to civil contempt. *See id.* at 754–55. Contrary to the Does' assertions, the Masts did not ask or direct Jonathan Mast to speak to anyone—including the Pipe Hitter Foundation—on their behalf. *See* Jon. Mast Dep. at 170:12–24 (Jonathan Mast's testimony that he was "acting entirely on [his] own in sharing photos with the Pipe Hitter Foundation"). *See also id.* at 148:13–16 ("Joshua and Stephanie Mast had no knowledge that Jonathan Mast was speaking with the Pipe Hitter Foundation or that he would speak with One America News Network[.]"). Nor did the Masts provide Jonathan with any of the photos that were provided to PHF. *See* Jon. Mast Dep. at 112:13–16 ("I did not receive any advice from Josh or Stephanie or Richard or anybody really. I just looked at the Google drive myself and pulled certain photos and sent those over."). Put simply, the Masts had no knowledge of or involvement in Jonathan Mast's communications with the Pipe Hitter Foundation or One America News Network. Without clear and convincing evidence that the Masts participated in Jonathan Masts' actions, the Masts cannot be held in contempt.

## CONCLUSION

For all these reasons Defendants Joshua and Stephanie Mast respectfully ask the Court to deny the Does' motion to show cause and for sanctions, and to lift the Protective Order.

Dated: May 22, 2024                    Respectfully submitted,

                                       */s/ John S. Moran*
                                       John S. Moran (VSB No. 84326)
                                       MCGUIREWOODS LLP
                                       888 16th St. N.W., Suite 500
                                       Black Lives Matter Plaza
                                       Washington, DC 20006
                                       T: (202) 828-2817
                                       F: (202) 828-3327
                                       jmoran@mcguirewoods.com