# Exhibit D

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF VIRGINIA

3    _____

4    BABY DOE, et al.,

5                         Plaintiffs,

6    v.                        Civil Action No.

7                              3:22cv00049-NKM-JCH

8    JOSHUA MAST, et al.,

9                         Defendants.

     _____

10

11

12

13

14              Video-recorded Deposition of

15                    JONATHAN MAST

16               Monday, July 17, 2023

17                     9:33 a.m.

18               Charlottesville, Virginia

19

20

21

22

23

24          Reported by:  Mark E. Brown, RPR

25

Page 2

1      Video-recorded Deposition of JONATHAN MAST, taken

2      by and before Mark E. Brown, RPR, Notary Public in

3      and for the Commonwealth of Virginia, taken pursuant

4      to Notice to Take Deposition and Rule 4:5 of the

5      Rules of the Supreme Court of Virginia, commencing at

6      9:33 a.m., July 17, 2023, at the Law Offices of

7      McGuire Woods, LLP, 323 2nd Street, S.E.,

8      Charlottesville, Virginia 22902.

9      APPEARANCES:

10           ON BEHALF OF THE PLAINTIFFS:

11                     HUNTON ANDREWS KURTH, LLP

12                     By:  LEWIS F. POWELL, III, ESQUIRE

13                     Riverfront Plaza, East Tower

14                     951 East Byrd Street

15                     Richmond, VA 23219

16                     (804) 788-8488

17                     lpowell@hunton.com

18

19                     LATHAM & WATKINS, LLP

20                     By:  EHSON KASHFIPOUR, ESQUIRE

21                        LIA ROSE CATTANEO, ESQUIRE

22                     555 Eleventh Street, N.W., Suite 1000

23                     Washington, D.C. 20004-1304

24                     (202) 637-2200

25                     ehson.kashfipour@lw.com

```
                                              Page 3

 1      APPEARANCES CONTINUED:

 2

 3

 4            ON BEHALF OF DEFENDANTS JOSHUA AND STEPHANIE

 5            MAST:

 6                    McGUIRE WOODS, LLP

 7                    By:  MICHAEL FRANCISCO, ESQUIRE

 8                    888 16th Street, NW, Suite 500

 9                    Washington, D.C. 20006

10                    (202) 857-1722

11                    mfrancisco@mcguirewoods.com

12

13

14          ON BEHALF OF DEFENDANT JONATHAN MAST:

15                    HARDING COUNSEL, PLLC

16                    By:  ELLIOTT HARDING, ESQUIRE

17                    608 Elizabeth Avenue

18                    Charlottesville, VA 22901

19                    (434) 962-8465

20                    elliott@hardingcounsel.com

21

22

23

24

25
```

```
                                            Page 4

 1     ZOOM APPEARANCES:

 2                     ALSTON & BIRD

 3                     By:  MICHAEL R. HOERNLEIN, ESQUIRE

 4                          SAMANTHA VAN WINTER, ESQUIRE

 5

 6                     AMERICAN FREEDOM LAW CENTER

 7                     By:  DAVID YERUSHALMI, ESQUIRE

 8

 9                     LATHAM & WATKINS, LLP

10                     By:  DAMON PORTER, ESQUIRE

11

12                     HUNTON ANDREWS KURTH, LLP

13                     By:  JEREMY C. KING, ESQUIRE

14

15                     INTEGRITY LAW FIRM

16                     By:  RICK BOYER, ESQUIRE

17

18                     LAW OFFICE OF B. TYLER BROOKS, PLLC

19                     By:  TYLER BROOKS, ESQUIRE

20

21                     USDOJ

22                     By:  KATHRYN WYER, ESQUIRE

23

24                     McGUIRE WOODS, LLP

25                     By:  STEPHEN TAGERT, ESQUIRE
```

Page 5

1                         C O N T E N T S

2

3       EXAMINATION OF JONATHAN MAST                    PAGE

4

5            By Mr. Powell                               8

6

7

8

9                       E X H I B I T S

10                   (Attached to the transcript)

11

12     NO.              DESCRIPTION                    PAGE

13     Exhibit 1        Deposition Subpoena             16

14     Exhibit 2        June 13, 2023 letter            23

15     Exhibit 3        Protective Order                32

16     Exhibit 4        June 26, 2023 letter            39

17     Exhibit 5        May 9, 2023 email               57

18     Exhibit 6        May 19, 2023 email              68

19     Exhibit 7        April 10 text messages          76

20     Exhibit 8        Google photo album             84

21     Exhibit 9        Google photo album name list    87

22     Exhibit 10       May 9 text messages             97

23     Exhibit 11       May 5, 2023 email string        108

24     Exhibit 12       May 10, 2023 email string       114

25     Exhibit 13       Pipe Hitter Website screenshots  130

Page 6

1            E X H I B I T S   C O N T I N U E D

2

3      NO.                  DESCRIPTION                      PAGE

4

5      Exhibit 14      May 17 text messages              132

6      Exhibit 15      June 10, 2023 email string        150

7      Exhibit 16      June 10, 2023 email               152

8      Exhibit 17      Slusher Declaration               153

9      Exhibit 18      June 13, 2023 email               160

10     Exhibit 19      June 13, 2023 email               160

11     Exhibit 20      June 14 text messages             165

12     Exhibit 21      June 15, 2023 email string        176

13     Exhibit 22      July 13, 2023 email string        180

14     Exhibit 23      July 13, 2023 email string        184

15     Exhibit 24      July 13, 2023 email string        184

16     Exhibit 25      July 13, 2023 email               190

17     Exhibit 26      May 7, 2020 email string          207

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Good morning.  We are

3      going on the record at 9:33 a.m. on July 17, 2023.

4              This is the video-recorded deposition of

5      Jonathan Mast taken in the matter of Baby Doe, et al.

6      versus Joshua Mast, et al., filed in the United

7      States District Court for the Western District of

8      Virginia, case number 3:22cv00049-NKM-JCH.

9              My name is Emmanuel Pezoa from the firm of

10     Veritex Legal Solutions.  The court reporter is Mark

11     Brown from the firm of Veritex Legal Solutions.

12             Will counsel please state their appearances

13     and affiliations for the record.

14             MR. POWELL:  Good morning.  I'm Lewis

15     Powell with Hunton Andrews Kurth.  I represent the

16     Plaintiffs.

17             MS. CATTANEO:  Lia Cattaneo with Latham &

18     Watkins, also Plaintiffs.

19             MR. KASHFIPOUR:  Ehson Kashfipour, Latham &

20     Watkins for the Plaintiffs.

21             MR. HARDING:  Elliott Harding here with Mr.

22     Jonathan Mast.

23             MR. FRANCISCO:  Michael Francisco on behalf

24     of Defendants Joshua and Stephanie Mast.

25             MR. YERUSHALMI:  David Yerushalmi, American

Page 8

1    1    Freedom Law Center representing Richard Mast.
2    2              MR. BROOKS:  Tyler Brooks, counsel for
3    3    Ahmad Osmani.
4    4              MR. HOERNLEIN:  This is Mike Hoernlein with
5    5    Alston Bird on behalf of Defendant Kim Motley, also
6    6    joined by Samantha Van Winter from my firm.
7    7              MR. BOYER:  Rick Boyer, co-counsel for
8    8    Ahmad Osmani here with Tyler Brooks.
9    9              MS. WYER:  Kathryn Wyer for the Federal
10   10   Nominal Defendants.
11   11             MR. POWELL:  Everybody in the room all set
12   12   to go?  Are you
     y to go, Mr. Mast?
13
13   13             THE WITNESS:  Yes.
14
14   14             THE VIDEOGRAPHER:  Will the court reporter
15
15   please swear in the witness.
16
16              JONATHAN MAST
17
17        was sworn and deposed as follows:
18
18        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
19
19   BY MR. POWELL:
20
20        Q    Mr. Mast, good morning.  I'm Lewis Powell.
21
21   We were introduced before the deposition began but I
22
22   just wanted to say hello to you once again on the
23
23   record.  Thank you for being here.
24
24        A    Thank you.
25
25        Q    What is your full name, please.

Page 9

1        A     Jonathan Michael Mast.

2        Q     Middle initial is "M" as in Mary or

3    Michael?

4        A     Uh-huh.

5        Q     Have you ever gone by any other name?

6        A     No.

7        Q     How old are you?

8        A     I'm 34.

9        Q     When and where were you born?

10       A     Orlando, Florida, 1989.

11       Q     Can you give me a month.

12       A     March.

13       Q     That's fine.  What's your residential

14   address, please?

15       A     ████████████████████████████████.

16       Q     Do you use email?

17       A     Yeah.

18       Q     What email addresses do you use?

19       A     I have several.  For work I use my

20   ██████@liberty.edu.  Most of my personal info goes

21   through ███████████@gmail.  And then a third one I

22   have is actually a character from my favorite Lord of

23   the Rings.  The character is

24   ██████████████@proton.me.

25       Q     Have you used any other messaging services

Page 10

```
 1       or other forms of electronic communication?
 2            A     Just my phone text messages and Signal and
 3       Facebook messenger.
 4            Q     How about What's App?
 5            A     No.  Well, I used it a long time ago but
 6       not -- I don't use it as a primary communication.
 7       It's been at least six or seven years since I've last
 8       used it.
 9            Q     Do you use Signal?
10            A     Yeah.  Uh-huh.
11            Q     How long have you used Signal?
12            A     I'm not sure.  It's probably two or three
13       years.
14            Q     Why did you start using Signal?
15            A     Just as an alternative means for a secured
16       communication method.
17            Q     Did someone suggest that to you?  Was it
18       your brother Joshua?
19            A     I don't think so, no.
20            Q     But this is something you started using
21       after your brother became interested in adopting Baby
22       Doe, correct?
23            A     I don't believe so.  I think my family had
24       been using Signal -- at least a couple members of my
25       family had been using Signal prior to that.
```

Page 11

1      Q     Well, it is true, isn't it, that he formed

2    the intention to attempt to adopt Baby Doe in the

3    fall of 2019; isn't that correct?

4      A     Fall of 2019.  I don't know that that's

5    absolutely correct as far as the intention of

6    adopting her in 2019.  He became aware of her

7    existence in 2019.

8      Q     I'm just trying to pin down when in

9    relation to that did you start using Signal, if you

10   can remember.

11     A     Oh, I could not tell you.

12     Q     Are you active on social media?

13     A     I have a Facebook account.  That's the only

14   form of social media I have -- well, unless you

15   consider YouTube social media, but, I mean, I have an

16   account but I don't really use it much.

17     Q     And that's it for social media for you?

18     A     Uh-huh.

19     Q     Have you ever been convicted of a felony?

20     A     No.

21     Q     Have you ever been arrested for anything

22   more serious than a routine traffic offense?

23     A     Never been arrested.

24     Q     And Joshua Mast is your brother, right?

25     A     Correct.

```
                                              Page 12

 1          Q      How old is he?

 2          A      Forty.  He just turned 40, I think.

 3          Q      And you have other brothers?

 4          A      I do.

 5          Q      Who are they and how old are they?

 6          A      Richard Mast, he is the oldest.  He would

 7   be -- I'm 34.  He is 44.  Joshua is 40.  Caleb is 38.

 8   Me, 34.  Jacob is 32.  Jesse is 25.

 9          Q      Joshua and Richard are lawyers, right?

10          A      Uh-huh.

11          Q      Is Caleb a lawyer?

12          A      He is.

13          Q      What about Jacob and Jesse?

14          A      No.

15          Q      I'm sorry.  How old did you say Jesse is?

16          A      Twenty-five.

17          Q      Let's go over some deposition guidelines

18   before we get into the meat of this.  Is that all

19   right?

20          A      Sure.

21          Q      You understand that you are under oath?

22          A      Of course.

23          Q      Just as if you were testifying in a court

24   of law.

25          A      Sure.
```

1     Q     Have you ever given a deposition before?

2     A     I have not.  First time.

3     Q     Have you ever testified in court before?

4     A     No.

5     Q     Are you currently taking any medications

6     that would interfere with your ability to understand

7     my questions and to answer them truthfully?

8     A     No, no medications at all.

9     Q     If I ask a question and you don't

10    understand it, please ask me to clarify it.  All

11    right?

12    A     Okay.

13    Q     So if you answer a question, may we assume

14    that you understood the question and answered it

15    truthfully?

16    A     Sure.  I will ask for clarification

17    otherwise.

18    Q     For the benefit of the court reporter, you

19    and I need to try not to talk over one another, it

20    makes it difficult for him and makes the record a bit

21    messy, so please wait for me to finish a question

22    before you attempt to answer it and I will try to

23    afford you the same respect.  I will let you answer

24    before I go on to my next question.  Okay?

25    A     Sounds fair.

Page 14

1       Q    I've got a stack of documents here.  It's

2    actually only half this size because I have them

3    clipped together, so the time will come pretty soon

4    when I'm going to have the court reporter mark

5    exhibits, he will hand the record exhibit to you, we

6    will distribute copies to the lawyers in the room and

7    the lawyers who are online will also have digital

8    access to them, so there's going to be some paper

9    shuffling, but when the exhibit is in front of you,

10    then I will ask questions of you about the document.

11    All right?

12       A    Sure.

13       Q    From time to time, lawyers, including your

14    own lawyer, may have objections.  There's no judge

15    here to rule on the objections and they have every

16    right to object to my questions if they think the

17    question is in some respect defective.  Once the

18    objection is over, though, you're going to have to

19    answer.  Do you understand?

20       A    Sure.  Yeah.

21       Q    I will try to take a break every hour or so

22    but I don't want you to feel like you're a captive in

23    here.  If you need to take a break for whatever

24    reason on a different interval just let me know.

25       A    Thank you.

Page 15

```
 1          Q      Any questions about the process?
 2          A      A couple.  I presume we will be referring
 3     to people in the actual case itself.  Do you want me
 4     to refer to them as like the Plaintiffs John, Jane
 5     Doe and Baby Doe or do you care?
 6          Q      I'm coming to that but that's a good
 7     question.  So let's go ahead and get that nailed down
 8     now.  It's very important for all of us to refer to
 9     the Plaintiffs as John Doe, Jane Doe and Baby Doe.
10     Are you okay with that?
11          A      I'm fine with that.
12          Q      There are exceptions, however, because in
13     some of the documents her Americanized name will
14     appear and something that I understand is a code name
15     that somebody applied to her also appears in the
16     documents, and if that's what the document says,
17     that's what we're going to focus on, so we will deal
18     with that as we get to it, but I'm glad you brought
19     that up because I'm just going to go ahead now and
20     invoke paragraph (3)(b) of the recently-entered
21     protective order, I think it's document number 224,
22     which affords any counsel 30 days to designate
23     testimony and/or exhibits as confidential under the
24     protective order.  That's my right and it's the right
25     of all the lawyers involved in the case.  That's not
```

Page 16

1      something for you to worry about, that's something

2      the lawyers will deal with later.  All right?

3          A      Okay.

4                  MR. POWELL:  Let's get this marked as

5      Exhibit 1, please.

6                  (Mast Deposition Exhibit No. 1 was marked

7                  for identification and attached to the

8                  transcript.)

9      BY MR. POWELL:

10         Q      Mr. Mast, you have in front of you

11     Deposition Exhibit 1.  Can you identify that as the

12     subpoena that we had served on you to compel your

13     testimony today?

14         A      Yeah, it looks like it.

15         Q      And you will see down just below the middle

16     of the page it says, "Please provide requested

17     documents no later than June 28th of this year."  Do

18     you see that?

19         A      I don't see it but I know it's on here

20     because I remember that date.

21         Q      It's right --

22         A      Thank you.  Yeah.  Okay.

23         Q      So you see that?

24         A      Yeah.

25         Q      Do you recall when you first saw the

1    subpoena?

2        A    Yes.  On the 17th I found a document in my

3    front door.

4        Q    Did you read it then?

5        A    I think so.  Yeah.

6        Q    Did you understand it?

7        A    Yeah.

8        Q    Did you understand that it was effectively

9    a court order?

10       A    Yes.

11       Q    And commanding you to produce the requested

12   documents on or before June 28th, right?  That's the

13   language we just looked at.

14       A    Sure.  I understand that.  Yes.

15       Q    You understand that your lawyer, Mr.

16   Harding, did not produce any documents to us until

17   late in the evening of July the 13th, correct?

18       A    That is correct.

19       Q    Did anybody give you advice about your

20   compliance with the subpoena?

21       A    Sort of.  I was attempting to acquire an

22   attorney and talked to somebody who couldn't take my

23   case but they did mention that I could basically ask

24   for an extension.

25       Q    Who was that?

1           A     His name is Kevin Bailey.  He's an attorney

2       in Appomattox, Virginia.  Somebody I was -- actually,

3       I was trying to get him to take my case and he was

4       not able to.

5           Q     But you never retained him, did you?

6           A     No, sir, I did not.

7           Q     Did you speak with any other lawyers before

8       you retained Mr. Harding last week?

9           A     Oh, yes, 19 of them.

10          Q     Nineteen lawyers?

11          A     I believe it was actually -- I think he was

12      number 21.

13              MR. POWELL:  Better than 22.

14              MR. HARDING:  I'm not going to object.

15      BY MR. POWELL:

16          Q     Let me be more specific.  You know that

17      your brother and sister-in-law are represented by

18      Mr. Francisco and his firm, correct, the McGuire

19      Woods firm?

20          A     Yes.

21          Q     Did you speak with anybody at McGuire Woods

22      about compliance with the subpoena?

23          A     No, not a single one.

24          Q     What about Hannon Wright?

25          A     I don't know who that is.

1       Q      He's one of the lawyers in the state case.

2       A      No.

3       Q      Did you speak with your brother Joshua

4    about the subpoena?

5       A      I informed him I received one.

6       Q      Did you talk to him about your obligation

7    of compliance?

8       A      No.

9       Q      What about with Richard?

10      A      Same.  I informed him I received one but

11   that's about it.

12      Q      And the only lawyer you actually have

13   retained in connection with complying with the

14   subpoena is Mr. Harding; is that correct?

15      A      Correct.

16      Q      I'm curious, Mr. Mast.  Why did you wait

17   until the evening of June 28th, the day you were

18   supposed to produce documents in compliance with the

19   subpoena, before reaching out to my colleague

20   Mr. Elliker?

21      A      Sure.  Like I said to Mr. Elliker in my

22   email response, I have never dealt with a deposition

23   before, never been subpoenaed before and I was

24   nervous to respond without having talked to some form

25   of attorney and up until that point I was unable to

Page 20

1    acquire one.

2         Q    But I think I understood you to say earlier

3    that at least someone along the way suggested that

4    you would have the opportunity to negotiate a

5    different timetable?

6         A    Yes, that is correct.  And I don't think I

7    actually received -- I don't want to say incorrectly

8    here but I don't think I spoke to Kevin Bailey until

9    maybe a day or two before the 28th.  Not positive on

10   that.

11        Q    So am I understanding you to say that your

12   brother Joshua did not suggest that you wait until

13   the last day?

14        A    Oh, no, not at all.  Actually -- I don't

15   remember what day I spoke with him but it was well

16   before that and the only legal advice he said is "You

17   should get an attorney as quickly as you can."

18        Q    Did Richard advise you to wait until the

19   28th?

20        A    No, he did not.

21        Q    We counted up the documents that Mr.

22   Harding was good to send to us last Thursday evening

23   and there were only 39 of them.  Are you okay with

24   that number?

25        A    Sure.  I didn't count them.

Page 21

1        Q      Eleven of them were copies of documents

2    already in the file in the federal court case; is

3    that correct?

4        A      I don't know.  I didn't count.

5        Q      But a significant number of them were court

6    papers, right?  They have the caption of the case on

7    them.

8        A      Yes.

9        Q      What did you do to search for documents

10    that would comply with your subpoena obligations?

11        A      What did I do to search for -- can you say

12    it again?

13        Q      Yeah.  So you got the subpoena, you knew

14    you were under court order to produce documents,

15    right?

16        A      Right.

17        Q      What did you do to find the documents

18    responsive to the subpoena?

19        A      Oh.  I just -- as far as I understood, the

20    subpoena was basically asking for most of my

21    information that I had with the details that had been

22    listed there and I just went through my email and my

23    Signal messages and sent those over to Elliott and

24    Elliott forwarded them on to you guys.

25        Q      Did anybody help you find documents

```
                                                   Page 22

 1      responsive to the subpoena?

 2           A    No, not a single person.

 3           Q    When you say you looked in your emails, did

 4      you look in all three emails?

 5           A    No.  I specifically sent them from the

 6      third one.

 7           Q    The proton.me account?

 8           A    Yes.

 9           Q    So you did not check your Liberty account?

10           A    For information related to the case?

11           Q    Yes.

12           A    No.

13           Q    How about the gmail account?

14           A    No.

15           Q    Did you actually send the subpoena to any

16      of the lawyers you conferred with?

17           A    Several.  I don't think I sent it to Kevin

18      Bailey.  I will have to double check that.  Aside

19      from Elliott, I sent them to -- what was the name of

20      that attorney that -- Michie Hamlett was the law

21      firm.  David Thomas, I sent it to him.  And I think I

22      sent it to one other.

23           Q    Did you send it to Joshua?

24           A    The subpoena?

25           Q    Yes.
```

Page 23

1        A     I don't -- I do not remember.

2        Q     Did you send it to Richard?

3        A     I don't remember that either.  I don't

4    think I did but I don't remember.

5        Q     Did you send it to Caleb?

6        A     No.

7        Q     Did you read the subpoena to any of those

8    three, Joshua, Richard or Caleb?

9        A     No.

10       Q     Did you get any advice from any of the

11   three of them, your brothers who are lawyers, on how

12   to respond to the subpoena?

13       A     Oh.  No.

14       Q     Did you have any contact with your

15   sister-in-law Stephanie Mast regarding the subpoena?

16       A     None.

17             MR. POWELL:  Let's make this 2.

18             (Mast Deposition Exhibit No. 2 was marked

19             for identification and attached to the

20             transcript.)

21   BY MR. POWELL:

22       Q     Jonathan, you've got that -- excuse me.

23   I'm not going to call you by your first name.  Mr.

24   Mast, you have that Exhibit 2 in front of you now,

25   right?

Page 24

1          A     Yes, sir.

2          Q     And can you confirm that this is a copy of

3     the letter that my colleague, Mr. Elliker, sent to

4     you on June the 13th, 2023?

5          A     It does appear to be so, yes, sir.

6          Q     Do you recall when you first saw this?

7          A     This came to my Liberty email.  I don't

8     recall the exact day but it was probably the 13th or

9     14th.

10         Q     So at least within a few days of the date

11    of the letter itself?

12         A     Yeah, 24 hours, yeah.

13         Q     Did you read the letter?

14         A     I did.

15         Q     Did you understand it?

16         A     I did.

17         Q     Turn please to the third page of the

18    letter.  Down near the bottom you will see a header

19    that says, quote, "Demand to preserve documents and

20    electronically-stored information," close quote.  Do

21    you see that?

22         A     I do.

23         Q     Do you remember reading that provision in

24    the letter?

25         A     Yes, sir.

```
                                                     Page 25

  1          Q     Did you understand it?

  2          A     I believe so, yes, sir.

  3          Q     Have you complied with that directive?

  4          A     Oh.  Yes.

  5          Q     Have you -- since receiving Mr. Elliker's

  6     letter within a few days of June the 13th, have you

  7     deleted any documents, whether hard copy or digital,

  8     that relate to this case?

  9          A     No, sir.

 10          Q     Did you tell Joshua about Mr. Elliker's

 11     letter?

 12          A     I think that I didn't mention the letter.

 13     I just mentioned -- well, I mentioned I got a cease

 14     and desist, so, yeah, I guess I mentioned the letter

 15     itself.

 16          Q     The letter -- in lawyer talk, the letter is

 17     considered a cease and desist letter.  You understood

 18     that's what it was?

 19          A     Yes, sir.

 20          Q     And you told Joshua that you'd received it?

 21          A     Yes, sir.

 22          Q     Did you send a copy to Joshua?

 23          A     I don't want to say incorrectly but I don't

 24     think I did but I'm honestly not positive.

 25          Q     How about Richard?  Did you send a copy to
```

Page 26

1    Richard?

2         A    Same.  I don't remember for sure but I

3    don't think I did.

4         Q    How about Caleb?

5         A    I'm positive I didn't send it to Caleb.

6         Q    Do you get any advice from any of your

7    brothers who are lawyers about the preservation of

8    documents?

9         A    No.

10        Q    Before you sent -- before you retained Mr.

11   Harding last week, did you send the cease and desist

12   letter to any of the lawyers you were conferring

13   with?

14        A    Yes.  The same ones that I sent the

15   subpoenas to I also -- pretty much everything I

16   received from Hunton Andrews Kurth to the same

17   lawyers.

18        Q    Let's go back for a minute to what you did

19   to gather documents in compliance with the subpoena.

20             You mentioned that you searched your

21   proton.me email account, right?

22        A    Uh-huh.

23        Q    And you mentioned that you searched your

24   Signal account?

25        A    Uh-huh.

Page 27

1      Q     Do you have any automatic delete settings

2    activated on your Signal account?

3      A     Currently, no.

4      Q     Have you previously?

5      A     I have.

6      Q     Give me the details on that, please.

7      A     Well, Signal is an app that allows you to

8    have automatic deleting stuff and so I've had that as

9    a routine on most of -- most of my messages that I

10   use on Signal, I've had that as a normal thing.

11     Q     Is that feature activated now?

12     A     No, sir.  Once I got this I stopped them.

13     Q     You anticipated my question.  So before you

14   got the cease and desist letter, am I understanding

15   you to say that your Signal account had activated the

16   auto delete function?

17     A     Many of them, yes.

18     Q     Did you do it on an email-by-email basis or

19   did you just activate the setting and then it

20   operates automatically?

21     A     In Signal?

22     Q     Yes.

23     A     I operated the setting and it operated

24   automatically.

25     Q     So you just toggle it on or toggle it off

Page 28

1    and once you turn it on it's on for all incoming and

2    outgoing messages?

3         A      For a particular thread.  I think you can

4    select like certain threads.  If I had a message with

5    Elliott, for instance, I can syphon that one to

6    retain stuff and other ones not to.

7         Q      So then because the auto delete function on

8    your Signal account was active before you received

9    the cease and desist letter, there would be a number

10   of communications from you and to you on Signal that

11   are no longer available; isn't that right?

12        A      That would be correct, yes, sir.

13        Q      Can you -- would these include

14   communications with your brother Joshua?

15        A      Yeah.

16        Q      And Richard?

17        A      Yeah.

18        Q      How about Stephanie?

19        A      No.  I don't think I've ever sent anything

20   to Stephanie on Signal.

21        Q      Would these communications with Joshua and

22   Richard that are no longer available because of the

23   auto delete function, were they relating to this

24   case?

25        A      No.  Not as far as -- as far as the case,

Page 29

1      you're referring to like me being subpoenaed here or

2      the case overall?

3          Q     Let me give you a date range.  From January

4      the 1st of this year until the time you received

5      Mr. Elliker's cease and desist letter, you had

6      multiple communication with Joshua over Signal,

7      didn't you?

8          A     I did.

9          Q     And they are all gone now, correct?

10         A     Well, most of my communication wasn't

11     written.  I would just call my brother, so...

12         Q     But you were communicating -- between

13     January the 1st of this year and the time you

14     received Mr. Elliker's letter, you communicated

15     multiple times with your brother Joshua over Signal

16     regarding this case?

17         A     Not trying to avoid the question, I'm just

18     not sure, so...

19         Q     Let me try to neck it down a little bit.

20     You came to learn that your brother was in contact

21     with the Pipe Hitter Foundation in January of this

22     year, right?

23         A     Yes, that's right.

24         Q     And you yourself later were in contact with

25     the Pipe Hitter Foundation, correct?

Page 30

```
 1        A      Correct.

 2        Q      Did you communicate over Signal with your

 3   brother this year regarding his communication with

 4   the Pipe Hitter Foundation?

 5        A      I don't think so.  Not written anyway.  I

 6   might have called him on Signal because you can call

 7   as well.  I might have called him on Signal but I

 8   don't think I wrote anything about that.

 9        Q      So when you place a call over Signal how is

10   that stored?

11        A      I don't know if it is.  Just like a regular

12   phone, I think.  I don't know if it is stored or not.

13   It's just a call.

14        Q      Is there any record of the calls having

15   been made?

16        A      The dates show up when you like -- I'm not

17   an expert on Signal but when you go back into the app

18   and open it up, you can see like the date that you

19   called like you would with a regular phone.

20        Q      The same way on your outgoing calls on an

21   iPhone?

22        A      Yes.

23        Q      Your recent calls, incoming and outgoing?

24        A      I believe so.

25        Q      But does Signal capture the content of the
```

Page 31

```
 1    phone communication?

 2         A     I don't know.

 3         Q     Can you estimate the number of Signal

 4    emails -- when I say emails, Signal mails, not phone

 5    calls.  Can you estimate the number of Signal mails

 6    that you exchanged with your brother Joshua since

 7    January the 1st of this year that have anything to do

 8    with this matter?

 9         A     No.

10         Q     Let me give you -- would it be more than

11    ten?

12         A     I honestly don't know.  I don't -- I don't

13    think we communicated via Signal about the case very

14    much.

15         Q     What were you communicating with him over

16    Signal about if not this case?

17         A     Well, we call each other fairly often

18    actually, as I do with most of my brothers, we are a

19    fairly close family, most of us live in the area and

20    stuff.  So like just recently I was coordinating our

21    family get-together over the summer, you know, family

22    pictures, fishing.  I go fishing quite a bit.  Stuff

23    like that.

24         Q     Why would you Signal for those

25    communications rather than your gmail account?
```

Page 32

1        A      Well, gmail is an email, Signal is like a

2     text, so typically it's just easier to send a text

3     than to send an email.

4        Q      So with Mr. Elliker's cease and desist

5     letter, the protective order was attached, was it

6     not?  You will see it as an attachment to Exhibit 2.

7        A      Yes, sir.

8              MR. POWELL:  Let's mark this number 3,

9     please.

10             (Mast Deposition Exhibit No. 3 was marked

11             for identification and attached to the

12             transcript.)

13    BY MR. POWELL:

14       Q      Mr. Mast, the court reporter has just

15    handed you a copy of Exhibit 3 for your deposition.

16    I will just identify it for the record.  It's a copy

17    of the protective order that Judge Moon entered in

18    this case on September the 13th of last year.

19             Did you see that when you received Mr.

20    Elliker's letter?

21       A      I did.

22       Q      Did you read it?

23       A      I did.

24       Q      Did you understand it?

25       A      I believe so.  Yes, sir.

Page 33

1        Q      Did you understand that the purpose of
2     Judge Moon's protective order was to protect the
3     identity of John Doe, Jane Doe and Baby Doe?
4        A      Yes, sir.
5        Q      Had you ever seen the protective order
6     before you received it from Mr. Elliker?
7        A      I believe I may have stumbled across it
8     when I was looking through documents regarding the
9     case online, yes.
10       Q      Do you recall how it came into your
11    possession?
12       A      Yeah.  I went to Google and I was trying to
13    find information regarding the case and I eventually
14    found CourtListener which is -- I'm not exactly sure
15    how that exists or what it's relation is to the
16    actual case files but I found a lot of the
17    information on there.
18       Q      Including the protective order?
19       A      I think so.
20       Q      Why would you go to Google or CourtListener
21    to learn about what had been filed in the case rather
22    than going to your brother Joshua?
23       A      Well, I was looking for the actual
24    hard-copies to try to be -- basically to try to see
25    the actual evidence myself.

Page 34

```
 1          Q    Are you saying you did not ask your brother
 2     Joshua for a copy of the protective order?
 3          A    That's correct.
 4          Q    How about Richard?  Did you ask Richard for
 5     a copy?
 6          A    No, sir.
 7          Q    Do you recall when you -- approximately
 8     when you first saw the protective order?
 9          A    It would have been after I had started
10     talking to Pipe Hitter Foundation which I think was
11     in May, so I'm going to say some time between mid-May
12     and mid-June.
13          Q    So was it your communications with Pipe
14     Hitter Foundation that caused you to go on Google and
15     go to CourtListener?
16          A    Yeah.  Yes, short answer.
17          Q    Did you ask the Pipe Hitter Foundation for
18     a copy of the protective order?
19          A    No.
20          Q    Do you know whether the Pipe Hitter
21     Foundation even had a copy of the protective order
22     when you were dealing with the Pipe Hitter
23     Foundation?
24          A    I don't know for sure but I don't think
25     they did.
```

                                                        Page 35

1        Q    Once you found the protective order in the

2   way that you've just described for us, since then did

3   you discuss it with Joshua?

4        A    I may have discussed it with him as far as

5   like I understand that there's a protective order in

6   place but not in any great detail, no.

7        Q    How about with Richard, did you discuss it

8   with him?

9        A    I don't think so.

10       Q    So, Mr. Mast, just to be clear that I'm

11  understanding your testimony here about when you

12  first saw the protective order, you didn't get it

13  from Joshua so you say, correct?

14       A    Correct.

15       Q    You didn't get it from Richard?

16       A    Correct.

17       Q    You found it yourself?

18       A    Correct.

19       Q    Explain to me again why once you became

20  interested in locating the protective order you

21  undertook to do your own research rather than

22  contacting one of your brothers?  Why would you do it

23  that way?

24       A    If I could clarify that.  I didn't go

25  online to try to find the protective order.  I was

Page 36

1    actually going to find court documents because I was

2    trying to look at the evidence to familiarize myself

3    because I knew I was going to be going to -- with

4    Pipe Hitter Foundation, they were arranging me to do

5    some sort of media outlets, so I was going online to

6    try to be as accurate as I could about what was going

7    on with the case and the protective order was a

8    byproduct of that.  I wasn't searching for it.

9        Q    Did you go all the way back to the

10   beginning of the lawsuit in September of last year?

11       A    I definitely didn't read every document

12   that's online.  I mostly was trying to focus on the

13   evidence presented.  So I think I've seen the

14   original complaint if that's your question.

15            MR. YERUSHALMI:  This is David Yerushalmi.

16   I just want to interpose, if I may, and ask the

17   witness to pause a little bit between the question

18   and the answer because if any of the counsel,

19   including myself, wish to interpose an objection,

20   you're not giving us enough time to do so and I don't

21   want to interrupt your answer.

22            THE WITNESS:  Yes, sir, I can do that.

23   Thank you.

24   BY MR. POWELL:

25       Q    You still have the protective order in

Page 37

1      front of you, Mr. Mast?

2          A      Yes, sir.

3          Q      Turn to the third page, please.  And just,

4      if you will to yourself, just read the first two

5      sentences of paragraph number five.  You don't have

6      to read them out loud.  I just want you to refresh

7      your recollection by reviewing it and then I'm going

8      to ask you a question.

9          A      Yes, sir.

10         Q      We have already covered this point in your

11     testimony earlier but I just want to link it to

12     what's actually in the protective order.

13             Do you understand the sentences you just

14     read to yourself in the protective order to prohibit

15     our using names other than John Doe, Jane Doe and

16     Baby Doe in this deposition?

17         A      Can you say it one more time?

18         Q      Yeah.  Do you understand that neither you

19     nor the lawyers may use any names for the Plaintiffs

20     other than John Doe, Jane Doe and Baby Doe?

21         A      In this deposition?

22         Q      Yes.

23         A      Yes, sir.

24             MR. YERUSHALMI:  Objection.

25             MR. POWELL:  What's the objection?

```
                                                    Page 38
 1              MR. FRANCISCO:  I will interpose.
 2     Paragraph five specifically says you can do
 3     depositions where the names are used of the parties
 4     if the people in deposition know the names, which I
 5     think would apply here.
 6     BY MR. POWELL:
 7         Q    You understand that we are not to use those
 8     names, right?
 9              MR. YERUSHALMI:  Objection.  This is David
10     Yerushalmi.  I didn't hear the objection so I will
11     just interpose mine.  The document speaks for itself
12     and that misstates the document.
13              THE WITNESS:  Do I answer still?
14     BY MR. POWELL:
15         Q    He is objecting for the record, not to
16     coach you because he doesn't represent you, and even
17     if he did, it would be inappropriate to coach you, so
18     he has every right to object, as do all the lawyers.
19     You don't have to pay attention to their objections
20     unless Mr. Harding instructs you not to answer and I
21     don't think that's going to happen, but if it does we
22     will deal with it.
23              So I should have just left this alone
24     because I think you and I had agreed a while ago that
25     for purposes of the deposition today we're going to
```

Page 39

1      use the pseudonyms John Doe, Jane Doe and Baby Doe to

2      refer to the three Plaintiffs, correct?

3          A      That's fine with me.

4          Q      With one notable exception, as I said

5      earlier, in some of the documents her Americanized

6      name appears and the code name that someone assigned

7      to her appears and I am not going to edit those

8      documents.  All right?

9          A      That's fair.

10                MR. POWELL:  Make this number 4, please.

11                (Mast Deposition Exhibit No. 4 was marked

12                for identification and attached to the

13                transcript.)

14     BY MR. POWELL:

15         Q      Are you ready, Mr. Mast?

16         A      Yes, sir.

17         Q      So you've been -- this is a housekeeping

18     matter.  I'm not going to ask you questions about the

19     specifics.

20                I've handed you a copy of a letter dated

21     June the 26th from my colleague, Maya Eckstein, to

22     you enclosing a subpoena requiring your attendance at

23     a hearing that we have in front of Judge Moon this

24     Friday the 21st.  Did you receive this letter from

25     Ms. Eckstein?

Page 40

1          A     Yes, sir.

2          Q     And did you understand it to be compelling

3    your attendance at the hearing this Friday?

4          A     Yes, sir.

5          Q     Summarize for me please your educational

6    background.

7          A     Sure.  Graduate of high school.  I hold a

8    bachelor's degree in business marketing.

9          Q     From?

10         A     Liberty University.

11         Q     What year?

12         A     2013 I believe is when I graduated.  It's

13   been a little while.

14         Q     After your undergraduate degree from

15   Liberty have you had any other formal education from

16   then until now?

17         A     No, sir.

18         Q     Summarize your employment history since

19   college, please.

20         A     Let's see.  My -- I started working -- you

21   want like each job going forward?

22         Q     Please.  If you could do it -- this is not

23   a memory test.  I would just like a general idea of

24   the jobs you've held since you graduated from

25   college.

Page 41

```
 1        A     Online admissions counselor in 2013.

 2        Q     At Liberty?

 3        A     At Liberty, yes, sir.  And then I worked

 4   for -- in the online department

 5   intensives/hospitality.  You can just put

 6   hospitality, I guess.  And then --

 7        Q     I'm sorry.  Who was your employer there?

 8        A     Liberty as well.

 9        Q     All right.

10        A     Liberty University has been my main

11   employer since I graduated.

12        Q     And so just what jobs have you had from

13   Liberty?  You said you were an online admissions

14   advisor.

15        A     Yes, sir.  Hospitality coordinator.  And I

16   was an event coordinator for a different department.

17   And currently my role is an associate director at

18   Liberty University for special projects and events.

19        Q     Since you worked as an online admissions

20   advisor have you worked in the admissions department?

21        A     Yeah, actually, I went back to it.  So I

22   worked in the online admissions department.  I worked

23   in hospitality which was still underneath Liberty

24   online, and then they disbanded that department when

25   they started making intensives not mandatory anymore
```

```
                                                        Page 42
  1       for like on-campus requirements, and so they put

  2       everybody -- basically re-purposed those folks back

  3       into the admissions department.

  4           Q     And so you went back to admissions and then

  5       went with event coordination?

  6           A     Yes, sir.  And then after that I worked

  7       still for Liberty University as an event coordinator.

  8           Q     Have you ever served in our military?

  9           A     No, sir.

 10           Q     Let's talk a little bit about the general

 11       case background.  You have mentioned already that

 12       you're close with your brothers?

 13           A     Yeah.

 14           Q     You're in regular contact with them?

 15           A     Yes, sir.

 16           Q     As best you recall, when did you first

 17       learn of Joshua and Stephanie Mast's interest in

 18       trying to adopt Baby Doe?

 19           A     To adopt her, I can't recall, but to -- I

 20       remember her -- in 2019, it was fall of 2019 that we

 21       first learned of her existence, and when the actual

 22       adoption process started I'm not positive.

 23           Q     Are you aware that the custody and adoption

 24       proceedings in the Fluvanna County Circuit Court

 25       began in that fall of 2019?
```

Page 43

1          A     No.

2          Q     You just don't recall?

3          A     Oh.  Sorry.  I don't recall where the

4    adoption process started, so like I didn't know it

5    was in Fluvanna.

6          Q     You didn't know that until today?

7          A     No, no, no.  I didn't know that at the time

8    in 2019.  I didn't know that until I really started

9    researching the case.  I just knew that they were

10   trying to adopt her.

11         Q     As best you can recall, when did you learn

12   of your brother and sister-in-law's intention to try

13   to adopt Baby Doe?

14         A     Shortly after I started my... Probably in

15   2020.  If I had to give a month on it, maybe that

16   fall, like August or something.  That's a guess.

17         Q     How did you learn about it?

18         A     I don't remember the specifics but I'm sure

19   it was probably Joshua or Stephanie or somebody else

20   in my family heard from somebody else.  There's 26

21   members of my immediate family.  There's a bunch of

22   us.

23         Q     With reference to the Fluvanna County

24   custody and adoption proceedings, have you ever

25   received any documents from that file, either the

Page 44

1      juvenile and domestic relations court or the circuit

2      court?

3          A      To clarify, have I ever seen anything

4      regarding the dispute or the original adoption

5      process?

6          Q      You know that when there's a court case

7      there's a court file, right?

8          A      Yes, sir.

9          Q      And the documents end up in the court file?

10         A      Yes, sir.

11         Q      And you've seen a number of the court file

12     documents in this federal court case, right?  You

13     found them on your own.

14         A      Yes, sir.

15         Q      My question is with respect to the

16     proceedings in the Fluvanna courts, the juvenile and

17     domestic relations court and the circuit court, have

18     you ever seen any court documents from either of

19     those files?

20         A      I believe so, yes, sir.

21         Q      Which ones do you recall?

22         A      Well, the ones that I had sent over to

23     Mr. Elliker who forwarded them on to y'all.  So that

24     would be, I think -- I don't remember the exact label

25     but it would be like the original complaint.

Page 45

1        Q     Forgive me for interrupting.

2        A     Sure.  You're fine.

3        Q     What you sent Mr. Harding was the original

4    complaint in the federal court case.

5        A     Oh.  Apologies.

6        Q     My question may not have been precise.  I'm

7    talking about the state court custody and adoption

8    proceedings now, so limit -- that's my focus now.

9        A     Sorry.

10       Q     Have you seen any documents from the

11   custody or adoption files in the state court?

12       A     No, sir, I don't -- I don't think so

13   because it's my understanding everything for that is

14   sealed.

15       Q     You're right about that.  Do you understand

16   what that means?

17       A     Well, yes, sir, that it's not available to

18   the public record.

19       Q     It's not available to anybody outside the

20   litigants and the lawyers and the judge, right?

21       A     I believe so.

22       Q     So if any member of the media -- to your

23   understanding, I know this is more a lawyer's area

24   than yours, have you gone to either the J and DR

25   court or the circuit court and asked to see papers

Page 46

1     from the custody or adoption files?

2         A     No, sir.

3         Q     And you're understanding is that even if

4     you were to do that you would not have access to

5     them, right, because they are under seal?

6         A     Yes, sir.

7         Q     I will tell you that in the state court

8     adoption case on January the 5th, 2023, the judge

9     presiding there, Judge Worrell, entered an oral --

10    order in court prohibiting the parties from having

11    any contact with the media.  Are you aware of that

12    order?

13        A     Yes, sir, I believe so.

14        Q     How did you become aware of that?

15        A     I'm not sure.  I'm sure it was mentioned

16    with -- some member of my family probably mentioned

17    it to me.

18        Q     So to the best of your recollection, you

19    learned of Judge Worrell's January 5 order from one

20    of your family members, right?

21        A     Yes, sir.

22        Q     Would it have been Joshua?

23        A     It's possible.

24        Q     Wouldn't it have probably been him since he

25    is involved in that case?

Page 47

1      A     Well, I don't know if probably is correct
2   because he could have told somebody else and somebody
3   could have told me.
4      Q     Did you hear of it from Richard who is
5   counsel in that case?
6      A     I do not know.
7      Q     Have you seen a copy of the transcript of
8   what Judge Worrell said on January the 5th?
9      A     Unless it's this protective order, I have
10   not.
11      Q     Remember, this protective order is in the
12   federal court case and I'm talking to you now about
13   the state court adoption case.
14      A     No, sir, I have not then.
15      Q     Your brother Joshua and his wife Stephanie
16   appeared on the CBS Morning News Show in January,
17   right?
18      A     I don't know the month but they did appear
19   on CBS.
20      Q     On two successive days, correct?
21      A     I don't know that either.
22      Q     Have you seen those interviews?
23      A     I have seen the interviews.
24      Q     They were over two days, right?
25      A     I don't know.

Page 48

1          Q     Were you aware that they were going to

2    interview with CBS before they did so?

3          A     I'm just trying to remember.  I don't think

4    so.  It's possible.  Like I don't remember the exact

5    timeline but it's possible that I knew.

6          Q     Did it come to your attention that after

7    Joshua and Stephanie appeared on the CBS Morning News

8    that my team filed a motion in the federal court to

9    have them held in contempt for violating the

10   protective order because they shared photos of Baby

11   Doe with CBS?

12         A     Actually, no, I didn't -- I was surprised

13   to find that out -- I was surprised I didn't know

14   that because I found that out about a month ago, I

15   think.

16         Q     How did you learn of that?

17         A     Actually, it was the subpoena that I got --

18   or -- I don't know if it's the subpoena itself if

19   that's the proper term, but in one of those documents

20   I got it mentioned that my brother had once again

21   broken the protective order and was in contempt of

22   court, and that was -- that kind of surprised me

23   because I actually was unaware that they had been --

24   that there had been a hearing or whatever about that.

25              So that was when I first heard about the

Page 49

1     fact -- I knew they did the CBS interviews and I knew

2     there was -- like the judge had asked them not to

3     talk to the media anymore but I didn't know there was

4     a motion to hold them in contempt of court or

5     whatever that proper term is.

6          Q     So your testimony is that your brother

7     Joshua and his wife Stephanie having been asked by us

8     to be held in contempt by the court, they didn't

9     share that with you, is that your testimony?

10         A     If they shared it with me, I definitely

11    don't remember hearing that but I don't believe they

12    did.

13         Q     I think we've established this, Mr. Mast,

14    but let's go back to it.

15               Did I understand you to say earlier that

16    you became aware at some point in early 2023 that

17    your brother Joshua was in touch with an outfit

18    called the Pipe Hitter Foundation?

19         A     Yes, sir.

20         Q     How did you learn of this?

21         A     Let's see.  I received a call from Dena

22    Cruden, I think is how you say her last name,

23    C-r-u-d-a-n (sic), and she informed me she talked to

24    my brother Joshua and it went on from there.

25         Q     Am I understanding you to say that you were

Page 50

1    unaware of your brother Joshua's contacts with the

2    Pipe Hitter Foundation until you received a call from

3    Dena Cruden?

4         A    No, sir.  To clarify, my brother Joshua had

5    -- I think he had called me and said that I might get

6    a call from someone named Dena Cruden and that was

7    about it.

8         Q    Do you recall how far in advance of your

9    contact from Dena Cruden that you learned this from

10   your brother?

11        A    A day maybe.

12        Q    That close?

13        A    Yes, sir.

14        Q    And tell me about the conversation with

15   Joshua about his expectation that Dena Cruden was

16   going to contact you.

17        A    This was a while ago.  I think I was

18   actually fishing when I got the call.  As far as the

19   details go, I think he called and basically said that

20   he had -- I don't remember what term he used but like

21   had made contact or had been contacted by Pipe Hitter

22   Foundation, told me that they help vets and first

23   responders raise funds for legal defenses but that he

24   couldn't work with them and that he had given them my

25   number to see if I wanted to.

```
                                                    Page 51

 1         Q     Did he explain why he thought he could not

 2    work with the Pipe Hitter Foundation?

 3         A     No.

 4         Q     Did you ask him?

 5         A     I don't think so.

 6         Q     Why then was he advising you that Dena

 7    Cruden was going to call you instead of dealing with

 8    him?

 9              MR. HARDING:  I will object.  It's calling

10    for speculation.

11              MR. POWELL:  That's a good objection.

12              MR. FRANCISCO:  I will state for the record

13    that I join all the objections made so I don't have

14    to pipe up every single time unless you have an

15    objection to that.

16              MR. POWELL:  I do not.  I'm fine with that.

17    Thanks, Michael.

18    BY MR. POWELL:

19         Q     Were you curious to understand why your

20    brother Joshua thought he could not continue to

21    communicate with the Pipe Hitter Foundation?

22         A     To an extent.  I was at least -- I wasn't

23    extremely familiar but I was at least familiar enough

24    to know that he was trying not to talk about the

25    details of the court cases.
```

Page 52

1        Q       Did you do any research yourself regarding

2    the Pipe Hitter Foundation?

3        A       Yeah.

4        Q       And what did you learn?  I take it you must

5    have gone to the website?

6        A       Yes, sir.  I went to their website and

7    actually did quite a bit -- well, quite a bit --

8    mostly what I did was I wanted to make sure that they

9    were a legitimate organization and not a scammer.

10               Also, I was kind of like figuring out who

11   they were and I looked at the different people, some

12   of, not all of them, the current ongoing cases, like

13   they are defending a law enforcement person right

14   now, so like I did a lot of research into him and

15   stuff.

16       Q       Did you do this before or after you were

17   contacted by Dena Cruden?

18       A       Oh, after.

19       Q       Between the time Jonathan (sic) told you

20   that she was going to contact you and the time she

21   contacted you, did you do anything to learn about

22   what the Pipe Hitter Foundation --

23       A       No, not a single thing.

24       Q       You waited until you heard from her?

25       A       Uh-huh.

Page 53

1       Q     Do you know whether Joshua asked any other

2    members of your family to be in contact on his behalf

3    with the Pipe Hitter Foundation?

4       A     I don't know but I don't think so.

5       Q     So far as you know, you were the only

6    family member to be so asked by Joshua, right?

7             MR. HARDING:  I'm going to object again.

8    It calls for speculation.

9             MR. POWELL:  No, it does not.  I said "so

10   far as you know."

11            THE WITNESS:  So far as I know what?

12   BY MR. POWELL:

13      Q     Were you the only member of your family

14   Joshua asked to speak to the Pipe Hitter Foundation?

15      A     As far as I know.

16      Q     Do you know whether the Pipe Hitter

17   Foundation reached out to any other members of your

18   family other than you?

19      A     I don't -- I don't think so but I didn't

20   ask them.

21      Q     When Joshua called you soon before Dena

22   Cruden reached out to you and he explained that he

23   wanted you to talk to her, didn't he tell you that

24   the Plaintiffs had moved to have him and Stephanie

25   held in contempt of court for what they called --

Page 54

1              MR. HARDING:  Objection.  Calls --

2              MR. POWELL:  Let me finish my question,

3        please.

4        BY MR. POWELL:

5         Q     Didn't he tell you that we had moved for

6        contempt because of Joshua and Stephanie's interview

7        on CBS?

8         A     Absolutely not.

9         Q     He said nothing to you about the contempt

10       motion that we filed in January, is that your

11       testimony?

12        A     Yes, sir.

13        Q     Did Joshua say anything to you about a gag

14       order that he thought he might be subject to?  Again,

15       this is before you had any contact with the Pipe

16       Hitter Foundation.

17        A     And state the question again.

18        Q     When you spoke to Joshua before you spoke

19       to Dena Cruden or had contact with Dena Cruden, did

20       Joshua say that he thought he was subject to a gag

21       order?

22        A     To be more specific, he didn't mention on

23       the call about -- well, he had mentioned at some

24       point that there was a gag order in effect and so

25       that he wasn't -- I didn't know the specifics of what

Page 55

1    that meant but he had mentioned at some point before,

2    I'm not sure if it was that call or prior to that,

3    but there was a gag order in effect for at least one

4    of the court cases.

5        Q    Are those the words he used, gag order?

6        A    We have used that and protective order

7    interchangeably, yeah.

8        Q    So when is the first time you heard

9    Jonathan (sic) -- I'm sorry -- Joshua talk about a

10   protective order?

11       A    I don't know.

12       Q    Was it before or after this call you had

13   from him that he was going to hear from the Pipe

14   Hitter Foundation?

15       A    The first time that I heard about it was it

16   before that call?  Probably before, yeah.

17       Q    That there was a protective order in place,

18   you heard that from Joshua before he asked you to

19   speak to the Pipe Hitter Foundation?

20           MR. HARDING:  I'm going to object to the

21   framing of the question.  He didn't state that he was

22   told to talk to Pipe Hitter.  He stated that he would

23   receive a call from the Pipe Hitter Foundation.

24   BY MR. POWELL:

25       Q    When Joshua advised you that you were going

Page 56

1      to be contacted by the Pipe Hitter Foundation, you

2      could have declined, right?

3          A      Sure.

4          Q      Why did you not?

5          A      Didn't want to.

6          Q      Why?  I know that you didn't want to

7      because you did have contact with them, but why did

8      you not decline Joshua's request?

9                 MR. HARDING:  Objection to Joshua having

10     made a request for him to speak.  The testimony was

11     that he was notified that he may receive a call from

12     the Pipe Hitter Foundation.

13                MR. POWELL:  That's a fair objection.

14     BY MR. POWELL:

15         Q      Joshua said you were going to be contacted

16     by someone from the Pipe Hitter Foundation, right?

17         A      Yes, sir.

18         Q      And did he identify Dena Cruden by name?

19         A      By first name, I think.

20         Q      And then very soon after that conversation

21     with Joshua you received a text message from Dena

22     Cruden, right?

23         A      It was either text or a call.

24         Q      Asking for your cooperation, right?

25         A      No, not asking for my cooperation.  I think

Page 57

1      she asked if I would be willing to share some of the

2      story.

3          Q      And what did you say?

4          A      I said I would be willing to.

5                 MR. POWELL:  Let's mark this next, please.

6                 (Mast Deposition Exhibit No. 5 was marked

7                 for identification and attached to the

8                 transcript.)

9      BY MR. POWELL:

10         Q      Mr. Mast, you've been handed Exhibit 5

11     which I will identify as being a May 9, 2023 email

12     from Dena Cruden at Pipe Hitter Foundation to you.

13     The header is "Pipe Hitter Foundation: Fundraising

14     Campaign Implementation."  Do you see that?

15         A      Yes, sir.

16         Q      Do you recall receiving this from

17     Ms. Cruden on or about that day, May the 9th?

18         A      I do.

19         Q      And attached to her email is the Pipe

20     Hitter Foundation grant agreement, correct?

21         A      Uh-huh.

22         Q      And if you look to the last page of the

23     grant agreement, which is the third page of the

24     exhibit, that's your signature, right?

25         A      It is.

Page 58

1      Q    And you signed this contract on May the

2   10th of 2023?

3      A    Yes, sir.

4      Q    By this point in time did you understand

5   that Ms. Cruden, as represented on the email, was the

6   executive director of the Pipe Hitter Foundation?

7      A    I couldn't tell you her direct title but

8   yes.

9      Q    And you see there that's the way she

10   identified herself in the email, right?

11      A    Yes, sir.

12      Q    You don't have any reason to disagree with

13   that?

14      A    No, I do not.

15      Q    By then you had already been in

16   intermittent contact with her since her first contact

17   with you, right?

18      A    Yes, sir, intermittently.

19      Q    Before you signed this grant agreement, did

20   you send it to Joshua?

21      A    I don't think so.

22      Q    Were you aware of whether the Pipe Hitter

23   Foundation had shared it with Joshua before you were

24   asked to sign it?

25      A    No, I don't believe so.

Page 59

1          Q     You don't know or you don't think so --

2          A     I don't know.

3          Q     You don't know.  So it's possible -- I

4     don't want to ask the question like that.

5                You don't know one way or the other whether

6     Pipe Hitter Foundation had shared this grant

7     agreement with Joshua before you signed it?

8          A     No, I did not ask.

9          Q     Did Joshua know you were going to sign it?

10               MR. HARDING:  Objection.  Calls for

11    speculation.

12               THE WITNESS:  Do I wait?

13    BY MR. POWELL:

14         Q     You can answer the question.  Did Joshua

15    know you were going to sign this grant agreement?

16         A     Specifically I don't think so because I

17    don't remember talking about this with him.

18               He knew I was going to -- I did tell him at

19    some point I was going to work with Pipe Hitter

20    Foundation to raise funds but I don't think he knew

21    specifically that I was going to sign this.

22         Q     Well, you were signing on his behalf, were

23    you not?

24         A     No, I was signing on my behalf.

25         Q     Look at the first page of the agreement.

```
                                                        Page 60

  1         A     Yes, I understand that.

  2         Q     It identifies the grantees as Joshua Mast

  3    and his family, right?

  4         A     Sure.

  5         Q     And you signed on their behalf, correct?

  6               MR. FRANCISCO:  Objection.  Calls for legal

  7    conclusion.

  8               MR. YERUSHALMI:  David Yerushalmi.  I join

  9    the objection.

 10               MR. HARDING:  I'm joining that as well.

 11               MR. POWELL:  For the benefit of the record,

 12    counsel in the room and online, I like

 13    Mr. Francisco's proposal that you need not adopt an

 14    objection posed by either the witness's lawyer or any

 15    of the other Defendants' lawyers.  I think we can --

 16    the record can reflect that I have heard the

 17    objection and I will deem it as having been raised by

 18    all of you, not just whoever speaks.  Fair enough,

 19    everybody?  Any objection to that?

 20               MR. HARDING:  No.

 21               MR. YERUSHALMI:  None from David

 22    Yerushalmi.

 23               MR. HOERNLEIN:  No objection.

 24    BY MR. POWELL:

 25         Q     So the purpose of this grant agreement, as
```

1    you understood it, Mr. Mast, was to enable the Pipe

2    Hitter Foundation to provide financial assistance to

3    your brother Joshua, right?

4         A    That's accurate.

5         Q    And you signed on his behalf in order to

6    facilitate that arrangement, right?

7         A    Well, if I can change my wording or to

8    clarify the question before I say yes or no, I didn't

9    look at it as signing on his behalf.  I was going to

10   partner with Pipe Hitter Foundation to raise funds

11   and then distribute that to my brother, so signing

12   this on his behalf, that's what I mean by that.

13        Q    Sure.  Because the money wasn't going to

14   come for your benefit, was it?

15        A    No.

16        Q    Or your family's benefit, right?

17        A    Correct.

18        Q    It was going to be for the benefit of the

19   people identified on the first page of this document

20   as the grantees, right?

21             MR. HARDING:  I'm going to object.  I think

22   the document speaks for itself.  It says the grantees

23   are Mr. Mast and his family.  My client is part of

24   his family.

25   BY MR. POWELL:

```
                                                        Page 62

 1        Q     Who did you -- look at the first and second

 2   line of this contract, please, Mr. Mast.

 3        A     Sure.

 4        Q     The first sentence says, "The Pipe Hitter

 5   Foundation is implementing a fundraising campaign in

 6   support of Joshua Mast and his family, paren,

 7   grantees, close paren, under the PHF's hardship and

 8   legal defense grant program, paren/close paren."  Do

 9   you see that?

10        A     Yes, sir.

11        Q     Did you expect that any money raised

12   pursuant to this agreement would go to anybody other

13   than Joshua Mast and his immediate family?

14        A     To be accurate, all the money came to me

15   and then they entrusted me to distribute that.

16        Q     Understood.  Did you understand that this

17   agreement allowed you to distribute the funds to

18   anybody other than Joshua Mast and his immediate

19   family?

20        A     Did I understand that this agreement

21   allowed me to distribute the funds to anyone other

22   than Joshua Mast and his family.  That is my

23   understanding.

24        Q     And of the funds that came to you did you

25   distribute all of them to Joshua?
```

Page 63

1          A     I did.

2          Q     Did you keep any of them?

3          A     Well, no essentially.  I forwarded my

4     brother once during a particular month that he was

5     having a hard time keeping up with something and I

6     loaned him a thousand and then reimbursed myself a

7     thousand from Pipe Hitter after that.

8          Q     To be clear, you didn't send any of the

9     Pipe Hitter Foundation's money to anybody other than

10    Joshua and his immediate family, right?

11         A     That is accurate.

12         Q     And you understood that was the purpose

13    when you signed this document -- this contract on May

14    the 10th, correct?

15         A     Yes, sir.

16         Q     And you were acting as Joshua's and his

17    family's representative when you signed this

18    document, right?

19               MR. FRANCISCO:  Objection.  Calls for a

20    legal conclusion.

21               MR. YERUSHALMI:  Objection.

22    BY MR. POWELL:

23         Q     Go ahead.  You can answer.

24         A     By representative I don't mean like legal

25    representative or that he had authorized me to or had

Page 64

1   even discussed it with me, but representing as I'm

2   telling the story because that's part of my family,

3   sure.

4        Q     Have you ever signed a binding contract on

5   behalf of anyone else who did not authorize you to

6   sign it ever in your life?

7        A     I don't think I have signed a contract for

8   anybody else ever.

9        Q     You have signed them for yourself, of

10  course.

11       A     Of course.

12       Q     And this is the only one in your life you

13  signed on behalf of someone else?

14             MR. HARDING:  Objection.  Calls for a legal

15  conclusion that it is actually signed on behalf of

16  someone else.

17  BY MR. POWELL:

18       Q     So, Mr. Mast, I'm reminding you that you

19  are under oath and I'm telling you that Judge Moon is

20  going to see this in the hearing on Friday.

21             Do you want him to believe that you were

22  not acting on Joshua's behalf when you signed this?

23       A     I want him just to believe the truth --

24             MR. YERUSHALMI:  Objection.  Hold on one

25  second.  Objection.  This is David Yerushalmi.  It's

Page 65

1  argumentative.  Go ahead.

2          THE WITNESS:  Well, I will finish what I

3  was saying.  I just want him to know what I believe

4  is the truth and that's exactly what I just said.

5          I signed this document for myself and they

6  were entrusting me with the funds to distribute to my

7  brother for help regarding legal fees, immediate

8  needs and stuff like that.

9  BY MR. POWELL:

10     Q     You were expecting to be the intermediary

11 then between the Pipe Hitter Foundation and Joshua

12 Mast and his family for the money, correct?

13     A     For distributing the funds, correct.

14     Q     And in effect, you were acting as an agent

15 for the purpose of transmitting the money that you

16 got from the Pipe Hitter Foundation to the grantees,

17 right?

18          MR. HARDING:  Objection.  Calls for a legal

19 conclusion.

20          MR. YERUSHALMI:  Object.

21          MR. POWELL:  Let's take a break.

22          THE VIDEOGRAPHER:  We are now off the

23 record.  The time is 10:39 a.m.

24          (Recess, 10:39 a.m. - 10:54 a.m.)

25          THE VIDEOGRAPHER:  We are now on the

Page 66

1    record.  The time is 10:54 a.m.

2    BY MR. POWELL:

3         Q     Mr. Mast, what did you do to prepare for

4    your deposition today?

5         A     Really just two things.  Prior to acquiring

6    an attorney I was taking steps in case I had to come

7    here without one, and so I went to YouTube and

8    Googled how to prepare for a deposition.

9         Q     Did you find anything useful on YouTube?

10        A     I mean, a few things, I guess.

11        Q     And other than your YouTube research, what

12   else did you do to prepare for the deposition?

13        A     Just really about it.  Just YouTube and

14   Google searched if anybody had any like internet tips

15   and then I talked with my attorney.

16        Q     So you spoke with Mr. Harding about the

17   deposition before this morning, right?

18        A     Yes, sir.

19        Q     When did that happen?

20        A     Oh.  Let's see.  I think we -- trying to

21   make sure I'm accurate.  Today is Monday.  Would have

22   been Thursday, something like that.

23        Q     A couple days ago?  End of last week?

24        A     Yes, sir.

25        Q     How long did you speak with Mr. Harding

```
                                                    Page 67

1      about the deposition?

2           A     I think we had like a 20-minute phone call.

3           Q     Is that it?

4           A     And we spoke again after that and then this

5      morning.

6           Q     So you've had three conversations with Mr.

7      Harding in preparation for the deposition?

8           A     Approximately.

9           Q     What -- approximately how long in total do

10     you think you've spent with Mr. Harding preparing for

11     your testimony today?

12          A     Ballpark?

13          Q     Sure.  That's fine.

14          A     Maybe an hour.

15          Q     Did you talk with Joshua about your

16     deposition today?

17          A     He knew I had been summoned to one but not

18     as far as getting legal advice or anything.

19          Q     Did he give you any suggestions or advice

20     regarding how to comport yourself in the deposition

21     today?

22          A     No, sir.

23          Q     How about from Richard?  Did you get any

24     advice from him?

25          A     No, sir.
```

Page 68

1      Q     How about from anybody at the McGuire Woods

2   firm?  That's the firm representing Joshua and

3   Stephanie -- Mr. Francisco's firm.

4      A     No.  This is the first time I've ever met

5   or spoken to anybody from that firm.

6      Q     This morning?

7      A     Yes, sir.

8      Q     How about from any of the lawyers

9   representing Joshua and Stephanie in the state court

10   case?  Did you speak with any of them in preparation

11   for the deposition today?

12      A     No.  I've actually never met any of the

13   attorneys or representatives for either case.

14            MR. POWELL:  Let's mark this 6, please.

15            (Mast Deposition Exhibit No. 6 was marked

16             for identification and attached to the

17             transcript.)

18   BY MR. POWELL:

19      Q     Mr. Mast, you've been handed deposition

20   Exhibit No. 6 and I will tell you that so far as I

21   can tell from the single-page message that you may

22   not have seen that until today but I will identify it

23   for the record.

24            It is from Dena Cruden to somebody named

25   Pam Tedesco and it says, "Hi Pam.  Per our discussion

Page 69

1    today please send 5K via ACH to Jonathan Mast."  Do

2    you see that?

3         A    Yes, sir.

4         Q    Did you receive $5,000 from the Pipe Hitter

5    Foundation on or after May the 19th?

6         A    After, yes, sir.

7         Q    Do you recall when the money came in?

8         A    I think it was about five or six days.

9         Q    So May the 19th was a Friday.  Would it

10   have been some time in the following week?

11        A    Yes, sir, I think that's right.  There was

12   a small delay where I had to follow up and they said

13   that there was some kind of error on their end but I

14   think that's about right.

15        Q    And do you identify that account

16   information on Exhibit 6 to be for your personal bank

17   account?

18        A    I believe it is.  I don't have the numbers

19   memorized but I believe it is.

20        Q    I looked up the routing number.  It is for

21   the First National Bank in Altavista.  Is that where

22   you bank?

23        A    That's me.

24        Q    Is that account in your name only?

25        A    Me and my wife.

```
                                              Page 70
 1          Q     And you understood that the money was
 2    coming to you and to your First National Bank account
 3    from the Pipe Hitter Foundation in furtherance of the
 4    grant agreement that you had signed on May the 10th,
 5    right?
 6          A     Yes, sir.
 7          Q     And what did you do with the $5,000?
 8          A     I forwarded it to my brother.
 9          Q     How did you do that?
10          A     Check.
11          Q     Same day?  Soon after you got the money?
12          A     Soon after.
13          Q     You send all $5,000 to your brother?
14          A     No.  I -- this is the instance where I had
15    reimbursed myself a thousand because I had loaned him
16    a thousand.
17          Q     You had advanced him a thousand so then you
18    kept a thousand of the five?
19          A     Uh-huh.
20          Q     And sent the four to him?
21          A     Correct.
22          Q     Has the Pipe Hitter Foundation sent more
23    money to you since this initial installment of
24    $5,000?
25          A     No, sir.
```

Page 71

1       Q      Not a nickel?

2       A      No, sir.

3       Q      Why not?

4       A      Shortly after -- what was the date on this?

5    I think that -- this is a little bit speculative but

6    I think that they -- I hadn't had as many -- I don't

7    remember the exact dates for when I had talked to the

8    media outlets but there was a lull, if you will, in

9    fundraising.

10      Q      Do you know whether the Pipe Hitter

11   Foundation is still undertaking to raise money for

12   your brother Joshua and his family?

13      A      Well, to my understanding they have put a

14   pause on everything until after this so I don't know.

15      Q      When you say "after this" you mean the

16   issue that we have with the Defendants and with you

17   regarding what has happened this spring, right?

18      A      Yes, sir.

19      Q      Do you have any expectation that after this

20   current dispute is resolved that the Pipe Hitter

21   Foundation is going to continue to send money to you

22   for your brother or do you know one way or the other?

23      A      I don't know one way or the other.  We

24   haven't really had a lot of discussion.  I personally

25   haven't had a lot of discussion with Pipe Hitter

Page 72

1    Foundation.  It has been mostly through their

2    attorney, so...

3         Q    And that would be Caitlin Contestable?

4         A    Correct.

5         Q    When did you first have contact with

6    Ms. Contestable?

7         A    It would have been a couple weeks ago.

8         Q    Tell me about that contact.

9         A    Oh.  Pretty brief.  Just said -- introduced

10   myself and she clarified that she had advised Dena

11   specifically but Pipe Hitter Foundation basically to

12   send communications through her just to be on the

13   up-and-up until this deposition and whatnot.

14        Q    Who initiated this contact that you had

15   with Ms. Contestable?

16        A    I think I had asked Dena a question and she

17   said, "Can't really talk right now, not to be rude or

18   anything, but just with the legal issue going on, you

19   should probably talk to our attorney and do that and

20   we will try to funnel communications through her."

21             So I got Caitlin's number from Dena and I

22   think I called Caitlin first and then Caitlin -- I

23   can't remember if I called her and she picked up or

24   if she called me back but I think I called her first.

25        Q    Just to be clear, you understood from Dena

Page 73

1      that Caitlin Contestable is a lawyer representing the

2      Pipe Hitter Foundation, right?

3          A      Yeah.

4          Q      And based on Dena Cruden's advice, you

5      initiated contact with Ms. Contestable, correct?

6          A      Correct.

7          Q      Do you recall approximately when that was

8      in reference to when you first got money from the

9      Pipe Hitter Foundation?

10         A      It wasn't until -- this was in May, right?

11         Q      Yes.

12         A      So I talked to Caitlin for the first

13     time -- I didn't even know her name until after the

14     subpoena, so it probably would have been a week or

15     two ago.

16         Q      Some time in late June or early July?

17         A      Yes, sir.

18         Q      Tell me about your first conversation with

19     Ms. -- let me back up.  Is that the only conversation

20     you had with Ms. Contestable?

21         A      I think I called her twice.

22         Q      Did you speak with her both times?

23         A      Yes, sir.

24         Q      And what did she tell you?

25         A      Let's see.  Not much.  She just said what I

Page 74

1      stated earlier along the lines of basically it was

2      just like should I continue conversing with the

3      people I have been talking with at the Pipe Hitter

4      Foundation and basically let's put a pause on that

5      for now and you should definitely get an attorney,

6      she said to do that, and that's about it.

7          Q      So you came away from those two

8      conversations with the understanding that she wanted

9      you to go through her for any future dealings that

10     you might have with the Pipe Hitter Foundation, am I

11     understanding that correct?

12         A      That was my understanding.

13         Q      And were you fine with her request to go

14     through her?

15         A      Yeah.

16         Q      Are those the only two times you have

17     spoken with her?

18         A      Yes, sir.

19         Q      Have you exchanged any emails with her?

20         A      She sent me one email with a copy of the

21     grant agreement.

22         Q      But you already had seen that, right,

23     because you signed it?

24         A      Yeah.

25         Q      Do you recall if she sent you anything

Page 75

```
 1    else?
 2        A       She did not.
 3        Q       Did you send anything to her?
 4        A       No, sir.
 5        Q       Do you know how much money the Pipe Hitter
 6    Foundation has raised for your brother Joshua's --
 7        A       Well, I can -- I know the five grand that
 8    they initially sent to me and then I think there was
 9    somewhere close to four or five grand.  Again, I'm
10    not positive on the number, but I think it was
11    somewhere in the ballpark of four or five grand that
12    they were preparing to send, if I'm remembering
13    correctly, when this happened.
14        Q       When this happened, you mean the dispute
15    over the protective order that we're talking about
16    today?
17        A       Yes, sir.
18        Q       So how did you learn that they had raised
19    an additional 4 or $5,000?
20        A       I had asked Dena.
21        Q       So she told you they had raised an
22    additional 4 to $5,000?
23        A       Yes.
24        Q       In addition to the 5,000 they had already
25    sent to you?
```

Page 76

```
1        A     Yes, sir, I think that's right.

2        Q     And am I understanding you to say that she

3   said they were going to put a pause on it and not

4   send the money to you?

5        A     Yes, sir.

6        Q     Do you know whether the Pipe Hitter

7   Foundation is continuing to try to raise money for

8   your brother and his immediate family one way or the

9   other, do you know?

10       A     I don't know for sure but to my

11  understanding every indication was that they were not

12  for now.

13       Q     Let's go back, Mr. Mast, to your first --

14  what I think is your first communication with Dena

15  Cruden.

16            MR. POWELL:  Let's mark this as Exhibit 7.

17            (Mast Deposition Exhibit No. 7 was marked

18             for identification and attached to the

19             transcript.)

20  BY MR. POWELL:

21       Q     So, Mr. Mast, you've been handed Exhibit 7

22  which is a two-page text string starting on April the

23  10th.  I think they are all on April the 10th.  Do

24  you have that in front of you?

25       A     I do.
```

Page 77

1          Q     And it starts off -- this is a text from

2    Dena Cruden to you and she says, "Good morning

3    Jonathan.  My name is Dena Cruden and I am the

4    executive director for the Pipe Hitter Foundation."

5    Do you see that?

6          A     Yes, sir.

7          Q     And then she continues and says, "May I

8    call you today at 10 p.m. Pacific Standard Time as we

9    have been speaking with your brother Joshua.  Thank

10   you, Dena."  Do you see that?

11         A     Yes, sir.

12         Q     Would this be your first contact with

13   anybody from the Pipe Hitter Foundation, to the best

14   of your recollection?

15         A     That's got to be right.  Yeah, I think so.

16         Q     So this would have come not long after your

17   brother Joshua had advised you that you were going to

18   be receiving a contact from the Pipe Hitter

19   Foundation, right?

20         A     Yeah, he informed me of that, yeah.

21         Q     So when she says that she had been speaking

22   with your brother Joshua, did you learn from her when

23   that conversation began between Joshua and the Pipe

24   Hitter Foundation?

25         A     No, I did not ask.

```
                                                          Page 78

  1          Q     She was attempting to schedule a phone call

  2    with you.  Did you have that phone call initially

  3    with her on or about April the 10th?

  4          A     It was near there.  I think it was the same

  5    day but it might have been a day or two after.

  6          Q     Tell me what you remember about your first

  7    phone call with her that followed this text message.

  8          A     Okay.  Let's see.  I'm trying to remember

  9    where I was.

 10          Q     Did you call her or did she call you?

 11          A     She called me.

 12          Q     All right.  She had your cell phone number,

 13    right, because that's how you got the text?

 14          A     Yes, sir.  I don't remember a great deal.

 15    I remember she explained who she was, what Pipe

 16    Hitter Foundation does as far as acquiring funds for

 17    military members and first responders, particularly

 18    for legal defense stuff, told me a tiny bit about

 19    Eddie Gallagher, and just that she asked me if I

 20    would be comfortable sharing the story regarding my

 21    brother Joshua, Baby Doe and just all that was going

 22    on and if I would be comfortable doing any kind of

 23    media interviews and --

 24          Q     How did you answer those questions?

 25          A     I thought about it for a bit and then said,
```

Page 79

1      "Yeah, I think I'd like to."

2          Q      Did you answer her "yes" during that first

3      phone call?

4          A      I think I did.

5          Q      Did she tell you where she thought she

6      might be able to arrange interviews for you?

7          A      No, not a single one at the time.

8          Q      Look at the second page of the exhibit,

9      please.  Down near -- well, at the bottom of the

10     second page, she says, quote, "Thanks again.  Can you

11     share an email address so I can provide it to our PR

12     firm and I will make introductions."  Do you see

13     that?

14         A      I do.

15         Q      Did you provide your email address to her

16     for that purpose?

17         A      I did eventually but I didn't provide it

18     right then.

19         Q      Why not right then?

20         A      Well, because this was -- seemed like it

21     was going to probably be a lot of communication and I

22     created a new email account to keep track of that.  I

23     have my personal account, my gmail, I have my work

24     stuff in my Liberty.  I figured I'd create this one

25     for handling these communications.

Page 80

```
 1        Q     So by this one you mean the proton.me
 2   account?
 3        A     That's correct.
 4        Q     So you set that email account up
 5   specifically to deal with these issues?
 6        A     Correct.
 7        Q     Have you used that email document for any
 8   other purpose?
 9        A     Forwarding my attorney my communications
10   with them.  That's about it.
11        Q     Have you used it for any communications
12   with the McGuire Woods firm?
13        A     No.
14        Q     What about the lawyers representing Richard
15   Mast or Mr. Osmani?
16        A     No, sir.  Again, never had any
17   communication with either firm.
18        Q     Or the lawyer representing Ms. Motley.
19   Have you communicated with that firm?
20        A     I called them once but never emailed them,
21   no.
22        Q     Called who?
23        A     I tried to call Ms. Motley once but I
24   didn't get ahold of anybody.  They never returned my
25   call.
```

```
                                                    Page 81

 1          Q     When did you try to reach -- and by

 2     Ms. Motley you mean Kimberly Motley who you

 3     understand is a defendant in this case, right?

 4          A     I do.

 5          Q     Why were you trying to reach her?

 6          A     Well, this is not a short answer but AP

 7     News had written a story about my family and

 8     Ms. Motley was mentioned in that and when I spoke to

 9     AP News in regards to a little bit about what I

10     remembered and knew about the case and the

11     circumstances leading up to it, most of the

12     background information prior to the actual case, they

13     asked me to provide names of people that would be

14     expert witnesses or somebody that could verify some

15     of the stuff that I was saying, and so I came up with

16     as many names as I could and she was one of them.

17          Q     So you're referencing your contact with AP

18     News that happened last month, right?

19          A     Yeah, it was in June some time.

20          Q     And am I understanding you to say that

21     either during or after that interview that you had on

22     AP News they asked for the names of additional

23     people?

24          A     Correct.

25          Q     And you gave them Kimberly Motley's name?
```

Page 82

```
 1         A     Correct.

 2         Q     Was that after you had tried to reach her

 3    by phone?

 4         A     No.  Oh, yes.  So I talked to AP News and

 5    then tried to call Ms. Kimberly.

 6         Q     And how did you have her contact

 7    information?

 8         A     I Googled it.

 9         Q     You didn't get it from your brother --

10         A     No.

11         Q     -- Joshua?

12         A     Huh-uh.

13         Q     And you didn't speak to her at all?

14         A     No, not even a receptionist.  I just got a

15    voice mail.

16         Q     And she never called you back; is that

17    correct?

18         A     Correct.

19         Q     So where -- back to the document that you

20    just turned over.  When Ms. Cruden asked you for your

21    email address so she could provide it to the Pipe

22    Hitter Foundation's PR firm, did you understand who

23    that was -- who their PR firm was?

24         A     I didn't at the time.  I just knew it was

25    Pipe Hitter Foundation PR firm.
```

Page 83

1      Q     Did you not ask who it was?

2      A     Like for specific names?  No, sir.

3      Q     Did you later learn that it was an

4   enterprise called Vought and Associates?

5   V-o-u-g-h-t.

6      A     That's actually new to me.  Is that Mary

7   Vought?

8      Q     Yes.

9      A     Yeah, I know who that is but I didn't know

10   that it was a separate company from Pipe Hitter.

11      Q     So -- I will come back to that.  Thank you.

12      A     Uh-huh.

13      Q     So after this text message and phone call

14   with Dena did you report to your brother Joshua about

15   those communications?

16      A     No.

17      Q     You mentioned Mary Vought.  You have

18   communicated with her, right?

19      A     Yes, sir.

20      Q     Did you understand that she was acting on

21   behalf of the Pipe Hitter Foundation or on behalf of

22   your brother Joshua and his family?

23      A     I just knew that she was with Pipe Hitter

24   Foundation.

25      Q     Did you think she was on the Pipe Hitter

Page 84

1    Foundation payroll?

2         A    I didn't know but I kind of presumed that.

3    I didn't know if they were a partner or -- all I knew

4    is the terminology that we used is our media partner.

5         Q    And that's what you heard from Dena Cruden?

6         A    Uh-huh.

7              MR. POWELL:  Let's mark this 8.

8              (Mast Deposition Exhibit No. 8 was marked

9              for identification and attached to the

10             transcript.)

11   BY MR. POWELL:

12        Q    Mr. Mast, you've been handed Deposition

13   Exhibit 8.  You've seen this photo album before,

14   haven't you?

15        A    Many times, yes, sir.

16        Q    And this is a photo album available through

17   Google, correct?

18        A    Yes, sir.

19        Q    And there near the top of the first page,

20   this is one of those instances we talked about at the

21   top of the deposition, you see the name Lily,

22   L-i-l-y, right?

23        A    Yes, sir.

24        Q    And that's the Americanized name that your

25   brother Joshua and Stephanie use for Baby Doe, right?

Page 85

1        A     Correct.

2        Q     When did you first have access to this

3    Google photo album?

4        A     The email I'm sure would tell me.  I think

5    it was either 2020 or 2021.

6        Q     Do you know who set it up?

7        A     No.  Probably one of my -- probably one of

8    my brothers or my sisters-in-law.

9        Q     Do you know when it was first set up?

10       A     No.

11       Q     Do you recall when you first had access to

12   it?

13       A     As soon as it was sent to me in 2020 or

14   2021.

15       Q     Do you know for what purpose it was

16   established?

17       A     To share photos with my brother's family,

18   particularly Joshua and Steph's family, with the rest

19   of us.

20       Q     Have you ever added photos to it?

21       A     No.

22       Q     Do you have that ability?

23       A     I've never tried.

24       Q     Have you ever downloaded photos from the

25   Google photo album?

Page 86

1          A       Yeah.

2          Q       For what purpose?

3          A       To have photos of my family on like

4     devices.

5          Q       Have you downloaded photos from the Google

6     photo album and shared them with someone other than

7     your family and friends?

8          A       Yeah.  I sent some photos from this to Pipe

9     Hitter Foundation.

10         Q       Anybody else?  And when I say anybody else,

11    I mean other than your immediate family and friends.

12    You have said the Pipe Hitter Foundation is someone

13    outside of that group to whom you have forwarded

14    photos, right?

15         A       If memory serves correctly, I think I

16    sent -- I can't remember if it was me who forwarded

17    these to Pipe Hitter and then they sent them on to

18    OANN or if I sent them directly to OANN but they had

19    some photos as well.

20         Q       So by OANN you mean the One America News

21    Network where you gave an interview in June, right?

22         A       Yes, sir.

23         Q       So you were aware that One America News had

24    photos from the Google photo app before your

25    interview took place?

Page 87

1        A     Correct.

2        Q     And I think I'm understanding you to say

3    you can't recall, at least not at the moment, whether

4    those photos got to the One America News Network

5    because you sent them or because Pipe Hitter sent

6    them?

7        A     Correct.  I think it was me.

8        Q     Other than Pipe Hitter Foundation and

9    possibly the One America News Network, do you recall

10   sending photos from Exhibit 8 to anyone else?  Again,

11   not including your immediate family and friends.

12       A     I don't believe I did.

13       Q     Have you ever shared the link to the photo

14   album with anyone else?

15       A     Maybe my mom.  I'm not positive, though.  I

16   could go back and maybe check but I don't think I

17   have.

18             MR. POWELL:  Let's mark this next.

19             (Mast Deposition Exhibit No. 9 was marked

20             for identification and attached to the

21             transcript.)

22   BY MR. POWELL:

23       Q     You've been handed Exhibit 9, Mr. Mast.  I

24   will tell you that my office compiled this list from

25   the first page of the -- of Exhibit 8.  Do you have

Page 88

1    any reason to disagree with that?

2         A     What is it?

3         Q     Well, if you look at the first page of

4    Exhibit 8 right under the name Lily you will see a

5    bunch of small --

6         A     Oh.  It's the people who have access to the

7    album.

8         Q     That's what I'm asking you.

9         A     Sure.  I don't have any reason to disagree

10   with that.

11        Q     Okay.  So the list of names and email

12   addresses on Exhibit 9, from your understanding, is

13   those people who are identified on the photo album

14   itself?

15        A     I never checked it, but sure.

16        Q     So I don't want to spend too much time on

17   this but let's just run down the list.  I assume you

18   obviously know the third name on the list is

19   Stephanie Mast, your sister-in-law?

20        A     Uh-huh.

21        Q     Then Joshua Mast, your brother.  Who is

22   Fran Mast?

23        A     My great aunt.

24        Q     Do you know who Jennifer Brothers is?

25        A     Who?

Page 89

1    Q    Jennifer Brothers at the top.

2    A    I do not.

3    Q    How about Ashley Delgado?

4    A    No.

5    Q    Down below Fran Mast is Flavio and

6    Jacqueline Porta.  Do you know who they are?

7    A    I don't.

8    Q    Who is Bridget Mast?

9    A    I think that is my cousin.

10   Q    Next is Lauren Mast Hershey.  Is that

11   another cousin?

12   A    Yes.  Aunt.

13   Q    Below her name is Anna White.  Who is she?

14   A    No idea.

15   Q    How about Dillon Throckmorton?

16   A    Also no idea.

17   Q    How about Cindy Beyer?

18   A    Huh-uh.

19   Q    Next is Emily Holmes.

20   A    No.

21   Q    Next is Eric Macrush.  Do you know who he

22   is?

23   A    I don't.

24   Q    How about Liliana Balcazar?

25   A    I don't.

Page 90

1          Q     How about Georgia Pine K9?

2          A     I don't know who that is.  Kacy Labuda is

3    my cousin.

4          Q     Beneath Kacy Labuda is an email address.

5    Do you recognize that email address?

6          A     Huh-uh.

7          Q     That would be a no?  Sorry.

8          A     No, sir.  Sorry.

9          Q     That was one of the instructions I didn't

10   give you is uh-huh and huh-uh don't do very well on

11   the record.

12         A     Sorry.

13         Q     It's fine.  You've been doing great.  So

14   the next one is an email address bentaplace.  Do you

15   recognize that?

16         A     Bentheplacedesign?  No, sir.

17         Q     Beneath that is battleshowers@gmail.com?

18         A     Bertieshowers.  That is my great aunt.

19         Q     Great aunt.  The next email is

20   firechuck@gmail.  Do you recognize that?

21         A     I do not.

22         Q     The next is hannonwright@gmail.  Do you

23   know who that is?

24         A     I don't.

25         Q     Do you not know that Mr. Wright represents

Page 91

1      your brother and sister-in-law in the state court

2      case?

3           A     Well, I don't recognize the email but that

4      name rings a bell.

5           Q     But you know that Hannon Wright is one of

6      the lawyers representing Joshua and Stephanie?

7           A     Well, I get the cases confused sometimes so

8      I thought it was John Moran.

9           Q     Mr. Moran is with McGuire Woods.  He

10     represents your brother and sister-in-law in the

11     federal case which is the case we're talking about

12     here.  So beneath Mr. Wright's email do you recognize

13     the next email?

14          A     No.

15          Q     How about the next one?

16          A     No.

17          Q     I expect you to recognize the one below

18     that.

19          A     That's mine.

20          Q     That's your gmail address, correct?

21          A     Yes, sir.

22          Q     The one you identified at the top of the

23     deposition.  Beneath your email who is that person,

24     if you know?

25          A     I don't know that person or...  My mom is

Page 92

```
 1      on here.
 2          Q     Where is your mother?
 3          A     Roberta.mast@gmail.com.
 4          Q     Okay.  So we've skipped over some.
 5          A     Yeah.
 6          Q     Above your mother's name is Richard Mast.
 7      That's your brother Richard, right?
 8          A     Yes.
 9          Q     And above Richard's name is pasterkeaton.
10      Do you know who that is?
11          A     I don't.
12          Q     There's pasterkeaton and pastorkeaton.  You
13      don't know who they are?
14          A     First time seeing this.  No, I have no idea
15      who that is.
16          Q     And above that is -- it looks like Isabel.
17      I'm sorry, the typeface is so small.  Do you know who
18      that is?
19          A     I do not.
20          Q     And did we do Justin McCoons?
21          A     We did not and I do not know who that is
22      either.  Nor joshpeter1975.
23          Q     Okay.  And beneath your mother's email
24      address -- so there are only two because Roberta Mast
25      is your mother?
```

Page 93

1          A      That's correct.

2          Q      And the two emails beneath your mother's

3     email, do you recognize those?

4          A      I do not.

5          Q      And so do you understand that the people

6     whose names are listed on Exhibit 9 have the same

7     access to the Google photo album that you enjoy?

8          A      I do, yeah.

9          Q      If you look back at the previous exhibit,

10    Exhibit 8, I'm asking you to confirm what I think is

11    obvious.  These photos are meant to be in

12    chronological order; is that correct?

13         A      I don't know.  I think so, yeah.

14         Q      And the first several pages of Baby Doe are

15    before she left Afghanistan, can you agree with that?

16         A      I agree with that.

17         Q      If you turn all the way to page nine, do

18    you have that?

19         A      I do.

20         Q      And in the third row you will see a

21    picture.  That's your sister-in-law Stephanie with

22    Baby Doe, correct?

23         A      That's correct.

24         Q      And do you understand that to be a

25    photograph taken of the two of them in the Ramstein

Page 94

1    Air Force Base in Germany?

2         A    I wasn't sure if it was Germany or in

3    States, but yes.

4         Q    But in any event, it's after Baby Doe left

5    Afghanistan?

6         A    Oh, yeah.

7         Q    So if you scroll forward through the rest

8    of the photos, this is just my interpretation, these

9    all appear to have been taken since Baby Doe left

10   Afghanistan.  Do you agree with that?

11        A    Yeah, I agree with that.

12        Q    So if we go to the -- let's just go to the

13   last two or three pages.  Actually, Mr. Mast, let me

14   ask you a different question.

15        A    Sure.

16        Q    Get the other exhibit in front of you, the

17   one-pager.  Don't put the photos too far away.  But

18   if you look at the top of the one to the right of the

19   long list of names, you see where it says "Lily"?

20        A    Yeah.

21        Q    And then there's a date range, September

22   the 6th, 2019 to June the 4th, 2023.  Do you see

23   that?

24        A    I do.

25        Q    So is it your understanding from looking at

Page 95

1      Exhibit 8 that the most recent photos, say the last

2      three pages or so, are fairly current?

3           A     Yeah, that seems right.

4           Q     When did you last see Baby Doe?

5           A     We had a family get-together at my mom's

6      house late May.

7           Q     Of this year?

8           A     Yes, sir.

9           Q     So six weeks or so ago?

10          A     I think that's right.

11          Q     How regularly have you seen her in 2023?

12          A     At least four times.

13          Q     So if you look at the last two or three

14     pages of Exhibit 8, can you say that these are

15     pictures of Baby Doe the way she looks now?

16          A     Yes.

17          Q     I asked you a little while ago, Mr. Mast,

18     who you recall sending the Google photo album to and

19     you answered my questions.

20                Do you have any awareness of to whom the

21     other people listed on Exhibit 9 have sent the photo

22     album?

23          A     Oh, I have no idea.

24          Q     Do you know whether Joshua has advised any

25     of the people on that list of the existence of Judge

Page 96

1      Moon's protective order?

2           A     I do not.

3           Q     Do you know whether Stephanie has advised

4      any of the people on the list of Judge Moon's

5      protective order?

6           A     No, sir, I don't know.

7           Q     Do you know whether your brother Richard

8      has advised any of the people on the list of Judge

9      Moon's protective order?

10          A     I do not know that either.

11          Q     Do you know if there is any record of the

12     persons or email addresses to whom the URL for this

13     album, Exhibit 8, has been sent?

14          A     I do not know.

15          Q     Are you aware of any way to determine how

16     far and wide Exhibit 8 has been circulated by the

17     people on the list shown on Exhibit 9?

18          A     No, sir.  Aside from my immediate influence

19     of like sending it to --

20          Q     Sure.  Other than what you recall you did,

21     but you don't have any way of knowing to whom, if

22     anybody, the other people on the list on Exhibit 9

23     may have sent the URL for this photo album?

24          A     Correct.  I don't know.

25                MR. POWELL:  Let's mark this 10, please.

Page 97

 1            (Mast Deposition Exhibit No. 10 was marked
 2            for identification and attached to the
 3            transcript.)
 4    BY MR. POWELL:
 5        Q    Mr. Mast, you've been handed Exhibit 10
 6    which if you will take a few minutes to look at it,
 7    you will see it's a string of text messages between
 8    you and Dena Cruden starting on May the 9th and
 9    running up until May the 11th.  Do you see that?
10        A    I do.
11        Q    Now that you have Exhibit 10 in front of
12    you, do you recall exchanging these text messages
13    with Ms. Cruden regarding the project -- the Pipe
14    Hitter Foundation fundraising agreement?
15        A    Yes, sir, I do.
16        Q    And right there at the beginning on the
17    first page at the top she's -- after saying, "Good
18    morning," she says she has an agreement that she is
19    sending to you on behalf of the Pipe Hitter
20    supporting Joshua.  She asks may she send it to you
21    for your signature, right?
22        A    That's right.
23        Q    And that's the agreement we looked at a
24    little while ago that you signed on May the 10th?
25        A    Yes, sir, that's right.

Page 98

1          Q       Turn to the second page of Exhibit 11,

2     please.  Exhibit 10.  Sorry.  The one in front of

3     you.

4          A       Okay.

5          Q       You offered her a couple of editorial

6     suggestions in the agreement, right?

7          A       I did.

8          Q       Did she make those changes?

9          A       Yes.

10         Q       Did -- are those your suggested changes or

11    did they come from someone else?

12         A       They came from me.  I looked it over and

13    found it had the wrong name and whatever else is

14    there.

15         Q       And then you said there a little below the

16    middle of the page, you say, quote, "Once those

17    changes are made I will be happy to proceed," right?

18         A       I did.

19         Q       And that's what happened, correct?

20         A       Yeah.

21         Q       Still on that second page of Exhibit 10,

22    you go on to say, quote, "As for the other document,

23    I think it might be worth editing that the baby was,

24    quote, code named Starfish with a capital S, close

25    quote, instead of just named starfish."  Do you see

Page 99

```
 1    that?
 2         A     I do.
 3         Q     And that was another suggestion you made?
 4         A     It was.
 5         Q     But what was the other document to which
 6    you were referring?
 7         A     Beg your pardon?
 8         Q     At the beginning of that sentence you say,
 9    "As for the other document."
10         A     Oh.  Apologies.
11         Q     That's all right.
12         A     So there's two documents that she sent over
13    to me that I looked over and reviewed.  One was like
14    a newsletter or what was going on their web page and
15    that just kind of summarized the story and I based
16    that heavily on what was on America Freedom Law
17    Center I think is their name.  They had a
18    summarization of some of the facts of the case and --
19    so anyway, so it was similar to that, and then I -- I
20    didn't want people to think that her name was
21    actually Starfish so I clarified that.
22         Q     I think you've answered my question.  So
23    the, quote/unquote, other document to which you were
24    referring in your text message with Dena Cruden was
25    what ultimately was posted on the Pipe Hitter
```

Page 100

```
 1      Foundation website?
 2           A     Yes, sir.
 3           Q     And in looking at that draft, am I
 4      understanding you to say that you did some research
 5      of your own on the American Freedom Law Center
 6      website?
 7           A     Uh-huh.
 8           Q     Did you know that Mr. Yerushalmi was
 9      representing your brother Richard?
10           A     Yes.  Well, rephrase.  I know that he is
11      representing him now.  I didn't know who David
12      Yerushalmi was at the time but I knew who American
13      Freedom Law Center was.
14           Q     And how did you know who the American
15      Freedom Law Center was in May of this year?
16           A     Richard had told me who they were, not
17      necessarily in May, some time before.
18           Q     And what was the context in which Richard
19      was telling you who the America Freedom Law Center
20      is?
21           A     Just that that was a firm that his lawyer
22      was from.
23           Q     But I thought you just said you didn't know
24      Mr. Yerushalmi was in the case until recently?
25           A     Well, Yerushalmi specifically, like his
```

Page 101

1      name, but the firm, yes.

2          Q      So you understood from Richard at some

3      point that the American Freedom Law Center was

4      providing legal representation to him but you didn't

5      know until recently that it was Mr. Yerushalmi?

6          A      Specifically, yes.

7          Q      When did Richard tell you that he was being

8      represented by the American Freedom Law Center?

9          A      Oh, I don't remember.  That was a while

10     ago.

11         Q      It would have been this calendar year,

12     wouldn't it?

13         A      Yeah, it would have to have been, I think.

14         Q      So after January 1st of this year?

15         A      Again, I think so but I don't know.

16         Q      Would it have been before or after your

17     first contact with Dena Cruden on April the 9th?

18         A      Oh, before.

19         Q      Did you have any contact with anybody at

20     the American Freedom Law Center in preparing what you

21     were going to say to Dena?

22         A      No, sir.  As I said before, I had never

23     spoken to any other attorneys -- actually, until I

24     started looking for my own, I hadn't spoken to any

25     attorneys in regards to this.

Page 102

1        Q     So you just did your own research by going

2   to the website for the American Freedom Law Center?

3        A     Uh-huh.

4        Q     But you didn't have any contact with any of

5   their personnel or their lawyers at the time; is that

6   correct?

7        A     Or since, ever, yes, that's correct.

8        Q     Turn to the third page of this text string.

9   Do you have that in front of you?

10       A     Yes, sir.

11       Q     Right above the middle of the page, I see

12  where you sent to Dena this message, "Also, do y'all

13  want or already have photos to insert into the

14  newsletter."  Do you see that?

15       A     I do.

16       Q     And the newsletter would have been the

17  document that you anticipated was going to be posted

18  on the Pipe Hitter Foundation website?

19       A     That's correct.

20       Q     Did she respond to that question?

21       A     It doesn't look like it's here.  She might

22  have called me instead to talk about it.

23       Q     Do you recall that she did follow up that

24  question with a phone call?

25       A     I don't recall but we must have talked

Page 103

1    about it because I remember sending photos to her.

2         Q    Did you -- I will show you some documents

3    in a minute consistent with your recollection.

4    Before we get there, though, were you sending them to

5    her on your own initiative or because she asked for

6    them?

7         A    I think she asked me if they had any photos

8    that they could use.  Yeah, I think that's right.

9         Q    Do you remember sending to her the link to

10   the Google photo album?

11        A    If memory serves correctly, what I thought

12   I did was selected a few photos and sent them to her

13   so they wouldn't have the whole family album.

14        Q    Let's keep talking about the photos a

15   little bit because I think it's consistent with what

16   you just testified.  Turn to I guess the third page

17   of the exhibit.  It's the fourth page of the exhibit.

18        A    Okay.

19        Q    The one that starts with "also as silly as

20   it sounds."  Do you see that?

21        A    Yes, sir.

22        Q    Skip down to below the middle of the page,

23   you will see an entry on May the 10th from you and

24   you say, quote, "Sorry for the many messages.  I went

25   ahead and sent some of the better photos I thought

Page 104

1    were appropriate."  Do you see that?

2         A    I do.  Yes, sir.

3         Q    So that's consistent with what you've

4    already told me that you remember sending photos to

5    her?

6         A    Yes, sir.

7         Q    Whether at her request or your own

8    initiative?

9         A    Uh-huh.

10        Q    What did you mean when you said to her that

11   you sent photos that you thought were appropriate?

12        A    Oh, a couple things.  I really meant in

13   general context like they would be good photos for

14   what we were doing.  I didn't really have anything

15   specific in mind but like a general version of what I

16   meant was appropriate.

17        Q    Would these have family photos for your

18   brother and Joshua and Stephanie and Lily?  I'm

19   calling her Lily.  I should call her Baby Doe.  Let

20   me rephrase the question.

21             When you say appropriate -- better photos

22   that you thought were appropriate, would these have

23   been photos on the Google photo album?

24        A    Oh, yeah.

25        Q    And explain to me again why you thought

Page 105

1    they were appropriate for transmission to the Pipe

2    Hitter Foundation?

3         A    Well, as far as I think what you're getting

4    at, they were pictures that show Baby Doe and my

5    brother Joshua and I think one with Stephanie.

6         Q    Taken since they -- since Baby Doe left

7    Afghanistan, right?

8         A    Some.  Some of them were, some of them

9    weren't.

10        Q    So there were photos of Baby Doe obviously

11   without your brother and sister-in-law that

12   were taken -- well, there was one of your brother and

13   Baby Doe in Afghanistan, right?

14        A    Yes, sir.

15        Q    All right.  I'm with you.  Turn to the next

16   page, please.  Down below the middle of the page she

17   says this, quote, "Hi Jonathan, may I connect you via

18   Signal with our PR agency Mary Vought."  Do you see

19   that?

20        A    I do.

21        Q    And you said, "Yes, that is fine."

22   Correct?

23        A    Yes.

24        Q    Do you have any understanding of why she

25   wanted to connect you with the PR agency using

Page 106

1    Signal?

2        A     Not specifically as to Signal.  I know why

3    she was connecting me with the PR agency.

4        Q     Did you ask her why she wanted you to use

5    Signal?

6        A     Oh, I think I had asked that.

7        Q     Right.  But she says here on this text

8    message, "Hi Jonathan, may I connect you via Signal

9    with our PR agency."

10       A     Right.  I'm saying that I had requested to

11   Dena previously if we could communicate via Signal.

12   I just asked her if she had a Signal and so she

13   probably just presumed that that was what I preferred

14   to communicate on.

15       Q     And you said yes?

16       A     Yes, I said that was fine.

17       Q     Down at the very bottom of the page is a

18   text that says, quote, "2K, that is $2,000, already

19   came in this morning quickly."  Do you see that?

20       A     I do.

21       Q     And that's from Dena, right?

22       A     That's correct.

23       Q     And did you understand she to be saying

24   that they had raised $2,000?

25       A     Yes.  It was my understanding that after I

Page 107

1    had signed that document and sent it over they

2    had either -- I don't know if they do an email blast

3    or if they just put it on the website, but from those

4    initial interactions that's where that came from.

5         Q    Okay.  So you signed it on May the 10th and

6    her text to you is the very next day, May the 11th,

7    right?

8         A    Uh-huh.

9         Q    Do you recall how often you communicated

10   over Signal with Mary Vought or any of her

11   colleagues?

12        A    To clarify, did I ever use anything else?

13        Q    No.  Do you recall how often you used

14   Signal to communicate with her?

15        A    No.  I mean, it was sporadic because they

16   wouldn't just contact me to say hi.  It was

17   basically, were you available for this or that.

18        Q    Do you still have copies of those texts?

19        A    Some of them.

20        Q    Did you produce them to your lawyer for

21   production to me?

22        A    I think so.

23        Q    When you say some of them, why would you

24   not have all of them?

25        A    Well, prior to me receiving the subpoena, I

Page 108

1    had -- as I mentioned earlier, I had my Signal set up

2    to remove a lot of stuff automatically.

3        Q    So that's consistent with your earlier

4    testimony.  Once you got the subpoena and the cease

5    and desist letter from Mr. Elliker, you disabled the

6    auto delete feature on Signal?

7        A    Uh-huh.  Yeah.  Well, I should also

8    clarify, on ones relevant to the case.  I haven't

9    removed it on every single Signal thread.

10       Q    We may have covered this already, Mr. Mast.

11   If so, I apologize.

12       A    That's okay.

13       Q    Have you been communicating with Joshua

14   about this matter using Signal?

15       A    Well, I have called him on Signal but I

16   never texted or emailed him anything about it, so I

17   have used Signal as a means -- it's pretty much the

18   only means I communicate with all of my family.  It's

19   become our habit over the last couple of years to

20   just use Signal for the most part.  There's a few

21   exceptions.

22              MR. POWELL:  Let's make this 11.

23              (Mast Deposition Exhibit No. 11 was marked

24              for identification and attached to the

25              transcript.)

Page 109

```
 1        BY MR. POWELL:

 2          Q     Mr. Mast, you've been handed Deposition

 3        Exhibit 11.  Let me identify it for the record.  It's

 4        a series of multiple emails starting on May the 5th

 5        going all the way through I think the 10th of May.

 6        Do you have that in front of you?

 7          A     I do.

 8          Q     And the email at the top of the first page

 9        is an email from Dena Cruden to your brother Joshua

10        dated May the 5th, right?

11          A     Yes.

12          Q     So that -- you recognize your brother's

13        email address as https://protect-us.mimecast.com/s/mSgTCjRPR5UnR2DJ

          iWPFOd?domain=icloud.com

14          A     Well, I don't use that one with him.  He

15        also graduated from Liberty so we have always

16        communicated via the Liberty email for the most part,

17        but, yes, I believe that is his.

18          Q     And regardless of the email address, it's

19        clear to you, isn't it, that is Dena sending to

20        Joshua the information about the fundraising

21        campaign?

22          A     It appears to be so, yes.

23          Q     And were you aware -- is this the first

24        time you knew that the fundraising goal was $100,000

25        or did you already know that?
```

Page 110

```
 1              MR. FRANCISCO:  Objection.  Foundation.  I

 2      don't think he's on that first email.

 3              MR. POWELL:  He's not.  You're quite right.

 4      BY MR. POWELL:

 5      Q    I will withdraw the question, Mr. Mast.

 6      Let me phrase a better one.

 7      A    Okay.

 8      Q    So down at the bottom of the first page,

 9      that's Dena forwarding to you on May the 9th a copy

10      of the email she sent to Joshua.  Am I understanding

11      that correctly?

12      A    Yes, sir, I think that is correct.  At the

13      time I don't think I even realized that this is

14      forwarded.  She told me she was sending attachments

15      for the agreement and what was going on the website

16      and so she just sent me those and I -- so it kind of

17      caught me by surprise seeing his email there because

18      I don't -- anyway, yes.  Sorry.  Long answer.

19      Q    And so you learned then on May the 9th that

20      the fundraising campaign goal was $100,000?

21      A    Uh-huh.  Yeah.

22      Q    And that's the number that appears on the

23      actual agreement that you signed, right?

24      A    Yes, sir.  And I'm not sure if I saw it

25      here or on the agreement but I knew it was 100,000.
```

Page 111

1    Q    May the 9th or May the 10th you learned

2  what the number was?

3    A    Yes.

4    Q    So turn to the second page please of

5  Exhibit 11.  So right there is you're sending to Dena

6  some photos in chronological order of, as you say in

7  this email, Lily when she first came into American

8  custody, right?

9    A    Yes.

10    Q    Why were you sending these to Dena?  Did

11  she ask for them?

12    A    This was in reference to our text

13  conversation earlier about photos that were

14  appropriate for the website and fundraising.

15    Q    So this is just a continuation of that

16  conversation, you are now actually initiating on

17  sending photos to her?

18    A    Uh-huh.

19    Q    And these are photos that you selected?

20    A    I think so, yeah.

21    Q    From the Google photo album?

22    A    Yes.

23    Q    Did she give you any criteria for selecting

24  the photographs?

25    A    She did not.  Just I think that all we said

Page 112

```
 1    was some decent photos.

 2         Q    So you understood to make the selections

 3    and you sent them to her?

 4         A    I did.

 5         Q    Did you get any help from anybody else?

 6         A    No.

 7         Q    Did you get any advice from Jonathan (sic)

 8    or Stephanie on what photos to send to Dena?

 9         A    To Joshua and Stephanie?  No, I did not.

10         Q    I'm sorry.  Did I say Jonathan?

11         A    My dad does it all the time.  It's okay.

12         Q    Sorry.

13         A    But, no, I did not.  I did not receive any

14    advice from Josh or Stephanie or Richard or anybody

15    really.  I just looked at the Google drive myself and

16    pulled certain photos and sent those over.

17         Q    If you turn to the fourth page of the

18    exhibit, it's got I guess the last three photos in

19    the stack you sent to her.

20         A    Yeah.

21         Q    Is that Senator Cruz in the middle of the

22    photo at the top?

23         A    I believe it is.

24         Q    Do you have any idea -- and do you

25    recognize that to be Baby Doe in your brother's arms?
```

Page 113

1          A     Yeah.   That's Joshua, Stephanie, Baby Doe,

2     Ted Cruz and I don't know who the other people are.

3          Q     Do you have any idea why your brother and

4     sister-in-law were with Baby Doe and Senator Cruz?

5          A     To my understanding, I don't know if it was

6     Joshua or a third-party or whatever but somehow some

7     communication with Ted Cruz's office probably back in

8     2019 or 2020, they had had some communication about

9     helping in the process of trying to get her out of

10    Afghanistan, and so I think that he was going back to

11    say, "Well, here she is, she's out of Afghanistan."

12    Something along those lines.

13         Q     Fair to say you don't know exactly why your

14    brother and sister-in-law took Baby Doe to see

15    Senator Cruz, right?

16         A     Yeah.

17         Q     If I want to know that I should ask them,

18    right?

19         A     Probably.

20         Q     Or Senator Cruz?

21         A     That's fine too.

22         Q     Staying on that same page, you go down --

23    there's a second email that you sent to Dena that

24    same day and you said, "Here is part two of the

25    photos," right?

Page 114

1          A      Yep.

2          Q      And so those were additional photos that

3    you selected from the Google photo album to send to

4    Dena?

5          A      That's right.

6          Q      For her consideration and use with the Pipe

7    Hitter Foundation website posting?

8          A      Yes, sir.

9          Q      So you understood that she was going to use

10   those in support of the fundraising campaign?

11         A      Yes, sir.

12                MR. POWELL:  12, please.

13                (Mast Deposition Exhibit No. 12 was marked

14                for identification and attached to the

15                transcript.)

16   BY MR. POWELL:

17         Q      Mr. Mast, you have been handed Deposition

18   Exhibit 12 which is a series of emails between you

19   and Dena starting on the morning of Wednesday, May

20   the 10th and running to Thursday, May the 11th.  Do

21   you see that?

22         A      Yes, sir.

23         Q      And there in the middle of the first page,

24   there's an email, I don't see your name on it but

25   it's to Dena from someone named Benjamin Nichols and

Page 115

1    he says to her, "Hi Dena.  Attached is the HTML for

2    our new grantee announcement.  Please let me know if

3    you have any edits to this of the landing page."  Do

4    you see that?

5           A     Yes, sir.

6           Q     And that's an email that Dena forwarded to

7    you that same date, right?

8           A     Yes.

9           Q     So when she forwarded Mr. Nichols' email to

10   you, you knew what was going to be posted on the Pipe

11   Hitter Foundation, right?

12          A     Yes.

13          Q     Have a look at the third page of Exhibit

14   12.  There is a photograph embedded there on the page

15   of your brother Joshua, Stephanie and Baby Doe.  Do

16   you see that?

17          A     I do.

18          Q     Did you send that photo to the Pipe Hitter

19   Foundation?  The reason I ask is I didn't see it

20   among the photos that were attached to the emails

21   that you sent previously.

22          A     I don't recall.  There is like 20-some

23   photos in here.  I don't see it attached in here

24   either, but there is also -- what are these?

25          Q     That's a fair question.

Page 116

1        A      So I think I did but it looks like when it

2     was printed it didn't download the images.

3        Q      That's a very fair comment.  I wondered

4     that myself.  So what you're saying I think is in the

5     previous emails when you were sending photographs to

6     Dena there are references to photos that just don't

7     show up in the emails, right?

8        A      I think that's right and that's where I

9     think this came from.

10       Q      So go back to the photo album, the whole

11    thing.  You're getting there.  There you go.  If you

12    turn to page ten of Exhibit 8, top line.

13       A      Yeah.

14       Q      That's the photo that's embedded in the

15    newsletter that Dena forwarded to you the morning of

16    May the 10th, right?

17       A      Yes, sir.  I think it's safe to say that I

18    copied that and sent that in.

19       Q      Turn to the -- I'm back to Exhibit 12.

20    Same one.  You've got it.  So flip the page to the

21    next page in Exhibit 12, the one after the

22    photograph.  Are you there?

23       A      Yes, sir.

24       Q      Down below the middle of the page is an

25    email from you same day, May the 10th, you say that

Page 117

```
 1    the photos look great.  And then you go on to say in
 2    the fourth paragraph from the top, it says -- and I'm
 3    reading from the email, "In a helicopter raid behind
 4    Taliban lines."  That's in quotes.  And then you say,
 5    "It wasn't a raid but a volunteer-based targeted
 6    rescue/evacuation of Joshua's interpreter's three
 7    siblings, Lily's caretakers and Lily herself."  Do
 8    you see that?
 9        A    Yes.
10        Q    So am I understanding your email to
11    Ms. Cruden that morning to be saying you wanted to
12    amend the newsletter that was going to be posted on
13    her website to change the language as you suggested?
14        A    Yes, sir.  If you want additional context,
15    this is referring specifically to when the
16    translator's three siblings, John, Jane Doe and Baby
17    Doe were all in Kabul, I think, and I just didn't
18    want somebody to think that -- raid seemed to
19    indicate that they were going out and raiding.  This
20    was, like I said, just trying to get her over the
21    rush at the Kabul airport into the airport itself.
22        Q    Before you sent that email to Dena making
23    that editorial suggestion, had you forwarded her
24    email to Joshua so that he would get a chance to see
25    what the Pipe Hitter Foundation was going to post?
```

Page 118

1      A     I do not recall that.

2      Q     Did you read it to him?

3      A     I don't think so.

4      Q     Isn't it true, Mr. Mast, that the language

5   that you proposed that be substituted into the

6   newsletter came from Joshua not from you?

7      A     No, not at all -- well, as far as how do I

8   know about the story or this verbiage?

9      Q     Both.

10      A     How I knew about the story came from Joshua

11   because I was involved with that at the time.  I

12   remember being up late at night knowing that they

13   were going to go out and try to acquire her and

14   couldn't sleep thinking about it.  But as far as the

15   terminology, that absolutely came from me.

16      Q     And so just for the time context here, this

17   would have been in August of '21 when the country was

18   falling to Taliban?

19      A     Yeah.

20      Q     And a lot of people were getting evacuated,

21   U.S. personnel, Afghan personnel, et cetera, et

22   cetera?

23      A     Uh-huh.

24      Q     Tell me what was going on with you and

25   Joshua at that time.

Page 119

1          A     Well, the whole family was up late at

2     night, like I knew that he was working around the

3     clock to try to get not only them but multiple people

4     out.  There's -- don't ask me for an exact number but

5     it was over a dozen, maybe as many as 30 people that

6     he assisted in getting into contact with or helping

7     them get out of the country, people that were -- so

8     anyway, I was familiar with all of that.

9               And as far as relates to this, though, what

10     was going on specifically was -- well, not really

11     anything going on, I was just receiving updates, as

12     were most of us, from him about what was the latest.

13          Q     At the top of your answer you referred to

14     "them".  That would be John Doe and Jane Doe and Baby

15     Doe, right?

16          A     Just now?

17          Q     Let me ask it a different way so you don't

18     have to remember exactly what you said in response to

19     my last question.

20               Am I understanding you to say that at the

21     time when things were going badly in Afghanistan,

22     your brother was trying to facilitate the evacuation

23     of John Doe, Jane Doe and Baby Doe to the United

24     States?

25          A     Yes, along with many other people.

Page 120

```
 1        Q    That's where I'm going.  There were
 2   additional people that, to your recollection, your
 3   brother was trying to assist in getting out of the
 4   country?
 5        A    Correct.
 6        Q    And there is a reference in the proposed
 7   substitute language there to Joshua's interpreter's
 8   three siblings?
 9        A    Yes.  The interpreter is referring to the
10   fellow that was helping him translate to John and
11   Jane Doe all this time.
12        Q    That would be Mr. Osmani?
13        A    Ahmad Osmani.
14        Q    Ahmad Osmani.  So the reference to Joshua's
15   interpreter's three siblings would be Mr. Osmani's
16   three siblings to your understanding?
17        A    Yes, that is correct.
18        Q    Who else in your family was participating
19   in Joshua's efforts to monitor what was going on in
20   Afghanistan at this time?
21        A    Was informed of?  Nobody was really
22   participating.  He's the only one that was really
23   handling that.  But as far as who was informed of it,
24   our whole family was, extended family too, in-laws,
25   et cetera.
```

Page 121

1      Q      Where were you physically at the time?

2      A      Rustburg, Virginia.

3      Q      Where was Joshua?

4      A      He was -- he's stationed in MARSOC in North

5   Carolina, so he was -- I think he was down there.

6   No, he might have been in Charlottesville at the time

7   because he moved from Charlottesville down to MARSOC

8   in Wilmington, North Carolina, so he might have been

9   in Charlottesville at the time.  Yeah, that sounds

10  correct.  I think Charlottesville.

11     Q      And then he and Stephanie moved to North

12  Carolina?

13     A      Yes.  He got stationed down there.

14     Q      So Dena -- going back to that page we were

15  just looking at, down at the bottom of the page, she

16  responds to your request, "Will do."

17     A      Yes, sir.

18     Q      Turn to the next page, please.

19     A      Okay.

20     Q      And then you will see that apparently she

21  forwarded your requested change to Ben Nichols there

22  at the top of the page?

23     A      Yes.

24     Q      And then later that same morning you sent

25  to her some additional photographs, right?

Page 122

```
1        A     Are these additional or just -- I think
2    they are, yes.
3        Q     So you say in your email at 11:51 a.m. on
4    the morning of May 11, you said to Dena, "Here are
5    the photos that I was able to locate that were used
6    in the CBS news story."  Do you see that?
7        A     Yes.
8        Q     And so did you pull those photos off of the
9    Google photo album?
10       A     I think I did.  Yes, I think I did.
11       Q     But you knew because you had seen the CBS
12   Morning News story that those photos had been used by
13   CBS?
14       A     Correct.
15       Q     And so in your text to Dena you say that
16   they, quote, "They are, quote, fine to share since
17   they are already public," close quote.  Do you see
18   that?
19       A     I do.
20       Q     What was your basis for saying that in your
21   email to Dena?
22       A     I started thinking about it after I had
23   sent all those photos over to her and they have a lot
24   of -- my first instinct was just like these would be
25   good for fundraising because it shows his family and
```

Page 123

1    all that stuff, but I started thinking about it more

2    and I was like, well, it's already got -- basically I

3    had a second thought where I had seen a lot of photos

4    of my family get shown in news articles that were,

5    shall we say, not friendly towards the story of --

6    and my brother, and I was like, well, some of those

7    are already circulating anyway, why don't I not share

8    anything that has my other nephews, as little as my

9    family as possible except for Joshua and Steph and I

10    will try to stick with ones that are already in what

11    I consider to be public domain because presumably

12    hundreds of thousands of people had already seen

13    these CBS interviews, I don't know what the extent

14    is, so I was like, well, they should be fine because

15    these are already public.

16         Q     Did you get any advice from anyone on your

17    opinion that because they had already been aired on

18    CBS they were fine to share?

19         A     My wife.

20         Q     Did you confer with any lawyer on that

21    question?

22         A     No.

23         Q     You didn't confer with Joshua about it?

24         A     No.

25         Q     Or Richard?

Page 124

1      A      Huh-uh.

2      Q      Or any of Joshua's lawyers?

3      A      No.

4      Q      Or Richard's lawyer?

5      A      No.  Again, never spoken to Richard or

6   Josh's lawyers.

7      Q      The next sentence you say -- and this is in

8   your email to Dena on May 11, same exhibit we have

9   been looking at, you say, quote, "Anything else, just

10  please blur out for now as discussed," close quote.

11  Do you see that?

12     A      I remember saying that.  Yeah, I see it.

13     Q      What did you mean by that?

14     A      Just like if she was older, like anything

15  that wasn't on the CBS interview, maybe blur out her

16  face just so it would be -- so that photos that

17  weren't already in public domain wouldn't be

18  broadcasted.

19     Q      And the last clause of that sentence says

20  "as discussed."  So had you had a conversation with

21  Dena about how to handle these photos?

22     A      Yeah.  I remember wrestling with the

23  concept of it and like whether I should basically

24  change my mind after I had already sent her all the

25  photos and I decided I did.  I asked her if I could

1    call her and I just called.  I don't think there's

2    actually a written record of it.

3         Q    Do you remember how she reacted to your

4    request to blur out photos that were not used by CBS?

5         A    Generally.  She was -- I remember she was

6    very receptive to it.  She didn't mind.  But I don't

7    have any like specifics.  She said, "Sure.  That's no

8    problem.  If you think that's best, we will do that."

9    Something along those lines.

10        Q    Do you recall when you first spoke with

11   Dena either on the phone or by text or by email about

12   the CBS News story that was aired in January?

13        A    It would have been this conversation here,

14   so between May 10th and 11th, I guess.  I think

15   that's when I referenced it.

16        Q    Do you recall knowing when you spoke of

17   this with Dena that she was already aware of the CBS

18   interview or were you the one who told her about it?

19        A    I think I was the one that told her about

20   it.  Yeah, I think that's right.

21        Q    Do you remember telling her that after CBS

22   ran that story that we had filed a motion with the

23   court to have your brother and sister-in-law held in

24   contempt because of the photos that showed up on CBS?

25        A    I'm positive I didn't because I didn't find

Page 126

1    out about the contempt for the CBS interview until I

2    got the subpoena.

3        Q     And the cease and desist letter?

4        A     Yes.  Yes.

5             MR. POWELL:  We've been going about an

6    hour.  Let's take a break.

7             THE WITNESS:  All right.

8             THE VIDEOGRAPHER:  Please stand by.  We are

9    now off the record.  The time is 12:04 p.m.

10            (Recess, 12:04 p.m. - 12:19 p.m.)

11            THE VIDEOGRAPHER:  We are now on the

12   record.  The time is 12:19 p.m.

13   BY MR. POWELL:

14       Q     Mr. Mast, I want to go back briefly to your

15   creation of your samewisegamgee12@proton.me email

16   address.

17       A     Yes, sir.

18       Q     You testified about that earlier and when

19   you set it up.  Remind me why you chose to do that.

20       A     Sure.  As I said earlier, I try to keep my

21   emails -- I'm not a neat freak or anything but I like

22   things organized, so I figured since this was

23   probably going to be an endeavor where I was

24   receiving presumably a few communications, it would

25   be easier to keep it organized that way.  I get quite

Page 127

1    a few emails for work and I didn't want to use that

2    one.

3         Q    Why did you choose proton.me?

4         A    It's just a different email address than I

5    had.  I couldn't create another school one and I

6    didn't want to create a gmail one.

7         Q    What is your familiarity with the way that

8    email works?

9         A    With proton?

10        Q    Yes.

11        A    I was just told it was a secure server.

12        Q    Who told you that?

13        A    Nobody.  It's like --

14        Q    Was it Richard?  He uses it too, doesn't

15   he?

16        A    I've never sent an email to him with a

17   proton email address so I don't know.

18        Q    Have you ever received an email from

19   Richard from proton?

20        A    From proton?  I don't think so.  No.

21        Q    When you say it uses a secure server what

22   do you mean?

23        A    Well, secure server.  I was just told that

24   it's -- like gmail is -- people have said that it's

25   less secure as far as information can be leaked.  And

Page 128

1      my Liberty email address was one for my employer, and

2      so I was just told the proton -- I discovered, not

3      necessarily told, that proton was a more secure email

4      chain, like stuff wouldn't be leaked or as easily

5      hacked or things like that.

6           Q     Did you do any independent research to

7      confirm what you had been told about the security of

8      proton.me?

9           A     Just asked around.

10          Q     Did you ask any members of your family

11     about it?

12          A     No, just other friends and stuff.

13          Q     Did you ask any lawyers about it?

14          A     No.

15          Q     So we were talking, Mr. Mast, before the

16     break about your back and forth with Dena sending her

17     photographs for use on the Pipe Hitter Foundation

18     website and we talked about that and we talked about

19     some editorial comments you made about suggestions

20     you made about the content of the newsletter they

21     were going to put up, right?

22          A     Yes.

23          Q     Did you come to learn that soon after that

24     the Pipe Hitter Foundation put information about your

25     brother and sister-in-law's case and Baby Doe up on

Page 129

1      its website?

2          A      Yes.

3          Q      Have you seen all of the things that the

4      Pipe Hitter Foundation posted?

5          A      As far as I know, yeah.

6          Q      And you have seen the website postings?

7          A      Yes.

8          Q      And the Instagram postings?

9          A      I don't have Instagram, didn't see anything

10     that they posted there, and I don't think I checked

11     their Facebook page either.  I just saw the website

12     and was told that they were going to put it on their

13     social media platforms but it would mirror everything

14     that was on the website.

15         Q      Did you look anywhere other than the Pipe

16     Hitter Foundation's website for what it had posted

17     regarding these matters?

18         A      Not until I got the cease and desist

19     letter.

20         Q      And then what did you do?

21         A      I went to Facebook -- no, I called my

22     brother Jacob and asked him -- because he has

23     Instagram.  I think he might be the only one in the

24     family that uses it.  I'm not sure.  Anyway, we're

25     not a social media family really.

Page 130

1        But I called my brother Jacob and asked him

2     to go to Pipe Hitter Foundation Instagram handle, I

3     think is the right term, and asked him to verify what

4     the cease and desist letter was saying that there

5     were certain photos of Baby Doe that weren't blurred

6     and that's how I found that out.

7              MR. POWELL:  Let's mark this as 13, please.

8              (Mast Deposition Exhibit No. 13 was marked

9              for identification and attached to the

10             transcript.)

11    BY MR. POWELL:

12      Q    Mr. Mast, you have been handed Deposition

13    Exhibit 13 and I will represent to you that this is a

14    compendium of information that we found available

15    online.  You see the date at the header, "Visited

16    June the 11th, 2023."

17             Let's just scroll through the pages here

18    and let me know which of these you recognize.

19      A    Okay.  Do you want me to state which ones I

20    recognize?

21      Q    Yes, please.

22      A    Okay.  So page one, everything on there I

23    recognize.  Page two, I recognize everything on

24    there.  Page three, I recognize that.  Page four I

25    had not seen until after I got the cease and desist

Page 131

```
 1      letter but I have a Facebook account so I went and
 2      looked that up afterwards.  And then page five, that
 3      is Instagram, same thing as what I said earlier about
 4      my brother Jacob and using him as a resource to look
 5      at that.  And same thing for page six.  Same thing
 6      for page seven.  And same thing for page eight.
 7           Q     So page seven and eight are Facebook and
 8      Instagram posts by Eddie Gallagher and his wife
 9      Andrea, right?
10           A     That's correct.
11           Q     Have you had any contact with either of
12      them?
13           A     No.
14           Q     Do you know who they are?
15           A     I know they are the ones who the Pipe
16      Hitter Foundation was kind of formed I think by Eddie
17      Gallagher's brother for his legal defense, raising
18      funds specifically.
19           Q     Do you know whether the Pipe Hitter
20      Foundation has a Listserv?
21           A     A list?
22           Q     Listserv.  An email list.
23           A     Like an email publication that they send
24      out?
25           Q     Yes.
```

Page 132

1          A      Yeah, I was aware of that.

2          Q      So do you know that the Pipe Hitter

3     Foundation not only posted what we see here in

4     Exhibit 13 to its web page but also pushed out an

5     email to its members?

6          A      That was initially discussed as a

7     possibility but it never -- it was not discussed

8     afterwards, but I assume that was probably the case,

9     yes.

10         Q      So you don't know one way or the other what

11    else the Pipe Hitter Foundation did with this

12    information other than what we see in Exhibit 13?

13         A      Correct.  I never received the email

14    publication, I don't think.

15         Q      Do you recall, Mr. Mast, sending an email

16    to Dena Cruden on May the 17th asking if Joshua could

17    use Pipe Hitter Foundation grant money for basic

18    living necessities?

19         A      I think I did.  I don't know about the date

20    but I remember having a conversation with her at some

21    point along those lines.

22              MR. POWELL:  Let's mark this 14, please.

23              (Mast Deposition Exhibit No. 14 was marked

24              for identification and attached to the

25              transcript.)

Page 133

1    BY MR. POWELL:

2        Q    Mr. Mast, you have in front of you

3    Deposition Exhibit 14 which you will see is an

4    exchange of text messages between you and Ms. Cruden

5    starting with your initiating text there at the top

6    of the first page, Wednesday, May 17, where you text

7    her, quote, "Would you have time to talk for a few

8    moments regarding funds raised being distributed to

9    my brother," close quote.  Do you see that?

10       A    I do.

11       Q    And then you go on in the next paragraph to

12   say that he had -- he Joshua had confided in you that

13   he was out of money and was praying for a miracle,

14   and you were wondering if some of the Pipe Hitter

15   funds could be used -- you will see there in the

16   third-to-the-last line -- quote, for basic living

17   necessities.  Do you see that?

18       A    I do.

19       Q    Tell me what you remember about your

20   conversation with Dena about this subject.

21       A    I remember talking to her that I was -- I

22   had at some point talked to my brother, I don't

23   remember when, but he had said that things were

24   pretty tight financially and told me a little bit

25   about that and that was the end of the conversation.

Page 134

```
 1              And, anyway, so I was like, well, let me
 2      see -- I thought to myself maybe I would be able to
 3      use the funds because Dena and I hadn't spoken
 4      extensively about like do we wait until we get the
 5      goal of 100,000 before we distribute it or can we do
 6      it piecemeal, so I called about to ask about that.
 7          Q    Well, you already begun a piecemeal
 8      distribution, right, because you had already received
 9      $5,000.
10          A    Oh.  Was this after that?
11          Q    Yes.
12          A    Then yes.
13          Q    Okay.  So did you have just that one
14      conversation with Joshua when he asked the question?
15          A    About this?
16          Q    Yes.
17          A    Yes.
18               MR. FRANCISCO:  Objection.  States facts
19      not in evidence.
20      BY MR. POWELL:
21          Q    And then you sent the text message to Dena
22      asking for a phone call, right?
23          A    Yes.
24          Q    So did you speak with Dena about that?
25          A    Let me make sure I'm following right.  Did
```

Page 135

1    I speak with Dena about talking with my brother about

2    him needing funds?

3        Q    No, different question.  We have

4    established that your brother asked you to ask

5    whether the funds could be used for basic living

6    necessities and you then texted --

7        A    No, my brother didn't ask me that.

8        Q    He said he was short of funds.

9        A    He said he was short of funds.  He never

10   asked me for anything.  So I went to Dena to ask

11   after I heard the information.  He didn't ask me for

12   anything.

13       Q    So that was entirely of your initiative to

14   reach out to Dena?

15       A    That is correct.

16       Q    And that's what's reflected on the first

17   page of this text.  And then you had a phone call

18   with her, correct?

19       A    Yes.

20       Q    Tell me about that phone call.

21       A    With Dena?

22       Q    Yes.

23       A    I called her and asked if we could talk and

24   she said sure and eventually we talked and I just

25   said that -- I asked for an update on if there were

Page 136

1      funds available, like had any more come in since the

2      last distribution, I think, and just that my brother

3      was tight on funds just because of the whole legal

4      deal and asked if it could be used not strictly for

5      legal finances but also basic living necessities.

6            Q      What did she say?

7            A      She said yes.

8            Q      That you could --

9            A      Use them for both.

10           Q      That you could dispense funds to Joshua who

11     could then use them not only for legal defense but

12     also for basic living necessities?

13           A      Yes, essentially.

14           Q      Did you get that from her in writing?

15           A      Isn't that on the actual agreement where it

16     says on the first page?

17           Q      Other than that did you get any

18     confirmation from her after this phone call that you

19     could do that?

20           A      I don't think I got anything in writing.

21           Q      Did you communicate to Joshua that it was

22     going to be possible for him to use Pipe Hitter

23     Foundation funds for basic living necessities?

24           A      I don't remember because we haven't sent

25     any other funds after that -- if this happened after,

Page 137

```
1     which I think did, the 17th, so this happened after
2     the first initial funds were distributed to me --
3                    MR. FRANCISCO:  I just want to state for
4     the record the email --
5                    MR. POWELL:  I got it.
6     BY MR. POWELL:
7          Q     I think where Mr. Francisco is going with
8     this is I may have misled you to think that the money
9     -- the first $5,000 had already been received in your
10    account before this exchange of text messages, but if
11    you look at the bottom of the second page of the text
12    string you will see -- this is her to you -- "You
13    should see it in your account by Monday."
14         A     Great.  Okay.
15         Q     That would be the $5,000 he is talking
16    about, right?
17         A     Yeah.  So this message was prior to me
18    receiving the first five grand.
19         Q     After you had signed the contract but
20    before the first installment arrived?
21         A     Yes.
22         Q     And so far as you've said the only
23    installment, correct?
24         A     Yes.
25         Q     Up at the top of the second page, Mr. Mast,
```

Page 138

1    you say to Dena, "Hi Dena.  After speaking with my

2    wife and my brother, I think it best to send the

3    funds to me and I will distribute it to him for the

4    reasons we discussed last call."  So why did you

5    speak to your wife about this?

6         A    Well, because we handle all of our finances

7    together.

8         Q    And did you say earlier that that account

9    is in both of your names?

10        A    Uh-huh.

11        Q    Yes?

12        A    Yes, sir.  Sorry.

13        Q    That's all right.  And you said, "after

14   speaking with my wife and brother."  So am I

15   understanding this correctly that this would be the

16   second conversation with your brother about this

17   distribution of how he could use the money?

18        A    Yeah.  What I think -- I must have called

19   Joshua afterwards and told him that I would be

20   sending funds to him and asked for him the best way

21   to get them to him, if he wanted a check or transfer

22   or whatever.

23        Q    And so in that same sentence you say, "I

24   think it best to send the funds to me and I will

25   distribute to him for the reasons we discussed last

Page 139

1    call."  The "we" you're referring to is you and Dena?

2          A     Dena.

3          Q     We talked a little bit earlier, Mr. Mast,

4    about the One America News interview.

5          A     Yes, sir.

6          Q     It's correct that you gave an interview to

7    One America News on June 11th?

8          A     Yes, I think that was the date.

9          Q     Who arranged that?  Sorry.  Did counsel on

10   the phone -- I don't want to interrupt an objection.

11         Who arranged the interview with One America

12   News?

13         A     That would be what I refer to as the media

14   team for Pipe Hitter Foundation but it would be Mary

15   Vought.

16         Q     Vought, V-o-u-g-h-t.

17         A     So Mary and she has a couple of other team

18   members that I am in communication with and I don't

19   know which one specifically had reached out to OANN

20   but it was them.

21         Q     And it's true, isn't it, that several

22   images of Baby Doe are displayed during your

23   interview, correct?

24         A     That is correct.

25         Q     How did the One America News outfit get

Page 140

1      those photos?

2           A      I think that I sent them to the fellow who

3      did the interview on One America News Network.

4           Q      When you did that did you provide to One

5      America News a copy of the protective order or were

6      you then still not aware of the protective order?

7           A      I did not provide one and I was not aware

8      yet.

9           Q      So just to be clear, I think I have this in

10     the chronology of your testimony.  You said that you

11     didn't become aware of the protective order until you

12     got it from Mr. Elliker and the cease and desist

13     letter?

14          A      No.  I knew that one existed but I didn't

15     have a physical copy of one until then.  I don't

16     think I read the actual protective order.

17          Q      Until you received it from Mr. Elliker in

18     the cease and desist letter?

19          A      Correct.

20          Q      So the photos that showed up in the

21     interview that you gave, they originate in the Google

22     photo album, correct?

23          A      That's right.

24          Q      Whether they came from you or from Mary

25     Vought, that's where they started and someone

Page 141

1    provided them to the One America News Network?

2        A    Yes.

3        Q    At the end of the interview, I've watched

4    it many times, I don't want to mischaracterize your

5    testimony, you directed viewers to the Pipe Hitter

6    Foundation website if they wanted to donate and help

7    in the legal battle, correct?

8        A    I did.

9        Q    Who asked you to do that?

10       A    Nobody.  I mean, myself, Dena and Mary

11   talked.  The conversation was an instruction of like,

12   "How do I do this?"  And they're like, "Just direct

13   them back to the website and we will have everything

14   there."

15       Q    Your interview is still available on the

16   One America News website, isn't it?

17       A    I haven't checked but I presume so.

18       Q    You've never asked them to take it down,

19   have you?

20       A    No.

21       Q    I saw it yesterday so it was up at least as

22   late as yesterday but you haven't looked at it

23   recently?

24       A    Not in at least two weeks.

25       Q    Did you have a copy of the questions you

Page 142

1    were asked before the interview took place?

2         A    No, not a copy.  I did speak with the

3    gentleman who gave the interview and just to make

4    sure to introduce myself, to meet him and just ask

5    what the nature of the interview was going to be

6    like; was it going to be long, short, things like

7    that.

8         Q    Was it just you and him in that

9    conversation?

10        A    It was.

11        Q    Who arranged the conversation?

12        A    Mary.

13        Q    And what did he tell you about where he had

14   planned to go during the interview?

15        A    He just said that it was going to be a

16   little bit of discovery.  It was actually a pretty

17   short call.  Probably five minutes.  And let's see.

18   He said it was going to be a shorter interview.  He

19   was going to ask me to tell how -- like Baby Doe's

20   origins and -- I can't recall a whole lot of other

21   detail but he did say it was going to be fairly short

22   and just a few questions.

23        Q    Did One America News publish the entire

24   interview?

25        A    No.

Page 143

1       Q      How long did the interview last?

2       A      I would guess ten to 15 minutes.

3       Q      I don't have in my head how long -- what

4    they ran with --

5       A      Five minutes.

6       Q      I was thinking it was around five.

7       A      Yeah.

8       Q      So who decided what to run and what not to

9    run?

10      A      They did.

11      Q      Did you have any input in that?

12      A      No.

13      Q      Did Mary?

14      A      I don't know.

15      Q      Did anybody from the Pipe Hitter Foundation

16   have any input in the decision making at One America

17   News regarding what to run from your interview?

18      A      I don't know.  That would be news to me if

19   that was the case.

20      Q      Was there anything in the interview that

21   they did not run that you thought was important?

22      A      They didn't -- they edited a portion that

23   was -- sorry, I didn't pause.  But they edited a

24   portion that I wished to have clarified better and I

25   realized that that might be taken poorly when I got

Page 144

1    the cease and desist letter.  The cease and desist

2    letter concluded that I was calling John and Jane Doe

3    Taliban and that's not what I was trying to say.  I

4    was referring to -- I don't know -- at some point in

5    the interview I was referring to basically trying to

6    summarize the political goings-on and negotiations

7    between the U.S. and the Taliban and I wasn't trying

8    to say that John and Jane Doe were Taliban.  I was

9    trying to describe that negotiation process for the

10   withdraw.

11        Q    So the short answer to my question is there

12   were portions of your interview that they didn't run

13   that you wish they had?

14        A    Yes.

15        Q    So all of the information that you shared

16   in the interview, none of that was from your own

17   personal firsthand knowledge, was it?

18        A    Like being there?

19        Q    Yes.

20        A    No.  It was firsthand knowledge in terms of

21   I spoke about it with my brothers at the time that it

22   occurred but I wasn't there in person.

23        Q    But the story that you relayed during the

24   interview with One America News was your brother

25   Joshua's story, correct?

Page 145

1      A    Yes.  Most of the information came from him

2   at the time that it occurred, correct.

3      Q    So during this time frame, April and May of

4   2023, Joshua knew you were in touch with the Pipe

5   Hitter Foundation, correct?

6      A    Yeah, I had told him that I had decided to

7   touch base with them and partner with them.

8      Q    Did he know in advance that you were going

9   to be interviewed by One America News?

10     A    No, he did not.

11     Q    Why didn't you tell him?

12     A    I purposely didn't tell anyone in my family

13  because there has been a lot of, oh, politely put,

14  negative media coverage of my family and I didn't

15  want any repercussions to go to anybody else but me.

16     Q    Were you aware on June 28th Joshua and

17  Stephanie's lawyers filed in the federal court case

18  something called a memorandum in opposition to

19  Plaintiffs' motion to show cause?

20     A    Yes, I think so.  Is that where the cease

21  and desist letter gets filed with the complaint, my

22  brother's attorney filed their response to that?

23     Q    Let's back up a little bit.  This is not a

24  memory quiz for you and I'm not asking you to

25  recreate what's in the court file.

Page 146

1              You became aware, I'm sure, that after the

2    One America News story ran that on behalf of the

3    Plaintiffs we filed a second motion with the court

4    trying to have your brother and sister-in-law held in

5    contempt for violation of the protective order.

6         A    Yes, I am aware of that.

7         Q    And in support of that motion we filed a

8    memorandum in support of the motion and then your --

9    the lawyers representing your brother and

10   sister-in-law did what good lawyers do, they filed a

11   memorandum in opposition to what we had said.

12        A    Yes.  I found that out because I received a

13   second letter from y'all, Hunton Andrews Kurth.  So I

14   got a second letter from that and that basically

15   didn't make sense to me because at the time I didn't

16   know my brother had sent something, and so I went and

17   looked it up on CourtListener and found both.

18        Q    Did you read the memorandum in opposition

19   that was filed by your brother's lawyers?

20        A    Yes.

21        Q    I'm going to hand you a copy because I want

22   to show one sentence to you.

23             For the benefit of the people on the phone,

24   I'm not marking this as an exhibit but this is the --

25   so for the benefit of the lawyers on the phone, this

Page 147

1    is document number 239.  It's the memorandum in

2    opposition that McGuire Woods filed on behalf of

3    Joshua and Stephanie on June the 28th.

4            So turn to the third page, please, Mr.

5    Mast.  Looking down to the last sentence of the long

6    paragraph that begins above the middle of the page.

7    Are you with me?

8       A    I am.

9       Q    The sentence reads, "Joshua and Stephanie

10   Mast had no knowledge that Jonathan Mast was speaking

11   with the Pipe Hitter Foundation."  Do you see that?

12      A    I do.

13      Q    That's not true, is it?

14      A    I believe speaking is referencing the stuff

15   published on social media, the website, et cetera.

16   So they didn't know that, what I had said, et cetera,

17   et cetera.  They knew that I made contact with Pipe

18   Hitter Foundation -- at least I think they did.

19      Q    Well, you testified just a few minutes ago

20   that you were -- that Joshua was aware in April and

21   May that you were in contact with the Pipe Hitter

22   Foundation, right?

23      A    I did say that, yes.

24      Q    So this language from this memorandum in

25   support that I just read to you is not true, is it?

Page 148

1        A    I would say it needs to be clarified.

2        Q    Who is going to clarify it?  This is

3    something filed with the court.

4        A    That's not for me to know.  Well, it also

5    goes on to say "until he had already done so," and

6    that is correct.

7        Q    Well, that's with reference to the One

8    America News interview which you just said he didn't

9    know about that until after the fact.

10            MR. FRANCISCO:  Objection.  Argumentative.

11            THE WITNESS:  Well, to clarify, just to be

12    as clear as I can, the sentence itself, if you take

13    the whole thing in context, Joshua and Stephanie Mast

14    had no knowledge that Jonathan Mast was speaking with

15    the Pipe Hitter Foundation or that he would speak

16    with One America News Network until after Jonathan

17    had already done so, and that is correct.

18            MR. HARDING:  He testified to that.

19            THE WITNESS:  I talked with them first and

20    then informed Joshua of that.

21    BY MR. POWELL:

22        Q    So let's parse that sentence which is what

23    I think you've just undertaken to do.  Do you

24    interpret the phrase at the end "until after Jonathan

25    had already done so" to refer to the whole sentence?

Page 149

1              MR. FRANCISCO:  Objection.  This document

2      speaks for itself.  It's a legal pleading not by

3      Jonathan.

4      BY MR. POWELL:

5          Q    Let me ask it another way.  You testified

6      just a few minutes ago that Joshua knew you were in

7      touch with the Pipe Hitter Foundation in April and

8      May of this year, correct?

9          A    Well, yeah, because he had to know how I

10     was sending him $5,000 or $4,000.

11         Q    And you knew that he was in touch with the

12     Pipe Hitter Foundation because he told you that

13     someone from the Pipe Hitter Foundation was going to

14     reach out to you.  That's the text message that you

15     had the initial contact with Dena on April the 9th.

16         A    Sure.  And I believe somewhere in this

17     document says he had been put in touch with the Pipe

18     Hitter and told them he couldn't work with them and

19     that's why he directed them to another member of the

20     family.

21         Q    Right.  So you were then in contact

22     intermittently in April and May with the Pipe Hitter

23     Foundation and Jonathan (sic) knew about that, didn't

24     he?

25         A    Joshua.  Yes.

Page 150

1      Q     I'm sorry.

2      A     That's okay.

3      Q     Joshua knew about that, right?

4      A     Yes, I think so.  Well, after I made

5   contact with them, correct, yes.

6      Q     Thank you.  That's all I have on that one.

7   So we talked a little bit earlier about your AP

8   interview.  Let's dig into that a little bit, please.

9      A     Okay.

10            (Mast Deposition Exhibit No. 15 was marked

11            for identification and attached to the

12            transcript.)

13   BY MR. POWELL:

14      Q     So I think you have already testified, Mr.

15   Mast, that you have been interviewed by the

16   Associated Press, correct?

17      A     I did a phone interview with them, correct.

18      Q     You jumped ahead in my outline.  So it was

19   by phone?

20      A     Yes, sir.

21      Q     Do you remember approximately when it was?

22      A     After the OANN interview but that's -- I

23   don't remember the date.

24      Q     Let's see if we can put some date concept

25   to my questions.  You have Exhibit 15 in front of you

Page 151

1    which says at the top of the page, "Documentation

2    Part One."

3         A    Yep.

4         Q    And this is an email from you using your

5    proton.me account to several people whose last name

6    is Vought and then also including Dena Cruden and Joe

7    Koss, right?

8         A    Yes, sir.

9         Q    And in the first paragraph of your email

10   you reference the upcoming interview.  That would be

11   the upcoming interview with the Associated Press,

12   right?

13        A    Yes, sir.

14        Q    So am I understanding this email to be

15   you're sending documents to the Associated Press that

16   you thought might be of assistance to the AP in

17   preparing to interview you?

18        A    No.  I think that I sent -- this was what I

19   sent over to Pipe Hitter Foundation so they could be

20   a little more familiar with what I was going to be

21   talking about.

22        Q    Did you expect the people who received your

23   email there at the top of the first page to forward

24   the documents that you had sent by email to the

25   Associated Press?

Page 152

1      A      No, not at the time, no.  I did that later.

2      Q      You sent documents to the AP after the

3  interview?

4      A      Yes.

5      Q      We will come to that in a minute.  So

6  whether Dena Cruden or the people at Vought sent to

7  the AP before your interview the documents that you

8  had sent, you don't know one way or the other, do

9  you?

10     A      I do not.

11            (Mast Deposition Exhibit No. 16 was marked

12            for identification and attached to the

13            transcript.)

14  BY MR. POWELL:

15     Q      You've been handed Exhibit 16, right?

16     A      Yes, sir.

17     Q      One pager.  It is titled at the top

18  "Documentation part two."  And this is an email that

19  you sent also on June the 10th to the people -- same

20  people you sent the previous email to, right?

21     A      Uh-huh.  Yes, sir.

22     Q      You sent this just a few minutes later?

23     A      Yes, sir.  That's right.

24     Q      So you're sending to the recipients

25  additional documents that you thought might be of

Page 153

1   interest to the AP in preparation for your interview,

2   right?

3        A      More or less, yes.

4        Q      And do you know one way or the other

5   whether those four documents that you sent with what

6   has been marked as Exhibit 16, whether they were ever

7   transmitted to the Associated Press?

8        A      Not from this email but I do know -- well,

9   I was told that we would send over a lot of this

10  information to the AP eventually.  I sent a second

11  email after this.  This was in preparation for the

12  interview.  So post-interview I reorganized a lot of

13  these into a more structured format and then resent

14  it.

15       Q      We're going to come to that in a minute.

16  So looking at Exhibit 16, there are four documents

17  that you sent, right?

18       A      Yes, sir.

19       Q      And the second document listed as among the

20  attachments something that shows up on the exhibit as

21  the Rhonda Slusher statement.  Do you see that?

22       A      I do.

23              (Mast Deposition Exhibit No. 17 was marked

24              for identification and attached to the

25              transcript.)

Page 154

1    BY MR. POWELL:

2         Q    Mr. Mast, the court reporter has just

3    handed you Exhibit 17.  Can you confirm for me that

4    this is the Rhonda Slusher statement that you sent

5    around to the recipients of your email on May the

6    10th which is Exhibit 16?

7         A    Yes, sir, it is.

8         Q    How did you come into possession of the

9    Slusher Declaration?

10        A    This one I'm not sure.  Almost

11   everything -- I think everything that I acquired I

12   got off of CourtListener.com.

13        Q    I can assure you that this document is not

14   on CourtListener.com and the reason -- look at the

15   first page.  Virginia, In The Circuit Court of

16   Fluvanna County.  Do you see that?

17        A    I do.

18        Q    Will you accept my representation that this

19   is from the circuit court file?

20        A    This is state court and that's the federal

21   court -- the rest of the federal court?

22        Q    The Slusher Declaration was in the state

23   court case.

24        A    Okay.

25        Q    The reason I'm curious as to how it came

Page 155

1    into your possession is, as we've discussed earlier,

2    all those files are under seal.  How did you get this

3    document?  Your brother sent it to you, right?

4    Joshua sent it to you --

5         A    That's possible.

6         Q    Or Stephanie or even Richard, right?

7         A    It's possible.  I'm not sure I recall this

8    one.

9         Q    Well, you recalled it well enough to send

10   it to the AP just a month -- just five weeks ago.

11             MR. HARDING:  Objection.  Argumentative.

12             THE WITNESS:  I meant recalling where I got

13   it.

14   BY MR. POWELL:

15        Q    Well, you clearly had it, right, because

16   you sent it to the AP.

17        A    Oh, yeah, I definitely had it.

18        Q    You just don't recall where you got it?

19        A    Right.  I looked through hundreds of pages

20   of documents on the internet trying to pull

21   everything I could.

22        Q    You told me earlier that so far as you

23   know, you were not in the possession of any other of

24   the documents from the sealed state court records,

25   correct?

Page 156

1          A     Correct.  I did say that.

2          Q     When you saw the declaration of Rhonda

3     Slusher were you not concerned that this is a

4     document that you should never have had?

5          A     No, sir, I didn't.  To be honest with you,

6     I didn't even realize when I first got subpoenaed

7     that it was for the federal court because I thought

8     District Court of Charlottesville was the state

9     court.

10         Q     That's not my question.  My question is

11    were you concerned when you saw the Rhonda Slusher

12    Declaration that you shouldn't have had it at all?

13         A     Right.  I'm trying to answer my motivation

14    as to why I wasn't concerned because I didn't even

15    know the difference between the district court -- I

16    didn't know that these were federal documents, I just

17    knew they were in the public domain on

18    CourtListener.com, and so I didn't look at the title

19    of the documents, I just looked at the content of it.

20         Q     So is your testimony, just to be clear,

21    that you have no idea today how you came into

22    possession of the Slusher Declaration?

23         A     No.  My testimony today is that I'm not

24    sure that if I got this off CourtListener.com.  I may

25    have received it from one of my brothers, I do not

Page 157

```
 1   remember.
 2        Q    When I first asked you this question you
 3   said you got it from Joshua, right?
 4        A    I did not say that.
 5             MR. HARDING:   Objection.   That is not what
 6   he testified to.
 7   BY MR. POWELL:
 8        Q    I will let the record reflect what you said
 9   in response to my first question.   That's where you
10   got it, isn't it?   You got it from your brother
11   Joshua?
12        A    I don't believe I did.
13        Q    Or from your brother Richard?
14        A    Again, it's possible that I got that from
15   there.   I don't remember because, again, I didn't
16   even differentiate the Fluvanna County Court ones
17   from the Western District Court ones when I was
18   acquiring everything.
19        Q    Do you recall if you got the Slusher
20   Declaration from any of the lawyers representing your
21   family in the state court case?
22        A    No.   Again, like I said a couple times, I
23   have never contacted any of the lawyers from any of
24   my brothers.
25        Q    Who interviewed you from the AP?
```

Page 158

1          A     I think there were three people.  Martha

2     Mendoza.  Forgive me if I don't remember the other

3     two.  I think it was a Jessica and I don't remember

4     the third.

5          Q     And did you tell me earlier it was a phone

6     call?

7          A     It was.

8          Q     Not Zoom?

9          A     No.

10         Q     How long did it last?

11         A     Well, it was Zoom but it was no camera.  I

12    think it was Zoom but it was a phone call.

13         Q     So the cameras were not activated?

14         A     Correct.

15         Q     How long approximately was it?

16         A     An hour and ten minutes maybe.

17         Q     And do you remember how soon after June the

18    10th it was?  A day or two later?

19         A     I think so, yeah.

20         Q     The reason I say that, I'm about to show

21    you your follow-up emails which are dated June the

22    13th.

23         A     I think I sent the documentation emails the

24    night before, so yes.

25         Q     Did you share any of Baby Doe's photos with

1    the AP?

2          A     I did not.

3          Q     Do you know whether anyone else did?

4          A     I don't know.

5          Q     For example, did photos of Baby Doe come up

6    during the interview?

7          A     No.  They were just interested in the

8    story.

9          Q     So far as you're aware, Mr. Mast, is this

10   Slusher Declaration the only document from the state

11   court file that has come into your possession?

12         A     As far as I know.  All the rest I think are

13   from the federal.

14         Q     You're referring to the exhibits.  That's

15   not my question.  My question is do you have in your

16   possession beyond the Slusher Declaration that you

17   sent to the AP any other documents that, to your

18   knowledge, are from the state court file?

19         A     No, sir, I do not.

20         Q     Do you have any expectation that the AP may

21   do a follow-up interview?

22         A     No, not an expectation.

23         Q     Do you know what they are going to do with

24   the interview that you gave?

25         A     I don't.  I was a little surprised that

Page 160

1       they had sat on it for so long.

2            Q     Well, you say "so long".  It's been early

3       June you say?

4            A     Uh-huh.

5            Q     So we previewed this a little bit.  Let's

6       see if we can get through these before lunch.  You

7       sent some materials to the AP after your interview,

8       right?

9            A     Yes, sir.

10                 MR. POWELL:  Let's mark these 18 and 19.

11                 (Mast Deposition Exhibit No. 18 was marked

12                 for identification and attached to the

13                 transcript.)

14                 (Mast Deposition Exhibit No. 19 was marked

15                 for identification and attached to the

16                 transcript.)

17      BY MR. POWELL:

18           Q     Mr. Mast, you've been handed two exhibits,

19      18 and 19.  The earlier one, 18, is entitled "AP News

20      Email."  The second one is entitled "AP News Email

21      Part Two."  Do you see those documents?

22           A     I do.

23           Q     And these are in line with your testimony

24      earlier that after the interview with the AP you

25      followed up and sent some additional materials?

Page 161

1          A     Yes, sir.  That's right.

2          Q     And that's in these two emails, Exhibits 18

3     and 19 are your transmittal documents not directly to

4     the AP but to Dena and the people at Vought?

5          A     Yes, sir, that's right.  Specifically Mary.

6     Oh, Dena is on this.  Okay.  Her too.

7          Q     What was your purpose in sending these

8     additional documents to the recipients of these two

9     emails, Exhibits 18 and 19?

10         A     So AP News had -- well, the nature of the

11    conversation was I countered a lot of points or

12    provided alternate perspective and/or straight-up

13    contradicted what they were saying from information

14    that I was aware of based upon my history with

15    everything and they asked for any information that I

16    could provide to substantiate what I was saying and

17    so this is what I came up with.

18         Q     So they asked you for substantiation of

19    your interview -- what you said in the interview?

20         A     AP News did, yes.

21         Q     And then you, in response to that, gathered

22    the documents that you sent with the transmittal

23    emails that are Exhibits 18 and 19?

24         A     Correct.

25         Q     Do you know whether any of those were

Page 162

1    delivered to the AP?

2         A    I presumed they were.

3         Q    That's not what I asked you.  Do you know

4    if any of them were?

5         A    I do not.

6         Q    So did you follow up with Dena or any of

7    the Voughts to see what happened to these materials I

8    sent, did you send them to the AP?

9         A    Yes, I did do that.  I didn't -- no, as in

10   like I didn't send them personally.  So I think that

11   they were because I asked.

12        Q    Your recollection is that after you

13   transmitted the documents that you sent attached to

14   Exhibits 18 and 19 that those documents made their

15   way to the AP?

16        A    Yes.

17        Q    All of them?

18        A    I believe so.

19        Q    Since you sent these two emails, Exhibit 18

20   and 19, have you had any other communication with the

21   Pipe Hitter Foundation or Vought about further

22   contact or interviews with the AP?

23        A    A little bit.  We talked about trying to

24   come up with that list of names we talked about

25   earlier and that was about it.

Page 163

1        Q      That's when Ms. Motley's name came up,

2     right?

3        A      Yes, sir.

4        Q      Anything else that you can recall sort of

5     in the realm of follow-up with the AP beyond what

6     you've testified to?

7        A      No.  Mary said that she would handle

8     contacting them -- no, that's not right.  I contacted

9     Kimberly Motley or tried to.

10       Q      Tried to.

11       A      Yes, sir.  No.

12       Q      So that was it for the AP?

13       A      Yes.

14       Q      At least up until today?

15       A      Correct.

16       Q      I may have asked you this, Mr. Mast, and if

17    I did I apologize.  Why did you call Ms. Motley?

18       A      Oh.  So when -- I knew Kimberly Motley's

19    familiarity with everything because I remember her

20    from when in 2019/2020 when she was assisting my

21    brother Joshua with the whole process and when I was

22    talking with AP, I don't know -- I don't remember the

23    exact conversation of why it came up, but like I

24    said, they were looking for additional sources to

25    substantiate and I asked who that could be and they

Page 164

1    said anybody that was there at the time who could

2    verify to this.  So I was like, well, she was

3    somebody that was there, so that's why I contacted

4    her to see if she would be willing to make a

5    statement for AP.

6         Q     But as I think you said you did not have

7    any -- you never actually spoke with Ms. Motley?

8         A     Correct.

9         Q     Nor communicated with her in any other way?

10        A     Correct.

11        Q     Ever?

12        A     No, sir.

13        Q     So never ever?

14        A     I have never ever spoken to her.

15              MR. POWELL:  Is this a good time for a

16   lunch break?

17              MR. HARDING:  Yes.

18              THE VIDEOGRAPHER:  Please stand by.  We are

19   now off the record.  The time is 1:02 p.m.

20              (Recess, 1:02 p.m. - 1:46 p.m.)

21              THE VIDEOGRAPHER:  We are now on the

22   record.  The time is 1:46 p.m.

23   BY MR. POWELL:

24        Q     Mr. Mast, do you recall sending a text to

25   Dena Cruden on June the 14th that begins with these

Page 165

1        words, "Hi Dena, got a rather sensitive issue to

2        discuss as soon as you get a brief moment."  Do you

3        remember that?

4             A     Yes, I think so.

5                   (Mast Deposition Exhibit No. 20 was marked

6                   for identification and attached to the

7                   transcript.)

8        BY MR. POWELL:

9             Q     Mr. Mast, you've just been handed

10       Deposition Exhibit 20 by the court reporter.  It's a

11       multi-page text exchange between you and Dena Cruden

12       starting on June the 14th and running until June the

13       15th.  Do you have that in front of you?

14            A     I do.

15            Q     So there at the top, the first thing you

16       say is, "Hi, hi Dena, got a rather sensitive issue to

17       discuss as soon as you get a brief moment."  And then

18       it refers something on Instagram that he says Eddie

19       may have shared.  That would be Eddie Gallagher, you

20       believe?

21            A     Yes, sir.

22            Q     Without reference to the text message, do

23       you remember what it was that caused you to initiate

24       this text conversation with Dena on June the 14th?

25            A     The initial cease and desist letter I

Page 166

1    received.

2        Q     The one from Mr. Elliker that we marked as

3    an exhibit early on in the deposition?

4        A     That's correct.

5        Q     And what was it about Mr. Elliker's letter

6    that made you want to reach out to Dena Cruden?

7        A     As previously stated, I don't have a lot of

8    social media platforms and so when I received the

9    letter, it included a lot of exhibits which was --

10   Instagram was one of them, and so on the Instagram

11   handle, I read -- I think that's where I saw that it

12   was Eddie's Instagram handle and so that's where I

13   presume that was.  Hence, the text came from that.

14       Q     And you reference the cease and desist

15   letter there on the first page, right?

16       A     Yeah.

17       Q     And then skipping down in the text, you say

18   quote, "Seeing as how that photo came from me and

19   wasn't one of the ones that aired on CBS, thus

20   already in the public domain, I think it would

21   behoove us to take precaution to blur it out like the

22   one on the Pipe Hitter's Instagram account."  Do you

23   see that?

24       A     Yes.

25       Q     So was it your intention in this text

Page 167

1    message then to share your concern with Ms. Cruden

2    and to have her take steps to blur out what you had

3    seen on Mr. Gallagher's Instagram?

4         A    Correct.

5         Q    And that was one of the photos that you

6    provided?

7         A    Yes.

8         Q    Did she do what you asked her to do?

9         A    I think she went a step beyond and just had

10   them remove the post altogether.

11        Q    So if you turn to the next page of the

12   exhibit, you will see it looks like you and she spoke

13   that day, right?

14        A    Yes.

15        Q    And you've got embedded in the second page

16   of the exhibit, are those the photos that caused your

17   concern?

18        A    No, not these ones.  These were the ones

19   that were on CBS, to the best of my recollection.  It

20   was one where she was standing on a box that is in a

21   different message maybe.

22        Q    So it wasn't one of these three on the

23   second page, it was another one?

24        A    Yeah.  My thought process was any of the

25   ones where she was younger in Afghanistan and

Page 168

```
 1    whatnot, those were fine, and anything that aired on

 2    CBS was fine, but the ones that I provided from my

 3    family access album we should probably have blurred

 4    out if we could do that.

 5         Q    And consistent with your testimony down at

 6    the bottom of the second page of this exhibit, she

 7    says, "FYI, we deleted it just to be safe," right?

 8         A    Right.

 9         Q    And you said "thank you."

10         A    Uh-huh.

11         Q    And then continuing on, continuing the text

12    conversation with Dena about checking every photo,

13    right?

14         A    Yes.

15         Q    And then down at the bottom of the third

16    page you say, "Dena, I have one more photo edit

17    request to make, I'm sorry."  Do you see that?

18         A    Yes.

19         Q    And you go on to say, "I basically decided

20    that I probably shouldn't have used any recent photos

21    of Starfish for two reasons," right?

22         A    Uh-huh.

23         Q    And the first one you say is retaliation

24    and then the second one, which goes over onto the

25    next page is, "to not give the opposition a reason to
```

Page 169

1    screech that I'm breaking the protective order."  Do

2    you see that?

3         A    Yes.

4         Q    And you go on in that sentence to say,

5    "even though I don't believe I am because I don't

6    believe it applies to me."  Do you see that?

7         A    I do.

8         Q    And so did she follow your request?

9         A    To blur out the photos?

10        Q    Yes.

11        A    Again, she -- I think she did with

12   everything.  At some point they removed the whole

13   page from their website, Instagram, et cetera, just

14   as a safety precaution.

15        Q    Where you say on the fourth page of Exhibit

16   20, there in the middle of the page where you refer

17   to the protective order and you say, quote, "even

18   though I don't believe I am," and by that meant you

19   didn't believe you were subject to the protective

20   order?

21        A    Correct.

22        Q    What's the basis for you're having said

23   that to Dena?

24        A    Well, I wasn't an expert on the protective

25   order, I just read it from when it was sent to me,

1    but my thought process was I didn't believe that I

2    had been authorized to act on anybody's behalf and

3    that my name wasn't listed in the protective order

4    and that I knew about this information previously and

5    that this was already in the public domain, anybody

6    could have gone and gotten these photos from CBS

7    because those are still up, as far as I know.  They

8    were up when I sent these.  That's how I reference

9    which photos to send over.  So that's why I thought I

10   was at least following the spirit of the law and I

11   thought the letter as well.

12       Q     You said in your answer just now that you,

13   quote, "were not authorized to act on anyone's

14   behalf."  Did I hear your testimony correctly?

15       A     Yeah.

16       Q     Is it your testimony that you were not

17   authorized by Joshua to act on his behalf?

18       A     That is correct.

19       Q     Is it your testimony that you were acting

20   entirely on your own in sharing photos with the Pipe

21   Hitter Foundation and sharing photos with anyone

22   else, that this was just you, Jonathan Mast, acting

23   on your own?

24       A     Yes, that is correct.

25       Q     And that you were not acting on behalf of

Page 171

1     your brother Joshua?

2          A     As a formal or authorized representative or

3     agent, yes, that is correct.

4          Q     Even as informal.  Didn't Joshua know what

5     you were doing?

6          A     He knew that I was raising funds and that's

7     about it.

8          Q     Didn't he know that you were sharing

9     photographs?

10         A     He did not.

11         Q     Did you ever seek any legal advice

12    regarding whether the protective order applied to

13    you?

14         A     No.  Just my wife and I discussed it at

15    length.

16         Q     So you didn't ask your brother Joshua who

17    is a lawyer, you didn't ask him whether the

18    protective order applied to you?

19         A     No.

20         Q     And you didn't ask your brother Richard who

21    is a lawyer whether the protective order applied to

22    you?

23         A     No.

24         Q     So the next-to-the-last page of this

25    exhibit, Mr. Mast, you've got some other pictures

Page 172

 1      embedded in that page, right?

 2           A    Yes.

 3           Q    And then down at the bottom you say, "So

 4      whenever you have the chance to either remove or edit

 5      that top photo, I'd appreciate it.  Thanks."

 6           A    Yes.

 7           Q    And the top photo is the one that I think

 8      you've already testified is of Stephanie and Baby Doe

 9      on her way from Afghanistan to the U.S.?

10           A    Correct.

11           Q    And that is one that was in the album?

12           A    Yes.

13           Q    Let's look at the last page of this

14      exhibit.  So help me understand what's going on here

15      on the last page, Mr. Mast.  Is this all your

16      communication to Dena?

17           A    Yes, sir, this is what I communicated to

18      Dena.

19           Q    You're sending her the link to the CBS news

20      story?

21           A    Yes, sir.

22           Q    And you're asking her in the text at the

23      bottom as you preface by saying, "Just thinking out

24      loud."  Then you go on to say, "But do you think

25      there is any possibility of using the CBS interview

Page 173

1       that was done prior to the gag order coming into

2       place as a means of spreading the story and linking

3       it to PHF somehow."  Do you see that?

4            A     Yes, sir.

5            Q     What became of that suggestion?

6            A     Well, again, I'm trying to remember if we

7       spoke on the phone after that or what, but nothing

8       really happened with it at the moment because, as I

9       stated previously, the Pipe Hitter Foundation kind of

10      put a pause on our communications and fundraising

11      efforts and just kind of held off for the time being.

12           Q     When you refer in the fourth line of the

13      paragraph we were just looking at to the gag order,

14      what were you -- what did you mean by that?

15           A     The protective order.  I sometimes use

16      those terms interchangeably.  I know the legal term

17      is protective order but gag order is shorter to say.

18           Q     So what you were referring to was the

19      protective order that Mr. Elliker sent to you and the

20      cease and desist letter?

21           A     Yes.

22           Q     Which we marked as a separate exhibit

23      today, right?

24           A     Yes.

25           Q     It was not the gag order that Judge Worrell

Page 174

1      entered in the state court case, was it?

2           A     I'm not sure.  I'm actually not aware if

3      there is -- I know he had asked them not to speak to

4      the media in the court -- in the state court case, so

5      is that a gag order?

6           Q     That's a question not for you or me to

7      resolve today, but I take it in your mind, and this

8      is consistent with your testimony today I think, that

9      you have sometimes used the phrase protective order

10     and gag order interchangeably?

11          A     Yes, sir.

12          Q     But here in this text message with Dena in

13     the last page of this exhibit, when you wrote gag

14     order, you were referring to the protective order

15     with a capital P and a capital O in this case, right?

16     The one that you got from Mr. Elliker.

17          A     Yes, sir.  To my knowledge, that was the

18     only protective order that existed.  I didn't know if

19     that applied to both courts, I'm not an attorney, I

20     didn't ask anybody, so I didn't know if that

21     protective order applied to both courts or where it

22     originated from, so I'm just referring to the overall

23     protective order.

24          Q     Just referring to?

25          A     Well, I'm just trying to say I'm not sure

Page 175

1    on the time frame of this like when I reference like

2    that it was a couple days prior to the gag order

3    coming into place, I don't know if that was in

4    federal court or in state court, so in my mind, I

5    kind of like linked the two together as far as the

6    protective order going back and forth.  But to answer

7    your question as close as I can, yeah, the protective

8    order that Mr. Elliker sent to me.

9         Q     So what you're referring to as sort of the

10   timing here, you're thinking about the timing of the

11   CBS interview and when the gag order was entered?

12        A     Yes.

13        Q     But you're aware now, are you not, that the

14   protective order that Judge Moon signed that is an

15   exhibit in your deposition which Mr. Elliker sent to

16   you that he entered that last September?  Do you

17   understand that to be the case now?

18        A     Yes, I do understand that now.

19        Q     And my understanding from your testimony so

20   far that you're not aware that the Pipe Hitter

21   Foundation posted to its website the CBS interview,

22   are you?

23        A     I do not believe they did.  I didn't ask

24   them to anyway.

25        Q     But I take it from your testimony that you

Page 176

1    got the impression from Dena that they were pausing

2    and they weren't going to do anything else on this?

3         A    Correct, for the time being.

4         Q    Do you remember an interview you did on

5    June 13th with someone named Steve Abramowicz?

6         A    Yeah.

7              (Mast Deposition Exhibit No. 21 was marked

8              for identification and attached to the

9              transcript.)

10   BY MR. POWELL:

11        Q    Mr. Mast, you have been handed Deposition

12   Exhibit 21 which is mostly just on the first -- a

13   one-page document, but it's your email of June 15th

14   of this year to Steve Abramowicz with copies to

15   people at Vought and also Dena Cruden, right?

16        A    Yes, sir.

17        Q    And this is June the 15th at 5:57 in the

18   morning, right?

19        A    That's right.

20        Q    And you start off -- Steve Abramowicz was

21   the person from Mill Creek podcast who interviewed

22   you, right?

23        A    That's right.

24        Q    And that interview took place on June the

25   13th, according to my notes, two days before you sent

Page 177

1      the email which is Exhibit 21.

2          A      That sounds correct.

3          Q      So what was the purpose of your sending

4      this email to Abramowicz after your interview with

5      him?

6          A      So the Mill Creek View podcast posted a

7      description of the video and when I read it, I felt

8      like it was inaccurate and I was -- my whole purpose

9      in doing all of this was to try to be as truthful as

10     I can, and so I was just emailing him to try to ask

11     if they would be willing to edit to my suggestions to

12     be a little more accurate.

13         Q      Did they do that?

14         A      They did.

15         Q      Who arranged for you to interview with

16     Mr. Abramowicz?

17         A      Mary Vought or Joe Koss, one of the Pipe

18     Hitter Foundation media folks.

19         Q      Do you know if Dena Cruden herself was

20     involved in arranging --

21         A      I don't think so but I don't know.

22         Q      Why did you include her among the CC

23     recipients of this email?

24         A      Out of habit.  I typically sent anything I

25     sent to the media team also to Dena.  I didn't know

Page 178

1    what she needed to be informed of and what not, so it

2    was shorter than catching her up later.

3        Q    And the interview was over Zoom, right?

4        A    Yeah, I think so.

5        Q    And is the -- that interview is available

6    on their website, right?

7        A    Yes.

8        Q    So I could go look at it today if I wanted

9    to?

10       A    I believe so.

11       Q    And it was pretty long, right?  It was like

12   45 minutes plus?

13       A    It was pretty long.  That is pretty close

14   to accurate, yeah.  Well, the episode is an hour long

15   but my interview was like 30 minutes.

16       Q    Yours is the first part of it?

17       A    I think so.

18       Q    So how would you describe your purpose --

19   what was your objective in speaking to

20   Mr. Abramowicz?

21       A    Well, I stated in the interview at some

22   point where I said I had two or three different

23   objectives.  One was to address a lot of the negative

24   press that my whole family had received, though at

25   the end of the day, I felt like it was a secondary

Page 179

```
 1    reason.  Really that's not -- people can say mean
 2    things.  The primary objective was to try to raise as
 3    much financial support as I could for my brother and
 4    his legal fees, and then the secondary objective was
 5    my family, and the third objective, obviously I
 6    thought I was doing a good thing for my niece or --
 7         Q     Baby Doe.
 8         A     Baby Doe, because -- well, I think that
 9    speaks for itself.
10         Q     Did you provide any photographs of Baby Doe
11    to Abramowicz?
12         A     I don't believe I did.
13         Q     Do you recall if any were actually used
14    during the interview?
15         A     No, none were.  Not by me at least.
16         Q     Well, if I were to go look at the video --
17         A     Oh, that's what you mean.  No.
18         Q     So they are not visible on his podcast?
19         A     That is correct.
20         Q     Since the time you sent your email to
21    Mr. Abramowicz on June the 15th have you had any
22    further contact with him?
23         A     I think I sent him one other -- wait.
24    Nope.  I think that's it.  He sent me an email back
25    but I have not responded to anything else, I don't
```

Page 180

1          think.

2              Q     What did he say in his email back to you?

3              A     That they were -- I asked to come back on

4          the show later in this email on Exhibit 21 at the

5          bottom of the page, and he said that they were full

6          until August but maybe.

7              Q     Who is James Laporta?

8              A     James Laporta is a journalist who -- I

9          forget the name of his company he works for now but

10         he's a journalist.

11                   (Mast Deposition Exhibit No. 22 was marked

12                   for identification and attached to the

13                   transcript.)

14         BY MR. POWELL:

15             Q     Mr. Mast, you have been handed Exhibit 22

16         which looks to be a couple of emails with -- between

17         you and Mr. Laporta.

18                   And at the top of the first page of Exhibit

19         22, I will just note for the record this is among the

20         documents you forwarded to Mr. Harding for

21         consideration to produce, right?

22             A     Yes, sir.

23             Q     I am not asking you and I don't want you to

24         communicate in this deposition any of the content of

25         your conversation with Mr. Harding, that's covered by

Page 181

1    the attorney/client privilege, so let's stay away

2    from that.

3         A     Thank you.

4         Q     But the fact that you forwarded this to him

5    and he then produced it to my team is not

6    controversial and I think that is reflected by the

7    record here.

8              So how did you first come into contact with

9    Laporta?  How did you know to reach out to him?

10        A     I had heard that he had -- he was a former

11   AP News reporter and at some point, I don't know

12   when, he had talked to my brother Joshua and my

13   sister-in-law Stephanie and that he had probably

14   recorded the conversation.

15             He at least had some kind of off-the-record

16   interview and he was let go by AP News and I don't

17   know the chronological order of when all those events

18   happened but I thought to myself, well, maybe if he

19   has any other information about it he might be

20   willing to do an interview with me or publish it or

21   something like that, and so I reached out to him via

22   Facebook to see if I could have a call with him.

23        Q     So you learned of him from your brother

24   Joshua?

25        A     Yes, I believe so.

Page 182

```
 1        Q    And you learned in that context that Joshua
 2   and maybe Stephanie too had had some contact with
 3   Mr. Laporta?
 4        A    Yeah.
 5        Q    About these matters?
 6        A    Yeah.
 7        Q    Was that while he was still with AP or
 8   after?
 9        A    Was the conversation I had with Joshua
10   while he was still at AP?
11        Q    I'm trying to get the timing of when Joshua
12   and Stephanie had contact with Mr. Laporta.  Was he
13   still employed with AP News or what it after that?
14        A    I honestly don't know.
15        Q    He was fired by -- I'm sorry, did I say ABC
16   News?
17        A    I don't think so.
18        Q    He was fired by the Associated Press,
19   right?
20        A    He was.
21        Q    Do you know why?
22        A    He told me that he had -- I'll try to be as
23   quick as I can.  He told me that he had posted a
24   tip -- an unverified tip regarding the Russia/Ukraine
25   war and that there were two civilians in Poland that
```

Page 183

1    were killed and the tip was that it might have been a

2    Russian missile and so he posted this, and I don't

3    know the -- what site this is or whatever but he said

4    there's basically a site that reporters worldwide can

5    post things in and that that tip got published with

6    his name attached to it when it was unverified and

7    was said so by him, and then AP News dismissed him

8    before digging into it more.  And then later another

9    reporting company who he described as reports on the

10   media verified that that wasn't his fault and he

11   didn't say that this actually happened, it was an

12   unverified tip for somebody else to follow up on and

13   that they let him go as a result.

14        Q     Did the AP retract what it had said about

15   him as justification for firing him?

16        A     No idea.

17        Q     Why would you want to go talk with someone

18   who had been fired by the Associated Press?

19        A     I didn't care, I just knew that he was

20   somebody who had already talked to my brother and

21   Stephanie and that he might be willing to write on

22   that.

23        Q     Did he ask you to send materials to him

24   that you sent?

25        A     I think I volunteered it.

Page 184

1          Q     And you sent him three emails, right?

2          A     Yes, that sounds right.  Pretty much

3     everything I sent to AP I sent to him.

4                MR. POWELL:  Let's mark this next.

5                (Mast Deposition Exhibit No. 23 was marked

6                for identification and attached to the

7                transcript.)

8                MR. POWELL:  Let's make this 24.

9                (Mast Deposition Exhibit No. 24 was marked

10               for identification and attached to the

11               transcript.)

12    BY MR. POWELL:

13         Q     So Mr. Mast, just trying to be efficient

14    here.  You've already got Exhibit 22 which is the

15    first of three emails you sent to Laporta, correct?

16         A     That's right.

17         Q     And then 23 and 24 are the second and third

18    emails that you sent to him, right?

19         A     Yes.

20         Q     Was your brother Joshua aware that you were

21    in contact with Laporta?

22         A     No, he had no idea.

23         Q     Did you tell him that after you had been in

24    contact with Laporta?

25         A     I don't recall if I did or not.

Page 185

1        Q     In other words, so far as you recall, you

2   didn't communicate to Joshua your intention to reach

3   out to Laporta before you did so?

4        A     Definitely not, no.

5        Q     In the first of the emails, Exhibit 22,

6   this is just your transmittal email to your lawyer,

7   you said, "I hoped he might be willing to do a story

8   on it since he was already familiar to an extent."

9   And when you said that that was because you knew that

10  Joshua had spoken to him, right?

11       A     Yes, sir.

12       Q     So you reached out to him, as you say in

13  the email to your lawyer, to tell him about your AP

14  interview, right?

15       A     Yes.  I had done the AP interview the day

16  before or maybe a couple days before and -- anyway,

17  yes, short answer to your question.

18       Q     So I think you've already testified once

19  you established contact with him you decided to send

20  to him everything that you had already sent to the

21  AP?

22       A     Yes.

23       Q     And that's what you did in these three

24  emails together, Exhibits 22, 23 and 24?

25       A     Yes, sir, that is correct.

Page 186

```
 1        Q      Are those the only emails that you have
 2   sent to him that transmitted documents to him?
 3        A      I believe so, yes, sir.
 4        Q      The last paragraph of your email says, "I
 5   presume you won't mind but I'm going to CC members of
 6   my media advisory team."  Do you see that?
 7        A      Yes, sir.
 8        Q      And then you've got Pipe Hitter Foundation
 9   in parens, right?
10        A      Yes, sir.
11        Q      Who did you mean to be referring to as your
12   quote/unquote media advisory team?
13        A      Three people specifically, Mary Vought, Joe
14   Koss and Rachel -- I can't remember her last name.
15        Q      It may be Rachel Semmel.  I'm looking at
16   the CC.  S-e-m-m-e-l.
17        A      Yes.  That's right.
18        Q      Also with Vought, right?
19        A      Yes, sir.
20        Q      Let's look at No. 24, please.  This is the
21   third of the three emails you sent to Laporta.  Down
22   right below the middle of the page you say, "Hi
23   James, here is the documentation I got from the law
24   firm and the corresponding documentation."  Do you
25   see that?
```

Page 187

1        A      Yes, sir.

2        Q      What law firm are you referring to there?

3        A      Oh.  In the bottom link, the third link,

4    it's referencing the -- no, that's not right.  I

5    think I'm referring to ACLJ but I don't see that I

6    sent him the link to that so I might have made a

7    mistake there.

8        Q      It could be my law firm, right?  It could

9    be Mr. Elliker?

10       A      Well, no, I would have had no need for

11   that.  I think I was sending him the summary of what

12   was on ACLJ's website summarizing the case and I must

13   have forgotten to include the link.

14       Q      Okay.  So your memory looking at Exhibit 24

15   is that when you say the documentation you got from

16   the law firm, you're talking about Mr. Yerushalmi's

17   firm, the American --

18       A      American -- what is it called again?

19   American Freedom Law Center.

20       Q      Yes.

21       A      I probably said it wrong.

22       Q      No, you got it just right.

23       A      Yes, I think that's correct.

24       Q      Did Mr. Laporta ask for that or is this a

25   part of your voluntary effort?

Page 188

1        A    I might have sent him the cease and desist

2    letter.  Maybe that's what it's referring to.

3        Q    Look up at the top of the first page of

4    Exhibit 24.  That's the way I interpret it because in

5    your email to Mr. Harding transmitting to him your

6    correspondence with -- yeah --

7        A    That's what it is.  Apologies.

8        Q    No, no, that's totally fine.  There's a lot

9    of stuff here.  So I was correct then that when you

10   say the documentation you got from the law firm

11   you're referring to what my colleague Mr. Elliker

12   sent to you?

13       A    Yes, sir.

14       Q    All right.  And explain to me why you

15   thought it was important to send all of that to

16   Mr. Laporta.

17       A    Well, I had -- I was sending him everything

18   I had about the case and this was additional news in

19   the case and I thought that might be relevant to

20   updates regarding the case.

21       Q    So in the package that you sent to him,

22   whether it's the first or the second or the third,

23   did you include the protective order that Judge Moon

24   had entered in this case?

25       A    I don't think so unless it was included in

Page 189

1      the cease and desist letter.

2          Q     But your intention was to forward to him

3      what you had received from my law firm?

4          A     Yes, sir.

5          Q     Did you send a copy of the subpoena that we

6      had served on you?

7          A     What date is this?

8          Q     We're now in July.

9          A     This is the 16th that I sent this?  I

10     actually remember this because the email that I got

11     was the 16th and -- but the hard copy I got was on

12     the 17th, so I didn't actually see the subpoena.  So

13     email with the cease and desist I got on the 16th and

14     the hard copy that I got was on my front door on the

15     17th.

16         Q     I misspoke a little while ago.  I was

17     looking at the date on the top of the page.  So your

18     correspondence with Mr. Laporta was on or about June

19     the 16th as reflected on these three exhibits?

20         A     Yes, sir, that's right.  So to answer your

21     question, I don't think that I sent him the subpoena

22     because I don't think I had gotten it until the

23     following day.  I could be off on that.

24         Q     Well, why would you not have sent the

25     subpoena once you got it?  If your intention was to

Page 190

1    get into Mr. Laporta's hands all the documentation

2    that you had, why would you not have sent the

3    subpoena to him?

4        A    I didn't have a very good reason as to why

5    or why not, I just did not.  Partially because the

6    one that I got was a hard copy, if I'm not mistaken.

7    I have it over there in my briefcase and it wasn't

8    already digital.

9        Q    Since these emails, Exhibits 22, 23 and 24,

10   have you had any additional communication with

11   Laporta?

12       A    I don't believe so.  No, sir.

13       Q    Do you have any idea whether he is

14   intending to do a story on these matters?

15       A    He hasn't contacted me to say he has.  He

16   said he would write a memo and discuss it.

17       Q    So insofar as you know today, you don't

18   know one way or the other, do you, whether he is

19   planning to do anything?

20       A    No, sir, I don't.

21       Q    Who is Sarah Carter?

22       A    Oh, I think that is a staff member for

23   Former Vice President Pence's office.

24               (Mast Deposition Exhibit No. 25 was marked

25               for identification and attached to the

Page 191

```
 1              transcript.)

 2    BY MR. POWELL:

 3        Q    The court reporter has just given you

 4    Exhibit 25.  You will see why I asked you who --

 5        A    Oh, I said wrong.  I'm sorry.

 6        Q    That's all right.  Let me identify this for

 7    the record and then we will back up.

 8        A    Apologies.

 9        Q    That's quite all right.  So Exhibit 25 is

10    an email regarding a potential I guess something on

11    Sarah Carter's podcast?

12        A    Yes.

13        Q    And the email at the top of the first page

14    of Exhibit 25 is your transmittal email to your

15    lawyer, Mr. Harding, where you're forwarding to him

16    an email exchange with Rachel Vought down further on

17    the page, correct?

18        A    That is correct.

19        Q    And the subject of your email with Rachel

20    Vought with CCs to others was "Invitation, JM hold,

21    Sarah Carter's podcast."  Do you see that?

22        A    I do.

23        Q    So let's go back to who is Sarah Carter.

24        A    Sorry.  So I was confusing her with

25    somebody else.
```

Page 192

```
 1          Q      That's all right.
 2          A      Sarah Carter is a journalist who spent a
 3    lot of time in Afghanistan.  She has a podcast.  She
 4    talks on, well, most recently anyway, the war in
 5    Afghanistan, the withdrawal and things like that.
 6          Q      Is she affiliated with any network?
 7          A      I don't know for sure.  I presume she is.
 8    I was told she was a pretty well-known journalist.
 9          Q      Who told you that?
10          A      Somebody on Pipe Hitter.
11          Q      Was it Dena Cruden or was it someone with
12    --
13          A      It had to be Mary or Joe or Rachel.
14          Q      One of the Vought people?
15          A      Yeah.
16          Q      Were they trying to set up an interview for
17    you with Sarah Carter?
18          A      Yes.
19          Q      Did that happen?
20          A      No, it did not.  She was out of the
21    country.
22          Q      Is she still out of the country?
23          A      No, I don't think so.  I wasn't told when
24    she would be back, but somewhere between that time
25    frame after she went out of the country I got the
```

Page 193

1    subpoena and as I mentioned earlier things kind of

2    paused.

3         Q    So your email with people from Vought that

4    covers most of the first page of Exhibit 25 that was

5    with reference to a potential podcast with Sarah

6    Carter but that podcast never happened, right?

7         A    Correct.  Yes, sir.

8         Q    Do you have any reason to believe that

9    you're going to have further communication with Sarah

10   Carter about a possible interview?

11        A    Well, I haven't been promised anything so I

12   don't know for sure.

13        Q    Did you have any direct communication with

14   her?

15        A    No.  Unfortunately, no.

16        Q    So the communications with her on your

17   behalf were by Vought?

18        A    Correct.

19        Q    So far as you can recall, did Vought reach

20   out to any other journalists or media organizations

21   trying to set up an interview with you other than

22   what we've talked about today?

23        A    I'm sure they did.  They told me that they

24   had reached out to quite a few but I never got a list

25   or anything like that, I just went with their

Page 194

1    recommendations.

2         Q     So other than the outfits we've spoken

3    about today, including individuals, can you identify

4    any of the other either journalists or reporters or

5    media outlets that you know Vought reached out to on

6    your behalf?

7         A     Just one.  No, maybe two.  I know that I

8    got an invite to go on the Stew Peters Show which I

9    declined and another radio show here in

10   Charlottesville, Joe Thomas I think, and I did an

11   interview there.

12        Q     Let's go one at a time.  What was the first

13   one?

14        A     Stew Peters.

15        Q     Stew Peters.  You had an invitation to

16   interview with him?

17        A     Yes, sir.

18        Q     But you declined?

19        A     I did.

20        Q     Who is he?

21        A     He appears to be -- well, he's a radio show

22   host.  I did a little digging on him and I didn't

23   particularly like his -- I didn't want to be

24   affiliated with him so I didn't like some of the

25   messages and verbiage he uses and political views he

Page 195

1    took.

2         Q    Did you have any direct contact with him?

3         A    No, sir, never did.

4         Q    So this is someone that so far as you

5    recall Vought contacted in order to possibly set up

6    an interview for you?

7         A    Correct.

8         Q    And then you did some independent research

9    on him and decided you didn't want to go forward with

10   it?

11        A    Yes, sir.  I tried to research everybody

12   that they offered to me to interview with and make

13   sure I was not going to be affiliated with somebody

14   that was going to be portraying my family in a bad

15   way.

16        Q    And then you mentioned -- let me back up.

17   So what was it about what you found on Stew Peters

18   that caused you to think he might portray your family

19   in a negative light?

20        A    Well, I didn't like what he had to say.

21   This is just me personally but I didn't like what he

22   had to say regarding LGBTQ activities.  He just

23   seemed to have some rather, I don't like to use the

24   term, but far-right rhetoric, was kind of extreme and

25   I didn't like that.

Page 196

```
 1        Q    Did you ask Vought why they tried to set up
 2    something with him for you?
 3        A    I did not.  I did ask how much they knew
 4    about him and they weren't -- they didn't have a lot
 5    of experience with him before.  I think they just saw
 6    that he had a fairly large platform.  Anyway, what
 7    was your original question?
 8        Q    How it was you came to have some contact --
 9    or you knew that Vought had Stew Peters on their
10    list.
11        A    Yeah.
12        Q    And then you did some research on him and
13    decided that you were not going to go forward with
14    him?
15        A    Correct.
16        Q    Was anything ever scheduled with him?
17        A    No, I don't believe so.  I never agreed to
18    a schedule.
19        Q    And then you mentioned somebody here in
20    Charlottesville and I did not write down his name.
21        A    I think his name is Joe Thomas.
22        Q    Did you interview with him?
23        A    I did.  I think he was the first interview
24    I did.
25        Q    Before the One America News interview?
```

Page 197

1          A     I think so.

2          Q     Is he affiliated with a local radio station

3     here in Charlottesville?

4          A     I think so.  Joe Thomas Show.  I don't know

5     what the radio station is.

6          Q     But that's broadcast here in the -- it's

7     one of the Charlottesville area radio stations?

8          A     I don't know.  I did -- my interview with

9     him got posted to YouTube, so I don't know if it got

10    posted to the radio show.

11         Q     And that's someone that Vought set up for

12    you?

13         A     Yes, sir.

14         Q     And your recollection is that that was

15    before you did the One America News interview?

16         A     I believe so.

17         Q     Was it -- how was the interview conducted?

18         A     Over -- it was probably Zoom.  It was

19    definitely video.  I remember because I had trouble

20    getting my camera on for the first five minutes of

21    the interview.  Anyway, and that was similar to the

22    Mill Creek View podcast where it was more of a

23    podcast feel and it was kind of extensive, maybe 20

24    minutes, 30 minutes.

25         Q     Did you provide any photographs to Mr.

Page 198

1     Thomas before the interview?

2          A     No, sir, I did not.

3          Q     Did you provide any photos to him after the

4     interview?

5          A     No, sir.

6          Q     Is your interview still available on

7     YouTube if I went to look for it?

8          A     Probably.  I don't know for sure but it

9     probably is.

10         Q     Have you seen it yourself?

11         A     Yes.

12         Q     And you say it was 20 to 30 minutes?

13         A     I think so.

14         Q     How sure are you that that took place

15    before the interview with the One America News

16    Network?

17         A     I'm pretty positive.

18         Q     Did you tell your brother Joshua that you

19    were going to interview with Joe Thomas?

20         A     No.

21         Q     Did you tell him after the interview that

22    you had been interviewed by Joe Thomas?

23         A     No, I don't think so.

24         Q     Did you tell your brother Richard?

25         A     No.

Page 199

1      Q    Or your sister-in-law Stephanie?

2      A    No.

3      Q    So is it your testimony that as of today

4    they don't know that you gave an interview to him?

5      A    I believe so.  I didn't send them the link.

6    I didn't tell them who I interviewed with, so I don't

7    think they would know.

8      Q    Why would you not have done that?  Why

9    would you not have kept your brother and

10   sister-in-law up to speed on your efforts to tell

11   their story?

12     A    Sure.  Well, as I mentioned previously,

13   there has been a lot of negative media attention

14   directed towards my family and I was trying to keep

15   it all with just me in case something went south and

16   that way I would be the only one that bears

17   repercussions for it.

18     Q    But you were telling what you believe to be

19   their story, right?

20     A    That's correct.

21     Q    Backing up to Stew Peters.  Did you send

22   any emails to him or any members of his staff?

23     A    No, I never had any communications with him

24   directly.

25     Q    No text messages, no emails?

Page 200

1          A     No, sir.

2          Q     What about with Joe Thomas, any emails or

3     text messages or anything?

4          A     Not directly.  He forwarded me the Zoom

5     link -- sorry.  He forwarded one of the Vought or

6     Pipe Hitter Foundation media people the Zoom link and

7     they sent it to me, so aside from speaking to him

8     directly, I never had any direct communication with

9     him.

10         Q     Did you speak to him before the interview?

11         A     No.

12         Q     So your only contact with him was the

13    actual interview itself?

14         A     Yes, sir.

15         Q     Anyone else that you can recall who you

16    were potentially going to interview with or actually

17    have an interview with other than who we have talked

18    about already today?

19         A     No, sir.  Let me count them off just to

20    make sure.  No, I think that's it.

21         Q     Mr. Mast, I'm going to sort of change gears

22    time-wise with you and I want to go back in time and

23    ask you some questions about activities that you may

24    have been involved in before January the 1st of this

25    year.

Page 201

1        A      Okay.

2        Q      So you know obviously that John Doe and

3    Jane Doe and Baby Doe were among the people evacuated

4    from Afghanistan in August of 2021, right?

5        A      Yes, sir.

6        Q      And you mentioned earlier I think that you

7    were at least aware of the things that your brother

8    Joshua was doing in order to facilitate their

9    evacuation and others?

10       A      Yes, to an extent, yes.

11       Q      What did you do other than to be someone

12   who your brother could talk to?  Were you actually

13   directly involved in efforts to facilitate the

14   evacuation of the Does out of Afghanistan?

15       A      No, sir, I was not.

16       Q      Did you contact anyone in support of the

17   efforts to get them out?

18       A      No, sir, I don't think so.

19       Q      For example, did you reach out to any

20   politicians, state, local or national?

21       A      No.  No, I did not.

22       Q      Do you know whether your brother did?

23       A      I do not know.

24       Q      She's been with your brother and

25   sister-in-law since September of 2021, correct?

Page 202

1        A      I believe so.

2        Q      Do you know whether they have made

3    presentations to church groups about her?

4        A      I think -- I don't know if this is a

5    presentation as much as like Stephanie's mother, so

6    my brother's mother-in-law, attended a church and

7    they were all -- they were visiting and I don't know

8    if it was like a service oriented around this, I

9    don't think that was the case, but I think that there

10   was mention of that from the pulpit like when they

11   were coming to visit my brother's mother-in-law's

12   church.

13             MR. FRANCISCO:  I'd like to make a standing

14   objection.  I don't see this line of questions

15   covered by the deposition notice in all the topics in

16   the motion for production.  Maybe I'm missing

17   something but I don't see anywhere where this is

18   noticed as an area of the deposition.

19   BY MR. POWELL:

20       Q      Have you attended any church service with

21   your brother and your sister-in-law and Baby Doe?

22       A      No.  They live in North Carolina or

23   Charlottesville and I'm in Rustburg, so...

24       Q      Do you know whether Baby Doe has had any

25   medical issues since she's been in this country?

Page 203

1          A     I don't know.

2          Q     Do you know if she's had any surgeries?

3          A     No.

4          Q     Do you know if she's had any seizures?

5          A     I don't know.  I don't think so.

6          Q     Do you know if she's had any difficulty

7     walking?

8          A     I don't.

9          Q     Do you know if she's had any difficulty

10    with her cognitive development?

11         A     No, I do not know.

12         Q     What about with her eyesight?

13         A     No, I don't know that either.

14         Q     Are you aware that your brother advised

15    John Doe while the Does were still in Afghanistan

16    that all of these things might befall Baby Doe if she

17    didn't get proper medical care in the U.S.?

18         A     I do remember that because from what I

19    remember -- this is a while ago obviously, but from

20    what I remember going on at the time we had discussed

21    at some point that the Does were saying most of those

22    things.  I remember just a couple things, not all of

23    that.  I remember that they said she couldn't or

24    wouldn't walk, couldn't or wouldn't talk and that she

25    was having seizures and he in turn gave that

Page 204

1      information to his pediatrician, he has four children

2      already, and the pediatrician advised him on that and

3      that's how that went.

4          Q      So you're telling me this information came

5      from the Does to your brother and not the other way

6      around?

7          A      Yes, sir, that is correct.

8          Q      And what's the basis for your saying that?

9          A      Well, I was there when my brother had the

10     conversations, he was Stateside and I remember when

11     he was giving us updates on the situation him saying

12     that was something that they had discussed and he was

13     concerned for her.

14         Q      So this is what your brother was telling

15     you he had heard from John and Jane Doe, right?

16         A      That is correct.

17         Q      She's almost four, right?

18         A      That's right.

19         Q      Isn't her birthday July of 2019?  That's

20     what the doctors thought.

21         A      Yeah, it's coming up here the end of July.

22         Q      Does she attend preschool --

23         A      I don't know actually.

24         Q      -- in North Carolina?

25         A      I'm not sure.

Page 205

```
 1              MR. HARDING:  I'm going to reiterate the
 2      objection here as to the scope --
 3              MR. POWELL:  I think everybody has got the
 4      objection.
 5      BY MR. POWELL:
 6          Q    Have you spoken with Baby Doe recently?
 7          A    Define recent.  A couple of weeks, maybe a
 8      month ago.
 9          Q    Sure.  In this calendar year.
10          A    Yeah.  Yeah.
11          Q    How is her English?
12          A    Fantastic.
13          Q    Does she speak with an accent?
14          A    No.
15          Q    So if you had not known she was born on the
16      far side of the earth, would you not suspect it when
17      you speak to her?
18          A    Yes, you're correct.
19          Q    Do you know if she can read?
20          A    I do not know.
21          Q    Is she being raised in the Christian faith
22      or the Muslim faith?
23          A    I have never witnessed any religious
24      instruction given, so...
25          Q    You're saying you don't know the answer to
```

Page 206

```
 1    that?
 2         A     I'm saying what I said.
 3         Q     Do you know whether she is being raised as
 4    a Christian?
 5         A     Well, my family --
 6               MR. FRANCISCO:  Object to relevance.  I
 7    don't see where this is anything but vexatious and
 8    probing of personal matters.  I can't imagine how it
 9    relates to this federal case.
10    BY MR. POWELL:
11         Q     Do you know?
12         A     My family is Christian --
13               MR. YERUSHALMI:  This is David Yerushalmi.
14    I'm going to also interpose an objection that it's
15    argumentative, well beyond the notice, and it's
16    getting to the point where it's a waste of everyone's
17    time.
18    BY MR. POWELL:
19         Q     Do you know if she has been baptized in the
20    Christian faith?
21         A     I do not know.
22         Q     Have you ever spoken to John or Jane Doe?
23         A     No.
24         Q     Last one, I promise.
25         A     You're fine.
```

Page 207

1              (Mast Deposition Exhibit No. 26 was marked

2              for identification and attached to the

3              transcript.)

4              THE WITNESS:  Maybe this goes --

5              MR. HARDING:  Just hold on.

6              THE WITNESS:  All right.

7    BY MR. POWELL:

8         Q    You've been handed Exhibit 26, Mr. Mast,

9    which I'm sorry the font is so small.

10        A    That's okay.

11        Q    I can barely read it but I just wanted to

12   see if you can tell me what's going on here.  This is

13   an email from you to someone named Kyle Scheren there

14   at Liberty May the 6th, 2020.

15        A    Yeah.

16        Q    And you're sending him some materials about

17   Baby Doe, right?

18        A    Yes.

19        Q    And you start off by saying, quote, "My

20   brother asked me to forward these along in case the

21   opportunity arises to post them to social media for

22   OSD."  Do you see that?

23        A    I do.

24        Q    Is OSD the Office of Spiritual Development

25   at Liberty?

Page 208

```
 1        A     It is.

 2        Q     So you were doing this at your brother

 3   Joshua's suggestion, right?  Request actually.  He

 4   asked you to do it.

 5        A     Bear with me.

 6        Q     Sure.  Take your time.

 7        A     Yes, that looks like that's correct.

 8        Q     So look at the first full paragraph there

 9   after you say "I hope you're doing well."  The second

10   sentence says, quote, "The shorter of the two videos

11   is the, quote/unquote, safe version where it uses a

12   lot more discretion about details but tells the

13   story."  Do you see that?

14        A     Yes, sir.

15        Q     Do you recall what you meant by that

16   sentence?

17        A     So this is two -- no, three years prior to

18   my involvement with Pipe Hitter Foundation.  I think,

19   if I remember correctly, that this is referencing a

20   summarization of something that my -- I don't know if

21   Joshua and Stephanie did it themselves or if somebody

22   assisted them with the process but they were trying

23   to kind of at this point make record of everything

24   that had happened thus far and were -- I'm sorry, I

25   think I got distracted from your question, so what
```

Page 209

1    was that again?

2         Q    So I'm trying to understand what you meant

3    by the sentence that I just referenced when you said

4    that the shorter of the two videos is the safe

5    version.  What did you mean by that?

6         A    They did a video recording and the one was

7    super long and the other was shorter, so the safe

8    recording was information to protect people that was

9    redacted or things like that.

10        Q    A video recording of who?

11        A    Just Joshua and Stephanie.

12        Q    They were in this country and Baby Doe was

13   still in Afghanistan then, right?

14        A    Yes.

15        Q    Up at the top Mr. Scheren responds, "Thanks

16   for sending this over, praying for your family, let

17   me look into a few things and get back to you."  Do

18   you see that?

19        A    Yes, sir.

20        Q    Did he get back to you?

21        A    He actually left Liberty University shortly

22   thereafter, so no.

23        Q    Did he post anything that you sent to him

24   to Liberty's website or to --

25        A    He did not.  Nothing really came of this.

Page 210

1      Liberty never got involved with posting anything or

2      anything of that nature.

3          Q      Is this the only contact you had with

4      Mr. Scheren about Baby Doe?

5          A      Yes, sir.  I actually forgot about this

6      that this even existed, so, yes, this was the only --

7          Q      Have you had any contact with anybody else

8      at Liberty about Baby Doe?

9          A      I have talked to some coworkers like just

10     some vague details regarding what's going on and

11     things like that as far as when it was occurring like

12     that he was coordinating and some of the general

13     story that I've shared in some of my interviews and

14     stuff like that.

15         Q      But just informal conversation?

16         A      Correct.

17         Q      My question was imprecise.  Have you sent

18     anything to anybody at Liberty about Baby Doe other

19     than what's reflected in this exhibit?

20         A      No, sir, I have not.

21             MR. POWELL:  I think I'm done for today but

22     let's take a five-minute break so I can confer with

23     my colleagues.  I'm not trying to cut off any

24     examination.

25             MR. FRANCISCO:  That's fine.

Page 211

1          THE VIDEOGRAPHER:  Please stand by.  We are

2      now off the record.  The time is 2:39 p.m.

3          (Recess, 2:39 p.m. - 2:53 p.m.)

4          THE VIDEOGRAPHER:  We are now on the

5      record.  The time is 2:53 p.m.

6          MR. POWELL:  Mr. Mast, thank you for your

7      attention to my questions today.  I am done for today

8      but I am not ending the deposition, I am suspending

9      it and reserving my right to reopen it if and when

10     developments in the case would justify that, but for

11     now I am done and I'm going to turn you over to

12     anybody else who has questions.

13          THE WITNESS:  Thank you.

14          MR. HARDING:  This is Elliott Harding on

15     behalf of Mr. Mast.  We don't have any follow-up

16     questions.

17          MR. FRANCISCO:  Michael Francisco on behalf

18     of Joshua and Stephanie Mast.  We don't have any

19     questions.

20          MR. YERUSHALMI:  David Yerushalmi on behalf

21     of Richard Mast, nothing further.

22          MR. HOERNLEIN:  Mike Hoernlein on behalf of

23     Kim Motley.  We have no questions.  Thanks.

24          MR. BROOKS:  Tyler Brooks on behalf of

25     Ahmad Osmani and we have no questions at this time.

Page 212

1      Thank you.

2              MR. POWELL:  I think then we are done

3      unless anybody disagrees except for the reservation

4      of rights that I put on the record a few moments ago.

5      Any disagreement with that?

6              MR. HARDING:  No disagreement.

7              MR. POWELL:  Gentlemen on the phone, thank

8      you.  Have a good day.

9              THE VIDEOGRAPHER:  We are now off the

10     record at 2:54 and this concludes the testimony given

11     by Jonathan Mast.

12

13

14              (Signature having not been waived, the

15              deposition of JONATHAN MAST was concluded

16              at 2:54 p.m.)

17

18

19

20

21

22

23

24

25

Page 213

1          REQUESTED CHANGES TO THE DEPOSITION OF

2              JONATHAN MAST, TAKEN 7/17/23

3              Reported by Mark E. Brown, RPR

4      Page/Line:      Change to/from:            Reason:

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16                         _____

17                         JONATHAN MAST

18

19     Commonwealth of Virginia, to wit:

20     Subscribed to before me

21     this _____ day of _____, 2023

22     _____

23              Notary Public

24     My Commission Expires:

25     Registration No.

Page 214

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2              I, Mark E. Brown, Registered Professional

3    Reporter and Notary Public for the Commonwealth of

4    Virginia at large, whose commission expires November

5    30, 2024 do certify that the aforementioned appeared

6    before me, was sworn by me, and was thereupon

7    examined by counsel; and that the foregoing is a

8    true, correct, and full transcript of the testimony

9    adduced.

10             I further certify that I am neither

11   related to nor otherwise associated with any counsel

12   or party to this proceeding, nor otherwise interested

13   in the event thereof.

14             IN WITNESS WHEREOF, I have hereunto set my

15   hand and affixed my notarial seal at Richmond this

16   19th day of July, 2023.

17

18

19             _____

20             Mark E. Brown, RPR, Notary Public

21             Commonwealth of Virginia

22             Registration No. 7564442

23

24

25

Page 215

1    LEWIS F. POWELL, III, ESQ

2    lpowell@hunton.com

3                        July 19th, 2023

4    RE:    Doe, Baby Et Al v. Mast, Joshua Et Al

5         7/17/2023, Jonathan Mast (#6005284)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

**[& - 2023]**

| & |
|---|
| **&** 2:19 4:2,9 7:17,19 |

**1**

**1** 5:13 8:1 16:5 16:6,11
**10** 5:19,22,24 6:6,7 8:10 77:8 96:25 97:1,5 97:11 98:2,21
**100,000** 109:24 110:20,25 134:5
**1000** 2:22
**108** 5:23
**10:39** 65:23,24
**10:54** 65:24 66:1
**10th** 58:2 63:14 70:4 76:23,23 78:3 97:24 103:23 107:5 109:5 111:1 114:20 116:16 116:25 125:14 152:19 154:6 158:18
**11** 5:23 8:11 98:1 108:22,23 109:3 111:5 122:4 124:8
**114** 5:24
**11:51** 122:3
**11th** 97:9 107:6 114:20 125:14

130:16 139:7
**12** 5:24 8:12 114:12,13,18 115:14 116:19 116:21
**12:04** 126:9,10
**12:19** 126:10 126:12
**13** 5:14,25 6:9 6:10,13,14,15 6:16 8:13 130:7,8,13 132:4,12
**130** 5:25
**132** 6:5
**13th** 17:17 24:4 24:8 25:6 32:18 158:22 176:5,25
**14** 6:5,11 8:14 132:22,23 133:3
**14th** 24:9 164:25 165:12 165:24
**15** 6:6,12 8:15 143:2 150:10 150:25
**150** 6:6
**152** 6:7
**153** 6:8
**15th** 165:13 176:13,17 179:21

**16** 5:13 6:7 8:16 152:11,15 153:6,16 154:6
**160** 6:9,10
**165** 6:11
**16th** 3:8 189:9 189:11,13,19
**17** 1:16 2:6 6:5 6:8 7:3 8:17 133:6 153:23 154:3
**176** 6:12
**17th** 17:2 132:16 137:1 189:12,15
**18** 6:9 8:18 160:10,11,19 160:19 161:2,9 161:23 162:14 162:19
**180** 6:13
**184** 6:14,15
**19** 5:18 6:10 8:19 18:9 160:10,14,19 161:3,9,23 162:14,20
**190** 6:16
**1989** 9:10
**19th** 69:5,9 214:16 215:3
**1:02** 164:19,20
**1:46** 164:20,22
**1st** 29:4,13 31:7 101:14 200:24

| 2 |
|---|
| **2** 5:14 8:2 23:17,18,24 32:6 |

**2,000** 106:18,24
**20** 6:11 8:20 67:2 115:22 165:5,10 169:16 197:23 198:12
**20004-1304** 2:23
**20006** 3:9
**2013** 40:12 41:1
**2019** 11:3,4,6,7 42:20,20,25 43:8 94:22 113:8 204:19
**2019/2020** 163:20
**202** 2:24 3:10
**2020** 6:17 43:15 85:5,13 113:8 207:14
**2021** 85:5,14 201:4,25
**2023** 1:16 2:6 5:14,16,17,18 5:23,24 6:6,7,9 6:10,12,13,14 6:15,16 7:3 24:4 46:8 49:16 57:11 58:2 94:22

**[2023 - 9th]**

95:11 130:16
145:4 213:21
214:16 215:3
**2024**   214:5
**207**   6:17
**21**   6:12 8:21
18:12 118:17
176:7,12 177:1
180:4
**21st**   39:24
**22**   6:13 8:22
18:13 180:11
180:15,19
184:14 185:5
185:24 190:9
**224**   15:21
**22901**   3:18
**22902**   2:8
**23**   5:14 6:14
8:23 184:5,17
185:24 190:9
**23219**   2:15
**239**   147:1
**24**   6:15 8:24
24:12 184:8,9
184:17 185:24
186:20 187:14
188:4 190:9
**25**   6:16 8:25
12:8 190:24
191:4,9,14
193:4
**26**   5:16 6:17
43:20 207:1,8

**26th**   39:21
**28th**   16:17
17:12 19:17
20:9,19 145:16
147:3
**2:39**   211:2,3
**2:53**   211:3,5
**2:54**   212:10,16
**2k**   106:18
**2nd**   2:7

**3**

**3**   5:15 8:3
15:20 32:8,10
32:15
**30**   15:22 119:5
178:15 197:24
198:12 214:5
215:17
**30658**   214:18
**32**   5:15 12:8
**323**   2:7
**34**   9:8 12:7,8
**359**   9:15
**38**   12:7
**39**   5:16 20:23
**3:22cv00049**
1:7 7:8

**4**

**4**   5:16 8:4
39:10,11 75:19
75:22
**4,000**   149:10
**40**   12:2,7

**434**   3:19
**44**   12:7
**45**   178:12
**4:5**   2:4
**4th**   94:22

**5**

**5**   5:17,23 8:5
46:19 57:6,10
**5,000**   69:4 70:7
70:13,24 75:19
75:22,24 134:9
137:9,15
149:10
**500**   3:8
**555**   2:22
**57**   5:17
**5:57**   176:17
**5k**   69:1
**5th**   46:8 47:8
109:4,10

**6**

**6**   5:18 8:6
68:14,15,20
69:16
**6005284**   215:5
**608**   3:17
**637-2200**   2:24
**68**   5:18
**6th**   94:22
207:14

**7**

**7**   5:19 6:17 8:7
76:16,17,21

**7/17/2023**
215:5
**7/17/23**   213:2
**7564442**   214:22
**76**   5:19
**788-8488**   2:16

**8**

**8**   5:5,20 8:8
84:7,8,13
87:10,25 88:4
93:10 95:1,14
96:13,16
116:12
**804**   2:16
**84**   5:20
**857-1722**   3:10
**87**   5:21
**888**   3:8

**9**

**9**   5:17,21,22
8:9 57:11
87:19,23 88:12
93:6 95:21
96:17,22
**951**   2:14
**962-8465**   3:19
**97**   5:22
**9:33**   1:17 2:6
7:3
**9th**   57:17 97:8
101:17 110:9
110:19 111:1
149:15

| a | | | |
|---|---|---|---|
| **a.m.**  1:17 2:6 7:3 65:23,24 65:24 66:1 122:3 | 138:8 151:5 166:22 | 110:23 136:15 140:16 200:13 | 126:16 127:4 127:17 128:1 178:23 |
| **abc**  182:15 | **accuracy**  215:9 | **actually**  9:22 | **addresses**  9:18 |
| **ability**  13:6 85:22 | **accurate**  36:6 61:4 62:14 63:11 66:21 177:12 178:14 | 14:2 18:2,11 19:12 20:7,14 22:15 31:18 36:1 37:12 41:21 48:12,17 | 88:12 96:12 |
| **able**  18:4 79:6 122:5 134:2 | **ach**  69:1 | | **adduced**  214:9 |
| **above**  92:6,9,16 102:11 147:6 215:6 | **acknowledg...** 215:12 | 48:23 50:18 52:7 64:15 | **admissions** 41:1,13,19,20 41:22 42:3,4 |
| **abramowicz** 176:5,14,20 177:4,16 178:20 179:11 179:21 | **aclj**  187:5 | 68:12 83:6 94:13 99:21 | **adopt**  11:2 42:18,19 43:10 43:13 60:13 |
| | **aclj's**  187:12 | 101:23 111:16 | |
| | **acquire**  17:21 20:1 118:13 | 125:2 142:16 164:7 174:2 | **adopting**  10:21 11:6 |
| **absolutely**  11:5 54:8 118:15 | **acquired** 154:11 | 179:13 183:11 189:10,12 | **adoption**  42:22 42:23 43:4,24 44:4 45:7,11 46:1,8 47:13 |
| **accent**  205:13 | **acquiring**  66:5 78:16 157:18 | 200:16 201:12 204:23 208:3 209:21 210:5 | |
| **accept**  154:18 | **act**  170:2,13,17 | | **advance**  50:8 145:8 |
| **access**  14:8 46:4 85:2,11 88:6 93:7 168:3 | **acting**  63:16 64:22 65:14 83:20 170:19 170:22,25 | **added**  85:20 | |
| | | **addition**  75:24 | **advanced** 70:17 |
| | | **additional** 75:19,22 81:22 114:2 117:14 120:2 121:25 122:1 152:25 160:25 161:8 163:24 188:18 190:10 | **advice**  17:19 20:16 23:10 26:6 67:18,19 67:24 73:4 112:7,14 123:16 171:11 |
| **account**  11:13 11:16 22:7,9 22:13 26:21,24 27:2,15 28:8 31:25 69:15,17 69:24 70:2 79:22,23 80:2 80:4 131:1 137:10,13 | **action**  1:6 | | |
| | **activate**  27:19 | | |
| | **activated**  27:2 27:11,15 158:13 | | |
| | **active**  11:12 28:8 | | **advise**  20:18 |
| | **activities** 195:22 200:23 | **address**  9:14 79:11,15 82:21 90:4,5,14 91:20 92:24 109:13,18 | **advised**  55:25 72:10 77:17 95:24 96:3,8 203:14 204:2 |
| | **actual**  15:3 33:16,23,25 42:21 81:12 | | **advising**  51:6 |

**advisor** 41:14
41:20
**advisory** 186:6
186:12
**affiliated** 192:6
194:24 195:13
197:2
**affiliations**
7:13
**affixed** 214:15
**afford** 13:23
**affords** 15:22
**afghan** 118:21
**afghanistan**
93:15 94:5,10
105:7,13
113:10,11
119:21 120:20
167:25 172:9
192:3,5 201:4
201:14 203:15
209:13
**aforemention...**
214:5
**agency** 105:18
105:25 106:3,9
**agent** 65:14
171:3
**ago** 10:5 38:24
48:14 50:17
66:23 72:7
73:15 95:9,17
97:24 101:10
147:19 149:6
155:10 189:16

203:19 205:8
212:4
**agree** 93:15,16
94:10,11
**agreed** 38:24
196:17
**agreement**
57:20,23 58:19
59:7,15,25
60:25 62:12,17
62:20 70:4
74:21 97:14,18
97:23 98:6
110:15,23,25
136:15
**ahead** 15:7,19
63:23 65:1
103:25 150:18
**ahmad** 8:3,8
120:13,14
211:25
**ahold** 80:24
**air** 94:1
**aired** 123:17
125:12 166:19
168:1
**airport** 117:21
117:21
**al** 1:4,8 7:5,6
215:4,4
**album** 5:20,21
84:13,16 85:3
85:25 86:6
87:14 88:7,13
93:7 95:18,22

96:13,23
103:10,13
104:23 111:21
114:3 116:10
122:9 140:22
168:3 172:11
**allotted** 215:20
**allowed** 62:17
62:21
**allows** 27:7
**alston** 4:2 8:5
**altavista** 69:21
**alternate**
161:12
**alternative**
10:15
**altogether**
167:10
**amend** 117:12
**america** 86:20
86:23 87:4,9
99:16 100:19
139:4,7,11,25
140:3,5 141:1
141:16 142:23
143:16 144:24
145:9 146:2
148:8,16
196:25 197:15
198:15
**american** 4:6
7:25 100:5,12
100:14 101:3,8
101:20 102:2
111:7 187:17

187:18,19
**americanized**
15:13 39:5
84:24
**andrea** 131:9
**andrews** 2:11
4:12 7:15
26:16 146:13
**anna** 89:13
**announcement**
115:2
**answer** 13:7,13
13:22,23 14:19
34:16 36:18,21
38:13,20 59:14
63:23 78:24
79:2 81:6
110:18 119:13
144:11 156:13
170:12 175:6
185:17 189:20
205:25
**answered**
13:14 95:19
99:22
**anticipated**
27:13 102:17
**anybody** 17:19
18:21 21:25
45:19 62:12,18
63:9 64:8
66:14 68:1,5
77:13 80:24
86:10,10 96:22
101:19 112:5

112:14 143:15
145:15 164:1
170:5 174:20
210:7,18
211:12 212:3
**anybody's**
170:2
**anymore**  41:25
49:3
**anyone's**
170:13
**anyway**  30:5
99:19 110:18
119:8 123:7
129:24 134:1
175:24 185:16
192:4 196:6
197:21
**ap**  81:6,9,17,22
82:4 150:7
151:16 152:2,7
153:1,10
155:10,16
157:25 159:1
159:17,20
160:7,19,20,24
161:4,10,20
162:1,8,15,22
163:5,12,22
164:5 181:11
181:16 182:7
182:10,13
183:7,14 184:3
185:13,15,21

**apologies**  45:5
99:10 188:7
191:8
**apologize**
108:11 163:17
**app**  10:4 27:7
30:17 86:24
**apparently**
121:20
**appear**  15:14
24:5 47:18
94:9
**appearances**
2:9 3:1 4:1
7:12
**appeared**  47:16
48:7 214:5
**appears**  15:15
39:6,7 109:22
110:22 194:21
**applicable**
215:8
**applied**  15:15
171:12,18,21
174:19,21
**applies**  169:6
**apply**  38:5
**appomattox**
18:2
**appreciate**
172:5
**appropriate**
104:1,11,16,21
104:22 105:1
111:14

**approximately**
34:7 67:8,9
73:7 150:21
158:15
**april**  5:19
76:22,23 78:3
101:17 145:3
147:20 149:7
149:15,22
**area**  31:19
45:23 197:7
202:18
**argumentative**
65:1 148:10
155:11 206:15
**arises**  207:21
**arms**  112:25
**arrange**  79:6
**arranged**  139:9
139:11 142:11
177:15
**arrangement**
61:6
**arranging**  36:4
177:20
**arrested**  11:21
11:23
**arrived**  137:20
**articles**  123:4
**ashley**  89:3
**aside**  22:18
96:18 200:7
**asked**  45:25
49:2,7 53:1,6
53:14 55:18

57:1 58:24
72:16 75:20
78:19 81:13,22
82:20 95:17
103:5,7 106:6
106:12 124:25
128:9 129:22
130:1,3 134:14
135:4,10,23,25
136:4 138:20
141:9,18 142:1
157:2 161:15
161:18 162:3
162:11 163:16
163:25 167:8
174:3 180:3
191:4 207:20
208:4
**asking**  21:20
56:24,25 88:8
93:10 132:16
134:22 145:24
172:22 180:23
**asks**  97:20
**assigned**  39:6
**assist**  120:3
**assistance**  61:2
151:16
**assisted**  119:6
208:22
**assisting**
163:20
**associate**  41:17
**associated**
150:16 151:11

151:15,25
153:7 182:18
183:18 214:11
**associates** 83:4
**assume** 13:13
88:17 132:8
**assure** 154:13
**attached** 5:10
16:7 23:19
32:5,11 39:12
57:7,19 68:16
76:18 84:9
87:20 97:2
108:24 114:14
115:1,20,23
130:9 132:24
150:11 152:12
153:24 160:12
160:15 162:13
165:6 176:8
180:12 183:6
184:6,10
190:25 207:2
215:11
**attachment**
32:6
**attachments**
110:14 153:20
**attempt** 11:2
13:22
**attempting**
17:21 78:1
**attend** 204:22
**attendance**
39:22 40:3

**attended** 202:6
202:20
**attention** 38:19
48:6 199:13
211:7
**attorney** 17:22
18:1 19:25
20:17 22:20
66:6,15 72:2
72:19 74:5
80:9 145:22
174:19 181:1
215:13
**attorneys** 68:13
101:23,25
**august** 43:16
118:17 180:6
201:4
**aunt** 88:23
89:12 90:18,19
**authorize** 64:5
**authorized**
63:25 170:2,13
170:17 171:2
**auto** 27:16 28:7
28:23 108:6
**automatic** 27:1
27:8
**automatically**
27:20,24 108:2
**available** 28:11
28:22 45:17,19
84:16 107:17
130:14 136:1
141:15 178:5

198:6 215:6
**avenue** 3:17
**avoid** 29:17
**aware** 11:6
42:23 46:11,14
48:1 49:16
58:22 86:23
96:15 109:23
125:17 132:1
140:6,7,11
145:16 146:1,6
147:20 159:9
161:14 174:2
175:13,20
184:20 201:7
203:14
**awareness**
95:20

**b**

**b** 4:18 5:9 6:1
15:20
**baby** 1:4 7:5
10:21 11:2
15:5,9 33:3
37:16,20 39:1
42:18 43:13
48:10 78:21
84:25 93:14,22
94:4,9 95:4,15
98:23 104:19
105:4,6,10,13
112:25 113:1,4
113:14 115:15
117:16 119:14
119:23 128:25

130:5 139:22
142:19 158:25
159:5 172:8
179:7,8,10
201:3 202:21
202:24 203:16
205:6 207:17
209:12 210:4,8
210:18 215:4
**bachelor's** 40:8
**back** 26:18
30:17 36:9
41:21 42:2,4
49:14 72:24
73:19 76:13
82:16,19 83:11
87:16 93:9
113:7,10
116:10,19
121:14 126:14
128:16 141:13
145:23 175:6
179:24 180:2,3
191:7,23
192:24 195:16
200:22 209:17
209:20
**background**
40:6 42:11
81:12
**backing** 199:21
**bad** 195:14
**badly** 119:21
**bailey** 18:1
20:8 22:18

[balcazar - brief]                                                          Page 7

balcazar   89:24
ballpark   67:12
   75:11
bank   69:16,21
   69:22 70:2
baptized
   206:19
barely   207:11
base   94:1 145:7
based   73:4
   99:15 117:5
   161:14
basic   132:17
   133:16 135:5
   136:5,12,23
basically   17:23
   21:20 33:24
   42:2 50:19
   72:11 74:1,4
   107:17 123:2
   124:23 144:5
   146:14 168:19
   183:4
basis   27:18
   122:20 169:22
   204:8
battle   141:7
battleshowers
   90:17
bear   208:5
bears   199:16
befall   203:16
beg   99:7
began   8:21
   42:25 77:23

beginning
   36:10 97:16
   99:8
begins   147:6
   164:25
begun   134:7
behalf   2:10 3:4
   3:14 7:23 8:5
   53:2 59:22,24
   60:5 61:5,9,12
   64:5,13,15,22
   83:21,21 97:19
   146:2 147:2
   170:2,14,17,25
   193:17 194:6
   211:15,17,20
   211:22,24
behoove   166:21
believe   10:23
   18:11 25:2
   30:24 32:25
   33:7 40:12
   44:20 45:21
   46:13 49:11
   58:25 64:21,23
   65:3 69:18,19
   87:12 109:17
   112:23 147:14
   149:16 157:12
   162:18 165:20
   169:5,6,18,19
   170:1 175:23
   178:10 179:12
   181:25 186:3
   190:12 193:8

   196:17 197:16
   199:5,18 202:1
bell   91:4
ben   121:21
beneath   90:4
   90:17 91:12,23
   92:23 93:2
benefit   13:18
   60:11 61:14,16
   61:18 146:23
   146:25
benjamin
   114:25
bentaplace
   90:14
bentheplaced...
   90:16
bertieshowers
   90:18
best   42:16
   43:11 46:18
   77:13 125:8
   138:2,20,24
   167:19
better   18:13
   103:25 104:21
   110:6 143:24
beyer   89:17
beyond   159:16
   163:5 167:9
   206:15
binding   64:4
bird   4:2 8:5
birthday
   204:19

bit   13:20 29:19
   31:22 36:17
   42:10 52:7,7
   71:5 78:18,25
   81:9 103:15
   133:24 139:3
   142:16 145:23
   150:7,8 160:5
   162:23
blast   107:2
blur   124:10,15
   125:4 166:21
   167:2 169:9
blurred   130:5
   168:3
born   9:9
   205:15
bottom   24:18
   79:9 106:17
   110:8 121:15
   137:11 168:6
   168:15 172:3
   172:23 180:5
   187:3
box   167:20
boyer   4:16 8:7
   8:7
break   14:21,23
   65:21 126:6
   128:16 164:16
   210:22
breaking   169:1
bridget   89:8
brief   72:9
   165:2,17

briefcase 190:7
briefly 126:14
broadcast 197:6
broadcasted 124:18
broken 48:21
brooks 4:18,19
8:2,2,8 211:24
211:24
brother 10:18
10:21 11:24
18:17 19:3
20:12 28:14
29:11,15,20
30:3 31:6
33:22 34:1
43:12 47:15
48:20 49:6,17
49:24 50:1,4
50:10 51:20
61:3,11 63:4
65:7 70:8,13
71:12,22 75:6
76:8 77:9,17
77:22 78:21
82:9 83:14,22
84:25 88:21
91:1,10 92:7
96:7 100:9
104:18 105:5
105:11,12
109:9 113:3,14
115:15 119:22
120:3 123:6

125:23 128:25
129:22 130:1
131:4,17 133:9
133:22 135:1,4
135:7 136:2
138:2,14,16
144:24 146:4,9
146:16 155:3
157:10,13
163:21 171:1
171:16,20
179:3 181:12
181:23 183:20
184:20 198:18
198:24 199:9
201:7,12,22,24
202:21 203:14
204:5,9,14
207:20 208:2
brother's 85:17
109:12 112:25
145:22 146:19
202:6,11
brothers 12:3
23:11 26:7
31:18 35:22
42:12 85:8
88:24 89:1
144:21 156:25
157:24
brought 15:18
brown 1:24 2:2
7:11 213:3
214:2,20

bunch 43:21
88:5
business 40:8
byproduct 36:8
byrd 2:14

c

c 4:13 5:1 6:1
7:1 49:23
caitlin 72:3,22
72:22 73:1,12
caitlin's 72:21
caleb 12:7,11
23:5,8 26:4,5
calendar
101:11 205:9
call 23:23
29:11 30:6,9
30:13 31:17
49:21 50:2,6
50:18 51:7
54:23 55:2,12
55:16,23 56:11
56:23 67:2
77:8 78:1,2,7
78:10,10 79:3
80:23,25 82:5
83:13 102:24
104:19 125:1
134:22 135:17
135:20 136:18
138:4 139:1
142:17 158:6
158:12 163:17
181:22

called 30:6,7,19
49:18 50:5,19
53:21,25 72:22
72:23,24,24
73:21 78:11
80:20,22 82:16
83:4 102:22
108:15 125:1
129:21 130:1
134:6 135:23
138:18 145:18
187:18
calling 51:9
104:19 144:2
calls 30:14,20
30:23 31:5
53:8 54:1
59:10 60:6
63:19 64:14
65:18
camera 158:11
197:20
cameras 158:13
campaign
57:14 62:5
109:21 110:20
114:10
campus 42:1
capital 98:24
174:15,15
caption 21:6
captive 14:22
capture 30:25
care 15:5
183:19 203:17

**[caretakers - clarified]**                                                      Page 9

caretakers
  117:7
carolina  121:5
  121:8,12
  202:22 204:24
carter  190:21
  191:23 192:2
  192:17 193:6
  193:10
carter's  191:11
  191:21
case  7:8 15:3
  15:25 17:23
  18:3 19:1 21:2
  21:6 22:10
  25:8 28:24,25
  29:2,16 31:13
  31:16 32:18
  33:9,13,16,21
  36:7 42:11
  43:9 44:6,12
  45:4 46:8,25
  47:5,12,13
  66:6 68:10,13
  81:3,10,12
  91:2,11,11
  99:18 100:24
  108:8 128:25
  132:8 143:19
  145:17 154:23
  157:21 174:1,4
  174:15 175:17
  187:12 188:18
  188:19,20,24
  199:15 202:9

206:9 207:20
  211:10
cases  51:25
  52:12 55:4
  91:7
catching  178:2
cattaneo  2:21
  7:17,17
caught  110:17
cause  145:19
caused  34:14
  165:23 167:16
  195:18
cbs  47:16,19
  48:2,7,11 49:1
  54:7 122:6,11
  122:13 123:13
  123:18 124:15
  125:4,12,17,21
  125:24 126:1
  166:19 167:19
  168:2 170:6
  172:19,25
  175:11,21
cc  177:22 186:5
  186:16
ccs  191:20
cease  25:13,17
  26:11 27:14
  28:9 29:5 32:4
  108:4 126:3
  129:18 130:4
  130:25 140:12
  140:18 144:1,1
  145:20 165:25

166:14 173:20
  188:1 189:1,13
cell  78:12
center  4:6 8:1
  99:17 100:5,13
  100:15,19
  101:3,8,20
  102:2 187:19
certain  28:4
  112:16 130:5
certify  214:5,10
cetera  118:21
  118:22 120:25
  147:15,16,17
  169:13
chain  128:4
chance  117:24
  172:4
change  61:7
  117:13 121:21
  124:24 200:21
  213:4
changes  98:8
  98:10,17 213:1
  215:10
character  9:22
  9:23
charlottesville
  1:18 2:8 3:18
  121:6,7,9,10
  156:8 194:10
  196:20 197:3,7
  202:23
check  22:9,18
  70:10 87:16

138:21
checked  88:15
  129:10 141:17
checking
  168:12
children  204:1
choose  127:3
chose  126:19
christian
  205:21 206:4
  206:12,20
chronological
  93:12 111:6
  181:17
chronology
  140:10
church  202:3,6
  202:12,20
cindy  89:17
circuit  42:24
  44:1,17 45:25
  154:15,19
circulated
  96:16
circulating
  123:7
circumstances
  81:11
civil  1:6
civilians  182:25
clarification
  13:16
clarified  72:10
  99:21 143:24
  148:1

[clarify - confidential]                                      Page 10

**clarify**  13:10
  35:24 44:3
  50:4 61:8
  107:12 108:8
  148:2,11
**clause**  124:19
**clear**  35:10
  63:8 72:25
  109:19 140:9
  148:12 156:20
**clearly**  155:15
**client**  61:23
  181:1
**clipped**  14:3
**clock**  119:3
**close**  24:20
  31:19 42:12
  50:12 62:7,8
  75:9 98:24
  122:17 124:10
  133:9 175:7
  178:13
**coach**  38:16,17
**code**  15:14 39:6
  98:24
**cognitive**
  203:10
**colleague**  19:19
  24:3 39:21
  188:11
**colleagues**
  107:11 210:23
**college**  40:19
  40:25

**come**  14:3 48:6
  61:14 66:6
  77:16 83:11
  98:11 128:23
  136:1 152:5
  153:15 154:8
  159:5,11
  162:24 180:3
  181:8
**comfortable**
  78:20,22
**coming**  15:6
  70:2 173:1
  175:3 202:11
  204:21
**commanding**
  17:11
**commencing**
  2:5
**comment**  116:3
**comments**
  128:19
**commission**
  213:24 214:4
**commonwealth**
  2:3 213:19
  214:1,3,21
**communicate**
  30:2 51:21
  106:11,14
  107:14 108:18
  136:21 180:24
  185:2
**communicated**
  29:14 31:13

80:19 83:18
  107:9 109:16
  164:9 172:17
**communicating**
  29:12 31:15
  108:13
**communication**
  10:1,6,16 29:6
  29:10 30:3
  31:1 76:14
  79:21 80:17
  113:7,8 139:18
  162:20 172:16
  190:10 193:9
  193:13 200:8
**communicati...**
  28:10,14,21
  31:25 34:13
  72:12,20 79:25
  80:9,11 83:15
  126:24 173:10
  193:16 199:23
**company**  83:10
  180:9 183:9
**compel**  16:12
**compelling**
  40:2
**compendium**
  130:14
**compiled**  87:24
**complaint**
  36:14 44:25
  45:4 145:21
**completed**
  215:17

**compliance**
  17:20 18:22
  19:7,18 26:19
**complied**  25:3
**comply**  21:10
**complying**
  19:13
**comport**  67:20
**concept**  124:23
  150:24
**concern**  167:1
  167:17
**concerned**
  156:3,11,14
  204:13
**concluded**
  144:2 212:15
**concludes**
  212:10
**conclusion**  60:7
  63:20 64:15
  65:19
**conducted**
  197:17
**confer**  123:20
  123:23 210:22
**conferred**
  22:16
**conferring**
  26:12
**confided**
  133:12
**confidential**
  15:23

**[confirm - correct]**

**confirm**  24:2
  93:10 128:7
  154:3
**confirmation**
  136:18
**confused**  91:7
**confusing**
  191:24
**connect**  105:17
  105:25 106:8
**connecting**
  106:3
**connection**
  19:13
**consider**  11:15
  123:11
**consideration**
  114:6 180:21
**considered**
  25:17
**consistent**
  103:3,15 104:3
  108:3 168:5
  174:8
**contact**  23:14
  29:20,24 42:14
  46:11 50:9,16
  50:21 52:20
  53:2 54:15,19
  56:7 58:16,16
  72:5,8,14 73:5
  77:12,18 81:17
  82:6 101:17,19
  102:4 107:16
  119:6 131:11

147:17,21
149:15,21
150:5 162:22
179:22 181:8
182:2,12
184:21,24
185:19 195:2
196:8 200:12
201:16 210:3,7
**contacted**
  50:21 52:17,21
  56:1,15 157:23
  163:8 164:3
  190:15 195:5
**contacting**
  35:22 163:8
**contacts**  50:1
**contempt**  48:9
  48:21 49:4,8
  53:25 54:6,9
  125:24 126:1
  146:5
**content**  30:25
  128:20 156:19
  180:24
**contestable**
  72:3,6,15 73:1
  73:5,20
**context**  100:18
  104:13 117:14
  118:16 148:13
  182:1
**continuation**
  111:15

**continue**  51:20
  71:21 74:2
**continued**  3:1
**continues**  77:7
**continuing**
  76:7 168:11,11
**contract**  58:1
  62:2 63:13
  64:4,7 137:19
**contradicted**
  161:13
**controversial**
  181:6
**conversation**
  50:14 56:20
  73:18,19 77:23
  111:13,16
  124:20 125:13
  132:20 133:20
  133:25 134:14
  138:16 141:11
  142:9,11
  161:11 163:23
  165:24 168:12
  180:25 181:14
  182:9 210:15
**conversations**
  67:6 74:8
  204:10
**conversing**
  74:2
**convicted**
  11:19
**cooperation**
  56:24,25

**coordinating**
  31:20 210:12
**coordination**
  42:5
**coordinator**
  41:15,16 42:7
**copied**  116:18
**copies**  14:6
  21:1 33:24
  107:18 176:14
  215:14
**copy**  24:2 25:7
  25:22,25 32:15
  32:16 34:2,5
  34:18,21 39:20
  47:7 74:20
  110:9 140:5,15
  141:25 142:2
  146:21 189:5
  189:11,14
  190:6
**correct**  10:22
  11:3,5,25
  17:17,18 18:18
  19:14,15 20:6
  21:3 28:12
  29:9,25 30:1
  34:3 35:13,14
  35:16,18 39:2
  47:1,20 57:20
  60:5 61:17
  63:14 65:12,13
  70:21 72:4
  73:5,6 74:11
  80:3,6 81:24

[correct - cruden]                                      Page 12

| | | | |
|---|---|---|---|
| 82:1,17,18 | 214:8 | 205:7 | **courtlistener....** |
| 84:17 85:1 | **correctly** 75:13 | **course** 12:22 | 154:12 156:24 |
| 87:1,7 91:20 | 86:15 103:11 | 64:10,11 | **courts** 44:16 |
| 93:1,12,22,23 | 110:11 138:15 | **court** 1:1 2:5 | 174:19,21 |
| 96:24 98:19 | 170:14 208:19 | 7:7,10 8:14 | **cousin** 89:9,11 |
| 102:6,7,19 | **corresponden...** | 12:23 13:3,18 | 90:3 |
| 105:22 106:22 | 188:6 189:18 | 14:4 17:9 21:2 | **coverage** |
| 110:12 120:5 | **corresponding** | 21:5,14 32:14 | 145:14 |
| 120:17 121:10 | 186:24 | 36:1 42:24 | **covered** 37:10 |
| 122:14 131:10 | **counsel** 3:15 | 44:1,2,6,7,9,11 | 108:10 180:25 |
| 132:13 135:15 | 7:12 8:2,7,18 | 44:12,17,17,18 | 202:15 |
| 135:18 137:23 | 15:22 36:18 | 45:4,7,11,25,25 | **covers** 193:4 |
| 139:6,23,24 | 47:5 60:12 | 46:7,10 47:12 | **coworkers** |
| 140:19,22 | 139:9 214:7,11 | 47:13 48:8,22 | 210:9 |
| 141:7 144:25 | 215:14 | 49:4,8 51:25 | **create** 79:24 |
| 145:2,5 148:6 | **counselor** 41:1 | 53:25 55:4 | 127:5,6 |
| 148:17 149:8 | **count** 20:25 | 68:9 91:1 | **created** 79:22 |
| 150:5,16,17 | 21:4 200:19 | 125:23 145:17 | **creation** 126:15 |
| 155:25 156:1 | **counted** 20:21 | 145:25 146:3 | **creek** 176:21 |
| 158:14 161:24 | **countered** | 148:3 154:2,15 | 177:6 197:22 |
| 163:15 164:8 | 161:11 | 154:19,20,21 | **criteria** 111:23 |
| 164:10 166:4 | **country** 118:17 | 154:21,23 | **cruden** 49:22 |
| 167:4 169:21 | 119:7 120:4 | 155:24 156:7,8 | 50:3,6,9,15 |
| 170:18,24 | 192:21,22,25 | 156:9,15 | 51:7 52:17 |
| 171:3 172:10 | 202:25 209:12 | 157:16,17,21 | 53:22 54:19,19 |
| 176:3 177:2 | **county** 42:24 | 159:11,18 | 56:18,22 57:12 |
| 179:19 184:15 | 43:23 154:16 | 165:10 174:1,4 | 57:17 58:5 |
| 185:25 187:23 | 157:16 | 174:4 175:4,4 | 68:24 76:15 |
| 188:9 191:17 | **couple** 10:24 | 191:3 | 77:2,3 82:20 |
| 191:18 193:7 | 15:2 66:23 | **courtlistener** | 84:5 97:8,13 |
| 193:18 195:7 | 72:7 98:5 | 33:14,20 34:15 | 99:24 101:17 |
| 196:15 199:20 | 104:12 108:19 | 146:17 | 109:9 117:11 |
| 201:25 204:7 | 139:17 157:22 | **courtlistener....** | 132:16 133:4 |
| 204:16 205:18 | 175:2 180:16 | 154:14 156:18 | 151:6 152:6 |
| 208:7 210:16 | 185:16 203:22 | | 164:25 165:11 |

166:6 167:1
176:15 177:19
192:11
**cruden's** 73:4
**cruz** 112:21
113:2,4,15,20
**cruz's** 113:7
**cs** 215:15
**curious** 19:16
51:19 154:25
**current** 52:12
71:20 95:2
**currently** 13:5
27:3 41:17
**custody** 42:23
43:24 45:7,11
46:1 111:8
**cut** 210:23

**d**

**d** 6:1 7:1 49:23
**d.c.** 2:23 3:9
**dad** 112:11
**damon** 4:10
**date** 16:20
24:10 29:3
30:18 71:4
94:21 115:7
130:15 132:19
139:8 150:23
150:24 189:7
189:17
**dated** 39:20
109:10 158:21
**dates** 30:16
71:7

**david** 4:7 7:25
22:21 36:15
38:9 60:8,21
64:25 100:11
206:13 211:20
**day** 19:17 20:9
20:13,15 24:8
50:11 57:17
70:11 78:5,5
107:6 113:24
116:25 158:18
167:13 178:25
185:15 189:23
212:8 213:21
214:16
**days** 15:22
24:10 25:6
47:20,24 66:23
69:8 175:2
176:25 185:16
215:17
**deal** 15:17 16:2
38:22 78:14
80:5 136:4
**dealing** 34:22
51:7
**dealings** 74:9
**dealt** 19:22
**decent** 112:1
**decided** 124:25
143:8 145:6
168:19 185:19
195:9 196:13
**decision** 143:16

**declaration** 6:8
154:9,22 156:2
156:12,22
157:20 159:10
159:16
**decline** 56:8
**declined** 56:2
194:9,18
**deem** 60:17
**defective** 14:17
**defendant** 3:14
8:5 81:3
**defendants** 1:9
3:4 7:24 8:10
60:15 71:16
**defending**
52:13
**defense** 62:8
78:18 131:17
136:11
**defenses** 50:23
**define** 205:7
**definitely** 36:11
49:10 74:5
155:17 185:4
197:19
**degree** 40:8,14
**delay** 69:12
**delete** 27:1,16
28:7,23 108:6
**deleted** 25:7
168:7
**deleting** 27:8
**delgado** 89:3

**delivered** 162:1
**demand** 24:19
**dena** 49:21
50:3,6,9,15
51:6 52:17
53:21 54:19,19
56:18,21 57:12
68:24 72:10,16
72:21,25 73:4
75:20 76:14
77:2,3,10
83:14 84:5
97:8 99:24
101:17,21
102:12 106:11
106:21 109:9
109:19 110:9
111:5,10 112:8
113:23 114:4
114:19,25
115:1,6 116:6
116:15 117:22
121:14 122:4
122:15,21
124:8,21
125:11,17
128:16 132:16
133:20 134:3
134:21,24
135:1,10,14,21
138:1,1 139:1
139:2 141:10
149:15 151:6
152:6 161:4,6
162:6 164:25

165:1,11,16,24
166:6 168:12
168:16 169:23
172:16,18
174:12 176:1
176:15 177:19
177:25 192:11
**department**
41:4,16,20,22
41:24 42:3
**deponent**
215:13
**deposed** 8:17
**deposing**
215:13
**deposition** 1:14
2:1,4 5:13 7:4
8:21 12:17
13:1 16:6,11
19:22 23:18
32:10,15 37:16
37:21 38:4,25
39:11 57:6
66:4,8,12,17
67:1,7,16,20
68:11,15,19
72:13 76:17
84:8,12,21
87:19 91:23
97:1 108:23
109:2 114:13
114:17 130:8
130:12 132:23
133:3 150:10
152:11 153:23

160:11,14
165:5,10 166:3
175:15 176:7
176:11 180:11
180:24 184:5,9
190:24 202:15
202:18 207:1
211:8 212:15
213:1
**depositions**
38:3
**describe** 144:9
178:18
**described** 35:2
183:9
**description**
5:12 6:3 177:7
**designate** 15:22
**desist** 25:14,17
26:11 27:14
28:9 29:5 32:4
108:5 126:3
129:18 130:4
130:25 140:12
140:18 144:1,1
145:21 165:25
166:14 173:20
188:1 189:1,13
**detail** 35:6
142:21
**details** 21:21
27:6 50:19
51:25 208:12
210:10

**determine**
96:15
**development**
203:10 207:24
**developments**
211:10
**devices** 86:4
**difference**
156:15
**different** 14:24
20:5 41:16
52:11 94:14
119:17 127:4
135:3 167:21
178:22
**differentiate**
157:16
**difficult** 13:20
**difficulty** 203:6
203:9
**dig** 150:8
**digging** 183:8
194:22
**digital** 14:7
25:7 190:8
**dillon** 89:15
**direct** 58:7
141:12 193:13
195:2 200:8
**directed** 141:5
149:19 199:14
**directive** 25:3
**directly** 86:18
161:3 199:24
200:4,8 201:13

**director** 41:17
58:6 77:4
**disabled** 108:5
**disagree** 58:12
88:1,9
**disagreement**
212:5,6
**disagrees** 212:3
**disbanded**
41:24
**discovered**
128:2
**discovery**
142:16
**discretion**
208:12
**discuss** 35:3,7
165:2,17
190:16
**discussed** 35:4
64:1 124:10,20
132:6,7 138:4
138:25 155:1
171:14 203:20
204:12
**discussion**
68:25 71:24,25
**dismissed**
183:7
**dispense**
136:10
**displayed**
139:22
**dispute** 44:4
71:20 75:14

[distracted - eddie]                                   Page 15

**distracted**
  208:25
**distribute**   14:6
  61:11 62:15,17
  62:21,25 65:6
  134:5 138:3,25
**distributed**
  133:8 137:2
**distributing**
  65:13
**distribution**
  134:8 136:2
  138:17
**district**   1:1,2
  7:7,7 156:8,15
  157:17
**doctors**   204:20
**document**
  14:10 15:16,21
  17:2 36:11
  38:11,12 61:19
  61:22 63:13,18
  65:5 80:7
  82:19 98:22
  99:5,9,23
  102:17 107:1
  147:1 149:1,17
  153:19 154:13
  155:3 156:4
  159:10 176:13
**documentation**
  151:1 152:18
  158:23 186:23
  186:24 187:15
  188:10 190:1

**documents**
  14:1 15:13,16
  16:17 17:12,16
  19:18 20:21
  21:1,9,14,17,25
  24:19 25:7
  26:8,19 33:8
  36:1 39:5,8
  43:25 44:9,12
  44:18 45:10
  48:19 99:12
  103:2 151:15
  151:24 152:2,7
  152:25 153:5
  153:16 155:20
  155:24 156:16
  156:19 159:17
  160:21 161:3,8
  161:22 162:13
  162:14 180:20
  186:2
**doe**   1:4 7:5
  10:22 11:2
  15:5,5,9,9,9
  33:3,3,3 37:15
  37:15,16,20,20
  37:20 39:1,1,1
  42:18 43:13
  48:11 78:21
  84:25 93:14,22
  94:4,9 95:4,15
  104:19 105:4,6
  105:10,13
  112:25 113:1,4
  113:14 115:15

  117:16,17
  119:14,14,15
  119:23,23,23
  120:11 128:25
  130:5 139:22
  144:2,8 159:5
  172:8 179:7,8
  179:10 201:2,3
  201:3 202:21
  202:24 203:15
  203:16 204:15
  205:6 206:22
  207:17 209:12
  210:4,8,18
  215:4
**doing**   78:22
  90:13 104:14
  171:5 177:9
  179:6 201:8
  208:2,9
**domain**   109:13
  123:11 124:17
  156:17 166:20
  170:5
**domestic**   44:1
  44:17
**donate**   141:6
**door**   17:3
  189:14
**double**   22:18
**download**
  116:2
**downloaded**
  85:24 86:5

**dozen**   119:5
**dr**   45:24
**draft**   100:3
**drive**   9:15
  112:15

e

**e**   1:24 2:2 5:1,9
  6:1,1 7:1,1
  186:16,16
  213:3 214:2,20
**earlier**   20:2
  37:11 39:5
  49:15 74:1
  108:1,3 111:13
  126:18,20
  131:3 138:8
  139:3 150:7
  155:1,22 158:5
  160:19,24
  162:25 193:1
  201:6
**early**   49:16
  73:16 160:2
  166:3
**earth**   205:16
**easier**   32:2
  126:25
**easily**   128:4
**east**   2:13,14
**eckstein**   39:21
  39:25
**eddie**   78:19
  131:8,16
  165:18,19

**[eddie's - english]**

| | | | |
|---|---|---|---|
| **eddie's** 166:12 | 131:11 172:4 | 88:11 90:4,5 | **emailing** |
| **edit** 39:7 | 194:4 203:13 | 90:14,19 91:3 | 177:10 |
| 168:16 172:4 | **electronic** 10:1 | 91:12,13,23 | **emails** 22:3,4 |
| 177:11 | **electronically** | 92:23 93:3 | 31:4,4 74:19 |
| **edited** 143:22 | 24:20 | 96:12 107:2 | 93:2 109:4 |
| 143:23 | **eleven** 21:1 | 109:8,9,13,16 | 114:18 115:20 |
| **editing** 98:23 | **eleventh** 2:22 | 109:18 110:2 | 116:5,7 126:21 |
| **editorial** 98:5 | **elizabeth** 3:17 | 110:10,17 | 127:1 158:21 |
| 117:23 128:19 | **elliker** 19:20,21 | 111:7 113:23 | 158:23 161:2,9 |
| **edits** 115:3 | 24:3 33:6 | 114:24 115:6,9 | 161:23 162:19 |
| **education** | 44:23 108:5 | 116:25 117:3 | 180:16 184:1 |
| 40:15 | 140:12,17 | 117:10,22,24 | 184:15,18 |
| **educational** | 166:2 173:19 | 122:3,21 124:8 | 185:5,24 186:1 |
| 40:5 | 174:16 175:8 | 125:11 126:15 | 186:21 190:9 |
| **effect** 54:24 | 175:15 187:9 | 127:4,8,16,17 | 199:22,25 |
| 55:3 65:14 | 188:11 | 127:18 128:1,3 | 200:2 |
| **effectively** 17:8 | **elliker's** 25:5 | 131:22,23 | **embedded** |
| **efficient** 184:13 | 25:10 29:5,14 | 132:5,13,15 | 115:14 116:14 |
| **effort** 187:25 | 32:4,20 166:5 | 137:4 151:4,9 | 167:15 172:1 |
| **efforts** 120:19 | **elliott** 3:16,20 | 151:14,23,24 | **emily** 89:19 |
| 173:11 199:10 | 7:21 21:23,24 | 152:18,20 | **emmanuel** 7:9 |
| 201:13,17 | 22:19 28:5 | 153:8,11 154:5 | **employed** |
| **ehson** 2:20 7:19 | 211:14 | 160:20,20 | 182:13 |
| **ehson.kashfi...** | **email** 5:17,18 | 176:13 177:1,4 | **employer** 41:7 |
| 2:25 | 5:23,24 6:6,7,9 | 177:23 179:20 | 41:11 128:1 |
| **eight** 131:6,7 | 6:10,12,13,14 | 179:24 180:2,4 | **employment** |
| **either** 23:3 | 6:15,16,17 | 185:6,13 186:4 | 40:18 |
| 43:25 44:18 | 9:16,18 19:22 | 188:5 189:10 | **enable** 61:1 |
| 45:24 47:21 | 21:22 24:7 | 189:13 191:10 | **enclosing** 39:22 |
| 56:23 60:14 | 26:21 27:18,18 | 191:13,14,16 | **endeavor** |
| 68:13 80:17 | 32:1,3 57:11 | 191:19 193:3 | 126:23 |
| 81:21 85:5 | 57:19 58:5,10 | 207:13 | **enforcement** |
| 92:22 96:10 | 74:20 79:11,15 | **emailed** 80:20 | 52:13 |
| 107:2 115:24 | 79:22 80:4,7 | 108:16 | **english** 205:11 |
| 125:11 129:11 | 82:21 85:4 | | |

[enjoy - exhibits]

| | | | |
|---|---|---|---|
| **enjoy** 93:7 | 169:13 215:4,4 | **example** 159:5 | 96:13,16,17,22 |
| **entered** 15:20 | **evacuated** | 201:19 | 97:1,5,11 98:1 |
| 32:17 46:9 | 118:20 201:3 | **except** 123:9 | 98:2,21 103:17 |
| 174:1 175:11 | **evacuation** | 212:3 | 103:17 108:23 |
| 175:16 188:24 | 117:6 119:22 | **exception** 39:4 | 109:3 111:5 |
| **enterprise** 83:4 | 201:9,14 | **exceptions** | 112:18 114:13 |
| **entire** 142:23 | **evening** 17:17 | 15:12 108:21 | 114:18 115:13 |
| **entirely** 135:13 | 19:17 20:22 | **exchange** 133:4 | 116:12,19,21 |
| 170:20 | **event** 41:16 | 137:10 165:11 | 124:8 130:8,13 |
| **entitled** 160:19 | 42:5,7 94:4 | 191:16 | 132:4,12,23 |
| 160:20 | 214:13 | **exchanged** 31:6 | 133:3 146:24 |
| **entrusted** | **events** 41:18 | 74:19 | 150:10,25 |
| 62:15 | 181:17 | **exchanging** | 152:11,15 |
| **entrusting** 65:6 | **eventually** | 97:12 | 153:6,16,20,23 |
| **entry** 103:23 | 33:13 79:17 | **excuse** 23:22 | 154:3,6 160:11 |
| **episode** 178:14 | 135:24 153:10 | **executive** 58:6 | 160:14 162:19 |
| **eric** 89:21 | **everybody** 8:11 | 77:4 | 165:5,10 166:3 |
| **errata** 215:11 | 42:2 60:19 | **exhibit** 5:13,14 | 167:12,16 |
| 215:13,17 | 195:11 205:3 | 5:15,16,17,18 | 168:6 169:15 |
| **error** 69:13 | **everyone's** | 5:19,20,21,22 | 171:25 172:14 |
| **esq** 215:1 | 206:16 | 5:23,24,25 6:5 | 173:22 174:13 |
| **esquire** 2:12,20 | **evidence** 33:25 | 6:6,7,8,9,10,11 | 175:15 176:7 |
| 2:21 3:7,16 4:3 | 36:2,13 134:19 | 6:12,13,14,15 | 176:12 177:1 |
| 4:4,7,10,13,16 | **exact** 24:8 | 6:16,17 14:5,9 | 180:4,11,15,18 |
| 4:19,22,25 | 44:24 48:4 | 16:5,6,11 | 184:5,9,14 |
| **essentially** 63:3 | 71:7 119:4 | 23:18,24 32:6 | 185:5 187:14 |
| 136:13 | 163:23 | 32:10,15 39:11 | 188:4 190:24 |
| **established** | **exactly** 33:14 | 57:6,10,24 | 191:4,9,14 |
| 49:13 85:16 | 65:4 113:13 | 68:15,20 69:16 | 193:4 207:1,8 |
| 135:4 185:19 | 119:18 | 76:16,17,21 | 210:19 |
| **estimate** 31:3,5 | **examination** | 79:8 84:8,13 | **exhibits** 14:5 |
| **et** 1:4,8 7:5,6 | 5:3 8:18 | 87:10,19,23,25 | 15:23 159:14 |
| 118:21,21 | 210:24 | 88:4,12 93:6,9 | 160:18 161:2,9 |
| 120:25 147:15 | **examined** | 93:10 94:16 | 161:23 162:14 |
| 147:16,17 | 214:7 | 95:1,14,21 | 166:9 185:24 |

[exhibits - felt]

Page 18

189:19 190:9
**existed** 140:14
174:18 210:6
**existence** 11:7
42:21 95:25
**exists** 33:15
**expect** 62:11
91:17 151:22
**expectation**
50:15 71:19
159:20,22
**expecting**
65:10
**experience**
196:5
**expert** 30:17
81:14 169:24
**expires** 213:24
214:4
**explain** 35:19
51:1 104:25
188:14
**explained**
53:22 78:15
**extended**
120:24
**extension** 17:24
**extensive**
197:23
**extensively**
134:4
**extent** 51:22
123:13 185:8
201:10

**extreme** 195:24
**extremely**
51:23
**eyesight** 203:12

**f**

**f** 2:12 215:1
**face** 124:16
**facebook** 10:3
11:13 129:11
129:21 131:1,7
181:22
**facilitate** 61:6
119:22 201:8
201:13
**fact** 49:1 148:9
181:4
**facts** 99:18
134:18
**fails** 215:19
**fair** 13:25 39:9
56:13 60:18
113:13 115:25
116:3
**fairly** 31:17,19
95:2 142:21
196:6
**faith** 205:21,22
206:20
**fall** 11:3,4
42:20,25 43:16
**falling** 118:18
**familiar** 51:23
51:23 119:8
151:20 185:8

**familiarity**
127:7 163:19
**familiarize**
36:2
**family** 10:23,25
31:19,21,21
43:20,21 46:16
46:20 53:2,6
53:13,18 60:3
61:23,24 62:6
62:13,19,22
63:10 64:2
65:12 71:12
76:8 81:7
83:22 85:17,18
86:3,7,11
87:11 95:5
103:13 104:17
108:18 119:1
120:18,24,24
122:25 123:4,9
128:10 129:24
129:25 145:12
145:14 149:20
157:21 168:3
178:24 179:5
195:14,18
199:14 206:5
206:12 209:16
**family's** 61:16
63:17
**fantastic**
205:12
**far** 11:5 21:19
28:25,25 35:4

50:8,18 53:5
53:10,11,15
67:18 68:20
78:16 94:17
96:16 105:3
118:7,14 119:9
120:23 127:25
129:5 137:22
155:22 159:9
159:12 170:7
175:5,20 185:1
193:19 195:4
195:24 205:16
208:24 210:11
**fault** 183:10
**favorite** 9:22
**feature** 27:11
108:6
**federal** 8:9 21:2
44:12 45:4
47:12 48:8
91:11 145:17
154:20,21
156:7,16
159:13 175:4
206:9
**feel** 14:22
197:23
**fees** 65:7 179:4
**fellow** 120:10
140:2
**felony** 11:19
**felt** 177:7
178:25

[figured - forth]                                                          Page 19

**figured**  79:24
126:22
**figuring**  52:10
**file**  21:2 43:25
44:7,9,11
145:25 154:19
159:11,18
**filed**  7:6 33:21
48:8 54:10
125:22 145:17
145:21,22
146:3,7,10,19
147:2 148:3
**files**  33:16
44:19 45:11
46:1 155:2
**finances**  136:5
138:6
**financial**  61:2
179:3
**financially**
133:24
**find**  21:17,25
33:13 35:25
36:1 48:13
66:9 125:25
**fine**  9:13 15:11
39:3 45:2
51:16 67:13
74:13 90:13
105:21 106:16
113:21 122:16
123:14,18
168:1,2 188:8
206:25 210:25

**finish**  13:21
54:2 65:2
**firechuck**  90:20
**fired**  182:15,18
183:18
**firing**  183:15
**firm**  4:15 7:9
7:11 8:6 18:18
18:19 22:21
68:2,2,3,5
79:12 80:12,17
80:19 82:22,23
82:25 100:21
101:1 186:24
187:2,8,16,17
188:10 189:3
**first**  13:2 16:25
23:23 24:6
34:8 35:12
37:4 42:16,21
48:25 50:22
55:8,15 56:19
58:16 59:25
61:19 62:1,4
68:4 69:21
70:2 72:5,22
72:24 73:8,12
73:18 76:13,14
77:12 78:6,17
79:2 84:19
85:2,9,11
87:25 88:3
92:14 93:14
97:17 101:17
109:8,23 110:2

110:8 111:7
114:23 122:24
125:10 133:6
135:16 136:16
137:2,9,18,20
148:19 151:9
151:23 154:15
156:6 157:2,9
165:15 166:15
168:23 176:12
178:16 180:18
181:8 184:15
185:5 188:3,22
191:13 193:4
194:12 196:23
197:20 208:8
**firsthand**
144:17,20
**fishing**  31:22
31:22 50:18
**five**  12:16 37:5
38:2 69:8
70:18 75:7,9
75:11 131:2
137:18 142:17
143:5,6 155:10
197:20 210:22
**flavio**  89:5
**flip**  116:20
**florida**  9:10
**fluvanna**  42:24
43:5,23 44:16
154:16 157:16
**focus**  15:17
36:12 45:8

**folks**  42:2
177:18
**follow**  69:12
102:23 158:21
159:21 162:6
163:5 169:8
183:12 211:15
**followed**  78:7
160:25
**following**  69:10
134:25 170:10
189:23
**follows**  8:17
**font**  207:9
**force**  94:1
**foregoing**
214:7
**forget**  180:9
**forgive**  45:1
158:2
**forgot**  210:5
**forgotten**
187:13
**form**  11:14
19:24
**formal**  40:15
171:2
**format**  153:13
**formed**  11:1
131:16
**former**  181:10
190:23
**forms**  10:1
**forth**  128:16
175:6

| | | | |
|---|---|---|---|
| **forty**  12:2 | 59:20 61:2,10 | 130:24 153:5 | 23:24 37:1 |
| **forward**  40:21 | 62:5 65:11,16 | 153:16 204:1 | 39:23 76:24 |
| 94:7 151:23 | 69:5 70:3,22 | 204:17 | 94:16 97:11 |
| 189:2 195:9 | 71:11,21 72:1 | **fourth**  103:17 | 98:2 102:9 |
| 196:13 207:20 | 72:11 73:2,9 | 112:17 117:2 | 109:6 133:2 |
| **forwarded** | 74:4,10 75:6 | 169:15 173:12 | 150:25 165:13 |
| 21:24 44:23 | 76:7 77:4,13 | **frame**  145:3 | 189:14 |
| 63:3 70:8 | 77:19,24 78:16 | 175:1 192:25 | **full**  8:25 180:5 |
| 86:13,16 | 82:25 83:21,24 | **framing**  55:21 | 208:8 214:8 |
| 110:14 115:6,9 | 84:1 86:9,12 | **fran**  88:22 89:5 | **function**  27:16 |
| 116:15 117:23 | 87:8 97:14 | **francisco**  3:7 | 28:7,23 |
| 121:21 180:20 | 100:1 102:18 | 7:23,23 18:18 | **fundraising** |
| 181:4 200:4,5 | 105:2 110:1 | 38:1 51:12 | 57:13 62:5 |
| **forwarding** | 114:7 115:11 | 60:6 63:19 | 71:9 97:14 |
| 80:9 110:9 | 115:19 117:25 | 110:1 134:18 | 109:20,24 |
| 191:15 | 128:17,24 | 137:3,7 148:10 | 110:20 111:14 |
| **found**  17:2 | 129:4 130:2 | 149:1 202:13 | 114:10 122:25 |
| 33:14,16 35:1 | 131:16,20 | 206:6 210:25 | 173:10 |
| 35:17 44:13 | 132:3,11,17 | 211:17,17 | **funds**  50:23 |
| 48:14 98:13 | 136:23 139:14 | **francisco's** | 59:20 61:10 |
| 130:6,14 | 141:6 143:15 | 60:13 68:3 | 62:17,21,24 |
| 146:12,17 | 145:5 147:11 | **freak**  126:21 | 65:6,13 78:16 |
| 195:17 | 147:18,22 | **freedom**  4:6 | 131:18 133:8 |
| **foundation** | 148:15 149:7 | 8:1 99:16 | 133:15 134:3 |
| 29:21,25 30:4 | 149:12,13,23 | 100:5,13,15,19 | 135:2,5,8,9 |
| 34:10,14,17,21 | 151:19 162:21 | 101:3,8,20 | 136:1,3,10,23 |
| 34:23 36:4 | 170:21 173:9 | 102:2 187:19 | 136:25 137:2 |
| 49:18 50:2,22 | 175:21 177:18 | **friday**  39:24 | 138:3,20,24 |
| 51:2,21 52:2 | 186:8 200:6 | 40:3 64:20 | 171:6 |
| 52:22 53:3,14 | 208:18 | 69:9 | **funnel**  72:20 |
| 53:17 54:16 | **foundation's** | **friendly**  123:5 | **further**  162:21 |
| 55:14,19,23 | 63:9 82:22 | **friends**  86:7,11 | 179:22 191:16 |
| 56:1,12,16 | 129:16 | 87:11 128:12 | 193:9 211:21 |
| 57:12,13,20 | **four**  70:20 75:9 | **front**  14:9 | 214:10 |
| 58:6,23 59:6 | 75:11 95:12 | 16:10 17:3 | |

**furtherance**
70:3
**future**  74:9
**fyi**  168:7

**g**

**g**  7:1 83:5
139:16
**gag**  54:13,20,24
55:3,5 173:1
173:13,17,25
174:5,10,13
175:2,11
**gallagher**  78:19
131:8 165:19
**gallagher's**
131:17 167:3
**gather**  26:19
**gathered**
161:21
**gears**  200:21
**general**  40:23
42:10 104:13
104:15 210:12
**generally**  125:5
**gentleman**
142:3
**gentlemen**
212:7
**georgia**  90:1
**germany**  94:1,2
**getting**  67:18
105:3 116:11
118:20 119:6
120:3 197:20
206:16

**give**  9:11 17:19
27:6 29:3
31:10 43:15
67:19 90:10
111:23 168:25
**given**  13:1
50:24 191:3
205:24 212:10
**giving**  36:20
204:11
**glad**  15:18
**gmail**  9:21
22:13 31:25
32:1 79:23
90:20,22 91:20
127:6,24
**gmail.com**
90:17
**gmail.com.**
92:3
**go**  8:12,12
12:17 13:24
15:7,19 26:18
30:17 31:22
33:20 34:14,15
35:24 36:9
49:14 50:19
62:12 63:23
65:1 74:9,13
76:13 87:16
94:12,12 98:22
113:22 116:10
116:11 117:1
118:13 126:14
130:2 133:11

142:14 145:15
168:19 169:4
172:24 178:8
179:16 181:16
183:13,17
191:23 194:8
194:12 195:9
196:13 200:22
**goal**  109:24
110:20 134:5
**goes**  9:20 148:5
168:24 207:4
**going**  7:3 14:4
14:8,18 15:17
15:19 18:14
23:23 33:22
34:11 36:1,3,3
36:5,6 37:7
38:21,25 39:7
39:18 40:21
48:1 50:16
51:7 52:20
53:7 55:13,20
55:25 56:15
59:9,15,18,19
59:21 61:9,13
61:18,21 64:20
71:21 72:18
76:3 77:17
78:21 79:21
99:14 101:21
102:1,17 109:5
110:15 113:10
114:9 115:10
117:12,19,25

118:13,24
119:10,11,21
120:1,19
121:14 126:5
126:23 128:21
129:12 136:22
137:7 142:5,6
142:15,18,19
142:21 145:8
146:21 148:2
149:13 151:20
153:15 159:23
172:14 175:6
176:2 186:5
193:9 195:13
195:14 196:13
198:19 200:16
200:21 203:20
205:1 206:14
207:12 210:10
211:11
**goings**  144:6
**good**  7:2,14
8:20 15:6
20:22 51:11
77:2 97:17
104:13 122:25
146:10 164:15
179:6 190:4
212:8
**google**  5:20,21
33:12,20 34:14
66:14 84:17
85:3,25 86:5
86:24 93:7

[google - hi]                                          Page 22

95:18 103:10
104:23 111:21
112:15 114:3
122:9 140:21
**googled**  66:8
82:8
**gotten**  170:6
189:22
**graduate**  40:7
**graduated**
40:12,24 41:11
109:15
**grand**  75:7,9
75:11 137:18
**grant**  57:20,23
58:19 59:6,15
60:25 62:8
70:4 74:21
132:17
**grantee**  115:2
**grantees**  60:2
61:20,22 62:7
65:16
**great**  35:6
78:14 88:23
90:13,18,19
117:1 137:14
**group**  86:13
**groups**  202:3
**guess**  25:14
41:6 43:16
66:10 103:16
112:18 125:14
143:2 191:10

**guidelines**
12:17
**guys**  21:24

**h**

**h**  5:9 6:1 83:5
139:16
**habit**  108:19
177:24
**hacked**  128:5
**half**  14:2
**hamlett**  22:20
**hand**  14:5
146:21 214:15
**handed**  32:15
39:20 57:10
68:19 76:21
84:12 87:23
97:5 109:2
114:17 130:12
152:15 154:3
160:18 165:9
176:11 180:15
207:8
**handle**  124:21
130:2 138:6
163:7 166:11
166:12
**handling**  79:25
120:23
**hands**  190:1
**hannon**  18:24
91:5
**hannonwright**
90:22

**happen**  38:21
66:19 192:19
**happened**
71:17 75:13,14
81:18 98:19
136:25 137:1
162:7 173:8
181:18 183:11
193:6 208:24
**happy**  98:17
**hard**  25:7
33:24 63:5
189:11,14
190:6
**harding**  3:15
3:16 7:21,21
17:16 18:8,14
19:14 20:22
26:11 38:20
45:3 51:9 53:7
54:1 55:20
56:9 59:10
60:10,20 61:21
64:14 65:18
66:16,25 67:7
67:10 148:18
155:11 157:5
164:17 180:20
180:25 188:5
191:15 205:1
207:5 211:14
211:14 212:6
**hardingcouns...**
3:20

**hardship**  62:7
**head**  143:3
**header**  24:18
57:13 130:15
**hear**  38:10 47:4
55:13 170:14
**heard**  43:20
48:25 52:24
55:8,15,18
60:16 84:5
135:11 181:10
204:15
**hearing**  39:23
40:3 48:24
49:11 64:20
**heavily**  99:16
**held**  40:24 48:9
49:8 53:25
125:23 146:4
173:11
**helicopter**
117:3
**hello**  8:22
**help**  21:25
50:22 65:7
112:5 141:6
172:14
**helping**  113:9
119:6 120:10
**hereunto**
214:14
**hershey**  89:10
**hi**  68:25 105:17
106:8 107:16
115:1 138:1

165:1,16,16
186:22
**high** 40:7
**history** 40:18
161:14
**hitter** 5:25
29:21,25 30:4
34:10,14,17,20
34:22 36:4
49:18 50:2,21
51:2,21 52:2
52:22 53:3,14
53:16 54:16
55:14,19,22,23
56:1,12,16
57:12,13,20
58:6,22 59:6
59:19 61:2,10
62:4 63:7,9
65:11,16 69:4
70:3,22 71:10
71:20,25 72:11
73:2,9 74:3,10
75:5 76:6 77:4
77:13,18,24
78:16 82:22,25
83:10,21,23,25
86:9,12,17
87:5,8 97:14
97:19 99:25
102:18 105:2
114:7 115:11
115:18 117:25
128:17,24
129:4,16 130:2

131:16,19
132:2,11,17
133:14 136:22
139:14 141:5
143:15 145:5
147:11,18,21
148:15 149:7
149:12,13,18
149:22 151:19
162:21 170:21
173:9 175:20
177:18 186:8
192:10 200:6
208:18
**hitter's** 166:22
**hoernlein** 4:3
8:4,4 60:23
211:22,22
**hold** 40:7 49:4
64:24 191:20
207:5
**holmes** 89:19
**honest** 156:5
**honestly** 25:24
31:12 182:14
**hope** 208:9
**hoped** 185:7
**hospitality** 41:5
41:6,15,23
**host** 194:22
**hour** 14:21
67:14 126:6
158:16 178:14
**hours** 24:12

**house** 95:6
**housekeeping**
39:17
**html** 115:1
**https** 109:13
**huh** 9:4 10:10
11:18 12:10
26:22,25 52:25
57:21 70:19
82:12 83:12
84:6 88:20
89:18 90:6,10
90:10 100:7
102:3 104:9
107:8 108:7
110:21 111:18
118:23 124:1
138:10 152:21
160:4 168:10
168:22
**hundreds**
123:12 155:19
**hunton** 2:11
4:12 7:15
26:16 146:13
**hunton.com**
2:17 215:2

**i**

**icloud.com**
109:13
**idea** 40:23
89:14,16 92:14
95:23 112:24
113:3 156:21
183:16 184:22

190:13
**identification**
16:7 23:19
32:11 39:12
57:7 68:16
76:18 84:9
87:20 97:2
108:24 114:14
130:9 132:24
150:11 152:12
153:24 160:12
160:15 165:6
176:8 180:12
184:6,10
190:25 207:2
**identified**
58:10 61:19
88:13 91:22
**identifies** 60:2
**identify** 16:11
32:16 56:18
57:11 68:22
69:15 109:3
191:6 194:3
**identity** 33:3
**iii** 2:12 215:1
**images** 116:2
139:22
**imagine** 206:8
**immediate**
43:21 62:13,18
63:10 65:7
76:8 86:11
87:11 96:18

implementati...
  57:14
implementing
  62:5
important   15:8
  143:21 188:15
imprecise
  210:17
impression
  176:1
inaccurate
  177:8
inappropriate
  38:17
include   28:13
  177:22 187:13
  188:23
included   166:9
  188:25
including   14:13
  33:18 36:19
  87:11 151:6
  194:3
incoming   28:1
  30:23
incorrectly
  20:7 25:23
independent
  128:6 195:8
indicate   117:19
indication
  76:11
individuals
  194:3

influence   96:18
info   9:20
informal   171:4
  210:15
information
  21:21 22:10
  24:20 33:13,17
  69:16 81:12
  82:7 109:20
  127:25 128:24
  130:14 132:12
  135:11 144:15
  145:1 153:10
  161:13,15
  170:4 181:19
  204:1,4 209:8
informed   19:5
  19:10 49:23
  77:20 120:21
  120:23 148:20
  178:1
initial   9:2
  70:23 107:4
  137:2 149:15
  165:25
initially   75:8
  78:2 132:6
initiate   165:23
initiated   72:14
  73:5
initiating
  111:16 133:5
initiative   103:5
  104:8 135:13

input   143:11
  143:16
insert   102:13
insofar   190:17
instagram
  129:8,9,23
  130:2 131:3,8
  165:18 166:10
  166:10,12,22
  167:3 169:13
installment
  70:23 137:20
  137:23
instance   28:5
  70:14
instances   84:20
instinct   122:24
instruction
  141:11 205:24
instructions
  90:9
instructs   38:20
integrity   4:15
intending
  190:14
intensives   41:5
  41:25
intention   11:2
  11:5 43:12
  166:25 185:2
  189:2,25
interactions
  107:4
interchangea...
  55:7 173:16

174:10
interest   42:17
  153:1
interested
  10:21 35:20
  159:7 214:12
interfere   13:6
intermediary
  65:10
intermittent
  58:16
intermittently
  58:18 149:22
internet   66:14
  155:20
interpose   36:16
  36:19 38:1,11
  206:14
interpret
  148:24 188:4
interpretation
  94:8
interpreter
  120:9
interpreter's
  117:6 120:7,15
interrupt   36:21
  139:10
interrupting
  45:1
interval   14:24
interview   48:2
  54:6 81:21
  86:21,25
  124:15 125:18

126:1 139:4,6
139:11,23
140:3,21 141:3
141:15 142:1,3
142:5,14,18,24
143:1,17,20
144:5,12,16,24
148:8 150:8,17
150:22 151:10
151:11,17
152:3,7 153:1
153:12,12
159:6,21,24
160:7,24
161:19,19
172:25 175:11
175:21 176:4
176:24 177:4
177:15 178:3,5
178:15,21
179:14 181:16
181:20 185:14
185:15 192:16
193:10,21
194:11,16
195:6,12
196:22,23,25
197:8,15,17,21
198:1,4,6,15,19
198:21 199:4
200:10,13,16
200:17
**interviewed**
145:9 150:15
157:25 176:21

198:22 199:6
**interviews**
47:22,23 49:1
78:23 79:6
123:13 162:22
210:13
**introduce**
142:4
**introduced**
8:21 72:9
**introductions**
79:12
**invitation**
191:20 194:15
**invite** 194:8
**invoke** 15:20
**involved** 15:25
46:25 118:11
177:20 200:24
201:13 210:1
**involvement**
208:18
**iphone** 30:21
**isabel** 92:16
**issue** 71:16
72:18 165:1,16
**issues** 80:5
202:25
**iwpfod** 109:13

**j**

**j** 45:24
**jacob** 12:8,13
129:22 130:1
131:4

**jacqueline** 89:6
**james** 180:7,8
186:23
**jane** 15:4,9
33:3 37:15,20
39:1 117:16
119:14,23
120:11 144:2,8
201:3 204:15
206:22
**january** 29:3
29:13,21 31:7
46:8,19 47:8
47:16 54:10
101:14 125:12
200:24
**jch** 1:7 7:8
**jennifer** 88:24
89:1
**jeremy** 4:13
**jesse** 12:8,13,15
**jessica** 158:3
**jm** 191:20
**jmmast** 9:20
**job** 40:21
**jobs** 40:24
41:12
**joe** 151:6
177:17 186:13
192:13 194:10
196:21 197:4
198:19,22
200:2
**john** 15:4,9
33:3 37:15,20

39:1 91:8
117:16 119:14
119:23 120:10
144:2,8 201:2
203:15 204:15
206:22
**join** 51:13 60:8
**joined** 8:6
**joining** 60:10
**jonathan** 1:15
2:1 3:14 5:3
7:5,22 8:16 9:1
23:22 52:19
55:9 69:1 77:3
105:17 106:8
112:7,10
147:10 148:14
148:16,24
149:3,23
170:22 212:11
212:15 213:2
213:17 215:5
**jonathanmms...**
9:21
**josh** 112:14
**josh's** 124:6
**joshpeter1975**
92:22
**joshua** 1:8 3:4
7:6,24 10:18
11:24 12:7,9
19:3 20:12
22:23 23:8
25:10,20,22
28:14,21 29:6

29:15 31:6
33:22 34:2
35:3,13 42:17
43:19 46:22
47:15 48:7
49:7,17,24
50:4,15 51:20
53:1,6,14,21
54:6,13,18,20
55:9,18,25
56:9,15,21
58:20,23 59:7
59:9,14 60:2
61:3 62:6,13
62:18,22,25
63:10 65:11
67:15 68:2,9
71:12 77:9,17
77:22,23 78:21
82:11 83:14,22
84:25 85:18
88:21 91:6
95:24 97:20
104:18 105:5
108:13 109:9
109:20 110:10
112:9 113:1,6
115:15 117:24
118:6,10,25
121:3 123:9,23
132:16 133:12
134:14 136:10
136:21 138:19
145:4,16 147:3
147:9,20

148:13,20
149:6,25 150:3
155:4 157:3,11
163:21 170:17
171:1,4,16
181:12,24
182:1,9,11
184:20 185:2
185:10 198:18
201:8 208:21
209:11 211:18
215:4
**joshua's** 50:1
56:8 63:16
64:22 75:6
117:6 120:7,14
120:19 124:2
144:25 208:3
**journalist**
180:8,10 192:2
192:8
**journalists**
193:20 194:4
**judge** 14:14
32:17 33:2
39:23 45:20
46:8,9,19 47:8
49:2 64:19
95:25 96:4,8
173:25 175:14
188:23
**july** 1:16 2:6
6:13,14,15,16
7:3 17:17
73:16 189:8

204:19,21
214:16 215:3
**jumped** 150:18
**june** 5:14,16
6:6,7,9,10,11
6:12 16:17
17:12 19:17
24:4 25:6
34:12 39:21
73:16 81:19
86:21 94:22
130:16 139:7
145:16 147:3
152:19 158:17
158:21 160:3
164:25 165:12
165:12,24
176:5,13,17,24
179:21 189:18
**justification**
183:15
**justify** 211:10
**justin** 92:20
**juvenile** 44:1
44:16

**k**

**k9** 90:1
**kabul** 117:17
117:21
**kacy** 90:2,4
**kashfipour**
2:20 7:19,19
**kathryn** 4:22
8:9

**keep** 63:2 79:22
103:14 126:20
126:25 199:14
**keeping** 63:5
**kept** 70:18
199:9
**kevin** 18:1 20:8
22:17
**killed** 183:1
**kim** 8:5 211:23
**kimberly** 81:2
81:25 82:5
163:9,18
**kind** 48:22
52:10 69:13
78:22 84:2
99:15 110:16
131:16 173:9
173:11 175:5
181:15 193:1
195:24 197:23
208:23
**king** 4:13
**knew** 21:13
36:3 43:9 48:5
49:1,1 59:18
59:20 67:17
81:10 82:24
83:23 84:3
100:12 109:24
110:25 115:10
118:10 119:2
122:11 140:14
145:4 147:17
149:6,11,23

[knew - lawyer]                                                    Page 27

150:3 156:17
163:18 170:4
171:6 183:19
185:9 196:3,9
**know** 11:4
14:24 16:19
18:16,25 21:4
30:11,12 31:2
31:12,21 34:20
34:24 38:4
43:4,6,7,8 44:6
45:23 47:1,6
47:18,21,25
48:13,18 49:3
51:24 53:1,4,5
53:10,11,15,16
54:25 55:11
56:6 59:1,2,3,5
59:9,15 65:3
71:10,14,22,23
73:13 75:5,7
76:6,9,10 83:9
83:9 84:2,3
85:6,9,15
88:18,24 89:6
89:21 90:2,23
90:25 91:5,24
91:25 92:10,13
92:17,21 93:13
95:24 96:3,6,7
96:10,11,14,24
100:8,10,11,14
100:23 101:5
101:15 106:2
107:2 109:25

113:2,5,13,17
115:2 118:8
123:13 127:17
129:5 130:18
131:14,15,19
132:2,10,19
139:19 143:14
143:18 144:4
145:8 146:16
147:16 148:4,9
149:9 152:8
153:4,8 155:23
156:15,16
159:3,4,12,23
161:25 162:3
163:22 170:7
171:4,8 173:16
174:3,18,20
175:3 177:19
177:21,25
181:9,11,17
182:14,21
183:3 190:17
190:18 192:7
193:12 194:5,7
197:4,8,9
198:8 199:4,7
201:2,22,23
202:2,4,7,24
203:1,2,4,5,6,9
203:11,13
204:23 205:19
205:20,25
206:3,11,19,21
208:20

**knowing** 96:21
118:12 125:16
**knowledge**
144:17,20
147:10 148:14
159:18 174:17
**known** 192:8
205:15
**koss** 151:7
177:17 186:14
**kurth** 2:11 4:12
7:15 26:16
146:13
**kyle** 207:13

**l**

**l** 84:22,22
186:16
**label** 44:24
**labuda** 90:2,4
**landing** 115:3
**language** 17:13
117:13 118:4
120:7 147:24
**laporta** 180:7,8
180:17 181:9
182:3,12
184:15,21,24
185:3 186:21
187:24 188:16
189:18 190:11
**laporta's** 190:1
**large** 196:6
214:1,4
**late** 17:17
73:16 95:6

118:12 119:1
141:22
**latest** 119:12
**latham** 2:19 4:9
7:17,19
**lauren** 89:10
**law** 2:6 4:6,15
4:18 8:1 12:24
18:17 22:20
23:15 52:13
85:8 88:19
91:1,10 93:21
99:16 100:5,13
100:15,19
101:3,8,20
102:2 105:11
113:4,14
125:23 146:4
146:10 170:10
181:13 186:23
187:2,8,16,19
188:10 189:3
199:1,10
201:25 202:6
202:21
**law's** 43:12
128:25 202:11
**laws** 120:24
**lawsuit** 36:10
**lawyer** 12:11
14:14 17:15
19:12 25:16
60:14 73:1
80:18 100:21
107:20 123:20

124:4 171:17
171:21 185:6
185:13 191:15
**lawyer's** 45:23
**lawyers** 12:9
14:6,7,13
15:25 16:2
18:7,10 19:1
22:16 23:11
26:7,12,17
37:19 38:18
45:20 60:15
68:8 80:14
91:6 102:5
124:2,6 128:13
145:17 146:9
146:10,19,25
157:20,23
**leading** 81:11
**leaked** 127:25
128:4
**learn** 29:20
33:21 42:17
43:11,17 48:16
49:20 52:4,21
75:18 77:22
83:3 128:23
**learned** 42:21
46:19 50:9
110:19 111:1
181:23 182:1
**left** 38:23 93:15
94:4,9 105:6
209:21

**legal** 7:10,11
20:16 50:23
60:6 62:8
63:20,24 64:14
65:7,18 67:18
72:18 78:18
101:4 131:17
136:3,5,11
141:7 149:2
171:11 173:16
179:4 215:23
**legitimate** 52:9
**length** 171:15
**letter** 5:14,16
24:3,11,13,18
24:24 25:6,11
25:12,14,16,16
25:17 26:12
27:14 28:9
29:5,14 32:5
32:20 39:20,24
108:5 126:3
129:19 130:4
131:1 140:13
140:18 144:1,2
145:21 146:13
146:14 165:25
166:5,9,15
170:11 173:20
188:2 189:1
**lewis** 2:12 7:14
8:20 215:1
**lgbtq** 195:22
**lia** 2:21 7:17

**liberty** 22:9
24:7 40:10,15
41:2,3,8,10,13
41:18,23 42:7
79:24 109:15
109:16 128:1
207:14,25
209:21 210:1,8
210:18
**liberty's** 209:24
**liberty.edu.**
9:20
**life** 64:6,12
**light** 195:19
**liliana** 89:24
**lily** 84:21 88:4
94:19 104:18
104:19 111:7
117:7
**lily's** 117:7
**limit** 45:8
**line** 62:2
116:12 133:16
160:23 173:12
202:14 213:4
**lines** 74:1
113:12 117:4
125:9 132:21
**link** 37:11
87:13 103:9
172:19 187:3,3
187:6,13 199:5
200:5,6
**linked** 175:5

**linking** 173:2
**list** 5:21 87:24
88:11,17,18
94:19 95:25
96:4,8,17,22
131:21,22
162:24 193:24
196:10
**listed** 21:22
93:6 95:21
153:19 170:3
**listserv** 131:20
131:22
**litigants** 45:20
**little** 29:19
36:17 40:13
42:10 71:5
81:9 95:17
97:24 98:15
103:15 123:8
133:24 139:3
142:16 145:23
150:7,8 151:20
159:25 160:5
162:23 177:12
189:16 194:22
**live** 31:19
202:22
**living** 132:18
133:16 135:5
136:5,12,23
**llp** 2:7,11,19
3:6 4:9,12,24
**loaned** 63:6
70:15

**[local - mast]**

**local** 197:2 201:20
**locate** 122:5
**locating** 35:20
**long** 10:5,11 66:25 67:9 77:16 94:19 110:18 142:6 143:1,3 147:5 158:10,15 160:1,2 178:11 178:13,14 209:7
**longer** 28:11,22
**look** 22:4 36:2 57:22 59:25 61:9 62:1 79:8 88:3 93:9 94:18 95:13 97:6 102:21 115:13 117:1 129:15 131:4 137:11 154:14 156:18 172:13 178:8 179:16 186:20 188:3 198:7 208:8 209:17
**looked** 17:13 22:3 52:11 69:20 97:23 98:12 99:13 112:15 131:2 141:22 146:17 155:19 156:19

**looking** 33:8,23 94:25 100:3 101:24 121:15 124:9 147:5 153:16 163:24 173:13 186:15 187:14 189:17
**looks** 16:14 92:16 95:15 116:1 167:12 180:16 208:7
**lord** 9:22
**lot** 33:16 52:14 71:24,25 79:21 108:2 118:20 122:23 123:3 142:20 145:13 153:9,12 161:11 166:7,9 178:23 188:8 192:3 196:4 199:13 208:12
**loud** 37:6 172:24
**lpowell** 2:17 215:2
**lull** 71:8
**lunch** 160:6 164:16
**lw.com** 2:25

**m**

**m** 9:2 186:16 186:16
**macrush** 89:21

**made** 30:15 50:21 51:13 56:10 98:17 99:3 128:19,20 147:17 150:4 162:14 166:6 187:6 202:2
**mail** 82:15
**mails** 31:4,5
**main** 41:10
**make** 23:17 39:10 52:8 66:21 79:12 98:8 108:22 112:2 134:25 142:3 146:15 164:4 168:17 184:8 195:12 200:20 202:13 208:23
**makes** 13:20,20
**making** 41:25 117:22 143:16
**mandatory** 41:25
**march** 9:12
**mark** 1:24 2:2 7:10 14:4 32:8 57:5 68:14 76:16 84:7 87:18 96:25 130:7 132:22 160:10 184:4 213:3 214:2,20

**marked** 16:4,6 23:18 32:10 39:11 57:6 68:15 76:17 84:8 87:19 97:1 108:23 114:13 130:8 132:23 150:10 152:11 153:6 153:23 160:11 160:14 165:5 166:2 173:22 176:7 180:11 184:5,9 190:24 207:1
**marketing** 40:8
**marking** 146:24
**marsoc** 121:4,7
**martha** 158:1
**mary** 9:2 83:6 83:17 105:18 107:10 139:14 139:17 140:24 141:10 142:12 143:13 161:5 163:7 177:17 186:13 192:13
**mast** 1:8,15 2:1 3:5,14 5:3 7:5 7:6,22,24 8:1 8:12,16,20 9:1 11:24 12:6 16:6,10 19:16 23:15,18,24

32:10,14 35:10
37:1 39:11,15
49:13 57:6,10
60:2 61:1,23
62:2,6,13,18,22
64:18 65:12
66:3 68:15,19
69:1 76:13,17
76:21 80:15
84:8,12 87:19
87:23 88:19,21
88:22 89:5,8
89:10 92:6,24
94:13 95:17
97:1,5 108:10
108:23 109:2
110:5 114:13
114:17 118:4
126:14 128:15
130:8,12
132:15,23
133:2 137:25
139:3 147:5,10
147:10 148:13
148:14 150:10
150:15 152:11
153:23 154:2
159:9 160:11
160:14,18
163:16 164:24
165:5,9 170:22
171:25 172:15
176:7,11
180:11,15
184:5,9,13

190:24 200:21
207:1,8 211:6
211:15,18,21
212:11,15
213:2,17 215:4
215:5
**mast's** 42:17
**materials** 160:7
160:25 162:7
183:23 207:16
**matter** 7:5 31:8
39:18 108:14
**matters** 129:17
182:5 190:14
206:8
**maya** 39:21
**mccoons** 92:20
**mcguire** 2:7 3:6
4:24 18:18,21
68:1 80:12
91:9 147:2
**mcguirewoo...**
3:11
**mean** 11:15
61:12 63:24
66:10 71:15
75:14 80:1
81:2 86:11,20
104:10 107:15
124:13 127:22
141:10 173:14
179:1,17
186:11 209:5
**means** 10:15
45:16 108:17

108:18 173:2
**meant** 55:1
93:11 104:12
104:16 155:12
169:18 208:15
209:2
**meat** 12:18
**media** 11:12,14
11:15,17 36:5
45:22 46:11
49:3 71:8
78:23 84:4
129:13,25
139:13 145:14
147:15 166:8
174:4 177:18
177:25 183:10
186:6,12
193:20 194:5
199:13 200:6
207:21
**medical** 202:25
203:17
**medications**
13:5,8
**meet** 142:4
**member** 45:22
46:16 53:6,13
149:19 190:22
**members** 10:24
43:21 46:20
53:2,17 78:17
128:10 132:5
139:18 186:5
199:22

**memo** 190:16
**memorandum**
145:18 146:8
146:11,18
147:1,24
**memorized**
69:19
**memory** 40:23
86:15 103:11
145:24 187:14
**mendoza** 158:2
**mention** 17:23
25:12 54:22
202:10
**mentioned**
25:13,13,14
26:20,23 42:11
46:15,16 48:20
54:23 55:1
81:8 83:17
108:1 193:1
195:16 196:19
199:12 201:6
**message** 28:4
56:21 68:21
78:7 83:13
99:24 102:12
106:8 134:21
137:17 149:14
165:22 167:1
167:21 174:12
**messages** 5:19
5:22 6:5,11
10:2 21:23
27:9 28:2 97:7

[messages - name]                                                    Page 31

97:12 103:24
133:4 137:10
194:25 199:25
200:3
**messaging**  9:25
**messenger**  10:3
**messy**  13:21
**met**  68:4,12
**method**  10:16
**mfrancisco**
3:11
**michael**  3:7 4:3
7:23 9:1,3
51:17 211:17
**michie**  22:20
**mid**  34:11,12
**midatlantic**
215:15
**middle**  9:2
16:15 98:16
102:11 103:22
105:16 112:21
114:23 116:24
147:6 169:16
186:22
**mike**  8:4
211:22
**military**  42:8
78:17
**mill**  176:21
177:6 197:22
**mind**  104:15
124:24 125:6
174:7 175:4
186:5

**mine**  38:11
91:19
**minute**  26:18
67:2 103:3
152:5 153:15
210:22
**minutes**  97:6
142:17 143:2,5
147:19 149:6
152:22 158:16
178:12,15
197:20,24,24
198:12
**miracle**  133:13
**mirror**  129:13
**mischaracteri...**
141:4
**misled**  137:8
**missile**  183:2
**missing**  202:16
**misspoke**
189:16
**misstates**  38:12
**mistake**  187:7
**mistaken**  190:6
**mom**  87:15
91:25
**mom's**  95:5
**moment**  87:3
165:2,17 173:8
**moments**  133:8
212:4
**monday**  1:16
66:21 137:13

**money**  61:13
62:11,14 63:9
65:12,15 69:7
70:1,11,23
71:11,21 73:8
75:5 76:4,7
132:17 133:13
137:8 138:17
**monitor**  120:19
**month**  9:11
43:15 47:18
48:14 63:4
81:18 155:10
205:8
**moon**  32:17
39:23 64:19
175:14 188:23
**moon's**  33:2
96:1,4,9
**moran**  91:8,9
**morning**  7:2,14
8:20 47:16
48:7 66:17
67:5 68:6 77:2
97:18 106:19
114:19 116:15
117:11 121:24
122:4,12
176:18
**mother**  92:2,25
202:5,6,11
**mother's**  92:6
92:23 93:2
**motion**  48:8
49:4 54:10

125:22 145:19
146:3,7,8
202:16
**motivation**
156:13
**motley**  8:5
80:18,23 81:2
81:2,8 163:9
163:17 164:7
211:23
**motley's**  81:25
163:1,18
**moved**  53:24
54:5 121:7,11
**msgtcjrpr5un...**
109:13
**multi**  165:11
**multiple**  29:6
29:15 109:4
119:3
**muslim**  205:22

---

**n**

**n**  5:1,1 6:1,1
7:1 49:23
**n.w.**  2:22
**nailed**  15:7
**name**  5:21 7:9
8:25 9:5 15:13
15:14 18:1
22:19 23:23
39:6,6 49:22
56:18,19 69:24
73:13 77:3
81:25 84:21,24
88:4,18 89:13

91:4 92:6,9
98:13 99:17,20
101:1 114:24
151:5 163:1
170:3 180:9
183:6 186:14
196:20,21
**named**  50:6
68:24 98:24,25
114:25 176:5
207:13
**names**  37:15,19
38:3,4,8 81:13
81:16,22 83:2
88:11 93:6
94:19 138:9
162:24
**national**  69:21
70:2 201:20
**nature**  142:5
161:10 210:2
**near**  24:18 78:4
79:9 84:19
**neat**  126:21
**necessarily**
100:17 128:3
**necessities**
132:18 133:17
135:6 136:5,12
136:23
**neck**  29:19
**need**  13:19
14:23 60:13
187:10

**needed**  178:1
**needing**  135:2
**needs**  65:21
148:1
**negative**
145:14 178:23
195:19 199:13
**negotiate**  20:4
**negotiation**
144:9
**negotiations**
144:6
**neither**  37:18
214:10
**nephews**  123:8
**nervous**  19:24
**network**  86:21
87:4,9 140:3
141:1 148:16
192:6 198:16
**never**  11:23
18:5 19:22,23
68:12 80:16,20
80:24 82:16
85:23 88:15
101:22 108:16
124:5 127:16
132:7,13 135:9
141:18 156:4
157:23 164:7
164:13,14
193:6,24 195:3
196:17 199:23
200:8 205:23
210:1

**new**  79:22 83:6
115:2
**news**  47:16
48:7 81:7,9,18
81:22 82:4
86:20,23 87:4
87:9 122:6,12
123:4 125:12
139:4,7,12,25
140:3,5 141:1
141:16 142:23
143:17,18
144:24 145:9
146:2 148:8,16
160:19,20
161:10,20
172:19 181:11
181:16 182:13
182:16 183:7
188:18 196:25
197:15 198:15
**newsletter**
99:14 102:14
102:16 116:15
117:12 118:6
128:20
**nichols**  114:25
115:9 121:21
**nickel**  71:1
**niece**  179:6
**night**  118:12
119:2 158:24
**nine**  93:17
**nineteen**  18:10

**nkm**  1:7 7:8
**nominal**  8:10
**nope**  179:24
**normal**  27:10
**north**  121:4,8
121:11 202:22
204:24
**notable**  39:4
**notarial**  214:15
**notary**  2:2
213:23 214:3
214:20
**note**  180:19
215:10
**notes**  176:25
**notice**  2:4
202:15 206:15
**noticed**  202:18
**notified**  56:11
**november**
214:4
**number**  7:8
15:21 18:12
20:24 21:5
28:9 31:3,5
32:8 37:5
39:10 44:11
50:25 69:20
72:21 75:10
78:12 110:22
111:2 119:4
147:1
**numbers**  69:18
**nw**  3:8

[o - order] Page 33

| o | objectives | okay 13:12,24 | 60:12 130:15 |
|---|---|---|---|
| **o** 5:1 6:1 7:1 | 178:23 | 15:10 16:3,22 | **open** 30:18 |
| 83:5 139:16 | **obligation** 19:6 | 20:23 78:8 | **operated** 27:23 |
| 174:15 | **obligations** | 88:11 92:4,23 | 27:23 |
| **oann** 86:18,18 | 21:10 | 98:4 103:18 | **operates** 27:20 |
| 86:20 139:19 | **obvious** 93:11 | 107:5 108:12 | **opinion** 123:17 |
| 150:22 | **obviously** | 110:7 112:11 | **opportunity** |
| **oath** 12:21 | 88:18 105:10 | 121:19 130:19 | 20:4 207:21 |
| 64:19 | 179:5 201:2 | 130:22 134:13 | **opposition** |
| **object** 14:16 | 203:19 | 137:14 150:2,9 | 145:18 146:11 |
| 18:14 38:18 | **occurred** | 154:24 161:6 | 146:18 147:2 |
| 51:9 53:7 | 144:22 145:2 | 187:14 201:1 | 168:25 |
| 55:20 61:21 | **occurring** | 207:10 | **oral** 46:9 |
| 65:20 206:6 | 210:11 | **old** 9:7 12:1,5 | **order** 5:15 |
| **objecting** 38:15 | **offense** 11:22 | 12:15 | 15:21,24 17:9 |
| **objection** 14:18 | **offered** 98:5 | **older** 124:14 | 21:14 32:5,17 |
| 36:19 37:24,25 | 195:12 | **oldest** 12:6 | 33:2,5,18 34:2 |
| 38:9,10 51:11 | **office** 4:18 | **once** 8:22 14:17 | 34:8,18,21 |
| 51:15 54:1 | 87:24 113:7 | 27:12 28:1 | 35:1,5,12,20,25 |
| 56:9,13 59:10 | 190:23 207:24 | 35:1,19 48:20 | 36:7,25 37:12 |
| 60:6,9,14,17,19 | **offices** 2:6 | 63:4 80:20,23 | 37:14 46:10,12 |
| 60:23 63:19,21 | **oh** 11:11 18:9 | 98:16 108:4 | 46:19 47:9,11 |
| 64:14,24,25 | 20:14 21:19 | 185:18 189:25 | 48:10,21 54:14 |
| 65:18 110:1 | 23:13 25:4 | **ones** 26:14 28:6 | 54:21,24 55:3 |
| 134:18 139:10 | 43:3 45:5 | 44:21,22 108:8 | 55:5,6,10,17 |
| 148:10 149:1 | 52:18 66:20 | 123:10 130:19 | 61:5 75:15 |
| 155:11 157:5 | 72:9 82:4 88:6 | 131:15 157:16 | 93:12 96:1,5,9 |
| 202:14 205:2,4 | 94:6 95:23 | 157:17 166:19 | 111:6 140:5,6 |
| 206:14 | 99:10 101:9,18 | 167:18,18,25 | 140:11,16 |
| **objections** | 104:12,24 | 168:2 | 146:5 169:1,17 |
| 14:14,15 38:19 | 106:6 134:10 | **ongoing** 52:12 | 169:20,25 |
| 51:13 | 145:13 155:17 | **online** 14:7 | 170:3 171:12 |
| **objective** | 161:6 163:18 | 33:9 35:25 | 171:18,21 |
| 178:19 179:2,4 | 179:17 187:3 | 36:5,12 41:1,4 | 173:1,13,15,17 |
| 179:5 | 190:22 191:5 | 41:13,19,22,24 | 173:17,19,25 |

[order - pasterkeaton]                                                Page 34

174:5,9,10,14
174:14,18,21
174:23 175:2,6
175:8,11,14
181:17 188:23
195:5 201:8
**organization**
52:9
**organizations**
193:20
**organized**
126:22,25
**oriented** 202:8
**original** 36:14
44:4,25 45:3
196:7
**originate**
140:21
**originated**
174:22
**origins** 142:20
**orlando** 9:10
**osd** 207:22,24
**osmani** 8:3,8
80:15 120:12
120:13,14
211:25
**osmani's**
120:15
**outfit** 49:17
139:25
**outfits** 194:2
**outgoing** 28:2
30:20,23

**outlets** 36:5
71:8 194:5
**outline** 150:18
**outside** 45:19
86:13
**overall** 29:2
174:22
**own** 14:14
35:21 44:13
100:5 101:24
102:1 103:5
104:7 144:16
170:20,23

**p**

**p** 7:1 174:15
**p.m.** 77:8 126:9
126:10,10,12
164:19,20,20
164:22 211:2,3
211:3,5 212:16
**pacific** 77:8
**package** 188:21
**page** 5:3,12 6:3
16:16 24:17
37:3 57:22,23
59:25 61:19
68:21 76:22
79:8,10 84:19
87:25 88:3
93:17 97:17
98:1,16,21
99:14 102:8,11
103:16,17,22
105:16,16
106:17 109:8

110:8 111:4
112:17 113:22
114:23 115:3
115:13,14
116:12,20,21
116:24 121:14
121:15,18,22
129:11 130:22
130:23,24,24
131:2,5,6,6,7
132:4 133:6
135:17 136:16
137:11,25
147:4,6 151:1
151:23 154:15
165:11 166:15
167:11,15,23
168:6,16,25
169:13,15,16
171:24 172:1
172:13,15
174:13 176:13
180:5,18
186:22 188:3
189:17 191:13
191:17 193:4
213:4
**pager** 94:17
152:17
**pages** 93:14
94:13 95:2,14
130:17 155:19
**pam** 68:25,25
**paper** 14:8

**papers** 21:6
45:25
**paragraph**
15:20 37:5
38:2 117:2
133:11 147:6
151:9 173:13
186:4 208:8
**pardon** 99:7
**paren** 62:6,7,8
62:8
**parens** 186:9
**parse** 148:22
**part** 61:23 64:2
108:20 109:16
113:24 151:2
152:18 160:21
178:16 187:25
**partially** 190:5
**participating**
120:18,22
**particular** 28:3
63:4
**particularly**
78:17 85:18
194:23
**parties** 38:3
46:10
**partner** 61:10
84:3,4 145:7
**party** 113:6
214:12
**pasterkeaton**
92:9,12

**[pastorkeaton - pipe]**                                Page 35

| | | | |
|---|---|---|---|
| **pastorkeaton** 92:12 | **personal** 9:20 69:16 79:23 144:17 206:8 | 93:7 95:18,21 96:23 103:10 104:23 111:21 | 124:21,25 125:4,24 130:5 140:1,20 |
| **pause** 36:17 71:14 74:4 76:3 143:23 173:10 | **personally** 71:24 162:10 195:21 | 112:22 114:3 115:18 116:10 116:14 122:9 140:22 166:18 | 158:25 159:5 167:5,16 168:20 169:9 170:6,9,20,21 198:3 |
| **paused** 193:2 | **personnel** 102:5 118:21 118:21 | 168:12,16 172:5,7 | **phrase** 110:6 148:24 174:9 |
| **pausing** 176:1 | **persons** 96:12 | **photograph** 93:25 115:14 116:22 | **physical** 140:15 |
| **pay** 38:19 | **perspective** 161:12 | | **physically** 121:1 |
| **payroll** 84:1 | **peters** 194:8,14 194:15 195:17 196:9 199:21 | **photographs** 111:24 116:5 121:25 128:17 171:9 179:10 197:25 | **picked** 72:23 |
| **pediatrician** 204:1,2 | | | **picture** 93:21 |
| **pence's** 190:23 | **pezoa** 7:9 | | **pictures** 31:22 95:15 105:4 171:25 |
| **people** 15:3 38:4 52:11 61:19 74:3 81:13,23 88:6 88:13 93:5 95:21,25 96:4 96:8,17,22 99:20 113:2 118:20 119:3,5 119:7,25 120:2 123:12 127:24 146:23 151:5 151:22 152:6 152:19,20 158:1 161:4 176:15 179:1 186:13 192:14 193:3 200:6 201:3 209:8 | **phf** 173:3 | **photos** 48:10 85:17,20,24 86:3,5,8,14,19 86:24 87:4,10 93:11 94:8,17 95:1 102:13 103:1,7,12,14 103:25 104:4 104:11,13,17 104:21,23 105:10 111:6 111:13,17,19 112:1,8,16,18 113:25 114:2 115:20,23 116:6 117:1 122:5,8,12,23 123:3 124:16 | **piecemeal** 134:6,7 |
| | **phf's** 62:7 | | **pin** 11:8 |
| | **phone** 10:2 30:12,19 31:1 31:4 67:2 78:1 78:2,7,12 79:3 82:3 83:13 102:24 125:11 134:22 135:17 135:20 136:18 139:10 146:23 146:25 150:17 150:19 158:5 158:12 173:7 212:7 | | **pine** 90:1 |
| | | | **pipe** 5:25 29:21 29:25 30:4 34:10,13,17,20 34:22 36:4 49:18 50:2,21 51:2,14,21 52:2,22 53:3 53:14,16 54:15 55:13,19,22,23 56:1,12,16 57:12,13,19 58:6,22 59:6 59:19 61:1,10 |
| **person** 22:2 52:13 91:23,25 144:22 176:21 | **photo** 5:20,21 84:13,16 85:3 85:25 86:6,24 87:13 88:13 | | |

[pipe - potential]                                                    Page 36

62:4 63:7,9
65:11,16 69:4
70:3,22 71:10
71:20,25 72:11
73:2,9 74:3,10
75:5 76:6 77:4
77:13,18,23
78:15 82:21,25
83:10,21,23,25
86:8,12,17
87:5,8 97:13
97:19 99:25
102:18 105:1
114:6 115:10
115:18 117:25
128:17,24
129:4,15 130:2
131:15,19
132:2,11,17
133:14 136:22
139:14 141:5
143:15 145:4
147:11,17,21
148:15 149:7
149:12,13,17
149:22 151:19
162:21 166:22
170:20 173:9
175:20 177:17
186:8 192:10
200:6 208:18
**place**   30:9 35:6
55:17 86:25
142:1 173:2
175:3 176:24

198:14
**plaintiffs**   1:5
2:10 7:16,18
7:20 8:18 15:4
15:9 37:19
39:2 53:24
145:19 146:3
**planned**   142:14
**planning**
190:19
**platform**   196:6
**platforms**
129:13 166:8
**plaza**   2:13
**pleading**   149:2
**please**   7:12
8:15,25 9:14
13:10,21 16:5
16:16 24:17
27:6 32:9 37:3
39:10 40:5,19
40:22 54:3
57:5 62:2
68:14 69:1
79:9 96:25
98:2 105:16
111:4 114:12
115:2 121:18
124:10 126:8
130:7,21
132:22 147:4
150:8 164:18
186:20 211:1
**pllc**   3:15 4:18

**plus**   178:12
**podcast**   176:21
177:6 179:18
191:11,21
192:3 193:5,6
197:22,23
**point**   19:25
37:10 49:16
54:24 55:1
58:4 59:19
101:3 132:21
133:22 144:4
169:12 178:22
181:11 203:21
206:16 208:23
**points**   161:11
**poland**   182:25
**politely**   145:13
**political**   144:6
194:25
**politicians**
201:20
**poorly**   143:25
**porta**   89:6
**porter**   4:10
**portion**   143:22
143:24
**portions**
144:12
**portray**   195:18
**portraying**
195:14
**posed**   60:14
**positive**   20:9
25:24 26:5

42:22 75:10
87:15 125:25
198:17
**possession**
33:11 154:8
155:1,23
156:22 159:11
159:16
**possibility**
132:7 172:25
**possible**   46:23
48:4,5 59:3
123:9 136:22
155:5,7 157:14
193:10
**possibly**   87:9
195:5
**post**   117:25
153:12 167:10
183:5 207:21
209:23
**posted**   99:25
102:17 115:10
117:12 129:4
129:10,16
132:3 175:21
177:6 182:23
183:2 197:9,10
**posting**   114:7
210:1
**postings**   129:6
129:8
**posts**   131:8
**potential**
191:10 193:5

**[potentially - produce]**

**potentially**
  200:16
**powell**  2:12 5:5
  7:14,15 8:11
  8:19,20 16:4,9
  18:13,15 23:17
  23:21 32:8,13
  36:24 37:25
  38:6,14 39:10
  39:14 51:11,16
  51:18 53:9,12
  54:2,4 55:24
  56:13,14 57:5
  57:9 59:13
  60:11,24 61:25
  63:22 64:17
  65:9,21 66:2
  68:14,18 76:16
  76:20 84:7,11
  87:18,22 96:25
  97:4 108:22
  109:1 110:3,4
  114:12,16
  126:5,13 130:7
  130:11 132:22
  133:1 134:20
  137:5,6 148:21
  149:4 150:13
  152:14 154:1
  155:14 157:7
  160:10,17
  164:15,23
  165:8 176:10
  180:14 184:4,8
  184:12 191:2

  202:19 205:3,5
  206:10,18
  207:7 210:21
  211:6 212:2,7
  215:1
**pr**  79:11 82:22
  82:23,25
  105:18,25
  106:3,9
**praying**  133:13
  209:16
**precaution**
  166:21 169:14
**precise**  45:6
**preface**  172:23
**preferred**
  106:13
**preparation**
  67:7 68:10
  153:1,11
**prepare**  66:3,8
  66:12
**preparing**
  67:10 75:12
  101:20 151:17
**preschool**
  204:22
**presentation**
  202:5
**presentations**
  202:3
**presented**
  36:13
**preservation**
  26:7

**preserve**  24:19
**president**
  190:23
**presiding**  46:9
**press**  150:16
  151:11,15,25
  153:7 178:24
  182:18 183:18
**presumably**
  123:11 126:24
**presume**  15:2
  141:17 166:13
  186:5 192:7
**presumed**  84:2
  106:13 162:2
**pretty**  14:3
  26:15 72:9
  108:17 133:24
  142:16 178:11
  178:13,13
  184:2 192:8
  198:17
**previewed**
  160:5
**previous**  93:9
  116:5 152:20
**previously**  27:4
  106:11 115:21
  166:7 170:4
  173:9 199:12
**primary**  10:6
  179:2
**printed**  116:2
**prior**  10:25
  55:2 66:5

**probably**  10:12
  24:8 43:14,19
  46:16,24 47:1
  55:16 72:19
  73:14 79:21
  85:7,7 106:13
  113:7,19
  126:23 132:8
  142:17 168:3
  168:20 181:13
  187:21 197:18
  198:8,9
**probing**  206:8
**problem**  125:8
**proceed**  98:17
**proceeding**
  214:12
**proceedings**
  42:24 43:24
  44:16 45:8
**process**  15:1
  42:22 43:4
  44:5 113:9
  144:9 163:21
  167:24 170:1
  208:22
**produce**  17:11
  17:16 19:18
  21:14 107:20
  180:21

81:12 107:25
  137:17 173:1
  175:2 208:17
**privilege**  181:1

| | | | q |
|---|---|---|---|

**produced**
181:5
**production**
107:21 202:16
**professional**
214:2
**program** 62:8
**prohibit** 37:14
**prohibiting**
46:10
**project** 97:13
**projects** 41:18
**promise** 206:24
**promised**
193:11
**proper** 48:19
49:5 203:17
**proposal** 60:13
**proposed** 118:5
120:6
**protect** 33:2
109:13 209:8
**protective** 5:15
15:21,24 32:5
32:17 33:2,5
33:18 34:2,8
34:18,21 35:1
35:5,12,20,25
36:7,25 37:12
37:14 47:9,11
48:10,21 55:6
55:10,17 75:15
96:1,5,9 140:5
140:6,11,16
146:5 169:1,17

169:19,24
170:3 171:12
171:18,21
173:15,17,19
174:9,14,18,21
174:23 175:6,7
175:14 188:23
**proton** 127:9
127:17,19,20
128:2,3
**proton.me** 22:7
26:21 80:1
126:15 127:3
128:8 151:5
**proton.me.**
9:24
**provide** 16:16
61:2 79:11,15
79:17 81:13
82:21 140:4,7
161:16 179:10
197:25 198:3
**provided** 141:1
161:12 167:6
168:2
**providing**
101:4
**provision** 24:23
**pseudonyms**
39:1
**public** 2:2
45:18 122:17
123:11,15
124:17 156:17
166:20 170:5

213:23 214:3
214:20
**publication**
131:23 132:14
**publish** 142:23
181:20
**published**
147:15 183:5
**pull** 122:8
155:20
**pulled** 112:16
**pulpit** 202:10
**purpose** 33:1
60:25 63:12
65:15 79:16
80:8 85:15
86:2 161:7
177:3,8 178:18
**purposed** 42:2
**purposely**
145:12
**purposes** 38:25
**pursuant** 2:3
62:12
**pushed** 132:4
**put** 41:5 42:1
71:13 74:4
76:3 94:17
107:3 128:21
128:24 129:12
145:13 149:17
150:24 173:10
212:4

**q**

**question** 13:9
13:13,14,21,24
14:17 15:7
27:13 29:17
36:14,17 37:8
44:15 45:6
54:2,17 55:21
59:4,14 61:8
72:16 94:14
99:22 102:20
102:24 104:20
110:5 115:25
119:19 123:21
134:14 135:3
144:11 156:10
156:10 157:2,9
159:15,15
174:6 175:7
185:17 189:21
196:7 208:25
210:17
**questions** 13:7
14:10,16 15:1
39:18 78:24
95:19 141:25
142:22 150:25
200:23 202:14
211:7,12,16,19
211:23,25
**quick** 182:23
**quickly** 20:17
106:19
**quite** 31:22
52:7,7 110:3

126:25 191:9
193:24
**quiz** 145:24
**quote** 24:19,20
79:10 98:16,22
98:24,25 99:23
103:24 105:17
106:18 122:16
122:16,17
124:9,10 133:7
133:9,16
166:18 169:17
170:13 186:12
207:19 208:10
208:11
**quotes** 117:4

**r**

**r** 4:3 7:1 49:23
**rachel** 186:14
186:15 191:16
191:19 192:13
**radio** 194:9,21
197:2,5,7,10
**raid** 117:3,5,18
**raiding** 117:19
**raise** 50:23
59:20 61:10
71:11 76:7
179:2
**raised** 60:17
62:11 75:6,18
75:21 106:24
133:8 205:21
206:3

**raising** 131:17
171:6
**ramstein** 93:25
**ran** 125:22
143:4 146:2
**range** 29:3
94:21
**rather** 31:25
33:21 35:21
165:1,16
195:23
**reach** 81:1,5
82:2 135:14
149:14 166:6
181:9 185:2
193:19 201:19
**reached** 53:17
53:22 139:19
181:21 185:12
193:24 194:5
**reaching** 19:19
**reacted** 125:3
**read** 17:4 23:7
24:13 32:22
36:11 37:4,6
37:14 118:2
140:16 146:18
147:25 166:11
169:25 177:7
205:19 207:11
215:9
**reading** 24:23
117:3
**reads** 147:9

**ready** 39:15
**realize** 156:6
**realized** 110:13
143:25
**really** 11:16
43:8 66:5,13
71:24 72:17
104:12,14
112:15 119:10
120:21,22
129:25 173:8
179:1 209:25
**realm** 163:5
**reason** 14:24
58:12 88:1,9
115:19 154:14
154:25 158:20
168:25 179:1
190:4 193:8
213:4 215:11
**reasons** 138:4
138:25 168:21
**recall** 16:25
24:6,8 33:10
34:7 42:16,19
43:2,3,11
44:21 50:8
57:16 69:7
73:7 74:25
85:11 87:3,9
95:18 96:20
97:12 102:23
102:25 107:9
107:13 115:22
118:1 125:10

125:16 132:15
142:20 155:7
155:18 157:19
163:4 164:24
179:13 184:25
185:1 193:19
195:5 200:15
208:15
**recalled** 155:9
**recalling**
155:12
**receipt** 215:18
**receive** 39:24
55:23 56:11
69:4 112:13
**received** 19:5
19:10 20:7
25:20 26:16
28:8 29:4,14
32:19 33:6
43:25 49:21
50:2 56:21
127:18 132:13
134:8 137:9
140:17 146:12
151:22 156:25
166:1,8 178:24
189:3
**receiving** 25:5
57:16 77:18
107:25 119:11
126:24 137:18
**recent** 30:23
95:1 168:20
205:7

**recently** 15:20
31:20 100:24
101:5 141:23
192:4 205:6
**receptionist**
82:14
**receptive** 125:6
**recess** 65:24
126:10 164:20
211:3
**recipients**
152:24 154:5
161:8 177:23
**recognize** 90:5
90:15,20 91:3
91:12,17 93:3
109:12 112:25
130:18,20,23
130:23,24
**recollection**
37:7 46:18
77:14 103:3
120:2 162:12
167:19 197:14
**recommendat...**
194:1
**record** 7:3,13
8:23 13:20
14:5 30:14
32:16 38:15
45:18 51:12
60:11,16 65:23
66:1 68:23
90:11 96:11
109:3 125:2

126:9,12 137:4
157:8 164:19
164:22 180:19
181:7,15 191:7
208:23 211:2,5
212:4,10
**recorded** 1:14
2:1 7:4 181:14
**recording**
209:6,8,10
**records** 155:24
**recreate** 145:25
**redacted** 209:9
**refer** 15:4,8
39:2 139:13
148:25 169:16
173:12
**reference** 43:23
73:8 111:12
120:6,14 148:7
151:10 165:22
166:14 170:8
175:1 193:5
**referenced**
125:15 209:3
215:6
**references**
116:6
**referencing**
81:17 147:14
187:4 208:19
**referred** 119:13
**referring** 15:2
29:1 99:6,24
117:15 120:9

139:1 144:4,5
159:14 173:18
174:14,22,24
175:9 186:11
187:2,5 188:2
188:11
**refers** 165:18
**reflect** 60:16
157:8
**reflected**
135:16 181:6
189:19 210:19
**refresh** 37:6
**regarding**
23:15 29:16
30:3 33:8,13
44:4 52:1 65:7
67:20 71:17
78:20 97:13
129:17 133:8
143:17 171:12
182:24 188:20
191:10 195:22
210:10
**regardless**
109:18
**regards** 81:9
101:25
**registered**
214:2
**registration**
213:25 214:22
**regular** 30:11
30:19 42:14

**regularly** 95:11
**reimbursed**
63:6 70:15
**reiterate** 205:1
**relate** 25:8
**related** 22:10
214:11
**relates** 119:9
206:9
**relating** 28:23
**relation** 11:9
33:15
**relations** 44:1
44:17
**relayed** 144:23
**relevance**
206:6
**relevant** 108:8
188:19
**religious**
205:23
**remember**
11:10 16:20
20:15 23:1,3,4
24:23 26:2
42:20 43:18
44:24 47:11
48:3,4 49:11
50:20 59:17
71:7 72:23
78:6,8,14,15
86:16 101:9
103:1,9 104:4
118:12 119:18
124:12,22

125:3,5,21
132:20 133:19
133:21,23
136:24 150:21
150:23 157:1
157:15 158:2,3
158:17 163:19
163:22 165:3
165:23 173:6
176:4 186:14
189:10 197:19
203:18,19,20
203:22,23
204:10 208:19
**remembered**
81:10
**remembering**
75:12
**remind** 126:19
**reminding**
64:18
**remove** 108:2
167:10 172:4
**removed** 108:9
169:12
**reopen** 211:9
**reorganized**
153:12
**repercussions**
145:15 199:17
**rephrase**
100:10 104:20
**report** 83:14
**reported** 1:24
213:3

**reporter** 7:10
8:14 13:18
14:4 32:14
154:2 165:10
181:11 191:3
214:3
**reporters** 183:4
194:4
**reporting**
183:9
**reports** 183:9
**represent** 7:15
38:16 130:13
**representation**
101:4 154:18
**representative**
63:17,24,25
171:2
**representatives**
68:13
**represented**
18:17 58:5
101:8
**representing**
8:1 64:1 68:2,9
73:1 80:14,18
91:6 100:9,11
146:9 157:20
**represents**
90:25 91:10
**request** 56:8,10
74:13 104:7
121:16 125:4
168:17 169:8
208:3

**requested**
16:16 17:11
106:10 121:21
213:1
**requirements**
42:1
**requiring**
39:22
**rescue** 117:6
**research** 35:21
52:1,14 66:11
100:4 102:1
128:6 195:8,11
196:12
**researching**
43:9
**resent** 153:13
**reservation**
212:3
**reserving** 211:9
**residential** 9:13
**resolve** 174:7
**resolved** 71:20
**resource** 131:4
**respect** 13:23
14:17 44:15
**respond** 19:24
23:12 102:20
**responded**
179:25
**responders**
50:23 78:17
**responds**
121:16 209:15

**response** 19:22
119:18 145:22
157:9 161:21
**responsive**
21:18 22:1
**rest** 85:18 94:7
154:21 159:12
**result** 183:13
**retain** 28:6
**retained** 18:5,8
19:13 26:10
**retaliation**
168:23
**retract** 183:14
**return** 215:13
215:17
**returned** 80:24
**review** 215:7
**reviewed** 99:13
**reviewing** 37:7
**rhetoric** 195:24
**rhonda** 153:21
154:4 156:2,11
**richard** 8:1
12:6,9 19:9
20:18 23:2,8
25:25 26:1
28:16,22 34:4
34:4 35:7,15
47:4 67:23
80:14 92:6,7
96:7 100:9,16
100:18 101:2,7
112:14 123:25
124:5 127:14

[richard - saying]

127:19 155:6
157:13 171:20
198:24 211:21
**richard's** 92:9
124:4
**richmond** 2:15
214:15
**rick** 4:16 8:7
**right** 11:24
12:9,19 13:11
14:11,16 15:24
15:24 16:2,21
17:12 21:6,15
21:16 23:25
26:21 28:11
29:22,23 38:8
38:18 39:8
41:9 44:7,12
45:15,20 46:5
46:20 47:17,24
52:13 53:6
56:2,16,22,24
57:24 58:10,17
60:3 61:3,6,16
61:20 63:10,18
65:17 66:17
69:11,14 70:5
71:17 72:17
73:2,10 74:22
76:1 77:15,19
78:12,13 79:18
79:19 81:3,18
83:18 84:22,25
86:14,21 88:4
92:7 94:18

95:3,10 97:16
97:21,22,25
98:6,17 99:11
102:11 103:8
105:7,13,15
106:7,10,21
107:7 109:10
110:3,23 111:5
111:8 113:15
113:18,25
114:5 115:7,11
116:7,8,16
119:15 121:25
125:20 126:7
128:21 130:3
131:9 134:8,22
134:25 137:16
138:13 140:23
147:22 149:21
150:3 151:7,12
152:15,20,23
153:2,17 155:3
155:6,15,19
156:13 157:3
160:8 161:1,5
163:2,8 166:15
167:13 168:7,8
168:13,21
172:1 173:23
174:15 176:15
176:18,19,22
176:23 178:3,6
178:11 180:21
182:19 184:1,2
184:16,18

185:10,14
186:9,17,18,22
187:4,8,22
188:14 189:20
191:6,9 192:1
193:6 195:24
199:19 201:4
204:15,17,18
207:6,17 208:3
209:13 211:9
**rights** 212:4
**rings** 9:23 91:4
**riverfront** 2:13
**roberta** 92:24
**roberta.mast**
92:3
**role** 41:17
**room** 8:11 14:6
60:12
**rose** 2:21
**routine** 11:22
27:9
**routing** 69:20
**row** 93:20
**rpr** 1:24 2:2
213:3 214:20
**rude** 72:17
**rule** 2:4 14:15
**rules** 2:5
**run** 88:17
143:8,9,17,21
144:12
**running** 97:9
114:20 165:12

**rush** 117:21
**russia** 182:24
**russian** 183:2
**rustburg** 9:15
121:2 202:23

**s**

**s** 5:1,9 6:1 7:1
98:24 109:13
186:16
**s.e.** 2:7
**safe** 116:17
168:7 208:11
209:4,7
**safety** 169:14
**samantha** 4:4
8:6
**samewisega...**
126:15
**samwisegam...**
9:24
**sarah** 190:21
191:11,21,23
192:2,17 193:5
193:9
**sat** 160:1
**saw** 16:25 24:6
34:8 35:12
110:24 129:11
141:21 156:2
156:11 166:11
196:5
**saying** 34:1
65:3 81:15
97:17 106:10
106:23 116:4

**[saying - send]**                                                                Page 43

117:11 122:20
124:12 130:4
161:13,16
172:23 203:21
204:8,11
205:25 206:2
207:19
**says** 15:16
16:16 24:19
38:2 61:22
62:4 68:25
77:2,7,21
79:10 94:19
97:18 105:17
106:7,18 115:1
117:2 124:19
136:16 149:17
151:1 165:18
168:7 186:4
208:10
**scammer** 52:9
**schedule** 78:1
196:18
**scheduled**
196:16
**scheren** 207:13
209:15 210:4
**school** 40:7
127:5
**scope** 205:2
**screech** 169:1
**screenshots**
5:25
**scroll** 94:7
130:17

**seal** 46:5 155:2
214:15
**sealed** 45:14
155:24
**search** 21:9,11
**searched** 26:20
26:23 66:14
**searching** 36:8
**second** 62:1
64:25 79:8,10
98:1,21 111:4
113:23 123:3
137:11,25
138:16 146:3
146:13,14
153:10,19
160:20 167:15
167:23 168:6
168:24 184:17
188:22 208:9
**secondary**
178:25 179:4
**secure** 127:11
127:21,23,25
128:3
**secured** 10:15
**security** 128:7
**see** 16:15,18,19
16:23 24:18,21
30:18 32:6,19
33:24 40:20
45:25 49:21
50:25 57:14
58:9 62:9
64:20 66:20

69:2 73:25
77:5,10 78:8
79:12 84:21
88:4 93:20
94:19,22 95:4
97:7,9 98:25
102:11,14
103:20,23
104:1 105:18
106:19 113:14
114:21,24
115:4,16,19,23
117:8,24
121:20 122:6
122:17 124:11
124:12 129:9
130:15 132:3
132:12 133:3,9
133:15,17
134:2 137:12
137:13 142:17
147:11 150:24
153:21 154:16
160:6,21 162:7
164:4 166:23
167:12 168:17
169:2,6 173:3
181:22 186:6
186:25 187:5
189:12 191:4
191:21 202:14
202:17 206:7
207:12,22
208:13 209:18

**seeing** 92:14
110:17 166:18
**seek** 171:11
**seemed** 79:20
117:18 195:23
**seems** 95:3
**seen** 33:5 36:13
44:3,11,18
45:10 47:7,22
47:23 68:22
74:22 84:13
95:11 122:11
123:3,12 129:3
129:6 130:25
167:3 198:10
**seizures** 203:4
203:25
**select** 28:4
**selected** 103:12
111:19 114:3
**selecting**
111:23
**selections**
112:2
**semmel** 186:15
**senator** 112:21
113:4,15,20
**send** 20:22
22:15,23 23:2
23:5 25:22,25
26:5,11 32:2,3
58:20 63:8
69:1 70:13
71:21 72:12
75:3,12 76:4

| | | | |
|---|---|---|---|
| 97:20 112:8 | 102:12 103:12 | **sentence** 62:4 | **settings** 27:1 |
| 114:3 115:18 | 103:25 104:11 | 99:8 124:7,19 | **seven** 10:7 |
| 131:23 138:2 | 107:1 110:10 | 138:23 146:22 | 131:6,7 |
| 138:24 153:9 | 110:16 112:3 | 147:5,9 148:12 | **several** 9:19 |
| 155:9 162:8,10 | 112:16,19 | 148:22,25 | 22:17 93:14 |
| 170:9 183:23 | 113:23 115:21 | 169:4 208:10 | 139:21 151:5 |
| 185:19 188:15 | 116:18 117:22 | 208:16 209:3 | **share** 49:9 57:1 |
| 189:5 199:5,21 | 121:24 122:23 | **sentences** 37:5 | 79:11 85:17 |
| **sending** 87:10 | 124:24 127:16 | 37:13 | 122:16 123:7 |
| 95:18 96:19 | 134:21 136:24 | **separate** 83:10 | 123:18 158:25 |
| 97:19 103:1,4 | 140:2 146:16 | 173:22 | 167:1 |
| 103:9 104:4 | 151:18,19,24 | **september** | **shared** 48:10 |
| 109:19 110:14 | 152:2,6,8,19,20 | 32:18 36:10 | 49:10 58:23 |
| 111:5,10,17 | 152:22 153:5 | 94:21 175:16 | 59:6 86:6 |
| 116:5 128:16 | 153:10,17 | 201:25 | 87:13 144:15 |
| 132:15 138:20 | 154:4 155:3,4 | **series** 109:4 | 165:19 210:13 |
| 149:10 151:15 | 155:16 158:23 | 114:18 | **sharing** 78:20 |
| 152:24 161:7 | 159:17 160:7 | **serious** 11:22 | 170:20,21 |
| 164:24 172:19 | 160:25 161:22 | **served** 16:12 | 171:8 |
| 177:3 187:11 | 162:8,13,19 | 42:8 189:6 | **sheet** 215:11 |
| 188:17 207:16 | 169:25 170:8 | **server** 127:11 | **short** 34:16 |
| 209:16 | 173:19 175:8 | 127:21,23 | 81:6 135:8,9 |
| **sense** 146:15 | 175:15 176:25 | **serves** 86:15 | 142:6,17,21 |
| **sensitive** 165:1 | 177:24,25 | 103:11 | 144:11 185:17 |
| 165:16 | 179:20,23,24 | **service** 202:8 | **shorter** 142:18 |
| **sent** 21:23 22:5 | 183:24 184:1,3 | 202:20 | 173:17 178:2 |
| 22:17,19,21,22 | 184:3,15,18 | **services** 9:25 | 208:10 209:4,7 |
| 24:3 26:10,14 | 185:20 186:2 | **set** 8:11 80:4 | **shortly** 43:14 |
| 28:19 44:22 | 186:21 187:6 | 85:6,9 108:1 | 71:4 209:21 |
| 45:3 70:20,22 | 188:1,12,21 | 126:19 192:16 | **show** 30:16 |
| 74:20,25 75:8 | 189:9,21,24 | 193:21 195:5 | 47:16 103:2 |
| 75:25 85:13 | 190:2 200:7 | 196:1 197:11 | 105:4 116:7 |
| 86:8,16,17,18 | 209:23 210:17 | 214:14 | 145:19 146:22 |
| 87:5,5 95:21 | 215:14 | **setting** 27:19 | 158:20 180:4 |
| 96:13,23 99:12 | | 27:23 | 194:8,9,21 |

**[show - skipped]**

Page 45

197:4,10
**showed** 125:24
140:20
**shown** 96:17
123:4
**shows** 122:25
153:20
**shuffling** 14:9
**siblings** 117:7
117:16 120:8
120:15,16
**sic** 49:23 52:19
55:9 112:7
149:23
**side** 205:16
**sign** 58:24 59:9
59:15,21 64:6
215:12
**signal** 10:2,9,11
10:14,24,25
11:9 21:23
26:24 27:2,7
27:10,15,21
28:8,10,20
29:6,15 30:2,6
30:7,9,17,25
31:3,4,5,13,16
31:24 32:1
105:18 106:1,2
106:5,8,11,12
107:10,14
108:1,6,9,14,15
108:17,20
**signature** 57:24
97:21 212:14

214:18
**signed** 58:1,19
59:7 60:5 61:5
63:13,17 64:4
64:7,9,13,15,22
65:5 70:4
74:23 97:24
107:1,5 110:23
137:19 175:14
215:20
**significant** 21:5
**signing** 59:22
59:24 61:9,11
**silly** 103:19
**similar** 99:19
197:21
**single** 18:23
22:2 51:14
52:23 68:21
79:7 108:9
**sir** 18:6 24:1,5
24:25 25:2,9
25:19,21 27:12
28:12 32:7,25
33:4 34:6
36:22 37:2,9
37:23 39:16
40:1,4,17 41:3
41:15 42:6,9
42:15 44:8,10
44:14,20 45:12
45:17 46:2,6
46:13,21 47:14
49:19 50:4,13
52:6 54:12

56:17 57:15
58:3,11,18
62:10 63:15
66:18,24 67:22
67:25 68:7
69:3,6,11 70:6
70:25 71:2,18
73:17,23 74:18
75:4,17 76:1,5
77:6,11 78:14
80:16 83:2,19
84:15,18,23
86:22 90:8,16
91:21 95:8
96:6,18 97:15
97:25 100:2
101:22 102:10
103:21 104:2,6
105:14 110:12
110:24 114:8
114:11,22
115:5 116:17
116:23 117:14
121:17 126:17
138:12 139:5
150:20 151:8
151:13 152:16
152:21,23
153:18 154:7
156:5 159:19
160:9 161:1,5
163:3,11
164:12 165:21
172:17,21
173:4 174:11

174:17 176:16
180:22 185:11
185:25 186:3,7
186:10,19
187:1 188:13
189:4,20
190:12,20
193:7 194:17
195:3,11
197:13 198:2,5
200:1,14,19
201:5,15,18
204:7 208:14
209:19 210:5
210:20
**sister** 18:17
23:15 43:12
88:19 91:1,10
93:21 105:11
113:4,14
125:23 128:25
146:4,10
181:13 199:1
199:10 201:25
202:21
**sisters** 85:8
**site** 183:3,4
**situation**
204:11
**six** 10:7 69:8
95:9 131:5
**size** 14:2
**skip** 103:22
**skipped** 92:4

**[skipping - starting]**

**skipping**
   166:17
**sleep**  118:14
**slusher**  6:8
   153:21 154:4,9
   154:22 156:3
   156:11,22
   157:19 159:10
   159:16
**small**  69:12
   88:5 92:17
   207:9
**social**  11:12,14
   11:15,17
   129:13,25
   147:15 166:8
   207:21
**solutions**  7:10
   7:11 215:23
**somebody**
   15:15 17:22
   18:2 43:19,20
   47:2,2 68:24
   81:14 117:18
   164:3 183:12
   183:20 191:25
   192:10 195:13
   196:19 208:21
**soon**  14:3 53:21
   56:20 70:11,12
   85:13 128:23
   158:17 165:2
   165:17
**sorry**  12:15
   41:7 43:3 45:9

55:9 90:7,8,12
92:17 98:2
103:24 110:18
112:10,12
138:12 139:9
143:23 150:1
168:17 182:15
191:5,24 200:5
207:9 208:24
**sort**  17:21 36:5
163:4 175:9
200:21
**sounds**  13:25
103:20 121:9
177:2 184:2
**sources**  163:24
**south**  199:15
**speak**  18:7,21
19:3 53:14
55:19 56:10
66:25 68:10
73:22 82:13
134:24 135:1
138:5 142:2
148:15 174:3
200:10 205:13
205:17
**speaking**  77:9
77:21 138:1,14
147:10,14
148:14 178:19
200:7
**speaks**  38:11
60:18 61:22
149:2 179:9

**special**  41:18
**specific**  18:16
   54:22 83:2
   104:15
**specifically**
   22:5 38:2
   59:16,21 72:11
   80:5 100:25
   101:6 106:2
   117:15 119:10
   131:18 139:19
   161:5 186:13
**specifics**  39:19
   43:18 54:25
   125:7
**speculation**
   51:10 53:8
   59:11
**speculative**
   71:5
**speed**  199:10
**spend**  88:16
**spent**  67:10
   192:2
**spirit**  170:10
**spiritual**
   207:24
**spoke**  20:8,15
   54:18,18 66:16
   67:4 81:8
   125:10,16
   144:21 164:7
   167:12 173:7
**spoken**  68:5
   74:17 101:23

101:24 124:5
134:3 164:14
185:10 194:2
205:6 206:22
**sporadic**
   107:15
**spreading**
   173:2
**spring**  71:17
**stack**  14:1
   112:19
**staff**  190:22
   199:22
**stand**  126:8
   164:18 211:1
**standard**  77:8
**standing**
   167:20 202:13
**starfish**  98:24
   98:25 99:21
   168:21
**start**  10:14
   11:9 176:20
   207:19
**started**  10:20
   34:9 40:20
   41:25 42:22
   43:4,8,14
   101:24 122:22
   123:1 140:25
**starting**  76:22
   97:8 109:4
   114:19 133:5
   165:12

[starts - suggestions]

Page 47

starts   77:1
  103:19
state   7:12 19:1
  45:7,11 46:7
  47:13 51:12
  54:17 55:21
  68:9 91:1
  130:19 137:3
  154:20,22
  155:24 156:8
  157:21 159:10
  159:18 174:1,4
  175:4 201:20
stated   55:22
  74:1 166:7
  173:9 178:21
statement
  153:21 154:4
  164:5
states   1:1 7:7
  94:3 119:24
  134:18
stateside
  204:10
station   197:2,5
stationed   121:4
  121:13
stations   197:7
stay   181:1
staying   113:22
step   167:9
steph   123:9
steph's   85:18
stephanie   3:4
  7:24 23:15

28:18,20 42:17
43:19 47:15
48:7 49:7
53:24 68:3,9
84:25 88:19
91:6 93:21
96:3 104:18
105:5 112:8,9
112:14 113:1
115:15 121:11
147:3,9 148:13
155:6 172:8
181:13 182:2
182:12 183:21
199:1 208:21
209:11 211:18
stephanie's
  54:6 145:17
  202:5
stephen   4:25
steps   66:6
  167:2
steve   176:5,14
  176:20
stew   194:8,14
  194:15 195:17
  196:9 199:21
stick   123:10
stopped   27:12
stored   24:20
  30:10,12
story   57:2 64:2
  78:20 81:7
  99:15 118:8,10
  122:6,12 123:5

125:12,22
144:23,25
146:2 159:8
172:20 173:2
185:7 190:14
199:11,19
208:13 210:13
straight   161:12
street   2:7,14,22
  3:8
strictly   136:4
string   5:23,24
  6:6,12,13,14,15
  6:17 76:22
  97:7 102:8
  137:12
structured
  153:13
stuff   27:8 28:6
  31:20,22 52:15
  65:8 78:18
  79:24 81:15
  108:2 123:1
  128:4,12
  147:14 188:9
  210:14
stumbled   33:7
subject   54:14
  54:20 133:20
  169:19 191:19
subpoena   5:13
  16:12 17:1,20
  18:22 19:4,14
  19:19 21:10,13
  21:18,20 22:1

22:15,24 23:7
23:12,15 26:19
39:22 48:17,18
73:14 107:25
108:4 126:2
189:5,12,21,25
190:3 193:1
subpoenaed
  19:23 29:1
  156:6
subpoenas
  26:15
subscribed
  213:20
substantiate
  161:16 163:25
substantiation
  161:18
substitute
  120:7
substituted
  118:5
successive
  47:20
suggest   10:17
  20:12
suggested   20:3
  98:10 117:13
suggestion   99:3
  117:23 173:5
  208:3
suggestions
  67:19 98:6
  128:19 177:11

[suite - telling]                                                                  Page 48

**suite**   2:22 3:8
**summarization**
  99:18 208:20
**summarize**
  40:5,18 144:6
**summarized**
  99:15
**summarizing**
  187:12
**summary**
  187:11
**summer**   31:21
**summoned**
  67:17
**super**   209:7
**support**   62:6
  114:10 146:7,8
  147:25 179:3
  201:16
**supporting**
  97:20
**supposed**   19:18
**supreme**   2:5
**sure**   10:12
  12:20,25 13:16
  14:12,20 17:14
  19:21 20:25
  26:2 29:18
  33:14 34:24
  40:7 43:18
  45:2 46:15,15
  52:8 55:2 56:3
  60:4 61:13
  62:3 64:3
  66:21 67:13

76:10 85:4
88:9,15 94:2
94:15 96:20
110:24 125:7
126:20 129:24
134:25 135:24
142:4 146:1
149:16 154:10
155:7 156:24
174:2,25 192:7
193:12,23
195:13 198:8
198:14 199:12
200:20 204:25
205:9 208:6
**surgeries**   203:2
**surprise**   110:17
**surprised**
  48:12,13,22
  159:25
**suspect**   205:16
**suspending**
  211:8
**swear**   8:15
**sworn**   8:17
  214:6
**syphon**   28:5

**t**

**t**   5:1,1,9 6:1,1
  83:5 139:16
**tagert**   4:25
**take**   2:4 14:21
  14:23 17:22
  18:3 52:4
  65:21 97:6

126:6 141:18
148:12 166:21
167:2 174:7
175:25 208:6
210:22
**taken**   2:1,3 7:5
  93:25 94:9
  105:6,12
  143:25 213:2
**taliban**   117:4
  118:18 144:3,7
  144:8
**talk**   13:19 19:6
  25:16 42:10
  49:3 51:24
  53:23 55:9,22
  67:15 72:17,19
  102:22 133:7
  135:23 183:17
  201:12 203:24
**talked**   17:22
  19:24 49:23
  66:15 71:7
  73:12 82:4
  84:20 102:25
  128:18,18
  133:22 135:24
  139:3 141:11
  148:19 150:7
  162:23,24
  181:12 183:20
  193:22 200:17
  210:9
**talking**   34:10
  45:7 47:12

59:17 74:3
75:15 91:11
103:14 128:15
133:21 135:1
137:15 151:21
163:22 187:16
**talks**   192:4
**targeted**   117:5
**team**   48:8
  139:14,17
  177:25 181:5
  186:6,12
**ted**   113:2,7
**tedesco**   68:25
**tell**   11:11 25:10
  46:7 50:14
  53:23 54:5
  58:7 59:18
  68:20,21 72:8
  73:18,24 78:6
  79:5 85:4
  87:24 101:7
  118:24 133:19
  135:20 142:13
  142:19 145:11
  145:12 158:5
  184:23 185:13
  198:18,21,24
  199:6,10
  207:12
**telling**   64:2,19
  100:19 125:21
  199:18 204:4
  204:14

[tells - think]                                                      Page 49

| | | | |
|---|---|---|---|
| **tells** 208:12 | **text** 5:19,22 6:5 | 148:13 165:15 | 72:24 73:21 |
| **ten** 31:11 | 6:11 10:2 32:2 | 179:6 | 75:8,10 76:1 |
| 116:12 143:2 | 32:2 56:21,23 | **things** 66:5,10 | 76:14,23 77:15 |
| 158:16 | 76:22 77:1 | 104:12 119:21 | 78:4 79:1,4 |
| **term** 48:19 | 78:7,13 83:13 | 126:22 128:5 | 83:25 85:4 |
| 49:5 50:20 | 97:7,12 99:24 | 129:3 133:23 | 86:15 87:2,7 |
| 130:3 173:16 | 102:8 106:7,18 | 142:6 179:2 | 87:16 89:9 |
| 195:24 | 107:6 111:12 | 183:5 192:5 | 93:10,13 95:10 |
| **terminology** | 122:15 125:11 | 193:1 201:7 | 98:23 99:17,20 |
| 84:4 118:15 | 133:4,5,6 | 203:16,22,22 | 99:22 101:13 |
| **terms** 144:20 | 134:21 135:17 | 209:9,17 | 101:15 103:7,8 |
| 173:16 | 137:10,11 | 210:11 | 103:15 105:3,5 |
| **test** 40:23 | 149:14 164:24 | **think** 10:19,23 | 106:6 107:22 |
| **testified** 13:3 | 165:11,22,24 | 12:2 14:16 | 109:5 110:2,12 |
| 103:16 126:18 | 166:13,17,25 | 15:21 17:5 | 110:13 111:20 |
| 147:19 148:18 | 168:11 172:22 | 18:11 20:2,6,8 | 111:25 113:10 |
| 149:5 150:14 | 174:12 199:25 | 22:17,21 23:4 | 116:1,4,8,9,17 |
| 157:6 163:6 | 200:3 | 25:12,24 26:3 | 117:17,18 |
| 172:8 185:18 | **texted** 108:16 | 28:3,19 30:5,8 | 118:3 121:5,10 |
| **testifying** 12:23 | 135:6 | 30:12 31:13 | 122:1,10,10 |
| **testimony** | **texts** 107:18 | 33:19 34:10,24 | 125:1,8,14,19 |
| 15:23 16:13 | **thank** 8:23,24 | 35:9 36:13 | 125:20 127:20 |
| 35:11 37:11 | 14:25 16:22 | 38:5,21,24 | 129:10,23 |
| 49:6,9 54:11 | 36:23 77:9 | 44:24 45:12 | 130:3 131:16 |
| 56:10 67:11 | 83:11 150:6 | 48:3,15 49:13 | 132:14,19 |
| 108:4 140:10 | 168:9 181:3 | 49:22 50:5,17 | 136:2,20 137:1 |
| 141:5 156:20 | 211:6,13 212:1 | 50:19 51:5 | 137:7,8 138:2 |
| 156:23 160:23 | 212:7 | 53:4,19 56:19 | 138:18,24 |
| 168:5 170:14 | **thanks** 51:17 | 56:25 58:21 | 139:8 140:2,9 |
| 170:16,19 | 79:10 172:5 | 59:1,16,20 | 140:16 145:20 |
| 174:8 175:19 | 209:15 211:23 | 60:15 61:21 | 147:18 148:23 |
| 175:25 199:3 | **thereof** 214:13 | 64:7 66:20 | 150:4,14 |
| 212:10 214:8 | **thing** 27:10 | 67:2,10 69:8 | 151:18 154:11 |
| 215:9,18 | 52:23 116:11 | 69:11,14 71:5 | 158:1,3,12,19 |
| | 131:3,5,5,6 | 71:6 72:16,22 | 158:23 159:12 |

[think - today]                                                                           Page 50

162:10 164:6
165:4 166:11
166:20 167:9
169:11 172:7
172:24 174:8
177:21 178:4
178:17 179:8
179:23,24
180:1 181:6
182:17 183:25
185:18 187:5
187:11,23
188:25 189:21
189:22 190:22
192:23 194:10
195:18 196:5
196:21,23
197:1,4 198:13
198:23 199:7
200:20 201:6
201:18 202:4,9
202:9 203:5
205:3 208:18
208:25 210:21
212:2
**thinking**
118:14 122:22
123:1 143:6
172:23 175:10
**third** 9:21 22:6
24:17 37:3
57:23 88:18
93:20 102:8
103:16 113:6
115:13 133:16

147:4 158:4
168:15 179:5
184:17 186:21
187:3 188:22
**thomas** 22:21
194:10 196:21
197:4 198:1,19
198:22 200:2
**thought** 51:1
51:20 54:14,20
78:25 79:5
91:8 100:23
103:11,25
104:11,22,25
123:3 134:2
143:21 151:16
152:25 156:7
167:24 170:1,9
170:11 179:6
181:18 188:15
188:19 204:20
**thousand** 63:6
63:7 70:15,16
70:17,18
**thousands**
123:12
**thread** 28:3
108:9
**threads** 28:4
**three** 10:12
22:4 23:8,11
39:2 67:6
94:13 95:2,13
112:18 117:6
117:16 120:8

120:15,16
130:24 158:1
167:22 178:22
184:1,15
185:23 186:13
186:21 189:19
208:17
**throckmorton**
89:15
**thursday** 20:22
66:22 114:20
**tight** 133:24
136:3
**time** 10:5 13:2
14:3,13,13
29:4,13 34:11
36:20 37:17
43:7 51:14
52:19,20 55:8
55:15 58:4
63:5 65:23
66:1 68:4
69:10 73:13,16
77:8 79:7
81:19 82:24
88:16 92:14
100:12,17
102:5 109:24
110:13 112:11
118:11,16,25
119:21 120:11
120:20 121:1,6
121:9 126:9,12
133:7 144:21
145:2,3 146:15

152:1 164:1,15
164:19,22
173:11 175:1
176:3 179:20
192:3,24
194:12 200:22
200:22 203:20
206:17 208:6
211:2,5,25
215:19
**timeframe**
215:8
**timeline** 48:5
**times** 29:15
73:22 74:16
84:15 95:12
141:4 157:22
**timetable** 20:5
**timing** 175:10
175:10 182:11
**tiny** 78:18
**tip** 182:24,24
183:1,5,12
**tips** 66:14
**title** 58:7
156:18
**titled** 152:17
**today** 16:13
38:25 43:6
66:4,21 67:11
67:16,21 68:11
68:22 69:1
75:16 77:8
156:21,23
163:14 173:23

**[today - two]** Page 51

174:7,8 178:8
190:17 193:22
194:3 199:3
200:18 210:21
211:7,7
**together** 14:3
31:21 95:5
138:7 175:5
185:24
**toggle** 27:25,25
**told** 25:20 47:2
47:3 50:22
52:19 55:22
75:21 78:18
100:16 104:4
110:14 125:18
125:19 127:11
127:12,23
128:2,3,7
129:12 133:24
138:19 145:6
149:12,18
153:9 155:22
182:22,23
192:8,9,23
193:23
**took** 86:25
113:14 142:1
176:24 195:1
198:14
**top** 84:19,21
89:1 91:22
94:18 97:17
109:8 112:22
116:12 117:2

119:13 121:22
133:5 137:25
151:1,23
152:17 165:15
172:5,7 180:18
188:3 189:17
191:13 209:15
**topics** 202:15
**total** 67:9
**totally** 188:8
**touch** 49:17
145:4,7 149:7
149:11,17
**towards** 123:5
199:14
**tower** 2:13
**track** 79:22
**traffic** 11:22
**transcript** 5:10
16:8 23:20
32:12 39:13
47:7 57:8
68:17 76:19
84:10 87:21
97:3 108:25
114:15 130:10
132:25 150:12
152:13 153:25
160:13,16
165:7 176:9
180:13 184:7
184:11 191:1
207:3 214:8
215:6,20

**transfer** 138:21
**translate**
120:10
**translator's**
117:16
**transmission**
105:1
**transmittal**
161:3,22 185:6
191:14
**transmitted**
153:7 162:13
186:2
**transmitting**
65:15 188:5
**tried** 80:23
82:2,5 85:23
163:9,10
195:11 196:1
**trouble** 197:19
**true** 11:1 118:4
139:21 147:13
147:25 214:8
**truth** 64:23
65:4
**truthful** 177:9
**truthfully** 13:7
13:15
**try** 13:19,22
14:21 29:19
33:24,24 35:25
36:6 43:12
72:20 76:7
81:1 118:13
119:3 123:10

126:20 177:9
177:10 179:2
182:22
**trying** 11:8
18:3 29:17
33:12 36:2,12
42:18 43:10
48:3 51:24
66:20 78:8
81:5 113:9
117:20 119:22
120:3 144:3,5
144:7,9 146:4
155:20 156:13
162:23 173:6
174:25 182:11
184:13 192:16
193:21 199:14
208:22 209:2
210:23
**turn** 24:17 28:1
37:3 93:17
98:1 102:8
103:16 105:15
111:4 112:17
116:12,19
121:18 147:4
167:11 203:25
211:11
**turned** 12:2
82:20
**twenty** 12:16
**twice** 73:21
**two** 10:12 20:9
37:4 47:20,24

**[two - used]** Page 52

| | | | |
|---|---|---|---|
| 66:5 73:15 | 107:8 108:7 | 175:17,18 | 42:7 209:21 |
| 74:7,16 76:22 | 110:21 111:18 | 209:2 | **unquote**  99:23 |
| 78:5 92:24 | 118:23 124:1 | **understanding** | 186:12 208:11 |
| 93:2,25 94:13 | 138:10 152:21 | 20:11 27:14 | **unverified** |
| 95:13 99:12 | 160:4 168:10 | 35:11 45:13,23 | 182:24 183:6 |
| 113:24 130:23 | 168:22 | 46:3 49:25 | 183:12 |
| 141:24 152:18 | **ukraine**  182:24 | 62:23 71:13 | **upcoming** |
| 158:3,18 | **ultimately** | 74:8,11,12 | 151:10,11 |
| 160:18,21 | 99:25 | 76:2,11 81:20 | **update**  135:25 |
| 161:2,8 162:19 | **unable**  19:25 | 87:2 88:12 | **updates**  119:11 |
| 168:21 175:5 | **unaware**  48:23 | 94:25 100:4 | 188:20 204:11 |
| 176:25 178:22 | 50:1 | 105:24 106:25 | **url**  96:12,23 |
| 182:25 194:7 | **under**  12:21 | 110:10 113:5 | **us.mimecast....** |
| 208:10,17 | 15:23 21:14 | 117:10 119:20 | 109:13 |
| 209:4 | 46:5 62:7 | 120:16 138:15 | **usdoj**  4:21 |
| **tyler**  4:18,19 | 64:19 88:4 | 151:14 175:19 | **use**  9:16,18,19 |
| 8:2,8 211:24 | 155:2 | **understood** | 10:6,9 11:16 |
| **typeface**  92:17 | **undergraduate** | 13:14 20:2 | 27:10 37:19 |
| **typically**  32:2 | 40:14 | 21:19 25:17 | 38:7 39:1 |
| 177:24 | **underneath** | 61:1 62:16 | 84:25 103:8 |
| | 41:23 | 63:12 70:1 | 106:4 107:12 |
| **u** | **understand** | 72:25 101:2 | 108:20 109:14 |
| **u**  6:1 49:23 | 12:21 13:6,10 | 112:2 114:9 | 114:6,9 127:1 |
| 83:5 139:16 | 14:19 15:14 | **undertaken** | 128:17 132:17 |
| **u.s.**  118:21 | 17:6,8,14,15 | 148:23 | 134:3 136:9,11 |
| 144:7 172:9 | 24:15 25:1 | **undertaking** | 136:22 138:17 |
| 203:17 | 32:24 33:1 | 71:11 | 173:15 195:23 |
| **uh**  9:4 10:10 | 35:5 37:13,18 | **undertook** | **used**  9:25 10:5 |
| 11:18 12:10 | 38:7 40:2 | 35:21 | 10:8,11 38:3 |
| 26:22,25 52:25 | 45:15 49:15 | **unfortunately** | 50:20 55:5,6 |
| 57:21 70:19 | 51:19 58:4 | 193:15 | 80:7,11 84:4 |
| 82:12 83:12 | 60:1 62:16,20 | **united**  1:1 7:6 | 107:13 108:17 |
| 84:6 88:20 | 81:3 82:22 | 119:23 | 122:5,12 125:4 |
| 89:18 90:6,10 | 83:20 93:5,24 | **university** | 133:15 135:5 |
| 90:10 100:7 | 106:23 172:14 | 40:10 41:10,18 | 136:4 168:20 |
| 102:3 104:9 | | | |

**[used - way]**

174:9 179:13
215:20
**useful**  66:9
**uses**  127:14,21
129:24 194:25
208:11
**using**  10:14,20
10:24,25 11:9
37:15 105:25
108:14 131:4
151:4 172:25

**v**

**v**  1:6 83:5
139:16 215:4
**va**  2:15 3:18
**vague**  210:10
**valley**  9:15
**van**  4:4 8:6
**verbiage**  118:8
194:25
**verified**  183:10
**verify**  81:14
130:3 164:2
215:9
**veritex**  7:10,11
**veritext**  215:14
215:23
**veritext.com.**
215:15
**version**  104:15
208:11 209:5
**versus**  7:6
**vets**  50:22
**vexatious**  206:7

**vice**  190:23
**video**  1:14 2:1
7:4 177:7
179:16 197:19
209:6,10
**videographer**
7:2 8:14 65:22
65:25 126:8,11
164:18,21
211:1,4 212:9
**videos**  208:10
209:4
**view**  177:6
197:22
**viewers**  141:5
**views**  194:25
**violating**  48:9
**violation**  146:5
**virginia**  1:2,18
2:3,5,8 7:8
9:15 18:2
121:2 154:15
213:19 214:1,4
214:21
**visible**  179:18
**visit**  202:11
**visited**  130:15
**visiting**  202:7
**voice**  82:15
**voluntary**
187:25
**volunteer**
117:5
**volunteered**
183:25

**vought**  83:4,7
83:17 105:18
107:10 139:15
139:16 140:25
151:6 152:6
161:4 162:21
176:15 177:17
186:13,18
191:16,20
192:14 193:3
193:17,19
194:5 195:5
196:1,9 197:11
200:5
**voughts**  162:7

**w**

**wait**  13:21
19:16 20:12,18
59:12 134:4
179:23
**waited**  52:24
**waived**  212:14
**walk**  203:24
**walking**  203:7
**want**  14:22
15:3 20:7
25:23 36:16,21
37:6,11 40:21
56:5,6 59:4
64:21,23 65:3
88:16 99:20
102:13 113:17
117:14,18
126:14 127:1,6
130:19 137:3

139:10 141:4
145:15 146:21
166:6 180:23
183:17 194:23
195:9 200:22
**wanted**  8:22
50:25 52:8
53:23 74:8
105:25 106:4
117:11 138:21
141:6 178:8
207:11
**war**  182:25
192:4
**washington**
2:23 3:9
**waste**  206:16
**watched**  141:3
**watkins**  2:19
4:9 7:18,20
**way**  20:3 30:20
35:2,23 36:9
58:9 59:5
71:22,23 76:8
93:17 95:15
96:15,21 109:5
119:17 126:25
127:7 132:10
138:20 149:5
152:8 153:4
162:15 164:9
172:9 188:4
190:18 195:15
199:16 204:5

**[we've - yeah]**                                                    Page 54

we've  49:13
    92:4 126:5
    155:1 193:22
    194:2
web  99:14
    132:4
website  5:25
    52:5,6 100:1,6
    102:2,18 107:3
    110:15 111:14
    114:7 117:13
    128:18 129:1,6
    129:11,14,16
    141:6,13,16
    147:15 169:13
    175:21 178:6
    187:12 209:24
wednesday
    114:19 133:6
week  18:8
    26:11 66:23
    69:10 73:14
weeks  72:7
    95:9 141:24
    155:10 205:7
went  21:22
    33:12 41:21
    42:4,5 49:24
    52:6 66:7
    103:24 129:21
    131:1 135:10
    146:16 167:9
    192:25 193:25
    198:7 199:15
    204:3

western  1:2 7:7
    157:17
whatnot  72:13
    168:1
whereof  214:14
white  89:13
wide  96:16
wife  47:15 49:7
    69:25 123:19
    131:8 138:2,5
    138:14 171:14
willing  57:1,4
    164:4 177:11
    181:20 183:21
    185:7
wilmington
    121:8
winter  4:4 8:6
wise  200:22
wish  36:19
    144:13
wished  143:24
wit  213:19
    214:1
withdraw
    110:5 144:10
withdrawal
    192:5
witness  8:13,15
    36:17,22 38:13
    53:11 59:12
    65:2 126:7
    148:11,19
    155:12 207:4,6
    211:13 214:14

    215:8,10,12,19
witness's  60:14
witnessed
    205:23
witnesses  81:14
wondered
    116:3
wondering
    133:14
woods  2:7 3:6
    4:24 18:19,21
    68:1 80:12
    91:9 147:2
wording  61:7
words  55:5
    165:1 185:1
work  9:19
    50:24 51:2
    59:19 79:23
    127:1 149:18
worked  41:3,19
    41:20,22,22
    42:6
working  40:20
    119:2
works  127:8
    180:9
worldwide
    183:4
worrell  46:9
    47:8 173:25
worrell's  46:19
worry  16:1
worth  98:23

wrestling
    124:22
wright  18:24
    90:25 91:5
wright's  91:12
write  183:21
    190:16 196:20
writing  136:14
    136:20
written  29:11
    30:5 81:7
    125:2
wrong  98:13
    187:21 191:5
wrote  30:8
    174:13
wyer  4:22 8:9,9

| x |
| --- |
| x  5:9 6:1 |

| y |
| --- |
| y  8:12 84:22 |

y'all  44:23
    102:12 146:13
yeah  9:17
    10:10 14:20
    16:14,22,24
    17:5,7 21:13
    24:12,12 25:14
    28:15,17 33:12
    34:16 37:18
    41:21 42:13
    52:3 55:7,16
    73:3 74:15,24
    77:15,20,20

[yeah - zoom]                                    Page 55

79:1 81:19
83:9 86:1,8
92:5 93:8,13
94:6,11,20
95:3 98:20
101:13 103:8
104:24 108:7
110:21 111:20
112:20 113:1
113:16 116:13
118:19 121:9
124:12,22
125:20 129:5
132:1 137:17
138:18 143:7
145:6 149:9
155:17 158:19
166:16 167:24
170:15 175:7
176:6 178:4,14
182:4,6 188:6
192:15 196:11
204:21 205:10
205:10 207:15
**year**   16:17 29:4
29:13,22 30:3
31:7 32:18
36:10 40:11
95:7 100:15
101:11,14
149:8 176:14
200:25 205:9
**years**   10:7,13
108:19 208:17

**yep**   114:1
151:3
**yerushalmi**   4:7
7:25,25 36:15
36:15 37:24
38:9,10 60:8,8
60:21,22 63:21
64:24,25 65:20
100:8,12,24,25
101:5 206:13
206:13 211:20
211:20
**yerushalmi's**
187:16
**yesterday**
141:21,22
**younger**   167:25
**youtube**   11:15
66:7,9,11,13
197:9 198:7

**z**

**zoom**   4:1 158:8
158:11,12
178:3 197:18
200:4,6

Rules of Supreme Court of Virginia

Part Four - Pretrial Procedures

Depositions and Production at Trial

Rule 4.5

(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed, the
deposition shall be submitted to the witness for
examination and shall be read to or by him, unless
such examination and reading are waived by the
witness and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within 21 days of its
submission to him, the officer shall sign it and
state on the record the fact of the waiver or of
the illness or absence of the witness or the fact
of the refusal to sign together with the reason, if
any, given therefor; and the deposition may then be
used as fully as though signed unless on a motion

to suppress under Rule 4:7(d)(4) the court holds
that the reasons given for the refusal to sign
require rejection of the deposition in whole or in
part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.