IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

BABY DOE, *et al.*,

        Plaintiffs,

-v.-

JOSHUA MAST, *et al.*,

        Defendants,

CIVIL NO: 3:22-cv-00049-NKM-JCH

**DEFENDANTS RICHARD MAST'S REPLY TO PLAINTIFFS' RESPONSE TO JOINT MOTION TO MODIFY THE FOURTH AMENDED PRETRIAL ORDER**

Defendant Richard Mast[1] hereby replies to Plaintiffs' response (Dkt. No. 412) to the Joint Motion to Modify the Fourth Amended Pretrial Order (Dkt. No. 399). To provide the Court with as concise a reply as the undersigned is capable of producing in short order, we will deal with the specifics serially. Initially, however, we note two matters in advance.

**I.   PREFATORY MATTERS**

**One**, at the meet-and-confer on this motion, Plaintiffs' counsel Maya Esktein opposed any extension of the trial date and informed Defendants' counsel that Plaintiffs presently intended to seek a unilateral extension of their discovery deadline based upon their claim that Defendants Joshua and Stephanie Mast had obstructed Plaintiffs' discovery efforts. Ms. Ekstein repeated this position at the May 2, 2024, hearing (which dealt with several different discovery motions). Why

---

[1] Given the timing of the filing of Plaintiffs' response to the motion (May 22), this reply brief would not otherwise be due until Wednesday, May 29. Given the timing of the hearing on this motion next Tuesday, May 28, 2024, itself expedited to deal with current and impending pretrial dates predicated upon a September trial date, Defendant Richard Mast has filed this expedited reply separate from the co-movants (Defendants Joshua and Stephanie Mast and Defendant Osmani) to provide the Court with the opportunity to review facts and issues raised by Plaintiffs' response in a proper context in advance of the hearing. Nothing herein should be attributed to the co-movants, who have not had the opportunity to review this reply in advance.

1

Plaintiffs now come to the Court and "regrettably" agree to an extension, when none of the circumstances have changed since the meet-and-confer, is never explained by Plaintiffs.

**Two**, during the meet-and-confer for this motion and during the May 2 hearing noted above, and likewise in their response to this motion, Plaintiffs take the position that certain of the Defendants and some third-parties have "actively opposed and delayed" discovery. (Pls.' Resp. at 1). This is simply not true. There have been discovery disputes, but it would be "derisive and unprofessional" to assert that these disputes have been in bad faith to "actively oppose and delay" discovery. Indeed, just recently, the Court required Plaintiffs to answer an interrogatory they had refused to answer properly. (Dkt. No. 400). Further, Plaintiffs themselves have delayed discovery as noted in the motion. Finally, Plaintiffs reference to "4,258 documents (totaling 17,371 pages)" is standard fare with electronic communications and the number of documents and pages says absolutely nothing about whether Plaintiffs have been diligent in their discovery obligations.

We now turn to Plaintiffs' response.

## II.   ARGUMENTS BY COUNTERPOINT

(1)   "This case has been pending since September 2022. It has been set for trial three times, with two of those settings already sacrificed." (Pls.' Resp. at 1). As noted in the motion, approximately one year ago (May 19, 2023), all parties agreed that the trial date should be moved because discovery was ongoing and because the Court had not yet ruled on dispositive and various other motions critical to discovery. The Court agreed. Just a few months later, on August 31, 2023, the parties again agreed to seek an extension of the trial date for essentially the same reasons. The Court again agreed and set the current date of September 9, 2024. At the hearing, Magistrate Judge Hoppe referred to that date as a firm trial date. At the time, the undersign asked for clarification given the fact that it was not likely that the predicates for the previous Court-approved

extensions would be resolved by then. Indeed, nothing has materially changed. The fact that two trial dates have come and gone given the circumstances driven in large measure by the Court's decisions, or, more accurately, lack thereof, is hardly an argument to set yet another trial date that does not recognize the prejudice to Defendants if discovery is cut-off prior to the resolution of the pending motions.

(2) "But, assuming such defenses, counterclaims, crossclaims, and third-party claims exist, Defendants already could have been conducting such discovery." (Pls.' Resp. at 3). This is wrong. Discovery must be related to a matter "that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Plaintiffs, for their part, have already refused to produce documents on the basis that the request went beyond this boundary. By its very nature, a counterclaim, as opposed to an affirmative defense, is not necessarily related to a claim or defense, and, as such, would be an improper inquiry prior to the Court's ruling on the pending motions to dismiss.

(3) "Defendants have never identified what those elusive claims may be, and Plaintiffs are insufficiently imaginative to discern what legitimate claims Defendants may assert. Nor have they explained what discovery they will require that has not already been taken (or could have been taken)." (*Id.*). To begin, Defendants should not be placed in the position to provide Plaintiffs with their legal opinions in advance of a required filing. *Smith v. Scottsdale Ins. Co.*, 621 F. App'x 743, 746 (4th Cir. 2015) ("Work product is generally protected and can be discovered only in limited circumstances. Fact work product is discoverable only upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship. ***Opinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circum****stances.") (cleaned up) (emphasis added). This is especially true here where this issue arises because the Court has set a trial date

3

and pre-trial dates that have in the past, and will likely again in the future, come due in advance of the Court's rulings on the dispositive motions.

