```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF VIRGINIA
 2                       Charlottesville Division

 3

 4    - - - - - - - - - - - - - - - - - -
                                         )
 5    BABY DOE, et al,                    )
                                          )
 6               Plaintiffs,              )   CIVIL ACTION NO.
                                          )   3:22cv49
 7    v.                                  )
                                          )
 8    JOSHUA MAST, et al,                 )
                                          )
 9               Defendants.              )
      - - - - - - - - - - - - - - - - - -

10

11                    TRANSCRIPT OF PROCEEDINGS

12                        (MOTIONS HEARING)

13                    Charlottesville, Virginia

14                          May 29, 2024

15

16    BEFORE:  THE HONORABLE NORMAN K. MOON,
                Senior United States District Judge
17

18

      APPEARANCES:
19
      COUNSEL FOR THE PLAINTIFFS:
20
              HUNTON & WILLIAMS LLP
21            By:  Maya Miriam Eckstein
                   Lewis Franklin Powell, III
22            Riverfront Plaza, East Tower
              951 East Byrd Street
23            Richmond, VA  23219

24

25
```

```
────Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024────
 1   Appearances Cont:

 2           HUNTON ANDREWS KURTH LLP
             By:  Kevin Spencer Elliker
 3           Riverfront Plaza, East Tower
             951 E. Byrd Street
 4           Richmond, VA  23219

 5           LATHAM & WATKINS LLP
             By:  Ehson Kashfipour
 6           555 Eleventh Street, NW, Suite 1000
             Washington, DC  20004

 7

 8   COUNSEL FOR THE DEFENDANTS:

 9           MCGUIRE WOODS LLP
             By:  John Savage Moran
10           888 16th Street, N.W., Suite 500
             Washington, DC  20006
11
             FIRST & FOURTEENTH PLLC
12           By:  Michael Lee Francisco
             800 Connecticut Ave, NW, Suite 300
13           Washington, DC  20006

14
     ALSO PRESENT - COUNSEL FOR JONATHAN MAST:
15
             HARDING COUNSEL, PLLC
16           By:  Elliott M. Harding
             2805 Meadow Vista Dr.
17           Charlottesville, VA  22901

18

19

20

21

22

23

24

25
```

Cynthia L. Bragg, Official Court Reporter

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          (Proceedings commenced at 12:57 p.m.)

2          THE COURT:  Good afternoon.  Call the case, please.

3          THE CLERK:  This is the matter of Baby Doe, et al v.

4    Joshua Mast, et al, civil action number 3:22cv49.

5          THE COURT:  Is the plaintiff ready?

6          MS. ECKSTEIN:  We are, Your Honor.

7          THE COURT:  Is the defendant ready?

8          MR. MORAN:  Yes, your Honor.

9          THE COURT:  All right.  We're here today on

10   plaintiffs' motion on why defendant Joshua Mast and also

11   Jonathan Mast should not be held in contempt for violating

12   the court's protective order requiring use of pseudonyms for

13   plaintiffs and the otherwise limited disclosure of their

14   identifying information.

15          The court has considered the parties' prehearing

16   filings and thanks the parties for those submissions.  I

17   would get into argument.  I would like to hear, first, if

18   there is any evidence, but I'm interested in what evidence

19   and basis is there to support the continued imposition of the

20   protective order in the case today as opposed to when it was

21   first entered, and what real risks remain present to

22   plaintiffs, as well as to innocent third parties, were

23   plaintiffs' identifying information to be disclosed, and how

24   does a protective order mitigate those risks?

25          Second, have plaintiffs or any innocent third

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   parties been harmed or subjected to increased risk of harm on

2   account of the asserted violation of the protective order by

3   the defendants allegedly trying to circumvent the protective

4   order?

5           Third, the manner of disclosure of Baby Doe's

6   likeness appears to be a central underlying violation of the

7   protective order.  As she has gotten older, wouldn't any risk

8   of harm of identifying her diminish because it would be less

9   likely anyone would be able to identify the plaintiffs'

10  families based on her likeness today as opposed to when she

11  was first found in Afghanistan.

12          Finally, fourth, what legitimate reason could the

13  defendants, and Joshua Mast especially, have in identifying

14  plaintiffs specifically by name that would outweigh any

15  accompanying risk of harm to their families in Afghanistan?

16          With that in mind, plaintiffs may proceed.  Do you

17  anticipate you calling any witnesses?

18          MS. ECKSTEIN:  We do not anticipate calling any

19  witnesses.

20          THE COURT:  Does the defendant plan on calling any

21  witnesses?

22          MR. MORAN:  Your Honor, Joshua Mast and Jonathan

23  Mast are here.  We won't call them unless the Court expresses

24  an interest in hearing from them.

25          THE COURT:  Okay.  Well, we'll proceed on

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    plaintiffs' motion.

2          MS. ECKSTEIN:  If I could have a moment, Your Honor,

3    just to hook up a PowerPoint.

4          THE COURT:  Okay.  I understand some counsel may be

5    listening in on Zoom.  This is a court proceeding, and under

6    the rules of the court in the Western District of Virginia

7    and elsewhere, I think, recording and broadcasting court

8    proceedings is not permitted, so no attorney or any other

9    person may record or broadcast these proceedings.

10          MS. ECKSTEIN:  Thank you, your Honor.  So we're here

11    on our second motion to show cause regarding Joshua Mast and

12    also seek to hold his brother, Jonathan Mast, in contempt as

13    an aider and abettor.

14          As you noted, the parties have filed prehearing

15    briefs.  In ours we set forth on evidentiary basis for the

16    motion, and we believe that based on the evidence submitted

17    in those briefs, you have enough evidence before you now to

18    hold both Joshua and Jonathan in contempt.

19          It's my understanding from Mr. Moran that he doesn't

20    object to the admission of any of the items that we

21    identified in our prehearing brief into evidence, so I have

22    those here for you.

23          Does it make sense to submit them to the Court?

24    It's exhibits A through R to our prehearing brief.  There is

25    also Joshua Mast's declaration, which was actually submitted

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1    to the Court at docket 239-1.  There is Ms. Disarro's

2    declaration from the Pipe Hitter Foundation, that was ECF

3    number 257-2.  Then we also have on thumb drives a copy of

4    the One America News Network interview that Jonathan Mast did

5    in which some identifying photographs were presented.

6            THE COURT:  That doesn't require us to take all

7    those notebooks, does it?

8            MS. ECKSTEIN:  Only one of each, or as many as you

9    want, I should say.

10           THE COURT:  Well, I mean, we don't want a lot of --

11   you know, we don't keep a lot of records like that, if we can

12   avoid it.  But everything that's necessary that, you know,

13   there is an exhibit of, anything that you're going to rely

14   upon ought to be -- any document needs to be filed, I think.

15           MS. ECKSTEIN:  Yes.  So we have one copy for you,

16   one copy for the law clerk, one copy for the deputy, and we

17   also have a copy for Mr. Moran.  Does that make sense?

18           THE COURT:  Yes.

19           MS. ECKSTEIN:  My apologies, Judge.  So you should

20   have in front of you a binder that has Exhibits A through R

21   to our prehearing brief.  You should also have Joshua Mast's

22   declaration, you should have Dena Disarro's declaration, and

23   you should have a thumb drive.

24           THE COURT:  I do.

25           MS. ECKSTEIN:  Great.

1          MR. MORAN:  Your Honor, if I may briefly again, on

2     the representation of counsel that these are the same

3     exhibits submitted in support of the motion, we don't object

4     to their consideration for purposes of the motion.

5          For example, we're not raising a hearsay objection.

6     If they were to later be admitted for another purpose, we

7     would reserve the right to raise that objection.

8          THE COURT:  All right.  Thank you.

9          MS. ECKSTEIN:  So, Your Honor, in his prehearing

10    brief Joshua Mast made four arguments in opposition to our

11    requests that he and his brother Jonathan be held in

12    contempt.

13         The first is that the protective order is not valid,

14    as you suggested earlier that we need to address.  Number

15    two, that Joshua Mast did not knowingly violate the

16    protective order.  Number three, that he took all reasonable

17    steps to comply with the protective order.  And number four,

18    that the Does, the plaintiffs, have not suffered any harm as

19    a result of this violation of the protective order.  I'd like

20    to address each of those arguments in turn.

21         With respect to your questions about the protective

22    order, my colleague, Kevin Elliker, is prepared to address

23    the issue of the protective order, whether it's still valid,

24    whether it's still necessary, which I think is a little bit

25    of a different question than whether it's valid.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          The protective order was certainly valid at the time

2     that you entered it, and it was valid at the time that the

3     violations occurred.  Whether it continues to be necessary I

4     think is a different question, and, as I mentioned, my

5     college, Mr. Elliker, is prepared to address it.

6          We can move straight into the evidence now and then

7     have him address that or the other way around, whatever you

8     prefer.

9          THE COURT:  Just go on into the evidence.

10         MS. ECKSTEIN:  Okay.  Great.  With respect to

11    Mr. Mast's assertion that he did not violate the protective

12    order, his argument in the prehearing brief at least rests

13    solely on his ascertain that Jonathan Mast should be believed

14    when he says he wasn't representing Joshua Mast in working

15    with the Pipe Hitter Foundation.

16         The evidence, though, Your Honor, shows otherwise,

17    and there are 14 key facts.  There are 14 of them, and they

18    won't take that much time, but I'll run through these.

19         The first key fact, Your Honor, is that Joshua Mast,

20    he initiated the discussions with the Pipe Hitter Foundation,

21    and we know that from his own declaration, Joshua Mast's

22    declaration, in which he states that he inquired with the

23    Pipe Hitter Foundation about a grant to address the

24    significant expenses resulting from this lawsuit as well as

25    others.

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1          Fact number two:  Joshua Mast provided the Pipe

2   Hitter Foundation with background information on this lawsuit

3   and a link to a Google photo album that included hundreds of

4   identifying photographs of Baby Doe.  And when I say

5   identifying photographs, I'm referring to photographs that

6   show her face, that make it clear this is who this child is.

