**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| **BABY DOE, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | |
| ) | **Case No. 3:22-cv-49-NKM-JCH** |
| ) | |
| **JOSHUA MAST, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**JONATHAN MAST'S POST-HEARING BRIEF IN OPPOSITION TO THE**
**PLAINTIFFS' MOTION TO SHOW CAUSE AND SANCTIONS**

NOW COMES, the non-party respondent, Mr. JONATHAN MAST, by and through counsel, and provides his post-hearing brief in opposition to the Plaintiffs' Motion to Show Cause requesting for this Court to hold him in civil contempt of this Court's Protective Order (ECF No. 26). In furtherance of Mr. Mast's opposition to the Plaintiffs' motion, he states the following:

**Argument**

A party moving for civil contempt must show four elements by clear and convincing evidence: (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's 'favor'; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (cleaned up). For the following reasons, the Plaintiffs have failed to establish these elements by clear and convincing evidence.

I.      **The Protective Order Is Not A Valid Decree Because The Court Lacks Subject Matter Jurisdiction.**

This Court lacks subject-matter jurisdiction over the underlying case. The Amended Complaint asserts two grounds for original jurisdiction: diversity jurisdiction under 28 U.S.C. § 1332, and federal question jurisdiction under 28 U.S.C. § 1331 (combined with supplemental jurisdiction under 28 U.S.C. § 1367). Amended Complaint, ¶¶ 18-19. Neither statute applies to this case.

A.      **This Court lacks diversity jurisdiction due to the lack of complete diversity**

This Court lacks diversity jurisdiction for three main reasons. First, noncitizens are both plaintiffs and defendants in this case, thereby defeating diversity. "[T]he presence of aliens on two sides of a case destroys diversity just like the presence of two citizens of the same state." *Univ. Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2d Cir. 2002) (quotation marks omitted). More specifically, this Court lacks jurisdiction "over a case with alien Plaintiffs and a permanent resident alien Defendant because complete diversity is destroyed." *Jiuna Wang v. NYZ Mgmt. Servs., LLC*, No. 3:19-cv-00642-FDW-DSC, 2020 U.S. Dist. LEXIS 98349, at *9 (W.D.N.C. June 2, 2020). Here, Plaintiffs John and Jane Doe allege they are citizens of Afghanistan. Amended Complaint, ¶ 12. Defendant Ahmad Osmani is alleged to be "an Afghan national permanently residing in Tennessee." *Id*. ¶ 16. A lawful permanent resident "is an alien for the purposes of diversity jurisdiction." *Tagger v. Strauss Grp., Ltd.*, 951 F.3d 124, 126 (2d Cir. 2020) (per curiam); *see also Hung Cavalieri v. Avior Airlines C.A.*, 25 F.4th 843, 849 (11th Cir. 2022 ("[A] foreign citizen admitted to the United States for permanent residence is not a citizen of a State, but rather a citizen or subject of a foreign state." (quotation marks and alterations omitted)). The presence of non-citizens on both sides of the case destroys complete diversity under § 1332 and requires dismissal, therefore the protective order and the motion to show cause should be

dismissed and any order holding that Jonathan Mast is in contempt of such order would be void *ab initio*.

Second, Plaintiffs have named U.S. Secretary of State Antony Blinken and U.S. Secretary of Defense Lloyd Austin, "in their official capacities," as "nominal defendants." Amended Complaint, ¶ 17. A suit against a federal official in their official capacity is treated as a suit against the United States. *Partovi v. Matuszewski*, No. 09-5334, 2010 U.S. App. LEXIS 18451, at *2 (D.C. Cir. Sept. 2, 2010) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). And "the presence of the United States as a party destroys diversity jurisdiction, because the United States is not a citizen of any State under 28 U.S.C. § 1332." *Bautista Cayman Asset Co. v. Asociacion de Miembros de la Policia de Puerto Rico*, 17 F.4th 167 (1st Cir. 2021); *Koppers Co. v. Garling & Langlois*, 594 F.2d 1094, 1097 n.1 (6th Cir. 1979) (holding that the United States is a "party who may not be sued in diversity"); *see also E. Indem. Co. v. J.D. Conti Elec. Co.*, 573 F. Supp. 1036, 1039 (E.D. Va. 1983) ("The United States is not a citizen of any state for jurisdictional purposes."). The "nominal defendant" exception is inapplicable here. "[A] federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980). The U.S. Court of Appeals for the Fourth Circuit has held a party qualifies as "nominal" for jurisdictional purposes if it "ha[s] no immediately apparent stake in the litigation . . . In other words, the key inquiry is whether the suit can be resolved without affecting the non-consenting nominal defendant in any reasonably foreseeable way." *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 260 (4th Cir. 2013); *accord Williams v. Branch Banking & Trust Co.*, No. 3:16-cv-843-JAG, 2017 U.S. Dist. LEXIS 173435, at *3 (E.D. Va. Feb. 6, 2017).

