IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

BABY DOE, *et al.*,

    Plaintiffs,

-v.-

JOSHUA MAST, *et al.*,

    Defendants,

CIVIL NO: 3:22-cv-00049-NKM-JCH

**DEFENDANT RICHARD MAST'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF TO PROVIDE THE COURT WITH NEW EVIDENCE AND ARGUMENT TO SUPPORT MOTION TO VACATE PROTECTIVE ORDER AND/OR MOTION TO MODIFY PROTECTIVE ORDER**

    Defendant Richard Mast hereby moves the Court alternatively, either (1) pursuant to Local Rule 11(c)(3), to grant leave for Defendant Richard Mast to file a supplemental brief providing the Court with new evidence and argument that the protective order (Dkt. No. 26), currently subject to Defendant Richard Mast's motion to vacate (Dkt. No. 176) ("the Gag Order"[1]), should be vacated or amended immediately; or (2) to consider this filing an altogether new, second motion to vacate or amend the Gag Order immediately.

    The basis for this motion is the Court's rhetorical query at the last hearing on Plaintiffs' second motion to have Joshua Mast (and, on that occasion, also his brother, Jonathan) held in contempt for purportedly violating the Gag Order. At the hearing, Joshua Mast's counsel, Mr. Moran, noted that by prohibiting Defendants from identifying the Does to prospective witnesses (and we note, especially those witnesses in Taliban-controlled Afghanistan) unless Defendants obtain non-disclosure agreements from these witnesses in advance, and then turn over these non-disclosure agreements to Plaintiffs to do whatever they wish with them, Defendants effectively have been

---

[1] We address this nomenclature *infra* at note 4.

1

precluded from conducting any investigations involving, or witness interviews of, Afghanis, especially those in Afghanistan. (Hr'g Tr. [May 29, 2024], 40:8-12 ["Hr'g Tr."]). The Court then asked Mr. Moran: "Well, I mean, you could have asked the magistrate judge in this case to allow you to change that aspect of the order, couldn't you? I mean, did you do that?" (*Id*. at 45:11-14). Although a bit of an odd query at this stage of the litigation (as we shall explain below), Defendant Richard Mast hereby takes note of the Court's implicit invitation and asks the Court to vacate or modify the Gag Order to, at least belatedly, provide Defendants' their due process rights to defend themselves by allowing them to conduct effective investigations and witness interviews in Afghanistan, including the ability to name Plaintiffs *sans* the requirement of non-disclosure agreements.

The proposed supplemental brief or, alternatively, memorandum in support of a new motion follows.

## MEMORANDUM

### I. BACKGROUND

The rationale for seeking (and presumably for this Court's issuing) the protective order (Dkt. No. 26) requiring the use of pseudonyms (only to shield Plaintiffs' true names) and the asymmetrical requirement to obtain non-disclosure agreements from third parties (only required of Defendants) was to prevent the Taliban and neighboring villagers back in Afghanistan from learning about this litigation and thus tying John and Jane Doe to Baby Doe and the death of her parents during a U.S. Army operation directed at a specific foreign fighter compound in the village where Baby Doe and her parents lived. (Pls.' Mot. for Leave to Proceed Under Pseudonyms ["Motion for Protective Order"] [Dkt. No. 4] at 2-5). The purported fear expressed by Plaintiffs was that they would like to be able to return to Afghanistan once they have physical custody of Baby Doe and that knowledge by the Taliban of their story would put their lives at risk. They are also worried that local villagers

2

might take punitive measures against John and Jane Doe's family members when they connect John and Jane Doe, Baby Doe, and the facts alleged in this litigation.

As argued in the motion to vacate the protective order (Dkt. Nos. 176, 194, and 439), given the publicity generated by Plaintiffs themselves and the ease by which journalists located the specific village at which the foreign fighters' compounds were located, it is obvious that whatever rational fears might have existed prior to Plaintiffs' global, multifaceted publicity campaign, they have long-since evaporated.  Indeed, immediately after the first Plaintiffs-sponsored AP article was published setting out Plaintiffs' narrative in hook-line-and-sinker fashion, the Taliban regime published a notice on its official website demonstrating it was fully apprised of, and embraced, Plaintiffs' narrative. (Mot. to Vacate at 4-5).  In fact, even before the Plaintiff-promoted publicity, the Taliban were aware of John Doe's efforts to leave Afghanistan with Baby Doe in tow insofar as John Doe had sought permission from the Taliban to permit John Doe to take Baby Doe out of Afghanistan.[2]

To be a bit more graphic, in the AP article discussed in the supplemental brief (Dkt. No. 439), the AP team interviewed purported family members of Baby Doe and photographed them under the watchful eyes of the Taliban.  In one scene captured by the Taliban-friendly AP crew, Taliban fighters join the "innocent" villagers to pray at the grave site of Baby Doe's purported father.

