Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1                    UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF VIRGINIA
2                     CHARLOTTESVILLE DIVISION

3   ************************************************************

4   BABY DOE, ET AL.,          CIVIL CASE NO.:  3:22CV49
                               MAY 2, 2024, 11:07 A.M.
5                              TELEPHONIC MOTIONS HEARING
            Plaintiffs,
6   vs.

7   JOSHUA MAST, ET AL.,       Before:
                               HONORABLE JOEL C. HOPPE
8                              UNITED STATES MAGISTRATE JUDGE
            Defendants.        WESTERN DISTRICT OF VIRGINIA
9
    ************************************************************
10
    APPEARANCES:
11

12  For the Plaintiffs:        MAYA MIRIAM ECKSTEIN, ESQUIRE
                               LEWIS FRANKLIN POWELL, III, ESQUIRE
13                             Hunton & Williams LLP
                               Riverfront Plaza, East Tower
14                             951 East Byrd Street
                               Richmond, VA 23219
15                             804-788-8788

16                             SEHLA ASHAI, ESQUIRE
                               Elbially Law PLLC
17                             704 East 15th Street, Ste 204
                               Plano, TX 75074
18                             972-423-7330

19

20  FTR OPERATOR:  Karen Dotson

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                      255 West Main Street, Suite 304
23                    Charlottesville, Virginia  22902
                      434.296.9284

24
          PROCEEDINGS RECORDED BY ELECTRONIC RECORDING;
25  TRANSCRIPT PRODUCED BY COMPUTER.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  APPEARANCES CONTINUED:

2

3  For the Plaintiffs:        EHSON KASHFIPOUR, ESQUIRE
                              DAMON R. PORTER, ESQUIRE
4                             Latham & Watkins LLP
                              555 Eleventh Street, NW, Suite 1000
5                             Washington, DC 20004-1304
                              202-637-1002
6

   For Defendants Joshua and Stephanie Mast:
7                             MICHAEL LEE FRANCISCO, ESQUIRE
                              First & Fourteenth PLLC
8                             800 Connecticut Ave NW, Suite 300
                              Washington, DC 20006
9                             202-998-1978

10 For Defendants Joshua and Stephanie Mast:
                              JOHN SAVAGE MORAN, ESQUIRE
11                            FRANCIS AUL, ESQUIRE
                              McGuireWoods LLP
12                            888 16th St. N.W., Suite 500
                              Washington, DC 20006
13                            202-525-0356

14 For Defendant Richard Mast:
                              DAVID ELIEZER YERUSHALMI, ESQUIRE
15                            American Freedom Law Center
                              2020 Pennsylvania Avenue NW
16                            Suite 189
                              Washington, DC 20006
17                            646-262-0500

18 For Defendant Kimberley Motley:
                              MICHAEL ROGER HOERNLEIN, ESQUIRE
19                            SAMANTHA LYNN VAN WINTER, ESQUIRE
                              Alston & Bird LLP
20                            101 S. Tryon Street, Ste. 4000
                              Charlotte, NC 28280
21                            704-444-1041

22 For Defendant Ahmad Osmani:
                              RICHARD DEAN BOYER, ESQUIRE
23                            Boyer Law Firm, PLLC
                              P.O. Box 10953
24                            Lynchburg, VA 24506
                              434-401-2093

25

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   (Proceedings commenced, 11:07 a.m.)

2            THE COURT:  Hi, this is Joel Hoppe.  Who is on the

3   line for the Plaintiffs Does?

4            MS. ECKSTEIN:  Good morning, Judge.  This is Maya

5   Eckstein, and I'm here with my colleague Lewis Powell.  I think

6   a few folks may be on the line from Latham & Watkins as well.

7            (Indiscernible.)

8            THE COURT:  Who is on the line for Defendant Richard

9   Mast?

10            MR. YERUSHALMI:  Good morning, Magistrate Judge

11   Hoppe.  David Yerushalmi.

12            THE COURT:  Good morning.

13            And who is on the line for defendants Joshua and

14   Stephanie Mast?

15            MR. FRANCISCO:  Good morning, Your Honor.  Michael

16   Francisco, and with me is John Moran and Francis Aul.  And I

17   would note that Mr. Aul recently filed his *pro hac vice* motion

18   that hasn't been acted upon, but if he's permitted, he would

19   like to argue parts of the motion for us.

20            THE COURT:  All right.  Well, that's fine, and I'll

21   grant that motion.

22            MR. AUL:  Thank you, Your Honor.

23            THE COURT:  Is anybody else on the line for one of

24   the parties?

25            MR. HOERNLEIN:  Good morning.  This is Mike

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  Hoernlein.  With me is Samantha Van Winter for Ms. Motley.

2          THE COURT:  Good morning.

3          MR. BOYER:  Good morning, Your Honor.  Rick Boyer.  I

4  am here for Ahmad Osmani.

5          THE COURT:  Good morning.

6          Do either of you intend to have any argument today?

7  I don't think that you're part of these motions.

8          MR. BOYER:  Judge, Rick Boyer for Mr. Osmani.  I

9  don't anticipate having argument.

10          MR. HOERNLEIN:  Your Honor, Mike Hoernlein for

11  Ms. Motley.  I'm not intending to participate this morning.

12          THE COURT:  Okay.  All right.  Thank you.

13          Well, counsel, we are here on these three groups of

14  motions.  There is the Does' motions for sanctions concerning

15  Joshua and Stephanie Mast's discovery productions, and that's

16  at ECF 336.  And then we also have Joshua and Stephanie Mast's

17  motion to compel responses to interrogatories from the Does.

18  That's at ECF 356.  And then there also are cross motions

19  concerning a subpoena that was issued to Liberty University.

20          My thought is to take up these motions in that order,

21  that we will take up the Does' motion first, the motion for

22  sanctions, and then take up Joshua and Stephanie Mast's motion

23  to compel, and we'll address the Liberty University motions.

24          So Ms. Eckstein or Mr. Powell, I think the motion for

25  sanctions is the first one that we'll take up, and that's your

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1 motion.  I'll be happy to hear from you.

2          MS. ECKSTEIN:  Thank you, Your Honor.  This is Maya

3 Eckstein.  I'll be handling this motion.

4          Your Honor, as you know, we filed this case in

5 September of 2022, and we served a request for production in

6 December of 2022.  It's now May of 2024, and we still don't

7 have all of Joshua and Stephanie Mast's responsive documents.

8 You entered an order on November 28 that required them to

9 produce all responsive documents within 30 days, by December

10 29th.  They didn't.  They produced on that day just a fraction

11 of their responsive documents.  And to this day, they still

12 have not produced all responsive documents.  For this reason,

13 and the additional reasons I will address, we respectfully ask

14 for sanctions.

15          The first step in an analysis of sanctions, of

16 course, is to determine whether there has been a violation of a

17 court order.  The Court issued its November 28th order and it

18 granted plaintiffs' motion to compel.  That came after Joshua

19 and Stephanie Mast refused to respond to our request for almost

20 a full year.  But the order had several elements to it.  It

21 first required Joshua and Stephanie Mast to supplement their

22 objections and responses to our request for production within

23 21 days, by December 19th.  And it specifically said at page 12

24 of your order that any objection must state with specificity

25 the grounds for objecting to the request and must state whether

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  any responsive materials are being withheld on the basis of

2  that objection.

3      To this day, they have not served supplemental

4  objections or responses.  Instead, on December 19th, we

5  received an email from Mr. Francisco saying that they intended

6  to stand on objections that were included in a November 16th

7  letter that we had received.  Obviously, that November 16th

8  letter came before your November 28th order.

9      That letter did not include any responses to the

10 requests for production.  The letter did contain some general

11 objections, but it did not state what, if any, materials were

12 being withheld on the basis of those objections.  And still, to

13 this day, Joshua and Stephanie Mast have not told plaintiffs

14 whether they are withholding documents in response to any

15 particular objection other than privilege.  And many of the

16 objections --

17     THE COURT:  Ms. Eckstein, have they identified what

18 requests for productions they are responding to substantively

19 with the actual documents?

20     MS. ECKSTEIN:  They have not.  And I would add that

21 many of the objections that were listed in the November 16th

22 letter are the same objections that this Court rejected in its

23 November 28th order.  And I will note that in their opposition

24 brief on this motion, they do not address this issue of

25 supplemental responses and objections at all.  They essentially

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   concede the issue.

2          Second, the order required Joshua and Stephanie Mast

3   to produce all other responsive material within 30 days, by

4   December 29th.  On December 29th, we received 204 documents.

5   Then Joshua and Stephanie Mast dribbled out additional

6   productions such that by the time we filed our reply brief on

7   February 21st, we received a total of about 350 documents.  But

8   at the same time, in their opposition brief, Joshua and

9   Stephanie Mast acknowledged that they still had not produced

10  six times as many documents -- responsive documents still had

11  not been produced.

12         And these responsive documents that have not been

13  produced fall into three categories, which I will address each

14  of them separately.  The three categories are 2,176 documents

15  for which they claim they needed what's called *Touhy* approval;

16  some unknown number of documents that they are withholding

17  because they relate to the juvenile domestic relations

18  proceedings and possibly the adoption proceeding; and then

19  there were an additional 235 documents that had appeared on

20  their original privilege log, were removed from a revised

21  privilege log, but have not been produced.

22         And I thought -- before I jumped into these three

23  categories, I thought I would give the Court the state of play

24  today.  Where are we today based on what's happened since the

25  filing of the motion and the briefing?

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          With respect to the *Touhy* related documents, as I

2     call them, Joshua and Stephanie Mast produced on April 4th and

3     April 15th a total of about 1,500 of the 2,176 documents that

4     had been withheld on the basis of *Touhy*.  Late Tuesday night

5     this week around 7 or 8 p.m., they produced until 552 documents

6     comprising more than 4,000 pages that they said completes their

7     production of documents that they claimed needed *Touhy*

8     approval.  We don't know at this point if that is actually the

9     case because we simply have not had a chance to review these

10    4,000-some pages.  We hope that is correct.

11          With respect to the juvenile domestic relations and

12    adoption proceeding documents, those still have not been

13    produced.

14          With respect to the 235 documents that have been on

15    their original privilege log and were withdrawn from their

16    revised privilege log, only three of those appear to be

17    produced.  232 have not been produced.  I suppose it's possible

18    that some of them may be in their Tuesday night production, but

19    I understand that production to largely be *Touhy* documents, not

20    documents that were on the privilege log.  So I don't think

21    that would be the case.

22          In addition, I would mention that we have the 207

23    emails on which Joshua Mast used his Liberty University email

24    address that is the subject of the other motion to compel that

25    you will hear later on.  And I will add that before Tuesday

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    evening's production, we had done a Bates stamp analysis

2    essentially looking at the Bates numbers of the documents that

3    have been produced and the documents on the privilege log.  And

4    in that Bates stamp analysis we determined there were 2,280

5    pages that either not been produced or placed on a privilege

6    log.  Again, I suppose some of those gaps may have been filled

7    with the Tuesday night production, but I simply don't know

8    that.  And I don't think that's the case, but I don't know

9    that.

10           And of course it goes without saying that none of the

11   productions that happened in April were made on December 29th.

12   In fact, they were made four months after December 29th, the

13   deadline that had been set by the Court.

14           So with respect to the so-called *Touhy* documents,

15   *Touhy*, of course, references the Supreme Court case that allows

16   the federal government to require its employees to seek

17   approval when official information is sought in support of

18   private litigation.  Joshua and Stephanie Mast never raised

19   this issue of needing *Touhy* approval before now.  It wasn't in

20   their original objections to our requests for production.  It

21   wasn't in their amended objections to our requests for

22   production.  It wasn't in opposition.  They didn't raise it in

23   opposition to our motion to compel.  They didn't raise it at

24   the hearing on that motion to compel.  And they didn't raise it

25   in the November 16th letter, which they consider their

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  supplemental objections required by the Court's November 28th

2  order.

3          When we filed our motion for sanctions, we knew that

4  they were withholding some documents on the basis of needing

5  *Touhy* approval, but we had no idea how many.  We didn't find

6  that out until they filed their opposition brief when they

7  disclosed for the first time that there were 2,176 such

8  documents.  And since then, as set forth in the surreply that

9  we filed, we learned that Joshua and Stephanie Mast did not

10  even ask the federal government for *Touhy* approval to produce

11  these documents until February 2nd and February 9th, five to

12  six weeks after the Court's deadline for Joshua and Stephanie

13  Mast to complete their production.

14          Finally, on April 4th and 15th, they produced about

15  1,500 of these documents, and on Tuesday evening they

16  supposedly produced the rest.  We're essentially taking their

17  word for it that that is, in fact, the case.  We had asked them

18  for a log of the documents that were withheld under *Touhy* so we

19  can verify what has been produced.  And they did give us a log,

20  but the log used *Touhy* Bates labels.  The Bates labels for each

21  documents were actually on the log listed as *Touhy* and then the

22  number.  But when they produced the documents, they used

23  different Bates labels altogether, and we have no way to marry

24  the two.  So we can't compare the documents that have been

25  produced to the log to know what has been produced with

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   redactions, etc.  We just don't know.

