# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

July 24, 2024

LAURA A. AUSTIN, CLERK
BY   s/ S. MELVIN
       DEPUTY CLERK

BABY DOE, *et al.*,

                   *Plaintiffs,*

         v.

JOSHUA MAST, *et al.*,

                   *Defendants.*

CASE NO. 3:22-cv-00049

MEMORANDUM OPINION
& ORDER

JUDGE NORMAN K. MOON

The facts alleged in Plaintiffs' complaint tell a remarkable story of resilience and duplicity. In the aftermath of a September 2019 joint operation by the United States and Afghan militaries conducted in rural Afghanistan, "Baby Doe" was found in the rubble of her family's home. Her parents and siblings lay dead. She was seriously injured, and was, as a result, taken to a U.S. military hospital for emergency treatment. A short time later, the International Committee of the Red Cross ("ICRC") and the United States and Afghan governments began trying to find, and reunite Baby Doe with, her biological family in Afghanistan.

In February 2020, their efforts paid off. Baby Doe and her family were reunited. Plaintiffs John Doe (Baby Doe's cousin) and his wife Jane Doe are a young, married Afghan couple who became Baby Doe's guardians. They raised Baby Doe as their own daughter for a year and a half. But, at the same time, an American couple's efforts to remove Baby Doe from their care were well underway.

Defendant Joshua Mast—a Marine Corps Major and Judge Advocate—was stationed in Afghanistan in the fall of 2019 where he became familiar with Baby Doe and her case. Joshua knew that the ICRC was searching for Baby Doe's family. Yet in October 2019, Joshua and his wife Defendant Stephanie Mast asked a *Virginia* family court for temporary custody of Baby

Doe, claiming that she was "stateless," and that the Afghan government would soon waive its authority (also called "jurisdiction") over her. At the time, Baby Doe had never been to Virginia. Or the United States. Stephanie had never met her. But based on their representations, the Virginia family court awarded temporary custody to the Masts. Days later, Stephanie secured an interlocutory order of adoption from the Virginia Circuit Court, designating Joshua and Stephanie Mast as Baby Doe's father and mother.

Then, the day before Baby Doe was to be reunited with her biological family in Afghanistan, the Masts came to this Court and sued the government, asking for an emergency order stopping the transfer. Joshua's brother, Defendant Richard Mast, represented them in all these proceedings. When this Court asked Richard why Joshua and Stephanie wished to stop Baby Doe's return to her relatives in Afghanistan, he responded falsely that they did not seek to adopt Baby Doe—only to get her medical care in the United States. This Court denied the motion.

The Masts, however, were undeterred by Baby Doe's reunification with her own family. Indeed, mere days later, Richard secured the Masts a final adoption order from the Virginia Circuit Court for Baby Doe. Moreover, Joshua Mast proceeded with a new plan to contact the Does directly to convince them to bring Baby Doe to the United States. To do so, Joshua utilized his connection with Defendant Kimberly Motley—a lawyer who worked in Afghanistan. Joshua had told Motley that he and his wife wanted to adopt Baby Doe and raise her in the United States. Motley knew about the custody order. She also knew that Afghanistan hadn't waived jurisdiction over Baby Doe, voiding the order. And she knew that the ICRC reunited Baby Doe with her Afghan family. Yet still, Motley agreed to help the Masts take Baby Doe from John and Jane Doe so the Masts could raise her. On behalf of the Masts, Motley directly connected with

2

John and Jane Doe. Over the next year, Motley ingratiated herself to John and Jane Doe, telling them repeatedly that a U.S. family (the Masts) wanted to help Baby Doe get needed, specialized medical care in the United States. She even introduced John and Jane Doe to the Masts directly. Joshua Mast paid Motley several thousand dollars for her assistance.

The Masts also worked with Defendant Ahmad Osmani—an Afghan with family in Afghanistan. Osmani met Joshua Mast in a WhatsApp Bible study group, and he agreed to help the Masts bring Baby Doe to the United States so they could raise her as their daughter. Osmani served as a translator between the Masts and John and Jane Doe. He told the Does the same story as Motley. Yet neither Motley nor Osmani in their outreach to John and Jane Doe told them about the Masts' custody or adoption orders; or efforts to stop Baby Doe's reunification with them. Joshua Mast wired Osmani over a thousand dollars. He used the funds to get the Masts a fake Afghan passport for Baby Doe, with an Americanized name and the Masts' last name.

In August 2021, with the Taliban approaching Kabul, John and Jane Doe felt it could be their last chance to get Baby Doe medical care in the United States. Though Jane Doe was in the third trimester of her pregnancy, they agreed to bring Baby Doe to the United States to get medical care only after Joshua assured them that they would be able to return to Afghanistan afterward. While en route, Joshua and Stephanie Mast pressed them three times to let Baby Doe travel with them to the United States, claiming it would make her entry into the United States easier. The Does refused. Joshua Mast also falsely told the Does that he was acting as their attorney and could help get them through customs. When they finally arrived in the United States, Joshua Mast gave the immigration officer the fake Afghan passport for Baby Doe—which the Does had never seen before. He told them it was merely a means to facilitate her easy travel to the United States.

In September 2021, once John, Jane and Baby Doe were in the United States and housed at Fort Pickett in Virginia, Joshua Mast devised a plan to remove Baby Doe from their care once and for all. Under the guise of a transfer of housing, a woman in a transport vehicle placed Baby Doe in a car seat while the Does were in the vehicle; when it stopped, the woman picked up Baby Doe and held her. A social worker "then informed John and Jane Doe that they were not Baby Doe's lawful guardians and that Joshua Mast had adopted the child." Initially they did not understand. When Joshua Mast entered the room, however, the Does understood that he would be taking Baby Doe. The woman handed Baby Doe to Stephanie Mast over John and Jane Doe's objections. Jane Doe—more than eight months pregnant at the time—fell to the ground crying, and begged Joshua Mast not to take Baby Doe. Joshua and Stephanie Mast abducted Baby Doe, and John and Jane Doe have not seen Baby Doe since that day.

John and Jane Doe have been doggedly pursuing avenues to challenge the Masts' custody and adoption orders over Baby Doe in the Virginia courts. This month, they achieved some success, as the Virginia Court of Appeals held that the Masts' custody and adoption orders were void from the outset. This federal case does not involve adoption or custody. It involves John and Jane Doe's claim that the Masts, Motley and Osmani conspired to abduct Baby Doe, committing fraud and several torts in the process. They seek millions in compensatory and punitive damages.

This matter is before the Court on Defendants' motions to dismiss Plaintiffs' amended complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and for failure to state a claim. For the following reasons, the Court holds that it has subject matter jurisdiction over the bulk of this case—though two of Plaintiffs' claims, their request for declaratory relief, and any claims brought on behalf of Baby Doe will be dismissed *without prejudice* at this time as falling within the domestic relations exception to federal diversity jurisdiction. Notwithstanding

4

those claims, the Court will not abstain from resolving John and Jane Doe's three remaining tort claims under the *Burford* or *Colorado River* abstention doctrines. The Court further concludes that it has personal jurisdiction over Defendants Kimberly Motley and Ahmad Osmani. Finally, Plaintiffs have stated more-than-plausible state-law claims of fraud, conspiracy and intentional infliction of emotional distress against the Defendants.

## **Background**[1]

### 1.  Baby Doe's Past

Baby Doe's biological parents and five of her siblings were killed on September 6, 2019, in a joint United States-Afghan military operation in rural Afghanistan. Dkt. 68 ("Am. Compl.") ¶¶ 3, 22. U.S. forces discovered Baby Doe—then only two months old—in the rubble of her destroyed home, and transported her to a U.S. military hospital for medical care. *Id.* She suffered serious injuries, including bone fractures and second-degree burns. *Id*.

The U.S. military subsequently informed the International Committee of the Red Cross ("ICRC") that Baby Doe was in its custody, and the ICRC began searching for her family. *Id.* ¶ 23. The ICRC is the organization that the Fourth Geneva Convention[2] has charged to care for children orphaned during wartime and to assist with family reunifications—a role which the ICRC and national Red Cross and Red Crescent societies have performed for many years. *Id.*

---

[1] On a motion to dismiss for failure to state a claim, the Court must "accept as true all factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Court must further "draw all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). The Court may also take judicial notice of state-court proceedings that directly relate to the issues in this federal-court action. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239–40 (4th Cir. 1989).

[2] Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287.

¶¶ 23–24.[3] On October 25, 2019, the ICRC made contact with Baby Doe's uncle, who sought its assistance reuniting her with her family. *Id.* ¶ 25.

    2.  Joshua & Stephanie Mast Initiate Virginia Adoption Proceedings

In 2019, Joshua Mast was a Captain Judge Advocate in the U.S. Marine Corps deployed in Afghanistan. *Id.* ¶ 26. He is also an attorney, barred in Virginia, who served at the Center for Law and Military Operations. *Id.* ¶¶ 13, 29. Joshua Mast learned about Baby Doe while she was in the custody of the Department of Defense and under the care of the Military Health System. *Id.* ¶ 26. Plaintiffs allege, upon information and belief, that Joshua Mast knew the ICRC would be searching for Baby Doe's family in Afghanistan, yet he "began taking steps to remove [her] to the United States." *Id.* ¶¶ 27–28, 36.

Plaintiffs allege that, as a military lawyer, Joshua Mast knew or should have known that he would need to comply with Afghan (as well as United States and Virginia) law if he sought to legally adopt a child from Afghanistan. *Id*. ¶¶ 38–39; *see also id.* ¶¶ 29–40 (citing governing laws and treaties, including the bilateral Security and Defense Cooperation Agreement between the United States and Afghanistan). Thus, Joshua Mast should have known that before a child in Afghanistan can be adopted in the United States, U.S. law requires that legal guardianship or custody must first be obtained over the child in the "foreign-sending country," here, Afghanistan. *Id.* ¶ 40 & n.3. Afghanistan's laws "expressly prohibit the guardianship or custody of Muslim Afghan children by non-Afghan non-Muslims." *Id.* ¶ 41. Joshua and his wife Stephanie Mast are neither Muslims nor Afghan Nationals. *Id.* ¶ 42. And, given what Joshua knew about how Baby Doe came into the DOD's temporary custody, Plaintiffs allege that he

---

[3] *See* ICRC, Restoring Family Links, http://icrc.org/en/what-we-do/restoring-family-links (last visited July 23, 2024).

also should have known that Baby Doe would be considered a Muslim Afghan child. *See id.*
¶¶ 39, 41.

Nevertheless, in October 2019, Joshua and Stephanie Mast initiated custody proceedings
for Baby Doe in the Juvenile & Domestic Relations Court ("JDR Court") in Fluvanna County,
Virginia, and adoption proceedings in the Fluvanna County Circuit Court. *Id.* ¶ 43. Joshua
Mast's brother, Richard Mast, is an attorney barred in Virginia, and he represented Joshua and
Stephanie in these proceedings. *Id.* ¶¶ 14, 43.

Plaintiffs allege that the Masts lacked "any legitimate legal basis" for initiating the
custody and adoption proceedings in Virginia, considering that (1) "they had not obtained legal
guardianship of Baby Doe in Afghanistan," (2) "Baby Doe had lived her entire life in
Afghanistan," (3) "Baby Doe had never stepped foot on Virginia soil and remained in
Afghanistan," (4) Afghanistan "had sole and exclusive jurisdiction over Baby Doe," and (5)
Baby Doe "had no connection with the United States or Virginia." *Id.* ¶¶ 43–44. The Masts also
failed to serve notice of the custody and adoption proceedings on the Department of Defense,
even though it "was Baby Doe's 'physical' and 'legal' custodian at the time," which Plaintiffs
assert violated Virginia law. *Id.* ¶ 45. The Masts represented to the Virginia courts "that they
expected the Government of Afghanistan to waive its jurisdiction over Baby Doe," when, "[i]n
fact, the Government of Afghanistan *explicitly asserted its jurisdiction over the child* and
requested, and then secured, her release from the U.S. military facility." *Id.* ¶ 46 (emphasis
added). Plaintiffs also allege that the Masts "falsely claimed" to the Virginia courts "that Baby
Doe's birth country and nationality were unknown, that she was a 'stateless minor,' and that she,
therefore, was subject to the Virginia courts' jurisdiction because no other court would have
jurisdiction." *Id.* ¶ 47. By contrast, in Plaintiffs' view, Baby Doe "was never stateless," because,

under Afghan laws, "any child found in the territory of Afghanistan whose parents' nationality is unknown is considered a citizen of Afghanistan." *Id.* ¶ 48.

On November 6, 2019, the JDR Court concluded that it had jurisdiction over the case and granted Joshua and Stephanie Mast temporary custody of Baby Doe, which would expire in one year if the JDR Court did not renew it. *Id.* ¶ 49 & n.6. Plaintiffs allege that the JDR Court's decision was issued in reliance on "the factual and legal misrepresentations made by the Masts." *Id.* Two days later, Stephanie and her brother-in-law Richard Mast appeared before the Circuit Court and allegedly based on the same and further misrepresentations, secured an order directing the State Registrar "to issue a Certificate of Foreign Birth for Baby Doe on an expedited basis for the purpose of obtaining medical care." *Id.* ¶ 53. Stephanie "had never met Baby Doe, and had no firsthand knowledge of Baby Doe's parents' identities, her nationality, or even her medical needs." *Id.* Two days after that, Stephanie, again represented by Richard, secured from the Circuit Court an "Interlocutory Order of Adoption," which "designat[ed] Joshua and Stephanie Mast as Baby Doe's father and mother." *Id.* ¶ 54. Stephanie promptly secured from the State Registrar a Certificate of Foreign Birth, which also designated Joshua and Stephanie Mast as Baby Doe's father and mother. *Id.* ¶ 55.

### 3. Efforts to Reunite Baby Doe with Her Afghan Relatives

On October 24, 2019, Baby Doe's maternal uncle submitted a request to the ICRC for assistance returning her to her extended family. *Id.* ¶ 56. On November 17, 2019, the Afghan Ministry of Labor and Social Affairs "documented its official involvement in the search for Baby Doe's biological family." *Id.* ¶ 57. Soon after, the ICRC located Baby Doe's paternal uncle, who is Plaintiff John Doe's father. *Id.* ¶ 58. Plaintiffs assert that, "[u]nder the laws of Afghanistan (like the laws in many other Muslim countries), legal guardianship of an orphan is

transferred to the child's paternal uncle (in the absence of a paternal grandfather or a brother)." *Id*.

By early January 2020, the Afghan Deputy Minister of Social Affairs met with the U.S. State Department's Assistant Chief of Mission in Kabul, Donna Welton, to inform her that the Afghan government had identified Baby Doe's family. *Id.* ¶ 59. On January 5, Ms. Welton responded: "We stand ready to transfer custody of the infant following an official request from the Afghan government. This is a high priority for our government and we would kindly request that the Ministry of Labor and Social Affairs expedite this official request so that the infant can be reunited with her family members as soon as possible." *Id.* ¶ 60. High-level Afghan officials understood in February 2020 that Baby Doe was to be "reintegrated into her family." *Id.* ¶ 61.

When the Masts learned of Baby Doe's impending release on February 26, 2020 to her biological family in Afghanistan, they filed a complaint and petition for a temporary restraining order ("TRO") in this Court, naming as defendants, among others, the Department of Defense, Department of State and Ms. Welton as Assistant Chief of Mission to the U.S. Embassy in Kabul. *Id.* ¶ 62; *Baby L., et. al. v. Esper, et al.*, No. 3:20-cv-9 (W.D. Va. Feb. 26, 2020), Compl. & Pet. (Dkt. 29-2).[4] The Masts sought an emergency order stopping the United States Government from transferring Baby Doe to the custody of the Government of Afghanistan for reunification with her biological family. Am. Compl. ¶ 63; *Baby L., et al. v. Esper, et al.*, No. 3:20-cv-9, Mem. in Supp. of Mot. for TRO, at ECF 24–27 (Dkt. 29-8). Richard Mast filed the complaint and petition on Joshua and Stephanie Mast's behalf. *Id.* They represented themselves to be "the sole legal custodians of [Baby Doe]" on grounds that they had "petitioned for and

---

[4] "Baby L." is a reference to the English first name that Joshua and Stephanie Mast gave the child. In this action, the child is referred to as "Baby Doe."

received sole legal and physical custody of [Baby Doe]," in their home jurisdiction. *Baby L.* Compl. & Pet. ¶¶ 12, 14.

During the hearing convened later that day, Richard Mast stated that the Masts were not seeking to adopt Baby Doe, but were only trying to bring her to the United States for medical treatment. Am. Compl. ¶ 65; *Baby L., et. al. v. Esper, et al.*, No. 3:20-cv-9, Tr. for TRO Hr'g at 23 (Dkt. 27-2). The Court inquired: "what are you asking for, ultimately? Your client is not asking to adopt the child.", to which Richard Mast responded: "No, sir. He wants to get her medical treatment in the United States because we dispute this is a family member. …" *Baby L.* Tr. for TRO Hr'g at 23.[5] In reality, Richard Mast had very recently represented Joshua and Stephanie Mast to secure an Interlocutory Order of Adoption from the Fluvanna County Circuit Court. Am. Compl. ¶ 65. Richard, Joshua, and Stephanie Mast never informed this Court or the United States Government of the pending adoption proceedings. *Id.*

That day, the Court denied Plaintiffs' motion for a TRO, holding that they were unlikely to prevail on the merits of their underlying cause of action. Am. Compl. ¶ 69. The Court ruled from the bench that the Masts had not established several of the *Winter* factors[6] required to issue a TRO, namely a likelihood of success on the merits, that the balance of equities tipped in their favor, or that issuing a TRO would be in the public interest. *See Baby L.* Tr. for TRO Hr'g at 39–

---

[5] Richard Mast also made numerous other representations at the TRO hearing that Joshua and Stephanie Mast intended to bring Baby Doe to the United States only for medical treatment. *See, e.g.*, *Baby L.* Tr. for TRO Hr'g at 4–5 (stating that Joshua Mast "sought permission from his chain of command to advocate on [Baby Doe's] behalf to seek a path to the United States for her to get medical treatment"); *id.* at 5 (stating that Joshua Mast "obtained … the path to treatment in the United States," and "so he received that order from the J&DR court in his county of residence, and he then sought to create the legal pathway that was necessary to bring her here for treatment"); *id.* at 7 (arguing that the *Baby L* Defendants "all had notice that this was a pathway to treatment in the US was being sought by our … client").

[6] *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008).

40. The Court explained that while the JDR Court's orders were "foundational to [the Masts'] asserted authority to care" for Baby Doe, they "reflect[ed] an assumption" that the Government of Afghanistan would issue a waiver of jurisdiction over Baby Doe, which it did not do. *Id.* at 40–41. Further, the Court explained that the Department of Defense "should have been formally served with and provided notice of the proceedings," and that the Masts had failed to "proceed through the proper channels" for Baby Doe to enter the United States. *Id.* Accordingly, the Court denied the Masts' petition for a TRO. *Id.* at 42; Am. Compl. ¶ 69.

The Department of Justice later filed a notice with the Court that Baby Doe had been released from U.S. custody and reunited with her "next of kin" on February 27, 2020. *Id.* ¶ 70. "At that time, Baby Doe was placed in the care of her paternal uncle, John Doe's father." *Id.* ¶ 71. Baby Doe's paternal uncle subsequently "transferred his guardianship of Baby Due, pursuant to his authority under the laws of Afghanistan, to his son and daughter-in-law, John and Jane Doe." *Id.* ¶ 72. Baby Doe's paternal uncle was concerned that she "would require ongoing medical care," and he thought that "John and Jane Doe were best suited to care for Baby Doe because they were a young, educated couple who lived in a larger, more cosmopolitan area, with better access to doctors and hospitals than the rural region of Afghanistan where he lived." *Id.* ¶ 72. John and Jane Doe "welcome[d] Baby Doe into their family and raise[d] her as their own child." *Id.* ¶ 73. John and Jane Doe "provided everything for Baby Doe," including food, medical care, and treated and loved her like their own biological child. *Id.* ¶ 74. Baby Doe was surrounded by family. *Id.* Plaintiffs John and Jane Doe "raise[d] Baby Doe as their first child for eighteen months, until the very moment of her abduction on September 3, 2021." *Id.*

4.  <u>The Masts Enlisted Kimberly Motley to Assist in Their Scheme by Establishing Contact with John and Jane Doe</u>

Back in the fall of 2019, Joshua and Stephanie Mast had first reached out to Kimberly Motley, a U.S. citizen and attorney who had worked in Afghanistan, "to assist in their efforts to bring Baby Doe to the United States." *Id.* ¶ 76. For her part, Motley had learned of Baby Doe through another servicemember and was "representing herself as a 'guardian ad litem' for Baby Doe," even though no court order named her as such, and "Afghan law does not provide for 'guardians ad litem.'" *Id.* ¶ 78.

At the time, Joshua Mast had identified himself to Motley as a U.S. Marine stationed in Afghanistan "who sought to remove Baby Doe from Afghanistan." *Id.* He "advised Motley that he and Stephanie Mast intended to adopt Baby Doe." *Id.* ¶ 76. Between October 25–27, 2019, the Masts and Motley "communicated numerous times" by email and phone about their "shared desire to remove Baby Doe from Afghanistan." *Id.* ¶ 77. Notably, in their email exchange, Joshua "acknowledged that he needed approval from the Government of Afghanistan to obtain a visa for Baby Doe to travel to the United States." *Id.* Motley asked the Government of Afghanistan to secure citizenship documentation for Baby Doe as an Afghan citizen, including a passport and Afghan ID. *Id.* ¶ 78.

When the Masts failed to stop Baby Doe's reunification with her family in Afghanistan, Plaintiffs allege that the Masts devised a plan to "convince Baby Doe's family to let her travel to the United States, where [they] could abduct her and raise her as their own child." *Id.* ¶ 75. Thus, on February 27, 2020—*the very day that the United States released Baby Doe to the Afghan Government* and ICRC for reunification with her family—Joshua Mast asked Motley for help "handl[ing] [Baby Doe's] situation privately," by locating her relatives, offering medical care to Baby Doe, and then bringing her from Afghanistan to the United States, where the Masts had

12

already petitioned a Virginia Court for legal custody over her. *Id.* ¶ 79. Joshua Mast also

provided Motley with an official communication from the Government of Afghanistan to the

United States that requested Baby Doe's return for reunification with her family in Afghanistan.

