IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BABY DOE, *et al.*, | ) |
| *Plaintiffs,* | ) ) ) |
| v. | ) ) Case No. 3:22-cv-49-NKM |
| JOSHUA MAST, *et al.*, | ) ) ) |
| *Defendants,* | ) ) ) |

**DEFENDANTS JOSHUA AND STEPHANIE MAST'S**
**BRIEF IN SUPPORT OF MOTION FOR RECONSIDERATION OF SANCTIONS ORDER**

Defendants Joshua and Stephanie Mast respectfully ask the Court to reconsider its July 10, 2024 Order Granting In Part Plaintiffs' Motion for Sanctions ("Sanctions Order")[1] to the extent that it calls for the shifting of expenses, including attorney's fees.

The Masts and their counsel understand the Court's frustration and regret not bringing to the Court's attention sooner the two issues central to the Sanctions Order: the delay in production occasioned by submission of documents to the United States for *Touhy* review, and their belief that they were prohibited from producing sealed state court records. Had they done so, the Court and the parties could have addressed those issues in close to real time, rather than after the fact.[2] Going forward, the Masts and their counsel will ensure that any other discovery issues will be promptly addressed with opposing counsel and brought to the Court's attention if necessary. The Masts and

---

[1] *See* the Court's Memorandum Opinion and Order Granting In Part Plaintiffs' Motion for Sanctions (ECF No. 445); Plaintiffs' Motion, and Brief in Support of Motion, For Sanctions As To Defendants Joshua Mast and Stephanie Mast (ECF No. 336).

[2] The Masts completed their production of the *Touhy* documents on April 30, 2024, *see* Ex. K (Mast Apr. 30, 2024 Production Letter), and in light of the Court's July 10 order have agreed to produce the JD&R records, which have been submitted to an e-discovery team for production and are expected to be delivered to Plaintiffs no later than this Friday, July 26, 2024.

their counsel did, however, have a good faith basis to proceed cautiously out of concern for violating Joshua Mast's obligations as an active member of the United States Marine Corps ("USMC") and Virginia law that calls for the sealing of juvenile custody records. And this is an unusual case in that both sides (on information and belief) are being represented *pro bono* in connection with a years-long dispute comprising litigation across multiple jurisdictions that neither side could afford to litigate through paid counsel.

Given the contrition of the Masts and their counsel, their commitment to being proactive on discovery going forward, their good-faith basis for proceeding cautiously, and the unique circumstances of this case, the Masts and their counsel respectfully ask that the Court reconsider the Sanctions Order to the extent that it contemplates an award of expenses, including attorney's fees, under Rule 37(b)(2)(C).

### I. Background

The Court's November 28, 2023 Discovery Order directed the Masts to produce "[a]ll other responsive materials . . . to Plaintiffs' counsel" by December 28, 2023.[3] Immediately following the Court's order, the Masts and their counsel undertook a substantial effort to make that ordered production and to do so on schedule. They collected and reviewed more than "46,000 documents drawn from five email accounts, three cell phones, two personal computers, an external hard drive, two cloud storage accounts, several messaging applications, and paper documents in the Masts' possession."[4] These documents and materials comprised over 186 gigabytes of data.[5]

The Masts' counsel carefully reviewed that data, which required "more than 600 attorney and staff hours" to ensure that responsive documents were properly identified and categorized.[6] During the course of those 600 hours, the Masts' counsel identified and categorized documents not only to

---

[3] Disc. Order 12 (citing Fed.R.Civ.P. 24(b)(2)(B)–(C)).
[4] Masts' Resp. in Opp'n to Pls' Mot. for Sanctions (ECF No. 340) at 3.
[5] *Id.*
[6] *Id.*

2

determine which were responsive to Plaintiffs' document requests but also to identify which documents required *Touhy* authorization for Joshua Mast to produce—based on the parties' collective course of dealing with the United States throughout the life of this dispute in both state and federal court.[7] Based on that review, the Masts and their counsel determined that Joshua Mast had 2,176 responsive documents that were in his possession but not within his legal custody or control, which he could not produce without first seeking and obtaining *Touhy* authorization.[8] *See, e.g.*, *Lowe v. D.C.*, 250 F.R.D. 36, 39 (D.D.C. 2008) ("As a government employee, . . . [a party's] 'control' of documents created in the ordinary course of the government's business is secondary to that of his employer; he cannot on his own initiative remove government files and provide them to a third party." (citing *United States ex. rel. Touhy v. Ragen*, 340 U.S. 462, 467 (1951))).

