**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| JOHN AND JANE DOE, | : |
| *Plaintiffs & Counterclaim-Defendants*, | : |
| | : |
| v. | : |
| | : CIVIL ACTION NO. 3:22-cv-49 |
| JOSHUA & STEPHANIE MAST, | : |
| | : |
| *Defendants & Counterclaim-Plaintiffs*, | : **ANSWER TO AMENDED** |
| | : **COMPLAINT; AFFIRMATIVE &** |
| | : **OTHER DEFENSES; &** |
| RICHARD MAST & KIMBERLEY MOTLEY, | : **COUNTERCLAIM COMPLAINT** |
| | : |
| *Defendants*. | : |
| | : **JURY DEMANDED** |

## (1) ANSWER TO AMENDED COMPLAINT

Defendants Joshua & Stephanie Mast respond to Plaintiffs' Amended Complaint as follows:

### INTRODUCTION

**1.      This action for conspiracy, tortious interference with parental rights, fraud, intentional infliction of emotional distress, and false imprisonment arises from a U.S. Marine Corp Judge Advocate's unlawful abduction of Baby Doe, an Afghan war orphan, from her biological family and legal guardians, Plaintiffs John and Jane Doe. Plaintiffs seek a declaratory judgment and compensatory and punitive damages.**

**ANSWER:** Joshua and Stephanie Mast (hereinafter, "the Masts") state that Paragraph 1 asserts legal conclusions to which no response is required. To the extent Paragraph 1 contains factual allegations to which is required, the Masts deny the allegations contained within Paragraph 1.

**2.      Defendants collectively engaged in a fraudulent scheme over the course of nearly two years to accomplish the abduction of Baby Doe for the purpose of "adoption" by Defendants Joshua and Stephanie Mast.**

**ANSWER:**  The Masts deny the allegations contained within Paragraph 2.

    **3.**      **On September 6, 2019, Baby Doe's parents and five siblings were killed in a U.S. military operation in rural Afghanistan. She survived and U.S. forces transported her to a military hospital for emergency medical treatment. Baby Doe, then only two months old, was seriously injured in the battle.**

**ANSWER**: The Masts admit that the Child's parents were killed in a U.S. military operation after they chose to fight the 75th Ranger Regiment to their deaths and that the Child miraculously survived an attempt by the Afghan partner force to murder her during the mission that was thwarted by U.S. Army Rangers. This allowed the child to be transported to a U.S. military hospital where she could recover from her serious injuries, and were she remained for approximately five months. The Mast's extended the offer to pay for DNA confirmation of any alleged biological relationship approximately three years ago, and expressly deny that any of the five different Afghan identities asserted for "Baby Doe" correspond to her true identity or origin. The Masts deny all other allegations contained within Paragraph 3.

    **4.**      **In November 2019, while Baby Doe was recovering from her injuries in a U.S. military hospital in Afghanistan, Defendants Joshua and Stephanie Mast, represented by Defendant Richard Mast (a member of the Virginia Bar), fraudulently obtained a custody order and an interlocutory order of adoption over Baby Doe from Virginia courts that they knew, or reasonably should have known, lacked personal and subject matter jurisdiction over Baby Doe, a citizen of Afghanistan who had biological family in Afghanistan and had no legal or physical connection to the United States (the "Fraudulent Custody and Adoption Orders").**

**ANSWER**: The Masts admit that they obtained a custody order and interlocutory adoption order in late 2019 so the Child could be transported from a hospital in Afghanistan that was constantly under rocket fire and could be treated at the University of Virginia's medical center to be transported to a U.S. military hospital where should recover from her serious injuries. The Masts deny all other allegations contained within Paragraph 4.

5.      Notwithstanding the Fraudulent Custody and Adoption Orders, the U.S. government in Afghanistan refused to release Baby Doe to Joshua and Stephanie Mast. Instead, the U.S. government honored its unambiguous federal and international legal obligations to release her to the government of Afghanistan so that she could be reunited with her next of kin in Afghanistan. Pursuant to Afghan law, Baby Doe's first cousin (John Doe) and his wife (Jane Doe) assumed permanent guardianship over her, loved her, and welcomed her as their first child.

**ANSWER:**  The Masts deny the characterization of the custody and adoption orders as fraudulent, the legal characterizations of United States obligations and Afghan law, and the characterization of the relationship between the Child and John and Jane Doe. The Masts admit that the Child was transferred out of United States custody in Afghanistan. The Masts otherwise deny the allegations contained within Paragraph 5.

6.      Undeterred, Joshua and Stephanie Mast engaged the services of Kimberley Motley to search for and communicate with John and Jane Doe. Motley was aware that Joshua and Stephanie Mast had obtained the Fraudulent Custody and Adoption Orders for Baby Doe and was aware from the outset that Joshua and Stephanie Mast wanted to take physical custody of her in the United States and intended to adopt her as their own child. In coordination with Joshua and Stephanie Mast, however, Motley never disclosed the Masts' true intentions to the Does.

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations regarding Defendant Kimberley Motley's awareness or knowledge and on that basis denies them. Plaintiff Jane Doe has admitted that Motley disclosed to her from the beginning that an American family wanted to provide a home for the child. The Masts otherwise deny the allegations contained within Paragraph 6.

7.      Instead, Motley told the Does only that an American family wanted to help Baby Doe with her continuing medical needs. Joshua and Stephanie Mast's primary and undisclosed intention, however, was to induce John and Jane Doe to bring Baby Doe to the United States to enable them (one way or another) to acquire physical custody of Baby Doe based on the "authority" of the Fraudulent Custody and Adoption Orders.

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations regarding Defendant Kimberley Motley's statements and on that basis denies them. The Masts deny that their intentions were undisclosed. Joshua Mast told John Doe, through

3

an interpreter, that his intention was for the Child to live with the Masts in the United States, and

John and Jane Doe agreed that it was in the child's best interest to live with the Masts. The Masts

otherwise deny the allegations contained within Paragraph 7.

**8.     Despite communicating with John and Jane Doe for more than a year, first through Kimberley Motley, and eventually both directly and through Ahmad Osmani, Joshua and Stephanie Mast never revealed to them the Fraudulent Custody and Adoption Orders. Instead, through their omissions and misrepresentations, Joshua and Stephanie Mast deceived John and Jane Doe into believing that the Masts' only interest was in helping Baby Doe access medical care that was not available in Afghanistan. In reality, however, the Masts' chief objective was to consummate their illicit scheme to take Baby Doe from her lawful Afghan parents.**

<u>**ANSWER:**</u>  The Masts deny the allegations contained within Paragraph 8.

**9.     In August 2021, as a result of this long-running and coordinated fraudulent scheme, John and Jane Doe brought Baby Doe to the United States for medical care, only to have Joshua and Stephanie Mast tear her away from the only parents she had known for most of her life.**

<u>**ANSWER:**</u>  The Masts deny the allegations contained within Paragraph 9.

**10.    Defendants have caused irreversible harm to an innocent toddler and Plaintiffs John and Jane Doe. As her true family and legal guardians, they raised Baby Doe for 18 months before the abduction and love her as their own child. Though this lawsuit can never make them whole, Defendants must be held accountable for their unconscionable conduct.**

<u>**ANSWER:**</u>  The Masts deny the allegations contained within Paragraph 10.

## <u>PARTIES</u>

**11.    Baby Doe is a three-year-old Afghan citizen whose biological parents died in 2019. She currently is being held in North Carolina by Joshua and Stephanie Mast.**

<u>**ANSWER:**</u>  The Masts admit that the Child is a five-year-old girl whose biological parents died

in 2019 and that she lives with her adopted family in North Carolina. The Masts otherwise deny

the allegations contained within Paragraph 11.

**12.     John and Jane Doe, citizens of Afghanistan, are a married couple and the legal guardians of Baby Doe under the laws of Afghanistan. John Doe is the paternal first cousin of Baby Doe. John and Jane Doe currently reside in Texas.**

<u>**ANSWER**</u>:  The Masts deny the allegations contained within Paragraph 12.

**13.     Joshua and Stephanie Mast are a married couple, and are United States citizens claiming domicile in Palmyra, Virginia, but currently residing in North Carolina, where Joshua Mast is stationed in the United States Marine Corps. Joshua Mast is a Major in the Marine Corps, a Judge Advocate, and an attorney admitted to the bar of the Commonwealth of Virginia.**

<u>**ANSWER**</u>:  The Mast's deny that they claim domicile in Palmyra, Virginia. The Mast's currently reside and are domiciled in Hampstead, North Carolina. They have not resided in Palmyra since July of 2020. The Mast's admit that Joshua Mast is a Major in the United States Marine Corps. Major Mast is currently serving as the Executive Officer of a Raider Support Battalion and not as a Judge Advocate. Major Mast is admitted to the bar of the Commonwealth of Virginia.

**14.     Upon information and belief, Richard Mast is a United States citizen domiciled and residing in Forest, Virginia. Richard Mast is Joshua Mast's brother and is also an attorney admitted to the bar of the Commonwealth of Virginia. Richard Mast is affiliated with an entity named "Liberty Counsel."**

<u>**ANSWER**</u>:  The Masts admit the allegations in Paragraph 14.

**15.     Upon information and belief, Kimberley Motley is a United States citizen domiciled and residing in North Carolina. Upon information and belief, Motley is an attorney admitted to the bar of the state of Wisconsin and has periodically worked in Afghanistan. Upon information and belief, Motley is the general counsel of Women for Afghan Women, which has a Community Center in Alexandria, Virginia.**

<u>**ANSWER**</u>:  The Masts admit that Kimberley Motley is a United States citizen. The Mast's lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 15 and on that basis deny them.

16.     **Upon information and belief, Ahmad Osmani is an Afghan national permanently residing in Tennessee. Upon information and belief, Osmani is married to Natalie Osmani, a U.S. citizen.**

**ANSWER:**  The Masts acknowledge Ahmad Osmani is an Afghan national married to a U.S.

citizen. The Mast's lack information sufficient to form a belief about the truth of the remaining

allegations in Paragraph 16 and on that basis deny them.

17.     **United States Secretary of State Antony Blinken and United States Secretary of Defense General Lloyd Austin are named as nominal defendants, in their official capacities, as parties who are necessary to this proceeding. Plaintiffs are seeking no relief from them in this action.**

**ANSWER:**  The Masts admit the allegations in Paragraph 17.

## JURISDICTION & VENUE

18.     **This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are completely diverse in citizenship, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.**

**ANSWER:**  The Masts deny the allegations in Paragraph 18.

19.     **This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, and supplemental subject matter jurisdiction under 28 U.S.C. § 1367, because Plaintiffs' right to relief as to Count 1 and their request for declaratory relief necessarily depend on resolution of substantial questions of federal law.**

**ANSWER:**  The Masts deny the allegations in Paragraph 18.

20.     **All Defendants are subject to personal jurisdiction in Virginia under Virginia Code §§ 8.01-328.1(A)(1) and (3), because the causes of action asserted in this Complaint arise from their having transacted business in Virginia and/or having caused tortious injury by an act or omission in Virginia. Defendants Motley and Osmani also are subject to personal jurisdiction in Virginia as alleged co-conspirators with Joshua and Stephanie Mast and Richard Mast. As co-conspirators, Motley and Osmani are liable for the Mast defendants' acts and omissions in Virginia, as set forth herein, in furtherance of the conspiracy to enable Joshua and Stephanie Mast to abduct Baby Doe. In addition, at the request of Joshua and Stephanie Mast and in furtherance of the conspiracy, Osmani voluntarily appeared in Virginia to testify on the Masts' behalf in the proceeding filed by John and Jane Doe in the Circuit Court of Fluvanna County to vacate that court's Fraudulent Adoption Order.**

**ANSWER:**  The Masts deny the allegations in Paragraph 20.

6

21.     Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of Defendants' wrongful conduct occurred in this district.

**ANSWER:**  Paragraph 21 asserts legal conclusions to which no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 21.

<u>**FACTUAL ALLEGATIONS**</u>

I.     **BABY DOE'S ORPHANED PAST**

22.     **Baby Doe's biological parents and five of her siblings were killed on September 6, 2019, in Afghanistan, in a joint United States and Afghan military operation in the course of which their home was destroyed. Baby Doe sustained serious injuries, including a fractured skull and femur, and second-degree burns. U.S. military forces discovered Baby Doe in the rubble and immediately transported her to a nearby U.S. military hospital for urgent surgical and medical care. She was then transferred to [REDACTED] on September 25, 2019, at which time her condition stabilized.**

**ANSWER:**  The Masts admit that the Child's biological parents died fighting in close combat with U.S. Army Rangers because they refused to surrender and fought U.S. forces to the death. The child has no known siblings, and the Mast's extended an offer to pay for a DNA comparison approximately three years ago. The Masts also admit that the Child sustained serious injuries, which were treated only by a U.S. military hospital and the Masts. The Masts also admit she was transferred between U.S. military hospitals on September 25, 2019. The Masts otherwise deny the allegations in Paragraph 22.

23.     **The International Committee of the Red Cross ("ICRC") is the organization authorized to care for children who are orphaned during wartime and to assist with family reunifications under the Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949 ("The Fourth Geneva Convention"). The U.S. military informed ICRC that Baby Doe was in its custody, and ICRC began searching for her family.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 and on that basis deny them. Furthermore, the ICRC did not vet John Doe, Jane Doe, or plaintiff John Doe's father for biological or familial relationship to the

child. Plaintiff's were aware of this fact and did not provide responsive discovery in the Virginia Circuit Court until this federal proceeding.

24.    The ICRC has worked for over one hundred years in conflict areas and humanitarian disasters to reunite separated family members through its "Restoring Family Links Program." ICRC and the national Red Cross and Red Crescent societies are universally recognized as experts in family tracing and reunification. *See https://www.brookings.edu/wp-content/uploads/2016/06/0119_internal_displacement_complete.pdf, p, 332.*

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24 and on that basis deny them. Furthermore, the ICRC did not vet John Doe, Jane Doe, or plaintiff John Doe's father for biological or familial relationship to the child. Plaintiff's were aware of this fact and did not provide responsive discovery in the Virginia Circuit Court until this federal proceeding.

25.    By October 25, 2019, ICRC made contact with Baby Doe's uncle, who requested ICRC's assistance in reuniting her with her family.

**ANSWER:**  The Masts deny that the individual referred to in Paragraph 25 as the Child's uncle is, in fact her uncle. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 and on that basis deny them.

26.    Through his position as a Captain Judge Advocate in the United States Marine Corps deployed in Afghanistan, Joshua Mast learned of Baby Doe while she was in the custody of the Department of Defense (the "DoD") and under the care of the Military Health System,.

**ANSWER:**  The Masts admit the allegations in Paragraph 26.

27.    Upon information and belief, Joshua and Stephanie Mast and Richard Mast were aware that ICRC would be searching for Baby Doe's biological family in Afghanistan.

**ANSWER:**  The Masts admit the allegations in Paragraph 27.

28.    In spite of this knowledge, the Masts began taking steps to remove Baby Doe to the United States.

**ANSWER:**  The Masts deny the allegations in Paragraph 28.

**29.**     Joshua Mast is an attorney, barred in Virginia, who served at the Center for Law and Military Operations, and whose responsibilities in Afghanistan included collection and analysis of data on targeting, collateral damage estimation, and civilian casualty response in an active combat zone. As an attorney and member of the United States' Armed Forces in Afghanistan, it was his professional responsibility to be aware of Afghanistan's status as a sovereign nation, and of the Security and Defense Cooperation Agreement Between the Islamic Republic of Afghanistan and the United States of America (the "Bilateral Agreement") that governed U.S. military operations in Afghanistan.

**ANSWER:**  The Masts admit that Joshua Mast is an attorney barred in Virginia who served at the

Center for Law and Military Operations. The U.S. was unilaterally negotiating with the Taliban

regarding control over the territory of Afghanistan during the alleged period, the Deputy SJA,

USFOR-A was involved in these negotiations, and regularly briefed the Office of the SJA on the

status of negotiations with that terrorist organization which resulted in the collapse of the U.S.

backed government and resulting catastrophe. The Masts otherwise deny the allegations in

Paragraph 29.

**30.**     As a U.S. military attorney, Joshua Mast knew, or should have known, that the Bilateral Agreement governed the U.S. military presence in Afghanistan, and that all U.S. military operations in Afghanistan were conducted under its auspices. Moreover, he was aware the Bilateral Agreement specifically recognized Afghan sovereignty and limited the Afghan Government's jurisdiction only over active-duty U.S. Armed Forces and DoD civilian employees; the Bilateral Agreement did not limit Afghanistan's jurisdiction over Afghan nationals in Afghanistan.

**ANSWER:**  The Masts deny the allegations in Paragraph 30. Furthermore., the U.S. abrogated the

Bilateral "Security" Agreement, gave Afghanistan to a terrorist organization, and left many former

Afghan government officials to their deaths. Finally, the child's status as an authorized Department

of Defense dependent allowed her to depart Afghanistan on a military aircraft with her military

identification card in accordance with the BSA – which is exactly how the child ultimately escaped

the Taliban takeover of Afghanistan.

