**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

_____

JOHN AND JANE DOE,                          :     CIVIL ACTION NO. 3:22-cv-49
                                            :
  *Plaintiffs & Counterclaim-Defendants*,   :
                                            :
                                            :     **(1) <u>ANSWER TO AMENDED</u>
v.                                          :       <u>COMPLAINT;</u>**
                                            :     **(2) <u>AFFIRMATIVE & OTHER</u>**
JOSHUA & STEPHANIE MAST,                     :       <u>DEFENSES; &</u>
                                            :     **(3) <u>COUNTERCLAIM</u>**
  *Defendants & Counterclaim-Plaintiffs*,   :       <u>COMPLAINT</u>
                                            :
                                            :
RICHARD MAST & KIMBERLEY MOTLEY,             :
                                            :
  *Defendants*.                           :
-------------------------------------------------------- :

## (1) ANSWER TO AMENDED COMPLAINT

  Subject to his affirmative defenses set forth below, and without waiver of any rights, privileges, or defenses, Defendant Richard Mast hereby submits this Answer to Plaintiffs Amended Complaint ("Complaint"). Each numbered response in this Answer is made subject to the following limitations as if fully set forth therein. First, no responses in this Answer constitute an acknowledgment or admission of the validity or relevance of such allegation. Second, section headings and subheadings throughout the Complaint contain characterizations of the Complaint to which no response is required. To the extent a response is deemed required, Defendant Richard Mast denies any allegations in the section headings and subheadings of the Complaint. Third, where Defendant Richard Mast states that he lacks knowledge or information sufficient to form a belief about the truth of a certain allegation, Defendant reserves the right to argue that the allegations are true or false based on the evidence. Fourth, Defendant Richard Mast by use of the pseudonym "Baby Doe" does not admit that the child subject to this litigation is in any way related

to "John Doe" or "Jane Doe" or any member of their family, actual or claimed. Finally, except to the extent expressly admitted herein, Defendant Richard Mast denies each and every allegation in Plaintiffs' Complaint. The numbered paragraphs in this Answer correspond to the numbered paragraphs of the Complaint.

COMES NOW Defendant Richard Mast, by and through his attorneys of record, responds to Plaintiffs' Complaint as follows:

**1.      This action for conspiracy, tortious interference with parental rights, fraud, intentional infliction of emotional distress, and false imprisonment arises from a U.S. Marine Corp Judge Advocate's unlawful abduction of Baby Doe, an Afghan war orphan, from her biological family and legal guardians, Plaintiffs John and Jane Doe. Plaintiffs seek a declaratory judgment and compensatory and punitive damages.**

**ANSWER:** Richard Mast states that Paragraph 1 asserts legal conclusions to which no response is required. Richard Mast otherwise denies the allegations contained within Paragraph 1. The Does are not legal guardians under any theory of Afghan law or U.S. federal or state law or U.S. federal or state law and are not biologically related to Baby Doe.

**2.      Defendants collectively engaged in a fraudulent scheme over the course of nearly two years to accomplish the abduction of Baby Doe for the purpose of "adoption" by Defendants Joshua and Stephanie Mast.**

**ANSWER:**  Richard Mast denies the allegations contained within Paragraph 2. In fact, the child the Petitioner's assert is "Baby Doe" was the biological daughter of Al Qaeda foreign fighters who entered Afghanistan to wage jihad against the United States and its allies. The child's parents were targeted and killed in close combat with the 75th Ranger Regiment due to their association with the East Turkistan Islamic Party as confirmed by multi-source intelligence feeding the Joint Targeting Process of the Special Operations Joint Task Force (JTF) that had been operating in Afghanistan for nearly twenty years at that point. Contemporaneously, the child's biological parents were classified as "Enemy, Killed in Action" (EKIA) because they refused to surrender and fought to the death. Despite the accurate and specific classified intelligence at the TOP SECRET and

SECRET level, the child was turned out of U.S. protection in an objectively dangerous manner to

non-relative, terrorist affiliated persons without DNA testing or vetting for terrorist affiliations.

> **3.     On September 6, 2019, Baby Doe's parents and five siblings were killed in a U.S. military operation in rural Afghanistan. She survived and U.S. forces transported her to a military hospital for emergency medical treatment. Baby Doe, then only two months old, was seriously injured in the battle.**

**ANSWER:**  Richard Mast admits that the Child's parents were killed in a U.S. military

operation after they chose to fight the 75th Ranger Regiment to their deaths and that the Child

miraculously survived an attempt by the Afghan partner force to murder her during the mission

that was thwarted by U.S. Army Rangers. This allowed the child to be transported to a U.S.

military hospital where she could recover from her serious injuries, and were she remained for

approximately five months. Richard Mast's Circuit Court clients, Joshua and Stephanie Mast,

extended the offer to pay for DNA confirmation of any alleged biological relationship

approximately three years ago. Richard Mast expressly denies that any of the five different

Afghan identities asserted for "Baby Doe" correspond to her true identity or origin. Richard Mast

denies all other allegations contained within Paragraph 3.

> **4.     In November 2019, while Baby Doe was recovering from her injuries in a U.S. military hospital in Afghanistan, Defendants Joshua and Stephanie Mast, represented by Defendant Richard Mast (a member of the Virginia Bar), fraudulently obtained a custody order and an interlocutory order of adoption over Baby Doe from Virginia courts that they knew, or reasonably should have known, lacked personal and subject matter jurisdiction over Baby Doe, a citizen of Afghanistan who had biological family in Afghanistan and had no legal or physical connection to the United States (the "Fraudulent Custody and Adoption Orders").**

**ANSWER:**  Defendant Richard Mast admits that he filed for a custody order; foreign birth

order; and interlocutory order of adoption to obtain the foreign birth order on behalf of Baby

Doe, Joshua Mast, and Stephanie Mast. Richard Mast obtained a custody order and interlocutory

adoption order in late 2019 so the Child could be transported from a hospital in Afghanistan that

was constantly under rocket fire and could be treated at the University of Virginia's medical

center so she could recover from her serious injuries. Richard Mast denies all other allegations contained within Paragraph 4.

**5.     Notwithstanding the Fraudulent Custody and Adoption Orders, the U.S. government in Afghanistan refused to release Baby Doe to Joshua and Stephanie Mast. Instead, the U.S. government honored its unambiguous federal and international legal obligations to release her to the government of Afghanistan so that she could be reunited with her next of kin in Afghanistan. Pursuant to Afghan law, Baby Doe's first cousin (John Doe) and his wife (Jane Doe) assumed permanent guardianship over her, loved her, and welcomed her as their first child.**

**ANSWER**:  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding the reasons the United States released the Child to a person who never provided any confirmation of biological relationship and on that basis denies them. Richard Mast otherwise denies the allegations contained within Paragraph 5. John Doe and Jane Doe are not permanent or legal guardians of the child under any theory of Afghan law or U.S. federal or state law or U.S. federal or state law. In addition, John Doe admitted that his father was responsible to the Taliban for the child, and that the Taliban had denied permission for the child to go to America prior to the start of the historical evacuation. In addition, it is appalling that U.S. Embassy Kabul would fail to keep a U.S. Forces, Afghanistan (USFOR-A) commitment to DNA test any claimant when the former Afghan government expressly requested it. Such blatant disregard for child safety falls below the standard of care Americans should expect of their government and was a foreshadowing of the callous incompetence resulting in the abandonment of Afghanistan to a brutal terrorist organization and the avoidable deaths of many allies and thirteen American servicemembers.

**6.     Undeterred, Joshua and Stephanie Mast engaged the services of Kimberley Motley to search for and communicate with John and Jane Doe. Motley was aware that Joshua and Stephanie Mast had obtained the Fraudulent Custody and Adoption Orders for Baby Doe and was aware from the outset that Joshua and Stephanie Mast wanted to take physical custody of her in the United States and intended to adopt her as their own child. In coordination with Joshua and Stephanie Mast, however, Motley never disclosed the Masts' true intentions to the Does.**

4

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding Defendant Kimberley Motley's awareness or knowledge and on that basis denies them. In addition, John Doe represented he had hired a woman to care for the child, and that he was an unmarried man who did not live with the child. John Doe further represented that his father was responsible for the child.  Plaintiff Jane Doe has admitted that Motley disclosed to her from the beginning that an American family wanted to provide a home for the child.   In addition, the Does have improperly withheld as "marital communications" contemporaneous communications that go to their knowledge of what Mrs. Motley relayed regarding Major Joshua and Stephanie Mast and the intent to have the child live with the Masts in America. Richard Mast otherwise denies the allegations contained within Paragraph 6.

**7.      Instead, Motley told the Does only that an American family wanted to help Baby Doe with her continuing medical needs. Joshua and Stephanie Mast's primary and undisclosed intention, however, was to induce John and Jane Doe to bring Baby Doe to the United States to enable them (one way or another) to acquire physical custody of Baby Doe based on the "authority" of the Fraudulent Custody and Adoption Orders.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding Defendant Kimberley Motley's statements and on that basis denies them. Richard Mast understands that Major Mast personally informed Plaintiffs using the strongest words for legal responsibility over a child in Pashto, to send the child to live with him and his wife in the United States as the Taliban was conquering Afghanistan. The Does were fully aware of the Masts' intention and manifested belief that it was in the child's best interest to live with the Masts. As Richard Mast understood from Joshua Mast contemporaneously and in subsequent litigation, in every instance, John Doe represented that Plaintiff John Doe's father was responsible to the Taliban for the child, and that the Taliban denied permission for the child to go to America. Richard Mast otherwise denies the allegations contained within Paragraph 7.

**8.      Despite communicating with John and Jane Doe for more than a year, first through Kimberley Motley, and eventually both directly and through Ahmad Osmani, Joshua and Stephanie Mast never revealed to them the Fraudulent Custody and Adoption Orders. Instead, through their omissions and misrepresentations, Joshua and Stephanie Mast deceived John and Jane Doe into believing that the Masts' only interest was in helping Baby Doe access medical care that was not available in Afghanistan. In reality, however, the Masts' chief objective was to consummate their illicit scheme to take Baby Doe from her lawful Afghan parents.**

**ANSWER:**  Richard Mast denies the allegations contained within Paragraph 8. Plaintiff John and Jane Doe are not parents under any theory of Afghan law or U.S. federal or state law or U.S. federal or state law. Plaintiff John Doe represented to Major Mast that John Doe's father was responsible to the Taliban for the child on multiple occasions. John Doe expressly stated he was not responsible for the child, and that he thought the child should live with the Masts in America, and that there was "no hope in Afghanistan." The Plaintiffs never referred to the child as their daughter or to themselves as legally responsible for her until their second lawsuit was initiated in litigation in the United States. Even if that description were legally accurate (which it is not), the Plaintiffs are estopped from asserting that claim against the Masts because John Doe represented (documented in an audio recording) to the Masts that the child did not live with John Doe, Jane Doe, or John Doe's father in July 2021, and that third parties to this suit had become like a mother and father to the child.  In addition, Jane Doe was an unmarried minor child living in her father's home through October 2020 according to her own admission on her public Facebook profile and admissions to Mrs. Motley. John Doe also represented he believed it was in the child's best interest to live in the United States with the Masts each time he spoke with Major Mast during the fall of Afghanistan to the Taliban. Not only were Plaintiffs fully aware of the Masts intent – they used her military identification documents and personally registered her using her U.S. identity to come to America. John and Jane Doe were told by Major Mast he would bring all of the child's U.S. documents (on video tape) when he sought to fly into Kabul during the evacuation to ensure all four children in

6

the group and the Plaintiffs were successfully evacuated. Plaintiffs were given copies of all of the

child's U.S. documents upon their safe arrival in the United States.

**9.     In August 2021, as a result of this long-running and coordinated fraudulent scheme, John and Jane Doe brought Baby Doe to the United States for medical care, only to have Joshua and Stephanie Mast tear her away from the only parents she had known for most of her life.**

**ANSWER:**  Richard Mast denies the allegations contained within Paragraph 9. The responses to

Paragraph 8 are incorporated herein. In addition, Plaintiffs have admitted that Jane Doe threatened

to stay in Afghanistan with the child and told John Doe to go to America if he wanted to. Plaintiffs

have both admitted that John Doe promised Jane Doe that, if she agreed to come to America, the

child would never have to leave her side. Neither Plaintiffs informed Joshua and Stephanie Mast

of this collateral promise until the Plaintiffs had been evacuated from Afghanistan by U.S. special

forces expressly using the child's U.S. identity. Plaintiffs were fully aware the Masts intended to

have the child live with them in the United States under the benefits her U.S. identity provided.

Plaintiff John Doe expressed multiple times that his teenage wife was attached to the child but

would be fine with the child living with the Masts once her own daughter was born. Any conflict

between the Does on what was ultimately in the child's best interest or misrepresentations John

Doe made to Jane Doe to induce her to accompany him to America is no fault of the Masts. In

addition, when John Doe was flagged on the Biometrically Enabled [Terror] Watch List (BEWL)

and was detained and interrogated at Washington Dulles Airport along with a Pashtun friend from

his village in Afghanistan, it was objectively reasonable for the Masts to demand the child be

removed given her having been recovered from a 75th Ranger Regiment mission to capture/kill

senior Al Qaeda leadership, John Doe's repeated representations his father was responsible to the

Taliban for the child, and John Doe stating that he had many Taliban fighters in his phone when

he brought the child to U.S. forces to be evacuated in 2021. The Masts representations to this court

in 2020 that the child was being turned over to likely non-relative, terrorist affiliated persons based

on every available piece of intelligence have proven to be an inconvenient truth.

**10.     Defendants have caused irreversible harm to an innocent toddler and Plaintiffs John and Jane Doe. As her true family and legal guardians, they raised Baby Doe for 18 months before the abduction and love her as their own child. Though this lawsuit can never make them whole, Defendants must be held accountable for their unconscionable conduct.**

**ANSWER:**  Richard Mast denies the allegations contained within Paragraph 10. Richard Mast

incorporates by reference the response to Paragraph 12. In addition, John Doe and Jane Doe are

not legal guardians of the child under any theory of Afghan law or U.S. federal or state law or U.S.

federal or state law. John Doe represented his father was responsible to the Taliban for the child

on multiple occasions. John Doe represented that the child did not live with him, his family, or his

father in July of 2021, and that third parties to this case had become like a mother and father to the

child. Jane Doe represented that the child referred to Jane Doe's mother as "mom." John and Jane

Doe have admitted they did not live together until October, 2020, and then only next door to a

common dwelling with at least twenty-three other persons living in it. Jane Doe was an unmarried

minor child living in her father's home and attending high school until October 2020, when she

graduated high school. John and Jane Doe never referred to the child as their daughter, or to

themselves as her mother and father to the Masts prior to their second lawsuit in March, 2022.

**11.     Baby Doe is a three-year-old Afghan citizen whose biological parents died in 2019. She currently is being held in North Carolina by Joshua and Stephanie Mast.**

**ANSWER:**  Richard Mast admits that the Child is a five-year-old girl whose biological parents

died in 2019 and that she lives with her adopted family in North Carolina. Richard Mast otherwise

denies the allegations contained within Paragraph 11. The child's true identity and origin does not

correspond to any of the five different Afghan identities/names utilized to refer to Baby Doe.

Richard Mast's Circuit Court clients, Joshua and Stephanie Mast, extended the offer to pay for DNA comparison approximately three years ago.

**12.     John and Jane Doe, citizens of Afghanistan, are a married couple and the legal guardians of Baby Doe under the laws of Afghanistan. John Doe is the paternal first cousin of Baby Doe. John and Jane Doe currently reside in Texas.**

<u>**ANSWER:**</u>  John and Jane Doe are not legal guardians of Baby Doe under any theory of Afghan law or U.S. federal or state law. John Doe has admitted that neither he nor his father have a court order granting them custody or guardianship of the child. John Doe is not biologically related to Baby Doe. The Plaintiffs have represented to the Virginia Circuit Court that their claims do not rely on a biological relationship to the child. Richard Mast's Circuit Court clients, Joshua and Stephanie Mast, extended the offer to pay for DNA comparison approximately three years ago. John Doe is not biologically related to Baby Doe.  Richard Mast otherwise denies the allegations contained within Paragraph 12.

**13.     Joshua and Stephanie Mast are a married couple, and are United States citizens claiming domicile in Palmyra, Virginia, but currently residing in North Carolina, where Joshua Mast is stationed in the United States Marine Corps. Joshua Mast is a Major in the Marine Corps, a Judge Advocate, and an attorney admitted to the bar of the Commonwealth of Virginia.**

<u>**ANSWER:**</u>  Richard Mast admits that Major Joshua Mast and Stephanie Mast are a married couple.  Richard Mast understands that Joshua and Stephanie Mast currently reside and are domiciled in Hampstead, North Carolina. They have not resided in Palmyra, Virginia since July of 2020 and therefore deny the allegations to the contrary. Richard Mast admits that Joshua Mast is a Major in the United States Marine Corps.  Major Mast is currently serving as the Executive Officer of a Raider Support Battalion and not as a Judge Advocate. Major Mast is admitted to the bar of the Commonwealth of Virginia.

**14.     Upon information and belief, Richard Mast is a United States citizen domiciled and residing in Forest, Virginia. Richard Mast is Joshua Mast's brother and is also an**

attorney admitted to the bar of the Commonwealth of Virginia. Richard Mast is affiliated with an entity named "Liberty Counsel."

**ANSWER:** Richard Mast admits the allegations in Paragraph 14.

15.    Upon information and belief, Kimberley Motley is a United States citizen domiciled and residing in North Carolina. Upon information and belief, Motley is an attorney admitted to the bar of the state of Wisconsin and has periodically worked in Afghanistan. Upon information and belief, Motley is the general counsel of Women for Afghan Women, which has a Community Center in Alexandria, Virginia.

**ANSWER:** Richard Mast admits that Kimberley Motley is a United States citizen. Richard Mast

lacks knowledge or information sufficient to form a belief about the truth of the remaining

allegations in Paragraph 15 and on that basis denies them.

16.    Upon information and belief, Ahmad Osmani is an Afghan national permanently residing in Tennessee. Upon information and belief, Osmani is married to Natalie Osmani, a U.S. citizen.

