**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
August 16, 2024
LAURA A. AUSTIN, CLERK
BY  s/ S. MELVIN
DEPUTY CLERK

JOHN DOE, et al.,

                            *Plaintiffs*,

          v.

JOSHUA MAST, *et al*.,

                            *Defendants*.

Case No. 3:22-cv-00049

MEMORANDUM OPINION
& ORDER

Judge Norman K. Moon

Before the Court are a series of motions concerning whether Plaintiffs should be afforded the ability to continue litigating this case using pseudonyms. The Court entered a Protective Order at the outset of this litigation allowing Plaintiffs to use pseudonyms following evidence that their families still living in Afghanistan under Taliban rule would face a serious risk of threat, injury, or death, should Plaintiffs' identities become known. Defendants ask the Court to vacate the Protective Order—arguing that the order is unfair largely because it shields Plaintiffs from public scrutiny, while permitting Defendants to be publicly named. For the reasons set forth below, the Court will deny the motions to vacate the Protective Order. Dkt. 26.

The Court also considers several motions by Plaintiffs seeking to enforce the Protective Order against Defendants Joshua and Stephanie Mast, and asking the Court to find them in civil contempt. The first alleged breach of the Protective Order stems from a television interview the Masts gave, in which they publicly identified Baby Doe from a photograph. The Court finds the disclosure inadvertent at best, and not rising to clear and convincing evidence of a knowing violation of the Protective Order.

1

The second alleged breach of the Protective Order stems from Joshua and Jonathan Mast's communications with a non-profit to seek funding for the Masts' legal defense in this action. Plaintiffs claim that Joshua Mast knowingly violated the Protective Order by sending photos of Baby Doe to the non-profit, and then seeking to maintain a fictitious distance with the entity by positioning his brother, Jonathan Mast, as the group's point of contact with the family. The non-profit posted identifying photos of Baby Doe on its website and social media accounts during the fundraising campaign. The Court finds Joshua and Jonathan Mast committed knowing violations of the Protective Order in this regard, and will find them in civil contempt.

### Background

Contemporaneously with the filing of their complaint, Baby Doe, John Doe, and Jane Doe filed a motion for leave to proceed as Plaintiffs in the litigation using pseudonyms. Dkts. 3, 4. Plaintiffs sought a protective order that would prohibit "Defendants and their counsel and representatives from disclosing any information that directly or indirectly identifies Plaintiffs or their family members … including but not limited to Plaintiffs' names and the locations of their residences abroad and places of birth." Dkt. 4-3 at 1. The primary basis for those protections, Plaintiffs asserted, was that disclosure of their identities or the locations of their homes in Afghanistan would jeopardize their safety and their families' safety. Dkt. 4 at 2.

Plaintiffs submitted evidence substantiating the reasons they feared for their safety. Significantly, John Doe filed a sealed declaration in which he explained that he and Jane Doe only disclosed their true whereabouts in the United States to a few trusted family members. Dkt. 15 ("John Doe Decl.") ¶ 8. They have told everyone else that they are in Qatar or elsewhere in "the Middle East." *Id.* John Doe explained that he is "extremely worried" that if his location in the United States were to become known in Afghanistan, the Taliban would (wrongly) believe he

had been helping the U.S. government—especially considering that John and Jane Doe had come

to the United States during the evacuation of Afghans who worked with the U.S. military. Dkt. 4

at 4; John Doe Decl. ¶ 7. In fact, John Doe had "never worked for the U.S. government." *Id.* ¶ 7.

Still, John Doe is afraid that as a result of a mistaken belief that he did, he and Jane Doe would

be "in danger of physical harm or death if [they] returned to Afghanistan." *Id.* John Doe also

testified that he knows that the Taliban have hurt or killed many who worked with the U.S.

government, often targeting their families to pressure them to return to Afghanistan. *Id.* ¶ 8.[1] As

a result, John Doe wrote of his fear that the Taliban would "harm or kill [their] families in

Afghanistan," either "to punish [them]," or "because they believe that [their] families are spies

for the U.S. government." *Id.* John Doe further attested that he was concerned that if his relatives

or people in Afghanistan learned that Baby Doe was taken by a non-Muslim family, they would

be very upset at John Doe and Jane Doe. He believes they could mistakenly think that John and

Jane Doe gave her up for a chance to come to the United States, and it is illegal in Afghanistan

for non-Muslims like the Masts to adopt Muslim children. *Id.* ¶¶ 9–10. Finally, John Doe also

explained how if their names were disclosed, he and Jane Doe would never be able to return to

Afghanistan because they would be in too much danger; and that even if just the locations of

their residences became known, their identities could be discovered. *Id.* ¶¶ 12–13.

The Court granted Plaintiffs' motion to proceed using pseudonyms and issued their

requested Protective Order. Dkt. 26. In the Protective Order, the Court found Plaintiffs had

satisfied the requisite standard for allowing litigants to proceed using a pseudonym set forth in

---

[1] *See also* Dkt. 4 at 4–5 (citing articles documenting how Afghans who provided assistance to the U.S. government or even non-governmental organizations have faced retaliatory killings and violence after the withdrawal of U.S. forces).

*James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). Dkt. 26 at 1–2.[2] Moreover, the Court explained that:

> Plaintiffs have demonstrated that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties, in view of the age of minor Plaintiff Baby Doe, and concluding that any risk of prejudice or unfairness (if any should exist) is more than sufficiently mitigated by the measured steps requested by Plaintiffs' counsel below which are tailored to protect such safety interests, in order to ensure Plaintiffs' safety and the safety of other innocent non-parties.

Dkt. 26 at 2.

The Protective Order contained certain provisions to guard against dissemination of Plaintiffs' identifying information, including (1) a prohibition on "Defendants and their counsel and representatives" from disclosing information "that directly or indirectly identifies Plaintiffs or their family members to any person," without first securing a signed non-disclosure agreement, enforceable through a contempt sanction; (2) court papers would use the pseudonyms John Doe, Jane Doe, and Baby Doe; (3) papers that "identify any Plaintiff directly or indirectly shall be filed under seal," with redacted copies filed on the public docket; (4) Defendants shall disclose to Plaintiffs' counsel any person with whom they have shared Plaintiffs' identities and provide executed copies of the non-disclosure agreement for each such individual; and (5) certain provisions were made for use of pseudonyms during depositions. Dkt. 26 at 2–3.

---

[2] The Court also cited its prior decision granting Plaintiffs' motion to seal John Doe's Declaration as well as other exhibits, in support of its ruling on the Protective Order. *See* Dkt. 26 at 1. In that sealing order, the Court explained how Plaintiffs' "valid concern for their safety and the safety of others," was a "significant interest" "outweigh[ing] the common law presumption in favor of the right of public access to judicial records." Dkt. 14 at 2.

4

## Motions to Amend, Modify or Vacate the Protective Order

Defendants Joshua and Stephanie Mast, and Richard Mast, have filed motions to amend, modify, or vacate the Protective Order entered permitting Plaintiffs leave to proceed under pseudonyms. Dkts. 130, 176, 442. For the reasons set forth below, their motions are denied.

Defendants Joshua and Stephanie Mast have filed a motion to modify the Court's protective order, in which they ask the Court to reject Plaintiff John and Jane Doe's ability to proceed using a pseudonym, as well as removing any restrictions on the use of their real names. Dkt. 130 at 3.[3] They raise two principal arguments in support of their request. First, the Masts assert that John and Jane Doe have themselves spoken to the press, "to tell *their* side of the story," "undermin[ing] their claimed fear of publicity and illustrat[ing] the fundamental unfairness of allowing Plaintiffs' asymmetrical anonymity." *Id.* at 8. Specifically, the Masts point to two articles in the Associated Press ("AP")[4] and the New York Times Magazine,[5] respectively, as examples when John and Jane Doe and their attorneys "provided their version of the facts while naming the Masts." *Id.* at 5–6. After the AP story was released in 2022, the Taliban issued a statement on the internet (later taken down) stating: "According to information from reliable sources, a Marine officer Joshua Mast, [sic] has forcibly taken the only remaining child of a family martyred in their bombardment in Afghanistan from her relatives in Virginia and registered her as his own family member." *Id.* at 6.

---

[3] The Masts did not object to Baby Doe remaining under a pseudonym.

[4] Juliet Linderman, et al., *Afghan couple accuse US Marine of abducting their baby*, Associated Press (Oct. 20, 2022), https://apnews.com/article/afghan-baby-us-marine-custody-battle-b157557538b84b288a0a8415735e24ab (last visited Aug. 8, 2024).

[5] Rozina, Ali, *How Did This Man Think He Had the Right to Adopt This Baby?*, The New York Times Magazine (Nov. 20, 2022), https://www.nytimes.com/2022/11/10/magazine/afghanistan-orphan-baby-l.html (last visited Aug. 8, 2024).

