CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

September 30, 2024
LAURA A. AUSTIN, CLERK
BY   s/ S. MELVIN
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| JOHN DOE, et al., | ) | |
| Plaintiffs, | ) | Civil Action No. 3:22cv00049 |
| | ) | |
| v. | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| JOSHUA MAST, et al., | ) | By:   Joel C. Hoppe |
| Defendants. | ) | United States Magistrate Judge |

This matter is before the Court on three discovery motions related to Plaintiffs John Doe

and Jane Doe's requests for production of communications that Defendant Joshua Mast and/or

Defendant Stephanie Mast sent or received using email accounts owned by non-party Liberty

University, Inc. ("LU" or "Liberty"). ECF Nos. 345, 347, 358. Plaintiffs sought copies of these

emails from Defendants Richard Mast, Joshua Mast, and Stephanie Mast (together, "the Masts"[1])

via Plaintiffs' first set of Rule 34 requests served in December 2022, ECF No. 345-1, at 7–9, and

from LU via Rule 45 subpoenas served in March 2023 and February 2024, respectively, ECF No.

359-2, at 10–11; ECF No. 345-6, at 10.[2] In early 2023, the Masts responded that they were

withholding roughly 220 emails, sent from or to certain LU email accounts, that the Masts

considered to be privileged and/or protected attorney-work product. *See* ECF No. 361 (Defs. J&S

Mast); ECF No. 359-6 (Def. R. Mast).[3] Thus, Plaintiffs initially agreed that LU did not need to

---

[1] Joshua and Stephanie Mast are a married couple who, beginning in the fall of 2019, obtained a series of
Virginia state-court custody and adoption orders for the foreign-born child referred to in this action as
"Baby Doe." *See generally Doe v. Mast*, --- F. Supp. 3d ---, 2024 WL 3524070, at *1–7 (W.D. Va. July
24, 2024) (Moon, J.). Richard Mast is Joshua's brother and Stephanie's brother-in-law. *Id.* at *3–4. He is
also a Virginia attorney who represented Joshua and Stephanie in the Virginia state-court proceedings, as
well as in a federal-court action related to Baby Doe filed in February 2020. *See id.* at *3–5. Richard does
not represent Joshua or Stephanie in this civil action, 3:22cv49 (W.D. Va.).

[2] Pinpoint citations to documents filed on the electronic docket use the header page numbers generated by
CM/ECF and the exhibit labels assigned by the filing party.

[3] The Masts' privilege logs also list emails that Richard, Joshua, or Stephanie sent or received using
accounts ending in @gmail.com, @lc.org, @mail.mil, or @mac.com. *See id.* Plaintiffs do not challenge

1

produce those same emails in response to Plaintiffs' first Rule 45 subpoena. ECF No. 359-3

(Apr. 6, 2023). Liberty withheld these emails from their spring 2023 production. *See id.*

Plaintiffs later determined that "LU's policy regarding the use of its email system"

defeated the Masts' expectation that the contents of any communication sent or received using

their LU email accounts would remain confidential. Pls.' Combined Br. 8, ECF No. 359 (citing

ECF No. 345-4); *see* Def. R. Mast's Mot. Prot. Order 7–8 (citing meet-and-confer emails

exchanged on December 6, 2023), ECF No. 345.[4] In February 2024, "Plaintiffs served a second

subpoena on LU, seeking the LU emails that previously were withheld [by Liberty] based on

J&S Mast's assertion that they were privileged."[5] Pls.' Combined Br. 8; *see* ECF No. 345-6, at 2,

5, 10. This subpoena directs Liberty to produce "[a]ll communications relating to" three

---

[4] the Masts' privilege designations with respect to those accounts. Instead, they appear to focus on the emails sent from or to any account ending in @liberty.edu. *See, e.g.*, Pls.' Combined Br. 8 n.11 ("A handful of the communications withheld by Richard Mast involve an LU email account belonging to a third party, such as Richard Mast's law clerk (hwbradburn@liberty.edu).").

[4] Richard notes that Plaintiffs' meet-and-confer emails cited two Fourth Circuit decisions in cases on appeal from criminal convictions, *United States v. Hamilton*, 701 F.3d 404 (4th Cir. 2012), and *United States v. Simons*, 206 F.3d 392 (4th Cir. 2000), to support this determination. *See* Def. R. Mast's Mot. Prot. Order 7–8, 12–14. The Masts' opening briefs demonstrate that the facts in this case are materially different from the facts in *Hamilton*, 701 F.3d at 408–09, and in *Simons*, 206 F.3d at 395, 398–99, and persuasively explain why those decisions do not support Plaintiffs' position that Joshua waived the asserted privileges by using his personal LU email account to send or receive the contested emails. *See* Def. R. Mast's Mot. Prot. Order 12–14 (distinguishing *Simons*, 206 F.3d at 391, 398–99); Defs. J&S Masts' Br. in Supp. 8–9 (distinguishing *Hamilton*, 701 F.3d at 408). Plaintiffs' waiver arguments in their response brief primarily rely on *In re Asia Global Crossing*, 322 B.R. 247 (Bankr. S.D.N.Y. 2005), which set out a four-factor test to determine whether an employee has an objectively reasonable "expectation of privacy in his [personal] files and email" created, sent, or stored on systems owned and controlled by his employer, *id.* at 257. *See generally* Pls.' Combined Br. 17–21 (discussing the four *Asia Global* factors). The Masts addressed the *Asia Global* factors in their respective reply briefs. *See* Def. R. Mast's Reply 6–10; Defs. J&S Masts' Reply & Br. in Opp'n 5–13. Below, I explain why *Asia Global* is not persuasive authority in this case.

[5] Plaintiffs generally refer to Defendant Joshua Mast and Defendant Stephanie Mast using the singular moniker "J&S Mast." *See, e.g.*, Pls.' Combined Br. 5–8. There is no evidence that Stephanie sent or received any relevant emails from her LU email account. *See id.* Ex. 3, at 2 ("A search of Stephanie Mast's Liberty email account of the same terms and exclusions returned no hits.").

categories of information[6] "that were (a) sent *by* Joshua Mast or Stephanie Mast *to*, or (b) sent *to* Joshua Mast and/or Stephanie Mast *from* each of the [twenty-four] email addresses" listed in Request No. 1. ECF No. 345-6, at 10 (emphasis added). This list includes four email accounts linked to Richard Mast, one LU email account linked to Richard's law clerk, and one gmail.com account linked to Hannon Wright, Esq., who represented Joshua and Stephanie in Virginia state court beginning in December 2021.[7] *Id.*; *see* Defs. J&S Masts' Br. in Supp. 4–5. Request No. 2 directs LU to produce "[a]ll communications *between* Joshua Mast *and* Stephanie Mast regarding" the same three categories of information. ECF No. 345-6, at 10 (emphasis added); *see* Defs. J&S Masts' Br. in Supp. 4–5.

Defendant Richard Mast and Defendants Joshua and Stephanie Mast promptly filed separate motions seeking to quash or modify Plaintiffs' second Rule 45 subpoena to LU and for protective orders forbidding production of the contested emails. *See* Def. R. Mast's Mot. Prot. Order (citing Fed. R. Civ. P. 26(c)(1), 45(d)(3)(A)), ECF No. 345; Defs. J&S Masts' Mot. Prot. Order (citing Fed. R. Civ. P. 26(c)(1), 45(d)(3)(A)), ECF No. 347.[8] Plaintiffs John and Jane Doe opposed the Masts' motions for a protective order, ECF No. 359, and filed a cross-motion asking

---

[6] Those categories are: "(1) a child located at any time in Afghanistan and/or that child's relatives or caregivers, (2) a child purportedly adopted by Joshua and Stephanie Mast, and/or (3) court proceedings initiated by or filed against Joshua Mast and/or Stephanie Mast relating to the custody and/or adoption of a child." ECF No. 345-6, at 10.

[7] Those accounts are: rmast@lc.org; rlmast@liberty.edu; rlmast@protonmail.com; richard.l.mast.jr@gmail.com; hwbradburn@liberty.edu; and hannonwright@gmail.com. *See* ECF No. 345-10.

[8] Plaintiffs' subpoena requires LU to produce the contested emails at a law firm in Richmond, ECF No. 345-6, at 2, which is in the Eastern District of Virginia, 28 U.S.C. § 127(a). *See* Fed. R. Civ. P. 45(d)(3)(A) (giving "the court for the district where compliance is required" primary authority over motions to quash or modify non-party subpoenas issued in actions that are pending in other federal district courts). Liberty did not ask this Court to quash or modify this subpoena. Accordingly, I consider the Masts' motions under Rule 26(c)(1) of the Federal Rules of Civil Procedure. *See, e.g.*, *Singletary v. Sterling Transp. Co., Inc.*, 289 F.R.D. 237, 240–41 & n.2 (E.D. Va. 2012).

3

the Court to compel the Masts to produce any such emails in their possession, as Plaintiffs

previously requested under Rule 34, Pls.' Cross Mot. (citing Fed. R. Civ. P. 37(a)), ECF No. 358.

The motions have been fully briefed and argued. Def. R. Mast's Mot. Prot. Order, ECF No. 345;

Defs. J&S Masts' Br. in Supp., ECF No. 347-1; Pls.' Combined Br., ECF No. 359; Def. R.

Mast's Reply & Br. in Opp'n, ECF No. 369; Defs. J&S Masts' Reply & Br. in Opp'n, ECF No.

374; Pls.' Reply Def. R. Mast, ECF No. 375; Pls.' Reply Defs. J&S Mast, ECF No. 380; Tr. of

Tele. Mots. Hr'g 52–82, ECF No. 454.

