IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| JOHN & JANE DOE, | : |
| *Plaintiffs & Counterclaim-Defendants,* | : |
| v. | : CIVIL ACTION NO. 3:22-cv-49 |
| JOSHUA & STEPHANIE MAST, | : |
| *Defendants & Counterclaim-Plaintiffs,* | : |
| RICHARD MAST, | : |
| *Defendant & Counterclaim-Plaintiff,* | : |
| & KIMBERLEY MOTLEY, | : |
| *Defendant.* | : |

**MEMORANDUM OF DEFENDANTS JOSHUA & STEPHANIE MAST IN OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS (ECF No. 486)**

Defendants Joshua & Stephanie Mast have pleaded valid counterclaims against Plaintiffs John & Jane Doe for defamation, intentional infliction of emotional distress, and civil conspiracy over which this Court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiffs' arguments for attacking those claims rest primarily on the fundamentally wrong suggestion that the merits of the those claims and this Court's jurisdiction depend on the validity of the Masts' adoption. They do not. The Does had falsely and knowingly accused the Masts of being kidnappers and instigated an international media campaign to smear their good name. That conduct is tortious and actionable regardless of how the Virginia courts ultimately adjudicate the Does' collateral attack on the Masts' adoption. With that point clarified, and applying the well-worn principle that the Masts' allegations must be taken as true on the Does' Rule 12 motion, the rest falls naturally into place.

1

The Masts have stated valid claims over which this Court has jurisdiction, and the motion to dismiss should be denied.

*First*, there is no basis to dismiss the Masts' counterclaims under the domestic-relations exception. The Does' false kidnapping accusations are actionable without regard to the ultimate validity of the Masts' adoption. Moreover, in denying in part the Masts' prior motion to dismiss some of the Does' claims, the Court previously adopted a fairly formal approach to the domestic-relations exception. *See* Memorandum Opinion & Order, at 27–49, ECF No. 455 ("MTD Mem. Op."). Applying that approach evenhandedly to the Masts' counterclaims, there is no basis to dismiss them on jurisdictional grounds. And of course, if the Court chooses to revisit its prior holding and to apply a more stringent approach, then it must do so with equal scrutiny of the Does' own claims.

*Second*, the Masts' defamation claim is not time-barred under the well-established republication doctrine. The Masts have credibly alleged—and the Does cannot dispute at this preliminary stage—that the Does false kidnapping accusations have continued up to the present day, and certainly within the one-year limitations period, giving rise to a continued line of defamatory articles and other public statements. Under the republication doctrine, those allegations more than enough to make the Masts' claim timely.

*Third*, on the merits, the Masts have pleaded a valid claim of defamation. Contrary to the Does' suggestion, the Masts' defamation claim is subject to the ordinary federal Rule 8 pleading standard, not a heightened particularly standard based on Virginia law. *See Hatfill v. New York Times Co.*, 416 F.3d 320, 337 (4th Cir. 2005). And the Masts' allegations readily meet that standard. While the Does claim that their litigation filings shield them from liability, the litigation privilege does not protect out-of-court statements made by them or their attorneys, even if they repeat the same false allegations the Does have made in court. *See US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 58 (D.D.C. 2021).

2

*Finally*, the Masts have also pleaded valid claims of intentional infliction of emotional distress and civil conspiracy. The parties agree that these claims rise and fall together with the Masts' defamation claim. But here, that means those claims should survive along with the validly pleaded defamation claim.

The Court should therefore deny the Does' motion to dismiss.

## BACKGROUND

In ruling on Defendants' motions to dismiss, the Court observed that "[t]he facts alleged in Plaintiffs' complaint tell a remarkable story of resilience and duplicity." MTD Mem. Op. 1. That story was false. Of course, the Court was required to accept it as true for purposes of Rule 12. *See id.* at 5 n.1 (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)). But the Masts will establish at trial, through testimonial and documentary evidence, the same thing they already established before the Virginia Circuit Court: that the Does' entire "kidnapping" narrative is false. At any rate, the Court is required to decide the Does' Rule 12 motion based on the allegations in the Counterclaim Complaint and drawing all reasonable inferences in favor of the Masts—just as they enjoyed the reverse presumption when the Court ruled on the motions to dismiss their claims.

