Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1                UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
2                  CHARLOTTESVILLE DIVISION

3   ****************************************************************

4   BABY DOE, ET AL.,           CIVIL CASE NO.:  3:22CV49
                                JANUARY 15, 2025, 1:02 P.M.
5                               CHARLOTTESVILLE, VIRGINIA
                                MOTIONS HEARING
6           Plaintiffs,
    vs.
7
    JOSHUA MAST, ET AL.,        Before:
8                               HONORABLE ROBERT S. BALLOU
                                UNITED STATES DISTRICT JUDGE
9           Defendants.         WESTERN DISTRICT OF VIRGINIA

10  ****************************************************************

11  APPEARANCES:

12
    For the Plaintiffs:         MAYA MIRIAM ECKSTEIN, ESQUIRE
13                              KEVIN ELLIKER, ESQUIRE
                                LEWIS FRANKLIN POWELL, III, ESQUIRE
14                              Hunton & Williams LLP
                                Riverfront Plaza, East Tower
15                              951 East Byrd Street
                                Richmond, VA 23219
16                              804-788-8788

17  For Defendants Joshua and Stephanie Mast:
                                JOHN SAVAGE MORAN, ESQUIRE
18                              McGuireWoods LLP
                                888 16th St. N.W., Suite 500

19

20

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                     255 West Main Street, Suite 304
23                   Charlottesville, Virginia  22902
                     434.296.9284

24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    APPEARANCES CONTINUED:

2

3    For Defendant Kimberley Motley:
                              MICHAEL ROGER HOERNLEIN, ESQUIRE
4                             Alston & Bird LLP
                              101 S. Tryon Street, Ste. 4000
5                             Charlotte, NC 28280
                              704-444-1041

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  (Proceedings commenced, 1:02 p.m.)

2           THE COURT:  Good afternoon, everybody.

3           Let's call our case if we can, please.

4           THE CLERK:  Doe and others versus Mast and others,

5  Civil Action Number 3:22-cv-49.

6           THE COURT:  All right.  Let the record reflect that

7  the parties are present by their counsel.

8           I don't think I've had the pleasure of meeting

9  anyone.  So I'm going to start, Ms. Eckstein, by process of

10 elimination, being the only woman on the pleadings, I know who

11 you are.  If you could go ahead and introduce your team, then

12 we'll go over to the defendants' side.

13          MS. ECKSTEIN:  That would be great.  Sitting with me

14 at counsel table is Kevin Elliker, who will be arguing today

15 the pending motions, and also Lewis Powell.

16          THE COURT:  Mr. Powell, I think we've met before --

17          MR. POWELL:  We have, sir, yes.

18          THE COURT:  -- a long, long time ago.  I think it was

19 a mediation we had involving a swim team, if I remember

20 correctly.

21          MR. POWELL:  You're exactly correct.  Good to see you

22 again.

23          THE COURT:  Good to see you again.

24          Mr. Moran, I think you have the Masts, if I remember

25 correctly.

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1      MR. MORAN:  Yes, sir.  John Moran of McGuireWoods for

2 the Masts.

3      MR. HOERNLEIN:  Good afternoon, Your Honor.  Mike

4 Hoernlein on behalf of Kim Motley.

5      THE COURT:  Nice to meet you.  I know we don't have

6 anyone for Mr. Osmani.

7      MR. MORAN:  Mr. Osmani has been dismissed from the

8 case.  Mr. Richard Mast is not my client, but he is not a party

9 to this motion, and so he's not here.

10      THE COURT:  Right.  Okay.  And he's pro se; is that

11 right?

12      MR. MORAN:  He is represented by Mr. Yerushalmi.

13      THE COURT:  All right.  Very well.  So there are a

14 couple of things I'd like to do.  We can follow these up

15 afterwards since we don't have anyone here.  I am going to kind

16 of take a pulse at the end as to kind of exactly -- we'll

17 figure some of it during the course of the argument -- where

18 things are.  I'd like to get this case set for trial so that we

19 can move forward.  I see you looking for your calendar.  We're

20 not going to do it today since we don't have all the counsel

21 here, but we'll get some dates set out.  If we have to schedule

22 a conference call next week to get it on the calendar, we can.

23      It strikes me that especially since the Court of

24 Appeals has ruled regarding the original custody and adoption

25 orders, and I think, if memory serves me correctly, the Supreme

         Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025


1   Court has denied a writ --

2            MR. MORAN:  No, Your Honor.  The Supreme Court has

3   granted review.

4            THE COURT:  I looked at it last night and I thought I

5   saw it was refused on October 2nd.

6            MS. ECKSTEIN:  It granted review and it's scheduled

7   for a hearing in the February sitting, which is February 24th

8   through 28th.

9            MR. MORAN:  So we don't know, but I think we expect a

10  ruling around July.

11           MS. ECKSTEIN:  Hopefully earlier.

12           MR. MORAN:  By around July.

13           THE COURT:  I'll age myself.  When Chief Justice

14  Carrico came in, he set the schedule.  A case is not going to

15  sit in the Virginia Supreme Court for more than a year.  So you

16  all got up there in July, August.  So you know you'll have

17  something by then.

18           All right.  So we're primarily here today then -- one

19  other thing.  It fell off my radar screen.  I know there is a

20  motion to reconsider the sanctions order.  I realized that as I

21  was going back through all this today, that I had not ruled on

22  that. I'll get that ruled on quickly.

23           Is there any reason for argument on that or just

24  submit it on the papers?

25           MR. MORAN:  Your Honor, we would be pleased to

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  address any questions the Court may have, but we'd otherwise

2  submit it on the papers.

3          THE COURT:  I would love to tell you that I've read

4  it, but just in getting ready for this, I realized I hadn't

5  touched it.  So I haven't looked back at it.  I need to look

6  not only at your motion and the response, but also go back and

7  reread Judge Moon's sanctions order and also the earlier order

8  that I know part of that deals with what the Fourth Circuit has

9  in front of it now, as well as which order is it really dealing

10 with.

11         Okay.  So let's address the motions to dismiss.

12 Mr. Elliker?

13         MR. ELLIKER:  Elliker, Your Honor.

14         THE COURT:  Mr. Elliker, go right ahead.

15         MR. ELLIKER:  Thank you very much, Your Honor.  And

16 Your Honor, I have -- because I think it might be helpful given

17 the articles -- I have a demonstrative, if I could pass that

18 up.

19         THE COURT:  That would be fine.  I've printed out all

20 the articles as well.

21         And Mr. Moran, do you have a copy of this?

22         MR. MORAN:  Yes, Your Honor.

23         THE COURT:  Okay.  Very good.

24         MR. ELLIKER:  Good afternoon, Your Honor.  Kevin

25 Elliker from Hunton on behalf of John and Jane Doe.

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1           As you noted, we're here on the plaintiffs' motions

2    to dismiss the counterclaims filed by Joshua and Stephanie Mast

3    and also by Kimberley Motley.  Even though there is two sets of

4    claims, they are effectively identical.  Where there is any

5    kind of distinction, I will try to parse that out.  But both

6    sets of defendants have alleged defamation, IIED and

7    conspiracy.  As we laid out in our papers, we think that the

8    motion really boils down to the viability of the defamation

9    claims.  I think that Joshua and Stephanie Mast have agreed

10   with that.  Ms. Motley has a contention that I can talk about,

11   about why she thinks that her conspiracy claim could survive

12   the dismissal of defamation.  At the tail end of our reply

13   brief we explain why that's pretty clearly not the case under

14   Virginia law.  But on the assumption that what we're really

15   just talking about here is the viability of the defamation

16   claims, that's what I'm going to address today.

17           There's three categories or three parts to the

18   argument that I'd like to address.  First is the question of

19   the domestic relations exception.  The second is the statute of

20   limitations, and then the third is the sufficiency of those

21   defamation allegations.

22           THE COURT:  It struck me that as it relates to the

23   defamation -- the domestic relations exception -- and this is

24   the reason -- I don't know how I missed they granted review in

25   the Supreme Court because I completely misread it.  So don't

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    trust anything I say from here on out.  But at least at this

2    point in time, the custody order and both adoption orders are

3    void *ab initio*.  The court didn't have subject matter

4    jurisdiction, right?  And so it makes what Judge Moon did

5    imminently reasonable; and that is that the facts and

6    circumstances that relate to your underlying claim all are what

7    happened in Afghanistan coming over to the United States, and

8    the Masts gaining -- I'll use custody in the terms of

9    physically getting Baby Doe.  And then it kind of stops there

10   in some respects.  To the extent that there's going to be

11   further proceedings with respect to the custody and adoption of

12   Baby Doe, that's going to go forward really on the strength or

13   not of each party's position as to where they are today.

14         Why would the domestic relations exception not be

15   dealt with the same way as it relates to defamation, which all

16   talks about the actions of the Masts to get the Does over here

17   essentially was kidnapping.  That's what they claim is

18   defamation.  That all occurred based upon what they're going to

19   argue is their belief that they had a valid and existing legal

20   order.  And it doesn't matter what happens after that's no

21   longer valid and existing, right?

22         MR. ELLIKER:  Well, Judge, I think I agree with you

23   that Judge Moon's analysis guides what happens here, but I

24   think it actually -- it tilts the other direction in favor of

25   dismissing these claims.  And the reason is that the

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  plaintiffs' claims that survive the motion to dismiss accrued

2  and arose out of events that all took place before this lawsuit

3  was filed, before any of the custody disputes started to be

4  litigated in Virginia state court.  The defamation claims, by

5  definition, don't arise until after this lawsuit has been

6  filed.  And the basis of the defamation claims with respect to

7  the Masts is --

8         THE COURT:  But if the -- but if the custody battle

9  that existed then is over -- I know it's not over because

10  you're in the Supreme Court, but if it's determined that there

11  is -- that those are void orders, what does it matter?  It's

12  not what does it matter, but how does the domestic relations

13  exception, which is really -- and Judge Moon was very clear.

14  It's very narrow where the point of the lawsuit is to seek an

15  order that will provide for custody, adoption or a divorce

16  decree.  And he allowed your claims to go forward -- or the

17  three that go forward -- because they only sought money damages

18  in traditional tort fashion.

