**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

JOHN AND JANE DOE,

       *Plaintiffs*,

v.

JOSHUA MAST, *et al.*,

       *Defendants.*

Case No. 3:22-cv-49-RSB-JCH

**PLAINTIFFS JOHN AND JANE DOE'S RESPONSE TO MOTION
OF DEFENDANTS JOSHUA MAST, STEPHANIE MAST, & RICHARD MAST
FOR A PROTECTIVE ORDER**

## Table of Contents

Page

I. Introduction ................................................................................................ 1

II. Factual Background ................................................................................... 2

    A. Plaintiffs' Amended Complaint alleges a wide-ranging scheme and conspiracy to induce Plaintiffs to bring Baby Doe to the United States under false pretenses.............. 2

    B. Evidence obtained through discovery and related litigation corroborates Plaintiffs' allegations. ................................................................................................. 3

        1. J&S Mast and R Mast made false representations to, and concealed critical information from, state and federal courts. .................................................... 3

        2. With R Mast's involvement, J&S Mast fraudulently induced Plaintiffs to bring Baby Doe to the United States. ..................................................................... 8

        3. Defendants submitted fraudulent documents to the federal government.................. 13

    C. The Masts assert various privileges in response to Plaintiffs' discovery requests........... 16

        1. J&S Mast and R Mast's articulated bases for privilege. ............................................. 16

            a) Attorney-Client and Work-Product Privilege ............................................. 16

            b) Spousal Privilege .................................................................................. 17

        2. J&S Mast and R Mast refuse to produce the withheld documents. ........................... 17

III. Argument ................................................................................................... 17

    A. Applicable Legal Principles ...................................................................... 18

        1. Attorney-Client Privilege ............................................................................ 18

        2. Work Product Privilege ............................................................................... 19

        3. Marital Communications Privilege ............................................................. 20

        4. The Crime-Fraud Exception ...................................................................... 20

    B. The crime-fraud exception applies to the Disputed Records. ........................... 24

        1. There is abundant – let alone prima facie – evidence of the Masts' fraud.................. 24

        2. The Disputed Records bear a close relationship to the fraud asserted by Plaintiffs in this case. ............................................................................................. 26

            a) J&S Mast's Disputed Records withheld under the attorney-client and work product privileges........................................................................... 27

            b) R Mast's Disputed Records withheld under the attorney-client and work product privileges........................................................................... 28

            c) J&S Mast's Disputed Records withheld under spousal privilege. ....................... 30

    C. The Masts' arguments against the application of the crime-fraud exception lack merit. . 32

D.  Plaintiffs' assertion of the crime-fraud exception is not untimely. ................................... 36

**IV. Conclusion** ........................................................................................................................... **38**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. v. J.M.*,
   81 Va. App. 213 (2024) ....................................................................................4, 7, 9

*Abbott Lab's. v. H&H Wholesale Servs., Inc.*,
   No. 17 CV 3095 (CBA)(LB), 2018 WL 2459271 (E.D.N.Y. Mar. 9, 2018)....................34, 35

*Adair v. EQT Prod. Co.*,
   285 F.R.D. 376 (W.D. Va. 2012)................................................................................18

*Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*,
   369 F. 3d 385 (4th Cir. 2004) ...........................................................................36, 37

*Brown v. Commonwealth*,
   223 Va. 601 (1982) ..............................................................................................20

*Brownfield v. Hodous*,
   82 Va. Cir. 315 (2011) .........................................................................................20

*Chaudhry v. Gallerizzo*,
   174 F.3d 394 (4th Cir. 1999) ................................................................................22

*Commonwealth v. Edwards*,
   235 Va. 499 (1988) ..............................................................................................18

*Doe v. Mast*,
   741 F.Supp.3d 409 (W.D. Va. 2024) ......................................................................8

*Dye v. Alsbrook*,
   No. 7:23CV00036, 2024 WL 1193566 (W.D. Va. Mar. 20, 2024) ..........................35

*In re: General Motors LLC Ignition Switch Litigation*,
   No. 14-MC-2543 (JMF), 2015 WL 7574460 (S.D.N.Y. Nov. 25, 2015) ...................32, 33, 34

*Gibbs v. Stinson*,
   No. 3:18-CV-676, 2021 WL 4853575 (E.D. Va. Oct. 17, 2021)...........................27

*In re: Grand Jury Subpoena*,
   2 F.4th 1339 (11th Cir. 2021) ..............................................................................21, 26

*In re Grand Jury*,
   705 F.3d 133 (3d Cir. 2012)..................................................................................21

*In Re Grand Jury Investigation*,
    352 F. App'x 805 (4th Cir. 2009) ...............................................22

*In re Grand Jury Proc., G.S., F.S.*,
    609 F.3d 909 (8th Cir. 2010) ...............................................26

*In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*,
    401 F.3d 247 (4th Cir. 2005) ...............................................*passim*

*In re Grand Jury Subpoena #£06-1*,
    274 F. App'x 306 (4th Cir. 2008) ...............................................22, 23

*In re Grand Jury Subpoena Duces Tecum*,
    731 F. 2d 1032 (2d Cir. 1984)...............................................35

*Hatfill v. N.Y. Times Co.*,
    459 F. Supp. 2d 462 (E.D. Va. 2006) ...............................................18

*Koch v. Specialized Care Servs., Inc.*,
    437 F. Supp. 2d 362 (D. Md. 2005)...............................................25

*Lifenet Health v. LifeCell Corp.*,
    No. 2:13CV486, 2014 WL 4162113 (E.D. Va. Aug. 19, 2014) ...............................................36

*Marquette Equip. Fin., LLC v. Rowe Fine Furniture, Inc.*,
    No. 1:07CV676, 2008 WL 11512190 (E.D. Va. Mar. 13, 2008) ...............................................25

*Navient Sols., LLC v. L. Offs. of Jeffrey Lohman*,
    No. L19-CV-461, 2020 WL 1917837 (E.D. Va. Apr. 20, 2020)...............................................22, 25

*Nicholas v. Bituminous Cas. Corp.*,
    235 F.R.D. 325 (N.D. W.Va. 2006)...............................................18

*Owens-Corning Fiberglas Corp. v. Watson*,
    243 Va. 128 (1992) ...............................................24, 25, 30

*Peterson v. Fairfax Hosp. Sys.*,
    32 Va. Cir. 294 (1993) ...............................................21, 23

*Rambus, Inc. v. Infineon Tech. AG*,
    222 F.R.D. 280 (E.D. Va. 2004)...............................................37, 38

*Rockwood Select Asset Fund XI (6)-1, LLC v. Devine, Millimet & Branch, PA*,
    113 F. Supp. 3d 471 (D.N.H. 2015)...............................................25

*In re Richard Roe II, Inc.*,
    168 F. 3d 69 (2d Cir. 1999)...............................................33

*In re Sealed Case*,
  676 F.2d 793 (D.C. Cir. 1982) ..........................................................................................21

*In re Sealed Case*,
  754 F. 2d 395 (D.C. Cir. 1985) .........................................................................................35

*SEC v. Nat'l Student Mktg. Corp.*,
  18 Fed. R. Serv. 2d 1302, 1974 WL 415 (D.D.C. 1974) ................................................26

*Sevachko v. Commonwealth*,
  35 Va.App. 346 (2001) ....................................................................................................18

*Seventh Dist. Comm. of Va. State Bar v. Gunter*,
  212 Va. 278 (1971) ....................................................................................................19, 21

*Socol v. Haas*,
  No. 3:18-CV-00090, 2021 WL 2635847 (W.D. Va. June 25, 2021)....................................35

*Trammel v. United States*,
  445 U.S. 40 (1980)............................................................................................................20

*United States v. Alexander*,
  736 F. Supp. 968 (D. Minn. 1990)....................................................................................20

*United States v. Ceglia*,
  No. 12-CR-876 (VSB), 2015 WL 1499194 (S.D. N.Y. Mar. 30, 2015)...........................33, 34

*United States v. Harris*,
  No. 2:14CR76, 2014 WL 4930811 (E.D. Va. Oct. 1, 2014)................................................27

*United States v. Kaplan*,
  No. 02 CR. 883, 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ............................................26

*United States v. Moazzeni*,
  906 F. Supp. 2d 505 (E.D. Va. 2012) ...........................................................................21, 26

*United States v. Olano*,
  507 U.S. 725 (1993)....................................................................................................36, 37

*United States v. Parker*,
  834 F.2d 408 (4th Cir. 1987) ...........................................................................................20

*United States v. Wilson*,
  No. CV DKC 21-360, 2025 WL 26662 (D. Md. Jan. 3, 2025)............................................22

*United States v. Zolin*,
  491 U.S. 554 (1989)....................................................................................................23, 30

*X Corp. v. Doe*,
   805 F. Supp. 1298 (E.D. Va. 1992), *aff'd sub nom. Under Seal v. Under Seal*,
   17 F.3d 1435 (4th Cir. 1994) ................................................................................................21

**Statutes**

Va. Code Ann. § 8.01-398 ........................................................................................................20

Va. Code § 63.2-1216 ..............................................................................................................36

**Other Authorities**

Fed. R. Evid. 501 ....................................................................................................................18

## I.    **Introduction**

The Masts invoke privilege not to protect legitimate legal advice or spousal confidences, but to bury the very documents that prove their fraud. For years, Joshua and Stephanie Mast ("J&S Mast")—guided and assisted by Richard Mast ("R Mast")—misled courts, the United States government, and Plaintiffs, all in service of their scheme to abduct Baby Doe. Their misconduct is not speculation. It is documented in judicial findings, contemporaneous evidence, and their own words. The only question is whether privilege shields communications that furthered this scheme. The answer is no.

The law is clear: privileges are strictly construed, and the crime-fraud exception pierces them when the client's purpose is to commit or cover up a fraud. Plaintiffs have far surpassed the "low hurdle" for a *prima facie* showing. The Masts lied to Virginia courts to obtain adoption orders, lied to Plaintiffs about Baby Doe's medical condition to induce them to travel to the United States, lied to federal agencies to manufacture false documents—and even lied to *this* Court regarding their now-obvious intent to adopt Baby Doe. Their privilege logs confirm that numerous communications sit at the heart of those frauds:  communications about custody and adoption proceedings, immigration filings, and supposed medical needs (collectively, the "Disputed Records"). That is more than enough to trigger the crime-fraud exception.

Allowing the Masts to hide these records would perpetuate the very fraud they committed on Plaintiffs, the courts, and the government. The crime-fraud exception exists precisely to prevent parties from converting privileges into tools of concealment. Plaintiffs are entitled to these documents now. At a minimum, this Court should conduct *in camera* review, which requires only a modest showing that the records may reveal evidence of fraud—a showing Plaintiffs easily meet. The Masts' conduct was sustained and deliberate. Privilege cannot shield the truth from the light of day.

