# EXHIBIT 14

```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF VIRGINIA
 2                  CHARLOTTESVILLE DIVISION

 3     *************************************************************
       "BABY L.", a minor, by and
 4     through her legal guardians and
       next friends, DOE 1 and DOE 2,
 5     et al.,
                                    CIVIL NO.: 3:20-CV-00009
 6                                  February 26, 2020
                                    Lynchburg, Virginia
 7              Plaintiffs,         SEALED TRO HEARING
                                    (Conference Call)
 8         vs.

 9     DR. MARK ESPER, in his official  Before:
       capacity as Secretary for the    HONORABLE NORMAN K. MOON
10     United States Department of       UNITED STATES DISTRICT JUDGE
       Defense, et al.,                  WESTERN DISTRICT OF VIRGINIA

11

12              Defendants.

13     *************************************************************
       APPEARANCES:
14
       For the Plaintiffs:
15
            RICHARD L. MAST, ESQUIRE
16          Liberty Counsel
            PO Box 11108
17          Lynchburg, Virginia  24506
            800-671-1776
18          court@lc.org

19

20

21     _____
                  Mary J. Butenschoen, RPR, CRR
22                210 Franklin Road, S.W., Room 540
                    Roanoke, Virginia  24011
23                   540-857-5100, Ext. 5312

24     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
       PRODUCED BY COMPUTER.
25
```

```
 1    APPPEARANCES (Continued):

 2    For the Defendants (By Telephone):

 3    KATHRYN L. WYER, ESQUIRE
      ALEXANDER K. HAAS, ESQUIRE
 4    US Department of Justice - Civil Division
      1100 L Street, NW, Rm. 12014
 5    Washington, DC 20005
      202-616-8470
 6    kathryn.wyer@usdoj.gov
      alexander.haas@usdoj.gov
 7

 8    LAURA DAY ROTTENBORN, ESQUIRE
      DANIEL P. BUBAR, ESQUIRE
 9    US Attorneys Office
      310 First Street, SW, Suite 906
10    Roanoke, Virginia  24011
      540-857-2901
11    laura.rottenborn@usdoj.gov
      daniel.bubar@usdoj.gov
12

13    ///

14

15

16

17

18

19

20

21

22

23

24

25
```

Baby L v. Esper, et al. - 3:20-CV-00009          3

```
 1    (Proceedings commenced 3:17 p.m.)

 2         THE CLERK:  Good afternoon.  This is the case of

 3    Baby L, a minor, v. Dr. Mark Esper and others, Case Number

 4    3:20-CV-00009.

 5         Could you please state your name as who is on the

 6    line.

 7         MS. WYER:  This is Kathryn Wyer with the Department

 8    of Justice.

 9         MR. HAAS:  This is Alexander Haas with the

10    Department of Justice.

11         MR. BUBAR:  Dan Bubar with the United States

12    Attorney's Office, Western District of Virginia.

13         MS. ROTTENBORN:  Laura Rottenborn, United States

14    Attorney's Office.

15         THE REPORTER:  Mary Butenschoen, the court

16    reporter.

17         THE COURT:  Mr. Mast is here in my office.  This is

18    Judge Moon.

19         First of all, Mr. Mast, I have a couple of

20    questions.  Why is this getting to us this afternoon?  It

21    looks from all of the papers, it looks like this situation was

22    known of a long time.

23         (Interruption by court reporter.)

24         MR. MAST:  This has been going on for a little while

25    now.  We have been at work as much as we could within the
```

1  system to --

2          THE COURT:  No, but, I mean, the hearing to point

3  why wasn't it brought to the Court sooner than an hour or two

4  ago, a couple hours?

5          MR. MAST:  Because the -- we've been engaging in all

6  efforts to work within the system, work within the DoD system

7  through our plaintiff, DOE 1's connections in DoD and the US

8  Supreme Court.  We brought it today because we received --

9  we've never been able to talk with Department of Defense or

10  Department of State presuming that they were acting in good --

11  well, that DoD at least was acting in good faith.  DoD agency

12  initiated parole Visa request as early as February 11, so we

13  were giving it time to play out.  And we again found out that

14  Department of State or actors with the Department of State

15  were planning to release her at 1 a.m. Eastern tomorrow

16  morning to ICRC and there was no --

17          THE COURT:  And when did you learn that?

18          MR. MAST:  I learned that early this morning.

19          THE COURT:  Okay.  What proceedings did you go

20  through with the government or with the Department of Defense?

21          MR. MAST:  So the -- well, DOE 1 I presume -- how

22  would you like me to refer to the plaintiffs?

23          THE COURT:  That's fine.

24          MR. MAST:  DOE 1 was in ███████████.  He sought

25  permission from his chain of command to advocate on her behalf

1    to seek a path to the United States for her to get medical

2    treatment.  She has a skull fracture.  She has secondary burns

3    to the face.  She has an extreme fracture of a hip and femur.

4    And as the orphan child of ████████ terrorists, he correctly

5    anticipated that there would be prejudice and bias against her

6    within the system in ████████ and the fact that the ████████

7    cannot take children under the age of three.  She was pushed.

8    ████████ had asked the ████████ Customs to take her.  They

9    declined and said we can't take care of a child that young.

10            So our Doe client sought permission from the ████████

11   ████████.  He obtained that and he, in the path to treatment

12   in the United States, sought sole legal custody in ████████

13   because of his residence in ████████.  He was present in

14   ████████ at the time with the child.  The J&DR court and

15   the circuit court in his county of residence assessed all the

16   factors in which the Court has, and the court record has been

17   supplemented since then, and --

18            (Interruption by the court reporter.)

19            MR. MAST:  So he sought custody of the child to act

20   in her best interest because there was no best interest of the

21   child, analysis that had been undertaken.  And so he received

22   that order from the J&DR court in his county of residence, and

23   he then sought to create the legal pathway that was necessary

24   to bring her here for treatment.

25            And he had also advocated up through different

Case 3:20-cv-00009-RGJ-CHL Document 27-2 Filed 04/02/20 Page 7 of 45
PageID#: 7702
Baby L v. Esper, et al. - 3:20-CV-00009                    6

 1    contacts to the Vice President's office.  The vice president's
 2    office reached out -- and forgive me if I'm jumping around.
 3    Reached out and sought -- and said to █████, which is US Forces
 4    ███████████, and to █████, US Embassy █████.  ██████████████ is
 5    ████████████████████████████ in █████.  And she was due to be
 6    handed over initially when our client found out and he secured
 7    a directive from the Vice President's office saying make every
 8    effort to get her to the United States.
 9             THE COURT:  So that's not a legal proceeding,
10    though.  The Vice President, how does he fit into chain of
11    command?
12             MR. MAST:  Through the Vice President's office as
13    part of the Executive Office of the President.
14             THE COURT:  But that's just using influence as
15    opposed to --
16             MR. MAST:  That was influence at that point,
17    correct, sir.
18             THE COURT:  Was there any legal proceeding he should
19    have gone through?  That's what I'm sort of getting at.  Was
20    there some sort of administrative proceeding that your client
21    needed to go through with the Army?
22             MR. MAST:  He did, Your Honor.  He sought -- so
23    after getting clearance from his direct supervisor who is in
24    the JAG shop in ████████████, in █████, he sought custody here
25    in █████.  They granted that.  He sought a record of

Case 3:20-cv-00009-HRW Document 27-2 Filed 04/02/20 Page 8 of 45
Baby L v. Esper, et al. - 3:20-CV-00009                    7
Pageid#: 7703

1    foreign birth.  And then when he received these, whenever he

2    received these, he notified DoD, notified ████ and notified

3    ████ at the time.  And so they have all had notice that this

4    was a pathway to treatment in the US was being sought by our

5    Doe client.

6              And so ████ was on board after the Vice President's

7    office had made every effort to intervene to get her here to

8    the United States.

