# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

| | |
|---|---|
| JOHN DOE, *et al.* | ) |
| | ) |
|     *Plaintiffs &* | ) |
|     *Counterclaim Defendants*, | ) |
| | ) |
| v. | )   Case No. 3:22-cv-49-RSB-JCH |
| | ) |
| JOSHUA MAST, *et al.* | ) |
| | ) |
|     *Defendants &* | ) |
|     *Counterclaim Plaintiffs*. | ) |
| | ) |

## REPLY OF DEFENDANTS JOSHUA MAST, STEPHANIE MAST, & RICHARD MAST IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER

## INTRODUCTION

John and Jane Doe contrast the Masts' prior court filings and statements with assertions from hearsay affidavits and other evidence purporting to show that that Masts made false representations or omitted material information. But even if the Does' characterizations of the statements and evidence were accurate, they would not establish a *prima facie* case that Richard Mast's legal representation of Joshua and Stephanie Mast was in furtherance of a fraudulent scheme—as the Does must show to compel *in camera* review of the Masts' privileged documents. At most, an evidentiary hearing would be appropriate for the Court to assess the reliability of the Does' evidence. But since Plaintiffs have not asked for a hearing, and independent grounds foreclose their challenge, the Court should enter a protective order.

*First*, the Does' opposition brief confirms that they improperly seek privileged materials to challenge the state-court adoption proceedings. The Court dismissed those claims, squarely holding that it lacks subject-matter jurisdiction to hear a challenge to the custody and adoption proceedings. Yet the majority of the privileged materials Plaintiffs seek are from those very proceedings. The rest relate to federal litigation and advocacy with no meaningful connection to Plaintiffs' surviving tort claims. The Court should thus reject the Does' challenge and issue a protective order because they seek discovery relevant only to dismissed claims. *E.g.*, *Dye v. Alsbrook*, No. 7:23CV00036, 2024 WL 1193557, at *5 n.7 (W.D. Va. Mar. 20, 2024).

*Second*, the Does offer no good justification for their failure to raise this crime-fraud argument until now—more than a year after receiving the Masts' privilege log, and long after they raised a privilege challenge based on the Masts use of Liberty University email accounts. The Does do not get unlimited bites at the apple; they could and should have raised this argument sooner when seeking the Masts' privileged communications; and their failure to do so constitutes a classic

forfeiture. *See Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 395 (4th Cir. 2004); *Grassi v. Info. Res., Inc.*, 63 F.3d 596, 604 (7th Cir. 1995) (affirming district court's denial of motion to compel production of privileged materials as untimely where "plaintiffs should have requested these documents at some earlier point").

***Third***, the affidavits from unavailable witnesses the Does cite are not sufficiently reliable to establish a *prima facie* case for the crime-fraud exception. While the formal hearsay rules may not apply, *see* FED. R. EVID. 104(a), the Court still must assess reliability, *see, e.g.*, *United States v. Matlock*, 415 U.S. 164, 175–76 (1974). The affidavits the Does cite have serious reliability problems: They were submitted by federal government witnesses whom the Federal Government refused to make available for cross-examination; they were submitted in support of a position the United States has since reconsidered and withdrawn; and the United States recently determined that federal officials had improperly distorted the factual record to favor the Does by weaponizing their classification authority. Given these circumstances, the Court should not rely on those affidavits to order *in camera* review, or at least should conduct an evidentiary hearing first.

***Fourth***, the Does' allegations are hotly disputed on the merits, but even if taken as true, would not establish that the crime-fraud exception applies. The Court need not reach the merits to determine whether the Does have met their evidentiary burden to justify *in camera* review. But even if the Does' allegations were all taken as true, they do not make the Masts' litigating positions false, much less fraudulent—and they certainly do not establish that the Masts' retaining legal counsel was done in furtherance of a fraudulent scheme. They simply highlight that key factual issues in this case are hotly disputed. The Southern District of New York explained in the *GM Ignition Switch* litigation that courts should not invoke the crime-fraud exception based on a party's attack on the veracity of a counter-party's factual assertion and aggressive litigation

2

tactics—even where there are allegations of bad faith. *See In re: General Motors LLC Ignition Switch Litigation*, No. 14-MC-2543 (JFM), 2015 WL 7574460, at *9–10 (S.D.N.Y. Nov. 25, 2015). Here, the Does' evidence at most shows that each side has evidence from which to argue for their version of the facts. That is not fertile ground for a crime-fraud challenge.

