```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF VIRGINIA
 2                      Charlottesville Division

 3    - - - - - - - - - - - - - - - - - -
        BABY DOE, et al.,              )    CASE NO. 3:22cv49
 4                                     )
               Plaintiffs,             )
 5                                     )
        v.                             )
 6                                     )
        JOSHUA MAST, et al.            )
 7                                     )    MOTION FOR PROTECTIVE
               Defendants.             )    ORDER
 8    - - - - - - - - - - - - - - - - - -

 9                   TRANSCRIPT OF PROCEEDINGS

10                   Charlottesville, Virginia
                        November 10, 2025
11                         12:05 p.m.

12
      BEFORE:  THE HONORABLE JOEL C. HOPPE
13             United States Magistrate Judge

14
      APPEARANCES:
15
               HUNTON
16             BY:  MAYA M. ECKSTEIN, ESQ.
                    LEWIS F. POWELL III, ESQ.
17             Counsel for the Plaintiffs

18             MCGUIREWOODS
               BY:  JOHN MORAN, ESQ.
19             Counsel for the Defendants Joshua

20             and Stephanie Mast

21             AMERICAN FREEDOM LAW CENTER
               BY:  DAVID ELIEZER YERUSHALMI, ESQ.
22             Counsel for the Defendant Richard Mast

23             ALSTON & BIRD
               BY:  THOMAS WILLIAM DAVIDSON, ESQ.
24             Counsel for the Defendant K. Motley

25    Reported By:  Frank R. Austin, RPR, RMR, CRR, CSR
```

1          THE COURT:  Good afternoon.  Would you please call

2    the case.

3          THE CLERK:  Yes, sir.  Baby Doe, et al. versus

4    Joshua Mast, et al., Case 3:22cv49.

5          THE COURT:  All right.  And are the plaintiffs ready

6    to proceed?

7          MS. ECKSTEIN:  Yes, Your Honor.

8          THE COURT:  And for the Masts?

9          MR. MORAN:  Yes, Your Honor.  I'm here on behalf of

10   Joshua and Stephanie Mast.  Mr. Yerushalmi is here on behalf

11   of Richard Mast.  Since it's primarily my client's privilege,

12   I plan to present argument today.

13         THE COURT:  Thank you.  I think it is your motion

14   for the protective order.  So I'll hear from you first.

15         MR. MORAN:  Yes, Your Honor.  As you note, we're

16   here on the Masts' motion for a protective order.  The

17   protective order in question concerns a number of documents

18   that have been on our privilege log for quite some time, and

19   we are here because plaintiffs have alleged that they are

20   discoverable under the crime-fraud exception.

21         To start, we think it's now undisputed that the

22   materials are presumptively privileged under the

23   attorney-client privilege, the work product doctrine and the

24   marital privilege, and so that a protective order should

25   issue unless the Court were to conclude that the crime-fraud

1    exception applies.  We have laid out a number of reasons why
2    we don't think it applies and why the Court should enter a
3    protective order.  There's really three things I'd like to
4    emphasize, and of course I'm happy to answer any questions
5    that the Court may have.
6         First, under Judge Moon's Rule 12(b) ruling, it's
7    important to recognize that these materials relate to the
8    plaintiffs' collateral attack on the state court adoption
9    obtained by Joshua and Stephanie Mast for the child at issue
10   and that that is outside the scope of this court's
11   jurisdiction under Judge Moon's ruling.  Judge Moon did hold
12   that plaintiffs could pursue fraud claims that did not
13   implicate the validity of the underlying state court adoption
14   and allowed those claims to go forward.  But the materials
15   that we're talking about here, which are attorney-client
16   privileged communications, draft pleadings, and other
17   engagements related to that very state court proceeding that
18   led to the custody order in the first instance, then to the
19   adoption order, and then to a TRO hearing where the Masts
20   attempted to unsuccessfully -- and that's important -- to
21   prevent the transfer of the custody of the child, those all
22   in our view go to the theory that Judge Moon held was outside
23   the federal court's jurisdiction.
24        THE COURT:  Judge Moon allowed several claims to go
25   forward.  Why do you contend or do you contend that these

1   documents couldn't have any relation to the claims that are

2   still in the case?

3          MR. MORAN:  So, Your Honor --

4          THE COURT:  The recording stopped.  So hold on for a

5   moment.  The recording equipment in this courtroom rarely

6   works.  So Kayla does an amazing job trying to keep it

7   running.

8          MR. MORAN:  Happy to be patient.

9          THE COURT:  So I think Ms. Lokey is going to have to

10  contact IT to get them to get the system back up.  Usually it

11  does come back up, but it oftentimes -- we'll be able to keep

12  it for the rest of the hearing once we get it back.  We'll

13  take a short recess.

14          (Whereupon, a recess was taken.)

15          THE COURT:  We have the equipment back up.  All

16  right.  Please continue.

17          MR. MORAN:  Thank you, Your Honor.  I had a bit of

18  time to think about your question.  For framing, as I recall

19  it, it was a question about why the documents at issue here

20  couldn't potentially be relevant to plaintiffs' claims that

21  survived Judge Moon's motion to dismiss ruling.  In classic

22  lawyerly fashion, I have a two-part response to that

23  question, one of which has its own two subparts.

24          So the principal response is causation.  I want to

25  break that down into two pieces.  One, as to the privileged

1    documents that are related to the custody and adoption

2    proceedings themselves, which are sort of the core of the

3    lacuna in federal jurisdiction.  Those we think are very

4    straightforward.  There's simply no way that plaintiffs could

5    use those documents in a way to support their surviving

6    claims that doesn't require as a matter of causation

7    collaterally attacking the custody and adoption orders.  So

8    if the Court lacks jurisdiction to opine on those matters,

9    then those documents aren't going to be relevant to any of

10   the claims that may have survived the motion to dismiss.

11         The other reason is related to -- is more sort of

12   blended in with the standard under the crime-fraud exception,

13   which is that in order to obtain access to otherwise

14   privileged documents, plaintiffs don't just need to show that

15   there was a fraud and that these documents are potentially

16   relevant to support their claims.  They need to show that

17   there's an intimate connection between the documents and

18   demonstrating the use of the legal representation in

19   furtherance of the fraud.