But there is a deeper problem with the Court's failure to rule on pending motions. Because the Court has issued its *ex parte* asymmetrical "gag order" preventing Defendants, and only Defendants, from disclosing facts to third parties that might "directly or indirectly" identify the Does, Defendants have been unable to conduct any real form of independent investigation in Afghanistan, precisely the situs of the tortious conduct of which Plaintiffs' complain. Any effort to enlist an Afghani "in country" to investigate claims relating to Baby Does' real or *faux* family requires the Afghani to sign a non-disclosure agreement required by an "infidel U.S. court[2]," evidencing the Afghani's efforts to assist the Masts. It should go without saying, but apparently it needs saying, that this would be a death sentence under a tyrannical Taliban regime that has already publicly embraced Plaintiffs' false narrative that Defendants are guilty of kidnapping an Afghani child. And, it doesn't stop there. The Court's gag order requires Defendants to turn over those non-disclosure agreements to Plaintiffs, who can then turn around and email them to the Taliban because Plaintiffs are free to communicate with anyone they wish *sans* non-disclosure agreement, including the Taliban (and, based upon the evidence developed so far, they [or their family members on their behalf] have indeed communicated with the Taliban [*see* Defs.' Prehearing Br. (Dkt. No. 415) at 8-11; 14-15].) It cannot be gainsaid that Baby Does' relationship to John and Jane Doe–biological, familial, and legal–is at the heart of this case. The bottom line is that it should be obvious to any neutral and unbiased observer that the Court's gag order applying only to Defendants has deleteriously and materially impacted Defendants' ability to defend themselves

---

[2] See "The Terrorism Industry": An Al-Qaeda Course in Security and Intelligence, Part Two, at 2, located at
https://www.ict.org.il/UserFiles/The%20Terrorism%20Industry%20Part%20Two.pdf.

against the false and scurrilous allegations made recklessly, if not intentionally, by Plaintiffs. Until the Court grants the currently pending motions to rescind or amend that patently illegal gag order, Defendants are denied due process and a fair opportunity to defend themselves and to fully develop their counterclaims.

(4) In response to the Defendants' point that the Virginia courts should decide the fundamental question whether John and Jane Doe have any claim to being the lawful custodians of Baby Doe, Plaintiffs argue: "Defendants' assertion that 'none of the claims against the parties can survive if John and Jane Doe are not recognized as the Child's parents and if Joshua and Stephanie Mast are recognized as the Child's lawful parents' is categorically incorrect." (Pls.' Resp. at 3-4). Plaintiffs say no more on this point, so it is hard to counter this position specifically. We do so here at an appropriate level of generality. To begin, Plaintiffs' position is at odds with commonsense and with Plaintiffs' earlier concession. (Pls.' Opp'n to Mot. to Dismiss [Dkt. No. 113] at 5-6 [conceding, effectively, that such a ruling by the Virginia courts would be fatal to the claim of interference with parental rights]). If the Virginia courts find that John and Jane Doe are not the legal custodians or guardians of Baby Doe (they most certainly are not biological or adoptive parents), they could not possibly claim interference with parental rights. Further, if John and Jane Doe had illegal custody of Baby Doe, they could not have suffered a fraud for at least two reasons. One, the Masts had, and still have, a valid order of custody. John and Jane Does have nothing; they are interlopers and strangers to Baby Doe. The Masts owed them no duty of care relative to their bogus claim to Baby Doe. Two, the Does gave up nothing of value and have suffered no damages precisely because Baby Doe was not their chattel, any more than Baby Doe was John Doe's father's chattel to just hand off to his son. The same analysis applies to the infliction of emotional distress claim. The duty of care is not to inflict an "outrageous" infliction

5

of emotional distress. There is nothing outrageous about a legal custodian obtaining custody of a child held as chattel by interlopers through a legal process. Conspiracy, of course, fails when the underlying tort claims fail.

### III. CONCLUSION

For the foregoing reasons, and for those noted in the motion, Defendant Richard Mast asks the Court to extend the trial dates, currently set for September 9–20, 2024 to either (1) nine months following the Court's ruling on the currently pending motions to dismiss and to extend the other pretrial event dates accordingly.

Dated: May 24, 2024               Respectfully submitted,

*/s/David Yerushalmi*
David Yerushalmi, Esq.*
American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20006
(*Admitted *pro hac vice*)

E. Scott Lloyd
Lloyd Law Group, PLLC
Va. Bar # 76989
20 E. 8th Street, Suite 3
Front Royal, VA 22630
Office: (540) 823-1110
Cell: (540) 631-4081
Fax: (540) 583-4279
scott@lloydlg.com

*Counsel for Defendant Richard Mast*

## CERTIFICATE OF SERVICE

     I hereby certify that on May 24, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

                                            */s/David Yerushalmi*
                                            David Yerushalmi, Esq.