7          And, again, we know that from -- well, first of all,

8   Exhibit R to our prehearing brief, that's an email from

9   Joshua Mast to the Pipe Hitter Foundation.  It includes that

10  background information, and it includes the link to the

11  Google photo album.  The Google photo album itself is Exhibit

12  L to be our brief.

13         Fact number three:  Joshua Mast told the Pipe Hitter

14  Foundation that he could not work with it in a public-facing

15  capacity because of the Court's protective order.  Again, we

16  know that from his own declaration where he states, "When I

17  inquired with the Pipe Hitter Foundation about a grant, I

18  explained to it that due to the Court's gag order," and

19  that's how they refer to it is a gag order rather than a

20  protective order.

21         "Due to the Court's gag order and its restrictions

22  on identifying Baby Doe in this suit, we were essentially

23  unable to defend ourselves or have others do so on our

24  account."  So Joshua Mast recognized he couldn't have

25  somebody do this on his account to act as a proxy for him.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    In addition, we have the statements from

2    Ms. Disarro's declaration.  Ms. Disarro is the executive

3    director of a Pipe Hitter Foundation, and she submitted a 115

4    paragraph declaration that detailed the communications step

5    by step with her and Joshua Mast and with her and Jonathan

6    Mast.  She states, "I was told about a gag order by Joshua

7    Mast during a telephone call that occurred in March of 2023."

8    She also testified in her declaration that Joshua

9    Mast told her that neither he nor his wife would be permitted

10   to speak publicly about the case or Baby Doe, and it would

11   prevent them from serving in a public-facing capacity.

12   Fact number four:  Joshua Mast suggested instead

13   that Jonathan Mast, his brother, act in that public-facing

14   capacity.  And we know that first by Ms. Disarro's

15   declaration where she explicitly says he believed, meaning

16   Joshua Mast, believed his brother, Jonathan Mast, could serve

17   in a public-facing capacity to talk about the Mast case, and

18   we know that he did, in fact, do that.  His interview on the

19   One America News Network is one such example.

20   Fact number five:  Joshua Mast put Jonathan Mast in

21   touch with the Pipe Hitter Foundation in April of 2023, and

22   we know that in large part because of Jonathan Mast and his

23   testimony at his deposition.  He was specifically asked,

24   "Joshua said you were going to be contacted by somebody from

25   the Pipe Hitter Foundation, right?"  "Yes."

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1        Fact number six:  Jonathan Mast himself was familiar

2   with the court's protective order even before he began

3   communicating with the Pipe Hitter Foundation.  And how do we

4   know that?  Again, we know that because of Jonathan Mast's

5   own testimony when he testified -- when he was asked, "So

6   when is the first time you heard Joshua talk about a

7   protective order?"  At first he said, "I don't know."  Then

8   he's asked, "Was it before or after this call you had from

9   him," meaning Joshua Mast, "that he was going to hear from

10  the Pipe Hitter Foundation."  And Jonathan Mast answers, "The

11  first time that I heard about it was" -- "Was it before the

12  call?"  "Probably before, yes."

13        In addition, he also testified that he has seen the

14  protective order, and -- this is Jonathan Mast -- and he

15  understood the purpose of Judge Moon's protective order was

16  to protect the identity of John Doe, Jane Doe, and Baby Doe.

17        Fact number seven:  Jonathan Mast himself sent the

18  Pipe Hitter Foundation a link to that same Google photo album

19  with hundreds of identifying photographs as well as

20  additional photographs that he sent via an email, including

21  additional photographs of Baby Doe that identified her.

22        Again, we know this from Jonathan Mast's deposition

23  where he confirmed that he sent a link for the Google photo

24  album to the Pipe Hitter Foundation, and he testified that he

25  understood that the Pipe Hitter Foundation was going to use

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    those photos in support of a fundraising campaign.

2          Exhibit L to our prehearing brief and that's been

3    submitted to the Court is a printout of the Google photo

4    album with the hundreds of photographs that identify Baby

5    Doe.  Exhibit J is the email from Jonathan Mast to the Pipe

6    Hitter Foundation that attaches or provides additional

7    identifying photographs of Baby Doe.

8          Fact number eight:  Joshua Mast knew that Jonathan

9    Mast was working with the Pipe Hitter Foundation, and we know

10   that for a couple of reasons.

11         One, Joshua Mast himself in his declaration admits

12   that he learned, he says as late as February or early March

13   of 2023, that my brother, Jonathan Mast, had coordinated with

14   them, so he already had coordinated with the Pipe Hitter

15   Foundation to raise money for our expenses.

16         Now, I think his timing is a little bit off here

17   because the evidence shows that Ms. Disarro's first text with

18   Jonathan Mast appears to be in April of 2023, but regardless,

19   Joshua Mast admits that he was aware early in the process

20   that his brother had partnered with the Pipe Hitter

21   Foundation, and Jonathan Mast in the his deposition confirmed

22   this.

23         He was asked, "During this time frame, April and May

24   of 2023, Joshua knew you were in touch with Pipe Hitter

25   Foundation, correct?"  "Yes, I had told him I had decided to

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   touch base with them and partner with them."

2          Fact number nine:  Even though Joshua Mast had put

3   the Pipe Hitter Foundation in contact with his brother,

4   Jonathan Mast, nonetheless, the Pipe Hitter Foundation

5   continued to communicate with Joshua Mast about the

6   fundraising campaign, including by sending Joshua Mast a copy

7   of the grant agreement for his signature.

8          Ms. Disarro in her declaration states that she

9   continued operating with the understanding that she could

10  speak with Joshua about the public awareness and legal

11  defense grant fundraising campaign privately, but that

12  Jonathan Mast would need to serve in the public-facing

13  capacity.  She further states that Joshua Mast was provided

14  with our standard legal defense agreement.

15         Fact number ten:  Joshua Mast told the Pipe Hitter

16  Foundation that he could not sign the grant agreement, but

17  that Jonathan Mast could do so instead.  And Ms. Disarro

18  explains that Joshua Mast told her he couldn't signed it

19  because of the Court's protective order, the so-called gag

20  order.  And he told Ms. Disarro to speak with Jonathan

21  instead about signing that agreement.

22         Fact number 11:  Jonathan Mast then signed the Pipe

23  Hitter Foundation grant agreement on Joshua Mast's behalf.

24  Exhibit K to our prehearing brief and that's now been

25  submitted to the Court is a copy of that grant agreement, and

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    it has Jonathan Mast's signature on it.  The grant agreement
2    states that the Pipe Hitter Foundation "is implementing a
3    fundraising campaign in support of Joshua Mast and his
4    family," and then defines Joshua Mast and his family as
5    grantees.
6           Then it states that the purpose of the funds raised
7    are to provide grantees' financial support for legal defense
8    and specifically refers to the legal fees of Joshua Mast.
9    And Jonathan Mast confirmed, he acknowledged that the purpose
10   of the grant agreement was to enable the Pipe Hitter
11   Foundation to provide financial assistance to his brother
12   Joshua.
13          Fact number 12:  As a result of the grant agreement,
14   the Pipe Hitter Foundation transferred $5,000 to Jonathan
15   Mast.  He then transferred $4,000 of those dollars to Joshua
16   Mast and kept $1,000 for himself because he had already given
17   his brother Joshua a $1,000 loan.  So in effect the entire
18   $5,000 from the Pipe Hitter Foundation went to Joshua Mast.
19          Fact number 13:  In May and June of 2023, the Pipe
20   Hitter Foundation published information about this litigation
21   along with identifying photographs of Baby Doe, at least
22   three of which appear to have come from the Google photo
23   album, the link that was provided by both Joshua and Jonathan
24   Mast to the Pipe Hitter Foundation, and the Pipe Hitter
25   Foundation published this information on its website and

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    related social media accounts with hundreds of thousands of

2    followers.

3          Exhibit A to our prehearing brief and submitted to

4    the Court today are the screen shots from the Pipe Hitter

5    Foundation website.  And as I mentioned, Exhibit L is the

6    Google photo album.

7          If you look at Exhibit A, I can tie the specific

8    photographs to the Google photo album, as well as Exhibit J,

9    which is the email that Jonathan Mast sent to the Pipe Hitter

10   Foundation with additional photographs.

11         For example, on Exhibit A on page 1, there is a

12   photo of Joshua Mast holding Baby Doe, and she's wearing a

13   purple shirt.  You will find that on Exhibit L, the Google

14   photo album, page 1, and you will also find it in Exhibit J

15   at the page that's Bates labeled PHF-39.

16         On page 2 of Exhibit A there is a photo of Stephanie

17   Mast with Baby Doe.  You can find that in Exhibit L, the

18   Google photo album, on page 9.  You can also find that at

19   Exhibit J, the email from Jonathan Mast, at the page Bates

20   labeled PHF-39.

21         Back to Exhibit A, on page 3 there is another

22   photograph of Baby Doe with a white blanket.  You can find

23   that in the Google photo album, Exhibit L, at page 3.

24         Then on page 8 of Exhibit A you will see a photo of

25   Baby Doe in which she's older.  It seems to be a more recent

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    photograph.  She's standing on some exercise equipment.  That

2    appeared on Eddie Gallagher's Instagram account.  Eddie

3    Gallagher is the founder of the Pipe Hitter Foundation.  And

4    you will find that in Exhibit J, the email from Jonathan Mast

5    to the Pipe Hitter Foundation, at the page that's Bates

6    labeled PHF-45.

7           The last fact, fact number 14:  On June 6 of 2023

8    Jonathan Mast solicited donations for the Pipe Hitter

9    Foundation legal defense fund for Joshua Mast for this

10   litigation through an interview on the One America News

11   Network, which itself published identifying photographs of

12   Baby Doe that Jonathan Mast provided to it.

13          The thumb drive that I've submitted to the Court has

14   a recording of that interview, and there are a number of

15   photos there, four photos, that appear of Baby Doe.  At

16   minute 1:01 there is Baby Doe.  She's in a red onesie.  You

17   can find that in Exhibit L, the Google photo album, on page

18   3.

19          At 1:08 and 3:25 of the interview you'll see the

20   same photo of Joshua Mast holding Baby Doe who is wearing a

21   purple shirt.  You'll find than in Exhibit L, the Google

22   photo album, at page 1, and Exhibit J, Jonathan Mast's email,

23   at PHF-39.  Then at 2:43 of the interview you'll see the

24   photo of Baby Doe with the white blanket, and that, again, is

25   on Exhibit L, the Google photo album, at page 3.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1        Jonathan Mast testified at his deposition that he

2   gave the One America News Network those photographs, and he

3   even gave them a link to the Google photo album.