A nominal party must lack a "palpable interest in the outcome of a case." *Hartford Fire Ins. Co.*, 736 F.3d at 259-60. This determination requires "a practical inquiry, focused on the particular facts and circumstances of a case." *Id*. Here, the Federal Defendants filed an Answer expressly declaring the United States has "underlying interests relating to the status of Baby Doe." *Doe*, 2023 U.S. Dist. LEXIS 119767, at *3 n.3. Moreover, the United States has gone so far as to file a "21-page Statement of Interest" in the matters at issue in this case. Amended Complaint, ¶ 153. As Plaintiffs explain: Consistent with the positions taken by the United States before this Court in response to the Masts' TRO Petition, the SOI explicitly confirms the position of the United States that Baby Doe was not a "stateless minor" but was instead an Afghan citizen subject to the jurisdiction of Afghanistan; that the Government of Afghanistan never waived jurisdiction over her but, in fact, affirmatively asserted jurisdiction over Baby Doe; and that, in the exercise of its exclusive authority over foreign affairs, the United States transferred physical custody of Baby Doe to the Government of Afghanistan so that she could be reunified with her family, as identified by the Afghan government. The United States further took the position in the SOI that a state court cannot usurp or contradict the decisions made by the United States with regard to foreign affairs. *Id.*

In the course of resolving a discovery dispute, the Magistrate Judge stated that, because the Amended Complaint "assert[s] no claims against, and see[s] no relief from[] Federal Defendants," they "are 'nominal' parties to this action." *Doe v. Mast*, No. 3:22-cv-49, 2023 U.S. Dist. LEXIS 119767, at *4 (W.D. Va. July 12, 2023) (quotation marks omitted) (citing *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir. 2002)). The Magistrate Judge was neither purporting to determine whether Secretary Blinken and Secretary Lloyd qualify as mere "nominal defendants" for diversity purposes, nor applied the Fourth Circuit's *Hartford Fire Ins. Co.*

standard. Since the United States has asserted a strong interest in the subject matter of this case, including the status of Baby Doe, the enforcement of its determinations, and the protection of its sovereign foreign affairs authority, it has sufficient "stake" in this case to be taken into account as a real party-in-interest for diversity purposes. *Hartford Fire Ins. Co.*, 736 F.3d at 260; cf. Doe, 2023 U.S. Dist. LEXIS 118767, at *10 ("Federal Defendants readily concede they are 'parties' to this lawsuit for other purposes, including their ability to view case filings accessible only to court users and the parties. Allowing them to pick and choose which situations they have 'party status,' and which they do not, will unnecessarily complicate this litigation with little added benefit." (citation omitted)).

Finally, although Plaintiffs allege Baby Doe is an Afghan citizen, *see* Amended Complaint, ¶ 11, in the event this Court determines she has become a U.S. citizen based on events following her adoption by the Masts, complete diversity would be eliminated. "[D]iversity must be 'complete' to satisfy th[e] Congressional grant. This means that no plaintiff may share a citizenship with any defendant." *Navy Fed. Credit Union v. Ltd. Fin. Servs.*, LP, 972 F.3d 344, 352-53 (4th Cir. 2020) (quoting *Strawbridge v. Curtiss*, 7 U.S. 267 (1806)). Baby Doe has lived with the Defendant Masts for nearly the past three years, *id*. ¶¶ 9, 11. If she is a U.S. citizen, then this case would involve citizens of the same state on both sides, thereby defeating complete diversity. Any and all of these reasons are sufficient to hold that this Court lacks the subject-matter jurisdiction under § 1332.