//


//


//

---

[2] As John Doe himself stated in his voice recording entered into evidence during the Virginia state court proceedings: "… I was denied permission from Taliban to take her [out of Afghanistan], . . .." *See* Virginia Circuit Court Hr'g Tr. [June 8, 2022], at 655:1-2 (admitting into evidence Resps.' Ex. No. 10); *see* translation of audio recording as "Resp_Exh_10_D_[John Doe]-0003378," filed herewith under seal as Ex. 1.

3



The caption for this melodramatic, obviously staged photograph is the following: "Taliban fighters and other men pray in a cemetery in a village in a remote region of Afghanistan, on Friday, Feb. 24, 2023.  A farmer, his wife and their five children killed during a Sept. 5, 2019, night raid by U.S. forces, were buried here, where generations of their kin had been laid to rest. (AP Photo/Ebrahim Noroozi)."[3]  And, in classic stilted journalistic form, the AP article provides the human-interest element by naming several of the villagers who were prepared to speak publicly (yes, in the presence of the Taliban) about the "innocent farmer" and his dead children.  (We put aside for the time being the fact that no one, neither in court nor in published articles, has ever actually identified Baby Doe as the daughter of an "innocent farmer" as opposed to the daughter of the foreign terrorist couple that were more than prepared to martyr themselves and Baby Doe as an act of jihad.)

Quite apparently, peril and danger do not reside in Afghanistan with those pursuing Plaintiffs'

---

[3] *See* Martha Mendoza et. al, *A baby was found in the rubble of a US raid in Afghanistan. But who exactly was killed and why?*, Associated Press (Aug. 4, 2023) at https://tinyurl.com/2p9rkhx6) (high-resolution photos available at https://tinyurl.com/mrr3u9ds and at https://tinyurl.com/4xujaxty).

narrative, well-known to the Taliban, but rather with anyone who might speak out against Plaintiffs' self-created (and patently false) narrative. This includes Afghani witnesses who know the truth about John and Jane Doe and their fraudulent claims to be related to Baby Doe and the vacuous assertion to have acquired custody rights to the child by virtue of John Doe's father's chattel-like hand-off of Baby Doe to John Doe.

With this backdrop, all well-known to the Court, we remind the Court here that Defendant Mast pointed out in his earlier motion that the Gag Order was egregiously unconstitutional insofar as it required Defendants to obtain non-disclosure agreements from prospective witnesses and to then turn these over to Plaintiffs. (Def. Mast's Mot. to Vacate at 13-17). Beyond the First Amendment and attorney work product issues raised in that earlier motion, the effect of denying Defendants any reasonable opportunity to conduct discovery in Afghanistan to defend against the Doe's false custodial claims violates basic principles of due process. *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465-471 (holding the Federal Rules of Civil Procedure and due process require the courts to permit discovery and to have the viable opportunity to present a defense against claims: "We say instead that judicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords every party against whom a claim is stated."); *see also Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council*, 683 F.3d 539, 560-67 (4th Cir. 2012) (King, J., dissenting) (discussing the importance of discovery relative to due process); *Whitehorn v. Wolfgang's Steakhouse, Inc.*, No. 09 Civ. 1148, 2010 U.S. Dist. LEXIS 58460, at *8-*9 (S.D.N.Y. June 14, 2010) (citing district court cases from several circuits standing for the principle that civil discovery is a due process right).

Given the fact that the Gag Order's unfair preclusive effect on Defendants' discovery efforts has been pending before the Court since March 3, 2023, had Defendants made the same argument in a subsequent motion submitted to Magistrate Judge Hoppe (given the Court's failure to rule on the

5

motion to vacate in a timely fashion), Plaintiffs would most certainly have argued that Defendants were engaging in "judge shopping," or possibly they might have employed some other well-worn idiom–*viz.*, "taking a second bite of the apple." This aspect of the Court's Gag Order[4] has effectively suffocated investigations and third-party discovery in Afghanistan. We accept the Court's recent invitation to make this clear.