2          In addition to that, it's not clear that they even

3   needed *Touhy* approval for some or all of these documents.  A

4   significant number of them were sent between private email

5   addresses, not addresses owned by the U.S. government.  That

6   begs the question why *Touhy* approval was required at all.

7   Others don't seem to contain any government information at all

8   such as the so-called prayer request email that is discussed in

9   the brief.

10         In addition, the *Touhy* regulations, specifically

11  32 CFR 97.9(b), require that a government employee who receives

12  a litigation request for documents must notify his or her chief

13  legal advisor immediately.  That's the language in the

14  regulation, immediately.  But Joshua and Stephanie Mast didn't

15  make the request for *Touhy* approval until 14 months after

16  receiving our request for production.  Again, this begs the

17  question:  Was *Touhy* approval even necessary?  Instead, this

18  whole *Touhy* process seems to have been a delay tactic.

19         Now, with respect to the juvenile and domestic

20  relations documents, and possibly the adoption proceeding

21  documents, it's not clear if they're withholding documents

22  related to the adoption proceeding.  It's clear they are as to

23  the juvenile and domestic relations proceedings.  We do not

24  know how many documents are at issue.  They have not told us.

25  What is clear is that the Court ordered the production of these

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  documents.  That's at pages 4 and 5 and 12 of the Court's order

2  at ECF Number 326.

3         THE COURT:  Ms. Eckstein, what overlap is there

4  between the discovery requests in this case and any discovery

5  that has been produced in the state cases concerning custody

6  and adoption?

7         MS. ECKSTEIN:  So there has been discovery in the

8  state case regarding the adoption.  We -- I believe that we

9  have asked for discovery regarding the juvenile and domestic

10 relations and the Masts have refused to provide that.

11 Mr. Kashfipour can correct me if I'm incorrect about that.

12 He's more active in the state case than me.

13        In addition, as your order said, they do not have to

14 produce to us documents that were produced in the state case,

15 and we're not asking them to.  We do want to know if they're

16 withholding documents on that basis.

17        I hope that answers your question.

18        I'll note also that Joshua and Stephanie Mast, the

19 basis for refusing to produce these documents is a number of

20 state statutes that they never before asserted as an issue.

21 The issue of these state statutes, again, it wasn't raised in

22 their original objections to their request for production.  It

23 wasn't raised in their amended objection.  It wasn't raised in

24 response to our motion to compel.  It wasn't raised at the

25 hearing on the motion to compel and it wasn't raised in the

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  November 16th letter.

2         In addition, the statute -- these statutes that they

3  newly found, they simply don't apply here.  Our request for

4  production seek documents in Joshua and Stephanie Mast's

5  possession relating to the juvenile and domestic relations and

6  adoption proceedings.  They do not ask them to get records from

7  the court's own files.  The Virginia statute that they cite,

8  16.1-305(A) and (A)(1) address how juvenile case files are

9  handled by the court to whom those files are open for

10 inspection and how inspection is to be conducted.  They do not

11 address files in a party's possession.

12        In addition, the statute that establishes a Class 3

13 misdemeanor establishes that for someone who discloses or makes

14 use or knowingly permits the use of identifying information

15 otherwise available to the public concerning the juvenile, but

16 Baby Doe's identity is already known to plaintiff.  And

17 regardless, if this were truly a concern, Joshua and Stephanie

18 Mast could produce that information with Baby Doe's real name

19 redacted and replaced with "Baby Doe."  We don't think that

20 would have been necessary, but it could have been done to

21 resolve this.

22        And it's worth noting that Joshua and Stephanie Mast

23 do not cite to a single case to which the statutes they rely on

24 were interpreted as they propose, and we have found none.

25 Indeed, under their reading of the statute, any party to a

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   custody proceeding who shared a copy of the custody order with

2   a friend, a relative, an employer, etc., would be subject to a

3   misdemeanor.  That cannot be an appropriate reading of the

4   statute.  And let's not forget, Joshua and Stephanie Mast

5   themselves shared documents from Baby Doe's custody file with

6   third parties such as Ms. Motley.  That belies their concern

7   about these statutes.  Again, this seems to have been another

8   delay tactic.

9        Now, with respect to the documents from the privilege

10  log, this is very short, very easy.  There were 235 documents

11  that appeared on their original log.

12        THE COURT:  Ms. Eckstein?

13        MS. ECKSTEIN:  Oh, yes, I'm sorry.  Go ahead.

14        THE COURT:  As to this JDR court records, is there

15  any mechanism under Virginia law for the parties to jointly

16  request the court documents, or like a consent procedure for

17  the documents to be produced?

18        MS. ECKSTEIN:  I believe that that would be

19  appropriate and available here.  We -- in the state court

20  proceeding, we did seek access to the juvenile and domestic

21  relations court file itself.  The J&DR court denied that motion

22  without prejudice.  And my recollection is that it was heard by

23  the circuit court on appeal and affirmed without prejudice.  I

24  believe that's correct.  Mr. Moran certainly will correct me if

25  I'm wrong about that.  So that's the status there, but

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  certainly a joint request could be made if there were true

2  concern about these statutes.

3         THE COURT:  Is there -- there's no objection at this

4  point to the relevancy of any juvenile court record, is there?

5         MS. ECKSTEIN:  I'm not aware of it.

6         MR. FRANCISCO:  Your Honor, we don't think they're

7  relevant, but we're certainly aware they think they are.

8         This is Michael for Joshua and Stephanie Mast.

9         MS. ECKSTEIN:  And I will add, Your Honor, that in

10  your order of November 28th, I believe you overruled their

11  objection on this point of relevance.

12         THE COURT:  All right.  Thank you.

13         MR. MORAN:  Your Honor, this is John Moran.

14         Just because you had asked and Ms. Eckstein had

15  corrected, it is right that there has been a request of the JDR

16  court by plaintiffs through other counsel to access those

17  records.  The guardian ad litem -- separate and apart from

18  Joshua and Stephanie Mast, the guardian ad litem, who is a

19  party to that proceeding, objected to their access to the

20  records, and the court considered the arguments and issued the

21  rulings that it did.  So it's not simply a matter of the

22  plaintiff and Joshua and Stephanie Mast.  The guardian ad litem

23  and the court itself have a say in the matter.  And so, you

24  know, Joshua and Stephanie Mast are trying to abide by their

25  legal obligations and the rulings of the state court.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1        THE COURT:  But as far as the litigation in this case

2   is concerned, is there any reason why Joshua and Stephanie Mast

3   and the Does couldn't jointly petition the JDR court for

4   release of the court record for use in this case pursuant to

5   the protective order?

6        MR. MORAN:  Well, again, Your Honor, I mean, I think

7   they've asked for it.  We did not directly oppose it.  We

8   stated our position on -- that it was premature because they

9   had framed their request not as a request to use it in this

10  case, but as a request to use it in the further state court

11  proceedings that were contemplated.  And our position was

12  because that was on appeal and could -- would either go forward

13  or not, it was premature based on the basis that they asserted

14  the J&DR court had stated.  If they wanted to articulate

15  another basis, we could -- and go back to the J&DR court, we

16  could review that and consider it.

17        But again, I would note that it's not -- as far as

18  I'm aware, it's not something that the Does and the Masts would

19  have the authority to consent to, because the guardian ad litem

20  and the court itself independently would also have to weigh in.

21        THE COURT:  But the request has not been made with

22  the backdrop of this case or the context of discovery requested

23  in this case that I think is relevant.  I think it's been

24  addressed.

25        MS. ECKSTEIN:  That's correct, Your Honor.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          MR. MORAN:  That's accurate, Your Honor.  I will just

2    note that this case was pending at the time that they made the

3    request, and they, for reasons sufficient unto themselves,

4    chose to frame it as a request justified by access for the

5    state case, not for this case.  But if they want to go back and

6    ask again, I'm not aware -- I mean, it was dismissed without

7    prejudice.  So I'm not aware of any reason why they wouldn't be

8    able to do that.

9          THE COURT:  All right.  And Mr. Moran, one of the

10   reasons for -- that you assert for not producing the JDR court

11   record is because you don't have authority to do it under state

12   law, right?

13         MR. MORAN:  Correct.  That's our understanding.  They

14   have taken the position, I believe, that the privacy provisions

15   of -- that that only applied to the court, not to the parties.

16   But that's not how we understand it.  We think that would sort

17   of make the provisions relatively meaningless.

18         But, right, we're trying to comply with our

19   obligations under Virginia law and the orders of the court

20   denying the request.

21         THE COURT:  All right.  Mr. Moran, I'll get back

22   to -- after Ms. Eckstein has finished her argument -- get back

23   to you and hear more about JDR records.

24         MR. MORAN:  If I understood, Your Honor, I think

25   Mr. Aul will plan to address it.  I apologize for jumping in,

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  but since I was there and litigated that in the J&DR court, I

2  just wanted to jump in.

3           THE COURT:  That's perfectly fine.

4           Ms. Eckstein?

5           MS. ECKSTEIN:  Thank you, Your Honor.

6           And just to reiterate, we don't think that's a proper

7  reading of the statute.  They haven't cited a single case

8  suggesting that's a proper reading of the statute.  Obviously,

9  what happened in the state case dealt with discovery in the

10 state case, not in this case.  And additionally, since they

11 were truly concerned, they should have moved for

12 reconsideration.  They should have come to you and asked for

13 reconsideration of your order, and they didn't.  Instead, they

14 took it upon themselves to say, No, we're not going to comply

15 with the order.  We're simply not going to do it, without going

16 to you and asking for permission.

17          With respect to the documents that were withdrawn

18 from the privilege log, the original privilege log we received

19 the evening of January 31st after we filed our motion.  It

20 was -- it contained thousands of documents.  There were many

21 issues with it.  There were no privilege descriptions.  There

22 were no designations for many of the documents as to what the

23 privilege assertion was -- work product, attorney-client, etc.

24 We sent them a lengthy deficiency letter to address the issues

25 of the privilege log.  On February 9th they provided a revised

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   privilege log in which they withdrew many of the documents that

2   were on the January 31st log.  There are still, by our count,

3   232 of those documents that have been withdrawn as privileged

4   that have not been produced.

5           So that is how things have unfolded in response to

6   your order.  It seems to us the evidence is clear that there

7   has been a clear violation of that order.

8           The next step in the analysis, of course, is to

9   determine whether a sanction is appropriate.  As Your Honor

10  noted in the *Sines versus Kessler* case, a sanction has been --

11  (indiscernible) -- specifically related to the particular

12  claims at issue in the order to provide discovery.  And there

13  is the four-factor test for determining an appropriate

14  sanction.  And I'll go through quickly the four factors.

15          The first is whether the noncompliance was made in

16  bad faith.  Not every sanction requires a finding of bad faith,

17  but it certainly exists here.  Bad faith, as you noted in *Sines*

18  *versus Kessler,* includes willful conduct where the party

19  clearly should have understood his duty to the court, but

20  nonetheless deliberately disregarded it.  And that is the case

21  here.  Your Honor issued an order.  It was direct.  It was

22  unambiguous on its face.  Joshua and Stephanie Mast don't even

23  suggest it was ambiguous or they didn't understand it.  They

24  implicity admit that they understood all of it, but they

25  decided to ignore it.  They didn't search supplemental

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  responses and objections.  They didn't state whether they were

2  withholding documents responsive to any particular request on

3  the basis of an objection other than privilege.  And they did

4  not produce the great majority of their responsive documents

5  within 30 days of the Court's order, and even today are

6  withholding documents.  Had they truly had an issue, they

7  should have moved for reconsideration, and they didn't.

8       They have demonstrated a pattern of indifference and

9  disrespect to the Court's authority.  They ignored our requests

10 for production for a year, refusing to produce a single

11 document.  They ignored the Court's order compelling them to

12 complete their production by December 29th.  Instead, they

13 unilaterally decided that they could withhold thousands of

14 documents, that they could withhold them on new grounds never

15 before asserted, and they can do so without seeking the Court's

16 permission.  They have repeatedly delayed compliance with the

17 Court's order, and again even today they're still not in

18 compliance.

19      With respect to the question of the plaintiffs'

20 prejudice, there can be no legitimate question about prejudice.

21 The plaintiffs cannot take Joshua and Stephanie Mast's

22 deposition or Richard Mast's deposition until Joshua and

23 Stephanie Mast produce their responsive documents.  We also

24 cannot take or know even of third-party discovery that might be

25 needed based on a review of the withheld documents.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          In fact, discovery, as you know, closes on June 11th.