*Id.* ¶ 80.

Plaintiffs allege that "Motley agreed to work with the Masts as they implemented their

plan." *Id.* ¶ 81. Joshua Mast thereafter provided Motley with information he had received about

the identities of the people to whom Baby Doe had been transferred, and Motley used that

information to find a point of contact who would be able to connect her with Plaintiffs John and

Jane Doe. *Id.* ¶ 82.

On or around March 6, 2020—mere days after Baby Doe was reunited with her family—

Motley called John Doe at the Masts' direction. *Id.* ¶ 83. John Doe and Jane Doe described

themselves to Motley as Baby Doe's "cousin," and "the wife of [John Doe] and the mother of

[Baby Doe]," respectively. *Id.* ¶ 84. In a later conversation the same day, Motley advised Jane

Doe that she understood that Baby Doe had serious medical issues, and that Motley knew an

American family who wanted to help Baby Doe. *Id.* ¶ 85. Plaintiffs allege that, "pursuant to her

agreement with Joshua and Stephanie Mast," Motley did not disclose to John and Jane Doe that

the Masts had a custody order and interlocutory adoption order for Baby Doe, nor that the Masts

had initiated court proceedings to finally adopt Baby Doe. *Id.*

On March 22, 2020, Joshua Mast wired a $4,500 payment to Motley via the electronic

payments application PayPal. *Id.* ¶ 87. He also messaged her to confirm that she had received the

funds. *Id.* Motley continued to communicate with John and Jane Doe for over a year, "making

multiple offers to assist with Baby Doe's medical care and occasionally asking for photographs

of Baby Doe." *Id.* ¶ 88. Plaintiffs allege that Motley undertook these actions at the Masts'

13

direction and "received thousands of dollars to do so." *Id.* Importantly, on July 30, 2020, in response to Motley's request for photos, Jane Doe sent to Motley photographs of Baby Doe in swimming trunks in a small wading pool. *Id.* ¶ 90.

5.   The Masts Obtain a Final Adoption Order

All the while, the Masts continued pursuing a final adoption order from the Virginia Circuit Court. *Id.* ¶ 91. On December 3, 2020—nine months after Baby Doe had been reunited with her family in Afghanistan—the Circuit Court entered a final order of adoption for Joshua and Stephanie Mast. *Id.* ¶ 93. In the final adoption order, the Circuit Court continued to find (incorrectly in Plaintiffs' view) that Baby Doe "remains up to this point in time an orphaned, undocumented, and stateless minor," and therefore "has the legal identity granted by order of this [Circuit] Court as constituting her sole legal identity." *Id.* At the time of the order, no one (including Joshua, Stephanie, or Richard Mast) informed John or Jane Doe of these proceedings, nor had anyone informed the United States government. *Id.* Indeed, Richard Mast had expressly represented to this federal Court, and in the presence of the United States' counsel, that the Masts did not intend to adopt Baby Doe. *Id.*

6.   The Masts Enlisted Ahmad Osmani to Assist in Their Scheme to Lure Baby Doe to the United States

Joshua Mast met Ahmad Osmani through a "WhatsApp" Bible study group in early 2021. *Id.* ¶ 94. Osmani offered to help the Masts bring Baby Doe to the United States "so that they may raise her as their daughter." *Id.* Osmani first began to help the Masts by assisting them in securing a fake Afghan passport for Baby Doe.

On February 2, 2021, Stephanie Mast emailed Joshua Mast an altered photo of Baby Doe "for use in obtaining an Afghan passport for Baby Doe," using a photo of the toddler that "is nearly identical" to the one that Jane Doe sent to Motley on July 30, 2020. *Id.* ¶ 95; *see also id.*

¶¶ 90, 127 (redacted photos).[7] But this new photo had been "altered to add a shirt [and] remove the background content," so it could "be reformatted as a passport photo." *Id.* ¶¶ 94–95; *see also id.* ¶¶ 127–28. Joshua forwarded that altered photo to Osmani "to be conveyed to his contact in the Afghan passport office." *Id.* ¶ 95.

"In March 2021, Osmani assisted Joshua and Stephanie Mast in obtaining a fake Afghan passport for Baby Doe." *Id.* ¶ 96. The Masts wired over $1,000 to Osmani, "who then wired those funds to a contact in Afghanistan to pay for the procurement of the fake Afghan passport with a fake Americanized name that featured the Mast's last name." *Id.*

On July 10, 2021, Motley offered to introduce John and Jane Doe to "the American family supposedly interested in providing medical care for Baby Doe." *Id.* ¶ 98. Motley then facilitated a phone call between the Masts and the Does, with Osmani serving as the interpreter. *Id.* ¶ 98. On the call, Joshua Mast told the Does that he had been "a volunteer in the U.S. military hospital who was responsible for her care while she was hospitalized there." *Id.* Joshua further told them that, as a result, "he was familiar with Baby Doe's medical needs and warned them that, if Baby Doe did not receive medical care in the United States, she could be blind, brain damaged, and/or permanently physically disabled." *Id.* He "insisted" that Baby Doe would face "serious, permanent harm," if not brought to the United States for treatment. *Id.* ¶ 100. John Doe, who had trained as a nurse in Afghanistan, was not aware that Baby Doe would face the medical issues Joshua Mast described on the call, though John and Jane Doe were concerned about the risk of permanent scarring, irregularities in her gait, and other unknown symptoms. *Id.* ¶ 99.

During that initial conversation, and in later conversations as well, Joshua Mast asked John and Jane Doe to send Baby Doe to the United States for medical treatment. *Id.* ¶ 100. They

---

[7] Unredacted versions of these photos are filed under seal at Dkt. 77 ¶ 127.

declined, however, because "they did not want to be separated from their daughter." *Id.* Further, by July 2021, Jane Doe was in the third trimester of her pregnancy and was concerned about traveling to the United States. *Id.* ¶ 101. John and Jane Doe asked Joshua Mast if he would be willing to help them take Baby Doe to India or Pakistan for medical care, where Joshua Mast could pay the doctors directly, but Mast declined, insisting India and Pakistan did not have the specialists required for Baby Doe's care. *Id.*

Nonetheless, the Masts built up a relationship of trust with John and Jane Doe over time. *Id.* ¶ 102. They communicated by phone and in written correspondence, and Osmani had other direct conversations with John and Jane Doe, and they began to trust him too. In their telling, Osmani was an Afghan who spoke to them in their native language, and he repeatedly referred to John Doe as his "brother," and he told them that the Masts "were trustworthy people with no ulterior motives who just wanted to help Baby Doe receive medical care." *Id.* Over time, John and Jane Doe began to fear that Baby Doe would suffer long-term consequences if they didn't get her medical care from specialists. *Id.* ¶ 103.

Throughout all of these communications between the Masts, Motley and Osmani with John and Jane Doe, no one informed the Does that the Masts had obtained a custody order for Baby Doe from their local JDR Court in Virginia, filed a federal lawsuit against the United States trying to stop Baby Doe's reunification with them in Afghanistan, and had obtained a final adoption order for Baby Doe in a Virginia court. *Id.* ¶¶ 93, 104. Instead, the Masts allegedly misrepresented that "they wanted to bring Baby Doe to the United States solely so that she could receive medical treatment and for the sake of doing something good." *Id.*

16

7.  John & Jane Doe Agree to Bring Baby Doe to United States

In August 2021, with U.S. troops withdrawing from Afghanistan and the Taliban retaking control, the Masts again reached out to John and Jane Doe to ask them to bring Baby Doe to the United States for medical treatment. *Id.* ¶ 105. In these dangerous circumstances, John and Jane Doe believed that it could be their last opportunity to obtain specialized medical care for Baby Doe. *See id.* As a result, they told Joshua Mast "that they were considering his proposal, but were concerned that they would not be able to return to Afghanistan." *Id.*

Joshua Mast and Osmani "assured them that they would need to be in the United States for Baby Doe's medical care for only two or three months and that they would then be able to re-enter Afghanistan without issue." *Id.* ¶ 106. (Again, they did not inform the Does about the Masts' adoption order, etc.) The Masts "continued to misrepresent that [they] merely wanted to bring Baby Doe to the United States solely to provide her with medical care." *Id.* Allegedly in reliance upon those misrepresentations, John and Jane Doe "agreed to travel to the United States for the purpose of obtaining medical care for Baby Doe." *Id.* ¶ 107.

Joshua Mast informed John and Jane Doe he would prepare immigration paperwork for them and Baby Doe to permit them to enter the United States to obtain Baby Doe's medical care. *Id.* ¶ 108. He never informed them, however, that he had submitted a U.S. Citizenship & Immigration Services ("USCIS") Form I-360[8] for Plaintiff John Doe, which listed Mast's North Carolina address as a mailing address. *Id.* ¶¶ 108–09.[9] Plaintiffs believe it was Osmani's wife,

---

[8] *See* USCIS, I-360 Petition for Amerasian, Widow(er), or Special Immigrant Visa.

[9] In fact, John and Jane Doe only later learned that Mast had filed an I-360 on their behalf. On November 10, 2021, USCIS mailed an "intent to deny" letter to Mast's North Carolina address, providing them until December 10, 2021 to respond. Mast never informed John and Jane Doe of the USCIS communication, and as a result, they did not timely respond. In

Natalie Osmani, who filled out the form. *Id.* ¶ 109. She wrote by hand a special visa category: "Special Immigrant Afghanistan National escorting military dependent." *Id.* ¶ 110. But no such category exists.[10] Moreover, Plaintiffs allege that "it was false to claim that John Doe would be escorting a U.S. 'military dependent' when the U.S. had by this time represented to this Court that it did not recognize any custodial relationship between Joshua Mast, Stephanie Mast and Baby Doe." *Id.* Nonetheless, John and Jane Doe were placed on a list of potential evacuees with pending Special Immigrant visa applications. *Id.* ¶ 111.

Richard Mast also was involved in communications with U.S. immigration authorities seeking to get John and Jane Doe, Baby Doe, and also Osmani's siblings to the United States. *See id.* ¶¶ 112–14. On August 20, 2021, Richard Mast wrote USCIS that "[John and Jane Doe] are helping US DoD at great risk to themselves, and have cared for a minor DoD dependent child ([Baby Doe]) who has serious medical needs." *Id.* ¶ 112. (Yet Baby Doe was not a "minor DoD dependent child" at that time, because she had been reunited with her Afghan family and was no longer in DOD's custody. *Id.* ¶ 113.). In another email to USCIS, Richard Mast wrote that Osmani's siblings were the "family of an Afghan pastor" who had been "very instrumental in helping a US Marine" "adopt an Afghan child." *Id.* ¶ 114.

8. Travel to the United States

The Does traveled to Kabul on August 23, 2021, to spend the night with Osmani's family, at the direction of Joshua Mast and Osmani. *Id.* ¶ 116. The next morning, the Does and Osmani's siblings traveled to Hamid Karzai International Airport in the midst of the evacuation

---

fact, they only learned of the I-360 petition later when they filed requests for personal records with USCIS. *Id.* ¶ 111 n.7.

[10] *See* USCIS, I-360 Petition for Amerasian, Widow(er), or Special Immigrant Visa, available at http://uscis.gov/i-360 (last visited July 23, 2024).

18

efforts. *Id.* The Does flew from Afghanistan to Qatar, then to Germany, and ultimately to the United States. *Id.* ¶ 117.

Between August 24, and 26, 2021, Joshua Mast and Osmani communicated with the Does over WhatsApp while they were en route. *Id.* ¶¶ 116–17. Joshua Mast sent Jane Doe a WhatsApp voice note on August 26, 2021, that instructed her to tell anyone who asked that he (Joshua Mast), was their lawyer. *Id.* ¶ 119. He sent her a text stating:

> If anyone asks to talk about your documents, show them this text: I am Major Joshua Mast, USMC. I am a Judge Advocate with MARSOC,[11] and I am here at Ramstein to provide this group of 6 pax with their original documents and escort them through the process. MARSOC coordinated a JSOC[12] operation to extract them to Kabul airport three days ago, and I am tracking them down for the above purpose.

*Id.* Joshua Mast also left John Doe a voice message, stating:

> [I]f someone tries to talk about documents, we want to come and show them all the forms that we filed for you all to get to America instead of staying here in Germany. So before you talk to them about it, say "we have a lawyer here to talk with you about that for us" and that's me. Just show them the text and have them call me.

*Id.* ¶ 120.

When the Does landed in Ramstein Air Base in Germany, Joshua and Stephanie Mast met them. *Id.* ¶ 121. The Masts visited the Does three times, and "repeatedly [tried] to convince John and Jane Doe to allow Baby Doe to travel separately with the Masts, insisting that it would be easier for the toddler to enter the United States that way." *Id.* However, using Osmani as an interpreter, John and Jane Doe refused each time, because they did not want to leave Baby Doe in anyone else's care. *Id.* While they were in Germany, John Doe informed the Masts that he had promised Jane Doe, "that Baby Doe would never leave her side while they were in the United

---

[11] United States Marine Forces Special Operations Command.

[12] Joint Special Operations Command.

States." *Id.* ¶ 122. In another conversation in Germany, "Jane Doe told Stephanie Mast that she

could not live without Baby Doe and that, given all that Baby Doe had been through, Baby Doe

meant even more to Jane Doe than her own yet-to-be-born child." *Id.* ¶ 123.

On August 29, 2021, the Does and Osmani and his siblings arrived at Dulles

International Airport. *Id.* ¶ 125. When they arrived, Joshua Mast met the families while they

were in line for inspection, pulled them out of the line, and then took them over directly to an

inspecting officer, where they presented their identification documents. *Id.* John Doe presented

his Afghan passport and Jane Doe presented an Afghan ID. *Id.* ¶ 126. The Does then explained

that Baby Doe had not yet received an ID, "as it was customary in Afghanistan to procure one

only when the child was old enough to attend school." *Id.* Baby Doe was only two years old at

the time. *Id.*

To John and Jane Doe's surprise, Joshua Mast at that point handed to the inspecting

officer an Afghan passport for Baby Doe. *Id.* ¶ 127.[13] John and Jane Doe had never seen this

passport, and they did not procure it themselves. *Id.* They were further shocked to see that the

picture of Baby Doe was the same as the one that Jane Doe had sent to Motley through

WhatsApp on July 30, 2020, of Baby Doe in swimming trunks—with minor alterations. *See id.*

¶¶ 127–30. Furthermore, the fake passport listed Baby Doe's last name as "Mast." *Id.* ¶ 131.

"When John and Jane Doe asked Joshua Mast why the name on the passport was incorrect, he

told them to keep quiet and that it was just to make it easier to get medical care for Baby Doe."

*Id.* ¶¶ 131–33. The Does "were paroled into the United States, which permits them to lawfully

remain in the United States" until a defined date (then August 28, 2023). *Id.* ¶ 133. The Does

---

[13] Plaintiffs note that Baby Doe's having an Afghan passport would contradict the Masts'
representations to multiple courts that she was not Afghan and had no nationality. *Id.*

were then transported to refugee housing at Fort Pickett, in Blackstone, Virginia—a location Joshua Mast instructed them to request. *Id.*

Five days later, on September 3, 2021, the Does were instructed that they would be moving to another housing unit at Fort Pickett. *Id.* ¶ 134. The Does were then escorted into a van, in which a woman sat in the last row with an infant seat, and Baby Doe was placed in that infant seat. *Id.* However, rather than being transported to another housing unit on the base, the Does were taken to a building where the woman "picked up Baby Doe and held her while instructing John and Jane Doe to walk to the front of the building." *Id.* They met someone who purported to be a social worker from the Department of State. *Id.*

The social worker then "informed John and Jane Doe that they were not Baby Doe's lawful guardians and that Joshua Mast had adopted the child." *Id.* ¶ 136. Plaintiffs allege that they did not understand what she meant by "adoption," "as guardianship and kinship care in Afghanistan are not understood the same way as adoption in the U.S. legal system." *Id.* ¶ 137. But the Does did understand that Baby Doe would not be returning with them to their housing unit, and that Joshua Mast would be taking Baby Doe with him. *Id.* When Joshua Mast entered the room, Jane Doe, who was more than eight months pregnant, "fell to the ground crying and begging him not to take Baby Doe. The woman holding Baby Doe removed her from the room, against John and Jane Doe's objections, and gave her to Stephanie Mast, who was waiting outside." *Id.* ¶ 138. "John Doe pleaded with Joshua Mast to act like the 'brother' that he had promised to be to them. Joshua Mast refused, leaving John and Jane Doe in tears as he and Stephanie Mast abducted Baby Doe." *Id.* ¶ 139. John and Jane Doe have not seen their Baby Doe since September 3, 2021. *Id.*

9.  The Aftermath

The next day, the Does contacted Joshua Mast and asked why he had taken their child. "Mast responded that he had been instructed to pick up Baby Doe or she would be sent to an orphanage." *Id.* ¶ 140. He did not add any detail or mention the adoption order.

In another conversation about two weeks later, Joshua and Richard Mast "again failed to disclose the adoption order, but instead told the Does that they currently were not able to properly care for Baby Doe at Fort Pickett and were not financial stable enough to provide for her." *Id.* ¶ 141. However, Joshua and Richard Mast told the Does that after they left the base and got jobs and were financially stable, "they would discuss Baby Doe's status with the Does." *Id.* Afterward, the Does tried to maintain a connection with Joshua Mast, hoping he might allow them to see Baby Doe, but "he repeatedly refused." *Id.* ¶ 142.

10. Virginia Court Proceedings

On March 28, 2022, Plaintiffs John and Jane Doe petitioned the Circuit Court to vacate the final adoption order and grant them custody of Baby Doe. *See* Dkt. 449-1 at 3 (*A.A. v. J.M.*, No. 0876-23-2, at 3 (Va. Ct. App. July 16, 2024) (Slip Op.)) ("*A.A. v. J.M.* Slip Op."); Am. Compl. ¶ 152.[14] Joshua and Stephanie Mast argued that the Does lacked standing to challenge the adoption, and that Virginia Code § 63.2-1216, which prohibits challenges to a final adoption order after six months, barred any collateral attack. *See A.A. v. J.M.* Slip Op. at 3–4.

On May 3, 2023, following several days of evidentiary hearings, the Circuit Court entered summary judgment for the Does—voiding the final adoption order and finding that they were "de facto parents of the child and 'were entitled to some process that they did not receive,'"

_____

[14] In the state court proceedings, all adult parties are identified only by their first and last initials. In this federal action, the adult plaintiffs are identified as John Doe and Jane Doe, and the defendants are identified by their first and last names.

but also left the interlocutory adoption order and custody order in place. *Id.* The Circuit Court certified the entire order for appeal, which was heard by the Virginia Court of Appeals. *Id.*

On July 16, 2024, the Virginia Court of Appeals rendered its decision. The Court of Appeals held that, because the Circuit Court "lacked the power to render the interlocutory and final adoption orders and the J&DR court lacked subject-matter jurisdiction to issue the custody order," the Court of Appeals found "all the orders … void ab initio." *Id.* at 22. Accordingly, the Court of Appeals affirmed in part and reversed in part the Circuit Court's ruling (reversing as to the interlocutory adoption and custody orders). *Id.* The Court of Appeals further "direct[ed] the circuit court to dismiss the adoption proceedings and conduct a hearing on the existing custody petition filed by [John and Jane Doe], which remains pending before the circuit court." *Id.* at 22–23. The Court of Appeals wrote that Joshua and Stephanie Mast "may file custody or adoption petitions at their discretion." *Id.* at 23.

## The Complaint

Plaintiffs John Doe, Jane Doe and Baby Doe, filed suit in this Court in September 2022. Dkt. 1 ("Compl."). They named as Defendants Joshua Mast, Stephanie Mast, Richard Mast, as well as Kimberly Motley and Ahmad Osmani, as well as "nominal defendants" the Secretary of the United States Department of State and the Secretary of the United States Department of Defense.[15] Plaintiffs charged that the individual Defendants had conspired to unlawfully abduct Baby Doe from them—her biological family. *Id.* ¶ 1. Plaintiffs subsequently filed the operative amended complaint in November 2022. Dkt. 68 ("Am. Compl.").

---

[15] The nominal Federal Defendants were dismissed from this action in August 2023. *See* Dkt. 270.

In the amended complaint, Plaintiffs assert that this Court has subject matter jurisdiction on account of diversity of citizenship. They also assert that this Court has federal question subject matter jurisdiction, and supplemental jurisdiction, "because Plaintiffs' right to relief as to Count I and their request for declaratory relief necessarily depend on resolution of substantial questions of federal law." Am. Compl. ¶¶ 18–19.

In their Amended Complaint, Plaintiffs bring five state-law causes of action against the individual Defendants: (1) Tortious Interference with Parental Rights (against all Defendants); (2) Fraud (Joshua Mast, Stephanie Mast, and Kimberly Motley); (3) Common Law Conspiracy (all Defendants); (4) Intentional Infliction of Emotional Distress (occasionally, "IIED") (all Defendants); and (5) False Imprisonment (Joshua and Stephanie Mast). Plaintiffs John, Jane, and Baby Doe each seek $10,000,000 in compensatory damages as well as $5,000,000 in punitive damages "or the maximum allowed under Virginia law against each of the Defendants." *Id.* at pp. 44–45. Plaintiffs have also sought a declaratory judgment seeking numerous forms of relief with respect to Baby Doe's citizenship, whether she was a "stateless" person, her lack of connection to the United States and Virginia, and the legal effects of the actions of the United States Government. *See id.*

## **Standard of Review**

A motion to dismiss pursuant to Rule 12(b)(1) tests a district court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). "A Rule 12(b)(1) motion to dismiss should be granted 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a

matter of law.'" *Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of Balt.*, 855 F.3d 247, 251 (4th Cir. 2017) (quoting *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)).

Rule 12(b)(2) provides that a defendant may file a motion to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a *prima facie* case of jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019); *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014). That is, the court must determine "whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction," but the court "must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." *Hawkins*, 935 F.3d at 226.

Finally, "[a] motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). It does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "This pleading standard does not require detailed factual allegations." *ACA Fin. Guar. Corp.*, 917 F.3d at 211 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, "[t]o meet the Rule 8 standard and 'survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Nadendla v. WakeMed*, 24 F.4d 299, 305 (4th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). The complaint's "[f]actual allegations must be enough to raise a right to relief above the

25

speculative level," *Twombly*, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *King*, 825 F.3d at 212. However, the Court need not "accept the legal conclusions drawn from the facts," or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United. Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotation marks omitted).