While the Masts and their counsel can understand the Court's view that they should have initiated the *Touhy* review earlier in the 30-day production window,[9] they respectfully submit that it would not have been practicable to do so. Until counsel had reviewed the documents in response to the Discovery Order, they were not in a position to determine which documents needed to be submitted to the United States for *Touhy* review. Indeed, even after they submitted those documents for *Touhy* review, the United States asked them to undertake additional work to identify which federal agencies had equities implicated by each document. Of course, in hindsight, the Masts and their counsel should have brought these issues promptly to the Court's attention, and they regret that they did not do so.

As soon as the Masts and their counsel determined that there was a concrete set of responsive documents requiring *Touhy* authorization before release, they initiated the *Touhy* review process. On

---

[7] *See generally United States v. Soriano-Jarquin*, 492 F.3d. 495, 504 (4th Cir. 2007) (citing *United States ex rel. Touhy v. Ragan*, 340 462, 465–68 (1951)) (explaining the principle of *Touhy* authorization for government employees to provide evidence in civil litigation).
[8] Masts' Resp. in Opp'n to Pls' Mot. for Sanctions (ECF No. 340) at 3.
[9] *See* Court's Memorandum Opinion and Order Granting In Part Plaintiffs' Motion for Sanctions (ECF No. 445) at 41.

December 28, 2023, counsel contacted Kathryn Wyer, the Department of Justice point of contact for *Touhy* requests in this matter, to notify her of the 2,176 responsive documents that needed to be reviewed before production to Plaintiffs.[10] Several days later, Ms. Wyer informed the Masts and their counsel that she needed additional information to determine whether the United States would authorize the release of those documents. In particular, she asked that the Masts connect each of the 2,176 documents to Plaintiffs' specific requests for production and identify which government agencies had "primary equities in the documents at issue."[11] She further asked that the Masts prepare and submit "separate requests for each agency from which you are seeking authorization."[12]

Throughout the following weeks, the Masts and their counsel worked closely with Ms. Wyer to address her requests and to follow up as additional questions or government requests arose. On February 2 and February 9, 2024, the Masts resubmitted two sets of *Touhy* documents for review.[13] On February 23, 2024, Ms. Wyer confirmed receipt of the documents and indicated that the review was ongoing.[14] She also sought the Masts' input regarding various categories of documents, such as documents already produced in state court, documents with information identifying federal employees, and documents filed by the United States in state court.[15] She concluded: "Once I complete the process of transmitting the relevant documents to the relevant agencies, and the agencies are able to conduct their own review, the agencies may identify additional information that must be redacted or otherwise protected."[16] The Masts agreed to all of Ms. Wyer's preferences for handling the documents and stated they would coordinate with Plaintiffs to get their approval to her proposal not to reproduce documents already produced in the parallel state litigation.[17]

---

[10] *See* Ex. A (Masts' Dec. 28, 2023 *Touhy* Letter).
[11] Ex. B (Wyer Jan 2, 2024 Email).
[12] *Id.*
[13] *See* Ex. C (Mast Feb. 2, 2024 *Touhy* Letter); Ex. D (Mast Feb. 9, 2024 *Touhy* Letter).
[14] *See* Ex. E (Wyer Feb. 23, 2024 *Touhy* Letter).
[15] *Id.*
[16] *Id.*
[17] *See* Ex. F (Mast Mar. 2, 2024 *Touhy* Letter).