**31.**     As a U.S. military attorney, Joshua Mast knew, or should have known, that all obligations of the United States and Afghanistan under the Bilateral Agreement were

"without prejudice to Afghan sovereignty over its territory," and that U.S. Armed Forces personnel and DoD civilian employees were obligated to "respect the Constitution and laws of Afghanistan." Bilateral Agreement, Articles 3:1, 3:2.

**ANSWER:**  The Masts admit that Joshua Mast was aware of the Bilateral Agreement but do not accept the legal characterization of that agreement. Furthermore, the agreement does not create third party rights or obligations under international law, is non-justiciable by the terms of the agreement, and is irrelevant to any claim or defense in this proceeding. The Masts otherwise deny the allegations in Paragraph 31.

32.     As a U.S. military attorney, Joshua Mast knew, or should have known, that U.S. military bases under the Bilateral Agreement are not U.S. territory. Indeed, the Bilateral Agreement is explicit that "Afghanistan has full sovereignty over its airspace, territory, and waters." Bilateral Agreement, Article 10:1. Joshua Mast was also aware that even if Baby Doe's identity was unknown, her nationality would be determined under Afghan law. Accordingly, he knew, or should have known, that Baby Doe, as a civilian in Afghanistan, was subject solely to the sovereign jurisdiction of Afghanistan for the entire time she was in the care of U.S. military hospitals.

**ANSWER:**  The Mast's incorporate by reference the responses to Paragraphs 29, 30, and 31 and otherwise deny the allegations in Paragraph 32.

33.     As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should have known, that under Article 12 of Afghanistan's law on citizenship, if a child is found in the territory of Afghanistan and "his/her parents' documents proving their citizenship are not available," the child is considered a citizen of Afghanistan. See United Nations High Commission for Refugees, Law on Citizenship of the Islamic Emirate of Afghanistan (English Translation), Article 12 (June 24, 2000), available at http://www.refworld.org/pdfid/404c988d4.pdf; *see also* Athayi, Abdullah, *Report on Citizenship Law: Afghanistan*, Robert Schuman Centre for Advanced Studies, European University Institute (March 2017), at p. 9, available at https://cadmus.eui.eu/bitstream/handle/1814/45933/GLOBALCIT_CR_2017_09. pdf.

**ANSWER:**  The Masts deny the allegations in Paragraph 33.

34.     As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should have known, that regardless of where in Afghanistan Baby Doe was recovered, all territory within the internationally recognized borders of Afghanistan was subject to the jurisdiction of the laws of Afghanistan. Bilateral Agreement, Article 10:1.

**ANSWER:**  The Masts deny the allegations in Paragraph 34.

**35.     On information and belief, these basic, uncontroversial principles of national sovereignty were not only known to Joshua Mast but were core obligations of his practice while serving as an attorney in the U.S. Marines in Afghanistan.**

**ANSWER:**  The Masts admit Joshua Mast understands national sovereignty, including the three requirements for sovereignty under international law (defined territory, permanent population, control/effective government). It is a historical fact that these factors did not exist concurrently in Afghanistan during any relevant period. In addition, it is a historical fact that the U.S backed former Afghan government never realized sovereignty over the territory of Afghanistan, and, during the alleged period, the United States unilaterally negotiated with the Taliban over control of Afghanistan without the participation of the then existing Afghan government. The Masts otherwise deny the allegations in Paragraph 35.

**36.     On information and belief, Joshua Mast also knew that the ICRC was actively searching for Baby Doe's family, and he knew that, as Baby Doe was recovered from a remote area of Afghanistan, this process would be labor- and time-intensive.**

**ANSWER:**  The Mast's incorporate by reference the responses to Paragraphs 23, 24, and 25. Furthermore, Joshua Mast was aware that permission from the Taliban to access the area in question would be required ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. The Masts otherwise deny the allegations in Paragraph 36.

**37.     Virginia-barred lawyers like Joshua Mast and Richard Mast are expected to "conform to the requirements of the law, both in the professional service to clients and in the lawyer's business and personal affairs." Virginia Rules of Professional Conduct, Preamble. Virginia-barred lawyers also are expected to "use the law's procedures only for legitimate purposes and not to harass or intimidate others." Id. Further, lawyers are expected to "provide competent representation to a client," which "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Virginia Rules of Professional Conduct, 1.1.**

**ANSWER:**   Paragraph 37 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 37.

**38.   A myriad of national and state laws governs international adoptions in the United States. In the case of an orphaned child in Afghanistan sought to be adopted in Virginia, the laws of the United States and Virginia require that prospective adoptive parents follow the laws of the Government of Afghanistan.**

**ANSWER:**   Paragraph 38 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Furthermore, the laws of the Afghanistan defer to the state in which a lawsuit is instituted if a civil controversy arises and has a choice of law provision that imposes the law of the father's home state. In addition, Virginia Courts are not required to apply or enforce the child custody laws of a foreign state if they violate fundamental principles of human rights. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 38.

**39.   As Virginia attorneys, Joshua Mast and Richard Mast knew, or should have known, that they would need to comply with the applicable laws of Afghanistan, the United States, and Virginia.**

**ANSWER:**   The Masts admit Joshua Mast understands his obligations as a Virginia attorney. Furthermore, the Mast's advocated to the relevant authorities and abided by the requests and guidance provided during all relevant periods. But for the U.S. Embassy's bad faith and unlawful conduct in regards to the child and the Mast's, the child would not have been exposed to the danger, deprivation, abuse, and neglect she endured. The Masts otherwise deny the allegations in Paragraph 39.

40.   **As such, U.S. law requires that, before a child in Afghanistan can be adopted by someone in the United States, legal guardianship or custody must be obtained over the child in Afghanistan.**

**ANSWER:**   Paragraph 40 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 40.

41.   **Afghanistan's laws, however, expressly prohibit the guardianship or custody of Muslim Afghan children by non-Afghan non-Muslims.**

**ANSWER:**   Paragraph 41 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. In addition, laws that discriminate on the bases of national origin and religion are unenforceable under the Constitution of the United States and the Commonwealth of Virginia. Such laws are repugnant to a free people. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 41.

42.   **Joshua and Stephanie Mast are not Muslim and are not Afghan nationals.**

**ANSWER:**   The Masts admit the allegations in Paragraph 42.

43.   **Despite lacking any legitimate legal basis for doing so, in October 2019 Joshua and Stephanie Mast initiated custody proceedings for Baby Doe in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "Juvenile Court") and adoption proceedings in the Fluvanna Circuit Court (the "Circuit Court"), despite the fact that Baby Doe had never stepped foot on Virginia soil and remained in Afghanistan. Richard Mast represented Joshua and Stephanie Mast in these proceedings.**

**ANSWER:**   The Masts admit that they initiated the referenced proceedings and that they were represented by Richard Mast. The Masts otherwise deny the allegations in Paragraph 43.

44.   **Joshua and Stephanie Mast initiated these proceedings in their county of residence, even though: (a) they had not obtained legal guardianship of Baby Doe in Afghanistan; (b) Baby Doe had lived her entire life in Afghanistan; (c) Afghanistan had sole and exclusive jurisdiction over Baby Doe; and (d) Baby Doe had no connection with the United States or Virginia.**

**ANSWER:**   The Masts admit that the Child was an orphan in Afghanistan when they learned of her plight. The Masts otherwise deny the allegations in Paragraph 44.

**45.     By failing to serve notice of the custody and adoption proceedings on the DoD, which was Baby Doe's "physical" and "legal" custodian at the time, the Masts violated Virginia law.**

**ANSWER:**  The Masts deny the allegations in Paragraph 45.

**46.     Joshua and Stephanie Mast, through Richard Mast as counsel, advised both the Juvenile Court and the Circuit Court that they expected the Government of Afghanistan to waive its jurisdiction over Baby Doe. In fact, the Government of Afghanistan explicitly asserted its jurisdiction over the child and requested, and then secured, her release from the U.S. military facility.**

**ANSWER:**  The Masts admit they relayed to the Circuit Court their understanding of what the

then existing Afghan Government planned to do at each step of obtaining the custody and adoption

of their daughter. In addition, the Embassy generated the document referenced in paragraph 46

and improperly pressured Afghans through back channels to sign them and drop scientific vetting

standards, such as DNA testing. The Afghan official who signed the document in question could

not read  English and denied the statements of fact contained in the document. Unfortunately, the

corruption in this case was initiated by the Embassy, and does not reflect an appropriate objective

standard of care American's typically apply to children in dangerous situations. Consequently, the

child was handed over to non-relative, terrorist affiliated persons in a war zone despite all evidence

available. They otherwise deny the allegations in Paragraph 46.

**47.     The Masts also falsely claimed to both the Juvenile Court and the Circuit Court that Baby Doe's birth country and nationality were unknown, that she was a "stateless minor," and that she, therefore, was subject to the Virginia courts' jurisdiction because no other court would have jurisdiction. The Masts knew or should have known these claims were untrue.**

**ANSWER:**  The Masts deny the allegations in Paragraph 47.

**48.     At the same time, they claimed to have asked the Government of Afghanistan to waive jurisdiction over Baby Doe, thereby acknowledging Afghanistan's jurisdiction in the first place. In fact, Baby Doe was never stateless. Under the laws of Afghanistan, any child found in the territory of Afghanistan whose parents' nationality is unknown is considered a citizen of Afghanistan. Baby Doe was found in Afghanistan, and, to the extent**

her deceased parents' nationality could not be proven, she was deemed under the laws of Afghanistan to be an Afghan citizen. The Masts knew, or should have known, that Baby Doe's nationality was Afghan under Afghan law.

**ANSWER:** The Mast's deny the allegations in Paragraph 48.

49.     On November 6, 2019, relying on the factual and legal misrepresentations made by the Masts, and without serving the requisite process on the DoD , the Juvenile Court mistakenly concluded that it had jurisdiction over the case under Virginia Code §§ 20-146.12(A)(2) and (4) and granted the Masts temporary custody of Baby Doe.

**ANSWER:** Paragraph 49 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 49.

50.     To reach this conclusion under subsection (A)(2), the Court was required to have found that a court of the home state of the child had declined jurisdiction. As discussed above, the Government of Afghanistan had jurisdiction, and had explicitly asserted jurisdiction over Baby Doe for reunification with her real family.

**ANSWER:** Paragraph 50 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 50.

51.     Also under subsection (A)(2), the Court was required to have found that both the child *and* a person acting as a parent had a significant connection to the Commonwealth of Virginia. Yet, Baby Doe had no connection to Virginia and Joshua Mast was a stranger to her. He had no caretaking responsibilities, rights, or bonds of affection that would constitute a parent-child relationship. Only misrepresentations by the Masts could have led the Court to conclude otherwise.

**ANSWER:** Paragraph 51 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 51.

52.     Finally, under subsection (2), the Court was required to have found that substantial evidence was available in this Commonwealth concerning the child's care, protection, training, and personal relationships. The Masts knew or should have known that such evidence would be in Afghanistan and made available to the ICRC and the Afghan government's Ministry of Labor and Social Affairs, not the Masts.

**ANSWER:**  Paragraph 52 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 52.

**53.    Two days later, Stephanie Mast appeared before the Circuit Court, represented by her brother-in-law, Richard Mast. Relying on the same, and additional, factual and legal misrepresentations, the Circuit Court issued an Order directing the State Registrar of Virginia to issue a Certificate of Foreign Birth for Baby Doe on an expedited basis for the purpose of obtaining medical care. Stephanie Mast had never met Baby Doe, and had no firsthand knowledge of Baby Doe's parents' identities, her nationality, or even her medical needs.**

**ANSWER:**  The Masts admit that Stephanie Mast appeared before the Circuit Court to provide it with the Masts' understanding of the Child's plight and of the relevant facts in Afghanistan. The Masts otherwise deny the allegations in Paragraph 53.

**54.    Another two days later, Sunday November 10, 2019, Stephanie Mast appeared before the Circuit Court, again represented by Richard Mast. The Circuit Court issued an Interlocutory Order of Adoption that same day, designating Joshua and Stephanie Mast as Baby Doe's father and mother.**

**ANSWER:**  The Masts admit the allegations in Paragraph 54. Furthermore, this petition was requested by the Virginia Attorney General's Office to resolve a dispute over the issuance of the child's birth certificate required to submit a Humanitarian Parole Visa. The birth certificate was immediately provided to Headquarters, Marine Corps, and the child was approved as Major Mast's dependent with full knowledge she was a patient at the Craig Joint Theatre Hospital at Bagram Air Field.

**55.    That same day, Stephanie Mast presented the Interlocutory Order of Adoption and an application for a Certificate of Foreign Birth to the State Registrar, who promptly issued it, designating Joshua and Stephanie Mast as Baby Doe's father and mother. Richard Mast arranged Stephanie Mast's meeting with the State Registrar.**

**ANSWER:**  The Masts incorporate the response to paragraph 54, and admit the allegations in Paragraph 55.

**B.     Relying on their fraudulently obtained Virginia state court orders, the Masts sought to prevent the United States from releasing Baby Doe to her biological family.**

**56.     On October 24, 2019, Baby Doe's maternal uncle submitted a request to the ICRC through its Restoring Family Links Program for assistance in returning Baby Doe to her extended family.**

**ANSWER:** The Masts deny that the individual referred to in Paragraph 56 as Baby Doe's maternal uncle is, in fact, her maternal uncle. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56 and on that basis deny them.

**57.     On November 17, 2019, the Afghan Ministry of Labor and Social Affairs documented its official involvement in the search for Baby Doe's biological family.**

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 57 and on that basis deny them.

**58.     The ICRC worked to verify the family's relationship with Baby Doe and facilitated the family's contact with the Afghan government. The ICRC's efforts to reunite Baby Doe with her biological family came to fruition when it located her paternal uncle, John Doe's father. Under the laws of Afghanistan (like the laws in many other Muslim countries), legal guardianship of an orphan is transferred to the child's paternal uncle (in the absence of a paternal grandfather or a brother).**

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 58 and on that basis deny them.

**59.     In late December 2019 or early January 2020, the Afghan Deputy Minister of Social Affairs met with U.S. State Department's Assistant Chief of Mission in Kabul, Donna Welton, and informed her that the Afghan government had identified Baby Doe's family.**

**ANSWER:** The Masts deny that the Afghan Government identified the Child's family. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 59 and on that basis deny them.

**60.     On January 5, 2020, Ms. Welton wrote an email to the Deputy Minister stating: "We stand ready to transfer custody of the infant following an official request from the Afghan government. This is a high priority for our government and we would kindly request that the Ministry of Labor and Social Affairs expedite this official request so that the infant can be reunited with her family members as soon as possible" (emphasis added).**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 60 and on that basis deny them.

**61.     In February 2020, Afghanistan's Acting Minister of Labor and Social Affairs informed the Director of Social Security within the Ministry of Labor and Social Affairs, Directorate of [REDACTED], that Baby Doe was to be "reintegrated into her family."**

**ANSWER:**  The Masts incorporate the response to paragraph 46 and otherwise state that they lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 61 and on that basis deny them.

**62.     Upon learning of Baby Doe's impending release on February 26, 2020, to her biological family in Afghanistan, the Masts filed a pseudonymous Complaint and Petition for a Temporary Restraining Order (the "TRO Petition") in this Court, the United States District Court for the Western District of Virginia, naming as defendants the DoD, the U.S. Department of State (the "DoS"), the Assistant Chief of Mission of the United States Embassy-Kabul, and various unknown persons. Richard Mast's signature block on the TRO Petition identifies his employer as "Liberty Counsel."**

**ANSWER:**  The Masts admit they filed suit to prevent an objectively dangerous transfer of the child without DNA testing and terrorist vetting to what has proven to a non-relative, terrorist affiliated person. The Virginia Circuit Court has previously held the Does have failed to demonstrate a biological relationship, and John Doe's father's Taliban flag displayed on his WhatsApp profile was admitted into evidence. John and Jane Doe are not biologically related to the child, and were unknown to the U.S. government, ICRC, and MOLSA during all relevant periods. The Masts otherwise deny the allegations in Paragraph 62.

**63.     In the TRO Petition, the Masts sought to enjoin the United States government from releasing Baby Doe from its custody to the Government of Afghanistan for reunification with her biological family, relying on their fraudulently obtained Juvenile Court custody order as a basis for this request.**

**ANSWER:**  The Masts admit they sought to enjoin the U.S. government from releasing the Child without DNA testing and terrorist vetting given the extraordinary circumstances of her recovery

███████████████████████████████████████████████. The

Masts otherwise deny the allegations in Paragraph 63.

**64.     Within hours of docketing the TRO Petition, U.S. District Judge Norman K. Moon convened a hearing at which Richard Mast represented Joshua and Stephanie Mast, and the U.S. Department of Justice (the "DOJ") represented the DoD and the DoS.**

<u>**ANSWER:**</u>  The Masts admit the allegations in Paragraph 64.