**ANSWER:**  Richard Mast understands that Ahmad Osmani is an Afghan national married to a

U.S. citizen. Richard Mast lacks information sufficient to form a belief about the truth of the

remaining allegations in Paragraph 16 and on that basis denies them.

17.    United States Secretary of State Antony Blinken and United States Secretary of Defense General Lloyd Austin are named as nominal defendants, in their official capacities, as parties who are necessary to this proceeding. Plaintiffs are seeking no relief from them in this action.

**ANSWER:** Richard Mast admits the allegations in Paragraph 17 as of the filing of the Complaint.

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are completely diverse in citizenship, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.

**ANSWER:** Richard Mast denies the allegations in Paragraph 18.

19.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, and supplemental subject matter jurisdiction under 28 U.S.C. § 1367, because Plaintiffs' right to relief as to Count 1 and their request for declaratory relief necessarily depend on resolution of substantial questions of federal law.

**ANSWER:**  Richard Mast denies the allegations in Paragraph 18. The Court has also held that

there is no federal question jurisdiction in this case. *See* ECF No. 455.

20.     All Defendants are subject to personal jurisdiction in Virginia under Virginia
Code §§ 8.01-328.1(A)(1) and (3), because the causes of action asserted in this Complaint
arise from their having transacted business in Virginia and/or having caused tortious injury
by an act or omission in Virginia. Defendants Motley and Osmani also are subject to personal
jurisdiction in Virginia as alleged co-conspirators with Joshua and Stephanie Mast and
Richard Mast. As co-conspirators, Motley and Osmani are liable for the Mast defendants'
acts and omissions in Virginia, as set forth herein, in furtherance of the conspiracy to enable
Joshua and Stephanie Mast to abduct Baby Doe. In addition, at the request of Joshua and
Stephanie Mast and in furtherance of the conspiracy, Osmani voluntarily appeared in
Virginia to testify on the Masts' behalf in the proceeding filed by John and Jane Doe in the
Circuit Court of Fluvanna County to vacate that court's Fraudulent Adoption Order.

**ANSWER:**  Richard Mast admits he is a resident of Virginia but denies the other allegations in

Paragraph 20. Insofar as Paragraph 20 asserts legal conclusions to which no response is required,

the allegations are denied.

21.     Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of
Defendants' wrongful conduct occurred in this district.

**ANSWER:**  Paragraph 21 asserts legal conclusions to which no response is required. Inasmuch as

a response is required, Richard Mast denies the allegations in Paragraph 21.

22.     Baby Doe's biological parents and five of her siblings were killed on
September 6, 2019, in Afghanistan, in a joint United States and Afghan military operation in
the course of which their home was destroyed. Baby Doe sustained serious injuries, including
a fractured skull and femur, and second-degree burns. U.S. military forces discovered Baby
Doe in the rubble and immediately transported her to a nearby U.S. military hospital for
urgent surgical and medical care. She was then transferred to [REDACTED] on September
25, 2019, at which time her condition stabilized.

**ANSWER:**  Richard Mast admits that the Child's biological parents died fighting in close combat

with U.S. Army Rangers because they refused to surrender and fought U.S. forces to the death.

The child has no known siblings, and the Masts extended an offer to pay for a DNA comparison

approximately three years ago. Richard Mast also admits that the Child sustained serious injuries,

which were treated only by a U.S. military hospital and the Masts. Richard Mast also admits she

was transferred between U.S. military hospitals on September 25, 2019. Richard Mast otherwise

denies the allegations in Paragraph 22.

**23.     The International Committee of the Red Cross ("ICRC") is the organization authorized to care for children who are orphaned during wartime and to assist with family reunifications under the Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949 ("The Fourth Geneva Convention"). The U.S. military informed ICRC that Baby Doe was in its custody, and ICRC began searching for her family.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 23 and on that basis denies them. Furthermore, the ICRC did

not vet John Doe, Jane Doe, or plaintiff John Doe's father for biological or familial relationship to

the child. Plaintiffs were aware of this fact and did not provide responsive discovery in the Virginia

Circuit Court until this federal proceeding.

**24.     The ICRC has worked for over one hundred years in conflict areas and humanitarian disasters to reunite separated family members through its "Restoring Family Links Program." ICRC and the national Red Cross and Red Crescent societies are universally recognized as experts in family tracing and reunification. *See https://www.brookings.edu/wp-content/uploads/2016/06/0119_internal_displacement_complete.pdf, p, 332.***

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 24 and on that basis denies them. Furthermore, the ICRC did

not vet plaintiff John Doe, Jane Doe, or plaintiff John Doe's father for biological or familial

relationship to the child. Plaintiffs were aware of this fact.

**25.     By October 25, 2019, ICRC made contact with Baby Doe's uncle, who requested ICRC's assistance in reuniting her with her family.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 25 and on that basis denies them. The ICRC did not vet John

Doe, Jane Doe, or John Doe's father for a biological or familial relationship to the child at all.

Plaintiffs were aware of this fact.

**26.    Through his position as a Captain Judge Advocate in the United States Marine Corps deployed in Afghanistan, Joshua Mast learned of Baby Doe while she was in the custody of the Department of Defense (the "DoD") and under the care of the Military Health System.**

**ANSWER:**   Richard Mast admits the allegations in Paragraph 26. Specifically, then-Captain Mast's office was tasked with determining a safe and acceptable outcome for an innocent that had been injured in a suicide blast.

**27.    Upon information and belief, Joshua and Stephanie Mast and Richard Mast were aware that ICRC would be searching for Baby Doe's biological family in Afghanistan.**

**ANSWER:**   Richard Mast admits the allegations in Paragraph 27. Furthermore, Major Mast collected on behalf of the Office of the Staff Judge Advocate, U.S. Forces Afghanistan (USFOR-A) : 1) the Concept of Operations (CONOP) from the 75th Ranger Regiment mission to capture or kill three named Al Qaeda objectives during which the child was recovered; 2) the Civilian Casualty attribution required by Department of Defense policy that categorized both of the child's deceased parents as "Enemy, Killed in Action (EKIA)" and not as civilian casualties, 3) the Tactical Interrogation Report (TIR) of the sole detainee from the objective where the child was recovered who indicated the occupants of the compound were Uighurs associated with the East Turkistan Islamic Party (ETIP), and did not speak Dari or Pashto, 4) the Air Mission Report for 5-6 September 2019 detailing the ordnance dropped resulting in "that building was destroyed  IAW JTF ROE" [in accordance with Joint Task Force Rules of Engagement], and the amount of U.S. casualties sustained in combat with the child's parents; and 5) emails from the Staff Judge Advocate for the Special Operations Joint Task Force that conducted the mission stating "the family (and most of the village) were suspected to be terrorist foreign fighters that relocated to REDACTED/ Afghanistan for the sole purpose of waging violent terrorism."

WHAT:  Child injured during ▮▮▮ operation.
-Child's mother died of mortal wounds during a barricaded shooter engagement; remains were left on the objective per TF-20.
-The father is presumed KIA - he was very likely he was one of the individuals in the building shooting and throwing grenades at the assault force - that building was destroyed IAW JTF ROE, this was how the CIVCAS occurred -Per ▮▮▮, the family (and most of the village) were suspected to be terrorist foreign fighters that relocated to ▮▮▮/Afghanistan for the sole purpose of waging violent terrorism.  Therefore, child may not be of Afghan descent.

These contemporaneous source documents were compiled, summarized, and declassified for release to the ICRC and then existing Afghan government. Colonel Joseph Fairfield, the Staff Judge Advocate for USFOR-A provided this information to the ICRC and Afghans on 31 October 2019 and directed the child's DNA be collected for comparison to any claimants, as was U.S. policy until Donna Welton, Assistant Chief of Mission, U.S. Embassy Kabul declined the Afghan's request to DNA test the claimant.

**28.    In spite of this knowledge, the Masts began taking steps to remove Baby Doe to the United States.**

**ANSWER:**  Richard Mast denies the allegations in Paragraph 28. Specifically, all information in the custody or control of the United States and known to the Defendants indicates the child was provided to non-relative terrorist affiliated persons two days before the "peace deal" with the Taliban was announced. After the Vehicle Borne Improvised Explosive Device (VBIED) and complex attack by the Taliban adjacent to the child's hospital occurred in December, 2019, the Masts immediately sought to have her moved to a safer location for continued treatment as per her rights as a patient in a DoD facility.

**29.    Joshua Mast is an attorney, barred in Virginia, who served at the Center for Law and Military Operations, and whose responsibilities in Afghanistan included collection and analysis of data on targeting, collateral damage estimation, and civilian casualty response in an active combat zone. As an attorney and member of the United States' Armed Forces in Afghanistan, it was his professional responsibility to be aware of Afghanistan's**

status as a sovereign nation, and of the Security and Defense Cooperation Agreement Between the Islamic Republic of Afghanistan and the United States of America (the "Bilateral Agreement") that governed U.S. military operations in Afghanistan.

**ANSWER:** Richard Mast admits Joshua Mast is an attorney barred in Virginia who served at the Center for Law and Military Operations. The U.S. was unilaterally negotiating with the Taliban regarding control over the territory of Afghanistan during the alleged period, the Deputy SJA, USFOR-A was involved in these negotiations, and regularly briefed the Office of the SJA on the status of negotiations with that terrorist organization which resulted in the collapse of the U.S. backed government and resulting catastrophe. Richard Mast otherwise denies the allegations in Paragraph 29.

> 30.  As a U.S. military attorney, Joshua Mast knew, or should have known, that the Bilateral Agreement governed the U.S. military presence in Afghanistan, and that all U.S. military operations in Afghanistan were conducted under its auspices. Moreover, he was aware the Bilateral Agreement specifically recognized Afghan sovereignty and limited the Afghan Government's jurisdiction only over active-duty U.S. Armed Forces and DoD civilian employees; the Bilateral Agreement did not limit Afghanistan's jurisdiction over Afghan nationals in Afghanistan.

**ANSWER:** Richard Mast denies the allegations in Paragraph 30. Furthermore, the U.S. abrogated the "Bilateral 'Security' Agreement" (BSA), gave Afghanistan to a terrorist organization, and left many former Afghan government officials to die at the hands of the Taliban. Finally, the child's status as an authorized Department of Defense dependent allowed her to depart Afghanistan on a military aircraft with her military identification card in accordance with the BSA – which is exactly how the child ultimately escaped the Taliban takeover of Afghanistan.

> 31.  As a U.S. military attorney, Joshua Mast knew, or should have known, that all obligations of the United States and Afghanistan under the Bilateral Agreement were "without prejudice to Afghan sovereignty over its territory," and that U.S. Armed Forces personnel and DoD civilian employees were obligated to "respect the Constitution and laws of Afghanistan." Bilateral Agreement, Articles 3:1, 3:2.

**ANSWER:** Richard Mast denies the allegations in Paragraph 31. Furthermore, the referenced document does not create third party rights or obligations under international law, are non-

justiciable by the terms of the agreement, and are irrelevant to any claim or defense in this proceeding.

**32.     As a U.S. military attorney, Joshua Mast knew, or should have known, that U.S. military bases under the Bilateral Agreement are not U.S. territory. Indeed, the Bilateral Agreement is explicit that "Afghanistan has full sovereignty over its airspace, territory, and waters." Bilateral Agreement, Article 10:1. Joshua Mast was also aware that even if Baby Doe's identity was unknown, her nationality would be determined under Afghan law. Accordingly, he knew, or should have known, that Baby Doe, as a civilian in Afghanistan, was subject solely to the sovereign jurisdiction of Afghanistan for the entire time she was in the care of U.S. military hospitals.**

<u>**ANSWER**</u>:  Richard Mast incorporates by reference the response to paragraph 27, 29, 30, and 31 of the complaint. Richard Mast denies the allegations in Paragraph 32.

**33.     As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should have known, that under Article 12 of Afghanistan's law on citizenship, if a child is found in the territory of Afghanistan and "his/her parents' documents proving their citizenship are not available," the child is considered a citizen of Afghanistan. See United Nations High Commission for Refugees, Law on Citizenship of the Islamic Emirate of Afghanistan (English Translation), Article 12 (June 24, 2000), available at http://www.refworld.org/pdfid/404c988d4.pdf; _see also_ Athayi, Abdullah, _Report on Citizenship Law: Afghanistan_, Robert Schuman Centre for Advanced Studies, European University Institute (March 2017), at p. 9, available at https://cadmus.eui.eu/bitstream/handle/1814/45933/GLOBALCIT_CR_2017_09. pdf.**

<u>**ANSWER**</u>:  Richard Mast denies the allegations in Paragraph 33. Furthermore, this is a frivolous allegation that cites as its basis in "law" the **Islamic Emirate of Afghanistan**, also known as the Taliban. Major Mast did not recognize the Taliban as a legitimate source of any binding legal rights or obligations during his time assigned to the U.S. mission to capture or kill as many of them as possible in 2019, or at the present time.

**34.     As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should have known, that regardless of where in Afghanistan Baby Doe was recovered, all territory within the internationally recognized borders of Afghanistan was subject to the jurisdiction of the laws of Afghanistan. Bilateral Agreement, Article 10:1.**

<u>**ANSWER**</u>:  Richard Mast denies the allegations in Paragraph 34. In addition, to the extent that Paragraph 34 asserts legal conclusions to which no response is required, the allegations are denied.

35.     On information and belief, these basic, uncontroversial principles of national sovereignty were not only known to Joshua Mast but were core obligations of his practice while serving as an attorney in the U.S. Marines in Afghanistan.

**ANSWER:**  Richard Mast admits Joshua Mast understands national sovereignty, including the three requirements for sovereignty under international law (defined territory, permanent population, control/effective government). It is a historical fact that these factors did not exist concurrently in Afghanistan during any relevant period. In addition, it is a historical fact that the U.S backed former Afghan government never realized sovereignty over the territory of Afghanistan, and, during the alleged period, the United States unilaterally negotiated with the Taliban over control of Afghanistan without the participation of the then existing Afghan government. Richard Mast otherwise denies the allegations in Paragraph 35.

36.     On information and belief, Joshua Mast also knew that the ICRC was actively searching for Baby Doe's family, and he knew that, as Baby Doe was recovered from a remote area of Afghanistan, this process would be labor- and time-intensive.

**ANSWER:**  Richard Mast incorporates by reference the response to paragraph 23, 24, 25 and 27 of the complaint. Richard Mast understands that Major Mast was aware that permission from the Taliban to access the area in question would be required for the ICRC to visit the Al Qaeda camp from which the child was recovered. Major Mast was also aware that the 75th Ranger Regiment had targeted and killed the child's parents based on their affiliation with the East Turkistan Islamic Party. Ultimately, the ICRC did not vet John and Jane Doe for a biological or familial relation to the child nor did they vet John Doe's father.

37.     Virginia-barred lawyers like Joshua Mast and Richard Mast are expected to "conform to the requirements of the law, both in the professional service to clients and in the lawyer's business and personal affairs." Virginia Rules of Professional Conduct, Preamble. Virginia-barred lawyers also are expected to "use the law's procedures only for legitimate purposes and not to harass or intimidate others." Id. Further, lawyers are expected to "provide competent representation to a client," which "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Virginia Rules of Professional Conduct, 1.1.

**ANSWER:**   Paragraph 37 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 37.

**38.    A myriad of national and state laws governs international adoptions in the United States. In the case of an orphaned child in Afghanistan sought to be adopted in Virginia, the laws of the United States and Virginia require that prospective adoptive parents follow the laws of the Government of Afghanistan.**

**ANSWER:**   Paragraph 38 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 38.

**39.    As Virginia attorneys, Joshua Mast and Richard Mast knew, or should have known, that they would need to comply with the applicable laws of Afghanistan, the United States, and Virginia.**

**ANSWER:**   Richard Mast admits that he understands his obligations as a Virginia attorney. Richard Mast otherwise denies the allegations in Paragraph 39.

**40.    As such, U.S. law requires that, before a child in Afghanistan can be adopted by someone in the United States, legal guardianship or custody must be obtained over the child in Afghanistan.**

**ANSWER:**   Paragraph 40 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 40.

**41.    Afghanistan's laws, however, expressly prohibit the guardianship or custody of Muslim Afghan children by non-Afghan non-Muslims.**

**ANSWER:**   Paragraph 41 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 41.

**42.    Joshua and Stephanie Mast are not Muslim and are not Afghan nationals.**

**ANSWER:**   Richard Mast admits the allegations in Paragraph 42.

**43.**     Despite lacking any legitimate legal basis for doing so, in October 2019 Joshua and Stephanie Mast initiated custody proceedings for Baby Doe in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "Juvenile Court") and adoption proceedings in the Fluvanna Circuit Court (the "Circuit Court"), despite the fact that Baby Doe had never stepped foot on Virginia soil and remained in Afghanistan. Richard Mast represented Joshua and Stephanie Mast in these proceedings.

**ANSWER:**  Paragraph 43 asserts legal conclusions to which no response is required. To the extent

an answer is required, Richard Mast denies the allegations in Paragraph 43.

**44.**     Joshua and Stephanie Mast initiated these proceedings in their county of residence, even though: (a) they had not obtained legal guardianship of Baby Doe in Afghanistan; (b) Baby Doe had lived her entire life in Afghanistan; (c) Afghanistan had sole and exclusive jurisdiction over Baby Doe; and (d) Baby Doe had no connection with the United States or Virginia.

**ANSWER:**  Richard Mast admits that the Child was an orphan in Afghanistan when he learned of

her plight. Richard Mast otherwise denies the allegations in Paragraph 44.

**45.**     By failing to serve notice of the custody and adoption proceedings on the DoD, which was Baby Doe's "physical" and "legal" custodian at the time, the Masts violated Virginia law.

**ANSWER:**  Paragraph 45 asserts legal conclusions to which no response is required. To the extent

an answer is required, Richard Mast denies the allegations in Paragraph 45.

**46.**     Joshua and Stephanie Mast, through Richard Mast as counsel, advised both the Juvenile Court and the Circuit Court that they expected the Government of Afghanistan to waive its jurisdiction over Baby Doe. In fact, the Government of Afghanistan explicitly asserted its jurisdiction over the child and requested, and then secured, her release from the U.S. military facility.