Second, the Masts contend that anonymity for John and Jane Doe is not warranted because John Doe's name was, for a time, publicly available in certain docket entries in the pending state-court adoption and custody proceedings involving these same parties. *Id.* at 2, 6. Thus, the Masts claim that John Doe and Jane Doe have not satisfied the *James* factors[6] for a party to proceed using a pseudonym. *Id.* at 8–11.

The Masts also argue that, regardless whether Plaintiffs are allowed to proceed using pseudonyms, the Court "must lift any restrictions on discussion of Plaintiffs" or the subject matter of this case, which they characterize as a "gag order" that violates the First Amendment. *Id.* at 12–13. They argue that requiring Defendants to (1) secure a non-disclosure agreement before sharing Plaintiffs' identities, and (2) share such disclosures with Plaintiffs, effectively constitutes a "gag order" that must survive strict scrutiny to pass constitutional muster. *Id.*

In addition, Richard Mast, a codefendant and brother of Joshua Mast, has also filed several of his own motions to vacate the Protective Order. Dkts. 176, 442. Therein, he largely repeats arguments raised in Joshua and Stephanie Mast's motion. For instance, in his initial motion, Richard characterizes the Protective Order as a "unilateral gag order," which he argues is unconstitutional on grounds that it fails to satisfy the stringent "strict scrutiny" standard applicable to true gag orders. Dkt. 176 at 8–17. Richard trots out a parade of horribles and "absurd consequence[s]" that he claims would follow from leaving the Protective Order in place—largely on behalf of Joshua and Stephanie Mast. *Id.* at ii. For example, he asserts that the Protective Order's requirement for a non-disclosure agreement would preclude Joshua and Stephanie Mast from registering Baby Doe in school without getting non-disclosure agreements signed by teachers and administrators. *Id.* Richard Mast also contends that his own wife and

---

[6] These factors derive from *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993).

other family members would have to sign a non-disclosure agreement under the terms of the Protective Order. He also claims the Protective Order is unconstitutionally vague. *Id.* at 17–18. While Richard Mast levies invectives against the Protective Order ("biased … asymmetrical … [and] extreme," *id.* at 1), the merits of his claims largely can be distilled into whether its terms constitute a true "gag order," or whether the *James* factors have been satisfied.

Recently, Richard Mast filed another motion to vacate or modify the Protective Order. Dkt. 442. He raises a bevy of arguments therein, some of which the Court has already resolved.[7] His primary new argument, however, is that the Protective Order has "effectively prohibit[ed] Defendants' defense." *Id.* at 9. For example, Richard argues that he "knows of specific individuals in Afghanistan who have, or can obtain, relevant information" supportive of Defendants' defenses, but they "will not sign non-disclosure agreements for a federal court; nor will they allow themselves to be exposed to the Taliban as witnesses for the Masts." *Id.* at 9–10; *id.* at 10 ("no Afghani will sign a U.S. non-disclosure agreement"). Thus, he argues that the Protective Order infringes not only his discovery rights but also due process rights. *Id.* at 10–11.

1. Governing Legal Standard

Rule 10(a) of the Federal Rules of Civil Procedure states that a civil complaint "must name all the parties." Fed. R. Civ. P. 10(a). That rule reflects the "general presumption of openness of judicial proceedings" grounded in the common law and First Amendment. *Doe v. Doe*, 85 F.4th 206, 210 (4th Cir. 2023). Allowing a litigant to proceed in federal court under a

---

[7] For instance, Richard Mast requested that the Court resolve outstanding motions to dismiss for lack of subject matter jurisdiction before considering the motions to vacate or amend the Protective Order, or resolving the parties' Rule 12(b)(6) motions. *See* Dkt. 442 at 6–9. And Richard elaborated further on his subject matter jurisdiction challenges. *See id.* Since the filing of Richard's motion, the Court has held that the Court has subject matter jurisdiction, rejecting his and his codefendants' arguments. *See* Dkt. 455 ("MTD Mem. Op.") at 26–61. The Court need not rehash its rulings on the topic.

pseudonym runs counter to public's right of access to judicial proceedings, while providing a litigant's identity furthers the openness of judicial proceedings. *Id.* at 210–11.

Yet certain circumstances can warrant permitting a litigant to sue under a pseudonym. In some cases, "privacy or confidentiality concerns are sometimes sufficiently critical that parties or witnesses should be allowed this rare dispensation." *James*, 6 F.3d at 238. "Extraordinary circumstances" must support the request, that "balanc[e] the party's stated interest in anonymity against the public's interest in openness and any prejudice that would pose to the opposing party." *Doe v. Pub. Citizen*, 749 F.3d 246, 274 (4th Cir. 2014). Whether to allow a litigant to proceed under a pseudonym is committed to the trial court's discretion. *Doe*, 85 F.4th at 211; *James*, 6 F.3d at 238.

In *James*, the Fourth Circuit identified five (non-exhaustive) factors that district courts should consider when deciding whether to allow a litigant to proceed using a pseudonym:

(1) Whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature;

(2) Whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent nonparties;

(3) The ages of the persons whose privacy interests are sought to be protected;

(4) Whether the action is against a governmental or private party; and

(5) Relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Doe*, 85 F.4th at 211 (quoting *James*, 6 F.3d at 238) (cleaned up).

Defendants dispute that the *James* factors supply the legal framework that governs the propriety of the Protective Order. Defendants instead characterize the Court's order as a "gag

order," which they assert is presumptively unconstitutional and must satisfy strict scrutiny. *See, e.g.*, Dkt. 176 at 7–8; *id.* at 8–16; Dkt. 130 at 12–13.

Defendants' arguments are unpersuasive. The Court did not issue a "gag order." The Court allowed Plaintiffs leave to proceed using pseudonyms: John Doe, Jane Doe, and Baby Doe. This stands in stark contrast with the actual "gag orders" issued in the gag-order cases that Defendants have cited. *In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018) (district court imposed order that "the parties, their lawyers, and all potential witnesses were not allowed to 'give or authorize *any* extrajudicial statement … relating to the trial, the parties or issues in this case' if such statement could reasonable reach 'public communications media' and could 'interfere with a fair trial or prejudice any plaintiff, the defendant, or the administration of justice'") (emphasis added); *Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, 606 F. Supp. 2d 617, 626 (E.D. Va. 2008) (ruling that "publishing false information about the Court's rulings is egregious and vexatious misconduct justifying the imposition of sanctions").

Time and again, the Fourth Circuit has explained that the decision to allow a party to proceed in litigation using a pseudonym is governed by its framework in *James v. Jacobson*. *E.g.*, *Doe v. Sidar*, 93 F.4th 241, 247 (4th Cir. 2024); *Doe v. Doe*, 85 F.4th 206, 211 (4th Cir. 2023) ("In *James*, we set out five nonexhaustive factors for district courts to consider when deciding motions to proceed by pseudonym."); *Pub. Citizen*, 749 F.3d at 273 ("In *Jacobson*, we identified the following nonexclusive factors for district courts to consider when determining whether a party should be permitted to litigate pseudonymously …"); *James*, 6 F.3d at 238. To be sure, a court's decision to allow a litigant to use a pseudonym involves some intrusion on the public's right of access to the courts and judicial proceedings, implicating First Amendment and common law interests. *Pub. Citizen*, 749 F.3d at 261, 264. But, as the Fourth Circuit has

explained, those interests are accounted for in the *James* factors. *Doe v. Doe*, 85 F.4th at 210–11; *Doe v. Sidar*, 93 F.4th at 247.

The Court also is not persuaded by Defendants' argument that the Court imposed an unconstitutional "gag order" by prohibiting Defendants from disclosing Plaintiffs' identities and identifying information concerning their residences in Afghanistan, unless Defendants first secure a signed non-disclosure agreement for every such disclosure. *See, e.g.*, Dkt. 130 at 12–13; Dkt. 176 at 12–17. It could be said that inherent in any order permitting a party to proceed under a pseudonym is an implicit command that the parties bound by the order not publicly disclose the pseudonymous litigant's real name. Such an order is a limited intrusion on the public's "interest in knowing the names of the litigants," after all. *See Public Citizen*, 749 F.3d at 273. And an order permitting a party to use a pseudonym would be of scant (if any) utility if the opposing litigant could publicly name them. Still, it would appear the better practice—which Plaintiffs followed here—to explicitly seek a protective order prohibiting Defendants' disclosure of their identities in addition to asking for leave to proceed under a pseudonym. *See, e.g.*, *Doe v. Va. Polytechnic. Inst. & State Univ.*, No. 7:21-cv-378, 2022 WL 972629, at *4 (W.D. Va. Mar. 30, 2022) (granting the plaintiff's motion to proceed under a pseudonym and motion for a protective order prohibiting the defendants from disclosing his identity). That way, the Court would be most explicit in articulating the litigants' rights and obligations. In many respects, a protective order is a corollary to a pseudonym order. Yet that does not mean that the order allowing the pseudonym and prohibiting disclosure of the litigant's real identity becomes a "gag order" subject to strict scrutiny. Defendants have cited no precedent that would support applying the "strict scrutiny" standard under these circumstances. To the contrary, all authority supports the application of the *James* factors in considering such requests. *See id.* at * 2–4 (applying *James*

10

factors); *Doe v. Alger*, 317 F.R.D. 37, 39–42 (W.D. Va. 2016) (applying *James* factors in decision to allow a pseudonym and entry of "a protective order prohibiting the use of [plaintiff's] real name … during this case"). The Court will therefore consider Plaintiffs' requests using the established *James* framework.