## I. Summary

The motions concern a dispute over 220 emails that Joshua Mast "sent or received using

his LU email account," jkmast@liberty.edu, between October 13, 2019 and March 30, 2022; and

one (1) email that Richard Mast sent from his LU email account, rlmast@liberty.edu, on

November 9, 2019.[9] Pls.' Combined Br. 7–8 & nn.10, 11 (citing Pls.' Combined Br. Am. Ex. 5

(Plaintiffs' excerpts from J&S Masts' final privilege log), ECF Nos. 361, 368-2; *id.* Ex. 6

---

[9] I refer to these 221 emails as the "contested LU emails." Pls.' Combined Br. 8. Notably, while Plaintiffs use the phrase "LU email account" (and similar descriptive terms) throughout their briefs, they never clearly explain what an "LU email account" is. *See generally id.* at 6–9, 11–12, 15–16, 20–21; Pls.' Reply Defs. J&S Mast 3–5; Pls.' Reply Def. R. Mast 1–2, 5–9. Based on the parties' briefing and exhibits, it appears that an "LU email account" is a Liberty University student, faculty, staff, or alumni email address that ends in "@liberty.edu." Tr. of Tele. Mots. Hr'g 71–72; *see, e.g.*, Pls.' Combined Br. 8–15 (discussing LU's current Acceptable Use Policy attached as Exhibit 4 to Richard's motion, which applies to "[a]ll University Students, Faculty, Staff, and Alumni"); Defs. J&S Masts' Br. in Supp. 2 (referencing "communications sent or received by Joshua's legacy student and alumni email account"); Def. R. Mast's Mot. Prot. Order Ex. 4, Liberty Univ., Inc. Info. Servs. Office, Acceptable Use Policy (last revised July 2020), ECF No. 345-4, at 1, 4, 12; *id.* Ex. 3, Decl. of Richard L. Mast ¶¶ 3–8 (distinguishing between his LU email address, rlmast@liberty.edu, and his Liberty Counsel employee email address, rmast@lc.org) (Feb. 25, 2024), ECF No. 345-3; Defs. J&S Masts' Reply & Br. in Opp'n Ex. 1, Decl. of Joshua K. Mast ¶ 2 ("I attended Liberty University for my undergraduate degree and later for law school, and was assigned the email address jkmast@liberty.edu in approximately 2005. I have maintained this Liberty University email account ever since, as Liberty University continues to provide access to student alumni email addresses for life.") (Mar. 25, 2024), ECF No. 374-1.

(Plaintiffs' excerpts from R. Mast's final privilege log), ECF No. 359-6)); Defs. J&S Masts' Br.

in Supp. 7, 11; Tr. of Tele. Mots. Hr'g 71–72. More specifically, Plaintiffs seek production of:

(i)     117 emails that Joshua sent or received using his LU email account and which Joshua and Stephanie's final privilege log identifies as:

    a.  privileged attorney-client communications (45 emails);

    b.  both privileged attorney-client communications and protected attorney-work product (69 emails);

    c.  or both privileged attorney-client communications and privileged inter-spousal communications (3 emails).

*See* Pls.' Combined Br. 7–8 & n.10 (citing *id.* Am. Ex. 5, ECF Nos. 361, 368-2); Defs. J&S Masts' Br. in Supp. 11.

(ii)    64 additional emails that Joshua received (but did not send) using his LU email account and which Richard's final privilege log[10] identifies as:

    a.  protected attorney-work product (5 emails); or

    b.  both protected attorney-work product and privileged attorney-client communications (59 emails).

*See id.* at 8 & n.11 (citing *id.* at Ex. 6, at 2–3). Joshua received 63 of these emails between October 22, 2019, and October 26, 2020. The 64th email was sent from Richard's work email address (rmast@lc.org) to another attorney on September 8, 2022. Joshua was copied on this message.

(iii)   One (1) "discussion of legal strategy; document draft anticipating litigation" that Richard sent using his LU email account, rlmast@liberty.edu, and which his final privilege log identifies as both protected attorney-work product and a privileged attorney-client communication. Pls.' Combined Br. Ex. 6, at 2.

(iv)    40 emails exchanged between Joshua's LU email account and Stephanie's mac.com email account and which their final privilege log identifies as privileged confidential spousal communications. *See* Pls.' Combined Br. 7–8 & n.10; Defs. J&S Masts' Br. in Supp. 11.

*See generally* Pls.' Combined Br. 7–8 & n.10; Defs. J&S Masts' Br. in Supp. 11.

---

[10] Plaintiffs note that Richard "also used an LU email account" and that his final privilege log "claims as privileged 65 communications . . . . that were sent *or* received using *either* Richard Mast's *or* Joshua Mast's LU email account," *id.* at 8 (emphasis added), between October 22, 2019, and September 8, 2022. *See id.* (citing *id.* Ex. 6, at 2–3). It appears that 64 of those 65 communications were sent by Richard using his Liberty Counsel employee email address, rmast@lc.org, and received by Joshua on his LU email account, jkmast@liberty.edu. Pls.' Combined Br. Ex. 6, at 2–3. Plaintiffs do not argue that Richard waived any privileges or protections by using his @lc.org account to send the contested LU emails.

The Masts argue that the attorney-client privilege and/or the attorney work-product

doctrine shield these emails from discovery, *see* Fed. R. Civ. P. 26(b), and that the Masts did not

waive those protections simply because they used their LU email accounts to send or receive

these emails. *See* Def. R. Mast's Mot. Prot. Order 8–15 (citing federal cases applying federal

common law); Defs. J&S Masts' Br. in Supp. 6–10 (same). Joshua and Stephanie make the same

argument with respect to 43 emails that they claim are protected by the marital-communications

privilege. *See* Defs. J&S Masts' Br. in Supp. 11–13 (citing federal cases applying federal

common law).

Plaintiffs contend that "none of these privileges survived contact with LU's email

system," Pls.' Combined Br. 5, because the terms of the University's Acceptable Use Policy in

effect since June 2018, ECF No. 345-4 (last revised July 2020), destroys the Masts' "objectively

reasonable" intent to communicate "in confidence." Pls.' Combined Br. 17 (quoting *In re Asia

Global Crossing, Ltd.*, 322 B.R. 247, 258–59 (Bankr. S.D.N.Y. 2005)).[11] Thus, "Plaintiffs argue

---

[11] As noted, the parties briefed their motions relying primarily on the four-factor test set out in *In re Asia Global Crossing*, 322 B.R. 247 (Bankr. S.D.N.Y. 2005). *See* Tr. of Tele. Mots. Hr'g 61, 77. That case involved a motion to compel several individuals, all former officers of the debtor Asia Global, to comply with a subpoena seeking confidential emails that the officers sent from their work email accounts to their personal attorneys before Asia Global declared bankruptcy. *See id.* at 251–53. The bankruptcy judge, expressly applying federal common law governing attorney-client privilege, *id.* at 254–55, "looked toward the Fourth Amendment reasonable expectation of privacy standard to determine the reasonableness of [the officer's] intent that the communications remain confidential." *Sprenger v. Rector & Bd. of Visitors of Va. Tech.*, No. 7:07cv502, 2008 WL 2465236, at *3 (W.D. Va. June 17, 2008) (citing *Asia Global*, 322 B.R. at 258); *see generally Asia Global*, 322 B.R. at 255–59. The judge explained that, "[i]n general," a court trying to determine if an employee had an "objectively reasonable" expectation of privacy in his personal files or emails created, sent, or stored on systems owned and controlled by his employer should consider four factors:

> (1) does the corporation maintain a policy banning *personal or other objectionable* use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or emails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

*Asia Global*, 322 B.R. at 257 (emphasis added). All four *Asia Global* factors mirror the Fourth Amendment standard for determining when an "unreasonable search" has occurred, *see, e.g.*, *Simons*, 206 F.2d at 398, and federal common law governing privileges afforded to certain kinds of confidential

communications, *see, e.g.*, *Hamilton*, 701 F.3d at 408–09 (marital privilege) (citing *Asia Global*, 322 B.R. 257). The first factor also derives from common-law agency principles, *see* Tr. of Tele. Mots. Hr'g 58–63, 77, which makes it particularly helpful in "determining whether *employees* have an expectation of privacy in emails sent and received *on their employer's* domain," Pls.' Combined Br. 17 (emphasis added). *See* Pls.' Combined Br. 17–18 n.59 (citing district court cases applying *Asia Global* in this context); *accord Doe 1 v. George Wash. Univ.*, 480 F. Supp. 3d 224, 226 n.2 (D.D.C. 2020) (concluding that federal-court decisions addressing whether an employee waives attorney-client privilege by using a work-issued email account to communicate with his or her attorney were "sufficiently analogous" to whether "a student/employee who uses a university-issued email account to communicate with his or her attorney has waived the attorney-client privilege," and noting that applying this traditional employee-employer framework is "particularly appropriate where the student is also an employee of the university"). Plaintiffs do not cite any cases applying the *Asia Global* factors in determining whether university *alumni* have an expectation confidentiality in emails sent and received *on their alma mater's* domain. *See* Tr. of Tele. Mots. Hr'g 58–61, 77.

Plaintiffs cite one district court decision applying *Asia Global* in the context of current university student-employees who used their university-issued email accounts to communicate with counsel. *See generally* Pls.' Combined Br. 17–19 nn. 59, 63, 65 (citing *Doe 1*, 480 F. Supp. 3d at 227). In *Doe 1*, five then-current "student/employees" at George Washington University filed suit under Title IX, 20 U.S.C. § 1681, alleging that they were sexually harassed while employed through the federal work-study program. *See Doe 1*, 480 F. Supp. 3d at 224, 228–29. All five student-employees used their GW-issued email accounts to communicate with their personal attorneys about the events at issue in that lawsuit. *See id.* at 225. The university therefore had copies of those emails, which plaintiffs asserted were protected by attorney-client privilege, in its possession without plaintiffs producing or disclosing them in discovery. Applying the *Asia Global* framework, the district court concluded that four of the student-employees "effectively waived the attorney-client privilege when they used their GW-issued e-mail accounts to communicate with their attorneys," *id.* at 230, because the record demonstrated that those individuals had to click on a link accepting the terms of GW's email policy when they set up their university-issued email accounts in 2016. *See id.* at 226–28, 230. GW's email policy in effect at the time "caution[ed] students that [they] have no right of personal privacy" in the content of any message or attachment "they send or receive using the GW email system" and "provided that [GW] may search, review, monitor, or copy any email sent to or from a GW email account for approved purposes only, including . . . gathering information potentially relevant to legal claims by or against GW." *See id.* at 227 (brackets omitted). The court upheld the fifth student-employee's privilege assertion because "the evidence submitted by the defendants [did] not clearly show whether [she] agreed to GW's e-mail policy and, if she did, what the terms of that policy were when that occurred." *Id.* at 228 (noting that Jane Doe 1 set up her GW-email account in 2014).