\* \* \*

This case arises from the recovery of an infant by U.S. Special Forces off a battlefield in Afghanistan in 2019 following a raid of a foreign fighter training camp to capture or kill three Al Qaeda terrorist leaders. Counterclaim Compl. ¶ 11, ECF No. 467. The Child's mother died in the engagement attempting to kill the American soldiers and severely injured the Child, leaving her for dead. *Id.* ¶¶ 13–16. While the Afghan soldiers wanted to shoot the child, Army Rangers intervened and brought her to a U.S. military hospital. *Id.* ¶¶ 18, 25.

At the time the Child was rescued by U.S. forces and taken to receive treatment for her injuries in the Military Hospital system, Major Joshua Mast (then Captain) was deployed in

3

Afghanistan where he served as a Marine Corps Judge Advocate. *Id.* ¶ 25. Joshua Mast grew concerned that the Child, a foreign female infant in Afghanistan being treated in a Military Hospital under consistent rocket attack, would not have access to the medical care required to treat her injuries. *Id.* ¶ 26. Joshua Mast—with the full knowledge of his command—fought for the child's rights to safety, medical treatment, and to not be turned over to non-relatives in an objectively dangerous manner. *Id.* ¶ 28. In furtherance of these efforts, Joshua Mast initiated custody proceedings in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "J&DR Court") largely to establish a legal identity that would allow the Child to receive appropriate medical care in the United States via a humanitarian parole visa. *Id.* ¶ 31.

The J&DR Court granted custody of the Child to Joshua and Stephanie Mast, but the Child still needed a legal identity as she had none. *Id.* ¶ 32. The Masts then filed in Fluvanna County Circuit Court, a Petition to Amend a Certificate of Birth, which Judge Richard E. Moore signed on November 8, 2019. *Id.* ¶ 33. The Virginia Department of Health declined to issue a Certificate of Birth on the basis of that Order, *id.* ¶ 34, and the Virginia Department of Health, through the Office of the Attorney General, advised the Masts that they should file a petition for adoption, *id.* ¶ 37. The Masts thereafter filed a petition for adoption, obtained an interim order of adoption, and secured a certificate of foreign birth for the Child. *Id.* ¶ 44. Joshua Mast presented these developments to his chain of command in Afghanistan, providing actual notice to DoD; the Child was approved by DoD as the DoD Dependent of Joshua Mast, her U.S. guardian; and the DoD drafted a written request to Afghan government officials to send The Child to her U.S. Guardian in America for treatment. *Id.* ¶ 45. Captain Mast's commander in Afghanistan made preparations to move the Child to Germany and then to the U.S., on the basis of Baby Doe's only legal identity, and status as Captain Mast's DoD Dependent. *Id.* ¶ 46.

In October 2019, over Joshua Mast's objections, the United States decided to relinquish custody of the Child. *See generally* Counterclaim Compl. ¶¶ 47–58. Joshua Mast objected because

4

it was clear to him that the Child would not receive adequate medical care in Afghanistan, was not an Afghan national (but a stateless child), and was likely being turned over to non-relative, terrorist affiliated persons. *Id.* ¶ 54. That Masts understand that, after the Child left DoD custody, she was placed with John Doe's father, who purports to be the older half-brother of the Child's purported biological father. *Id.* ¶ 58. John Doe's father obtained the child without a DNA test or terror ties vetting by the Americans, despite Afghan government officials requesting a DNA test. *Id.* ¶ 105.

Notwithstanding this set back, the Masts never gave up their care and concern for the Child. Nearly two years later, in the late summer of 2021, as the Taliban campaign swept over Afghanistan, Joshua Mast established contact with John Doe and requested he bring the Child to Kabul to fly to the United States before the country collapsed. *Id.* ¶ 61. Joshua Mast communicated with John Doe through an interpreter and understood, based on John Doe's representations, that John Doe's father was the actual person with decision-making authority over the Child. *Id.* ¶¶ 62–63. At no point did John Doe represent that he personally had legal responsibility for the Child. *Id.* ¶ 63. Critically, Joshua Mast was candid with John Doe from the beginning and throughout their discussions, that Joshua and Stephanie Mast had adopted the Child, that they had created a legal identity for her in the United States, and that they intended for her to live with them in the United States using the strongest words for legal responsibility over a child in Pashto. *Id.* ¶ 67. The Does' allegation that the Masts concealed their true intentions is thus flatly false.