19         How is it any different?

20         MR. ELLIKER:  Well, Judge, I would say that to the

21  extent you're looking at what the Court of Appeals did as

22  somehow making a decision that removes the issue of the

23  domestic relations exception, I would just point out that Judge

24  Moon's decision dismissing our claims was entered after that

25  Court of Appeals decision was entered.  And on page 23 of ECF

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  455, Judge Moon talks about the fact that the Court of Appeals

2  has voided those orders *ab initio*.  And so I just don't think

3  that under Judge Moon's -- the way that he applied the

4  exception to the plaintiff's claims, that that decision coming

5  down somehow takes care of that issue, because again, the

6  Masts' claim is that they could not have kidnapped their own

7  daughter, is essentially what they're saying.  They were

8  defamed, and they say in their allegations that they were not

9  nefarious wrongdoers.  They're loving and caring adoptive

10  parents.

11        And so the language Judge Moon used in his opinion

12  where he said that the tortious interference with parental

13  rights and the false imprisonment claims could not move forward

14  at this time with respect to the plaintiffs, he said it's hard

15  to see how those claims could go forward without having to

16  explore the scope and extent of the claims to parental rights.

17  And again, the whole notion here of kidnapping is that -- you

18  know, we talk about it in the briefing that the allegations of

19  abduction without legal cause, right -- I mean, however you

20  want to call it, if you want to parse words about it, whether

21  it should be called kidnapping or not, the assertion is that

22  they have been defamed because they did not kidnap the child.

23  And the truth is that the legality of what they did is at issue

24  in the court proceedings.  And I think that -- I recognize,

25  Your Honor, it's a concededly bizarre circumstance for the

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1   domestic relations exception to arise, but I also think this is

2   a very bizarre and surreal set of facts through which this

3   litigation could come up.  So we would submit --

4            THE COURT:  But in the same vein -- and I'm not going

5   to relitigate what Judge Moon has already decided.  I made a

6   decision when I first started this job that if I ever

7   inherit -- that whenever I inherit a case from another judge,

8   unless the judge made an error of law, it's the law of the

9   case, because otherwise I'm relitigating everything that that

10  judge has done.

11           But the underlying claims that you have as well,

12  whether they be fraud or the conspiracy or the intentional

13  infliction, also are dependent upon whether there is a valid

14  custody or adoption order, because if the adoption order that

15  was entered in 2020 -- I think it was 2020 -- 2019 to 2020 is

16  valid, then there's no fraud, arguably.

17           MR. ELLIKER:  Well, I'd respectfully push back on

18  that, Judge.  I think that the fraud allegation is that the

19  Masts misled the Does into the material facts that led them to

20  decide to come to the United States.  And that does not --

21  whether or not they misled the Does in that respect has nothing

22  to do with the validity of the order that they held in their

23  hands.  Imagine a circumstance in which there is a way for an

24  American family to get an adoption decree for a child who has

25  never set foot in America.  There's not, but imagine there's a

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  way that there could be that circumstance.  Even in that

2  circumstance, if the American family then contacted the foreign

3  family and lied to them and said, We want to bring your child

4  here just to give them medical care, we'll take care of it,

5  that would still be the basis for a fraud claim.

6            THE COURT:  Maybe.  Maybe not.  It becomes more --

7  much more challenging if they have a valid and enforceable

8  legal order.

9            MR. ELLIKER:  I don't disagree with you on that,

10  Judge.  And thankfully recognizing the challenge of applying

11  the domestic relations exception, I'd just point out that even

12  if the Court is inclined to think that perhaps there is

13  jurisdiction or could rule in the alternative, we think that

14  even if there is subject matter jurisdiction, these claims

15  should not move forward for the other two reasons, if I could

16  move to those.

17            THE COURT:  And you may have more solid ground here.

18            MR. ELLIKER:  Well, I would say we're treading on

19  ground where there's more case law.

20            THE COURT:  Right.  I guess that's a better way to

21  put it.

22            MR. ELLIKER:  In that respect, Judge, I think it's

23  helpful to start on the statute of limitations issue where the

24  parties agree.  I think all the parties agree that --

25            THE COURT:  Before you go there, one other thing that

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    jumped out at me is that -- and I have to go back and look at

2    the complaint, but it struck me that John and Jane Doe are

3    being dealt with as one, that it's the statements of the Does,

4    but aren't they separate defendants?  Don't they have to

5    identify the separate statements made by each defendant as to

6    what -- who defamed who?

7            MR. ELLIKER:  I think that that's -- candidly, Judge,

8    I haven't researched what kind of, you know, joint and

9    severable liability there is among married couples.  Frankly,

10   the Masts -- Joshua and Stephanie Mast -- have filed these

11   claims jointly as having been jointly defamed.  So we could

12   certainly look into that and submit supplemental briefing on

13   that issue.

14           THE COURT:  I mean, I think you can certainly -- a

15   spouse can certainly ratify what their spouse does.  I mean, if

16   my wife and I are sued for defamation based upon statements

17   that I made only, and she hasn't said or done anything, she's

18   not responsible for those statements, unless necessarily she

19   ratifies them, right?  I think that's the state of Virginia

20   law.

21           MR. ELLIKER:  That sounds right to me, Judge.  I

22   would say that that also gets towards the insufficiency of the

23   allegations themselves, which I'll get to -- turn to in a

24   moment, if that's okay.

25               On the statute of limitations issue, the parties

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1   agree we're talking about the application of Virginia law for

2   the limitations period, and that that limitations period is one

3   year from when the counterclaims are filed.  There is no

4   argument that the original filing of the lawsuit by the

5   plaintiffs tolled that time period.  And so we're really

6   talking about under Virginia law, the allegedly defamatory

7   statements have to have been made within the year preceding the

8   filing of their counterclaims.  So we're talking about a period

9   between September and August of 2023 to September/August of

10  this past year, because there's a few weeks' difference between

11  when they filed their counterclaims.

12          THE COURT:  And I think your argument is really easy.

13  You've got two articles at that point.  It's the republication

14  piece that's the more difficult piece.

15          MR. ELLIKER:  And I'll jump right to that, Judge.  We

16  think that the issue of republication, as you point out, the --

17  well, I should say this:  I think that the implication of the

18  republication argument that's been made by the defendants here

19  in support of their counterclaims is the tacit acknowledgment

20  that that's the only way that they can get in the claims that

21  predate that year.

22          THE COURT:  It's from that October 2022 article, I

23  believe.

24          MR. ELLIKER:  Right.  And Your Honor, I can explain

25  what this chart shows now.  The chart here has listed the seven

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    articles that have been discussed in the pleadings and the date

2    that they were published.  And then you can see there are six

3    different categories that we've put across the top to identify

4    a reason why that article would not provide a sufficient basis

5    for a defamation claim.

6              I would just point out, before I forget, article

7    number 2 on this list is from the *New York Times* magazine.

8    It's one of the longer articles. Your Honor said you printed

9    them out.  That *New York Times* magazine article was cited by

10   Richard Mast.  And so it was discussed in the original motion

11   to dismiss because it was relevant to him.  That article has

12   not been cited by either of the counterclaims that remain in

13   front of you.  Ms. Motley generically mentions the *New York*

14   *Times*, but doesn't cite this article.  So I'd just point out

15   that that's why that very first column says, Article not

16   alleged.  It's not even included there.

17             But with respect to republication, Your Honor, we're

18   only talking about articles 6 and 7 at that point as being a

19   basis to try to draw back in any of the preceding five

20   articles.  As we point out in our papers, I think that the

21   argument is pretty clearly foreclosed by the Fourth Circuit's

22   decision in *Lokhova* from 2021.  That was a published decision

23   written by Judge Thacker and it talks about this argument that

24   republishing -- it talks about the application of the

25   republication doctrine in the context of the Internet.  It says

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  when there is a hyperlink included in an online publication,

2  that hyperlink in and of itself does not constitute a

3  republication.  And I would just point out to you that on page

4  143 of the opinion, after discussing case law from the Third

5  Circuit about this issue, the court wrote, We see no principled

6  reason for holding a hyperlink distinct from a traditional

7  reference, such as a footnote, for purposes of republication.

8         So imagine, if you will, Judge, looking at any of

9  those articles where there is a hyperlink, instead of it being

10  a link that you could click on, a footnote, and the footnote

11  drops, and at the bottom there's a Bluebook citation to the

12  article that would have been hyperlinked.  That is exactly the

13  circumstance here.  Now --

14         THE COURT:  As opposed to pulling a quote out of the

15  article and then putting it into the new article that Joe Smith

16  said such and such.

17         MR. ELLIKER:  Absolutely.  And Judge, I think, you

18  know, all of us are I think fairly tech savvy these days.

19  There are frequently websites that we might go to where they

20  would say, Did you see this article that was written in the *New*

21  *York Times*?  And then there's a block quote and you can read

22  that.  And there may be a hyperlink within it, but it actually

23  republishes it.  And I think that is the circumstance where the

24  *Nunes versus Lizza* case is addressing, the Eighth Circuit

25  decision the Masts discuss.  In that case, Ryan Lizza, who is a

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

 1  journalist, had written an article that Congressman Devin Nunes

 2  said was defamatory.  And then he retweeted a link to it.  And

 3  I do want to -- I do feel compelled to correct something in our

 4  briefing, Judge.  The *Lizza* case is not a case about statute of

 5  limitations.  It's actually about sufficiency of alleging

 6  actual malice.  What Congressman Nunes argued was that the

 7  context of the retweet itself was another defamatory

 8  republication because the retweet came after Nunes had filed

 9  his lawsuit.  The idea was:  Here's this defamatory article.

10  Journalist gets sued.  After he gets sued, knowing it's

11  disputed, he goes, hey, I've got a great story for my readers

12  to read.  And then retweets it.

13          THE COURT:  Publishes it again.

14          MR. ELLIKER:  Exactly.

15          And so the Eighth Circuit says that's sufficient to

16  show actual malice, and they did that by talking about why that

17  is a valid republication.

18          There is a citation in the Eighth circuit to the

19  Fourth Circuit *Lokhova* decision and it says, We're not

20  addressing the circumstance that happened in *Lokhova* where

21  there is this argument that -- or I should say, even the Eighth

22  Circuit decision acknowledges that *Lokhova* is not this broad

23  proposition that you can never hyperlink.  It's the context.

24          And we put in the reply, Judge, the two examples that

25  the Masts had for the, you know, alleged context around these

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  hyperlinks in the articles.  One of those hyperlinks, back to

2  the October '22 article, is in the middle of a paragraph where

3  the *Associated Press* is describing statements that the U.S.