## II.    Factual Background

The "Background" section of the Masts' brief omits much. Plaintiffs provide below a brief background of the allegations in their Amended Complaint, and then turn to *evidence* of the Masts' myriad fraudulent conduct, uncovered through discovery and related litigation.

### A.    Plaintiffs' Amended Complaint alleges a wide-ranging scheme and conspiracy to induce Plaintiffs to bring Baby Doe to the United States under false pretenses.

Plaintiffs' Amended Complaint asserts that J&S Mast, among others, lured Plaintiffs to the United States under false pretenses. ECF No. 68 at ¶¶ 75-139. On July 24, 2024, this Court granted in part and denied in part Defendants' motions to dismiss. ECF No. 455. As relevant here, the Court determined that Plaintiffs plausibly pled state-law fraud claims against J&S Mast (as well as Defendant Motley), conspiracy against all defendants, and intentional infliction of emotional distress against all defendants with respect to the scheme to lure them to the United States. *Id.* at 96-97.

Regarding fraud, the Court found that "Plaintiffs' allegations show that J&S Mast engaged in a long-standing, concerted duplicitous attempt to trick Plaintiffs into bringing Baby Doe to the United States, lured with representations that [J&S] Mast[] were only trying to assist her [to] get medical care in the United States, when in fact they hid their motivation all along to adopt her and effectively abduct her from Plaintiffs' care." *Id.* at 83.

Similarly, on conspiracy, the Court held that Plaintiffs' allegations demonstrate that Defendants, with others, "combined to effect a preconceived plan and unity of design and purpose—to mislead Plaintiffs into bringing Baby Doe out of Afghanistan and into the United States for the ostensible purpose of getting medical care, where J&S Mast would have legal custody of Baby Doe and could abduct her against Plaintiffs' will." *Id.* at 86. This Court relied in part on allegations detailing how Defendants "worked together to facilitate Baby Doe's abduction

2

by, among other things, making misrepresentations on immigration applications, filings with the
U.S. Citizenship and Immigration Services ('USCIS') and to this Court in their attempt to stop
Baby Doe's return to her Afghan family in 2020." *Id.* at 89. The Court rejected R Mast's argument
that a lawyer cannot conspire with a client. *Id.* at 90-91. It recognized that "[w]hether part of
Richard's challenged conduct . . . fell outside the scope of his representation of Joshua and
Stephanie, and/or whether such conduct rose to the level of 'tortious, malicious, or illegal' conduct
that would permit a conspiracy claim between attorney and client, are best suited for resolution on
summary judgment or at a full jury trial." *Id.* at 91. The Court also refused to dismiss various
claims against Stephanie Mast because "[t]here are specific and detailed allegations about her
involvement organizing the scheme and furthering it alongside her husband and the codefendants
here." *Id.* at 92.

> **B.      Evidence obtained through discovery and related litigation corroborates
>           Plaintiffs' allegations.**

J&S Mast's scheme to obtain legal and physical custody of Baby Doe was accomplished
through various frauds committed on Plaintiffs, the state and federal court system, and the federal
government. Evidence supporting each set of fraudulent activity is discussed in turn below.

> 1.      <u>J&S Mast and R Mast made false representations to, and concealed critical
>         information from, state and federal courts.</u>

The Masts' fraudulent activity began with their many misrepresentations to the Virginia
courts. They made false statements to, and withheld critical facts from, the Fluvanna County
Juvenile & Domestic Relations (J&DR) court, the Fluvanna County Circuit Court, and even this
Court.

**J&DR Court**. Record evidence demonstrates that J&S Mast and R Mast made numerous
misrepresentations to the J&DR Court. To begin, J&S Mast, with R Mast as their attorney,
misrepresented to the J&DR Court in November 2019 that efforts to find Baby Doe's next of kin

had been unsuccessful.[1] That statement was knowingly false because, as early as October 2019, at least Joshua Mast knew the Afghan Government and the International Committee for the Red Cross (ICRC) were actively searching for, and had made contact with, individuals claiming to be Baby Doe's family.[2] J&S Mast and R Mast also falsely represented to the J&DR Court that Baby Doe was stateless, that the Afghan Government would waive its jurisdiction over Baby Doe, and that Baby Doe was in need of urgent medical care.[3] In reality, the United States already had determined that Baby Doe was an Afghan citizen, Afghanistan already had exercised jurisdiction over Baby Doe, and nothing suggested that Baby Doe suffered serious medical ailments.[4] Yet, the J&DR court relied on J&S Masts and R Masts' false representations to assert jurisdiction and grant custody to J&S Mast on November 6, 2019.[5]

---

[1] *See* Exh. 1 at 3 (Custody Order) ("Diligent efforts have been made . . . to identify living family members of the Child. No family members have been identified. No information regarding the Child's . . . family members has been provided.").

[2] Exh. 2 at 5 (Fairfield Decl., Ex. A (October 2019 Meeting Minutes)) (meeting minutes indicating that ICRC was in "contact with individuals claiming to be relatives of the infant"); Exh. 3 at 1-2 (Welton Decl.) (confirming Joshua Mast's attendance at October 23, 2019 meeting); Exh. 4 at 1339:18–1344:3 (Aug. 9 J. Mast Tr.) (Joshua Mast testifying he attended the meeting).

[3] *See* Exh. 1 at 2-6 (Custody Order, In the matter of Baby L., No. JJ004656-01-00 (Juv. & Dom. Rel. Ct. Nov. 6, 2019)).

[4] Exh. 3 at 23-24 (Welton Decl.). Even if the United States and Afghan governments had not yet made final determinations at the time that J&S Mast petitioned for custody, J&S Mast admitted that they "were aware of [their] ongoing obligation to inform" the J&DR and Circuit Courts "if [they] became aware of any other proceedings . . . that could affect the courts' custody . . . proceedings." Exh. 5 at 4 (Respondents' Responses to Petitioners' First Set of Requests for Admission, *A.A. v. J.M.*, No. CL2200018600 (Fluvanna Cnty. Cir. Ct. May 1, 2022)).

[5] *See* Exh. 1 at 2, 3, 4, 5 (Custody Order) (asserting jurisdiction on the grounds that Baby Doe was stateless, that the Afghan government would imminently waive jurisdiction, and that she needed urgent medical care). In Plaintiffs' state court challenge to the custody and adoption orders, the Virginia Court of Appeals held the custody order void because the J&DR court's jurisdiction relied on J&S Mast's misrepresentations that "the child was stateless and that a waiver from Afghanistan was imminent." *A.A. v. J.M.*, 81 Va. App. 213, 232 (2024). An appeal to the Supreme Court of Virginia remains pending, but this appellate court finding at least inferentially demonstrates that these facts were material.

**Circuit Court**. J&S Mast and R Mast continued their fraudulent efforts in procuring the interlocutory and final adoption orders from the Circuit Court.

*First*, J&S Mast and R Mast falsified at least two material facts to the Circuit Court in their petition for an interlocutory adoption order: (a) that Baby Doe was in J&S Mast's physical custody, and (b) that the search for Baby Doe's relatives was "unsuccessful."[6] In fact, at least Joshua Mast knew by November 2019 that Baby Doe was in the United States' custody (and both J&S Mast and R Mast certainly knew she was not then, and had *never* been, in J&S Mast's custody) and that search efforts for her family were ongoing—not "unsuccessful." *See infra* at 9. The Circuit Court relied on these misrepresentations when it entered its November 2019 interlocutory adoption order.[7]

Then, in support of a final order of adoption, J&S Mast and R Mast doubled down on these false representations by concealing from the Circuit Court other critical information about Baby Doe's reunification with her Afghan family. By December 2019, as the ICRC was verifying that John Doe and his father were Baby Doe's next of kin,[8] Joshua Mast admitted to "just ignoring" that individuals had come forward and were being vetted as potential relatives of Baby Doe.[9] By at least February 2020—10 months before entry of the final adoption order—the Masts were aware that Afghanistan had formally asserted jurisdiction over Baby Doe, that Afghanistan had demanded the child's return for family reunification, and that the United States had agreed that the

---

[6] *See* Exh. 6 at ¶ 1 (Interlocutory Adoption Order) (finding that Baby Doe is "in the legal and physical care and custody" of J&S Mast); ¶ 2 (finding that a "diligent search for living relatives ha[d] been unsuccessful").

[7] *See* Exh. 6 at 1 (Interlocutory Adoption Order).

[8] Exh. 2 at 4-5 (Fairfield Decl., Ex. A (October 2019 Meeting Minutes)).

[9] Exh. 7 (December 14, 2019 WhatsApp exchange between Joshua Mast and Norman West).

child should be united with the individuals determined to be her family in Afghanistan.[10] Yet, J&S Mast and R Mast never apprised the Circuit Court of this development—a failure for which the Circuit Court admonished them after the Does came forward to challenge the adoption.[11]

*Second*, the Masts misrepresented to the Circuit Court on October 26, 2020, that "no relatives of the child [had been] located" and that her nationality was unknown.[12] Yet, J&S Mast had been in contact with Plaintiffs for months by then (through Motley), and Plaintiff Jane Doe had introduced herself to them as Baby Doe's "mother."[13] Nonetheless, J&S Mast and R Mast did not at any point in the nine-and-a-half months between Baby Doe's transfer to Plaintiffs and the final adoption order inform the Circuit Court of the truth.[14]

Instead, and because of J&S Mast and R Mast's misrepresentations and omissions, the final adoption order again erroneously concluded that the child was "an undocumented, orphaned, stateless minor" whose legal residence was J&S Mast's address in North Carolina (even though

---

[10] Exh. 3 at 23-25 (U.S. State Department Cable No. 20556 February 25, 2020) (stating that the U.S. government had a "meeting with [Joshua Mast] and his counsel, to . . . notify [them] of [the] decision to move forward with transferring [B]aby [Doe] to Government of Afghanistan for family reunification").

[11] Exh. 8 at 31 (Findings and Rulings, *A.A. v. J.M.*, No. CL2200018600 (Fluvanna Cnty. Cir. Ct. Nov. 18, 2022)) ("The fact that the child was placed by the [Red Cross] with a couple claiming to be relatives, even if the [Defendants] did not believe them, and even if they are not shown to be relatives, should have been disclosed to the Court.").

[12] Exh. 9 at 1 (Order Appointing *Guardian Ad Litem*, *In the Matter of Baby L.*, No. 19CL719 (Fluvanna Cnty. Cir. Ct. Oct. 26, 2020)); *see also* Exh. 10 (a timeline that J&S Mast and R Mast submitted to the Circuit Court on March 30, 2020, falsely indicating that Baby Doe had been "located in [an] orphanage" and was later placed with an unknown "refugee family" by March 2020).