9              THE COURT:  The Court -- I'm interested in whether

10   it was an administrative process, not so much who knew -- who

11   shot John, who knew whom.  I want to be sure that he's done

12   everything, if there would be any procedure that he should

13   have gone through legally.

14             MR. MAST:  He did, Your Honor.  And so in seeking --

15   so he would otherwise be a stranger to her except that he had

16   met with her, sought to establish a relationship, sought

17   approval of the direct █████████████, and everyone was on

18   board at that point of bringing her to the United States.

19             And so in order to act on her behalf legally he had

20   to -- to have standing to do that.  The ████████ courts found

21   that standing under UCCJEA and that it was appropriate.  I

22   believe we have a copy of the order there.

23             THE COURT:  Well, has he gone through the Secretary

24   of Defense?  I mean, whatever --

25             MR. MAST:  The Department of Defense, Your Honor.

Case 3:20-cv-00009-HRB-DJH Document 22-1 Filed 07/02/20 Page 9 of 45
Pageid#: 7704
Baby L v. Esper, et al. - 3:20-CV-00009                    8

 1   Through that gears the defense, it's the -- the acronym is

 2   escaping me, but it's the system that -- that they put

 3   ██████████████████████████████████████████ through that system.

 4   And so he provided notice to the chain of command; notice to

 5   the Department of Defense.  The Department of Defense issued a

 6   ███████████████████, approved her for treatment under ████████,

 7   and based on that -- and approved.  I mean, so everything was

 8   paid for, including tomorrow's appointment at ███ for her.

 9   And he made repeated requests saying I've got her approved as

10   a ██████████, I need her to be moved, and those requests have

11   been made to DoD, and ████ has had knowledge of that.

12          THE COURT:  Was there any procedure he should have

13   followed?  When was he notified that his interest in the child

14   was not being recognized?

15          MR. MAST:  So he was -- I'm sorry.  So he foresaw --

16   he saw the writing on the wall that ████ was not going to take

17   and invest in taboo child standard.  He sought a legal pathway

18   by getting custody.

19          THE COURT:  I understand that.  But once he gets

20   custody or he wants to get the child out of █████████ back

21   to █████████, when did he know that he would be brought and by

22   whom?

23          MR. MAST:  It's uncertain as to when the specific

24   time because we have had no communication regarding this.

25   It's been through second channels.  So it's a one-way line of

Case 3:22-cv-00009-NKM-JCH Document 27 Filed 04/02/21 Page 10 of 44 Pageid#: 558
Pageid#: 7705
Baby L v. Esper, et al. - 3:20-CV-00009                    9

1    communications, And here's my ████████, I want her to be

2    moved, and we get no response.  So this was in -- everything

3    was on track for her to be moved at ████████ of 2019.  And

4    DoD had reached -- I'm sorry, ████ had reached out to

5    ████████████, who had requested a waiver of jurisdiction,

6    and it was on his desk to be signed.  A courtesy call was made

7    to International Committee of the Red Cross by one of the

8    staff captains there in ████.  And he said this is a courtesy

9    call, and then they immediately came out with, oh, we think

10   we've found her relative.

11        So prior to November, so between October and

12   November the ████ was in the lead.  Their goal was to bring

13   her to the states as well.  They were acting as if the rights

14   get secured under the ████████ court jurisdiction mattered,

15   and then they stopped.  The process came to a halt, and she

16   was -- she was left in limbo.  And so --

17        THE COURT:  When was that?

18        MR. MAST:  That would have been since the -- two

19   days before ████████████, so that's November the 25-ish,

20   around the November 25 timeline.  So she was due to be flown

21   out within 48 hours.  That was put on hold.  The president did

22   not -- ████████████ did not say no, but he said we're going

23   to defer decision until after the election results were

24   satisfied.  So we have this anonymous claimant.

25        Plaintiff Doe reached out to ICRC saying I want to

1    make this anonymous claimant aware that we've established a

2    path to US citizenship -- or not citizenship, but the US

3    treatment.  And ICRC notified ██████, and ██████████████

4    ██████████████████  in December approached Major General ████████

5    and was very upset that our Doe client was advocating on her

6    behalf and basically retook the reins from ██████.  It was prior

7    to that point, so from the 6th of November custody to early

8    December, everyone in ██████ was acting consistent with the

9    child's best interest and consistent with our Doe client's

10   wishes.

11          And when she did that, she had a conversation with

12   General ████████, and the result of that conversation was ██████

13   was back in the lead, whereas they said we won't oppose it,

14   but let ██████ be the lead.  And she convinced him to give an

15   order, a gag order, to all ██████ personnel talking about Baby

16   L's case and an order that no one can advocate on her behalf.

17   And so from December to now we've been continuing to lobby

18   through contacts.  And we have persisted and requested that

19   they respect the custody rights.

20          February 10 we found out that they were due to fly

21   her out, and we had to send a demand letter at that point.

22   And so, again, they have never notified us or given us a

23   chance to discuss her situation and protect our client's

24   rights.  Again, it's a surprise we're flying her out at 1

25   a.m., and that's coming through back channels.

Case: 3:22-cv-00009-JRSB Document: 27-2 Filed: 01/02/20 Page: 25 of 43 PageID #: 460
Case: 3:22-cv-00009-HRSB-DJB Document: 27-2 Filed: 01/02/20 Page: 2 of 43 PageID #: 360
Pageid#: 7707
Baby L v. Esper, et al. - 3:20-CV-00009          11

1          THE COURT:  Well, you were told February the 10th

2     you knew they were going to one day fly her out, right?

3          MR. MAST:  We received word that DoD had placed a

4     hold on her transfer and I had spoken with lawyers from DoD.

5     I spoke with Ryan Newman, and we were still confident that --

6     we felt fairly good that, in light of them placing a hold, in

7     light of DoD initiating a parole Visa, an agency initiated

8     parole Visa, we still thought there was an opportunity to work

9     together.  Because we're sensitive to the national security

10    interests that are here and we have no desire to -- you know,

11    we don't want to cause harm to those interests, but we think

12    those can still be secured.  We just want a TRO on her being

13    removed without their permission, and we think that there's a

14    pathway to resolve her case in the interest of justice in a

15    way that respects the best interest of the child.

16         THE COURT:  Well, is there any legal decision you

17    have, case law, that would support the position that you will

18    -- you have to establish that you're likely to prevail.