***Finally***, the Does do not provide any good reason why the Court should not wait to rule on their crime-fraud assertion until the Supreme Court of Virginia rules on whether Code § 63.2-1216 bars the Does from arguing, even indirectly, that the Masts' adoption order was fraudulently obtained—especially where the Does waited more than a year to raise the issue in the first place.

## ARGUMENT

### I. The Does improperly seek privileged materials to support their dismissed challenges to the state-court adoption proceedings.

The Does argue extensively about alleged misrepresentations and omissions made in the Virginia state-court proceedings that led to the Masts' final order of adoption. *See* Opp. 3–7, 24–31. But even if one were to assume that the privileged materials from those cases were discoverable, they would be relevant only to Plaintiffs dismissed challenge to the state-court adoption, over which this Court lacks jurisdiction. *See* Mem. Op. & Order (ECF No. 455), at 47–49. The Does are "not entitled to discovery that is only relevant to" dismissed claims. *LifeNet Health v. LifeCell Corp.*, No. 2:13CV486, 2014 WL 4162113, at *6 (E.D. Va. Aug. 19, 2014).

The Does argue that those proceedings remain relevant because, they say, "the Masts could not have committed their fraud on Plaintiffs . . . absent the custody and adoption orders themselves." Opp. 36. But that contention cannot be squared with the narrow theory on which the Court allowed their fraud claim to proceed under Rule 12. The Court reached the opposite conclusion: that Plaintiffs' fraud claim could proceed because it "is not dependent on a present or prior family relationship." Mem. Op. & Order (ECF No. 455), at 42. The Court's analysis of the

3

Does' fraud allegations, *see id.* at 42–44, makes clear that their allegations about the state-court custody and adoption proceedings were purposefully omitted and cannot form the basis for their fraud claim in light of the domestic-relations exception. That decision is law of the case, and the Does cannot side-step it here to obtain discovery of privileged documents that would support their adoption challenge—which is pending in state court before the Supreme Court of Virginia.

The documents from the other contexts, the federal TRO proceeding and advocacy to federal officials, are irrelevant because they bear no connection to the Masts' alleged inducement for the Does to come to the United States. The TRO proceeding was *unsuccessful*, and the Does were never a party to it. It thus had no effect on them. As for advocacy to federal officials, they similarly fail to identify any meaningful connection between those efforts and their surviving claims. They argue that "[t]hese records relate to frauds upon the U.S. government because they show what information the Masts possessed when they communicated with various branches of the U.S. government and what misrepresentations they made to obtain federal documentation for [the Child]." Opp. 28. They also argue that the Masts did not disclose to them that these efforts were underway. *See id*. But none of that shows the relevance needed to invoke the crime-fraud exception: not just that the documents could prove to be useful evidence, but that the communications themselves were made in furtherance of the fraud.

Simply put, the privileged records fall outside the scope of the Does' surviving claims and/or bear no meaningful connection to the Does or their surviving theory of fraud. That is an adequate and independent basis to enter a protective order.

## II.     The Does' crime-fraud argument is untimely.

The Does also offer no good explanation for their delay in raising the crime-fraud argument until now, more than a year after the received the Masts' privilege log and long after they raised, and the Court rejected, a wholly separate challenge to the privilege assertions. It is undisputed that

4

the Does have had the Masts' privilege logs in their current form since February 2024—more than 18 months. In the meantime, the Does did challenge the Masts' privilege assertions, just not based on the crime-fraud exception. Instead, they argued waiver based on the Masts' use of Liberty University email systems, a theory this Court rejected. *See Doe v. Mast*, No. 3:22CV00049, 2024 WL 4353070 (W.D. Va. Sept. 30, 2024). Then, many months later, in June 2025, the Does asked to meet and confer on application of the crime-fraud exception.

The Court need not permit *seriatim* discovery litigation. The Does could have asserted the crime-fraud exception back in 2024 when they argued waiver, and they offer no explanation for why they did not. Thus, contrary to the Does' suggestion, it is not merely "the passage of time" that forfeited their argument, Opp. 37; it is the fact that they disputed and litigated the application of the privilege and are now seeking to re-litigate on a separate ground that they could have raised but did not. That is "'the failure to make the timely assertion of a right,'" *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 395 (4th Cir. 2004) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)), and it would undermine judicial economy and fundamental fairness to allow the Does to challenge the Masts' privilege assertions piecemeal.[1]

The Does claim a lack of prejudice from their delay, *see* Opp. 37, but prejudice is neither necessary to establish forfeiture nor absent here. Had the Does raised this crime-fraud objection earlier, the Parties and the Court could have addressed it in consolidated briefing rather than spreading briefing out across multiple motions—and multiple years. The passage of time has also necessarily affected the availability of evidence potentially relevant to the dispute.