20         So if, for example, plaintiffs have a surviving

21   claim which is of the flavor that they were fraudulently

22   induced to leave Afghanistan and to come to the United

23   States, and they never would have done that but for the

24   fraud, and they've been harmed by that fraud in a number of

25   ways, it's theoretically possible that some of the materials

1    from the earlier litigation that predates that could be
2    relevant in the sense of ultimately leading to exhibits that
3    they might use at trial for their claim, but they wouldn't be
4    able to show that intimate connection that's necessary to
5    pierce the privilege under the crime-fraud exception.  Again,
6    they start to run into the same causation problems, because
7    either we are talking about the documents that are from the
8    very custody and adoption proceedings that are carved out in
9    federal jurisdiction, or we're talking primarily about a TRO
10   proceeding that was ultimately unsuccessful.  So there's
11   no -- it didn't have any causal effect on plaintiffs in terms
12   of --
13          THE COURT:  Does that remove it from a conspiracy,
14   the conspiracy allegations?  Conspiracy is sort of a
15   continuum of an agreement, right?
16          MR. MORAN:  Conspiracy is broad.  Your Honor, we're
17   somewhere in uncharted territory here a little bit.  I would
18   submit if the conspiracy is so broad that it ties in the
19   original custody and adoption proceedings, and it relates to
20   the initial effort to obtain custody and prevent the transfer
21   out of DOD custody -- again, at that point there was no
22   direct privity with plaintiffs.  So they were not the target
23   of any communications or of any legal efforts that were going
24   on.  At that point in time, if the alleged conspiracy reaches
25   back and includes that, then it runs into the lack of federal

1    jurisdiction.  Again, I don't know that I can point to a case

2    that says --

3         THE COURT:  You have trouble with that.  Conspiracy

4    is an agreement and then some acts taken in furtherance of

5    it.  So I think arguing that it's just the actual --

6    conspiracy doesn't start until the Does are involved in the

7    activities, or there's a communication directly with the

8    Does.  It seems like you are talking more about the actual

9    alleged fraudulent statements rather than the conspiracy,

10   which of course is going to start earlier.  I think textbook

11   conspiracies begin before there's actually some sort of

12   substantive actions.  There's an agreement before there's any

13   overt action taken, right?

14        MR. MORAN:  Well, Your Honor, I suppose my point

15   would be more factually nuanced, which is it's undisputed

16   that the time that the Masts initiated the custody and

17   adoption proceedings, and even at the time of the emergency

18   TRO proceeding, the plaintiffs were not yet affiliated with

19   the child.  So there couldn't be at that point a prospective

20   conspiracy that was targeting them that then gets cast

21   forward into the future.  And again, I suppose it may be sort

22   of a sliding scale, but to the extent that the primary object

23   of the conspiracy is to obtain -- the alleged conspiracy, is

24   to obtain custody and control of the child, that strikes me

25   as being inextricably bound up in the custody and adoption

8

1    proceedings that Judge Moon held were outside the scope of

2    federal jurisdiction.  But again, this is not the only reason

3    that we put forward for denying their argument on

4    crime-fraud.  The second --

5          THE COURT:  I see what you're arguing there.  In

6    your reply brief you cited to some findings of the Circuit

7    Court about your clients' intentions and how the Circuit

8    Court didn't ascribe any improper intentions to their initial

9    interest in the child.  So perhaps at some point, even under

10   the plaintiffs' theory, that the Does -- or the Masts, their

11   intentions may have been something different, and then it

12   shifted as the facts may have changed.

13         MR. MORAN:  Yeah.  We're in the challenging world of

14   we haven't -- and this is not their fault.  Plaintiffs have

15   not yet been putting on their case.  So we don't know

16   precisely what sort of post 12(b)6 theory they plan to

17   articulate, or 12(b)1 and 12(b)6 theory they plan to

18   articulate in terms of their ultimate theory of fraud.  So

19   we're a little bit shooting in the dark on that.  But I think

20   we do know from Judge Moon's ruling that any theory that

21   hinges on the custody and adoption order would be considered

22   outside the scope of federal jurisdiction, and particularly

23   as it relates to their attempt to secure documents that are

24   the very privileged communications that culminated in the

25   adoption order, we think there's at least a serious question

as to whether those are discoverable, even setting apart
their allegations about the crime-fraud.

     The second point I wanted to emphasize is based on
the logic of the Southern District of New York's decision,
the GM Ignition Switch litigation, which is essentially the
insight that allegations of fraudulent litigation conduct
where a party alleges that their counterparty has knowingly
made false statements in the course of litigation, are not
really the type of "fraud" that the crime-fraud exception is
designed to get at, and that there are other mechanisms that
are designed to decide the truth, and if and when it's
concluded that a party was knowingly -- made knowingly false
statements in litigation or was too aggressive in their
litigation tactics, that that doesn't necessarily result in a
crime-fraud piercing of the privilege.  That's more the
province of sanctions and other remedies that would exist in
the judicial system.  I think the risk that the Court in GM
Ignition Switch recognized is that, as this case illustrates,
there are often hotly contested litigation matters that drag
on for a long period of time, where the parties not only
dispute the facts, but at times accuse one another of making
knowingly false claims in litigation, of sharp elbow
litigation tactics, and that if every one of those cases
opened the door to crime-fraud piercing, then it would
actually do more to sort of devolve into a back and forth

over those issues rather than pushing it toward substantive
engagement on the merits.  We think that's really bolstered
here by the factual allegations that plaintiffs relied on in
their response brief, where, for example, they -- we walked
through some of this in our reply, where they say it was
false to say that no family had been identified during the
course of the TRO proceedings.  Again, it's undisputed that
even if there were family that had come forward, it was
actually not plaintiffs themselves, and the people that had
reported to come forward turned out not to be the ones that
were recognized by the Red Cross as potential family members,
and even in the midst of that, the Masts had a good faith
basis for disbelieving that those were actually familial
relationships.  So I certainly understand the spirit in which
they say, well, they said there was no family available.  We
contend that was false.  But to me that's a classic factual
dispute hotly contested in the litigation, and to say that it
becomes the basis for piercing the privilege under the
crime-fraud exception would vastly expand that doctrine and
open the door to it in a wide range of cases.