4        So, Your Honor, based on these facts, we believe you

5   have sufficient facts in front of you to establish that a

6   violation of the protective order, several violations of the

7   protective order occurred.

8        We have separately for you -- this is a

9   demonstrative.  It's a timeline of the events that tries to

10  consolidate all of this.  It doesn't repeat what you've seen,

11  but it basically puts it in a timeline format.

12       These facts that I've gone through now here are

13  undisputed, and they establish Joshua Mast's violations of

14  the protective order as well as those of Jonathan Mast as an

15  aider and abettor.  They meet the requirements for a finding

16  of civil contempt.

17       I would add there is likely more evidence that we

18  don't have.  We know that Joshua Mast communicated with Dena

19  Disarro of the Pipe Hitter Foundation using the Signal

20  messaging application, and we know that he set his Signal

21  messages application, the messages with Ms. Disarro, to auto

22  delete.  This is during the middle of this case, of this

23  litigation, that he sets his communications about this

24  litigation to auto delete.

25       So as a result there are likely additional

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    communications between Joshua Mast and Ms. Disarro that we

2    simply don't have.  Ms. Disarro states as much in her

3    declaration.  Nonetheless, the facts that we have already

4    addressed we believe are sufficient for a finding of

5    contempt.

6          I want to briefly touch on the issue of harm.

7    Mr. Elliker will address the questions that you raised, but I

8    want to address it in a different context.

9          THE COURT:  Okay.

10          MS. ECKSTEIN:  Number one, with respect to harm,

11   Joshua Mast argues that the Does have not suffered any harm

12   apparently because they can't point to anyone in Afghanistan

13   who identified them through the Pipe Hitter Foundation's

14   postings.

15          This is the same argument that was made when we were

16   here on our first show cause motion regarding the CBS

17   interviews that were broadcast, and as we noted then, actual

18   harm is not a requirement.  That's from the Desimone case,

19   Roe v. General Motors, and additional cases cited in our

20   brief.

21          Frankly, it would be nonsensical to require actual

22   harm here that would confound the very purpose of the Court's

23   protective order.  The protective order is intended to

24   protect the plaintiffs and innocence nonparties in

25   Afghanistan.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          It should not take an innocent nonparty in

2     Afghanistan actually being harmed to have a protective order

3     violation.  That should not excuse Joshua Mast and Jonathan

4     Mast's conduct here.

5          Not only that, we raised -- we identified several

6     other harms that have resulted from these violations of the

7     protective order that the Joshua Mast prehearing brief does

8     not address at all.  It completely ignores them.

9          Those are the harms by the increased risk to

10    innocent nonparties in Afghanistan, the harm by the delay in

11    court proceedings and expenditure of resources.  As you know,

12    this is our second motion to show cause.  We've expended

13    considerable sums on this motion as well as the last one.

14         We took the deposition of Jonathan Mast for this

15    one.  We subpoenaed documents from Jonathan Mast and the Pipe

16    Hitter Foundation with respect to this show cause motion.  We

17    had motion practice with the Pipe Hitter Foundation.  We

18    would much prefer to be focusing our attention on the heart

19    of this case rather than on these side issues.

20         In addition, there is harm to the judicial system

21    itself requiring this court to spend unnecessary resources

22    dealing with these issues.  So harm is present even if there

23    is not actual harm to the plaintiffs themselves.

24         Now, a defense, of course, to civil contempt when

25    all four elements of contempt are found is if the alleged

———Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024———

1    contemptor took all reasonable steps.  Joshua Mast continues

2    to invoke what I refer to as the head in the sand defense.

3    He says, I didn't ask or direct Jonathan Mast to talk to

4    anybody, including the Pipe Hitter Foundation, on my behalf.

5    I didn't do that.

6              Courts have rejected this defense of willful

7    ignorance, and we've cited several such cases on pages 25 and

8    26 of our prehearing brief.  We think this Court should

9    reject it here as well.

10             Let's remember that willfulness is not a requirement

11   of a finding of civil contempt.  We know that from the

12   Supreme Court's decision in McComb v. Jacksonville in which

13   the Court was very clear stating, "Since the purpose of civil

14   contempt is remedial, it matters not with what intent the

15   defendant did the prohibited act."  The Court went on, "An

16   act does not cease to be in violation of a decree merely

17   because it may have been done innocently."

18             Now, we don't think this was done innocently here.

19   Even if intent was required -- it's not, but even if it was,

20   as we believe exists here, the evidence establishes that

21   Joshua Mast knew exactly what he was doing when he asked

22   Jonathan Mast to speak with the Pipe Hitter Foundation.

23             Joshua Mast asked Jonathan Mast to speak to the Pipe

24   Hitter Foundation on his behalf.  After Joshua Mast asked

25   Jonathan Mast to interface with the Pipe Hitter Foundation,

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    Jonathan signed the grant agreement on Joshua's behalf.  And

2    when the Pipe Hitter Foundation sent funds to Jonathan Mast

3    pursuant to the grant agreement, he gave that money,

4    forwarded that money to Joshua Mast.

5         Not only that, let's not forget that Joshua Mast

6    himself sent the Pipe Hitter Foundation a link to the Google

7    photo album that contains hundreds of photographs with Baby

8    Doe's face clearly showing, clearly identifying her.  And he

9    continued to interact with the Pipe Hitter Foundation long

10   after he supposedly ceded that responsibility to Jonathan

11   Mast and after he knew that Jonathan Mast had partnered with

12   the Pipe Hitter Foundation.

13        So what could Joshua Mast have done differently?

14   There is a lot that he could have done differently.  We

15   identified in our prehearing brief a number of reasonable

16   steps he could have taken.  He did not respond to this, by

17   the way.

18        Well, I should say that he did say in the prehearing

19   brief that he acted in good faith, but what's required by the

20   case law is not just some general notion of good faith.  It's

21   a demonstration by the contemptor of having made in good

22   faith all reasonable efforts to comply, and that's where we

23   think he certainly has failed.  He did not make reasonable

24   efforts to comply.

25        What could he have done?  He could have given the

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    Pipe Hitter Foundation a copy of the protective order.  He

2    talked about the protective order with the Pipe Hitter

3    Foundation.  Just send them a copy.  He didn't do that.

4         He could have not sent the Pipe Hitter Foundation a

5    link to the Google photo album with the identifying

6    photographs of Baby Doe, providing only nonidentifying

7    photographs.  He could have directed his brother Jonathan not

8    to do that as well.

9         He could have directed the Pipe Hitter Foundation

10   itself, do not use any identifying photographs of Baby Doe.

11   And after the Pipe Hitter Foundation published her

12   identifying photographs, he could have directed it to remove

13   them, but he didn't.  Joshua Mast does not dispute he did

14   none of these things.

15        So, Your Honor, we believe the Court has broad

16   discretion here to fashion an appropriate remedy for civil

17   contempt.  I don't think we're asking for a lot.  We're

18   asking for a finding of contempt and an award of attorneys'

19   fees.  An award of fees is appropriate even without a finding

20   of willful disobedience, although I think it certainly exists

21   here.  We ask that the Court find Joshua and Jonathan Mast in

22   contempt.

23        In closing, Your Honor, it should be clear to the

24   Court that Joshua Mast is an individual who does not like to

25   follow court orders and rules.  In the Baby Doe litigation

1    previously before this Court, you ruled that the custody

2    order he had obtained was substantially likely to be invalid

3    because the federal government's foreign policy decision, yet

4    after that order, he continued to pursue Baby Doe's adoption.

5    And his counsel, his other brother Richard Mast, didn't even

6    mention to you the interim adoption order he had in hand when

7    you directly asked about adoption.

8        Again, Joshua Mast moved to stay discovery in this

9    case pending a ruling on his motion to dismiss.  Judge Hoppe

10   denied that motion back in October of 2023, but Joshua Mast

11   nonetheless still did not produce any documents in response

12   to our first request for production, which had been pending

13   since December of 2022, until he was ordered to do so in

14   response to the motion to compel that we filed, and Judge

15   Hoppe ordered that production.  That was on November 28,

16   2023.

17       But even then he still did not comply with that

18   order which required us to file a motion for sanctions.

19   Judge Hoppe heard that motion on May 2nd.  Since then,

20   unfortunately, we've had to file yet another motion regarding

21   his failure to properly respond to requests for admission.

22   That motion is before Judge Hoppe.  Then, of course, we have

23   the protective order violations themselves, the first one

24   with CBS, and now this one with the Pipe Hitter Foundation.

25       Now, maybe because of the experience that he had

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   with respect to the CBS motion to show cause, this time

2   Joshua Mast essentially went into the shadows in search of

3   plausible deniability.  He decided to use his brother

4   Jonathan as a proxy.

5           Each of these decisions by Joshua Mast has required

6   plaintiffs and the Court to spend a considerable amount of

7   time addressing everything except the heart of the case.

8           This motion practice easily could have been avoided

9   had Joshua Mast merely taken a few reasonable steps, but he

10  didn't, so we're here once again taking up the Court's time

11  on something other than the substance of the case itself.

12          Contempt sanctions are designed to coerce a

13  reluctant party to obey a Court's directive.  Respectfully,

14  Your Honor, we need to put an end to this conduct.  We ask

15  that the Court find Joshua Mast and Jonathan Mast in contempt

16  and award plaintiffs their attorneys' fees.

17          Should I turn it over to Mr. Elliker to address --

18          THE COURT:  Yes, please.

19          MR. ELLIKER:  Good morning, Your Honor.  My name is

20  Kevin Elliker.  I'm here on behalf of the plaintiffs.

21          As Ms. Eckstein explained, Your Honor, there is, I

22  think, an important distinction between the questions that

23  Your Honor asked about that you have particular concerns

24  about that I want to make sure I address and the element that

25  has to be satisfied in plaintiffs' view to make a finding of

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   civil contempt.

2        That distinction is, on the one hand, whether there

3   was a valid order at the time of the conduct at issue.

4   That's what -- I'll address that issue first.  The second

5   issue that the Court's questions went to are more about the

6   ongoing need for the protective order going forward.