### B.   This Court Lacks Federal-Question Jurisdiction

Recognizing the lack of complete diversity, the Amended Complaint also makes a desultory attempt at asserting federal-question jurisdiction under 28 U.S.C. § 1331. Amended Complaint, ¶ 19. The complaint involves five counts, all of which arise under state law. Plaintiffs

nevertheless contend their "right to relief as to Count I and their request for declaratory relief necessarily depend on resolution of substantial questions of federal law." *Id*.

The Supreme Court has recognized a "'slim category' of cases . . . in which state law supplies the cause of action but federal courts have jurisdiction under § 1331, because 'the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019) (citing *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1 (1983)); *see also Empire HealthChoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006) (calling it a "special and small category" of cases). The Fourth Circuit has emphasized "state-law claims only rarely give rise to § 1331 jurisdiction." *Burrell*, 918 F.3d at 380. Under this doctrine, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258; *accord Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005). This case fails on most of these prongs.

First, though this case involves strong federal interests, it does not involve material issues of substantive federal law. The main issues appear to be whether the Virginia court had jurisdiction over Baby Doe, whether the Defendants fraudulently obtained guardianship and adoption orders from the Virginia courts, and whether Virginia law or Afghan law governs decisions concerning Baby Doe's guardianship. *See* Amended Complaint at 44-45, Prayer for Relief a.(ii)-(ix), ¶¶ 18-19. Indeed, even the declaratory judgments Plaintiffs seek do not involve questions of constitutional or statutory interpretation in need of resolution, but rather the unremarkable general

assertion that, under the Supremacy Clause, official acts taken pursuant to federal constitutional or statutory authority preempt contrary state laws and acts. *See* Amended Complaint at 44-45, Prayer for Relief a.(i), (x)-(xii); *cf. Rhode Island v. Shell Oil Prods.*, Co., L.L.C., 35 F.4th 44, 57 (1st Cir. 2022) ("[S]peaking about federal law or federal concerns in the most generalized way is not enough for Grable purposes."). "[E]ven if the complaint[] raise[s] federal policy issues that are national and international in scope, implicate foreign affairs and negotiations with other nations, and require uniform standards, they do not 'raise a substantial question of federal law for the purpose of determining whether there is jurisdiction under § 1331." *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 748 (9th Cir. 2022); *see also Shell Oil Prods.*, 35 F.4th at 56-57 (holding a state-law claim does not necessarily constitute a federal question simply because it implicates federal interests such as "national security, and foreign affairs").

Second, "it is not enough that the federal issue be significant to the particular parties in the immediate suit." *Gunn*, 568 U.S. at 260. "'[F]act-bound and situation-specific' effects are not sufficient to establish federal arising under jurisdiction." *Id*. at 263 (quoting *Empire*, 547 U.S. at 701). The disputes in this case arise from a unique constellation of unusual facts that are extremely unlikely to recur, including the identity of Baby Doe's parents as Al Qaeda fighters (including at least one suicide bomber), their deaths during a firefight with U.S. troops in Afghanistan, Baby Doe's serious medical issues, the harried U.S. withdrawal from Afghanistan and subsequent seizure of control by the Taliban, and the Masts' litigation in Virginia state court.

Finally, federal-question jurisdiction under *Grable* is inappropriate because states have a "special responsibility" over adoption, guardianship, and other child custody matters. *See Sosna v. Iowa*, 419 U.S. 393, 404 (1975) (noting "domestic relations . . . has long been regarded as a virtually exclusive province of the States"). Treating Plaintiffs' claims as raising federal-question

issues would "disrupt the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. In *Gunn*, the Court held states' "special responsibility for maintaining standards among members of the licensed professions" was sufficiently "special" to preclude invocation of the *Grable* doctrine. 568 U.S. at 264 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978)). States' responsibility for family-related matters such as parental rights, adoption, guardianship, and child custody is even more important and central to their constitutional role in our federal structure. *See Moore v. Sims*, 442 U.S. 415, 435 (1979) ("Family relations are a traditional area of state concern."). Thus, this Court should not exercise federal-question jurisdiction over one or more of Plaintiffs' state law claims under the narrow *Grable* doctrine.