## II.   THE LEGAL PREDICATE TO ANY RULING BY THIS COURT

Before we enter into the factual and legal arguments for this motion, it is important to remind the Court that the issue of subject-matter jurisdiction has been raised on several occasions and has not yet been addressed by the Court.[5] We respectfully submit that before this Court may rule on the extant 12(b)(6) motions, the pending order to show cause motions for civil contempt, the pending motions to vacate or amend the Gag Order, and, more particularly, this motion, the Court must respond to the challenge to this Court's subject matter jurisdiction. *United States Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76 (1988) (making clear that a federal court must address a non-party's argument of a lack of subject-matter jurisdiction before it rules on a civil contempt motion, unless the underlying order purportedly violated was in aid of the court

---

[4] Plaintiffs claim the Gag Order is in fact no gag order. (*See, e.g.*, Hr'g Tr. at 28:2-29:15). This is sheer misdirection and a kind of Orwellian Newspeak. The Gag Order quite effectively precludes Defendants from speaking with anyone about this case. No Afghani, and certainly no Afghani living in the Taliban's world, would sign a non-disclosure agreement required by a U.S. court in an effort to assist Defendants, thereby contradicting Plaintiffs' (and the Taliban's) narrative that Baby Doe is an Afghani child kidnapped by a Christian U.S. Marine. Further, imagine Defendant Mast's counsel informing prospective witnesses that they are required to turn these non-disclosure agreements over to Plaintiffs' counsel who are then free to email them to the Taliban or to those family members of John Doe, like his father, who are in contact with the Taliban. Plaintiffs' argument that the "protective order" is not in fact a gag order is pablum.

[5] *See* Defs.' respective motions to dismiss challenging this Court's subject-matter jurisdiction or personal jurisdiction (all currently pending incredibly for over 18 months): Dkt. Nos. 85 at 10-21 (subject-matter); 120 at 9-12; Dkt. Nos. 88 at 7-11 (subject-matter); 122 at 2-7 (subject-matter), 10; Dkt. Nos. 91 at 10-19 (personal); 119 at 6-7 (personal); Dkt. Nos. 93 at 6-11 (personal and subject-matter); 124 at 1-3 (personal and subject-matter); *see* filings relevant to non-party Piper Hitter's motion to quash challenging this Court's subject-matter jurisdiction: Dkt. Nos. 257 at 8-14 (subject-matter jurisdiction); 273 at 1-7 (subject-matter); Dkt. No. 271 at 2-16 (subject-matter).

determining subject-matter jurisdiction);[6] *see also Willy v. Coastal Corp.*, 503 U.S. 131, 138-39 (1992) (explaining why Rule 11 sanctions are enforced even without subject-matter jurisdiction and why they are different from civil contempt proceedings: "A civil contempt order has much different purposes than a Rule 11 sanction.  Civil contempt is designed to force the contemnor to comply with an order of the court; Rule 11 is designed to punish a party who has already violated the court's rules.  Given that civil contempt is designed to coerce compliance with the court's decree, it is logical that the order itself should fall with a showing that the court was without authority to enter the decree."). Indeed, *United States Catholic Conference* makes clear that if this Court lacks subject-matter jurisdiction, then the Gag Order, which was not issued to assist the Court's determination of its subject-matter jurisdiction, is void, and this Court has no power to issue a civil contempt order. *Id*. at 77 ("It follows that if a district court does not have subject-matter jurisdiction over the underlying action, and the process was not issued in aid of determining that jurisdiction, then the process is void and an order of civil contempt based on refusal to honor it must be reversed.").

We won't burden the Court by repeating the pointed arguments raised previously challenging subject-matter jurisdiction (*see supra* note 3).[7]  However, it is important to flush out two nuances to these challenges raised by Plaintiffs' responses.  First, Plaintiffs have argued that this case fits the Supreme Court's extremely narrow exception to the subject-matter jurisdictional requirement of an actual federal claim (absent diversity).  *Gunn and Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 313-314 (2005) (evaluating federal question jurisdiction under

---

[6] Thus, we respectfully suggest that Magistrate Judge Hoppe erroneously relied on *United States Catholic Conference* as authority to avoid addressing non-party Piper Hitter Foundation Inc.'s ("PHF") subject-matter jurisdiction challenge in support of its motion to quash. (Mem. Op. & Order, Dkt. No. 378 at 1 n.1).  While the magistrate judge granted the motion, he should have ruled on the jurisdictional issue (by way of "Findings and Recommendations" per Federal Rules of Civil Procedure 72(b)) before ruling on the merits of the motion.