2    That is one month from now, just over a month.  We know, based

3    on a meet and confer that the parties held yesterday, that the

4    defendants intend to ask the Court to continue the trial date

5    again.  We have our third trial date, and at the last hearing

6    that we had in which we discussed a continuance, you were very

7    explicit.  You said this is a firm trial date.  The parties

8    need to be ready for trial.  They intend to move again to

9    continue the trial date.  We intend to oppose that motion,

10   although we do believe that the discovery cutoff should be

11   extended for plaintiffs only so that we can address these

12   issues raised by Joshua and Stephanie Mast's failure to timely

13   produce documents.  Obviously, we'll brief that.

14          With respect to the need for -- yes, go ahead.

15          THE COURT:  I didn't say anything.

16          MS. ECKSTEIN:  Oh, sorry.

17          Okay.  With respect to the need for deterrence,

18   again, I don't think that can be questioned.  These issues have

19   needlessly eaten up the Court's time and the parties' time.

20   And unfortunately, the conduct continues.  I regret to inform

21   the Court we'll be filing a motion soon about Joshua and

22   Stephanie Mast's failure to appropriately respond to requests

23   for admissions and likely their failure to respond to

24   interrogatories.  We've met and conferred on the requests for

25   admission.  I have asked for a meet and confer on the

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  interrogatories.  I'm assuming we will not be able to reach an

2  agreement, and they completely refuse to respond to the

3  interrogatories.  And so I suspect we will have a motion on

4  that as well.  In addition, we have received only a very small

5  handful of documents from Stephanie Mast.  We've asked for a

6  meet and confer on that issue as well.  And then, of course,

7  there is the Liberty University documents which you'll hear

8  about later.  So the need for deterrence cannot legitimately be

9  questioned.  We keep facing delay tactic after delay tactic

10  after delay tactic.

11        And then finally, with respect to whether a less

12  severe sanction would be appropriate, a finding of civil

13  contempt and fees are appropriate here.  We are not asking at

14  this point for an adverse inference or -- (indiscernible) --

15  sanctions or the like.  We're asking that Joshua and Stephanie

16  Mast be found in contempt, that they be required to pay our

17  fees incurred in prosecuting this motion and chasing these

18  documents, and that they be ordered to produce all the

19  documents they have yet to produce.

20        To conclude, Your Honor, as I said --

21        THE COURT:  Ms. Eckstein, is a finding of contempt

22  necessary for ordering attorneys' fees and also further

23  production of any outstanding documents?

24        MS. ECKSTEIN:  No, I don't believe it is.  I don't

25  believe it is under 37(b)(2)(C).  I think you can proceed

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    without a finding of contempt, although we do believe that a

2    finding of contempt is appropriate here.

3            And to conclude, as I said at the beginning, we filed

4    this case in September of 2022.  It's now almost two years

5    later and we still don't have all their responsive documents.

6            You ended your November 28th order with an

7    interesting statement on pages 11 and 12.  You stated that it

8    was your, quote, "Expectation that counsel for all parties will

9    redirect their time and energy to discovering the facts needed

10   to resolve the actual legal issues at stake in this federal

11   court action, and everyone will work together to keep the case

12   on schedule for trial."

13           That simply hasn't happened.  Instead, Joshua and

14   Stephanie Mast have taken it upon themselves to decide what to

15   produce and when to produce, regardless of your order.  That

16   they simply cannot do, and we respectfully ask that you impose

17   sanctions and that this case can proceed.

18           THE COURT:  Thank you, Ms. Eckstein.

19           Who is going to address this motion for Joshua and

20   Stephanie Mast?

21           MR. FRANCISCO:  Michael Francisco, Your Honor.  Sorry

22   for the confusion on that point.  I'll be arguing this motion.

23           THE COURT:  Okay.  Mr. Francisco, go ahead.

24           MR. FRANCISCO:  Thank you, Your Honor.

25           I think we've laid out much of the relevant facts and

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  arguments in our brief, and I'll try not to be overly redundant

2  from that.

3          To be candid, it feels like this is a motion to

4  compel that's already been -- (inaudible).  So let me give a

5  little bit of perspective here on the documents that the

6  plaintiffs are seeking.

7          I guess as an initial matter, Your Honor,

8  Ms. Eckstein closed by reading from your order that the parties

9  were to direct their efforts to produce discovery and prepare

10 for trial.  And frankly, that's precisely what counsel for the

11 Masts did.  We had 30 days from that order to produce these

12 responsive documents.  As we laid out in the brief, we have

13 over 600 hours of attorney and staff time that were consumed in

14 that 30-day period and shortly thereafter to do the production.

15 We were looking at 45,000 pages of documents, 160 some --

16 (indiscernible) -- of data.  And as we previously indicated

17 before this Court, much of the relevant material has already

18 been disclosed to the plaintiffs in the state litigation.  That

19 still remains the case.  Virtually every subject they have

20 asked for discovery here has already been subject to discovery.

21          Now, nonetheless, after this Court made its ruling,

22 we didn't dispute that ruling.  Instead, we started complying

23 with the discovery order.  And it took a lot of effort to go

24 through additional sources of documents and see if there were

25 bits of information that might have been overlooked in the

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   state litigation.  And ultimately we found a small handful of

2   responsive documents and produced those by the 28th.

3        So I think it's very misleading to characterize our

4   efforts as being dilatory or contemptuous or ignoring the

5   Court's order.  Instead, we were working quite diligently to

6   comply with it.

7        As to the specific categories of documents, Your

8   Honor, the *Touhy* category are documents that are not in our

9   legal custody and control to produce.  And the plaintiffs

10  continue to make an argument, although a weak one, that we are

11  misunderstanding or misreading the *Touhy* regulations.  I would

12  say two things to that:  First, the plaintiffs well know how

13  the *Touhy* obligations work in this legal dispute because

14  they're aware from the state case where both sides have made

15  *Touhy* requests and gotten information approved and a *Touhy*

16  request has been revoked.  So they certainly knew that we had

17  this mechanism that we had to go through.

18       Secondly, in all the correspondence with the

19  Department of Justice representatives on these *Touhy* requests

20  that the Masts made, not once did the Department of Justice

21  say:  You're asking for permission for documents that don't

22  require *Touhy* permission.  Now, ultimately the Department of

23  Justice has recently finished that review of those documents we

24  identified.  Many of them were allowed to be produced.  Some of

25  them were rejected for production.  Some of them were redacted

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  by the Department of Justice.  But there's nothing from the

2  Department of Justice indicating that we have been engaging in

3  a delay tactic or anything other than complying with our

4  legal -- our client's legal obligations as a member of the U.S.

5  military.

6          THE COURT:  Have you turned over all of the -- these

7  *Touhy* documents that the federal government has authorized you

8  to turn over?

9          MR. FRANCISCO:  Yes.  And let me make two factual

10  points that I think are particularly relevant here.

11          Ms. Eckstein is mistaken.  We requested from the

12  Department of Justice that we needed *Touhy* approval for a

13  series of documents before we made the production on December

14  28th.  We started the process of requesting *Touhy* approval.

15  That required -- I'm sorry?

16          THE COURT:  When did you start that?

17          MR. FRANCISCO:  On the 28th we sent a letter to the

18  Department of Justice and said that we have a number of

19  documents in this litigation the plaintiffs need us to produce

20  and we need to have approval.  Please tell us the procedures of

21  which to do that.  The Department of Justice responded some

22  time later -- I think it was roughly a week and-a-half or two

23  weeks -- and they required us to categorize the documents in a

24  way that was burdensome, and we had to identify which agencies

25  had equities in which documents, including some documents that

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   had multiple agencies.  And so I think it took roughly two more

2   weeks for us to do what the Department of Justice required

3   before we made that sort of, if you will, production with the

4   Department of Justice seeking approval.  But we absolutely

5   started the process before the December 28th deadline.  And

6   we've done nothing but express to the Department of Justice our

7   desire to have these documents --

8           THE COURT:  Mr. Francisco, you're talking about

9   December 28th of 2023, a year after the requests were initially

10  made, right?

11          MR. FRANCISCO:  That's not entirely accurate, Your

12  Honor.  Our clients made requests back in May of 2022 for all

13  the documents we think are relevant to this dispute, and

14  that -- the results of that ultimate *Touhy* production were made

15  in the state court process.  This request was made on the 28th.

16          THE COURT:  But nothing was -- there was no *Touhy*

17  request made after receiving the plaintiffs' request for

18  production of documents in this case until December 28th of

19  2023?

20          MR. FRANCISCO:  Well, that's correct, Your Honor.  We

21  had a motion to stay discovery that was pending throughout this

22  whole process.  And so certainly we were standing on our motion

23  to stay discovery, which this Court denied.  And as soon as

24  this Court denied that, we went through the process of

25  identifying the specific documents that may need approval as

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  quickly as we could.  And so the discovery review process took

2  that 30 days -- we didn't have a pre-existing list of every

3  particular message and email that might have government

4  information that came from these additional sources.

5       So we had made *Touhy* requests before, but we started

6  identifying the specific documents that would need that as soon

7  as we started the production of documents review.  In other

8  words, it was not possible for us the day after you made the

9  order in October to submit a *Touhy* request to the government

10 because what we needed to do was identify specific documents,

11 not make a categorical request.  That would have taken some

12 time and not covered all the information.

13      THE COURT:  Under your review of the plaintiffs'

14 request for production of documents, in the initial review did

15 you determine that there would be -- you would need to make a

16 *Touhy* request at some point?

17      MR. FRANCISCO:  Not as to the specific documents,

18 Your Honor.  We identified that the bulk of the information

19 they're requesting had previously been produced to them in the

20 state court litigation.  There was an extensive conferral back

21 and forth about what additional information they were looking

22 for.  And plaintiffs essentially said, We want you to do a new

23 global review of every possible source of electronic

24 information.  And we said that that would require extremely

25 burdensome efforts by the plaintiff that we didn't think would

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  identify very many documents, which ultimately proved to be the

2  case.

3      But we had previous *Touhy* requests in the state

4  litigation about categories, and we had requested the specific

5  documents.  But until we undertook the review of this

6  additional information such as additional cell phone data and

7  the like that might not have been fully reviewed in the state

8  case with different cutoffs, we endeavored to make that request

9  as soon as practical.  And, you know, indeed we asked the

10 Department of Justice in those requests to expedite the review

11 of these documents because the plaintiffs have said they need

12 them for litigation.  And we, as quickly as we could --

13 typically in a matter of days -- as soon as the Department of

14 Justice produced documents on a rolling basis, we produced

15 those to the plaintiffs.  And that, through efforts partly out

16 of our control, has recently been complete.  There is no more

17 *Touhy* documents from the ones we requested that need to be

18 produced.  That production is completely done at this time.

19      THE COURT:  And were those -- the *Touhy* documents

20 that were produced in April, were those all new documents in

21 that they had not been produced in the state court matter?

22      MR. FRANCISCO:  That's an impossible question to

23 answer, Your Honor.  My belief from working with the documents

24 is that a substantial portion of those documents actually were

25 produced in the state case, but ultimately we found it to be

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   impossible to perfectly filter out the state discovery from the

2   federal discovery.  And so while we did our best efforts to

3   filter those out and expedite things, at the end of the day we

4   had to identify documents that likely were produced in the

5   state litigation and simply reproduced them this case, again,

6   because we were under the burden to do this as quickly as

7   possible.

8           THE COURT:  Mr. Francisco, why didn't you ask the

9   Court for an extension of the discovery production deadline in

10  the order or ask to reconsider that order?

11          MR. FRANCISCO:  Sure, Your Honor.  Perhaps in

12  hindsight we should have asked for an extension.  I will tell

13  you that the thinking at the time was that we could comply with

14  the order, even though it was a tight order, and get the

15  production done.  Now, at the end of the day, there was a

16  technical hangup with the cell phone collection that required

17  these 14 documents and 28 documents to be reviewed and produced

18  a couple of days later.  That was consistent with how the

19  parties had done production in the past.

20          On the *Touhy* issue and the J&DR issue, Your Honor,

21  our view is that those are not subject to this Court's order

22  because they're not in our legal custody and control to

23  produce.  Like, we are prohibited from producing them, absent

24  getting approval from the government or the state court.  And

25  so --

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          THE COURT:  Well, Mr. Francisco, wouldn't that just

2     provide a reason for you to request some -- get some extension

3     of the deadline rather than just not complying with the

4     deadline?

5          MR. FRANCISCO:  Well, we don't think it was not

6     complying, Your Honor.  I suppose we could have asked for an

7     extension, but our view was by requesting *Touhy* approval by the

8     28th and identifying every document that we thought needed

9     *Touhy* approval, that that was compliance with the order.  At

10    that point, it was up to the Department of Justice.