## Subject Matter Jurisdiction & Abstention Doctrines

Defendants first argue that the Court lacks subject matter jurisdiction, principally on the notion that Plaintiffs' claims are in essence a dispute over custody of Baby Doe—a subject that falls outside federal court jurisdiction under the so-called "domestic relations" exception. Defendants also contend that various abstention doctrines warrant staying this action pending resolution of ongoing proceedings in Virginia courts—which are considering whether the Does or the Masts are entitled to custody of Baby Doe and whether the Masts' adoption of Baby Doe was lawful.[16] For the following reasons, the Court concludes that it possesses subject matter jurisdiction over the core of Plaintiffs' lawsuit, and that no abstention doctrine supports staying proceedings in this case pending a final conclusion of state court proceedings.

### 1.    Domestic Relations Exception

Defendants first argue that "[t]he Court should dismiss the Amended Complaint under the domestic-relations exception to diversity jurisdiction, which prevents this Court from granting what the Does seek: custody over Baby Doe." Dkt. 101 at 11. They contend that the "crux" of the Amended Complaint, including all causes of action and "all 12 declarations [Plaintiffs] seek,

---

[16] Joshua and Stephanie Mast principally developed the domestic relations exception and abstention arguments, Dkt. 86 at 11–21; Dkt. 120 at 1–15, though Osmani and Richard Mast also have joined in these arguments, Dkt. 93 at 1–2, 11; Dkt. 99 at 8–10.

are premised on the theory that the Adoption Order is invalid and that Baby Doe should be in [ ] their custody." *Id.* at 11–12.

  a.  *The Contours of the Domestic Relations Exception*

  As most relevant here, federal courts have original subject matter jurisdiction over two general types of cases: those arising under federal law, and those between citizens of different states where the amount in controversy exceeds $75,000. *See Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 437 (2019) (citing 28 U.S.C. §§ 1331, 1332(a)). "These jurisdictional grants are knowing as 'federal-question jurisdiction' and 'diversity jurisdiction,' respectively." *Id.* at 437–38. "Each serves a distinct purpose: Federal-question jurisdiction affords parties a federal forum in which to vindicate federal rights, whereas diversity jurisdiction provides a neutral forum for parties from different States" to litigate disputes arising under state law. *Id.* at 438 (internal quotation marks omitted). "If federal question jurisdiction exists, the citizenship of the parties is irrelevant and nothing more need be established." *Fed. Nat. Mortg. Ass'n v. Davis*, 963 F. Supp. 2d 532, 535 n.3 (E.D. Va. 2013). If the complaint does not properly invoke federal-question jurisdiction, however, then the federal court's power to hear the case must be predicated on diversity jurisdiction. *See id.*

  "The generally applicable rule is that a federal court, whose jurisdiction has been [properly] invoked, *must* exercise that jurisdiction and address the matter before it." *Sonda v. W. Va. Oil & Gas Conservation Comm'n*, 92 F.4th 213, 219 (4th Cir. 2024). "Indeed, the Supreme Court has emphasized that this duty is a 'virtually unflagging obligation.'" *Id.* (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988)). This is so because "federal courts have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Id.* (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)).

27

But the Supreme Court has also long recognized a narrow exception to the jurisdiction of the federal courts for certain "domestic relations" matters. *Ex Parte Burrus*, 136 U.S. 586 (1890); *Barber v. Barber*, 21 How. 582 (1859). It has explained that the domestic relations exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992). To be sure, the Constitution does not itself demand the exclusion of domestic relations matters from federal courts' jurisdiction. *Id.* at 695–97. Rather, the Court grounded this jurisdictional carve-out upon "Congress' apparent acceptance of this construction of the diversity jurisdiction [statute]," and in its later "leav[ing] undisturbed 'the Court's nearly century-long interpretation' of the diversity statute 'to contain an exception for certain domestic relations matters.'" *Marshall v. Marshall*, 547 U.S. 293, 307 (2006) (quoting *Ankenbrandt*, 504 U.S. at 700); *see generally* 28 U.S.C. § 1332 (diversity jurisdiction). The Court found further support for "the rule that federal courts lack power to issue these types of decrees," in view of the "special proficiency" that state courts have developed "handl[ing] issues that arise in the granting of such decrees" over many years. *Ankenbrandt*, 504 U.S. at 704.

Federal courts should be wary of taking too expansive a view of the domestic relations exception, however. Take *Ankenbrandt*. There, the Supreme Court "reined in" some lower courts' expansive interpretations of the domestic relations exception. *See Marshall*, 547 U.S. at 299 (citing *Ankenbrandt*, 504 U.S. 689). The Court held that the "domestic relations exception" *did not* bar the suit of a plaintiff against her former husband and his new female companion, alleging tort claims and seeking money damages for her former husband committing "sexual and physical abuse" of their children. *Ankenbrandt*, 504 U.S. at 691. As the Court explained, "[t]his lawsuit in no way seeks such a [divorce, alimony or child custody] decree," but rather alleged

28

that the defendants had "committed torts" against the children. *Id.* at 704. Accordingly, "subject-matter jurisdiction pursuant to § 1332 [was] proper in this case." *Id.*

Binding Fourth Circuit precedent has also operated to ensure a narrow application of the domestic relations exception. In *Cole v. Cole*, the Fourth Circuit reversed a district court's order of dismissal on the basis of the domestic relations exception. 633 F.2d 1083 (4th Cir. 1980). In *Cole*, an ex-husband sued his ex-wife and police officers, bringing claims of malicious prosecution and conspiracy on the grounds that the defendants initiated false criminal charges against him for assault, abandonment and nonsupport of his ex-wife. *Id.* at 1085. The Fourth Circuit explained that "[n]ot all family feuds … fall directly into the specialized category of true domestic relations cases," but rather, the court "must consider the exact nature of the rights asserted or of the breaches alleged." *Id.* at 1088. And, "where the alleged breaches (whether tortious or contractual in nature) are of a duty which does not arise solely from family relations law, a federal district court may not deny jurisdiction" based on the relation of the parties. *Id.* Still, the Fourth Circuit also cautioned federal courts to be "alert to preclude what are genuinely divorce, alimony, or child custody and support cases from creeping around the barrier" to federal courts' hearing those cases. *Id.* Thus, the inquiry was whether deciding the case would "require the court either to adjust family status or to establish duties under family-relations law or to determine whether or not such duties had been breached." *Id.* at 1089. Accordingly, because the Fourth Circuit in *Cole* determined that "the duty to abstain from malicious prosecution, from abuse of process, … and from conversion does not arise out of or require, in order to give rise to

the duty, a present or prior family relation," the Fourth Circuit reversed the dismissal order invoking the domestic relations exception. *Id.*[17]

Several years later, the Fourth Circuit again reversed another district court for invoking the domestic relations exception. *See Wasserman v. Wasserman*, 671 F.2d 832 (4th Cir. 1982). In that case, the plaintiff was an ex-wife who sued as defendants her ex-husband and his present wife as well as his parents and the attorneys who represented him in a divorce proceeding. The plaintiff alleged that "the defendants removed, or assisted in removing, her children from her custody without her consent during [their] divorce proceedings." *Id.* at 833. The plaintiff further alleged that the defendants' removal of three young children from her custody, taking them outside the state of Maryland, and "prevent[ing] the children from returning to or contacting [the plaintiff] and conceal[ing] their location from her" gave rise to three claims: child enticement, intentional infliction of emotional distress, and civil conspiracy. *Id.* The Fourth Circuit, "guided by the principles announced in *Cole v. Cole*," held that "*Cole* compel[led] the district court to entertain this suit." *Id.* at 834. That was because the plaintiff's complaint had only alleged "generally cognizable common law torts," which were "in no way dependent on a present or prior family relationship." *Id.* at 834–35. In other words, they would not "require the existence of any rule particularly marital in nature," and indeed, "could have arisen between persons with no marital relationship whatsoever." *Id.* at 835. Finally, and "[m]ost importantly," the plaintiff "[was] not seeking a determination of entitlement to custody or any other adjustment of family status," in contrast with cases "in which the parties actually seek a declaration of present or

---

[17] The Supreme Court in *Ankenbrandt* later favorably cited *Cole* as an example of the "better reasoned views" of the federal circuit courts that "similarly stated that the domestic relations exception [w]as narrowly confined to suits for divorce, alimony, or child custody decrees." 504 U.S. at 703 n.6 (citing *Cole*, 633 F.2d at 1087).

future rights as to custody or visitation." *Id.* Thus, the Fourth Circuit in *Wasserman* concluded that the domestic relations exception did not apply.

A few years after *Wasserman*, the Fourth Circuit reversed yet another district court's application of the exception in *Raftery v. Scott*, 756 F.2d 335 (4th Cir. 1985). In that case, an ex-husband sued his ex-wife, seeking damages for intentional infliction of emotional distress on account of her efforts to destroy the father-son relationship. However, the Fourth Circuit explained that "the domestic relationship between the parties largely terminated with the 1977 divorce, and the suit concern[ed] not the establishment and implementation of visitation rights but, rather, s[ought] an award of damages precisely because of acts by the former wife to frustrate whatever domestic relations aspects remained of her relationship with her former husband." *Id.* at 337. Because "someone who had never been married to Raftery," such as another family member or "even a nonrelative such as a child nurse or babysitter," could have "set about destroying the relationship between the father and his son, any cause of action arising out of such behavior would not be foreclosed from a hearing in federal court because it partook of some intra-family aspects." *Id.* at 337–38. The Fourth Circuit again articulated the rule: "[a] decision by a federal court not requiring the adjustment of family status or establishing familial duties or determining the existence of a breach of such duties, does not contravene the domestic relations exception to federal diversity jurisdiction." *Id.* at 338. Thus, the Fourth Circuit held that "jurisdiction is not lacking." *Id.*

By contrast, in *Doe v. Doe*, the Fourth Circuit confronted "[a] purely custodial case between private parties," about which the court explained "[r]eason and precedent both dictate … that the federal court not intervene." 660 F.2d 101, 106 (4th Cir. 1981). The case concerned a dispute between a divorced couple (John and Jane Doe) over custody of their child (Jack Doe).

*Id.* at 102. When John Doe remarried, his new wife (Ann) petitioned to adopt Jack in Virginia state court, and Jane Doe contested the adoption. *Id.* The state court permitted Ann to adopt the child, thereby terminating Jane Doe's parental rights. *Id.* Jane Doe appealed the adoption order to the Supreme Court of Virginia. *Id.* While that appeal was pending, however, Jane Doe filed a petition for writ of habeas corpus in federal district court, "alleging that the detention of Jack Doe was unlawful." *Id.* Therein, Jane Doe argued that the Virginia Code provision allowing the adoption was unconstitutional, as was the state court's decision. *Id.* While the district court stayed the case pending resolution of the appeal in the Supreme Court of Virginia, the Fourth Circuit held that the district court clearly erred by not dismissing the case "for want of jurisdiction." *Id.* at 105. The Fourth Circuit explained that "[r]easons abound" why federal courts should not take "habeas jurisdiction in custody disputes between [a] man and [his] wife," not the least of which that "federal courts are not nearly as well equipped as are local state courts to deal with the problems of child custody." *Id.* at 106 & n.5. Finding that this was "a purely custodial case between private parties," the Fourth Circuit held that the domestic relations exception forbade the federal courts from interfering in the custody dispute. *Id.*

   b. *Whether This Case Presents Federal Questions, Rendering the Domestic*
    *Relations Exception Irrelevant*

   Having thus described the contours and effect of the domestic relations exception, the Court will now consider Plaintiffs' argument that the exception is inapplicable on the grounds that they properly invoked *federal question* jurisdiction. *See* Dkt. 113 at 9–11. They argue, rightly, that in the Fourth Circuit the domestic relations exception "is applied only as a judicially implied limitation on the *diversity jurisdiction*; it has no generally recognized application on *federal question jurisdiction*." *United States v. Johnson*, 114 F.3d 476, 481 (4th Cir. 1997)

(emphases added); *see* Dkt. 101 at 14 (acknowledging that "the Fourth Circuit has held that the domestic-relations exception does not apply to federal claims").[18]

"Federal courts are courts of limited jurisdiction," which "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life. Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). As Plaintiffs are the parties asserting jurisdiction, they bear the burden of establishing subject matter jurisdiction. *See Adams*, 697 F.2d at 1219. In the Amended Complaint, Plaintiffs first pleaded diversity jurisdiction. Am. Compl. ¶ 18 (citing 28 U.S.C. § 1332). But they further assert that the Court also has federal question subject matter jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction under 28 U.S.C. § 1367, "because Plaintiffs' right to relief as to Count 1 and their request for declaratory relief necessarily depend on resolution of substantial questions of federal law." Am. Compl. ¶ 19.

A case "arises under" federal law so as to confer federal question jurisdiction under two circumstances. "Most directly, a case arises under federal law when federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). This accounts for the "vast bulk of suits that arise under federal law." *Id.* However, in the Amended Complaint, Plaintiffs only bring five purely state-law causes of action, *see* Am. Compl. ¶¶ 154–202, rendering this manner of establishing federal question jurisdiction inapplicable.

Still, Plaintiffs contend that although their complaint "assert[s] only state law claims," it nonetheless "can invoke federal question jurisdiction" under the second circumstance—by satisfying the test in *Gunn v. Minton*. *See* Dkt. 113 at 9. In *Gunn*, the Supreme Court explained

---

[18] While the Masts note that the federal circuits "are split on whether the domestic-relations exception applies to federal-question jurisdiction," the parties agree that "the Fourth Circuit has held that it applies only to diversity jurisdiction." Dkt. 120 at 7–8. In any event, as this Court ultimately concludes that Plaintiffs' Amended Complaint has not properly raised a federal question, any circuit split is immaterial to the issues before the Court.

that there is a "special and small category" of cases in which "arising under jurisdiction still lies." 568 U.S. at 258. Specifically, courts will possess federal question jurisdiction over the "slim category" of cases in which "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.*

Plaintiffs argue that "[e]ach of the *Gunn* elements is met here." Dkt. 113 at 10. First, Plaintiffs write that a federal issue is "necessarily raised" because it "is a necessary element of one of the well-pleaded state claims[.]" *Id.* (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. of S. Cal.*, 461 U.S. 1, 13 (1983)). In Plaintiffs' view, "a federal issue is a necessary element of Count I for tortious interference with parental rights … because the declaratory relief that Plaintiffs John and Jane Doe seek—which raises questions under the U.S. Constitution's Supremacy Clause—will establish that they had a right to maintain a parental or custodial relationship with Baby Doe." Dkt. 113 at 10. As for the second element, Plaintiffs contend that the "issue of whether John and Jane Doe have parental rights is 'actually disputed,'" and explain that the "gravamen of Plaintiffs' Amended Complaint is that Defendants interfered with the Does' parental rights." *Id.* On the third *Gunn* element, Plaintiffs argue that the federal issue they have raised is the "Supremacy Clause," which is "of critical importance to the federal system as a whole." *Id.* at 11. Finally, they claim that "the issue presented here is 'capable of resolution in federal court without disrupting the federal-state balance approved by Congress.'" *Id.* (quoting *Gunn*, 568 U.S. at 258). Plaintiffs further opine that, while "[t]here is no question that domestic relations is one area in which states have special responsibilities," the domestic relations exception is "judge-made," and is not "approved by Congress." *Id.*

34

Plaintiffs' arguments in support of federal question "arising under" jurisdiction are not persuasive. At the outset, while *Gunn*'s first element requires a federal issue to be "necessarily raised," it is not at all clear what Plaintiffs believe that integral federal issue to be. Plaintiffs argued that the Amended Complaint's first (state law) claim for intentional interference with parental rights necessarily relies on a federal issue, which they describe as establishing "that they had a right to maintain a parental or custodial relationship with Baby Doe." Dkt. 113 at 10. But, as pleaded, the Amended Complaint also asserts that *Afghan* law—not *United States* federal law—established Plaintiffs' parental and custodial rights over Baby Doe. *See, e.g.*, Am. Compl. ¶ 155; *id.* ¶ 157 (alleging that "each of the Defendants was aware that [Plaintiffs] were the lawful guardians of Baby Doe as determined by the Government of Afghanistan"); *id.* ¶ 72 ("Baby Doe's paternal uncle transferred his guardianship of Baby Doe, pursuant to his authority under the laws of Afghanistan, to his son and daughter-in-law, John and Jane Doe.").[19]

"A plaintiff's right to relief for a given claim necessarily depends on a question of federal law only when *every* legal theory supporting the claim requires the resolution of a federal issue." *Dixon v. Coburg Diary, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc). As a result, "if the plaintiff can support his claim with even one theory that does not call for an interpretation of federal law, his claim does not 'arise under' federal law for purposes of § 1331." *Id.* at 817. Since a plain reading of Plaintiffs' intentional interference with parental rights claim does not solely rest on a federal issue—but instead, Plaintiffs have put forward a theory supporting the

---

[19] Additionally, in arguing that they stated a plausible claim for tortious interference with parental rights that survived Defendants' Rule 12(b)(6) motion to dismiss, Plaintiffs further asserted that the Masts "were complete strangers to [Baby Doe] and her Afghan relatives," and that "[Plaintiffs] had become her legal guardians *under Afghan law*." Dkt. 113 at 34 (emphasis added) (citing Am. Compl. ¶¶ 71–74).

claim based upon foreign law and Virginia law—the Court cannot accept that an issue of federal law is "necessarily raise[d]" by the claim.[20]

Further, Plaintiffs vaguely cite the Supremacy Clause, Am. Compl. at pp. 44–45 (Prayer (a)(i), (x), (xi)), yet assert only that the declaratory relief they seek "*raises questions* under the U.S. Constitution's Supremacy Clause"—without identifying what those questions are. Dkt. 113 at 10 (emphasis added). It is not enough to gesture to "raise[d] questions" under federal law and the Supremacy Clause to demonstrate a "disputed issue of federal law" that is "necessarily raise[d]" in a case. *Cf. Manning v. Merrill Lynch Pierce Fenner & Smith*, 772 F.3d 158, 165 (3d Cir. 2014) ("Defendants simply cannot carry their burden of establishing [removal] jurisdiction based on a 'disputed question of federal … law' without identifying the particular source of federal law for the judiciary to interpret") (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 310 (2005)).

Even assuming Plaintiffs had shown that a federal issue is "necessarily raised" in this case—and they have not—they still have not demonstrated that such federal issue is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Plaintiffs have asserted that there is a federal issue necessarily raised because the declaratory relief they seek "will establish that they had a right to maintain a parental or custodial relationship with Baby Doe." Dkt. 113 at 10. And Plaintiffs seek declarations that, as a matter of federal law (under the Supremacy Clause and "Executive's foreign affairs power"),

---

[20] Plaintiffs' contention that their "derivative claim for conspiracy in Count III" also necessarily raises an issue of federal law on the same grounds, fails for the same reasons. *See* Dkt. 113 at 10. Plaintiffs' conspiracy count could be satisfied upon a theory that Defendants conspired to defraud Plaintiffs—another Virginia state-law claim—further cementing that there is at least one theory of Plaintiffs' conspiracy claim that does not contemplate the interpretation of federal law. *See Dixon*, 369 F.3d at 816–17.

the United States' decisions to recognize Baby Doe as an Afghan citizen and thus the Afghan

Government's jurisdiction over her; and to allow her transfer to the Government of Afghanistan

for family reunification, are binding on and supersede any contrary ruling by the Virginia courts,

Am. Compl. at pp. 44–45 (Prayer (a)(i), (x)-(xii)).

With this argument, Plaintiffs try to cloak a quintessential state-law matter—a

determination of child custody—in federal garb. But child custody has long been held a matter of

state law, not federal law. *See Ex Parte Burrus*, 136 U.S. at 593–94 ("The whole subject of the

domestic relations of husband and wife, parent and child, belongs to the laws of the states, and

not to the laws of the United States."); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13

(2004) (citation omitted) (abrogated on other grounds by *Lexmark Int'l, Inc. v. Statis Control

Components, Inc.*, 572 U.S. 113, 127–28 (2014)) (absent certain "rare instances … in which it is

necessary to answer a substantial federal question that transcends or exists apart from the family

law issue," "in general it is appropriate for the federal courts to leave delicate issues of domestic

relations to the state courts"). And "sound policy considerations" support the "long-held

understanding" that domestic relations matters (like child custody fights) were reserved for state

courts. *Ankenbrandt*, 504 U.S. at 703. Thus, while Plaintiffs write that the "gravamen" of their

complaint is that Defendants "interfered with John and Jane Does' parental rights," Dkt. 113

at 10, this, in fact, betrays the fundamental state-law basis of Plaintiffs' claims—and not the

existence of some discrete, underlying federal issue.[21]

---

[21] That is not to say that the decision of the Executive Branch to transfer Baby Doe to the
Afghan Government for reunification with her relatives, and the underlying important federal
interests including exercise of the foreign affairs powers, are irrelevant to John and Jane Doe's
efforts to get Baby Doe back. Indeed, those federal interests are amply documented by the
submission of the Statement of Interest of the United States of America in Fluvanna County
Circuit Court. *See* Dkt. 77-1. But the preemptive effect of such federal interests vis-à-vis John
and Jane Doe's, and the Masts' asserted parental and custodial rights over Baby Doe is an issue

Plaintiffs make one last attempt to get "arising under" jurisdiction, by arguing that the issue presented here is capable of resolution in federal court "without disrupting the federal-state balance *approved by Congress*," focusing on that last limitation. Dkt. 113 at 11 (quoting *Gunn*, 568 U.S. at 258 (Plaintiffs' emphasis)). In their view, the domestic relations exception is only "judge made"—not "approved by Congress"—so even if there is some disruption, it isn't one that would upset a Congressionally-approved balance, and so the fourth *Gunn* element is satisfied. *See* Dkt. 113 at 11 (citing *Loubser v. Thacker*, 440 F.3d 439, 440 (7th Cir. 2006)). However, though the domestic relations exception had its origins in the courts, Plaintiffs' argument overlooks the Supreme Court's determination that *Congress*, through its amendment of the 1948 diversity statute, had accepted the "nearly century-long interpretation" of prior statutes construing "diversity jurisdiction to contain an exception for certain domestic relations matters." *See Ankenbrandt*, 504 U.S. at 700.