Plaintiffs were not prepared to agree to Ms. Wyer's preference for not producing documents already produced in state court and asked for a "detailed log of potentially Touhy responsive documents, including those documents in the two categories . . . that you proposed need not be produced," which the Masts agreed to prepare.[18]

On March 21, 2024, Ms. Wyer contacted the Masts and their counsel to identify documents that were and were not authorized for production, as well as documents requiring redaction before production.[19] She explained that her response was a partial review of the documents submitted for *Touhy* review and sought the Masts' cooperation in identifying the appropriate documents to produce from the state court case that were not under seal and had the appropriate redactions.[20]

On March 29, 2024, Ms. Wyer notified the Masts and their counsel that another partial review was complete and transmitted "agency decisions regarding two subsets of documents," which authorized some documents for release with redactions and denied the release of others.[21] She directed the Masts to mark another category of documents as Confidential before production.[22]

On April 23, 2024, Ms. Wyer shared "agency decisions regarding a third group of documents" and "revised authorizations regarding two documents" that she had previously addressed on March 29.[23] Ms. Wyer stated her review was now complete, as this final set represented "the remainder of the documents you transmitted in your February 2 and 9 requests."[24]

In all, it took three months and twenty-seven days from the Masts' initial submission until the United States had provided (partial) *Touhy* authorization for Joshua Mast to produce the responsive documents identified in his possession. The Masts and their counsel respectfully submit that

---

[18] Ex. G (Mast Mar. 13, 2024 *Touhy* Letter).
[19] *See* Ex. H (Wyer Mar. 21, 2024 *Touhy* Letter).
[20] *Id.*
[21] *See* Ex. I (Wyer Mar. 29, 2024 *Touhy* Letter).
[22] *Id.*
[23] Ex. J (Wyer Apr. 23, 2024 *Touhy* Letter).
[24] *Id.*

contacting Ms. Wyer earlier than December 28, 2023, would not have substantially changed this timeline. Her first request would almost certainly have been for them to identify which documents were at issue, which they would not have been in a position to do until the document review was complete. To be sure, if the Masts and their counsel had more proactively brought this issue to the Court's attention, there may have been additional efficiencies to be gained—or the Court may have ordered the parties to pursue an alternative approach. But to the extent the *Touhy* review process caused a delay in the production of documents following the Discovery Order, the vast majority of that delay was attributable to the time it took for the United States to conduct its review rather than by any delay in the Masts' initiation of the review process at the outset.

Separate from the *Touhy* review process, the Masts and their counsel produced 204 documents, totaling 800 pages, to Plaintiffs by December 28, 2023, pursuant to the Discovery Order.[25] Unfortunately, technical issues with the Masts' collected cell phone data, prevented them from producing all responsive documents by the deadline. The Masts worked expeditiously to resolve the technical errors and made two supplemental productions: one on January 8, 2024, comprising 14 documents and 20 pages,[26] and one on January 28, 2024, comprising 24 documents, totaling 70 pages.[27]

The Masts also maintained their position that they could not produce the custody-proceeding records from the Juvenile & Domestic Relations (J&DR) Court, which were sealed by law under Virginia Code § 16.1-305, and to which Plaintiffs had specifically been denied access by the J&DR Court several times. As the Masts noted in their opposition to the original sanctions motion, violating the seal on those records may be prosecuted as a Class 3 misdemeanor. *See* Va. Code § 16.1-309(A).

---

[25] *See supra* n. 9, at 4.
[26] *Id.*
[27] *Id.* After completing the production in response the Discovery Order, the Masts also re-reviewed documents previously withheld on the basis of privilege. Based on that re-review, the Masts and their counsel withdrew the assertions of privilege over 110 documents, which they produced to Plaintiffs on February 9, 2024. *See id.*

6

The Masts made clear that they would follow the Court's orders if specifically directed to produce those documents,[28] but the Discovery Order had not specifically addressed the issue. Now that the Court has made clear in the Sanctions Order that the Masts must produce them to comply with their federal discovery obligations, they are producing these documents to Plaintiffs.[29] Once again, the Masts and their counsel regret that they did not bring this issue proactively to the Court's attention at a sooner date. But their approach was not motivated by any bad-faith purpose. Rather, they were making a good-faith effort to navigate compliance between this Court's discovery order and their obligations under Virginia law and the state courts' prior rulings on Plaintiffs' access to the custody records.

## II. Legal Standard

Under Rule 54(b), a "district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgments when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003). "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Id.* at 14.