**65.     During the hearing, Richard Mast falsely represented to the Court that Joshua and Stephanie Mast were *not seeking to adopt* Baby Doe, but instead were interested only in bringing her to the United States for the purposes of medical treatment. Having just represented Joshua and Stephanie Mast in the Fluvanna Circuit Court to obtain an interlocutory order of adoption, Richard Mast knew that his representation to Judge Moon was false. So, too, did Joshua and Stephanie Mast. Neither Joshua Mast, Stephanie Mast, nor Richard Mast informed this Court or the United States government of the pending adoption proceedings.**

<u>**ANSWER:**</u>  The Masts deny the allegations in Paragraph 65.

**66.     For their part, the DOJ attorneys described the Juvenile Court custody order as "unlawful," "deeply flawed and incorrect," and apprised Judge Moon that the Masts had failed to serve the DoD and the DoS with notice of the custody proceedings.**

<u>**ANSWER:**</u>  The Masts admit the allegations in Paragraph 66.

**67.     The DOJ attorneys also advised Judge Moon that, while Baby Doe was in the physical custody of the U.S. government to receive emergency medical care, she remained subject to the jurisdiction of the Government of Afghanistan, which had "determined that it's not going to waive jurisdiction because it has located that relative."**

<u>**ANSWER:**</u>  The Masts incorporate the responses to Paragraph 46 and 66, and admit the positions

that the DOJ attorney conveyed to the Court. Furthermore, the same attorney represented that the

United States could not and did not determine if John Doe's father was a "proper person" to turn

the child over to, or an actual biological relative. The Masts otherwise deny the allegations in

Paragraph 67.

**68.**     Furthermore, the DOJ attorneys noted that "if the United States had been involved in th[e custody] proceeding as it should have been since it had custody . . . we would have been able to correct some of the factual errors that were happening there."

**ANSWER:**  The Masts admit the position that the DOJ attorney conveyed to the Court and otherwise deny the allegations in Paragraph 68.

**69.**     Unsurprisingly, Judge Moon denied the request for a TRO that same day, finding that Joshua and Stephanie Mast were unlikely to prevail on the underlying cause of action. In so doing, Judge Moon observed that: (a) the Juvenile Court orders were "foundational to plaintiffs' asserted authority to care" for Baby Doe, but they "reflect an assumption" that the Government of Afghanistan would issue a waiver of jurisdiction, which it did not do; (b) as custodian of Baby Doe, the DoD "should have been formally served with and provided notice of the proceedings"; and (c) the Masts had failed to "proceed through proper channels," including obtaining the consent of the Afghan government and obtaining a visa for Baby Doe to enter the United States.

**ANSWER:**  The Masts admit Judge Moon denied the request for a TRO. To the extent that the allegations in Paragraph 69 quote that order, that order speaks for itself and no response is required. Inasmuch as a response is required, the Mast deny the allegations in Paragraph 69.

**70.**     The next day, February 27, 2020, the DOJ filed a notice with the federal court advising that Baby Doe had been released from U.S. custody for reunification with her "next of kin."

**ANSWER:**  The Masts admit the DOJ filed a notice. To the extent that the allegations in Paragraph 70 quote that notice, the notice speaks for itself and no response is required. Inasmuch as a response is required, the Mast deny the allegations in Paragraph 70.

**71.**     At that time, Baby Doe was placed in the care of her paternal uncle, John Doe's father.

**ANSWER:**  The Masts aver that John Doe's father is not the Child's paternal uncle and otherwise deny the allegations in Paragraph 71.

**72.**     Concerned that Baby Doe would require ongoing medical care, Baby Doe's paternal uncle transferred his guardianship of Baby Doe, pursuant to his authority under the laws of Afghanistan, to his son and daughter-in-law, John and Jane Doe. Baby Doe's paternal uncle believed that John and Jane Doe were best suited to care for Baby Doe because they were a young, educated couple who lived in a larger, more cosmopolitan area, with better access to doctors and hospitals than the rural region of Afghanistan where he lived.

**ANSWER:**  The Masts deny the allegations in Paragraph 72.

73.    **Though they themselves were young newlyweds who had not yet had biological children, John and Jane Doe agreed to welcome Baby Doe into their family and raise her as their own child.**

**ANSWER:**  The Masts deny the allegations in Paragraph 73.

74.    **John and Jane Doe provided everything for Baby Doe that a parent would provide, including food, milk, diapers, and arranging medical care. Most importantly, they loved Baby Doe like they would love their own biological child. After more than five months of living in a medical institution on a military base, Baby Doe was finally surrounded by the love of a family, with grandparents and young aunts and uncles who also adored her. Plaintiffs John and Jane Doe continued to raise Baby Doe as their first child for eighteen months, until the very moment of her abduction on September 3, 2021.**

**ANSWER:**  The Masts deny the allegations in Paragraph 74.

III.    **DEFENDANTS LURED PLAINTIFFS TO THE UNITED STATES UNDER FALSE PRETENSES.**

A.    **Joshua and Stephanie Mast engaged Kimberley Motley to locate and contact John and Jane Doe in Afghanistan under the guise of offering medical care for Baby Doe in the United States, failing to disclose to the Does the custody and adoption orders the Masts had fraudulently obtained.**

75.    **Having failed to prevent Baby Doe's reunification with her biological family in Afghanistan, and having failed thus far to obtain physical custody of Baby Doe, Joshua and Stephanie Mast pursued a new strategy: convince Baby Doe's family to let her travel to the United States, where Joshua and Stephanie Mast could abduct her and raise her as their own child.**

**ANSWER:**  The Masts deny the allegations in Paragraph 75.

76.    **In the fall of 2019, Joshua Mast and Stephanie Mast reached out to Kimberley Motley, a U.S. citizen and attorney who had worked in Afghanistan, to assist in their efforts to bring Baby Doe to the United States. Joshua Mast identified himself as a U.S. Marine stationed in Kabul who sought to remove Baby Doe from Afghanistan. He advised Motley that he and Stephanie Mast intended to adopt Baby Doe.**

**ANSWER:**  The Masts admit that they communicated with Kimberley Motley in the fall of 2019

a Marine stationed in Afghanistan after she had reached out to USFOR-A to serve as a guardian

ad litem for the child. The Masts otherwise deny the allegations in Paragraph 76.

77.     Between October 25-27, 2019, Joshua Mast and Motley communicated numerous times through emails and phone calls to share information about a shared desire to remove Baby Doe from Afghanistan. In the course of their email exchange, Joshua Mast acknowledged that he needed approval from the Government of Afghanistan to obtain a visa for Baby Doe to travel to the United States.

**ANSWER:** The Masts deny the allegations in Paragraph 77.

78.     Motley, who previously learned of Baby Doe through another U.S. servicemember and was representing herself as a "guardian ad litem" for Baby Doe (despite there being no court order naming her as such, and despite that Afghan law does not provide for "guardians ad litem"), asked the Government of Afghanistan to secure citizenship documentation for Baby Doe as an Afghan citizen, including a passport and "tashkira" (an Afghan identification document).

**ANSWER:** The Masts admit that the former Afghan Government refused a U.S. backed request to provide identity documents for the child so she could seek a visa to the United States. In addition, Mrs. Motley is a well-known humanitarian lawyer that has represented underprivileged women and children in Afghanistan at great personal risk on numerous occasions. In addition, Mrs. Motley successfully assisted hundreds of at risk refugees flee the Taliban during the evacuation, including John Doe and Jane Doe. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 78 and on that basis deny them.

79.     On February 27, 2020, the day the United States released Baby Doe to the Afghan Government and the ICRC for reunification with her family, Joshua Mast advised Motley that he needed help to "handle [Baby Doe's] situation privately" by locating her relatives, contacting them, offering them medical care, and then bringing the child out of Afghanistan to the United States, where the Masts had already successfully petitioned a Virginia Court for legal custody over the child.

**ANSWER:** The Masts deny the allegations in Paragraph 79.

80.     That same day, Joshua Mast provided Motley with a copy of an official diplomatic communication from the Government of Afghanistan to an official with the U.S. Department of Defense, formally requesting the return of Baby Doe to their physical custody for reunification with her family in Afghanistan. By this time, Motley also had received a copy of the Masts' Juvenile Court order, which she knew was void because it was expressly conditioned on a waiver of jurisdiction from the Government of Afghanistan, and the

diplomatic communication that Mast sent her showed that the Government of Afghanistan was affirmatively asserting jurisdiction over Baby Doe, not waiving it.

**ANSWER**: The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 80 and on that basis deny them. The Masts otherwise deny the allegations in Paragraph 80.

81.     In addition, in spite of her prior recognition that Baby Doe was an Afghan citizen, and her knowledge that the Government of Afghanistan had demanded her return for reunification with her family and that the United States had agreed, Motley agreed to work with the Masts as they implemented their plan.

**ANSWER**: The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 81 and on that basis deny them. The Masts otherwise deny the allegations in Paragraph 81.

82.     Joshua Mast provided Motley with information he received about the identities of the people to whom Baby Doe was transferred. Motley used this information to find a contact who could connect her with John and Jane Doe.

**ANSWER**: The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 82 and on that basis deny them. At the time, the Mast's were informed that the child was being turned over to an unvetted claimant that wished to remain anonymous, did not want to be DNA tested, and was likely ███████. The Masts were unaware of the identities of John Doe's father until December, 2021. The Mast's were unaware of John Doe and Jane Doe's name, identity or contact information until July 2021. The Masts otherwise deny the allegations in Paragraph 82.

83.     On or about March 6, 2020, just days after Baby Doe was united with her family, Motley called John Doe for the first time, pursuant to her agreement with, and at the direction of, Joshua and Stephanie Mast.

**ANSWER**: Mrs. Motley expressly declined to represent the Masts and did not act on their behalf. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of

the allegations related to Motley in Paragraph 83 and on that basis deny them. The Masts deny the remaining allegations in Paragraph 83.

**84.     In their initial introductions to Motley in March 2020, John and Jane Doe described themselves to Motley as Baby Doe's "cousin," and "the wife of [John Doe] and the mother of [Baby Doe]," respectively.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 84 and on that basis deny them.

**85.     In a subsequent conversation that same day, Motley advised Jane Doe that she understood Baby Doe had serious medical issues and that Motley knew an American family who wanted to help her. Pursuant to her agreement with Joshua and Stephanie Mast, Motley did not disclose the Masts' custody order and interlocutory adoption order for Baby Doe, and did not disclose the Masts' intention to adopt Baby Doe or that the Masts had initiated court proceedings to do so.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 85 and on that basis deny them.

**86.     Five days later, the Masts filed a brief relating to their rejected TRO Petition, but did not disclose to the Court that they were in contact with John and Jane Doe through Motley or that Baby Doe was with her biological family and legal guardians in Afghanistan.**

**ANSWER:**  The Masts admit that they filed a brief but otherwise deny the allegations in Paragraph 86.

**87.     On March 22, 2020, Joshua Mast wired a $4,500 payment to Motley via PayPal and messaged her to confirm that she received the funds.**

**ANSWER:**  The Masts admit that they transmitted $4,500 to Mrs. Motley to support her work to advocate for the best interests of the Child through her established charitable fund.

**88.     Motley continued to communicate with and befriend John and Jane Doe on behalf of the Masts over the course of more than a year, making multiple offers to assist with Baby Doe's medical care and occasionally asking for photographs of Baby Doe. Motley did so at the direction of Joshua and Stephanie Mast and received thousands of dollars to do so.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 88 and on that basis deny them. The Masts admit

that videos were requested to provide to the Child's pediatrician at the University of Virginia to diagnose the symptoms Jane Doe had described of her "shaking" at night and during the day, and her eyes "twitching." Contemporaneously, Joshua Mast also reached out to Kandahar Air Field to coordinate accepting the child to the hospital at that location to ensure she had appropriate medical care. The Masts otherwise deny the allegations in Paragraph 88.

**89.    Motley also continued to hide the identity of the person or people purportedly willing to help Baby Doe, or that Joshua and Stephanie Mast had obtained a custody order and an interlocutory adoption order for Baby Doe.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 89 and on that basis deny them.

**90.    On July 30, 2020, and in response to one of Motley's requests for photos, Jane Doe sent her photographs of Baby Doe in swim trunks in a small wading pool.**

**ANSWER:**  The Masts are aware of the photograph referred to in Paragraph 90 but otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 90 and on that basis deny them.

**B.      The Masts made additional misrepresentations to the Circuit Court to obtain a Final Order of Adoption of Baby Doe.**

**91.    At the same time Motley was communicating with and befriending John and Jane Doe at the behest of Joshua and Stephanie Mast, the Masts continued pursuing a final order of adoption in the Circuit Court.**

**ANSWER:**  The Masts admit that they continued to purse a final adoption order in the Circuit Court to create a legal path to the United States before the Taliban took over Afghanistan. The Masts otherwise deny the allegations in Paragraph 91.

**92.    The Masts did so despite knowing that: (a) Baby Doe was in the custody of individuals determined by the Government of Afghanistan and ICRC to be her biological family and legal guardians under the laws of Afghanistan; (b) Joshua and Stephanie Mast had not obtained an order of custody or guardianship over Baby Doe in Afghanistan; (c) the Afghan government had asserted jurisdiction over Baby Doe; (d) this Court, the United States District Court for the Western District of Virginia, had characterized the Juvenile Court custody order as falsely premised upon the existence of a waiver of jurisdiction by the**

Afghan government; and (e) the DoD (Baby Doe's former custodian and Joshua Mast's employer) and the DoS (the agency that oversees intercountry adoptions) regarded the state court orders as "unlawful." Upon information and belief, the Masts intentionally failed to advise the Circuit Court of any of these facts.

**ANSWER:** The Masts deny the allegations in Paragraph 92.

93.      On December 3, 2020, nine months after Baby Doe had been reunited with her family in Afghanistan, and as a direct result of the Masts' omissions and misrepresentations, the Circuit Court entered a final order of adoption for Joshua and Stephanie Mast, incorrectly finding that Baby Doe "remains up to this point in time an orphaned, undocumented, stateless minor," and therefore "has the legal identity granted by order of this Court as constituting her sole legal identity." At the time of the order, neither Joshua and Stephanie Mast, Richard Mast, nor anyone else had informed John Doe or Jane Doe of the pendency of those proceedings. Nor had anyone informed the United States – despite this Court's denial of Joshua and Stephanie Mast's request for a TRO, and despite Richard Mast's express representation to this Court (in the presence of United States' counsel) that Joshua and Stephanie Mast did not intend to adopt Baby Doe – that Joshua and Stephanie Mast had in fact continued to pursue Baby Doe's adoption.

**ANSWER:** The Masts admit the Fluvanna County Circuit Court entered a final adoption order, which placed the Child with the Masts—a place where she remains today. To the extent that the allegations in Paragraph 93 quote that order, that order speaks for itself and no response is required. Inasmuch as a response is required, the Mast deny the allegations in Paragraph 93.

**C.      With the assistance of Osmani and Motley, Joshua Mast built a fraudulent relationship of trust with John and Jane Doe, offering to help obtain medical care in the United States for Baby Doe but never disclosing the Fraudulent Custody and Adoption Orders.**

94.      After Joshua Mast met Ahmad Osmani in 2021 through a WhatsApp Bible study group, Osmani offered to help Joshua and Stephanie Mast bring Baby Doe to the United States so that they may raise her as their daughter.

**ANSWER:** The Masts were introduced to Mr. Osmani through a friend of their family as a person who could interpret both Pashto and Dari. Mr. Osmani acted in the capacity of an interpreter and translator during the course of his interactions with the Masts. The Masts otherwise deny the allegations in Paragraph 94.

95.     On February 2, 2021, Stephanie Mast emailed Joshua Mast an altered photo of Baby Doe for use in obtaining an Afghan passport for Baby Doe. The photo was nearly identical to the photo of Baby Doe that Jane Doe sent to Kimberley Motley, see supra ¶ 90. However, the photo that Stephanie Mast emailed to Joshua Mast had been altered to add a shirt, remove the background content, and be reformatted as a passport photo. Joshua Mast forwarded Stephanie Mast's email and the altered photo to Ahmad Osmani to be conveyed to his contact in the Afghan passport office.

**ANSWER:**  The Masts admit the allegations in Paragraph 95. The Passport Office required a more modest photo of the child, and a digital shirt was added to the image, which was otherwise unaltered. Furthermore, John Doe and Jane Doe utilized the passport to identify the child with full knowledge of the Mast's claims while in the United States in 2021.

96.     In March 2021, Osmani assisted Joshua and Stephanie Mast in obtaining a fake Afghan passport for Baby Doe. Joshua and Stephanie Mast wired more than $1,000 to Osmani, who then wired those funds to a contact in Afghanistan to pay for the procurement of the fake Afghan passport with a fake Americanized name that featured the Mast's last name.

**ANSWER:**  The Masts admit that a passport was issued by the former Government of Afghanistan within its territorial boundaries based on the child's U.S. documents and admitted medical needs. Furthermore, John Doe and Jane Doe utilized the child's U.S identity, including the child's military ID to themselves be evacuated from Afghanistan. In addition, the Doe's used the child's Afghan passport to identify the child with full knowledge of the Mast's claims while in the United States in 2021. Finally, the child has no legal identity beyond that provided by the United States.  The Masts otherwise deny the allegations in Paragraph 96.