**ANSWER:**  Richard Mast admits he relayed to the Circuit Court the understanding of Joshua and

Stephanie Mast of what the then-existing Afghan Government planned to do at each step of seeking

the custody and adoption of the Masts' daughter. Richard Mast otherwise denies the allegations in

Paragraph 46.

**47.**     The Masts also falsely claimed to both the Juvenile Court and the Circuit Court that Baby Doe's birth country and nationality were unknown, that she was a "stateless minor," and that she, therefore, was subject to the Virginia courts' jurisdiction because no

other court would have jurisdiction. **The Masts knew or should have known these claims were untrue.**

**ANSWER**:  Richard Mast denies the allegations in Paragraph 47. The Masts believed, and Richard

Mast continues to so believe, that the great weight of evidence supports the conclusion that the

child was not a citizen of Afghanistan by operation of law, but was in fact the biological daughter

of an Al Qaeda foreign fighter who died in close combat with U.S. Army Rangers.

**48.    At the same time, they claimed to have asked the Government of Afghanistan to waive jurisdiction over Baby Doe, thereby acknowledging Afghanistan's jurisdiction in the first place. In fact, Baby Doe was never stateless. Under the laws of Afghanistan, any child found in the territory of Afghanistan whose parents' nationality is unknown is considered a citizen of Afghanistan. Baby Doe was found in Afghanistan, and, to the extent her deceased parents' nationality could not be proven, she was deemed under the laws of Afghanistan to be an Afghan citizen. The Masts knew, or should have known, that Baby Doe's nationality was Afghan under Afghan law.**

**ANSWER:**  Paragraph 48 asserts legal conclusions to which no response is required. To the extent

an answer is required, Richard Mast denies the allegations in Paragraph 48.

**49.    On November 6, 2019, relying on the factual and legal misrepresentations made by the Masts, and without serving the requisite process on the DoD , the Juvenile Court mistakenly concluded that it had jurisdiction over the case under Virginia Code §§ 20-146.12(A)(2) and (4) and granted the Masts temporary custody of Baby Doe.**

**ANSWER:**  Paragraph 49 asserts legal conclusions to which no response is required. The

referenced rules speak for themselves. Inasmuch as a response is required, Richard Mast admits

that the Juvenile Court concluded that it had jurisdiction over the case under Virginia Code §§ 20-

146.12(A)(2) and (4) and granted the Masts temporary custody of Baby Doe on November 6, 2019.

The remainder of the allegations of Paragraph 49 are denied.

**50.    To reach this conclusion under subsection (A)(2), the Court was required to have found that a court of the home state of the child had declined jurisdiction. As discussed above, the Government of Afghanistan had jurisdiction, and had explicitly asserted jurisdiction over Baby Doe for reunification with her real family.**

**ANSWER:**   Paragraph 50 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 50.

**51.    Also under subsection (A)(2), the Court was required to have found that both the child _and_ a person acting as a parent had a significant connection to the Commonwealth of Virginia. Yet, Baby Doe had no connection to Virginia and Joshua Mast was a stranger to her. He had no caretaking responsibilities, rights, or bonds of affection that would constitute a parent-child relationship. Only misrepresentations by the Masts could have led the Court to conclude otherwise.**

**ANSWER:**   Paragraph 51 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 51.

**52.    Finally, under subsection (2), the Court was required to have found that substantial evidence was available in this Commonwealth concerning the child's care, protection, training, and personal relationships. The Masts knew or should have known that such evidence would be in Afghanistan and made available to the ICRC and the Afghan government's Ministry of Labor and Social Affairs, not the Masts.**

**ANSWER:**   Paragraph 52 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 52.

**53.    Two days later, Stephanie Mast appeared before the Circuit Court, represented by her brother-in-law, Richard Mast. Relying on the same, and additional, factual and legal misrepresentations, the Circuit Court issued an Order directing the State Registrar of Virginia to issue a Certificate of Foreign Birth for Baby Doe on an expedited basis for the purpose of obtaining medical care. Stephanie Mast had never met Baby Doe, and had no firsthand knowledge of Baby Doe's parents' identities, her nationality, or even her medical needs.**

**ANSWER:**   Richard Mast admits that he represented his sister-in-law Stephanie Mast, who appeared before the Circuit Court to provide it with the Masts' understanding of the child's plight and of the relevant facts in Afghanistan. Richard Mast admits that the Juvenile Court "found that substantial evidence was available in this Commonwealth concerning the child's care, protection,

training, and personal relationships." Richard Mast otherwise denies the allegations in Paragraph

53. Furthermore, Plaintiffs John and Jane Doe had never met Baby Doe and had no firsthand

knowledge of Baby Doe's parents' identities, her nationality, or even her medical needs during the

alleged period. John and Jane Doe admitted they had never met the child's supposed ten siblings,

and had not visited the general area since 2012; and had never met the child's supposed living

siblings or introduced her to her supposed siblings after February 27, 2020.

**54.      Another two days later, Sunday November 10, 2019, Stephanie Mast appeared before the Circuit Court, again represented by Richard Mast. The Circuit Court issued an Interlocutory Order of Adoption that same day, designating Joshua and Stephanie Mast as Baby Doe's father and mother.**

**ANSWER**:  Richard Mast admits the allegations in Paragraph 54. Furthermore, this petition was

requested by the Virginia Attorney General's Office to resolve a dispute over the issuance of the

child's birth certificate required to submit a Humanitarian Parole Visa. The birth certificate was

immediately provided to Headquarters, Marine Corps, and the child was approved as Major Mast's

dependent with full knowledge she was a patient at the Craig Joint Theatre Hospital at Bagram Air

Field.

**55.      That same day, Stephanie Mast presented the Interlocutory Order of Adoption and an application for a Certificate of Foreign Birth to the State Registrar, who promptly issued it, designating Joshua and Stephanie Mast as Baby Doe's father and mother. Richard Mast arranged Stephanie Mast's meeting with the State Registrar.**

**ANSWER**:  Richard Mast incorporates the response to paragraph 54, and otherwise admits the

allegations in Paragraph 55.

**56.      On October 24, 2019, Baby Doe's maternal uncle submitted a request to the ICRC through its Restoring Family Links Program for assistance in returning Baby Doe to her extended family.**

**ANSWER**:  Richard Mast denies the allegations of Paragraph 56 to the extent they assert that

Baby Doe is related to John Doe directly or indirectly.  Further, Richard Mast lacks knowledge or

information sufficient to form a belief about the truth of all of the allegations in Paragraph 56 and

on that basis denies them.

**57.     On November 17, 2019, the Afghan Ministry of Labor and Social Affairs documented its official involvement in the search for Baby Doe's biological family.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 57 and on that basis denies them.

**58.     The ICRC worked to verify the family's relationship with Baby Doe and facilitated the family's contact with the Afghan government. The ICRC's efforts to reunite Baby Doe with her biological family came to fruition when it located her paternal uncle, John Doe's father. Under the laws of Afghanistan (like the laws in many other Muslim countries), legal guardianship of an orphan is transferred to the child's paternal uncle (in the absence of a paternal grandfather or a brother).**

**ANSWER:**  Richard Mast denies the allegations of Paragraph 58 to the extent they allege a

biological relationship between Baby Doe and John Doe or his father.  Richard Mast lacks

knowledge or information sufficient to form a belief about the truth of the remaining allegations

in Paragraph 58 and on that basis denies them.

**59.     In late December 2019 or early January 2020, the Afghan Deputy Minister of Social Affairs met with U.S. State Department's Assistant Chief of Mission in Kabul, Donna Welton, and informed her that the Afghan government had identified Baby Doe's family.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 59 and on that basis denies them. Furthermore, the then

existing Afghan government expressly requested Donna Welton fulfil the U.S. commitment to

DNA test potential relatives in late December 2019 because there was no evidence the claimant

was related to the child.

**60.     On January 5, 2020, Ms. Welton wrote an email to the Deputy Minister stating: "We stand ready to transfer custody of the infant following an official request from the Afghan government. This is a high priority for our government and we would kindly request that the Ministry of Labor and Social Affairs expedite this official request so that the infant can be reunited with her family members as soon as possible" (emphasis added).**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 60 and on that basis denies them.

61.     **In February 2020, Afghanistan's Acting Minister of Labor and Social Affairs informed the Director of Social Security within the Ministry of Labor and Social Affairs, Directorate of [REDACTED], that Baby Doe was to be "reintegrated into her family."**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 61 and on that basis denies them.

62.     **Upon learning of Baby Doe's impending release on February 26, 2020, to her biological family in Afghanistan, the Masts filed a pseudonymous Complaint and Petition for a Temporary Restraining Order (the "TRO Petition") in this Court, the United States District Court for the Western District of Virginia, naming as defendants the DoD, the U.S. Department of State (the "DoS"), the Assistant Chief of Mission of the United States Embassy-Kabul, and various unknown persons. Richard Mast's signature block on the TRO Petition identifies his employer as "Liberty Counsel."**

**ANSWER:**  Richard Mast admits he filed suit seeking a Temporary Restraining Order on behalf of Joshua Mast, Stephanie Mast, and Baby Doe to prevent an objectively dangerous transfer of the child without DNA testing and terrorist vetting to what has proven to be a non-relative, terrorist affiliated person. The Virginia Circuit Court has previously held the Does have failed to demonstrate a biological relationship, and John Doe's father's Taliban flag displayed on his WhatsApp profile was admitted into evidence. John and Jane Doe are not biologically related to the child, and were unknown to the U.S. government, ICRC, and MOLSA during all relevant periods. Richard Mast admits his signature block speaks for itself and otherwise denies the allegations in Paragraph 62.

63.     **In the TRO Petition, the Masts sought to enjoin the United States government from releasing Baby Doe from its custody to the Government of Afghanistan for reunification with her biological family, relying on their fraudulently obtained Juvenile Court custody order as a basis for this request.**

**ANSWER:**  Richard Mast admits seeking to enjoin the U.S. government from releasing the Child without DNA testing and terrorist vetting given the extraordinary circumstances of the recovery

and the origin of her skull fracture from a suicide vest detonation at an Al Qaeda compound. John Doe and Jane Doe were unmarried, unknown strangers to the child who have never proven any biological relationship and declined DNA tests since their arrival in the United States. Richard Mast otherwise denies the allegations in Paragraph 63.

**64.     Within hours of docketing the TRO Petition, U.S. District Judge Norman K. Moon convened a hearing at which Richard Mast represented Joshua and Stephanie Mast, and the U.S. Department of Justice (the "DOJ") represented the DoD and the DoS.**

<u>**ANSWER**</u>:  Richard Mast admits the allegations in Paragraph 64.

**65.     During the hearing, Richard Mast falsely represented to the Court that Joshua and Stephanie Mast were *not seeking to adopt* Baby Doe, but instead were interested only in bringing her to the United States for the purposes of medical treatment. Having just represented Joshua and Stephanie Mast in the Fluvanna Circuit Court to obtain an interlocutory order of adoption, Richard Mast knew that his representation to Judge Moon was false. So, too, did Joshua and Stephanie Mast. Neither Joshua Mast, Stephanie Mast, nor Richard Mast informed this Court or the United States government of the pending adoption proceedings.**

<u>**ANSWER**</u>:  Richard Mast denies the allegations of Paragraph 65.

**66.     For their part, the DOJ attorneys described the Juvenile Court custody order as "unlawful," "deeply flawed and incorrect," and apprised Judge Moon that the Masts had failed to serve the DoD and the DoS with notice of the custody proceedings.**

<u>**ANSWER**</u>:  Richard Mast admits the allegations in Paragraph 66 insofar as they reflect the inaccurate representations by the DOJ attorneys.

**67.     The DOJ attorneys also advised Judge Moon that, while Baby Doe was in the physical custody of the U.S. government to receive emergency medical care, she remained subject to the jurisdiction of the Government of Afghanistan, which had "determined that it's not going to waive jurisdiction because it has located that relative."**

<u>**ANSWER**</u>:  Richard Mast admits the allegations in Paragraph 67 insofar as they reflect the inaccurate representations by the DOJ attorneys.

**68.     Furthermore, the DOJ attorneys noted that "if the United States had been involved in th[e custody] proceeding as it should have been since it had custody . . . we would have been able to correct some of the factual errors that were happening there."**

**ANSWER:**  Richard Mast admits the allegations in Paragraph 68 insofar as they reflect the inaccurate representations by the DOJ attorneys.

**69.     Unsurprisingly, Judge Moon denied the request for a TRO that same day, finding that Joshua and Stephanie Mast were unlikely to prevail on the underlying cause of action. In so doing, Judge Moon observed that: (a) the Juvenile Court orders were "foundational to plaintiffs' asserted authority to care" for Baby Doe, but they "reflect an assumption" that the Government of Afghanistan would issue a waiver of jurisdiction, which it did not do; (b) as custodian of Baby Doe, the DoD "should have been formally served with and provided notice of the proceedings"; and (c) the Masts had failed to "proceed through proper channels," including obtaining the consent of the Afghan government and obtaining a visa for Baby Doe to enter the United States.**

**ANSWER:**  Richard Mast admits Judge Moon denied the request for a TRO. To the extent that the allegations in Paragraph 69 quote that order, that order speaks for itself and no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 69.

**70.     The next day, February 27, 2020, the DOJ filed a notice with the federal court advising that Baby Doe had been released from U.S. custody for reunification with her "next of kin."**

**ANSWER:**  Richard Mast admits the DOJ filed a notice. To the extent that the allegations in Paragraph 70 quote that notice, the notice speaks for itself and no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 70. John and Jane Doe are not biologically related to the child. John and Jane Doe were unknown to the U.S., ICRC, or Afghan government during any relevant period. Furthermore, the United States admitted in the same proceeding it could not and did not corroborate any purported relationship.

**71.     At that time, Baby Doe was placed in the care of her paternal uncle, John Doe's father.**

**ANSWER:**  Richard Mast denies the allegations in Paragraph 71.

**72.     Concerned that Baby Doe would require ongoing medical care, Baby Doe's paternal uncle transferred his guardianship of Baby Doe, pursuant to his authority under the laws of Afghanistan, to his son and daughter-in-law, John and Jane Doe. Baby Doe's paternal uncle believed that John and Jane Doe were best suited to care for Baby Doe because they were a young, educated couple who lived in a larger, more cosmopolitan area, with better access to doctors and hospitals than the rural region of Afghanistan where he lived.**

**ANSWER**:  Richard Mast denies the allegations in Paragraph 72.

**73.    Though they themselves were young newlyweds who had not yet had biological children, John and Jane Doe agreed to welcome Baby Doe into their family and raise her as their own child.**

**ANSWER**:  Richard Mast denies the allegations in Paragraph 73. Jane Doe was 17 years old and an unmarried minor child living in her parents' home with at least twenty-three immediate and extended family members with the child while attending high school through October 2020. Prior to becoming engaged to be married to defendant John Doe in October 2019, Jane Doe had never met John Doe and had spoken to him approximately five times via telephone. Despite similar representation in the Virginia Court, as well as a fraudulent identity document presented to allege Jane Doe was two years older than her actual age sworn under oath (and therefore not a minor child lacking legal capacity during all relevant periods,) the Circuit Court held that there was "no question" that Jane Doe was unmarried when the child started living with her extended family. In addition, John Doe represented he hired a woman to take care of the child, and that the child did not live with John Doe, Jane Doe, or John Doe's father. Jane Doe admitted on her Facebook profile that she was married on October 13, 2020.  Finally, Jane Doe admitted to both Joshua and Stephanie Mast that she was mocked by girls in her high school class for taking care of a child when she did not have a husband.

**74.    John and Jane Doe provided everything for Baby Doe that a parent would provide, including food, milk, diapers, and arranging medical care. Most importantly, they loved Baby Doe like they would love their own biological child. After more than five months of living in a medical institution on a military base, Baby Doe was finally surrounded by the love of a family, with grandparents and young aunts and uncles who also adored her. Plaintiffs John and Jane Doe continued to raise Baby Doe as their first child for eighteen months, until the very moment of her abduction on September 3, 2021.**

**ANSWER**:  Richard Mast denies the allegations in Paragraph 74, and incorporates by reference the answer to Paragraph 73. Furthermore, there is significant evidence of neglect, abuse, and lack of medical care of the child while she was purportedly in John Doe and Jane Doe's care.

75.     Having failed to prevent Baby Doe's reunification with her biological family in Afghanistan, and having failed thus far to obtain physical custody of Baby Doe, Joshua and Stephanie Mast pursued a new strategy: convince Baby Doe's family to let her travel to the United States, where Joshua and Stephanie Mast could abduct her and raise her as their own child.

**ANSWER:**  Richard Mast denies the allegations in Paragraph 75.

76.     In the fall of 2019, Joshua Mast and Stephanie Mast reached out to Kimberley Motley, a U.S. citizen and attorney who had worked in Afghanistan, to assist in their efforts to bring Baby Doe to the United States. Joshua Mast identified himself as a U.S. Marine stationed in Kabul who sought to remove Baby Doe from Afghanistan. He advised Motley that he and Stephanie Mast intended to adopt Baby Doe.

**ANSWER:**  Richard Mast admits the allegations in paragraph 76 to the extent that Joshua and Stephanie Mast communicated with Kimberley Motley in the fall of 2019 while Joshua was a Marine stationed in Afghanistan, after Ms. Motley had reached out to USFOR-A to serve as a guardian ad litem for the child. Richard Mast denies the rest of the allegations in Paragraph 76.

77.     Between October 25-27, 2019, Joshua Mast and Motley communicated numerous times through emails and phone calls to share information about a shared desire to remove Baby Doe from Afghanistan. In the course of their email exchange, Joshua Mast acknowledged that he needed approval from the Government of Afghanistan to obtain a visa for Baby Doe to travel to the United States.