    2.  <u>Application of the *James* Factors</u>

        a.  *Risk of Harm to Plaintiffs and Their Families in Afghanistan*

The *James* factor of paramount significance in this case is "whether identification poses a risk of retaliatory physical or mental harm to the requesting party or *even more critically, to innocent nonparties*." *See James*, 6 F.3d at 238 (emphasis added).

When the Court initially granted Plaintiffs' motion to proceed under pseudonyms, Plaintiffs presented a compelling case, based upon record evidence, that disclosure of their names would put them, Baby Doe, and innocent non-party family members in Afghanistan at great risk of physical harm. Dkt. 26 at 2. John Doe testified in a sealed affidavit that he and Jane Doe have told only a few trusted family members that they are in the United States. John Doe Decl. ¶ 6. They fear that if their identifies become known, the Taliban will wrongly believe John Doe was helping the U.S. government, though he was not. *Id.* ¶ 7. John Doe testified that he knew that the Taliban "have hurt or killed many people who worked with the U.S. government and have targeted their families to find them or pressure them to return." *Id.* ¶ 8. As a result, John Doe testified that he feared the Taliban would harm or kill their families in Afghanistan. *Id.* This and other evidence readily showed the grave safety risks that John and Jane Doe and their families in Afghanistan would face if their identities became public. *See* Dkt. 4 at 4–5 (citing reports of Taliban targeting Afghans in "retaliatory killings or violence" if they were believed to have provided assistance to United States or non-governmental organizations). In addition, John

Doe testified that others in Afghanistan may erroneously believe he and Jane Doe voluntarily gave Baby Doe to the Masts for the "chance to come to the U.S."—a belief that would yet further risk visiting harm upon the Does' families in Afghanistan, as it is illegal in Afghanistan for non-Muslims to adopt Muslim children. John Doe Decl. ¶¶ 8–10; Am. Compl. ¶ 41.

Notably, besides characterizing the threat of harm as "speculation," Dkt. 149 at 6, the Masts do not directly challenge Plaintiffs' evidence or present contrary evidence that John and Jane Doe and their families would not face such a risk of physical harm or even death. Dkt. 130 at 9–10; Dkt. 149 at 6–7. This is significant. No party has presented any substantial evidence to challenge Plaintiffs' evidence that if their names become known, the Taliban could well believe (incorrectly) that John Doe had been working for the United States, and carry out violence against the Does' families remaining in Afghanistan as they have to those who provided assistance to the United States before the Taliban came to power. This evidence is just as relevant and compelling as it was when Plaintiffs first presented it.

To be sure, in some respects, the threat of physical harm imminently facing *John and Jane Doe directly* has decreased since they were granted asylum in the United States. Dkt. 415 at 8. But the threat to their families, as "innocent nonparties," has become only more real and acute. And the evidence before the Court demonstrates a continuing, clear, and substantiated risk of physical harm to Plaintiffs' families in Afghanistan, should their identities become public. As Plaintiffs' counsel articulated and have supported with evidence, there already have been several instances in which certain known members of Plaintiffs' families in Afghanistan appear to have been directly targeted by shadowy figures alluding to Plaintiffs and/or Baby Doe. *See* Dkt. 415-3 ("John Doe USCIS Decl.") ¶¶ 55–75; *see also* Dkt. 436 ("May 2024 Hr'g") at 31 (arguing that

"innocent parties still remain in Afghanistan"). The Court finds that the threat to Plaintiffs'

families in Afghanistan, if Plaintiffs' identities become known, is anything but speculative.

The Masts have several counterarguments—but no supporting evidence—for why this

risk-of-harm factor should not weigh in favor of John and Jane Doe's continued pseudonymity.

First, they argue that Plaintiffs' "willingness to speak to the news media entirely undermines

their prior representation to this Court that they fear the consequences of media coverage about

the case." Dkt. 130 at 9–10; Dkt. 149 at 1, 6 (similar). There is no dispute that Plaintiffs John and

Jane Doe spoke to two media outlets (the AP and the New York Times) about this case. Dkt. 137

at 6 (noting Plaintiffs' "decision to speak with select members of the press … only with express

guarantees from those journalists to identify them only with pseudonyms"); Dkt. 167 ("MTD

Hr'g") at 80. Plaintiffs explained that they did so after their lawyers received requests for

comment from news outlets, and they believed the "story was going to be covered," and they

wanted to do so with "two entities that they trusted." MTD Hr'g at 80. Yet critically, Plaintiffs

did so only giving their names to the media outlets on condition of anonymity; the organizations

honored that commitment to their anonymity; and as a result, the outlets did not include their

names or photographs, or other identifying information that would undermine the anonymity

Plaintiffs requested, and the Court countenanced in the Protective Order. *See supra* at 5 nn.4–5.[8]

Nothing in the limited outreach by Plaintiffs to these two media outlets, under the identity-

protecting terms described, undermines the Court's assessment of the risk of physical harm that

---

[8] To the extent that the Masts have argued that the allowing Plaintiffs to proceed using pseudonyms in view of their press outreach is "highly prejudicial" to the Masts and the other named defendants because it "inflame[s] the public against the Masts [and] invites harm upon them," Dkt. 130 at 10; Dkt. 149 at 6–7, the Court will consider such arguments in considering the fifth *James* factor: "the risk of unfairness to the opposing party from allowing an action against [them] to proceed anonymously." *See James*, 6 F.3d at 238.

would be occasioned by disclosure of Plaintiffs' identities, particularly to innocent third parties—namely, Plaintiffs' families living in Afghanistan.

The Masts also argued that Plaintiffs' request to use pseudonyms is undermined by the fact that, for a time, the Virginia custody and adoption proceedings publicly identified John and Jane Doe by their real names on the public case docket. Dkt. 130 at 2, 6. However, the Virginia Court of Appeals later unequivocally accepted John and Jane Doe's assertions "that the danger flowing from identification affects not only themselves but also family members who are not parties to the underlying litigation." Dkt. 168 at 2 (citing Dkt. 168-1 at 2). That court then allowed the parties to proceed in the state-court litigation using their first and last initials. The Masts' argument in this regard is therefore unfounded. To the contrary, the subsequent ruling of the Virginia Court of Appeals provides yet further support for finding a continued risk of physical harm to Plaintiffs' families if Plaintiffs' identities become known.

Finally, the Masts argue in a recent filing that certain newly discovered evidence undermines Plaintiffs' assertion that the Protective Order is necessary to protect their identities and their family members in Afghanistan. Dkt. 415 at 14–15. In the Masts' view, "the facts establish that anyone in Afghanistan can readily discern who the Does and the child in this case are." *Id.* at 15. The Masts' argument fails. For one, the evidence the Masts marshal falls far short of showing that "anyone in Afghanistan can readily discern" who Plaintiffs and their families are. Second, there is a vast gulf between the relief that the Masts seek—i.e., that the two adult Plaintiffs' names are included in the case caption and docket for anyone to see, versus evidence that certain interested persons with ample resources and inclination may be able to connect the dots. Substantial safety considerations remain for Plaintiffs' families still living in Afghanistan. As a result, the Court must require a far greater evidentiary basis that the Protective Order is no

longer fulfilling its intended function before the Court will jettison the Protective Order and spotlight Plaintiffs' identities.

Accordingly, the Court finds that the "risk of physical or mental harm" *James* factor weighs significantly in favor of retaining Plaintiffs' pseudonymity.

> b. *Age of the Person Seeking Anonymity*

Another *James* factor considers "the ages of the persons whose privacy interests are sought to be protected." *See James*, 6 F.3d at 238. This factor bears little on the disputed issues before the Court. Plaintiffs John and Jane Doe do not argue that *their* ages counsel in favor of anonymity. *See* Dkt. 137 at 11–12; Dkt. 149 at 7–8. And as to Baby Doe, no Defendant argues that she should not be afforded protection of a pseudonym, given that she is a minor. Dkt. 130 at 3; Dkt. 137 at 11; Dkt. 176 at 1.