Plaintiffs' reliance on *Doe 1* is not persuasive. First, that decision explicitly relied on federal common law in a case asserting a federal cause of action. *See generally Doe 1*, 480 F. Supp. 3d at 225–30. A federal court sitting in diversity, on the other hand, must apply the forum state's laws governing privileges and waiver. *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 285 n.5 (4th Cir. 2000) ("[I]n a diversity action the availability of an evidentiary privilege is governed by the law of the forum state." (citing Fed. R. Evid. 501)). Here, Plaintiffs assert claims under state law, invoking the Court's diversity jurisdiction. Second, unlike the plaintiffs in *Doe 1*, Joshua and Richard were not "student/employees" of Liberty, 480 F. Supp. 3d at 226 n.2, when they used their LU email accounts to send or receive the contested emails in 2019–2022. They were LU alumni who continued to use the original email accounts that they were assigned as undergraduates in 2005. *See* R. Mast Decl. ¶ 3; J. Mast Decl. ¶ 2. Finally, as explained below, the record in this case "does not clearly show whether [Joshua or Richard] agreed to [LU's] e-mail policy, and if [they] did, what the terms of that policy were when that occurred," *Doe 1*, 480 F. Supp. 3d at 229. Under Virginia law, that information is relevant to whether the contested LU emails are privileged from

7

that, to the extent that any of the communications at issue would otherwise qualify for protection, any applicable privilege was waived" when the Masts used LU's email system to send or receive them. Pls.' Reply Defs. J&S Mast 4 n.11; *accord* Pls.' Combined Br. 16–25 (arguing that the Masts waived any work-product protections by using their LU email accounts to send or receive the contested emails); Pls.' Reply Defs. J&S Mast 4 ("J&S Mast waived any attorney-client or marital privilege when they chose to use LU's email system to transmit the disputed emails."); Pls.' Reply Def. R. Mast 12–14 ("[T]he Masts' handling of the [d]isputed [e]mails resulted in wholesale wavier of any work-product protection.").

Separately, Plaintiffs assert that the Masts cannot claim work-product protection for any of the contested emails exchanged "before December 8, 2021, the date Plaintiffs sought to vacate the adoption order in the parallel state court litigation." Pls.' Combined Br. 23. They argue that these emails are associated only with the Virginia state-court custody and adoption proceedings, and that any such proceedings prior to December 8, 2021, "were not 'litigation' for the purposes of the work product doctrine" because they were "ex parte" and "not adversarial." *Id.* at 22. Plaintiffs do not suggest that Virginia custody and adoption proceedings are *inherently* non-adversarial. *See id.* at 21–23; Pls.' Reply Def. R. Mast 9–12. Rather, it was the Masts' failure to notify "other parties with interest" in Baby Doe that rendered the pre-December 8, 2021 proceedings ex parte and non-adversarial. Pls.' Combined Br. 22; *see id.* at 23 ("There is no reason to protect the adversarial process when there is no adversary."); Pls.' Reply Def. R. Mast 9–12 (arguing the same). Richard's final privilege list identifies five (5) emails falling into this

---

discovery in this case. *See generally Walton v. Mid-Atl. Spine Specs., P.C.*, 694 S.E.2d 545, 551–52 (Va. 2010); *Banks v. Mario Indus. of Va.*, 650 S.E.2d 687, 695–96 (Va. 2007).

category. *See* Pls.' Combined Br. Ex. 6, at 2. Richard sent these emails to his law clerk "HWB" (hwbradburn@liberty.edu) in February and March 2020. *See id.*

For the reasons explained below, I find that the Masts have shown that the asserted privilege or protection applied to the contested LU emails and that the privilege or protection was not waived simply because the Masts used LU's email system to send or receive those communications. Accordingly, I will grant the Masts' motions for a protective order, ECF No. 345, 347, and deny Plaintiffs' cross motion to compel, ECF No. 358. Each party will bear its own expenses. *See* Fed. R. Civ. P. 26(c)(3), 37(a)(5)(B).

## II. The Legal Framework

"Unless otherwise limited by court order," parties to a federal civil action "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). "But those materials may be discovered if 'they are otherwise discoverable under Rule 26(b)(1)' and the party seeking discovery 'shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'" *In re Grand Jury 2021 Subpoenas*, 87 F.4th 229, 252 (4th Cir. 2023) (quoting Fed. R. Civ. P. 26(b)(3)(A)(i)–(ii)).

Rule 26(b)(1) contemplates that pretrial discovery will be "broad in scope and freely permitted." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003). "Generally, the burden is on the party resisting discovery to clarify and explain precisely why its objections are proper," *United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 411 (D. Md. 2005), under Rule 26(b) or "consistent with recognized privileges," *Hickman v. Taylor*,

329 U.S. 495, 501 (1947). *See, e.g.*, *Kinetic Concepts, Inc. v. ConvaTec, Inc.*, 268 F.R.D. 226, 243–44 (M.D.N.C. 2010) (the party opposing a Rule 37(a) motion must show why it should not be compelled to produce discovery otherwise allowed under Rule 26(b)(1)); *Baron Fin. Corp. v. Natanzon*, 240 F.R.D. 200, 202 (D. Md. 2006) (the party seeking a Rule 26(c) protective order must show good cause why it should issue); Fed. R. Civ. P. 26(b)(5) (the party withholding otherwise discoverable information by claiming that it is privileged or protected under Rule 26(b)(3) must "expressly make the claim" and describe the nature of the materials withheld "in a manner that . . . will enable other parties to assess the claim"). District courts have "broad discretion to manage discovery and make discovery rulings." *W.S. v. Daniels*, 258 F. Supp. 3d 640, 643 (D.S.C. 2017 (citing *U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002) ("We afford substantial discretion to a district court in managing discovery and review discovery rulings only for abuse of that discretion.")).

A.      *Choice of Law*

The Masts object to Plaintiffs' requests to produce the contested LU emails on grounds that those emails are protected by the attorney-client privilege, the work-product doctrine, and/or the marital-communications privilege. Both federal law and Virginia law recognize all three protections. *E.g.*, *Wolfle v. United States*, 291 U.S. 7, 14–15 (1934) (discussing the marital-communications privilege); *Doe v. Bedford County*, No. 6:19cv43, 2020 WL 2832226, at *1, *5–11 (W.D. Va. May 29, 2020) (Moon, J.) (discussing the attorney-client privilege and attorney-work product doctrine); *Brownfield v. Hodous*, No. CL09-183, 2011 WL 7493287, at *2–3 (Va. Cir. Ct. Mar. 3, 2011) (discussing Virginia's attorney-client and marital-communications privileges (citing Va. Code § 8.01-398)). The Court therefore must decide which law(s) applies to the pending motions. *Smith v. Scottsdale Ins. Co.*, 40 F. Supp. 3d 704, 716 (N.D. W. Va. 2014)

10

("When the Court's jurisdiction is based upon the diversity of the parties it applies state law regarding the attorney client privilege and federal common law to claims of work-product protection."), *aff'd*, 621 F. App'x 743, 745 (4th Cir. 2015); *Asia Global*, 322 B.R. at 254–55 (concluding that federal common law applied to attorney-client privilege questions arising in the context of a Rule 2004 subpoena duces tecum issued in a bankruptcy-court proceeding, and rejecting debtor's argument that California law applied).

The parties' arguments on all three issues cite federal court decisions explicitly applying federal common law, including several published Fourth Circuit decisions in criminal matters. *See generally* Def. R. Mast's Mot. Prot. Order 4–5, 10–15; Defs. J&S Masts' Br. in Supp. 6–12; Pls.' Combined Br. 3–4, 16–24; Def. R. Mast's Reply 3–4, 6–15; Defs. J&S Masts' Reply & Br. in Opp'n 3–4. Federal law applies to privilege questions arising in a federal criminal action, *see, e.g.*, *Hamilton*, 701 F.3d at 406 (marital-communications privilege on appeal from conviction); *Simons*, 206 F.3d at 395 (attorney-client privilege on appeal from conviction); *United States v. Jones*, 696 F.2d 1069, 1070 (4th Cir. 1982) (attorney-client privilege on appeal from an order denying motion to quash grand jury subpoena), and in "a civil case based upon a *federal* cause of action," *Hawkins v. Stables*, 148 F.3d 379, 382 (4th Cir. 1998) (emphasis added) (citing Fed. R. Evid. 501); *see, e.g.*, *Sprenger*, 2008 WL 2465236, at *1, *5 (granting motion to quash a subpoena issued in a federal-question case); *Asia Global*, 322 B.R. at 254 (denying motion to compel compliance with a subpoena issued in a bankruptcy case). In a diversity case based on a *state* law cause of action, however, the forum state's law governing privileges and waivers apply. *Ashcraft*, 218 F.3d at 285 n.5; *see, e.g.*, *Doe*, 2020 WL 2832226, at *1, *5–11 (denying county's motions to claw back "a purportedly privileged report" and applying Virginia law in concluding that the county waived any attorney-client privilege by inadvertently disclosing the document to

opposing counsel and then failing to take prompt and reasonable steps to rectify its error) (citing *Walton*, 694 S.E.2d at 551–52); *Harleysville Ins. Co. v. Holding Funeral Home*, No. 1:15cv57, 2017 WL 4368617, at *5–8 (W.D. Va. Oct. 2, 2017) (Jones, J.) (in a diversity action, applying Virginia law in concluding that plaintiff's inadvertent disclosure of attorney-client privileged materials did not waive the privilege); *cf. Smith v. Scottsdale Ins. Co.*, 621 F. App'x 743, 745 (4th Cir. 2015) (noting that the forum state's privilege laws apply in a diversity action) (citing Fed. R. Evid. 501); *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 107 & n.1 (4th Cir. 1995) (same); *Seidman v. Fishburne-Hudgins Educ. Found.*, 724 F.2d 413, 414–15 & n.1 (4th Cir. 1984) (same).