When the Afghan Government collapsed on August 15, 2021, and the evacuation began, Joshua Mast again contacted John Doe about bringing the Child to U.S. forces, extremely concerned that they may not get another chance—a belief that John Doe shared. *Id.* ¶ 68. Through the efforts of Joshua Mast and other U.S. military personnel, and based on the legal identity of the Child under the Adoption Order, John and Jane Doe were able to flee Afghanistan, notwithstanding the chaos of the U.S. withdrawal, by bringing the Child to U.S. Forces. *Id.* ¶ 69. Joshua Mast made sure that the U.S. military did not evacuate only the Child but also that they brought John Doe and

5

Jane Doe along so they would not be killed by the Taliban for disobeying their orders. *Id.* ¶ 70. But for the personal efforts of Joshua Mast and the child's U.S. identity, John Doe and Jane Doe would not have been able to flee Afghanistan in the aftermath of the U.S. withdrawal. *Id.* ¶ 71. The circumstances of the withdrawal make clear that the Masts were in no way attempting to "kidnap" Baby Doe or otherwise trick John Doe and Jane Doe—and that John Doe and Jane Doe were well aware of that fact. *Id.* ¶ 78.

Upon the Does entry to the United States, Joshua Mast learned derogatory information about John Doe, the details of which are known to John Doe and Jane Doe, but which are subject to a protective order sought and obtained by the United States Government. *Id.* ¶ 79. That information, along with subsequent developments, changed the Masts' view of the Does; while the Masts were still willing to provide them what help they could, they became more wary. *Id.* John and Jane Doe were paroled in the United States and ultimately were sent to Fort Pickett, Virginia. *Id.* ¶ 80. On September 3, 2021, the Masts went to Fort Pickett and took custody of the Child pursuant to the final order of adoption from the Virginia Circuit Court. *Id.* ¶ 81.

In November 2021, the Does initiated a series of legal challenges to the Masts' adoption. *See generally* Counterclaim Compl. ¶¶ 82–108. Initially, John Doe claimed to be a cousin of the Child but did not assert any sort of parental relationship, alleging instead that the Child's unspecified "Afghan family" had initiated "proceedings" to gain custody of her. *Id.* ¶ 82. But after the Masts interposed Virginia Code § 63.2-1216—which bars collateral attacks on final orders of adoption after six months—the Does started to claim that they were the Child's *de facto* parents. *Id.* ¶ 84. The state-court litigation is ongoing. An appeal on the application of Virginia Code § 63.2-1216 is currently pending before the Virginia Supreme Court, which has stayed all proceedings in the Circuit Court in the meantime. In the past three years, the Does have made numerous false and inconsistent claims about their relationship with the Child and their dealings with the Masts during the evacuation from Afghanistan. *See* Counterclaim Compl. ¶¶ 87–108.

The Does' lies have cast Joshua and Stephanie Mast as kidnappers, when the Does know full well that the Masts were candid about their intentions to bring the Child to the United States to live with them pursuant to the adoption order. *Id.* ¶ 87. The Does have also not constrained their lies to the courtroom and the docket. *Id.* ¶ 88. On numerous occasions, both directly and through agents or intermediaries, the Does have repeated these false allegations to members of the media and other third parties. *Id.* ¶ 89. They have done so with full knowledge of their falsity and with the specific intent of procuring negative news stories about the Masts that, they hope, will influence the litigation in their favor. *Id.* ¶ 90. Those efforts have borne fruit, as multiple news outlets have published—and continue to publish—the Does' false accusations against the Masts. *See id.* ¶¶ 112–19. The following are just the particular examples cited in the Masts' Counterclaim Complaint, but there are many more out there:

- Associated Press, *Afghan couple accuse US Marine of abducting their baby* (Oct. 20, 2022)

- Associated Press, *Afghan war orphan remans with Marine accused of abduction* (Dec. 31, 2022)

- Taliban, Official Statement (recounting that "a Marine officer Joshua Mast, has forcibly taken the only remaining child of a family martyred in their bombardment in Afghanistan from her relatives in Virginia")

- Associated Press, *US Marine's adoption of Afghan war orphan voided* (March 31, 2022)

- Associated Press, *A baby was found in the rubble of a US raid in Afghanistan. But who exactly was killed and why?* (Aug. 4, 2023)

- Associated Press, *Secret records: Governments says Marine's adoption of Afghan orphan seen as abduction, must be undone* (Sept. 15, 2023)

- Associated Press, *Appeals court voids Marine's adoption of Afghan orphan; child's fate remains in limbo* (July 16, 2024)

Numerous other media outlets have covered the story and spread the Does' false kidnapping narrative, as a simple Google search of the Masts' names reveals. By spreading these lies, the Does have caused significant damage to Joshua and Stephanie Mast, to their reputations, and to their

lives. *Id.* ¶ 120.