4  government has made in the state court proceeding.  And then it

5  ends with -- you know, it has a quote.  The *Associated Press*

6  says, According to secret records reviewed by the *Associated

7  Press*.  It's in the middle of that sentence that there is a

8  hyperlink back to the October article.

9        So we think that even if you were to try to look at

10 the context around the hyperlink to find something that makes

11 this a republication, it's not as though they were saying, look

12 what the -- look what the plaintiffs in this case had said

13 previously.  It's just contextually, not only is it about what

14 the government has said, it's quoting them from something they

15 filed in court.  So even if that were -- even if what the

16 government said were true --

17        THE COURT:  There's no immunity there.

18        MR. ELLIKER:  Right.  Exactly.

19        THE COURT:  From you all's perspective, is -- are

20 there statements that are made -- because there's a

21 discussion -- and I'll talk to Mr. Moran about this -- this

22 kidnapping narrative and what that means, whether that's

23 sufficient.  But are there actual statements made in any other

24 article, other than the October 20, 2022 article, that are

25 attributed to either John or Jane Doe?

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1         MR. ELLIKER:  Your Honor, I note here in the chart

2   there is the second-to-last column.  It says, plaintiffs not

3   quoted.  Those first three articles do have quotes from the

4   plaintiffs.  I know the statement you're thinking of with

5   respect to a quote of Jane Doe saying something about -- using

6   the word kidnap in the first article.  I can't recall off the

7   top of my head, Your Honor, what the statement is in the second

8   one, but I know they are quoted in those articles.

9         THE COURT:  I think in some of those articles -- and

10  Mr. Moran will have a better sense than I -- some of it is

11  talking about their feelings of losing Baby Doe, and whether

12  that's actionable or not is I guess maybe a separate question.

13        MR. ELLIKER:  Well, and Judge, I think that assuming

14  that we're comfortable with -- well, I should say that I think

15  republication --

16        THE COURT:  I know you're comfortable with it.

17        MR. ELLIKER:  I should say I'm very comfortable with

18  it, Judge.  But I would just point out:  Republication ends it,

19  right?  If there is no republication here, then as we were just

20  talking about, the only articles that even purport to quote the

21  plaintiffs -- set aside whether what they actually said was

22  defamatory, but even the ones that actually purport to quote

23  them -- all are time barred.  And so really then you're only

24  looking at those in-period articles which do not quote the

25  plaintiffs.

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1            THE COURT:  And the rest of them are hyperlinked?

2            MR. ELLIKER:  Yes.  And I would say, the third column

3 here says, no later hyperlink.  That is an indication that

4 articles 2 and 3 are not hyperlinked in the in-period articles.

5 So if you're relying on a hyperlink to pull back an article to

6 be timely asserted, articles 2 and 3 don't get -- you don't get

7 those, because there's no hyperlinks to those in the other

8 articles.

9            THE COURT:  In other words, no publication within the

10 one year?

11           MR. ELLIKER:  Right.  Exactly.

12           And I should also say that the particulars of this

13 republication argument are all based on the responses from

14 Joshua and Stephanie Mast in their opposition.  Ms. Motley

15 doesn't identify where and how there has been any

16 republication, other than just generically saying in the

17 complaint that this has been republished, but there is no

18 assertion of when.  And I submit, Judge, that that's likely

19 because Ms. Motley is not mentioned in any articles after

20 November of 2022.

21           THE COURT:  Do I -- if I agree with you with respect

22 to defamation, it does have a waterfall effect with respect to

23 the other claims.  I get that.  But do I have to give, from at

24 least the plaintiff's perspective, the defendants an

25 opportunity to amend, understanding the way the Fourth Circuit

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  tells us how to deal with 12(b)(6)s and so forth?  Factually

2  they may not be able to get there, but don't I have to give

3  them a chance if possibly there is sufficient evidence out

4  there?

5       MR. ELLIKER:  Well, Judge, I would just say that each

6  defamation claim is premised on -- in general in Virginia, if

7  you're making a defamation claim, it's premised on a statement.

8       THE COURT:  Right.

9       MR. ELLIKER:  Now, they have not identified a

10 statement anywhere in their complaint for any of these

11 articles, and so it's hard to see what they would do.  But I do

12 think that as to these seven articles, there is no need to give

13 leave to amend because it would be futile.

14      THE COURT:  They rise and fall.  Right.

15      MR. ELLIKER:  It would be futile.  I mean certainly

16 the first five, those are time barred.  But even number 6 and

17 number 7, we know that there's no statements alleged in the

18 complaints.  And that's probably because, if you go to the next

19 column, the plaintiffs aren't quoted in the articles.  So they

20 don't need leave -- so, I mean, I don't think -- I think we can

21 just look at the practical reality, Judge.  They don't need

22 leave to amend to assert claims of defamation on two articles

23 that don't quote the plaintiffs.

24      THE COURT:  Are you satisfied -- and this is outside

25 the pleadings, but it helps me kind of understand where we

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  are -- is this the universe of articles that deals with this

2  particular issue?  I'm sure the case has been reported on in

3  many different places, but if all they're doing is reporting on

4  pleadings and allegations made in pleadings, that's something

5  different.  Is this the universe we're dealing with?  I'm sure

6  you all know all the publications that have been out there more

7  likely than not.

8          MR. ELLIKER:  I would say it's not, Judge, because

9  the case continues to get media attention.  In fact, in the

10 Masts opposition to our motion to dismiss they identified

11 another article that had been published in the intervening

12 time.  We say, just for the sake of the record, that that's not

13 the basis for a claim because it's not included in their

14 complaint.

15         THE COURT:  But wouldn't you want me, then --

16 especially if I agree with you -- that the statements that are

17 made more than a year before, especially if I agree with you

18 that they're not actionable, wouldn't you want me to deal with

19 that, because I presume that what's being picked up now would

20 all be republication things?

21         MR. ELLIKER:  Absolutely, Judge.  That's why I think

22 in terms of -- if I may be so bold as to think how a decision

23 might come out on this, setting aside the jurisdictional

24 domestic relations issue, we're talking about the articles --

25 all these articles published are all time barred.  To the

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  extent all that we're seeing in articles 6 and 7 are those

2  hyperlinks, that's not sufficient for republication.  And then

3  with respect to any -- and then with respect to articles 6 and

4  7 themselves, that's where we have the other issues, which I

5  believe are not as -- is my third point, so hopefully -- I

6  appreciate your indulgence in talking through these issues --

7  having to do with the insufficiency of actually alleging

8  defamation.  There is a back and forth in the briefing about

9  Virginia pleading standard of *in haec verba* versus what the

10 federal pleading standard is.  I don't think that we need to

11 get too caught up on that because we can just look at what

12 *Twombly* and *Iqbal* say with respect to sufficient allegations,

13 plausibly supporting the claim, and then ask, well, in

14 defamation we're talking about the words, right, the defamatory

15 words.  And they don't allege what the words that our clients

16 said were.  All they talk about is this freeform narrative.

17 And the reason that we find that so problematic, Judge, is

18 because the articles are written about the litigation.  The

19 narrative that they say is defamatory is the narrative of what

20 the litigation --

21         THE COURT:  It's in the pleadings, right?

22         MR. ELLIKER:  And in fact, Judge, yesterday when I

23 was looking at -- looking back through to prepare for today's

24 hearing, I noticed -- trying to figure out again:  What exactly

25 are the defendants saying are the words, if they said any words

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1   at all?  And Ms. Motley's claim at paragraph 103 uses the

2   words, in quotes, lied and lured, that she's defamed because

3   the plaintiff said that she, quote, lied to them, and that she,

4   quote, lured them to the United States.  Those two words don't

5   appear in any of the articles.  Lied and lured are not in the

6   articles.  The word lure appears three times in our amended

7   complaint where we assert our claims against Ms. Motley.  And I

8   think that gives the game away, Judge.  What we're really

9   talking about here is using these defamation claims as a way to

10  fight back against the veracity of the claims that have been

11  brought to them in this court.  Of course, we all know the way

12  to do that is through this litigation system, and not through

13  using a defamation counterclaim.

14          Judge, I'm happy to address any other particular

15  questions you might have, but you already mentioned amendment.

16  I think it would be futile, but I do appreciate your indulgence

17  on this.

18          THE COURT:  One other question just to make sure that

19  I'm clear and that it's on the record.  What, in your view, are

20  the counterclaim plaintiffs' -- or the defendants' --

21  allegations as to what the conduct was to constitute

22  intentional infliction?

23          Is it -- does this all spring out of the defamation

24  or is there -- are there separate acts that are alleged?  I

25  wasn't aware of any separate acts alleged.

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1          MR. ELLIKER:  I'm not aware either.  I do believe,

2     Judge, that the claim is that the intentional infliction of

3     emotional distress was accomplished by way of defamation.  And

4     I'm fairly certain that Mr. Moran in his response agrees with

5     that.  I think even Mr. Hoernlein in his response also agrees

6     that the IIED claim, the substance of that, what is the basis

7     of it, is the defamation.

8          Now, very briefly, the nuanced sort of conspiracy

9     question, Mr. Moran concedes for his clients that everything

10    rises and falls with defamation.  For Ms. Motley there is a

11    contention that the civil conspiracy claim could survive if

12    defamation is dismissed because there was also a conspiracy to

13    commit IIED.  But I think they're all daisy chained together.

14    If IIED is with defamation and defamation goes away, then it's

15    gone.

16         THE COURT:  But likewise, if defamation survives,

17    they're all going to survive more -- well, maybe intentional

18    infliction has a few different elements to it.

19         MR. ELLIKER:  Right, Judge.  And candidly, we did not

20    seek to dismiss the IIED and conspiracy claims on their own --

21    on their own.  We did it by virtue of how they're tied up with

22    defamation.

23         I would also just add that there's a Supreme Court of

24    Virginia case that says Virginia doesn't recognize a conspiracy

25    to commit IIED.  So even if somehow it were on its own, that's

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  not -- you know, there's a theoretical world in which I guess

2  the only claim left is IIED if that didn't depend on

3  defamation.

4        THE COURT:  Okay.

5        MR. ELLIKER:  Thank you very much.

6        THE COURT:  Mr. Moran, how are you today?

7        MR. MORAN:  Doing well.  How are you?

8        THE COURT:  Doing well, thank you.

9        MR. MORAN:  Your Honor, the Masts' defamation claim

10  rests on the straightforward principle that if you knowingly

11  lie about someone and damage their reputation, you are liable

12  in tort, even if you happen to also be litigating against them.