[13] Exh. 11 at 1 (March 19, 2020 WhatsApp message exchange between Jane Doe and Motley).

[14] Exh. 4 at 1364:24-1365:13 (Aug. 9, 2022 J. Mast Tr.) ("Q. [J.M.], did you ever notify Judge Moore that any government requested [the Child] to be transferred to them for reunification with her next of kin? [J.M.]: So, no.").

she had yet to step foot on U.S. soil).[15] Indeed, the Circuit Court has expressly recognized that J&S Mast and R Mast should have disclosed that Afghanistan was not waiving jurisdiction, that the United States made a determination to give Baby Doe to the Afghan government to transfer her to her family,[16] and that failing to disclose this information amounted to "extrinsic fraud."[17]

*Third*, J&S Mast and R Mast—in a glaring act of judicial nondisclosure—never told the Circuit Court about the federal proceedings they initiated in this Court. J&S Mast (represented by R Mast) petitioned Judge Moon for a temporary restraining order to block the United States from reuniting Baby Doe with her Afghan family ("the TRO Litigation"). Judge Moon denied that petition. Yet J&S Mast and R Mast "did not relay to the circuit court that the federal district court had denied their petition for a TRO." *A.A. v. J.M.*, 81 Va. App. 213, 225 (2024). That omission was material because it went directly to the merits of Plaintiffs' basis for custody.

**This Court.** J&S Mast and R Mast perpetrated fraud against this Court by misleading Judge Moon about their intentions towards Baby Doe as part of their fraudulent scheme to abduct her. As the Court is aware, J&S Mast and R Mast "falsely" represented their intentions towards Baby Doe when they filed the TRO Litigation, asking this Court for an emergency order preventing the United States from transferring Baby Doe from its custody to Afghanistan's custody so that

---

[15] Exh. 12 at 1-2 (Final Adoption Order).

[16] Exh. 13 at 5 (Order Granting Summary Judgment, *A.A. v. J.M.*, No. CL2200018600 (Fluvanna Cnty. Cir. Ct. May 3, 2023) ("There are some things that the Court should have been made aware of from [J&S Mast and R Mast] in this process that the Court was never made aware of . . .  [T]he fact of the matter is the Court did not have all of the information known to the Respondents at the time the order was entered. For example, that there was no waiver coming and the United States made a determination to surrender or give the child to the Afghan government."); Exh. 8 at 31 (Findings and Rulings) ("The fact that the child was placed by the [Red Cross] with a couple claiming to be relatives, even if [J&S Mast and R Mast] did not believe them, and even if they are not shown to be relatives, should have been disclosed to the Court.").

[17] Exh. 13 at 5 (Summary Judgment Order); *see also A.A.*, 81 Va. App. at 232.

she could be reunited with her relatives. ECF No. 455 at 2. At the February 26, 2020 TRO hearing, R Mast explicitly assured Judge Moon that J&S Mast were "not asking to adopt the child." *Doe v. Mast*, 741 F.Supp.3d 409, 427 (W.D. Va. 2024). These remarks were patently and demonstrably false: just two months earlier, J&S Mast (again, represented by R Mast) had secured an interlocutory adoption order for Baby Doe.[18]

Judge Moon denied the Masts' request for a TRO, finding that J&S Mast were unlikely to succeed on the merits because their custody order was based on Afghanistan's waiver of jurisdiction (which never happened), the balance of equities did not tip in their favor, and a restraining order would not be in the public interest.[19]

### 2. With R Mast's involvement, J&S Mast fraudulently induced Plaintiffs to bring Baby Doe to the United States.

J&S Mast hid the existence of the Fluvanna County custody and adoption proceedings from Plaintiffs. Instead, they falsely told Plaintiffs that they wanted to bring Baby Doe to the United States *solely* to provide her with medical care. The purpose of their fraudulent conduct was to induce Plaintiffs to bring Baby Doe to the United States, so J&S Mast could claim her as their own.

*First*, J&S Mast did not inform (and actively hid from) Plaintiffs that they had obtained custody and adoption orders for Baby Doe and were intending to adopt her. Several pieces of evidence support this conclusion.

For starters, J&S Mast knew that Baby Doe was in the custody of the United States and that U.S. officials were working to reunite Baby Doe with her Afghan family. Yet, they failed to provide legal notice of their custody and interlocutory adoption proceedings to the United States.

---

[18] Exh. 6 (Interlocutory Adoption Order).

[19] Exh. 14 at 39-42 (Transcript Order Denying TRO).

On October 23, 2019, Joshua Mast attended a meeting with representatives of the United States, Afghanistan, and the ICRC, who met to discuss their efforts to reunite Baby Doe with her next of kin.[20] Yet, two weeks later, J&S Mast petitioned for and obtained custody and interlocutory adoption orders for Baby Doe from the J&DR and circuit courts, respectively.[21] J&S Mast never provided legal notice of those court proceedings to the United States, which (as Joshua Mast knew) was Baby Doe's legal custodian at the time of those proceedings and was actively trying to reunite her with her Afghan family.[22] Had the United States been given legal notice, it could have intervened in the court proceedings and informed Plaintiffs, who would have then been on notice of J&S Mast' intentions.[23]

Once in touch with Plaintiffs directly, J&S Mast never told Plaintiffs about (let alone provided legal notice of) the custody or adoption proceedings before convincing them to leave Afghanistan and bring Baby Doe to the United States. After Joshua Mast established contact with

---

[20] Exh. 2 at 5 (Declaration of Colonel Joseph M. Fairfield, Ex. A, (October 23, 2019 Meeting Minutes between U.S., Afghanistan, and ICRC officials)) (meeting minutes state that ICRC was in "contact with individuals claiming to be relatives of the infant"); Exh. 3 at 1-2 (Declaration of U.S. Department of State Foreign Office Donna Welton) (describing the October 2019 meeting and Joshua Masts' attendance); Exh. 4 at 1339:18–1344:3 (Aug. 9, 2022 J. Mast Trial Tr.) (Joshua Mast testifying he attended the October 23, 2019 meeting).

[21] *A.A. v. J.M.*, 81 Va. App. 213, 221, 223 (2024); *see also* Exh. 1 (Custody Order, *In the matter of Baby L.*, No. JJ004656-01-00 (Juv. & Dom. Rel. Ct. Nov. 6, 2019)); Exh. 15 at 2 (Petition for Adoption, *In the Matter of Baby L.*, No. 19CL719 (Fluvanna Cnty. Cir. Ct. Nov. 11, 2019)); Exh. 6 (Interlocutory Adoption Order, *In the Matter of Baby L.*, No. 19CL719 (Fluvanna Cnty. Cir. Ct. Nov. 11, 2019)).

[22] *See* Exh. 4 at 1350:18-21 (Aug. 9, 2022 J. Mast Tr.) (Joshua Mast did not give notice of the adoption proceedings at the TRO hearing), 1346:8-25 (no one represented DOJ at the custody proceedings); Exh. 14 at 28 (Transcript Order Denying TRO) (United States did not receive formal notice of the custody proceedings); Exh. 3 at 23 (Welton Decl.) ("Since September, the baby has received medical treatment and care at Bagram Airfield's Craig Hospital").

[23] *See* Exh. 14 at 38 (Order Denying TRO) ("[I]f the United States had been involved in [J&S Mast' custody] proceeding as it should have been since [the United States] had custody, we imagine things would not have gone the same way because we would have been able to correct some of these factual errors that were happening there.").

Plaintiffs and confirmed Baby Doe was in Plaintiffs' care, J&S Mast and R Mast submitted a timeline to the Circuit Court on March 30, 2020, that falsely represented that Baby Doe had been living "in [an] orphanage in Kandahar" since March 2, 2020.[24] The Circuit Court subsequently issued a final order allowing J&S Mast to adopt Baby Doe on December 3, 2020.[25] J&S Mast *never* informed Plaintiffs of the adoption proceedings or the final adoption order until after they arrived in the United States.[26]

*Second*, Joshua Mast misrepresented the severity of Baby Doe's medical needs to Plaintiffs to convince them to bring her to the United States. In February 2020, before contacting Plaintiffs, Joshua Mast began to develop his plan to persuade Plaintiffs to bring Baby Doe to the United States by "offer[ing] free medical care in the states."[27] Recognizing that there would be "no guarantee of [Plaintiffs'] willingness to give [Baby Doe] up,"[28] Joshua Mast engaged Defendant Kimberley Motley to make contact with Plaintiffs on his behalf.[29] Motley made contact with Plaintiffs, representing that an unidentified American family (*i.e.*, J&S Mast) wanted to provide Baby Doe with medical care in the United States—on the condition that Plaintiffs sent Baby Doe

---

[24] Exh. 10 (Timeline submitted to court).

[25] Exh. 12 (Final Order of Adoption, *In the matter of Baby L.*, No. 19CA12 (Fluvanna Cnty. Cir. Ct. 2020)).

[26] Exh. 16 at 1745:19-1746:4, 1747:12-21 (Aug. 23, 2022 S. Mast Tr.) (Stephanie Mast admits that Respondents decided to tell Plaintiffs "the truth" for the "first time" only after meeting Plaintiffs in Germany.); Exh. 4 at 1309:24–1310:20 (Aug. 9, 2022 J. Mast Tr.) (Joshua Mast instructed his interpreter not to give the adoption documents to Plaintiffs until after they left Afghanistan).

[27] Exh. 17 (February 27, 2020 WhatsApp Exchange).

[28] Exh. 18 (February 8, 2021 WhatsApp Exchange).

[29] *Id.*

to the United States alone.[30] Plaintiffs declined the offer, instead suggesting that they find a suitable alternative medical institution in India or Pakistan that would permit them to travel with Baby Doe.[31] But Motley insisted that the then-unidentified American family would not support treatment anywhere but the United States.[32] In June 2021, Joshua Mast began speaking directly with Plaintiffs,[33] and began pushing aggressively for Plaintiffs to send Baby Doe to the United States. In doing so, he claimed that American doctors had reviewed her records and determined that she could become blind, lose her ability to walk, or even die as a result of injuries that purportedly resulted from the incident that killed her biological parents.[34] Although Plaintiffs observed only "redness" and "itching" in Baby Doe, Plaintiffs ultimately acceded to coming to the United States with Baby Doe for her medical treatment because Joshua Mast's assertions about her supposed medical needs "scared [them] a lot."[35] When Plaintiffs ultimately agreed to leave Afghanistan with Baby Doe, they had no idea J&S Mast would take Baby Doe from them.[36]

---

[30] Exh. 19 (Timeline created by Circuit Court); Exh. 20 at 199:20-200:11, 201:17-22 (May 24, 2024 Jane Doe Tr.).