19         MR. MAST:  Yes, sir.

20         THE COURT:  TRO is not going to be the end of it,

21    so --

22         MR. MAST:  No, and we think can prevail.  We've seen

23    with *Boumediene* and with *Hamdi* that even these adult

24    terrorists have due process rights.  In fact, committees

25    evaluate their case.  And here we have an orphan infant girl

Case: 2:22-cv-00009-HRSB-DCI Document 27-2 Filed 07/02/20 Page 2 of 43 Pageid#: 361
Pageid#: 7708
Baby L v. Esper, et al. - 3:20-CV-00009                    12

1    who ████████████████████████████████████████████

2    ████████████.  And we think there's a pathway to -- I think

3    that we're likely to prevail on the merits at the end of the

4    day.  Can't take a minor child who a plaintiff has -- in this

5    case our client has done everything right, and he's provided

6    notice and he's acted with the knowledge and consent of the

7    ████████████, and he's gone through the DoD process to

8    establish ████████, and he's continually notified -- I mean,

9    there have been hundreds of emails.  And the ████ and ████ have

10   long known about this, and they have just simply refused, and

11   they have treated these rights as a nullity and saying that

12   these Court decisions don't matter.

13          So we're not saying that -- we're saying that she

14   need to be vetted for DNA family ties.  They need to be vetted

15   for ████ terrorist ties, because it is unconscionable to

16   turn over a six-month old female to random claimants that the

17   US government has not satisfied -- or have not even done the

18   due diligence.  There is hundreds of pages of classified

19   documents that support this position.  There's 150 pages of

20   declassified documents that support this position.  And we

21   have -- they just can't simply wave a magic wand and say no

22   due process for you because we don't like the fact that you've

23   established legal custody.

24          And so we're prepared to address that in two weeks,

25   but we need to preserve the status quo so that we can do that

Case 3:22-cv-00094-RGJ-DOH Document 27-2 Filed 01/14/20 Page 26 of 43 PageID #: 362
Pageid#: 7709
Baby L v. Esper, et al. - 3:20-CV-00009                    13

1    so this little girl is not condemned to suffer --

2             THE COURT:  Well, it seems, though, that the

3    emergency here is caused by your delay.  I mean, you could

4    have -- you knew this day was coming.

5             MR. MAST:  Respectfully, Your Honor, I would

6    disagree.  We have had -- we've just been given no

7    information.

8             THE COURT:  Well, that's enough.  I mean, when

9    you're told -- you were told that on the 10th, you got

10   negative information then which would have indicated --

11            MR. MAST:  We were still under the impression that

12   DoD was working and that they had initiated a parole Visa

13   request.  Up until last night we were still -- we were still

14   hopeful that DoD was on our side, but we came to the

15   conclusion --

16            THE COURT:  Well, just like in any other case, you

17   can't hope you're going to settle the case and let the statute

18   run.  I mean, this is not a -- it's not that type of case,

19   but, I mean, I have had people working on this all morning

20   long.  We had other stuff to do.  You picked a crucial time in

21   court.  You filed hundreds of pages of documents and expect us

22   to read them in an hour.  I mean, that's not very respectful

23   of the Court's time.  I mean, you can't just walk in anywhere

24   that I know of and demand that type of attention.  I mean,

25   there is responsibility, and it's not...

1          Who would like to respond right now?  I would like

2     to let Mr. Mast off the hook right now and see what objections

3     there are to the TRO.

4          MS. WYER:  Yes, Your Honor.  This is Kathryn Wyer

5     with the Department of Justice for the defendants.

6          The situation from our perspective is that the ███

7     did get this custody order in the state court.  But as

8     plaintiffs' counsel just acknowledged, that was premised on

9     the understanding that the government of ██████████ would

10    issue a waiver of its jurisdiction, and that has never

11    happened.

12         This child is in -- has been under medical care in

13    ██████, ███████████, because she was found on the ██████████

14    there, but she is in ████████████, and it's really the

15    government of ██████████ that has the authority over her.

16    And at this point it has requested that the United States

17    return her to them because they have identified a relative

18    that they want to reunite her with and that transfer -- you

19    know, it's important for the United States to meet its

20    international obligations, and so that is what the United

21    States was planning to do here.

22         THE COURT:  Well, Mr. Mast says that what his client

23    is interested in is being sure that this person who is seeking

24    custody of the child is a proper person for the child to be

25    returned to.

Case: 2:22-cv-00049-HRW-DCH Document 27-2 Filed: 08/02/20 Page: 16 of 44 Page ID #: 364
Pageid#: 7711
Baby L v. Esper, et al. - 3:20-CV-00009                    15

1            MS. WYER:  And that's really something that's within

2     ███████████  authority to determine.  We can't under

3     international law impose that -- we can't tell the government

4     of the  ████████  how to go about doing that, and it has gone

5     through its process to determine that.

6            The International Red Cross has been involved in

7     this determination, and our understanding is that it has -- it

8     made a final determination on that point and it made a request

9     to us based on that to return the child to them.

10           THE COURT:  What did the International Red Cross do?

11           MS. WYER:  Well, their role, one of their major

12    missions is to reunite families that are separated during

13    wartime, so that has played a role as it normally does in

14    assisting and identifying relatives.  And, you know, it has

15    been involved throughout the process.

16           THE COURT:  Okay.  All right.  Anything else?

17           MS. WYER:  Well, we -- I mean, I could mention that,

18    for example, there's no -- there's no proper habeas

19    jurisdiction here because the child is in  ███████████ , and

20    there's no habeas jurisdiction at  ████████   Under  ███████████

21    ████████  ████████  DC circuit decision, the Court --

22           THE COURT:  Well, do you have any authority, I mean,

23    like this where you have a state custody order?  I would think

24    this would be rather unique situation.

25           MS. WYER:  It is unique because under -- usually

Case: 3:20-cv-00009-WHR-SLO Doc #: 27 Filed: 07/24/20 Page: 17 of 44 PageID #: 365
Pageid#: 7712
Baby L v. Esper, et al. - 3:20-CV-00009          16

1    these kinds of international custody or adoption issues are

2    handled under the Uniform Custody Act that states have enacted

3    which kind of take into account international law, and they

4    are between foreign governments and private individuals in the

5    United States.  But here I guess the complicated factor is

6    that DoD happened to be -- have custody of the child because

7    it was providing medical treatment.

8            But at the same time, under that uniform law, the

9    state court is not supposed to exercise jurisdiction over a

10   child unless the foreign government has authorized it.  And

11   here that's what that jurisdictional waiver means.  Since the

12   government of ████████████ did not waive its jurisdiction, the

13   state -- the ████████ state court did not really have proper

14   jurisdiction as the home state of a child to issue a custody

15   order.

16           And in any event, because it doesn't have

17   jurisdiction over the United States, our obligations, the

18   United States' obligations towards ████████████ can't really be

19   impacted by what -- by that order.  So I -- the DoD is in the

20   position of having to fulfill its international obligations

21   here, and so that -- it's really kind of -- it's trying to do

22   that because it's very important that we meet our obligations.

23   The State Department thinks that this is a proper course of

24   action, and that's what the government here wants to do.

25           THE COURT:  Have you examined the state court

Case 3:22-cv-00094-HRM-DCU Document 27-2 Filed 04/02/24 Page 18 of 44 Page ID #: 366
Pageid#: 7713
Baby L v. Esper, et al. - 3:20-CV-00009                              17

1    proceedings?

2            MS. WYER:  Well, we are aware of the order.  It's a

3    sealed proceeding so we -- we don't have access to it.

4            THE COURT:  But my question is:  Did the judge take

5    up whether ███████ had waived its rights in the situation?