---

[1] The Does acknowledge that they are not challenging the applicability of attorney-client, work product, or marital privilege on any basis other than the crime-fraud exception. *See* Opp. 37 n.79. They therefore concede their applicability and forfeit any right they might otherwise have to challenge them. Indeed, the prospect that the Does challenge the Masts' privilege assertion yet again if this effort should fail shows how important it is for the Court to enforce the prior forfeiture.

5

Finally, the Does suggest that their challenge is timely merely because discovery has not yet closed. *See* Opp. 37. But again, that misses the point. The issue here is not (as it sometimes is) that a party waited until after the close of discovery to raise a claim. The issue is that the Does are taking a second run at challenging the Masts' privilege assertions based on a theory that they could and should have raised over a year ago when they brought their first challenge.

### III.     The Court should not rely on hearsay from unavailable government witnesses.

The Does rely largely on juxtaposing the Masts' prior representations with the assertions contained in hearsay affidavits. *See* Opp. 3–15 & Exs. 2 (Fairfield Decl.), 3 (Welton Decl.), 25 (Reed Decl.). The Masts recognized that the formal hearsay rules may not apply at this stage. *See* FED. R. EVID. 104(a). Nevertheless, the court should not rely on hearsay statements, even in making a preliminary determination, without first assessing their reliability. *See, e.g.*, *United States v. Matlock*, 415 U.S. 164, 175–76 (1974) (in the context of a suppression hearing).[2] There are significant reasons to question reliability here.

*First*, the affidavits are from federal government witnesses whom the Federal Government refused to make available for cross-examination. Despite repeated requests, the United States has not to date granted *Touhy* authorization for these officials to testify subject to cross-examination; it has submitted one-sided affidavits instead. The Masts also sought discovery from the United States in this case, including to probe the veracity of the assertions contained in these affidavits

---

[2] Federal law does not categorically prohibit consideration of hearsay in assessing a *prima facie* application of the crime-fraud exception, *see United States v. Lentz*, 419 F. Supp. 2d 820, 831 (E.D. Va. 2005); FED. R. EVID. 104(a), but state law sometimes does, *see, e.g.*, *State ex rel. Nix v. Cleveland*, 83 Ohio St. 3d 379, 384, 700 N.E.2d 12, 17 (1992), and federal courts treat such limitations as part of the governing privilege rules under Rule 104(a), *see, e.g.*, *United States v. Philip Morris USA, Inc.*, No. 99-CV-2496 (GK), 2004 WL 7372142, at *8 n.4 (D.D.C. Sept. 7, 2004) (holding that prohibition on use of hearsay to establish crime-fraud exception under Australian law applied in challenge to assertion of privilege governed by Australian law). The Masts are not aware, however, of any Virginia decisions squarely addressing whether hearsay evidence may be used to establish application of the crime-fraud exception.

and similar submissions. The United States promptly moved to shut down such discovery. *See* Mot. for Protective Order (ECF No. 204). And when the Court held that the United States must participate in discovery as a Party, *see* Mem. Op. & Order (ECF No. 252), the Does agreed to dismiss the Federal Defendants from the case, *see* Stipulation to Dismiss Nominal Defendants (ECF No. 270). The Does and the United States have thus gone to great lengths to deny the Masts the opportunity to test the assertions contained in these affidavits, raising serious concerns about their reliability and the fairness of relying on them to pierce the Masts' assertions of privilege.

**Second**, these affidavits were submitted in support of a series of Statements of Interest filed by the United States in the parallel state-court proceedings. But the United States has since reconsidered and withdrawn its position,[3] after the Masts raised concerns with federal officials including about the accuracy of the factual representations made. The withdrawal too raises concerns about the reliability of these affidavits and the fairness of relying on them to pierce the Masts' assertions of privilege.