           THE COURT:  It seems the allegations here are not
just that there may have been some fraud occurring during
litigation, but it's broader than that.  The allegations
concern alleged fraud from outside of litigation.  There's a
lot more going on over the course of the couple years here.

1    It's not just discovery misconduct or litigation misconduct.

2         MR. MORAN:  It is broad, Your Honor.  I think the

3    core of it as it relates to these materials, the vast

4    majority, but I admit not all, of the materials they are

5    seeking to obtain are privileged communications during the

6    course of litigation proceeding or draft work product in

7    those litigation proceedings.  So they're intimately tied up

8    with that.

9         I think the second point bleeds over into maybe it's

10   a slightly different point, not so much a GM Ignition Switch

11   point, but just that it's hard for us to take on the burden

12   of proving a negative and say prove that there was never any

13   statement that rises to the level of fraud that's extrinsic

14   to a legal proceeding.  But when we look at the allegations

15   on which plaintiffs are relying, you know, we don't say, Oh,

16   gee, they got us.  We say, Well, wait a second.  It's not

17   that simple, and we have a response to it.  Usually when

18   there's a factual assertion and a response, and there's

19   evidence that points one way, there might be evidence that

20   points another way, in the context of litigation we think of

21   that as a factual dispute, not as a fraud.

22        Even if one party -- of course in every litigation

23   one party ends up losing their side of the facts, but we

24   don't say that they -- in retrospect that they committed

25   fraud, because they do so -- even if the Court thinks, like,

1    Hey, the evidence was strong, and really I don't think -- I'm

2    not sure in good faith why you would have made this factual

3    assertion.  We don't say that was a crime-fraud

4    representation.  We're going to go back and pierce the

5    privilege.

6         THE COURT:  But it's -- of course the analysis

7    involves some examination of merits, allegations, but it's

8    not reserving anything on the merits.  I mean, there's the, I

9    guess, threshold to do in camera review, and then there's the

10   prima facie case.  The Fourth Circuit has been pretty clear

11   about what standard of review the district courts are

12   supposed to apply there, and it's not deciding the case on

13   the merits.

14        MR. MORAN:  No.  That's right.  So if the Court were

15   ultimately to conclude that any in camera review were

16   appropriate, A, we wouldn't refute the Court of resolving the

17   merits prematurely.  We recognize that there's -- it's a

18   threshold standard.  At the same time, we do think that --

19   and this was sort of the third point, which is that

20   because -- because so much of these materials are wrapped up

21   in the custody and adoption proceedings, because the Court

22   knows both from the pleadings in this case and can take

23   judicial notice that there's a pending state court case

24   related to the validity of that adoption, and I think both

25   sides expected that we would have the Virginia Supreme

1    Court's ruling in that case by now.  We certainly expect it

2    at any moment, but we don't control when it comes out.  It

3    would still be prudent, even if the Court were just making

4    that threshold showing of saying we think there's enough of a

5    showing of fraud to proceed to the next step of in camera

6    review, we respectfully submit it would be prudent to wait on

7    that ruling from the Virginia Supreme Court.  And I say that

8    because I don't expect that it will -- even if it were to

9    work out the way that we would hope, I don't expect that both

10   parties will suddenly agree that all matters are resolved.

11   But we would certainly take the view that if the Supreme

12   Court of Virginia upholds the application of 63.2-1216, which

13   is the finality bar that covers both direct and indirect

14   attacks on a final order of adoption, it would certainly be

15   our view that would preclude the state law claims that have

16   survived in this case and also would --

17        THE COURT:  Why is that?  Is it a factual finding

18   that the Virginia Supreme Court is upholding on -- or is it

19   just like a statute of limitations type --

20        MR. MORAN:  So it's a statute of repose issue.

21   Plaintiffs are proceeding -- this is part of Judge Moon's

22   ruling.  There are no federal claims at issue in the case.

23   We are proceeding on state law claims that arise under

24   Virginia law, and code 63.2-1216 governs the ability to bring

25   those claims under Virginia law.  One of the things it says

1    is that it forecloses any attack, direct or indirect.  So it

2    would ultimately turn in part on the scope of that clause,

3    indirect, what it means to bring an indirect collateral

4    attack.  That's why I fully suspect the parties might have a

5    difference of opinion about how that would particularly apply

6    to these claims.  We would expect to brief that before the

7    Court.  But I think it would be, you know -- from our vantage

8    point, it would be unfortunate, and I think just to point

9    this out to the Court, that if the Court were to say, you

10   know, we think that there's sufficient indicia of fraud or in

11   camera review of the privileged materials that relate to this

12   state court adoption, obtaining the state court adoption, and

13   then the Virginia Supreme Court were to say that, you know,

14   that adoption is final and that plaintiffs are precluded from

15   making any direct or collateral attack on that, that there

16   would at least be a tension between those rulings that could

17   potentially be avoided.

18          We don't see any particular urgency here where

19   plaintiffs have waited quite some time, and we've raised

20   questions about the timeliness of their effort, but any --

21   ultimately, this is, of course, the Court's decision about

22   the timing of its ruling.  But I just pointed it out because

23   it's potentially an equitable consideration that would govern

24   the Court's decision.

25          THE COURT:  Judge Moon's decision to remove the

1    claims that implicate domestic relations and sort of undo the

2    adoption, does that sort of get rid of your argument -- if

3    Judge Moon has already said the claims going forward aren't

4    going to affect the state court's decision about adoption,

5    then why does this Virginia Code section have any application

6    on the current claims?