7        I first want to start by explaining why I think

8   there really should be little debate that the Court's

9   protective order is valid and certainly was valid when

10  entered and was valid at the time of the conduct at issue

11  here.

12       The use of pseudonyms in litigation in the Fourth

13  Circuit is guided by the Fourth Circuit's 1993 decision in

14  James v. Jacobson.  In that case, the Court cited several

15  factors where the Court advised district courts to consider,

16  among them whether the request for pseudonymity is based on

17  avoiding mere annoyance or inconvenience versus preserving

18  privacy in a matter that's a sensitive or highly personal

19  nature.

20       The second factor is whether identification poses a

21  risk of retaliatory physical or mental harm, or even

22  critically to innocent non-parties.  The third factor is the

23  ages of the persons who privacy interests are sought to be

24  protected.  Fourth, whether the action is against the

25  government or private party.  Fifth, whether the risk of

———Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024———

1    unfairness to the opposing party from allowing the action

2    against it, what is the risk of unfairness to the opposing

3    party of allowing that?

4           James is still the law of the Fourth Circuit.  It

5    was cited not three months ago in a published decision, Doe

6    v. Sidar, which is 93 F.4th 241.  It's a February 2024

7    decision citing those five factors and going through and

8    reversing a district court's determination to remove

9    anonymity protections as an abuse of discretion.  Just a few

10   months before that another decision from the Fourth Circuit,

11   Doe v. Doe, 85 F.4th 206.  That's from October of 2023.

12          In that decision the court acknowledges that there

13   is a First Amendment right of public access and openness in

14   judicial proceedings, and yet these factors can be

15   considered, and the Court in its discretion can allow parties

16   to proceed under pseudonyms.

17          I think that the additional components of the

18   protective order here are necessary carryons to allowing the

19   plaintiffs to proceed via pseudonym.  It is cold comfort to

20   allow their names to remain pseudonymous on the caption if

21   there is not additional protections that have to go into

22   protecting that information during the course of discovery

23   and litigation.

24          Most importantly, Your Honor, as you know, you

25   relied on the James case and cited it and made factual

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    findings in the protective order showing that the plaintiffs

2    had established grounds to proceed by pseudonym and for the

3    entry of the protective order, and those are laid out in some

4    detail in the protective order.

5            On all of this, Your Honor, the Masts do not argue

6    that a party can never proceed by pseudonym.  They do not

7    argue that restrictions like the ones in the protective order

8    can never be put in place.  They don't argue that the Court

9    relied on the wrong law or that it's bad law or that it

10   relied on the wrong factors.

11           They don't make any of those arguments because they

12   can't.  Really what their argument is is they disagree with

13   the Court's decision to exercise its discretion in the way

14   that it did and enter the protective order.  That is not an

15   argument as to the legal validity of the order.

16           They've obviously filed a motion to have that

17   protective order modified.  In fact, the very first argument

18   in their prehearing brief, argument one, is that the Court

19   should lift the protective order, which I know does not go

20   towards the question of whether it was a valid order when it

21   was violated.

22           We contest the arguments that they make, and I'll

23   address those in a moment, but I think it just bears emphasis

24   that the point, for purposes of finding contempt, is not

25   whether they think the order should be in place today.  It's

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    whether the order was valid when it was violated last year.

2         Now, the primary argument that they do make as to

3    validity arises under the First Amendment.  They repeatedly

4    refer to the Court's protective order as a gag order.  They

5    cite exactly zero cases, Your Honor, where the granting of

6    pseudonymity protections have been deemed an unconstitutional

7    gag order.

8         The case they rely on in principle is the

9    *Murphy-Brown* case, which our firm knows a fair amount about

10   that case, Your Honor, because we're the party that won --

11   we're the lawyers who won that case for *Murphy-Brown* at the

12   Fourth Circuit on mandamus having that particular order

13   thrown out as a gag order.

14        The circumstances of that case could not be more

15   different.  That was a mid-trial order from the trial judge

16   ordering that the parties could not disclose information that

17   could be prejudicial to the proceedings during the course of

18   trial.  It was a blanket prohibition against all parties.  It

19   was a true gag order.  That was what Judge Wilkinson in the

20   *Murphy-Brown* decision walked through and explained the First

21   Amendment implications for that.

22        The Fourth Circuit in its many, many decisions

23   citing James v. Jacobson doesn't cite any gag order cases.

24   So I think what that indicates is that the First Amendment

25   construct for a gag order like *Murphy-Brown* stands apart from

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    the question of whether a party can proceed via pseudonym.

2         Now, most importantly, Your Honor, their selective

3    quotation of the protective order where they say it's a gag

4    order makes it seem like the Court said you can't talk about

5    anything having to do with the case, right?  That you can't

6    come out and raise money; you can't give an interview to news

7    networks.  That's not what the protective order says.

8         What the protective order says is that they're

9    prohibited from disclosing identifying information.  There is

10   an important word, "unless."  It doesn't prohibit the

11   disclosure of identifying information.  It prohibits that

12   disclosure unless the person who receives the information

13   also executes a nondisclosure agreement that's subject to the

14   contempt power of this court.  So it's not a true gag order,

15   as they say.

16        Again, I think, Your Honor, that their argument

17   betrays that they really actually don't argue that it's

18   unconstitutional because they disagree with it only as to the

19   plaintiffs.  They actually don't raise an issue as to

20   maintaining the confidentiality as to the child.

21        So they don't seriously contest that there are

22   interests identified by the Court here that would support the

23   entry of a protective order.  It means that their argument is

24   not based on legal principles, legal validity.  It's about

25   the factual underpinning, and they simply disagree.

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1            Now, on that particular point, Your Honor -- so I'll

2    stop there and say that I think everything I have just said

3    is sufficient to show the first element that has to be proven

4    to find Joshua and Jonathan Mast in civil contempt.  There

5    was a valid order.  It was valid when it was entered, and it

6    was valid in 2023.

7            Even if -- not if.  We know that they disagree with

8    the entry of the order.  We know that they filed a motion

9    with the court to modify the order.  We know that they want

10    it lifted.  We understand all of that stuff.

11            None of that, though, gives license to go ahead and

12    act as though it isn't in place or to engage in a form of

13    self-help to essentially tee up -- I'm not suggesting that

14    this was a long plan, but to wait until this boomerangs back,

15    and now we're going to take down a protective order on a

16    First Amendment argument or to say that the facts as they

17    stand now show that it shouldn't exist; therefore, we'll

18    retroactively forgive a violation in the past.  I think none

19    of that passes muster.

20            In terms of the protective order as it stands today,

21    Your Honor, I think that what I can say is the Masts have

22    made much of discreet pieces of information that they say in

23    small ways show that someone or some people or some

24    individuals might have the ability to identify the plaintiffs

25    in this litigation.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          I don't think that that is sufficient to show that
2    the protective order should not be in place because there is
3    a difference between individuals being able to put together
4    pieces of information on their own through their own
5    ingenuity, whether it's media outlets or investigators or
6    whoever it may be, to on their own go and try to find the
7    pieces of information.  It's another thing to open up the
8    court's docket to allow that information to be spilled out
9    into the public where it's inevitable that anyone could grab
10   that information and take it with them.

11         I also think it's important that innocent parties
12   still remain in Afghanistan.  Of course, as has been written
13   about I think in the papers, Your Honor, the plaintiffs have
14   been granted asylum.  That reenforces, I think, the view that
15   they have a well-founded fear of what would happen to them if
16   they went back to Afghanistan.

17         It stands to reason, Your Honor, that if they are
18   then publicly identified in the court's docket making it easy
19   to identify their family members back in Afghanistan, that
20   risk propounds onto them, onto the family members there.
21   Certainly, I think among all protective order cases this one
22   stands apart in terms of the kind of harm we're talking about
23   here with innocent folks who are back in Afghanistan.

24         Ms. Eckstein discussed the harms.  I think Your
25   Honor asked about the disclosure of the child's likeness

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   given her aging and whether she looks today like she did when

2   folks who may be able to identify her and associate her with

3   a particular family or relatives.

4           I would say that I think it would be difficult to --

5   first of all, I would say the plaintiffs don't object

6   themselves to maintaining confidentiality as to the child.

7   Whether they would say that we only want that as to her name,

8   and we would be fine with having photographs put out there

9   with her, I think it's unclear how we would decide whether

10  someone's likeness starts to make them look like someone from

11  a family somewhere else in the world.

12          Certainly, I know just the other day I was showing

13  Mr. Powell a photograph of my daughter, and he said, "Gosh,

14  that looks just like your wife." So I think to lift the

15  protective order as to the likeness of the child based on the

16  supposition that she doesn't look now like she did then

17  overlooks that she could still be identified by folks back in

18  Afghanistan and create that risk to innocent parties.

19          Your Honor, I think that addresses the questions

20  that the Court identified. Thank you. I appreciate your

21  time.

22          THE COURT: Okay. Mr. Moran.

23          MS. ECKSTEIN: Real quick, two housekeeping things.

24          THE COURT: Yes.

25          MS. ECKSTEIN: I just wanted to make sure the Court

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   was aware that Jonathan Mast is here with his counsel.

2           THE COURT:  Okay.

3           MS. ECKSTEIN:  I wanted to make sure the Court was

4   aware.  Then, separately, I do have the PowerPoints in

5   binders if you would like a copy, if I could submit them to

6   the Court.

7           THE COURT:  All right.

8           MR. MORAN:  Thank you, Your Honor.  John Moran for

9   defendants Joshua and Stephanie Mast.

10          As Ms. Eckstein said, Mr. Jonathan Mast and his

11  counsel are here.  We do not represent him.  If the Court

12  wishes to hear from them, we certainly have no objection.

13          With the Court's indulgence, I'd like to address

14  three things.  First, the actual sanctions motion that's here

15  before us today; number two, the question that the Court has

16  raised about the ongoing need for the protective order; then

17  third, to briefly address some of the related points that

18  Mr. Elliker raised about the protective order.

19          First, we think the most -- we've set forth our

20  arguments in the briefing, including the prehearing brief.

21  We think the simplest way for the Court to resolve this case

22  is to hold the plaintiffs have not met their burden of

23  showing by clear and convincing evidence either that there

24  was a knowing violation of the protective order or that the

25  movants have suffered harm as a result.  That is their burden

1   under Ashcraft and Fourth Circuit precedent.