In the absence of any statutory subject-matter jurisdiction for the underlying case, this Court should deny the motion for show cause against Jonathan Mast.

## II.    Jonathan Mast Did Not Violate The Protective Order.

The Protective Order (ECF No. 26) contains a series of limitations on the conduct of the Defendants. Based on the conduct alleged to have violated such order, (ECF No. 403, at pp. 3–5) the only provisions of such Order that are at issue are those within Paragraph 1 and 4.

1.    The Defendants and their counsel and representatives are prohibited from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction. This applies to any disclosure in the course of any investigation undertaken by the Defendants, their counsel, or their other agents or representatives.

…

4.    Defendants shall disclose to Plaintiffs' counsel any person to whom Defendants,   their counsel or representatives, have disclosed Plaintiffs' identities, and shall provide Plaintiffs with copies of the executed non-disclosure agreements required by this Order.

*Id*. at p.2, ¶¶ 1, 4.

The Plaintiffs do not, and cannot, claim that Jonathan Mast violated the Order as it relates to name pseudonymity for John Doe, Jane Doe, or Baby Doe. They also do not claim the violation concerned the revelation of the locations of the Plaintiffs' residences abroad or places of birth. Instead, the Plaintiffs argue that Jonathan Mast's provision of photographs of Baby Doe to the Pipe Hitter Foundation constitutes identification of Baby Doe and the provision of photographs was not subject to a nondisclosure agreement in accord with the Order.

### A. There Is No Evidence That Joshua Mast Violated The Order And Therefore Jonathan Mast Cannot Be Found To Have Aided or Abetted A Violation.

All parties agree that Joshua Mast interacted with PHF as early as January 7, 2023, when he "provided an emailed summary of the matter" to PHF, along with "related documents." ECF No. 257-2 (Disarro Decl.) at ¶ 24; PHF 00001- 00253; *see also* ECF No. 239-1 (Declaration of Joshua Mast ("J Mast Decl.") at ¶ 4 ("In approximately late January or early February 2023, a military member introduced me to the Pipe Hitter Foundation . . . ."). Joshua Mast "inquired about a grant" to address "significant expenses" resulting from "this lawsuit and others . . . bought by [] John and Jane Doe." J Mast Decl. at ¶ 5-6. Nevertheless, the Plaintiffs have drawn an unsupported, and materially-incorrect conclusion as it relates to Joshua Mast's intent or culpability concerning reluctance to engage with PHF.

### 1. Joshua Mast Remains Capable of Addressing The Media Insofar As This Court's Protective Order Is Concerned.

In their pre-hearing brief and oral argument, the Plaintiffs suggest that Joshua Mast was concerned about *this* Court's Protective Order when he told PHF about the so-called "gag order" in March 2023. *See* Pltfs' Pre-Hearing Brief, ECF No. 402 at pp. 5,6 (citing ECF No. 257-2 (Disarro Decl.) at ¶ 55 ("I was told about a 'gag order' by Joshua Mast during a telephone call that

occurred, to the best of my recollection, sometime in March 2023"); *see also* J Mast Decl. at ¶ 6 ("When I inquired about a grant, I . . . explained to the [PHF] that due to the Court's gag order and its restrictions on identifying [Baby Doe] in this suit, we were essentially unable to defend ourselves" in public); ¶ 9 ("Stephanie and I knew about this Court's gag order")).

This Court's Protective Order *does not* bar Joshua Mast from addressing the media about this case or the state adoption proceedings. To consider this Court's Protective Order a true "gag order" is a misnomer. Meanwhile, and very importantly, there is an actual "gag order" which that was issued by the Fluvanna County Circuit Court that prohibits the Masts from addressing the media as it relates to the adoption proceedings underlying this suit. *See* <u>Fluvanna County Circuit Court Order</u>, at p.4 ("It is further ORDERED that the Parties and their counsel shall refrain from making any statements to the news media about this matter until it has been resolved."), Exhibit A (attached). It is this state-issued court order that prohibits Joshua Mast from serving as a "public face" for a media-related campaign to raise funds for litigation, hence Joshua stating that he could not serve in a such a role and subsequently suggesting PHF speak to Jonathan should either party be interested in advancing the fundraising efforts. It was due to this state-issued court order, not this Court's Protective Order, that Joshua Mast told Disarro that "neither he nor Stephanie Mast would be permitted to speak publicly about the case or Baby Doe." ECF No. 257-2 (Disarro Decl.) at ¶¶ 55-56. The Plaintiffs argue that "Joshua Mast's concerns about" this Court's Protective Order "arose again in his conversations with Disarro in April 2023, when he texted her "that the 'gag order' would prohibit both him and Stephanie Mast from serving in a public-facing capacity in support of the public awareness and legal defense fundraising campaign." ECF No. 402 at p.6. The Plaintiffs then argue that "as a result" of this Court's Protective Order, "Joshua Mast then stated