[7] All the arguments previously raised remain extant (other than the fact that the government officials named as nominal parties are no longer parties) and are thus incorporated herein by reference.

28 USC § 1331 when no actual federal claim exists by requiring a finding that all four of the following factors exist: whether a federal issue is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress). Thus, Plaintiffs attempt to get past the first factor (*i.e.*, necessarily raised) by citing their request for declaratory relief. In their own words:

- "Questions of federal law are core to the Amended Complaint, which seeks declaratory relief grounded in the 'Supremacy Clause of the United States Constitution' and the 'Executive Branch's foreign policy decision to allow Baby Doe's transfer to the Government of Afghanistan for family reunification.'" (Pls.' Opp'n to PHF's Mot. to Quash [Dkt. No. 274] at 3);

- "Similarly, here, a federal issue is a necessary element of Count I for tortious interference with parental rights (as well as the derivative claim for conspiracy in Count III) because the declaratory relief that Plaintiffs John and Jane Doe seek – which raises questions under the U.S. Constitution's Supremacy Clause – will establish that they had a right to maintain a parental or custodial relationship with Baby Doe." (Pls.' Opp'n to Defs.' Motions to Dismiss [Dkt. No. 113] at 10);

- "First, a federal issue is a necessary element of Count I for tortious interference with parental rights because the declaratory relief that Plaintiffs seek – which raises questions under the U.S. Constitution's Supremacy Clause – will establish that they had a constitutional right to maintain a parental or custodial relationship with Baby Doe." (Pls.' Opp'n to PHF's Mot. to Quash [Dkt. No. 267] at 10).

The fatal flaw of Plaintiffs' argument, of course, is their insistence that John and Jane Doe's right to claim parental or legal custodial status rests on the naked assertion that the U.S. government granted *them* this status by virtue of a "foreign policy decision." However, the only evidence of a

8

"foreign policy decision" by the U.S. government to which Plaintiffs cite, either in this litigation or in the Virginia state litigation, is a decision by State Department personnel to accept the claim of the Afghanistan Ministry of Labor and Social Affair ("MOLSA") that a paternal uncle of Baby Doe, purportedly John Doe's father, had been located, and MOLSA and the International Committee of the Red Cross ("ICRC") were prepared to take physical custody of the child from the Department of Defense and turn her over to John Doe's father.[8]  Yet, even assuming arguendo that this decision qualifies as a "foreign policy" decision of the U.S. government, at best it relates to MOLSA's claim that Baby Doe is an Afghan child and that MOLSA had decided to hand her over to John Doe's father.  That decision says nothing about John or Jane Doe and their false claim of lawful custody by virtue of John Doe's father deciding that he could *sua sponte* hand over Baby Doe to whomever he wished.  Plaintiffs' efforts to stretch the "preemptive" effect of U.S. foreign policy to John and Jane Doe is bereft of any factual, legal, or logical support.

In other words, by their own evidence, and by the U.S. government's submissions in the Virginia state court proceedings (and filed in this matter by Plaintiffs), John and Jane Doe's claims have nothing to do with our government's foreign policy or the Supremacy Clause or any other federal question.  As such, this Court must dismiss this action based upon its lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).

### III. THE COURT'S GAG ORDER EFFECTIVELY PROHIBITS DEFENDANTS' DEFENSE.

Defendant Richard Mast knows of specific individuals in Afghanistan who have, or can obtain, relevant information that would undermine John and Jane Doe's claim that they are related to Baby Doe.  These individuals will not sign non-disclosure agreements for a federal court; nor will they allow themselves to be exposed to the Taliban as witnesses for the Masts.  Yet, these witness

---

[8] *See* U.S. Gov't Statement of Interest (Dkt. No.68-1 (filed under seal)); U.S. Gov't Answer to Plaintiffs' amended complaint (Dkt. No. 131).

9

interviews are critical to the defense of this matter.