11         For example, I wouldn't know how long of an extension

12    to have requested.  But again, until we get approval for those

13    documents, we didn't think that they were responsive to this

14    Court's order because they weren't in our custody and control.

15         Your Honor, I also want to mention it's not as if we

16    were trying to hide the ball or delay here.  For instance, the

17    plaintiffs requested that they wanted to see a log of the *Touhy*

18    documents.  And that's not a legal requirement under any court

19    precedent or rule because it's not a privilege.  Nonetheless,

20    even though we don't believe we had any legal obligation to do

21    so, we produced a hundreds-of-pages-long log that identified

22    for them what those *Touhy* documents were while we continued to

23    work with the DOJ to get the documents produced.

24         Your Honor, I'll move on briefly to the J&DR records.

25    I think that one is relatively simple.  Our view is that we're

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  prohibited from Virginia statute and the Court's rulings from

2  producing that handful of documents.  If the court in

3  Virginia -- state court rules otherwise, we're obviously happy

4  to comply with that as soon as possible, but they've been

5  denied by the Court several times from obtaining those

6  documents.  We don't think, until that changes, that we're free

7  to produce those.  We certainly don't -- go ahead.

8           THE COURT:  The plaintiffs have discussed a few

9  categories of documents under that request.  There's the

10 categories that they view as the court file or court records,

11 and then they've also said there are -- there may be documents

12 that Defendant Masts have that I guess are not part of that

13 court record, but would fall under the request.

14          Are there some documents under that second category

15 that you produced or that you haven't produced?

16          MR. FRANCISCO:  No, Your Honor.  That's complete

17 speculation from the plaintiffs.  Everything that we've

18 identified requiring the J&DR approval is what we believe is

19 the court's file.  There is no document that I'm aware of that

20 fits that description.

21          I would note again that that's why this is really a

22 motion to compel that should require conferral instead of

23 moving straight to a sanctions motion.

24          THE COURT:  I disagree with that.  I mean, there is

25 an order that I entered that the plaintiffs are saying that you

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  didn't comply with.  I mean, that's the basis of it.  It's a

2  violation of an order.  It's not another discovery request.

3       Part of that order was for you to identify what

4  documents you haven't produced.  If you had done that, then the

5  plaintiffs wouldn't have to speculate about what has or hasn't

6  been produced.  We would have that for the plaintiffs to

7  evaluate, for you to evaluate, and for me to evaluate in

8  determining whether you complied with the Court's order.  That

9  was part of the reason for me putting that language in that

10 order.

11      MR. FRANCISCO:  Well, Your Honor, I think we've been

12 putting an extreme amount of effort into identifying those

13 documents and producing them or letting them know which ones

14 are not produced.

15      The whole notion that we didn't update our objection

16 letter I think is -- it misses the point here.  We've conferred

17 with the plaintiffs on our objections.  My understanding was

18 they were going to narrow some of their requests potentially or

19 clarify them.  They declined to do so.  We looked at our prior

20 objections and we thought they were sufficient.

21      The reality is as we sat on December 28th, or as we

22 sat -- as we sit here today, the plaintiffs know what is being

23 withheld or what is being produced, and it was produced

24 ultimately.  We did not withhold anything for any reason other

25 than privilege or the *Touhy* information restriction or the J&DR

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  restriction.  That's been very clear.  Every production letter

2  we have has noted that we have identified documents that

3  require *Touhy* approval, and we went out of our way to identify

4  those documents even before they were subject to production for

5  them so that they could see what the documents were.  But we've

6  done everything we can to produce all the documents.  We're not

7  withholding anything.

8          And along those lines, there's confusion on the

9  privilege log I can clarify very quickly, Your Honor.  Again,

10  there is speculation from plaintiff that there's 232 documents

11  that weren't produced in the privilege log.  That's completely

12  incorrect.  It was produced in the *Touhy* production last week.

13  And the reason there were 232 documents that they had trouble

14  identifying is simply because there were some documents that

15  were marked for *Touhy* approval that were also marked for

16  privilege, that in our subsequent quality control review we

17  downgraded the privilege assertion but they maintained their

18  status requiring *Touhy* approval.  So there's nothing left to

19  produce, and there never was documents withheld from the

20  privilege log.

21          THE COURT:  Mr. Francisco, I think the court record,

22  the last objections and responses that you made to the first

23  request for production, is that your first amended responses

24  and objections at 230 -- ECF 230-3?

25          MR. FRANCISCO:  Your Honor, I'm sorry, I'm not

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  certain, sitting here, what the document number is.  We can

2  certainly endeavor to identify that and get back to the Court.

3  I'm just not comfortable saying for certain right now.

4          THE COURT:  Do you know -- I mean, was there a second

5  amended response, or the first amended response that I referred

6  to, is that the last one that you recall making?

7          MS. ECKSTEIN:  Your Honor, this is Maya Eckstein.

8  That's correct.  The first amended responses are the last

9  official formal objections and responses that we received.

10  They were attached to our motion to compel.

11          THE COURT:  And Mr. Francisco, I think you had sent a

12  letter that is now part of the record in November saying that

13  you stood on those objections and responses.

14          MR. FRANCISCO:  That's right, Your Honor.

15          I would note, however, that we sent that objection

16  letter and we stood by those objections at the time that we

17  were still actively reviewing documents.  And so, of course to

18  the extent we identified, for example, specific documents that

19  required Touhy approval, or that were subject to the J&DR

20  confidentiality rules, we obviously would have to identify

21  those through the process.  We were in the midst of doing the

22  review and the production when that letter was produced.

23          THE COURT:  It looks like from that letter and your

24  first amended objections that you produced documents for six of

25  the requests, but none of the others; is that right?

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1         MR. FRANCISCO:  That does not sound right to me, Your

2    Honor.  I think -- I'd have to look at the specific requests.

3    I don't think there's any allegation we have declined to

4    produce documents responsive to particular requests, other than

5    the issues with the J&DR, the privilege, and the *Touhy* issue.

6         THE COURT:  All right.  Well, I think I'm going from

7    reviewing your first amended request and seeing if there is any

8    affirmative statement in them saying that you're going to fail

9    to produce documents.  That's how I'm getting to this six

10   number that there's some statement in six of them -- and I

11   think it's 5, 9, 12, 15, and 18 where -- let's see -- saying

12   that there would be -- because you're agreeing to some

13   production.  I think the rest of your responses indicate that

14   you're not.  And so that's another reason why I gave you the

15   opportunity to supplement.

16        MR. FRANCISCO:  Your Honor, I think through the

17   conferral call that we had with Ms. Eckstein around that time

18   we made clear after this Court's ruling that we were simply

19   going to produce all responsive documents, other than the legal

20   privilege.  So if the letter had indicated otherwise, then

21   perhaps that was an oversight or a mistake, but I don't think

22   there's ever been confusion as between us and the plaintiffs.

23   We were no longer, for instance, objecting on burdensome,

24   relevance, ambiguity.  All of those types of objections we

25   essentially set aside, and we just simply produced all the

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  documents as quickly as we could, other than these three

2  categories.  And I thought that was well understood in the

3  conferral call.  And if there was a holdover in the previous

4  letter and email that indicated otherwise, then it certainly

5  wasn't intentional, and I think the plaintiffs have known that

6  these are the only bases we have for withholding documents.

7         THE COURT:  All right.  Mr. Francisco, what else

8  would you like to say?

9         MR. FRANCISCO:  I would say, Your Honor, no sanction

10  is appropriate in this circumstance.  Even if it would have

11  been more prudent, or in hindsight we should have filed

12  requests to reconsider and extend the deadline, I want to make

13  very clear that the Masts have done everything they can to try

14  to timely comply with these requests, including an

15  extraordinary amount of effort reviewing substantial data.  And

16  every time the plaintiffs had questions about specific issues,

17  we talk to them and we try to come to an understanding, such as

18  when we voluntarily gave them the *Touhy* log so they could have

19  information about that.

20         And there's this vague notion from their argument,

21  Your Honor, that there might be other deficiencies or issues

22  that they're going to raise for a new discovery request in the

23  future, but frankly we haven't had a chance to confer on those,

24  and it's a little bit troubling that they're arguing or

25  insinuating things like that Stephanie Mast has a small amount

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  of documents, and therefore you should infer that we're trying

2  to hide information.  That's just absolutely not the case.  We

3  have produced every single responsive document for Stephanie

4  Mast in this case.  And again, we haven't had a chance to

5  confer on this, but I just want to use that as an example to

6  say the Masts here are not trying to delay whatsoever.  It has

7  been a complicated and burdensome review process that was

8  largely due to the number of electronic devices, the amount of

9  data that was collected, all of the previous state court

10 litigation, and Mr. Mast's obligations as a member of the

11 military to comply with *Touhy* that we've gone through the

12 process, again, not trying to delay, at every step of the way

13 telling the Department of Justice we want them to do this as

14 quickly as possible.

15         The last point I want to make, Your Honor, is that we

16 don't think they've shown prejudice certainly that would

17 justify any sort of sanction in these circumstances.  And, in

18 fact, they hardly mention prejudice in their brief, other than

19 to say that they can't -- you know, they don't want to depose

20 Mr. Mast until stuff is produced.  But again, they have -- they

21 have -- and have had for quite some time -- most all of these

22 documents.  And there really is no prejudice from, for

23 instance, the two weeks it took to produce 14 extra documents

24 or the fact that we spent some number of days finalizing a

25 privilege log consistent with the plaintiffs' own practice in

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  doing that.  There's no prejudice from the slight delays that

2  unfortunately have been necessitated in this case.  And

3  certainly if we would have briefed and argued a motion for an

4  extension or reconsideration, it would not have resulted in the

5  documents getting to the Masts or getting to the plaintiffs any

6  faster than they were.  We really moved as quickly as possible

7  in these circumstances to produce the documents.

8       And moreover, we're done with the production.  The

9  *Touhy* documents have been produced.  The privilege log issue I

10  understand is subject to a separate motion on the

11  attorney-client privilege.  The 230 documents is not accurate.

12  Those have all been produced.  There is nothing left to

13  produce.  They have the privilege log.  They have the extra

14  information.  We're happy to continue to comply with requests

15  as quickly as possible and confer, and we regret that it's

16  taken this long to get to this hearing.

17       THE COURT:  It sounds like there's been one -- at

18  least one outstanding issue concerning the JDR documents and

19  whether those can be obtained for use in this litigation.

20       MR. FRANCISCO:  Correct, Your Honor.  I might suggest

21  that if they go at the J&DR court and disclose the context of

22  this federal discovery, you know, we certainly can look at not

23  being an impediment to that process.  I'd be a little bit

24  hesitant to commit my client to that without conferring with

25  him.  But as Mr. Moran noted, that J&DR process is not entirely

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  in our control.  But what we're very comfortable with saying is

2  if and when the Virginia state court clarifies the issue and

3  says they can have copies of documents, we'll produce them

4  within three days absolutely.

5          THE COURT:  All right.  Thank you, Mr. Francisco.

6          Ms. Eckstein, is there anything else you'd like to

7  say on this motion?

8          MS. ECKSTEIN:  Thank you, Your Honor.  Just a few

9  points that Mr. Francisco addressed.

10          With respect to the production in the state court he

11  said -- I think Mr. Francisco said something to the effect of

12  there weren't many documents to produce in federal court

13  because they had been produced in state court.  What we know is

14  that, at least as of Tuesday night, now they have produced more

15  than 2,000 documents.  Our review of those documents, to the

16  extent that we've been able to produce other than those

17  produced Tuesday night, is that many of those documents were

18  not produced in state court.  So this is not a duplicative

19  production from the state court.  These are new materials that

20  we had not previously seen.

21          With respect to the argument that they do not have

22  legal custody or control over the *Touhy*-related documents, I

23  mean, frankly, this is not an issue that was previously raised.

24  They had many opportunities to raise this issue.  They waited

25  until after your order compelling the documents' production.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  That's simply not how litigation is supposed to proceed.

2           Mr. Francisco references a December 28th letter to

3  the Department of Justice to ask how the *Touhy* process should

4  work.  That's a little confusing to me because, as he himself

5  said, we've handled many *Touhy* issues in the state court

6  litigation.  They know how that process works.  Regardless, we

7  have asked him for a copy of that December 28th letter that he

8  sent to the Department of Justice so we can see what it says.

9  Joshua Mast and Stephanie Mast have not produced it.

10          With respect to the juvenile and domestic relations

11  court documents -- also not being in our possession, custody

12  and control -- again, this is an issue that was never raised

13  before, not until after you issued your order compelling the

14  documents' production.  And I want to be clear on this point.

15  We are not asking them to go to the court and get copies of the

16  court's files for us.  We're asking them to produce only what

17  is in their possession.  Now, they may have a copy of the

18  custody order in their possession or a copy of the petition for

19  custody in their possession, but we're not asking for them to

20  go get it from the Court.  We're only asking for documents in

21  their own possession, custody, and control to be produced.

22          With respect to the log of *Touhy* documents that

23  Mr. Francisco mentioned, as I mentioned in my argument, that

24  log has become useless to us because they produced the

25  documents using a totally different Bates number or Bates label

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  than what is used on the log.  We have no way of comparing the

2  two.  So it was a useless exercise at this point.