For these reasons, federal question jurisdiction does not exist in this matter and the sole basis for jurisdiction is diversity jurisdiction. Accordingly, the domestic relations exception is applicable. Still, the fact that the exception is applicable does not mean that it will bar any and all of Plaintiffs' claims. Rather, the Court must proceed to address each of Plaintiffs' claims to ascertain whether—and if so, the extent to which—they fall within the scope of the domestic relations exception.

---

for the Virginia courts that are adjudicating such rights. *See A.A. v. J.M.* Slip Op. at 21–22 n.24. As to Plaintiffs' state tort-law claims seeking monetary relief in this federal case, Plaintiffs have not shown that such federal interests are necessarily raised or anything more than tangential or cumulative.

*c. Whether the Domestic Relations Exception Bars Plaintiffs' Claims*

In view of *Ankenbrandt* and the trio of Fourth Circuit cases reversing district courts' application of the domestic relations exception, Defendants have a steep hill to climb in arguing that the "narrow" exception applies. *See Ankenbrandt*, 504 U.S. at 701. The domestic relations exception "encompasses only cases involving *the issuance of* a divorce, alimony, or child custody *decree*," *id.* at 704 (emphases added), and the Amended Complaint does not, by its terms, seek any such decree from this Court, Am. Compl. at pp. 44–46. Nor does it seek injunctive relief. *See id.* And generally, the fact that Plaintiffs do not seek such forms of relief prohibited in federal court would largely resolve the question, as the domestic relations exception "does not apply when the parties do not ask the federal court to perform these status-related functions—issuing a divorce, alimony, or child custody decree …." *Chevalier v. Estate of Barnhart*, 803 F.3d 789, 797 (6th Cir. 2015).

Still, the Court must "be alert to preclude what are genuinely divorce, alimony or child custody and support cases from creeping around the barrier." *Cole*, 633 F.2d at 1088. Thus, the Court "must consider the exact nature of the rights asserted or of the breaches alleged," and, "where the alleged breaches (whether tortious or contractual in nature) are of a duty which does not arise solely from family relations law, a federal district court may not deny jurisdiction" based on the relation of the parties. *Id.*

i.   Intentional Infliction of Emotional Distress

Fourth Circuit precedent readily establishes that the Court maintains jurisdiction over a number of Plaintiffs' claims, which fall outside the domestic relations exception. For instance,

the Fourth Circuit has squarely held that intentional infliction of emotional distress[22] (count 4) is a "generally cognizable common law tort" that is "in no way dependent on a present or prior family relationship." *Wasserman*, 671 F.2d at 834–35; *Raftery*, 756 F.2d at 337–38 (same).[23] A breach of the obligation not to cause another severe emotional distress is a breach of a generally applicable common law duty, *Wasserman*, 671 F.2d at 834–35 & n.2—not one that "arise[s] *solely* from family relations law," *Cole*, 633 F.2d at 1088 (emphasis added). Plaintiffs raise an IIED claim against the Masts, Motley and Osmani alleging that they "knowingly facilitated the plan to abduct Baby Doe by misrepresenting their intentions to [Plaintiffs] when persuading them to bring Baby Doe to the United States supposedly for the sole purpose of obtaining medical treatment"; that those actions were outrageous and intolerable; and that they caused Plaintiffs "extreme emotional distress." Am. Compl. ¶¶ 193–95. And Plaintiffs allege that Richard Mast made fraudulent statements to the Virginia courts and submitted a "deceptive immigration application" for Plaintiff John Doe. *Id.* ¶ 192.[24]

---

[22] The tort of IIED in Virginia "requires four elements to be proved: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe." *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006).

[23] "In *Wasserman* … we held" that "'the tort[ ] of … intentional infliction of emotional distress … [is] in no way dependent on a present or prior family relationship,'" and it therefore "does not contravene the domestic relations exception to federal diversity jurisdiction." *Raftery*, 756 F.2d at 338 (quoting *Wasserman*, 671 F.2d at 834–35).

*See also Drewes v. Ilnicki*, 863 F.2d 469, 472 (6th Cir. 1988) (holding that the plaintiff's "intentional infliction of emotional distress claim is a traditional tort action for damages," the facts of which were "almost identical to those in *Raftery*, where the Fourth Circuit held that the federal courts had jurisdiction").

[24] Plaintiffs also allege that "the Masts conspired to separate Baby Doe unlawfully from the only family she had ever known for the vast majority of her short life," and that the Masts' conduct "was both deceitful and criminal, violating the laws of Afghanistan, Virginia, and the United States." *Id.* ¶¶ 190–91. However, as Plaintiffs have not asked the Court for an award of custody, Dkt. 113 at 5; *see generally* Am. Compl., neither does Plaintiffs' IIED claim require the Court to pass upon the validity of Virginia custody and adoption decrees—further demonstrating

Plaintiffs also do not ask the Court "to adjust family status or to establish duties under family-relations law or to determine whether or not such duties had been breached." *See Cole*, 633 F.2d at 1089. And, in any event, nothing about the claim would require the Court to make such a determination. Plaintiffs seek the traditional tort remedy of monetary damages, not prohibited relief like an award of custody. *See Ankenbrandt*, 504 U.S. at 691, 703–04. Plaintiffs' IIED claim not fall within the domestic relations exception. *See Raftery*, 756 F.2d at 337–38; *Wasserman*, 671 F.2d at 834–35. It is therefore cognizable.

ii.   Common Law Conspiracy

For similar reasons, Plaintiffs' common law conspiracy claim (count 3) also falls outside the domestic relations exception. The Fourth Circuit has held that a plaintiff ex-husband's complaint alleging conspiracy against his ex-wife and police officers "did not present any true domestic relations claims." *Cole*, 633 F.2d at 1087–88. Like IIED, conspiracy[25] is another "generally cognizable common law tort[ ]" that is "in no way dependent on a present or prior family relationship." *Wasserman*, 671 F.2d at 834–35.

Here, Plaintiffs claim that each Defendant "acted in furtherance of this conspiracy to defraud John and Jane Doe and to abduct and unlawfully restrain Baby Doe." Am. Compl. ¶ 183. To that end, Plaintiffs allege that the Masts and Motley "fraudulently induced" Plaintiffs to send a photograph of Baby Doe that would be used in her fake Afghan passport; and that the Masts

---

it falls outside the bounds of the domestic relations exception. *See* Dkt. 113 at 5 (arguing that Plaintiffs' claims including IIED "stand even if the Adoption Order were not void"); *id.* at 7 (arguing that Plaintiffs' IIED claim does not "require a finding that the Adoption Order is void").

[25] "A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by criminal or unlawful means. The foundation of a civil action of conspiracy is the damage caused by the acts committed in furtherance of the conspiracy." *Comm. Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995).

(on their own and acting through Motley and Osmani) "fraudulently misrepresented their intentions" to persuade Plaintiffs to bring Baby Doe to the United States, allegedly "for the sole purpose of obtaining medical treatment," when in fact they planned to take custody of her. *See, e.g.*, Am. Compl. ¶¶ 183–86. And, as described elsewhere, Plaintiffs set forth in great factual detail allegations underlying those claims of fraud as well as Defendants' combination together to effectuate that fraud. *See infra* pp. 77–83. Plaintiffs also claim that Richard Mast made false representations to the Virginia courts and USCIS in furtherance of the conspiracy. *Id.* ¶ 185. And, as in *Wasserman*, Plaintiffs are not seeking "a determination of entitlement to custody or any other adjustment of family status," but rather monetary damages on their conspiracy claim. *See id.* at 835; Am. Compl. at pp. 44–45; *see also Raftery*, 756 F.2d at 338 ("A decision by a federal court not requiring the adjustment of family status or determining the existence of a breach of such duties, does not contravene the domestic relations exception to federal diversity jurisdiction."). Thus the domestic relations exception is no bar to resolution of Plaintiffs' common law conspiracy claim.[26]

> iii.   Fraud

So too does Plaintiffs' claim of fraud (count 2) survive this challenge, as common law fraud in Virginia also constitutes a "generally cognizable common law tort" that also is not dependent on a present or prior family relationship. *See Wasserman*, 671 F.2d at 834–35.[27] The

---

[26] The Court is similarly persuaded by Plaintiffs' arguments that their common law conspiracy claim is not necessarily premised on the alleged invalidity of the Virginia Adoption Order, further demonstrating that the domestic relations exception is no obstacle to the Court's consideration of the conspiracy claim. *See* Dkt. 113 at 5–7.

[27] The "common law tort" of fraud requires proof of the following elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Qiu v. Huang*, 885

alleged breach is not of a duty that "arise[s] solely from family relations law." *Cole*, 633 F.2d at 1088. In the Amended Complaint, Plaintiffs charge the Masts and Motley with common law fraud. *See* Am. Compl. ¶¶ 161–79. Among other things, they allege that the Masts and Motley "intentionally made misleading and false statements and/or material omissions to [Plaintiffs] to perpetrate the abduction of Baby Doe," and that Plaintiffs relied on those misrepresentations "when they communicated with [Motley], sent her photographs of Baby Doe, and agreed to travel to the United States for the purpose of obtaining medical treatment for Baby Doe." *Id.* ¶¶ 162, 165. The Masts used and digitally altered the photograph to obtain a fake Afghan passport for Baby Doe. *Id.* ¶ 166. And the Masts and Motley "intentionally misrepresented to [Plaintiffs] that their sole intention was to procure medical assistance for Baby Doe," when they withheld information about the Virginia custody and adoption proceedings and orders, *id.* ¶ 168, and ultimately "utilized [an] opportunity" at Fort Pickett "to remove Baby Doe from [Plaintiffs' custody," *id.* ¶ 171.

Plaintiffs further allege that they reasonably relied "on this pattern of deception" by the Masts and Motley, and as a result, Plaintiffs "traveled to the United States and subjected themselves to the controlled environment of a military base that Joshua Mast manipulated to his advantage to abduct Baby Doe in broad daylight." *Id.* ¶¶ 172–73. Plaintiffs allege that if they had been aware that the real purpose of the communications "was to facilitate the Masts' abduction of Baby Doe, they would never have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast." *Id.* ¶ 175. As pleaded, the fraud claim is a "generally cognizable common law tort" that is not dependent on a

S.E.2d 503, 513 (Va. Ct. App. 2023) (quoting *Thompson v. Bacon*, 425 S.E.2d 512, 514 (Va. 1993)).

present or prior family relationship. *See Wasserman*, 671 F.2d at 834–35. Also Plaintiffs do not

seek custody or an adjustment to family status, but rather seek money damages. *See id.* Plaintiffs'

fraud claim also survives the domestic relations exception challenge.

> iv.   Tortious Interference with Parental Rights

Plaintiffs' claims for tortious interference with parental rights and false imprisonment of

Baby Doe present closer questions. In *Wasserman*, the Fourth Circuit held that it was reversible

error for a district court to have applied the domestic relations exception when the plaintiff

brought a claim for "child enticement," which the court explained was a "generally cognizable

common law tort[ ]" that was "in no way dependent on a present or prior family relationship."

671 F.2d at 834–35 & n.2. The elements of that common law claim, as recognized by the Fourth

Circuit in *Wasserman*,[28] are not dissimilar from the elements of the later-recognized Virginia law

claim for tortious interference with parental rights.[29] And Plaintiffs argue, with some force, that

this case is like *Raftery*, 756 F.2d 335. As in *Raftery*, Plaintiffs allege that "nonrelative[s] … had

set about destroying the relationship" between Plaintiffs and their daughter, *id.* at 337–38, and

they "primarily" seek "an award of award of damages for Defendants' tortious acts of

---

[28] *Wasserman*, 671 F.2d at 834 n.2 (quoting Restatement (Second) of Torts § 700 (1979)) ("One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.").

[29] *Wyatt v. McDermott*, 725 S.E.2d 555, 562 (Va. 2012) (describing the elements of the tort as: "(1) the complaining parent has a right to establish or maintain a parental or custodial relationship with his/her minor child; (2) a party outside of the relationship between the complaining parent and his/her child intentionally interfered with the complaining parent's parental or custodial relationship with his/her child by removing or detaining the child from returning to the complaining parent, without that parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights; (3) the outside party's intentional interference caused harm to the complaining parent's parental or custodial relationship with his/her child; and (4) damages resulted from such interference.").

interference with the Does' parental rights," as well as other claims. Dkt. 113 at 4–5. Furthermore, Plaintiffs argue that they "do not ask this Court to 'adjust family status,' 'establish family duties,' or establish that Defendants 'breached such duties.'" *Id.* at 4. To be sure then, intentional interference with parental rights is a generally applicable common law tort that *can* arise even between complete strangers. *Cf. Wasserman*, 671 F.2d at 835 (considering that child enticement, intentional infliction of emotional distress and civil conspiracy are claims that "could have arisen between persons with no marital relationship whatsoever").

Significantly, however, resolving the merits of Plaintiffs' tortious interference with parental rights claim would require the Court "either to adjust family status or to establish duties under family-relations law," or, at the very least, "to determine whether or not such duties had been breached." *See Cole*, 633 F.2d at 1089. The claim squarely relies on Plaintiffs' allegation that they were "the biological family and legal guardians of Baby Doe," and thus they had "parental rights" and "custodial rights" under Afghan law and "United States Supreme Court and federal law." Am. Compl. ¶ 155.[30]

Yet Plaintiffs' reliance on this allegation of parental rights—which Defendants dispute and is at issue in the pending Virginia proceedings—sets Plaintiffs' claim apart from the torts at issue in *Cole*, *Wasserman*, or *Raftery*.[31] It is hard to conceive of how the Court could rule on

---

[30] *See also* Dkt. 113 at 10 (arguing that Plaintiffs John and Jane Doe "will establish that they had a right to maintain a parental or custodial relationship with Baby Doe").

[31] In *Cole*, the court wrote that "[t]he duty to abstain from malicious prosecution, from abuse of process, from arson, and from conversion does not arise out of or require, in order to give rise to the duty, a present or prior family relation," i.e., torts that undeniably could not ask for an adjustment of family status or determination of duties under family relations law. *Cole*, 633 F.2d at 1088–89. In *Wasserman*, the Fourth Circuit wrote that "[m]ost important[ ]" to its analysis was the fact that the appellant "is not seeking a determination of entitlement to custody or any other adjustment of family status." 671 F.2d at 835. Indeed, the appellant in that case "concede[d] the existence of [a child custody] decree and suggest[ed] neither an intent to challenge it or any way the decree is susceptible of such challenge." *Id.* Thus, the pending child

Plaintiffs' tortious interference with parental rights claim, without exploring the scope and extent of Plaintiffs' claim to parental rights. Because Plaintiffs' tortious interference with parental rights claim asks the Court for a determination of family status, a declaration of its existence, and a determination of the breach of such duties and status, the domestic relations exception precludes the claim's consideration at this time.

v.    False Imprisonment

Plaintiffs' false imprisonment claim (Plaintiffs' count V) similarly falls within the domestic relations exception. Integral to the claim is Plaintiffs' allegation that "[s]ince September 3, 2021, Joshua and Stephanie Mast have continued to keep Baby Doe captive, *without the permission or consent of her lawful guardians*." Am. Compl. ¶ 199 (emphasis added). The claim could stand if the (disputed) allegation is accepted that Plaintiffs are her lawful guardians, it would fail if the Court concluded they were not. The claim, as pleaded, turns on a disputed state-law question of child custody at issue in pending Virginia proceedings. While, in the abstract, false imprisonment could be described as a "generally cognizable common law claim," *see Wasserman*, 671 F.2d at 834–35, as pleaded, Plaintiffs in effect ask the Court "either to adjust family status or to establish duties under family-relations law or to determine whether or not such duties had been breached," *see Cole*, 633 F.2d at 1089. Accordingly, Plaintiffs' false imprisonment claim similarly falls within the domestic relations exception to diversity jurisdiction at this time.

---

enticement and IIED claims could proceed. *Id.* at 834–35. Finally, in *Raftery*, the Fourth Circuit noted that the parties' "domestic relationship largely terminated with the 1977 divorce," and that the suit "concerns not the establishment and implementation of visitation rights, but, rather, seeks an award of damages" because the ex-wife sought to frustrate "whatever domestic relations aspects remained of her relationship with her former husband." 756 F.2d at 337.

vi.    Declaratory Relief

Plaintiffs' attempt to downplay any relation of this federal case to the ongoing custodial

and adoption dispute pending in the Virginia courts, is also less than persuasive in the context of

their specific requests for declaratory relief. In *Wasserman*, the Fourth Circuit found significant

the fact that that case "d[id] not involve a custodial decree still subject to review and

modification," and that the litigants "concede[d] the existence of [a state custody] decree" and

had no "intent to challenge it." 671 F.2d at 835. Not so here. Of course, Plaintiffs do not

explicitly seek an injunction or declaratory judgment awarding them legal or physical custody of

Baby Doe. *See* Am. Compl. at pp. 44–46 (Prayer for Relief). Nor could they. But significantly,

Plaintiffs also do not exclusively seek retrospective relief in the form of money damages. *See id.*

Instead, Plaintiffs seek twelve separate declarations that appear singularly focused on

undermining the factual and legal basis for the Masts' Virginia state court custody and adoption

orders.

Some courts have allowed tort claims for purely retrospective relief to proceed, while

barring claims for prospective relief that effectively challenged child custody decisions. For

instance, the D.C. Circuit held that the domestic-relations exception was "no bar to the exercise

of federal diversity jurisdiction" in "a tort suit arising out of an alleged abduction by one parent

of a child in the custody of the other parent" that sought monetary damages. *Bennett v. Bennett*,

682 F.2d 1039, 1042 (D.C. Cir. 1982) (citing *Wasserman*). At the same time, the D.C. Circuit

"refuse[d] to entertain a request for prospective relief" that required consideration of the best

interests of the child, especially when there was "at least one, and possibly two, state courts

[that] seem to claim continuing jurisdiction over the custody of [the children]." *Id.* at 1042–43.

So too here, the Court concludes that Plaintiffs' requested declaratory judgments are akin to the requests for prospective relief in *Bennett*.[32] If granted, the declarations sought would directly undermine the Virginia state court custody and adoption orders—or, at the very least, adjudicate factual and legal issues that are inextricably bound up with the Virginia courts' custody and adoption determinations—but only tangential to Plaintiffs' remaining requests for retrospective relief. Some requests are thinly veiled. For example, Plaintiffs seek a declaration that the Executive's exercise of its foreign affairs power by transferring Baby Doe to Afghan custody "is binding on state courts." Am. Compl. at p. 45 (Prayer (a)(xii)). Or that "a state court lacks authority to override the Executive Branch's foreign policy decision" to transfer Baby Doe. *Id.* (Prayer (a)(xi)). Or, again, that the Executive's decision to transfer Baby Doe "supersedes and nullifies any conflicting state court action." *Id.* (Prayer (a)(x)). These cannot be understood except as a broadside to the Virginia state custody and adoption orders.

But the other more subtle declaratory judgments would similarly intrude upon Virginia's pending consideration of Baby Doe's custody and adoption. *See, e.g.*, *id.* at pp. 44–45 (Prayer (a)(v)-(vii)) (seeking declarations that Baby Doe "had no connection, let alone a significant connection, to the Commonwealth of Virginia"). Federal law does not recognize "a direct role for the federal courts in determining child custody." *See Bennett*, 682 F.2d at 1043. Because the declarations Plaintiffs seek cross the line into predicate rulings upon the question of Baby Doe's custody and adoption status, the Court concludes that they fall within the domestic relations

---

[32] To be sure, while the court in *Bennett* addressed a request for injunctive relief rather than declaratory relief, this Court considers the motivating distinction to be whether the plaintiff had only sought retrospective relief (i.e., money damages) versus prospective relief (in the form of injunctive or declaratory relief). *See Bennett*, 682 F.2d at 1042 (distinguishing between a suit that "compassed only retrospective relief," over which the court had jurisdiction, compared with "a case in which the parties actually seek a declaration of present or future rights as to custody or visitation") (citing *Wasserman*, 671 F.2d at 835).

exception to federal diversity jurisdiction. Still, as in *Bennett*, with respect to Plaintiffs' "claim for monetary damages, [the Court] see[s] no bar to the exercise of federal diversity jurisdiction in this case." *Id.* at 1042. "A federal court is entirely competent, in this case as much as any other, to determine traditional tort issues such as the existence of a legal duty, the breach of that duty, and the damages flowing from that breach." *Id.*

At bottom, the domestic relations exception does not bar Plaintiffs' case. The domestic relations exception only "divests the federal courts of the power to issue divorce, alimony, and child custody decrees," *Ankenbrandt*, 504 U.S. at 703—none of which are explicitly sought by Plaintiffs in this action. Its core persists—that which seeks monetary relief for torts that arise independently of any family-court decision, like the Fourth Circuit's decision in *Wasserman*. Plaintiffs' fraud, conspiracy, and intentional infliction of emotional distress counts are all generally cognizable common law tort claims, that are not dependent on any family relationship or other duty arising in domestic relations. These counts remain.

Still, the Court must excise those aspects Plaintiffs' case—specifically, their requests for declaratory relief as well as their claims of tortious interference with parental rights and false imprisonment—as running afoul of the domestic relations exception, and so the Court shall dismiss them, *without prejudice*.[33]

2.   *Burford* Abstention

Defendants also argue that, "[e]ven if the domestic-relations exception to federal jurisdiction did not apply, this matter still presents a textbook case for abstention." Dkt. 101

---

[33] At the conclusion of any state court proceedings relating to Baby Doe's adoption, Plaintiffs may move this Court to amend their complaint to reallege such claims and requests for relief, to the extent they would not be inconsistent with the final state court decision.

at 16. Defendants contend that abstention is warranted both under *Burford*[34] and *Colorado River*[35] abstention principles. *Id.* at 17–19 (*Burford*); *id.* at 19–21 (*Colorado River*).

Federal courts "have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). Indeed, federal courts have a "virtually unflagging obligation" to exercise the jurisdiction Congress that provided them. *Colorado River*, 424 U.S. at 817. But that duty is not "absolute." *Quackenbush*, 517 U.S. at 716. There are certain judicially recognized situations where federal courts should abstain.

*Burford* identifies one such situation. The *Burford* abstention doctrine "'justif[ies] dismissal of a federal action' in a 'narrow range of circumstances.'" *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (quoting *Quackenbush*, 517 U.S. at 726). A court should abstain under *Burford* when (1) there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," and (2) "the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*"). But those "extraordinary circumstances" must be present to dismiss a case under *Burford*, and notably, the balance between state and federal interests "only rarely favors abstention." *Quackenbush*, 517 U.S. at 728.