A party's "misguided conception of their duties and ultimately unsuccessful legal theory does not warrant the imposition of sanctions under Rule 37(c)(2)." *McMahan v. Adept Process Servs., Inc.*, 279 F.R.D. 356, 364 (E.D. Va. 2011). Rule 37(b)(2)(C) provides that expenses, including attorney's fees, should not be awarded if they party's "failure was substantially justified or other circumstances make an award of expenses unjust." A party's position is substantially justified if 'a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact.'" *Shin v. Lee*, 550 F. Supp. 3d 313, 321 (E.D. Va. 2021) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565-66 n. 2 (1988)).

---

[28] *See id.* at 10-11.
[29] *See supra* n. 9, at 41-42.

7

### III. Argument

The Masts and their counsel acknowledge that, in hindsight, they should have brought these issues proactively to the Court's attention. They regret that they did not do so, apologize to the Court, and commit to avoiding any similar circumstance in the future. At the same time, the Masts and their counsel did not act in bad faith and had a reasonable, even if ultimately mistaken basis, for submitting Joshua Mast's documents for *Touhy* review and for withholding the sealed custody records. Combined with the other unique circumstances of this case—including that (upon information and belief) counsel for both sides are representing their clients *pro bono* in a long-running dispute that neither side can afford to litigate on a paid basis—the Masts and their counsel respectfully submit that, even if the Court continues to believe that their position was not justified, it still would not be just to award expenses, including attorney's fees.

### A. The Masts and Their Counsel Acknowledge That They Should Have Brought These Issues Proactively to the Court's Attention and Will Ensure That No Similar Situation Arises

The Masts and their counsel do not bring this motion to challenge the Court's determination that they failed to comply with the Discovery Order in a timely manner. They understand the Court's perspective and frustration and acknowledge, in hindsight, that they should have been proactive in notifying the Court of the issues associated with *Touhy* review and the sealed Virginia custody records. That would have allowed the Court an opportunity to amend the timeline, to clarify the Discovery Order, or to direct the parties to proceed differently. The failure to do so was not motivated by any bad-faith purpose. Rather, the Masts were narrowly focused on reviewing and producing documents as quickly as possible following the November 28 Discovery Order within a tight 30-day window over the holidays. Of course, in retrospect, it would have been prudent to take additional time to brief the Court on those issues in parallel.

The Masts and their counsel can assure the Court that they take seriously their discovery obligations in this case and will ensure that, going forward, they dedicate sufficient resources to

8

ensure timely compliance and take a proactive approach to raising any issues that cannot be resolved by negotiation with the other parties.

> **B.   The Masts and Their Counsel Had a Reasonable Basis to Believe That the *Touhy* Documents Were Not Required to Be Produced by December 28 Because, Without *Touhy* Authorization, They Were Not Within Joshua Mast's Legal Possession, Custody, or Control**

The Sanction Order is based on the Court's determination that the Masts failed to comply with their discovery obligations under Rule 34(a),[30] which applies to documents or other records over which the parties "have possession, custody, or control." Fed. R. Civ. P. 34(a). Though the Rule is broadly construed, *Sines v. Kessler*, No. 3:17-CV-00072, 2020 WL 3106318, at *5, n.5 (W.D. Va. June 11, 2020), the Masts and their counsel had a good-faith (even if ultimately mistaken) basis to believe that Rule 34(a) did not apply to the *Touhy* documents at issue here. *See Lowe v. District of Columbia*, 250 F.R.D. 36, 39 (D.D.C. 2008) ("As a government employee, . . . [a party's] 'control' of documents created in the ordinary course of the government's business is secondary to that of his employer; he cannot on his own initiative remove government files and provide them to a third party."); *Dotson v. Edmonson*, No. CV 16-15371, 2017 WL 4310676, at *5 (E.D. La. Sept. 28, 2017) (explaining that an employee's "access" to documents or information from his employer does not necessarily constitute "possession, custody, or control" for purposes of discovery). In particular, Joshua Mast is an active member of the United States military. Not just based on his own surmise, but based on the actual course of dealing in this litigation (including the parallel proceedings in state court), Joshua Mast believed that he was not in possession, custody, or control over documents subject to *Touhy* review—at least until the United States provided him with authorization to produce those documents.