97.     Osmani knew that Baby Doe was living with her biological family in Afghanistan. In fact, during his first encounter with Osmani and Joshua Mast, John Doe told Osmani and Joshua Mast that John Doe is Baby Doe's cousin. Osmani even identified John Doe as the child's cousin in the contact information Osmani stored in his phone for John Doe.

**ANSWER:**  The Masts admit that the word "cousin" appeared in Mr. Osmani's contacts, but it was included in scare quotes. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 97 and on that basis deny them.

**98.** **On July 10, 2021, Motley offered for the first time to introduce John and Jane Doe to the American family supposedly interested in providing medical care for Baby Doe. Motley then facilitated a telephone conversation between John and Jane Doe and Joshua Mast, during which Ahmad Osmani provided interpretation. Mast told John and Jane Doe that he was familiar with Baby Doe's medical needs and warned them that, if Baby Doe did not receive medical care in the United States, she could be blind, brain damaged, and/or permanently physically disabled. In the course of their conversations, Mast claimed to be a volunteer in the U.S. military hospital who was responsible for her care while she was hospitalized there.**

**ANSWER:** The Masts admit that Joshua Mast spoke to John Doe for the first time on July 10, 2021. Furthermore, Joshua Mast explained to John Doe that his job was to ensure that only bad people were targeted by U.S. forces in Afghanistan, that Joshua Mast had volunteered to assist the doctors and nurses who had cared for the Child achieve her long-term best interests, that Joshua Mast and Stephanie Mast had volunteered to seek and had received legal responsibility for the child under U.S. law; that this was done because the Mast's believed the Child was a foreign child and had significant medical concerns; that the Child had all the documents necessary to fly internationally and leave Afghanistan; that the Child's pediatrician at the University of Virginia had clinical concerns based on the symptoms Jane Doe had reported and the Child's medical history of a skull fracture, fractured femur, and second degree burns on her face and neck. Furthermore, Joshua Mast explained that the Child's U.S. identity required the Mast's to treat the child equally as there other children, and that the U.S. identity entitled her to healthcare through Joshua Mast's employment, as well as college benefits. In addition, Joshua Mast repeatedly emphasized that Afghanistan was imminently collapsing to the Taliban, and that it was urgent to fly the Child out of Kabul before international flights were stopped. John Doe represented that he was a nurse and was aware of the child's clinical outcome if she did not receive the care she needed. He first asked if Joshua Mast could get him and his brother in law a visa to the United States, and when he was told that was not possible, represented to Joshua Mast that he thought the Child should come to the U.S. to live with the Masts, but that his father was responsible for the Child

and he would have to ask permission. Consistent with factual findings of the Virginia Circuit Court, the strongest words for legal responsibility over a child in Pashto were used to reference the Mast's legal relationship to the Child. On July 10, 2021, the Does fully understood that the Mast's believed the Child was foreign, that the Masts had accepted responsibility for the Child under U.S. law, and that the Masts were asking for the Child to be sent to the U.S. to live with them before the Taliban takeover on August 15, 2021. The Masts otherwise deny the allegations in Paragraph 98.

**99.     John Doe, who trained as a nurse in Afghanistan, was not aware of the medical issues that Mast described. But John and Jane Doe were concerned about the scarring on Baby Doe's face from the burns she sustained, Baby Doe's irregular gait due to the leg injury she sustained, and the severe allergic reactions of unknown origin that she seemed to periodically suffer.**

<u>**ANSWER**</u>:  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 99 and on that basis deny them.

**100.     Mast insisted that Baby Doe would suffer serious, permanent harm if she were not brought to the United States for special treatment. In that initial conversation and in other subsequent conversations, Mast asked John and Jane Doe to send Baby Doe to the United States for medical treatment. They declined because they did not want to be separated from their daughter.**

<u>**ANSWER**</u>:  The Masts incorporate their response to Paragraph 98 and otherwise deny the allegation in Paragraph 100.

**101.     By July 2021, Jane Doe was in the third trimester of pregnancy and concerned about traveling to the United States. As a result, John and Jane Doe asked Mast if he would be willing to facilitate their taking Baby Doe to India or Pakistan for medical care, where he could pay doctors or hospitals directly, without providing any money to John and Jane Doe. Mast declined, insisting that hospitals in India and Pakistan did not have the specialists required to help Baby Doe.**

<u>**ANSWER**</u>:  The Masts deny the allegations in Paragraph 101.

**102.     Over time and over the course of other telephone conversations and written communications, Ahmad Osmani helped Joshua and Stephanie Mast foster a relationship of trust with John and Jane Doe. Osmani also had conversations with the Does on other occasions in which the Masts did not participate. Osmani routinely referred to John Doe as**

his "brother." John and Jane Doe trusted Osmani, an Afghan who spoke their native language, when he told them that the Masts were trustworthy people with no ulterior motives who just wanted to help Baby Doe receive medical care. Upon information and belief, Osmani maintained contact with John and Jane Doe and reported back to Joshua Mast at his direction about his conversations with the Does. Unbeknownst to John and Jane Doe, Osmani was not the impartial interpreter he made himself out to be. Rather, Osmani knew that the Masts intended to take Baby Doe from her biological family, and Osmani helped them do so.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 102 and on that basis deny them.

103. Joshua Mast also repeatedly referred to John Doe as his "brother" and insisted he only wanted to help Baby Doe obtain needed medical care. Based on the repeated warnings of Joshua and Stephanie Mast about Baby Doe's medical needs, and based on the repeated assurances by Osmani that the Masts were honest people who just wanted to help Baby Doe, John and Jane Doe began to fear that she would suffer long-term consequences if they did not obtain specialist care for her.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 103 related to John and Jane Doe and on that basis deny them. The

Masts otherwise admit the allegations in Paragraph 103.

104. Neither Joshua Mast, Stephanie Mast, Motley, nor Osmani disclosed to John and Jane Doe at this time that the Masts had (unsuccessfully) filed a legal action in the United States to prevent Baby Doe's reunification with her biological family and legal guardians in Afghanistan, or that the Masts had obtained an order of adoption for Baby Doe in a Virginia court. Instead, Joshua and Stephanie Mast misrepresented that they wanted to bring Baby Doe to the United States solely so that she could receive medical treatment and for the sake of doing something good.

**ANSWER:** The Masts deny the allegations in Paragraph 104.

D. As Afghanistan fell to the Taliban, John and Jane Doe believed that they might never have another chance to obtain necessary medical care for Baby Doe.

105. In August 2021, as U.S. troops withdrew and the Taliban began to retake Afghanistan, Joshua and Stephanie Mast again reached out to John and Jane Doe to convince them to bring Baby Doe to the United States for medical treatment. Given the political situation in Afghanistan and the Taliban's advances, John and Jane Doe believed this could be their last and only chance to obtain medical care for Baby Doe. As a result, they advised

Joshua Mast that they were considering his proposal, but were concerned that they would not be able to return to Afghanistan.

**ANSWER:** The Masts admit that Joshua Mast told John Doe that Afghanistan was collapsing in July and August 2021. Immediately after John Doe informed the Masts that the Taliban had forbidden the Child from going to American, the historical evacuation commenced. Prior to this event, there was no foreseeable way for John Doe or Jane Doe to leave Afghanistan, and the entire conversation surrounded sending the Child to live with the Masts before the Taliban took over Afghanistan. The Masts deny that John Doe ever mentioned returning to Afghanistan or medical care for the Child as his motivation for leaving Afghanistan. Rather, John Doe represented that there was "no hope in Afghanistan" and inquired how he could be employed, how much money he could make, and what life was like in America. The Masts otherwise deny the allegations in Paragraph 105.

106.    Joshua Mast and Ahmad Osmani assured them that they would need to be in the United States for Baby Doe's medical care for only two or three months and that they would then be able to re-enter Afghanistan without issue. Again, Joshua Mast and Ahmad Osmani failed to inform John and Jane Doe about the adoption order he and his wife and brother had fraudulently obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, Mast and Osmani continued to misrepresent that the Masts merely wanted to bring Baby Doe to the United States solely to provide her with medical care.

**ANSWER:** The Masts deny the allegations in Paragraph 106.

107.    In reliance on Joshua Mast's misrepresentations regarding the purpose and duration of their travel, as well as their ability to return to Afghanistan, ignorant of Mast's and his wife's true intentions, and in reliance on Osmani's reassurances, John and Jane Doe agreed to travel to the United States for the purpose of obtaining medical care for Baby Doe.

**ANSWER:** The Masts deny the allegations in Paragraph 107.

**E.     Joshua Mast and Richard Mast filed a fraudulent immigration application for John Doe and made false statements to USCIS, without John Doe's knowledge or consent.**

108.     **Joshua Mast informed John and Jane Doe that he would prepare immigration paperwork for them and Baby Doe to permit them to enter the United States for the purpose and duration of Baby Doe's medical care.**

**ANSWER:**  The Masts deny the allegations in Paragraph 108.

109.     **In fact, Mast did not file the appropriate immigration paperwork for John and Jane Doe and Baby Doe for the purpose of having them visit the United States for a short duration to obtain medical care for Baby Doe. Instead, on August 20, 2021 and unbeknownst to John and Jane Doe, Richard Mast emailed U.S. Citizenship and Immigration Services ("USCIS") a Form I¬360 Petition for Plaintiff John Doe. Upon information and belief, the form was prepared at the direction of Joshua and Stephanie Mast by Natalie Osmani, Ahmad Osmani's wife. Ms. Osmani signed the petition as its preparer, but listed Defendant Joshua Mast as the person acting on behalf of the petitioner, and provided Mast's North Carolina home address as a mailing address.**

**ANSWER:**  The Masts deny the allegations in Paragraph 109.

110.     **In addition, Ms. Osmani wrote by hand the following visa category: "Special Immigrant Afghanistan national escorting military dependent." Not only does no such visa category exist, but it was false to claim that John Doe would be escorting a U.S. "military dependent" when the United States had by this time represented to this Court that it did not recognize any custodial relationship between Joshua Mast, Stephanie Mast and Baby Doe.**

**ANSWER:**  The Masts admit that they obtained a military ID card for the Child, which John Doe used to be evacuated from Afghanistan by U.S. Special Forces from behind Taliban lines. The Masts otherwise deny the allegations in Paragraph 110.

111.     **Upon information and belief, John and Jane Doe nonetheless were placed on a list of potential evacuees with pending Special Immigrant Visa Applications as a result of the petition.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 111 and on that basis deny them.

112.     **In his August 20, 2021, email to the USCIS, Richard Mast falsely wrote: "[John and Jane Doe] are helping US DoD at great risk to themselves, and have cared for a minor DoD dependent child ([Baby Doe]) who has serious medical needs."**

**ANSWER:**  The Masts admit that Richard Mast wrote the quoted email but deny that it was false.

113.    Of course, by then Baby Doe was not a "minor DoD dependent child," because she had been returned to her family in the exercise of the Government of Afghanistan's jurisdiction. Instead, John and Jane Doe were by then Baby Doe's legal guardians, raising her as their own child; they were not "caring" for her on behalf of Joshua and Stephanie Mast, the DoD, or anyone else. Nor were they doing so as a "service to the US Government."

**ANSWER:**  The Masts deny the allegations in Paragraph 113.

114.    In another email to USCIS seeking the evacuation of Ahmad Osmani's siblings to the United States, Richard Mast wrote that Osmani's siblings were the "family of an Afghan pastor" who had been "very instrumental to helping a US Marine" represented by Liberty Counsel "adopt an Afghan child." Upon information and belief, the reference to a "US Marine" is a reference to Joshua Mast, and the reference to "an Afghan child" is a reference to Baby Doe.

**ANSWER:**  The Masts lack personal knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 114 and on that basis deny them.

115.    John and Jane Doe were not aware of the misrepresentations being made by Richard Mast, on behalf of Joshua and Stephanie Mast, about them and Baby Doe.

**ANSWER:**  The Masts deny the allegations in Paragraph 115.

116.    The Does traveled to Kabul on August 23, 2021, to spend the night there with Osmani's parents and siblings, at the direction of Joshua Mast and Osmani. The next morning, the Does traveled to Hamid Karzai International Airport as part of the evacuation efforts under Operation Allies Refuge. Osmani's siblings accompanied them.

**ANSWER:**  The Masts deny that the Does were not fully informed and acting on their own volition

to flee Afghanistan. In addition, John Doe was comminating with the Special Operations Task

Force he was aware had been tasked with evacuating the Child to America and had informed John

Doe they would "take the child" when he arrived in Kabul. Only through Joshua Mast's affirmative

efforts were the Does able to evacuate with the Child after Joshua Mast personally ensured the

operators were aware that the Does were at risk of being murdered by the Taliban if they were not

evacuated. The Masts otherwise lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 116 and on that basis deny them.

117.     Between August 24 and August 26, 2021, Joshua Mast and Osmani continued to communicate with John and Jane Doe over WhatsApp as they transited from Afghanistan to the United States through Qatar and Germany.

**ANSWER:**  The Masts admit that Joshua Mast communicated with John and Jane Doe while they were transited from Afghanistan to Qatar and Germany, and that John and Jane Doe were only able to enter the United States due to the Masts' efforts.

118.     Again, Joshua Mast and Osmani failed to inform John and Jane Doe about the adoption order that Joshua and Stephanie Mast had obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, they continued to misrepresent that the Masts wanted to bring Baby Doe to the United States only to provide her with medical care.

**ANSWER:**  The Masts deny the allegations in Paragraph 118.

F.     **Joshua Mast told John and Jane Doe he was their lawyer and facilitated their entry into the United States.**

119.     On August 26, 2021, as Plaintiffs were in transit to the United States, Joshua Mast sent a WhatsApp voice note to Jane Doe, instructing her to tell anyone who asks that he was their lawyer. He also sent her a text stating:

> If anyone asks to talk about your documents, show them this text: I am Major Joshua Mast, USMC. I am a Judge Advocate with MARSOC, and I am here at Ramstein to provide this group of 6 pax with their original documents and escort them through the process. MARSOC coordinated a JSOC operation to extract them to Kabul airport three days ago, and I am tracking them down for the above purpose.

**ANSWER:**  The Masts deny the allegations in Paragraph 119.

**120.     At approximately the same time, Mast left John Doe a voice message, assuring him he would get them to the United States, and stating:**

> **[I]f someone tries to talk about documents, we want to come and show them all the forms that we filed for you all to get to America instead of staying here in Germany. So before you talk to them about it, say "we have a lawyer here to talk with you about that for us" and that's me. Just show them the text and have them call me.**

**ANSWER:**  The Masts admit Joshua Mast repeatedly told immigration and military authorities that the Does had disobeyed the Taliban by bringing the child to U.S. forces against the Taliban's orders and that Jane Doe should be expedited through the process so she could deliver her child in a safe location. The Masts further admit that Joshua Mast conveyed these efforts to John Doe.

**121.     When Plaintiffs landed at Ramstein Airforce Base in Germany, Joshua and Stephanie Mast met them. During their brief stop in Germany, Joshua and Stephanie Mast visited Plaintiffs' room three times, repeatedly trying to convince John and Jane Doe to allow Baby Doe to travel separately with the Masts, insisting that it would be easier for the toddler to enter the United States that way. John and Jane Doe repeatedly refused, as they did not want to leave Baby Doe in anyone else's care. Osmani provided interpretation over the telephone.**

**ANSWER:**  The Masts admit that Joshua Mast communicated with John and Jane Doe while they were transited from Afghanistan to Qatar and Germany and that John and Jane Doe were only able to enter the United States due to the Masts' efforts. The Masts otherwise deny the allegations in Paragraph 121.

**122.     Before leaving Germany, John Doe informed Joshua and Stephanie Mast of a promise John Doe had made to Jane Doe: that Baby Doe would never leave her side while they were in the United States. There can be no doubt that Joshua and Stephanie Mast were aware that John and Jane Doe understood they would have control over Baby Doe's location and custody while in the United States, and that they intended to continue to care for her as their daughter.**

**ANSWER:**  The Masts admit that John Doe first revealed the collateral promise he made to Jane Doe after the Does were safely out of Afghanistan. Neither John Doe nor Jane Doe made any reference to any sort of parental or legal claim to custody or control of the Child at that time or at

any other time; rather, John Doe represented to Joshua Mast both before and after this conversation that his wife was attached to the Child but would be fine with the Child's living with the Masts once her own child was born. The Masts otherwise deny the allegations in Paragraph 122.

**123.   During a conversation in Germany, Jane Doe told Stephanie Mast that she could not live without Baby Doe and that, given all that Baby Doe had been through, Baby Doe meant even more to Jane Doe than her own yet-to-be-born child.**

**ANSWER:**   The Masts admit that Jane Doe and Stephanie Mast spoke about Jane Doe's feelings toward the Child. Jane Doe stated she did not love her own unborn child, and that she loved the Child more than she loved John Doe. These statements were unsettling and disturbing to Stephanie Mast. The Masts otherwise deny the allegations in Paragraph 123.