**ANSWER:**  Richard Mast is without sufficient personal knowledge and therefore denies the allegations in Paragraph 77.

78.     Motley, who previously learned of Baby Doe through another U.S. servicemember and was representing herself as a "guardian ad litem" for Baby Doe (despite there being no court order naming her as such, and despite that Afghan law does not provide for "guardians ad litem"), asked the Government of Afghanistan to secure citizenship documentation for Baby Doe as an Afghan citizen, including a passport and "tashkira" (an Afghan identification document).

**ANSWER:**  Richard Mast lacks sufficient personal knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 78 and on that basis denies them. In addition, Mrs. Motley is a well-known humanitarian lawyer who has represented underprivileged women and children in Afghanistan at great personal risk on numerous occasions. In addition, Mrs. Motley

successfully assisted hundreds of at-risk refugees flee the Taliban during the evacuation – including John Doe and Jane Doe.

**79.    On February 27, 2020, the day the United States released Baby Doe to the Afghan Government and the ICRC for reunification with her family, Joshua Mast advised Motley that he needed help to "handle [Baby Doe's] situation privately" by locating her relatives, contacting them, offering them medical care, and then bringing the child out of Afghanistan to the United States, where the Masts had already successfully petitioned a Virginia Court for legal custody over the child.**

**ANSWER:**  Richard Mast admits successfully petitioning a Virginia Court for legal custody over the child; Richard Mast denies Baby Doe's "reunification with her family" occurred on February 27, 2020, or any other day, or that relatives of the child were located; Defendant Richard Mast is without sufficient personal knowledge to admit or deny remainder and therefore denies the allegations in Paragraph 79.

**80.    That same day, Joshua Mast provided Motley with a copy of an official diplomatic communication from the Government of Afghanistan to an official with the U.S. Department of Defense, formally requesting the return of Baby Doe to their physical custody for reunification with her family in Afghanistan. By this time, Motley also had received a copy of the Masts' Juvenile Court order, which she knew was void because it was expressly conditioned on a waiver of jurisdiction from the Government of Afghanistan, and the diplomatic communication that Mast sent her showed that the Government of Afghanistan was affirmatively asserting jurisdiction over Baby Doe, not waiving it.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 80 and on that basis denies them. Richard Mast denies the remainder of the allegations of Paragraph 80.

**81.    In addition, in spite of her prior recognition that Baby Doe was an Afghan citizen, and her knowledge that the Government of Afghanistan had demanded her return for reunification with her family and that the United States had agreed, Motley agreed to work with the Masts as they implemented their plan.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 81 and on that basis denies them. Richard Mast otherwise denies the allegations in Paragraph 81.

82.     **Joshua Mast provided Motley with information he received about the identities of the people to whom Baby Doe was transferred. Motley used this information to find a contact who could connect her with John and Jane Doe.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 82 and on that basis denies them.

83.     **On or about March 6, 2020, just days after Baby Doe was united with her family, Motley called John Doe for the first time, pursuant to her agreement with, and at the direction of, Joshua and Stephanie Mast.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 83 and on that basis denies them.

84.     **In their initial introductions to Motley in March 2020, John and Jane Doe described themselves to Motley as Baby Doe's "cousin," and "the wife of [John Doe] and the mother of [Baby Doe]," respectively.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 84 and on that basis denies them.

85.     **In a subsequent conversation that same day, Motley advised Jane Doe that she understood Baby Doe had serious medical issues and that Motley knew an American family who wanted to help her. Pursuant to her agreement with Joshua and Stephanie Mast, Motley did not disclose the Masts' custody order and interlocutory adoption order for Baby Doe, and did not disclose the Masts' intention to adopt Baby Doe or that the Masts had initiated court proceedings to do so.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 85 and on that basis denies them.

86.     **Five days later, the Masts filed a brief relating to their rejected TRO Petition, but did not disclose to the Court that they were in contact with John and Jane Doe through Motley or that Baby Doe was with her biological family and legal guardians in Afghanistan.**

**ANSWER:**  Defendant Richard Mast admits filing a notice of voluntary dismissal of the TRO suit on March 11, 2020; Defendant Richard Mast admits filing a response to the court's order for further briefing on motion to proceed under seal and proceed under pseudonyms notwithstanding the notice of voluntary dismissal; Defendant Richard Mast is without personal knowledge of

whether Joshua and Stephanie Mast "were in contact with John and Jane Doe through Motley" and therefore denies this aspect of the allegations; Defendant Richard Mast admits Baby Doe was in Afghanistan, but denies "Baby Doe was with her biological family" and denies that "Baby Doe was with…her legal guardians." Richard Mast otherwise denies the allegations in Paragraph 86. John Doe and Jane Doe are not biologically related to the child. John Doe and Jane Doe are not legal guardians of the child under any theory of law. Furthermore, the Masts fully disclosed to the Virginia Circuit Court their understanding of where the child was, who she was with, and the child's medical symptoms Jane Doe had described as her "shaking" at night and during the day, and her eyes "twitching."

**87.    On March 22, 2020, Joshua Mast wired a $4,500 payment to Motley via PayPal and messaged her to confirm that she received the funds.**

**ANSWER:**  Defendant Richard Mast is without personal knowledge of whether Joshua Mast wired any payment to Kimberley Motley and therefore denies.

**88.    Motley continued to communicate with and befriend John and Jane Doe on behalf of the Masts over the course of more than a year, making multiple offers to assist with Baby Doe's medical care and occasionally asking for photographs of Baby Doe. Motley did so at the direction of Joshua and Stephanie Mast and received thousands of dollars to do so.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 88 and on that basis denies them.

**89.    Motley also continued to hide the identity of the person or people purportedly willing to help Baby Doe, or that Joshua and Stephanie Mast had obtained a custody order and an interlocutory adoption order for Baby Doe.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 89 and on that basis denies them.

**90.    On July 30, 2020, and in response to one of Motley's requests for photos, Jane Doe sent her photographs of Baby Doe in swim trunks in a small wading pool.**

**ANSWER:**  Richard Mast lacks personal knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 90 and on that basis denies them.

**91.    At the same time Motley was communicating with and befriending John and Jane Doe at the behest of Joshua and Stephanie Mast, the Masts continued pursuing a final order of adoption in the Circuit Court.**

**ANSWER:**  Richard Mast admits the allegations in Paragraph 91 to the extent he pursued a final adoption order in the Circuit Court to create a legal path to the United States before the Taliban took over Afghanistan. Richard Mast denies the remaining allegations in Paragraph 91.

**92.    The Masts did so despite knowing that: (a) Baby Doe was in the custody of individuals determined by the Government of Afghanistan and ICRC to be her biological family and legal guardians under the laws of Afghanistan; (b) Joshua and Stephanie Mast had not obtained an order of custody or guardianship over Baby Doe in Afghanistan; (c) the Afghan government had asserted jurisdiction over Baby Doe; (d) this Court, the United States District Court for the Western District of Virginia, had characterized the Juvenile Court custody order as falsely premised upon the existence of a waiver of jurisdiction by the Afghan government; and (e) the DoD (Baby Doe's former custodian and Joshua Mast's employer) and the DoS (the agency that oversees intercountry adoptions) regarded the state court orders as "unlawful." Upon information and belief, the Masts intentionally failed to advise the Circuit Court of any of these facts.**

**ANSWER:**  Richard Mast denies that Baby Doe was in the custody of individuals determined by the Government of Afghanistan and ICRC to be her biological family and legal guardians under the laws of Afghanistan.  Richard Mast denies that he failed to advise the Circuit Court of any relevant facts.  The remainder of the allegations assert legal conclusions to which no response is required.  To the extent a response is required, the remainder of the allegations of Paragraph 92 are denied.

**93.    On December 3, 2020, nine months after Baby Doe had been reunited with her family in Afghanistan, and as a direct result of the Masts' omissions and misrepresentations, the Circuit Court entered a final order of adoption for Joshua and Stephanie Mast, incorrectly finding that Baby Doe "remains up to this point in time an orphaned, undocumented, stateless minor," and therefore "has the legal identity granted by order of this Court as constituting her sole legal identity." At the time of the order, neither Joshua and Stephanie Mast, Richard Mast, nor anyone else had informed John Doe or Jane Doe of the pendency of those proceedings. Nor had anyone informed the United States – despite this Court's denial of Joshua and Stephanie Mast's request for a TRO, and despite Richard**

Mast's express representation to this Court (in the presence of United States' counsel) that Joshua and Stephanie Mast did not intend to adopt Baby Doe – that Joshua and Stephanie Mast had in fact continued to pursue Baby Doe's adoption.

**ANSWER:**  Richard Mast admits the Fluvanna County Circuit Court entered a final adoption order, which placed the Child with the Masts—a place where she remains today. To the extent that the allegations in Paragraph 93 quote that order, that order speaks for itself and no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 93.

94.    After Joshua Mast met Ahmad Osmani in 2021 through a WhatsApp Bible study group, Osmani offered to help Joshua and Stephanie Mast bring Baby Doe to the United States so that they may raise her as their daughter.

**ANSWER:**  Richard Mast is without personal knowledge as to the allegations in Paragraph 94 and therefore denies  the allegations in Paragraph 94.

95.    On February 2, 2021, Stephanie Mast emailed Joshua Mast an altered photo of Baby Doe for use in obtaining an Afghan passport for Baby Doe. The photo was nearly identical to the photo of Baby Doe that Jane Doe sent to Kimberley Motley, see supra ¶ 90. However, the photo that Stephanie Mast emailed to Joshua Mast had been altered to add a shirt, remove the background content, and be reformatted as a passport photo. Joshua Mast forwarded Stephanie Mast's email and the altered photo to Ahmad Osmani to be conveyed to his contact in the Afghan passport office.

**ANSWER:**  Richard Mast is without personal knowledge as to the allegations in Paragraph 95 and therefore denies the allegations in Paragraph 95.

96.    In March 2021, Osmani assisted Joshua and Stephanie Mast in obtaining a fake Afghan passport for Baby Doe. Joshua and Stephanie Mast wired more than $1,000 to Osmani, who then wired those funds to a contact in Afghanistan to pay for the procurement of the fake Afghan passport with a fake Americanized name that featured the Masts last name.

**ANSWER:**  Richard Mast is without personal knowledge as to the allegations in Paragraph 96 and therefore denies the allegations in Paragraph 96.

97.    Osmani knew that Baby Doe was living with her biological family in Afghanistan. In fact, during his first encounter with Osmani and Joshua Mast, John Doe told Osmani and Joshua Mast that John Doe is Baby Doe's cousin. Osmani even identified John Doe as the child's cousin in the contact information Osmani stored in his phone for John Doe.

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 97 and on that basis denies them. Richard Mast denies that John Doe and Jane Doe are biologically related to the child.

**98.     On July 10, 2021, Motley offered for the first time to introduce John and Jane Doe to the American family supposedly interested in providing medical care for Baby Doe. Motley then facilitated a telephone conversation between John and Jane Doe and Joshua Mast, during which Ahmad Osmani provided interpretation. Mast told John and Jane Doe that he was familiar with Baby Doe's medical needs and warned them that, if Baby Doe did not receive medical care in the United States, she could be blind, brain damaged, and/or permanently physically disabled. In the course of their conversations, Mast claimed to be a volunteer in the U.S. military hospital who was responsible for her care while she was hospitalized there.**

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 98 and on that basis denies them.

**99.     John Doe, who trained as a nurse in Afghanistan, was not aware of the medical issues that Mast described. But John and Jane Doe were concerned about the scarring on Baby Doe's face from the burns she sustained, Baby Doe's irregular gait due to the leg injury she sustained, and the severe allergic reactions of unknown origin that she seemed to periodically suffer.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 99 and on that basis denies them.

**100.    Mast insisted that Baby Doe would suffer serious, permanent harm if she were not brought to the United States for special treatment. In that initial conversation and in other subsequent conversations, Mast asked John and Jane Doe to send Baby Doe to the United States for medical treatment. They declined because they did not want to be separated from their daughter.**

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 100 and on that basis denies them.

**101.    By July 2021, Jane Doe was in the third trimester of pregnancy and concerned about traveling to the United States. As a result, John and Jane Doe asked Mast if he would be willing to facilitate their taking Baby Doe to India or Pakistan for medical care, where he could pay doctors or hospitals directly, without providing any money to John and Jane Doe. Mast declined, insisting that hospitals in India and Pakistan did not have the specialists required to help Baby Doe.**

**ANSWER:**  Richard Mast is without personal knowledge and therefore denies the allegations in

Paragraph 101.

**102.   Over time and over the course of other telephone conversations and written communications, Ahmad Osmani helped Joshua and Stephanie Mast foster a relationship of trust with John and Jane Doe. Osmani also had conversations with the Does on other occasions in which the Masts did not participate. Osmani routinely referred to John Doe as his "brother." John and Jane Doe trusted Osmani, an Afghan who spoke their native language, when he told them that the Masts were trustworthy people with no ulterior motives who just wanted to help Baby Doe receive medical care. Upon information and belief, Osmani maintained contact with John and Jane Doe and reported back to Joshua Mast at his direction about his conversations with the Does. Unbeknownst to John and Jane Doe, Osmani was not the impartial interpreter he made himself out to be. Rather, Osmani knew that the Masts intended to take Baby Doe from her biological family, and Osmani helped them do so.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 102 and on that basis denies them.

**103.   Joshua Mast also repeatedly referred to John Doe as his "brother" and insisted he only wanted to help Baby Doe obtain needed medical care. Based on the repeated warnings of Joshua and Stephanie Mast about Baby Doe's medical needs, and based on the repeated assurances by Osmani that the Masts were honest people who just wanted to help Baby Doe, John and Jane Doe began to fear that she would suffer long-term consequences if they did not obtain specialist care for her.**

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations

contained in Paragraph 103 and on that basis denies them.

**104.   Neither Joshua Mast, Stephanie Mast, Motley, nor Osmani disclosed to John and Jane Doe at this time that the Masts had (unsuccessfully) filed a legal action in the United States to prevent Baby Doe's reunification with her biological family and legal guardians in Afghanistan, or that the Masts had obtained an order of adoption for Baby Doe in a Virginia court. Instead, Joshua and Stephanie Mast misrepresented that they wanted to bring Baby Doe to the United States solely so that she could receive medical treatment and for the sake of doing something good.**

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations

contained in Paragraph 104 and on that basis denies them.

**105.   In August 2021, as U.S. troops withdrew and the Taliban began to retake Afghanistan, Joshua and Stephanie Mast again reached out to John and Jane Doe to convince them to bring Baby Doe to the United States for medical treatment. Given the political**

situation in Afghanistan and the Taliban's advances, John and Jane Doe believed this could be their last and only chance to obtain medical care for Baby Doe. As a result, they advised Joshua Mast that they were considering his proposal, but were concerned that they would not be able to return to Afghanistan.

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 105 and on that basis denies them.

106.    Joshua Mast and Ahmad Osmani assured them that they would need to be in the United States for Baby Doe's medical care for only two or three months and that they would then be able to re-enter Afghanistan without issue. Again, Joshua Mast and Ahmad Osmani failed to inform John and Jane Doe about the adoption order he and his wife and brother had fraudulently obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, Mast and Osmani continued to misrepresent that the Masts merely wanted to bring Baby Doe to the United States solely to provide her with medical care.

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 98 and on that basis denies them.  Moreover, this allegation is frivolous and absurd on its face. The Taliban had completely taken over Afghanistan, there were refugees falling from the bottom of aircraft to their deaths, revenge killings, and tens of thousands of internally displaced persons throughout Afghanistan at this time, and no commercial flights out of the entire country. It is incredulous to assert the Does believed, or that Joshua Mast represented, that anyone could return to Afghanistan under those conditions.

107.    In reliance on Joshua Mast's misrepresentations regarding the purpose and duration of their travel, as well as their ability to return to Afghanistan, ignorant of Mast's and his wife's true intentions, and in reliance on Osmani's reassurances, John and Jane Doe agreed to travel to the United States for the purpose of obtaining medical care for Baby Doe.

**ANSWER:**  Richard Mast denies the allegations in Paragraph 107.

108.    Joshua Mast informed John and Jane Doe that he would prepare immigration paperwork for them and Baby Doe to permit them to enter the United States for the purpose and duration of Baby Doe's medical care.

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 108 and on that basis denies them.

109. **In fact, Mast did not file the appropriate immigration paperwork for John and Jane Doe and Baby Doe for the purpose of having them visit the United States for a short duration to obtain medical care for Baby Doe. Instead, on August 20, 2021 and unbeknownst to John and Jane Doe, Richard Mast emailed U.S. Citizenship and Immigration Services ("USCIS") a Form I¬360 Petition for Plaintiff John Doe. Upon information and belief, the form was prepared at the direction of Joshua and Stephanie Mast by Natalie Osmani, Ahmad Osmani's wife. Ms. Osmani signed the petition as its preparer, but listed Defendant Joshua Mast as the person acting on behalf of the petitioner, and provided Mast's North Carolina home address as a mailing address.**

**ANSWER:** Defendant Richard Mast admits emailing U.S. Citizenship and Immigration Services ("USCIS") a Form I360 Petition for Plaintiff John Doe under the exigent circumstances on August 20, 2021 surrounding the fall of the former Afghan Government. Richard Mast is without personal knowledge, and therefore denies, the allegations regarding the form's preparation, including at whose direction the form was prepared; and who ultimately signed it; the form speaks for itself.

110. **In addition, Ms. Osmani wrote by hand the following visa category: "Special Immigrant Afghanistan national escorting military dependent." Not only does no such visa category exist, but it was false to claim that John Doe would be escorting a U.S. "military dependent" when the United States had by this time represented to this Court that it did not recognize any custodial relationship between Joshua Mast, Stephanie Mast and Baby Doe.**

**ANSWER:** Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 110 relating to Ms. Osmani and on that basis denies them. Richard Mast denies the allegations in Paragraph 110. The remainder of Paragraph 110 asserts legal conclusions to which no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 110.