The only dispute on this factor is that the Masts argue that Baby Doe should not be referred to as "Baby Doe," as they believe this particular pseudonym "false[ly] and unfairly implies that the Mats' adoptive daughter is not related to them but is instead related to Plaintiffs." Dkt. 130 at 10. Rather, the Masts contend that she should be referred to by "the initials of Baby Doe's legal name … because she is the Masts' adopted daughter." Dkt. 149 at 7. The Court will not change Baby Doe's pseudonym. Innumerable docket entries and briefs in this action so refer to her. And the Masts' argument about unfair implications of the pseudonym "Baby Doe" is unfounded—the Court has been clear that "[t]his federal case does not involve adoption or custody," which are matters being addressed in the Virginia courts. Dkt. 455 ("MTD Mem. Op.") at 4. The Court will not wade into those waters to resolve a dispute over which pseudonym is preferable. Put simply, nothing should be read into the Court's use of the

pseudonym, "Baby Doe," except that the Court found that the child's true identity should not be made public under the *James* factors.

c.   *Whether the Case Involves a Sensitive and Highly Personal Matter*

The Masts next argued that the subject matter of this case is not of a "sensitive and highly personal" matter, largely on the basis that Plaintiffs and their attorneys have "discuss[ed] it with the media" as have their attorneys. Dkt. 130 at 9; Dkt. 149 at 4; *see James*, 6 F.3d at 238.

The Court disagrees. This case involves an alleged scheme by the Masts and their co-defendants to dupe Plaintiffs into bringing their young daughter Baby Doe to the United States to receive specialized medical care, only to have the Masts abduct Baby Doe once they arrived in the United States. The fact that Plaintiffs and their attorneys engaged in limited outreach to the press on a few occasions, and on condition that their anonymity was preserved, does not detract from the sensitive and highly personal nature of this case. Moreover, the record does not support any suggestion that Plaintiffs sought anonymity "merely to avoid the annoyance and criticism that may attend any litigation." *See James*, 6 F.3d at 238. Rather, the record shows that Plaintiffs have acted on a more-than-good-faith fear that publication of their names or other identifying information will result in substantial risk of physical harm to their family still in Afghanistan. The Court finds that this factor also weighs in favor of retaining Plaintiffs' pseudonymity.

d.   *Whether the Case Is Against a Governmental or Private Party*

Next, the Court considers the fourth *James* factor, "[w]hether the action is against a governmental or private party." *See James*, 6 F.3d at 238. Plaintiffs initially filed this action against both private individual defendants (the Masts, et al.) as well as two federal cabinet officials as "nominal defendants" in their official capacities. Dkt. 68 ("Am. Compl.") at 1 (Caption). Subsequently, however, Plaintiffs filed a stipulation of dismissal against the two

federal officials, leaving only private parties as defendants. Dkt. 270. To be sure, when a litigant only sues a governmental party, courts have generally been more likely to allow a plaintiff leave to proceed under a pseudonym. *Alger*, 317 F.R.D. at 41. The rationale underlying that factor is that a case against a government "do[es] no harm to its reputation." *Id.* Conversely, when a litigant only sues a private party, this factor is more likely to weigh against allowing anonymity or pseudonymity. *See Doe*, 85 F.4th at 215. That is because a suit against private parties "may damage their good names and result in economic harm." *Alger*, 317 F.R.D. at 41.

Notwithstanding the initial inclusion of the two federal officials as defendants, the Court finds that this factor does weigh somewhat against retaining John and Jane Doe's pseudonymity, as Plaintiffs brought the case against several private individuals and they remain the only defendants in this action. To be sure, the Masts argue stridently that "[t]his is … not a case where the plaintiffs have sought bilateral pseudonymity to protect *both sides* in a private dispute," but rather, charge that Plaintiffs "are using their pseudonymity to shield themselves while publicly attacking the Masts." Dkt. 130 at 10. This argument sounds in both the fourth *James* factor (identity of the opposing party), and the fifth James factor (the "risk of unfairness to the opposing party from allowing an action against it to proceed anonymously"). Yet the Fourth Circuit has explained that it would be improper for a court to adopt a "flat rule" that "the fairness factor always counsels against letting a plaintiff in a civil action use a pseudonym at trial unless the defendant is also using one." *See Sidar*, 93 F.4th at 248. This admonition similarly counsels against attributing overbearing weight solely to this one factor—the identity of the opposing party—especially when, as here, the Court finds that other factors, namely the risk of retaliatory and physical harm, weigh heavily in favor of granting protection. Thus, the Court finds that the fourth *James* factor weighs somewhat against retaining pseudonymity, yet the Court finds that

17

the weight of this factor on the Court's cumulative assessment of the *James* factors is leavened considerably by the presence of the other *James* factors.

### e.  *Risk of Unfairness to Party Opposing the Pseudonym*

Lastly, the Court considers the "risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." *See James*, 6 F.3d at 238. The parties' arguments on this factor mirror in some respects their arguments on the prior factor—that the case is brought against private parties rather than a government.

The Masts' argument in this regard largely focuses on the perceived unfairness of Plaintiffs' seeking anonymity while they have been publicly named as Defendants in the action. Dkt. 130 at 10–11. They argue that it is "highly prejudicial" for the Court to allow Plaintiffs "to enjoy the cloak of pseudonymity," while they "have shared their false and defamatory accusations against the Masts with the media and indeed the world." *Id.* at 10–11. The Masts argue that "Plaintiffs' speaking to the media has resulted in" negative publicity about them; various posts by others on social media claiming, among other things, Joshua Mast committed a "war crime"; and certain outlets publicizing photos of the Masts' biological children and disclosure of the town where they live. *Id.* at 11; Dkt. 149 at 8 (arguing that allowing Plaintiffs to proceed under pseudonyms "is exceptionally unfair to the Masts because the Plaintiffs have used pseudonymity to draw public attention to the private family matters of the Masts").

Again, the Fourth Circuit has admonished courts that the fairness factor does not "always counsel[ ] against letting a plaintiff in a civil action use a pseudonym at trial unless the defendant is also using one." *See Sidar*, 93 F.4th at 248. That is not to say the issue is irrelevant—just that the Court's consideration of the fairness factor must be grounded in the specifics of the case, and not any general aversion to one-sided anonymity requests. In this case, any potential unfairness

to the Masts is greatly mitigated by one fact—they have always known Plaintiffs' identities.

Thus, the Masts cannot persuasively argue in seeking to modify the Protective Order that

Plaintiffs' use of pseudonyms has hindered the Masts' ability to mount a defense—as it might in

a case in which the defendants do not know the plaintiffs' identities. *See Student A v. Liberty

Univ., Inc.*, 602 F. Supp. 901, 920 (W.D. Va. 2022) (finding that the "unfairness factor" was

"significantly mitigated by named Plaintiffs' willingness to provide names and other discovery to

certain Defense counsel and limited persons at Liberty so that they could prepare its defense");

*Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 594 (E.D. Va. 2016)

(finding this factor did not weigh against allowing plaintiff to use a pseudonym when there was

"no indication" defendants "faced any hardship in mounting an effective defense as a result").

Richard Mast has raised a related argument challenging other provisions in the Protective

Order, namely the requirement that persons to whom Defendants or their representatives disclose

Plaintiffs' true identities must sign a non-disclosure agreement. Dkt. 442 at 9–11. He claims

unfairness arising from the Protective Order that, in his view, not only undermines his discovery

rights but also due process rights.[9] *See id.* The Court finds, at this time, the argument both

speculative and underdeveloped. While Richard Mast says he "knows of specific individuals"

who could be helpful to his case but from whom he cannot get information on account of the

Protective Order, *see id.* at 9–10, he offers no specific facts, much less evidence, to substantiate

the assertion. It is further entirely unclear why, for instance, these individuals' concerns to not

"allow themselves to be exposed to the Taliban as witnesses for the Masts," counsel *against* the

provisions of *this* Protective Order (to protect the identities of Plaintiffs), rather than seeking

---

[9] Counsel for Joshua and Stephanie Mast made a similar point at oral argument in May, calling it a "genuine problem," but similarly did not back it up with any evidence or specifics at that time, or in the months that have followed. *See* May 2024 Hr'g at 40.

from the Magistrate Judge *a discovery protective* order that would include measures to protect other potential witnesses' safety. *See* Fed. R. Civ. P. 26(c)(1). The Court also notes that Richard Mast has been engaging in discovery and has opposed other parties' motions for discovery protective orders.[10] Without further development, the Court finds at this time that this argument does not support any unfairness to Defendants under this *James* factor.[11]

The Masts attempt to claim "*Plaintiffs' speaking to the media* has resulted in pictures of the Masts' other children being widely disseminated and in disclosing the town in which the Masts' live." Dkt. 130 at 11 (emphasis added). As objectionable as that other outlet's publication of photos of the Masts' biological children may be, there is no basis to believe that *Plaintiffs' statements* to the media prompted this disclosure, as the Masts argue. Nor does the Court find persuasive the Masts' attempt to lay directly at Plaintiffs' feet all the vitriol the Masts have received from corners of social media for their alleged conduct that underlies Plaintiffs' claims in this case. *See* Dkt. 130 at 10–11. There is no evidence to support that Plaintiffs, for example, were egging on those who subjected the Masts to online abuse.