This is a diversity action involving state-law tort claims. *See generally Mast*, 2024 WL 3524070, at *12–23, *28, *36–46. Thus, Virginia law determines whether the Masts can show the contested LU emails are privileged communications and, if so, that they did not waive the applicable privilege by using their LU email accounts to send or receive those communications. *See Harleysville Ins. Co.*, 2017 WL 4368617, at *5 (attorney-client privilege); *cf. McSweeny v. Kahn*, No. 4:05cv132, 2008 WL 11333599, at *9 (N.D. Ga. Aug. 7, 2008) (in a diversity action, applying Georgia law governing the marital-communications privilege). Richard's final privilege log also identifies five contested LU emails that are not privileged communications, but that he claims are shielded from discovery as attorney-work product. *See* Pls.' Combined Br. Ex. 6, at 2. Those claims are governed by Rule 26(b) and federal common law. *Harleysville Ins. Co.*, 2017 WL 4368617, at *5 (citing *Cont'l Cas. Co. v. Under Armour, Inc.*, 537 F. Supp. 2d 761, 769–70 (D. Md. 2008)); *Smith*, 40 F. Supp. 3d at 716.

B.     *Virginia Privilege Law*

Virginia recognizes both the attorney-client privilege and a marital-communications privilege. *Walton*, 694 S.E.2d at 549 (attorney-client communications); Va. Code § 8.01-398 (2005) (codifying a marital-communications privilege in most civil cases); *see Brownfield*, 2011 WL 7493287, at *2–3 (discussing both privileges in the context of denying a motion to compel production of confidential attorney-client communications made in the presence of client's spouse). The party invoking either privilege bears the burden to show that it applies to the communication at issue and that it has not been waived by the privilege holder's conduct. *See Walton*, 694 S.E.2d at 554 (attorney-client); *cf. Thomas v. Commonwealth*, 850 S.E.2d 400, 407 (Va. Ct. App. 2020) (a witness asserting a testimonial privilege, including "the spousal privilege [and] the attorney client privilege" bears the burden of demonstrating his or her entitlement to it).

     *1.*    *Confidential Attorney-Client Communications*

"As a general rule, confidential communications between an attorney and his or her client made in the course of that relationship and concerning the subject matter of the attorney's relationship are privileged from disclosure." *Walton*, 694 S.E.2d at 549. "The attorney-client privilege may be expressly or impliedly waived by the client's conduct." *Id.*; *accord Commonwealth v. Edwards*, 370 S.E.2d 296, 301 (Va. 1988) ("The privilege may be expressly waived by the client, or a waiver may be implied from the client's conduct. The waiver, like the privilege belongs to the client and not to the attorney.") (internal citation omitted). Joshua and Stephanie did not expressly waive an asserted privilege with respect to the contested LU emails. Instead, Plaintiffs appear to argue that (1) Joshua inadvertently "disclosed" his confidential attorney-client and inter-spousal communications to a third party (i.e., Liberty University, Inc.) by using his LU email account to send or receive the messages, and (2) such disclosure "waived" the asserted privilege because LU's email policy in effect since July 28, 2020, made very clear

that users had no expectation of privacy or confidentiality in the content of their emails. *See generally* Pls.' Combined Br. 9–20, 23–25.

In Virginia, an "inadvertent" disclosure occurs when the privilege holder's "failure to exercise proper precautions to safeguard" privileged materials allows a stranger to obtain or otherwise gain access to those materials. *Walton*, 694 S.E.2d at 551; *cf. Brownfield*, 2011 WL 7493287, at *2 ("The presence of a stranger to the lawyer-client relationship does not destroy confidentiality if another privilege protects the communications in the same way as the attorney-client privilege." (quoting Restatement (Third) of the Law Governing Lawyers § 71 cmt. b)). An inadvertent disclosure can waive the attorney-client privilege even if the client did not realize that a third party had access to material that the client intended to keep confidential. *Walton*, 694 S.E.2d at 551; *see also id.* at 554 ("For the proponent of the privilege to enjoy the benefits of the privilege, he or she must also bear the burden of taking sufficient measures to safeguard privileged documents."). Thus, "[w]hile knowingly, but mistakenly, producing a document may be an inadvertent disclosure, unknowingly providing access to a document by failing to implement sufficient precautions to maintain its confidentiality may also result in an inadvertent disclosure." *Id.* at 552. Once the trial court determines that the client inadvertently disclosed the specific materials that he claims are privileged, "it must then determine whether the attorney-client privilege has been waived for the items produced" or disclosed. *Id.*

"[T]here is no bright line rule for what constitutes [implied] waiver." *Id.* at 549; *see id.* at 552–54. In *Walton*, the Virginia Supreme Court adopted a "multi-factor analysis" for courts to apply in all cases involving inadvertent disclosure of otherwise privileged or protected materials. *Id.* at 552.[12] This fact-specific analysis "requir[es] the court to assess whether the holder of the

---

[12] The *Asia Global* factors, on the other hand, are not universally applicable. *See* 322 B.R. at 251, 257–58. They were designed specifically "to measure the employee's expectation of privacy in his [personal] files

privilege or protection took reasonable steps to prevent disclosure and promptly took reasonable steps to rectify the error." *Id.* Implied "wavier may occur if the disclosing party failed to take reasonable measures to ensure and maintain the document's confidentiality, or to take prompt and reasonable steps to rectify the error." *Id.* The *Walton* framework requires a court to consider "five primary factors" based on the relevant facts in each case:

> (1) the reasonableness of the precautions to prevent inadvertent disclosures, (2) the time taken to rectify the error, (3) the scope [and pace] of discovery, (4) the extent of the disclosure, and (5) whether the party asserting the claim of privilege or protection for the communication has used its unavailability for misleading or otherwise improper or overreaching purposes in the litigation, making it unfair to allow the party to invoke confidentially under the circumstances.

*Id.* at 552; *see id.* at 552–54. "None of these factors is independently dispositive" of whether the inadvertent disclosure waived the asserted privilege or protection. *Id.* at 552. "[T]he court must also consider any other factors arising from the posture of the case at bar that have a material bearing on the reasonableness issues." *Id.* "This approach balances concerns of fairness and the fundamental importance of protection of the privilege long recognized in Virginia law 'against the care or negligence with which the privilege is guarded.'" *Id.* (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103, 105 (S.D.N.Y. 1985)).

2.    *Confidential Spousal Communications*

Under Virginia law, "[i]n any civil proceeding, a person has a privilege to refuse to disclose, and to prevent anyone else from disclosing, any confidential communication between his spouse and him during their marriage, regardless of whether he is married to that spouse at

---

and e-mail" stored on systems owned and controlled by his employer, *see id.* at 257, considering "the company's e-mail policies regarding [personal] use and monitoring, its access to the e-mail systems, and the notice provided to the employees," *id.* at 259. *See, e.g.*, *id.* at 251 ("Assuming a communication is otherwise privileged, the [employee's] use of the company's e-mail system does not, *without more*, destroy the privilege." (emphasis added)).

the time he objects to disclosure."[13] Va. Code § 8.01-398. "For the purposes of this section, 'confidential communication' means a communication made privately by a person to his spouse that is not intended for disclosure to any other person." *Id.*

The Virginia Supreme Court "ha[s] construed the privilege embodied in this statute broadly to include 'all information or knowledge privately imparted and made known by one spouse to the other . . . through conduct, acts, signs, and spoken or written words,'" *Burns v. Commonwealth*, 541 S.E.2d 872, 889–90 (Va. 2001) (quoting *Menefee v. Commonwealth*, 55 S.E.2d 9, 15 (Va. 1949)).[14] *Cf. Brownfield*, 2011 WL 7493287, at *2 (concluding that § 8.01-398's current text "recognizes a spousal privilege that protects the [couple's] communications in the same way as the attorney-client privilege" protects confidential communications between a client and her attorney (quotation marks omitted)). "[T]he word 'privately' as used in the statute is . . . synonymous with confidential." *Thomas v. First Nat'l Bank*, 186 S.E. 77, 83 (Va. 1936) (emphasis omitted). Thus, whether the privilege applies to an inter-spousal communication "depends 'upon the nature of the communication [and] whether it was intended to be secret or confidential.'" *Edwards v. Commonwealth*, 457 S.E.2d 797, 800 (Va. Ct. App. 1995) (applying Va. Code § 8.01-398(A)) (quoting *Thomas*, 186 S.E. at 83). Virginia courts look for "objective

---

[13] "This privilege may not be asserted in any proceeding in which the spouses are adverse parties, or in which either spouse is charged with a crime against the person or property of the other [spouse] or against the minor child of either spouse." Va. Code § 8.01-398. Those exceptions are not relevant here.

[14] *Burns* and *Menefee* interpreted prior versions of § 8.01-398 that expressly "limit[ed] the privilege to situations where a spouse is being examined in an action or is revealing a private communication through testimony." *Burns*, 541 S.E.2d at 890 (quoting Va. Code § 8.01-398(A) (1977)). Unlike the current § 8.01-398, those versions did not extend a marital-communications privilege to document discovery or non-testimonial evidence. *See Wood v. Hodnett*, 377 F. Supp. 740, 742 (W.D. Va. 1974) (concluding that Virginia's marital-communications privilege was limited to judicial testimony); *cf. Blough v. Food Lion, Inc.*, No. 93-1169, 1993 WL 321797, at *2 (4th Cir. Aug. 25, 1993) (concluding that the district court erred in relying on § 8.01-400, which "expressly applie[d] only to an individual 'giving testimony as a witness,'" to quash a non-party subpoena seeking production of relevant documents from plaintiff's religious counselor)). The current version went into effect on July 1, 2005. *Carpenter v. Commonwealth*, 654 S.E.2d 345, 348 (Va. Ct. App. 2007).

indicia of confidential intent" in making the latter determination. *See, e.g.*, *id.* (finding "no objective indicia of confidential intent" in wife's statements describing husband's clothing, "which he displayed in public when he left home"); *Harris v. Commonwealth*, 453 S.E.2d 292, 293–95 (Va. Ct. App. 1995) (concluding that the spousal privilege did not apply to the portion of husband and wife's conversation that the "co-lessee" of their apartment overheard where both spouses knew the person "was within their hearing and, thus, their conversation was not wholly private"); *cf. Brownfield*, 2011 WL 7493287, at *2–3 (finding client "intended that [her] communications [with counsel] would remain confidential and did not manifest any contrary intent by permitting her husband" to attend the meeting).