*   *   *

While their collateral attack on the Masts' adoption was still pending in Virginia Circuit Court, the Does initiated this federal lawsuit against the Masts; Joshua's brother, Richard, who is also one of their attorneys; Joshua's interpreter, Ahmad Osmani; and Kimberley Motley, a lawyer and advocate for women and girls in Afghanistan who had helped Joshua Mast find the Child and get in touch with John Doe. They purported to seek $20 million in damages, as well as a series of declaratory judgments that they would take back to state court in support of their effort to invalidate the Masts' adoption.

The Masts originally filed their own motion to dismiss the Does' claims on October 14, 2022, *see* ECF No. 49, and the other defendants filed Rule 12 motions as well. But the Court did not resolve those motions for until nearly two years later. On July 24, 2024, the Court ruled on the motions to dismiss, *see* MTD Mem. Op., ECF No. 455, dismissing a substantial portion of Plaintiffs' case:

- The Court rejected the Does' effort to bring claims on behalf of the Child as "Baby Doe." MTD Mem. Op. 57–59.

- The Court rejected the Does' requests for declaratory relief as improper attempts to interfere with the pending proceedings in Virginia state court. MTD Mem. Op. 47–49.

- The Court held that the Does had failed to state any claims arising under federal law. MTD Mem. Op. 32–38.

- The Court applied the well-established "domestic-relations exception" to federal jurisdiction to dismiss multiple causes of action because they would have required the Court to adjudicate the Does' alleged parental rights. MTD Mem. Op. 44–46.

- The Does voluntarily dismissed their claims against Defendant Osmani, *see* ECF No. 460, after it became apparent that he would destroy complete diversity, *see* ECF Nos. 256, 271.

As a result, all that remains of the Does' original action is set of three state-law tort claims against the Masts, Richard Mast, and Kimberley Motley

On August 7, 2024, the Masts filed their Answer and a Counterclaim Complaint asserting

8

three causes of action against the Does: defamation, intentional infliction of emotional distress, and civil conspiracy. *See* ECF No. 467. All three causes of action arise from the Does' willful dissemination of lies about the Masts and the circumstances of their adoption in an effort to cast them as kidnappers. The Does have now moved to dismiss those counterclaims under Rule 12, arguing that the Court lacks jurisdiction over them under the domestic-relations exception, that the defamation claim is time-barred (in part), and that they fail to state a claim on the merits. This opposition follows.

## ARGUMENT

The Court should deny the motion to dismiss because the Court has jurisdiction over the Masts' counterclaims, none of the claims is barred by a statute of limitations, and each of the claims is validly pleaded at this stage, giving due deference to the Masts' factual allegations—which are admittedly contrary to the Does' disputed factual allegations.

### I.   The Domestic-Relations Exception Does Not Limit the Court's Jurisdiction Over the Masts' Counterclaims

There is no basis to dismiss the Masts' counterclaims under the domestic-relations exception. Contrary to the Does' argument, *see* Mem. of Law in Supp. of Pltfs.' Mot. to Dismiss Defendants' Counterclaims, at 8–9, ECF No. 487 ("Doe MTD Br."), their false kidnapping accusations are actionable without regard to the ultimate validity of the Masts' adoption.

The Does have defamed—and continue to defame—the Masts as kidnappers and "child-snatch[ers]." *Id.* at 9. Those accusation are false and damaging, and that remains so even if it turns out that the Masts' adoption was not legally valid. There is a world of difference between obtaining an adoption order that turns out to be legally invalid due, for example, to a defect in the court's jurisdiction and being a kidnapper. Kidnapping is a criminal offense, *see* Va. Code § 18.2–47, and a crime of moral turpitude, R. SMOLLA, LAW OF DEFAMATION § 7:13 (2d ed.). Wrongly accusing someone of kidnapping is thus defamatory *per se*. *See Yeagle v. Collegiate Times*, 255 Va. 293,

9

296 (1998) (acknowledging that "a statement is defamatory *per se*" if "it imputes the commission of a crime involving moral turpitude"); *Great Coastal Exp., Inc. v. Ellington*, 230 Va. 142, 146, 334 S.E.2d 846, 849 (1985) ("At common law, defamatory words which are actionable *per se* . . . [include words] which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished."). The notion that the Masts' adoption might be legally invalid is not remotely equivalent to their being criminals. Indeed, the Virginia Circuit Court previously rejected the Does' suggestion that the Masts acted out of any improper motive, much less a criminal one.