13  Judge Nichols in the DDC case of *U.S. Dominion, Incorporated*

14  *versus Powell,* which we cited in our opposition described, this

15  straightforward principle.  And we think it's telling that the

16  Does didn't address it in their reply brief.

17        THE COURT:  But don't you -- and we can circle back

18  to the domestic relations exception if you want or not -- and I

19  recognize that you all filed this counterclaim notwithstanding

20  the very strenuous objection to Judge Moon's ruling on the

21  domestic relations.  So I know you're not conceding anything in

22  that regard.  Don't you have to identify what the statements

23  are of each of the John and Jane Does?  I mean, they're not

24  responsible for each other's statements, right?

25        MR. MORAN:  So Your Honor, our understanding and as

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  we've alleged it -- and if the Court -- we can get to this

2  later -- if the Court decides that there is more particularity

3  required, we've asked for the opportunity to re-plead to meet

4  it.  But our understanding is that -- and I'll refrain the urge

5  to call some potential media witnesses out of the crowd -- but

6  our understanding is that John and Jane Doe gave a joint

7  interview to the news media in which these statements were made

8  and presumably ratified as to one another.  I mean, you know,

9  again, if the Court felt like we had to get into the

10  granularity of that, then we would do what we felt like we

11  needed to do to do that, as well as statements that were made

12  on their behalf by agents, namely attorneys who represented

13  both of them jointly.  And so just as a matter of the facts as

14  we understand them and have alleged them, we don't believe this

15  is a case where, you know, a husband or wife made a defamatory

16  statement and we're trying to lump them together just because

17  they happen to be married.  We just think the context in which

18  we understand these statements to have been made, and then in

19  fact republished -- I mean, I think in a certain sense even the

20  original articles that quote the Does are actually

21  republications of the statements that were made by the Does or

22  their agents directly to the reporters in the first instance.

23  There was a completed and actionable defamation at that

24  point --

25           THE COURT:  That has to occur, right?

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1          MR. MORAN:  Right.  And I think that's part of

2     what -- but I think that actually matters for the rest of what

3     happens after the one-year limitations cutoff, because what

4     they want to say is, unless we can point to an instance in

5     which the original republication in one of the 2022 articles

6     was repeated verbatim in a subsequent article, we can't show

7     republication.  But to the extent that the subsequent articles

8     are based on the privately published defamation to the

9     reporters that predated the limitations period but then result

10    in the post limitation period reporting, that is also

11    actionable.

12          THE COURT:  What they're really saying -- I think

13    this is Mr. Elliker's argument, and he'll correct me if I'm

14    wrong -- is that in the two articles that are within the one

15    year, is that really all you have are hyperlinks, and that the

16    Fourth Circuit has dealt with this republication issue

17    regarding hyperlinks and said that's not a republication if you

18    simply provide a hyperlink.  And so you may be exactly right

19    that the prior articles contain actionable items, but because

20    they're not quoted, or that statement isn't brought forward

21    into the last two articles but only hyperlinked, you're barred

22    by the statute of limitations.

23          MR. MORAN:  So Your Honor, we don't think it's

24    accurate to say that they're only hyperlinks.  I can explain

25    why we think the hyperlink cases, which we view as a narrow

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1   exception to the otherwise widely well-established

2   republication rule, is basically to say:  Let sleeping dogs

3   lie.  If there was an old defamation outside the limitations

4   period and it was published on the Internet, and someone else

5   happens to repost a link or it gets referred to again, we're

6   not going to drudge all this back up and say, hey, this was

7   time barred but now it's been republished.  Let's go back; we

8   can litigate over it.  That's not at all what we have here.

9   This is an ongoing media campaign that is consciously waged in

10  parallel with litigation from both before the limitations

11  period and to this day.

12          But I do want to make sure I go back to this point --

13  Mr. Elliker's point about the indisputably timely articles.

14  And for example, what he labels as -- I left the demonstrative

15  there -- I think article 6.  Yes, what he has labeled as

16  article 6 is a story by the *Associated Press* titled, Secret

17  Records:  Government says Marine's adoption of Afghan orphan

18  seen as abduction must be undone.  And I'll just read one

19  paragraph.  As the family grew and bonded, Mast tracked them

20  down and tried to convince them to send the child to the United

21  States by promising medical care, the Afghan family told AP

22  last year.  They said they refused to go along with the plan.

23  They didn't want to be separated from the girl, who appeared to

24  have fully recovered from a fractured skull, broken leg, and

25  serious burns.

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1          That's far more than a mere hyperlink back to the

2    story.  They're referring back to the fact that they gave

3    them -- that they were interviewed by the AP the year before.

4    They repeat -- they don't verbatim there say they told us that

5    they were kidnappers, but they repeat key elements of their

6    version of the narrative, and certainly would then invite any

7    reader who clicked on the hyperlink to go back and read in full

8    what it was that they had said to the AP the year before.  So

9    even if we are under the --

10          THE COURT:  But doesn't that statement, standing

11    alone, have to be actionable?

12          MR. MORAN:  So we don't think so, Your Honor.

13    Again -- and this is the other important piece I want to make

14    sure is clear -- that it's not as simple as Mr. Elliker says.

15    And this is, we think, the key holding of the Dominion case.

16    And again, I think it's very telling that they don't even

17    address it, right?

18          Unless the Court -- maybe the Court is not familiar,

19    but this is the Sydney Powell lying about the -- allegedly

20    lying about the 2020 election and basically using the same

21    argument, which is to say, I wasn't committing actionable

22    defamation against these election workers.  I was just

23    litigating my case.  And sure I was sending my pleadings to

24    every news outlet that would look at them, but that's -- you

25    know, that's all protected by the litigation privilege.  And

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  Judge Nichols says, No, it's not.  Just because you write

2  something in a court document and you file it with the court,

3  that may be privileged.  But if you're then sending those

4  things to the media, if you're then vouching for those

5  allegations and saying, hey, here's the document where we

6  explain what really happened, that can be actionable

7  defamation, even though it's contained under the heading --

8       THE COURT:  I get that.  But doesn't this statement,

9  which is the one in article 6, which is September 15, 2023,

10 doesn't that statement, standing alone, have to be actionable?

11 I mean, there is not any indication -- I read this article -- I

12 don't have it committed to memory the way you do, I'm sure --

13 and it was the only point in there in which there was some

14 indication that the Does had either spoken to the press or made

15 any statements.  And there's not any indication that the

16 pleadings were sent out beyond the ECF documents or the court

17 filing system.

18      MR. MORAN:  Your Honor, there are a few embedded

19 points I'd like to address in there.

20      THE COURT:  Please.

21      MR. MORAN:  So one, I do think that we are entitled

22 to bring a claim.  So suppose it's true as we have alleged --

23 and as the Court would naturally on a motion to dismiss --

24 suppose it's true that what the Does told the reporters in 2022

25 when they sat down with them and when their counsel spoke with

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  them, are all the things that they have pleaded in their

2  complaint and alleged in litigation, that they -- which is

3  presumably what you would do, right?  You're bringing the

4  litigation.  You're making these allegations there.  You decide

5  to set up an interview with a reporter.  You go and you repeat

6  all the things that were said there.  If you then have an

7  article like this 2023 article that says here is the story

8  that -- you know, that they have set out, here's what they

9  allege against the Masts, and it mostly cites the litigation,

10  and then it talks about a piece of it and says, you know, as

11  they told us last year when they sat down with us, we don't

12  think -- certainly not at the pleading stage, we don't think

13  that you can say, well, if the media was careful and they just

14  cited the pleadings for all the really bad stuff about

15  kidnapping and lying and deceit, and then they just cited your

16  interview for the more heartwarming pieces of your story, that

17  that's immune from liability.  Now, it may be that plaintiffs

18  and counterclaim defendants would have a defense at trial to

19  say all of our actionable defamation that was not privileged by

20  litigation occurred outside the limitations period, but since

21  then we've been very fastidious.  We have not repeated any of

22  it.  And lucky us, the media has been very careful never to

23  republish anything -- only to republish our litigation

24  statements, and never to republish our private defamation to

25  them.

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1          THE COURT:  Maybe I agree with you, but that's not

2     the way in which you pled your counterclaim.  You pled your

3     counterclaim that there is a kidnapping narrative.  You haven't

4     alleged facts upon which it's plausible for me to conclude or

5     someone to conclude that the publication was made to a reporter

6     which then repeats a kidnapping narrative that may not have a

7     direct quote one way or the other.  And so you may be right.

8     If the Does sat down with -- here it's Martha Mendoza.  They

9     sat down with Martha Mendoza and they said, Here are our

10    pleadings, and then they repeated their story to her, and she

11    took that interview and then wrote an article, but only quoted

12    them once or twice like you say -- we were heartbroken when

13    these events occurred -- you may be right at that point in

14    time.  But that's not the way in which it's alleged.

15         MR. MORAN:  So Your Honor, I'm happy to be perfectly

16    candid with the Court.  So again, that's not how we viewed the

17    pleading burden at this stage.  If the Court were to say that

18    it is the pleading burden, we'd welcome the opportunity to meet

19    it.  The somewhat limiting factor, we know the nuts and bolts

20    of this, right?  We have requested in discovery the

21    communications between the Does and the media.  They have --

22    they previously refused to produce that information in

23    discovery.  If the Court orders us to provide clarity on

24    penalty of having the claims dismissed, you can be assured I

25    will be revisiting that with counsel as to whether or not we're

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  entitled to those materials in discovery.

2          THE COURT:  And I'm sure the reporter doesn't want to

3  talk to you.

4          MR. MORAN:  And then we'd do the best we could to lay

5  that out.

6          We think under Rule 8 -- and not just Rule 8 standing

7  alone, but the context of this case, both what we've pleaded in

8  the counterclaim complaint -- we think the Court can also just

9  look at their complaint and our answer to the complaint to

10  inform the reasonableness of the allegations we're making.  And

11  I think that's where I point to --

12          THE COURT:  Well, since we're being candid with each

13  other here today, the challenge that I had is knowing how much

14  of the article springs from statements that are attributed to

15  the Does and how much of the article springs from statements

16  that are contained in the pleadings.  And I think you would

17  agree with me that if an industrious reporter pulls down all

18  the pleadings and writes an article solely from those

19  pleadings, it's not actionable against the Does.