[31] Exh. 19 ("Respondents request the child be transferred to the US for medical treatment. Petitioners refused to send the child alone."); Exh. 20 at 202:4-20 (May 24, 2023 Jane Doe Tr.) (Plaintiffs testified to suggesting medical treatment in Pakistan or India); Exh. 21 at 979:2-3 (June 10, 2022 John Doe Trial Tr.) (John Doe: "I had access to India, not being able to come to the United States.").

[32] Exh. 20 at 201:20-202:3 (May 24, 2023 Jane Doe Tr.) ("Q: Was it ever your understanding that seeking medical treatment for [Baby Doe] would mean losing her? Jane Doe: At some point [Motley] told me that [Baby Doe's] treatment is not possible in Afghanistan, and she was always requesting and telling me that you should bring [Baby Doe] to Kabul and we will send her to the United States…"); Exh. 22 at 48:13-17 (Mar. 24, 2023 Jane Doe Dep. Tr.).

[33] Exh. 23 at 79:5-10 (May 20, 2022 K. Motley Dep. Tr.).

[34] Exh. 20 at 204:2-14 (May 24, 2022 Jane Doe Tr.).

[35] *Id.* at 200:2-8, 204:2-9.

[36] *Id.* at 200:12-14 ("Q: Did Ms. Motley ever tell you that that American family intended to take custody of [Baby Doe]? Jane Doe: Never"); Exh. 24 at 583:25-584:21 (June 8, 2022 John Doe Trial Tr.) (John Doe testifying he did not know J&S Mast intended to take Baby Doe).

To date, J&S Mast have supplied no evidence suggesting that Baby Doe faced any serious medical ailments while in Plaintiffs' custody. The evidence only belies their claims. For instance, Baby Doe's treating doctor at Bagram Air base determined in September 26, 2019, that she was "a healthy healing infant."[37] And even after they absconded with Baby Doe, J&S Mast admitted that the only "treatment" they claim to have provided Baby Doe was for "physical, speech, occupational and therapy, and treatment for parasites and lice."[38] The only conclusion that can be reasonably drawn from the available evidence is that J&S Mast misrepresented the nature of Baby Doe's medical ailments to fraudulently induce Plaintiffs to come to the United States.

*Finally*, R Mast not only knew of, but was a knowing and active participant in J&S Mast's fraudulent omissions and misrepresentations to Plaintiffs. R Mast was J&S Mast's lawyer during the state court custody and adoption proceedings,[39] so he helped directly further their adoption efforts. He also was likely aware that J&S Mast were hiding their adoption efforts from Plaintiffs because he falsely represented—to this Court—that J&S Mast did not intend to adopt Baby Doe, even though he already had obtained for them an interlocutory order of adoption.[40] And he participated in J&S Mast's efforts to induce Plaintiffs to come to the United States by emailing to USCIS, on J&S Mast's behalf, immigration forms containing misrepresentations about Baby Doe's status, including her relationship with Plaintiffs.[41]

---

[37] Exh. 25 at 3, 8 (Declaration of Lieutenant Colonel Rosemary M. Reed); *see also* Exh. 2 at 5 (Fairfield Decl., Ex. A (October 2019 Meeting Minutes)).

[38] Exh. 26 at 12 n.19 (Opening Brief of Appellants, *J.M. v. A.A.*, No. 240707 (Va. Dec. 11, 2024).

[39] Exh. 15 at 3 (Petition for Adoption).

[40] Exh. 14 at 23 (Transcript Order Denying TRO, *Baby L. v. Esper*, No. 3:20-CV-00009 (W.D. Va. Feb. 26, 2020); *see also infra* at 7-8 (discussing fraud on this Court).

[41] *See* discussion *infra* at 15-16.

3.    Defendants submitted fraudulent documents to the federal government.

To cap it off, J&S Mast perpetrated a fraud on the U.S. government by submitting documents with false information about Baby Doe and Plaintiffs in an effort to manufacture legal bases for their travel out of Afghanistan and into the United States.

The first document that Joshua Mast falsified was his November 2019 application to the Defense Enrollment Eligibility Reporting System ("DEERS"), seeking to enroll Baby Doe as his dependent.[42] In the application, Joshua Mast falsely listed Baby Doe's address as being in Palmyra, Virginia—almost two years before she had even set foot in the United States.[43] Relying on this misrepresentation, the DoD approved the application and issued an ID card.[44]

Joshua Mast then focused on ways to secure Baby Doe's entrance into the United States. He first sought to clear a path for her entrance by seeking advance parole from the Department of Homeland Security on the grounds that he was her guardian and she was in dire need of medical care. On or around March 27, 2020, Joshua Mast submitted an application to USCIS for parole for Baby Doe.[45] This application indicated that Joshua Mast was Baby Doe's guardian, represented that Baby Doe had significant medical needs, and requested grant of parole.[46] Yet, at that time, Baby Doe was in Plaintiffs' custody in Afghanistan. Understandably, USCIS responded to the application by requesting evidence that "the Ministry of Labor and Social Affairs . . . in Afghanistan ha[d] transferred legal custody of the beneficiary ([Baby Doe])" to Joshua Mast and

---

[42] Exh. 27 (DEERS Application).

[43] *Id.*; *see also* Exh. 3 at 23 (Welton Decl.) (observing that Baby Doe was in Bagram Air Base in November 2019).

[44] Exh. 28 (DEERS Approval).

[45] Exh. 29 at 1 (USCIS Letter to Joshua Mast entitled "Request for Additional Evidence").

[46] *Id.*

that an "Afghan Family Court and the Government of the Islamic Republic of Afghanistan ha[d] consented to . . . Joshua Kenneth Mast's legal guardianship of beneficiary and granted permission for the beneficiary to travel outside of Afghanistan."[47] USCIS also requested "a current signed and dated letter . . . from [Baby Doe's] current treating physician(s) in Afghanistan," including "a detailed and specific description of her current condition, her current care needs, a detailed prognosis, and a detailed explanation on of all treatments or therapies currently being recommended."[48] J&S Mast, of course, had no such evidence, as the Afghan government had transferred custody to Plaintiffs, not J&S Mast. Unable to present the requested evidence, Joshua Mast withdrew his application in September 2020 and USCIS closed the case without granting Baby Doe parole.[49]

Having failed to obtain parole for Baby Doe, J&S Mast looked for other ways to get her to the United States, regardless of legality. In or around December 2020, Joshua Mast paid someone in Afghanistan to procure a fake Afghan passport for Baby Doe,[50] even while he insisted she was "stateless." [51] The photograph used in the fake passport was an image Plaintiffs had shared with Kimberley Motley that the Masts doctored,[52] and the name used in the passport was the Americanized name that J&S Mast foisted on Baby Doe.[53] J&S Mast procured the passport in

---

[47] *Id.* (capitalization altered without notation).

[48] *Id.* at 2.

[49] Exh. 30 (September 11, 2020 email withdrawing application); Exh. 31 (USCIS case closure notification); Exh. 4 at 1435:5-7 (Aug. 9, 2022 J. Mast Tr.).

[50] Exh. 32 at 1250:17-23 (Aug. 1, 2022 J. Mast Tr.).

[51] Exh. 32 at 1254:3-6.

[52] Exh. 32 at 1248:10-17.

[53] Exh. 32 at 1248:10-17 (Aug. 1, 2022 Josuha Mast Tr.) ("Q. But you did use a photo that Kimberly Motley gave you that you knew came from the [Does] when applying for a passport; is that correct? A. Yes. That's correct. Q. And did you modify that photo? A. Yeah. They didn't like

secret; Plaintiffs learned of its existence only when Joshua Mast presented it to U.S. immigration enforcement agents on behalf of Baby Doe to secure her entrance into the United States in August 2021.[54]

Defendants' efforts to obtain false government documents did not stop there. Having secured a fake travel document for Baby Doe, they then sought to obtain false travel documents for Plaintiffs (who refused to send Baby Doe to the United States alone). On August 21, 2021, R Mast emailed USCIS a Form I-360 Petition for Plaintiff John Doe,[55] without John Doe's knowledge or consent. The form was prepared at the direction of J&S Mast and listed Joshua Mast as the person acting on behalf of John Doe.[56] R Mast's email falsely described Plaintiffs as "helping U.S. DoD at great risk to themselves," and having "cared for a minor DoD dependent child ([Baby Doe]) who has serious medical needs."[57] Plaintiffs, as Baby Doe's adoptive parents, were neither "helping DoD" nor "car[ing] for a minor DoD dependent child." They were raising their daughter while being strung along by J&S Mast about the urgent need for their child's medical care. And, as discussed above, Baby Doe did not have ongoing "serious medical needs." *See supra* at 10-12. The Masts deliberately misrepresented Plaintiffs' relationship to Baby Doe in the I-360 Petition and submitted it on behalf of John Doe with neither his knowledge nor consent.

---

it, because it wasn't modest enough. So they asked for a more modest one."); Exh. 33 (Original Photo); Exhibit 34 (Afghan Passport).

[54] Exh. 20 at 212:15-17, (May 24, 2022 Jane Doe Tr.) ("Q: When is the first time you saw this [passport]? A: That was 2021 … in Washington, D.C."), 213:2-11 (describing Mast producing the passport); Exh. 34 (Afghan Passport).

[55] Exh. 35 (August 21, 2021 email).  The I-360 is an immigration form that can be filed as part of the green card application process by certain classes of immigrants who have faced extraordinary circumstances.  U.S. Citizenship and Immigration Services, Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, https://www.uscis.gov/i-360.

[56] Exh. 36 (USCIS I-360 form).

[57] Exh. 35.

**C.    The Masts assert various privileges in response to Plaintiffs' discovery requests.**

Plaintiffs' Requests for Production (RFPs) to Defendants asked them to produce documents regarding various topics, including the J&DR and Circuit Court proceedings (RFP Nos. 2, 3, 16, 17), communications with government entities and employees about Baby Doe (RFP Nos. 6, 9, 15), and communications with other defendants about Baby Doe or Plaintiffs (RFP No. 14). Plaintiffs' First Set of Requests for Production to Defendants (attached as Exh.37)

Following motion practice and an Order from this Court compelling J&S Mast's document production, J&S Mast provided Plaintiffs with privilege logs on February 9, 2024, and March 7, 2024, asserting privilege over 422 documents (attached as Exhs. 38 and 39, respectively). For his part, R Mast produced a privilege log on January 17, 2024, asserting privilege over 258 responsive documents (attached as Exh. 40). In Exh. 41, Plaintiffs combined the privilege logs of J&S Mast and R Mast, listing just the Disputed Records subject to this motion.