6            MS. WYER:  Yes.  I think what happened there is that

7    the ████ believed that the government of ████████ was

8    going to waive jurisdiction, and that's what they told the

9    Court, and the Court kind of prematurely issued an order based

10   on the understanding that was going to happen.  And that's

11   what it says in the order, that it anticipates the government

12   is going to do that.

13           As the plaintiffs' counsel just explained, they

14   thought that this was going to happen after the ████████

15   ██████, but then, ultimately, it never did happen.  So that

16   order, that state court order, was issued based on a false

17   premise that has never happened.  And now the government

18   has -- of ███████ has determined that it's not going to

19   waive jurisdiction because it has located that relative and

20   now it intends to reunite the family.

21           THE COURT:  I'm looking at the order.

22           It says, "Evidence was provided that through the

23   ████████████ after consultation with the ████████

24   ████████████████████ has indicated

25   that it will issue a medical/responsibility/jurisdiction

Case: 2:22-cv-00009-HRW-DCI Document 27-2 Filed 02/22/25 Page 19 of 44 PageID #: 367
Pageid#: 7714
Baby L v. Esper, et al. - 3:20-CV-00009          18

 1    waiver to consent to the US acting in the best interest of the

 2    child as a refugee requesting asylum."

 3              That's the finding of the court in that case.

 4              MS. WYER:  Really, under international law, the home

 5    state -- I mean, the ████████ court did not have jurisdiction

 6    to issue any order unless it properly qualified as the home

 7    state or an exception applied.  And, I mean, it shouldn't

 8    really have acted prematurely based on that understanding

 9    unless the waiver had actually been issued.  It was still, we

10    think, improper for it to go ahead with that order.

11              MR. HAAS:  And its findings said it will issue, not

12    that it had issued.

13              THE COURT:  Right.

14              All right.  Mr. Mast, would you like to respond?

15              MR. MAST:  Yes.  Thank you, sir.

16              All of the available intelligence that we have

17    indicates that these are foreign fighters, not citizens of

18    ████████, and their tactics -- their trainings, tactics,

19    and procedures indicated they move every 30 days.  There are

20    several countries in the region.  The evidence strongly

21    indicates that they are associated with the ████████████

22    ████████████, and as foreigners to ████████ they are --

23    this would be improper to -- the request to -- the request for

24    waiver of jurisdiction was primarily a face saving means of

25    allowing the ██████ to defer jurisdiction for political

1    expediency given the elections.  And the intelligence

2    supporting that waiver request, which ████ made and which ████

3    has opposed throughout this process, was very strong.  I mean,

4    we would not be saying if American jihadists were killed on a

5    ████████ and an American baby was recovered, that because

6    baby was found in ████████ that they had jurisdiction.

7    This was a face saving means to allow them to waive

8    jurisdiction or to simply consent in the best interest of the

9    child.

10          Under UCCJEA, if there's no country that has

11   jurisdiction, and if you look at the record and the

12   intelligence that we have, there is strong evidence that no

13   country had jurisdiction over this because as illegal

14   jihadists that have either come out of ████ through

15   ████████, none of them would have had citizenship and they

16   would have had no citizenship to pass on.

17          Alternatively, if they retained citizenship then

18   they would still be citizens of the country from which they

19   came, in which case the child shouldn't have just been punted

20   to the ████ just because we found her in the rurals of

21   ████████, but because, you know, she was -- all of the

22   intelligence indicates that they are a migratory jihadist

23   group who are citizens of no country.

24          So the courts, ████ courts, considered

25   UCCJEA, and where the strong evidence was that there was no

1   country that actually had home jurisdiction, it had

2   jurisdiction to act, and it had -- you know, where there

3   are -- there's the savings clause under UCCJEA that addresses

4   if it would violate fundamental human rights.  And to take a

5   six-month -- well, now a six-month old, then a two-month

6   old -- orphan female child in country this where there's no

7   reason if there's a plausible means which ██ supported,

8   which the vice president's office supported, and which ██

9   itself said we will not oppose, you be lead to do that, and

10  then say -- the easy way out is ████ has jurisdiction,

11  where that's not necessarily the case and where the record has

12  not been examined.  We would say that's -- that's appropriate

13  to act in the best interest of the child.

14          We acted in the best interest of Haitian refugees,

15  and we conducted a family tracing analysis, and we

16  ultimately -- they received far more due process than she has.

17  So there's the two aspects of Baby L and her due process

18  rights.  If terrorist detainees have the right to have a

19  committee look at their case, then surely a baby has the

20  right -- that right as well.  But the ████ courts properly

21  exercised jurisdiction under UCCJEA.

22          THE COURT:  Well, I will ask the government, is it

23  your position that the Department of State has determined that

24  the person seeking custody is the relative of this child?

25          MS. WYER:  Your Honor, the State Department's

1  position is that under international law it's for the

2  government of ████████ to make that determination.  And

3  according to our understanding, the government of ████████

4  has gone through a vetting process, its own vetting process.

5  It has -- it has identified this individual.  It has actually

6  identified the child as an ████, not at a stateless minor at

7  all.  And so in its understanding the child is ████, the

8  relative is ████, and it is the government of ████████

9  position that the child needs to be returned to it for family

10 reunification.

11      I mean, here we're dealing with a child in

12 ████████, a non-US citizen in ████████, and I don't

13 believe that she has her own due process rights under United

14 States law.  It's a matter of international law and what is

15 the United States' obligation under international law given

16 that it's only because the United States happened to be

17 ████████ their -- with the consent of the government of

18 ████████ and came into custody of the child just for

19 purposes of providing medical care.  Now the government of

20 ████████ has requested that she be reunited with her

21 family.

22      MR. MAST:  Your Honor, so when we're dealing with

23 ████████ who are about 40 percent or so of the population of

24 ████████ -- the child was recovered in ████ conference

25 which has never been under government ████████████

1                ████████████ control.  They have had multiple power sharing

2    agreements with the ████████ and their leadership.  You know,

3    it's an open question as to the full -- the rights of

4    statehood over these areas.

5           But what we do know is that the strength of US

6    intelligence was strong enough that ██████████████████████

7    ████████████████████████████████████████████████

8    ██████ .  ████████████████████████████████ .  We knew at that

9    time that they were foreign fighters.  This would be no

10   different than if we covered an American child that's from

11   American foreign fighters or a British child from them.  There

12   would be no claim that ████████████ has sovereignty over

13   foreign fighters.

14         THE COURT:  Isn't this an individual citizen of the

15   United States?  Wouldn't it be an international situation?

16         MR. MAST:  Your Honor, it didn't have to be an

17   international situation except that for the bad acts of State

18   Department, ██████ , and ████████████ .  We have word from one of

19   the attendees of that phone conference that there was never an

20   analysis.  There was laughing at the best interest of the

21   child in this consideration.  And General ████████ said I trust

22   the uncle, and that was one of the -- flippantly dismissed it.

23   The second claim was that the uncle -- well, the first two

24   claims is an uncle had --

25         THE COURT:  How do you perceive -- I mean, what --

Case: 2:22-cv-00094-HRW-JGW Document: 27 Filed: 01/02/24 Page: 24 of 41 Pageid #: 572
Case: 3:20-cv-00009-RGJ Doc #: 27-1 Filed: 08/26/25 Page: 24 of 44 Pageid #: 7719

Baby L v. Esper, et al. - 3:20-CV-00009                    23

 1    what are you asking for, ultimately?  Your client is not

 2    asking to adopt the child.