**Third**, the United States has determined that federal officials improperly distorted the factual record in this dispute by weaponizing their classification authority.[4] Earlier this week, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[3] *See* Ex. A (Mar. 5, 2025 Letter from Acting AAG Y. Roth to Supreme Court of Virginia).
[4] *See* Ex. B (Declaration of Christopher Fox). The declaration is marked "Filed Under Seal," but the United States has represented to counsel that this designation was inadvertent. The Masts are actively seeking to clarify the status of this declaration in the state-court record. But for the time being, the entire state-court record remains under seal, and the Masts will therefore submit it under seal here as well for now.

7



Given these circumstances, the Court should not rely on these hearsay affidavits for purposes of the Does' privilege challenge, which would be fundamentally unfair to the Masts.

IV. **The Does' allegations are disputed on the merits, but even if taken as true, would not support application of the crime-fraud exception.**

The Does offer extensive argument, *see* Opp. 3–15, purporting to show that the Masts made misrepresentations to a whole host of audiences—the Virginia courts, the federal court, federal executive officials, and the Does themselves. These same allegations underly the merits of their complaint. But they cannot establish a fraudulent scheme, even if all of the evidence (including the hearsay affidavits) were accepted as true. At best, the Does—like all the briefing the Court has received throughout this litigation—show that there are two competing stories, each with evidence and factual inferences that might support them.

> The Fluvanna County Circuit Court recognized this stark dichotomy:
>
> There are really only two possible overarching narratives the Court can see. One is that the Masts, with no obligation, stepped up and stepped in early on when literally no one else did or would, to help a child in severe need who had no one, to save her life and procure her safety, to spend their time and money to try to help this child. . . . Of course they got emotionally committed to the child. They believed early on that if she was left in Afghanistan she was going to be placed in an orphanage or worse. It is the Court's view that anything they did improper grew out of this.
>
> The other narrative, championed by Petitioners, is that the Masts, with bad motives from the beginning, decided to steal a child, to take her for their own benefit and gratification, knowing or believing that there were actual family members who were essentially in the place of parents available. ***The Court rejects that interpretation and narrative***.

8

Opp., Ex. 8, at 33 (emphasis added). This sort of dispute is why the law recognizes a civil tort of fraud, so a jury or court can hear the evidence and resolve the dispute as a neutral arbiter. It is not why the law recognizes a crime-fraud exception to attorney-client privilege; that is a unique remedy designed to address criminal abuses of the attorney-client relationship.

That is the central insight of the *GM Ignition Switch* decision. "[W]ithholding documents and materials that should have been turned over (or turned over earlier) . . . is the stuff that ordinary (albeit perhaps overly aggressive) litigation is made of, which can and should be addressed by sanctions in the same case, not the stuff that crimes and frauds are made of, which can and should result in the wholesale disclosure later of all attorney-client communications and attorney work product." *In re: Gen. Motors LLC*, No. 14-MC-2543 (JMF), 2015 WL 7574460, at *9 (S.D.N.Y. Nov. 25, 2015). "The attorney-client privilege is not vitiated merely because a client is alleged to have committed an unlawful or fraudulent act." *Invesco Institutional (N.A.), Inc. v. Paas*, 244 F.R.D. 374, 392 (W.D. Ky. 2007). "'Forfeiture of the privilege requires the client's *use or aim to use* the lawyer to foster the crime or the fraud.'" *Rockwood Select Asset Fund XI, (6)-1, LLC v. Devine, Millimet & Branch, PA*, 113 F. Supp. 3d 471, 478 (D.N.H. 2015) (quoting *In re Grand Jury Proc.*, 417 F.3d 18, 23 (1st Cir. 2005)). And as *GM Ignition Switch* illustrates, the mere fact that an alleged misrepresentation or concealment occurred in the context of litigation does not trigger the crime-fraud exception. Courts are thus particularly reluctant to apply the crime-fraud exception in civil cases "where the alleged criminal or fraudulent activity[] is the exact activity which is the subject of the pending suit." *Criswell v. City of O'Fallon, Mo.*, No. 4:06CV01565 ERW, 2008 WL 250199, at *4 (E.D. Mo. Jan. 29, 2008).