7            MR. MORAN:  So they're obviously thematically

8    related, Your Honor.  They arise under different legal

9    standards.  So what Judge Moon had before him is a question

10   about the scope of federal question jurisdiction under the

11   domestic relations exception, whereas what we would be

12   raising is a question about the scope of Code 63.2-1216 under

13   Virginia law.  I could at least imagine, for example, a

14   universe where the federal courts say the domestic relations

15   exception is to be construed very narrowly.  So we're going

16   to prohibit -- we're not going to consider any claim that's

17   specifically and narrowly focussed on adoption, but anything

18   that's outside of that very tight ring we will entertain

19   jurisdiction on, on the one hand.  Then the Virginia Supreme

20   Court is saying, Well, 63.2-1216 is very broad.  So it

21   precludes anything that could potentially be construed as an

22   indirect attack.  So you would have claims where you could

23   say yes, they would survive a motion to dismiss under the

24   domestic relations exception under Rule 12(b)1 in terms of

25   the scope of federal jurisdiction, but then on the merits

1  might conclude they are barred by 63.2-1216 as interpreted by

2  the Supreme Court of Virginia.  So unless the Court has any

3  further questions --

4       THE COURT:  It sounds like an interesting issue that

5  probably hasn't been addressed.

6       MR. MORAN:  We may need to get there at some point.

7  We shall see.

8       THE COURT:  Thank you.  For the Does.

9       MS. ECKSTEIN:  Good afternoon, Your Honor.  Maya

10 Eckstein for the Does.  I want to address each of the

11 arguments raised by Mr. Moran.  Let me just start briefly --

12 we don't need -- we're not required to prove the crime-fraud

13 exception applies by beyond a reasonable doubt, by clear and

14 convincing evidence, or by preponderance of the evidence.

15 Our burden is not that high, which is the burden that I hear

16 being suggested here.  The burden -- our burden is to make a

17 prima facie showing that the Masts were engaged in or

18 planning a criminal or fraudulent scheme when the disputed

19 records were created and to show that the disputed records

20 bear a close relationship to the Masts' existing or future

21 scheme to commit a crime or fraud.  We believe we've made

22 that showing.

23       And the Masts' misconduct here is not speculation.

24 It is documented.  It is documented in judicial findings,

25 contemporaneous evidence, and even in their own testimony.

1    That misconduct, it forms the building blocks of our claims

2    for fraud, intentional infliction of emotional distress, and

3    conspiracy.  The misconduct that is reflected in these

4    disputed records is evidence of the Masts' intent to defraud

5    the Does and the Does' reasonable reliance on the Masts'

6    misrepresentations and admissions.  The Masts want to bury

7    the very documents and facts that form the building blocks of

8    our claims, and they should not be allowed to hide behind

9    privilege to do so.

10         I want to address the first argument that my friend,

11   Mr. Moran, mentioned, and this is the relevance argument.  I

12   think there's a piece of it that is really focused on the

13   domestic relations exception.  They argue, the Masts argue,

14   that the Court's decision, Judge Moon's decision, to dismiss

15   two of the claims based on the domestic relations exception

16   somehow prevents discovery of the state court litigation on

17   the three claims that were not dismissed.  But the domestic

18   relations exception is not that broad.  Judge Moon even

19   recognized this much in his ruling.  ECF 455, page 128, he

20   specific said the domestic relations exception, it's a narrow

21   exception.  It divests the federal court of the power to

22   issue divorce, alimony, and child custody decrees.  He also

23   cautioned that the federal courts should be wary of taking

24   too expansive a view of the domestic relations exception.

25         Well, this is a discovery dispute.  In this

1    discovery dispute we are not asking for issuance of a

2    divorce, alimony, or child custody dispute.  The rules of

3    discovery apply here, not the domestic relations exception.

4    It's notable that defendants do not cite to a single case

5    that apply the domestic relations exception in the discovery

6    context.  We certainly have not found one ourselves.

7          THE COURT:  But you would agree that if the

8    documents -- the communications at issue were aimed at issues

9    solely of domestic relations, that they wouldn't be relevant

10   in this case anymore?

11         MS. ECKSTEIN:  To the extent the documents were

12   requested for a claim that sought issuance of a divorce

13   decree, alimony decree, custody decree, you're right.  Judge

14   Moon has made that clear that's off the table.  Our position

15   is that those documents relating to the state court

16   proceeding, they do form the building blocks.  They are

17   evidence of the Masts' intent.

18         For example, Mr. Moran said, Well, the Does were

19   not -- did not even have Baby Doe at the time of the original

20   child custody order, and then the Masts came to this court to

21   seek the TRO.  But in between the TRO and the final adoption

22   order, the Does absolutely had custody of Baby Doe, and the

23   Masts knew it.  They were very aware of that.  They were in

24   communication with the Does at that time.  And the events

25   that preceded that -- the TRO, including the request to get

1   custody, are all evidence of intent.  They are also evidence

2   that go to the reasonable reliance element of fraud, because

3   we're talking here not just about misrepresentations to the

4   Does, but also omissions.  Had the Does known that the Masts

5   obtained a custody order for Baby Doe, they would never have

6   gotten on that plane to come to the United States.  So they

7   formed the building blocks.  They're not the core of the

8   claim.  The core of the claim is the fraud on the Does.  It's

9   not the fraud on the courts.  It's the fraud on the Does.

10  But they do prove the elements of intent and reasonable

11  reliance.

12          The Masts also make this argument about relevance.

13  This is more of a discovery relevance argument as opposed to

14  a close relationship argument, although I think there's

15  probably a relationship between the two.  But to the extent

16  they're making this argument in the context of discovery

17  relevance, we have a few response to that.  First, they've

18  waived this relevance argument.  You remember, Your Honor, we

19  filed a motion to compel, and you issued a ruling on that

20  motion to compel.  In your ruling, which is ECF 326, you

21  noted that the Masts had not raised a single relevance

22  objection to our request for production.  To the extent they

23  had raised objections, you overruled them.  Other objections,

24  but not relevancy.  Simply didn't raise a relevancy

25  objection.  At this point we believe they waived this

1    relevance argument.  Set that aside for a moment.  Judge Moon

2    himself recognized the relevance of the state court

3    proceedings when he ruled on the motion to dismiss.