2        In particular, on the showing of harm, that goes

3   very closely to the questions that the Court has raised about

4   the ongoing need for the protective order.  Now, I agree with

5   Mr. Elliker that there are two separate questions of whether

6   there is a need for the protective order on an ongoing basis

7   and whether the protective order was valid when it was issued

8   and at the time of the conduct that's the issue of this

9   hearing.

10       We've set forth our arguments as to why we don't

11  think the order is valid, but, again, our argument here is

12  not self-help, as Mr. Elliker insinuated.  The point here was

13  not that Joshua Mast believed that he was free to ignore the

14  protective order because he didn't like it or because he had

15  challenged it.  In fact, clearly the record shows that he

16  changed his conduct in order to ensure that he was complying

17  with the protective order, at least as he understood it, and

18  we know --

19       THE COURT:  Well, he changed it to reach the same

20  result.  I mean, he changed just that someone else did what

21  he was trying to achieve.

22       MR. MORAN:  Well, again, Your Honor, we think the

23  record is clear that what he was trying to achieve was to

24  receive financial help to support him in defending this

25  litigation.

1        THE COURT:  I know, but he was trying not to -- for

2   him not to violate the protective order, rather he was having

3   someone else do it for him.

4        MR. MORAN:  Well, again, Your Honor, the record

5   shows he knew that his family, his brother included, were

6   supportive of him and his family, and they wanted them to get

7   this help as well.

8        THE COURT:  Well, the question is was it aiding and

9   abetting by Jonathan of Joshua and vice versa.

10        MR. MORAN:  Understood, Your Honor.  We believe that

11   both their testimony and the declaration on which the

12   plaintiffs rely are clear that Joshua initially spoke to the

13   Pipe Hitters Foundation.  Again, I'm --

14        THE COURT:  I don't know if you do any criminal law,

15   but have you ever been in a conspiracy case in a criminal

16   case?

17        MR. MORAN:  Yes, your Honor, I'm very familiar with

18   it.

19        THE COURT:  I mean, if you were to raise this kind

20   of motion at the close of the government's evidence and say

21   there was not evidence of a conspiracy, I think you'd be

22   laughed out of court.

23        MR. MORAN:  Well, again, Your Honor, I think the

24   question would be what is the common goal of the conspiracy?

25   What plaintiffs want to insinuate is that the goal of the

1    conspiracy was to circumvent the protective order by getting

2    pictures of our client's child out into public view.  I would

3    respectfully submit that if that was the goal, then this was

4    a very round about way to do it.

5          THE COURT:  Well, I can't imagine people with a law

6    degree thinking they can do something like this.  I mean, it

7    is clumsy and it's just to me -- I just can't believe that

8    somebody would think this was okay.

9          MR. MORAN:  I understand that, Your Honor.  Again,

10   we've laid out why we believe that Joshua Mast acted in good

11   faith and, again, if you'd like to hear from him, we would

12   call him.

13         I suppose I can move on to the second piece of that

14   which is that plaintiffs also have the burden of establishing

15   that they were harmed by the disclosure.

16         THE COURT:  Right.

17         MR. MORAN:  Still to this day, even after the Court

18   raised those questions and a year after we filed our motion

19   to lift the protective order on the grounds that we didn't

20   think it had a factual basis, they still have not come

21   forward with any evidence to show that there is actual harm

22   or a heightened risk of harm to them or to their family from

23   these disclosures.

24         If that were all the matter, then we believe that

25   would be enough to defeat the motion, but the facts of this

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    case are sort of extraordinary in that resolve, which is that

2    we know, and there is no dispute, that plaintiffs, through

3    their counsel, have given on-the-record statements to

4    reporters.  The Associated Press is here in the courtroom.

5    They've run stories than included on-the-record statements

6    from plaintiffs and their counsel.  We know that members of

7    the media have traveled to Afghanistan and spoken with

8    members of their family about the underlying facts of this

9    case and reported on them publicly.

10          So it's difficult for us to accept the

11   representation of the plaintiffs, which is unsupported by any

12   evidence, to merely accept their representation that our

13   client by allowing photographs of their daughter to be posted

14   online, which is something every parent has to make decisions

15   about and deal with, but that by allowing that to happen,

16   that they are putting plaintiffs and their family at danger

17   and risk of identification when there are American reporters

18   and other reporters running around Afghanistan interviewing

19   their family members about the underlying facts of this case.

20          So, again, we think that goes both to the question

21   of whether the protective order should continue forward on an

22   ongoing basis, but it also goes to the question of whether or

23   not they've met their burden of proving by clear and

24   convincing evidence that they were harmed by the conduct that

25   is the subject of the sanctions motion.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          THE COURT:  Well, isn't the main -- I mean, they're

2    not prohibited from discussing the case.  They just are told

3    they cannot identify --

4          MR. MORAN:  Well, Your Honor, the plaintiffs are

5    under no restrictions.  If they --

6          THE COURT:  Okay.  But what is the harm to the

7    defendants in not being able to identify the plaintiffs?

8          MR. MORAN:  So, Your Honor, I think I need to

9    separate that into plaintiffs Jane Doe and John Doe, who are

10    the adult plaintiffs, and then Baby Doe who is our client's

11    child whom they've purported to represent and named as a

12    plaintiff in this case and make subject of the protective

13    order.

14          That child lives with our clients.  She has for over

15    two and a half years.  They have her meet family and friends.

16    People can -- anyone who knows them and knows that they're

17    associated with this lawsuit because their names are included

18    on the docket can see her today and say, Oh, that must be the

19    child that's associated with this lawsuit.  So there is a

20    need, I think, to separate the identification of, again, John

21    and Jane Doe, the adult plaintiffs in this case on the one

22    hand, and Baby Doe, the minor child, on the other hand.

23          Our clients' position is that the federal rules

24    already provide for the use of initials in the case of a

25    minor child, that that would be more than adequate

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    pseudonymity for purposes of this case, but if the Court said

2    that Baby Doe were a preferable moniker for the child in the

3    conduct of litigation, then we would understand that.

4          The question about identifying -- so that issue is

5    separated from the harm to plaintiffs because the mere fact

6    that somebody identifies the minor child, knows that she

7    lives with our clients, that she's their daughter, that

8    doesn't give rise directly to any risk in Afghanistan for

9    members of their family.

10          As to their identities, again, there is no

11    insinuation here that their discussions with the Pipe Hitter

12    Foundation included identifying information about who John

13    Doe and Jane Doe really are, what their names are, their

14    address, their identity, any of that information.  Our

15    clients have been fastidious about avoiding --

16          THE COURT:  But you're complaining about the

17    protective order not allowing you to name the plaintiffs.

18    You're not prohibited from discussing the case as long as you

19    don't name them.  That's what I was asking.  Why is that such

20    a terrible burden on the defendants?

21          MR. MORAN:  Understood, Your Honor.  The principal

22    burden of that is in fact development for the case.  For

23    example, when we are endeavoring to contact potential

24    witnesses, either in the United States or in Afghanistan, we

25    are limited by the fact of not being able to say, you know,

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   here is the person that we're talking about, unless -- again,

2   Mr. Elliker raised this.  We have two choices.  We either try

3   to talk around it and find a way to figure out if somebody

4   knows anything without telling them who we're even asking

5   about, or we could go to plaintiffs' counsel and say --

6           THE COURT:  Is that a genuine problem or a

7   theoretical problem?

8           MR. MORAN:  No, Your Honor, it has been a genuine

9   problem.  I mean, our clients have had difficulty contacting

10  potential witnesses based on their understanding that they

11  are unable to tell those potential witnesses who it is that

12  they're interested in asking about.

13          Again, I think what Mr. Elliker did is important to

14  come back to.  So he said that the case law under James is

15  very lenient, or perhaps, you know, more lenient on the use

16  of pseudonyms on the docket sheet and in the public filings

17  and the litigation so that if somebody looks up the docket,

18  it says John Doe and Jane Doe and Baby Doe.

19          If that were all we were talking about, we would

20  still have the objections that we raised, but I don't think

21  we would be as concerned about the scope of the protective

22  order.

23          The problem, and what they say, is that these other

24  restrictions are essentially necessary corollaries.  That,

25  well, gee, what good is it to have pseudonyms if you don't

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    have an order that prohibits the parties from naming the
2    person that's subject to the pseudonyms.  I understand the
3    logic of that, but that's not what James and the related
4    cases say.
5        It precisely is a gag order.  That's the piece of
6    the order that we -- that's the reason that we've used that
7    terminology.  It's one thing to say that they will be listed
8    as John Doe and Jane Doe and Baby Doe on the docket sheet and
9    in the public filings.  It's another thing to say that Joshua
10   and Stephanie Mast are prohibited from identifying them to
11   any third party.
12       I think as this episode illustrates, it's
13   particularly challenging when it relates to their minor child
14   and how they navigate.  You know, the last time we were here
15   on the first motion, I believe, if I recall correctly, both
16   plaintiffs and the Court suggested, well, of course we don't
17   think that they would violate the protective order by taking
18   their daughter to the grocery store and having somebody see
19   her and identify her with them.
20       But under the logic of their rule, which is that by
21   any means necessary we need to make sure that nobody can
22   trace a line between a flesh and blood person and the
23   pseudonyms on the docket, there is no logical reason why that
24   and other similar day-to-day activities wouldn't constitute a
25   violation of the protective order as written.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          So, again, our clients have done their best to do

2   what they understand to be their obligations under the

3   protective order, but it's been very challenging under the

4   circumstances.

5          Again, we think for purposes of the motion that's

6   before the Court today, the key questions are, have the

7   plaintiffs proved by clear and convincing evidence that there

8   was a knowingly violation, and have they proved by clear and

9   convincing evidence that their clients were harmed?

10         On that last prong in particular, I think it's hard

11  to show clear and convincing evidence when there simply is no

12  evidence.  There is the representation of the counsel.  First

13  of all, they acknowledge that there is no actual harm as a

14  result of the disclosure, but they cite cases saying that

15  actual harm is not required.

16         Then they cited three things that they think meets

17  that test.  First, the increased risk to non-parties.  Again,

18  all we have is their say so.  They've not at any point

19  initially when they obtained the ex parte protective order

20  through last year when we filed a motion to lift the

21  protective order or even here today after the Court raised

22  its questions, they have not provided any evidence to

23  substantiate the risk to third parties.