sometime in either late March 2023 or early April 2023, through Signal text, that he believed his brother, Jonathan Mast, could serve in a public-facing capacity to talk about the Mast case." *Id*.

The idea that Joshua Mast intended to foster a violation of this Court's Protective Order is simply not the case, as he is allowed to discuss the case with the media insofar as this Court is concerned. Nothing in this Court's Protective Order suggests that Joshua cannot speak with the media about the case. The limited evidence proffered by the Plaintiffs does not suggest an intent to violate this Court's Protective Order, as it does not relate to this Court's Order at all.

### 2. Joshua Mast Took No Action To Order, Enable, Foster, or Authorize The Dissemination of Photographs By Jonathan Mast.

As the Does recognize, it was Jonathan Mast—not Joshua—that provided the Pipe Hitter Foundation with photographs of Baby Doe. *See* Plaintiffs' Pre-Hearing Brief at 21 ("Jonathan Mast [] sent PHF additional identifying photos of Baby Doe that he deemed 'appropriate for the website and fundraising.'"). Joshua told PHF that he could not serve as a figure to discuss the case and that he told PHF that his brother, Jonathan may be interested. He then told Jonathan about PHF contacting him, which, without more, does not violate the Protective Order. *See* Jon. Mast Dep. at 50:4–7 ("[M]y brother Joshua had . . . called me and said that I might get a call from someone named Dena Cruden and that was about it."). That was the extent of Joshua's involvement in the connection between PHF and Jonathan's relationship and those conversations are so lacking in any culpability, control, or direction that it renders the Plaintiffs' argument meritless.

Jonathan Mast repeatedly stated that he acted on his own accord and was not directed or asked to provide photos of Baby Doe to PHF by Joshua Mast. *See* Jon. Mast Dep. at 170:12–24 (Jonathan Mast's testimony that he was "acting entirely on [his] own in sharing photos with the Pipe Hitter Foundation"). Jonathan testified that he did not speak with Joshua or Stephanie Mast about his communications with the Pipe Hitter Foundation because he was trying to avoid creating

an agency relationship that could result in Joshua violating the Protective Order. *See, e.g.*, Jon. Mast Dep. at 199:8–17 ("Q. . . . Why would you not have kept your brother and sister-in-law up to speed on your efforts to tell their story? A. . . . [T]here has been a lot of negative media attention directed towards me and my family and I was trying to keep it all with just me in case something went south and that way I could be the only one that bears repercussions for it."). The Does' allegations that Joshua Mast sought to circumvent this Court's Protective Order by using Jonathan Mast to communicate with the Pipe Hitter Foundation are unsupported, as all the evidence suggests Jonathan Mast was acting on his own initiative and Joshua had no knowledge Jonathan was communicating with the Pipe Hitter Foundation or what Jonathan would ultimately say or do.

### 3. Joshua Mast Was Substantially Compliant and Acted In Good Faith In His Actions and Therefore Cannot Be Held In Contempt, Which Bars Jonathan From Being Held In Contempt As Well.

Numerous courts, including the Fourth Circuit, have held that "a good faith attempt to comply," as well as "substantial compliance," are defenses to a civil contempt order." *See, e.g., Consol. Coal Co. v. United Mineworkers of Am. Local 1702*, 683 F.2d 827, 832 (4th Cir.1982), *Dunkin' Donuts, Inc. v. Three Rivers Entm't And Travel*, 42 F. App'x 573, 575 (4th Cir. 2002): *Superior Performers, Inc. v. Meaike*, 2014 U.S. Dist. LEXIS 102827, 2014 WL 3734758, at \*3 (M.D.N.C July 29, 2014); *Chesapeake Bank v. Berger*, 2014 U.S. Dist. LEXIS 153996, 2014 WL 5500872, at \*3 (E.D. Va. Oct. 30, 2014), *appeal dismissed*, 629 F. App'x 501 (4th Cir. 2015).