Indeed, one of the great mysteries of this case is why John and Jane Doe refuse to provide a DNA sample of the children in Afghanistan they claim are the surviving children of the "innocent farmer" killed in the Army Ranger operation that left Baby Doe an orphan. (*See, e.g.*, Am. Compl. [Dkt. No. 68] at ¶ 3; John Doe's Decl. filed with the USCIS Houston Asylum Office ["Asylum Decl."] [produced by Pls. as Does 1939-53] at ¶ 74 [filed under seal at Dkt. No. 415-3]; Pls.' Answers to Interrogatories at 4 [indicating Baby Doe had 9 biological siblings, five of whom are deceased and three of whom are alive and apparently living with relatives in Afghanistan (the last child falsely listed as a "sibling" is John and Jane Doe's biological child)], filed herewith under seal as Ex. 2).

Astonishingly, the ICRC and MOLSA's "family reunification" "investigation" determined that it was in Baby Doe's best interest to tear her away from her alleged siblings and hand her off to an elderly man who claimed to be a paternal uncle – *viz*., John Doe's father. Not much of a family-friendly reunification effort. Notwithstanding the suspicious nature of this "reunification" effort, Defendants most certainly should have the option to investigate whether the alleged siblings are in fact siblings of Baby Doe. This can only be conducted in Afghanistan and only if Defendants are permitted to identify John and Jane Doe to Afghan contacts on the ground in Afghanistan. This, in turn, can only be done if and when the Court vacates or amends the Gag Order because, as noted above, no Afghani will sign a U.S. non-disclosure agreement.

Even more to the point, an ICRC document indicates that there is a specific individual–Abdul Basir–claiming to be a maternal uncle, who has custody of *all* of Baby Doe's siblings. (*See* ICRC "Request for Family Reunification," dated Oct. 24, 2019 ["ICRC RFFR"] [produced by Plaintiffs as Does 3719-21] at Does 3721, filed herewith under seal as Ex. 3). Once again, the only way to investigate these claims, which go to the core of the Does' false claim of custodial rights in this case, is to have the Court vacate or amend its Gag Order.

As provided above, this right to critical discovery is not some luxury afforded Defendants.

10

This is a fundamental due process right. *Nelson,* 529 U.S. 460 at 465-471 (holding the Federal Rules of Civil Procedure and due process require the courts to permit discovery and to have the viable opportunity to present a defense against claims: "We say instead that judicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords every party against whom a claim is stated."); *see also Greater Balt. Ctr. for Pregnancy Concerns*, 683 F.3d at 560-67 (4th Cir. 2012) (King, J., dissenting) (discussing the importance of discovery relative to due process); *Whitehorn*, No. 09 Civ. 1148, 2010 U.S. Dist. LEXIS 58460, at *8-*9 (citing district court cases from several circuits standing for the principle that civil discovery is a due process right). The Court's Gag Order violates that right.

Two final points. **First**, at the latest hearing on Plaintiffs' latest contempt motion, counsel for Plaintiffs made a claim about the Gag Order that was both factually false and legally hollow. Mr. Elliker stated:

> I'll also note, Your Honor, that the language that's in the protective order about how to handle the use of the pseudonyms and the protection of the identity of the plaintiffs during the course of discovery is verbatim from *James v. Jacobson*. So it's not as though that was invented out of whole cloth and plucked out.

(Hr'g Tr. at 66:17-22). We begin with the factually false assertion by Plaintiffs' counsel. The Gag Order is not verbatim from the gag order mentioned in *dicta* by the *James* court on several levels. One, in *James*, the Fourth Circuit was simply summarizing, not quoting "verbatim" the gag order. Two, the appellate court's description makes clear that there were substantive differences between the gag order at issue in *James* and our Gag Order. Specifically, there was symmetry insofar as the plaintiffs were also required to disclose to defendants any person to whom they had confided matters that would identify themselves. Moreover, the *James* lawsuit involved matters and witnesses in the U.S., not Afghanistan controlled by the Taliban. Thus, in *James*, there was no threat of murder or mayhem if a witness for the defense were to be asked to sign a non-disclosure agreement. *James v. Jacobson*, 6 F.3d 233, 235-36 (4th Cir. 1993).