3          With respect to the juvenile and domestic relations

4  documents, Mr. Francisco said that we know what's being

5  withheld.  We have no idea what's being withheld with respect

6  to that production, or how many documents there are.

7          You asked whether they produced documents in response

8  to requests for production.  We do not know as to which request

9  for production they are producing documents.  We don't know as

10  to which request for production they have withheld documents

11  because they have not told us.

12          Mr. Francisco said that based on the parties' meet

13  and confer, it was understood by plaintiff and everybody that

14  they intended to produce all responsive documents other than

15  privilege and J&DR documents, I guess.  But that November 16th

16  objection letter on which they are relying that they said they

17  stand on specifically includes objections; for example,

18  objections that the plaintiff did not specifically identify the

19  particular documents they want produced.  So are they

20  withholding documents on that basis?  We don't know.  And you

21  did already reject that basis for an objection in your November

22  28th order.

23          With respect to the comment that we haven't conferred

24  on other issues, we have, in fact, met and conferred with

25  respect to requests for admissions, and we have asked for meet

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  and confers on the other issues regarding Stephanie Mast and

2  the interrogatory response or the failure to respond to

3  interrogatories.

4        With respect to the argument that there is no

5  prejudice, he referred to this as a slight delay.  Three to

6  four months past a court order deadline for a complete

7  production is not a slight delay.  It's just not.  And there

8  are documents that still have not been produced.

9        Your Honor, they have not provided a legitimate

10 explanation for failure to produce, failure to complete their

11 production by December 29th, or for a failure to correct, to

12 ask the Court to amend its order for reconsideration for an

13 extension or for some other special dispensation, or for their

14 failure to provide amended responses and objections to our

15 request for production, and to state whether any documents are

16 being withheld based on those objections.  They haven't

17 provided a legitimate explanation for those failures, those

18 violations of the Court's order.  And we ask that sanctions be

19 imposed.

20        THE COURT:  Ms. Eckstein, a little housekeeping

21 matter related to this motion.  At ECF 344, I believe this is

22 supposed to be a sealed exhibit of the privilege log.  What's

23 actually filed there is not the privilege log.  So I think I

24 would ask that you would just re-submit the intended Exhibit 1

25 for filing and just have that -- have that document replaced.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    What's there in 344 was already included in -- as an attachment

2    to the motion for sanctions.

3              MS. ECKSTEIN:  We will do that, and we apologize for

4    any mistake in that regard.

5              MR. KASHFIPOUR:  I apologize, Your Honor.  Could I

6    clarify one quick point?  This is Ehson Kashfipour for the

7    plaintiffs.

8              I just want to clarify one point that counsel for the

9    Masts mentioned about the juvenile and domestic relations

10   court.  We have asked for access to the JDR court record on

11   multiple occasions.  Counsel for the Masts opposed those each

12   time.  We did, in fact, raise the fact that we need those

13   records to pursue this litigation in federal court.  The latest

14   hearing was on February 23rd, 2024.  Mr. Moran was not, in

15   fact, at that hearing, I believe.  But counsel for the Masts

16   did oppose our request at that hearing as well.

17             And I also want to note that there is no guardian ad

18   litem appointed in that JDR proceeding.

19             Thank you, Your Honor.

20             THE COURT:  Okay.  Mr. Moran or anyone for the Masts

21   have anything else they want to say on that point?

22             MR. FRANCISCO:  Your Honor, I would just say that

23   we're happy to fill in some of the gaps that frankly have been

24   identified on this call.  They're a little bit news to me.  To

25   the extent there is confusion on the *Touhy* log, we're happy to

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   provide a cross reference to that.  That was obviously a

2   document produced in the midst of production.  We can certainly

3   give copies of the letter to DOJ if this Court finds that

4   appropriate.  I mean, I think overall we've acted in good

5   faith.  We've been diligent in trying to comply.

6           The issue of the objection letter, I'm sorry, Your

7   Honor, that that's been more confusing than I certainly

8   understood it to be.  If it's helpful, we are certainly willing

9   to provide an updated objection letter that puts forth in

10  writing very clearly which requests we produced documents to,

11  and which ones are subject to these narrow categories.  I think

12  they're quite narrow, specific categories, and that we really

13  have produced all documents responsive to the request.  But I

14  recognize after this hearing that the written records might not

15  clearly reflect that as well as I thought.

16          So again, we'd be happy to do those sorts of

17  clarifying things on very short order, if that's necessary.

18          THE COURT:  Counsel, we've been going for a little

19  bit over an hour.  Why don't we take about a five-minute

20  recess.  Don't hang up.  Just put your phones on mute and we'll

21  come back in five minutes to address the other motions.

22          (Recess.)

23          THE COURT:  This is Joel Hoppe.  Let's resume this

24  hearing and we will pick up with Joshua and Stephanie Mast's

25  motion to compel, and this concerns two interrogatory requests.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          Counsel for the Masts, this is your motion.  So I'll

2   hear from you.

3          MR. MORAN:  Okay.  Thank you, Your Honor.  John Moran

4   for Joshua and Stephanie Mast.

5          Again, I'll try not to -- I don't want to regurgitate

6   the briefing here, but just for brief context, these two

7   interrogatories arise from a declaration that Plaintiff John

8   Doe submitted to the U.S. Customs and Immigration Service in

9   August of last year in support of his application for asylum.

10  That declaration was subsequently produced to us in this

11  litigation.  The declaration describes that there is a

12  different family in Afghanistan not previously disclosed who

13  claims that Baby Doe is their daughter.  And these claims are

14  apparently set forth in a video, or were recorded on video at

15  some point.

16         As the Court is well aware, the parentage of Baby Doe

17  is central to the claims the plaintiffs are asserting in this

18  litigation.  And we think it's fairly obvious that if John

19  Doe's declaration is true, then this video, if it is recorded

20  and exists, would substantially undermine plaintiffs' claims.

21  But at a minimum, we feel that we have the right to pursue that

22  in discovery.  As a result, the Masts -- (indiscernible) --

23  interrogatories, including number 13 and number 14, to help

24  understand this issue and determine whether their --

25  (indiscernible) -- is to obtain additional highly relevant

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   evidence.

2          The Does have two basic arguments for why they're

3   refusing to provide any further information about this

4   competing claim of parentage.  The first is reliance on Rule

5   33(d), but that rule applies only to business records, which

6   the declaration plainly is not.  The other, and what I take to

7   be their main objection, is simply to say that we can ask John

8   Doe about this when we depose him, but that is not their call

9   to make.  And if the current discovery schedule holds, then

10  it's highly unlikely that waiting for the deposition would give

11  us a meaningful opportunity to pursue this potentially

12  important evidence.

13         So, you know, again, we think we're entitled to have

14  them explain this competing claim, the provenance of the video,

15  and what John Doe knows about it, and that we're not limited to

16  reading the declaration for ourself under Rule 33(d), and we're

17  not limited to waiting for the deposition to ask him about it

18  in person.

19         THE COURT:  All right.  Who would like to address

20  this motion for the Does?

21         MS. ECKSTEIN:  Your Honor, this is Maya Eckstein

22  again.  I'll do that briefly.

23         I want to start by clarifying what the declaration

24  says.  It does not, as Mr. Moran suggested, describe a

25  different family that is claiming parentage to Baby Doe.  It

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  simply describes -- has been told to John Doe second and

2  thirdhand about what a stranger told other people.  It is not a

3  claim of parentage that they are aware of.  It's simply

4  providing hearsay upon hearsay information about something that

5  happened in Afghanistan.  The Does are not aware of any other

6  family that is making a parentage claim other than the Masts.

7        With respect to -- well, we agree that the Masts have

8  a right to pursue this issue in discovery.  We absolutely

9  agree, but we can only give them the information that we have.

10  We have no obligation to -- I mean, it would be improper to

11  come up with information, right, to just make it up.  We

12  have -- we have provided them the information that we have, and

13  that is the information that is in the declaration itself.

14        With respect to Rule 33(d) only applying to business

15  records, I'll note that that is an issue that the Masts

16  addressed for the first time in their reply brief.  In doing

17  so, they cited to a case, the *Landis versus Tailwinds Sports*

18  case out of the District of DC -- the District of Columbia.

19  We're not aware that that is the rule in the Western District

20  of Virginia.  It doesn't appear to have been addressed here

21  before or by the Fourth Circuit.  We also looked at the Eastern

22  District and didn't see that issue addressed there.  I will say

23  that in my 25 plus years of litigating, I have used, and other

24  parties have used, Rule 33(d) on behalf of individuals without

25  objection.  It has been done regularly and repeatedly.  If the

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

 1   Court believes it was improper to use Rule 33(d), we can

 2   certainly convert the language that is in the declaration

 3   itself to an interrogatory response, but we can't provide

 4   information that we don't have.  And so --

 5        THE COURT:  I don't think it's improper to use Rule

 6   33(d) so long as what's being produced fully responds to the

 7   interrogatory and accurately responds from John Doe's point of

 8   view.

 9        I do -- at least for number 13, I do question whether

10   providing the declaration response to every bit of that

11   request -- it says, Identify all persons with knowledge of the

12   video.  It may be that there is no additional information that

13   John Doe has as to this question, but I do think that you could

14   also say that.  And, you know, if there's no one else who has

15   knowledge of the video, you can -- at least as far as John Doe

16   knows -- you can say that as well.

17        MS. ECKSTEIN:  Understood, Your Honor.  We can

18   certainly do that.  We believe that the declaration does

19   respond to interrogatory 13.  It asks for -- identify all

20   persons with knowledge.  The declaration identifies people with

21   the knowledge of this supposed video.  It also provides

22   information about the creation, production, dissemination, and

23   format of the video -- supposed video.

24        As to past and current locations and the number of

25   copies of the supposed video, I think our position is the

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   objection and the response make clear that Jane and John Doe

2   don't know if the video even exists, so they cannot know past

3   or current locations or number of copies.

4         THE COURT:  Okay.  Ms. Eckstein, anything -- anything

5   else?

6         MS. ECKSTEIN:  No, Your Honor.  We believe we

7   appropriately responded to the interrogatories.  As I said, we

8   simply can't provide information that we don't have.  All the

9   information that our clients have is in that declaration.

10        Thank you.

11        THE COURT:  Mr. Moran, anything else?

12        MR. MORAN:  Just briefly, Your Honor.

13        I mean, we are not opposed to them taking the

14  information in their declaration and converting that into a

15  response, if that's what they believe in good faith to be an

16  accurate response.  As Your Honor noted, we don't believe that

17  the declaration itself -- which, of course, was drafted for a

18  different purpose -- you know, addresses with particularity the

19  questions we have.

20        For example, Ms. Eckstein says that they don't know

21  what form the video came, and that's the basis for their

22  objection.  That could very well be part of their substantive

23  response, but to simply object on the basis that they don't

24  know is sort of nonresponsive to the inquiry.  You know, if

25  they genuinely don't know, they can say that in their response

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  and we can go from there.

2          THE COURT:  All right.  Well, counsel, as to this

3  one, I'm going to issue a very short order on it.

4          For number 13 I'm going to require that the

5  plaintiffs supplement this interrogatory.  Where I think that

6  the response may be deficient is identifying all persons with

7  knowledge of.  In reading the declaration, perhaps it

8  identifies all persons John Doe is aware of, but that's not

9  necessarily the purpose of the declaration.  So it may be that

10 this response in essentially responding with the declaration is

11 sufficient, but perhaps not.  So I do want John Doe -- the

12 plaintiffs -- to supplement their response on 13, and I'll

13 spell that out further in a written order.

14         As far as 14, it seems that the declaration and the

15 response, that does address what 14 requests, and there really

16 isn't any information that I can tell from the language in 14

17 and in reviewing the declaration and the interrogatory response

18 that appears to be missing.  So I think that the response to 14

19 is reasonably sufficient.

20         Now, as plaintiffs' counsel noted, if there are other

21 issues to explore with this video, a deposition would be the

22 appropriate place to take up all those issues.  And I think for

23 14 the response is sufficient.

24         I'll enter a written order to address this motion.

25         MS. ECKSTEIN:  Thank you, Your Honor.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          THE COURT:  Let's move on to the Liberty University

2     emails.  And I think that each of the parties -- at least the

3     Does, and Richard Mast, and then Joshua and Stephanie Mast --

4     have filed motions on this.  So, you know, I do want to make

5     sure that everybody gets an opportunity to argue and to argue

6     in rebuttal as well.

7          Why don't we -- why don't we just take them up in the

8     order that they were filed.  Mr. Yerushalmi, if you want to

9     argue on behalf of your motion, you certainly can.  I'll have

10    you argue first, and then we can hear from Joshua and Stephanie

11    Mast's counsel, and then the Does, and then we can go back

12    through that same order for rebuttal.

13         Mr. Yerushalmi, would you like to argue as to your

14    motion?