Defendants, for their part, argue that the Court should abstain under *Burford*, because "adoption is a core state power," and that "this proceeding would intrude on the [Virginia

---

[34] The doctrine derives from *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

[35] So too, from *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

custody] proceeding." Dkt. 101 at 17. They further contend that "the Supreme Court has recognized that *Burford*'s abstention principles are relevant in some cases 'involving elements of the domestic relationship even when the parties do not seek divorce, alimony, or child custody.'" Dkt. 101 at 17 (quoting *Ankenbrandt*, 504 U.S. at 705). In Defendants' view, this lawsuit, at its core, "challenges whether Virginia rightfully allowed the Masts to adopt Baby Doe." Dkt. 101 at 19. And because Plaintiffs raise only "state common law claims," Defendants argue that this is a "parallel proceeding [that] risks upending the [Virginia] proceeding, as [Plaintiffs] ask this Court to declare Baby Doe's adoption invalid and to declare that the state court did not have jurisdiction to enter that order." *Id.*

True, the Supreme Court has explained that "[i]t is not inconceivable … that in certain circumstances, [*Burford* abstention] might be relevant in a case involving elements of the domestic relationship even when the parties do not seek divorce, alimony, or child custody." *Ankenbrandt*, 504 U.S. at 705. And that situation could arise when the case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," *see id.* at 705–06, i.e., when the *Burford* abstention requirements are met.

But that is not the case here. Defendants' arguments in favor of *Burford* abstention might have more force if this Court had not already analyzed Plaintiffs' claims—claim-by-claim—and excised from this case Plaintiffs' causes of action that fall within the scope of the domestic relations exception.[36] But the Court did.

---

[36] For example, as to Defendants' concern that Plaintiffs "ask this Court to declare Baby Doe's adoption invalid and to declare that the state court did not have jurisdiction to enter that order," Dkt. 101 at 19, that has little salience at present, as the Court has held that Plaintiffs' requests for declaratory relief similarly fell within the domestic relations exception.

And as to Plaintiffs' remaining claims, Defendants have not shown that the "extraordinary" requirements of *Burford* abstention have been met. Far from it. No one has explained, much less demonstrated, how resolving any of the remaining state-law causes of action (fraud, conspiracy, and intentional infliction of emotional distress)—generally applicable, common-law torts not dependent on a prior or present family relationship—would pose "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar." *See Martin*, 499 F.3d at 363.[37]

Nor have Defendants shown how "the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *See id*.

Defendants' arguments suggesting that "this parallel proceeding risks upending the [Virginia] Court proceeding," and that Plaintiffs have asked for a declaration that the Virginia adoption order is invalid, are likewise untethered from Plaintiffs' narrowed case. *See* Dkt. 101 at 19. Plaintiffs do not dispute that adoption is a "core state power." *See id*. And Plaintiffs' Amended Complaint simply does not "ask this Court to decide child custody," or "challeng[e]" Virginia's rules and procedures governing adoption." *See* Dkt. 113 at 12–13. And, to the extent thorny issues concerning the underlying adoption have been raised and are being addressed in the Virginia courts—they do not appear necessary to the resolution of any of the three tort claims for money damages remaining in this federal case.[38]

---

[37] The Court finds significant that Defendants' arguments supporting the first *Burford* element focus on Plaintiffs' tortious interference with parental rights and false imprisonment claims. *See* Dkt. 126 at 12–13. Again, the Court has already ruled that those claims fall within the domestic relations exception.

[38] Plaintiffs further argue that, "as it relates to Baby Doe's adoption … a decision by the United States government in its exercise of its exclusive authority over foreign affairs – to accede to a request by a foreign government to recognize a child as a citizen of that foreign

Simply put, Defendants have not shown that either of the two requirements of *Burford*

abstention are satisfied. All indications are that Plaintiffs' remaining tort claims for money

damages can go forward independently of the Virginia proceedings. At bottom, Defendants have

not shown that this is one of those "rare" cases in which *Burford* abstention is warranted. *See*

*Quackenbush*, 517 U.S. at 728.

3.  *Colorado River* Abstention

The Court next considers Defendants' further argument that abstention is appropriate

under the *Colorado River* doctrine. Again, Plaintiffs disagree, arguing that the Court should not

abstain.

"The rule is well recognized that the pendency of an action in the state court is no bar to

proceedings concerning the same subject matter in the Federal court having jurisdiction."

*vonRosenberg v. Lawrence*, 849 F.3d 163, 167 (4th Cir. 2017) (quoting *McClellan v. Carland*,

217 U.S. 268, 282 (1910)). A federal court may abstain, however, from exercising jurisdiction

over a duplicative federal action for purposes of "wise judicial administration," only if there

"exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under

_____

country and to transfer her physical custody to individuals that foreign government deemed her
legal guardians under that country's laws – cannot be contravened by a decision of any state
court (whether in Virginia or in any other state). This is not a question of state law – it is a
question of federal law, pursuant to the Supremacy Clause." Dkt. 113 at 13. Plaintiffs have
raised and no doubt will continue to raise these arguments in the Virginia courts challenging the
Masts' adoption of Baby Doe, and in support of their own claim to custody over her. *See A.A. v.
J.M.* Slip Op. at 21–22 n.24; *cf. Employers Res. Mgmt. Co., Inc. v. Shannon*, 66 F.3d 1126, 1130
(4th Cir. 1995) (quoting *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 149–50 (1988))
(explaining that, "when a state proceeding presents a federal issue, even a pre-emption issue, the
proper course is to seek resolution of that issue by the state court"). They predominantly if not
entirely concern issues of adoption not before this Court, and so do not support Defendants'
argument that the first *Burford* element supports abstention.

*Colorado River* to justify the *surrender* of that [federal] jurisdiction." *vonRosenberg*, 849 F.3d at

167 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25–26 (1983)).

A court considering whether abstention is appropriate under *Colorado River* must first

address the "threshold question" whether "there are parallel suits." *Al-Abood ex rel. Al-Abood v.

El-Shamari*, 217 F.3d 225, 232 (4th Cir. 2000). "Federal and state actions are parallel only 'if

substantially the same parties litigate substantially the same issues in different forums.'"

*vonRosenberg*, 849 F.3d at 168 (quoting *New Beckley Min. Corp. v. Int'l Union, United Mine

Workers of Am.*, 946 F.2d 1072, 1073 (4th Cir. 1991)). But, significantly, the state litigation

"must provide 'complete and prompt resolution of the issues between the parties,'" and if there is

"any serious doubt" the state might not do so, "abstention is improper." *vonRosenberg*, 849 F.3d

at 168 (quoting *Moses H. Cone*, 460 U.S. at 28). Accordingly, the "requirement of parallel

federal and state suits" has been "strictly construed," meaning that (1) "the parties involved

[must] be almost identical," and further, (2) "even state and federal claims arising out of the

same factual circumstances do not qualify as parallel if they differ in scope or involve different

remedies." *Id.* at 168.

To be sure, there is certainly some factual overlap between this case and the one still

pending in the Virginia courts. But that alone does not warrant *Colorado River* abstention. *See

New Beckley Min. Corp.*, 946 F.2d at 1074. The parties are not identical. In the Virginia

proceeding, Plaintiffs John and Jane Doe have brought suit only against Joshua and Stephanie

Mast. *See, e.g.*, Dkt. 113 at 18. Of course, they are parties in this federal suit, but so too are

several others that Plaintiffs have alleged are implicated in the Masts' scheme: Richard Mast,

Ahmad Osmani, and Kimberly Motley. *See* Am. Compl. The proceedings are not parallel then

54

because the parties involved must be—and are not—"almost identical." *See vonRosenberg*, 849 F.3d at 168.

In addition, the underlying relief sought, and the legal issues presented, are entirely different. In the Virginia suit, Plaintiffs have sought "only vacatur of the Adoption Order." *See* Dkt. 113 at 18. Meanwhile, this proceeding involves Plaintiffs' tort claims in which they seek money damages against Defendants. *See* Am. Compl. at pp. 44–46 (Prayer). No pending state court proceeding involves the tort claims presently before the Court; moreover, money damages will not be awarded in state court. Dkt. 113 at 18; *cf.* Dkt. 126 at 15 (arguing that "[a]sking for damages and using artful pleading … is not enough to allow this case to continue").

Therefore, because the state and federal lawsuits involve materially different parties, different claims, and different remedies and relief sought, they are not "parallel proceeding[s]," within the meaning of the *Colorado River* abstention doctrine.[39] Thus, *Colorado River* abstention is improper. *See vonRosenberg*, 849 F.3d at 168; *McLaughlin*, 955 F.2d at 935 ("before even considering the *Colorado River* factors, it is first necessary to determine whether there exist parallel duplicative state proceedings").

While the Court's decision can, and does, rest on the lack of a parallel proceeding, abstention would be no more appropriate following consideration of the non-exclusive *Colorado*

---

[39] *See McLaughlin v. United Va. Bank*, 955 F.2d 930, 935 (4th Cir. 1992) (holding that federal and state proceedings were not parallel under *Colorado River* because a breach of contract claim in a federal court "was not pending, nor [was] it ever [ ] pending, in any state court proceeding"); *Mulugeta v. Adamachew*, No. 1:17-cv-649, 2018 WL 4365569, at *4 (E.D. Va. Feb. 19, 2018) ("Actions are not considered parallel if they raise different issues or seek different remedies."); *Brown-Thomas v. Hynie*, 441 F. Supp. 3d 180, 217–18 (D.S.C. 2019) (holding, in case where "ongoing in litigation in the state courts is confined to determinations about the spousal status of [d]efendant Hynie and the administration of probate assets," and in federal suit where the plaintiffs brought "a copyright claim and various state law claims," that "*Colorado River* abstention is not appropriate because the state and federal suits are not parallel").

*River* factors.[40] The parties agree that the first two are inapplicable, as this case does not involve property and the federal and state courts are in the same geographic vicinity. *See* Dkt. 101 at 20; Dkt. 113 at 19. But the third factor—the desirability of avoiding piecemeal litigation—does not favor abstention because, as described above, the issues, claims, and relief sought in the federal and state suits is different. As Plaintiffs argue, "the issues in the [Virginia courts] relate to whether the final adoption order was void at the time it was entered, while the issues here relate to the conspirators' concurrent and subsequent actions using that order to harm Plaintiffs." *See* Dkt. 113 at 19. There is, accordingly, no "piecemeal litigation" raised by Plaintiffs' prosecution of each case. *See Gannet Co., Inc. v. Clark Constr. Grp., Inc.*, 286 F.3d 737, 744 (4th Cir. 2002) ("Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results.") (citation omitted).

As to the fourth factor—the relevant order in which the courts obtained jurisdiction—it is undisputed that the Virginia proceedings preceded the filing of this action. *See* Dkt. 101 at 20; Dkt. 113 at 19. And as to the fifth factor—whether state or federal law provides the rule of decision on the merits—Plaintiffs have brought only state-law claims. That supplies at least a state-law rule of decision as to the merits of those claims.[41] As a result, these two factors would

---

[40] These non-exhaustive factors are: "(1) whether the subject matter of the litigation involves property where the first court may assume *in rem* jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights." *Chase Brexton Health Servs., Inc.*, 411 F.3d at 463–64 (citations omitted).

[41] This is not to say that federal law and the decision of Executive Branch authorities could not inform the factual underpinnings of the remaining state-law tort claims. In any event, their import in this proceeding would be limited to the success of the state-law tort claims; not the propriety of the adoption and custody determinations.

weigh to an extent in favor of abstention, although that is counterbalanced by the material

differences between the proceedings: namely, the parties, claims raised, and the relief sought

therein. Finally, the sixth factor—the adequacy of the state proceeding to protect the parties'

rights—weights significantly against abstention, as there is no dispute Plaintiffs could not secure

money damages as redress for their tort claims against Defendant in the ongoing challenge to the

Baby Doe adoption proceeding in Fluvanna County Circuit Court.

On balance, the Court finds that these factors, and any other related issues raised by the

parties, weigh decisively against abstention. "Abstention from the exercise of federal jurisdiction

is the exception, not the rule." *Colorado River*, 424 U.S. at 813. Exceptional circumstances must

support abstention, *vonRosenberg*, 849 F.3d at 167, and Defendants have not shown such

exceptional circumstances, nor justifications that clearly support relinquishing federal

jurisdiction. The Court finds *Colorado River* abstention unjustified.

4.      Standing to Assert Claims on Behalf of Baby Doe

The parties next dispute whether Plaintiffs John and Jane Doe have standing to assert

claims on Baby Doe's behalf. In Defendants' view, Plaintiffs do not have standing to assert

claims on her behalf because "Baby Doe is legally and physically under the care of the Masts,"

and as such, they argue, only *they* "have standing to bring claims on Baby Doe's behalf."

Dkt. 101 at 10. They further argue that the Virginia Adoption Order is entitled to "full faith and

credit," and as such, "precludes [Plaintiffs'] attempt to bring claims on Baby Doe's behalf, even

if their allegations of a biological relationship were true." *Id.* at 11.

Plaintiffs, for their part, countered at oral argument that they had satisfied the

prerequisites for "next friend" standing. *See* Dkt. 167 ("MTD Hr'g Tr.") at 55. These included

that they provided an "adequate explanation as to why the real party in interest cannot bring this

suit [herself]," and that they are "dedicated to representing [her] interest[s]," and that they have a

"significant relationship with the representative party." *Id.* Plaintiffs argue that they meet those

factors: Baby Doe is a minor; they are dedicated to representing her interest; and that "[t]he U.S.

government recognizes them as her family and legal guardians," as set forth in paragraph 10 to

the Government's answer. *Id.* And further, they contend that "the state court has acknowledged

that [Plaintiffs] have a constitutionally protected relationship with Baby Doe." *Id.* Finally, they

argue that "[t]here is no requirement that [a] next friend be a parent or a guardian ad litem," and

that Fed. R. Civ. P. 17 and Va. Code § 8,01-8, "to the extent it applies in federal court at all,"

have no such requirement either. MTD Hr'g Tr. at 55–56.

The problem with Plaintiffs' position is that Fed. R. Civ. P. 17(c) "distinguishes between

a guardian or other duly appointed representative, on the one hand—in other words, a *general*

representative—and a guardian ad litem or a next friend, on the other hand—a special

representative." *Jonathan R. v. Justice*, 688 F. Supp. 3d 355, 358 (S.D. W. Va. 2023) (citing

*T.W. by Enk v. Brophy*, 124 F.3d 893, 895 (7th Cir. 1997)). And, significantly, "[a] special

representative is only appropriate where the minor lacks a conflict-free general representative

who is willing and able to litigate on their behalf." *Jonathan R.*, 688 F. Supp. 3d at 358. Pursuant

to Rule 17(c), certain types of representatives "may sue or defend on behalf of a minor,"

including "a general guardian." However, if the minor "does not have a duly appointed

representative," the minor then "may sue by a next friend or by a guardian ad litem." Fed. R.

Civ. P. 17(c)(1), (2). Thus, only if there is no "general guardian" may the minor sue by a next

friend. *See Genesco, Inc. v. Cone Mills Corp.*, 604 F.2d 281, 285 (4th Cir. 1979) ("[b]y is terms,

the second sentence of Rule 17(c) permits an infant who lacks a general guardian to bring suit by

his next friend, and no special appointment process for the next friend is required"); *Jonathan R.*,

58

688 F. Supp. 3d at 380 ("Without general guardians, the plaintiffs were permitted under the Federal Rules to commence this lawsuit by next friends …."). And, important here, being a parent usually qualifies an individual to be a "general guardian" who may act on behalf of a minor without formal court appointment. *E.g.*, *Epic Games, Inc. v. C.B.*, No. 5:19-cv-250, 2019 WL 8334611, at *1 (E.D.N.C. Sept. 27, 2019) (citing authorities).

While Plaintiffs argue that they meet the three-part test to qualify for "next friend" status for Baby Doe under Rule 17, *see* MTD Hr'g Tr. at 55–56, a prerequisite inquiry would be whether there is a "general guardian," including a parent, who could sue on her behalf. Thus, inherent in the issue whether Plaintiffs have standing to sue on behalf of Baby Doe, is the validity of and status of the Virginia adoption and custody orders. These outstanding issues at this time remain substantially intertwined with the pending proceedings in the Virginia courts. Thus, allowing Plaintiffs' asserted claims on behalf of Baby Doe would, at present, appear to require "the adjustment of family status or establishing familial duties," or that the Court "determin[e] the existence of a breach of such duties," and accordingly, would fall within the scope of the domestic relations exception. *See Raftery*, 756 F.2d at 338. That is not to say that Baby Doe would not be able to recover for any claims she may have personally, only that such claims may not be brought at this time by *Plaintiffs* on her behalf.

As with Plaintiffs' other claims that fell within the scope of the exception, the Court will dismiss all of the claims brought on behalf of Baby Doe, *without prejudice* to her re-raising them upon conclusion of the Virginia proceedings.

5.   Diversity Jurisdiction

Richard Mast alone argues that complete diversity is lacking between the parties. Dkt. 99 at 10. In his view, Baby Doe is a resident of North Carolina where she has resided with the Masts

and thus there is a lack of complete diversity because one Plaintiff, i.e., Baby Doe, is a citizen of North Carolina, where at least one Defendant, Kimberly Motley, is a citizen. *Id.* at 10–11.

This argument fails, and there is complete diversity between the parties. Baby Doe is alleged to be and is properly considered a citizen of Afghanistan. Am. Compl. ¶ 11. Plaintiffs have alleged in great detail how they did not knowingly or willingly relinquish their custody and care of Baby Doe to the Masts, but rather that Defendants orchestrated a scheme to abduct Baby Doe. *See generally* Am. Compl. ¶¶ 83–153; *see also id.* ¶¶ 134–39 (describing abduction). As Plaintiffs note and further allege, the Masts themselves procured a passport for Baby Doe identifying her as an Afghan citizen. *Id.* ¶ 130. Plaintiffs have also alleged facts demonstrating that Baby Doe was domiciled in Afghanistan when the Masts tricked John and Jane Doe into bringing Baby Doe to the United States so that she could receive specialized medical treatment that was not available in the Does' home country. *Id.* ¶¶ 1, 3, 11, 22, 48, 56–61, 70–74. They had always intended to return home to Afghanistan as a family—that is, until the Masts abducted Baby Doe from them when they got to Virginia. *Id.* ¶¶ 105–07. Plaintiffs have accordingly demonstrated that Baby Doe retained her Afghan citizenship for purposes of diversity jurisdiction. *See* Dkt. 113 at 21–22 (citing, e.g., *Delaware, L. & W.R. Co. v. Petrowsky*, 251 F. 554, 559 (2d Cir. 1918) (cited for the proposition that "if parental responsibility has been held by multiple parties in succession, whether the child's citizenship follows the current parties purporting to stand in place of the parents turns on whether such responsibility was knowingly and intentionally delegated by the former guardian")). As Plaintiffs are themselves citizens of Afghanistan, and currently residents of Texas, and Baby Doe is also a citizen of Afghanistan, Am. Compl. ¶¶ 11–16, there is complete diversity between the citizenship of Plaintiffs and the Defendants, none of whom are citizens of Afghanistan or Texas. In any event, the Court will

dismiss, *without prejudice*, all claims brought on Baby Doe's behalf for the reasons set forth above.

### **Personal Jurisdiction**

Two Defendants, Kimberly Motley and Ahmad Osmani, argue that Plaintiffs' claims against them should be dismissed for lack of personal jurisdiction. *See* Dkt. 91 at 10–19; Dkt. 93 at 6–10. For the reasons set forth below, the Court concludes that the exercise of personal jurisdiction over these out-of-state Defendants is constitutionally reasonable, and so their motions to dismiss for lack of personal jurisdiction will be denied.

A federal court may exercise personal jurisdiction over a defendant as provided by state law. Fed. R. Civ. P. 4(k)(1)(A); *ALS Scan, Inc. v. Dig. Serv. Consultants*, 293 F.3d 707, 710 (4th Cir. 2002). To establish personal jurisdiction over a non-resident defendant pursuant to a state long-arm statute, two requirements must be satisfied: (1) the forum state's long-arm statute must authorize the exercise of jurisdiction; and (2) if that authorization exists, the Due Process Clause of the Fourteenth Amendment requires that the defendant must have sufficient minimum contacts with the forum state. *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 (4th Cir. 2009). Here, because Virginia's long-arm statute (Va. Code § 8.01-328.1) extends personal jurisdiction over non-resident defendants to the full extent permitted by the Due Process Clause of the Fourteenth Amendment, these inquiries collapse into one, and the federal court must simply ascertain whether the non-resident defendant had sufficient "minimum contacts" with Virginia to satisfy due process. *Id.*; *see also ALS Scan*, 293 F.3d at 710 (explaining that, under such circumstances, "the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one").

For a State to exercise personal jurisdiction over a nonresident in a manner compliant with the Fourteenth Amendment Due Process Clause, a "nonresident generally must have 'certain minimum contacts … such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)). To assert "specific jurisdiction" over a defendant, the Court considers whether "the defendant's qualifying contacts with the forum state also constitute the basis for the suit." *Universal Leather*, 773 F.3d at 559.[42] Generally then, the Fourth Circuit has distilled the due process requirements into a three-prong test, asking: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 133 (4th Cir. 2023) (quoting *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 354 (4th Cir. 2020)). In any event, however, the "touchstone" of the personal jurisdiction analysis is "fairness." *Universal Leather*, 773 F.3d at 559.

1. Motley & Osmani Fall Within Virginia's Long-Arm Statute

Motley and Osmani first argue that the allegations in the Amended Complaint do not satisfy Virginia's long-arm statute. Dkt. 91 at 11–13; Dkt. 93 at 7–9. The statute permits the exercise of personal jurisdiction "over a person, who acts directly or by an agent, as to a cause of action arising from the person's … [t]ransacting any business in this Commonwealth." Va. Code

---

[42] A defendant is subject to general jurisdiction in a state if it is their domicile or they are otherwise essentially at home in the state. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–59 (2021). Here, however, no party contends that Motley or Osmani are subject to general personal jurisdiction in Virginia. Dkt. 91 at 12; Dkt. 113 at 26–32 (arguing only that the Court has *specific* personal jurisdiction over them).