Plaintiffs were not just aware of the fact that Joshua Mast would need *Touhy* authorization to produce certain records in connection with this dispute; they were responsible for it. At the outset of

---

[30] *See supra* n. 9.

9

the state litigation, Joshua Mast asked the United States to declassify and provide blanket *Touhy* authorization for all materials relevant to this litigation. The United States initially granted that authorization, but it was *Plaintiffs* who objected and convinced the United States to rescind that authorization.

The Masts and their counsel thus respectfully submit that, even if the Court ultimately disagrees with their position that Joshua Mast did not have "possession, custody, or control" of the *Touhy* documents until he received express authorization from the United States to produce them, they nevertheless had a good-faith basis for that view. They certainly were not motivated by any bad faith; if it were up to Joshua Mast and his counsel, they would have simply produced all responsive documents without going through the cumbersome review process based on the blanket *Touhy* authorization that Joshua Mast originally sought and which the United States had originally provided.

In the Sanctions Order, this Court cited the principle set forth in *Poole ex rel. Elliot v. Textron, Inc.*, 192 F. R. D. 494, 501 (D. Md. 2000), which explained that although a party may not "actually possess" documents held by the party's former attorney, the party has a legal right to request them and therefore the documents are within the party's "control" under Fed. R. Civ. P. 34. The Masts and their counsel do not dispute that general principle of constructive control but respectfully submit that the principle is distinct from the issues faced by a government employee, or even a private employee for that matter. A client has an unfettered right not only to access but to *use* his own files, even if they lie in the actual possession of his current or former attorney; an employee may have a right to access his work-related files for business purposes, but courts have generally recognized that that does not give him a sufficient right to use them for *other* purposes such that they should be considered within his "possession, custody, or control." See *Dotson*, 2017 WL 4310676, at *5; *see also In re Grand Jury Subpoena*, 646 F.2d 963, 969 (5th Cir. 1981) ("[M]ere access is not possession, custody, or control.").

The Masts and their counsel respectfully submit that *Hatfill v. New York Times Co.*, 242 F.R.D. 353 (E.D. Va. 2006), and *Mills v. East Gulf Coal Preparation Co., LLC*, 259 F.R.D. 118 (S.D. W. Va. 2009), are also distinguishable. In *Hatfill*, the court held that the New York Times as an *employer* had not ceded "possession, custody, or control" over work-related documents created by its *employees* through its document retention policy. *See* 242 F.R.D. at 355. Nothing in that decision suggests that a government employee like Joshua Mast is exempted from the *Touhy* process or should be deemed to be in "possession, custody, or control" of his work-related documents prior to obtaining *Touhy* authorization. In *Mills*, the court addressed a request for the plaintiff's personnel records which were in the possession of the plaintiff's military employer. *See* 259 F.R.D. at 123. While the Court did suggest that the plaintiff should have construed that request to cover any responsive documents in his possession and produced them, neither the parties nor the court in that case raised any concerns about *Touhy* authorization. *See id*. Respectfully, the Masts and their counsel do not believe *Mills* stands for the proposition that a military servicemember can and should produce documents to which he has access without seeking *Touhy* authorization.

As the *Dotson* Court explained, the fact that a party "can log onto their employer's website to obtain the documents . . . does not necessarily mean that the documents are in their possession, custody, or control." 2017 WL 4310676, at *5. "[I]n the case of an employee who has access to his employer's documents for the purpose of completing his work for the employer, it is not reasonable to presume that such access means the employee has the legal right to personally possess those documents outside of his employment." *Id*. Again, the Masts and their counsel do not bring this motion for reconsideration to challenge the Court's ultimate conclusion that they should have produced the documents sooner but respectfully to demonstrate that they did not act in bad faith.