**124.   Again, the Masts and Osmani failed to fully inform John and Jane Doe about the adoption order that the Masts obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, the Masts and Osmani continued to misrepresent that they only wanted to bring Baby Doe to the United States to provide her with medical care.**

**ANSWER:**   The Masts deny the allegations in Paragraph 124.

> **G.   Despite repeatedly representing to Virginia and federal courts that she was not Afghan and had no nationality, Joshua and Stephanie Mast used the Afghan passport they fraudulently obtained for Baby Doe, with Osmani's assistance, to bring Baby Doe to the United States.**

**125.   After several days of grueling travel, which were especially hard on Jane Doe, who was eight months pregnant, the Does and the Osmani siblings arrived at Dulles International Airport on August 29, 2021. Joshua Mast met the families while they waited in line for inspection, pulled them out of the line, and took them directly to an inspecting officer. There, they presented their identity documents.**

**ANSWER:**   The Masts admit that the Does and the Osmanis arrived at Dulles Airport on August 29, 2021, and that Joshua Mast was there. The Masts otherwise deny the allegations in Paragraph 125.

**126.   John Doe presented his Afghan passport to the inspecting officer, and Jane Doe presented her Afghan ID. They then explained to the inspecting officer that Baby Doe had not yet received an identification document, as it was customary in Afghanistan to**

procure one only when the child was old enough to attend school. At the time, Baby Doe was two years old.

**ANSWER:**  The Masts deny the allegations in Paragraph 126.

127.    To their surprise — and despite his representations to multiple courts that Baby Doe was not Afghan and had no nationality — Joshua Mast then handed an Afghan passport for Baby Doe to the inspecting officer. John and Jane Doe had never before seen this passport and did not procure it themselves. When the officer returned the passport to John and Jane Doe, they were shocked to see that the photograph in the passport appeared to be the same photograph that Jane Doe sent to Motley via WhatsApp on July 30, 2020, of Baby Doe in swim trunks in a small wading pool, but it had obviously been altered.

<table>
<tr><td align="center">**Original Photo**</td><td align="center">**Passport Photo**</td></tr>
<tr><td align="center">[REDACTED]</td><td align="center">[REDACTED]</td></tr>
</table>

**ANSWER:**  The Masts admit that Joshua Mast presented the Afghan passport to government officials, along with other documents. The Child was paroled into the United States using her military ID. Joshua Mast provided the passport, along with copies of all of the Child's original documents he had promised (on video) to bring when he attempted to fly to Kabul. John and Jane Doe subsequently used the Child's only identity documents for their intended purpose—to verify the Child's identity. John Doe and Jane Doe had previously been informed on July 10, 2021 that the Child had all the necessary documents to fly internationally from Kabul and leave Afghanistan. The Masts otherwise deny the allegations in paragraph 127.

128.    The altered picture had a different background, a shirt covering Baby Doe's shoulders and chest, and eliminated some stray hairs so it was less obvious that her hair was wet.

**ANSWER:**  The Masts incorporate the answer to paragraph 95 of the complaint and otherwise deny the allegations in Paragraph 128.

129.    Upon information and belief, the alteration of the photograph for use in the passport was done by, or at the direction of, both Joshua and Stephanie Mast.

**ANSWER:**  The Masts admit they procured a passport to help the Child and John and Jane Doe escape Afghanistan. The Masts otherwise deny the allegations in Paragraph 129.

**130.    Upon information and belief, the procurement of a fake Afghan passport for Baby Doe was orchestrated by Osmani. Osmani identified, communicated with, and, at the direction of Joshua and Stephanie Mast, paid an Afghan government official to create a passport for a child that Joshua Mast, Stephanie Mast, and Osmani claimed to the Circuit Court and this Court was not Afghan. The fake Afghan passport also identified Baby Doe with a fake name: an American name and the Mast's last name.**

**ANSWER:**  The Masts admit they procured a passport to help the Child and John and Jane Doe

escape Afghanistan. The Masts otherwise deny the allegations in Paragraph 130.

**131.    John and Jane Doe were stunned to see that the name on the passport was "[REDACTED] Mast."**

**ANSWER:**  The Masts deny the allegations in paragraph 131 on the basis that the Does had

previously also used the Child's U.S. identity as a dependent of Joshua Mast to leave Afghanistan.

**132.    When John and Jane Doe asked Joshua Mast why the name on the passport was incorrect, he told them to keep quiet and that it was just to make it easier to get medical care for Baby Doe.**

**ANSWER:**  The Masts deny the allegations in Paragraph 132.

**133.    After screening at the airport, Plaintiffs were paroled into the United States, which permits them to lawfully remain in the United States through August 28, 2023. They ultimately were transported to refugee housing at Fort Pickett, in Blackstone, Virginia, the location that Joshua Mast instructed them to request.**

**ANSWER:**  The Masts admit that John and Jane Doe were paroled in the United States and

ultimately were sent to Fort Pickett, Virginia. This was after Jane Doe called Joshua Mast and told

him they were being deported to Mexico via a bus. Joshua Mast spoke to the American personnel,

again explained that the Does had disobeyed the Taliban and could not be deported, and requested

they be sent to Fort Pickett, as it was the closest location to Joshua Mast's duty station. The Masts

otherwise deny the allegations in Paragraph 133.

**H.     Joshua and Stephanie Mast abducted Baby Doe.**

**134.     Five days later, on September 3, 2021, John and Jane Doe were instructed that they would be moving to another housing unit on the base. They were escorted to a van, in which a woman sat in the last row with an infant car seat next to her. Baby Doe was placed in the infant car seat.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 134 and on that basis deny them.

**135.     But the Does were not transported to another housing unit on the base. Instead, they were taken to a building where the woman in the car picked up Baby Doe and held her while instructing John and Jane Doe to walk to the front of the building. There, they met another unknown woman who later informed them she was a social worker from the DoS.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 135 and on that basis deny them.

**136.     Inside the building, they were met by the social worker, a Pashto interpreter, and the woman from the car, who continued to hold Baby Doe. The social worker then informed John and Jane Doe that they were not Baby Doe's lawful guardians and that Joshua Mast had adopted the child.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 136 and on that basis deny them.

**137.     John and Jane Doe did not understand what "adoption" meant, as guardianship and kinship care in Afghanistan are not understood in the same way as adoption in the U.S. legal system. John and Jane Doe did understand, though, that Baby Doe would not be permitted to return to their housing unit with them, but that Joshua Mast would be taking her with him.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 137 and on that basis deny them.

**138.     When Joshua Mast entered the room, Jane Doe, who was more than eight months pregnant, fell to the ground crying and begging for him not to take Baby Doe. The**

woman holding Baby Doe removed her from the room, against John and Jane Doe's objections, and gave her to Stephanie Mast, who was waiting outside.

**ANSWER**: The Masts admit that Joshua Mast came to the room at the Does' request out of concern for John Doe's representation that Jane Doe was attached to the Child but would be fine when her own child was born. Prior to this occasions, the Masts expressly advised John Doe and Jane Doe that they, the Masts, were legally responsible for the Child and would not be allowed to abandon her under U.S. law. John Doe appeared to be vacillating between what he had represented to the Masts, and what he had apparently represented to his wife to induce her to come to the United States. It was unclear at whom Jane Doe's anger was directed, and she did not address Joshua Mast directly during this brief interaction. Joshua Mast was directed to leave the room by the American personnel in authority prior to the Child's or the Does' leaving the room. The Masts otherwise deny the allegations in Paragraph 138.

139.    John Doe pleaded with Joshua Mast to act like the "brother" that he had promised to be to them. Joshua Mast refused, leaving John and Jane Doe in tears as he and Stephanie Mast abducted Baby Doe. John and Jane Doe have not seen their daughter since that day.

**ANSWER**: The Masts admit that John Doe and Jane Doe asserted that Jane Doe was emotionally attached to the Child. The Does never referred to the Child as their daughter, or asserted any sort of legal claim to the child in Afghanistan, Germany, or Fort Pickett. The Masts otherwise deny the allegations in Paragraph 139.

I.     John and Jane Doe suffer severe emotional distress as a result of the trauma of having Baby Doe taken from them.

140.    Bewildered and in despair, John and Jane Doe returned to their housing unit on the base. The next day, they contacted Joshua Mast and asked why he had taken their child. Mast responded that he had been instructed to pick up Baby Doe or she would be sent to an orphanage. He did not say who instructed him or mention the adoption order he and his wife had fraudulently obtained more than a year earlier.

**ANSWER**: The Masts deny the allegations in Paragraph 140.

**141.   In a conversation with Joshua Mast and Richard Mast approximately two weeks later, Joshua Mast and Richard Mast again failed to disclose the adoption order, but instead told the Does that they currently were not able to properly care for Baby Doe at Fort Pickett and were not financially stable enough to provide for her. But, they told John and Jane Doe, after the Does leave the base, got jobs, and were financially stable, they would discuss Baby Doe's status with the Does. At no point during this conversation did either Joshua Mast or Richard Mast refer to Baby Doe as the child of Joshua and Stephanie Mast or discuss the adoption order.**

**ANSWER:**  The Masts deny the allegations in Paragraph 141.

**142.   Over the next few weeks, John and Jane Doe attempted to maintain a connection with Joshua Mast over WhatsApp, hoping that he might allow them to see Baby Doe. They repeatedly begged him to allow them to see Baby Doe or at least speak with her, but he repeatedly refused. At the same time, just one month after having abducted Baby Doe, Joshua Mast took her to visit strangers at Liberty University so that they could meet her.**

**ANSWER:**  The Masts admit that they had previously invited the Does to be as involved in the Child's life as they wanted, but later changed their position. After that initial invitation, the Does did not reach out for over a year. In the last text conversation Jane Doe had with the Masts, she was invited to schedule a time to facetime the Child. The Does subsequently requested to live near the Masts and asked for and received hundreds of dollars' worth of fresh food and supplies, including a gift basket for their newly born child. The Masts otherwise deny the allegations in Paragraph 142.

**143.   John and Jane Doe were afraid of Mast, as he appeared to have lied to numerous government agencies about Baby Doe and gotten away with it. Mast abducted their child in broad daylight but appeared to face no consequences. They were afraid of angering him, believing that, if he could steal their child and get away with it, he could harm them, too.**

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 143 related to John and Jane Doe and on that basis deny them. The Masts otherwise deny the allegations in Paragraph 143.

**144.   Ahmad Osmani maintained frequent contact with the Does, who pleaded with him to help them get their child back. But Osmani continued to manipulate the Does, telling**

them that he wanted to help them when instead he was acting solely in furtherance of the Masts' scheme to abduct Baby Doe. For example, in the days after the abduction, the Does repeatedly asked Osmani for help in retaining a lawyer or contacting other public officials in the United States for help in getting their child back. But Osmani warned the Does that they must not seek legal help, that lawyers will defraud them, that this issue must be resolved directly with the Masts and that, regardless, no court would return the child to them because the court would see that the Masts had more money than them. Upon information and belief, Osmani attempted to dissuade the Does from seeking legal recourse at the direction of Joshua Mast, and reported his conversations back to Joshua Mast.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 144 and on that basis deny them.

145. Even though he knew that the Masts now claimed to be Baby Doe's adoptive parents and that the Masts had no intention of returning the child to the Does, Osmani suggested that if the Does kept in contact with the Masts, the Masts might be willing to return the child after the Does left the military base.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 145 and on that basis deny them.

146. John Doe continuously sought help from various agencies at Fort Pickett to help retrieve Baby Doe. Eventually, on September 18, 2021, an interpreter on the base with whom John and Jane Doe shared their story explained the meaning of "adoption" to them. This was the first time John and Jane Doe understood that Joshua and Stephanie Mast had been lying to them all the time and had no intention of returning Baby Doe to them.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 146 and on that basis deny them.

147. As a direct result of the decline of Jane Doe's mental health and the traumatic experience of losing Baby Doe, John Doe was afraid to leave Jane Doe alone in their room. He often asked other women in their building to keep an eye on her if he needed to be out of the room. Despite being in the ninth month of her pregnancy, Jane Doe no longer wanted to eat or drink, and she could not sleep. Both she and her husband were devastated and depressed.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 147 and on that basis deny them.

148. Jane Doe delivered her baby on October 1, 2021. Unfortunately, despite the joy of bringing a new child into this world, Jane Doe's depression deepened as it became increasingly clear that Joshua and Stephanie Mast would never voluntarily return Baby Doe

to them. By November 5, 2021, Jane Doe had become suicidal and was taken to the Stress Clinic on Fort Pickett for treatment.

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 148 and on that basis deny them.

149.    In November 2021, Jane Doe messaged Kimberley Motley to inform her that the Masts, whom Motley had introduced to the Does, had abducted Baby Doe, and pleaded with Motley to help her. Motley did not respond.

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 149 and on that basis deny them.

150.    As a direct result of Joshua and Stephanie Mast's intentional and forcible removal of Baby Doe, John and Jane Doe have been unable to exercise their parental rights as Baby Doe's biological family and legal guardians.

**ANSWER:**  The Masts deny that Jane Doe and John Doe are biologically related to the Child, or

that they are legal guardians of the child under any theory of Afghan law. Paragraph 150 otherwise

asserts legal conclusions to which no response is required. Inasmuch as a response is required, the

Masts deny the allegations in Paragraph 150.

151.    As a result of Joshua and Stephanie Mast's intentional and outrageous conduct, namely the abduction of Baby Doe in their presence, John and Jane Doe have experienced extreme emotional distress.

**ANSWER:**  Paragraph 151 asserts legal conclusions to which no response is required. Inasmuch

as a response is required, the Masts deny the allegations in Paragraph 151.

J.      **John and Jane Doe petitioned to vacate the Adoption Order, and the United States confirmed that Baby Doe was not a "stateless minor" but under the jurisdiction of Afghanistan, and confirmed that the United States transferred physical custody of Baby Doe to Afghanistan in the Executive Branch's exclusive authority over foreign affairs.**

152.    **In December 2021, John and Jane Doe initiated proceedings in the Fluvanna Circuit Court to vacate the Adoption Order. In March 2022, by order of the Circuit Court, John and Jane Doe filed a new petition under a new case caption.**

**ANSWER:**  The Masts admit the allegations in Paragraph 152 and note that those proceedings are

ongoing.

153.    **On August 22, 2022, the United States filed a 21-page Statement of Interest (the "SOI"), with supporting declarations, pursuant to 28 U.S.C. § 517 (attached as Exh. 1). Consistent with the positions taken by the United States before this Court in response to the Masts' TRO Petition, the SOI explicitly confirms the position of the United States that Baby Doe was not a "stateless minor" but was instead an Afghan citizen subject to the jurisdiction of Afghanistan; that the Government of Afghanistan never waived jurisdiction over her but, in fact, affirmatively asserted jurisdiction over Baby Doe; and that, in the exercise of its exclusive authority over foreign affairs, the United States transferred physical custody of Baby Doe to the Government of Afghanistan so that she could be reunified with her family, as identified by the Afghan government. The United States further took the position in the SOI that a state court cannot usurp or contradict the decisions made by the United States with regard to foreign affairs.**

**ANSWER:**  The Masts admit the United States DOJ filed a Statement of Interest. To the extent

that the allegations in Paragraph 153 quote that document, the document speaks for itself and no

response is required. Inasmuch as a response is required, the Mast deny the allegations in

Paragraph 153.

## CLAIMS FOR RELIEF

## COUNT I

## TORTIOUS INTERFERENCE WITH PARENTAL RIGHTS
### (AGAINST ALL DEFENDANTS)

154.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

**ANSWER:** The Masts incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

155.    As the biological family and legal guardians of Baby Doe, John and Jane Doe have parental rights to and in their relationship with Baby Doe. The right of parents or guardians to develop and to maintain a relationship with their child is a fundamental right recognized by the United States Supreme Court and federal law. Further, the U.S. government recognized that the Does' parental and custodial rights to Baby Doe fell under the jurisdiction of Afghanistan and are recognized under the laws of Afghanistan.

**ANSWER:** Paragraph 155 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 155.

156.    This Court concurred with the DOJ that sole jurisdiction over the custody of Baby Doe was a matter for the courts and Government of Afghanistan, which had expressly asserted its jurisdiction over Baby Doe.

**ANSWER:** Paragraph 156 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 156.

157.    Upon information and belief, each of the Defendants was aware that John and Jane Doe were the lawful guardians of Baby Doe as determined by the Government of Afghanistan. Each of the Defendants was aware John and Jane Doe had maintained physical custody of Baby Doe.