111. **Upon information and belief, John and Jane Doe nonetheless were placed on a list of potential evacuees with pending Special Immigrant Visa Applications as a result of the petition.**

**ANSWER:** Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 111 and on that basis denies them.

**112.   In his August 20, 2021, email to the USCIS, Richard Mast falsely wrote: "[John and Jane Doe] are helping US DoD at great risk to themselves, and have cared for a minor DoD dependent child ([Baby Doe]) who has serious medical needs."**

**ANSWER:**  Richard Mast admits the writing referenced in paragraph 112 because the statements were truthful and based on John Doe's repeated representation (on audio tape) that he and his family were in great danger if his photo was published with the child because they had disobeyed the Taliban in bringing the child to U.S. forces. Richard Mast denies this writing is or was false.

**113.   Of course, by then Baby Doe was not a "minor DoD dependent child," because she had been returned to her family in the exercise of the Government of Afghanistan's jurisdiction. Instead, John and Jane Doe were by then Baby Doe's legal guardians, raising her as their own child; they were not "caring" for her on behalf of Joshua and Stephanie Mast, the DoD, or anyone else. Nor were they doing so as a "service to the US Government."**

**ANSWER:**  Richard Mast denies the allegations in Paragraph 113.

**114.   In another email to USCIS seeking the evacuation of Ahmad Osmani's siblings to the United States, Richard Mast wrote that Osmani's siblings were the "family of an Afghan pastor" who had been "very instrumental to helping a US Marine" represented by Liberty Counsel "adopt an Afghan child." Upon information and belief, the reference to a "US Marine" is a reference to Joshua Mast, and the reference to "an Afghan child" is a reference to Baby Doe.**

**ANSWER:**  Richard Mast admits sending an email seeking evacuation of Ahmad Osmani's minor siblings under the exigent circumstances of August 2021 surrounding the fall of the former Afghan Government.

**115.   John and Jane Doe were not aware of the misrepresentations being made by Richard Mast, on behalf of Joshua and Stephanie Mast, about them and Baby Doe.**

**ANSWER:**   Richard Mast denies the allegations in paragraph 115. Richard denies making "misrepresentations." The Does were fully aware that the only possibility of their evacuation from Afghanistan was to disobey the Taliban and bring the child to U.S. forces – which is why they registered the child using her U.S. name and date of birth at every stage of the evacuation.

116. **The Does traveled to Kabul on August 23, 2021, to spend the night there with Osmani's parents and siblings, at the direction of Joshua Mast and Osmani. The next morning, the Does traveled to Hamid Karzai International Airport as part of the evacuation efforts under Operation Allies Refuge. Osmani's siblings accompanied them.**

**ANSWER:** Richard Mast is without personal knowledge as to whether and how the Does traveled to Kabul on August 23, 2021, "at the direction of Joshua Mast and Osmani" or otherwise on their own volition and on that basis denies the allegations. Richard Mast denies the "the Does traveled to Hamid Karzai International Airport."

117. **Between August 24 and August 26, 2021, Joshua Mast and Osmani continued to communicate with John and Jane Doe over WhatsApp as they transited from Afghanistan to the United States through Qatar and Germany.**

**ANSWER:** Defendant Richard Mast is without personal knowledge as to whether and how Joshua Mast and Osmani continued to communicate with John and Jane Doe over WhatsApp" as they "transited from Afghanistan to the United States through Qatar and Germany," and therefore denies the allegations in Paragraph 117.

118. **Again, Joshua Mast and Osmani failed to inform John and Jane Doe about the adoption order that Joshua and Stephanie Mast had obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, they continued to misrepresent that the Masts wanted to bring Baby Doe to the United States only to provide her with medical care.**

**ANSWER:** Richard Mast denies the allegations in Paragraph 118. The Virginia Circuit Court has previously ruled that the Masts used the strongest words for legal responsibility over a child in Pashto when describing their legal relationship to the child.

119. **On August 26, 2021, as Plaintiffs were in transit to the United States, Joshua Mast sent a WhatsApp voice note to Jane Doe, instructing her to tell anyone who asks that he was their lawyer. He also sent her a text stating:**

> **If anyone asks to talk about your documents, show them this text: I am Major Joshua Mast, USMC. I am a Judge Advocate with MARSOC, and I am here at Ramstein to provide this group of 6 pax with their original documents and escort them through the process. MARSOC coordinated a JSOC operation to extract**

> them to Kabul airport three days ago, and I am tracking them
> down for the above purpose.

**ANSWER:**   Defendant Richard Mast is without personal knowledge as to any of the allegations

contained in Paragraph 119 and on that basis denies them.

120.   At approximately the same time, Mast left John Doe a voice message, assuring him he would get them to the United States, and stating:

> [I]f someone tries to talk about documents, we want to come and
> show them all the forms that we filed for you all to get to
> America instead of staying here in Germany. So before you talk
> to them about it, say "we have a lawyer here to talk with you
> about that for us" and that's me. Just show them the text and
> have them call me.

**ANSWER:**   Defendant Richard Mast is without personal knowledge as to any of the allegations

contained in Paragraph 120 and on that basis denies them.

121.   When Plaintiffs landed at Ramstein Airforce Base in Germany, Joshua and Stephanie Mast met them. During their brief stop in Germany, Joshua and Stephanie Mast visited Plaintiffs' room three times, repeatedly trying to convince John and Jane Doe to allow Baby Doe to travel separately with the Masts, insisting that it would be easier for the toddler to enter the United States that way. John and Jane Doe repeatedly refused, as they did not want to leave Baby Doe in anyone else's care. Osmani provided interpretation over the telephone.

**ANSWER:**   Defendant Richard Mast is without personal knowledge as to any of the allegations

contained in Paragraph 121 and on that basis denies them.

122.   Before leaving Germany, John Doe informed Joshua and Stephanie Mast of a promise John Doe had made to Jane Doe: that Baby Doe would never leave her side while they were in the United States. There can be no doubt that Joshua and Stephanie Mast were aware that John and Jane Doe understood they would have control over Baby Doe's location and custody while in the United States, and that they intended to continue to care for her as their daughter.

**ANSWER:**   Defendant Richard Mast is without personal knowledge as to any of the allegations

contained in Paragraph 122 and on that basis denies them.

123.    During a conversation in Germany, Jane Doe told Stephanie Mast that she could not live without Baby Doe and that, given all that Baby Doe had been through, Baby Doe meant even more to Jane Doe than her own yet-to-be-born child.

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 123 and on that basis denies them.

124.    Again, the Masts and Osmani failed to fully inform John and Jane Doe about the adoption order that the Masts obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, the Masts and Osmani continued to misrepresent that they only wanted to bring Baby Doe to the United States to provide her with medical care.

**ANSWER:**  Richard Mast denies the allegations in Paragraph 124.

125.    After several days of grueling travel, which were especially hard on Jane Doe, who was eight months pregnant, the Does and the Osmani siblings arrived at Dulles International Airport on August 29, 2021. Joshua Mast met the families while they waited in line for inspection, pulled them out of the line, and took them directly to an inspecting officer. There, they presented their identity documents.

**ANSWER:**  Defendant Richard Mast admits John Doe and Jane Doe and the Osmani children arrived at Dulles International Airport on August 29, 2021. Defendant Richard Mast is without personal knowledge as to any of the remaining allegations contained in Paragraph 125 and on that basis denies them.

126.    John Doe presented his Afghan passport to the inspecting officer, and Jane Doe presented her Afghan ID. They then explained to the inspecting officer that Baby Doe had not yet received an identification document, as it was customary in Afghanistan to procure one only when the child was old enough to attend school. At the time, Baby Doe was two years old.

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 126 and on that basis denies them.

127.    To their surprise — and despite his representations to multiple courts that Baby Doe was not Afghan and had no nationality — Joshua Mast then handed an Afghan passport for Baby Doe to the inspecting officer. John and Jane Doe had never before seen this passport and did not procure it themselves. When the officer returned the passport to John and Jane Doe, they were shocked to see that the photograph in the passport appeared to be the same photograph that Jane Doe sent to Motley via WhatsApp on July 30, 2020, of Baby Doe in swim trunks in a small wading pool, but it had obviously been altered.

41

**Original Photo**                    **Passport Photo**

[REDACTED]                            [REDACTED]

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations

contained in Paragraph 127 and on that basis denies them.

**128.    The altered picture had a different background, a shirt covering Baby Doe's
shoulders and chest, and eliminated some stray hairs so it was less obvious that her hair was
wet.**

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations

contained in Paragraph 128 and on that basis denies them.

**129.    Upon information and belief, the alteration of the photograph for use in the
passport was done by, or at the direction of, both Joshua and Stephanie Mast.**

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations

contained in Paragraph 129 and on that basis denies them.

**130.    Upon information and belief, the procurement of a fake Afghan passport for
Baby Doe was orchestrated by Osmani. Osmani identified, communicated with, and, at the
direction of Joshua and Stephanie Mast, paid an Afghan government official to create a
passport for a child that Joshua Mast, Stephanie Mast, and Osmani claimed to the Circuit
Court and this Court was not Afghan. The fake Afghan passport also identified Baby Doe
with a fake name: an American name and the Masts last name.**

**ANSWER:**  Defendant Richard Mast admits that he, Joshua Mast and Stephanie Mast represented

to the Circuit Court and this Court that the child in question in this case was not Afghan. Defendant

Richard Mast denies the Afghan passport is fake; Defendant Richard Mast admits the Afghan

passport identified Baby Doe with her legal American name and the Masts' last name pursuant to

the Virginia Certificate of Foreign Birth issued as a result of the Circuit Court's interlocutory order

of adoption and final order of adoption. Richard Mast is without personal knowledge as to any of

Osmani's actions as alleged in Paragraph 130; and therefore, the remainder of Paragraph 130 is

denied. Richard Mast otherwise denies the allegations in Paragraph 130.

**131.    John and Jane Doe were stunned to see that the name on the passport was "[REDACTED] Mast."**

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 131 and on that basis denies them.

**132.    When John and Jane Doe asked Joshua Mast why the name on the passport was incorrect, he told them to keep quiet and that it was just to make it easier to get medical care for Baby Doe.**

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 132 and on that basis denies them.

**133.    After screening at the airport, Plaintiffs were paroled into the United States, which permits them to lawfully remain in the United States through August 28, 2023. They ultimately were transported to refugee housing at Fort Pickett, in Blackstone, Virginia, the location that Joshua Mast instructed them to request.**

**ANSWER:**  Defendant Richard Mast admits that John Doe and Jane Doe were paroled into the United States at Dulles International Airport; and that they ended up at Fort Pickett, Virginia; but Richard Mast is without personal knowledge as to the remaining allegations contained in Paragraph 133 and therefore denies the rest of the allegations in Paragraph 133.

**134.    Five days later, on September 3, 2021, John and Jane Doe were instructed that they would be moving to another housing unit on the base. They were escorted to a van, in which a woman sat in the last row with an infant car seat next to her. Baby Doe was placed in the infant car seat.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 134 and on that basis denies them.

**135.    But the Does were not transported to another housing unit on the base. Instead, they were taken to a building where the woman in the car picked up Baby Doe and held her while instructing John and Jane Doe to walk to the front of the building. There, they met another unknown woman who later informed them she was a social worker from the DoS.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 135 and on that basis denies them.

**136.    Inside the building, they were met by the social worker, a Pashto interpreter, and the woman from the car, who continued to hold Baby Doe. The social worker then informed John and Jane Doe that they were not Baby Doe's lawful guardians and that Joshua Mast had adopted the child.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 136 and on that basis denies them.

**137.    John and Jane Doe did not understand what "adoption" meant, as guardianship and kinship care in Afghanistan are not understood in the same way as adoption in the U.S. legal system. John and Jane Doe did understand, though, that Baby Doe would not be permitted to return to their housing unit with them, but that Joshua Mast would be taking her with him.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 137 and on that basis denies them.

**138.    When Joshua Mast entered the room, Jane Doe, who was more than eight months pregnant, fell to the ground crying and begging for him not to take Baby Doe. The woman holding Baby Doe removed her from the room, against John and Jane Doe's objections, and gave her to Stephanie Mast, who was waiting outside.**

**ANSWER:**  Richard Mast is without personal knowledge and therefore denies the allegations in

Paragraph 138.

**139.    John Doe pleaded with Joshua Mast to act like the "brother" that he had promised to be to them. Joshua Mast refused, leaving John and Jane Doe in tears as he and Stephanie Mast abducted Baby Doe. John and Jane Doe have not seen their daughter since that day.**

**ANSWER:**  Richard Mast is without personal knowledge and therefore denies the allegations in

Paragraph 139.

**140.    Bewildered and in despair, John and Jane Doe returned to their housing unit on the base. The next day, they contacted Joshua Mast and asked why he had taken their child. Mast responded that he had been instructed to pick up Baby Doe or she would be sent to an orphanage. He did not say who instructed him or mention the adoption order he and his wife had fraudulently obtained more than a year earlier.**

**ANSWER:**  Richard Mast is without personal knowledge and therefore denies the allegations in

Paragraph140.

**141.     In a conversation with Joshua Mast and Richard Mast approximately two weeks later, Joshua Mast and Richard Mast again failed to disclose the adoption order, but instead told the Does that they currently were not able to properly care for Baby Doe at Fort Pickett and were not financially stable enough to provide for her. But, they told John and Jane Doe, after the Does leave the base, got jobs, and were financially stable, they would discuss Baby Doe's status with the Does. At no point during this conversation did either Joshua Mast or Richard Mast refer to Baby Doe as the child of Joshua and Stephanie Mast or discuss the adoption order.**

**ANSWER:**  Richard Mast denies the allegations in Paragraph 141.

**142.     Over the next few weeks, John and Jane Doe attempted to maintain a connection with Joshua Mast over WhatsApp, hoping that he might allow them to see Baby Doe. They repeatedly begged him to allow them to see Baby Doe or at least speak with her, but he repeatedly refused. At the same time, just one month after having abducted Baby Doe, Joshua Mast took her to visit strangers at Liberty University so that they could meet her.**

**ANSWER:**  Richard Mast is without personal knowledge and therefore denies the allegations in

Paragraph 142.

**143.     John and Jane Doe were afraid of Mast, as he appeared to have lied to numerous government agencies about Baby Doe and gotten away with it. Mast abducted their child in broad daylight but appeared to face no consequences. They were afraid of angering him, believing that, if he could steal their child and get away with it, he could harm them, too.**

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 143 related to John and Jane Doe and on that basis denies

them. Richard Mast otherwise denies the allegations in Paragraph 143.

**144.     Ahmad Osmani maintained frequent contact with the Does, who pleaded with him to help them get their child back. But Osmani continued to manipulate the Does, telling them that he wanted to help them when instead he was acting solely in furtherance of the Masts' scheme to abduct Baby Doe. For example, in the days after the abduction, the Does repeatedly asked Osmani for help in retaining a lawyer or contacting other public officials in the United States for help in getting their child back. But Osmani warned the Does that they must not seek legal help, that lawyers will defraud them, that this issue must be resolved directly with the Masts and that, regardless, no court would return the child to them because the court would see that the Masts had more money than them. Upon information and belief,**

Osmani attempted to dissuade the Does from seeking legal recourse at the direction of Joshua Mast, and reported his conversations back to Joshua Mast.

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 144 and on that basis denies them.

145.    Even though he knew that the Masts now claimed to be Baby Doe's adoptive parents and that the Masts had no intention of returning the child to the Does, Osmani suggested that if the Does kept in contact with the Masts, the Masts might be willing to return the child after the Does left the military base.

**ANSWER:**  Richard Mast lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 145 and on that basis denies them.

146.    John Doe continuously sought help from various agencies at Fort Pickett to help retrieve Baby Doe. Eventually, on September 18, 2021, an interpreter on the base with whom John and Jane Doe shared their story explained the meaning of "adoption" to them. This was the first time John and Jane Doe understood that Joshua and Stephanie Mast had been lying to them all the time and had no intention of returning Baby Doe to them.

**ANSWER:**  Richard Mast denies "this was the first time John and Jane Doe understood" "adoption" and that Baby Doe would be living with Joshua and Stephanie Mast. The testimony of John Doe and Jane Doe in parallel Virginia court proceedings; the Afghan Civil Code that governs guardianship of children; the testimony of Afghan law experts in parallel Virginia court proceedings show that John Doe and Jane Doe substantively understood what "adoption" meant and that Joshua Mast and Osmani fully explained Joshua's claims over the child before they ever left Afghanistan. Richard Mast otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 146 and on that basis denies them.

147.    As a direct result of the decline of Jane Doe's mental health and the traumatic experience of losing Baby Doe, John Doe was afraid to leave Jane Doe alone in their room. He often asked other women in their building to keep an eye on her if he needed to be out of the room. Despite being in the ninth month of her pregnancy, Jane Doe no longer wanted to eat or drink, and she could not sleep. Both she and her husband were devastated and depressed.

**ANSWER:** Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 147 and on that basis denies them.

**148.    Jane Doe delivered her baby on October 1, 2021. Unfortunately, despite the joy of bringing a new child into this world, Jane Doe's depression deepened as it became increasingly clear that Joshua and Stephanie Mast would never voluntarily return Baby Doe to them. By November 5, 2021, Jane Doe had become suicidal and was taken to the Stress Clinic on Fort Pickett for treatment.**

**ANSWER:** Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 148 and on that basis denies them.

**149.    In November 2021, Jane Doe messaged Kimberley Motley to inform her that the Masts, whom Motley had introduced to the Does, had abducted Baby Doe, and pleaded with Motley to help her. Motley did not respond.**

**ANSWER:** Richard Mast lacks knowledge or information sufficient to form a belief about the

truth of the allegations in Paragraph 149 and on that basis denies them.

**150.    As a direct result of Joshua and Stephanie Mast's intentional and forcible removal of Baby Doe, John and Jane Doe have been unable to exercise their parental rights as Baby Doe's biological family and legal guardians.**

**ANSWER:** Paragraph 150 asserts legal conclusions to which no response is required. Inasmuch

as a response is required, Richard Mast denies the allegations in Paragraph 150.  Furthermore, Jane

Doe and John doe are not biologically related to the child. John Doe and Jane Doe are not "parents"

or legal guardians of the child under any theory of Afghan law or U.S. federal or state law.

**151.    As a result of Joshua and Stephanie Mast's intentional and outrageous conduct, namely the abduction of Baby Doe in their presence, John and Jane Doe have experienced extreme emotional distress.**

**ANSWER:** Paragraph 151 asserts legal conclusions to which no response is required. Inasmuch

as a response is required, Richard Mast denies the allegations in Paragraph 151.