The Masts have also highlighted a statement issued by the Taliban condemning the Masts as demonstrating the perceived unfairness that the Court "should shield [Plaintiffs] (and only [Plaintiffs]) from public scrutiny or criticism." *Id.* at 1–2. The Court need not discount that the

---

[10] *See* Dkt. 452 at 2 n.2 (explaining that Richard has "served 139 requests for production, 7 interrogatories, 7 requests for admission, and at least one third-party subpoena"); Dkts. 171, 210.

[11] Richard Mast attempts to distinguish *James* on the basis that the case "involved matters and witnesses in the U.S., not Afghanistan controlled by the Taliban," and that, "in *James*, there was no threat of murder or mayhem if a witness for the defense were to be asked to a sign a non-disclosure agreement." Dkt. 442 at 11. If anything, the location of the witnesses would appear to point in precisely the opposite direction: rendering even more important the need for the provisions of the Protective Order, and, were Defendants to substantiate the need, protections for non-party witnesses in a separate discovery protective order. Fed. R. Civ. P. 26(c)(1).

Masts would have legitimate concerns about the issuance of such a statement. Yet that does not negate or undermine the safety risks Plaintiffs demonstrated that their families who are living in Afghanistan would face, should Plaintiffs' identities come to light. *See* Dkt. 137 at 10.

At bottom, the Masts' objections are largely based on the perceived unfairness that *they* (the Masts) have not been afforded anonymity, rather than the risk of unfairness to them (the Masts) from allowing *Plaintiffs* to litigate the case under pseudonyms. *See James*, 6 F.3d at 238. The Court finds that, though the Masts have undoubtedly faced the harsh glare of the media spotlight following initiation of this litigation and the ongoing Virginia proceedings, the Masts have not demonstrated that the "risk of unfairness" *James* factor tilts in favor of jettisoning Plaintiffs' anonymity. Indeed, the Virginia Court of Appeals reached a similar conclusion when it determined that the litigants could file in that court using only their initials. *See* Dkt. 168 at 2; Dkt. 168-1. In so ruling, that court rejected the Masts' identical argument that "they would be 'highly prejudic[ed]' by allowing the proceedings to go forward anonymously, because [the Masts'] names have been used in media and social media while [Plaintiffs] continue to enjoy the cloak of pseudonymity." *See* Dkt. 168-1 at 2. Ultimately, the Virginia Court of Appeals found paramount the risk of "danger flowing from [Plaintiffs'] identification," which would affect "family members who are not parties to the underlying litigation." *Id.*

3.   Conclusion

Having considered the *James* factors, the Court finds that the "risk of harm" factor— particularly the risk of physical injury or even death facing Plaintiffs' relatives currently living in Afghanistan should Plaintiffs' identities become known—is of paramount significance. The Court also finds Plaintiffs did not initiate this lawsuit pseudonymously merely to avoid annoyance and criticism that attends any litigation, but rather based on a well-founded concern

of risk of physical harm—another *James* factor that weighs in Plaintiffs' favor. That the case is

against private parties weighs, to a degree, in the Masts' favor. But the Masts have not

demonstrated any unfairness from allowing *Plaintiffs* continued leave to proceed under

pseudonyms, much less unfairness to such a degree as would counterbalance the threat of

physical harm facing Plaintiffs' families in Afghanistan. On balance, then, the Court finds that

the *James* factors weigh decisively in favor of retaining the Protective Order; that Plaintiffs have

demonstrated that "exceptional circumstances" warrant the Court's affording them the "rare"

ability to litigate using pseudonyms, *see Pub. Citizen*, 749 F.3d at 273 (citing *James*, 6 F.3d at

238); and that, as a result, Plaintiffs may continue to proceed in this litigation using their

respective pseudonyms.[12]

---

[12] Even if strict scrutiny applicable to true "gag orders" governed the validity of the
Protective Order—and it does not—the Court would conclude that Plaintiffs have established
that such standard is met. Here, there is a "compelling" public interest in preserving Plaintiffs'
safety and the safety of their families. *See Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017) (en banc) (a state's "interest in the protection of its citizenry and
the public safety is not only substantial, but compelling"), *rev'd on other grounds*, *N.Y. State
Rifle & Pistol Ass'n*, 597 U.S. 1 (2022); *cf. Int'l Refugee Assistance Project v. Trump*, No. 17-cv-
361, 2017 WL 818255, at *2 (D. Md. Mar. 1, 2017) (holding that privacy concerning litigants'
faith and immigration status supported anonymity because, "if disclosed, [it] could jeopardize
their safety in foreign countries").

Moreover, the Court finds that the limited measures imposed in the Protective Order—
use of pseudonyms, prohibiting identification of Plaintiffs' identities and where they were from,
absent securing a non-disclosure agreement, etc.—are not only "narrowly tailored to serve their
intended purpose," but constitute "the least restrictive means" to ensure Plaintiffs' safety and that
of their families still living in Afghanistan. *See In re Murphy-Brown*, 907 F.3d at 799 (citations
omitted). Defendants suggest that leaving the Protective Order in place would spawn a parade of
horribles, including that it would preclude them from enrolling Baby Doe in kindergarten absent
the teacher signing a non-disclosure agreement. Dkt. 176 at ii, 17; Dkt. 149 at 9–10. Defendants'
artificially expansive interpretation of the Protective Order is unmoored from its text. It limits
Defendants' identification of Plaintiffs as such—*Plaintiffs in this case*—as well as identification
of Plaintiffs' family members. *See* Dkt. 26 at 2–3; Dkt. 188 at 3–4. Simply put, the common-
sense provisions in the Protective Order cannot reasonably be read to require that anyone
interacting with Baby Doe (e.g., her teacher) must execute a non-disclosure agreement first,
when she has not been identified in connection with this litigation. Giving the Protective Order
its natural meaning, Defendants have not identified any less restrictive means than those set forth

Accordingly, the Court will **DENY** Defendants' motions to amend, modify or vacate the Protective Order. Dkts. 130, 176, 442.

<u>**Motions to Hold the Masts in Civil Contempt for CBS Interview**</u>

Plaintiffs first filed a motion to show cause why Defendants Joshua and Stephanie Mast should not be held in civil contempt for violating the Court's Protective Order. Dkt. 141. In the motion, Plaintiffs charge that they were "stunned to see a CBS television segment" that included "photographs and video imagery of Baby Doe that CBS could have obtained only from the Masts or with their explicit permission." *Id.* at 2. They also took exception to other photographs shown in the news segment, as well as instances during the interview in which Joshua and Stephanie Mast identify Baby Doe from a photograph and describe the physical injuries she sustained in some of the events underlying this lawsuit. *Id.* Plaintiffs assert that by this conduct, the Masts have "imperiled" their safety as well as that of Plaintiffs' families. *Id.* Thus, Plaintiffs contend that the Masts committed a knowing violation of the Protective Order that warrants a civil contempt sanction. *Id.*

The next day, Plaintiffs filed a supplemental motion for an order to show cause based on a "second installment" of the CBS program. Dkt. 142. Plaintiffs claimed that the second program provided "additional evidence of the Masts' contumacious conduct," depicting photos and videos "that could have been obtained only from the Masts," and during which "Joshua Mast is shown passing unknown materials to the CBS reporter." *Id.* at 2.

---

in the Protective Order that would safeguard such compelling safety interests. *See* Dkt. 130 at 12–13. Thus, Defendants' arguments that the Protective Order fails to satisfy the strict scrutiny standard are without merit, both because that is not the governing legal framework, and because the Protective Order does satisfy that test. Nor for these reasons can the Protective Order be considered unconstitutionally vague.

In the Fourth Circuit, courts employ a burden-shifting framework to determine whether a party should be found in civil contempt. *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 462 (4th Cir. 2020). At the first step, a party moving for civil contempt must prove four elements by clear and convincing evidence:

> (1) The existence of a valid decree of which the alleged contemnor had actual or constructive knowledge;
>
> (2) That the decree was in the movant's favor;
>
> (3) That the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and
>
> (4) That the movant suffered harm as a result.

*De Simone v. VSL Pharms, Inc.*, 36 F.4th 518, 529 (4th Cir. 2022) (quoting *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (cleaned up in *De Simone*)). If the movant establishes these elements, the burden then shifts to the alleged contemnor "to demonstrate that she made in good faith all reasonable efforts to comply with the decree." *De Simone*, 36 F.4th at 529 (cleaned up). If the alleged contemnor fails to show good faith in making all reasonable efforts to comply with the order, they may be held in contempt. *Klopp*, 957 F.3d at 461–62. Civil contempt orders and the appropriateness of consequences crafted for violating court orders fall within the district court's discretion. *Id.* at 461.