A spouse can expressly or implicitly waive this privilege, of course. *See, e.g.*, *Holt v Commonwealth*, No. 2542-01-3, 2003 WL 1821767, at *4 (Va. Ct. App. Apr. 8, 2003) ("By answering the question rather than invoking his privilege, [husband] waived the privilege." (citing *Osborne v. Commonwealth*, 204 S.E.2d 289, 290 (Va. 1974)). Given the breadth of "the [spousal] privilege codified at Virginia Code § 8.01-398," *Brownfield*, 2011 WL 7493287, at *3, however, the burden may well be on the spouse's opponent "to demonstrate that the privilege has been waived," *Sprenger*, 2008 WL 2465236, at *4 (citing *Blau v. United States*, 340 U.S. 332, 334–34 (1951) (rejecting government's position that a defendant "should be denied the benefit of the [spousal] privilege because he failed to prove that the information was privately conveyed" to him by his wife because that position "ignore[d] the [federal common law] rule that marital communications are presumptively confidential")).

## C.   *The Work-Product Doctrine*

"Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by another party or its representative." Fed. R. Civ. P.

26(b)(3)(A). "But those materials may be discovered if 'they are otherwise discoverable under Rule 26(b)(1)' and the party seeking discovery 'shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'" *In re Grand Jury 2021 Subpoenas*, 87 F.4th at 252 (quoting Fed. R. Civ. P. 26(b)(3)(A)(i)–(ii)). The party invoking this protection bears the burden to show that it applies to each requested document and that it has not been waived. *See Nicholas v. Bituminous Cas. Co.*, 235 F.R.D. 325, 331–32 (N.D. W. Va. 2006).

The Fourth Circuit has long held "that, to be protected, 'the document must be prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation.'" *In re Grand Jury 2021 Subpoenas*, 87 F.4th at 252 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.* 967 F.2d 980, 984 (4th Cir. 1992)). "[M]aterials created in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation within the meaning of Rule 26(b)(3)." *Nat'l Union Fire Ins. Co.*, 967 F.2d at 984. "Determining the driving force behind the preparation of each requested document is therefore required in resolving" the proponent's claim that the document is protected work product. *Id.*

Rule 26(b)(3) does not define the phrase "in anticipation of *litigation*." Fed. R. Civ. P. 26(b)(3)(A) (emphasis added); *cf. FTC v. Grolier, Inc.*, 462 U.S. 19, 25 (1983) (noting that "Rule 26(b)(3) does not in so many words address the temporal scope of the work-product immunity"). "But the literal language of the Rule protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the [current] litigation." *Grolier*, 462 U.S. at 25. And, although the Fourth Circuit has explained that the work-product doctrine exists because "our

*adversary* system depends on the effective assistance of lawyers, fostered by . . . privacy in development of legal theories, opinions, and strategies for the client," *Nat'l Union Fire Ins. Co.*, 967 F.2d at 983 (emphasis added), it has not established a bright-line rule that documents prepared during non-adversarial proceedings can *never* be "prepared in anticipation of litigation," Fed. R. Civ. P. 26(b)(3)(A). *Cf. Adair v. EQT Prod. Co.*, 294 F.R.D. 1, 5–6 (W.D. Va. 2013) (Sargent, M.J.) (holding that Rule 26(b)(3)(A) did not apply to materials prepared for a regulatory board meeting where the withholding party failed to show that the meeting was "adversarial," and citing federal district court cases supporting the same conclusion). Rather, the court must consider the facts bearing on "the driving force behind the preparation of each requested document" to determine whether it was "prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Nat'l Union Fire Ins. Co.*, 967 F.2d at 984.

Once the Court finds that a document was prepared "in anticipation of litigation," Fed. R. Civ. P. 26(b)(3)(A), it must determine whether the documents reflect "opinion" work-product or "fact" work-product. *Nat'l Union Fire Ins. Co.*, 967 F.2d at 985; *see* Fed. R. Civ. P. 26(b)(3)(B). Opinion work-product, "which represents the actual thoughts and impressions of the attorney, . . . . enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances." *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017) (quotation marks omitted); *see* Fed. R. Civ. P. 26(b)(3)(B). "[F]act work product, which is a transaction for the factual events involved, . . . . is somewhat less protected," and can be discovered if the party seeking discovery meets its burden under Rule 26(b)(3)(A)(i)–(ii). *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 174 (4th Cir. 2019) (internal quotation marks omitted). "The [qualified] immunity for this class of document is little more than an 'anti-freeloader' rule

designed to prohibit one adverse party from riding to court on the enterprise of another." *Nat'l Union Fire Ins. Co.*, 967 F.2d at 985.

### III. Background

As noted, Plaintiffs seek production of 220 emails that Joshua Mast sent or received using his LU email account, jkmast@liberty.edu, between October 13, 2019, and March 30, 2022; and one (1) email that Richard Mast sent from his LU email account, rlmast@liberty.edu, on November 9, 2019. The Masts withheld all 221 emails from their Rule 34 productions. Liberty withheld the same emails from its Rule 45 production in the spring of 2023. Plaintiffs' second Rule 45 subpoena demands that LU produce the emails notwithstanding the Masts' assertions that they are privileged or otherwise protected.

\*

Plaintiffs' waiver arguments rely on LU's Acceptable Use Policy ("AUP") that was initially approved in June 2018. ECF No. 345-4, at 2–13. The AUP was last revised in July 2020. *Id.* at 11. The current AUP applies to "[a]ll University Students, Faculty, Staff, and Alumni," *id.* at 12, who access and/or use LU Information Systems, including University-provided "electronic mail services," *id.* at 2. Users "are expected to review, understand, and comply [with] this Policy and its associated standards." *Id.* at 2; *see id.* at 3–4, 9, 12 (associated standards of conduct and disciplinary actions applicable to current students, faculty, staff, and authorized guest users). "Every individual who accesses and/or uses the Information Systems, whether by 'clicking through' usage agreement [sic] during sign-on to any University systems, registration onto Liberty's network or any other equipment registration procedure, is deemed to assent to and must comply with this Policy." *Id.* at 2. Current LU students, faculty, and/or staff who violate the AUP "will be subject to disciplinary actions in the academic honor code and personal conduct code

that applies to them." *Id.* at 8. Additionally, "[u]pon separation of employment, . . . faculty and staff who *are not University alumni* will no longer have access to their [LU] email account." *Id.* at 4 (emphasis added). Alumni retain access to their LU email accounts after graduation. *See id.* at 3–4, 8–9, 12. The AUP does not contain any rules, standards, or consequences specific to LU Alumni who are not also LU Faculty or Staff. *See generally id.* at 2–12. Instead, Alumni who "repeatedly" violate the AUP may have their LU email accounts suspended or terminated. *Id.* at 8; *see also id.* at 3–4, 6–9, 12.

Liberty allows its students, faculty, staff, and alumni, to use their LU email accounts for "lawful purposes," *id.* at 11, consistent with the standards and codes of conduct applicable to that University group, *see id.* at 2–4, 6–9, 12. All users may use their LU email accounts "for their individual use." *Id.* at 3. Current students, faculty, and staff generally must use their LU email accounts to communicate about "the official business of the University, including all academic and administrative matters." *See id.* at 4. Users cannot use their email accounts "irresponsibly, wastefully, or in a manner that adversely affects the work or equipment of others at Liberty or on the Internet, as determined by the University in its sole discretion."[15] *Id.* at 6.

"The University owns all University email accounts and data transmitted or stored using the University email account." *Id.* at 4; *see id.* at 7, 9. Liberty therefore "reserves the right, with or without notice," to monitor, examine, save, read, transcribe, retransmit, copy, alter, or remove any content sent or received using an LU email account. *Id.* at 7; *see also id.* at 9. The University

---

[15] Specific prohibitions include: harassing, threatening, defaming, slandering, or intimidating any individual or group; generating and/or spreading "intolerant or hateful material" directed at another person or group "based on race, religion, national origin, ethnicity, age, gender, marital status, sexual orientation, veteran status, genetic makeup, or disability"; sending unsolicited emails, including job announcements; disclosing password information; communicating "in a manner that could be utilized for academic cheating"; conducting any "illegal, deceptive or fraudulent activity"; and placing bets, wagers, or operating games of chance. *Id.* at 6–7.

also "may disclose" or provide information to third parties, including law enforcement. *Id.* at 8. "No user of [LU's] Information Systems should have an expectation of privacy in their electronic communications." *Id.* at 9. "The confidentiality of any content [also] should not be assumed." *Id.* However, "[a]side from the right of the University to retrieve and read any [account user's] electronic communications or content, such messages or materials must be treated as confidential by other students or employees and accessed only by the intended recipient. Without prior authorization, no person is permitted to retrieve or read electronic mail messages not sent to them." *Id.* at 9–10; *see also id.* at 10. Finally, all LU email account users "are expected to take reasonable precautions, including password security and file protection measures, to prevent use of their accounts and files by unauthorized persons/entities. . . . Users who disclose their passwords to third parties are solely responsible for all consequences arising from such disclosure." *Id.* at 3–4.