The Does' argument under the domestic-relations exception thus misconstrues the Masts' defamation claim and what the trier of fact will need to decide in order to resolve it. The claim is not based on the notion that the Does' legal challenges to the adoption are false statements of fact, and the trier-of-fact can conclude that the Does have made false and damaging statements about the Masts' actions and motives without needing to assume or decide the validity of the adoption. Indeed, that is precisely what the Virginia Circuit Court previously did: rejected the Does' kidnapping allegations in the same decision that allowed their collateral attack on the adoption to move forward.

Under the fairly formal approach that the Court previously took to the domestic-relations exception, *see* MTD Mem. Op. 27–49, there is no basis to dismiss the Masts' claims on jurisdictional grounds. Defamation, intentional infliction of emotional distress, and civil conspiracy are all "'generally cognizable common law tort[s]' that [are] 'in no way dependent on a present or prior family relationship.'" *Id.* at 40 (quoting *Wasserman v. Wasserman*, 671 F.2d 832, 834–35 (4th Cir. 1982)). Defamation claims may be actionable in federal court, notwithstanding the domestic-relations exception, even when they relate a covered domestic proceeding provided that they do not seek prospective relief that would interfere with that proceeding. *See, e.g., Shophar v. Pathway Fam. Servs., LLC*, No. 22 CV 02333, 2024 WL

3950215, at *6 (N.D. Ill. Aug. 27, 2024); *Gilliam v. Ordiway*, 147 F. Supp. 3d 664, 669 & n.4 (E.D. Mich. 2015); *Johnson v. Myers*, No. 10-CV-1964 JS WDW, 2011 WL 809999, at *3 (E.D.N.Y. Feb. 23, 2011); *McKnight v. Middleton*, 699 F. Supp. 2d 507, 519 (E.D.N.Y. 2010), *aff'd*, 434 F. App'x 32 (2d Cir. 2011).

The upshot of the Does' theory is that, so long as they challenge the legality of the Masts' adoption, they are free to defame them as kidnappers and child-snatchers with impunity. That is not the law. The Masts may pursue their claim against the Does' false and defamatory out-of-court statements without interfering with the state-court proceedings or requiring the trier of fact to determine the adoption validity issues being adjudicated there. Might it be necessary at trial for the Court to establish some parameters about the arguments the parties can make? Sure. But the same goes for the Does' own claims of fraud, intentional infliction of emotional distress, and conspiracy, which the Court has held may proceed. And of course, if the Court chooses to revisit its prior holding and to apply a more stringent approach, then it must do so with equal scrutiny of the Does' own claims.[1]

Finally, the Does acknowledge that, as goes the Masts' defamation claim, so goes their intentional infliction of emotional distress and civil conspiracy claims. *See* Doe MTD Br. 10. Here, for the same reasons, the Court has jurisdiction over all three.

## II. The Masts Have Pleaded a Valid Defamation Claim

### A. The Defamation Claim Is Timely Because the Does' Defamation Continues Unabated & Under the Republication Doctrine

The Masts' defamation claim is not time-barred. The Does have undertaken a systematic and sustained effort to defame the Masts that, admittedly, started more than one year ago. Indeed, they

---

[1] *See* Counterclaim Compl. ¶ 2 ("The Masts continue to maintain that this Court lacks subject matter jurisdiction over Plaintiffs' claims and that this matter must therefore be dismissed in its entirety. But in light of the Court's ruling on jurisdiction, and so long as this Court continues to exercise subject-matter jurisdiction over this case, the Masts assert counterclaims for defamation, intentional infliction of emotional distress, and civil conspiracy.").

11

continue to press their false and defamatory narrative today. *See, e.g.*, Doe MTD Br. 9 (referring to "[t]he legality of the process used by the Masts to accomplish their *child-snatching* goal") (emphasis added). As the Does seem to acknowledge, however, the Masts are not foreclosed from bringing their defamation claim now. *See, e.g.*, Doe MTD Br. 11 (arguing that the Masts' claim is "largely barred"). The Masts do not need to show that the statute of limitations relates back to the original filing of Plaintiffs' complaint. *Cf.* Doe MTD Br. 13–17. Rather, their claim is timely because (i) the Does have continued to defame them within the one-year limitations period and (ii) they have caused their prior defamatory statements to be republished within the one-year limitations period.