20          MR. MORAN:  Solely being the key point there, Your

21  Honor.  And I think the proposition that Judge Nichols's

22  decision in the *Dominion* case stands for is that once you cross

23  that -- once a litigating party crosses the rubicon of engaging

24  with the media and vouching for their allegations, not only

25  does that create a little island of actionable defamation, but

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1   it actually brings their pleadings into what they're presenting

2   to the reporter.

3          THE COURT:  This is what I think *Iqbal* and *Twombly*

4   probably require, is it probably requires a more fulsome

5   factual allegation in that regard, rather than we think --

6   right now I think where you are is:  We think that the Does

7   actually made these statements to reporters, and we want to

8   conduct discovery to confirm that.

9          MR. MORAN:  Well, we know that they made at least the

10  statements that are reported in the 2022 article, and we know

11  that those statements were not just published in the 2022

12  article, but we know -- and I think we can plausibly infer as

13  well -- that they're part of -- they're part of the record, so

14  to speak, that the reporters have been using to continue to

15  write these stories about the overarching allegations.

16         I do want to make sure -- and this September article,

17  as Mr. Elliker said, it's the secret records article.  And I

18  think this is really telling in this regard because to some

19  degree their argument becomes entirely circular.  They say

20  that's not actionable because what that's talking about is a

21  disciplinary proceeding that was held by the Department of

22  Defense with respect to my client and Joshua Mast, and that's

23  -- anything that the government alleged there is privileged --

24  subject to the litigation privilege.

25         THE COURT:  This is supposedly the records that came

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  out of the J&D court or the Fluvanna County court?

2      MR. MORAN:  No, Your Honor.

3      THE COURT:  Are you talking about the United States

4  document?

5      MR. MORAN:  This is a reference to -- as I understand

6  it, this is a reference to a disciplinary proceeding in which

7  the Marine Corps reviewed whether or not Joshua Mast had

8  violated certain obligations he had to the military in

9  connection with the same factual allegations.  And we know that

10 counsel for the Does were there at the hearing talking to

11 the -- you know, it wasn't a criminal case.  It's not

12 prosecutors, but talking to the military lawyers and feeding

13 them the same arguments that they have been using throughout

14 the litigation.  And the two primary counts there were failure

15 to obey a lawful general order and a false official statement.

16 Mr. Mast was found not liable for those two -- for those two

17 allegations.  There were two separate ones.  There was a misuse

18 of a government computer and conduct unbecoming of an officer,

19 which was sort of a catchall for all three.  And because of the

20 computer issue, the military concluded that he had -- that

21 those allegations had been proved, but they recommended that he

22 be retained in the military and that the case be closed.

23      But the key point is that among the evidence that was

24 presented by the military attorneys at the disciplinary conduct

25 hearing were the very articles that we're talking about.  And

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  so we've arrived at this -- again, this sort of circular point

2  where they're giving statements to the media, the media is then

3  publishing those statements, they're then taking the media's

4  publication of those statements, giving them to lawyers for the

5  government to use against Mr. Mast in a disciplinary hearing.

6  The government is doing that, and then they're pointing and

7  saying, oh, well, if the media is reporting on the disciplinary

8  hearing, you can't hold us responsible because this is all just

9  litigation privilege, when it's all fed back to those same

10 statements.

11         THE COURT:  The problem is I can't rely upon any of

12 that at the 12(b)(6) stage, right?

13         MR. MORAN:  Well, Your Honor, I think the point is

14 you can't -- to me, at least, this goes to two issues.  It goes

15 to the continuing nature of the defamation and whether this is

16 a hyperlink situation where it's old statements that are just

17 now being kind of plucked back by a narrow republication, and

18 then they go to the question of the pleading standard, but I

19 think it is -- again, we could replead and allege all this, if

20 that's what the Court thought was necessary.  But again, we

21 don't think it's necessary, because the question is:  Is it

22 plausible based on the facts alleged that there has been an

23 actionable republication of the defamation -- of defamation

24 within the limitations period, and we think the answer is yes.

25         I mean, again, I will acknowledge readily this is a

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    privileged litigation statement, but just two weeks ago they

2    filed their response brief in the Supreme Court of Virginia and

3    these same allegations appeared again, that Joshua and

4    Stephanie Mast deceived the Fluvanna County Circuit Court in

5    entering a final order of adoption.  They hid the existence of

6    the A's -- which is in reference there.  They hid their

7    adoption efforts from them.  They hid their scheme from the

8    United States.  They relied -- relying on the M's falsehoods,

9    the circuit court granted the order.  They then spent months

10   luring their clients away to Virginia by bombarding them with

11   dire and false warnings that the child needed immediate medical

12   care.  And then later they have a section of their brief on

13   page 12 that says, the Ms lured their client to Virginia and

14   kidnapped their child.

15         So there is no -- I don't think there's a real

16   question about are they really -- are there really statements

17   here that are false and defamatory?  Again, as we've alleged

18   them, we recognize that at trial we'd have to prove that those

19   are false.

20         THE COURT:  But like you said, that's an immune

21   publication, right?

22         MR. MORAN:  So again, Your Honor, that in and of

23   itself is a privileged communication.  But what -- we think the

24   principle that should govern here and the principle that Judge

25   Nichols lays out in the *Dominion* opinion -- because again,

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  remember, this is precisely the argument that the defendants in

2  that case were making, which is, Hey, you know, they're saying

3  that we were defaming them -- these election officials say we

4  were defaming them, but we were litigating.  We were filing all

5  these claims.  All that this is based on is the statements that

6  were being made in documents.  And what the court said is, If

7  you write it in a court document and then you turn around to a

8  reporter and you say, here's our argument --

9          THE COURT:  It happens all the time.  People filing

10  their pleading and then they send it as part of a press

11  release.

12          MR. MORAN:  If it's actionable defamation, then

13  they're liable for it.

14          THE COURT:  That's different, right.  But I'm

15  constrained by the four corners of your counterclaim, right, as

16  to whether -- it's really just for me to decide and for both of

17  you all to argue as to what *Iqbal Twombly* requires.

18          MR. MORAN:  Absolutely, Your Honor.  And look, as

19  we've said, if the Court decides that the current pleadings

20  don't meet that, A, I would say we would ask for the

21  opportunity to replead; B, we would also, to the extent

22  possible, ask for the Court's guidance on what precisely it

23  thinks are needed, because the Does have laid out the state law

24  pleading standards that we still don't think apply, even if

25  there is some intermediate heightened standard, which I sort of

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  take to be their argument in the reply brief, which is okay,

2  well, even if you don't have to meet the Virginia pleading

3  standard, there's still sort of a heightened particularity

4  requirement that other federal courts have applied.  And so if

5  that's the route that the Court goes, we just want to -- you

6  know, for everyone's benefit -- and I think you rightly noted

7  that it's actually to their benefit to give us one chance to

8  shoot the shot, right?  If the Court says you need to do it,

9  here it is, and then we fail, then that gives them greater

10 protection than it would if you just said, yeah, the ones that

11 are particularly alleged here are insufficient.  As the Court

12 alluded to earlier, I do think that will become a much deeper

13 dive exercise than just recasting snippets of these seven

14 articles that are alleged in the --

15     THE COURT:  I think everything in this case is a

16 deeper dive.

17     MR. MORAN:  -- counter complaint.  And as I alluded

18 to as well, I think there may be -- you know, hopefully if I

19 need to, and I follow up about some discovery that we think we

20 might need, we could resolve that quickly.  I know those things

21 don't always shake out that way.  So we would take that piece

22 by piece.  And if we felt like we had to come back to the Court

23 or to Judge Hoppe, we would.

24     THE COURT:  But grapple with me -- grapple with, if

25 you will, this domestic relations exception.  Like I said, I

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  recognize the continuing objection you have to --

2          MR. MORAN:  Yeah.

3          THE COURT:  -- the jurisdiction of the claims against

4  your clients.  But if you could address Mr. Elliker's argument

5  that this is different, because to get to whether it is a false

6  statement that's then actionable -- kidnapping, luring and so

7  forth, if the order of adoption -- or if it's found in Fluvanna

8  County that your clients have no legal adoption, no legal

9  custody of Baby Doe, then that's different than if you're able

10 to prevail in the adoption matter, right?  And so it

11 necessarily requires some determination by this jury as to

12 whether you had a legal right to do -- the Masts had a legal

13 right to do what they did or the Does had a legal adoption

14 order in Afghanistan.  That's a poorly worded long question.

15         MR. MORAN:  I absolutely understand what the Court is

16 asking us to address.

17         So I think there are a couple of different ways to

18 tackle this, but the -- I think it turns a little bit -- in

19 terms of if we're talking about presenting it to the jury, I

20 think it turns a little bit on whether that issue has been

21 decided authoritatively in the state court proceeding before or

22 after trial.

23         THE COURT:  Which I'm presuming that it will not,

24 right, because if I set the case for trial either late this

25 year or early next year, you get an opinion from the Supreme

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    Court in July/August at the latest, you're not going to get

2    back to Fluvanna County and get out of there before the trial,

3    notwithstanding appeals that would then follow, right?

4              MR. MORAN:  It's very likely that -- I mean, if the

5    Supreme Court of Virginia agrees with us, then they remand with

6    instructions to dismiss the challenge and the adoption order is

7    back in place.  The Does, I would imagine, would have at least

8    the opportunity to seek further review in the U.S. Supreme

9    Court if they thought it was otherwise appropriate, and they

10   may choose to do that.

11             So again, I think, you know, there are two ways to

12   think of it.  One is let's assume for the sake of argument that

13   we have to go to trial without -- with the adoption orders

14   having been invalidated.  And their position is basically, Oh,

15   well, in that case you're toast because you can't possibly

16   claim defamation if the underlying adoption orders have been

17   invalidated.