1.    J&S Mast and R Mast's articulated bases for privilege.

a)    *Attorney-Client and Work-Product Privilege*

On their February 9, 2024 and March 7, 2024 privilege logs, J&S Mast identified at least 176 records dated before September 3, 2021 (the day J&S Mast took Baby Doe from Plaintiffs, thus completing their fraud), that were being withheld at least in part based on work product, attorney client, or both privileges. *See* Exh. 41 (Disputed Records).[58]

On his January 17, 2024 privilege log, R Mast identified at least 19 J&DR Court-related records that were dated before September 3, 2021 and that were being withheld at least in part as work product, attorney client, or both. *Id.*[59] He identified at least 120 records in the same time

---

[58] J&S Mast's privilege logs do not distinguish between fact and opinion work product.

[59] R Mast's privilege log does not distinguish between fact and opinion work product.

frame related to the Circuit Court that were being withheld on the same bases. *Id.* And he identified at least 82 records in the same time frame related to the TRO Litigation in this Court that he is withholding on the same bases. *Id.*

### b) *Spousal Privilege*

On their February 9, 2024 and March 7, 2024 privilege logs, J&S Mast identified 35 unique records pre-dating September 3, 2021, that were withheld at least in part based on spousal privilege. *Id*. They also claim attorney client or work product privilege for three of these records. J&S Mast do not provide any description of what is in these records, other than asserting that they are privileged.

### 2.    J&S Mast and R Mast refuse to produce the withheld documents.

Plaintiffs asked the Masts to produce the Disputed Records, and have made good faith efforts to resolve this dispute. When those efforts proved unsuccessful, the parties submitted a joint statement to the Court regarding the dispute. ECF No. 533. The Court then ordered the parties to brief the issues. ECF No. 534.

## III.    **Argument**[60]

Plaintiffs are entitled to documents created by the Masts in furtherance of their fraudulent scheme to induce Plaintiffs to bring Baby Doe to the United States under false pretenses. Under the relevant Virginia and federal law, attorney-client, work-product, and spousal privilege cannot be used to insulate wrongdoing. The Masts' records are improperly withheld where they relate to: (1) J&S Mast's fraud on Plaintiffs and R Mast's knowledge of and participation in that scheme, and in furtherance of the fraud on Plaintiffs; (2) the Masts' fraud on Virginia state and federal courts; and (3) the Masts' fraud on the U.S. Government.

---

[60] Unless otherwise noted, all brackets, internal quotation marks, and citations are omitted.

A.    **Applicable Legal Principles**[61]

1.    Attorney-Client Privilege

The attorney-client privilege protects "[c]onfidential communications between attorney and client made because of that relationship and concerning the subject matter of the attorney's employment" from disclosure. *Commonwealth v. Edwards*, 235 Va. 499, 508 (1988). "[T]he privilege is an exception to the general duty to disclose, is an obstacle to investigation of the truth, and should be strictly construed." *Id.* at 509.

The crime-fraud exception to the attorney-client privilege is well recognized in Virginia law; it applies "to communications between attorney and client where the client's purpose is the furtherance of a future intended crime or fraud." *Sevachko v. Commonwealth*, 35 Va.App. 346, 356 (2001). When applying the crime-fraud exception, "the client's knowledge and intentions . . . are of paramount concern because the client is the holder of the privilege." *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004* ("*In re Grand Jury 2005*"), 401 F.3d 247, 251 (4th Cir. 2005). "Therefore, for the exception to apply, the attorney need not be aware of the illegality involved. Rather, it is enough that the communication furthered, or was intended by the client to further, that illegality." *Id.* [62]

---

[61] Virginia law governs the attorney-client and spousal privilege claims here, where the court has diversity jurisdiction. Fed. R. Evid. 501; *Adair v. EQT Prod. Co.*, 285 F.R.D. 376, 380 (W.D. Va. 2012) ("Because the remaining claims in these cases are state law claims before the court under both pendent and diversity jurisdiction . . . the determination of whether the documents at issue are protected from production by a claim of privilege is governed by Virginia law."); *Hatfill v. N.Y. Times Co.*, 459 F. Supp. 2d 462, 465 (E.D. Va. 2006) ("[I]n diversity cases, Rule 501 directs the Court to apply state law, including state conflict-of-law provisions, to the law of privilege."). Federal law governs application of the work product doctrine in this case. *See Nicholas v. Bituminous Cas. Corp.*, 235 F.R.D. 325, 329 n. 2 (N.D. W.Va. 2006) ("In a diversity case federal courts apply federal law to resolve work-product privilege claims and state law to resolve attorney-client privilege claims.").

[62] While generally compatible, Fourth Circuit and Virginia law on the crime-fraud exception have a few subtle differences. For one thing, Virginia law seemingly only requires that

18

2.      <u>Work Product Privilege</u>

While the attorney-client privilege concerns confidential communications between an attorney and her client, "[t]he work product privilege protects an attorney's work done in preparation for litigation." *Id.* at 250. "The privilege encompasses both fact work product and opinion work product. Fact work product, which consists of documents prepared by an attorney that do not contain the attorney's mental impressions, can be discovered upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." *Id.* By contrast, "[o]pinion work product, which does contain the fruit of an attorney's mental processes, is more scrupulously protected as it represents the actual thoughts and impressions of the attorney." *Id.* Given that "the work product privilege protects not just the attorney-client relationship but the interests of attorneys to their own work product, the attorney, as well as the client, hold the privilege." *Id.*

Like the attorney-client privilege, the work product privilege "may be lost . . . when a client gives information to an attorney for the purpose of committing or furthering a crime or fraud." *Id.* at 251. But "fact work product is treated differently than opinion work product under the crime-fraud exception." *Id.* at 252. While fact work product "may be discovered upon prima facie evidence of a crime or fraud as to the client only," overcoming the privilege over opinion work

---

the moving party generally show that the privilege holder was engaging in a "fraudulent accomplishment," *Seventh Dist. Comm. of Va. State Bar v. Gunter*, 212 Va. 278, 287(1971), while the Fourth Circuit requires the moving party to evince "prima facie . . . evidence" of a crime or fraud. *In re Grand Jury 2005*, 401 F.3d 247, 254-55 (4th Cir. 2005). And while *Gunter* seemingly requires that the privilege communication "relate" to a fraudulent accomplishment, 212 Va. at 287, *In re Grand Jury* imposes a burden of showing the privileged record bearing a "close" relationship with the crime or fraud, 401 F.3d at 255. To simplify the analysis, Plaintiffs maintain that each of the Disputed Records satisfy the Fourth Circuit's slightly more involved test.

product requires a prima facie showing that the "attorney in question was aware of or a knowing participant in the criminal conduct." *Id.*

### 3.    Marital Communications Privilege

Virginia law provides that "[a] person has a privilege to refuse to disclose, and to prevent anyone else from disclosing, any confidential communication between his spouse and him during their marriage." Va. Code Ann. § 8.01-398. But, like the attorney-client and work-product privilege, the marital communications privilege is not absolute. *See Brown v. Commonwealth*, 223 Va. 601, 606 (1982) (agreeing with the Supreme Court's rationale that "'[t]estimonial . . . privileges,' which impair the right of the public to have all relevant evidence introduced in the fact-finding process, should be strictly construed" (quoting *Trammel v. United States*, 445 U.S. 40, 50 (1980)). "[W]here marital communications have to do with the commission of a crime in which both spouses are participants, the conversation does not fall within the marital privilege." *United States v. Parker*, 834 F.2d 408, 411 (4th Cir. 1987); *see also United States v. Alexander*, 736 F. Supp. 968, 1005 (D. Minn. 1990) (observing that the crime-fraud exception to spousal privilege has "been applied and upheld in the majority of circuits that have [faced] the question" and collecting cases); *Brownfield v. Hodous*, 82 Va. Cir. 315, 317-18 (2011) (noting that Virginia protects confidential marital communications "in the same way as the attorney-client privilege").

### 4.    The Crime-Fraud Exception

Applying the crime-fraud exception to otherwise privileged documents requires a two-step inquiry. First, the movant must make "a prima facie showing" that the privilege holder "was engaged in or planning a criminal or fraudulent scheme when" the privileged record was created. *In re Grand Jury 2005*, 401 F.3d at 251. Second, "the documents containing the privileged materials [must] bear a close relationship to the [privilege holder's] existing or future scheme to

commit a crime or fraud." *Id.*; *see also Seventh Dist. Comm. of Va. State Bar v. Gunter*, 212 Va. 278, 287 (1971); *Peterson v. Fairfax Hosp. Sys.*, 32 Va. Cir. 294, 295 (1993).

The first step of the crime-fraud analysis is satisfied with a "prima facie showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *In re Grand Jury 2005*, 401 F.3d at 251. "This is a low hurdle." *In re Grand Jury Subpoena* ("*In re Grand Jury 2021*"), 2 F.4th 1339, 1345 (11th Cir. 2021). The prima facie standard "usually means little more than a showing of whatever is required to permit some inferential leap sufficient to reach a particular outcome." *In re Grand Jury*, 705 F.3d 133, 152 (3d Cir. 2012); *accord Peterson*, 32 Va. Cir. at 295 (applying the prima facie standard). The movant need not prove the alleged fraud or crimes "beyond a reasonable doubt, by clear and convincing evidence, or even by a preponderance of the evidence." *United States v. Moazzeni*, 906 F. Supp. 2d 505, 516 (E.D. Va. 2012) (citing *In re Grand Jury 2005*, 401 F.3d at 251). Rather, it is sufficient to show "that a fraudulent scheme was afoot." *Id.*; *see In re Grand Jury 2005*, 401 F.3d at 251 (observing that the proof "must be such as to subject the opposing party to the risk of non-persuasion if the evidence . . . is left unrebutted"); *In re Sealed Case*, 676 F.2d 793, 815 (D.C. Cir. 1982) ("A specific showing of the client's intent in consulting the attorney or the attorney's intent in performing his or her duties is not required" because "to require it would almost certainly lead to . . . a near evisceration of the exception."); *X Corp. v. Doe*, 805 F. Supp. 1298, 1307 (E.D. Va. 1992) ("[R]equiring actual proof of the crime or fraud in lieu of the *prima facie* . . . imposes an impractical and unduly burdensome standard that tips the balance too far in favor of confidentiality and against the full and free discovery of the truth."), *aff'd sub nom. Under Seal v. Under Seal*, 17 F.3d 1435 (4th Cir. 1994).