 3               MR. MAST:  No, sir.  He wants to get her medical

 4    treatment in the United States because we dispute that this is

 5    a family member.  We believe that this is ███████.  If it

 6    were family, ██████ knows how to immediately go and get their

 7    children back from US custody.  It happens all the time.  We

 8    have a doctor who is the ██████████████████████████████ in

 9    ████████, ██████████, who can testify to this.  They

10    routinely run children through there that fall temporarily

11    into US custody.  What they will do is use children as human

12    shields.  They get injured, they get picked up, they get

13    patched up, and then ██████ knows how to immediately seek

14    custody of them.

15               She's been here 160 days, and that's because -- the

16    only reasonable explanation these foreign ██████ fighters

17    could know that with the ████████ going on right now, they

18    are being officially -- their insistence is being officially

19    denied.  There are no ████████ in ████████.  And so the

20    only hope they have is confidentiality through ICRC

21    approaching government -- approaching US through ICRC, which

22    they have, if that's true.  And then ICRC coaching the ██████

23    ████████████████████████ also in how to make the

24    request for her to be returned back.  And that's, you know,

25    where -- where that's the case, the indications are strong

 1  under ███████. We just want them -- the US to vet them for

 2  ███████ ties and to ensure DNA connection. And by making

 3  those two simple requests, ████████ will self select

 4  themselves out and you will not hear from this supposed family

 5  ever again.

 6            And so in the meantime she can receive -- she had a

 7  ██████████████████. Her head is ████████. She has that

 8  ████████████ on her leg. ████ is right here ready to treat

 9  her. And then any claims for actual relatives that are not

10  ████████ can be addressed here in the United States. They

11  just want to act in her best interest. They created a legal

12  path to do that. It was acquiesced to by DoD. And State said

13  they wouldn't interfere, and they have interfered a lot. And

14  they put her Visa on hold. They told DoD withdraw that agency

15  initiated Visa request. DoD initiated a parole Visa to get

16  her treatment and State -- and ████████ and the others call over

17  and said put it on hold. She could have been here now already

18  if they had just consented to her getting medical treatment.

19  It is absolutely outrageous that the United States government

20  would knowingly close its eyes and say that non-existent

21  screening protocols for under these circumstances ICRC --

22  which has to be in confidentiality. We understand that. They

23  have to be agent for all players, but that is not proof that

24  these are not ████████.

25            Strong evidence is that these are ████████. And if

1   you look at █████████████████████████, despite claims

2   that she's ████████, we think that's not the case.  We see child

3   soldiers.  We see child suicide bombers.  Their specialty is

4   training child ████████.  In all those pictures of little kids,

5   four-year-olds with AKs, and learning how to make suicide

6   vests and so forth.  If we give her back to them and they are

7   ████████ and we target them, she's going to die because US is

8   going to kill whoever she's with.  If she goes with them as an

9   orphan, she's subject to risk of sexual trafficking and she's

10  subject to risk because of her ██████████████ of being an

11  ideal suicide bomber.

12          THE COURT:  How many children has your organization

13  rescued?

14          MR. MAST:  From ██████████████ this is our first, but

15  we've talked to some of the US lawyers who are in ██████████████,

16  and they've rescued three.  And so we can't save them all, and

17  we're not claiming to, because we respect ████████████

18  sovereignty.  But here the circumstances were a clear path for

19  the US to respect ████████ sovereignty and say, All our intel

20  says that she's not ████████.  Are you okay with us getting her

21  medical treatment in the US?  Sure, no problem.

22          But ICRC and ████████████████, it's personal animus

23  where when she found that the vice president's office said

24  make every effort, ██████ said yes, sir, and they made every

25  effort.  When she heard that, she said okay, fine, you do it.

1    I won't interfere.

2           When the issue arose of another unvetted claimant

3    where we wanted to offer medical care and she found out, she

4    went running over to the general in charge and says gag order

5    and no one can advocate on their behalf, and they laughed

6    about this.  And it's outrageous.

7           THE COURT:  For the government, you said several

8    times international law requires that the Department of State

9    turn this child back to ███████████.  Can you cite to me

10   chapter and verse what you're relying upon?

11          MS. WYER:  I don't -- I don't have a cite that I can

12   provide right now, but that's from the State Department's view

13   of our international obligations.  I mean, stemming from, for

14   one thing, the fact that we are in ███████████ at all by the

15   consent of the government of ███████████, and it's really up

16   to them what happens to a child found in their territory.  All

17   of these -- by the same token, what legal authority would

18   allow the United States to impose these requirements on the

19   government of ███████████ since that's not the way it handles

20   its vetting?  It did its own vetting process.  We can't

21   dictate to the government of ███████████ how it needs to go

22   about vetting an individual as the relative of the child.  And

23   the UCCJEA recognizes that in the first instance by

24   designating one jurisdiction as -- as the proper jurisdiction

25   to make a determination, and here that would have been

Case: 3:22-cv-00094-RGJ-DJ Doc. Document: 27-2 Filed: 04/02/24 Page: 28 of 41 PageID #: 576
Pageid#: 7723
Baby L v. Esper, et al. - 3:20-CV-00009                    27

1     ███████, not ██████.

2         MR. HAAS:  Your Honor, this is Alexander Haas.

3         I would just like to add there is a ███████

4     ████████████ between the United States and ████████

5     that was concluded in ████ with the consent of their

6     government and ours, and it reflects an expectation that our

7     Armed Forces will conduct themselves in a manner consistent

8     with ████████ law.  In particular, ████████████████

9     ██████████████████████████████████

10    ██████████████████████████

11    ████████████████████████████

12    ████████ ██████████████████

13    ██████████████████████████████

14    ████████████████████████

15    ████████████

16        Now, this is a case that concerns the foreign

17    affairs and military interests of the United States, and you

18    had asked Counsel for the Plaintiff what specifically he was

19    asking for.  Initially he said that he wanted two weeks to

20    brief this, but it is also clear that he apparently wants the

21    Court to order the United States to take a citizen of another

22    country and return that person to the United States for

23    medical treatment.  That would have potentially profound

24    implications on our military and foreign affairs interests and

25    is something that we would urge you not to do.

1          You also asked plaintiff how much notice that he had

2    had, and I would remind the Court that he was aware two weeks

3    ago of what he referred to as the writing on the wall and

4    could have filed this motion then.  We don't think given the

5    shortness of time here that it is appropriate for the Court to

6    enter an order enjoining the United States, particularly on

7    the basis of a state court order to which we -- the United

8    States was not provided formal notice under ███████ law.

9          Counsel for the plaintiff said that DoD acquiesced

10   in the order, but we were not given legal notice of that order

11   as is required under ████████ law since we had physical and

12   constructive custody of the child.  That would have required

13   the serving of legal process on the Department of Defense,

14   among others, and we have searched and not found any evidence

15   that formal notice was provided.

16          And the notion that a state court order obtained on

17   the basis of what appears to be false or incomplete

18   information would then be used to constrain the foreign policy

19   and military affairs decisions of the United States is deeply

20   concerning.