The Does argue that "[t]he very purpose of the underlying civil litigation was to perpetrate a fraud, so the communications with counsel prosecuting the litigation and their work product were

9

plainly in furtherance of the overall fraud." *In re: Gen. Motors LLC*, No. 14-MC-2543 (JMF), 2015 WL 7574460, at *7 (S.D.N.Y. Nov. 25, 2015); *see* Opp. 33–34. But that contention runs them headlong into the Court's prior ruling that it lacks subject-matter to adjudicate their challenge to the state-court adoption proceeding. *See supra* Part I. It is also foreclosed by Virginia Code § 63.2-1216, which is the subject of the pending appeal before the Supreme Court of Virginia, and on its face precludes the Does from "attack[ing]" the Masts' adoption "in any proceedings, collateral or direct, for any reason, including but not limited to fraud." And most importantly, the Does do not offer any *evidence*—just the bare assertion—that the purpose of the litigation was to perpetrate a fraud. Even if one assumes the Masts made false statements or concealed material facts in the state-court proceedings or other proceedings, that would not establish that they sought legal advice and instituted the proceedings in order to further a fraudulent scheme.

The Does do not—and cannot—point to *anything* in the record showing that the Masts had a fraudulent motive in seeking to adopt the child or in retaining counsel to help them do so. Telling, they cite none of their evidentiary exhibits in making this argument. *See* Opp. 33–34. The Does instead presumably expect the Court to *infer* a fraudulent motive, but that is not sufficient. And the only court ever to address the matter squarely—the Fluvanna County Circuit Court—rejected that inference outright after hearing evidence over eleven days. *See* Opp, Ex. 8 at 33.

An inference of fraudulent intent is particularly unwarranted because even the Does' version of events does not make out a strong case for fraudulent litigation. Take a few notable examples:

- **Statements About the Search for Family (Opp. 3–4)**. The Does argue that "J&S Mast, with R Mast as their attorney, misrepresented to the J&DR Court in November 2019 that efforts to find [the Child]'s next of kin had been unsuccessful." Opp. 3–4. They further argue that this "statement was knowingly false because, as early as October 2019, at least Joshua Mast knew the Afghan Government and the International Committee for the Red Cross (ICRC) were

10

actively searching for, and had made contact with, individuals claiming to be [the Child]'s family. *Id.* at 4. But even taking the Does' argument at face value, those statements are not irreconcilable. In fact, the individuals "claiming to be [the Child]'s family" were not the Does and, like the Does, were not related to the Child.[5] In other words, efforts to find the Child's next of kin *had been* unsuccessful.

- **Alleged Omissions About Proceedings in Afghanistan (Opp. 4, 14)**. The Does argue that "J&S Mast and R Mast also falsely represented to the J&DR Court that Baby Does was stateless, that the Afghan Government would waive its jurisdiction over [the Child], and that [the Child] was in need of urgent medical care." Opp. 4. But the record makes clear that the Masts believed (and continue to believe) that the Child was not Afghani; that they believed in good faith at the time that a waiver of jurisdiction was forthcoming; and that they believed that the Child needed urgent medical care—which she did in fact receive.

  The Fluvanna County Circuit Court's findings, *see* Opp., Ex. 8, further refute the Does' assertion of fraud. The court squarely rejected the Does' assertion that it was fraudulent to call the Child stateless, finding that the Masts have a sincere belief in this position and that there is "ample reason for believing this." *Id.* at 28. That court also noted that, while "[i]t appears that the Afghanistan government . . . never actually formally waived jurisdiction over the matter, . . . an Afghan official expressed early on that they had not interest in taking the case, and would not take custody of the child." *Id.* at 4. The court also found it credible that the Masts "sought to get [the Child] medical care, a home, and a future, when no one else [would]." *Id.* at 33.

  The Does obviously disagree with those findings, but the key point here is not the underlying truth; it is the fact that the Does cannot establish a *prima facie* case from the crime-fraud exception by purporting to disprove the Masts' earlier litigating positions.

- **Statements About Intent to Adopt (Opp. 8)**. The Does argued that it was false for the Masts to represent in the earlier federal proceeding that they "were 'not asking to adopt the child.'" Opp. 8 (quoting *Doe v. Mast*, 741 F. Supp. 3d 409,

---

[5] *See* Ex. C (Dec. 2, 2019 Email from W. Jaillani, Afghan Ministry of Labor & Social Affairs) ("MoLSA CPAN member is currently working on family tracing of infant . . . but the village name provided to us is not correct. . . . No we have not found the infants uncle yet and ICRC has not provided us the infants uncle details."); *accord* Opp., Ex. 8, at 33 (rejecting the notion that the Masts "[knew] or [believed] that there were actual family members who were essentially in the place of parents available" and finding credible the Masts' testimony that they were "skeptical when they later heard reports of relatives being found"); *id.* at 35 ("The Court did not ever have confidence that this child is the child of B[——], [John Doe's] purported uncle, and there was no basis in the case to find this beyond [the Does'] testimony."). It is undisputed that John and Jane Doe never contacted the ICRC themselves claiming to be family and had not met the Child in 2019 when these statements were made. They have also refused to submit to DNA testing.