4           I'd like to hand Your Honor a chart.  This is a

5    chart that I prepared.  You'll see on the right-hand side,

6    facing the other way, you'll see the counts that remain in

7    the case, the fraud count, the IIED, and the conspiracy

8    count.  As to each of the frauds including -- let's focus for

9    now on the fraud on the state courts.  In that first column

10   we identify where in Judge Moon's opinion he explicitly

11   referenced the relevance, or recognized the relevance I

12   should say, of the state court proceedings to the fraud

13   claim.  Then we cite where in the amended complaint we

14   specifically tie the state court proceedings to the fraud

15   claim.  So just as the first example in his motion to dismiss

16   opinion, ECF 455, at page 43, Judge Moon noted the allegation

17   that the Masts and Motley intentionally misrepresented to

18   plaintiff that their sole intention was to provide -- I think

19   that should be provide, not produce.  I apologize -- medical

20   assistance for Baby Doe when they withheld information about

21   the Virginia custody and adoption proceedings and orders.  So

22   Judge Moon has already recognized the relevance of the state

23   court proceedings to the fraud claim as well as to the other

24   claims.  You'll see the same type of information for the

25   other two claims in this chart.

1          Let's remember also the focus of our fraud claim is

2    that the Masts lured the Does to come to the United States so

3    that they could take the child from them.  The Masts could

4    not have completed that fraud without those state court

5    orders.  It's also worth noting that this is a different

6    argument than the Masts made in the joint statement that the

7    parties filed that preceded this motion practice.  Based on

8    the joint statement, you provided permission for this motion

9    practice.  At ECF No. 533, the joint statement, on page 4,

10   which is the Masts' portion of the joint statement, the

11   Masts, they concede relevance.  They say there that the

12   plaintiffs, "Allege that the Masts' litigation position in

13   state and federal court were false, a disputed issue

14   inextricably intertwined with the merits of plaintiffs'

15   claims in this case."  So they have admitted this close

16   relationship, the relevance, and they should not now be heard

17   to argue otherwise.

18          With respect to -- that's about the state court, but

19   also with respect to the federal court related documents, the

20   government processed type documents.  That includes things

21   like the fake Afghan passport, the application -- the DEERS

22   application.  That's for military -- for a dependent of the

23   military personnel to be recognized.  Also the immigration

24   applications.  The chart also shows where in his opinion

25   Judge Moon recognized the relevance of those items to the --

1  to each of the three claims that were made in the case and

2  also where in the complaint we reference the relevance.

3         I want to address for a moment the General Motors

4  case.  This is an unpublished case from the Southern District

5  of New York.  I have to say that the Masts' reliance on it is

6  a little bit puzzling to me.  As I read it, that case stands

7  for the proposition that lawyer-generated documents that

8  reflect work that one would expect from an attorney in the

9  course of presenting a legitimate defense to a particular

10  kind of litigation, don't support a crime-fraud inference.

11  But that is not the situation here.  Here there is no

12  question, there is no dispute that the Masts told the state

13  and federal courts certain things that were wrong.  And

14  there's no question of the fact that the Masts failed to

15  inform numerous courts of various other things that they

16  knew.  And there's no question that the Masts obtained false

17  government documents such as the fake Afghan passport, and

18  there is no question that the Masts filed applications with

19  the government that contained false information.  Also, it's

20  worth noting in the General Motors case the Court did conduct

21  in camera review.

22         THE COURT:  I don't need to make a finding that you

23  are right on all of those assertions.  It's not a trial.  I'm

24  not deciding the merits of it.  This is a discovery issue.  I

25  think Mr. Moran has recognized that his clients have a story,

1    and it's different from the story that you would present.

2         MS. ECKSTEIN:  Yeah.  The burden on that first prong

3    of the crime-fraud exception is how we presented sufficient

4    evidence to allow for an inferential leap to reach a

5    particular outcome in this case that a fraudulent scheme was

6    afoot.  We believe we have, in fact, done that.  Rather than

7    the General Motors case, we think this case is more like the

8    Owens Corning Fiberglass Corporation case, which is cited in

9    our briefs.  This is a Virginia Supreme Court case.  That

10    case is from 1992.  In that case the Virginia Supreme Court

11    found that Owens Corning committed a fraud on another court

12    when it gave an answer to an interrogatory in that previous

13    litigation that contradicted the information that Owens

14    Corning then had.  So the crime-fraud exception applied.

15    That's the same situation here.  The Masts provided certain

16    information to various courts that contradicted information

17    that we have shown through the documents, the exhibits, that

18    they had.

19         The third argument that Mr. Moran raised is the

20    ruling that's expected from the Virginia Supreme Court.  I

21    think he and I both lost many bets as to when that ruling

22    would issue.  But that ruling is rather irrelevant to this

23    dispute today.  Frankly, it's irrelevant to the case

24    altogether.  The Masts say that section 63.2-1216 bars the

25    Does from invoking the crime-fraud exception.  That's what

1    they argue in their brief at -- the reply brief at pages 12

2    through 13.  The issue in the state court litigation, as you

3    noted, is whether 63.2-1216 bars a collateral attack of the

4    adoption order after six months.  Well, this crime-fraud

5    issue is not a collateral attack of the adoption order.

6    We're not seeking from this court avoiding that adoption

7    order, not in the litigation at all, and certainly not in the

8    context of a discovery dispute.

9           But even if the Supreme Court of Virginia rules in

10   the Masts' favor and hold that that statute bars the Does'

11   state court challenge to the adoption order, that does not

12   mean that it wasn't procured by fraud.  It means only that

13   the six-month rule prevents the Does from asking a state

14   court to void the adoption order on that basis.  It doesn't

15   mean that we can't seek discovery of it in this litigation so

16   long as it's relevant, which we discussed, and so --

17          And that goes also to the case entirely.  Even if we

18   lose, the Does lose at the Supreme Court of Virginia, that

19   doesn't affect the rest of the claims that are at issue,

20   because none of those claims ask for a voiding of adoption

21   order.  And the Masts do not cite to a single case that gives

22   63.2-1216 an expansive reading, this expansive reading that

23   that they're now advocating for, that it would preclude

24   discovery of relevant information in a federal litigation.

25   I'm not aware of any state court statute that can do that or

1   does that.  They certainly haven't cited a single case that

2   gives 63.2-1216 such an expansive reading.