24         THE COURT:  Just practically speaking, isn't anyone

25  who came to the United States from Afghanistan during this

1  period of time who stays here any period of time and goes

2  back under some risk, additional risk?  I don't mean just

3  might have an accident, but isn't there a real risk?

4          MR. MORAN:  Well, Your Honor, that could be.  I'd be

5  reticent to say that the Court can take judicial notice of

6  that risk.  I think, you know, if plaintiffs wanted to

7  rely --

8          THE COURT:  Well, maybe the Court can't take

9  judicial notice that it's an actual risk, but certainly

10 what's published in the news and anyone that reads the

11 newspapers and things think it's very dangerous.

12         You saw people fleeing from Afghanistan.  It wasn't

13 all because they wanted to come on a sightseeing trip to the

14 United States.  They were actually -- you could draw the

15 conclusion that these people were frightened to death because

16 of their association with the United States.

17         MR. MORAN:  Your Honor, I understand that as a

18 matter of human intuition based on current events, but what I

19 would point out is that if that were the case, then I would

20 not expect for plaintiffs to have their counsel making

21 on-the-record statements to the press about this litigation.

22         I would not expect for them to have members of the

23 media traveling around Afghanistan speaking with family

24 members and potential witnesses and then, you know, not

25 seeking to prevent those efforts as well or explaining why

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1   those developments, which are the result of their own actions

2   of communicating with the media, talking about the case,

3   trying to generate public interest, getting the media

4   involved to investigate their allegations on the one hand is

5   safe and doesn't create any risk of harm to them or their

6   family even if they return, but on the other hand, our client

7   sharing a link to a Google drive that happens to have some

8   younger photos of their daughter, that's, you know, a crisis

9   that calls out for remedy because it puts their family at

10  risk.

11          THE COURT:  Well, there may be two separate things,

12  but you do not agree that there is any risk when a person

13  comes to the United States, such as they did, brings the

14  child, and went back without the child?

15          MR. MORAN:  Again, Your Honor, I don't contest that

16  it could be a risk, but I think in order to justify a

17  restriction on our client's ability to speak out about the

18  case, which has a presumptive First Amendment right

19  protection, that they would need to come forward with actual

20  evidence to substantiate that.  Maybe that would be in the

21  form of expert testimony, maybe it would be in the form of a

22  declaration from --

23          THE COURT:  All right.  I understand your position.

24          MR. MORAN:  With that, Your Honor, again, we've set

25  forth our position in the briefing.  We've offered to put on

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    Joshua Mast and/or -- you know, again, Jonathan Mast is here.

2    He's not our client to represent.

3         Unless the Court has anything --

4         THE COURT:  Okay.  I was just -- you said that your

5    client was having trouble finding witnesses.  Can you tell us

6    any idea of how many witnesses there were?  Have you tried

7    to --

8         MR. MORAN:  I could confer briefly with my client.

9    I'm aware of one particular incident where it's created an

10   issue, but I could confer briefly if the Court --

11        THE COURT:  Okay.  Well, I mean, you could have

12   asked the magistrate judge in this case to allow you to

13   change that aspect of the order, couldn't you?  I mean, did

14   you do that?

15        MR. MORAN:  Well, we filed a motion to amend the

16   protective order about a year ago, and it has not been

17   resolved, Your Honor.  But we did not specifically go to

18   Judge Hoppe and say, We have one particular witness.  Can you

19   give us relief from the protective order.  I mean, perhaps we

20   would in the future if that would be the way to go.

21        THE COURT:  Okay.  Thank you.  Did Jonathan's

22   counsel wish to address the Court?

23        MR HARDING:  Good afternoon, Your Honor.  I'll be

24   brief.  My name is Elliott Harding.  I'm here on behalf of

25   Jonathan Mast.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          I recognize that neither party, nor does the Court,

2     have a prehearing brief from us on this issue, so I'm not

3     going to try to argue outside of some general things that I

4     think have already been addressed.

5          We're not here to argue on behalf of Joshua Mast,

6     but we believe that any liability to Jonathan, to my client,

7     would naturally have to flow from Joshua being held to be in

8     contempt, so they do somehow collapse into each other.

9          Ultimately, we don't believe that Joshua Mast is

10    Jonathan's -- they're brothers, but as the axiom is, you're

11    not your brother's keeper.  I think that Joshua Mast is not

12    responsible for Jonathan Mast being an interested person in

13    seeing litigation advanced in a noble and well-funded way,

14    and that's what we have here.

15         The standard would be actual notice that my client

16    could somehow fall within the scope of this Court's

17    protective order.  Now, he did testify that he had read the

18    order through his own due diligence of finding such order,

19    and he shouldn't be punished because as a layman he actually

20    took affirmative steps to try to be compliant with something

21    so that he didn't get his brother in trouble.

22         I say that because there is no evidence that this

23    Court or that the plaintiffs' counsel sent an order to my

24    client after the protective order was issued as some type of

25    a preemptive warning after it was issued to say everybody in

——Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024——

1   Joshua Mast's immediate family better take note that they

2   can't talk or show pictures of their niece in this case.

3          There is no evidence that Jonathan sent this Google

4   link to my client after having had a Signal conversation with

5   Pipe Hitter.  This is an active Google link that I believe

6   the family just shares generally, and it preexisted any type

7   of conversation with Pipe Hitter.

8          So that's one thing is what is the impetus of these

9   pictures even existing or being in my client's possession,

10  and that's just based on family.  It's not based on the idea

11  of going out and courting media.

12         There is no evidence that Joshua Mast had any

13  knowledge as to any network that Pipe Hitter could

14  potentially bring into the ambit of media coverage.  So there

15  is no evidence that Jonathan, I mean, that Joshua knew that

16  my client would have any conversations with One America News

17  Network or any network.  It could have been any network.

18  Joshua had no communication --

19         THE COURT:  Wasn't there evidence that Joshua told

20  Pipe Hitter that he couldn't do it, but his brother might be

21  a good -- would be a good source to talk to?

22         MR. HARDING:  That is literally the only link.

23         THE COURT:  I mean, does there have to be another

24  link?

25         MR. HARDING:  It could have been the neighbor.  It

Cynthia L. Bragg, Official Court Reporter

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   could have been a church member.  Just because there are

2   other people out there in the world that have a vested

3   interest in Joshua's case, does not make them agents.  He

4   knows what he can and cannot do, and he acted accordingly,

5   Joshua did.  He did not --

6          THE COURT:  Well, it was pretty clear in the

7   protective order that Joshua couldn't act himself or through

8   agents and representatives.

9          MR. HARDING:  Correct, but in the conversation with

10  Pipe Hitter -- again, just going off what the plaintiffs have

11  referenced.  I don't have his whole transcript.  I wasn't a

12  party to that deposition.

13         I don't believe that there is any reference to the

14  idea that, oh, you can go talk to my brother, and he'll

15  provide pictures, or he'll breach pseudonymity, but I can't

16  do that.  All he said was, effectively, I'm not allowed to

17  talk about it.  There are other people out there that might

18  talk about it.  That was the end of any direction.  That is

19  literally that there is someone else in the world that might

20  be interested.

21         I think that's notable because he didn't send my

22  client their contact information for Pipe Hitter and say go

23  call this woman, she wants to talk to you.  That's not what

24  happened.  He didn't affirmatively --

25         THE COURT:  Joshua told her to call his brother,

Cynthia L. Bragg, Official Court Reporter

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   right?

2          MR. HARDING:  He said that he might be someone that

3   she could talk to, but there is a big difference -- we're

4   talking about agency relationship, and that's really what is

5   at issue here.

6          There is a big difference between telling someone

7   that there is a third party in the world that might be vested

8   in seeing our case go well and might talk to you versus him

9   affirmatively telling my client and directing him to go do it

10  and say, I can't to it, but can you go do it for me?  I know

11  that sounds like a distinction without a difference, but --

12         THE COURT:  I mean, it sounds like something you

13  would hear in moot court in junior high school, frankly.  I

14  mean, it doesn't sound like a serious legal argument.

15         MR. HARDING:  Well, what I think is a serious legal

16  argument is the First Amendment and due process components to

17  my client being held in contempt.  He was not represented --

18         THE COURT:  Well, I think that's your issue too, but

19  that's not what you're arguing.

20         MR. HARDING:  Well, I was just going to the factual

21  aspect.  The Court has rightfully noted the one caveat in the

22  entire 14 points that the plaintiffs point to is that my

23  client's name came up in one conversation with Pipe Hitter

24  saying he might be somebody you could talk to.

25         They mentioned Signal conversations being deleted or

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    something like that.  What we don't know is whether or not --

2    no one directed my client what to do with those photos, yet

3    there is evidence in Joshua Mast's brief and in the

4    depositions referencing that he asked them to blur out the

5    photos, and the only photos that he thought were being

6    referenced were things that were already in the public

7    domain.

8         So at the end of the day, it's really not any -- if

9    a neighbor across the street were to be interested in this

10   case and take a picture of the Mast children playing in their

11   front yard, knowing the plight that they feel like they're

12   going through, and be sympathetic and say, These are people

13   I've known my whole life.  Here is their family.  No blurring

14   the photos, just goes out there and does it, puts pictures of

15   this young person up online, does a Go Fund Me and raises,

16   $10-, $20-, $30,000 and puts their name all over it, no one

17   would say that that person would fall within the purview of

18   this court's protective order.

19        All we have here, the only way we get there is the

20   idea that when he spoke to Pipe Hitter -- not knowing what

21   Pipe Hitter would necessarily end up doing, mind you -- he

22   said, I can't talk to you.  You might want to talk to my

23   brother.  That's it.  He didn't say, My brother will go on

24   the news and show you the exact pictures you're asking for or

25   anything like that.  He didn't tell my client to do that.  If

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    anything, I think he would have told him not to do that.

2         The reason I say that is because in my client's

3    deposition when he talks about if he had any conversations

4    with Joshua or his wife about Pipe Hitter, he said he didn't

5    because he was trying to a keep a distance.  Not because he

6    was trying to keep plausible deniability, but because he

7    doesn't believe he falls within the purview of this Court's

8    protective order, and I think he's right.