Not only would the Protective Order have permitted Joshua Mast to speak to the media, it would have allowed him to share photographs of Baby Doe, particularly those that were blurred in a manner which prohibited any revelation of Baby Doe's face. Joshua was not only substantially compliant with the Order, in that he avoided speaking with the media altogether, but he provided the representative counsel for the PHF with notice that a protective order existed in the case and

then relieved himself of any additional contact with PHF after suggesting they pursue alternative sources for comment.

By relieving himself of the contact with PHF and putting them on notice that a protective order existed, he did all that was necessary to abdicate responsibility for anything that took place between PHF, Jonathan Mast, or subsequent individuals. The Plaintiffs argue that Joshua should have actually had *more* contact, or delivered *more* direction to PHF and Jonathan as it related to what was said or done between the two. At the risk of Joshua advancing an even stronger claim of representation or agency, the Plaintiffs' suggestion strains credulity. All evidence suggests that Joshua was substantially compliant with the Order and acted in good faith by telling PHF about the Order, telling them he would not serve in a public facing role, and removing himself from further communication. As a result, he was not only "substantially compliant" but acted in good faith and therefore cannot be held in contempt for negligently fostering communication between two different third-parties which, *arguendo*, resulted in the dissemination of photographs. Because the defenses of substantial compliance and good faith must apply to Joshua Mast, he cannot be held in contempt and therefore Jonathan Mast cannot be deemed to have aided or abetted contempt.

###    B.    The Photographs Do Not "Identify" Baby Doe And Therefore Their Publication Does Not Violate The Order.

Baby Doe has not had her identity revealed, by definition, to anyone who already knows who she is. Absent pre-existing knowledge or context, anyone who sees a picture of Baby Doe could not know her identity by the revelation of a photograph. Unless someone is personally familiar with the Mast family or by virtue of the Does' media blitz publicly naming the Masts, the photographs at issue contained no means of identifying Baby Doe as the Mast's adoptive daughter. The Masts have five children and only one daughter. It would be impossible to "reveal" Baby Doe's identity or who she is to anyone who is not already aware of the case or who she is by virtue

of her living with her parents, the Masts. Because the Masts were not involved in Jonathan Mast's decision to share photos of Baby Doe with the Pipe Hitter Foundation, and because anyone recognizing Baby Doe from those photos could not have learned her identity through those photos, neither the Defendant Masts nor Jonathan Mast violated the Protective Order and they cannot be held in contempt. Additionally, the photograph of Baby Doe on exercise equipment features her hand covering at least the bottom half of her face in a manner such that no identification would be possible. As a result, it cannot be said that the provision of such photograph amounted to identification.

      C.      **Jonathan Mast Is Not A Representative or Agent of Joshua Mast And The Actual Notice Requirement for Aider and Abettor Has Not Been Established.**

The Plaintiffs argue that Jonathan Mast is within this Court's personal jurisdiction and may be subject to sanctions as an aider and abettor of Joshua Mast violating the Protective Order. In support of their argument, they cite a series of cases that are materially distinguished from the facts before this Court and they have failed to establish the requisite elements for personal jurisdiction in this case.

First, this case does not involve the violation of an injunction issued pursuant to Fed. R. Civ. Pr. 65. S*ee Tattoo Art, Inc. v. Tat Int'l, LLC*, No. 2:10CV323,19 WL 3912572, at *3 (E.D. Va. Sept. 7, 2012) (finding Rule 65(d) extends liability to third parties who are in active concert or participation); *JTH Tax, Inc. v. Lee*, 540 F.Supp. 2d 642 (2007) (considering a violation of a final order granting a permanent injunction); *Williams v. Ests. LLC*, No. 1:19-CV-1076, 2023 WL 2974078, at *5 (M.D.N.C. Apr. 17, 2023) (same). Personal jurisdiction can extend to third parties who violate an injunction pursuant to Rule 65(d) if such persons are *in active concert or participation* with anyone described in Rule 65(d)(2)(A) or (B)." Fed. R. Civ. Pr. 65(d)(2) (emphasis added). A protective order such does not constitute an injunction issued

pursuant to Rule 65 and the same degree of personal jurisdiction cannot be said to extend to third parties absent a rule to the contrary.