11

Legally, Mr. Elliker's statement is meaningless. The *James* court's description of the gag order is entirely *dicta* and not some imprimatur for similar gag orders. More important, as the *James* court makes clear, the gag order there was the product of a mutual agreement between the parties. *Id*. at 235 ("Following consultations between counsel, agreement was reached as to most aspects of a procedure for preserving the plaintiffs' anonymities during pretrial investigation and discovery. Remaining areas of dispute were resolved by the district court after a hearing.") The record does not allow us to know what areas were agreed upon by the parties (although we know it was "most aspects" of the gag order) and what "remaining areas" were decided by the court. And, quite obviously, unlike our Gag Order, the gag order in *James* was issued only after a hearing during which both sides were heard, not issued, as in our case, *ex parte* without any notice or opportunity to be heard by Defendants.

The **second** point to be made here before closing is John Doe's long tale about the threat his family faces from the Taliban and Baby Doe's maternal family. The truth is laid bare by John Doe's contradictory Asylum Declaration. As made crystal clear by John Doe himself, the Taliban and the villagers where Baby Doe was located are all fully aware of the Does and this litigation. And, if they are not, they are either dead or brain dead. (*See* Masts' Pre-Hearing Brief [Dkt. No. 415] at 9-11). Indeed, John Doe tells us, via his Asylum Declaration, that the fourth of five AP articles published online about his case to date (*see, e.g.,* https://apnews.com/search?q=%22joshua+mast%22&s=0) has brought all of the pieces together for the Taliban and any other Afghanis who might wish to harm the Does and their family members. In this AP article, the Taliban were on scene at the village as the AP personnel were interviewing the alleged family members of John Doe, including his brothers and father.[9] These interviews were recorded and published online by the AP. Incredibly, they included voice recordings of John Doe's father and two of Baby Doe's alleged siblings:

---

[9] Demonstrating the AP-Taliban relationship and their joint purpose to publicize the Does' false narrative, the AP article actually has Taliban fighters posing for photographs. Fascinating, no?

> More recently, the AP did another article based on an investigation they themselves did in Afghanistan into the attack that killed Bahlul and his family. This article, unfortunately, included pictures and voice recordings of my father and of two of [Baby Doe]'s surviving siblings **that would allow any Afghan to realize that this happened in [the Village housing foreign terrorists], and could allow anyone who knows our family members to know that we are the family that is being described in the article**.

(Asylum Decl. at ¶ 74 [emphasis added]). What John Doe conveniently leaves out, of course, is the fact that all of this publicity was sought by the Does and their counsel. *The New York Times* and the AP were literally enlisted to write and publish their respective articles by Plaintiffs' attorneys.[10,11]

## IV.   CONCLUSION

From Day One, the Gag Order was an unconstitutional and patently illegal *ex parte*, asymmetrical infringement of Defendants' First Amendment rights and has operated as a Due Process violation preventing Defendants from investigating the fraudulent narrative created by the Does with their legal counsel's assistance. It is time to end this abuse of justice now. The Court should vacate the Gag Order or, at the very least, amend it to eliminate the requirement of a non-disclosure agreement and the prohibition against identifying John and Jane Doe.

Dated: July 8, 2024                                    Respectfully submitted,

*/s/David Yerushalmi*
David Yerushalmi, Esq.*
American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20006
(*Admitted *pro hac vice*)

---

[10] *See, e.g.*, July 19-26, 2022 email string between Plaintiffs' attorneys Sehla Ashai and Elizabeth Vaughan, and *The New York Times* reporter Rozina Ali, setting up "on the record" Zoom call held July 26, 2022), filed herewith under seal as Ex. 4. The worldwide media blitz defaming the Defendants behind the protection of the Gag Order was clearly planned well in advance of the filing of Plaintiffs' September 3, 2022, Complaint [Dkt. No. 1] and *ex parte* Motion for Protective Order.
[11] *See, e.g.,* Dep. Tr. of John Doe at 94:11-14 (March 24, 2023) (Q "How did you receive communications from the press?" [John Doe]: "Through my lawyers, they have got my contact, and they reached out to me."), filed herewith under seal as Ex. 5.

E. Scott Lloyd
Lloyd Law Group, PLLC
Va. Bar # 76989
20 E. 8th Street, Suite 3
Front Royal, VA 22630
Office: (540) 823-1110
Cell: (540) 631-4081
Fax: (540) 583-4279
scott@lloydlg.com

*Counsel for Defendant Richard Mast*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

*/s/David Yerushalmi*
David Yerushalmi, Esq.