15         MR. YERUSHALMI:  Judge Hoppe, as we indicated in our

16    email to the Court, we'll rest on the briefing.  We believe it

17    is sufficient.  We will reserve our right that you provided for

18    rebuttal if we hear something untoward or outside of the scope

19    of the submissions, but we'll rest on our submissions.

20         Thank you.

21         THE COURT:  How about for Joshua and Stephanie Mast?

22         MR. AUL:  Your Honor, this is Francis Aul for Joshua

23    and Stephanie Mast.

24         I would like to say a few words.  I'll try to keep it

25    brief because I do think all the briefing in this case is

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    sufficient for this Court to decide these motions.  I would

2    just -- to contextualize, I'll begin at a slightly higher

3    level.  The plaintiffs do not dispute that our designation of

4    some of the materials in the Liberty University email accounts

5    would qualify as attorney-client privilege and marital

6    privilege.  As to those, their response is only that we

7    potentially waived those protections, and then separately under

8    the work product doctrine they do say that some of the

9    documents don't qualify under the requirement for the purpose

10   of litigation or that we acted in conscious disregard.

11       Now, I'll just run through the *Asia Global* factors

12   relatively quickly, but I think at a high level the question

13   here is, you know, does this Court accept the plaintiffs' sort

14   of construction of their own notion of how the policy at issue

15   here works, or whether the evidence presented from Liberty

16   University's director of IT, its counsel, and the statements of

17   Richard and Joshua Mast show that their reading does not

18   reflect the reality on the ground; in other words, that they

19   have an objectively reasonable expectation of privacy.

20       So I'll just start with the first factor.  I think

21   it's pretty clear here, the question being whether there is a

22   policy banning personal or objectionable use.  There is in the

23   policy some provisions banning objectionable use, but the Masts

24   could have used their email accounts for personal reasons.  I

25   think the plaintiffs point to two cases, but both of those are

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   really outliers in the grand scheme of things.  You know, there

2   is -- there is some mention in the policy that they lack

3   expectation of privacy, but most courts have said, well, that's

4   not sufficient to defeat their expectation of privacy here.

5   That's just a standard form boilerplate provision in all of

6   these electronic use policies.

7           For the next factor, whether the corporation

8   monitored the use of the employee's --

9           THE COURT:  Mr. Aul, when you refer to all of these

10  email policies, are you talking about all the

11  employer-furnished email systems or policies, or are you

12  talking about all email period, like Gmail and Yahoo and so

13  forth?

14          MR. AUL:  For sure -- what I mean to say is that I

15  think these are ubiquitous provisions in most any electronic

16  access policy you could find.  I did look around a little bit

17  to try to see what other universities in Virginia did, and I

18  found a lot of similar language, and I would expect a lot of

19  similar language in corporate computer policies.  You see it

20  come up in some of the cases.  But all I was meaning to say was

21  that Liberty University's policy and its provisions and its

22  language are very standard.

23          So on the question of monitoring, I think the

24  plaintiffs' basic submission here is that because Liberty

25  University reserved the right to monitor -- that they did, in

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  fact, monitor -- I think again here if you look at the cases

2  that we cite on page 8 of our opposition in note 3, I think

3  that most courts sort of coalesced around the view that what

4  matters is not whether they reserved the right, because, of

5  course, I think most of these policies would likely reserve the

6  right as a good business decision, but to look at the

7  historical practice of monitoring email -- you know, the email

8  accounts.  And I think that makes a lot of sense, you know,

9  because this is a prime example here of where the policy, as

10  plaintiffs have tried to point out, says that the University

11  reserves the right to monitor.  But we have the word of the IT

12  director who implements this policy saying, no, we have an

13  actual practice doing the opposite, trying to preserve the

14  privacy of the emails and not conducting regular monitoring.

15  So I think that matters in the ultimate question here is

16  whether the Masts have a reasonable expectation of privacy in

17  these emails.  It really matters what they understood and what

18  the University did.  So on that factor I would say that the

19  Court should look, as most cases have, to the historical

20  practice of, you know, in most of these cases the employer, but

21  here the University.

22          On the question -- the third factor, access of third

23  parties to these emails, there is only one case that plaintiffs

24  cite for the idea that, you know, because the policy says, hey,

25  these are potentially subject to disclosure, that's enough to

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  satisfy that third factor.  The case they cite is I think

2  easily distinguishable in a reserve fund, a heavily regulated

3  company who had to regularly provide communications and emails

4  to the government and regulatory agency.  That's not what

5  Liberty University is here and the Masts are not employees of

6  Liberty University.  So it wouldn't be expected that their

7  emails might be turned over as part of a regular production as

8  a regulatory body.

9        The last factor I would just say on whether they were

10  aware of this, it's entirely possible that perhaps Joshua, when

11  he first received this email account, was made aware of the

12  policy that existed at that time.  He couldn't recall that.

13        THE COURT:  What was the policy at that time?  Do we

14  have that in the record?

15        MR. AUL:  I do not have it, Your Honor.  Someone can

16  correct me if they have a copy of it, but we're talking mid

17  2000s.  We don't have a copy of that.

18        But I would just say that perhaps at some point

19  Joshua received or was required to accept that he had received

20  the policy in some form or fashion, but all the evidence we

21  have since that time is that both Richard and Joshua Mast

22  believed, as the University later confirmed, that the

23  University strives to protect the confidentiality of its

24  employees' and students' and alumni's emails.  That's confirmed

25  by the practice in this case and in the state court litigation

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    where at every turn the University has made us aware of these

2    subpoenas and given us an opportunity to object on whatever

3    grounds we have.

4           And just to sort of illustrate the point I opened

5    with, which is that, you know, the plaintiffs have proffered

6    sort of their own construction of how the policy worked in

7    practice and the divergence from the evidence here is the

8    plaintiffs' repeated reference to things like the splash screen

9    upon login.  You know, the attachments we have given to Joshua

10   Mast's declaration show that's just not the case here, that

11   there is -- you know, he hasn't received regular reminders.

12   He's always believed -- and the University has confirmed --

13   that they try to do their very best to protect things from

14   public exposure.

15          So, you know, I promised to be brief.  I think I've

16   probably gone a little longer than I intended to.  But I will

17   leave that there, unless the Court has questions.

18          THE COURT:  I mean, it seems that the plaintiffs'

19   arguments are based on the policy and the actual language of

20   the policy, but that Joshua Mast has submitted a declaration

21   that explains his experience in using this email system is

22   somewhat different than what is explained in the policy.

23          Is that accurate?

24          MR. AUL:  Yeah, I think that's precisely the point.

25   The plaintiffs look at the policy and as best they can

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  articulate how they think it works.  Again, I think the case

2  law looks to how things work in practice.  And you have a

3  declaration from Joshua, Richard, the IT director at Liberty

4  University, and its counsel.  So I just think that that

5  evidence should weigh much heavier in your analysis.

6        THE COURT:  Do the *Asia Global* factors, do they seem

7  to fit this situation well?  It seems that a lot of the cases

8  that were cited concern employee emails written on a system

9  that was provided by the employer, or in some instances

10  universities wanting to -- or accessing student emails on a

11  system that the University itself provided, which would be like

12  Liberty accessing the emails of the past themselves.

13        Does this work well here when it seems that the Masts

14  are alums.  They're former students.  They're not employees of

15  Liberty.  Does this test really work well?

16        They're basically just using the email system for

17  their personal use.  They're not employees.  They're not

18  students.

19        MR. AUL:  Yes, Your Honor.  We made a point of this

20  in our -- I believe it was our opposition brief, just to note

21  that we didn't think that this test maps particularly well onto

22  this context, and I'll state why in a second.

23        I'll just note that when we were looking around at

24  the cases that applied the *Asia Global* factors, I believe I

25  only found two, one of them being *Doe 1 versus George*

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   *Washington University,* which the plaintiffs cite, and another

2   one out of the Sixth Circuit which was ultimately overturned

3   and became kind of moot.  There are not many cases out there

4   applying *Asia Global* to this context.  And I think *Asia Global*

5   does not map on well to this situation because, as you rightly

6   noted, almost all those cases are about employer/employee

7   relationships.  And in that context you have the employees who

8   are acting as agents of the company using company computers and

9   company email addresses and constantly reminded about, you

10  know, acceptable conduct on their computers probably when they

11  log on and various other reminders.  You know, those employees

12  are, you know, at the sufferance of the employer, and the

13  employer has a very strong interest in making sure that it is

14  overseeing the electronic conduct and activity of its

15  employees.

16          And by contrast here, you have what I think is, you

17  know, essentially, you know, a Gmail account for their alumni

18  that the University just has no interest in policing or

19  observing or keeping tabs on.  You know, it might be different

20  for the Liberty University employees or maybe some students who

21  are actively enrolled in the University.  But it just seems to

22  me that if, you know, the -- (indiscernible) -- level test and

23  the objective expectation of privacy test is supposed to be

24  applied to this circumstance that you have to take into account

25  the different context that we have here, and how if this case

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    had never been brought, no one would ever have even thought to

2    take a look at the Mast email address, which, you know, gives

3    them a perfectly reasonable expectation of privacy in their

4    email.

5         THE COURT:  I mean, here again the policy clearly

6    applies to alums using the email system.  You have sort of like

7    a courtesy use of the email system.  But, you know, all of the

8    alums' use, it's all going to be private use.  The alums aren't

9    doing anything in some capacity for Liberty, or as employees of

10   Liberty, or as students of Liberty.  None of their emails

11   should have anything to do with Liberty, which seems like it's

12   part of the reason why an employer-provided email account would

13   have this type of expectation of privacy because the employer

14   or the University would want to have some ability to kind of

15   police what's going on in these electronic communications that

16   concern the employer or concern the University.

17        I'm not sure this test -- I haven't seen a different

18   one out there that specifically addresses these issues, but I'm

19   not sure it's the best test.

20        MR. AUL:  Yeah, the only other thing I would say,

21   Your Honor, is that we do know sort of what the tests that a

22   lot of courts have applied for waiver in the electronic space

23   and reasonable expectation of privacy.  I don't think you have

24   to specifically apply *Asia Global* to conclude, based on all of

25   the evidence that the parties have collected, is that, yes,

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    they did.  These were just private personal accounts the

2    University knew they were using for private personal reasons,

3    and had no interest in actively policing.

4                That's all I would say on that.

5                THE COURT:  All right.  Ms. Eckstein?

6                MR. POWELL:  Your Honor, it's Lewis Powell.  I'm

7    going to handle this motion.

8                May I proceed?

9                THE COURT:  Yes, sir, Mr. Powell, go ahead.

10               MR. POWELL:  Judge, to your question, Liberty's email

11   system is a private email system.  It is not like Gmail or

12   Yahoo or something that you or I or anyone on this phone call

13   could sign up for, and as to which we would have a reasonable

14   expectation of privacy because of the federal Stored

15   Communications Act.  That's not where we are.  Liberty's system

16   is a private system accessible only to students, staff,

17   faculty, and alumni.

18               Judge, as to whether the *Asia Global* factors apply, I

19   understand Your Honor's question about does it fit this

20   circumstance?  Well, the parties, counsel, all the briefing

21   have been in agreement that the *Asia Global* factors do apply.

22   It may not map precisely as opposing counsel suggests, but this

23   is the way the parties have briefed the issues.  And I think,

24   as Your Honor digs into this a little bit further, this is the

25   widely accepted test for whether there can be an objectively

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  reasonable expectation of privacy with respect to what happens

2  to emails on a privately owned system.  It's not like Gmail and

3  not like Yahoo.

4       So Judge, the question presented here, and it's in

5  the papers, is:  Do the Masts have a reasonable expectation

6  that their emails with their names on them -- when I say

7  "their," I don't mean they own them, because they do not -- on

8  Liberty's system should be shielded from discovery based on

9  their claims of attorney-client privilege, spousal

10  communications privilege, and attorney work product.

11       Under the applicable case law, Judge, to answer that

12  question, the Court must determine if any subjective

13  expectation of confidentiality which they might have had is

14  objectively reasonable.  For all the reasons set forth in our

15  briefs, and which I'll summarize in the next few minutes, we

16  think it abundantly clear that even if the Masts have had a

17  subjective expectation that these emails on Liberty's system

18  would be confidential, that expectation was, and remains to

19  this day, objectively unreasonable.  I'll first address

20  attorney-client and spousal privilege and then I'll spend a few

21  minutes at the end talking about work product.

22       As I noted, the parties agree that the *Asia Global*

23  case sets the table for your analysis.  On page 4 of their

24  March 25 brief, ECF 374, J and S Mast quote from a 2013

25  Delaware chancery court decision that was applying *Asia Global*.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   The Delaware court noted unremarkably, quote, "Assuming a

2   communication is otherwise privileged, the use of the company's

3   email system does not, without more, destroy the privilege."