§ 8.01-328.1(A)(1). Motley contends that the Amended Complaint fails to state what "business" she conducted in Virginia or what acts or omissions she performed in Virginia. Dkt. 91 at 11–12. Moreover, she claims that "mere emails and telephone calls directed at Virginia do not amount to transacting business." *Id.* at 12 (internal quotation marks omitted). For his part, Osmani contends that "he does not regularly transact any business in Virginia," and "certainly has not transacted any business in Virginia that would give rise to any cause of action for Plaintiffs." Dkt. 93 at 8. At most, he attests that he has "only the most tangential of connections to Virginia," including "a few trips to Dulles Airport and to testify in court." *Id.* Osmani charges that Plaintiffs' complaint improperly relies on "very nebulous conspiracy theories that lack any location or other concrete details," of which he denies being a party. *Id.* at 8–9. None of this, in Osmani's view, supports a basis for personal jurisdiction under Virginia's long-arm statute.

Plaintiffs respond that Motley's argument misses the mark, as "[t]he relevant inquiry is the constitutional question of whether the exercise of jurisdiction comports with the Due Process Clause." Dkt. 113 at 28. Plaintiffs assert that there is no problem on that score—as the Court's exercise of personal jurisdiction "would not offend traditional notions of fair play or substantial justice." *Id.* Further, Plaintiffs distinguish the authority cited by Motley. They argue that while merely "negotiating the terms of a transaction could not be considered 'transacting business,'" here "Motley's correspondence with Virginia-resident Joshua Mast *was* the business that Motley conducted," receiving communications to convey to Plaintiffs; then providing updates and photographs to Joshua Mast "as per their agreement." *Id.* at 28 n.17. In other words, Plaintiffs' claims against Motley "arise out of her communications with and collaboration with Joshua Mast," and therefore she was "transacting business" within the meaning of Va. Code § 8.01-328.1(A)(1). *Id.*

As for Osmani, Plaintiffs similarly counter that their allegations against him (even taking into account his own narrative included in his declaration), more than suffice to satisfy Virginia's long-arm statute. Dkt. 113 at 30–31. Plaintiffs argue that the allegations that Osmani entered into a conspiracy with the Masts and others were far from "threadbare" or "nebulous," and that personal jurisdiction is supported by his voluntary travel to Virginia to testify in a Virginia state court related proceeding concerning the custody of Baby Doe. *Id.*

The Court is mindful that Virginia's long-arm statute has been interpreted coextensively with the full extent of the Due Process Clause, such that the statutory and constitutional personal jurisdiction inquiry could be collapsed into one analysis. *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990); *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir. 2012). Indeed, even "a single act by a nonresident which amounts to 'transacting business' in Virginia" can support specific personal jurisdiction. *English & Smith*, 901 F.2d at 38. Nonetheless, as the parties have separately disputed whether Defendants' conduct falls within the language of Virginia's long-arm statute, the Court will proceed to address that statutory question first. *E.g.*, *English & Smith*, 901 F.2d at 38–40 (proceeding in two-step analysis).

The Court finds that Virginia's long-arm statute permits the exercise of personal jurisdiction over Motley, as Plaintiffs' claims against her arise from her "transacting any business" in Virginia. Va. Code § 8.01-328.1(A)(1). Plaintiffs have alleged that a Virginia couple (the Masts) engaged Motley's services as a lawyer with contacts in Afghanistan to help them search for and communicate with Plaintiffs, to lure Plaintiffs and Baby Doe from Afghanistan to the United States and Virginia in particular (where the Masts already had custody and adoption

64

orders) under the guise of offering medical care—but really so the Masts could abduct Baby Doe. *See* Am. Compl. ¶¶ 6, 7, 15, 75, 76, 79, 81.[43]

Indeed, the day after this Court denied the Masts' TRO request and Baby Doe was released to the Afghan Government and the ICRC to be reunited with her family, Joshua Mast advised Motley that he needed help to "handle [Baby Doe's] situation privately" to execute that scheme. *Id.* ¶ 79. Motley agreed to work with the Masts. *Id.* ¶ 81. She had received and was aware of the Masts' JDR Court order, which was conditioned on a waiver of Afghan jurisdiction, and she also received diplomatic communications from Afghanistan showing they were asserting (rather than waiving) jurisdiction over Baby Doe. *Id.* ¶ 80. As a result, Plaintiffs further allege that Motley knew the JDR Court order was "void." *Id.*

As part of this work, Motley initiated contact with Plaintiffs by phone within days after Baby Doe was placed in their care. *Id.* ¶ 83. Motley then maintained a correspondence with Plaintiffs for over a year—during which time she "ma[de] multiple offers to assist with Baby Doe's medical care and occasionally asking for photographs of Baby Doe," which she did "at the direction of [the Masts] and received thousands of dollars to do so." *Id.* ¶ 88. In fact, Joshua Mast wired Motley a $4,500 payment via the electronic payments app, PayPal, on March 22, 2020. *Id.* ¶ 87. Allegedly, Motley's dogged efforts allegedly not only seeded Plaintiffs' opinions of the Masts as well-meaning individuals only seeking to help Baby Doe get medical care, *id.* ¶¶ 83–85, 88–89, but they also culminated in a direct line of contact opening up between Plaintiffs and the Masts, *id.* ¶ 98. Moreover, in response to a request by Motley, Plaintiffs sent her a

---

[43] *See, e.g.*, Am. Compl. ¶ 76 ("In the fall of 2019, Joshua Mast and Stephanie Mast reached out to Kimberly Motley, a U.S. citizen and attorney who had worked in Afghanistan, to assist in their efforts to bring Baby Doe to the United States … [Joshua Mast] advised Motley that he and Stephanie Mast intended to adopt Baby Doe.").

photograph of Baby Doe in swimming trunks—the same photo that was used in modified form by the Masts to procure a fake Afghan passport for Baby Doe. *Id.* ¶¶ 90, 95–96, 127; *see also* Dkt. 91 at 12–13 (contending that Motley's "only alleged suit related conduct involved her correspondence with the Does and with Joshua Mast").

These allegations show that Motley certainly was "transacting business" in Virginia by agreeing to work on behalf of Virginia citizens (the Masts) to support their efforts to bring Baby Doe out of Afghanistan, under the guise of offering her medical care, and into the Masts' care under the authority of Virginia custody and adoption orders. The Masts paid her thousands for her work. Much more than a "single act" here connects Motley to Virginia—rather, Plaintiffs' allegations are that she engaged in a sustained course of conduct offering her services to Virginia residents and getting paid to help them realize their scheme.

While Motley contends that her phone calls and other communications do not support the exercise of personal jurisdiction, Dkt. 91 at 12–13, her authority is distinguishable. While courts have held that "[m]ere telephone conversations, telex messages and letters *negotiating* a transaction are insufficient to form a basis for in personam jurisdiction," *Unidyne Corp. v. Aerolineas Argentinas*, 590 F. Supp. 391, 396 (E.D. Va. Mar. 7, 1984) (emphasis in original), here, Motley's material communications were the services rendered pursuant to an agreement with the Virginia-based Masts (and for which she received thousands in compensation), Am. Compl. ¶¶ 81–90. They were not simply communications preceding or negotiating a transaction. Motley's other authority is no more helpful.[44] Plaintiffs' specific and detailed allegations more

---

[44] Other cases involved facts in which the communications to Virginia were more incidental to the claims at issue. *See, e.g.*, *Nathan v. Takeda Pharms. Am. Inc.*, 83 Va. Cir. 216, 2011 WL 8947650, at *8–9 (Va. Cir. Aug. 2, 2012) (holding that "mere emails and telephone calls directed at Virginia do not amount to transacting business in Virginia," in a case in which

66

than establish that Motley was "transacting business" in Virginia, and therefore fell within the purview of Virginia's long-arm statute.[45]

Plaintiffs' allegations also establish that Osmani transacted business in Virginia, and thus falls within the ambit of Virginia's long-arm statute. Plaintiffs' allegations are far from "threadbare." *See* Dkt. 93 at 7. To the contrary, "concrete details" are abundant, *see id.* at 9, including that Osmani met Joshua Mast "in 2021 through a WhatsApp Bible study group," in which he "offered to help [the Masts] bring Baby Doe to the United States so that they may raise her as their daughter," Am. Compl. ¶ 94; Osmani agreed to help the Masts "obtain[ ] a fake Afghan passport for Baby Doe," *id.* ¶ 96; the Masts sent Osmani an altered photo of Baby Doe they had received from Motley, for him to use in procuring the fake Afghan passport, *id.* ¶ 95, the Masts wired over $1,000 to Osmani, who "wired those funds to a contact in Afghanistan to pay for the procurement of the fake Afghan passport with a fake Americanized name that featured the Mast's last name," *id.*; and that Osmani served as a translator for numerous conversations between the Masts and Plaintiffs, *e.g., id.* ¶¶ 98, 102, as well as maintained separate correspondence directly with Plaintiffs in which he perpetuated the falsehood that the Masts only were interested in providing Baby Doe medical care, when in fact they wanted to raise Baby Doe themselves, *id.* ¶¶ 94, 97, 102–04.

---

the plaintiff traveled to Chicago to meet with a defendant training manager, who produced a report which was then emailed to Plaintiff and others in Virginia).

[45] In any event, the Court is mindful that Virginia's long-arm statute has been interpreted such that the exercise of jurisdiction mirrors the limits of the Due Process Clause. *Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir. 1982) (describing the statutory long-arm statute analysis as "interrelated" with the constitutional inquiry, given that the Virginia statute "has been construed to extend *in personam* jurisdiction to the outermost perimeters of due process"). And, for the reasons that follow, the exercise of jurisdiction over Motley is consistent with the constitutional limitations.

To be sure, Osmani's declaration challenging the exercise of personal jurisdiction states as a general matter that he has never lived in Virginia, does not own any property in Virginia and does not "operate any form of business or other such enterprise in [Virginia]." Dkt. 92-1 ¶ 4 ("Osmani Decl."). He also attests, in a conclusory manner, that any allegation he "ha[d] been engaged in any form of conspiracy to abduct [Baby Doe] is entirely and categorically false." *Id.* ¶ 6. But Osmani in his declaration does not squarely dispute any of the specific supporting facts alleged by Plaintiffs in their complaint, which at this stage of the litigation must be presumed to be true and all reasonable inferences drawn in their favor. *See New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005); *Grayson v. Anderson*, 816 F.3d 262, 267–68 (4th Cir. 2016).[46] Like the allegations concerning Motley, Plaintiffs' allegations concerning Osmani's conduct more than demonstrate that he transacted business in Virginia such that he falls within the ambit of Virginia's long-arm statute.[47]

---

[46] Plaintiffs also argue that Osmani's travel to testify in legal proceedings pending in Virginia state court between Plaintiffs and the Masts would only further support the exercise of personal jurisdiction here. Osmani Decl. ¶ 5; Dkt. 167 at 59 ("MTD Hr'g Tr.") (arguing that Osmani first came to Virginia in May 2022 to testify voluntarily); Dkt. 164 (subpoena, filed under seal, as to October 2022 testimony). The Court need not rely on that argument to conclude that Osmani was subject to the Virginia long-arm statute or that the assertion of specific personal jurisdiction over Osmani satisfied Due Process considerations.

[47] Since the Court determines that Motley and Osmani's alleged conduct qualifies as the transaction of business in Virginia under Va. Code § 8.01-328.1, the Court need not further rule on Plaintiffs' alternative argument that Virginia's long-arm statute was satisfied because Motley and Osmani were "causing tortious injury by an act or omission" in Virginia. Am. Compl. ¶ 20. *But see DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419, 425–26 (E.D. Va. 1996) ("This provision requires that an out-of-state defendant be physically present in Virginia when committing the act or omission giving rise to the tort at issue."); *People Exp. Airlines, Inc. v. 200 Kelsey Assocs., LLC*, 922 F. Supp. 2d 536, 545 (E.D. Va. 2013) (explaining that, "to subject a nonresident to personal jurisdiction in Virginia pursuant to § 8.01-328(A)(3), [plaintiff] must allege that one essential act of the alleged tort occurred in Virginia").

2. Motley & Osmani's Participation in Conspiracy Supports Imputing Co-Conspirators' Contacts with Virginia and Confers Personal Jurisdiction

Next, the Court considers whether Motley and Osmani are subject to specific personal jurisdiction consistent with the Due Process Clause, such that they "should reasonably anticipate being haled into court" in Virginia on account of their suit-related conduct and connection with the forum state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985). In this case, Plaintiffs allege and contend that Motley and Osmani are subject to specific jurisdiction on account of their involvement in a conspiracy with the Masts and others, by which those co-defendants' suit-related contacts can be imputed to Motley and Osmani. Am. Compl. ¶ 20.

Conspiracy jurisdiction imputes to a nonresident defendant constitutionally significant contacts with Virginia "through the actions of their alleged coconspirators." *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013). To establish "conspiracy jurisdiction," Plaintiffs "would have to make a plausible claim (1) that a conspiracy existed; (2) that the [defendant] participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia." *Id.*; *accord Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005) (explaining that the Fourth Circuit has "accepted the conspiracy theory as a means of showing sufficient contacts with the State of Maryland to authorize *in personam* jurisdiction") (citing *McLaughlin v. McPhail*, 707 F.2d 800, 807 (4th Cir. 1983) (per curiam)). And their complaint must include more than "bare allegations" to support personal jurisdiction via conspirators' contacts with the forum. *Unspam*, 716 F.3d at 329 (quoting *Lolavar*, 430 F.3d at 229).

At the outset, Motley and Osmani generally argue that conspiracy jurisdiction is no longer viable following the Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014). Next, Motley and Osmani each argue that Plaintiffs' allegations against them fall short of

69

pleading a plausible conspiracy claim and thus fall short of the standard for their coconspirators' contacts with Virginia to be imputed to them. The Court disagrees on both counts, and finds that their participation in the alleged conspiracy supports the exercise of personal jurisdiction over them.

      *a.  Conspiracy-Based Contacts with Forum State Are Imputable for Personal Jurisdiction Purposes*

Motley acknowledges, as she must, that "the Fourth Circuit recognized the existence of 'conspiracy jurisdiction'" in *Unspam*. Dkt. 91 at 16. When, as here, the Fourth Circuit has "decide[d] a legal issue in a published opinion, that ruling is binding on all future panels and district courts within this circuit unless it is abrogated by the Supreme Court or by an en banc decision of [the Fourth Circuit]." *Gibbons v. Gibbs*, 99 F.4th 211, 213 (4th Cir. 2024). Motley identifies no en banc decision of the Fourth Circuit reversing *Unspam* or the conspiracy theory of jurisdiction. Instead, she tries to avoid application of that published and controlling precedent by contending that "in *Walden*, the U.S. Supreme Court rejected the conspiracy-jurisdiction doctrine." *Id.* However, that contention misconstrues *Walden*, which simply did not address "conspiracy jurisdiction" at all.[48]

To be sure, the Supreme Court in *Walden* wrote that its "minimum contacts analysis" "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." 571 U.S. at 285. And there, the Court also explained that "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by

---

[48] Although Osmani, like Motley, contests that the actions of co-conspirators can impute contacts with the forum on the basis of *Walden*, he does not cite let alone attempt to distinguish the Fourth Circuit decision in *Unspam Technologies*. *See* Dkt. 93 at 10.

interacting with other persons affiliated with the State." *Id.* at 286. But in *Walden*, the Supreme

Court was considering the defendant's contacts with the *plaintiff* who was domiciled in the

forum State and later traveled to and suffered (financial) injury in the forum State, *see id.* ("the

plaintiff cannot be the only link between the defendant and the forum"); *id.* at 279–81—not a

defendant's contacts with a co-conspirator, co-defendant, who committed *suit-related conduct* in

furtherance of the conspiracy in the forum State that was sufficient to subject that co-conspirator

to jurisdiction in the forum State.[49] The difference is material. That is because

> when individuals conspire to do something that they could reasonably expect to
> have consequences in a particular forum, if one coconspirator who is subject to
> personal jurisdiction in the forum commits overt acts in furtherance of the
> conspiracy, those acts are attributable to the other co-conspirators, who thus
> become subject to personal jurisdiction even if they have no other contacts with the
> forum.

*St. Paul Fire & Marine Ins. Co. v. Hoskins*, No. 5:10-cv-87, 2011 WL 1897683, at *3 (W.D. Va.

May 18, 2011) (quoting *Cline v. Hanby*, No. 2:05-cv-885, 2006 WL 3692647, at *7 (S.D. W. Va.

Dec. 13, 2006)). And contacts between coconspirators in furtherance of the conspiracy are not

the sort of "random, fortuitous, or attenuated" contacts with "other persons affiliated with the

State" that the Supreme Court held insufficient to support personal jurisdiction. *See Walden*, 571

U.S. at 286.[50] Rather, such contacts between coconspirators that suffice to establish conspiracy

jurisdiction under *Unspam* constitute the sort of purposeful conduct by the defendant himself that

are necessary to establish jurisdiction under *Walden*, 571 U.S. at 285–86.

---

[49] It would be a different situation if an agent or co-conspirator committed acts
"unilaterally outside the scope of the relationship," which very well "may not be imputable."
*Compass Mkt'g, Inc. v. Schering-Plough Corp.*, 438 F. Supp. 2d 592, 595 n.4 (D. Md. 2006).

[50] *Compare, e.g.*, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)
(holding that "the fortuitous circumstance that a single Audi automobile, sold in New York to
New York residents, happened to suffer an accident while passing through Oklahoma," was not
sufficient to support the exercise of state-court jurisdiction in Oklahoma).

Further, Motley recognizes that a number of district courts within the Fourth Circuit "continue to consider conspiracy jurisdiction to comport with due process (at least in theory)," even after *Walden*,[51] and she has failed to cite any authority (nor is the Court aware of any) within the Fourth Circuit that has accepted her argument that *Walden* undermined conspiracy jurisdiction. Dkt. 91 at 17. Unless and until the Fourth Circuit acting en banc or the Supreme Court clearly reject conspiracy jurisdiction, it remains a valid basis to establish specific personal jurisdiction under *Unspam*.

            b. *Plaintiffs' Allegations Establish Personal Jurisdiction Over Motley*

Motley contends that, even if conspiracy jurisdiction is still valid, Plaintiffs' allegations do not satisfy the Fourth Circuit's standard set out in *Unspam*. Dkt. 91 at 18–19. The Court disagrees. Indeed, Plaintiffs' allegations detailing Motley's role in the alleged conspiracy to abduct Baby Doe are factual and specific—nothing at all like the "bare allegations" that fail *Unspam*'s conspiracy jurisdiction standard. *See Unspam*, 716 F.3d at 329. For instance, in *Unspam*, one of the plaintiffs alleged that his purchase of medications from an online source turned out to be a fraudulent transaction as his medications were never delivered, and he alleged that the defendants (foreign pharmacists and foreign banks) had "participated in a global Internet conspiracy to sell illegal prescriptions" in the United States and Virginia. *Id.* at 324, 329. Yet

---

[51] *See, e.g.*, *Galloway v. Martorello*, No. 3:19-cv-314, 2023 WL 5183204, at *8–11 (E.D. Va. Aug. 11, 2023) ("the Court finds that Due Process is satisfied under the conspiracy theory of personal jurisdiction"); *Comm'n on Health Care Certification, Inc. v. Fig Servs., Inc.*, No. 3:22-cv-39, 2022 WL 1696019, at *7 (E.D. Va. May 26, 2022) (recognizing continuing viability of conspiracy theory of personal jurisdiction, but holding that the elements were not satisfied in that case); *Coastal Labs, Inc. v. Jolly*, 502 F. Supp. 3d 1003, 1020 (D. Md. 2020) (holding that "Plaintiffs have also adequately alleged the conspiracy theory of jurisdiction" under Maryland law, which constituted "a *prima facie* showing that exercising personal jurisdiction over [Plaintiffs'] claims does not 'offend traditional notions of fair play and substantial justice'") (citing *Int'l Shoe*, 326 U.S. at 316).

crucially, the plaintiff "acknowledge[d] that he does not know who engaged him in the transaction or whether any of the four [defendant] banks processed his Visa charge." *Id.* at 329. Rather, he "speculate[d] that [his] transaction could well have been" processed through a foreign payment application on account of the "frequency with which [the banks] processed such transactions." *Id.* In other words, the plaintiff's "speculation about the processing of [his] transaction … amount[ed] to no more than a bare allegation or logical possibility," and there were no facts alleged "to show that the defendant banks participated in the alleged conspiracy." *Id.* at 330. Rather the facts alleged showed, at most, the banks were engaging in "arms-length transactions" conducted "in the ordinary course of business." *Id.*

In this case, Motley appears to concede that Plaintiffs have "plausibly allege[d]" that she "entered into an agreement" with the Masts in order "to locate Baby Doe and establish contact with [Plaintiffs] …." Dkt. 91 at 18–19. Rather, she claims that Plaintiffs' allegations at most establish that she tried to help the Masts get "medical care" for Baby Doe in the United States. *Id.* at 19. In other words, Motley challenges the second element of conspiracy jurisdiction—that Plaintiffs must plead "a plausible claim … that [Motley] participated in the conspiracy" alleged. *See Unspam*, 716 F.3d at 329.

Plaintiffs have alleged specific, detailed facts that Motley entered into an agreement to abduct Baby Doe from Plaintiffs so that the Masts could raise her as their own. For instance, they have alleged that "[i]n the fall of 2019," when the Masts reached out to Motley "to assist in their efforts to bring Baby Doe to the United States," Joshua Mast at that point "advised Motley that he and Stephanie Mast intended to adopt Baby Doe." Am. Compl. ¶ 76. Then, "[o]n February 27, 2020 … Joshua Mast advised Motley that he needed help to 'handle [Baby Doe's] situation privately,' by locating her relatives, contacting them, and then bringing the child out of

Afghanistan to the United States, where the Masts had already successfully petitioned a Virginia court for legal custody of the child." *Id.* ¶ 79. Motley's knowledge of the plan is further supported by the allegation that she had received a copy of the Masts' Juvenile Court order by February 27, 2020, but still "agreed to work with the Masts as they implemented their plan." *Id.* ¶¶ 80–81; *see also, e.g.*, *id.* ¶ 6 ("Motley was aware that Joshua and Stephanie Mast had obtained the Fraudulent Custody and Adoption Orders for Baby Doe and was aware from the outset that Joshua and Stephanie Mast wanted to take physical custody of her in the United States and intended to adopt her as their own child."). So there are more-than-plausible allegations that while Motley repeatedly told Plaintiffs John and Jane Doe that the Masts were only trying to provide Baby Doe medical care in the United States, Motley was well aware that the Masts intended to take custody of Baby Doe when she got to the United States. *See, e.g.*, *id.* ¶¶ 76–77, 79–81, 85, 88, 186. And given Motley's possession of and knowledge of the diplomatic correspondence from Afghanistan asserting jurisdiction over Baby Doe rather than waiving it, the Amended Complaint includes more-than-plausible allegations that she knew all along that the purported legal basis for the Masts' custody and adoption of Baby Doe was void and without legal effect. *See, e.g.*, *id.* ¶¶ 80–81, 85, 186.