What is true for a private employer is overwhelmingly true when the party's employer is the United States military. As "a government employee," Joshua Mast's interest in his work-related documents is "secondary to that of his employer," and courts have recognized that "he cannot on his

11

own initiative remove government files and provide them to a third party." *Lowe*, 250 F.R.D. at 39 (citing *Touhy*, 340 U.S. at 467). Rather, the Supreme Court's decision in *Touhy* and federal agencies' regulations in implementing those principles provide the framework for seeking authorization to disclose those documents in connection with private civil litigation. The Supreme Court explained the importance of this review process in *Touhy* itself: "When one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas *duces tecum* will be willingly obeyed or challenged is obvious." 340 U.S. at 468. Joshua Mast's government service in the USMC and the United States Marine Forces Special Operations Command ("MARSOC") has exposed him to sensitive government operations and information. Even his routine involvement in unclassified MARSOC activities, such as military schooling or government travel, could provide a thoughtful observer with indicators of MARSOC priorities and lines of effort. The United States' position on the scope of documents subject to *Touhy* review is indeed quite broad and cumbersome, but it is also understandable in context.

The Department of the Navy's *Touhy* regulations on their face required Joshua Mast to submit the documents that he had accessed and acquired in the course of his employment as a federal employee for review prior to release for discovery purposes. As an employee of the Department of the Navy, the Masts were subject to the *Touhy* regulations that the Department promulgated. *See* 32 CFR § 725.6(a) ("If a litigation request or demand is made of DON personnel for official DON or DOD information or for testimony concerning such information, the individual to whom the request or demand is made will immediately notify the cognizant DON official designated in § 725.6(c) and (d), who will determine availability and respond to the request or demand."). It was therefore reasonable for Joshua Mast to believe that he was required to obtain approval from the Department of the Navy before he would be deemed to have sufficient "possession, custody, or control" to produce these documents in response to Plaintiffs' discovery requests.

12

The Fourth Circuit has emphasized that government employees are "forbidden to disclose the material" when the appropriate agency official determines that "disclosure should not be permitted," *Smith v. Cromer*, 159 F.3d 875, 881 (1998)—a principle which trumps the otherwise applicable rules of discovery. And here, that admonition was reinforced by admonitions from the Department of Justice, both before and after the Discovery Order, that documents to which Joshua Mast had ready access were nevertheless "not authorized to be produced or used in this case and therefore should not be produced in any form."[31]

While Joshua Mast indisputably had *access* to the *Touhy* documents on and before December 28, 2023, the Masts and their counsel believed in good faith that those documents were not within his "possession, custody, or control" within the meaning of Rule 34 unless and until the United States authorized him to release them to Plaintiffs. They understand that the Court has disagreed with that premise, and for present purposes, they are not asking the Court to agree with their legal position. Rather, they are simply asking the Court to reconsider the issue to the extent it relates to the Masts' justification in taking the approach that they did and the assessment of expenses, including attorney's fees, pursuant to the Sanctions Order.

While the Masts and their counsel should have raised the issue proactively with the Court at an earlier date, they respectfully submit that the Masts would not have been able to produce the *Touhy* documents even if they had initiated the *Touhy* process immediately following the November 28 Discovery Order. The Masts initiated the *Touhy* review on December 28, 2023 and it concluded on April 23, 2024.[32] Accordingly, the *Touhy* process required nearly four months to review all the documents. Even if the Masts had already completed their collection and review and begun the *Touhy* process the day this Court issued the Discovery Order, the process would not have concluded until nearly three months after the December 28 deadline. Of course, had the Masts and their counsel raised

---

[31] Ex. J (Wyer Apr. 23, 2024 *Touhy* Letter); *see also* Ex. I (Wyer Mar. 29, 2024 *Touhy* Letter).
[32] *See id.*

13

the issue proactively, the Court could have modified the deadline or directed the parties to take a different approach. But the delay in producing the *Touhy* documents is primarily attributable to the time it took for the United States to process the documents, not any delay on the part of the Masts and their counsel. And to the extent the Masts and their counsel failed to act as quickly as possible, any delay was not undertaken in bad faith; it was attributable to the need (or least perceived need) to complete the review of the documents for responsiveness before submitting them to the United States for *Touhy* review.