**ANSWER:** The Masts deny the allegations in Paragraph 157. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97.

45

**158.    Notwithstanding this knowledge, each of the Defendants intentionally and willfully used improper, unethical and fraudulent means to preclude John and Jane Doe from continuing their parental relationship with Baby Doe and interfered with their parental rights, permanently depriving them of those rights.**

**ANSWER:**  Paragraph 158 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 158.

**159.    Defendants' actions as set forth above have resulted in the violation of these rights, causing John and Jane Doe harm for which they seek compensation.**

**ANSWER:**  Paragraph 159 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 159.

**160.    Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.**

**ANSWER:**  Paragraph 160 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 160.

## COUNT II

### FRAUD
### (AGAINST DEFENDANTS JOSHUA AND STEPHANIE MAST AND KIMBERLEY MOTLEY)

**161.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.**

**ANSWER:**  The Masts incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

**162.    Joshua and Stephanie Mast and Kimberley Motley intentionally made misleading and false statements and/or material omissions to John and Jane Doe to perpetrate the abduction of Baby Doe.**

**ANSWER:**  The Masts deny the allegations in Paragraph 162.

163.    Joshua and Stephanie Mast engaged the services of Motley, who acted as their agent, to, inter alia, contact John and Jane Doe and lure them into facilitating Baby Doe's travel to the United States, purportedly for the sole purpose of obtaining medical treatment for her, through false and misleading statements and material omissions.

**ANSWER:**  The Masts deny the allegations in Paragraph 163.

164.    Upon information and belief, Joshua and Stephanie Mast, through their agent Motley, procured the identities and location of John and Jane Doe, as well as photographs of Baby Doe procured from John and Jane Doe via WhatsApp.

**ANSWER:**  The Masts deny the allegations in Paragraph 164.

165.    John and Jane Doe relied on Motley's misrepresentations, which she made at the direction of Joshua and Stephanie Mast, when they communicated with her, sent her photographs of Baby Doe, and agreed to travel to the United States for what the Does thought was the sole purpose of obtaining medical treatment for Baby Doe.

**ANSWER:**  The Masts deny the allegations in Paragraph 165.

166.    One of the photographs that Joshua and Stephanie Mast obtained from John and Jane Doe through Motley, under false pretenses, was digitally altered to create the fraudulently obtained identification documents used to bring Baby Doe into the United States.

**ANSWER:**  The Masts deny the allegations in Paragraph 166.

167.    It was as a direct result of John and Jane Doe's reliance on Joshua and Stephanie Mast's prevarications, made through Motley, that Joshua and Stephanie Mast were able to lure Plaintiffs to the United States and unlawfully obtain physical custody of Baby Doe.

**ANSWER:**  Paragraph 167 asserts a legal conclusion, so no response is required. Inasmuch as a

response is required, the Masts deny the allegations in Paragraph 167.

168.    On July 10, 2021, as well as in subsequent conversations, Joshua and Stephanie Mast, with the assistance of Motley, intentionally misrepresented to John and Jane Doe that their sole intention was to procure medical assistance for Baby Doe, and that it was in the Does' best interest to send Baby Doe to the United States. Joshua and Stephanie Mast also intentionally withheld from John and Jane Doe any information or notice of the court proceedings they had initiated for Baby Doe in Virginia.

**ANSWER:**  The Masts deny the allegations in Paragraph 168.

**169.    On August 26, 2021, and in furtherance of the Masts' unlawful scheme to take Baby Doe from John and Jane Doe, Joshua Mast represented to John and Jane Doe that he was their attorney.**

**ANSWER:**  The Masts deny the allegations in Paragraph 169.

**170.    Shortly thereafter, while John and Jane Doe were in Germany awaiting their final flights to the United States, Joshua and Stephanie Mast came to their room three times and again made misrepresentations to them, reiterating that they wanted to take Baby Doe to the United States for the sole purpose of obtaining medical treatment for her. Further, Joshua and Stephanie Mast falsely stated that Baby Doe should travel with them, separately from the Does, because they were simply trying to make it easier for Baby Doe to enter the United States. Instead, their true intention was to unlawfully and permanently take physical custody of Baby Doe.**

**ANSWER:**  The Masts deny the allegations in Paragraph 170.

**171.    On September 3, 2021, Joshua Mast arranged for John and Jane Doe and Baby Doe to be moved to another building at Fort Pickett and revealed to John and Jane Doe for the first time that he had adopted Baby Doe. He then utilized this opportunity to remove Baby Doe from their custody.**

**ANSWER:**  The Masts deny the allegations in Paragraph 171.

**172.    John and Jane Does' reasonable reliance on this pattern of deception allowed Joshua and Stephanie Mast, through their agent Motley, to obtain the photographs necessary to procure fraudulently obtained identification documents, travel permissions, and erroneously granted custodial and adoption decisions necessary to effect this abduction.**

**ANSWER:**  Paragraph 172 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 172.

**173.    As a result of repeated material misrepresentations by the Masts and Motley, John and Jane Doe and Baby Doe traveled to the United States and subjected themselves to the controlled environment of a military base that Joshua Mast manipulated to his advantage to abduct Baby Doe in broad daylight.**

**ANSWER:**  Paragraph 173 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 173.

**174.    In reliance on the representation that they were only traveling to the United States for two to three months to obtain medical care for Baby Doe, after which they would return with Baby Doe to Afghanistan, John and Jane Doe left their homeland, to which they cannot yet return, and may never be able to return, because of the circumstances surrounding their departure. Specifically, John and Jane Doe fear that the current**

**Afghanistan government will be quick to assume they are U.S. military collaborators —
consequently, they fear they or their family will be shunned or targeted by the government,
or by others in their community.**

<u>ANSWER</u>:  Paragraph 174 asserts a legal conclusion, so no response is required. Inasmuch as a

response is required, the Masts deny the allegations in Paragraph 174.

**175.   Had John and Jane Doe been aware that the purpose of the communications
initiated by Joshua and Stephanie Mast and Motley was to facilitate the Masts' abduction of
Baby Doe, they never would have communicated with Motley, shared photographs of Baby
Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.**

<u>ANSWER</u>:  The Masts deny the allegations in Paragraph 175.

**176.   Had John and Jane Doe been aware that Joshua and Stephanie Mast had
fraudulently obtained orders of custody and adoption for Baby Doe, they never would have
communicated with Motley, shared photographs of Baby Doe, or traveled to the United
States at the behest of Joshua and Stephanie Mast.**

<u>ANSWER</u>:  The Masts deny the allegations in Paragraph 176.

**177.   Had John and Jane Doe been aware that Joshua and Stephanie Mast had filed
an action in a U.S. federal court to prevent Baby Doe's reunification with her biological
family and legal guardians, they never would have communicated with Motley, shared
photographs of Baby Doe, or traveled to the United States at the behest of Joshua and
Stephanie Mast.**

<u>ANSWER</u>:  The Masts deny the allegations in Paragraph 177.

**178.   John and Jane Doe have suffered and will continue to suffer what they regard
as the worst tragedy they have experienced, having their child unjustly ripped from their
lives.**

<u>ANSWER</u>:  The Masts deny the allegations in Paragraph 178.

**179.   Accordingly, Joshua and Stephanie Mast and Motley are jointly and severally
liable for the harm suffered by Plaintiffs as articulated above.**

<u>ANSWER</u>:  Paragraph 179 asserts a legal conclusion, so no response is required. Inasmuch as a

response is required, the Masts deny the allegations in Paragraph 179.

## COUNT III

## COMMON LAW CONSPIRACY
## (AGAINST ALL DEFENDANTS)

**180.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.**

**ANSWER:**  The Masts incorporate their responses to the allegations contained in the preceding

paragraphs as if fully set forth herein.

**181.    Each of the Defendants acted in concert, agreed, associated, mutually undertook and combined together to intentionally and purposely commit the wrongful and tortious acts against all of the Plaintiffs as set forth above. The concerted and purposeful actions of each Defendant have denied John and Jane Doe their parental rights and wrongfully interfered with their ability to establish and assert those rights; and denied Baby Doe her right to know and be raised in the natural home of her biological family and legal guardians.**

**ANSWER:**  Paragraph 181 asserts a legal conclusion, so no response is required. Inasmuch as a

response is required, the Masts deny the allegations in Paragraph 181.

**182.    Each of the conspirators is fully responsible for the acts of each other. The total effect of the conspiracy not only is tortious, but, indeed, also is a criminal act tantamount to child abduction under §§ 18.2-47(a) and 18.2-49 of the Code of Virginia. The actions of the conspirators violate federal statutes, laws and regulations of the Commonwealth of Virginia, and the laws of Afghanistan.**

**ANSWER:**  Paragraph 182 asserts a legal conclusion, so no response is required. Inasmuch as a

response is required, the Masts deny the allegations in Paragraph 182.

**183.    Each Defendant acted in furtherance of this conspiracy to defraud John and Jane Doe and to abduct and unlawfully restrain Baby Doe.**

**ANSWER:**  Paragraph 183 asserts a legal conclusion, so no response is required. Inasmuch as a

response is required, the Masts deny the allegations in Paragraph 183.

**184.    Joshua and Stephanie Mast, inter alia, fraudulently induced John and Jane Doe, through their agent Motley, to share photographs of Baby Doe, which they used to unlawfully obtain an Afghan passport for Baby Doe without the knowledge or consent of her biological family and legal guardians. Joshua and Stephanie Mast fraudulently misrepresented their intentions, both directly and through their agent Motley and through Osmani, to John and Jane Doe when persuading them to bring Baby Doe to the United States**

for the sole purpose of obtaining medical treatment. Joshua and Stephanie Mast abducted Baby Doe and have continued to deprive John and Jane Doe of any contact with her. Joshua and Stephanie Mast procured fraudulently obtained documents to affect her abduction.

**ANSWER:**  The Masts deny the allegations in Paragraph 184.

185.    Richard Mast, inter alia, at the direction of and on behalf of Joshua and Stephanie Mast, fraudulently misrepresented material facts, and made numerous omissions of fact, to multiple courts to unlawfully obtain custody and adoption orders that would facilitate the abduction by Joshua and Stephanie Mast of Baby Doe, as well material misrepresentations to this Court and USCIS in furtherance of the same. He did so in violation of his ethical rules of professional responsibility as an attorney licensed in the Commonwealth of Virginia. Richard Mast and Joshua and Stephanie Mast knew these statements to be false and the omissions to be material.

**ANSWER:**  The Masts deny the allegations in Paragraph 185.

186.    Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly made false representations to John and Jane Doe when persuading them to have Baby Doe travel to the United States to obtain medical treatment.

**ANSWER:**  The Masts deny the allegations in Paragraph 186.

187.    As set forth above, the Defendants' overt acts and omissions in furtherance of their conspiracy have harmed and will continue to harm each Plaintiff.

**ANSWER:**  Paragraph 187 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 187.

188.    Accordingly, the Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.

**ANSWER:**  Paragraph 188 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 188.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

189.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

**ANSWER:**  The Masts incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

190.    Since 2019, the conduct of Joshua and Stephanie Mast has shown a consistent pattern of reckless disregard for the very real possibility of causing extreme emotional distress to John and Jane Doe. As set forth above, the Masts conspired to separate Baby Doe unlawfully from the only family she had ever known for the vast majority of her short life. It is implausible that someone would be unaware of the extreme trauma that would be inflicted on parents when their child is ripped from their arms by someone who had for months been claiming that all he wanted was to help them.

**ANSWER:** The Masts deny the allegations in Paragraph 190.

191.    As alleged above, the conduct of Joshua and Stephanie Mast was both deceitful and criminal, violating the laws of Afghanistan, Virginia, and the United States. They were aware that Baby Doe had been reunited with her biological family and legal guardians, and chose to conceal this from Virginia state and federal courts. They continued to mispresent to the Virginia courts that Baby Doe was a stateless, unaccompanied orphan. Neither the government of Afghanistan nor the United States agreed with this determination. Nonetheless, to carry out their scheme, Joshua and Stephanie Mast consistently violated laws meant to safeguard not only the wellbeing of vulnerable children, but the foreign policy interests of the United States.

**ANSWER:** The Masts deny the allegations in Paragraph 191.

192.    Richard Mast knowingly furthered this scheme through his fraudulent in-court misrepresentations, by procuring the custody and adoption orders for Joshua and Stephanie Mast, and by submitting a deceptive immigration application for John Doe.

**ANSWER:** The Masts deny the allegations in Paragraph 192.

193.    Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly facilitated the plan to abduct Baby Doe by misrepresenting their intentions to John and Jane Doe when persuading them to bring Baby Doe to the United States supposedly for the sole purpose of obtaining medical treatment.

**ANSWER:** The Masts deny the allegations in Paragraph 193.

194.    These actions would be considered extreme, outrageous, and intolerable by any reasonable person.

**ANSWER:** Paragraph 194 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 194.

195.    As a direct result of the extreme, outrageous, and intolerable conduct of all Defendants, Plaintiffs have suffered extreme emotional distress. The lives of all three

Plaintiffs have been forever altered in fundamental ways that no individual should be expected to endure.

**ANSWER:**  The Masts deny the allegations in Paragraph 195.

196.    **Accordingly, Defendants are jointly and severally liable to Plaintiffs for all of their harm suffered at the hands of the Defendants, as set forth above.**

**ANSWER:**  Paragraph 196 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 196.

## COUNT V

### FALSE IMPRISONMENT
### (AGAINST DEFENDANTS JOSHUA AND STEPHANIE MAST)

197.    **Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.**

**ANSWER:**  The Masts incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

198.    **On September 3, 2021, Joshua Mast physically removed Baby Doe from the custody of her lawful guardians without their permission or consent, restricting her movement and confining her to the care of himself and Stephanie Mast.**

**ANSWER:**  The Masts deny the allegations in Paragraph 198.  The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97.

199.    **Since September 3, 2021, Joshua and Stephanie Mast have continued to keep Baby Doe captive, without the permission or consent of her lawful guardians.**

**ANSWER:**  The Masts deny the allegations in Paragraph 199.  The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97.

200.    **On September 3, 2021, Baby Doe began crying when the woman assisting Joshua Mast would not return her to Jane Doe, indicating Baby Doe's awareness of this restraint. John and Jane Doe, in their capacity as Baby Doe's legal guardians, were and are aware of and vehemently opposed to this unlawful restraint.**

**ANSWER:**  The Masts deny the allegations in Paragraph 200.  The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97.

**201.    As a result of this unlawful restraint, Baby Doe, John Doe and Jane Doe have been injured by this family separation since September 3, 2021.**

**ANSWER:**  Paragraph 201 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 201.

**202.    Accordingly, Joshua and Stephanie Mast are jointly and severally liable to Plaintiffs for all of the harm they have endured, as set forth above.**

**ANSWER:**  Paragraph 202 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 202.

## RELIEF REQUESTED

The Masts deny that John and Jane Doe are entitled to any relief and, on that basis, denies any and all allegations that follow the heading "Prayer for Relief" in the Amended Complaint.

## (2) AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof that they would not otherwise bear, Defendants Joshua & Stephanie Mast assert the following affirmative and other defenses to the allegations and claims in the Amended Complaint. The Masts deny wrongdoing or liability of any kind. No defense constitutes an admission that the Masts are liable to John and Jane Doe, that John and Jane Doe has been or will be injured or damaged, or that John and Jane Doe are entitled to relief from the Masts. The Masts reserve the right to add or amend its affirmative and other defenses as facts develop through discovery.

## First Defense

The district court lacks subject matter jurisdiction over Plaintiffs' claims.

**Second Defense**

Plaintiffs' claims are barred in whole or in part under doctrines of res judicata and collateral estoppel in other litigations.

**Third Defense**

Plaintiffs' claims for equitable relief are barred by the doctrine of unclean hands.

\* \* \*

Additional facts that may support additional defenses may come to light through discovery or further investigation. Joshua and Stephanie Mast reserve the right to assert new affirmative or other defenses in the future.

**(3) COUNTERCLAIM COMPLAINT**

**INTRODUCTION**

1.      Joshua and Stephanie Mast are the adoptive parents of the Child, an orphan of war and victim of terrorism, who was rescued under tragic circumstances from a battlefield in Afghanistan. The Masts have gone to great lengths at great personal expense and sacrifice to ensure that the Child has a safe and loving home and receives the medical care she requires. John and Jane Doe have engaged in a prolonged campaign to smear the Masts reputation and to attack their family including through the press. As part of that campaign, they have knowingly made false statements about the Masts and about their own relationship with the Child. Those knowingly false statements have tarnished the Masts' reputation, have inflicted substantial emotional distress, and have otherwise tortiously interfered with the lives of the Masts and their family.

2.      The Masts continue to maintain that this Court lacks subject matter jurisdiction over Plaintiffs' claims and that this matter must therefore be dismissed in its entirety. But in light of the Court's ruling on jurisdiction, and so long as this Court continues to exercise subject-matter

jurisdiction over this case, the Masts assert counterclaims for defamation, intentional infliction of emotional distress, and civil conspiracy.

## PARTIES

3.      Joshua Mast is the adoptive father of the Child, residing in North Carolina.

4.      Stephanie Mast is the adoptive mother of the Child, residing in North Carolina.

5.      John Doe is a national of Afghanistan, residing in Texas, who has asserted claims against the Masts related to the Child and who is prosecuting a civil proceeding in Virginia Circuit Court to challenge the validity of the Masts' adoption of the Child.

6.      Jane Doe is a national of Afghanistan, residing in Texas, who has asserted claims against the Masts related to the Child and who is prosecuting a civil proceeding in Virginia Circuit Court to challenge the validity of the Masts' adoption of the Child.