**152.    In December 2021, John and Jane Doe initiated proceedings in the Fluvanna Circuit Court to vacate the Adoption Order. In March 2022, by order of the Circuit Court, John and Jane Doe filed a new petition under a new case caption.**

**ANSWER:** Richard Mast admits the allegations in Paragraph 152 and notes that those proceedings are ongoing.

**153.   On August 22, 2022, the United States filed a 21-page Statement of Interest (the "SOI"), with supporting declarations, pursuant to 28 U.S.C. § 517 (attached as Exh. 1). Consistent with the positions taken by the United States before this Court in response to the Masts' TRO Petition, the SOI explicitly confirms the position of the United States that Baby Doe was not a "stateless minor" but was instead an Afghan citizen subject to the jurisdiction of Afghanistan; that the Government of Afghanistan never waived jurisdiction over her but, in fact, affirmatively asserted jurisdiction over Baby Doe; and that, in the exercise of its exclusive authority over foreign affairs, the United States transferred physical custody of Baby Doe to the Government of Afghanistan so that she could be reunified with her family, as identified by the Afghan government. The United States further took the position in the SOI that a state court cannot usurp or contradict the decisions made by the United States with regard to foreign affairs.**

**ANSWER:** Richard Mast admits the United States DOJ filed a Statement of Interest. To the extent that the allegations in Paragraph 153 quote that document, the document speaks for itself and no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 153 and further denies the legal and factual conclusions in the Statement of Interest.

**154.   Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.**

**ANSWER:** Richard Mast incorporates his responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

**155.   As the biological family and legal guardians of Baby Doe, John and Jane Doe have parental rights to and in their relationship with Baby Doe. The right of parents or guardians to develop and to maintain a relationship with their child is a fundamental right recognized by the United States Supreme Court and federal law. Further, the U.S. government recognized that the Does' parental and custodial rights to Baby Doe fell under the jurisdiction of Afghanistan and are recognized under the laws of Afghanistan.**

**ANSWER:** Paragraph 155 asserts a legal conclusion, so no response is required. To the extent a response is required, the allegations are denied. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97.

**156.**   This Court concurred with the DOJ that sole jurisdiction over the custody of Baby Doe was a matter for the courts and Government of Afghanistan, which had expressly asserted its jurisdiction over Baby Doe.

**ANSWER:**  Paragraph 156 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 156.

**157.**   Upon information and belief, each of the Defendants was aware that John and Jane Doe were the lawful guardians of Baby Doe as determined by the Government of Afghanistan. Each of the Defendants was aware John and Jane Doe had maintained physical custody of Baby Doe.

**ANSWER:**  Paragraph 157 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 157.

**158.**   Notwithstanding this knowledge, each of the Defendants intentionally and willfully used improper, unethical and fraudulent means to preclude John and Jane Doe from continuing their parental relationship with Baby Doe and interfered with their parental rights, permanently depriving them of those rights.

**ANSWER:**  Paragraph 158 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 158.

**159.**   Defendants' actions as set forth above have resulted in the violation of these rights, causing John and Jane Doe harm for which they seek compensation.

**ANSWER:**  Paragraph 159 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 159.

**160.**   Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.

**ANSWER:** Paragraph 160 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 160.

**161.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.**

**ANSWER:** Richard Mast incorporates his responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

**162.    Joshua and Stephanie Mast and Kimberley Motley intentionally made misleading and false statements and/or material omissions to John and Jane Doe to perpetrate the abduction of Baby Doe.**

**ANSWER:** Paragraph 162 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 162.

**163.    Joshua and Stephanie Mast engaged the services of Motley, who acted as their agent, to, inter alia, contact John and Jane Doe and lure them into facilitating Baby Doe's travel to the United States, purportedly for the sole purpose of obtaining medical treatment for her, through false and misleading statements and material omissions.**

**ANSWER:** Paragraph 163 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 163.

**164.    Upon information and belief, Joshua and Stephanie Mast, through their agent Motley, procured the identities and location of John and Jane Doe, as well as photographs of Baby Doe procured from John and Jane Doe via WhatsApp.**

**ANSWER:** Paragraph 164 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 164.

**165.    John and Jane Doe relied on Motley's misrepresentations, which she made at the direction of Joshua and Stephanie Mast, when they communicated with her, sent her photographs of Baby Doe, and agreed to travel to the United States for what the Does thought was the sole purpose of obtaining medical treatment for Baby Doe.**

**ANSWER:** Paragraph 165 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 165. Furthermore, the Does

were fully aware that the Masts intended the child to live with them in the United States prior to bringing the child to U.S. Special Forces for evacuation against the Taliban's orders.

**166.    One of the photographs that Joshua and Stephanie Mast obtained from John and Jane Doe through Motley, under false pretenses, was digitally altered to create the fraudulently obtained identification documents used to bring Baby Doe into the United States.**

**ANSWER:**  Paragraph 166 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 166. Furthermore, the child was paroled into the United States using her military identification card with which Plaintiffs John and Jane Doe had registered the child for evacuation.

**167.    It was as a direct result of John and Jane Doe's reliance on Joshua and Stephanie Mast's prevarications, made through Motley, that Joshua and Stephanie Mast were able to lure Plaintiffs to the United States and unlawfully obtain physical custody of Baby Doe.**

**ANSWER:**  Paragraph 167 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 167.

**168.    On July 10, 2021, as well as in subsequent conversations, Joshua and Stephanie Mast, with the assistance of Motley, intentionally misrepresented to John and Jane Doe that their sole intention was to procure medical assistance for Baby Doe, and that it was in the Does' best interest to send Baby Doe to the United States. Joshua and Stephanie Mast also intentionally withheld from John and Jane Doe any information or notice of the court proceedings they had initiated for Baby Doe in Virginia.**

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 168 and on that basis denies them. Insofar as Paragraph 168 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 168.

**169.    On August 26, 2021, and in furtherance of the Masts' unlawful scheme to take Baby Doe from John and Jane Doe, Joshua Mast represented to John and Jane Doe that he was their attorney.**

**ANSWER:** Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 169 and on that basis denies them. Insofar as Paragraph 169 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 169.

170.    **Shortly thereafter, while John and Jane Doe were in Germany awaiting their final flights to the United States, Joshua and Stephanie Mast came to their room three times and again made misrepresentations to them, reiterating that they wanted to take Baby Doe to the United States for the sole purpose of obtaining medical treatment for her. Further, Joshua and Stephanie Mast falsely stated that Baby Doe should travel with them, separately from the Does, because they were simply trying to make it easier for Baby Doe to enter the United States. Instead, their true intention was to unlawfully and permanently take physical custody of Baby Doe.**

**ANSWER:** Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 170 and on that basis denies them.  Insofar as Paragraph 170 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 170.

171.    **On September 3, 2021, Joshua Mast arranged for John and Jane Doe and Baby Doe to be moved to another building at Fort Pickett and revealed to John and Jane Doe for the first time that he had adopted Baby Doe. He then utilized this opportunity to remove Baby Doe from their custody.**

**ANSWER:** Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 171 and on that basis denies them. Insofar as Paragraph 171 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast lacks personal knowledge and therefore denies the allegations in Paragraph 171.

172.    **John and Jane Does' reasonable reliance on this pattern of deception allowed Joshua and Stephanie Mast, through their agent Motley, to obtain the photographs necessary to procure fraudulently obtained identification documents, travel permissions, and erroneously granted custodial and adoption decisions necessary to effect this abduction.**

**ANSWER:** Paragraph 172 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 172.

173.     As a result of repeated material misrepresentations by the Masts and Motley, John and Jane Doe and Baby Doe traveled to the United States and subjected themselves to the controlled environment of a military base that Joshua Mast manipulated to his advantage to abduct Baby Doe in broad daylight.

**ANSWER:**  Paragraph 173 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 173.

174.     In reliance on the representation that they were only traveling to the United States for two to three months to obtain medical care for Baby Doe, after which they would return with Baby Doe to Afghanistan, John and Jane Doe left their homeland, to which they cannot yet return, and may never be able to return, because of the circumstances surrounding their departure. Specifically, John and Jane Doe fear that the current Afghanistan government will be quick to assume they are U.S. military collaborators — consequently, they fear they or their family will be shunned or targeted by the government, or by others in their community.

**ANSWER:**  Defendant Richard Mast is without personal knowledge as to any of the allegations contained in Paragraph 174 and on that basis denies them. Insofar Paragraph 174 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 174.

175.     Had John and Jane Doe been aware that the purpose of the communications initiated by Joshua and Stephanie Mast and Motley was to facilitate the Masts' abduction of Baby Doe, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.

**ANSWER:**  Richard Mast denies the "purpose" set forth in Paragraph 175 and to the extent that Paragraph 175 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 175.

176.     Had John and Jane Doe been aware that Joshua and Stephanie Mast had fraudulently obtained orders of custody and adoption for Baby Doe, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.

**ANSWER:**  Richard Mast denies the allegations of "fraudulently obtained orders of custody and adoption." To the extent that Paragraph 176 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 176.

177.     Had John and Jane Doe been aware that Joshua and Stephanie Mast had filed **an action in a U.S. federal court to prevent Baby Doe's reunification with her biological family and legal guardians, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.**

**ANSWER:**  Richard Mast denies the factual allegations of Paragraph 177 and insofar as it asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 177.

178.     John and Jane Doe have suffered and will continue to suffer what they regard **as the worst tragedy they have experienced, having their child unjustly ripped from their lives.**

**ANSWER:**  Richard Mast denies that Baby Doe was or is "their child."  Further, Paragraph 178 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 178.

179.     Accordingly, Joshua and Stephanie Mast and Motley are jointly and severally **liable for the harm suffered by Plaintiffs as articulated above.**

**ANSWER:**  Paragraph 179 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 179.

180.     Plaintiffs repeat and re-allege all the allegations set forth in the foregoing **Paragraphs as if fully set forth and restated here.**

**ANSWER:**   Richard Mast incorporates their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

181.     Each of the Defendants acted in concert, agreed, associated, mutually **undertook and combined together to intentionally and purposely commit the wrongful and tortious acts against all of the Plaintiffs as set forth above. The concerted and purposeful actions of each Defendant have denied John and Jane Doe their parental rights and wrongfully interfered with their ability to establish and assert those rights; and denied Baby Doe her right to know and be raised in the natural home of her biological family and legal guardians.**

**ANSWER:**  Paragraph 181 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 181. John and Jane Doe are

not legal guardians of the child under any theory of Afghan law or U.S. federal or state law. Jane

Doe and John Doe are not adoptive parents under any theory of Afghan law or U.S. federal or state

law. John and Jane Doe are not biologically related to the child. Furthermore, John Doe and Jane

Doe are not biological parents of the child. The Commonwealth of Virginia does not recognize

parental rights outside of biological or adoptive parents, and this allegation is frivolous.

**182.   Each of the conspirators is fully responsible for the acts of each other. The total effect of the conspiracy not only is tortious, but, indeed, also is a criminal act tantamount to child abduction under §§ 18.2-47(a) and 18.2-49 of the Code of Virginia. The actions of the conspirators violate federal statutes, laws and regulations of the Commonwealth of Virginia, and the laws of Afghanistan.**

<u>**ANSWER:**</u>  Paragraph 182 asserts a legal conclusion, so no response is required. Inasmuch as a

response is required, Richard Mast denies the allegations in Paragraph 182.

**183.   Each Defendant acted in furtherance of this conspiracy to defraud John and Jane Doe and to abduct and unlawfully restrain Baby Doe.**

<u>**ANSWER:**</u>  Paragraph 183 asserts a legal conclusion, so no response is required. Inasmuch as a

response is required, Richard Mast denies the allegations in Paragraph 183.

**184.   Joshua and Stephanie Mast, inter alia, fraudulently induced John and Jane Doe, through their agent Motley, to share photographs of Baby Doe, which they used to unlawfully obtain an Afghan passport for Baby Doe without the knowledge or consent of her biological family and legal guardians. Joshua and Stephanie Mast fraudulently misrepresented their intentions, both directly and through their agent Motley and through Osmani, to John and Jane Doe when persuading them to bring Baby Doe to the United States for the sole purpose of obtaining medical treatment. Joshua and Stephanie Mast abducted Baby Doe and have continued to deprive John and Jane Doe of any contact with her. Joshua and Stephanie Mast procured fraudulently obtained documents to affect her abduction.**

<u>**ANSWER:**</u>  Paragraph 184 asserts a legal conclusion, so no response is required. Inasmuch as a

response is required, Richard Mast denies the allegations in Paragraph 184.

**185.   Richard Mast, inter alia, at the direction of and on behalf of Joshua and Stephanie Mast, fraudulently misrepresented material facts, and made numerous omissions of fact, to multiple courts to unlawfully obtain custody and adoption orders that would facilitate the abduction by Joshua and Stephanie Mast of Baby Doe, as well material misrepresentations to this Court and USCIS in furtherance of the same. He did so in violation of his ethical rules of professional responsibility as an attorney licensed in the**

**Commonwealth of Virginia. Richard Mast and Joshua and Stephanie Mast knew these statements to be false and the omissions to be material.**

**ANSWER:**  Richard Mast denies the factual allegations of Paragraph 185.  To the extent that Paragraph 185 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 185.

**186.   Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly made false representations to John and Jane Doe when persuading them to have Baby Doe travel to the United States to obtain medical treatment.**

**ANSWER:**  Paragraph 186 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 186.

**187.   As set forth above, the Defendants' overt acts and omissions in furtherance of their conspiracy have harmed and will continue to harm each Plaintiff.**

**ANSWER:**  Paragraph 187 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 187.

**188.   Accordingly, the Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.**

**ANSWER:**  Paragraph 188 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 188.

**189.   Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.**

**ANSWER:**  Richard Mast incorporates their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

**190.   Since 2019, the conduct of Joshua and Stephanie Mast has shown a consistent pattern of reckless disregard for the very real possibility of causing extreme emotional distress to John and Jane Doe. As set forth above, the Masts conspired to separate Baby Doe unlawfully from the only family she had ever known for the vast majority of her short life. It is implausible that someone would be unaware of the extreme trauma that would be inflicted on parents when their child is ripped from their arms by someone who had for months been claiming that all he wanted was to help them.**

56

**ANSWER:**  Paragraph 190 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 190.

**191.    As alleged above, the conduct of Joshua and Stephanie Mast was both deceitful and criminal, violating the laws of Afghanistan, Virginia, and the United States. They were aware that Baby Doe had been reunited with her biological family and legal guardians, and chose to conceal this from Virginia state and federal courts. They continued to mispresent to the Virginia courts that Baby Doe was a stateless, unaccompanied orphan. Neither the government of Afghanistan nor the United States agreed with this determination. Nonetheless, to carry out their scheme, Joshua and Stephanie Mast consistently violated laws meant to safeguard not only the wellbeing of vulnerable children, but the foreign policy interests of the United States.**

**ANSWER:**  Richard Mast denies the factual allegations of Paragraph 191.  To the extent that Paragraph 185 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 191.

**192.    Richard Mast knowingly furthered this scheme through his fraudulent in-court misrepresentations, by procuring the custody and adoption orders for Joshua and Stephanie Mast, and by submitting a deceptive immigration application for John Doe.**

**ANSWER:**  Richard Mast denies the factual allegations of Paragraph 192.  To the extent that Paragraph 185 asserts a legal conclusion, no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 192.

**193.    Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly facilitated the plan to abduct Baby Doe by misrepresenting their intentions to John and Jane Doe when persuading them to bring Baby Doe to the United States supposedly for the sole purpose of obtaining medical treatment.**

**ANSWER:**  Paragraph 193 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 193.

**194.    These actions would be considered extreme, outrageous, and intolerable by any reasonable person.**

**ANSWER:**  Paragraph 194 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 194.

195.    As a direct result of the extreme, outrageous, and intolerable conduct of all Defendants, Plaintiffs have suffered extreme emotional distress. The lives of all three Plaintiffs have been forever altered in fundamental ways that no individual should be expected to endure.

**ANSWER:** Paragraph 195 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 195.

196.    Accordingly, Defendants are jointly and severally liable to Plaintiffs for all of their harm suffered at the hands of the Defendants, as set forth above.

**ANSWER:** Paragraph 196 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 196.

197.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

**ANSWER:** Richard Mast incorporates his responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

198.    On September 3, 2021, Joshua Mast physically removed Baby Doe from the custody of her lawful guardians without their permission or consent, restricting her movement and confining her to the care of himself and Stephanie Mast.

**ANSWER:** Paragraph 198 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 198.

199.    Since September 3, 2021, Joshua and Stephanie Mast have continued to keep Baby Doe captive, without the permission or consent of her lawful guardians.

**ANSWER:** Paragraph 199 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 199.

200.    On September 3, 2021, Baby Doe began crying when the woman assisting Joshua Mast would not return her to Jane Doe, indicating Baby Doe's awareness of this restraint. John and Jane Doe, in their capacity as Baby Doe's legal guardians, were and are aware of and vehemently opposed to this unlawful restraint.

**ANSWER:** Paragraph 200 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 200.

**201.    As a result of this unlawful restraint, Baby Doe, John Doe and Jane Doe have been injured by this family separation since September 3, 2021.**

**ANSWER:** Paragraph 201 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 201.

**202.    Accordingly, Joshua and Stephanie Mast are jointly and severally liable to Plaintiffs for all of the harm they have endured, as set forth above.**

**ANSWER:** Paragraph 202 asserts a legal conclusion, so no response is required. Richard Mast further notes that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, Richard Mast denies the allegations in Paragraph 202.

**RELIEF REQUESTED**

Richard Mast denies that John and Jane Doe are entitled to any relief and, on that basis, denies any and all allegations that follow the heading "Prayer for Relief" in the Amended Complaint. Richard Mast respectfully requests that Plaintiffs' Relief Requested/Prayer for Relief be denied in its entirety, that Defendant Richard Mast be awarded costs and fees incurred in defending Plaintiffs' Complaint and that Defendant be granted such other relief as the Court deems appropriate.