During the hearing on Plaintiffs' motion to show cause, as well as on other motions, the Court heard testimony from Joshua Mast concerning the circumstances underlying his and Stephanie's involvement in the CBS interview. *See* MTD Hr'g at 98–111. Having heard the testimony and argument thereon, and considered other evidence submitted on this subject, the Court **finds**, with respect to the CBS interview, that Plaintiffs **have not shown** by clear and convincing evidence that either Joshua Mast or Stephanie Mast violated the terms of the

24

Protective Order and had knowledge at the time of such violations. *See De Simone*, 36 F.4th at 529. Moreover, even if Plaintiffs had shown this element—and they have not—the Court would conclude that the Masts had established that in good faith they made all reasonable efforts to comply with the Protective Order with respect to the CBS interview. *See id.*

The Court finds significant that (1) the Masts themselves never disclosed Plaintiffs' names, nor themselves provided identifying information where Baby Doe was found,[13] (2) Joshua Mast's testimony is unrefuted that third parties had provided CBS with the other photographs of Baby Doe,[14] (3) Joshua Mast testified that when CBS asked for permission to show photographs of Baby Doe, he "told them that we did not authorize anything that showed her face,"[15] and finally (4) Joshua Mast also testified, without contradiction, that he only "gave" photographs of Baby Doe to CBS that did not show her face.[16]

Of course, in the interview, Joshua Mast did identify Baby Doe from a photograph that the reporter says was "provided" to them. Yet the tenor of his response to the reporter ("I would say that's one of my favorite photos of her …"), reflect little more than an accidental slip, rather than a knowing violation of the Protective Order. The Court also views Stephanie Mast's

---

[13] MTD Hr'g at 99 (Joshua Mast, testifying that "we tried to stick with the … intent of that protective order. That's why we didn't talk about them [Plaintiffs] at all. We didn't name them. We didn't talk about where they're from in Afghanistan, that type of thing.").

[14] MTD Hr'g at 102–03 (Joshua Mast, testifying that CBS "didn't get those from us," referring to the photographs of Baby Doe showing her face); *id.* at 104–05 (testifying that he believed the protective order reflected a difference between "providing things that identify [Baby Doe] and [CBS] getting that from independent sources").

[15] MTD Hr'g at 102 (Joshua Mast testimony).

[16] MTD Hr'g at 106. To be sure, Joshua Mast did testify that he did "show" the CBS reporter photographs of Baby Doe as a baby that did show her face, but he did not "give" the photographs to the reporter. *Id.* at 107. To the extent this act evidences a violation of the Protective Order, the Court does not consider the violation such as would undermine the Court's conclusion that Joshua and Stephanie Mast acted in good faith in making all reasonable efforts to comply with the Protective Order vis-à-vis the CBS interview.

25

response concerning Baby Doe's injury in a similar light. Because the Court finds—with respect to the Masts' challenged conduct during the CBS interview—that Plaintiffs have failed to establish that Joshua and Stephanie Mast knowingly violated a term of the Protective Order. Alternatively, the Court finds that even if Plaintiffs had made a prima facie showing of all four elements of civil contempt,[17] the Masts established that they had taken in good faith all reasonable steps to comply with the Protective Order.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Show Cause and Supplemental Motion to Show Cause why Joshua and Stephanie Mast Should Not Be Held In Civil Contempt, with respect to the CBS interview. Dkts. 141, 142.

## Motion to Hold Joshua Mast and Jonathan Mast in Civil Contempt for Communications with the "Pipe Hitter Foundation"

Plaintiffs have also filed a motion to hold Joshua Mast and one of his brothers, Jonathan Mast, in civil contempt, for violating the Protective Order when they were enlisting an organization called the "Pipe Hitter Foundation" or "PHF" to implement a fundraising campaign for Joshua and Stephanie Masts' legal defense in this case. Dkts. 231, 403.[18] In the course of that fundraising campaign, the organization posted numerous identifying photos of Baby Doe on its website and social media accounts. Noting arguments made in the briefs that outstanding

---

[17] Because the Court held there was no knowing violation of the Protective Order, the Court need not address the other elements of civil contempt with respect to this motion.

[18] Plaintiffs initially sought a civil contempt sanction against Stephanie Mast as well, but they later withdrew the request "because discovery revealed no evidence that she was actively involved in Joshua Mast's scheme" with respect to the Pipe Hitter Foundation. Dkt. 403 at 2 n.1. In addition, Plaintiffs represented that "[d]iscovery further suggested that PHF was an innocent pawn," and that once Plaintiffs' counsel informed it of the Protective Order, "PHF acted promptly to pull down the social media posts" at issue in Plaintiffs' motion. *Id.* As a result, Plaintiffs also withdrew their request "that PHF be held in contempt as aiding and abetting Joshua Mast's violation of the Protective Order." *Id.*

discovery would be material to the issue, the Court granted a continuance so that the parties could conduct such discovery. Dkt. 263. Subsequently, the parties filed and the Court has considered prehearing memoranda and evidence, Dkts. 403, 415, the Court heard argument on the motion to hold Joshua and Jonathan Mast in civil contempt, Dkt. 436 ("May 2024 Hr'g"), and the Court received and considered post-hearing submissions, including the first filing from Jonathan Mast, Dkt. 437, 438. Upon consideration of the submissions and evidence, the Court makes the following findings of fact.

The Pipe Hitter Foundation is a 501(c)(3) non-profit organization that, among other things, provides financial support, legal defense grants, and otherwise advocates for service members, first responders and their families.[19] In early 2023, Joshua Mast initiated discussions with PHF in order to raise money for his legal defense in this case.[20] On January 7, 2023, Joshua emailed PHF background information on this case, and, significantly, also sent his contact within the organization a Google photo album that included hundreds of identifying photographs of Baby Doe.[21] When he sent the photographs to PHF, Joshua Mast did not inform the organization about the Protective Order, much less secure a non-disclosure agreement.[22] From January to March 2023, identifying photographs of Baby Doe were circulated amongst staff and the board of the PHF, when it was considering and later approved a legal defense grant for the Masts.[23]

---

[19] Dkt. 257-2 ("Disarro Decl.") ¶¶ 7–9.

[20] Dkt. 239-1 ("Joshua Mast Decl.") ¶ 6. Joshua Mast made the initial outreach through Brian Ferguson, an attorney with whom PHF had previously partnered. Disarro Decl. at 2 ¶¶ 20–24.

[21] Dkt. 407-6 ("Pls' Ex. R") at ECF 2–3 (email); Dkt. 407-4 ("Pls' Ex. L") (Google folder, including photographs).

[22] *See id.*; *see also* Disarro Decl. ¶¶ 23–24, 28, 54–55.

[23] Disarro Decl. ¶¶ 25–32, 36–37, 54.

The executive director of PHF only learned about the Protective Order in March 2023, when Joshua Mast told her about it.[24] While Joshua Mast told PHF's Executive Director that the Protective Order (which he called a "gag order") prevented *him* from speaking publicly about the case, Joshua Mast suggested that his brother, Jonathan Mast, could instead act on their behalf in that public-facing capacity.[25] Joshua then called Jonathan to let him know he could expect to hear from PHF's executive director.[26]

This evidence severely undermines the credibility of Joshua Mast's statements, made under oath, that "[his] understanding is the [PHF] subsequently reached out to [his] family members," and that in February or March 2023, "Stephanie and [Joshua] learned that [his] brother, Jonathan Mast, had coordinated with the [PHF] to raise money for [their] expenses."[27] Those statements would suggest that Joshua Mast was totally ignorant of the connection between his brother and PHF, that those two nonparties independently began working together without his knowledge. But Joshua's testimony omits material context that is supported by persuasive and consistent evidence before the Court: that he (Joshua) had prearranged with both PHF and Jonathan to have Jonathan serve as point of contact and spokesperson for the Masts' legal defense campaign. Considering this evidence, the Court finds that Joshua Mast knowingly

---

[24] Disarro Decl. ¶¶ 54–55. To the extent Joshua Mast testified that he "*from the outset* explained to [PHF] that due to the Court's gag order and its restrictions on identifying our daughter in this suit, we were essentially unable to defend ourselves …", Joshua Mast Decl. ¶ 6 (emphasis added), the Court finds more credible, persuasive, and supported by evidence the more detailed account by Ms. Disarro that she only learned of the Protective Order in March 2023. *See* Disarro Decl. ¶¶ 54–56; *id.* ¶¶ 19–55 (background).

[25] Disarro Decl. ¶¶ 55–57, 60–64.

[26] *See* Dkt. 403-6 ("Jonathan Mast Dep.") at 49–50, 56, 76–77.

[27] Joshua Mast Decl. ¶¶ 8–10.

designated Jonathan Mast to serve as his and Stephanie Mast's "representative," within the meaning of the Protective Order. *See* Dkt. 26 at 2 (¶ 1).