**

Joshua attended LU both for his undergraduate degree and for his law degree. J. Mast Decl. ¶ 2. Liberty assigned Joshua his LU email account "in approximately 2005." *Id.* Joshua "maintained this [LU] email account" after graduation because LU "provide[s] access to student alumni email addresses for life." *Id.* Over the past 18 years, he has "routinely used the email account . . . for personal and professional matters." *Id.*; *see id.* ¶ 4. "From at least 2010 to [the] present, [he] was generally aware that Liberty University maintained an acceptable use policy and understood it to mean that [LU] would preserve the privacy and confidentiality of [his] communications sent or received through [his] alumni email account." *Id.* ¶ 3. Joshua usually accesses his LU email account "via webmail access from a cellular phone or internet browser." *Id.* He has "never seen a 'splash screen' warning upon login" advising him of "limitations on

22

[this] email account." *Id.* ¶ 4. Instead, once he logs onto www.liberty.edu, the website simply displays a dashboard where he can click on his webmail. *See id.* ¶ 5 (citing J. Mast Decl. Ex. 1 (screenshots of Joshua's mylu.liberty.edu webmail account taken on March 24, 2024)). This page does not show "any automatic or regular reminders regarding Liberty University's acceptable use policy." *See id.*

Plaintiffs subpoenaed Joshua's LU emails directly from LU both in this litigation and in parallel state-court litigation. From Joshua's perspective, LU has "[a]t all times . . . acted to protect the confidentiality of [his] Liberty University email account," *id.* ¶ 7, including by contacting Joshua and his "counsel before making any productions so that [they] could assert privilege claims as appropriate," *id.* ¶ 8. "In the state court litigation, Liberty University recognized [Joshua's] assertions of privilege, as did the Plaintiffs who ultimately agreed not to seek communications protected by [his] assertion of attorney-client, marital, and work product privileges." *Id.* ¶ 8 (citing J. Mast Decl. Ex. 2, Letter from H. Wright, Esq., to B. Graham (July 28, 2022), ECF No. 374-1, at 11)). Liberty has also "accommodated [Joshua and Stephanie's] efforts to assert the same legal privileges" in response to Plaintiffs' second Rule 45 subpoena in this litigation. *Id.* Joshua asserts that Liberty's "sensitivity to [his] assertions of privilege further reinforced [his] understanding that [his] communications remained confidential and private." *Id.*

***

Richard also attended LU for his undergraduate degree and for law school. R. Mast Decl. ¶ 3. Liberty assigned Richard his LU email account in 2005, when he was an undergraduate. *Id.* He used his LU email account while he was enrolled in LU's law school from 2007 to 2010. *Id.* ¶ 4. "At all times, [he] expected that such communications were and would remain confidential." *Id.* ¶ 6. "From at least 2008 to present, [he has] known and understood that Liberty University's

23

email policy as practiced was to preserve confidentiality, privacy, and privileges relating to legal representation, including attorney-client privilege and attorney work-product doctrine." *Id.* ¶ 5. When Richard went to work for Liberty Counsel in 2011, *id.* ¶ 7, he "was assigned the email addresses richard@lc.org and rmast@lc.org," *id.* ¶ 8. Richard "continued using [his] rlmast@liberty.edu email address for certain attorney-client communications and attorney work products." *Id.* ¶ 8. On November 9, 2019, Richard sent one (1) contested email from his LU email account to another attorney. *See* Pls.' Combined Br. Ex. 6, at 2.

At Liberty Counsel, Richard "regularly collaborate[s] on pro bono or public interest matters" with LU Law School faculty and students, "all of whom use their [l]iberty.edu email addresses" to communicate with him. R. Mast Decl. ¶ 9. He has also supervised "numerous" LU law students who worked for Liberty Counsel as law clerks, interns, or externs. *Id.* ¶ 10. "The vast majority" of those students "used their [l]iberty.edu email addresses . . . on the expectation that such emails were subject to attorney-client privilege and work-product doctrine" protections. *Id.* Many of the emails listed on the Masts' privilege logs were exchanged (either directly or by carbon copy) between Richard's lc.org account and Joshua's liberty.edu account. *See* Pls.' Combined Br. Am. Ex. 5; *id.* Ex. 6. Richard attests that "[a]t all times while [he was] using the Liberty University email system"—whether by "sending emails to" that system or "receiving [emails] through" it—Liberty "had a standard policy and practice . . . to preserve the privacy, confidentiality, and privilege of attorney client and work product communications." R. Mast Decl. ¶ 17. Richard "was fully aware of such policy and practice" in 2019–2022. *See id.*

Richard attests that the emails marked as attorney-client privileged on the Masts' privilege logs were sent and received "in confidence as part of [his] representation" of Joshua and Stephanie Mast. *Id.* ¶ 21. He also attests upon information and belief, for the purpose of this

declaration and without waiving his client's attorney-client privilege, that Joshua and Stephanie "intended that the communications" on Richard's privilege log "were confidential and would be considered privileged attorney-client communications." *Id.* ¶ 18. Finally, Richard attests that he prepared "in anticipation of litigation or for the purpose of pending litigation" the five (5) emails on his log marked as protected attorney-work product. *Id.* ¶ 22. Richard sent these emails to his law clerk "HWB" (hwbradburn@liberty.edu) in February and March 2020. *See* Pls.' Combined Br. Ex. 6, at 2. They contain a "discussion of documents drafted in anticipation of litigation," as well as Richard's "notes on research" and miscellaneous issues. *See id.*

## IV. Discussion

### A.   *Privileged Emails*

#### 1.   *Confidential Intent*

Based on the available record, I find that Joshua Mast intended the 220 contested emails he exchanged with his wife and with their legal team "to be secret or confidential," *Edwards*, 457 S.E.2d at 800. *See* J. Mast Decl. ¶¶ 2–3. Richard intended the same for any attorney-client emails that he sent to Joshua's LU account. *See* R. Mast Decl. ¶¶ 3–10, 16–17, 21.

First, Joshua has used his LU email account since "approximately 2005," when LU assigned it to him as an undergraduate student. *See* J. Mast Decl. ¶ 2. The record does not show that LU even had a policy governing university-issued email accounts in 2005. Tr. of Tele. Mots. Hr'g 65–66, *see Doe 1*, 480 F. Supp. 3d at 229. The AUP in the record was initially approved in June 2018 and last revised in July 2020. *See* ECF No. 345-4, at 11, 13; Tr. of Tele. Mots. Hr'g 56, 65–66. Even assuming that LU had an email policy in 2005, the record "does not clearly show whether [Joshua] agreed to [the] e-mail policy, and if [he] did, what the terms of that policy were when that occurred," *Doe 1*, 480 F. Supp. 3d at 229. *Cf. Banks*, 650 S.E.2d at 695–

96 (concluding that an employee who prepared a personal document on his employer's computer system waived attorney-client privilege in the document because the company's employee handbook "provided that there was no expectation of privacy regarding [the company's] computers"). Nor is there any evidence that Joshua relayed private information to his wife and their legal team "with the understanding that the information [would] be revealed to others," *Edwards*, 370 S.E.2d at 301. Rather, the record demonstrates that Joshua reasonably assumed that the content of privileged emails that he sent and received over LU's email system would remain confidential, J. Mast Decl. ¶¶ 3–5, 8. *Cf.* Pls.' Reply Defs. J&S Mast 4 ("J&S Mast did not waive otherwise applicable privileges *merely* by communicating over email. Rather they waived [those] privileges because . . . they used an email system that *expressly did not afford them* a reasonable expectation of privacy." (emphasis added)); Tr. of Tele. Mots. Hr'g 65–68, 71 (Plaintiffs' counsel arguing the same).

Second, "[f]rom at least 2010 to [the] present, [Joshua] was generally aware that Liberty University maintained an acceptable use policy and understood [that policy] to mean that [LU] would preserve the privacy and confidentiality of [his] communications sent or received through [his] alumni email account." J. Mast Decl. ¶ 3. Joshua sent or received all 220 of the contested emails between October 13, 2019, and March 30, 2022. *See* Pls.' Combined Br. Am. Ex. 5. The current AUP was adopted in June 2018 and last revised on July 28, 2020. ECF No. 345-4, at 11. "There is no indication in the record that the Masts had to sign some agreement to . . . the 2018 policy" to keep using their LU alumni email accounts. Tr. of Tele. Mots. Hr'g 66 (Mr. Powell: "I think that's correct, Your Honor. I'm not aware of any such evidence in the record in this case."). Based on the facts in this case, I find that LU's current AUP does not apply to the contested LU emails that Joshua sent or received before July 28, 2020. *See Doe 1*, 480 F. Supp. 3d at 229.

26

Accordingly, Joshua "did not manifest any contrary intent by permitting," *Brownfield*, 2011 WL 7493287, at *2–3, LU information systems to send, receive, or store those communications.

Under *Banks* and *Walton*, it is fair to say that the terms of LU's current AUP may result in the inadvertent disclosure (to Liberty University) of privileged messages sent or received by any LU student, faculty, staff, or alumni who "is deemed to assent to and must comply with" those terms, ECF No. 345-4, at 2. *See Banks*, 650 S.E.2d at 695–96 (company recovered a deleted copy of privileged document from employee's work computer where employee handbook "provided that there was no expectation of privacy regarding [the company's] computers"); *Walton*, 694 S.E.2d at 552 ("[U]nknowingly providing access to a document by failing to implement sufficient precautions to maintain its confidentiality may also result in an inadvertent disclosure."). Reading the AUP's plain text, it is not clear that Joshua's use of his LU email account to communicate in confidence with his wife and their legal team after July 28, 2020, without more, supports a conclusion that he "assented to" LU's express right to monitor, read, copy, or disclose his private communications. *Cf. Banks*, 650 S.E.2d at 695–96 (employee handbook provided adequate notice that employee had "no expectation of privacy" in material prepared or stored on his work computer); *Walton*, 694 S.E.2d at 552, 554 (noting that the "inadvertent disclosure" analysis focuses on the privilege-holder's failure to take "proper precautions" or "sufficient measures" to safeguard a privilege document's confidentiality). The same is true for the two (2) attorney-client privileged messages that Richard sent to Joshua's LU email account after July 28, 2020. *See* Pls.' Combined Br. Ex. 6, at 3.