*First*, the Counterclaim Complaint alleges that the Does have defamed and continue to defame the Masts beyond August 7, 2023. *See, e.g.*, Counterclaim Compl. ¶ 118 (alleging that "[t]he Does' false narrative continues to be repeated and republished" and citing articles from September 2023 and July 2024). Indeed, as already noted, the Does continue to press their false narrative to this day. And while the Does' legal filings in this matter may not constitute actionable defamation, their out-of-court statements and communications certainly are. *See id.* ¶ 123 ("The defamatory statements are unambiguously about Joshua and Stephanie Mast, and they were made to third parties, including but not limited to reporters at the Associated Press."). The Does appear to acknowledge that their defamatory statements continued after August 7, 2023, *see* Doe MTD Br. 11, and the motion to dismiss based on the statute of limitations may be denied on that basis alone.

*Second*, the Masts' defamation claim is timely even as to defamatory statements made before August 7, 2023, because the Masts have credibly alleged the republication of those statements. *See* Counterclaim Compl. ¶¶ 115, 118–19, 125. "It is well settled that the author or originator of a defamation is liable for a republication or repetition thereof by third persons, provided it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication." *Weaver v. Beneficial Fin. Co.*, 199 Va. 196, 199 (1957); *see also Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 689 (4th Cir. 1989). "As a general rule, each time defamatory matter

12

is brought to the attention of a third person there is a new publication constituting a separate cause of action against the person responsible for such new publication." *Weaver*, 199 Va. at 200 (quotation omitted). "[T]he original publication date of these statements does not prohibit [the plaintiff] from bringing [suit]" where "the statements—if republished—were reiterated within one year of [the plaintiff's] bringing th[e] action." *Depp v. Heard*, 104 Va. Cir. 377, at \*6 (2020); *accord Weaver*, 199 Va. at 201 ("The republication was a new wrong and the alleged cause of action arose at this time."). The Does' defamatory statements before August 7, 2023, are thus actionable because they have been republished since then.

Contrary to the Does' suggestion, this is not an instance in which the mere posting of hyperlinks to old stories falls short of the republication standard. *See* Doe MTD Br. 11 (citing *Lokhova v. Halper*, 995 F.3d 134, 142 (4th Cir. 2021); *Lokhova v. Halper*, 441 F. Supp. 3d 238, 252 (E.D. Va. 2020)). *Lokhova* involved a wholly distinguishable situation in which the only alleged republication within the limitations period was an *admittedly non-defamatory article* which happened to contain a hyperlink to a prior article containing alleged defamation. *See* 441 F. Supp. 3d at 254 ("Lokhova does not contend that the April 9, 2019 article was itself defamatory; instead, she appears to be arguing that because the article contains a link to the May 18, 2018 article, it constitutes a republication of that earlier article, which Lokhova does allege was defamatory."). Other courts have distinguished *Lokhova* as holding only that a "'mere hyperlink,' without more, is not a republication." *Nunes v. Lizza*, 12 F.4th 890, 900 (8th Cir. 2021) (quoting *Lokhova*, 995 F.3d at 143); *see also Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 278 (S.D.N.Y. 2016) (holding that "[w]hether a particular event constitutes a republication giving rise to a new cause of action with a refreshed limitations period must be analyzed on a case-by-case basis" and that conduct beyond mere hyperlinking may suffice) (quotation omitted). Here, the republication of the Does' defamatory statements occurred in the context of new articles that incorporated some or all of

13

their prior defamatory statements, including (in many instances) to providing hyperlinks to the prior stories.

Take, for example, two Associated Press stories the Masts specifically cited, which were published after August 7, 2023. *See* Counterclaim Compl. ¶ 118 (citing, *inter alia*, M. Mendoza, C. Galofaro, & J. Linderman, *Secret records: Government says Marine's adoption of Afghan orphan seen as abduction, must be undone*, Associated Press (Sept. 15, 2023), https://apnews.com/article/afghan-war-orphan-marine-baby-abduct-adoption-8a0411f16067d73ad0d86b706f5ae46d; M. Mendoza, J. Linderman, & C. Galofaro, *Appeals court voids Marine's adoption of Afghan orphan; child's fate remains in limbo*, Associated Press (July 16, 2024), https://apnews.com/article/afghan-baby-adoption-marine-joshua-mast-2496683d5dbab37aa091e42edc24ad16). The September 15, 2023 article provides a prominent link to an earlier October 20, 2022, story that relays the Does' defamatory statements, but it does not provide a "mere hyperlink." The link comes in the context of a sentence describing "an act of international child abduction." The article likewise relays the position of the United States Government in sealed litigation filings, which in turn are based on the Does' allegations. The article describes, for instance, the Biden Administration's concern that "'a narrative that a U.S. servicemember stole a Muslim child' [is] harming America's standing on the world stage." That is precisely the false narrative, recounted in the linked story, that the Does have disseminated as widely as they can. The July 16, 2024, similarly contains not just hyperlinks to prior stories containing the Does' defamatory statements but amplifies and bolsters their defamatory narrative. It includes, for instance, a quote from an allied attorney at the National Center for Youth Law, who described the Masts' conduct as "unlawful" and responsible for "profound and unnecessary suffering."