18             Absolutely not.  It is -- the mere fact that someone

19   obtained an adoption order that turned out to be invalid for

20   one legal reason or another does not give somebody else license

21   to call them a kidnapper falsely or to accuse them of deceit

22   falsely.  It is entirely possible -- just to give one of many

23   factual scenarios that a jury could find -- it is entirely

24   plausible that the Masts in good faith, but ineffectually,

25   sought and obtained --

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1      THE COURT:  We had a good faith belief that what we
2  were doing was right and proper.
3      MR. MORAN:  Precisely, and that they were candid
4  about their intentions with the Does, as we have alleged, and
5  that the Does' allegation that they were deceived is simply
6  false.  And in that case, we believe a jury could find that the
7  Does had defamed the Masts without having -- even on the
8  assumption that the adoption order is invalid because it
9  doesn't turn on -- the defamation, the harm to their reputation
10  doesn't just turn on whether or not the adoption is valid.  It
11  turns on their character and what the statements that -- the
12  false statements made reflect about their character.  So that's
13  certainly doable.
14      Now, if we're at trial with that state court
15  litigation still going on, then I think the Court and the
16  parties would have to work through potentially some
17  line-drawing questions about, you know, for example -- I think
18  the Court may have alluded to this earlier -- we absolutely
19  believe that insofar as the adoption orders are valid, that
20  that gives a compelling argument that these statements were
21  false and defamatory.  It's not the only element of the claim,
22  but it's an important piece of the claim.
23      THE COURT:  And the Courts are given no guidance on
24  that anymore, because at least right now the Court of Appeals
25  has said any findings that Judge Worrell may have made in the

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    order setting it aside, null and void, right, because there was

2    no subject matter jurisdiction.  So there is nothing to be

3    taken away from the orders at this point in time, other than

4    the fact that they weren't valid.

5          MR. MORAN:  Yes.  Now, as a formal matter, our

6    position is that the legal effect of the Court of Appeals

7    ruling is stayed pending the review at the Supreme Court.

8    So --

9          THE COURT:  I won't disagree with that.

10         MR. MORAN:  I don't think we're literally in a

11   scenario -- but that is the import of the Court of Appeals

12   ruling, which is that the entire thing is void.  And it's not

13   particularly relevant to this claim, but there are subsidiary

14   disputes among the parties in the state court litigation about

15   whether the Does can assert -- they essentially want to rely on

16   that order to assert custody and say we should be given the

17   child.  And, of course, our position is, Wait a second, an

18   invalid rule just means we're in the wild west.  It doesn't

19   mean that you have any established right one way or the other.

20   And so those issues are obviously continuing to play out.

21         The key point for Your Honor's question is -- and the

22   way we understand Judge Moon's prior ruling is to say if there

23   is a way for a jury to get to a judgment against the defendant

24   that doesn't require them to weigh in on whether or not the

25   adoption is valid, then the case for now goes forward.  And

       Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    when we get to trial, you know, summary judgment and pretrial

2    proceedings, motions in limine, we can decide:  Are there any

3    lines that need to be drawn to say, hey, you're -- neither

4    party can talk about the state court proceedings, or they can

5    say this but not that, right?  Those are the types of lines

6    that the Court would have to draw at that point.  Now, that

7    feeds back somewhat into our argument about why we're not sure

8    the line that Judge Moon drew was the right one and why the

9    whole case should have been thrown out.  But I appreciate and

10   expect that if I were in the Court's shoes, I would probably

11   have a similar principle of non-relitigation as a matter of

12   self defense on some of those things.  So I fully appreciate

13   that.

14           With that, I think we have addressed the points that

15   I hoped to address, and I would turn it over to Mr. Hoernlein.

16           THE COURT:  All right.  Mr. Hoernlein, how are you

17   today?

18           MR. HOERNLEIN:  Good, Your Honor.  How are you?

19           THE COURT:  I'm doing just fine, thanks.

20           MR. HOERNLEIN:  So Your Honor, again, Mike Hoernlein

21   for Kim Motley.  I don't want to rehash all of the very good

22   arguments that Mr. Moran just made.  Many of them apply equally

23   to Ms. Motley.  The parties are -- the defendants are

24   differently situated in a number of ways, and so I'll try to

25   focus my comments on those issues.  And obviously, Your Honor,

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    jump in as you like.

2           So the thrust of Ms. Motley's claim here is

3    essentially to drum up publicity for this lawsuit, the Does

4    made some outrageous claims about Motley to reporters.  Now,

5    we've included in our counterclaim what we allege those

6    statements to be.  And when -- which specifically are that

7    Motley spent a year and-a-half, quote unquote, befriending the

8    Does to lure them to the United States as part of a

9    well-coordinated abduction effort involving the Masts.

10          Now, putting aside the claims that the Does have

11   against the Masts, putting aside the state court proceedings

12   regarding the adoption and custody of Baby Doe, the Does knew,

13   when they made those statements about Motley, that they were

14   false.  And the falsity is actually sort of on the face, we

15   think, of the complaint.  Now, the irony here is that we moved

16   to dismiss the Does' claims against Motley on a number of

17   grounds.  I understand Your Honor does not want to relitigate

18   Judge Moon's --

19          THE COURT:  No one has asked me to do so with respect

20   to Judge Moon's domestic relations exception or his July

21   opinion.

22          MR. HOERNLEIN:  And, Your Honor --

23          THE COURT:  And thank you for not asking me to do so.

24          MR. HOERNLEIN:  And if I get any hint that Your Honor

25   would like us to move to reconsider, that motion will be

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  forthcoming.

2       THE COURT:  I'm sure it would be.

3       MR. HOERNLEIN:  But Your Honor, the fact is that

4  Judge Moon, in denying our motion, found that the Does

5  adequately pled fraud.  Now, as we all know, fraud actually

6  does have a heightened pleading standard under 9(b).

7  Defamation does not.  And so part of our argument was that the

8  Does alleged that -- and this is a claim they've made to the

9  press, as we allege -- that Motley made statements to them

10 that, quote unquote, lured them to the United States.  She said

11 things to them that caused them to get on a plane with Baby Doe

12 and come here.  Now, we said -- we've looked at the complaint

13 very carefully, and we don't see what words they allege that

14 she said.  And Judge Moon said, Well, that's fine.  They

15 sufficiently alleged those words.

16      THE COURT:  But I think as to the defamation claim

17 with respect to Ms. Motley -- and I read the last two articles

18 specifically for this -- she is not mentioned.

19      MR. HOERNLEIN:  Your Honor, she is not mentioned by

20 name; that is correct.  The problem here -- and this does

21 make -- of all of the bizarre things about this case, this

22 aspect of the defamation claim is unusual as well.  The point

23 is that so many articles have been written about this case, and

24 so many -- both within the limitations period and outside the

25 limitations period -- and so many statements within the

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  litigation, within the bounds of this case and the state court

2  case -- that anyone who reads these articles knows who they're

3  talking about.  And they don't have to name Motley specifically

4  if it's very clear, because they've been making these

5  allegations over and over and over that Motley facilitated an

6  abduction.

7            THE COURT:  This kind of goes back to what I was

8  talking to Mr. Moran about, is that the source becomes

9  important, right?  And if the source is the pleadings -- and

10  we'll set aside the pleadings that are then mailed out -- but

11  if the source is the pleadings, then the words and the concepts

12  aren't actionable, right?  And so if an industrious reporter

13  gathers together the pleadings and writes an article that

14  describes all the actions that are attributed supposedly to

15  Ms. Motley, but simply says, A concerned human rights lawyer --

16  and defines her in that respect -- did A, B and C, it becomes

17  non-actionable because the lawyer spent the time gathering the

18  pleadings and writing the article.  And so it becomes important

19  to know the source of the claims and how you get there and

20  knowing what the pleadings -- and knowing whether the words are

21  actionable and whether it's sufficient particularity as

22  required by *Iqbal Twombly*.

23            MR. HOERNLEIN:  So Your Honor, first, the article

24  within the limitations period from September of 2023 that

25  Mr. Moran quoted, that article is not -- it's very clear from

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  the words in the article that the statement is based on what

2  the Does told the AP last year.  In fact, it says the Afghan

3  family.  And so sure, we can't say whether it was Jane Doe or

4  John Doe, but it's clear in this article within the limitations

5  period -- and I think Mr. Elliker, I'm sure it was an

6  oversight -- Mr. Elliker said that there was no statements in

7  these two articles at all.  And I would submit that's a

8  statement.  And it doesn't use the word lure.  It uses the word

9  convince them to send the child to the U.S.  And it doesn't use

10  Motley's name, but the problem is that every other statement

11  that the Does made in connection with the, quote unquote,

12  abduction involved Ms. Motley being an integral part of that

13  alleged scheme.  And again, they knew that that was false.  And

14  the falsity of it is actually apparent from their pleadings

15  themselves because they claimed that she made statements to

16  them before July 13th, 2019.  And then they don't make any

17  statement or any allegation about statements she might have

18  made.  All of the statements that they claim came from either

19  Joshua Mast or Osmani.  And then after Baby Doe is taken from

20  them, the allegation is that she waited two -- I'm sorry, the

21  Does waited two months to reach out to Ms. Motley to say, The

22  person you introduced us to took Baby Doe.

23          Now, if Motley was so integral to this scheme that

24  she spent a year and-a-half befriending the Does, wouldn't she

25  be one of the first people that the Does reach out to when Baby

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  Doe is taken from them?  But no, they wait two months, and then

2  they say the person you introduced us to said X, Y and Z or did

3  X, Y and Z.  And then they tell the AP and the *New York Times*

4  and others:  Motley lured them to the United States.  They knew

5  when they started making those statements that those statements

6  were false.  They defamed Motley.  And I understand we can't

7  point to the exact words that they said under cloak of

8  anonymity to the *New York Times* and the AP, but those articles

9  sure are very consistent with the pleadings.  And this article

10 demonstrates that the Does talked to the reporters.  And the

11 reporters are reporting on statements made to the reporters,

12 not just the pleadings.

13         Your Honor --

14         THE COURT:  And I'm presuming that this article in

15 September of 2023 is referring back to the October 2022

16 article.

17         MR. HOERNLEIN:  Well, it's not clear, Your Honor.

18 What is clear is that the Does told the AP reporters that they

19 were lured to -- or attempted to be lured to the United States.

20 That came from the Does.  Whether it became before the October

21 article or whether it came after the article, whether it came

22 from the lawyers or by attribution, I mean, it's not really

23 clear.  But at this pleading stage, we should not have to state

24 with that level of specificity.  If the same Rule 8(a) applies

25 to our claims as to their claims, then we should be able to

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  proceed to discovery on our claims as pled.

2          If Your Honor doesn't think that we've provided the

3  level of specificity required, we would like the opportunity to

4  replead.  I don't know that we would do that, but depending on

5  how Your Honor's opinion comes out, it may or may not be

6  something we would want to do.

7          I also, Your Honor, would like -- unless there's

8  anything else about that?