In the second step, the Court must determine whether the putatively privileged records "bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999). While the Fourth Circuit has not articulated what "close" means in a published opinion, decisions within the circuit reflect that the standard is not a demanding one. *See, e.g.*, *In Re Grand Jury Investigation*, 352 F. App'x 805, 807 (4th Cir. 2009) (affirming district court's application of crime-fraud exception to attorney-client privilege because "[c]ounsel's advice was used to "cloak the Corporation's [illegitimate] transfers"); *United States v. Wilson*, No. CV DKC 21-360, 2025 WL 26662, at *3 (D. Md. Jan. 3, 2025) (finding a "close relationship" where the attorney relied on communications from the client to draft fraudulent trust documents); *Navient Sols., LLC v. L. Offs. of Jeffrey Lohman*, No. L19-CV-461 (LMB/TCB), 2020 WL 1917837, at *7 (E.D. Va. Apr. 20, 2020) (finding the "close relationship" standard satisfied because plaintiff sought privileged records that formed "the building blocks of the scheme and of plaintiff's case") (cleaned up)).

As further explained below, Plaintiffs respectfully submit that they have made the required prima facie showing for imposition of the crime-fraud exception. Plaintiffs present here extensive evidence of the Masts' efforts to "engage[] in or plan[] a criminal or fraudulent scheme" and that the Disputed Records "bear a close relationship" to the Masts' "existing . . . scheme to commit a crime or fraud." *In re Grand Jury 2005*, 401 F.3d at 251.

Nonetheless, if the Court has questions about Plaintiffs' assertions, it should, at minimum, order *in camera* review of the Disputed Records so that it can confirm applicability of the crime-fraud exception. Contrary to the Masts' assertion,[63] the showing required for *in camera* review is

---

[63] The Masts incorrectly assert that the Court may order *in camera* review "if and only if [the Court] finds that Plaintiffs have made a prima facie showing that the crime-fraud exception applies." Masts' Br. at 3, n. 3 (citing *In re Grand Jury 2005*, 401 F. 3d at 253). That is inaccurate.

a "lesser evidentiary showing . . . than is required ultimately to overcome the privilege." *United States v. Zolin*, 491 U.S. 554, 572 (1989). The "threshold" showing required for *in camera* review is "not . . . a stringent one," but requires only "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish" application of the crime-fraud exception. *Id.* "Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Id.; accord Peterson*, 32 Va. Cir. at 296. That said, the Court need not conduct an *in camera* review when it is "able to determine by other means that allegedly privileged documents are connected to a crime or fraud." *In re Grand Jury 2005*, 401 F.3d at 255.

In exercising its discretion to order *in camera* review, the Court should consider "the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply." *Zolin*, 491 U.S. at 572.

As further explained below, the facts and circumstances of this case warrant at least *in camera* review to determine applicability of the crime-fraud exception. Although the volume of materials the court would be asked to review is somewhat large, it is not unmanageable. More important, the Disputed Records are likely to provide further, direct evidence of J&S Mast's fraudulent conduct and R Mast's participation in their efforts to defraud Plaintiffs. Given the

---

*See In re Grand Jury Subpoena #£06-1*, 274 F. App'x 306, 309-310 (4th Cir. 2008) (explaining that a district court "may determine whether the crime-fraud exception applies in one of two ways"; the first involves an *in camera* review of the disputed documents after a "threshold showing", while the second does not involve *in camera* review of the disputed documents, but a review of other evidence "establishing a prima facie case" for the exception).

extensive evidence already before the Court, *in camera* review of the Disputed Records is likely to establish the necessity for application of the crime-fraud exception.

*   *   *

In sum, to obtain the Disputed Records that the Masts claim are privileged attorney-client, fact work product, and marital communication records, Plaintiffs must make out a prima facie case of a fraudulent scheme by J&S Mast and show that the records bear a close relationship to that scheme. To obtain the Disputed Records that the Masts assert are privileged opinion work product, Plaintiffs also must make a prima facie showing that R Mast knew of, or participated in, J&S Mast's fraudulent conduct. And *in camera* review of privileged records is required only when the Court cannot use extrinsic evidence to determine that both prongs of the exception are satisfied, but Plaintiffs have presented a factual basis sufficient to support a reasonable person's good faith belief that the materials would reveal evidence of a crime or fraud.

**B.      The crime-fraud exception applies to the Disputed Records.**

1.      <u>There is abundant – let alone prima facie – evidence of the Masts' fraud.</u>

The proverbial mountain of evidence outlined above belies the Masts' assertion that Plaintiffs rely solely on "their own allegations and speculation about what these privileged documents might show." Masts' Br. at 12. The facts recited showcase the "factual basis to substantiate those allegations," *id.*, and compellingly establish that the Masts engaged in several wide-ranging frauds, all with the ultimate goal of inducing Plaintiffs to bring Baby Doe from Afghanistan to the United States so that Joshua and Stephanie Mast could take her from them.

The Masts' fraudulent activity started with their many misrepresentations to the Virginia state and federal courts. They withheld critical facts from, and made false statements to, the J&DR court, the Circuit Court, and even this Court. *See supra* at 3-8.  That fraudulent activity, in and of itself, is sufficient to satisfy Plaintiffs' prima facie case of fraud. *See, e.g.*, *Owens-Corning*

24

*Fiberglas Corp. v. Watson*, 243 Va. 128, 141-143 (1992) (holding that documents revealing fraud perpetrated by the defendant on another court were subject to the crime-fraud exception because excluding them from discovery "would merely perpetuate the original fraud upon the [other] court and would not serve to promote the administration of justice in Virginia's courts"); *Marquette Equip. Fin., LLC v. Rowe Fine Furniture, Inc.*, No. 1:07CV676, 2008 WL 11512190, at *2 (E.D. Va. Mar. 13, 2008) (holding that fraud on a court "constitutes a 'fraudulent scheme' within the meaning of Fourth Circuit crime-fraud jurisprudence").

The Masts' fraudulent activity continued when J&S Mast, with R Mast's involvement, induced Plaintiffs to bring Baby Doe to the United States so that they could take custody of Baby Doe. They did so by (1) failing to disclose to Plaintiffs the custody and adoption proceedings and (2) misrepresenting to Plaintiffs the severity of Baby Doe's medical ailments. *See supra* at 3-12. This evidence, too, alone satisfies Plaintiffs' prima facie burden of showing that the Masts engaged in fraudulent activity. *See, e.g.*, *Koch v. Specialized Care Servs., Inc.*, 437 F. Supp. 2d 362, 377-78 (D. Md. 2005) (plaintiff establishes crime-fraud exception in a tortious interference action with documents showing defendants discussed fraudulently terminating plaintiff's employment); *Rockwood Select Asset Fund XI, (6)-1, LLC v. Devine, Millimet & Branch, PA*, 113 F. Supp. 3d 471, 480 (D.N.H. 2015) (plaintiff satisfied initial burden because defendants "admit[ed] that they were aware" of a lawsuit at the time "they assured" plaintiff they were not aware of said lawsuit); *Navient Sols., LLC* , 2020 WL 1917837, at *7 (plaintiff satisfied initial burden where emails and deposition testimony corroborated existence of a fraudulent scheme and defendant/attorney's involvement in it).

And the record evidence shows the Masts continued their fraudulent activity by submitting various false documents to the U.S. government, including the very "passport" used to gain Baby Doe's entry into this country. *See supra* at 13-16.

The adduced record evidence each of the above examples of fraudulent activity—let alone the combined weight of them—is sufficient to demonstrate "that a fraudulent scheme was afoot." *Moazzeni*, 906 F. Supp. 2d at 516. Plaintiffs have thus more than cleared the "low hurdle" of meeting their prima facie burden. *In re Grand Jury 2021*, 2 F.4th at 1345.

In addition, with respect to R Mast, the only reasonable inference from the evidence is that he either knew of or was a knowing participant in J&S Mast's fraudulent activities. *See, e.g.*, *In re Grand Jury Proc., G.S., F.S.*, 609 F.3d 909, 915 (8th Cir. 2010) (confirming application of crime-fraud exception to attorney work product because there was "a reasonable likelihood" that bankruptcy attorney "knew or was willfully blind" to his clients' sham transactions); *United States v. Kaplan*, No. 02 CR. 883, 2003 WL 22880914, at *8 (S.D.N.Y. Dec. 5, 2003) (finding crime-fraud exception applicable to work product where attorney knew client was not injured but wanted to sue for car crash anyway). Where attorneys are also "defendants charged with acts allegedly committed partly in concert with their client," that "clearly sets them apart" from "the typical situation where shelter is sought under [the] 'work product' doctrine" or attorney-client privilege. *SEC v. Nat'l Student Mktg. Corp.*, 18 Fed. R. Serv. 2d 1302, 1974 WL 415, at *3 (D.D.C. 1974).

2.     <u>The Disputed Records bear a close relationship to the fraud asserted by Plaintiffs in this case.</u>

The link between the Disputed Records and the fraud claimed in this case cannot legitimately be questioned. As the Masts' privilege logs evince, these records plainly relate to the underlying facts of this case. More than that, they "furthered, or [were] intended . . . to further" J&S Mast's efforts to induce Plaintiffs to bring Baby Doe to the United States under false

pretenses, with R Mast's support. *United States v. Harris*, No. 2:14CR76, 2014 WL 4930811, at

*3 (E.D. Va. Oct. 1, 2014); *accord Gibbs v. Stinson*, No. 3:18-CV-676, 2021 WL 4853575, at *10

(E.D. Va. Oct. 17, 2021).

> a)    *J&S Mast's Disputed Records withheld under the attorney-client and work product privileges.*

On their February 9, 2024 and March 7, 2024 privilege logs, J&S Mast identify at least 176

unique records dated before September 3, 2021, that they are withholding at least in part based on

attorney-client or work product privilege. *See* Exhs. 38 and 39. These generally fall into two

categories: (1) records related to the state court and federal court proceedings, and (2) records

related to government processes. Each category of records bears a close relationship to the frauds

discussed above because they are intimately tied to J&S Mast's fraudulent misconduct towards the

Virginia Court system, the federal government, and Plaintiffs.

**Court Proceedings.** Most of the records on J&S Mast's privilege log are described as

being "prepared in connection with Virginia adoption proceedings" (*i.e.*, J&DR court and circuit

court); "Esper litigation" (*i.e.*, the TRO Litigation);[64] or generally "in anticipation of []

litigation."[65] These communications primarily include email correspondence between J&S Mast

and their counsel, including R Mast, regarding "custody filing process requests," "case strategy,"

draft petitions, and other documents prepared in connection with "Esper litigation," and "Virginia

adoption proceedings."[66] J&S Mast's repeated misrepresentations to these courts were part and

parcel to their fraudulent scheme. *See supra* at 3-8. Their preparations for and discussions about

---

[64] J&S Mast's privilege logs also sometimes refer to the TRO Litigation as the "Pompeo litigation" and "USFOR-A litigation." *See, e.g.*, Exhs. 38 and 39, J&SMAST-WDVA-01710, J&SMAST-WDVA-01838.