21          MR. MAST:  Your Honor, the ████████████████

22   ███████████ also says that ████████████████ may be moved into and

23   out of the country.  Duty personnel may be moved into and out

24   of the country without a need to request permission from the

25   government of ███████████.  And so --

Case 3:22-cv-00009-RGJ-DJC Document 27-2 Filed 07/02/21 Page 26 of 43 PageID #: 578
Case 3:20-cv-00009-RGJ Document 27-1 Filed 07/02/21 Page 30 of 44 PageID #: 478
PageID #: 7725

Baby L v. Esper, et al. - 3:20-CV-00009                    29

```
 1                    (Interruption by the court reporter.)

 2               THE COURT:  Isn't this -- couldn't this be in or

 3      under immigration?

 4               MR. MAST:  No, because she is being brought -- and

 5      what's what the agency initiative of DoD created.  DoD

 6      initiated parole Visa means that she could come for the

 7      limited purpose of getting medical treatment.  So that's with

 8      the full knowledge and consent of DoD, that they initiated

 9      this parole Visa.  It was only put on hold again through

10      State's actions.  They said they wouldn't oppose it.  And if

11      it was going to be such an international incident, why did

12      ████  fully support a pathway for her to get there to the

13      United States for medical treatment?  So we would say that

14      this has been --

15               THE COURT:  Would be no problem if the president of

16      ████████████  had agreed to this as recommended to state court

17      that he would.

18               MR. MAST:  Your Honor, that was -- and he never has

19      said no.  We just simply asked that they ask him, and State

20      has continually said -- they have continually opposed to even

21      ask him.  And so they have helped create the situation.  They

22      shouldn't benefit from creating these facts.

23               THE COURT:  But isn't that an answer when they

24      demand the child back, that the government of ████████

25      demands the back?  Why isn't that your answer?
```

Case 3:22-cv-00094-HRS-DJ Document 27-2 Filed 08/02/25 Page 26 of 43 Page id #: 479
Pageid#: 7726
Baby L v. Esper, et al. - 3:20-CV-00009                    30

1           MR. MASTer:  No, sir.  I mean, like we've seen over

2      in ██████, there have been British national children that have

3      identified and removed.  They know that they are not ██████.

4      This child is not ██████.  She's from foreign ██████ leaders.

5      And we have ████████████████████████████████████

6      ████████████████████████████ that we're aware of, and

7      we believe that those -- those give the easy way out to say

8      have they even tried.  They didn't even try.

9           THE COURT:  If this child should come to the United

10     States and have medical treatment, then the next step would be

11     to ask for asylum in the United States.

12          MR. MAST:  It may happen, Your Honor.

13          THE COURT:  Well, it would be sort of silly to bring

14     the child here and send her back to ████████████.

15          MR. MAST:  But a US court could apply law that

16     respects international human rights.  We have rights sex-based

17     discrimination that -- and other factors that make it

18     appropriate to apply US law here, especially when she was

19     never in the physical custody of the ██████████ government.

20     There is strong evidence that she's foreign and not subject to

21     their jurisdiction.  And so if there is evidence of

22     non-██████ claims who have not pulled an end run on family

23     custodial issues on the ████████████████████████████████,

24     which we think is the case with ICRC's help -- ICRC is not

25     going to disclose whether they are ██████ -- and they are

1   going to represent to ██ , who is relying upon ICRC they have

2   found family, that's just a bear assertion.  And so if

3   those -- if she is brought to the United States and if

4   claimants arise and they are vetted, two simple things: DNA

5   test vetting and look at the US intel.  Ask them to identify

6   themselves, because if they are not --

7          THE COURT:  Is the Court to do that?

8          MR. MAST:  No, Your Honor, we want some status quo

9   until the ██ makes these -- makes this request.

10         THE COURT:  Is this Court to order them to do

11  something?  That would be their job anyway.

12         MR. MAST:  Whose job, Your Honor?

13         MR. MAST:  The party you're speaking of to do the

14  vetting.

15         MR. MAST:  And that's what we're asking, do your job

16  because --

17         THE COURT:  Okay.  So they have done whatever and

18  you don't like the result.

19         MR. MAST:  No, sir, they haven't done their job.

20  They have not vetted for DNA.  They can vet for DNA within

21  four days.  They have her DNA on file.  They could vet for

22  ██ by saying we routinely require biometric screening of

23  detainees and others in areas where there's no ██

24  activity.  If they are ██ , they are not going to

25  identify themselves, and all of our intel says that they are

Case: 2:22-cv-00094-DCN Doc #: 27-2 Filed: 07/02/24 Page: 33 of 43 PageID #: 581
Case: 3:20-cv-00009-HRW-EBA Doc #: 138-1 Filed: 02/26/25 Page: 33 of 44 Page 33 of 44
PageID#: 7728
Baby L v. Esper, et al. - 3:20-CV-00009                    32

1    foreign fighters and we sent ███████████████████

2    █████████████████████████ on the strength of that

3    intel.  Now we can't say we don't know where the child is

4    from.

5              THE COURT:  Does the government have anything else?

6              MS. WYER:  Your Honor, we cannot -- the Court just

7    can't require the United States to impose obligations on

8    ████████████ that are not in accord with ███████████ law.  I

9    mean, we --

10             THE COURT:  I gather he's asking this Court to

11   impose --

12             MS. WYER:  The plaintiffs are essentially --

13             THE COURT:  -- United States.

14             MS. WYER:  Well, plaintiffs are essentially

15   demanding that the United States impose conditions on the

16   government of ███████████ to return a child that the

17   government of ███████████ is saying is their citizen and that

18   they have identified this child's family member.  They want to

19   reunify the child.  This is putting the United States in a

20   very difficult position.

21             THE COURT:  Is there any law that requires the

22   United States to do the vetting that Mr. Mast is speaking of?

23             MS. WYER:  No, Your Honor.  I'm not aware of any law

24   that would require that or even allow it.

25             MR. MAST:  Your Honor, it took ten years of that

Case: 3:20-cv-00009-WKB-DJH Document: 27 Filed: 01/02/20 Page: 33 of 44 - Page ID #: 482
Case: 3:22-cv-00004-WKB-DJH Document: 27 Filed: 01/02/20 Page: 33 of 44 - Page ID #: 582
Pageid#: 7729
Baby L v. Esper, et al. - 3:20-CV-00009                    33

1    statement of we can't impose obligations of the government of

2    ▮▮▮▮▮▮▮ for US forces to find the moral clarity to stop

3    the practice of pedophilia on US installations with the bacha

4    bazi boys.  And it took US personnel getting into fistfights

5    with men who were engaged in the rape of prepubescent boys on

6    US bases in order to finally come to that moral clarity that

7    we get to impose obligations which are consistent with

8    international human rights laws.

9          And in this situation it is inconsistent -- this

10   isn't saying this is a farmer in ▮▮▮▮▮▮▮ that we would

11   absolutely support reunification.  What we're saying is this

12   is ▮▮▮▮▮ training little ▮▮▮▮▮ to become suicide bombers,

13   and they are pulling the wool over the eyes of our ▮▮▮▮▮

14   partners.  And we need to mentor and assist, which is what we

15   are continuing to do -- we've been there for 20 years, de

16   facto control on ▮▮▮▮▮.  We need to assist our partners in

17   vetting in this instance.