11

427 (W.D. Va. 2024)).[6] They point out that, "just two months earlier, J&S Mast (again, represented by R Mast) had secured an interlocutory adoption order for Baby Doe." *Id.* But the record makes clear that the Masts initially sought the interlocutory adoption order to facilitate obtaining a Certificate of Foreign Birth, since the Child was a battlefield foundling with no documents or legal identity. The Masts did not intend to seek a final order at that time, but they later changed plans and decided to seek a final order in order to secure a path for the Child to come to the United States.[7] That did not make their prior statement false, much less fraudulent.

As these examples illustrate, these disputes are fine fodder for the merits of the litigation (within the bounds of the Court's jurisdiction and the scope of the claims that have been allowed to go forward), but they are not a basis for invoking the crime-fraud exception—even at the preliminary stage of ordering *in camera* review.

V.   **At a minimum, the Court should refrain from ruling on the Does' crime-fraud assertion while the Supreme Court of Virginia decides whether Code § 63.2-1216 bars them from alleging fraud, even indirectly, in the adoption.**

The Masts have explained why Code § 63.2-1216 bars the Does from invoking the crime-fraud exception and noted that the application of Code § 63.2-1216 is central to the pending decision from the Supreme Court of Virginia in parallel state proceedings. *See* Mot. 15. The Does dispute that, as they have in the state-court litigation. *See* Opp. 36. But the Masts made clear that they were not asking this Court to rule on the application of Code § 63.2-1216:

> Defendants are not asking this Court to decide whether § 63.2-1216 applies; that is a question of state law committed to the judgment of the Supreme Court of Virginia

---

[6] To be clear, characterizations in the Court's earlier ruling under Rule 12 is not "evidence" that establishes a *prima facie* case. At that stage, the Court was taking "all allegations in the complaint . . . as true" and drawing "all reasonable inferences . . . in the plaintiff's favor." *Id.* at 436.

[7] In January 2020, after obtaining the interlocutory order and before the statement made in the context of the TRO proceeding, Richard and Joshua Mast communicated with the office of Senator Ted Cruz. *See* Ex. D (January 2020 Email Exchange). The conversation makes clear that the ongoing efforts, including obtaining the interlocutory order, were "for exigent medical purposes and not for adoption." *Id.* at 1. Joshua Mast stated "that everyone's intent—including my own— is to guarantee [the Child's] safety, to ensure she has access to the medical care she needs to lead a normal life. . . . I am already [the Child's] permanent legal guardian, she is my registered DoD dependent, and she has access to free medical care through Tri-Care. I'm happy to remain her permanent legal guardian if that means we can save her life." *Id.* at 3.

12

> under the *Erie* doctrine, and the Supreme Court of Virginia is actively considering the question. But the Court should not lightly entertain Plaintiffs' untimely assertion of the crime-fraud exception, which they waited to raise until more than a year after obtaining Defendants' final privilege log and at a time when a decision from the Supreme Court of Virginia is imminent.

Mot. 15. And to that, the Does offer no response. For the reasons explained above, there are ample grounds to reject the Does' privilege challenge and to enter a protective order without needing to consider their factual fraud allegations. But unless the Court is prepared to do that, it would be prudent to wait for the Supreme Court of Virginia to resolve that key threshold issue before delving into an assessment of fraud allegations that the Does may be legally barred from raising.

## **CONCLUSION**

For the foregoing reasons, the Court should enter a protective order.

Dated: October 3, 2025

Respectfully submitted,

*/s/ John S. Moran*
John S. Moran (VSB No. 84326)
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com

*Counsel for Joshua & Stephanie Mast*

David Yerushalmi, Esq.*
American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20006
(*Admitted *pro hac vice*)

E. Scott Lloyd (VSB No. 76989)
Lloyd Law Group, PLLC
20 E. 8th Street, Suite 3
Front Royal, VA 22630
T: (540) 823-1110
M: (540) 631-4081
F: (540) 583-4279
scott@lloydlg.com

*Counsel for Richard Mast*