3            THE COURT:  So if there were a finding by a jury in

4   this court that the adoption as to the fraud claim or

5   conspiracy, that necessarily found that the adoption was

6   procured fraudulently, is there any need for that --

7            MS. ECKSTEIN:  I don't think there's any need for

8   that, not for the fraud claim that exists in this case.

9            Mr. Moran, at end of his argument, mentioned

10  something about the timeliness of the motion.  Would you like

11  me to address that?

12           THE COURT:  I know you addressed it in your brief.

13  I don't think that there's really -- the case that was cited

14  doesn't support that.  That argument -- can you address why

15  you-all didn't raise this issue sooner?

16           MS. ECKSTEIN:  So being frank, we probably could

17  have raised this sooner.  I will say this is a very different

18  issue from the Liberty University emails issue that we raised

19  previously about some of the privileged documents, but it's a

20  completely different issue, right?  Involves a completely

21  different analysis.  They are two frankly relatively complex

22  issues but involve a completely different analysis.  And also

23  the Liberty University ruling -- I mean, say it differently.

24  The disputed records, the majority of them did not use

25  Liberty University email system.  So that ruling really has

no bearing on the majority of the documents, the disputed

records at issue here.  I would add that a ruling on this

crime-fraud exception argument now will not affect any

deadline in the case.  We're currently in a situation where

we don't have a trial date.  We don't have a pending

scheduling order.  We're still essentially in the middle of

discovery.  Once Judge Ballou rules on our motion to dismiss

the counterclaims, I think at that point -- the parties have

agreed that their clients should really only be deposed once.

So we need to know which claims and counterclaims are in the

case.  So -- and that's reflected in filings that the parties

made to amend the pretrial scheduling order, ECF 399 on their

behalf, and ECF 412 on our behalf.  We both argued that.  As

a result, the Court did lift the scheduling order and the

trial date.

        The case -- I think the case that you're referencing

that they mention in their reply brief, Grassy versus

Information Reserve, I think it is, from the Seventh Circuit,

that case did find -- I was surprised, frankly, because we

had not found a single case saying the crime-fraud exception

argument is waived based on an untimely bringing of that

argument, but they did identify that case in the Seventh

Circuit.  So it caught our attention.  We looked at it.  What

was interesting about that case is the plaintiffs filed a

motion, the crime-fraud motion, two weeks before trial.

```
 1    That's why it wasn't timely.  They filed a motion two weeks
 2    before trial.  They asked for additional discovery of these
 3    privileged communications.  That's simply not the case here.
 4    Unless you have other questions?
 5           THE COURT:  I don't think so.
 6           MS. ECKSTEIN:  If I could conclude, we do believe
 7    that we've established that the crime-fraud exception applies
 8    here to the disputed records.  At a minimum certainly the
 9    Court should conduct in camera review of these documents.
10    That is a lesser evidentiary showing.  As you noted earlier,
11    requires only that we have put forward a factual basis
12    adequate to support a good faith belief by a reasonable
13    person that in camera review of the materials may reveal
14    evidence to establish application of the crime-fraud
15    petition.  And the Masts do not seriously suggest that we
16    have not met that standard.  We don't think in camera review
17    is required here.  Of course, the courts, the Fourth Circuit,
18    have recognized that you don't have to have in camera review
19    if there's other evidence that has been presented that makes
20    you able to determine that our burden has been met for the
21    crime-fraud exception application.
22           THE COURT:  All right.  There were a number of
23    documents at issue here.  It seems like the second prong of
24    the prima facie case would certainly be bolstered by an in
25    camera review, showing there's some relation between these
```

1    documents.

2        MS. ECKSTEIN:  Talking -- I think it's a little over

3    400 documents.  Thank you.

4        THE COURT:  Mr. Moran.

5        MR. MORAN:  Is just a couple points, Your Honor.

6    First on the timeliness, the reason I didn't raise that

7    myself is because I view that as the Court's prerogative.

8    You know, I don't think it's a clear cut case, but I do

9    believe that the Court would be justified in saying that, you

10   know, when a particular set of privileged communications are

11   at issue, the parties should bring forth all their best

12   arguments as to why they should be able to get them at one

13   time.  If the Court doesn't do that, maybe a month from now I

14   get a request for meet and confer about why does the marital

15   privilege even apply in the first place.  We sort of find

16   ourselves once again asking why couldn't we have hashed this

17   out at some earlier time when we were disputing the

18   production of these materials.

19       Two substantive points.  One, my friend on the other

20   side, she said that these communications related to the

21   adoption and the custody order are relevant because they have

22   allegations that the Masts withheld or concealed the fact of

23   the adoption order or the fact that they obtained an adoption

24   order.  The underlying privileged communications that led to

25   that adoption order are irrelevant to that theory.  What's

1  relevant to that theory is the fact that there was an

2  adoption order and that they didn't disclose that fact when

3  they were communicating with the Does.  There's no allegation

4  that they were communicating to the Does through the

5  attorneys such that the attorney-client relationship could be

6  brought into that allegation of fraud.  And they haven't

7  articulated any way in which piercing the privilege would

8  bolster their claim that the fact of the adoption or custody

9  order was never disclosed to their clients or that it was

10 knowingly withheld from their clients, because the -- the --

11 that theory, as I would understand it, trying to give it a

12 charitable reading, there's nothing about the way that the

13 adoption or custody order came about that would actually

14 change the theory.  It's -- if you told me I think -- she

15 said they had --

16      THE COURT:  If there's evidence of some wrongdoing

17 in obtaining the state court orders, is that part of the

18 conspiracy and the defendant's knowledge -- if the conspiracy

19 is, as we talked about earlier, it's a broad --

20      MR. MORAN:  It is broad.  In my reading of the case

21 law, is that's precisely what the courts have tried to avoid

22 allowing the crime-fraud exception to do.  It's one thing to

23 say, I can articulate clear evidence to make a prima facie

24 showing that this party obtained legal representation in

25 order to advance a criminal or fraudulent conspiracy.  It's

1    another thing to say, There was a big conspiracy going on,

2    and I think that if I get access to their privileged

3    documents, I'm going to find some stuff that's going to help

4    me make out that case.  The latter is essentially what I hear

5    the other side saying, that, Hey, these documents might be

6    relevant.  Conspiracy is broad.  We can find some stuff that

7    would either be evidence in itself or lead us to the

8    discovery of other evidence, the normal sort of relevance

9    discovery standard.  But what the courts have articulated is

10   that when they're applying the crime-fraud exception -- and

11   the Court alluded to it -- there needs to be that close

12   connection between the documents involving the legal

13   representation itself and the alleged fraud or the alleged

14   conspiracy.  Because what the crime-fraud exception is meant

15   to do is not to make it easier to prove the existence of a

16   crime or to prove the existence of a fraud.  It's essentially

17   to punish or police the act of obtaining legal representation

18   for the purposes of furthering that crime or that fraud.