9         He wasn't on actual notice.  He was not listed by

10   name.  The plaintiffs could have asked for that.  Talking

11   about maintaining a protective order, they could ask to

12   expand a protective order.  I don't think that would be

13   appropriate, but they're not asking for that today.

14        They could have asked to include all the brothers or

15   the parents or the cousins.  Anyone in the family can't post

16   pictures anywhere of their own family member or to talk about

17   what is an issue of public importance, international

18   important, and very personal importance to my client.  He

19   wasn't served with anything about the protective order.  He

20   didn't have counsel at the protective order hearing.

21        Mind you, I think it's notable that Pipe Hitter

22   isn't here today.  The plaintiffs intentionally reference in

23   their brief that they dropped them as a party because after

24   review they considered them an innocent pawn in the matter.

25   Yet they had legal counsel, they were informed about a

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    protective order.  My client didn't and wasn't as far as

2    being legally notified.

3         When a lawyer is told that there is a protective

4    order involved, you would think there is some due diligence

5    necessary before they start putting up pictures and calling

6    people to speak.  Yet if they're an innocent pawn in that

7    matter, I don't see how my client isn't as well.  They're the

8    impetus of any network connections, any media --

9         THE COURT:  They didn't desist after they knew about

10   the protective order.

11        MR. HARDING:  They knew about the protective order

12   before they even contacted my client.

13        THE COURT:  Right, but when they knew the actual

14   terms of the order, they didn't desist.

15        MR. HARDING:  Right, but they didn't take any

16   affirmative -- the plaintiffs noted all the --

17        THE COURT:  You may be right, they may be guilty.

18   But like you say, they're not here.  That's not a defense to

19   somebody else, that somebody else is equally guilty.

20        MR. HARDING:  Well, I think it just goes to the

21   weight of the plaintiffs' argument because it's not that the

22   Court has dropped them in the matter, it's that they

23   effectively concede that they're an innocent party.

24        I'm just saying to the weight of the argument that

25   my client is somehow a guilty party, I'm arguing that he's

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    just as innocent, if not more so, because he was not legally
2    represented at the time.  He was not the one that's handling
3    PR and putting people on networks.  In fact, he told them to
4    blur certain things in order to take good faith efforts to
5    make sure there was no backlash.
6            I say all of this because we've got some serious
7    concerns about his speech being limited and him not being on
8    any actual notice, which is the standard for an agent or an
9    aider and abettor in this type of situation.
10           He could read it all day as a layman, but that's not
11   the type of notice we're talking about from a due process
12   standard.  He was not actively represented.  He was dealing
13   with -- everybody else in this conversation was actively
14   represented, including Pipe Hitter.
15           He's acting under a good faith assumption that his
16   own layman reading of the order he's allowed to act.  He's
17   not named in it.  It doesn't mention him by reference, such
18   as immediate family.  He takes affirmative steps to blur any
19   photos.  The photos that were provided had already been in
20   the public domain.  And he was talking to a represented
21   entity that assists in these types of matters thinking
22   that --
23           Now, granted, there is no evidence as to whether or
24   not he knew that they did or did not have the protective
25   order, and to the Court's point, once Pipe Hitter got the

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    actual physical protective order, they took affirmative steps

2    to remove these things from online presence.

3            But, again, if that makes them an innocent actor, I

4    think my client is just as innocent because of his steps to

5    blur these things out, avoid any type of contact with his

6    brother, and, honestly, he might have said things that his

7    brother didn't like or wouldn't have wanted him to say in the

8    first place.

9            There is no definition of the scope of the agency

10   that they're trying to proffer to this court.  There is no

11   conversation saying go on to Pipe Hitter and do this, I'm not

12   allowed to do it.  That's not what we have.  What we have is

13   you might get contacted by these people.

14           Jonathan could have easily said no.  Jonathan could

15   have gone out and done this previously.  He could have done

16   it on his own accord, which he effectively did.  He could

17   have gone to secondary or third parties that did the same

18   thing Pipe Hitter does.  He could have done his own Go Fund

19   Me account and raised it on his own without having to use a

20   charitable intermediary for press purposes.

21           I don't think -- I think the plaintiffs would still

22   be making the same argument, though.  That's what I'm trying

23   to say.  I don't think the evidentiary hook that they're

24   trying to have this Court rely on exists.  We have Pipe

25   Hitter learning my client's name, and my client being

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    forewarned that he might hear from this entity.  That's the

2    extent.

3         Now, the idea that money exchanged hands is

4    irrelevant.  My client could have pocketed it all, and he

5    would have had a breach of contract or a fraud claim between

6    him and Pipe Hitter, but he could have personally went $5,000

7    prior to talking to Pipe Hitter and just used this as a way

8    to get his money back.  They're not saying he's aiding and

9    abetting in breach of the protective order because he's

10   loaning many to his brother.  The money is not what's at

11   issue here.

12        My client is the one who signed the document knowing

13   that it was just between him and Pipe Hitter.  He didn't go

14   out and have his brother review the terms before he signed

15   it.  There is just so much more evidence.  They're saying

16   there are things that Joshua --

17        THE COURT:  Didn't they send the agreement to his

18   brother, and the brother sent it back and said, Well, I can't

19   sign it, you sign it?

20        MR. HARDING:  He had already said he can't be a part

21   of it, meaning -- his name was referenced in it, but he

22   didn't say these terms, you know, edit this, amend this, make

23   sure you do that.  We don't have that.

24        I think it matters significantly, again harping on

25   two primary issues, First Amendment, just because he's his

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   brother doesn't mean he has to keep his mouth closed.  If
2   that's what the plaintiffs wanted, they should have asked for
3   that.  I don't know how that would have stood up with this
4   Court's review, but I'm just saying that they should have
5   asked for it, and maybe they can ask for it tomorrow.  But he
6   wasn't a part of it.

7           Then it goes to due process.  To hold him in
8   contempt for something that he had no legitimate actual
9   notice of -- granted, he did read it himself, but that's not
10  a court directive, that's not legally represented, and it's
11  not like a cease and desist or a forewarning type of letter
12  from opposing counsel to put you on notice and say go hire
13  counsel so they --

14          THE COURT:  So all he did was aid and abet his
15  brother in getting around the protective order; is that
16  correct?

17          MR. HARDING:  That's what they're arguing, but
18  that's not his position.  He wasn't trying to --

19          THE COURT:  I know it's not his position, but what
20  are the facts other than that?

21          MR. HARDING:  He wants to aid with his brother
22  having strong litigation, but violating the protective order
23  is not what he sought to do.  That's why we have blurred
24  images.  That's why we have pseudonymity being maintained.  I
25  think the blurred images is a huge recognition that my client

Cynthia L. Bragg, Official Court Reporter

1  is not looking to aid and abet Joshua doing anything other

2  than litigating the case generally and having a good outcome.

3         THE COURT:  Okay.

4         MR. HARDING:  We also don't have evidence that he

5  spoke to Joshua's attorneys about this going beforehand.

6  There is nothing to say they told him he could do it.  There

7  is just a huge lack here.  We do --

8         THE COURT:  Well, what about the fact that telephone

9  records were erased after a few days?

10        MR. HARDING:  The Signal app, I think it's wrong to

11 view an app that has automatic deletion as some type of

12 spoilage argument that weighs against an evidentiary finding.

13 I find that to be disingenuous.

14        THE COURT:  Would that not be a spoliation problem

15 in any other case?

16        MR. HARDING:  Not -- I mean, my client is not the

17 one who had that issue, so I can't speak to it.  I just find

18 it to be --

19        THE COURT:  Well, I mean, you're rendering an

20 opinion.

21        MR. HARDING:  If the Court is just asking for an

22 opinion about the use of Signal, there are plenty of

23 innocuous reasons that people want to have their messages on

24 automatic deletion.

25        THE COURT:  I know, but when you're in litigation

1  and you deliberately are using something that erases your

2  communications, isn't that a problem?

3          MR. HARDING:  Well, we don't --

4          THE COURT:  Okay.

5          MR. HARDING:  As someone who actively uses that

6  application, along with others that automatically delete, and

7  the Court is digressing into just pure opinion on the matter.

8  We don't have evidence of how many other conversations he was

9  having that were also being deleted.  All of his

10 conversations were likely being deleted within five days, or

11 however long he set the timer to.

12         We also don't know if he's the one that set the

13 automatic delete, right?  It could have been the other party.

14 That's how those apps work.  That's why I think it's wrong to

15 read too much into that because there is so much dynamics

16 into that type of thing.

17         I think it's a stretch to say that Joshua Mast was

18 somehow facilitating my client to aid and abet him purely

19 because some messages went away.

20         THE COURT:  Okay.  Well, I got into this because you

21 said there was no evidence of them talking, and that was, you

22 know, some reason where there may not be that evidence.  But

23 I understand your position.

24         MR. HARDING:  Ultimately, we just think it would be

25 an unfounded and arguably unconstitutional sanction for my

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   client to be brought within the scope of this.  We don't

2   believe Joshua Mast is his brother's keeper in this matter.

3        With that, we would ask for, obviously, my client

4   not to be held in violation of an order that he was not named

5   in or served with.  Thank you.

6        THE COURT:  Okay.  Thank you.  Go ahead.

7        MS. ECKSTEIN:  Thank you, your Honor.  Mr. Elliker

8   is going to address specifically the protective order issues,

9   but I want to address items stated by both Mr. Moran and

10  Mr. Harding.

11       With respect to Mr. Moran, he's again emphasizing

12  this lack of actual harm.  The case law is very clear.

13  Actual harm is not required, and he does not address the

14  other harms that we raised in our brief, including harm to

15  the Court itself, harm with respect to the expenditure of

16  time, resources, money, by the parties and the Court in terms

17  of time, of course.

18       We've heard this before, this argument that it

19  should be okay for his clients to post photographs of Baby

20  Doe.  I get it.  We're not saying otherwise.  What they can't

21  do is tie that to this litigation.  If they hadn't given

22  photographs that identified Baby Doe to the Pipe Hitter

23  Foundation but given ones of her from her back, for example,

24  or from some other way so that she can't be identified, we

25  would not be here today.  As well as with respect to the One

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    America News Network.  If they hadn't provided those

2    photographs to the Pipe Hitter Foundation or the One America

3    News Network, we would not be here today.

4           The protective order, as you know, I've heard from

5    Mr. Harding that his brother didn't think the protective

6    order applied to him, that Jonathan Mast didn't think that.