Additionally, this is not a case where Jonathan Mast was a named defendant who was added to the suit after the issuance of a protective order and thereby a party who would otherwise subject to its provisions. *See, e.g., Capital Source Fin., LLC v. Delco Oil, Inc.*, 520 F. Supp. 2d 684, 688, 697 (D. Md. 2007) (finding that jurisdiction was predicated on *in personam* jurisdiction over DeLuca, Delco, and the other Defendants *added by Plaintiff's amended complaint* [after the issuance of the TRO]." (emphasis added).

The Plaintiffs seemingly conflate the "representative" or agency relationship referenced in the Protective Order with "aiding and abetting liability" and argue that the Protective Order extends to Jonathan Mast generally regardless of his *mens rea.* These theories of liability—agency and aider-and-abettor—maintain separate doctrines and elements with independent facts necessary to establish the requisite degree of concerted action and intent for culpability. For the sake of addressing a representative or "agency" theory of liability, there is no evidence to suggest that Joshua Mast was his principal and that Jonathan was somehow directed or controlled by Joshua as his personal representative to violate this Court's Protective Order. For the sake of aider and abettor liability, there is no evidence that Joshua Mast intended to violate the Order and acted in concert with Jonathan to do so. Even more, there is no evidence that Jonathan intended for Joshua to violate the Order and he took every step he could to distance Joshua from the matter while also mitigating the efforts taken after being asked to cease and desist by the Plaintiffs. Ultimately, neither Jonathan nor Joshua Mast intended to identify the Plaintiffs and such intent would have been necessary to establish aiding and abetting liability.

III.    **Even If Jonathan Mast Engaged In Conduct That Violated The Protective Order and The Court Finds That He Was Acting As An Aider and Abettor or Agent and "Representative," A Finding of Contempt Is Not Warranted.**

A.    **Holding Mr. Mast In Contempt Will Violate His First and Fifth Amendment Rights.**

The Protective Order prohibits the Masts from "disclosing any information that directly or indirectly identifies Plaintiffs or their family members," *see* ECF No. 26 at 2, and is invalid as a violation of the Masts' First Amendment Rights. "[G]ag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions." *In re Murphy Brown, LLC*, 907 F.3d 788, 796–97 (4th Cir. 2018). Gag orders are prior restraints that "bear 'a heavy presumption against [their] constitutional validity.'" *Id.* at 797 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). They are also "presumptively unconstitutional because they are content based." *Id.* Gag orders must therefore survive strict scrutiny, meaning a court must make specific findings that a gag order is the least restrictive means of furthering a compelling state interest. *See id.* at 798–99. The Does have not provided a compelling state interest for why the Masts must comply with the Protective Order or why Jonathan Mast would need to comply with such order. These restrictions are not designed to protect the integrity of the judicial process—the way a gag order might be necessary in extraordinary circumstances to protect against contamination of the jury pool, *Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, 606 F. Supp. 2d 617, 625–26 (E.D. Va. 2008), or to insulate jurors from improper influence once seated, *see, e.g., Cap. Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1306 (Brennan, Circuit Justice, 1983) (describing "the State's interest is in shielding jurors from pressure during the course of the trial, so as to ensure the defendant a fair trial"). And the Does have not even purported to show that they otherwise advance a compelling state interest. Indeed, the Does' motion in support of the Protective Order focuses almost entirely on justifying

the use of pseudonyms rather than the new restrictions included in their proposed order. *See* Plaintiffs' Memorandum in Support of Motion to Proceed Under Pseudonyms and for Entry of a Protective Order (ECF No. 4).