4   That's the end of the quotation leaving an inquisitive

5   lawyer -- or a judge, if I may so -- respectfully to wonder

6   what the quote/unquote "more" could destroy the privilege.  It

7   turns out that the very next sentence from that opinion, which

8   J and S Mast omitted from their brief says this, quote, "An

9   employer's policies and procedures regarding work emails can

10  alter the employee's reasonable expectation of privacy," closed

11  quote.  That, Judge, is exactly what we have here.

12          Then the carryover sentence beginning at the bottom

13  of page 4 of Joshua and Stephanie Mast's brief says, quite

14  unremarkably that, quote, "An employer will naturally wish to

15  reserve its rights to monitor employees' use of its electronic

16  systems to prevent misconduct or illegality," closed quote.

17  And then the next sentence at the top of page 5, also

18  unremarkably, the Masts say, quote, "An employer can terminate

19  an employee for misuse of its electronic systems," closed

20  quote.

21          Judge, my phone is chirping at me.  Were you posing a

22  question?

23          THE COURT:  No, sir.

24          MR. POWELL:  Okay.  I'll keep going.

25          Then, Judge, by contrast, and quite remarkably, J and

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  S Mast say this in the next two sentences of their brief,

2  quote, "That dynamic is far more attenuated here given Joshua

3  Mast's alumni status."  Liberty's policy does not appear at all

4  designed with alumni in mind.  Well, Judge, as I think you

5  noted Liberty's policy has a section on page 12 entitled,

6  affected parties, black and white, affected parties, quote,

7  "All University students, faculty, staff, and alumni."  That's

8  a straightforward and categorical assertion by the owner of the

9  emails as to who the affected parties are.

10       *Asia Crossing* and all the cases cited by the parties

11  make clear that because there are four factors to consider, and

12  because of the widely divergent fact patterns, the analysis in

13  cases such as ours must be done case-by-case and fact-specific

14  basis.  So let's examine the undisputed facts here.

15       The Masts do not dispute the existence of the Liberty

16  acceptable use policy.  That is a fact.  Richard Mast very

17  helpfully appended a copy of it to his opening brief, ECF 345

18  as Exhibit 4, and I think Your Honor obviously has had a look

19  at it.  Joshua Mast admits in paragraph 3 of his declaration,

20  which is Exhibit 1 to his reply brief at ECF 374 that, quote,

21  "From at least 2010 to present, I was generally aware that

22  Liberty University maintained an acceptable use policy," closed

23  quote.  That admission of awareness is a fact.  He goes on to

24  say, however, in that same sentence that he, quote, "Understood

25  it to mean that it would preserve the privacy and

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   confidentiality for my communications sent or received through

2   my alumni email account," closed quote.  But he offers no basis

3   for this understanding, which, of course, is not a fact, and in

4   any event, is entirely subjective in nature.

5            Richard Mast stakes out similar ground in his

6   declaration, which is Exhibit 3 to his opening brief, ECF 345.

7   In paragraph 5 of his declaration, Richard Mast says, quote,

8   "From at least 2008 to the present, I have known and understood

9   that Liberty University's email policy as practiced was to

10  preserve confidentiality, privacy, and privileges related to

11  legal representation, including attorney-client privilege and

12  attorney work product doctrine," closed quote.  So Richard

13  Mast, like Joshua, admits to knowing of the policy's existence

14  for many years.  That is a fact.  His understanding --

15           THE COURT:  Mr. Powell, does the record contain a

16  copy of the policy that was in effect at the time that Richard

17  Mast and Joshua Mast signed up for their emails?

18           MR. POWELL:  I don't think that it does, Your Honor.

19  I'm looking at the last page of the acceptable use policy,

20  which I think you have, Your Honor, and which Richard Mast

21  appended to his brief.  Very near the end it has the initial

22  approval date was June the 25th, 2018.  The date of last review

23  was August 14th of last year -- the last year.  The date for

24  next review I guess is in August of 2028.

25           So the answer to your question is I don't know

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   whether there was a policy in effect when the Masts became

2   aware of a policy's existence.  If there was, we don't have it.

3   The only document we have is the acceptable use policy that's

4   an exhibit.

5          THE COURT:  There is no indication in the record that

6   the Masts had to sign some agreement to this policy, the 2018

7   policy, to continue using their Liberty email accounts?

8          MR. POWELL:  I think that's correct, Your Honor.  I'm

9   not aware of any such evidence in the record in this case.

10          Importantly, though, Judge, the Masts don't say that

11   the policy that you have in front of you is not in effect the

12   date -- (inaudible) -- they just -- they would like to impose

13   their subjective understanding of what they think it means and

14   have that override what the document actually says.

15          So Your Honor, for both Masts, determining their

16   subjective understanding, as I just noted, is whether that is

17   objectively reasonable depends on the balance of the facts.  So

18   let's look at the document itself, which I think is very

19   revealing.  And I'm going to highlight some of these, Your

20   Honor, if you will allow me.

21          On page 1, right at the beginning near the bottom of

22   the page in a heading, Assent to Terms of the Acceptable Use

23   Policy.  I'm going to read the words that I think matter,

24   quote, "Every individual who uses the information systems is

25   deemed to assent to and must comply with this policy."

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          Flipping to page 7, Judge, under the header General

2     Rights of the University, the University reserves the right

3     with or without notice to monitor, record, limit, or restrict

4     any user account.

5          Skipping down, The University further reserves the

6     right to periodically inspect systems and take any other

7     actions necessary to protect its information systems.  The

8     University also retains access rights to all files and

9     electronic mail on its information systems.  Anyone using these

10    systems expressly consents to such monitoring.

11         Now, I agree with my colleague representing the Masts

12    that the case law is at best mixed on what the right to

13    monitor -- whether that matters over and above whether the

14    University or the employer ever exercised that right.  But here

15    the objective fact before Your Honor is that the right to do so

16    is in black and white in this document.

17         Turning to page 8 under the header Right to Disclose

18    Information, the pertinent language says the University may

19    disclose information and may provide information to third

20    parties.  Final sentence, By accessing the information systems,

21    users give Liberty permission to conduct each of the operations

22    described above.

23         Starting at the bottom of page 8 and going over to

24    page 9, the University spells out what can happen to someone

25    who engages in illegal or illegitimate use of the system.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          Then in the middle of page 9 under the header

2    Electronic Content Property of the University, Right of the

3    University to Monitor Content, the pertinent language says as

4    follows:  University information systems and the messages,

5    email, files, attachments, graphics, and Internet traffic

6    generated through and in these systems are the property of the

7    University.  They are not the private property of any

8    University employee, faculty, staff, contractor, student, or

9    any other person.  No user of the information system should

10   have an expectation of privacy in their electronic

11   communications.

12          The next section on that same page under

13   Confidentiality of Content says, The confidentiality of any

14   content should not be assumed.

15          On page 11 the University reserves the right, with or

16   without notice, solely in its discretion to change the policy.

17          And then importantly, Judge -- I'll end where I began

18   on this -- and as you already noted on page 12 in black and

19   white the University says who the affected parties are, and

20   there's no differentiation between any of those four groups:

21   Students, faculty, staff, and alumni.  The policy applies to

22   all of them with equal force and effect.

23          Judge, it shouldn't be necessary for me to go any

24   further, but I must, because Richard Mast has tendered the

25   declarations of two Liberty employees in an effort to salvage

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    the Masts' assertion of objective reasonableness.  The Gauger

2    and Shipman declarations do not, in our estimation, move the

3    needle in support of the Masts.  Indeed, if they move the

4    needle at all, they move it in support of a conclusion that the

5    Masts' subjective expectation of confidentiality is objectively

6    unreasonable.

7            Richard Mast first submitted the Gauger declaration.

8    It's Exhibit 5 to his opening brief, ECF 345.  After we

9    highlighted the manifest weaknesses in the Gouger declaration,

10    Richard Mast submitted the Shipman declaration.  It's Exhibit 1

11    to his reply brief at ECF 369.

12            In our reply brief, ECF 375, we exposed the

13    hollowness of the Shipman declaration both for what it says and

14    for what it does not say.  We pointed out that all Shipman had

15    to say was that when the University is served with the subpoena

16    as to which it knows that its email user would object or would

17    move to quash, the University retreats to a neutral corner to

18    await resolution of the issue.  Those are my words, of course,

19    not Shipman's, but that's what they do.  That is exactly what

20    has happened here.  Shipman has not said that the University

21    has objected to or moved to quash the subpoena, because it has

22    not.  That inaction is an objective fact and it speaks volumes.

23    Liberty has not said that the Masts have a reasonable

24    expectation of privacy.  Of course, as I've just noted, the

25    policy says that they do not.  Liberty has not said that the

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   rules for alumni users are different than for other users.

2   Liberty has not disclaimed ownership of these emails.  The only

3   explanation for Liberty's neutrality is that going forward, it

4   wants to protect and preserve its unfettered rights to read and

5   disclose any emails entirely at its sole discretion.  Of

6   course, as noted, Liberty's policy makes crystal clear that it

7   does, indeed, own every single email on its system.  That is an

8   objective fact.  So is the fact that the Masts do not have any

9   ownership interest in any of it.  The reality is, if Liberty

10  wanted to delete all of these emails today, it could.  If

11  Liberty wanted to publish them all in the Lynchburg newspaper,

12  it could.  That's because Liberty owns them, and the Masts do

13  not.

14          Judge, we have fully briefed our contention that

15  under the facts of this case -- the objective facts of this

16  case -- we easily satisfy all four of the *Asia Global* factors

17  with respect to the Masts' assertion of privilege.  We're

18  content to rest on our briefs for how we hope the Court will

19  reach the same conclusion, but there is one more fact that you

20  will not see in any of the cases cited by either side, but

21  which we submit is important here.  Both Joshua and Richard

22  Mast are lawyers.  They are not wet-behind-the-ears

23  undergraduate students.  They are not faculty members who

24  likely -- and no doubt thankfully -- have little or no

25  real-world experience with the rough-and-tumble, hard-fought

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1   litigation.  Instead, Joshua and Richard Mast are experienced

2   lawyers who have inexplicably failed to pay attention to the

3   necessity of taking care to protect the confidentiality of

4   their attorney-client communications, spousal communications,

5   and work product.

6           Judge, this is going to sound disrespectful to the

7   Masts, but I'm just going to say it anyway.  They have been

8   asleep at the switch.  They want the Court to turn a blind eye

9   to the black-and-white provisions of Liberty's acceptable use

10  policy, which they cannot credibly assert means something other

11  than what by any objective measure the document so clearly

12  says.

13          So Judge, for all of those reasons, we ask that the

14  Court reject the Masts' argument and hold that they have waived

15  their asserted attorney-client and spousal communication

16  privileges.

17          THE COURT:  Mr. Powell, just briefly, from the

18  privilege log it appears that Richard Mast -- there may be two

19  emails that he used his Liberty University email before they're

20  on the privilege log.

21          Is that your assessment as well?

22          MR. POWELL:  Judge, I was just going to suggest

23  Mr. Yerushalmi could answer that question.

24          THE COURT:  Mr. Yerushalmi, are there just two

25  emails?

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          MR. YERUSHALMI:  Your Honor, I could pull up the

2     privilege log, but whatever is listed on Liberty University for

3     Richard Mast are the ones that we assert are privileged.

4          We also have listed -- and note in our briefing --

5     that the Joshua Mast emails with Richard Mast were related to

6     the litigation while Richard Mast has been representing Joshua

7     Mast were being asserted as privileged as well.

8          THE COURT:  And there certainly were more Joshua Mast

9     Liberty emails on the privilege log.  I just wanted to make

10    sure that I had the correct universe of the emails that were

11    being asserted as privileged, that they were using the Liberty

12    University email address.

13         MR. YERUSHALMI:  Yes, Your Honor.  If I may utilize

14    my rebuttal, if it's time now, I would appreciate it.

15         THE COURT:  Well, why don't we -- I'll finish hearing

16    from Mr. Powell.  And then, Mr. Yerushalmi, we'll turn to you,

17    okay?

18         MR. YERUSHALMI:  Thank you.

19         THE COURT:  Mr. Powell?

20         MR. POWELL:  Yes, sir, Judge, thank you.

21         Let's turn now to the work product issue.  We concede

22    that that is a steeper hill for us to climb in our assertion

23    that they do not have work product protection for these Liberty

24    emails.  As we noted in our briefs, though, Judge, there are

25    two categories of documents that we think is helpful to think

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  of in these terms.  There is a temporal issue.  Those documents

2  prepared between September of 2019 and December the 8th, 2021

3  would be the first category.  December 8, 2021 is when our

4  clients initiated the challenge in Fluvanna County to the

5  illegal adoption order, but before then when the Masts had

6  not -- when the Does had not gone to court, let's talk about

7  the previous period of time, which would be between September

8  2019 and December the 8th, 2021.