Nonetheless, despite knowing that the Masts intended to adopt Baby Doe and had custody and adoption orders from Virginia courts, *id.* ¶¶ 6–7, 76–81, Motley proceeded to contact Plaintiffs at the Masts' direction and seek to convince them that the Masts intended only to help Baby Doe get medical care in the United States and never advised them of the Masts' stated purpose to try to adopt Baby Doe or the custody and adoption orders, *id.* ¶¶ 8, 83–85, 88–89. Further still, in response to Motley's request for photos of Baby Doe, Plaintiffs sent Motley a photo of Baby Doe in her swimming trunks, *id.* ¶ 90, and the Masts sent a nearly identical photo

("altered to add a shirt, remove the background content, and be reformatted as a passport photo") to Osmani that was used on the fake Afghan passport Osmani procured for Baby Doe. *Id.* ¶¶ 95–96, 127. The Masts also paid Motley $4,500 for her services via PayPal. *Id.* ¶ 87. Establishing contact with Plaintiffs, fostering the relationship between the Masts and Plaintiffs, facilitating phone calls between them, misrepresenting the Masts' purposes as merely seeking to help provide Baby Doe medical care, and securing a photo of Baby Doe that Plaintiffs used in her fake Afghan passport—combined with specific allegations of Motley's knowledge and agreement to further the Masts' scheme (based on specific dates and text of communications between Motley and the Masts)—collectively more than establish a plausible claim that Motley conspired with the Masts to abduct Baby Doe. These allegations are specific and factual and, taken as true and drawing all reasonable inferences in Plaintiffs' favor at this stage of the litigation, they more than plead a plausible conspiracy claim against Motley. *See Unspam*, 716 F.3d at 329.

For these reasons, as well as those set forth below in the Court's holding on the motions to dismiss under Rule 12(b)(6) that Plaintiffs have pleaded a plausible conspiracy claim, *infra*, at pp. 83–92, the Court finds that the elements of conspiracy jurisdiction have been established as against Motley. *See Unspam*, 716 F.3d at 329. As a result, Motley's codefendants' (and especially the Masts') contacts with Virginia—that are extensive and involve securing numerous allegedly fraudulent state court orders and orchestrating Baby Doe's removal from Plaintiffs' physical custody in Virginia, Am. Compl. ¶¶ 49–55, 133–36—are constitutionally sufficient, suit-related "minimum contacts" with Virginia that are imputed to Motley. *See Unspam*, 716 F.3d at 329. Motley is thus subject to personal jurisdiction in Virginia.

75

c.   *Plaintiffs' Allegations Establish Personal Jurisdiction Over Osmani*

Osmani briefly argues that Plaintiffs may not use "allegations of actions by his supposed co-conspirators in the forum" to establish personal jurisdiction over him because him doing so is, "especially offensive to the Due Process Clause." Dkt. 93 at 10. Again, for the reasons set forth above, personal jurisdiction may be based on co-conspirators' contacts with the forum if the *Unspam* conspiracy-jurisdiction test is satisfied.

Here, Plaintiffs have alleged far more than "conclusory allegations" of Osmani's participation in a conspiracy with the Masts. *See id.* These allegations include, among other things, that Osmani (1) met Joshua Mast in a 2021 Bible study group and "offered to help [the Masts] bring Baby Doe to the United States so that they may raise her as their daughter," Am. Compl. ¶ 94; (2) agreed to help the Masts "obtain[ ] a fake Afghan passport for Baby Doe, *id.* ¶ 96; (3) was wired over $1,000 from the Masts, *id.* ¶¶ 98, 102; (4) which Osmani then wired "to a contact in Afghanistan to pay for the procurement of the fake Afghan passport," which featured the Masts' last name, *id.*; and (5) Osmani did, in fact, help the Masts secure from the Afghan government that fake passport for Baby Doe, which Joshua Mast used to get Baby Doe through immigration checks upon her arrival, *id.* ¶¶ 126–30. Moreover, Plaintiffs have alleged that (6) Osmani translated between the Masts and Plaintiffs, *id.* ¶¶ 98, 102–04; and (7) persistently asserted that the Masts only wished to help give Baby Doe medical care, when in fact Osmani knew that they intended to get custody of her and raise her, *id.* ¶¶ 8, 93, 98, 102–04.

These allegations, taken as true and drawing all reasonable inferences in Plaintiffs' favor, more than establish that Osmani participated in the conspiracy alleged. *See Unspam*, 716 F.3d at 329. Accordingly, for these reasons, as well as those set forth in the Court's ruling that Plaintiffs have pleaded a plausible conspiracy claim, *infra*, at 83–92, the Court finds that the elements of

conspiracy jurisdiction have also been established as against Osmani. *See Unspam*, 716 F.3d at 329. Thus, his co-defendants' suit-related contacts with Virginia are imputable to Osmani, and provide constitutionally sufficient, suit-related minimum contacts to subject Osmani to personal jurisdiction in Virginia.

For these reasons, Motley's and Osmani's motions to dismiss Plaintiffs' complaint for lack of personal jurisdiction will be denied. Dkt. 90; Dkt. 91 at 10–19; Dkt. 92; Dkt. 93 at 6–10.

### **Whether Plaintiffs Have Stated Claims to Relief on the Merits**

Finally, the Court turns to address Defendants' arguments that Plaintiffs have failed to state a claim for relief. As previously discussed, the Court concluded that the Amended Complaint's claims for tortious interference with parental rights and false imprisonment, as well as all claims brought on Baby Doe's behalf, fall within the domestic relations exception to federal diversity jurisdiction. *See supra* at pp. 39–49. Accordingly, the Court will consider only whether Plaintiffs have stated plausible claims of fraud, conspiracy, and intentional infliction of emotional distress under Virginia law.

1. Fraud

Plaintiffs have sued Joshua and Stephanie Mast, and Kimberly Motley for fraud. *See* Am. Compl. ¶¶ 161–79. The Masts and Motley have sought dismissal of the fraud count. The Court, however, concludes that Plaintiffs have stated a plausible claim of fraud.

For their part, Joshua and Stephanie Mast argue that Plaintiffs have failed to state a fraud claim because they "fail to allege with particularity not only [ ] 'the time, place, and contents of the false representations,' but also 'the identity of the person making the misrepresentation and *what he obtained thereby*.'" Dkt. 101 at 23 (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)) (Masts' emphasis). Likewise, Motley also argues that

Plaintiffs' claims do not "satisfy Rule 9(b)'s heightened pleading standard." Dkt. 91 at 21. She contends that the Amended Complaint lacks necessary "time, place, or content allegations" of the fraud that Motley allegedly committed. *Id.* at 22. The Masts further contend that "[i]n Virginia, fraud usually involves some loss of finances or property," and that because Plaintiffs have not "explained what property they lost or what damages were proximately caused by the Masts' actions," they therefore "failed to plead a claim for fraud." Dkt. 101 at 23.

The Masts cite no authority for the proposition that, without a loss of "finances or property," a fraud claim would not lie. The "common law tort" of fraud requires proof of the following elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Qiu v. Huang*, 885 S.E.2d 503, 513 (Va. Ct. App. 2023) (quoting *Thompson v. Bacon*, 425 S.E.2d 512, 514 (Va. 1993)). Nowhere does the tort demand a loss of finances or property—but rather, "resulting damage" to the plaintiff, *see id.*, and the "usual remedy in an action for fraud is to restore the defrauded party to the position he held prior to the fraud," *Murray v. Hadid*, 385 S.E.2d 898, 904 (Va. 1989).

Plaintiffs have included in their Amended Complaint more than sufficient factual allegations that, taken as true, would support plausible fraud claims against the Masts and Motley.

Plaintiffs claim that the Masts engaged Motley's services to find and contact Plaintiffs "and lure them into facilitating Baby Doe's travel to the United States, purportedly for the sole purpose of obtaining medical treatment for her," when, in fact, they sought "to perpetrate the abduction of Baby Doe." Am. Compl. ¶¶ 162–63. That claim is then backed up with specific facts. Plaintiffs allege that the Masts first reached out to Motley in the fall of 2019, to seek her

help "bring[ing] Baby Doe to the United States," and Joshua Mast further "advised Motley that he and Stephanie Mast intended to adopt Baby Doe." *Id.* ¶ 76. In other words, she was, from the very beginning, aware of the Masts' intention to adopt Baby Doe. The Masts and Motley communicated by email and phone between "October 25–27, 2019," about their "shared desire to remove Baby Doe from Afghanistan." *Id.* ¶ 77. Then, when the United States released Baby Doe to the Afghan Government for reunification with her family, Joshua Mast "advised Motley that *he needed help to 'handle [Baby Doe's] situation privately*,'" by locating her relatives, contacting them, offering them medical care, and then bringing the child out of Afghanistan to the United States, where the Masts had already successfully petitioned a Virginia Court for legal custody over the child." *Id.* ¶ 79 (emphasis added). Motley, however, had received the official Afghan diplomatic correspondence requesting Baby Doe's return for reunification with her family, and so while she had the JDR Court order. *Id.* ¶ 80. Accordingly, Plaintiffs allege that Motley should have known the latter to be void because it was "expressly conditioned on a waiver of jurisdiction from the Government of Afghanistan," and Motley had the diplomatic communication from Afghanistan asserting, rather than waiving, jurisdiction. *Id.*

Joshua Mast thereafter sent Motley information about "the identities of the people to whom Baby Doe was transferred," and Motley used that to find a contact that could connect her with Plaintiffs in Afghanistan. *Id.* ¶¶ 82–83. On March 6, 2020, Motley called Plaintiffs for the first time at the Masts' direction. *Id.* ¶ 83. In a later conversation that day, Motley "advised Jane Doe that she understood Baby Doe had serious medical issues and that Motley knew an American family who wanted to help her." *Id.* ¶¶ 84–85. But, per her agreement with the Masts, Motley "did not disclose the Masts' custody and interlocutory adoption order for Baby Doe, and

did not disclose the Masts' intention to adopt Baby Doe or that the Masts had initiated court proceedings to do so." *Id.* ¶ 85.

Shortly thereafter, on March 22, 2020, Joshua Mast wired Motley a $4,500 payment via PayPal. *Id.* ¶ 87. He messaged her to confirm she received the funds. *Id.* Motley "agreed to work with the Masts as they implemented their plan," *id.* ¶ 81, and she did so knowing that the Masts intended to adopt Baby Doe, *id.* ¶ 76. (By this time, Motley had received the Masts' JDR custody order, and she further knew the Government of Afghanistan had demanded her reunification with her family and the United States had agreed to do so. *Id.* ¶¶ 80–81.) Motley continued to "communicate with and befriend" Plaintiffs "on behalf of the Masts over the course of more than a year, making multiple offers to assist with baby Doe's medical care and occasionally asking for photographs of Baby Doe." *Id.* ¶ 88. Motley did so at the Masts' direction, and was paid those thousands to do so. *Id.* Notably, on another specific date, July 30, 2020, "in response to one of Motley's requests for photos, Jane Doe sent her photographs of Baby Doe in swim trunks in a small swimming pool." *Id.* ¶ 90. On February 2, 2021, the Masts emailed a photo of Baby Doe that was "nearly identical to the photo of Baby Doe that Jane Doe had sent to [Motley]," and that altered photo was sent to Osmani "to be conveyed to his contact in the Afghan passport office" to obtain "a fake Afghan passport for Baby Doe." *Id.* ¶¶ 95–96; *see also id.* ¶¶ 90, 127–30 (alterations of Baby Doe photo).

Plaintiffs have alleged these and other facts that the Court must take as true at this stage of the litigation. They certainly plead with particularity how Motley was aware of the Masts' intention to adopt Baby Doe, *id.* ¶ 76, knew that while the Masts had a custody order for Baby Doe, *id.* ¶ 80, and still on numerous, specific occasions, represented to Plaintiffs that she was a conduit for Americans who sought simply to assist Plaintiffs secure medical care for Baby Doe

in the United States—nothing more, *id.* ¶¶ 85, 88–89, 104, and that she secured from Plaintiffs photos of Baby Doe that the Masts ultimately used to get a fake Afghan passport for Baby Doe, *id.* ¶¶ 90, 95–96, 127–30. And throughout over a year of communications with Plaintiffs, Motley never once disclosed to them that the Masts had a custody order for Baby Doe, intended to adopt her, and sought to prevent the reunification of Baby Doe with her family. *See id.* ¶¶ 76, 80, 85, 88–89, 104. Plaintiffs have alleged these material misstatements and omissions, supporting a plausible claim of fraud against Motley that satisfies Rule 9(b)'s stringent pleading standard.

Joshua and Stephanie Mast, for their part, also argue in a cursory way—i.e., one sentence in their motion to dismiss—that Plaintiffs' allegations fail to state a claim of fraud with the requisite particularity. *See* Dkt. 101 at 23. Not so. Plaintiffs' allegations, particularly concerning the Masts, are extensive, detailed, and specific with respect to the who, what, where, and when, of the alleged fraud. Plaintiffs have laid out a detailed scheme by the Masts to "lure [Plaintiffs] into facilitating Baby Doe's travel to the United States, purportedly for the sole purpose of obtaining medical treatment for her," when in fact, they used repeated "false and misleading statements and material omissions" to "perpetrate the abduction of Baby Doe" when she arrived in the United States. Am. Compl. ¶¶ 162–65.

For example, Plaintiffs allege that "[o]n July 10, 2021, as well as in subsequent conversations, Joshua and Stephanie Mast, with the assistance of Motley, intentionally misrepresented to [Plaintiffs] that their sole intention was to procure medical assistance for Baby Doe, and that it was in [Plaintiffs'] best interest to send Baby Doe to the United States," while the Masts "also intentionally withheld from [Plaintiffs] any information or notice of the court proceedings that they had initiated for Baby Doe in Virginia." *Id.* ¶ 168. Then, "[o]n August 26, 2021, … Joshua Mast represented to [Plaintiffs] that he was their attorney." *Id.* ¶ 169. On that

same date, while Plaintiffs "were in Germany awaiting their final flights to the United States," "Joshua and Stephanie Mast came to their room three times and again made misrepresentations to them, reiterating that they wanted to take Baby Doe to the United States for the sole purpose of obtaining medical treatment for her." *Id.* ¶ 170. They also stated that Baby Doe should travel with them, "separately from [Plaintiffs], because they were simply trying to make it easier for Baby Doe to enter the United States," when in reality, "their true intention was to unlawfully and permanently take physical custody of Baby Doe." *Id.* Finally, on September 3, 2021, Plaintiffs allege that the Masts ultimately orchestrated the removal of Baby Doe from their custody while they were staying at Fort Picket, and only then "revealed to [Plaintiffs] for the first time that he had adopted Baby Doe." *Id.* ¶ 171.

Plaintiffs have included specific dates of numerous false representations by the Masts. *See, e.g.*, Am. Compl. ¶¶ 98, 119–21, 169–71. Specific false and misleading language, via text messages and voicemail by Joshua Mast were included in full in the Amended Complaint. *See, e.g.*, *id.* ¶ 119 (describing August 26, 2021, WhatsApp voice note from Joshua Mast to Jane Doe, "instructing her to tell anyone who asks that he was their lawyer"); *id.* (related text from Joshua Mast to Jane Doe the same day); *id.* ¶ 120 (voicemail from Joshua Mast to John Doe the same day, advising that if "someone tries to talk about documents … say 'we have a lawyer here to talk with you about that for us' and that's me"). Plaintiffs also describe in detail encounters with the Masts at the time while they were in Germany, and the Masts' three visits to Plaintiffs' room, in which they repeatedly "tr[ied] to convince [Plaintiffs] to allow Baby Doe to travel separately with the Masts, insisting that it would be easier for the toddler to enter the United States that way," but Plaintiffs "repeatedly refused, as they did not want to leave Baby Doe in anyone else's care." *Id.* ¶ 121. And again, the Masts did not inform Plaintiffs about the adoption order, or their

previous attempts to prevent Baby Doe from being reunited with her family in Afghanistan; instead, they "continued to misrepresent that they only wanted to bring Baby Doe to the United States to provide her with medical care." *Id.* ¶ 124.

These, and other allegations in the complaint, must be taken as true at this stage of the proceeding on a Rule 12(b)(6) motion to dismiss. And, taken as true, Plaintiffs' allegations show that the Masts engaged in a long-standing, concerted duplicitous attempt to trick Plaintiffs into bringing Baby Doe to the United States, lured with representations that the Masts were only trying to assist her get medical care in the United States, when in fact they hid their motivation all along to adopt her and effectively abduct her from Plaintiffs' care. The elements of fraud are pleaded with particularity. *See* Fed. R. Civ. P. 9(b). Plaintiffs have stated plausible fraud claims against the Masts as well as Motley.

    2.  <u>Conspiracy</u>

Plaintiffs have sued all Defendants—i.e., Joshua and Stephanie Mast, Richard Mast, Kimberly Motley and Ahmad Osmani—for common law conspiracy. *See* Am. Compl. ¶¶ 180–88. Each has sought dismissal of the conspiracy count for failure to state a claim. For the following reasons, the Court concludes Plaintiffs have stated a plausible claim of common law conspiracy under Virginia law, as to each of the Defendants.

"A common law conspiracy consists of two or more persons to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Bhattacharya v. Murray*, 93 F.4th 675, 698 (4th Cir. 2024) (quoting *The Country Vintner, Inc. v. Louis Latour, Inc.*, 634 S.E.2d 745, 751 (Va. 2006)). A civil action for conspiracy is based on "damage caused by the acts committed in furtherance of the conspiracy." *Comm. Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995).

Defendants raise myriad challenges to the conspiracy count. First, the Masts, Motley and Osmani argue that the Court should dismiss the common law conspiracy claim "because the Does fail to allege an underlying tort." Dkt. 101 at 25 (citing *Almy v. Grisham*, 639 S.E.2d 182, 189 (Va. 2007)); Dkt. 93 at 13; Dkt. 91 at 25. To be sure, "in Virginia a common law claim of civil conspiracy generally requires proof that the underlying tort was committed." *Almy*, 639 S.E.2d at 188. But the Court has already concluded that Plaintiffs have sufficiently pleaded a claim for fraud under Virginia law. *See supra* at pp. 77–83. Plaintiffs can pursue a common law conspiracy claim under a "conspiracy-to-defraud" theory. *See Terry v. SunTrust Banks, Inc.*, 493 F. App'x 345, 358–59 (4th Cir. 2012) (applying Virginia common law of conspiracy); *see also Vivos Acquisitions, LLC v. Health Care Res. Network, LLC*, No. 1:19-cv-1606, 2020 WL 1362285, at *10–11 (E.D. Va. Dec. 30, 2020) (holding that, because the counter-plaintiffs "adequately alleged their fraud claim," and "they have also met the requirements of Rule 9 and successfully alleged the underlying tort," their statutory and common law conspiracy claims under Virginia law survived).

Next, all Defendants argue that Plaintiffs have not stated a plausible conspiracy claim, as to them, with the requisite particularity. Joshua and Stephanie Mast argue that Plaintiffs' allegations do not "recount any particular meetings or communications between the Defendants, nor do they recount what in particular was allegedly said during these communications." Dkt. 101 at 25. Motley claims Plaintiffs "don't plausibly allege facts showing that [she] joined any conspiracy," but only "make conclusory allegations" as to a conspiracy "to abduct Baby Doe." Dkt. 91 at 25. Osmani says the allegations of conspiracy against him "are even weaker than the claims against the Masts," and that Plaintiffs' allegations do not demonstrate he "knew of any plot … and then actively and knowingly decided to advance it." Dkt. 91 at 13–14. Finally,

Richard Mast contends that the Amended Complaint has only "supposition" that he conspired with the other defendants, supporting nothing more than a "mere possibility" of misconduct, which does not suffice to state a plausible claim for relief. Dkt. 99 at 21.

Because Plaintiffs' common law conspiracy alleges fraud, the circumstances constituting the fraud must be pled with particularity. *See Terry*, 493 F. App'x at 358. Again, the Court has found Plaintiffs pleaded their fraud claim with particularity, sufficient to satisfy Rule 9(b). *See supra* at pp. 77–83. The remaining question as to common law conspiracy is whether Plaintiffs "have plausibly and non-conclusorily alleged" that Defendants "combined … to engage in concerted action to commit that fraud, as required by Virginia law." *See Terry*, 493 F. App'x at 359 (cleaned up). A defendant's "knowledge as to the true facts" and "intent to deceive" may be pled "generally," so long as the complaint "show[s] … that the defendants' knowledge and/or intent, where relevant, plausibly entitles the plaintiff to relief." *See id.* at 358 (cleaned up).

The Masts' arguments that "particular meetings or communications" are not included in the Amended Complaint is as incorrect as it is immaterial. Of course, "conclusory" language of a conspiracy will not suffice. *Marshall v. Marshall*, 523 F. Supp. 3d 802, 838 (E.D. Va. 2021). But neither need a plaintiff have been a proverbial "fly on the wall"—recording all that was said in hidden communications of co-conspirators in order to even *bring* a plausible conspiracy claim. Conspiracies, by their nature, are often clandestine, and direct evidence supporting them is difficult to unearth. *Cf. United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc). Rather, what Plaintiffs need to establish is that Defendants "combined together to effect a preconceived plan and unity of design and purpose." *See Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003) (citation omitted, cleaned up).

On that score, the Amended Complaint has numerous, well-pleaded and detailed allegations that, taken as true, establish that Joshua and Stephanie Mast, Richard Mast, along with Motley and Osmani, combined to effect a preconceived plan and unity of design and purpose—to mislead Plaintiffs into bringing Baby Doe out of Afghanistan and into the United States for the ostensible purpose of getting medical care, where the Masts would have legal custody of Baby Doe and could abduct her against Plaintiffs' will.