The Masts and their counsel also respectfully submit that, while the Court may believe that the Masts and their counsel should have proceeded differently—for instance, by raising the *Touhy* issue with the Court at an earlier stage—a conclusion that they should be sanctioned to pay attorney's fees may create the unintended incentive for government employees to produce work-related documents in civil litigation without seeking appropriate authorization. Again, the Masts and their counsel may not have approached this issue in the best manner, but they hope the Court appreciates that they did not act in bad faith and took steps that they believed were necessary to ensure that Joshua Mast complied with his legal obligations as military servicemember and federal employee.

C.   **The Masts and Their Counsel Had a Reasonable Basis to Believe That They Were Not Required to Produce the Sealed Virginia Custody Documents by December 28**

It is now unmistakably clear from the Sanctions Order that the Court understood its November 28 Discovery Order to require production of the sealed Virginia custody documents by December 28 and to preclude the Masts from raising a subsequent objection to that production. The Masts and their counsel do not intend to fight that issue any further and are producing those documents to Plaintiffs. They do hope that the Court appreciates, however, that here too they did not act in bad faith; they merely sought to ensure that the Masts complied with Virginia law, which requires those records to be maintained under seal, and with the prior rulings of the Virginia courts, which had squarely rejected Plaintiffs' request (albeit without prejudice) to pierce the seal and access those records. As

14

set forth in the Masts' opposition to the sanctions motion, they believed that Plaintiffs' request for the J&DR records through discovery in this federal case represented an improper attempt to end-run the Virginia Code's procedures for granting a non-party access to sealed custody records and the prior rulings which had denied Plaintiffs access to those records. Indeed, on Plaintiffs' appeal of those determinations, the Virginia Circuit Court subsequently issued a split decision, granting them access to certain records but not others.[33]

The Masts and their counsel respectfully submit that this subsequent action by the Virginia Circuit Court illustrates that they had at least a reasonable basis to believe that the Virginia procedures were the appropriate mechanism for Plaintiffs to seek access to those sealed court records. And at the same time, the Masts and their counsel were not motivated by bad faith to assert this objection—even accepting the Court's view, expressed in the Sanctions Order, that they were untimely in raising this objection after the Discovery Order. Their motivation, as explained in the Masts' opposition to the sanctions motion, was to respect the Virginia sealing law and related prior state-court rulings, and to avoid a sanction under Virginia law for violating the seal.

The Masts and their counsel appreciate the Court's clarification that the November 28 Discovery Order required the production of these documents as a matter of federal law, and as indicated, they are expeditiously producing the documents to Plaintiffs. Moreover, they appreciate that, in hindsight, they could and should have sought that clarification earlier. Nevertheless, they respectfully submit that they did not act in bad faith and that they had a reasonable (even if mistaken) basis to believe that it was appropriate for them to object to that portion of Plaintiffs' discovery requests.

---

[33] Hr'g Tr. at 63, *A.A and F.A. v. J.M and S.M.*, (No. CJ23000013-00) (Feb. 23, 2024) ("The Court cannot say at this time whether or not these persons have a legitimate interest in the records of the case that was closed that later became the subject of the proceedings in the circuit court. As a result, the Court denies their request for access at this time.")

15

### D. Even If the Court Does Not Agree That the Masts' Positions Were Justified (Even If Wrong), the Masts and Their Counsel Respectfully Submit That an Award of Expenses, including Attorney's Fees, Would Not Be Just and Appropriate Under the Totality of the Circumstances

In the Sanctions Order, the Court concluded under that the Masts' failure to produce was not "substantially justified," Fed. R Civ. P. 37(b)(2)(C), because, the Court concluded, they did "not demonstrate that 'reasonable [people] could differ as to the appropriateness of the[ir] contested action.'"[34] For the reasons set forth above, the Masts and their counsel hope that the Court will reconsider that assessment and—without needing to approve of or endorse the approach taken—agree that they did not act in bad faith and had a reasonable (even if mistaken) basis for their positions. But even if the Court does not reconsider that aspect of its ruling, Rule 37(b)(2)(C) still provides in the disjunctive that an award of expenses, including attorney's fees, should not be imposed where "other circumstances make an award of expenses unjust." Fed. R Civ. P. 37(b)(2)(C).

The Masts and their counsel respectfully submit that, under the totality of the circumstances, an award of expenses, including attorney's fees, would not be just and appropriate in this instance. First and foremost, this federal litigation is one piece of a broader years-long dispute that includes multiple related state-court proceedings, and throughout this litigation, both parties (upon information and belief) have been represented by *pro bono* counsel.[35] Neither side would be in a financial position to litigate these matters on a paid basis. Indeed, in the related Virginia litigation, the court has allocated 100% of the Guardian ad litem's fees to the Masts on the basis that Plaintiffs would be unable to afford them, and the burden of those fees alone have placed a significant financial strain on the Masts, who are paying off the obligation in monthly installments.[36] Under the

---

[34] *See supra* n. 9, at 37 (quoting *Bryte v. Am. Household, Inc.*, 142 F. App'x 699, 703 (4th Cir. 2005)).
[35] The Masts are not privy to the precise terms of engagement between Plaintiffs and their counsel but understand from prior statements and discussions that Plaintiffs are represented both by Latham & Watkins and by Hunton Andrews Kurth on a *pro bono* basis.
[36] *See* Order Appointing Guardian Ad Litem, *A.A and F.A. v. J.M and S.M.*, (No. CJ23000013-00) (Nov. 30, 2022). Additionally, when the Virginia Circuit Court imposed a discovery sanction on Plaintiffs for improperly withholding a document that impeached John Doe's hearing testimony, the

16

circumstances, awarding a sanction of expenses, including attorney's fees, against the Masts (or their *pro bono* counsel) would not be just and appropriate.

The Masts and their counsel recognize that *pro bono* counsel can recover attorney's fees in appropriate circumstances—particularly where *pro bono* counsel prevails against the Government in civil rights litigation that is subject to statutory fee-shifting. They do not mean to argue otherwise. Rather, the point here is that neither party is in financial position to bear a significant award of attorney's fees, and counsel on both sides have committed substantial resources to this litigation without remuneration. The Masts and their counsel therefore respectfully submit that the circumstances which would ordinarily counsel in favor of a fee award under Rule 37(b)(2)(C) are absent here and that such an award would not be just and appropriate.

The Masts and their counsel also recognize that an award of expenses, including attorney's fees, is intended to have a deterrent effect—both for the parties to the litigation and for litigants in future cases. But they respectfully submit that an award of expenses, including attorney's fees, is not necessary to serve that function here. As indicated above, the Masts and their counsel have heard the Court's order loud and clear, they regret not seeking the Court's guidance on these issues at an earlier stage, and they are committed to allocating the attention and resources necessary to ensure that no similar circumstance will arise in the future. Moreover, the Court's Sanctions Order itself, which publicly castigates the Masts and their counsel, itself provides substantial deterrence both specifically for the parties here and generally for parties in future cases. The Masts and their counsel respectfully submit that the additional deterrence of a fee award is not necessary under the circumstances.

---

court imposed a fixed sanction of just $1,000—which is the subject of a pending appeal in the Virginia Court of Appeals. *See* Order for Sanctions, *A.A and F.A. v. J.M and S.M.*, (No. CJ23000013-00) (Nov. 29, 2023).

17

## IV. Conclusion

As stated at the outset, the Masts and their counsel understand the Court's frustration and regret not bringing sooner to the Court's attention the issues that gave rise to the Sanctions order. Going forward, they will ensure that any other discovery issues will be promptly addressed with opposing counsel and brought to the Court's attention if necessary. The Masts and their counsel nevertheless respectfully submit that they did not act in bad faith and had a reasonable (even if mistaken) basis to proceed as they did with the *Touhy* documents and the sealed Virginia custody records. Given their contrition, their commitment to being proactive, their good-faith basis for proceeding cautiously, and the unique circumstances of this case, the Masts and their counsel respectfully ask that the Court reconsider the Sanctions Order to the extent that it contemplates an award of expenses, including attorney's fees, under Rule 37(b)(2)(C).

Dated:  July 24, 2024								Respectfully submitted,

*/s/ John. S. Moran*
John S. Moran (VSB No. 84326)
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com

*Attorney for Defendants Joshua & Stephanie Mast*

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of July 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

/s/ John. S. Moran
John S. Moran (VSB No. 84326)
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com

*Attorney for Defendants Joshua & Stephanie Mast*