## JURISDICTION AND VENUE

7.      As the Masts have previously argued, this Court does not have subject-matter jurisdiction over this dispute.

8.      But in light of the Court's ruling on jurisdiction, and so long as this Court continues to exercise subject-matter jurisdiction over this case, the Masts assert that this Court would also have jurisdiction over their counterclaims under 28 U.S.C. §§ 1332 and 1367.

9.      This Court has personal jurisdiction over John and Jane Doe because they initiated this action and submitted to the personal jurisdiction of this Court.

10.     Assuming that venue for Plaintiffs' claims is proper in this district under 28 U.S.C. § 1391(b), then venue is likewise proper for the Masts' counterclaims.

**RELEVANT FACTS**

**A.      The Child's Recovery in Afghanistan**

11.      The Child was recovered off the battlefield at approximately 6–8 weeks old during a U.S. Special Forces mission ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████.

12.      During the engagement, the Child's biological parents fought to the death in close combat against U.S. Special Forces, and her biological mother was wounded in a suicide blast detonation.

13.      An eye-witness Army Ranger on the ground the night of September 5-6, 2019 testified in Virginia Circuit Court that the Child's presumed father fought to the death, while holding the infant child in front of him like a human shield, aiming an AK-47 at the Rangers.

14.      The fighter's gun jammed; he disappeared back into the compound with the child; and reappeared without the child and with a grenade to throw at the Rangers. Four Rangers were wounded. One was not. The Ranger killed the fighter with grenades of his own at a distance of a few feet.

15.      The same eyewitness ranger testified that he then saw the Child's presumed mother run from the South Compound of Interest, with a person-borne improvised explosives device (IED) and while carrying the baby. The Ranger saw the woman blow herself and the baby up 15 feet in front of him, outside the compound, with the baby falling to the ground. The mother died. The baby suffered serious injuries. The Ranger tenderly picked the baby up and gave her to U.S. female soldiers who were on the mission to search women and children. One of them held her during the fight.

16.    The explosion severely injured the Child, fracturing her femur, deforming her skull, and leaving several burns, scars, and other signs of trauma on her face and body

17.    An eyewitness Ranger testified that at the North Compound of Interest approximately 100 meters from the location where the Child was blown up by her mother, stored explosives detonated, causing a wall collapse that buried multiple Rangers at the North Compound. He sprinted to the rescue with his dog.

18.    The Ranger returned to the South Compound to find that an Afghan Government soldier wanted to shoot the injured The Child in the head on the spot, and "throw her in the f***ing river" because the Afghan government soldier didn't want a foreign terrorist's child to grow up in his country. The Rangers prevented this and brought the Child to the hospital.

19.    Intelligence recovered by U.S. forces from the September 5-6 2019 raid included a picture of Child's likely father recovered from a terrorist's captured device. The picture was included in a declassified mission summary obtained by Associated Press and hosted at https://www.documentcloud.org/documents/23815515-declassified-mission-summary-1.

20.    This terrorist was a ███████████████████ fighter foreign to Afghanistan, not a "peaceful farmer." A detainee captured by US forces identified this man with the machine gun as living in the compound outside of which the Child's mother detonated herself and the Child, and beside which the Child was recovered. This man bears a strong physical resemblance to the Child.

21.    The Masts compared the Child's features to this fighter's photos early on. The similarities noted include: ████████████████████████████████████ ██████████████████████████████. The similarities have grown as the Child has grown.

22.    Another photo recovered from a terrorist's electronic device the night of the September 5-6 raid depicted another ████████████████ terrorist fighter in front of a black Al Qaeda flag. This man was reportedly the nephew of the older fighter. The picture was also listed in a document obtained and hosted by the AP.

23.    This picture (Image X) is not just any terrorist, but is a picture of the current second-in-command of the Turkistan Islamic Party, its "deputy emir," Abdusalam Al-Turkistani (a.k.a. various spelling variations), in front of a black Al Qaeda flag background.

24.    Abdusalam Al-Turkistani is very much alive today, giving a recent interview published in February 2023, around the time the AP went on its Taliban-guided tour of the village from which the Child was recovered, pictures of which AP published in an August 4, 2023 article. ████████████████████████████████████.

**B.    The Child's Recovery in Afghanistan**

25.    At the time the Child was rescued by U.S. forces and taken to receive treatment for her injuries in the Military Hospital system, Major Joshua Mast (then Captain) was deployed in Afghanistan where he served as a Marine Corps Judge Advocate.

26.    Joshua Mast grew concerned that the Child, a foreign female infant in Afghanistan being treated in a Military Hospital under consistent rocket attack, would not have access to the medical care required to treat her injuries.

27.    It was apparent to Joshua Mast and other military lawyers working the case (who helped compile what became the "Declassified Mission Summary") that The Child had no living relatives, due to the nature of the terrorist group from which she was recovered ████████ ████████████████████████████████████████████████████████, the sophistication of the unit

involved, the strength of the intelligence assessing her likely area of origin, and the devastating scale of the destruction of the AQ training camp.

28.     Joshua Mast—with the full knowledge of his command, as US DoD documents show—fought for the child's rights to safety, medical treatment, and to not be turned over to non-relatives in an objectively dangerous manner. Joshua Mast—along with others within DoD—demanded at a minimum a DNA test for any claimants and vetting for terrorist ties. The DoD was well aware the risk that unrelated Taliban proxies would step forth as "uncles" to try to claim the child. The command was fully informed Joshua Mast was seeking custody and birth documents to facilitate her safety, treatment and continuing care.

29.     Joshua Mast, while deployed and still in Afghanistan, reached out to a national nonprofit legal organization noted for its First Amendment-related defense of religious freedom, the sanctity of human life, and the family, because of that organization's expertise and reputation for protecting innocent human life, including preborn and newborn infants.

30.     His brother, Richard Mast, was an attorney at this nonprofit. Joshua explained the situation, and Richard Mast agreed to try to help him ensure a safe outcome for the infant child through advocacy and representation.

31.     Still in Afghanistan, Joshua Mast (through Richard's representation in Joshua's county of residence in Virginia) initiated custody proceedings in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "J&DR Court") largely to establish a legal identity that would allow her to  receive appropriate medical care in the United States via a humanitarian parole visa.

32.     After receiving the facts as understood by the Masts at the time (and borne out by multiple lawsuits later), and satisfied that it had jurisdiction, the J&DR Court granted custody of the Child to Joshua and Stephanie Mast, but the Child still needed a legal identity as she had none.

33.     Richard Mast filed again on their behalf, in Fluvanna County Circuit Court, a Petition to Amend a Certificate of Birth, which Judge Richard E. Moore signed on November 8, 2019. It was presented to the Virginia Department of Health that same day.

34.     The Virginia Department of Health declined to issue a Certificate of Birth on the basis of that Order, prompting further discussions between Richard Mast, the court, and the Virginia Office of the Attorney General.

35.     Richard Mast consulted extensively with an assigned Assistant Attorney General who represents and advises the Virginia Department of Health. This Assistant AG circulated the request to her superiors for input, including the facts as understood at the time, and the legal reasoning.

36.     The Virginia Office of the Attorney General, recognizing that the purpose of the request was to provide a legal identity and care for the Child, consulted with the Virginia Circuit Court judge regarding his authority to issue the order. The Virginia AG's Office never suggested that serving formal notice to the United States was necessary.

37.     The Virginia Department of Health, through the Office of the Attorney General, opined that Richard Mast should file a Petition for Adoption on behalf of the Masts, and that the Circuit Court could issue an "Interlocutory Order of Adoption," after which VDH could issue a Birth Certificate.

38.     On November 9, 2019, the Assistant AG informed Richard Mast: "Good morning. I've been communicating with my Deputy this morning and am waiting to hear back with a final

response. I'm guessing she is likely going to run this up the chain further. Her first response was similar to mine – **we need an adoption order**." Richard Mast responded with an offer to send further thoughts and analysis to the Virginia Office of the Attorney General, which he did.

39.     Later that day, the Assistant AG responded to Richard Mast while she was on the road: "I just stopped for a break and forwarded your email to my chain of command and texted my Deputy to alert her to it." She advised that she had spoken to the Circuit Court judge: "I just talked with him. He actually asked about his authority to enter an adoption order. I told him I would pursue it with my office [Office of the Attorney General], which I'm trying to do now" from her out-of-office location.

40.     Finally, the Assistant AG responded with a green light: "Talked with the judge. He will issue an interlocutory order. I advised [the Virginia Registrar] that **she can issue the certificate on the interlocutory order**. I think you're going to have to coordinate logistics with the judge because he's [out of state]. He's going to try to call you. Feel free to call me and I can give you more details but I think we found a way to get this done."

41.     The Assistant Attorney General continued, that the Circuit Court judge "knows what he wants the order to say and he and I went over it together… Please make sure the order states that the Mast's are the adoptive parents and should be listed as the parents on the birth certificate. The order...should also contain the dates and places of birth of Capt. and Mrs. Mast. It should also state that Baby [Doe's] place of birth and her natural parents are unknown."

42.     On November 10, 2019, Richard Mast responded that the "Petition and interlocutory order are done and sent to [C]aptain Mast for review; then will go to [a Virginia] adoption attorney" for final review, and that "Judge Moore has been advised."

43.     Richard Mast sought input from the Virginia adoption attorney, who reviewed the draft pleadings. She did not suggest serving formal notice to the United States was necessary.

44.     Pursuant to these consultations, Richard Mast filed the Petition for Adoption, and the Circuit Court judge signed an Interlocutory Order of Adoption so the Masts would be able to bring The Child to the United States. VDH issued the Birth Certificate. The Virginia Assistant Attorney General informed the Circuit Court on November 10, 2019: "the Registrar has issued the certificate of foreign birth for [the Child]. Thanks for your patience with me and my Office. Hope you can enjoy the rest of your weekend."

45.     Joshua Mast presented these developments to his chain of command in Afghanistan, providing actual notice to DoD. The Child was approved by DoD as the DoD Dependent of Joshua Mast, her U.S. guardian. The DoD drafted a written request to Afghan government officials to send The Child to her U.S. Guardian in America for treatment.

46.     Captain Mast's commander in Afghanistan made preparations to move the Child to Germany and then to the U.S., on the basis of Baby Doe's only legal identity, and status as Captain Mast's DoD Dependent.

**C.     The United States Relinquishes Custody of the Child**

47.     Joshua Mast believed at the time and continues to believe, with the hindsight of approximately two years of litigation and the testimony of eyewitnesses and Afghan law experts, that the Child was a stateless minor rather than an Afghan citizen based on, among other things, the fact that many fighters killed in the assault on the training camp were ███████████ ███████████, and that children born to foreigners do not receive birthright citizenship in Afghanistan.

48.     Joshua Mast raised these concerns with appropriate authorities, including in the Department of Defense (DoD) and the U.S. Congress, many of whom supported his efforts.

49.     The Commandant of the Marine Corps approved the Child as a DoD dependent with full knowledge of her location and status as a patient in a U.S military hospital at Bagram Air Base.

50.     At least one official from the State Department—the Assistant Chief of Mission (ACM) at the Embassy in Afghanistan—took the contrary view that the Child should be handed over to the custody of the then-extant Afghan Government.

51.     In a meeting on October 23, 2019 at which the ACM was supposed to receive a classified briefing on U.S. intelligence about the Child's likely origin ████████████████, ████████████, the ACM invited representatives of the Afghan Government ultimately and arranged for the Child to be placed in Afghan custody.

52.     The ACM also secured an order that restricted military personnel from advocating against transferring the Child to Afghan custody.

53.     Joshua Mast remained concerned for the dangerous situation facing the Child after the superficial review of the Embassy.

54.     It was clear to Joshua Mast that the Child would not receive adequate medical care in Afghanistan, was not an Afghan national (but a stateless child), and was likely being turned over to non-relative, terrorist affiliated persons.

55.     Joshua Mast and his wife, Stephanie, filed for a Temporary Restraining Order (TRO) in this Court on February 26, 2020 seeking to prevent a transfer of custody without a DNA test and vetting for terrorist affiliations, which had been the position of DoD during the preceding months leading up to the filing of the TRO.

56.     Counsel for the United States represented to this Court that the U.S. Government was unaware of Captain Mast's actions, but that was not true. At that time, the U.S. Government had in its possession an extensive memorandum signed two weeks' prior by Deputy Assistant Secretary of Defense Eric J Mauerer, which establishes (1) DoD's knowledge of both the J&DR Court Order and the Circuit Court Order, and (2) DoD's understanding, which was consistent with the understanding of the Masts at that time, that the request was not for purposes of adoption, but for humanitarian treatment and care for the child.

57.     After the Court questioned the Government's lawyers, who failed to apprise this Court of the high level DoD recognition of the Child as Joshua Mast's dependent, and after querying Richard Mast with a compound question (the answer to which has been wildly misconstrued by DOJ lawyers, Plaintiffs' counsel and the press), the Court denied that request, and the transfer of custody went forward.

58.     Upon information and belief, after the Child left DoD custody, she was placed with John Doe's father, who purports to be the older half brother of the child's purported biological father. John Doe's father has not testified in the past two years of litigation, but the Does assert this man left her with the Does.

**D.     The Masts Relocate the Child & Get Her Out of Afghanistan**

59.     After receiving reports that the Child was experiencing medical complications, the Masts continued to be concerned that the Child would not receive the medical care she needed in Afghanistan and that it was not a safe place for her.

60.     The Masts proceeded with finalizing their adoption of the Child in the United States.

61.     As the Taliban campaign swept over Afghanistan in the late summer of 2021, Joshua Mast established contact with John Doe and requested he bring the Child to Kabul to fly to the United States before the country collapsed.

62.     Joshua Mast communicated with John Doe through an interpreter, Ahmad Osmani.

63.     Based on John Doe's representations, Joshua Mast and Ahmad Osmani understood that John Doe's father was the actual person with decision-making authority over the Child. At no point did John Doe represent that he personally had legal responsibility for the Child.

64.     Osmani repeatedly asked on Joshua Mast's behalf whether John Doe's father had made a decision yet to send the Child to Joshua Mast.

65.     Osmani asked in one recorded message about how the Child was doing physically, and where she lived.

66.     John Doe left a recorded voice message in response for Joshua, which was interpreted by Osmani. Using the Child's American name, which Joshua had secured for her, John Doe stated that the little girl did not live with him, his father, or "[his] family," but with "another family" and "that family has become like her mother and father."

67.     Joshua Mast was candid with John Doe from the beginning and throughout their discussions, that Joshua and Stephanie Mast had adopted the Child, that they had created a legal identity for her in the United States, and that they intended for her to live with them in the United States using the strongest words for legal responsibility over a child in Pashto.

68.     When the Afghan Government collapsed on August 15, 2021, and the evacuation began, Joshua Mast again contacted John Doe about bringing the Child to U.S. forces, extremely concerned that they may not get another chance—a belief that John Doe shared.

69.     Through the efforts of Joshua Mast and other U.S. military personnel, and based on the legal identity of the Child under the Adoption Order, John and Jane Doe were able to flee Afghanistan, notwithstanding the chaos of the U.S. withdrawal, by bringing the Child to U.S. Forces.

70.     Joshua Mast made sure that the U.S. military did not evacuate only the Child but also that they brought John Doe and Jane Doe along so they would not be killed by the Taliban for disobeying their orders.

71.     But for the personal efforts of Joshua Mast and the child's U.S. identity, John Doe and Jane Doe would not have been able to flee Afghanistan in the aftermath of the U.S. withdrawal.

72.     Specifically, Joshua Mast was told by his commanding officer that the assets recovering the child "don't give a [expletive] about Afghans, and would likely stick a gun in their face and take [the Child]." Furthermore, Joshua Mast was told that he would have to "choose between [the Child] and [John and Jane Doe]" as it came down to execution of the mission to recover the Child from behind Taliban lines. Joshua Mast refused to abandon the Does to be murdered by the Taliban, and instead delayed the mission for over 24 hours until he personally confirmed the unit would evacuate the Does as well.

73.     During a stop in Germany on the trip from Afghanistan to the United States, concerns arose that John Doe and Jane Doe would be diverted to another country and would not be permitted to travel to the United States with the Child and the Masts.

74.     During that same trip, upon information and belief, Jane Doe confronted John Doe, expressing displeasure that he had consciously agreed to allow the Masts to take custody of the Child as a means to secure safe passage to the United States. This encounter illustrates that both

John Doe and Jane Doe were aware that Joshua and Stephanie Mast had adopted the Child and would have custody of her in the United States.

75.     Jane Doe also pejoratively referred to John Doe as a "Modegal" because "[John Doe] wants to go to America, and [the child] is the price."

76.     In Germany, John Doe revealed for the first time that he had made a collateral promise to Jane Doe to induce her to abandon her threat to remain in Afghanistan and instead accompany him to the America. Specifically, John Doe told Jane Doe that the Child would never leave her, Jane Doe's, side if Jane Doe would come to America. Neither John Doe nor Jane Doe made any reference to any sort of parental or legal claim to custody or control of the Child at that time or at any other time; rather, John Doe represented to Joshua Mast both before and after this conversation that his wife was attached to the Child but would be fine with the Child's living with the Masts once her own child was born. This promise demonstrates the Does were aware the Mast's intended the child to live with them in America.

77.     In Germany, Joshua Mast again intervened to ensure that John Doe and Jane Doe would be able to travel to the United States with Baby Doe and the Masts.

78.     But for Joshua Mast's intervention, John Doe and Jane Doe would not have been permitted to travel to the United States. This episode illustrates that the Masts were not attempting to "kidnap" Baby Doe or otherwise trick John Doe and Jane Doe—and that John Doe and Jane Doe were well aware of that fact.

79.     Upon the Does entry to the United States, Joshua Mast learned derogatory information about John Doe, the details of which are known to John Doe and Jane Doe, but which are subject to a protective order sought and obtained by the United States Government. That

information, along with subsequent developments, changed the Masts' view of the Does. While the Masts were still willing to provide them what help they could, they became more wary.

80.     John and Jane Doe were paroled in the United States and ultimately were sent to Fort Pickett, Virginia. This was after Jane Doe called Joshua Mast and told them they were being deported to Mexico via a bus. Joshua Mast spoke to the American personnel, again explained that the Does had disobeyed the Taliban and could not be deported, and requested they be sent to Fort Pickett, as it was the closest location to Joshua Mast's duty station.

81.     On September 3, 2021, the Masts went to Fort Pickett and took custody of Baby Doe pursuant to the final order of adoption from the Virginia Circuit Court.

**E.      Litigation Between the Does and the Masts**

82.     In November 2021, John and Jane Doe filed a petition seeking to set aside the Adoption Order in the Fluvanna County Circuit Court before Judge Richard Moore, who had presided over the original adoption proceeding. John Doe alleged that he was the "first cousin of the child" and that Baby Doe's unspecified "Afghan family" had initiated "proceedings" to gain custody of her. Neither John Doe nor Jane Doe alleged any parental or custodial rights over the Child under Afghan law or otherwise.

83.     Virginia law provides that "[a]fter the expiration of six months from the date of entry of any final order of adoption from which no appeal has been taken to the Court of Appeals, the validity thereof shall not be subject to attack in any proceedings, collateral or direct, for any reason, including but not limited to fraud, duress, failure to give any required notice, failure of any procedural requirement, or lack of jurisdiction over any person, and such order shall be final for all purposes." Va. Code § 63.2-1216. Virginia courts have recognized a narrow exception, allowing a parent with an "actual relationship of parental responsibility," not just a "mere

biological relationship," to contest an adoption if he proves extrinsic fraud by clear and convincing evidence that prevented filing within the six-month period. *See McCallum v. Salazar*, 49 Va. App. 51, 57 (2006) (quoting *F.E. v. G.F.M.*, 35 Va. App. 648, 663 (2001)).

84.     In March 2022, the Does repleaded the petition, alleging for the first time that they were "in effect, the child's adoptive parents as legal and permanent guardians of the minor child under Afghan law," "verbally delegated" from Doe's father. The Circuit Court has since held that the Does have not established any biological or legal parental relationship with Baby Doe, though it nevertheless allowed the case to proceed.

85.     That Virginia Circuit Court proceeding is ongoing and the current subject of an interlocutory appeal concerning the applicability of Code § 63.2-1216.

86.     The Does first filed this lawsuit on September 2, 2022, naming as defendants not only Joshua & Stephanie Mast but also Richard Mast, their lawyer in the state-court proceedings; Ahmad Osmani, Joshua Mast's interpreter; and Kimberley Motley, the renowned humanitarian lawyer who helped find and provide for the Child in Afghanistan.

87.     In the Circuit Court litigation, and as shown in discovery from that litigation, John Doe has made multiple false or inconsistent claims. And as explained below, upon information and belief, the Does have repeated those false claims, directly and through agents and intermediaries, the news media in a successful effort to plant defamatory news stories about Joshua and Stephanie Mast.

88.     John Doe has lied about his relationship with the Child. Indeed, his claims of relationship to the Child have varied wildly among the many court filings, testimony and evidence. In 2021, John Doe received a voice message recording from Afghan interpreter Osmani asking "Are you doing well? Is your wife doing well? How is your kid? <u>Have you heard</u> about how

70

[Child's American Name] is doing? Is [Child's American Name] at <u>your house</u>, or is she at <u>[your father's] House</u>? How is [Child's American Name]  doing? How is [your father] and everyone else in your family doing?"

89.     John Doe responded: "*And* [Child's American Name - *everything else is Pashto] no she is with someone else, there is another family she lives with them, she is not with me or [my father]. I bring her over sometimes, but she doesn't stay with me, <u>with my family</u>. For her <u>that family has become like her mother and father</u>.*"

90.     Notwithstanding these clear contemporaneous statements that the Child was not living with him or with his family—including Jane Doe—John Doe has repeatedly alleged he and Jane Doe acted as the Child's parents consistently over an extended period and cared for her in their home.

91.     John Doe testified under oath in 2022 that his father never asked permission of the Taliban to send the Child to America. Yet, he told US Conference of Catholic Bishops (USCCB) volunteers in 2021 (who took down a written report filed in the WDVA federal suit) that his family "**had asked permission from the Taliban to take the child to the US**" and that he "**chose to disobey the Taliban's order**" and take her anyways.

92.     This USCCB report mentions the derogatory information about John Doe, the false "eldest surviving uncle" claim of John Doe's father, and John Doe's false "Marine stomped on my foot and threw me back" claim. John Doe dropped this last allegation from the Amended Complaint, but repeated it in Paragraph 121 of the original complaint.

93.     John Doe wrongly withheld this document based on an unsupported assertion of attorney-client privilege, and it was therefore hidden from the Masts and the Virginia Circuit Court for over a year. The Circuit Court later sanctioned John Doe for withholding the memo.

94.     John Doe has repeatedly testified under oath and claimed in writing that his father is the oldest "half-brother" with two younger "half-brothers"; that his grandmother remarried, giving birth from the second marriage to the "half-brother" father of the Child, a "peaceful farmer." But this purported father's *Taskerah* (Afghan national identity document) shows that this individual is five years *older* than John Doe's father. The documentary evidence establishes that John Doe's family-origin narrative is false.

95.     The purported "peaceful farmer" is not a "younger" "half-brother" of John Doe's father, as John Doe and Jane Doe have repeatedly claimed to the courts and beyond. Moreover, John Doe and counsel have translated the purported father's name as "[NAME] Uncle," a homonym for the words "Sir" or "Commander" in Pashto. It would therefore be accurate to translate that name as "[NAME] Commander" or "[NAME] Sir," but that would not support John Doe's false "relative" narrative.

96.     John Doe has claimed that the Red Cross identified a family member in 2019. Yet this is demonstrably false as well. This reported "uncle" is an unrelated third-party. When ordered to respond to discovery in this case by identifying relevant family members, the Does did not identify this individual.

97.     This name of this individual, ███████████ is the name of the same claimant on two different official claims documents, each with a different name for the child. The Does do not contest that ████████ is unrelated to the child.

98.     The unrelated ███████████ who completed the ICRC "Request For Family Reunification" dated October 10, 2019, claimed that the child of John Doe's deceased "uncle" is named ███ and that "all other surviving siblings are living with" this ████████ The

72

WhatsApp profile at the number listed in the ICRC Request by ███████ displays a Taliban profile.

99.     The unrelated ███████ who completed the "OCT-2019" "Individual Case Report of Child Rights Violations" form claims the child of John Doe's deceased "uncle" is named ███ This ███████ provided a different WhatsApp phone number, which shows a profile image depicting a baby wearing a headband with the word "martyr" on it. This ███████ claimed that "in reality, no one knew about the child's existence. He explained that during the bombing incident, the child's three sisters, two brothers, mother, and father were killed. Initially, they thought the child had also died, but they later received a report from the Red Cross ███████ ███████████████████████████████████████████████████████████"

100.     Yet the child was not given to either ███████ but to John Doe's father, who appears nowhere in ICRC documents, except for a "Handover Certificate."

101.     At the outset of litigation, John Doe, though counsel requested and received from ICRC all documents relating to the child. The ICRC's initial privacy waiver draft permitting the release of documents was sent by ICRC to counsel drafted in the name of ███████ Moreover, the ICRC cover letter attached to this document lists the child by three different names. Counsel redrafted and returned the "waiver" to Red Cross, not with the signature of ███████ but signed by John Doe's father.

102.     There are a total of at least four different "Afghan names" for the child used in various documents by various individuals, with two different names for the supposed same child used by ███████ who has been disclaimed by John Doe as a relative. And the Does themselves have claimed at times to have used a fifth name for the child—though in

communications with the Masts, they used the American name the Masts had used in the adoption proceeding.

103.    John Doe has claimed no one in his family supports the Taliban. This is also demonstrably false.

104.    John Doe's father displayed support for the Taliban on his own WhatsApp profile, until it was brought to the attention of the Doe and their counsel in the Virginia Circuit Court litigation. Then, it promptly was removed from WhatsApp not to be seen again.

105.    John Doe's father obtained the child without a DNA test or terror ties vetting by the Americans, despite Afghan government officials requesting a DNA test.

106.    John Doe stated his father was "responsible" to the Taliban for the child. John Doe stated his father asked "permission" from the Taliban to send the child to America. John Doe stated he had many Taliban fighter contacts in his phone.

107.    These false allegations are not just isolated statements. They are part of a broader false narrative, crafted by John Doe and Jane Doe and refined during the course of this litigation and the antecedent related litigation in the Virginia Circuit Court, to paint Joshua and Stephanie Mast as "kidnappers."

108.    In support of this false "kidnapping" narrative, the Does have made numerous false statements about their alleged relationship to the Child and numerous false statements about the Masts' candor to them during the evacuation from Afghanistan. In truth, the Masts were candid with the Does from the beginning that they were seeking to bring the Child to the United States to live with them pursuant to a U.S. legal order. The Does, however, have lied by denying that these intentions were ever disclosed to them. And they have crafted these lies in furtherance of their

broader effort to obtain custody of the Child by painting Joshua and Stephanie Mast as "kidnappers."

### B.  False Media Publications

109.    The Does' false "kidnapping" narrative, and their supporting lies, have not been limited to the docket and the courtroom.

110.    On numerous occasions, both directly and through agents or intermediaries, the Does have repeated these false allegations to members of the media and other third parties. They have done so with full knowledge of their falsity and with the specific intent of procuring negative news stories about the Masts that, they hope, will influence the litigation in their favor.

111.    To further stack the deck, the Does have sought and obtained gag orders from this Court and from the Virginia Circuit Court that limit the Masts' ability to defend themselves in the court of public opinion.

112.    On October 20, 2022, the Associated Press published an article entitled *Afghan couple accuse US Marine of abducting their baby*. *See* https://apnews.com/article/afghan-baby-us-marine-custody-battle-b157557538b84b288a0a8415735e24ab.

113.    In reality, the Child is not their baby, and the Masts did not abduct her. But the article falsely conveys its defamatory message based on the information that the Does provided.

114.    Jane Doe is quoted directly in the article, having spoken on the record to the Associated Press to relay the Does' false "kidnapping" narrative. Two attorneys for the Does, Sehla Ashai and Maya Eckstein, also spoke on the record to the Associated Press on the Does' behalf. According to the article, the attorneys "say the baby's parents were actually farmers, unaffiliated with any terrorist group," and "described the event as a tragedy that left two innocent

civilians and five of their children dead." That account is demonstrably false, and yet it bolsters the Does' "kidnapping" narrative, as it is intended to do.

115.    The publication and republication of the Does' false "kidnapping" narrative and their supporting allegations did not stop with that first October 2022 article. The Associated Press, along with other news outlets, have continued to publish articles fueled by the Does' false "kidnapping" narrative. And the Does and their agents and intermediaries have continued to fuel the fire.

116.    On December 31, 2022, the Associate Press published a defamatory article, based on the Does' false "kidnapping" narrative, entitled *Afghan war orphan remans with Marine accused of abduction*. *See* https://apnews.com/article/afghanistan-politics-united-states-government-virginia-children-97a4e2f4c38925d50e5511a3232974f0.

117.    As recounted in that article, the Does' false "kidnapping" narrative prompted a public statement by the Taliban denouncing Joshua Mast. *See* https://www.documentcloud.org/documents/23558568-mofa-statement. The statement denouncing Joshua Mast says that it is based on "information from reliable sources"—*i.e.*, from the Does and their agents and intermediaries.

118.    The Does' false narrative continues to be repeated and republished, including in Associated Press articles from March 31, 2023, *see* https://apnews.com/article/afghanistan-baby-marine-adoption-joshua-mast-295673fb358cf30abd243995cd846c99; August 4, 2023, https://apnews.com/article/afghanistan-raid-marine-orphan-custody-1e73bba608994a53fca37b904dfd9a81; September 15, 2023, https://apnews.com/article/afghan-war-orphan-marine-baby-abduct-adoption-8a0411f16067d73ad0d86b706f5ae46d; and July 16, 2024, https://apnews.com/article/afghan-baby-adoption-marine-joshua-mast-2496683d5dbab37aa091e42edc24ad16.

119.    Numerous other media outlets have picked up on the story as well, further republishing the Does' false "kidnapping" narrative and the false statements that they have made in support of that narrative.

120.    The Does know the truth, and they know that their "kidnapping" narrative is false. But they have intentionally spread it to support their litigation efforts. And in the process, they have caused significant damage to Joshua and Stephanie Mast, to their reputations, and to their lives.

## COUNT I – Defamation

121.    The Does have numerous false factual allegations about Joshua and Stephanie Mast, including the false "kidnapping" narrative and the numerous subsidiary false statements that make up that narrative.

122.    These false statements are defamatory *per se* because they impute to the Masts a crime of mortal turpitude. They are also defamatory in fact by wrongly painting the Masts has nefarious wrongdoers who deceived the Does to steal their child, rather than loving and caring adoptive parents who helped to rescue a young girl in desperate need of help from a dire situation in a collapsing country.

123.    The defamatory statements are unambiguously about Joshua and Stephanie Mast, and they were made to third parties, including but not limited to reporters at the Associated Press.

124.    The Does' defamatory statements to the press and other third parties are not legally privileged.

125.    The Masts are not public figures and therefore need not establish that the Does' statements were made with actual malice, but in any event, the Does did act with actual malice. They knew then, and know now, that their "kidnapping" narrative is false and that their supporting

lies about their relationship to the Child and their interactions with the Masts are false. They have published and republished those statements nevertheless, motivated at least in part by a desire to increase their chances of prevailing in this litigation and the related state-court litigation.

126.    In any event, the Does acted with sufficient intent to be liable for defamation.

127.    The Does' defamatory statements about the Masts have caused substantial damages including financial loss, a loss of standing in the community, and emotional distress.

## <u>COUNT II – Intentional Infliction of Emotional Distress</u>

128.    The Does' conduct, and in particular their public pressing of the false "kidnapping" narrative, has inflicted extreme emotional distress upon Joshua and Stephanie Mast.

129.    The Does, who know that their "kidnapping" narrative is false and who were are from the beginning that the Masts intended to take custody of the Child, have acted with reckless disregard for the emotional distress that their conduct would inflict on the Masts.

130.    To falsely press a public narrative that the Masts "kidnapped" their child, when the Does knew that the Masts had been forthcoming about their intentions and when the child was not *their* child to begin with, is extreme, outrageous, and intolerable. So is continuing to press that false narrative after your prior conduct leads the Taliban to denounce Joshua Mast in a public statement.

131.    The Does' conduct is the direct and proximate cause of significant emotional distress that the Masts have suffered.

132.    That emotional distress has been severe, interfering with the Masts' ability to enjoy their ordinary lives.

## COUNT III – Civil Conspiracy

133.    The Does acted together and in combination with others to commit the tortious acts set forth herein.

134.    The Does' common objective was to spread the false "kidnapping" narrative against the Masts, motivated at least in part by a desire to influence the outcome of this litigation and the related state-court proceeding.

135.    The Does both had an unlawful purpose and employed unlawful means, including by intentionally defaming the Masts and by recklessly inflicting severe emotional distress upon them.

136.    The Masts have suffered damages as a direct and proximate result of the Does' unlawful scheme, including financial loss, a loss of standing in the community, and emotional distress.

### PRAYER FOR RELIEF

Wherefore, Joshua and Stephanie Mast ask the Court to enter judgment in their favor and against John Doe and Jane Doe and to order the following relief:

a.    An award of damages;

b.    An injunction prohibiting John Doe and Jane Doe from making further false and defamatory statements about Joshua Mast and/or Stephanie Mast;

c.    An award of reasonable expenses, including attorneys' fees and costs; and

d.    Any and all other relief that the Court deems just and proper.

Dated: August 7, 2024

/s/ John S. Moran

John S. Moran
MᴄGᴜɪʀᴇWᴏᴏᴅs LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com

*Counsel for Defendants Joshua and
Stephanie Mast*