**(2) AFFIRMATIVE AND OTHER DEFENSES**

Without assuming any burden of proof that he would not otherwise bear, Defendant Richard Mast asserts the following affirmative and other defenses to the allegations and claims in the Complaint. Richard Mast denies wrongdoing or liability of any kind. No defense constitutes an admission that Richard Mast is liable to John and Jane Doe, that John and Jane Doe has been

or will be injured or damaged, or that John and Jane Doe are entitled to relief from Richard Mast. Richard Mast reserves the right to add or amend his affirmative and other defenses as facts develop through discovery.

### First Affirmative Defense (Forgery)

1.  Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, because they are predicated upon forged documents.

### Second Affirmative Defense (Fraud)

2.  Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, because their claims are predicated on fraud committed by Plaintiffs.

### Third Affirmative Defense (Fraud on the Court)

3.  Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, because they have engaged in fraud on the Court.

### Fourth Affirmative Defense (Preemption)

4.  Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, because they are preempted by federal or state law.

### Fifth Affirmative Defense (Failure to State a Claim)

5.  Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, for failure to state a claim upon which relief may be granted.

### Sixth Affirmative Defense (No Violation of Law)

6.  Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, because Defendants have not engaged in any conduct that is a violation of any law or regulation.

### Seventh Affirmative Defense (Lack of Causation)

7.  Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, to the extent Plaintiff's alleged injuries and/or damages, if any, were not caused in fact

or proximately caused by any acts and/or omissions of Defendants.

### Eighth Affirmative Defense (Lack of Injury)

8. Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, to the extent they have not suffered any actual injury or damage.

### Ninth Affirmative Defense (Good Faith)

9. Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, because Defendants at all times acted in good faith and in compliance with applicable laws.

### Tenth Affirmative Defense (Unclean Hands/In Pari Delicto)

10. Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, by Plaintiffs' unclean hands and the doctrine of *in pari delicto.*

### Eleventh Affirmative Defense (Failure to Mitigate Damages)

11. Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, on the ground that Plaintiffs have failed to mitigate any claimed damages, to the extent they exist.

### Twelfth Affirmative Defense (Punitive Damages Inapplicable)

12. Plaintiffs' claims against Defendants, including Richard Mast, for punitive damages are prohibited under the Fifth, Eighth, and Fourteenth Amendment to the U.S. Constitution.

### Thirteenth Affirmative Defense
### (Estoppel/Promissory Estoppel/Collateral Estoppel/Res Judicata)

13. Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, by the doctrines of estoppel, promissory estoppel, collateral estoppel, and/or res judicata.

### Fourteenth Affirmative Defense
### (Waiver/Laches/Acquiescence/Accord and Satisfaction/Arbitration and Award )

14. Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, by the doctrines of waiver, laches, acquiescence, accord and satisfaction, and arbitration and award.

### Fifteenth Affirmative Defense (U.S. Constitution)

15. Plaintiffs' claims against Defendants, including Richard Mast, are barred, in whole or in part, by the U.S. Constitution, including but not limited to the First Amendment.

### Sixteenth Affirmative Defense (Reservation of Rights)

16. Defendant Richard Mast expressly and specifically reserves the right to amend this answer to add, delete, and/or modify defenses based upon legal theories, facts and circumstances that may or will be divulged through discovery and/or further legal analysis of Plaintiffs' position in the litigation.

### Seventeenth Affirmative Defense (Indispensable Parties)

17. Plaintiffs' claims are barred under Rule 19 because they have failed to join one or more indispensable parties.

### Eighteenth Affirmative Defense (No Capacity to Sue On Behalf of Baby Doe)

18. Plaintiffs' claims purportedly brought on behalf of Baby Doe fail because they are not brought by any individual with legal capacity to bring suit on her behalf.

### Nineteenth Affirmative Defense (Lack of Subject Matter Jurisdiction)

19. This Court lacks subject matter jurisdiction and/or failure to join indispensable party that would destroy subject matter jurisdiction.

### Twentieth Affirmative Defense (Other Defendants' Defenses Incorporated)

20. All other Defendants' applicable defenses are hereby incorporated by reference.

*       *       *

Additional facts that may support additional defenses may come to light through discovery or further investigation. Richard Mast reserves the right to assert new affirmative or other defenses in the future.

## (3) COUNTERCLAIM COMPLAINT

### INTRODUCTION

1.      Joshua and Stephanie Mast are the adoptive parents of the child referred to in this litigation as Baby Doe ("Baby Doe" or "the child"), an orphan of war and victim of terrorism, who was rescued under tragic circumstances from a battlefield in Afghanistan. The Masts have gone to great lengths at great personal expense and sacrifice to ensure that Baby Doe has a safe and loving home and receives the medical care she requires. John and Jane Doe have engaged in a prolonged campaign to smear the Masts reputation and to attack their family including through the press. As part of that campaign, they have knowingly made false statements about the Masts and about their own relationship with Baby Doe. Those knowingly false statements have tarnished the Masts' reputation, have inflicted substantial emotional distress, and have otherwise tortiously interfered with the lives of the Masts and their family.

2.      The Masts continue to maintain that this Court lacks subject matter jurisdiction over Plaintiffs' claims and that this matter must therefore be dismissed in its entirety. But in light of the Court's ruling recent ruling on jurisdiction, and so long as this Court continues to exercise subject-matter jurisdiction over this case, the Masts assert counterclaims for defamation, intentional infliction of emotional distress, and civil conspiracy.

### PARTIES

3.      Richard Mast is an attorney residing in Virginia.

4.      John Doe is a national of Afghanistan, residing in Texas, who has asserted claims against the Masts related to the child at issue here and who is prosecuting a civil proceeding in Virginia Circuit Court to challenge the validity of the Masts' adoption of the child.

5.      Jane Doe is a national of Afghanistan, residing in Texas, who has asserted claims against the Masts related to the child and who is prosecuting a civil proceeding in Virginia Circuit Court to challenge the validity of the Masts' adoption of the child.

## JURISDICTION AND VENUE

6.      As Richard Mast and the other Defendants have previously argued, this Court does not have subject-matter jurisdiction over this dispute.  This is especially true insofar as Defendant Osmani, who Plaintiffs just recently dismissed from the Complaint in an attempt to preserve diversity jurisdiction, is an indispensable party under Fed. R. Civ. P. 19(b), as will be set forth in a separate motion.

7.      But in light of the Court's ruling on jurisdiction, and so long as this Court continues to exercise subject-matter jurisdiction over this case, Richard Mast asserts that this Court would also have jurisdiction over their counterclaims under 28 U.S.C. §§ 1332 and 1367.

8.      This Court has personal jurisdiction over John and Jane Doe because they initiated this action and submitted to the personal jurisdiction of this Court.

9.      Assuming that venue for Plaintiffs' claims is proper in this district under 28 U.S.C. § 1391(b), then venue is likewise proper for the Masts' counterclaims.

## RELEVANT FACTS

### A.      Baby Doe's Recovery and Evacuation from Afghanistan

10.     The child was recovered off the battlefield at approximately 6–8 weeks old during a U.S. Special Forces mission to capture/kill three Al Qaeda (AQ) terrorist leaders associated with

the East Turkistan Islamic Movement (a.k.a. "Turkistan Islamic Party" or "TIP," a terrorist group composed of Uyghur or "Turkman" fighters) who were operating a foreign fighter training camp in Afghanistan.

11.    During the engagement, Baby Doe's biological parents fought to the death in close combat against U.S. Special Forces, and she was wounded in a suicide blast detonation.

12.    An eye-witness Army Ranger on the ground the night of September 5-6, 2019 testified in Virginia Circuit Court that the child's presumed father fought to the death, while holding the infant child in front of him like a human shield, aiming an AK-47 at the Rangers.

13.    The fighter's gun jammed; he disappeared back into the compound with the child; and reappeared without the child and with a grenade to throw at the Rangers. Four Rangers were wounded. One was not. The Ranger killed the fighter with grenades of his own at a distance of a few feet.

14.    The same eyewitness ranger testified that he then saw the child's presumed mother run from the South Compound of Interest, with a person-borne improvised explosives device (IED) and while carrying the baby. The Ranger saw the woman blow herself and the baby up 15 feet in front of him, outside the compound, with the mother and baby falling to the ground. The mother died. The baby suffered serious injuries. The Ranger tenderly picked the baby up and gave her to U.S. female soldiers who were on the mission to search women and children. One of them held her during the fight.

15.    The explosion had severely injured Baby Doe, fracturing her femur, deforming her skull, and leaving several burns, scars, and other signs of trauma on her face and body

16.    An eyewitness Ranger testified that at the North Compound of Interest approximately 100 meters from the location where Baby Doe was blown up by her mother, stored

explosives detonated, causing a wall collapse that buried multiple Rangers at the North Compound. He sprinted to the rescue with his dog.

17.     The Ranger returned to the South Compound to find that an Afghan Government soldier wanted to shoot the injured Baby Doe in the head on the spot, and throw her in the river, because the Afghan government soldier didn't want a foreign terrorist's child to grow up in his country. The Rangers prevented this and brought the baby to the hospital.

18.     The fight was a major engagement. The September 5-6, 2019 raid was specifically referenced in a Taliban propaganda video released on September 16, 2019 on Twitter, showing the effects of foreign fighters who placed their wives and children in harms' way so they could fight jihad. The video claims "war crimes," showing dead children with Asian features consistent with "Turkmen"/Uygher/TIP foreign fighter parents, but also includes dead military-aged males, and an Al Qaeda black flag later in the video. The video is titled "Hidden Crimes (15)" and dated "2019 September 6." It lists Char Chino district, in Uruzgan Province.

19.     Intelligence recovered by U.S. forces from the September 5-6 2019 raid included a picture of Baby Doe's likely father recovered from a terrorist's captured device. The picture was included in a declassified mission summary obtained by Associated Press and hosted at https://www.documentcloud.org/documents/23815515-declassified-mission-summary-1.

20.     This Asian ("Turkman" "Uygher" "Turkistani") terrorist was a Turkistan Islamic Party (TIP) fighter foreign to Afghanistan, not a "peaceful farmer." A detainee captured by US forces identified this man with the machine gun as living in the compound outside of which Baby Doe's mother detonated herself and Baby Doe, and beside which Baby Doe was recovered. This man's eyes, nose, mouth and ears are extremely similar to those of Baby Doe.

21.     The Masts compared Baby Doe's features to this fighter's photos early on. The similarities noted include: 1) her epicanthic fold and eye shape; 2) eyebrows; 3) upper lips; 4) noses with the same distinctive broad tip; 5) nostrils; and 6) ears. The similarities have grown as the child has grown.

22.     Another photo recovered from a terrorist's electronic device the night of the September 5-6 raid depicted another obviously Asian Turkistani terrorist fighter in front of a black Al Qaeda flag. This man was reportedly the nephew of the older fighter. The picture was also listed in a document obtained and hosted by the AP.

23.     This picture (Image X) is not just any terrorist, but is a picture of the current second-in-command of the Turkistan Islamic Party, its "deputy emir," Abdusalam Al-Turkistani (a.k.a. various spelling variations), in front of a black Al Qaeda flag background.

24.     Abdusalam Al-Turkistani is very much alive today, giving a recent interview published in February 2023, around the time the AP went on its Taliban-guided tour of the village from which Baby Doe was recovered, pictures of which AP published in an August 4, 2023 article. The AP publicly identified the province of the village as Uruzgan.

25.     The September 5-6 raid, like the other night raids, was part of a mature, multi-year *iterative targeting process* during which intelligence recovered from the bodies or personal effects of the terrorists within a targeted network (who were destroyed on a night raid) was used to target the next priority on the Joint Prioritized Effects List (JPEL) on the next prioritized raid.

26.     A few weeks after the night raid by the Rangers that rescued Baby Doe, on September 23, 2019, Asim Omar, Emir of AQIS (Al Qaeda Indian Subcontinent) was killed. All of this information was available to the State Department at the time, had it only looked at the evidence.

27.     At the time Baby Doe was rescued by U.S. forces and taken to receive treatment for her injuries in the Military Hospital system, Major Joshua Mast (then Captain) was deployed in Afghanistan where he served as a Marine Corps Judge Advocate.

28.     Joshua Mast grew concerned that Baby Doe, a foreign female infant in Afghanistan being treated in a Military Hospital under consistent rocket attack, would not have access to the medical care required to treat her injuries.

29.     It was apparent to Joshua Mast and other military lawyers working the case (who helped compile what became the "Declassified Mission Summary")  that Baby Doe had no living relatives, due to the nature of the terrorist group from which she was recovered (the Eastern Turkistan Islamic Movement/Turkistan Islamic Party, a group that originated in China and was active throughout several countries in Central and East Asia), the sophistication of the unit involved, the strength of the intelligence assessing her likely area of origin, and the devastating scale of the destruction of the AQ training camp.

30.     Joshua Mast – with the full knowledge of his command as US DoD documents show – fought for the child's rights to safety, medical treatment, and to not be turned over by the US to non-relatives in an objectively dangerous manner. Joshua Mast – along with DoD – demanded at a minimum a DNA test for any claimants and vetting for terrorist ties. The DoD was well aware the risk that unrelated Taliban proxies would step forth as "uncles" to try to claim the child. The command was fully informed Joshua Mast was seeking custody and birth documents to facilitate her safety, treatment and continuing care.

31.     Joshua Mast – while deployed and still in Afghanistan – reached out to a national nonprofit legal organization noted for its First Amendment-related defense of religious freedom,

the sanctity of human life, and the family, because of that organization's expertise and reputation for protecting innocent human life, including preborn and newborn infants.

32.     His brother, Richard Mast, was an attorney at this nonprofit. Joshua explained the situation, and Richard Mast agreed to try to help him ensure a safe outcome for the infant child through advocacy and representation.

33.     Still in Afghanistan, Joshua Mast (through representation by Richard Mast in association with another family law attorney) initiated custody proceedings in Joshua's county of residence in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "J&DR Court") largely to establish a legal identity that would allow her to  receive appropriate medical care in the United States via a humanitarian parole visa.

34.      After receiving the facts as understood by the Masts at the time (and borne out by multiple lawsuits later), and satisfied that it had jurisdiction, the J&DR Court granted custody of Baby Doe to Joshua and Stephanie Mast, but the child still needed a legal identity as she had none.

35.     Richard Mast filed again on their behalf, in Fluvanna County Circuit Court, a Petition to Amend a Certificate of Birth, which Judge Richard E. Moore signed on November 8, 2019. It was presented to the Virginia Department of Health that same day.

36.     The Virginia Department of Health declined to issue a Certificate of Birth on the basis of that Order, prompting further discussions between Richard Mast, the court, and the Virginia Office of the Attorney General.

37.     Richard Mast consulted extensively with an assigned Assistant Attorney General who represents and advises the Virginia Department of Health. This Assistant AG circulated the request to her superiors for input, including the facts as understood at the time, and the legal reasoning.

38.     The Virginia Office of the Attorney General, recognizing that the purpose of the request was to provide a legal identity and care for Baby Doe, consulted with the Virginia Circuit Court judge regarding his authority to issue the order. The Virginia OAG's office did not suggest serving formal notice to the United States was necessary.

39.     The Virginia Department of Health, through the Office of the Attorney General, opined that Richard Mast should file a Petition for Adoption on behalf of the Masts, and that the Circuit Court could issue an "Interlocutory Order of Adoption," after which VDH could issue a Birth Certificate.

40.     On November 9, 2019, the Assistant AG informed Richard Mast: "Good morning. I've been communicating with my Deputy this morning and am waiting to hear back with a final response. I'm guessing she is likely going to run this up the chain further. Her first response was similar to mine – **we need an adoption order**." Richard Mast responded with an offer to send further thoughts and analysis to the Virginia Office of the Attorney General, which he did.

41.     Later that day, the Assistant AG responded to Richard Mast while she was on the road: "I just stopped for a break and forwarded your email to my chain of command and texted my Deputy to alert her to it." She advised that she had spoken to the Circuit Court judge: "I just talked with him. He actually asked about his authority to enter an adoption order. I told him I would pursue it with my office [Office of the Attorney General], which I'm trying to do now" from her out-of-office location.

42.     Finally, the Assistant AG responded with a green light: "Talked with the judge. He will issue an interlocutory order. I advised [the Virginia Registrar] that **she can issue the certificate on the interlocutory order**. I think you're going to have to coordinate logistics with

the judge because he's [out of state]. He's going to try to call you. Feel free to call me and I can give you more details but I think we found a way to get this done."

43.     The Assistant Attorney General continued, that the Circuit Court judge "knows what he wants the order to say and he and I went over it together… Please make sure the order states that the Masts are the adoptive parents and should be listed as the parents on the birth certificate. The order...should also contain the dates and places of birth of Capt. and Mrs. Mast. It should also state that Baby [Doe's] place of birth and her natural parents are unknown."

44.     On November 10, 2019, Richard Mast responded that the "Petition and interlocutory order are done and sent to [C]aptain Mast for review; then will go to [a Virginia] adoption attorney" for final review, and that "Judge Moore has been advised."

45.     Richard Mast sought input from the Virginia adoption attorney, who reviewed the draft pleadings. She did not suggest serving formal notice to the United States was necessary.

46.     Pursuant to these consultations, Richard Mast filed the Petition for Adoption, and the Circuit Court judge signed an Interlocutory Order of Adoption so the Masts would be able to bring Baby Doe to the United States. VDH issued the Birth Certificate. The Virginia Assistant Attorney General informed the Circuit Court on November 10, 2019: "the Registrar has issued the certificate of foreign birth for Baby [Doe]. Thanks for your patience with me and my Office. Hope you can enjoy the rest of your weekend."

47.     Joshua Mast presented these developments to his chain of command in Afghanistan, providing actual notice to DoD. Baby Doe was approved by DoD as the DoD Dependent of Joshua Mast, her U.S. guardian. The DoD drafted a written request to Afghan government officials to send Baby Doe to her U.S. Guardian in America for treatment.

48. Captain Mast's commander in Afghanistan made preparations to move Baby Doe to Germany and then to the U.S., on the basis of Baby Doe's only legal identity, and status as Captain Mast's DoD Dependent.

49. Joshua Mast believed at the time and continues to believe, with the hindsight of approximately two years of litigation and the testimony of eyewitnesses and Afghan law experts, that Baby Doe was a stateless minor rather than an Afghan citizen based on, among other things, the fact that many fighters killed in the assault on the training camp were AQ Turkmen Uyghurs from Turkmenistan or China, and that children born to foreigners do not receive birthright citizenship in Afghanistan.

50. Joshua Mast raised these concerns with appropriate authorities, including in the Department of Defense (DoD) and the U.S. Congress, many of whom supported his efforts.

51. The Commandant of the Marine Corps approved Baby Doe as a DoD dependent with full knowledge of her location and status as a patient in a U.S military hospital at Bagram Air Base.

52. At least one official from the State Department—the Assistant Chief of Mission (ACM) at the Embassy in Afghanistan—took the contrary view that Baby Doe should be handed over to the custody of the then-extant Afghan Government.

53. In a meeting on October 23, 2019 at which the ACM was supposed to receive a classified briefing on U.S. intelligence about Baby Doe's likely origin as a child of a Turkistan Islamic Party member, the ACM invited representatives of the Afghan Government ultimately and arranged for Baby Doe to be placed in Afghan custody.

54. The ACM also secured an order that restricted military personnel from advocating against transferring Baby Doe to Afghan custody.

55.    Joshua Mast remained concerned for the dangerous situation facing Baby Doe after the superficial review of the Embassy.

56.    It was clear to Joshua Mast that Baby Doe would not receive adequate medical care in Afghanistan, was not an Afghan national (but a stateless child), and was likely being turned over to non-relative, terrorist affiliated persons.

57.    Joshua Mast and his wife, Stephanie, filed for a Temporary Restraining Order (TRO) in this Court on February 26, 2020 seeking to prevent a transfer of custody without a DNA test and vetting for terrorist affiliations, which had been the position of DoD during the preceding months leading up to the filing of the TRO.

58.    Counsel for DOJ falsely represented to this Court that the U.S. Government was unaware of Captain Mast's actions; when the U.S. Government had in its possession an extensive memorandum signed two weeks' prior by Deputy Assistant Secretary of Defense Eric J Mauerer reiterating 1) DoD's knowledge of both the J&DR Court Order, and the Circuit Court Order, and that DoD's understanding – like that of Joshua Mast – like that of Richard Mast – was that the request was not for purposes of adoption, but for humanitarian treatment and care for the child.

59.    After this Court questioned the DOJ lawyers, who failed to apprise this Court of the high-level DoD recognition of Baby Doe as Joshua Mast's dependent, and after querying Richard Mast with a compound question about the Masts' "ultimate" intentions at the TRO hearing (the answer to which has been wildly misconstrued by DOJ lawyers, Plaintiffs' counsel and the press), the Court denied that request, and the transfer of custody went forward.

60.    Upon information and belief, after Baby Doe left DoD custody, she was placed with John Doe's father, who falsely purports to be the older half-brother of the child's purported

biological father. John Doe's father has not testified in the past two years of litigation, but the Does assert this man left her with the Does and did so without a court order or any other official act.

61.     After receiving reports that Baby Doe was experiencing medical complications, the Masts continued to be concerned that Baby Doe would not receive the medical care she needed in Afghanistan and that it was not a safe place for her.

62.     The Masts proceeded with finalizing their adoption of Baby Doe in the United States.

63.     As the Taliban campaign swept over Afghanistan in the late summer of 2021, Joshua Mast established contact with John Doe and requested he bring Baby Doe to Kabul to fly to the United States before the country collapsed.

64.     Joshua Mast communicated with John Doe through an interpreter, Ahmad Osmani.

65.     Based on John Doe's representations, Joshua Mast and Ahmad Osmani understood that John Doe's father was the actual person with decision-making authority over the child.

66.     Osmani repeatedly asked on Joshua Mast's behalf whether John Doe's father had made a decision yet to send the child to Joshua Mast.

67.     Osmani asked in one recorded message about how the child was doing physically, and where she lived.

68.     John Doe left a recorded voice message in response for Joshua, which was interpreted by Osmani. Using the child's American name Joshua had secured for her, John Doe stated that the little girl did not live with John Doe, his father, or "[his] family," but with "another family" and "that family has become like her mother and father." Joshua Mast was candid with John Doe from the beginning and throughout their discussions, that Joshua and Stephanie Mast had adopted Baby Doe, that they had created a legal identity for her in the United States, and that

they intended for her to live with them in the United States using the strongest words for legal responsibility over a child in Pashto.

69.     When the Afghan Government collapsed on August 15, 2021, and the evacuation began, Joshua Mast again contacted John Doe about bringing Baby Doe to U.S. forces, extremely concerned that they may not get another chance—a belief that John Doe shared.

70.     Through the efforts of Joshua Mast and other U.S. military personnel, and based on the legal identity of Baby Doe under the Adoption Order, John and Jane Doe were able to flee Afghanistan, notwithstanding the chaos of the U.S. withdrawal, by bringing Baby Doe to U.S. Forces.

71.     Joshua Mast made sure that the U.S. military did not evacuate only Baby Doe but also that they brought John Doe and Jane Doe along so they would not be killed by the Taliban for disobeying their orders. .

72.     But for the personal efforts of Joshua Mast and the child's U.S. identity, John Doe and Jane Doe would not have been able to flee Afghanistan in the aftermath of the U.S. withdrawal.

73.     Specifically, Joshua Mast was told by his commanding officer that the assets recovering the child "don't give a [expletive] about Afghans, and would likely stick a gun in their face and take [the child]." Furthermore, Joshua Mast was told that he would have to "choose between [the child] and [John and Jane Doe]" as it came down to execution of the mission to recover the child from behind Taliban lines. Joshua Mast refused to abandon the Does to be murdered by the Taliban, and instead delayed the mission for over 24 hours until he personally confirmed the unit would evacuate the Does as well.

74.     During a stop in Germany on the trip from Afghanistan to the United States, concerns arose that John Doe and Jane Doe would be diverted to another country and would not be permitted to travel to the United States with Baby Doe and the Masts.

75.     During that same trip, upon information and belief, Jane Doe confronted John Doe, expressing displeasure that he had consciously agreed to allow the Masts to take custody of Baby Doe as a means to secure safe passage to the United States. This encounter illustrates that both John Doe and Jane Doe were aware that Joshua and Stephanie Mast had adopted Baby Doe and would have custody of her in the United States.

76.     Jane Doe also pejoratively referred to John Doe as a "Modegal" because "[John Doe] wants to go to America, and [the child] is the price."

77.     In Germany, John Doe revealed for the first time that he had made a collateral promise to Jane Doe to induce her to abandon her threat to remain in Afghanistan and instead accompany him to the America. Specifically, John Doe and Jane Doe admitted that the child would never leave Jane Doe's side if Jane Doe would come to America. This promise demonstrates both Does were aware the Masts intended the child to live with them in America.

78.     Once again, Joshua Mast intervened to ensure that John Doe and Jane Doe would be able to travel to the United States with Baby Doe and the Masts.

79.     But for Joshua Mast's intervention, John Doe and Jane Doe would not have been permitted to travel to the United States. This episode illustrates that the Masts were not attempting to "kidnap" Baby Doe or otherwise trick John Doe and Jane Doe—and that John Doe and Jane Doe were well aware of that fact.

80.     In fact, throughout the relevant time period, John Doe sought to use Baby Doe as a ticket to escape Taliban-controlled Afghanistan.

81.     John Doe was identified on the unclassified Biometrically Enabled [Terror] Watchlist (BEWL) upon his entry to the United States for a 2014 arms/explosives use. In the detention center, he met another military-aged male from his same home village, similarly identified.

82.     The US government has scrubbed John Doe's BEWL entry, as it has scrubbed the terrorism records of multiple "refugees." John Doe's BEWL screenshot cannot be released at this time, because of the federal protective order, but counsel for John Doe sent it to the US government (Richmond FBI Field Office) and still have copies of it, as revealed in federal discovery.

83.     Soon after John Doe was identified on the BEWL, after entered the United States, on September 3, 2021, the Masts took custody of Baby Doe.

**B.  Litigation Between the Does and the Masts**

84.     Prior to filing this litigation, John and Jane Doe filed a petition in the Virginia Circuit Court seeking to challenge the custody and adoption orders granting custody and adoptive parent rights to Joshua and Stephanie Mast.  That state court litigation is ongoing.

85.     John and Jane Doe falsely claim that Baby Doe's father was an innocent Afghan farmer and that the U.S. military killed him in the military operation described herein.  In addition, John and Jane Doe claim that the "innocent farmer's" wife and some of their other children were similarly killed.  They further assert that the surviving children of the "innocent farmer" remain in Afghanistan, the younger of whom are living with someone else.

86.     John and Jane Doe have never met any of the innocent farmer's children nor had they met Baby Doe until John Doe's father handed her off to John Doe.  John and Jane Doe had never seen a picture or any likeness of Baby Doe prior to John Doe's father handing her off to John Doe.

87.     Upon information and belief, John Doe's father had never met or seen Baby Doe prior to obtaining her from the ICRC on February 27, 2020.  John Doe's father had never seen a picture or any likeness of Baby Doe prior to obtaining her from the ICRC.

88.     Neither John nor Jane Doe have ever provided any evidence that they are biologically related to Baby Doe or that they ever had legal custody of her.

89.     John Doe's father has never presented any evidence that he is biologically related to Baby Doe or that he ever had legal custody of her.

## COUNTERCLAIMS

## COUNT ONE
### (Abuse of Process)

90.     John and Jane Doe know or should know that they are not the child's parents, legal custodians, or biologically related to her.

91.     Neither John Doe nor Jane Doe ever met the child prior to at least February 27, 2020.

92.     John Doe's father never met the child prior to at least February 27, 2020.

93.     No family member of John Doe ever saw the child prior to at least February 27, 2020.

94.     John and Jane Doe knew or should have known that this baby was the child of a foreign fighter not native to Afghanistan.

95.     John Doe's father never sought or obtained an Afghan court order in his favor as parent, adoptive parent, guardian, or custodian.

96.     John and Jane Doe never sought or obtained an Afghan court order in their favor as parents, adoptive parents, guardian, or custodian.

97.     John Doe and Jane Doe have never provided a DNA sample from John Doe nor from any of the claimed surviving full-blood children of the "innocent farmer."

98.     John Doe and Jane Doe retained attorneys to file this lawsuit in an attempt to use a federal court proceeding to improperly effect and improperly usurp and/or preempt state court proceedings on the validity of Joshua and Stephanie Mast's adoption, which are ongoing, by improperly seeking declaratory judgements falsely establishing the Does' custodial or parental rights to Baby Doe

99.     John and Jane Doe filed this federal lawsuit in order to improperly impact the state court processes, by use of the federal processes, including discovery; and including declaratory judgments.

100.    John and Jane Doe filed this suit to induce this court, through discovery and motions practice they have since carried out, to rule on declaratory judgments so as to improperly effect, usurp and/or preempt the Virginia court proceedings, which this Court ultimately dismissed as improper.

101.    John and Jane Doe sought and obtained an ex parte illegal protective order ("Gag Order") to prevent Defendant Richard Mast from engaging in effective discovery in the United States and in Afghanistan, where significant evidence to rebut their claims exists upon information and belief.

102.    Through this litigation, John and Jane Doe sought and obtained an ex parte illegal Gag Order to prevent Defendant Richard Mast from effectively engaging with witnesses in Afghanistan, thereby depriving Defendant Richard Mast of due process in defending against the Does' claims.

103.    Through this litigation, John and Jane Doe sought and obtained an ex parte illegal Gag Order to prevent Defendant Richard Mast (as well as the other defendants) from speaking to the public in rebuttal of the highly inflammatory allegations made by John and Jane Doe.

104.    Through this litigation, John and Jane Doe filed sought and obtained an ex parte illegal Gag Order to prevent Defendant Richard Mast (as well as the other defendants) from raising money in his/their defense.

105.    Through this litigation, John and Jane Doe sought and obtained an ex parte illegal Gag Order to prevent Defendant Richard Mast from identifying John Doe by name to Congress and other authorities (including Virginia law enforcement and the Virginia Attorney General's Office) as a Known/Suspected Terrorist (KST) to appropriate authorities who had been identified upon entry to the United States upon the Biometrically Enabled [Terror] Watch List (BEWL) and that his BEWL entry had been scrubbed from the system.

106.    As a direct and proximate result of the above-described abuse of process, Richard Mast has suffered financial damages and has suffered emotional distress.

## COUNT TWO
### (Defamation)

107.    John and Jane Doe have made false and defamatory statements to members of the press and others that Defendant Richard Mast was a principal in a fraudulent conspiracy with Defendant Joshua Mast to "abduct" and "kidnap" a child unrelated to them whom the Does now falsely claim as their daughter, in the absence of any Afghan legal authority or court order.

108.    John and Jane Doe, through their attorneys/agents, have made false and defamatory statements to members of the media, including but not limited to the following:

a.    "'When the Legislature made that law, they didn't have in mind what happens when someone internationally abducts a child,' [Elizabeth] Vaughan, the Virginia

adoption lawyer, told [NYT reporter Rozina Ali.]" *See* Rozina Ali, *"How Did This Man Think He Had the Right to Adopt This Baby?"* New York Times Magazine (Nov. 10, 2023), at https://www.nytimes.com/2022/11/10/magazine/afghanistan-orphan-baby-l.html.

b. "'It's the complete collapse of rule of law that allowed this abduction to happen,' Sehla Ashai, one of the lawyers who would go on to represent the baby's relatives, told [Rozina Ali]." *See* Rozina Ali, *"How Did This Man Think He Had the Right to Adopt This Baby?"* New York Times Magazine (Nov. 10, 2023), at https://www.nytimes.com/2022/11/10/magazine/afghanistan-orphan-baby-l.html.

c. "'She's living with a person who kidnapped her,' Jane said." *See* Rozina Ali, *"How Did This Man Think He Had the Right to Adopt This Baby?"* New York Times Magazine (Nov. 10, 2023), at https://www.nytimes.com/2022/11/10/magazine/afghanistan-orphan-baby-l.html.

d. "To Ashai, the Afghan passport suggests the Masts' willingness to deceive. 'If Mast is saying the baby is stateless, and then getting a passport for her, he knows she's not stateless,' she told [Rozina Ali]." *See* Rozina Ali, *"How Did This Man Think He Had the Right to Adopt This Baby?"* New York Times Magazine (Nov. 10, 2023), at https://www.nytimes.com/2022/11/10/magazine/afghanistan-orphan-baby-l.html.

e. "[F]rom the Does' perspective, Mast is an officer of a military that has killed their countrymen, women, children, with impunity over the last 20 years, who was driven by his own moral compass and abducted their daughter, removing her from a loving family and forcing a religion upon her that is not her own." *See* Rozina Ali, *"How*

*Did This Man Think He Had the Right to Adopt This Baby?"* New York Times Magazine (Nov. 10, 2023), at https://www.nytimes.com/2022/11/10/magazine/afghanistan-orphan-baby-l.html.

    f.   "Surely her child, who [Jane Doe] says was abducted by a U.S. Marine more than a year ago, would now be returned, she thought." *See* Martha Mendoza, et. al, *Afghan war orphan remains with Marine accused of abduction,* Associated Press (Dec. 31, 2022).

109.    In these articles, Richard Mast is named as the attorney assisting Joshua Mast in the "kidnapping."

110.    These and similar statements made to the press by John and Jane Doe, either directly or through their counsel, assert that the Masts engaged in a conspiracy to commit the crime of kidnapping.

111.    These statements were false when made and remain false.

112.    John and Jane Doe made these false statements knowing they were false, recklessly disregarding the truth, and/or negligently disregarding the truth.

113.    These false statements are defamatory *per se* because they impute to Richard Mast (and to his brother Joshua and his sister-in-law, Stephanie), a crime of moral turpitude. They are also defamatory in fact by wrongly painting the Masts has nefarious wrongdoers who deceived the Does to steal their child.

114.    As a direct result of these false statements, Richard Mast has suffered shame, humiliation, and emotional distress.

115.    The defamatory statements are unambiguously about Richard Mast (together with his brother and sister-in-law) and they were made to third parties, including but not limited to reporters at the Associated Press and New York Times Magazine.

116.    The Does' defamatory statements to the press and other third parties are not legally privileged.

117.    The Masts are not public figures and therefore need not establish that the Does' statements were made with actual malice, but in any event, the Does did act with actual malice. They knew then, and know now, that their "kidnapping" narrative is false and that their supporting lies about their relationship to the child and their interactions with the Masts are false. They have published and republished those statements nevertheless, motivated at least in part by a desire to increase their chances of prevailing in this litigation and the related state-court litigation.

118.    In any event, the Does acted with sufficient intent to be liable for defamation.

119.    The Does' defamatory statements about Richard Mast have proximately caused substantial damages, including financial loss, a loss of standing in the community, and emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, Richard Mast prays:

1. That Richard Mast have and recover from John and Jane Doe damages in an amount greater than $350,000 to be proven at trial;

2. That Richard Mast have and recover pre-judgment and post-judgment interest as may be allowed by law;

3. That Richard Mast have and recover from John and Jane Doe damages and Richard Mast's reasonable attorneys' fees and costs incurred in this action;

4. That this Court tax all costs of this action against John and Jane Doe;

5. That a jury trial be had on all issues which should be tried by jury;

6. That this Court order such other and further relief as it deems just and proper.

Dated: August 7, 2024                    Respectfully submitted,


*/s/David Yerushalmi*
David Yerushalmi, Esq.*
American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20006
(*Admitted *pro hac vice*)

E. Scott Lloyd
Lloyd Law Group, PLLC
Va. Bar # 76989
20 E. 8th Street, Suite 3
Front Royal, VA 22630
Office: (540) 823-1110
Cell: (540) 631-4081
Fax: (540) 583-4279
scott@lloydlg.com

*Counsel for Defendant Richard Mast*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 7, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

<u>*/s/David Yerushalmi*</u>
David Yerushalmi, Esq.