For his part, Jonathan Mast testified that he was familiar with the Protective Order before he heard from PHF, and that he understood that its purpose was to protect the identities of John Doe, Jane Doe, and Baby Doe.[28] Nonetheless, on May 10, 2023, Jonathan Mast sent PHF emails containing about twenty identifying photos of Baby Doe.[29]

At this time, Joshua Mast was aware that his brother Jonathan was working with PHF.[30] Still, PHF continued to communicate with Joshua Mast about the fundraising campaign.[31] After PHF sent Joshua Mast the legal defense grant agreement, Joshua said that he could not sign it due to the "gag order."[32] Instead, Joshua Mast told his contact at PHF to speak to Jonathan about the grant agreement; Jonathan was the one who ultimately signed this agreement on May 10, 2023.[33] The grant agreement provided that PHF would be "implementing a fundraising campaign in support of Joshua Mast and his family."[34] Following the fundraising campaign, PHF transferred $5,000 to Jonathan Mast on May 19, 2023, the entirety of which went to Joshua Mast.[35]

---

[28] Jonathan Mast Dep. at 54–55; *id.* at 32–33.

[29] Dkt. 407-3 ("Pls' Ex. J") (email from Jonathan Mast to Ms. Disarro); *see also* Jonathan Mast Dep. at 86 (testifying that, "I sent some photos from this [Google photo album] to Pipe Hitter Foundation").

[30] *See, e.g.*, Joshua Mast Decl. ¶ 10; Jonathan Mast Dep. at 145.

[31] Disarro Decl. ¶¶ 69–73.

[32] Disarro Decl. ¶ 74.

[33] Disarro Decl. ¶¶ 74–75, 81; Dkt. 403-11 ("Pls' Ex. K") (executed grant agreement).

[34] Pls' Ex. K at ECF 3.

[35] Disarro Decl. ¶ 109; Jonathan Mast Dep. at 69–70.

In the course of its fundraising campaign from May to June 2023, PHF published on its website and social media accounts information about this case, including numerous photos of Baby Doe that showed her face.[36] Joshua Mast and Jonathan Mast had sent several of these identifying photos of Baby Doe to PHF, which later published them on its fundraising pages.[37] As part of that fundraising campaign, Jonathan Mast also appeared on One America News Network to describe his family's side of the events involving Baby Doe.[38] In the interview, Jonathan Mast mentioned the ongoing state court litigation as well as this federal action, and he also solicited donations for the Masts' legal defense through the PHF website.[39] Moreover, during that interview, several identifying photos of Baby Doe were shown—photos which Jonathan Mast had sent to the media outlet as well.[40]

Accordingly, the Court finds, by clear and convincing evidence, that both Joshua and Jonathan Mast, by their conduct, violated the terms of the Protective Order and that they had knowledge (and at least constructive knowledge) of such violations. *See Ashcraft*, 218 F.3d at 301. The Protective Order prohibited "Defendants and their … representatives" "from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person … unless that person first executes a non-disclosure agreement." Dkt. 26 at 2.

---

[36] Disarro Decl. ¶ 25; Dkt. 407 ("Pls' Ex. A") (screenshots of PHF website donation page for Masts).

[37] These included an unredacted photo of Joshua Mast holding Baby Doe, and an unredacted photo of Stephanie Mast sitting next to Baby Doe. *Compare* Pls' Ex. A at ECF 2–4 (PHF donation page) *with* Pls' Ex. J at ECF 3–4 (photos sent by Jonathan Mast to PHF), and Pls' Ex. L at ECF 2, 10 (Google photo album). *See also* Disarro Decl. ¶¶ 25–27 (explaining that several photos of Baby Doe that were included in the Google photo album were ultimately used by PHF).

[38] Dkt. 403 at 13–14 (and accompanying record citations); Jonathan Mast Dep. at 139.

[39] *See id.*

[40] Jonathan Mast Dep. at 139–40.

30

Joshua and Jonathan Mast both shared identifying photographs of Baby Doe with PHF and

Jonathan sent them to One America News Network, which the organizations published on their

websites and social media accounts.[41] Of course, neither executed a non-disclosure agreement,

nor did Joshua or Jonathan ask them to do so.

Defendants argue that Joshua Mast did not knowingly violate the Protective Order,

claiming that Jonathan Mast had "acted on his own accord and was not directed or asked to

provide photos of Baby Doe." Dkt. 415 at 18; Dkt. 437 at 11–12. The Court finds that argument

carries little weight. For one, Joshua and Jonathan Mast each provided identifying photos of

Baby Doe to PHF, ignoring the Protective Order's express requirements. Further, the evidentiary

record demonstrates that Joshua Mast not only orchestrated Jonathan serving as his and

Stephanie's public-facing point of contact with PHF, but also that Joshua and PHF continued to

communicate afterward.[42] And, further still, the Court finds uncredible Defendants' story that

Joshua and Jonathan's actions vis-à-vis PHF were independent. For instance, Defendants wrote

in their initial opposition brief that "Joshua and Stephanie Mast had no knowledge that Jonathan

Mast was speaking with the [PHF] … until after Jonathan had already done so." Dkt. 239 at 3.

But that wasn't entirely true: Joshua knew that they were in touch.[43] And, in any event, the

statement falls apart in the face of credible evidence showing continued communication between

---

[41] *See* Pls' Exs. A, J, L, R; Jonathan Mast Dep. at 86, 139–40; Disarro Decl. ¶¶ 25–27.

[42] In fact, because Joshua Mast communicated with PHF by an electronic messaging application Signal that automatically deleted his messages, the full record of his communications is necessarily lacking. *See* Disarro Decl. ¶ 38 ("I began communicating with Joshua Mast at his request using an application called Signal …."). In any event, the record evidence still shows continued communication between Joshua Mast and PHF.

[43] Jonathan Mast Dep. at 147 (testifying that Joshua was aware in April and May 2023 that he (Jonathan) was in contact with PHF).

Joshua and Jonathan concerning the fundraising campaign.[44] Joshua Mast's sworn declaration was, at best, misleading, in that it indicated that PHF and Jonathan had independently sought to work together—omitting the key fact that the evidence ultimately demonstrated that Joshua had arranged with both parties ahead of time that Jonathan would serve as the public-facing point of contact for the fundraising campaign.

While Defendants argue that "all the evidence suggests Jonathan Mast was acting on his own initiative and Joshua had no knowledge Jonathan was communicating with [PHF] or what Jonathan would ultimately say or do," Dkt 437 at 12, the Court finds that the record evidence points in precisely the opposite direction. That is, the brothers were working together to achieve the same goal of boosting the Masts' legal defense fund.

Defendants also raise challenges to other elements of civil contempt,[45] including "the existence of a valid decree," and that "the movant suffered harm as a result," as well as other arguments seeking to avoid a contempt sanction. None are persuasive.

First, Defendants dispute the element of "the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge." *Ashcraft*, 218 F.3d at 301. In Defendants' view, the Protective Order is not a "valid decree" because it violated the Masts' First Amendment rights—repeating their now-rejected argument that the Protective Order is an unconstitutional "gag order" that failed to satisfy strict scrutiny under the Fourth Circuit's decision in *In re Murphy Brown*, 907 F.3d 788 (4th Cir. 2018); *see* Dkt. 415 at 16–17; Dkt. 437

---

[44] Jonathan Mast Dep. at 148 ("I talked with them [PHF] first and then informed Joshua of that.").

[45] There is and can be no real dispute that the second element of civil contempt has been satisfied—"that the decree was in the movant's [i.e., Plaintiffs'] favor," as the Court granted Plaintiffs' motion for a protective order and for leave to proceed using pseudonyms. *See* Dkt. 26; *Ashcraft*, 218 F.3d at 301.

at 16–17. This argument fails. As explained above, the Protective Order was not a "gag order," and the *James* factors established the governing standard for the Protective Order's issuance. *See supra* at 7–22. The Court has already concluded that the Protective Order satisfied, and continues to satisfy, the *James* factors. *See id.* Further, the Court has determined that even if strict scrutiny applies (and it doesn't), that the Protective Order satisfies that stringent standard. *See supra* at 22 n.12. And the Protective Order was not "reversed," which can render a decree invalid. *See Ashcraft*, 218 F.3d at 302–03. The Court therefore finds that Plaintiffs have demonstrated by clear and convincing evidence that the Protective Order was, and remains, a "valid decree." For substantially the same reasons, Jonathan Mast's mirror arguments that the Protective Order was unconstitutional and violated his First Amendment rights are rejected. *See* Dkt. 437 at 16–17.

Second, Jonathan Mast argues that there is not a valid decree because the Court lacks subject matter jurisdiction. *See* Dkt. 437 at 2–8. The Court has already addressed challenges to the Court's subject matter jurisdiction at length, and concluded that the Court has subject matter jurisdiction namely on account of diversity of citizenship. *See* MTD Mem. Op. at 26–61.[46] Jonathan Mast argues that one of the original individual defendants, Ahmad Osmani, should be treated as an alien for purposes of the subject matter jurisdiction analysis, and that having aliens as both plaintiffs and defendants defeats diversity jurisdiction. *See* Dkt. 437 at 2–3. The record is clear, however, that Osmani is a United States citizen, as he has represented in the Virginia state court proceedings, *see* Dkt. 267 at 8–9 nn. 3–4, Dkt. 283 at 2465–66 (representation by counsel), and therefore the Court is not confronted with the circumstance Jonathan hypothesizes. Further, Jonathan devotes several pages to his brief addressing the jurisdictional implications of

---

[46] To be sure, Jonathan Mast did not have the benefit of the Court's ruling on Defendants' motions to dismiss when he filed this submission contesting Plaintiffs' motion to hold him in civil contempt.

Plaintiffs' inclusion of federal "nominal defendants," apparently without recognizing that they have since been dismissed from the case. Dkt. 270. In any event, as "nominal defendants," they are disregarded for purposes of diversity jurisdiction. *See Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 260 (4th Cir. 2013); *Payne v. Bank of Am., N.A.*, No. 3:09-cv-80, 2010 WL 546770, at *4 (W.D. Va. Feb. 11, 2020); *cf. Doe v. Mast*, No. 3:22-cv-49, 2023 WL 4492466, at *4 (W.D. Va. July 12, 2023) (recognizing that "no claims have been asserted against" them, meaning that they are "nominal" parties in the action).[47]

Third, Defendants argue that Plaintiffs have failed to show by clear and convincing evidence that the "movant suffered harm as a result" of their violations of the Protective Order. *See* Dkt. 415 at 19–20. Defendants appear to have confused the requirement that the movant "suffered harm" with a requirement of "actual harm" or something akin to "tangible" harm. *See* Dkt. 239 at 9. But that is not the law. In similar circumstances, the Fourth Circuit has held that "monetary loss" is not required to constitute "harm," and that "informational harms" can suffice to satisfy the element. *See Klopp*, 957 F.3d at 465–66; *cf. Rainbow Sch., Inc. v. Rainbow Early Educ. Holding, LLC*, 887 F.3d 610, 619 (4th Cir. 2018) (holding that trademark confusion and dilution can constitute "harm" to support a contempt order). These and other cases show that Defendants' myopic emphasis on "actual harm" in the context of this case specifically, would make little sense in practice.

Put simply, it beggars belief that the Court would have to wait for *physical harm* to *actually* befall Plaintiffs' families in Afghanistan to impose a contempt sanction for a litigant's failure to abide by the terms of the Protective Order. For the reasons set forth above, the Court

---

[47] In view of the Court's opinion addressing subject matter jurisdiction, the Court need not address Jonathan Mast's challenges to federal question jurisdiction. *See* Dkt. 437 at 5–8.

has found that the risk of physical harm to Plaintiffs' families is anything but hypothetical or speculative, but rather it is concrete, supported by ample evidence. *See supra* at 11–15. By disclosing information identifying Baby Doe, accessible on the internet everywhere including to those in Afghanistan, Joshua and Jonathan put the safety of Plaintiffs' family members in Afghanistan in jeopardy. They have thus rendered it more likely that Plaintiffs' families will be recognized, and subject to reprisals based on, for example, a mistaken belief that John Doe had worked for the U.S. government. Therefore the Court finds by clear and convincing evidence that Plaintiffs have "suffered harm from the violation" of the Protective Order. *See Ashcraft*, 218 F.3d at 301.

      Fourth, Joshua and Jonathan Mast argue that, even if Plaintiffs have established the elements of civil contempt, the Court cannot hold them in contempt because they "took all reasonable steps to comply with the Protective Order." Dkt. 415 at 20–21; Dkt. 437 at 12. The Court finds that Joshua and Jonathan have not met their burden to demonstrate that they "made in good faith all reasonable efforts to comply" with the Protective Order. *See De Simone*, 36 F.4th at 529. Indeed, the weight of persuasive evidence is decidedly to the contrary. Joshua Mast's argument in this regard is that he and Stephanie Mast "did not ask or direct Jonathan Mast to speak to anyone—including [PHF]—on their behalf." Dkt. 415 at 21. And he argues that the Masts did not "provide Jonathan with any of the photos that were provided to PHF." *Id.*; *see also* Dkt. 437 at 12–13.

      These arguments overlook a clear point—Joshua and Jonathan Mast each provided dozens of individual identifying photos of Baby Doe to PHF, either directly emailing them or by sending PHF a link to a Google photo album containing hundreds of such photos. At the time they sent the photos, neither Joshua or Jonathan informed PHF of the Protective Order; sought to

get PHF to execute a non-disclosure agreement, as the Protective Order provided; or in any way suggested the photos should be treated with any measure of confidentiality at all—instead, the transmission of Baby Doe's identifying photos to PHF was for use in a public fundraising campaign for the Masts' legal defense. Ironically, the Masts' intended use of Baby Doe's photos on an internet and social media fundraising campaign, as well as on a news broadcast, significantly undermined the Masts' claimed efforts to secure *Baby Doe* a measure of privacy and confidentiality in this litigation, through use of a pseudonym and other measures.[48] Moreover, the Court finds that the weight of the evidence is that Joshua Mast did not even mention the so-called "gag order" to PHF for months after he sent them these photos.[49]

Whatever added insulation in legal liability Joshua and Jonathan Mast thought they were accomplishing by structuring their relationship with PHF in the manner they did, the evidence establishes that Jonathan Mast was serving as Joshua's representative throughout, and regularly apprised him about developments in the fundraising campaign. Nor is the Court persuaded by Jonathan's argument he should be considered to have taken all reasonable efforts to comply, because he requested that PHF remove identifying photos of Baby Doe once "it came to [his] attention that the production of photographs may prove subject to the Court Order." Dkt. 437 at 18. At most, that would support that he gave "some effort" to complying, which is not the relevant inquiry. The Court finds, collectively as well as individually, that Joshua and Jonathan Mast have not met their burden to show that they undertook in good faith all reasonable efforts to comply with the Protective Order.

---

[48] *See* Dkt. 130 at 14 (agreeing to anonymity for Baby Doe, and stating that "Baby Doe should continue to be protected through the use of her initials").

[49] *See, e.g.*, Disarro Decl. ¶¶ 23–24, 54–55.

For these reasons, the Court **finds** that **Plaintiffs have established, by clear and convincing evidence, all elements of civil contempt**: the Protective Order was a valid decree of which Joshua and Jonathan Mast had both actual and constructive knowledge; the Protective Order was a decree in Plaintiffs' favor; Joshua and Jonathan each, by their conduct, violated the terms of the decree and had at least constructive knowledge of such violations; and Plaintiffs suffered harm as a result. The Court further **finds** that Joshua and Jonathan Mast have not established that they took in good faith all reasonable steps to comply with the Protective Order, and as such, are not entitled to the defense from civil contempt. Accordingly, the Court **finds** Joshua and Jonathan Mast in **civil contempt**.

Plaintiffs have sought from Joshua and Jonathan Mast "the payment of Plaintiffs' attorney's fees related to the prosecution of this motion," as the appropriate sanction for the contumacious conduct. Dkt. 403 at 27. The Court **finds** the payment of reasonable attorney's fees Plaintiffs incurred in connection with the prosecution of this motion to show cause, to be reasonable and appropriate as a remedy for the contempt. *See In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (explaining that remedies for civil contempt "include ordering the contemnor to reimburse the complainant for losses sustained and for reasonable attorney's fees"); *see also id.* ("remedies and sanctions [for civil contempt] must be remedial and compensatory and, unlike criminal contempt, nonpunitive"). The Court further **finds** that the award of reasonable attorney's fees is a nonpunitive remedy that uses the least possible power necessary to ensure Joshua and Jonathan Mast's compliance with the Protective Order. *See Spallone v. United States*, 493 U.S. 265, 275 (1990). The Court will therefore direct Plaintiffs to

file a motion for reasonable attorney's fees incurred in connection with the prosecution of this specific motion to show cause, within thirty days of the issuance of this decision.[50]

<u>**Conclusion**</u>

For the aforementioned reasons, the Court has determined, and hereby issues the following **ORDERS**, that:

(1) Defendants' Motions to Amend, Modify, or Vacate the Protective Order will be and hereby are **DENIED**. Dkts. 130, 176, 442.

(2) Plaintiffs' Motion to Show Cause and Supplemental Motion to Show Cause Why Joshua and Stephanie Mast Should Not Be Found in Contempt, with respect to the CBS interview, will be and hereby are **DENIED**. Dkts. 141, 142.

(3) Plaintiffs' Motion to Show Cause Why Joshua and Jonathan Mast Should Not Be Found in Contempt, will be and hereby is **GRANTED**, to the extent set forth above. Dkt. 231.

(4) In view of the Court's decision granting Dkt. 231, Plaintiffs **shall file** any motion for reasonable attorney's fees incurred in connection with the prosecution of that motion, no later than **thirty (30) days** from the issuance of this decision.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion & Order to the parties.

Entered this 16th day of August, 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[50] Defendants will be entitled to respond in the usual course to the motion, should they, for example, wish to contest the amount or scope of such requested fees.

38