The current AUP states that any "individual who *accesses and/or uses* the Information Systems, *whether by 'clicking through' usage agreement during sign-on* to any University system, *registration* onto Liberty's network *or* any other equipment registration, *is deemed to*

*assent to* and must comply with this Policy." *Id.* at 2 (emphasis added). Presumably, Joshua

"registered onto Liberty's network" in 2005. *See* J. Mast Decl. ¶ 2; Tr. of Tele. Mots. Hr'g 65–

66. During the last 18 years, Joshua has frequently accessed/used his LU email account by

logging on via webmail. *See* J. Mast Decl. ¶¶ 2, 4. There is no evidence that he had to "click[]

through [a] user agreement during [this] sign-on" process after July 28, 2020. ECF No. 345-5, at

2 (quotation marks omitted). Joshua attests that he has "never seen a 'splash screen' warning

upon login of limitations on the email account." J. Mast Decl. ¶ 4. As of March 2024, logging

onto LU's website took Joshua directly to a "dashboard where [he] can click on [his] webmail

without further login." *Id.* ¶ 5. Thus, Joshua attests that he has never "received any automatic or

regular reminders regarding Liberty University's acceptable use policy." *Id.* ¶ 5. There is no

evidence that LU's website operated any differently from October 2019 through March 2022. *Cf.*

*Sprenger*, 2008 WL 2465236, at *1, *4–5 (in a federal-question case, applying federal common

law in granting plaintiffs' motion to quash a Rule 45 subpoena seeking husband and wife's

confidential messages exchanged using their state-agency work email accounts where the

agency's Policy stated "that 'no user should have any expectation of privacy in any message . . .

created, sent, retrieved, or received'" using the work account and "that state agencies have the

right to monitor e-mail sent or received by agency users," but there was "no showing that Mr. or

Mrs. Sprenger were notified of the Policy by a log-on banner, flash screen, or employee

handbook and whether Mr. or Mrs. Sprenger were ever actually aware of the Policy.").

 Finally, there is no evidence that Joshua acted, or failed to act, in a manner inconsistent

with preserving the confidential nature of the LU emails that he exchanged with his wife and

their legal team. *Cf. Jones*, 696 F.2d at 1072 ("Any disclosure inconsistent with maintaining the

confidential nature of the attorney-client relationship waives the attorney-client privilege.");

*Clagget v. Commonwealth*, 472 S.E.2d 263, 270 (Va. 1996) ("[T]he privilege is waived where the communication takes place under circumstances such that persons outside the privilege can overhear what is said."). For example, there is no indication that he copied or forwarded any of these confidential emails to a "stranger" who might destroy the privilege. *Compare Brownfield*, 2011 WL 7493287, at *2–3 (finding client "intended that [her] communications [with her attorney] would remain confidential and did not manifest any contrary intent by permitting her husband" to attend the meeting because Code § 8.01-398 "recognizes a spousal privilege that protects the [couple's] communications in the same way as the attorney-client privilege"), *with Harris*, 453 S.E.2d at 293–95 (concluding that the spousal privilege did not apply to the portion of husband and wife's conversation that the co-lessee of their apartment overheard where both spouses knew the person "was within their hearing and, thus, their conversation was not wholly private"). On the contrary, Joshua and Stephanie expressly invoked the applicable privilege(s) in response to Plaintiffs' discovery requests and identified the emails that they were withholding under Rule 26(b)(5).

  2. *Inadvertent Disclosure & Waiver Analysis*

  We now know that Liberty had "access to" the contents of all 221 contested emails, *Walton*, 694 S.E.2d at 552. *See, e.g.*, Pls.' Combined Br. Ex. 3, Email from R. Jenkins to M. Eckstein (Apr. 6, 2023 9:53 AM)), ECF No. 359-4. Both Joshua and Richard have known since "at least 2010" that LU generally "maintained an acceptable use policy" regarding its university-issued email accounts. J. Mast Decl. ¶ 3; *accord* R. Mast Decl. ¶ 5. Under *Banks* and *Walton*, it is fair to say that, as discussed above, Joshua and Richard "unknowingly made the [contested emails] available to" Liberty University (a stranger to the privilege) when they chose to use their @liberty.edu accounts to send and receive those messages. *Cf. Harleysville Ins. Co.*, 2017 WL

4368617, at *6 (applying *Walton* in concluding that plaintiff's agent "unknowingly and unintentionally made privileged documents available to a third party" when, without realizing that the third party still had access to a Box.com folder, he uploaded privileged documents to the same Box.com folder); *Banks*, 650 S.E.2d at 695–96 (employee deleted a privileged document from his work computer, but company was able to recover the document from the computer's hard drive). That choice resulted in the "inadvertent disclosure" of 221 privileged attorney-client or inter-spousal communications to Liberty University. *Cf. Harleysville Ins. Co.*, 2017 WL 4368617, at *6 (applying *Walton*, 694 S.E.2d at 552).

The next question is whether the Masts' inadvertent disclosures waived the asserted privilege(s) for those emails. *See Walton*, 694 S.E.2d at 552. Under *Walton*'s fact-specific framework, "waiver *may* occur [by inadvertent disclosure] if the disclosing party failed to take *reasonable* measures to ensure and maintain the document's confidentiality, or to take prompt and reasonable steps to rectify the error." *Id.* (emphasis added). The court must consider:

> (1) the reasonableness of the precautions to prevent inadvertent disclosures, (2) the time taken to rectify the error, (3) the scope [and pace] of discovery, (4) the extent of the disclosure, and (5) whether the party asserting the claim of privilege or protection for the communication has used its unavailability for misleading or otherwise improper or overreaching purposes in the litigation, making it unfair to allow the party to invoke confidentially under the circumstances.

*Id.* at 552; *see id.* at 552–54. "None of these factors is independently dispositive," and the court "must also consider any other factors arising from the posture of the case at bar that have a material bearing on the reasonableness issues." *Id.* at 552. My goal is to "balance[] concerns of fairness and the fundamental importance of protection of the [asserted] privilege long recognized in Virginia law against the care or negligence with which the privilege is guarded." *Id.* (internal quotation marks omitted); *cf. Brownfield*, 2011 WL 7493287, at *2–3 (finding client "intended that [her] communications [with her attorney] would remain confidential and did not manifest

30

any contrary intent by permitting her husband" to attend the meeting because Code § 8.01-398

"recognizes a spousal privilege that protects the [couple's] communications in the same way as

the attorney-client privilege").

Based on the available record, I find that the Masts acted reasonably under the

circumstances and that they did not waive the asserted privilege with respect to any of the

contested LU emails.

*First*, the precautions that Joshua took to preserve the confidentiality of the contested LU

emails "were reasonable under the circumstances." *Harleysville Ins. Co.*, 2017 WL 4368617, at

*6. The "disclosures" in this case occurred because LU's current AUP gives any "authorized

agent or employee of the University" complete authority to examine, save, read, transcribe,

retransmit, or disclose to third parties the contents of any email "generated through or within" its

information systems. ECF No. 345-4, at 9; *accord id.* at 2, 4, 7–10. The record does not establish

that Joshua knew, or should have known, that LU's authorized agents had unfettered access to

the contents of the contested emails until Plaintiffs' counsel raised the issue in December 2023.

*Cf. Hamilton*, 701 F.3d at 408–09 (rejecting defendant's argument that his employer's email-

monitoring policy should not retroactively apply to private emails that he sent to his wife using

his work email account where the record showed that defendant "had to acknowledge the [new]

policy by pressing a key to proceed to the next step of the log-on process[] every time he logged

onto his work computer" and that defendant "did not take *any* steps to protect the emails in

question, even after he was on notice" of the new policy). Thus, there was no reason for Joshua

to take any additional steps to guard against inadvertent disclosures. *See id.* at 408; *Harleysville*

*Ins. Co.*, 2017 WL 4368617, at *6 (explaining that uploading privileged materials to a Box.com

folder, without realizing that a third-party tangentially involved in the litigation's underlying

31

events still had access to that folder, was analogous to leaving the materials in a briefcase that was "buried somewhere in a large park, technically publicly-accessible, but for all practical purposes, secured"). Accordingly, this factor weighs strongly against finding waiver. *See id.*; *cf. Hamilton*, 701 F.3d at 408 ("In an era in which email plays a ubiquitous role in daily communications, [defendant's retroactive application] arguments caution against lightly finding waiver of the marital privilege by email usage.").

*Second*, the time taken to rectify the error was reasonable under the circumstances. Each "disclosure technically occurred" when Joshua sent or received the LU email at issue. *Cf. Harleysville Ins. Co.*, 2017 WL 4368617, at *7 ("The disclosure technically occurred on April 26, 2016, when Cesario uploaded the Claims File to the Box Folder."). He sent the first email on October 13, 2019, and the last email on March 30, 2022. *See* Pls.' Combined Br. Am. Ex. 5, at 2–7. Plaintiffs knew about these disclosures by mid-July 2022. But, based on the available record, it appears that Plaintiffs' counsel did not raise this waiver argument until December 2023. Def. R. Mast's Mot. Prot. Order 7–8. The Masts could not "claw back" their privileged emails from LU's servers at that point. Their only option was to reassert that these emails are privileged from discovery in this case, which is what they did. Pls.' Combined Br. 7. The Masts gave Plaintiffs' counsel their final privilege log on February 9, 2024. *Id.* Thus, this factor also weighs strongly against finding waiver.

*Third*, the scope of discovery is immaterial to my finding that the Masts acted reasonably. *See Harleysville Ins. Co.*, 2017 WL 4368617, at *6. This factor looks at whether the "volume of documents" the disclosing party needed to review before producing them to the requesting party might help explain why a privileged document was inadvertently included in that production. *City of Chesapeake v. Thrasher*, No. CL20-3178, 2021 WL 8775740, at *4 (Va. Cir. Ct. Aug. 10,

2021) (citing *Walton*, 694 S.E.2d at 554); *see also Walton*, 694 S.E.2d at 554 (discussing the volume and pace of discovery as relevant factors in the court's reasonableness determination). In this case, the inadvertent disclosures occurred before Plaintiffs served their first Rule 34 requests in December 2022.

*Fourth*, the extent of disclosure "was not extensive, as [the Masts] only inadvertently disclosed the privilege[d] documents to [Liberty's] counsel," *Harleysville Ins. Co.*, 2017 WL 4368617, at *7. *See* Pls.' Combined Br. Ex. 3. Although any "authorized agent and employee of the University" could have accessed the Masts' confidential emails, ECF No. 345-4, at 9, there is no evidence that anyone outside Liberty's Office of Legal Affairs did so. *Cf. Harleysville Ins. Co.*, 2017 WL 4368617, at *7 (noting that another third-party could have access the Box.com folder, but it did not do so). The Office of Legal Affairs has "[a]t all times . . . acted to protect the confidentiality of [Joshua's] Liberty University email account," J. Mast Decl. ¶ 7, including by contacting him and his "counsel before making any productions so that [the Masts] could assert privilege claims as appropriate," *id.* ¶ 8. The very limited extent of disclosure weighs against finding that the Masts waived the asserted privileges. *See, e.g.*, *Harleysville Ins. Co.*, 2017 WL 4368617, at *7 (reaching the same conclusion where the privilege holder "only disclosed the documents to one party").

*Fifth*, Plaintiffs do not argue that the Masts withheld these emails "for misleading or otherwise improper or overreaching purposes in th[is] litigation," such that it would be "unfair to allow [the Masts] to invoke confidentiality under the circumstances," *Walton*, 694 S.E.2d at 552. Accordingly, this factor is immaterial to my finding that the Masts acted reasonably under the circumstances. *See Harleysville Ins. Co.*, 2017 WL 4368617, at *7 (concluding that there was no waiver, and noting that factor five did not apply in that case).

For the reasons explained above, I find as a matter of Virginia law that Joshua Mast inadvertently disclosed all of the contested LU emails to Liberty University (but no one else) by using his LU alumni email account to send and receive these privileged communications. *Cf. Harleysville Ins. Co.*, 2017 WL 4368617, at *6–7 (applying *Walton*, 694 S.E.2d at 552–54). Balancing the *Walton* factors, I find that Joshua did not waive the asserted privilege(s) for any of the contested LU emails. Accordingly, the Masts' motions for protective order will be granted to the extent that they seek to forbid Plaintiffs from obtaining those emails in this action.[16] Fed. R. Civ. P. 26(c)(1)(A). Plaintiffs' motion to compel the Masts to produce the same emails will be denied. Fed. R. Civ. P. 37(a)(5)(B).

## B.      Attorney Work Product

Richard's final privilege log lists five additional LU emails that are not privileged, but that he claims are shielded from discovery under Rule 26(b)(3)(A). *See* Pls.' Combined Br. Ex. 6, at 2. Richard sent these emails to his law clerk "HWB" in February and March 2020. *Id.* They contain a "discussion of documents drafted in anticipation of litigation," as well as Richard's "notes on research" and miscellaneous issues. *See id.* Richard attests that he prepared these materials "in anticipation of litigation or for the purpose of pending litigation." R. Mast Decl. ¶ 22. It is not clear whether "pending litigation" refers to Virginia state-court custody and adoption proceedings that the Masts commenced in November 2019, to a federal-court action concerning

---

[16] While I do not find *Asia Global*'s employer-employee framework persuasive in the university-alumnus context at issue in this diversity action, I would reach the same conclusion had I applied *Asia Global*'s four-factor test to determine as a matter of federal law that the Masts did not waive the asserted privileges by using their LU alumni email accounts to exchange these confidential communications. *See, e.g.*, *Kreuze v. VCA Animal Hospitals, Inc.*, Civ. No. PJM-17-1169, 2018 WL 1898248, at *1–3 (D. Md. Apr. 20, 2018); *Doe 1*, 480 F. Supp. 3d at 229; *Sprenger*, 2008 WL 2465236, at *1, *4–5; *Asia Global*, 322 B.R. at 251, 257–61.

Baby Doe that was pending between February 26, 2020, and July 20, 2020, or to some combination of the two. *See id.* ¶¶ 14, 16, 22.

Plaintiffs argue that the Virginia proceedings "were not 'litigation' for the purposes of the work product doctrine" because they were "ex parte" and "not adversarial"—at least until John and Jane Doe moved to vacate the adoption order on December 8, 2021. *See* Pls.' Combined Br. 22–23 & nn. 81–85. Plaintiffs do not suggest that Virginia custody and adoption proceedings are *inherently* non-adversarial. *See generally id.* at 21–23; Pls.' Reply Def. R. Mast 9–12. Rather, it was the Masts' failure to notify "other parties with interest" in Baby Doe that rendered the pre-December 8, 2021 proceedings ex parte and non-adversarial. Pls.' Combined Br. 22; *see id.* at 23 ("There is no reason to protect the adversarial process when there is no adversary."); Pls.' Reply Def. R. Mast 9–12 (arguing the same). Notably, the cases that Plaintiffs cite to support their position all involved materials prepared in non-adversarial extrajudicial proceedings. *See, e.g.*, *Adair*, 294 F.R.D. at 5–6 (materials prepared for administrative hearing before the Virginia Gas & Oil Board where it appeared that this type of hearing was "required by the regulations in the ordinary course of business" for any applicant seeking a drilling permit); *In re Grand Jury Subpoenas Dated Mar. 9, 2001*, 179 F. Supp. 2d 270, 288 (S.D.N.Y. 2001) (application for presidential pardon); *Application of Minebea Co., Ltd.*, 143 F.R.D. 494, 499 (S.D.N.Y. 1992) (initial patent application). They do not dispute that Richard prepared these materials as part of ongoing judicial proceedings in Virginia state court. *See generally* Def. R. Mast's Reply 10–14; *cf. Grolier*, 462 U.S. at 25 (noting that "Rule 26(b)(3) does not in so many words address the temporal scope of the work-product immunity," but that the Rule's "literal language . . . protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the [current] litigation.")

As noted, binding Fourth Circuit precedent requires me to consider facts bearing on "the driving force behind the preparation of each requested document" to determine whether it was "prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Nat'l Union Fire Ins. Co.*, 967 F.2d at 984. Based on the facts of this case, I find that Richard carried his burden with respect to all five emails. *Cf. Stern v. O'Quinn*, 253 F.R.D. 663, 666–75 (S.D. Fla. 2008) (concluding that Rule 26(b)(3)(A) protected documents prepared during state-court custody proceeding).

First, Richard's declaration demonstrates that he prepared these five emails because he was representing Joshua and Stephanie Mast while they were actively litigating their claims over Baby Doe in Virginia state court, *Grolier*, 462 U.S. at 25. *See* R. Mast Decl. ¶¶ 13–14. Second, Virginia child-custody and adoption proceedings are not inherently non-adversarial extrajudicial matters. *See generally A.A. v. J.M.*, 903 S.E.2d 513, 517–27 (Va. Ct. App. 2024) (holding that the circuit court lacked subject-matter jurisdiction to issue both the custody order and the final adoption order in Baby Doe's case, rendering both orders void ab initio). "The power to adjudicate the adoption of a child and the associated termination of parental or familial relationships stems from the statutory framework enacted by the General Assembly." *Id.* at 517; *see generally id.* at 523–27 (discussing Code § 63.2-1216). The same is true of the power to adjudicate physical and legal custody of a child and the associated rights and obligations of interested parties. *See generally id.* at 522–23 (discussing Code § 20-146.12(A)).

Both statutory frameworks contemplate "adversarial" proceedings where multiple parties may make competing claims to the same child. *See generally id.* at 517, 522–27. For example, they require that certain persons be given notice and the opportunity to be heard before the court

36

enters a custody or adoption order. *See, e.g.*, Va. Code §§ 20-146.7, 20-146.16, 63.12-1202, 63.2-1216. "The parties dispute whether the United States had notice at any stage of the adoption proceedings. . . . The [Does] did not receive notice" of either the custody or the adoption proceedings. *See A.A.*, 903 S.E.2d at 519. Nonetheless, Virginia's statutory framework governing those judicial proceedings demonstrates that they are fundamentally different than administrative hearings that occur "in the ordinary course of business," *e.g.*, *Adair*, 294 F.R.D. at 1, 5–6, and other extrajudicial matters that are both inherently non-adversarial and mostly ex parte, *see, e.g.*, *In re Grand Jury Subpoenas Dated Mar. 9, 2001*, 179 F. Supp. 2d at 288; *Application of Minebea Co., Ltd.*, 143 F.R.D. at 499.

I also find that Richard's use of LU's email system to send and receive any contested email for which he claims work-product protection resulted in the "inadvertent disclosure" of those materials to Liberty University, *Victor Stanley v. Creative Pipe, Inc.*, 250 F.R.D. 251, 258 n.6 (D. Md. 2008) ("[I]f documents qualify as both attorney-client privileged and work-product protected, separate analysis is required to determine whether inadvertent production constitutes waiver."). *See, e.g.*, *Harleysville Ins. Co.*, 2017 WL 4368617, at *10 (finding inadvertent disclosure under similar circumstances). For the reasons explained above, however, the extent of this disclosure was limited to a few attorneys in LU's Office of Legal Affairs and did not "create[] a substantial risk that an adversary" would receive these materials, *Victor Stanley*, 250 F.R.D. at 258 n.6 ("[T]he majority view is that [inadvertent] disclosure of work-product material in a manner that creates a substantial risk that an adversary will receive it waives the protection."). Accordingly, Richard did not waive the work-product protection in this case. *Cf. Harleysville Ins. Co.*, 2017 WL 4368617, at *10 (applying Fed. R. Evid. 502 in concluding that privilege holder's inadvertent disclosure under similar circumstances did not waive the work-

product protection). Plaintiffs do not argue that they have a substantial need for these materials under Rule 26(b)(3)(A).

V. Conclusion

The Masts have shown that the asserted privilege or protection applied to the contested LU emails and that the privilege or protection was not waived simply because the Masts used LU's email system to send or receive those communications. Accordingly, the Masts' motions for a protective order, ECF Nos. 345, 347, are hereby **GRANTED** and Plaintiffs' cross motion to compel, ECF No. 358, is hereby **DENIED**. Each party will bear its own expenses. Fed. R. Civ. P. 26(c)(3), 37(a)(5)(B).

It is so ORDERED.

ENTERED: September 30, 2024

Joel C. Hoppe
United States Magistrate Judge