Another Associated Press article published after the Counterclaim Complaint was filed again provided a link to a story about the Does' prior defamatory statements in describing what it characterized as "his zealous quest to bring home the baby girl." J. Linderman, C. Galofaro, & M.

14

Mendoza, *Military board substantiates misconduct but declines to fire Marine who adopted Afghan orphan*, Associated Press (Oct. 9, 2024), https://apnews.com/article/afghan-baby-adoption-military-marines-0600f1da2b7af43490784aa27cd3e597. That story also repeats the Does' allegation that, "[o]nce in the U.S., [Joshua] Mast used the adoption papers to get the federal government to take the child from her Afghan relatives and give her to him," with another link to another story bearing their false allegations. And as the Masts have pleaded, "[n]umerous other media outlets have picked up on the story as well, further republishing the Does' false 'kidnapping' narrative and the false statements that they have made in support of that narrative." Counterclaim Compl. ¶ 119; *see, e.g.*, Evrim Agaci, *Afghan Child Custody Battle Intensifies*, The Pinnacle Gazette (July 19, 2024), https://evrimagaci.org/tpg/afghan-child-custody-battle-intensifies-1096; Liz Friden, *Afghan child remains in limbo after appeals court voids U.S. Marine's adoption*, Fox News (July 17, 2024), https://www.foxnews.com/us/afghan-child-remains-limbo-appeals-court-voids-u-s-marines-adoption.

These recent stories which perpetuate the Does' false and defamatory narrative and contain prominent links to prior stories bearing further details of that narrative go well beyond the "mere hyperlinks" that courts have held not to constitute republication. The Masts have also credibly alleged—and the Does cannot dispute at this preliminary stage—that the Does false kidnapping accusations have continued up to the present day, and certainly within the one-year limitations period, giving rise to a continued line of defamatory articles and other public statements. That is more than enough to make the Masts' claim timely.

B.   **The Defamation Claim Is Validly Pleaded**

The Masts have validly pleaded a claim of defamation against the Does under Virginia law.[2]

---

[2] The Does contend that Virginia law should govern. *See* Doe MTD Br. 17 n.12. The Masts do not dispute that at this stage, particularly since they agree that any differences in state law are not material

Joshua and Stephanie Mast have adequately pleaded that the Does made provably false statements about them—either directly or through their agents. As an initial matter, the Does wrongly suggest that the Masts' defamation claim is subject to a heightened pleading standard under Virginia law. *See* Doe MTD Br. 18 (citing *Brackney-Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 623 (W.D. Va. 2023)). While that decision recounts the heightened pleading standard for defamation under Virginia law, *see Brackney-Wheelock*, 652 F. Supp. 3d at 623–24 (citing *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 134 (2003)), the court did not actually apply it to dismiss any of the defamation claims in that case. And for good reason. It is well-established that "federal pleading standards are applicable to [a Rule 12(b) motion], even if the merits of the underlying claims will ultimately be decided under Virginia law." *Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*, 995 F. Supp. 2d 512, 514 n.1 (E.D. Va. 2014); *see also Hatfill v. New York Times Co.*, 416 F.3d 320, 337 (4th Cir. 2005) (holding that the only relevant questions on a Rule 12(b) motion in a diversity case are whether the "allegations are sufficient under Rule 8 to give [the defendant] 'fair notice of what [the plaintiff's] claim is and the grounds upon which it rests,'" and whether "they are adequate to state the final necessary element of a claim") (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 507 (2002)).

The Counterclaim Complaint more than adequately puts the Does on notice of the false and defamatory statements on which the Masts' defamation claim is based. The Masts have described in detail how they were candid with the Does about their intentions for the Child and the fact that they had obtained an adoption order in the United States. *See* Counterclaim Compl. ¶¶ 61–80. Notwithstanding this reality, the Does had repeatedly and falsely accused the Masts of fraud and deception in furtherance of an alleged scheme to kidnap the Child. *See id.* ¶¶ 87–108. To be sure, the Does have made these statements in testimony and court filings, which the Masts do not challenge

---

for purposes of this Rule 12 motion.

here directly as actionable defamation. But the Masts have also alleged, "upon information and belief, [that] the Does have repeated those false claims, directly and through agents and intermediaries, [to] the news media in a successful effort to plant defamatory news stories about Joshua and Stephanie Mast." Counterclaim Compl. ¶ 87.

The Does argue that the Masts cannot refer to their in-court statements to identify the content of their defamatory out-of-court statements, *see* Doe MTD Br. 20, but that is fundamentally wrong. To begin with, their argument turns primarily on the misguided notion that the Masts are held to Virginia's particularly pleading standard. As explained above, they are not. But even more fundamentally, the Does "cannot shield [themselves] from liability for [their] widely disseminated out-of-court statements by casting them as protected statements about in-court litigation; an attorney's out-of-court statements to the public can be actionable, even if those statements concern contemplated or ongoing litigation." *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 58 (D.D.C. 2021) (citing cases). The same principle applies *a fortiori* to the parties themselves. Just because the law provides a privilege to court filings to protect the judicial process, that does not mean parties or their attorneys are free to spread their lies through the news media after filing them in court. There is no question that the Does and at least two of their attorneys have made out-of-court statements to the media about the case.

These allegations more than satisfy the applicable federal pleading standards to state actionable false statements by the Does. As to Joshua and Stephanie Masts' defamation claim, the Does dispute only whether the Counterclaim Complaint adequately alleges that they made false statements. *See* Doe MTD Br. 17–21. They do not dispute that they have made statements *about the Masts*. *Cf. id.* at 21–23 (raising this sort of challenge to Defendant Richard Mast's defamation claim). Nor do they contend that the Masts have failed to allege that their statements were made with the requisite intent. The Masts' defamation claim must therefore be allowed to proceed. To the extent the Court has any doubts, however, it should make that clear and afford the Masts an opportunity to

17

replead with greater specificity as courts typically when they apply a heightened particularly pleading standard. *See, e.g.*, *Pullen Farm, LLC v. Seedway, LLC*, No. 3:23CV00032, 2024 WL 1252374, at *1 (W.D. Va. Mar. 22, 2024) (Ballou, J.) (dismissing claim "with leave to amend" for failure to meet particularly pleading requirement); *Entrepraneur Dream Team v. Certain Interested Underwriters of Lloyd's Ins. Co.*, No. 3:22CV529-RCY, 2023 WL 5167007, at *9 (E.D. Va. July 7, 2023) ("Typically, failure to plead fraud with particularity does not support a dismissal with prejudice. To the contrary, leave to amend is almost always allowed to cure deficiencies in pleading fraud.") (cleaned up), *report and recommendation adopted*, No. 3:22CV529 (RCY), 2023 WL 5670041 (E.D. Va. Aug. 31, 2023); *CertusView Techs., LLC v. S & N Locating Servs., LLC*, 107 F. Supp. 3d 500, 523 (E.D. Va. 2015) ("Courts ordinarily grant leave to amend following a dismissal for failure to satisfy Rule 9(b)'s particularity requirement.").

### III. The IIED & Civil Conspiracy Claims Are Validly Pleaded

The Masts have also validly pleaded claims of intentional infliction of emotional distress and civil conspiracy against the Does under Virginia law. Here again, as with their jurisdictional argument concerning the domestic-relations exception, the Does argue that the Masts' claims for intentional infliction of emotional distress and civil conspiracy must rise or fall with their defamation claim. *See* Doe MTD Br. 23–24. And once again, that means that the Masts' claims should survive for the same reasons that the defamation claim survives. And of course, if the Court were to hold that the defamation claim is subject to a particularly pleading standard which the Masts have failed to meet, then it should allow the Masts leave to amend on all three claims given their interconnection.

### CONCLUSION

The Court should deny the motion to dismiss.

Dated:  October 21, 2024 	Respectfully submitted,

                                            */s/ John. S. Moran*  
John S. Moran (VSB No. 84326)  
MCGUIREWOODS LLP  
888 16th St. N.W., Suite 500  
Black Lives Matter Plaza  
Washington, DC 20006  
T: (202) 828-2817  
F: (202) 828-3327  
jmoran@mcguirewoods.com  

*Attorney for Defendants Joshua & Stephanie Mast*