9          THE COURT:  No.

10         MR. HOERNLEIN:  I would like to just address briefly

11  the intentional infliction point, because I'm not sure I agree

12  with Your Honor or Mr. Elliker about this, and perhaps

13  Mr. Moran.

14         So while the underlying conduct at issue in the

15  defamation claim -- which is making outrageously false

16  statements about Motley -- is the same conduct at issue in the

17  IIED claim, the IIED claim does not rise and fall with the

18  defamation claim because there are different elements and there

19  are different limitations periods.  If Your Honor says, Well,

20  you know, this is time barred or these particular statements

21  are time barred, that might be true for defamation.  I believe

22  IIED has a two-year limitation period.

23         THE COURT:  It does.  It's a personal injury claim.

24         MR. HOERNLEIN:  Correct.  So if Your Honor's decision

25  hinges on limitations, it doesn't foreclose the intentional

52

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1   infliction claim.  And if Your Honor decides something about

2   republication, that would also not necessarily apply to IIED.

3   The point is, even if the conduct is the same, we submit that

4   the intentional infliction could stand on its own, depending on

5   how the Court comes out on the issues.

6           THE COURT:  One of the questions that I had is

7   whether if I -- and I understand exactly how you -- it lets you

8   sweep back into -- even if I agree that defamation is time

9   barred -- some further statements, but I'll break it down this

10  way:  I think you and Mr. Moran agree that the intentional

11  infliction claim arises out of the words spoken by the Does,

12  right?

13          MR. HOERNLEIN:  Yes, Your Honor.

14          THE COURT:  Spoken to the reporters and then

15  published.  My question as I read it is:  Do we run the risk,

16  if I agree with you that what's provided in the articles,

17  what's alleged is sufficiently to meet the first prong of an

18  IIED claim, and that is that it offends the generally accepted

19  standards of decency and morality of converting every

20  defamation claim into an intentional infliction claim?  And

21  maybe there is a spot out there, maybe this passes that spot

22  out there, but I'm sensitive to that fact, that just because

23  you've alleged defamation per se doesn't get to an IIED claim.

24  That's the first thing.

25          And then the second is:  Are there sufficient

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  allegations of severe emotional distress as required?  And I

2  think Judge Moon handed down a decision in June of this year --

3  not in your case, but in a different case -- that talks about

4  some of the pleadings required as to what the severity of the

5  emotional distress needs to be.

6         MR. HOERNLEIN:  So Your Honor, I think as to the

7  first point, it's a good question.  I'm not -- I think we do --

8  if there is a line, I think we clear it easily.  I'm not

9  prepared today to say where that line is supposed to be drawn.

10 I don't think that you --

11        THE COURT:  You're going to make me draw it, right?

12        MR. HOERNLEIN:  Your Honor, you have the robe and I

13 don't, but I'm certainly happy to brief it and offer any

14 suggestions.

15        THE COURT:  No, but I want to give you the benefit of

16 some of my thoughts.  So if you had some response.

17        MR. HOERNLEIN:  No, unfortunately, I don't know where

18 the line would be, but I think we -- as we have pled it, we

19 clear the line.  If Your Honor doesn't think so, but thinks

20 that a second attempt might do it, then we'd be happy to take

21 that.

22        And Your Honor, as to your second question, which I

23 didn't write down --

24        THE COURT:  It's whether -- and let me pull up Judge

25 Moon's --

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1          MR. HOERNLEIN:  Oh, that's -- I'm sorry, Your Honor.

2          THE COURT:  No, that's okay.  It's a case called --

3    let me make sure I've got the right case.  It's a case called

4    *Scheffer*, S-C-H-E-F-F-E-R, *versus Jamerson,* J-A-M-E-R-S-O-N,

5    handed down June 14th of this year, 2024, Westlaw 3013621.  And

6    it looks like it's on a motion to dismiss.  He writes -- it

7    looks like it's on page 3 of the Westlaw opinion -- with

8    respect to the severity element, liability arises only when the

9    emotional distress is extreme and only where the distress

10   inflicted is so severe that no reasonable person would be

11   expected to endure it.  And he cites the *Russo* case.  This is a

12   high standard.  It requires a plaintiff to allege that their

13   emotional distress reached such a level of severity that every

14   aspect of their life was fundamentally and severely altered

15   such that they had trouble even walking out the door; and cites

16   the *Almy versus Grisham* and *Pennell versus Vacation Reservation*

17   *Center, LLC* case.  I can give you those cites, if you want

18   those.  If you pull the case up, you'll see them.  Without such

19   severe -- without such serious life-altering symptoms, a

20   plaintiff cannot sustain an IIED claim in Virginia, and then it

21   goes on further.

22          Maybe he is applying a heightened pleading standard.

23   Maybe he is applying -- I don't think he cited *Iqbal Twombly* in

24   here, but he makes clear what I've always understood when I was

25   practicing and when I've been over here, is that an intentional

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1   infliction of emotional distress claim is separate and apart

2   from a run-of-the-mill tort claim.  It's disfavored under the

3   law and it requires proof of severe emotional distress that

4   goes beyond the normal emotional distress that one might suffer

5   in these circumstances.

6           But whether there is those allegations there, I'll

7   have to go back and look at your counterclaim.

8           MR. HOERNLEIN:  Understood.

9           THE COURT:  Anything further?

10          I think you had a little bit of a different view on

11  the conspiracy issue, as well, than Mr. Elliker suggested.

12          MR. HOERNLEIN:  Your Honor, just -- I'm going to just

13  rest on my brief.

14          THE COURT:  Thank you very much.

15          MR. HOERNLEIN:  If Your Honor has no other questions.

16          THE COURT:  All right.  Thank you very much.

17          Mr. Elliker?

18          MR. ELLIKER:  Thank you, Your Honor.  I will try to

19  be brief.

20          The question that I think Mr. Moran's argument about

21  republication raises is:  What is the limiting principle?  What

22  is the time period after which the October 2022 article can no

23  longer be the basis for a defamation claim?  Is it the article

24  that was published last year?  If the AP writes an article

25  about this hearing and they link back to the October '22

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  article, I think under Mr. Moran's theory, he now has a new

2  claim.  He can seek to amend his counterclaim and file a new

3  defamation claim.  That is premised on statements that are

4  alleged to have been made more than two years ago and published

5  more than two years ago.  And that is the reason why --

6       THE COURT:  But he's right if they quote those

7  statements, right?

8       MR. ELLIKER:  Well, Your Honor, I think there's

9  actually an important distinction between the liability of a

10 speaker when they give a statement the first time to the media

11 and the foreseeability of what that statement -- the time

12 that's published versus if that then gets republished over and

13 over again.  And if I may, defendants that are noticeably

14 absent from the counterclaim defendants are the media entities

15 that wrote these words that actually are the ones who put the

16 ink to paper to craft -- I shouldn't say craft.

17      THE COURT:  Well, let's not invite more parties.

18      MR. ELLIKER:  Certainly I wouldn't.  Look, I don't

19 think Mr. Moran wants to sue the AP and the *New York Times*.  I

20 certainly don't think Mr. Hoernlein does either, and I don't

21 think that they should be.  But a lot of what is being

22 discussed here in terms of the allegations that are alleged to

23 be defamatory, I heard a lot from the other side during the

24 argument that doesn't seem to be in the pleadings.  And I think

25 that is a problem in Rule 8.  But in terms of --

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1          THE COURT:  That may be, and it kind of takes me

2    to -- I feel like I've jumped around and probably messed all of

3    you all's arguments up, and I apologize.

4          It takes me to what Mr. Moran -- where I think he is,

5    that if I disagree with him as to the pleading requirements

6    under Rule 8 and *Iqbal Twombly* and say you've got to give us

7    more, his argument with respect to republication is that there

8    is more to it than simply a statement shows up in an article

9    and maybe some folks have taken things out of the pleadings,

10   because if the pleadings are circulated by the Does or those on

11   behalf of the Does outside -- well, if they're circulated; in

12   other words, not just pulled from CM/ECF, that that is a

13   publication of all the statements that are then made within the

14   pleadings, which arguably become actionable, and he wants an

15   opportunity to try to find out how the press got this

16   information.  What did the Does say to the press, if you will?

17   And I'm just going to have to figure that out, but I'd be

18   interested in your thoughts.

19         MR. ELLIKER:  Well, Your Honor, that raises a good

20   point that I really want to emphasize.  I know that you're new

21   to the case.  Something that was new to me today was the

22   statement that we haven't produced documents from media

23   communications, which is not the case.  And I know that

24   Mr. Francisco, who is co-counsel with Mr. Moran, has done a lot

25   of the discovery work, and so perhaps he's more versed with

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  that.  But the defendants have served RFPs for communications

2  with the media.  Those have been produced.  And so to the

3  extent we're talking about the ability to look and see what has

4  been communicated to the media, they have been.

5        And what doesn't appear in the pleadings here -- and

6  I can't say whether -- I'll put it this way:  Whatever bar

7  Rule 8 poses to them now, presumably the opinion you write will

8  give them guidance on that.  But then after that, for any

9  amended complaint, we're now going to be talking about whether

10  they actually have the facts to support that.  And that then

11  becomes an issue of speculation or plausibility.  And it cannot

12  just be the case that, well, they had to have gotten the

13  information from somewhere, and so therefore we presume that

14  because two years ago the Does spoke to the media, that now

15  everything that flows from that will continue to be a new cause

16  of action.

17        I put it this way, right, I mean, we talked a little

18  bit in the papers about the Johnny Depp case.  And

19  unfortunately that had to do with tolling.  That was a fun case

20  to talk about, and tolling did become an issue.  But imagine

21  that -- and there was a statute of limitations issues there.

22  Ms. Heard was alleged to have made defamatory statements about

23  Mr. Depp, and that was published.  Then time passed and claims

24  were barred after that.  But I think under the theory here, if

25  Ms. Heard had given an interview to the media, said what she

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1   said, then they published it, and then years passed and the

2   same newspaper writes an update about the trial and says,

3   according to what Ms. Heard told us three or four years ago,

4   now they've got a new defamation claim against her.

5           And so what that puts in circumstances where you have

6   lots of media attention is just this snowball effect of every

7   single time that there is a new hyperlink put, as long as they

8   can say, well, the information we think is the private

9   publication -- which is a phrase that doesn't appear in the

10  complaint, the counterclaims -- but the private publication in

11  2022 gives rise -- every single time that is fuel for a new

12  article that that becomes another basis for defamation

13  liability.  And I think that that raises the concern that Judge

14  Thacker talked about here in the *Lokhova* case was to say

15  that -- in quoting the Third Circuit -- if each link is an act

16  of republication, then the statute of limitations would be

17  re-triggered endlessly, and its effectiveness essentially

18  eliminated.

19          And the other thing that's in this complicated ball

20  of wax, Judge -- and the reason I started by talking about how

21  they haven't named any media defendants in here -- is that the

22  statements that surround hyperlinks are the statements of the

23  media.  So now we're talking about third-party statements that

24  then are being used to republish what the Does are alleged to

25  have said years earlier.  And again, that just brings me back

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1    to this idea of a limiting principle.  And there is a portion

2    of Judge Thacker's opinion that talks about third-party tweets

3    too, and that third parties are not -- the original speaker is

4    not responsible for republications by other parties.  So I

5    think --

6            THE COURT:  But is responsible for republication by

7    the original recipient.  In other words, I think Mr. Moran's

8    point is that these defamatory statements were made to the

9    reporter and then the reporter republishes.  And to the extent

10   the reporter continues to republish, the speaker would continue

11   to be responsible for that, not if, then, another reporter

12   picks it up, and another reporter and another reporter and

13   another reporter.  I think that's your point, right?

14           MR. ELLIKER:  Well, Your Honor, I'm not sure I agree

15   with that.  In the -- and that's because I think the identity

16   of the republisher is relevant.  Again, all these republication

17   cases are usually where the defendant who is alleged to have

18   been the defamer is also the person who then did the

19   republication.  That's the *Ryan Lizza* case.  It's his own tweet

20   of his own article.

21           In *Lokhova*, it's a *New York Times* article that

22   creates a hyperlink to a previous *New York Times* article, and

23   the *New York Times* is the defendant in the case.  And in

24   *Lokhova*, Judge Thacker wrote, The original *New York Times*

25   article that the appellant alleges was defamatory was

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  hyperlinked in a later article.  Thus, the hyperlink simply

2  served as a reference for the *New York Times*' existing

3  audience, and did not direct the old article to a new audience,

4  which is what is the focus of republication.

5        And the idea of directing to a new audience dates

6  back to the middle of the 20th century when you're talking

7  about how many copies of a single edition of the newspaper

8  versus the same statement appearing in multiple editions.

9        THE COURT:  But certainly republication has to mean

10 more than the original speaker republishing because otherwise

11 there is no republication here.  It's the statement to the

12 reporter is the defamatory statement.  That's then republished

13 when it's put in the paper, correct?  I mean, there is a

14 defamatory statement that's made to the reporter.  And if it

15 dies on the floor, it never goes anywhere else, but there still

16 was a defamatory statement made.  Nobody may know about it,

17 right, and then -- it's a little bit esoteric, but by

18 definition to Mr. Moran's point, there has been a republication

19 when it then resurfaces in the newspaper.

20       MR. ELLIKER:  Yeah, Judge, I understand the logic.  I

21 think in most defamation cases the moment of the newspaper

22 publishing is the first publication that's the basis for the

23 claim.  And so it's usually not, you know, we go back and say,

24 well, technically when you gave the interview, that was a

25 publication and then when they published it, right?

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1          Now, there certainly can be cases where there is a

2    defamation claim that doesn't have to do with newspapers.  If I

3    were to have a conversation with a group of people and just

4    said something to them --

5          THE COURT:  So-and-so is a thief.

6          MR. ELLIKER:  Right.  Exactly.  And so that could be

7    alleged to be defamatory.  Of course, in that context I think

8    you'd be talking about that particular tort and the damages

9    that arose from that particular statement at that time.

10         And here the idea of fueling this broad narrative and

11   how the castigation in the media is not about the so-called

12   publication of the moment that the Does spoke to or gave an

13   interview.  It's about the publication of these articles at

14   large.

15         And the last point I'll make, Judge, on the *Dominion*

16   case -- we did address the *Dominion* case in our reply brief --

17   I certainly don't disagree that there are statements that I

18   could make to you in this courtroom -- I won't, but there are

19   statements that I could theoretically make to you that if I

20   went on the courthouse steps and made, there's a difference in

21   my exposure if those statements are knowingly false.  The

22   problem here is we don't know what the statements are.

23         THE COURT:  But if you make statements in your

24   pleadings -- in other words, if you took your Supreme Court

25   pleading, which right now Mr. Moran agrees is protected, and

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1   you either make a press release and say, We have filed this

2   today -- this is Mr. Moran's point.  And I don't know the

3   answer to the question.  I've got to re-read the Dominion case

4   in this regard.  You either -- and let's just say the harder

5   case for him would be if you simply send it out by way of email

6   as a press flash.  Do you then lose the protection -- the

7   judicial immunity protection at that point?

8          MR. ELLIKER:  Judge, I think so.  I think you

9   probably do.  And I don't dispute, right, there's a difference

10  between if Sydney Powell is going and giving an interview and

11  she's saying word for word what her complaint says, she can't

12  then come back in and say, No, no, no, I was just reciting

13  that.  If you're out there doing a public reading of it, that's

14  a different type of --

15         THE COURT:  Nor can she give it to a reporter and

16  say, Here you go.

17         MR. ELLIKER:  I think that's probably a tougher case

18  and I'd want to research that whether -- if there were an

19  instance of someone just forwarding -- we know that reporters

20  can set up news alerts for Pacer and just get pleadings sent to

21  them.  And if the only difference is it's an attorney just

22  forwarding it to them instead of -- and I'm not suggesting

23  that's what happened here.  I think if Mr. Moran wants to

24  suggest that in an amended counterclaim, I really hope that he

25  has the factual support for it.  I really do.

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1          THE COURT:  Or does he need a chance to do a little
2    discovery?

3          MR. ELLIKER:  Well, but the discovery comes after you
4    can make the claim that will pass Rule 11, Judge.

5          THE COURT:  That's always the chicken and the egg
6    part of it.  It's difficult.

7          MR. ELLIKER:  I think that's right.  I think we can
8    talk about the consequences of *Twombly* and *Iqbal* in that
9    respect, Judge.  But I don't think that you can just come in
10   and put together a diffuse narrative that is identical to
11   statements that are privileged and just say, Well, we think
12   that they must have handed their pleadings to the *Associated*
13   *Press*, and based on that, the *Associated Press* thenceforth can
14   write whatever they want, and the Does will be liable for
15   defamation ad infinitum, right?  I just don't think that's the
16   way that defamation law is put together.  That's certainly -- I
17   mean, we have -- as you mentioned with Mr. Hoernlein, some
18   torts have a two-year statute of limitations.  Some have five.
19   This has one.  And I don't think that defamation is the kind of
20   claim that we want to have just lingering out there for ever
21   and ever, particularly you talk about the kind of evidence that
22   you have to put together.

23         And bear in mind, too, Judge, that if this were a
24   claim that were to go to trial, the proof of the defamation
25   claims is not the truth of what the Masts are alleged to have

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  done to the Does.  It's the truth of whether or not the Does

2  said what they're alleged to have said to the reporters.  And

3  so what I think these allegations and the discussion today from

4  the other side has really pointed up is they really want to

5  dispute the underlying facts.

6       Mr. Hoernlein came here and he started by talking

7  about why he thinks that the plaintiffs' claims against his

8  client are insufficient and why they're disproven by what he's

9  brought forward in his counterclaims.  But you disprove our

10 allegations in your answer and at trial, not by bringing

11 forward a claim for defamation.

12      THE COURT:  Not to reopen another can of worms, but

13 that argues against the domestic relations exception because if

14 it goes to the truth of what was said, that's then going to go

15 to what were all of the facts and circumstances and the events

16 that occurred really back in Afghanistan, right?

17      MR. ELLIKER:  I think that what it brings up is the

18 truth -- I mean, really the reason it's called a -- repeatedly

19 referred to it as a kidnapping narrative is because the lie

20 they say is the kidnapping, and their argument is we always

21 did -- we did this legally, right?  We did this lawfully.

22      Now, Mr. Moran has made the point that maybe there's

23 a very narrow way that they could say in good faith we really

24 thought what we were doing here was the right thing to do, and

25 because of that, that's the truth.  But I think our clients

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  would be entitled to try to combat that and say, well, no, it's

2  not true.  In fact, isn't it the case that you misled the

3  circuit court judge who signed the order?

4          THE COURT:  That's always going to be the case,

5  right?  I mean --

6          MR. ELLIKER:  I certainly think it would always be

7  the case as to these claims in this court.  And it's not a

8  question of whether or not those claims can be tried anywhere.

9  It's a question of whether those are claims that are proper for

10  this court to exercise diversity jurisdiction over.  So that's

11  why we said, you know, I think there is a theoretical world if

12  these claims were not untimely that they could have been pled

13  in state court, right, the same way -- I mean, that's the idea

14  is we're not -- Judge Moon isn't saying these are claims that

15  can never be brought anywhere.  He's just saying federal courts

16  don't touch domestic relations issues.

17          Judge, you've been very indulgent.  I very much

18  appreciate it.  I'm happy to answer any other questions.

19          THE COURT:  I don't have any other questions.  Thank

20  you very much.

21          While we're on the record, is there anything else we

22  need to address at this time?  Mr. Moran?

23          MR. MORAN:  Your Honor, the only thing I want to say

24  is if I did mischaracterize the state of discovery, I

25  apologize.  I'll take a look at it.  My understanding is that

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1  there were some things that were withheld that we had asked

2  for, but obviously we'll address that with opposing counsel.

3          THE COURT:  Listen, I've got good lawyers involved

4  that know how to communicate with each other and know how to

5  share information.  You have more than just a couple of

6  documents that you've exchanged back and forth.  To have them

7  all at the forefront of your mind is a challenge at any time.

8  I'm not terribly worried about that.  But thank you very much

9  for that, Mr. Moran.

10          Anything else to address on the record?

11          MS. ECKSTEIN:  Not from plaintiffs, Your Honor.

12          MR. HOERNLEIN:  No, Your Honor.

13          THE COURT:  So we'll stand in recess.

14  (Proceedings adjourned, 2:43 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Baby Doe, et al. v. Mast, et al., 3:22-cv-49, 1/15/2025

1                    C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11       I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14       /s/ Lisa M. Blair                Date: January 29, 2025

15

16

17

18

19

20

21

22

23

24

25