[65] *See, e.g.*, *id.*, J&SMAST-WDVA-02401; J&SMAST-WDVA-02869.

[66] *See generally* Exhs. 38 and 39.

those court proceedings will shed light on their misrepresentations and their efforts to defraud Plaintiffs.

**Government Processes.** J&S Mast's privilege log includes records related to obtaining visas for Plaintiffs and Baby Doe; travel requirements; exit processes from Afghanistan; Baby Doe's name change; and DoD assistance.[67] These records relate to frauds on the U.S. government because they show what information the Masts possessed when they communicated with various branches of the U.S. government and what misrepresentations they made to obtain federal documentation for Baby Doe. *See supra* at 13-16. These records also furthered the fraud against Plaintiffs because they relate to what J&S Mast told Plaintiffs about the circumstances of their evacuation from Afghanistan (and the related documents). *See id.*. J&S Mast did not disclose to Plaintiffs anything about Baby Doe's purported "name change," the fake passport they obtained for Baby Doe, or the fake immigration documents they procured for Plaintiffs until after Plaintiffs left Afghanistan.[68]

> b) *R Mast's Disputed Records withheld under the attorney-client and work product privileges.*

R Mast divides his subset of Disputed Records into three categories: records related to litigation in the J&DR court, the circuit court, and this Court. Each category closely relates to the frauds described above because R Mast's legal efforts to obtain an adoption order for Baby Doe on behalf of J&S Mast are part and parcel of J&S Mast' scheme to defraud Plaintiffs and obtain

---

[67] *See, e.g.*, Exhs. 38 and 39, J&SMAST-WDVA-01376 (visa), J&SMAST-WDVA-02995 (travel requirements), J&SMAST-WDVA-01702 (DoD assistance); Exh. 38, J&SMAST-WDVA-01555 (visa), J&SMAST-WDVA-03031 (exit process), J&SMAST-WDVA-02992 (name change).

[68] Exh. 42 at 3 (Declaration of John Doe in Support of the Petition to Vacate, *A.A. v. J.M.*, No. CL2200018600 (Fluvanna Cnty. Cir. Ct. Nov. 4, 2022)); Exhibit 10 at 1443:17-1444:13 (Aug. 9 J. Mast Tr.).

legal and physical custody of the child. And because R Mast knew that J&S Mast were engaging in fraudulent activity towards both Plaintiffs and each Virginia court, both his fact and opinion work product must be disclosed. *In re Grand Jury 2005*, 401 F.3d at 252.

**J&DR Court.** On his January 17, 2024 privilege log, R Mast identifies at least 19 records dated before September 3, 2021, relating to proceedings before the J&DR Court that he is withholding based on the attorney client privilege, work product, or both. Exh. 40. Many of the withheld documents are described as "discussion of legal strategy." *Id.* Others are described as various drafts for litigation. These records furthered J&S Mast's pursuit of the custody order without notice to Plaintiffs or the United States and relate to fraudulent misrepresentations or omissions the Masts' made to the J&DR Court in the course of obtaining the custody order. *See supra* at 3-4.

**Circuit Court.** R Mast identifies at least 120 records dated before September 3, 2021, related to proceedings before the Circuit Court that he is withholding based on the attorney client privilege, work product, or both. *Id.* These records include "status updates," draft documents, and emails amongst the Masts concerning their proceedings before the Circuit Court. These records furthered the Masts' pursuit of the interlocutory and final adoption orders without notice to Plaintiffs and relate to fraudulent misrepresentations or omissions the Masts made to the Circuit Court in the course of obtaining those orders. *See supra* at 5-7.

**This Court.** R Mast identifies at least 82 records dated before September 3, 2021, related to the TRO Litigation, withheld on similar grounds. Exh. 40. Many of these records are described as being "prepared in anticipation of litigation" or for "litigation strategy." *Id.* Those records furthered the fraud on this Court because they were prepared for briefing and argument in which R Mast affirmatively misled the Court about J&S Mast' intentions. *See supra* at 5-7. Further, the

29

Masts initiated the TRO Litigation to prevent Baby Doe from being transferred to Plaintiffs; their lack of success in the TRO Litigation led J&S Mast to reach out to Plaintiffs directly for the purpose of fraudulently inducing Plaintiffs to bring Baby Doe to the United States. *See supra* at 7-8.

*   *   *

There can be no legitimate dispute that the Disputed Records bear a close relationship to the fraud committed by the Masts on Plaintiffs, on the courts, and on the United States. Allowing the Masts to withhold these records would only further their fraud and "would not serve to promote the administration of justice." *Owens-Corning Fiberglas Corp.*, 243 Va. 128 at 142. The Court should order the Masts to produce the Disputed Records to Plaintiffs.

c)    <em>J&S Mast's Disputed Records withheld under spousal privilege.</em>

J&S Mast's privilege log entries for the Disputed Records withheld on the basis of the marital communications privilege are opaque entries that shed very little light into their contents.[69] These records likely bear a close relationship to the fraud perpetrated on Plaintiffs and the courts given their close proximity to the events described above.

Even so, given the opacity of J&S Mast' privilege logs, this Court should, at the very least, review the disputed records *in camera* to determine whether they are discoverable under the crime-fraud exception. As noted above, *in camera* review is appropriate if the movant provides "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish" application of the crime-fraud exception. *Zolin*, 491 U.S. at 572.

---

[69] *See, e.g.*, Exhs. 38 and 39, J&SMAST-WDVA-01573 ("January 6, 2020 Email among Joshua Mast and Stephanie Mast withheld pursuant to marital communications privilege,").

There is a good faith basis to believe J&S Mast's records withheld under spousal privilege reveal evidence of fraud. These Disputed Records include 32 records that pre-date September 3, 2021, claiming spousal privilege, and two records that pre-date September 3, 2021, claiming both spousal privilege and attorney-client privilege. *See* Exh. 41. These records all were generated between October 2019 and August 2021—a timeframe that falls squarely within the period during which the Masts were inducing Plaintiffs to bring Baby Doe to the United States under false pretenses, and making misrepresentations to various courts and the U.S. government.[70]

Consider a few examples. On October 23, 2019, representatives of the United States, Afghanistan, and the ICRC met to discuss their efforts to reunite Baby Doe with her family.[71] Joshua Mast attended the meeting,[72] and now withholds as a privileged marital communication an email exchanged with Stephanie Mast *the same day*.[73] This email will likely show what both J&S Mast knew before they misrepresented—just shortly thereafter—to the J&DR court and Circuit Court that Baby Doe was "stateless" and had no living relatives. J&S Mast also withhold two emails they exchanged on November 10, 2019, the day they represented to the Circuit Court that Baby Doe, who was still at Bagram Air Base, was "physically" in their custody.[74] These emails likely show J&S Mast's decision-making process about what they should disclose to the Circuit Court. And on December 5, 2020, just two days after the Circuit Court entered the final adoption order based on J&S Mast's misrepresentations, there are three attachments to emails that J&S Mast

---

[70] These Disputed Records post-date September 2019, when Baby Doe was orphaned and predate September 3, 2021, when J&S Mast took Baby Doe from Plaintiffs.

[71] Exh. 2 (Fairfield Decl., Ex. A (October 2019 Meeting Minutes)) at 5.

[72] Exh. 3 at 1-2 (Welton Decl.).

[73] *See* Exhs. 38 and 39, J&SMAST-WDVA-04580.

[74] *See* Exh. 15 at 2; Exhs. 38 and 39, J&SMAST-WDVA-01378, J&SMAST-WDVA-01379.

withheld based on spousal privilege.[75] Again, these emails likely show what J&S Mast knew about their misrepresentations to the Circuit Court. This circumstantial evidence strongly supports the inference that the disputed records were made in furtherance of the Masts' frauds. At the very least, *in camera* review is warranted. *See supra* at 23-24.

### C.    The Masts' arguments against the application of the crime-fraud exception lack merit.

The Masts assert that Plaintiffs cannot show a connection between the Disputed Records and the fraud asserted by Plaintiffs. In so arguing, they rely primarily on *In re: General Motors LLC Ignition Switch Litigation*, No. 14-MC-2543 (JMF), 2015 WL 7574460 (S.D.N.Y. Nov. 25, 2015), insisting that "Plaintiffs' argument bears many similarities to the unsuccessful privilege challenge." Masts' Br. at 13. Nothing could be further from the truth.

At issue in *General Motors* were "evaluations" conducted by the King & Spalding law firm (K&S) for General Motors in relation to potential litigation relating to faulty ignition switches in certain vehicles. 2015 WL 7574460, at *1. Plaintiffs sought production of more than 90,000 pages of documents under the crime-fraud exception, asserting that General Motors concealed the ignition switch defect by entering into confidential settlement agreements with other litigants, by failing to produce relevant and responsive evidence of the defect, and by utilizing K&S "in furtherance of its discovery fraud." *Id.* at *5. The court, however, rejected the crime-fraud assertion, finding that the plaintiffs failed to "provide a factual basis for a good faith belief that the communications and work product they seek . . . were made with the intent to further a crime or fraud." *Id.* at 6. Instead, the court explained, nothing in the documents suggested an intent to cover up the ignition switch defect. *Id.* at *6 (the documents did not "reveal any evidence" that General

---

[75] Exhs. 38 and 39, J&SMAST-WDVA-02332, J&SMAST-WDVA-02334, J&SMAST-WDVA-02340.

Motor's "*intent* in seeking to settle the matters was to conceal the defect from the public and its regulators" (emphasis in original)). Rather, the materials "appear[ed] to be nothing more than good-faith attorney evaluations of whether to settle individual cases in light of the risks of adverse verdicts and large damage awards against" General Motors. *Id.* These documents were "only the kind of documents that one would typically expect to find generated in the course of a legitimate defense of this particular kind of litigation." *Id.* (quoting *In re Richard Roe II, Inc.*, 168 F. 3d 69, 72 (2d Cir. 1999).

The exact opposite is true here. The Masts made numerous omissions and misrepresentations to the state and federal courts, the United States, and Plaintiffs, all with knowledge of their falsity.

This case is more like those cited by the *General Motors* court as cases in which there was "unmistakable evidence that the communications and materials at issue were made with an intent to further the relevant crime or fraud." *Id.* at *7 (discussing cases). For example, in *United States v. Ceglia*, No. 12-CR-876 (VSB), 2015 WL 1499194 (S.D. N.Y. Mar. 30, 2015), the defendant was charged with doctoring a contract and fabricating emails to defraud Facebook and its founder by filing a fraudulent lawsuit. As the *General Motors* court explained, "the very purpose of the underlying civil litigation" in *Ceglia* "was to perpetrate a fraud, so the communications with counsel prosecuting the litigation and their work product were plainly in furtherance of the overall fraud." *Id.*. The documents at issue included draft filings that the defendant "reviewed and commented on" and "responded to his attorney's questions. . . ." *Ceglia*, 2015 WL 1499194, at *4. Those "exchanges and the documents attached thereto directly furthered Ceglia's allegedly fraudulent purpose of recovering damages from Facebook and were related to the Facebook Contract and allegedly forged emails that were at the center of the civil suit." *Id.*

Similarly, here the Masts are charged with fraudulently inducing Plaintiffs to bring Baby Doe to the United States so that J&S Mast could exercise custody over her as a result of the custody and adoption orders they obtained through R Mast's legal representation. As in *Ceglia*, "the very purpose of the underlying" litigation "was to perpetrate a fraud." *General Motors*, 2015 WL 7574460, at *7 (citing *Ceglia*, 2015 WL 1499194, at *4-9). Thus, "the communications with counsel prosecuting the litigation and their work product were plainly in furtherance of the overall fraud." *Id.* at *7.

The Masts further argue that "[o]ther courts have followed" the *General Motors* case, "holding that allegations of false representations or concealment in litigation do not rise to the level of triggering the crime fraud exception." Masts' Br. at 13-14.[76] Yet, the very case they cite in support of that assertion—*Abbott Lab's. v. H&H Wholesale Servs., Inc.*, No. 17 CV 3095 (CBA)(LB), 2018 WL 2459271, at *5 (E.D.N.Y. Mar. 9, 2018))—*applied* the crime-fraud exception. In that case, the plaintiff asserted the crime-fraud exception to documents and communications generated throughout the case based on the defendant's alleged discovery fraud. *Id.* at *1. The defendant originally produced just 315 documents, failing to produce various documents regarding various topics, and then made a follow-up production of 3,500 documents. *Id.* While the plaintiff asserted that the documents originally were intentionally withheld, the defendant asserted that defects in its production efforts caused the original under-production. *Id.* Notably, the court ordered that the documents be produced for *in camera* review. *Id.*

Ultimately, the court found it appropriate to apply the crime-fraud exception because "the record [was] replete with troubling and unanswered questions." *Id.* at *5. The defendant simply

---

[76] Counsel has not found any citation to *General Motors* by any court within the Fourth Circuit.

"fail[ed] to []offer any sensible explanation for why" certain documents were not originally produced. *Id.* As a result, "a prudent person would have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud." *Id.* (quoting *In re Grand Jury Subpoena Duces Tecum*, 731 F. 2d 1032, 1039 (2d Cir. 1984) (cleaned up)). And, the court explained, it "cannot countenance the use of attorneys as 'front men' in a scheme to subvert the judicial process itself."[77] *Id.* (quoting *In re Sealed Case*, 754 F. 2d 395, 402 (D.C. Cir. 1985)). The same reasoning applies here. Moreover, while the court held that the documents it reviewed *in camera* were not themselves "in furtherance" of the crime or fraud, it nonetheless ordered that the plaintiff "may question witnesses at their depositions" about the defendant's deficient production and that the defendant "may not claim attorney-client privilege or work-product immunity with regard to communications concerning" that production. *Id.* at *6. The defendant and its counsel were "prohibited from withholding testimony about such communications on the basis of attorney-client privilege or work product immunity." *Id.* Moreover, the exception "shall apply to all oral communications concerning the productions, including the planning, preparation, searching, identifying, collecting, reviewing and delivering the documents and/or productions." *Id.*

Next, the Masts argue that the Disputed Records are relevant only to claims that the Court has dismissed and, thus, cannot be subject to further discovery. Masts' Br. at 14. But, again, the cases on which the Masts rely for this proposition do not support their argument, as they precluded discovery that was relevant *only* to dismissed claims. *See, e.g.*, *Dye v. Alsbrook*, No. 7:23CV00036, 2024 WL 1193566 (W.D. Va. Mar. 20, 2024) (allowing discovery only as to remaining claims); *Socol v. Haas*, No. 3:18-CV-00090, 2021 WL 2635847 (W.D. Va. June 25, 2021) (precluding

---

[77] The court further explained that a lawyer's knowledge of the fraud was immaterial to the analysis: "The exception applies even if the attorney is unaware that his advice is sought in furtherance of a crime or fraud." *Abbott Lab's*, 2018 WL 2459271, at *6.

discovery relevant only to dismissed claims); *Lifenet Health v. LifeCell Corp.*, No. 2:13CV486, 2014 WL 4162113, at *6 (E.D. Va. Aug. 19, 2014) ("Plaintiffs are not entitled to discovery that is only relevant to unaccused products or claims that have been dismissed from a case").

Here, the relevance to the Masts' fraud on the courts (including *this* Court) and to other entities is directly related to the fraud they committed on Plaintiffs. Indeed, the Masts could not have committed their fraud on Plaintiffs—inducing them to bring Baby Doe to the United States without disclosing the custody and adoption orders they'd obtained—absent the custody and adoption orders themselves. Nor could they have done so without the fake Afghan passport they acquired for Baby Doe.

Finally, the Masts suggest that a Virginia statute that prohibits certain challenges to the validity of adoption orders after six months—Va. Code § 63.2-1216—somehow precludes a federal court from acknowledging the fraudulent manner in which an adoption order was obtained. Masts' Br. At 14-15. Not only have Plaintiffs not sought to vacate the Masts' state court adoption order in this litigation (although they do so in the state court litigation), but the Masts fail to cite *anything* in support of their novel assertion. It seems merely an extension of the "we stole her fair and square" arguments that the Masts have made in the state courts, thus far unsuccessfully. And, regardless, the argument has no relevance to the Disputed Records that relate to the Masts' fraud on *this* Court, on the United States, and on Plaintiffs.

**D.    Plaintiffs' assertion of the crime-fraud exception is not untimely.**

Last, the Masts argue that Plaintiffs' assertion of the crime-fraud exception is untimely. It is not.

First, the Masts cite only a single case in support of this argument, *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, which explains that "forfeiture is the failure to make the timely assertion of a right." 369 F. 3d 385, 395, n. 7 (4th Cir. 2004) (quoting *United States v. Olano*, 507

U.S. 725, 733 (1993)). But the issue there was the plaintiff's failure to raise until appeal the defendant's failure to comply with Rule 11's 21-day safe harbor provision before the district court imposed Rule 11 sanctions. Thus, the question was whether *the appellate court* should consider the issue in the first instance. *Id.* at 390. The court unsurprisingly declined, particularly given the general rule that appellate courts will not consider issues not raised in the court below. *Id.* at 390. Notably, the Masts *do not cite to a single case* in which a party's assertion of the crime-fraud exception was considered forfeited based on the passage of time.[78]

Second, the Masts neither explain why Plaintiffs' assertion is purportedly untimely nor identify any prejudice they suffer from the timing of the current motion. After both parties identified issues to the Court precluding their ability to complete discovery—particularly depositions—before the then-pending deadline, *see* ECF Nos. 399, 412, the Court in May 2024 vacated its Scheduling Order and has not yet issued any new deadlines or set a new trial date. ECF Nos. 418, 420. Since then, the Court has resolved various motions and has Plaintiffs' motions to dismiss Defendants' counterclaims under advisement. *See* ECF No. 521. The Court presumably will enter a new scheduling order governing the remaining portions of the case, including discovery, once it rules on those motions.

Accordingly, Plaintiffs' assertions are not untimely and have not been forfeited, and the Masts fail to identify any prejudice from the timing of the motion. The Masts' forfeiture argument must be rejected.[79]

---

[78] Nor has Plaintiffs' counsel been able to identify such a case.

[79] The Masts also seem to argue that any challenge to their privilege assertions—as opposed to the instant argument for an *exception* to what could otherwise be appropriate privilege assertions—is untimely. *See, e.g.*, Masts' Br. at 11 ("While Plaintiffs have suggested that they do not 'concede' that these privileges apply, they have never articulated a factual or legal basis for challenging them."). But, as Plaintiffs note, they assume for purposes of asserting the crime-fraud exception to a privilege that the Masts' privilege assertions are otherwise appropriate. *See also*

IV.    <u>**Conclusion**</u>

At the end of the day, privilege is not license to lie. The Masts made repeated misrepresentations to Plaintiffs, to courts, and to the United States government. Those misrepresentations went to the very heart of their fraudulent scheme to induce Plaintiffs to bring Baby Doe to the United States so J&S Mast could claim her for themselves. The crime-fraud exception ensures that privileges cannot be twisted into shields for that kind of conduct. Indeed, the crime-fraud exception exists for this very case.

The evidence of Defendants' fraud is substantial and the Disputed Records plainly relate to it. The law is clear: Plaintiffs are entitled to these records. At minimum, the Court should review them *in camera*. The Court should deny Defendants' motion for a protective order and compel them to produce the Disputed Records.

Dated: September 26, 2025                    Respectfully submitted,

                                             /s/ *Maya M. Eckstein*
                                             Maya M. Eckstein (VSB No. 41413)
                                             Lewis F. Powell III (VSB No. 18266)
                                             Kevin S. Elliker (VSB No. 87498)
                                             HUNTON ANDREWS KURTH LLP
                                             951 E Byrd St
                                             Richmond, VA 23219
                                             Telephone: (804) 788-8200
                                             Fax: (804) 788-8218
                                             Email:  meckstein@Hunton.com
                                             Email:  lpowell@Hunton.com
                                             Email:  kelliker@Hunton.com

---

*Rambus, Inc. v. Infineon Tech. AG*, 222 F.R.D. 280, 287 (E.D. Va. 2004) ("The crime/fraud exception to the attorney-client and work product privileges provides that otherwise privileged communications or work product . . . will not be privileged or protected").

Sehla Ashai (*admitted pro hac vice*)
ELBIALLY LAW, PLLC
704 East 15th Street Suite 204
Plano, TX 75074
Telephone: (312) 659-0154
Email: ashai@elbiallylaw.com

Blair Connelly (*admitted pro hac vice*)
Zachary Rowen (*admitted pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10029
Telephone: (212) 906-1200
Email: blair.connelly@lw.com
Email: Zachary.rowen@lw.com

Ehson Kashfipour (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004-1304
Telephone: (202) 637-2200
Email: ehson.kashfipour@lw.com

*Counsel for Plaintiffs*

### Certificate of Service

I hereby certify that on the 26th day of September, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

By:    _/s/ Maya M. Eckstein_
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@Hunton.com

_Counsel for Plaintiffs_