18         This is not a recipe for every child who comes into

19   US custody, because this is unique.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

20   You have a picture of her likely father, and we have had two

21   false claimants already that couldn't be identified, or

22   wouldn't be identified.  One was ▮▮▮▮▮▮▮▮ who was in

23   ▮▮▮▮ prison who was the facilitator who said I brought them

24   here.  He was not the uncle.  Then we have another random

25   claimant that when we say we want to offer you medical

Case 3:22-cv-00009-HRB-DCH Document 27-2 Filed 07/02/20 Page 26 of 43 Page ID #: 583
Pageid#: 7730
Baby L v. Esper, et al. - 3:20-CV-00009                    34

1    treatment, that person magically disappears.  If the US, which

2    State Department said they were willing to do, the Vice

3    President's office said make every effort, they made him ask

4    to the president of ██████████ to provide a face saving means

5    of providing care for this child.  But that has created

6    animosity with the ███████████████████████ and she has

7    sabotaged this every step of the way.  There was a DoD

8    initiated parole Visa that is at USCIS that ████████████

9    (phonetic) has put on hold at State's request.  So if state

10   would just get out of the way, we could have already done

11   this, and there would not be an international incident.  And

12   why did DoD support this?  But now it's allowing State to take

13   the lead, and this is based on one woman's animus to being

14   gone over her head because she was not respecting

15   international human rights.

16        If you look at State's Twitter and all these other

17   things, they talk about child trafficking, they talk about

18   sexual exploitation, talk about rights for women.  And when

19   the rubber meets the road, they just want to wash their hands

20   of a baby.

21        MR. HAAS:  Your Honor, this is Alexander Haas again.

22   If I could just say one or two more things.

23        Plaintiffs' counsel says -- has gotten into a lot

24   of, you know, twists and turns here, but sort of circling back

25   to the legal principles.  You asked were there things that the

Case 3:20-cv-00009-HRB-DJH Document 27-2 Filed 07/02/20 Page 26 of 43 PageID #: 584
Pageid#: 7731
Baby L v. Esper, et al. - 3:20-CV-00009                           35

1    plaintiffs could have done.  Yes, we know of two now that have

2    not occurred.

3           First, that they requested and did not obtain the

4    consent of the government of ███████ to bring the child

5    here, and plaintiffs' counsel conceded that that was required

6    but has not been obtained.

7           Second, that they have submitted an application for

8    parole of this child to the United States.  And again,

9    plaintiff has conceded that has not been granted.

10          There are procedures that have -- that they have

11   attempted to take that have not -- not occurred.  And so in

12   the face of that, we don't think there is any legal basis for

13   them to attempt to bring this child here, particularly when

14   the government of a foreign country where our military is

15   present by their consent has requested the repatriation of

16   their citizen.

17          And to ask the Court in a matter of a few hours when

18   they have had notice of this for months and had notice that

19   something was up for several weeks to put a hold on a transfer

20   and order the United States to not -- to halt is a very -- a

21   very stark thing to ask this Court to do on such short notice,

22   given that this involves core Article II powers of the

23   executive branch to conduct our military and foreign affairs.

24          We're deeply concerned about what a message -- what

25   such an order would be saying given the separation of powers.

1    And to do all of this on the basis of what we believe is a

2    deeply flawed and incorrect state court order that could not

3    bind the United States in any event would be -- would be in

4    error, Your Honor.

5                THE COURT:  Does the government know or either party

6    know of any citations, particularly in the Fourth Circuit,

7    where a state court were not acting -- the federal court had a

8    situation where the state court were not acting or were acting

9    in excess of their jurisdiction?  I assume there probably are

10   situations.

11               MS. WYER:  Well, there are certainly cases that make

12   clear that a state court order cannot bind the United States

13   in any event, even if it were a valid order.

14               THE COURT:  Well, if the state court though made a

15   decision that -- or gave the plaintiff in this case, allowed

16   the plaintiff to adopt the child even though he's still in

17   ███████████, you would have a -- I'm saying the state court

18   did it would be probably in excess of its jurisdiction to do

19   it.  Maybe not, I don't know, but...

20               (Interruption by the court reporter.)

21               MR. MAST:  Rooker-Feldman Doctrine addresses state

22   court decisions, Your Honor.

23               MR. HAAS:  Your Honor, Rooker-Feldman Doctrine is an

24   abstention doctrine that would require the Court to abstain.

25               There are several lines of cases, though, that

Case 3:20-cv-00009-RGJ-DCH Document 27-2 Filed 07/02/20 Page 26 of 43 PageID #: 436
Pageid#: 7733
Baby L v. Esper, et al. - 3:20-CV-00009                    37

 1    relate specifically to the -- of the power of state courts to

 2    try to bind the United States.  And it's been clear since the

 3    civil war.  There's, you know, the famous case that we all

 4    learned in law school, *Tarble's* case -- that's 80 U.S. 397 in

 5    1871 -- that explained that state courts cannot issue, for

 6    example, writs of habeas corpus when someone is -- quote, Is

 7    in the custody under the authority of the United States.

 8            And then there's the ordinary sovereign immunity

 9    principles that apply.  And I direct you to a case called

10    *Smith v. Cromer*.  And I acknowledge it is in a different

11    context, it's not a custody issue, but that's 159 F.3d 875,

12    fourth Circuit from 1998.  And it held that state court orders

13    seeking to compel action by a federal official was, quote, An

14    action against the United States subject to the governmental

15    privilege of sovereign immunity.  And that the -- so that

16    would be another one.

17            THE COURT:  Okay, thank you.

18            Does the Department of Justice take the position

19    that the orders of the ████████ courts were unlawful?

20            MS. WYER:  Yes, Your Honor.  We think they were

21    unlawful for a number of reasons.  One of them because the

22    government of ████████ did not waive jurisdiction.  And so

23    under the Uniform Custody Law, ███████ should not have been

24    exercising jurisdiction.

25            And I think if you look at the ███████ state law

Case 3:20-cv-00009-HRW-CJS Document 27-2 Filed 02/26/25 Page 39 of 44 - Page ID#: 587
Pageid#: 7734
Baby L v. Esper, et al. - 3:20-CV-00009          38

1    decision ███████████████████████████████, that

2    discusses the proper jurisdiction of a ████████ court to

3    exercise jurisdiction over a custody proceeding.  And under --

4    under the home state definition, because ████████ did not

5    qualify as the home state, ████████ should not have been

6    exercising jurisdiction at all here.

7             And also the fact that the ████████ court did not

8    provide notice to DoD when DoD had custody of the child, I

9    mean, if the United States had been involved in that

10   proceeding as it should have been since it had custody, we

11   imagine things would not have gone the same way because we

12   would have been able to correct some of these factual errors

13   that were happening there.  So but anyway, in any case, a lack

14   of notice is another basis that we think it is an erroneous

15   decision and can't be binding on the United States.

16             THE COURT:  All right.  Anything else anyone like to

17   say?

18             Okay.  All right.  I'm going to try to come to a

19   decision by 5 o'clock.  Are you-all going to be available

20   then?

21             MR. HAAS:  Yes, Your Honor.

22             THE COURT:  All right, because I think depending on

23   what I do decide will be important for you to know.

24             Okay.  Why don't we adjourn now.  And can we get

25   back on -- can we rearrange this call for 5 o'clock?

Case 3:22-cv-00009-NKM-JCH Document 27 Filed 07/02/25 Page 26 of 43 Pageid#: 588
Case 3:20-cv-00009-NKM-JCH Document 27-1 Filed 07/02/25 Page 40 of 44 Pageid#: 7735
Baby L v. Esper, et al. - 3:20-CV-00009          39

 1          THE CLERK:  Everybody, if you-all dial in the same

 2     number at 5 o'clock we'll be on the line.

 3          MR. HAAS:  Thank you, Your Honor.

 4          THE REPORTER:  Okay.

 5          THE COURT:  Thank you.

 6          (A recess was taken 4:25 p.m. to 5:08 p.m.)

 7          THE CLERK:  Do we have everybody on the line from

 8     the DOJ, US Attorney's Office?

 9          MR. HAAS:  This is Alexander Haas from the

10     Department of Justice.

11          MS. WYER:  Kathryn Wyer from DOJ is here.

12          MR. BUBAR:  Dan Bubar from the US Attorney's Office.

13          MS. ROTTENBORN:  Laura Rottenborn, USAO.

14          THE COURT:  All right.  This is Judge Moon.  First I

15     want to thank counsel for your arguments today and for

16     appearing on very short notice.

17          This matter is before the Court on the plaintiffs'

18     motion for a temporary restraining order.  Plaintiffs are the

19     one seeking the emergency relief from the Court, and they have

20     to meet the standard articulated by the Supreme Court in

21     *Winter v. Natural Resources Defense Counsel* applicable to

22     motions for preliminary injunctions and TROs.

23          Plaintiffs must show, one, a likelihood of success

24     on the merits that plaintiffs are likely to suffer irreparable

25     harm absent the TRO, the balance of equity is tipped in

Case 3:20-cv-00009-NKM-JCH Document 27-2 Filed 01/02/20 Page 24 of 43 Pageid#: 489
Pageid#: 7736
Baby L v. Esper, et al. - 3:20-CV-00009                    40

 1  | favor -- plaintiffs' favor, and that issuing the TRO is in the
 2  | public interest.
 3  |      I've considered plaintiffs' filings today and the
 4  | argument of counsel.  Plaintiffs filed this action and their
 5  | request for a TRO and dozens of exhibits at 1 o'clock today.
 6  | The Court heard argument in the case from 3:30 to 4:30.  At 5
 7  | o'clock -- or at 5:06 or 7 now, I think -- the Court is
 8  | rendering this oral decision.
 9  |      Given the urgent time considerations plaintiffs have
10  | described that Baby L would be put on the plane today from
11  | ███████████████████ Eastern Standard Time tonight, after
12  | consideration of the governing law, arguments, and
13  | submissions, I will deny plaintiffs' request for a temporary
14  | restraining order.  I do not find that plaintiffs have
15  | established a likelihood of success on the merits, and, also,
16  | I find that the balance of equities do not tip -- as I said,
17  | do not tip in favor of the plaintiff, or that the TRO is
18  | necessarily in the public interest.
19  |      Plaintiffs' asserted rights to care for Baby L arise
20  | from two ██████ court orders from the Juvenile and Domestic
21  | Relations Court of ███████ and the ███████ Circuit Court.
22  | But as the government has articulated, these ███████ court
23  | orders by their express terms reflect an assumption that the
24  | government of ███████████████████ will issue a
25  | waiver of jurisdiction.  The order from the ███████ Juvenile

Case 3:20-cv-00009-NKRSB-DSC Document 27-2 Filed 01/02/20 Page 42 of 44 PageID #: 590
Pageid#: 7737
Baby L v. Esper, et al. - 3:20-CV-00009          41

1   and Domestic Relations Court states, quote:  Evidence was

2   provided that ████ through the ███████████ after

3   after consultation with the ███████████████

4   ███████████████████████ has indicated that it will

5   issue a medical/responsibility/jurisdiction waiver to consent

6   to the US acting in the best interest of the child as a

7   refugee requesting asylum.  The written copy of the waiver is

8   to be provided in a matter of days.

9              ████████  has not issued any waiver of

10  jurisdiction.  Instead, as Counsel for the government has

11  asserted today, ████████ is expressly requesting that Baby

12  L be returned under ████ authority and care.

13             The government has also asserted that as custodian

14  of Baby L Department of Defense should have been formally

15  served with and provided notice of the proceedings in ███████

16  County Circuit Court.  That was not done.

17             The ███████ orders were foundational to plaintiffs'

18  asserted authority to care for Baby L.  Given the plain terms

19  of the ███████ court orders and the lack of service and

20  notice upon DoD, I find that plaintiffs have not met their

21  burden of establishing a likelihood of success on the merits.

22             Plaintiffs' likelihood of success on the merits is

23  further diminished by their failure to proceed through proper

24  channels.  As the government articulated, plaintiffs' counsel

25  had two alternative avenues to pursuing this 11th hour TRO.

Case 3:20-cv-00009-HRB-DJH Document 27-2 Filed 07/02/20 Page 43 of 44 PageID #: 591
Pageid#: 7738
Baby L v. Esper, et al. - 3:20-CV-00009          42

1          First, they should have obtained the consent of the

2  ███████ government to the transfer of Baby L.  While

3  plaintiffs' counsel conceded both that it was required and

4  they sought it, it ultimately was not obtained.

5          Second, plaintiffs' counsel also submitted an

6  application for a Visa for this child to enter the US, which,

7  again, plaintiff conceded was not granted.

8          Plaintiffs' failure to succeed under the two avenues

9  demonstrate there's no legal basis to bring Baby L to the

10  United States.

11          Lastly, I cannot overlook the international

12  ramifications of the Court granting the request for temporary

13  restraining order.  The State Department has ably articulated

14  the US government's foreign policy interest and has argued

15  relations with ███████ are significantly implicated by

16  this case.

17          Plaintiffs' counsel suggested that if only the State

18  Department would, quote, get out of the way, end of quote,

19  everything would proceed in an orderly fashion and ███████

20  would respect human rights law.  But it is the role of the

21  State Department and not private litigants or the Court to

22  determine the foreign policy interest of the United States.

23          For these reasons, I deny plaintiffs' motion for a

24  TRO.

25          And that's the decision.  And anything else?

Case 3:22-cv-00094-RGB-DJL Document 27-2 Filed 07/02/20 Page 24 of 43 PageID #: 592
Pageid#: 7739
Baby L v. Esper, et al. - 3:20-CV-00009          43

```
1              MR. HAAS:  Nothing from United States, Your Honor.

2    Thank you very much.

3              (Interruption by court reporter.)

4              MR. MAST:  Clarification is that it was a DoD

5    initiated parole Visa.  We did not initiate the Visa.

6              THE COURT:  Okay.  With that correction then, we'll

7    adjourn.  Thank you all.

8              COUNSEL:  Thank you, Your Honor.

9              (The proceedings concluded at 5:15 p.m.)

10                          CERTIFICATE

11             I, Mary J. Butenschoen, certify that the foregoing

12   is a correct transcript from the record of proceedings in the

13   above-entitled matter.

14   /S/ Mary J. Butenschoen, RPR, CRR                3/14/2020

15

16

17

18

19

20

21

22

23

24

25
```