19   So --

20         THE COURT:  I think that may go a little too far.

21   It's just a step in parties exchanging information related to

22   the claims.  It's not finding that there was a prima facie

23   showing of fraud, saying there was -- there was fraud.  It's

24   a step in the development of each side's case.

25         MR. MORAN:  I agree it's incremental, but it has to

1    be -- the prima facie is a low bar, but it has to be a prima

2    facie case that would satisfy the crime-fraud exception if it

3    were borne out in the documents.  If the Court ends up

4    ordering in camera review, we're confident that when the

5    Court reviews them, it will satisfy itself that these are not

6    the types of documents that trigger the crime-fraud

7    exception.  They're relatively mundane privileged

8    communications.  That may be where we're headed, but we do

9    think it's critical that plaintiffs meet each step along the

10   way.

11          The other point I just wanted to make is on this

12   issue about the scope of -- or the relevance of the materials

13   and the allegation that we waived it.  So, first of all, the

14   first allegation is that we waived -- we waived it because at

15   the time that the Court ordered -- entered an order on the

16   motion to compel, we didn't make a relevance objection at

17   that point, but at that point we made our privilege

18   objection, which they had not challenged.  So we didn't have

19   any particular reason to fight over the relevance of

20   privilege, certain subset of privileged materials.

21          Relatedly, in the joint statement, the way that this

22   initially came to the Court is that plaintiffs raised an

23   allegation that the crime-fraud exception applied.  We

24   responded to that on the face of the allegation that the

25   crime-fraud exception applied.  Then we sent it to the Court

1    pursuant to the Court's procedure, which I think is a very

2    sensible way to approach these things and helps to streamline

3    the process.  I applaud the Court for adopting that.  At that

4    point, the way it was teed up, you know, we didn't think it

5    was proper to inject it.  When the Court said that it was

6    putting the burden on us -- understand.  I'm not complaining.

7    But putting the burden on us to file a motion for a

8    protective order, we said, well, let's raise all of our

9    arguments.  And I would actually note that it was plaintiffs,

10    to the extent they had a waiver argument, then forfeited it

11    by failing to raise that in their opposition to the motion

12    for a protective order, and there's case law well

13    establishing the principle that a waiver argument can be

14    itself forfeited if it's not timely raised in opposition.

15            THE COURT:  I don't think there is a waiver.

16            MR. MORAN:  Ultimately a minor point.  I'm not sure

17    it's the grounds on which at least the whole thing will be

18    resolved.  Maybe it will resolve a piece of it, but I wanted

19    to make that point as well.  I'm happy to answer any other

20    questions the Court may have.  But consistent with, I think,

21    the discussion with the other side, we certainly think that

22    at a maximum the next right step would be ordering an in

23    camera review before ordering the production of any

24    privileged documents.

25            THE COURT:  Thank you, Mr. Moran.  All right.  Well,

1    I do think these are -- I think it's really important to be

2    very careful anytime the Court is considering a finding of

3    crime-fraud exception and turning over privileged

4    communications.  So I do think that the Court would have to

5    have an in camera review in this instance before doing that

6    because of the care that is required.

7            So I of course am not going to rule on the motion

8    today.  I am going to find that in camera review of the

9    asserted privileged documents is necessary.  And this is

10   looking at the -- the standard in the Supreme Court case, in

11   Zolin.  As discussed in the Fourth Circuit's case from 2005,

12   the In Re:  Grand Jury Proceedings, and I think the Fourth

13   Circuit starts off, says, "Frequently judges use in camera

14   hearings to determine if the crime-fraud exception should

15   apply."  Just goes on to discuss that what's required is a

16   factual basis to support a good faith belief by a reasonable

17   person that in camera review of the materials may reveal

18   evidence to establish the claim that the crime-fraud

19   exception applies.

20           Here this -- of course this case has been litigated

21   for several years at this point.  Looking at Judge Moon's

22   decision on the motion to dismiss, he found that plaintiff

23   had made specific allegations of fraud and conspiracy by the

24   Masts, and that those were sufficient to allow fraud and

25   intentional infliction of emotional distress and conspiracy

1    claims to go forward on a motion to dismiss standard.  I

2    think Judge Moon noted that they were -- there were exhibits

3    attached to the complaint as well that certainly not making

4    any finding that those -- those prove the plaintiffs'

5    allegations, but they did provide some support for those

6    allegations.  The plaintiffs have offered exhibits related to

7    this motion as well that provide support that I think would

8    support a good faith belief by a reasonable person that in

9    camera review is appropriate.  It may reveal evidence.  It

10   may not.  But it may reveal evidence that the crime-fraud

11   exception applies.  Just given the gravity of this issue, I

12   think it's necessary for the Court to conduct an in camera

13   review.

14          Mr. Moran, do you think that you could provide those

15   within seven days?

16          MR. MORAN:  So, Your Honor, there's just --

17   ultimately, the answer is yes, but there are a couple caveats

18   I'd like to give.  One is I haven't had the chance to debrief

19   with my client and confer.  I can't say that we would

20   anticipate filing objections to the Court's ruling, but if

21   that were a possibility, I'd just recognize that the timing

22   of the order of production and that could not align, but I'm

23   willing to live with that.  If we decide to do that, which

24   again I'm not saying we are, then could do that on that time

25   frame.  The related question I would just have is whether the

 1    Court would be open to the limited, by the Court's
 2    discretion, ex-parte briefing on now that you have these
 3    documents in front of you, here's a bit of a description of
 4    the documents and our position as to why they fit within the
 5    ordinary attorney-client privilege, not crime-fraud
 6    exception.  Not to say those couldn't be staggered in the
 7    sense we couldn't prove the documents first and then -- so
 8    the Court could start looking at them, and then we could
 9    provide that at a later date.  I think seven days, if we were
10    given the opportunity to do that, would be a little tight,
11    although we would of course meet it if directed to do so.
12          Then the final related point would just be wanting
13    to confirm with the Court what format would be most helpful
14    and appropriate.  I mean, obviously as litigants, we often
15    produce these things in Relativity databases and other
16    eDiscovery platforms.  I don't know if the Court has that
17    capability.  It might prefer it either in electronic --
18          THE COURT:  The recording equipment --
19          MR. MORAN:  Either electronically in PDF format or
20    physically in some set of hard copies.  Depending on the
21    precise guidance, I just want to make sure we had enough time
22    to work with our team to get those together.  So seven days
23    frankly feels a little tight, but I'm not trying to drag it
24    out.  We would certainly work diligently.  If the Court said
25    it's going to issue a separate ruling, we are not going to

```
 1   wait for that.  We can go ahead and get going on pulling
 2   things together.
 3           THE COURT:  I think I contemplated doing an oral
 4   order, it's not -- for the reasons that I have stated, not
 5   resolving the --
 6           MR. MORAN:  The ultimate motion, yes.
 7           THE COURT:  I certainly would want to give you the
 8   opportunity to lodge an objection if you wanted to, although
 9   I'm not sure that there's a basis for doing that.
10           MR. MORAN:  The only reason I say that is because I
11   haven't had a chance to speak with my client about it.  I
12   don't anticipate --
13           THE COURT:  I'll give you the 14 days, because I
14   recognize that I think it's important to have that
15   conversation.  I think if we can get an electronic copy, if
16   you can do it in PDF, but also a paper copy, that would be
17   best.
18           MR. MORAN:  Yes.  Understood.
19           THE COURT:  Then as far as -- I'd like to hear from
20   Ms. Eckstein about any thoughts on any ex-parte briefing to
21   sort of explain these -- the documents.
22           MS. ECKSTEIN:  I think that would be inappropriate.
23   We obviously -- it's ex-parte.  So we don't get to see what
24   they say.  I think that's problematic.  In addition, their
25   briefing understandably will spin the documents to their
```

1    story without us having the opportunity to do the same.  I

2    don't think there's equity there.

3        THE COURT:  Some of the cases -- I hadn't focused on

4    this.  But some of the Fourth Circuit cases discussing the

5    crime-fraud privilege, that they talk about the government

6    making an ex-parte presentation.  It's a different

7    circumstance.

8        MS. ECKSTEIN:  Those are grand jury proceedings

9    typically, which would be closed.

10       THE COURT:  Are ex-parte.

11       MS. ECKSTEIN:  Yes, exactly.  I've not seen anything

12   like that in a civil case.

13       THE COURT:  Mr. Moran, have you seen any in a civil

14   case?

15       MR. MORAN:  I have not, Your Honor.  I would just

16   note there are two -- if afforded the opportunity, we would

17   do both.  There's two things that we could potentially do

18   through ex-parte briefing.  One is obviously present argument

19   as to why we don't think the documents show indicia of the

20   crime-fraud exception applying.  I certainly understand

21   Ms. Eckstein's objection to that.  At the same time I would

22   say the one-sided nature is by virtue of the attorney-client

23   privilege, and that is just how these matters are, given the

24   nature of the privilege.

25       The other thing that would be somewhat narrower

```
 1    would be -- for example, I could envision a version of the --
 2    essentially the privileged log plus, with an extra column
 3    that just gives us a chance to explain the context of some of
 4    these documents to the extent that, you know, we are allowed
 5    to start adding in information that is itself privileged,
 6    that the Court -- that we obviously would not have included
 7    in the log, that the Court may find helpful to its review.
 8         So again I understand why the other side is
 9    objecting, but I think it's just a product of the careful
10    protection of the privilege that the courts enjoy.  The fact
11    that they've had their chance to say why they think -- take
12    all of their allegations, meet a low bar, here's why this
13    makes a prima facie case, and now we're talking about, you
14    know, is the Court going to pierce the privilege and order
15    the production of attorney-client privileged documents, and
16    we think we should be afforded the opportunity to explain why
17    not.
18         THE COURT:  Not that I'm inviting objections to how
19    I ultimately resolve this motion.  Of course you'll have --
20    both sides will have the ability to file objections if you
21    disagree with how I resolve it and argue to the district
22    judge.  It wouldn't be ex-parte at that point, but it would
23    be before any documents would be turned over or not turned
24    over, too.  So I think you would have another opportunity, if
25    necessary.
```

1          MS. ECKSTEIN:  If I could say one last thing, which

2    is that the Court is very familiar with our allegations,

3    certainly very familiar with our defense of the allegations.

4    I think the Court can look at these documents independently

5    and make the determination as necessary.

6          THE COURT:  Okay.  Mr. Moran, I think 14 days is

7    reasonable to submit the documents.  And I'll look back

8    through the cases to see if there's anything allowing an

9    ex-parte submission, and if I see that, I'll enter another

10   order giving you the ability to do that.  I don't remember

11   seeing it.

12          MR. MORAN:  Understood, Your Honor.  We share the

13   other side's confidence in the Court's ability to review the

14   documents.  So it's mainly a question of would it be helpful.

15   And the Court may decide that, after doing some research and

16   looking at them, that it either would or would not care for

17   any additional input.

18          THE COURT:  All right.  Anything else?

19          MS. ECKSTEIN:  Not from plaintiffs, Your Honor.

20          MR. MORAN:  No, Your Honor.

21          THE COURT:  That brings this hearing to a close.

22   Thank you.

23      (Whereupon, the proceedings concluded at 1:11 p.m.)

24

25

```
 1                          CERTIFICATE

 2

 3        I, Frank R. Austin, certify that the foregoing is a

 4   correct transcript from the record of proceedings in the

 5   above-entitled matter.

 6

 7   /s/  Frank R. Austin              Date:  11/21/2025

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```