7    It does refer to representatives and agents.  Of course, they

8    are also prohibited, and in this case Jonathan Mast was

9    acting as Joshua Mast's representative.

10          Also, he did testify, Jonathan Mast did testify that

11   he was aware of the protective order, and he was aware of

12   protective order before he even got into contact with the

13   Pipe Hitter Foundation.  That's in his deposition.  It's

14   cited in the PowerPoint that I provided to the Court, so the

15   citations are there.

16          Mr. Harding said there was just one conversation --

17   yeah, just this one conversation about Joshua saying, Well,

18   Jonathan can do those, can talk to the Pipe Hitter Foundation

19   as opposed to me.

20          There are several instances in Ms. Disarro's

21   declaration in which she specifically references a couple of

22   different conversations in which Joshua Mast told her, I

23   can't be in a public-facing capacity, but my brother can.  I

24   can't sign the grant agreement, but my brother can.  And

25   those are paragraphs 62, 63, 69, and 75 of her declaration.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          I may have misunderstood Mr. Harding.  I heard him

2    say that he wasn't present at a deposition.  The only

3    deposition we've taken thus far of Jonathan Mast, he was

4    there.  I may have misunderstood what he said, but I just

5    wanted to make that clear.

6          Mr. Harding also made some comments about, well, the

7    Pipe Hitter Foundation knew about the protective order before

8    Jonathan Mast.  I want to be clear about a couple of things.

9          As I said, Jonathan Mast testified that he knew

10   about the protective order even before he contacted the Pipe

11   Hitter Foundation.  Ms. Disarro said she did not -- that the

12   Pipe Hitter Foundation did not have a copy of the protective

13   order until we reached out to them with a cease and desist

14   letter.  The cease and desist letter that we sent to the Pipe

15   Hitter Foundation, we sent one to Jonathan Mast, I believe on

16   the same day.

17         Also, Mr. Harding said that Jonathan Mast acted in

18   good faith in some way.  He even told the Pipe Hitter

19   Foundation to blur out some photographs.  I'd like to point

20   Your Honor to Exhibit I of our prehearing brief.  That's also

21   been submitted to the Court in the binder.  Exhibit I, this

22   is a text from Jonathan Mast to Dena Cruden.  Dena Cruden, by

23   the way, is the same person as Dena Disarro.  She got

24   married, so it's Dena Cruden-Disarro.

25         It's dated Wednesday, June 14th.  We sent the cease

1    and desist letter to Jonathan Mast the day before, and he

2    specifically says in this text message to Ms. Cruden, this is

3    after the Pipe Hitter Foundation has already posted the

4    identifying photographs in connection with this litigation,

5    and he says, "I got a cease and desist letter from the

6    opposition's law firm specifying that he had not blurred that

7    out," meaning that Eddie Gallagher had not blurred out some

8    of Baby Doe's face, "and that they might claim that I am

9    breaking the protective order."

10          "Seeing as how that photo" -- the specific photo

11   he's referring to is the one, I believe, where it's Baby Doe

12   standing on the exercise equipment.  Jonathan says, "Seeing

13   as how that photo came from me and wasn't one of the ones

14   that aired on CBS, thus already in the public domain, I think

15   it would behoove us to take a precaution to blur it out like

16   the one on Pipe Hitter's Instagram account.  I hope that

17   makes sense."

18          All he asked to be blurred out where photographs

19   that he thought were already in the public domain, even

20   though he also knew that we had filed a motion to show cause

21   as to the photographs that were displayed on the CBS

22   broadcast.  So this wasn't innocent.  He knew exactly what he

23   was doing as well.

24          Again, with respect to the protective order, in his

25   deposition he testified that he saw it, he read it, he

1    understood it.

2        Then finally to your questions, just real briefly,

3    about the Signal messaging app.  My understanding is that

4    those settings can be changed for every single message

5    stream.  So Joshua Mast could have changed those settings,

6    but he didn't in the middle of this litigation when he is

7    texting about this litigation.

8        Not only that, but Ms. Disarro avers in her

9    declaration, she says in her declaration that she can see on

10   her app that it is Joshua Mast who has the auto delete

11   settings on, auto delete within one week.  So it's not

12   someone else that had the auto delete settings on, it is

13   Joshua Mast who had those auto delete settings on.  So there

14   is likely a trove of correspondence back and forth that we

15   have not seen and we don't have access to anymore.

16       I'll turn it over to my colleague at this point

17   unless you have any questions.

18       THE COURT:  No questions.  Go ahead.  Well, just a

19   minute.  Speak to the point they raised that your clients

20   were making these public statements and revelations before

21   they were or at the same time.

22       MS. ECKSTEIN:  So my clients did speak with certain

23   news outlets, specifically the Associated Press and the New

24   York Times, but only on the condition, which the reporters

25   honored, that they not be identified.  Our clients were not

1    identified in any of the news articles that were published.

2         I heard something about how we should have somehow

3    controlled the media, prevented them from going to

4    Afghanistan.  I'm sure the Associated Press would laugh at

5    that, frankly.  We can't control them.  John Doe and Jane Doe

6    can't control what the press does.

7         They on their own, the Associated Press, decided to

8    go to Afghanistan and did its own investigation, and it got

9    that information on its own, not from our clients.

10        THE COURT:  Well, the information that got out there

11   once they started their interviews with people, did that put

12   the information out into the public so that this protective

13   order was no longer effective?

14        MS. ECKSTEIN:  So our clients did not know about

15   what the Associated Press was doing until it was reported.

16   So they had no idea.

17        To the extent -- we don't know what it is the

18   Associated Press told whomever they spoke with in

19   Afghanistan.  We don't know -- we don't know if they used

20   names.  We don't know what they did.

21        So that fear still exists.  I think, as you started,

22   the idea of them going back, our clients going back to

23   Afghanistan without the little girl, is deathly worrying to

24   them.

25        THE COURT:  Well, they couldn't go back now once

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   they've asked for asylum.  I mean, that's out of the

2   question.

3         MS. ECKSTEIN:  Absolutely.  Remember, one of the

4   reasons they asked for asylum is because of this fear,

5   because they can't go back without her.  Then there is the

6   risk to the innocent civilians who remain in Afghanistan, the

7   family members and the like.

8         You know, I don't know what the Taliban knows.  They

9   don't know what the Taliban knows.  All we know is that the

10  Associated Press did some investigation and reported on that

11  investigation.  We do not know what they said to whom, what

12  they revealed to whom, any of that information.

13        THE COURT:  Okay.  Thank you.

14        MS. ECKSTEIN:  Thank you.

15        THE COURT:  All right.

16        MR. ELLIKER:  Thank you, your Honor.  I'll be very

17  brief I think, just on a few of the legal questions or the

18  arguments that my friend Mr. Moran raised.

19        First is in terms of the mechanics of the protective

20  order, some discussion about how this affects the plaintiffs'

21  ability to conduct discovery.  I take Mr. Moran at his word,

22  the representation that it has had some effect, at least as

23  to one particular witness, although, you know, I don't know

24  that it necessarily is a blanket restriction on the ability

25  to conduct discovery, but that's not an argument that has

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    been raised by the Masts insofar as the issues put before the

2    Court on the motion to modify the protective order or their

3    response, their prehearing response.

4           They want the protective order lifted, right?  The

5    relief they request in their motion filed last January is to

6    deny the plaintiffs leave to proceed under pseudonyms, remove

7    restrictions on the use of their real names, maintain privacy

8    for the baby, and then allow filings from the circuit court

9    having -- there's, you know, a connection to the way that

10   sealing works in the circuit court to this one.

11          So the issue is, I suppose, an interesting one as to

12   the mechanics of it, and maybe there is a way that that could

13   be a discussion as to a more, you know, a slight tailoring

14   for a particular issue in discovery, but that's not the issue

15   that's been put before the Court through the motion that the

16   plaintiffs -- sorry, that the Masts have filed.

17          I'll also note, Your Honor, that the language that's

18   in the protective order about how to handle the use of the

19   pseudonyms and the protection of the identity of the

20   plaintiffs during the course of discovery is verbatim from

21   James v. Jacobson.  So it's not as though that was invented

22   out of whole cloth and plucked out.

23          Again, I think we're all on the same page that the

24   idea of the protective order going forward is a distinct

25   issue as to the contempt issue, but insofar as the Court is

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    considering how to handle the protective order going forward,

2    I think that if there is some kind of discovery-related

3    issue, maybe that's something that could be addressed in

4    particular, but it's certainly not something that's been teed

5    up by the plaintiffs -- excuse me, by the Masts' motion on

6    this.

7         I think as your discussion with Ms. Eckstein just

8    pointed out, particularly as it relates to the asylum, the

9    risk of harm I think is indisputable, right?  I mean, that is

10   certainly I think something the Court could recognize is a

11   finding of the United States government with respect to the

12   granting of asylum.

13        I don't think we have to talk about judicial notice.

14   I think we can talk about common sense with regard to the

15   connection of that risk of harm as to innocent parties would

16   remain in Afghanistan.  I don't think that we need to have to

17   have additional proof of specific risk of harm to particular

18   people who remain in Afghanistan.

19        Sorry, Your Honor.  Ms. Eckstein stole some of my

20   points.  Unless Your Honor has any additional questions, I

21   think that's all.

22        THE COURT:  All right.  Thank you.

23        Thank you-all.  I appreciate your presentations and

24   briefing.  I'll rule promptly on this, I promise you.

25        I would say in the meantime I caution the defendants

—Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—

1  and Jonathan Mast to abide by the terms of the protective

2  order until such time as the Court rules on the defendants'

3  motion to vacate or modify the protective order.

4       All right.  Thank you-all.  We'll recess court.

5       (The proceedings concluded at 2:39 p.m.)

6

7                    CERTIFICATION

8

9    I certify that the foregoing is a correct transcript

10 from the record of proceedings in the above-entitled matter.

11

12

13       _____/s/_____

14                 Cynthia L. Bragg

15                 June 6, 2024

16

17

18

19

20

21

22

23

24

25