Nor have the Does shown that the Protective Order is the least restrictive means of furthering any compelling state interest there might be. The restrictions are not narrowly tailored at all. On their face, they do not contain any limitations or carve-outs. They could be construed to apply, for instance, to the Masts' ongoing participation in the parallel state court proceedings where the Does filed suit without pseudonyms, and thus where their real names are regularly used by all parties and the Court. Nor have the Does offered any explanation why they should be entitled to provide notice of anyone to whom a party might identify them. Without proving that the Protective Order is narrowly tailored to a compelling state interest, the Does have failed to prove by clear and convincing evidence the validity of the Protective Order. Finally, there is a compelling interest in the rights of parents and family to be able to speak about familial affairs and issues of public interest and national importance. The facts of this case involve war veterans, adoption, litigation with national and international interests, public policy, and family relations. There is a compelling interest in Jonathan Mast being able to have the right as an American citizen to speak about what is taking place with his brother, sister-in-law, and his niece. To quell his right to speak about his family and their ongoing affairs via collateral application of the Protective Order cannot survive strict scrutiny. To hold him in contempt of such Order will violate his First Amendment rights to free expression along with his Fifth Amendment rights to substantive and procedural due process.

**B.      Contempt Is Not A Proper Finding And Sanctions Are Not Warranted.**

Civil contempt is a severe sanction reserved for only the most unreasonable violations of judicial orders. Courts find parties in contempt only in rare circumstances, such as when a party "has not diligently attempted in a reasonable manner to comply" with a court's order. *Chere Amie, Inc. v. Windstar Apparel Corp.*, 175 F. Supp. 2d 562, 565 (S.D.N.Y. 2001); s*ee also, e.g., In re Taggart*, 980 F.3d 1340, 1347 (9th Cir. 2020) ("Civil contempt is a 'severe remedy' and, correspondingly, the Supreme Court has set a significantly high hurdle for when it is imposed." (citing *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019))). As explained above and in Joshua Mast's pre-hearing brief in opposition, the Protective Order is invalid for lack of subject matter jurisdiction and as an unconstitutional violation of the Defendant Masts' First Amendment rights. Additionally, as-applied to Jonathan Mast, it is unconstitutional pursuant to the First Amendment and a finding of contempt for Jonathan would violate his rights to due process. Nevertheless, the Does have failed to establish that any purported violation of the Protective Order warrants the sanction of civil contempt. "To be clear and convincing, evidence must place in the ultimate factfinder an abiding conviction that the truth of [the party's] factual contentions are highly probable." *Cannon v. Peck*, 36 F.4th 547, 566 (4th Cir. 2022).  Contrary to the Plaintiffs' argument at the hearing on May 29, 2024, there is no evidence that Jonathan Mast knew that the photos previously depicted on CBS were subject to scrutiny per the Plaintiffs' First Motion to Show Cause, which has yet to be decided. Even more, once it came to Jonathan Mast's attention that the production of photographs to PHF may prove subject to Court Order, Mr. Mast requested for the image of Baby Doe on a treadmill be taken down and it was.

Finally, *arguendo*, should this Court find that Jonathan Mast acted as a representative agent of Joshua Mast rather than an aider and abettor, the liability for such contempt would flow solely to the principal, Joshua Mast, rather than on the agent in an independent capacity. Therefore,

Jonathan Mast could not be held in contempt and an award of sanctions as applied to Jonathan Mast would be improper.


## Conclusion

Because the Does have failed to clearly and convincingly establish that the Protective Order is valid and that Joshua or Jonathan Mast knowingly violated that Order, an order holding Jonathan Mast in civil contempt is not warranted.

WHEREFORE, Mr. JONATHAN MAST, does hereby respectfully request for this honorable Court to DENY the Plaintiffs' Motion for Show Cause and sanctions,

Respectfully submitted,

_____/s_____
Elliott M. Harding, Esq.
VSB No. 90442
*Counsel for Mr. Jonathan Mast*
Harding Counsel, PLLC
2805 Meadow Vista Dr.
Charlottesville, VA 22901
P: 434-962-8465
E: Elliott@HardingCounsel.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Brief in Opposition to the Plaintiffs' Motion for Show Cause was filed this 7th day of June, 2024 to the Court and notice of such filing is provided to all counsel of record via the Court's ECF notification system.

Respectfully submitted,

_____/s_____
Elliott M. Harding, Esq.
VSB No. 90442
*Counsel for Mr. Jonathan Mast*
Harding Counsel, PLLC
2805 Meadow Vista Dr.
Charlottesville, VA 22901
P: 434-962-8465
E: Elliott@HardingCounsel.com