9      For the first time period, the Masts cannot credibly

10  say that those so-called work product documents were prepared

11  in anticipation of litigation.  Three court orders were entered

12  during that time:  The custody order of November 6th, 2019, the

13  interlocutory adoption order of November the 10th, 2019, and

14  the final order of adoption on December the 3rd of 2020.  Just

15  because the Masts moved to the Fluvanna J&DR court and circuit

16  court for those orders does not by itself mean that their claim

17  of work product is defensible.  Instead, the question is

18  whether those proceedings were adversarial.

19      I'll note, Your Honor, we did not find -- and I don't

20  think the defense found -- a case answering that specific

21  question in the context of a custody or adoption proceeding.

22  But Magistrate Judge Sargent answered the question in a 2013

23  case involving an administrative proceeding.  It's the *Adair*

24  *v. EQT Production* case at 294 F.R.D. 1, cited in our reply

25  brief to Richard Mast, ECF 375 at page 10.  The question in the

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  *Adair* case was whether documents prepared in anticipation of an

2  administrative proceeding before the Virginia Oil and Gas Board

3  were entitled to work product protection.  Judge Sargent said

4  no.  We submit that her common-sense explanations apply here.

5  At page 5 she said this, quote, "Perhaps it is stating the

6  obvious, but I believe the better rule is that a proceeding,

7  including an administrative proceeding, should be considered

8  adversarial only if the proceeding has adversaries; i.e.,

9  opposing parties.  Thus, a proceeding should be considered

10  adversarial only if it is a proceeding in which one party has a

11  claim against another party."

12       That cannot be said of the J&DR and circuit court

13  proceedings here.  The only parties were the Masts.  That's why

14  the only endorsement by counsel at the end of each of those

15  three orders is by Richard Mast, their lawyer.

16       Moreover, Judge, those proceedings were *ex parte*.

17  Add to the significance of that, Judge Sargent said on the same

18  page, quote, "When the proceedings are not adversarial, but

19  mostly *ex parte*, this does not constitute litigation for

20  purposes of application of the work product doctrine," closed

21  quote.

22       Here, of course, Judge, all of the proceedings in the

23  Fluvanna courts were entirely *ex parte*.  So as to the first

24  category of documents, Judge, there can be no work product

25  protection at all.  You don't even have to go to the waiver

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    question.  They cannot credibly assert work product protection

2    over any documents that they prepared before the Does initiated

3    the adoption challenge in December of 2021.

4            So let's turn now --

5            THE COURT:  Mr. Powell, are those type of

6    proceedings, are they just inherently non-adversarial?  Can

7    they ever be adversarial?

8            MR. POWELL:  I think, Judge, they can.  I'd hasten to

9    say I've never actually litigated one, but I presume a custody

10   proceeding very well might be an argument between a mother and

11   a father over custody of children.  Adoption proceedings I

12   presume could be adversarial, but here they were not.  So

13   whether they -- as a general proposition either a custody or

14   adoption proceeding could be adversarial, I don't think that

15   answers the question.

16           Here they very clearly were not.  And that's the way

17   the Masts wanted it.  They went into the Fluvanna court, both

18   of them, misrepresenting that Baby Doe was a child -- was a

19   child who was a stateless minor and misrepresented that the

20   government of Afghanistan was going to waive jurisdiction.

21   There was no one in the courtroom, other than Richard Mast, in

22   those proceedings.  They were not adversarial.  They were not

23   -- they were *ex parte*.  And for all the reasons Judge Sargent

24   so clearly explained in her case, no work product should apply

25   for documents before the Does went to the Fluvanna Circuit

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    Court to challenge the adoption order.

2          Can I turn, Judge, quickly to the time period after

3    December 8, 2021?

4          THE COURT:  Yes.

5          MR. POWELL:  We concede, of course, that everything

6    that has happened since then -- both in Fluvanna, Virginia

7    Court of Appeals, and of course here -- has been adversarial.

8    So the work product section, at least initially -- (inaudible)

9    -- assertion by the defendants, but that by itself does not end

10   the inquiry.  Instead, the question now is whether, as to that

11   second category of documents, whether the Masts have waived any

12   work product protection by using Liberty's email system.

13         For all the reasons I have already stated with

14   respect to their clear-cut waiver of attorney-client and

15   spousal communications, we assert they have similarly waived

16   any work product protection on this second bucket of documents.

17   For case law support, Judge, I would recommend another decision

18   by Judge Sargent.  It's her 2017 decision in *Harleysville*

19   *Insurance versus Holding Funeral Home* in 2017, Westlaw 1041600.

20         We believe, Judge, for all these reasons, we think

21   that you should deny the Masts' motion to quash and grant our

22   motions to compel so that we can get these documents and move

23   this case forward.

24         Thank you, Judge.

25         THE COURT:  Thank you, Mr. Powell.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          Mr. Yerushalmi, what would you like to say?

2          MR. YERUSHALMI:  Thank you, Magistrate Judge Hoppe.

3          First of all, the reality is that we have never, on

4  behalf of Richard Mast, asserted that *Asia Global Crossing*

5  applies.  Mr. Powell indicated all parties have somehow

6  embraced that construct.  Indeed, in our reply brief at page 2,

7  going forward, we point out why it doesn't apply.  And the key

8  reason why it doesn't apply, and using the kind of turn of

9  phrase from the plaintiffs, they seem to weasel past paragraph

10 6 of Mr. Shipman's declaration.  They quote it, but they seem

11 to miss the import of it.  Paragraph 6 says, "With regard to

12 third-party and non-party subpoenas issued in legal actions

13 that do not involve Liberty University or any of its affiliates

14 as a party" -- so right there we can pause to note when

15 Mr. Powell says that the University doesn't make a distinction

16 between alumni and the students and the staff and faculty,

17 well, here we see that they do, because the alumni staff and --

18 excuse me, faculty, staff, and students are obviously

19 affiliates.

20     The paragraph continues, "The procedure and practice of

21 the University is to respect and preserve confidentiality and

22 privileges relating to attorney-client communications and work

23 product doctrine."

24     Now, all of the arguments presented by Mr. Powell and in

25 the briefing by the plaintiffs simply ignores that preserved

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  confidentiality.  You can't preserve a privilege that has

2  previously been waived.  It's preserved, meaning -- and again,

3  these are careful -- this is by a careful lawyer saying that we

4  preserve what exists, and what exists is a pre-existing

5  privilege.  And Joshua and Richard Mast understood that the

6  University preserved their privilege.

7        Now, as to the question of ownership, that simply is

8  irrelevant, because as we point out in our hypothetical in the

9  footnote, if I go into a store or a home and I'm going to have

10  a conversation with my lawyer, and I know the owner and I know

11  that his policy and practice is to preserve the confidentiality

12  when he knows I am having a conversation with my attorney and

13  it's confidential, it doesn't matter that he owns the videotape

14  of the security camera covering his store.  He and I know

15  objectively that he's going to preserve my right.  And that

16  also indicates that he's not going to monitor my emails.  He's

17  not going to publish them -- as Mr. Powell suggested the

18  University might do, or this hypothetical store owner might do.

19  Ultimately, we have a very objective actual policy.  Joshua and

20  Richard Mast understood that policy and relied on that policy.

21        The other thing, just because the Court asked the

22  question, Your Honor --

23            THE COURT:  Mr. Yerushalmi, when you say they

24  understood and relied on that policy, what policy are you

25  talking about, the written policy or the policy that's

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1    described in the declarations?

2              MR. YERUSHALMI:  The practice and procedure, which

3    was the actual policy utilized for purposes of non-associated

4    parties, meaning former alumni.  That actual practice and

5    procedure was to respect and to preserve the privilege, and

6    that's what they relied upon.  The written policy is simply

7    meaningless relative to the non-associated parties.

8              I would also indicate, Your Honor, just because you

9    had asked -- and notwithstanding the fact that we don't think

10   the written policy is even relevant here, nor would *Asia Global*

11   be relevant -- the policy that we provided in our briefing, our

12   original motion to quash, Mr. Gauger states at paragraph 3, if

13   memory serves me correctly, that, "The University has in place

14   an acceptable use policy (IT policy) for all of its information

15   systems, including, but not limited to, its recognized email

16   systems.  While the IT policy is subject to modification from

17   time to time, the matters discussed herein have been in place

18   since June 2018."

19             So just for purposes of the record and for

20   clarification, the policy -- the written policy -- which,

21   again, we believe is actually irrelevant to the Court's

22   decision-making here -- was in place as of June 2018, at least

23   as to the relevant issues.

24             The only other point that I would make that is not

25   covered in the briefing is just to discuss quickly the issue of

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  work product and *ex parte*.  Mr. Powell indicates he had not

2  found any case law relevant to the question whether or not the

3  adversarial nature dictates the question of whether or not it

4  applies as work product.  And he ultimately cited an

5  administrative proceeding where the court -- the magistrate

6  judge is apparently taking the view that in administrative

7  proceedings, the issue of whether it's adversarial -- but that

8  question was addressed in our briefing as well where we point

9  out that in the *American Telegraph* case -- and it's *United*

10 *States v. American Telegraph Company* 86 F.R.D. 603, and we've

11 discussed that at page 8 of our reply brief -- it's very clear

12 that when it comes to administrative proceedings, of which a

13 large universe of those are not at all adversarial, they're

14 regulatory, and so the question of whether or not it's

15 adversarial or *ex parte* likely does have some bearing whether

16 you're going to stretch litigation to an administrative

17 proceeding.  But as to whether or not an actual court-litigated

18 case -- as we point out in the JDR and especially in the

19 adoption proceedings -- there is actual provisions of notice to

20 other parties that either can be noticed initially or they can

21 come in subsequently and litigate; and, indeed, that's one of

22 the issues the plaintiffs have made out -- incorrectly, in our

23 view -- that certain parties were not given proper notice.  And

24 there the court said very clearly, "Defining" -- and I'm

25 quoting now from page 628 of that case -- "Defining litigation

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1  to include all proceedings in which there is a right of

2  cross-examination contemplates inclusion of all trial-type

3  hearings, proceedings in which a trial-type hearing may be" --

4  (inaudible) -- "a right, even if no such hearing is actually

5  held."  And that makes clear, at least in my reading of that

6  language, that as long as parties could come into the picture

7  and represent themselves as adversarial to the party at a

8  particular hearing or in that particular court case, that it

9  is, in fact, litigation.

10         The ultimate and bottom line here is that Joshua and

11  Richard Mast very reasonably -- objectively so -- relied on the

12  actual policy and practice of Liberty University that they

13  would -- and again, I emphasize this word -- preserve the

14  privilege.  If the privilege had been waived previously, there

15  is no preservation of it.

16         Thank you, Your Honor.

17         THE COURT:  Thank you, Mr. Yerushalmi.

18         So Mr. Aul, is there anything else that you'd like to

19  argue?

20         MR. AUL:  No, Your Honor.  Unless you have any

21  questions, we will rest.

22         THE COURT:  Mr. Powell, I'll give you a rebuttal

23  opportunity as well.

24         MR. POWELL:  Thank you, Judge.  Just a couple of

25  things.

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1         First, Mr. Yerushalmi did cite the *Asia Global*

2 *Crossing* case in his opening brief at page 10, I think.  So I

3 was a little surprised to hear him say that he's not sure that

4 *Asia Global Crossing* sets the table here for your decision.

5 The plaintiffs think it actually does, and the other Mast

6 defendants certainly do.

7         With respect to the Shipman declaration, paragraph 6,

8 Mr. Yerushalmi and I just have a different interpretation of

9 that, Judge.  The most important language, I submit, is at the

10 end.  It's the clause at the end that explains how the

11 University undertakes to respect and preserve confidential

12 privileges once someone asserts it.  It says, comma, by

13 delaying production, a reasonable amount of time to allow that

14 person time to seek a protective order.  That is exactly what

15 happened here.  And that's why I said Liberty's policy in these

16 circumstances, as confirmed by Shipman, is to retreat to a

17 neutral corner until the process works its way through.  And

18 that's what we're doing here with you today, Your Honor.

19         Thank you very much for your attention.

20         THE COURT:  Counsel, thank you all for your arguments

21 on this issue.  I do think that as to the Liberty University

22 emails, the briefing and your arguments present some really

23 interesting arguments, and I do want to consider them further,

24 and I'll issue a written opinion on these motions.

25         Is there anything else to take up here today?

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1          MS. ECKSTEIN:  Not from plaintiffs, Your Honor.

2    Thank you.

3          MR. FRANCISCO:  Nothing for Joshua and Stephanie

4    Mast, Your Honor.  Thank you.

5          MR. YERUSHALMI:  Nothing for Defendant Richard Mast.

6          THE COURT:  All right.  Well, counsel, thank you all

7    for calling in and for your arguments today.

8    (Proceedings adjourned, 1:26 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Baby Doe, et al. v. Mast, et al., 3:22CV49, 5/2/2024

1                C E R T I F I C A T E

2     I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11    I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14     /s/ Lisa M. Blair              Date: July 23, 2024

15

16

17

18

19

20

21

22

23

24

25