Numerous, specific factual details are alleged to support Defendants' combination to achieve that unlawful end:

- Fall 2019. Joshua and Stephanie Mast contacted Motley "to assist in their efforts to bring Baby Doe to the United States," and Joshua "advised Motley that he and Stephanie Mast intended to adopt Baby Doe." Am. Compl. ¶ 76.

- October 25–27, 2019. Joshua Mast and Motley exchanged emails and phone calls "about a shared desire to remove Baby Doe from Afghanistan." Joshua Mast acknowledged Afghan government needed to approve a visa for her to travel to the United States. *Id.* ¶ 77.

- February 27, 2020. The day after the United States released Baby Doe to the Afghan Government and the IRCR to be reunited with her family, Joshua Mast told Motley "he needed help to 'handle [Baby Doe's] situation privately,' by locating her relatives, contacting them, offering them medical care, and then bringing the child out of Afghanistan to the United States, where the Masts had already petitioned a Virginia Court for legal custody over the child." *Id.* ¶ 79.

  - Also on that day, Motley received a copy of the Masts' custody order, as well as a diplomatic communication showing that Afghanistan was not waiving jurisdiction over Baby Doe (negating a requirement of the custody order in Virginia). *Id.* ¶ 80.

- March 2020. Motley had a conversation with Plaintiffs where she "advised Jane Doe that she understood Baby Doe had serious medical issues and that [she] knew an American family who wanted to help her," but "[p]ursuant to her agreement with [the Masts], [she] did not disclose the Masts' custody order and interlocutory adoption order for Baby Doe." *Id.* ¶ 85.

- March 22, 2020. Joshua Mast wired Motley $4,500 via PayPal and messaged her to confirm receipt of the funds. *Id.* ¶ 87.

- Over the course of the following year, Motley "ma[de] numerous offers to assist with Baby Doe's medical care and occasionally ask[ed] for photographs of Baby Doe." She "did so at the direction of Joshua and Stephanie Mast and received thousands of dollars to do so." *Id.* ¶ 88.

- July 30, 2020. In response to a request by Motley for a photograph of Baby Doe, Jane Doe sent a photograph of her in swimming trunks in a small wading pool. *Id.* ¶ 90. This photograph was nearly identical to one the Masts later altered and sent to Ahmad Osmani for her fake Afghan passport. *Id.* ¶ 95.

- In early 2021, Joshua Mast met Ahmad Osmani in a WhatsApp Bible study group, during which "Osmani offered to help Joshua and Stephanie Mast bring Baby Doe to the United States so that they may raise her as their daughter." *See id.* ¶¶ 94–95.

- February 2, 2021, Stephanie Mast emailed Joshua an altered photo of Baby Doe, nearly identical to the one Jane Doe sent to Motley in July 2020—altered to be reformatted as a passport photo. Joshua forwarded it to Osmani, "to be conveyed to his contact in the Afghan passport office." *Id.* ¶ 95.

- March 2021. Osmani "assisted Joshua and Stephanie Mast in obtaining a fake Afghan passport for Baby Doe." They wired over $1,000 to Osmani, who wired those funds to "to a contact in Afghanistan to pay for the procurement of the fake Afghan passport with a fake Americanized name that featured the Mast[s'] last name. *Id.* ¶ 96.

  o Osmani knew that Baby Doe was living with her biological family in Afghanistan; in his phone, he identified John Doe as the child's cousin. *Id.* ¶ 97.

- July 10, 2021. Motley offered to introduce Plaintiffs to the American family interested in providing medical care to Baby Doe (i.e., the Masts), and Motley facilitated a conversation between Plaintiffs and Joshua Mast, in which Osmani provided interpretation. During the call:

  o Mast "claimed to be a volunteer in the U.S. military hospital who was responsible for her care while [Baby Doe] was hospitalized there." *Id.* ¶ 98.

  o "Mast told [Plaintiffs] that he was familiar with Baby Doe's medical needs and warned them that if Baby Doe did not receive medical care in the United States, she could become blind, brain-damaged, and/or permanently disabled. *Id.*

- Osmani had later telephone and written conversations with Plaintiffs in which the Masts did not participate. Osmani referred to John Doe as his "brother," and Plaintiffs trusted Osmani, "an Afghan who spoke their native language, when he told them that the Masts were trustworthy people with no ulterior motives who just wanted to help Baby Doe receive medical care." *Id.* ¶ 102.

- August 2021. As U.S. troops withdrew from Afghanistan and the Taliban was resurgent, the Masts again reached out to Plaintiffs to convince them to bring Baby Doe to the United States. *Id.* ¶ 105.

    o Plaintiffs said they were considering the proposal but they "were concerned that they would not be able to return to Afghanistan." *Id.*

    o Joshua Mast and Osmani "assured them that they would need to be in the United States for Baby Doe's medical care for only two or three months and that they would then be able to re-enter Afghanistan without issue." *Id.* ¶ 106. Mast and Osmani did not inform Plaintiffs about the final adoption order that the Masts had obtained. *Id.*

- August 20, 2021. Unbeknownst to Plaintiffs, Richard Mast emailed USCIS a petition on behalf of John Doe, prepared at the direction of Joshua and Stephanie Mast by Natalie Osmani, Ahmad Osmani's wife. *Id.* ¶ 109.

    o Richard Mast also wrote that John and Jane Doe "are helping US DoD at great risk to themselves, and have cared for a minor DoD dependent child [Baby Doe] who has serious medical needs." *Id.* ¶ 112. By then Baby Doe was not a DoD dependent.

- August 23, 2021. Plaintiffs spent the night in Kabul with Osmani's parents and siblings, at the direction of Joshua Mast and Osmani. *Id.* ¶ 116.

- August 24–26, 2021. Joshua Mast and Osmani continued to communicate with Plaintiffs as they traveled from Afghanistan to the United States. *Id.* ¶ 117.

- August 26, 2021. Joshua Mast instructed Plaintiffs John and Jane Doe and sent them text and voice messages telling them to tell others falsely that he was their lawyer. *Id.* ¶¶ 119–20.

- Circa August 26, 2021. Joshua and Stephanie Mast came to visit Plaintiffs three times while they were in Germany, trying to convince them to travel separately with Baby Doe, "insisting it would be easier for the toddler to enter the United States that way." Plaintiffs refused, because they didn't want to leave Baby Doe in anyone else's care. Osmani was the interpreter during these conversations. *Id.* ¶¶ 120–22.

Based on these and other facts in the Amended Complaint, Plaintiffs have detailed Defendants' involvement in a conspiracy to defraud Plaintiffs and abduct Baby Doe. The allegations include a scheme by Joshua and Stephanie Mast, working in combination with Motley and Osmani, to (by false pretenses) get a photograph of Baby Doe from Jane Doe, which they then used to procure a fake Afghan passport for Baby Doe with a fake, Americanized name and the Masts' familial name—fake documentation they then used to affect her abduction. *Id.* ¶ 184. The allegations also detail how Joshua and Stephanie Mast and Richard Mast worked together to facilitate Baby Doe's abduction by, among other things, making misrepresentations on immigration applications, filings with the USCIS and to this Court in their attempt to stop Baby Doe's return to her Afghan family in 2020. *Id.* ¶ 185. And they include various, false and misleading representations by the Masts, Motley and Osmani, to Plaintiffs, seeking to induce them to bring Baby Doe to the United States purportedly for the purpose of getting medical care—when the real purpose was that she could be forcibly removed from Plaintiffs' custody and the Masts could raise her in the United States. *Id.* ¶ 186.

Osmani's argument that Plaintiffs failed to allege how he "knew of any plot (assuming there was one) and then actively and knowingly decided to advance it," Dkt. 93 at 14, ignores the many facts alleged: in a WhatsApp Bible study in early 2021, Osmani offered to help Joshua Mast bring Baby Doe to the United States so the *Masts* could raise her, yet he told Plaintiffs that the Masts were only looking to help get her medical care; Osmani knew that Baby Doe was currently living with her biological family; and, in addition to translation services, he helped the Masts procure a fake Afghan passport for Baby Doe, using doctored images and wiring money to a contact in the Afghan government to name Baby Doe as a member of the Masts' family. *See, e.g.*, ¶¶ Am. Compl. ¶¶ 94–97, 102–07, 121, 184, 186. These allegations further demonstrate,

contrary to Osmani's arguments, Dkt. 93 at 13–14, that ample description is pleaded concerning the "when and where" of the agreement, and Osmani's motive for participating, *e.g.*, Am. Compl. ¶¶ 94–95 (early 2021, communication in a WhatsApp Bible study group, agreement with Joshua Mast to help him bring Baby Doe to the United States, so the Masts could raise her). And Osmani can hardly characterize allegations that he helped the Masts secure a fake Afghan passport for Baby Doe as a "common place" action that Plaintiffs unfairly paint "in a negative light." *See* Dkt. 93 at 13.[52]

Motley's argument that there are insufficient facts alleged "showing that [she] joined any conspiracy," fares no better. *See* Dkt. 91 at 25. Plaintiffs described specific communications that took place on specific dates between her and the Masts, supporting her knowing participation in the conspiracy to abduct Baby Doe, *e.g.*, Am. Compl. ¶¶ 76–85, and that she was paid thousands for her services, *id.* ¶¶ 87–88.

Richard Mast challenges the conspiracy count against him on a different basis. Richard argues that the claim should be dismissed as a matter of law because he was acting as Joshua and Stephanie's attorney in filing the petitions before the Virginia JDR and Circuit Courts. Dkt. 99 at 13–14. He continues: just as an agent cannot "conspire" with its principal, neither can a lawyer generally conspire with his client. *See id.* To be sure, under Virginia law "[g]enerally, an agent cannot conspire with its principal." *Mich. Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 925 (E.D. Va. 2000) (quoting *Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987)). While an attorney is an agent

---

[52] While Osmani argues that Plaintiffs have insufficiently explained what duty he had to inform them of the "information they allegedly were denied"—i.e., that the Masts planned to take Baby Doe from them and raise her as their own—Osmani has not explained how the issue would undermine the conspiracy claim or any element thereof. On its face, this appears to be more of a challenge to a claim of fraud, and Plaintiffs did not bring a fraud claim directly against Osmani.

for their client and thus would fall within that rule, *see id.*, the parties also do not dispute that this

rule does not apply where the attorney acted "tortiously, maliciously, or with illegal motives."

*See* Dkt. 99 at 14; Dkt. 113 at 41–42. Richard Mast then spends page-upon-page of his brief

arguing that: (1) his "motives were eminently reasonable and lawful"; (2) "dangerous

bureaucrats at the U.S. embassy" were to blame for agreeing to turn Baby Doe over to a

"government noted for its corruption and human rights abuses"; (3) the "actual facts" in his view,

citing certain evidence and testimony from the Virginia court record, cast doubt on Plaintiffs'

claim to a familial relationship with Baby Doe; and (4) "expert" testimony, State Department

reports and news articles all supported his view that he reasonably believed Baby Doe was not a

citizen of Afghanistan. *See* Dkt. 99 at 14–22.

      One glaring problem with Richard's argument is that it goes well beyond the pleadings

and asks the Court to not only consider, but credit, evidence in his favor notwithstanding the

complaint's well-pleaded allegations to the contrary. The Court cannot do this on a motion to

dismiss—the inquiry Richard seeks would, if anything, be more suitable to summary judgment.

Whether part of Richard's challenged conduct—such as filing false and misleading USCIS

applications without knowledge or authority of John Doe, or making blatant false representations

to this Court that Joshua and Stephanie did not intend to adopt Baby Doe—fell outside the scope

of his representation of Joshua and Stephanie, and/or whether such conduct rose to the level of

"tortious, malicious, or illegal" conduct that would permit a conspiracy claim between attorney

and client, are best suited for resolution on summary judgment or at a full jury trial. Richard may

re-raise his arguments at that time. At this time, a plausible conspiracy claim has been pleaded

against him.

Nor can the Court agree that only conclusory allegations have been pleaded against Stephanie Mast. There are specific and detailed allegations about her involvement organizing the scheme and furthering it alongside her husband and the codefendants here. *See, e.g.*, Am. Compl. ¶¶ 75–76 (describing formation of scheme and outreach to Motley); *id.* ¶ 95 (Stephanie forwarding altered photo of Baby Doe, later sent to Osmani for fake Afghan passport); *id.* ¶ 138 (Stephanie physically took Baby Doe over John and Jane Doe's protestations). There is no basis to dismiss the conspiracy (or any other) claim against her. *See* Dkt. 86 at 25–26.

At bottom, Plaintiffs' allegations more than amply establish—based on the above-mentioned and other specific facts often detailing specific conversations with dates, locations, and specific persons—how Defendants "combined together to effect a preconceived plan and unity of design and purpose," *See Bay Tobacco, LLC*, 261 F. Supp. 2d at 499, to achieve these unlawful ends.

3. <u>Intentional Infliction of Emotional Distress</u>

Finally, Plaintiffs have sued all Defendants for intentional infliction of emotional distress. *See* Am. Compl. ¶¶ 189–96. All Defendants have sought dismissal of the count, arguing that the Amended Complaint does not state a plausible IIED claim. For the following reasons, the Court has little difficulty finding that Plaintiffs have alleged plausible IIED claims against each of the Defendants.

An IIED claim requires a plaintiff to establish: "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe." *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006). The tort of IIED is not "favored" under Virginia law. *Id.*

The Masts argue that Plaintiffs' allegations are not such as would "clear this exceedingly high bar" of conduct that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Dkt. 101 at 24 (quoting *Harris*, 624 S.E.2d at 33). Osmani also argues that Plaintiffs' allegations against him do not establish that he engaged in "outrageous and intolerable" conduct. Dkt. 93 at 14–15. Motley similarly argues that no factual allegations against her that "come[ ] close to that threshold" of "outrageous and intolerable" conduct. Dkt. 91 at 23–24. She contends that her role was "limited to having conversations with the Does when they were in Afghanistan," which conduct was removed from "the actual cause of the alleged emotional distress." *Id.* at 23. Nor, in Motley's view, was she alleged to have taken any action "intentionally or recklessly." *Id.*

The Court concludes that each Defendant's alleged misconduct is sufficiently "outrageous and intolerable" to support an IIED claim. As described above, the facts alleged show that Joshua and Stephanie Mast orchestrated a scheme—in combination with Motley, Osmani and Richard Mast—for over a year to reach out to and gain the trust of Plaintiffs, and induce them to bring Baby Doe to the United States solely for the purpose of getting her medical care; and yet all the while hiding from them that they sought to abduct her and raise her as their own child. Then, without warning, Joshua and Stephanie Mast facilitated Baby Doe's removal from Plaintiffs' arms, and preventing her return, and only then informing them that the Masts had secured adoption and custody orders. This conduct is "outrageous and intolerable," and supports an IIED claim against Defendants. *Harris*, 624 S.E.2d at 33.

In *Raftery v. Scott*, the Fourth Circuit addressed a case in which a non-custodial parent (the father) sought to "foster a parent/child relationship with his son, who was nearly seven years

old" at the time, and in which the custodial parent, his ex-wife, opposed the exercise of visitation rights on the basis that it would negatively impact the child. 756 F.2d at 337. Attempted visitation proved unfruitful, and the father sued in federal court for intentional infliction of emotional distress. The Fourth Circuit noted that at the trial, "[t]here was evidence clearly sufficient to establish that the former wife had engaged in a continuing and successful effort to destroy and to prevent rehabilitation of the relationship between the former husband and their son." *Id.* On appeal, the Fourth Circuit concluded that those facts "supported a claim for intentional infliction of emotional distress." *Id.* at 339. Using *Raftery* as one point of comparison, if poisoning the relationship and preventing visitation between parent and child can support a claim for intentional infliction of emotional distress, surely Defendants' conduct—a scheme to abduct and remove a child from Plaintiffs' care after they raised her as their own child for 18 months—surpasses that in terms of outrageousness by an order of magnitude.[53]

---

[53] Later precedent from the Supreme Court of Virginia took issue with *Raftery*. In *McDermott v. Reynolds*, the court analyzed a plaintiff's claim "against his former wife's paramour for intentional infliction of emotional distress, when the conduct alleged would support an action for alienation of affection, a cause specifically prohibited by statute." 530 S.E.2d 902, 902 (Va. 2000). The "essential basis" of the plaintiff's claim was "that the defendant had an adulterous relationship with [the plaintiff's] wife, which he continued in an open and notorious manner after being confronted by [the plaintiff]." *Id.* at 904. That was, the court held, "precisely the type of conduct that the General Assembly intended to exclude from civil liability when it enacted Va. Code § 8.01-220," which bars claims for alienation of affection. *Id.* at 904. *McDermott* noted its "disagreement with the analysis and result reached in *Raftery*," as that court "focused its analysis on the elements of the two torts [IIED and alienation of affection], rather than on the conduct asserted." *Id.*

However, this Court considers *McDermott* of limited import and that *Raftery* still provides a useful guidepost as to the outrageousness of Defendants' conduct. Plaintiffs' claims are fundamentally different from alienation of affection claims. An "alienation of affection" claim "connotes only that the parent is not able to enjoy the company of his/her child," but the cause of action "does not suggest that the offending party has"—as here—"removed parental or custodial authority from the complaining parent." *Wyatt v. McDermott*, 725 S.E.2d 555, 562 (Va. 2012) (quoting *Kessel v. Leavitt*, 511 S.E.2d 720, 761 n.44 (W.Va. 1998)). Neither was that the case in *Raftery*. Thus, *McDermott* is inapplicable to the IIED claim before this Court.

Motley argues that her specific conduct was limited—in terms of "having conversations with [Plaintiffs] when they were in Afghanistan," and not responding to a text—and that specific conduct is not outrageous and intolerable. Dkt. 91 at 23–24. But Motley's conduct cannot be viewed in a vacuum. Instead, "[t]he outrageousness and intolerability analysis of an IIED claim requires *context driven consideration*." *Williams v. AM Lapomarda*, No. 3:19-cv-631, 2020 WL 3643466, at *15 (E.D. Va. July 6, 2020) (citing *Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743, 783 (W.D. Va. 2014)) (emphasis added). Moreover, Motley's gloss on her conduct does not account for the *substance* of her conversations with Plaintiffs—much less for its seriousness and centrality to the overall scheme. As alleged, Motley engaged in a months-long gaslighting-effort, tricking Plaintiffs into trusting the Masts and believing their motives were pure: to help get Baby Doe medical care. But Motley knew all along that the Masts' plan was to take custody of Baby Doe and raise her, against Plaintiffs' wishes and without consent, when Plaintiffs were ultimately convinced to bring her to the United States relying on those promises Motley and the Masts perpetuated about getting her medical care. Moreover, even assuming that Motley's conduct was not "intentionally" done to cause severe emotional distress to Plaintiffs, it certainly was done with "reckless" disregard that her conduct "likely would cause [Plaintiffs] severe emotional distress." *See Almy*, 639 S.E.2d at 187.[54]

---

[54] Motley cites *Sirleaf v. Doe*, in support of her argument that her conduct was not so "extreme and outrageous" as to support an IIED claim, saying the case stands for the proposition that "inaction through failure to report child abuse is not outrageously unacceptable." Dkt. 91 at 24 (citing *Sirleaf v. Doe*, No. 7:21-cv-237, 2021 WL 3362033, at *2 (W.D. Va. Aug. 3, 2021)). But in that case the court held that the first and second elements of an IIED claim were lacking because the only allegations were that the defendants "aided Doe after the fact and therefore became 'accessories' to the infliction of emotional distress." *Sirleaf*, 2021 WL 3362033, at *2. Here, by contrast the argument is not that Motley "provided *after-the-fact* aid to someone who inflicted distress on [Plaintiffs]," *see id.*, but rather, that Motley's *before-the-fact* conduct was integral to and resulted in severe emotional distress.

Osmani also argues that Plaintiffs have not explained how he owed Plaintiffs "a duty of any kind," such as would support liability for "an alleged failure to communicate." Dkt. 93 at 15. As Plaintiffs argue, Osmani mistakes the elements of an IIED claim, which are not based on any underlying duty, as in a claim for negligence or negligent infliction of emotional distress. *See A.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 476 & n.18 (Va. 2019). "[I]ntentional infliction of emotional distress, when applicable, creates a stand-alone tort duty." *Id.*

For these reasons, the Court concludes that each Defendant's alleged conduct was so outrageous and intolerable as to support an IIED claim against that Defendant.

### Conclusion

For the aforementioned reasons, the Court has concluded that the Court has subject matter jurisdiction over the core of Plaintiffs' case: their tort claims for money damages that exist independently of any domestic-relations issues of Baby Doe's custody and adoption pending in Virginia courts. Plaintiffs' fraud, common law conspiracy, and intentional infliction of emotional distress claims are all generally applicable tort claims for which they seek money damages. They are currently cognizable. But Plaintiffs' requests for declaratory relief, and their claims for tortious interference with parental rights and false imprisonment fall within the scope of the domestic relations exception, and they will be dismissed, *without prejudice* and with leave to refile upon conclusion of the Virginia court proceedings. So too will Plaintiffs' claims brought on behalf of Baby Doe follow suit. The Court has also ruled that neither *Burford* nor *Colorado River* abstention principles warrant abstention.

Moreover the Court has concluded that Osmani and Motley are subject to specific, personal jurisdiction in Virginia, and so their motions to dismiss for lack of personal jurisdiction will be denied. Finally, because Plaintiffs have stated more-than-plausible claims of fraud,

conspiracy, and intentional infliction of emotional distress, the Court will deny Defendants'
motions to dismiss for failure to state a claim. Accordingly, the Court **ORDERS**:

1.  The Masts' Rule 12(b)(1) motion to dismiss for lack of subject matter
    jurisdiction be **GRANTED IN PART** and **DENIED IN PART**; and their
    motion to dismiss pursuant to Rule 12(b)(6) be **DENIED**. Dkt. 85.

2.  Osmani and Motley's Rule 12(b)(2) motions to dismiss for lack of
    personal jurisdiction be **DENIED**; and their motion to dismiss pursuant to
    Rule 12(b)(6) be **DENIED**. Dkts. 90, 92.

3.  Richard Mast's Rule 12(b)(6) motion to dismiss be **DENIED**. Dkt. 88.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion & Order to all counsel
of record.

ENTERED this 24th day of July, 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE