**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 24-1900**

───────────────

BABY DOE, citizen of Afghanistan currently residing in North Carolina, by and through Next Friends, John and Jane Doe; JOHN DOE, citizen of Afghanistan and legal guardian of Baby Doe; JANE DOE, citizen of Afghanistan and legal guardian of Baby Doe,

        Plaintiffs – Appellees,

    v.

JOSHUA MAST; STEPHANIE MAST; RICHARD MAST,

        Defendants – Appellants,

   and

KIMBERLEY MOTLEY; AHMAD OSMANI; UNITED STATES SECRETARY OF STATE MARCO RUBIO, Nominal Defendant; UNITED STATES SECRETARY OF DEFENSE PETE HEGSETH, Nominal Defendant,

        Defendants.

───────────────

Appeal from the United States District Court for the Western District of Virginia, at Charlottesville.  Norman K. Moon, Senior District Judge.  (3:22-cv-00049-RSB-JCH)

───────────────

Argued:  September 10, 2025                 Decided:  April 22, 2026

───────────────

Before DIAZ, Chief Judge, and KING and RICHARDSON, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Richardson wrote the majority opinion, in which Chief Judge Diaz joined.  Judge King wrote a dissenting opinion.

---

**ARGUED:**  John S. Moran, MCGUIREWOODS, LLP, Washington, D.C., for Appellants. Kevin S. Elliker, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Appellees.  **ON BRIEF:**  David Eliezer Yerushalmi, AMERICAN FREEDOM LAW CENTER, Washington, D.C., for Appellants.  Maya M. Eckstein, Lewis F. Powell III, HUNTON ANDREWS KURTH LLP, Richmond, Virginia; Brittany M.J. Record, Ehson Kashfipour, Washington, D.C., Blair Connelly, Zachary Rowen, LATHAM & WATKINS LLP, New York, New York, for Appellees.

RICHARDSON, Circuit Judge:

To protect Plaintiffs and their family members living in Afghanistan, the district court issued a protective order that prohibited Defendants and their lawyers from "disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person . . . unless that person first executes a non-disclosure agreement." J.A. 51–52. Plaintiffs contend that disclosing their identities—or the details surrounding their evacuation from Afghanistan—would endanger both them and their family members in Afghanistan. On the other hand, Defendants argue that the protective order is an unconstitutional prior restraint on their speech because it limits their ability to communicate information that they obtained prior to—and independent of—discovery.

Although the order constitutes a content-based prior restraint, it fits into one of the narrow exceptions in which prior restraints can be permissible, subject to strict scrutiny. And the order satisfies strict scrutiny: It is narrowly tailored to safeguard the government's compelling interest in ensuring our Nation's security, which often depends on ensuring the safety of foreign nationals who ally themselves with United States military and diplomatic efforts abroad. Indeed, if such foreign nationals cannot rely on the United States' assurances of their protection, our Nation's ability to cultivate essential human assets abroad would be seriously undermined. In this case, the narrow protective order is the least restrictive means to safeguard this interest. Therefore, we affirm the district court's protective order.

## I.      BACKGROUND

In September 2019, an Afghan infant (Baby Doe) was injured and orphaned during a joint U.S.-Afghan military operation in Afghanistan.  U.S. Army Rangers then took Baby Doe to a U.S. military hospital for emergency care.  Soon thereafter, Major Joshua Mast, who was serving in Afghanistan as a Marine Corps Judge Advocate, learned about Baby Doe.  Mast and his wife, Stephanie Mast, began custody proceedings in Virginia.  They obtained an interlocutory adoption order in November 2019, which was finalized in December 2020.

Notwithstanding the adoption order, in February 2020, the U.S. Embassy gave custody over Baby Doe to John Doe's father, who claimed to be the child's paternal uncle. From that point forward, Baby Doe was cared for by John and Jane Doe.[1]  Through the efforts of U.S. military personnel, John, Jane, and Baby Doe evacuated Afghanistan in August 2021.  This evacuation occurred amid the chaotic U.S. withdrawal from Afghanistan, where thousands of individuals were relocated under Operation Allies Refuge.  The Does were taken to refuge housing at Fort Pickett, a U.S. military base in Blackstone, Virginia.  In September 2021, the Masts took custody of Baby Doe.

---

[1] That is, Baby Doe's cousin and his wife.

4

In March 2022, the Does challenged in Virginia state court the Masts' adoption of Baby Doe.  The Supreme Court of Virginia recently rejected the Does' challenge.  *See Mast v. A.A.*, 925 S.E.2d 665 (Va. 2026).[2]

In September 2022, the Does brought this federal suit against the Masts, Joshua's brother Richard, and others who assisted the Masts.  Along with their original complaint, the Does moved for a protective order that would prohibit Defendants from publicly disclosing the Does' identities.  In support, John Doe submitted a sealed declaration explaining that he and Jane Doe would fear for their own safety—and that of their family in Afghanistan—if their presence in the United States or the circumstances surrounding their departure from Afghanistan were revealed.  He expressed concern that if their location were revealed, then the Taliban would learn of it and harm their family members based on the false perception that Doe was a U.S. cooperator or spy.  This fear is even more acute because the Does came to the United States during the evacuation of Afghanistan—at the same time as many genuine cooperators.  He further explained that their family would be put at risk even if only their hometowns were publicly disclosed.

In September 2022, the district court granted *ex parte* the Does' motion for a protective order.  In doing so, it applied this Court's framework from *James v. Jacobson*, under which a trial court may permit a party to litigate under a pseudonym when privacy considerations outweigh the right of public access and the risk of unfairness to the opposing

---

[2] We leave it to the district court to address how, if at all, the Supreme Court of Virginia's ruling affects this ongoing litigation, including the Does' ability to assert third-party standing on behalf of Baby Doe.

party. 6 F.3d 233, 238 (4th Cir. 1993). The court concluded that the Does had "established grounds to proceed by pseudonym and for the entry of . . . a protective order." J.A. 50–51 (citing *James*, 6 F.3d 233 at 238 and *United States v. Doe*, 962 F.3d 139, 147 (4th Cir. 2020)). In particular, the court determined "that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent third-parties." J.A. 51. The court thus ordered:

> The Defendants and their counsel and representatives are prohibited from disclosing any information that directly or indirectly identifies Plaintiffs and their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction. This applies to any disclosure in the course of any investigation undertaken by the Defendants, their counsel, or their other agents or representatives.

J.A. 51–52. The Masts did not challenge the protective order at the time.

Despite their professed desire to remain anonymous, the Does engaged with the media about their case against the Masts, personally naming the Masts and publicizing their side of the story.[3] That spurred the Masts to file a series of motions to vacate or modify the September 2022 protective order, claiming the Does' actions undermined their claimed justifications for anonymity. The Masts argued that even if the Does are allowed to proceed under pseudonyms, the district court should rescind any restrictions on the Masts' ability

---

[3] In an article published by The Associated Press in October 2022, the Does and their lawyers provided their account. *See* Juliet Linderman et al., *Afghan couple accuse US Marine of abducting their baby*, Associated Press (Oct. 20, 2022). And in November 2022, the New York Times Magazine ran an article doing the same. *See* Rozina Ali, *How Did This Man Think He Had the Right to Adopt This Baby?*, N.Y. Times (Nov. 20, 2022). In each instance, the Does apparently received agreement from the press that their identities would not be disclosed.

6

to discuss the Does' identities outside the courtroom because such restrictions constitute content-based prior restraints that do not survive strict scrutiny and therefore violate the First Amendment.

On August 16, 2024, the district court denied these motions and held Joshua Mast in civil contempt for sharing photos of Baby Doe with a non-profit foundation that was helping the Masts raise money for litigation. On September 16, 2024, Joshua, Stephanie, and Richard Mast filed a notice of appeal.

## II.    DISCUSSION

### A.    Appellate Jurisdiction Exists

Before reaching the merits, we must assure ourselves of our own appellate jurisdiction. *See, e.g.*, *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934) ("An appellate federal court must satisfy itself . . . of its own jurisdiction."); *see also LeClair v. Tavenner*, 128 F.4th 257, 261 (4th Cir. 2025). Here, this requirement means that we must address two issues: (1) whether the notice of appeal was timely filed, and (2) whether the district court's August 16, 2024 order is immediately appealable. *See Bowles v. Russell*, 551 U.S. 205, 214 (2007) ("[T]he timely filing of a notice of appeal in a civil case is a jurisdictional requirement.").

### 1.    Timeliness of appeal

In a civil case, a notice of appeal must be filed within thirty days of the entry of the order being appealed. Fed. R. App. P. 4(a). The Masts didn't appeal the September 2022 order.

On August 16, 2024, the district court entered an order holding Joshua Mast in contempt for violating the September 2022 protective order and denying the Masts' motion to vacate or modify that protective order. The Masts timely appealed the district court's August 16, 2024 order refusing to modify the earlier protective order.[4]

Of course, the August 2024 order did not restart the clock for a timely appeal of the September 2022 order. *See FTC v. Minneapolis-Honeywell Regul. Co.*, 344 U.S. 206, 212 (1952); *cf. FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1330 (11th Cir. 2023). So the Masts may not challenge the initial protective order in this appeal. But that is not what they are doing.[5]

---

[4] They timely filed their notice of appeal on September 16, 2024. Because the thirty-day deadline fell on a Sunday, the filing period was extended to the next business day under Fed. R. App. P. 26(a).

[5] Some courts have suggested that a motion to modify an injunction cannot be used as a loophole to successively challenge the issuance of an injunction. *See, e.g.*, *Tyler v. Murphy*, 135 F.3d 594, 595 (8th Cir. 1998) ("Absent abuse, such as the filing of successive unsuccessful motions, the order denying a motion to dissolve an injunction is appealable."); *SEC v. Suter*, 832 F.2d 988, 990 (7th Cir. 1987) (suggesting that an order denying a motion to vacate an injunction is appealable unless "the *only purpose* of the motion was to take a belated appeal" (emphasis added)); *SEC v. Young*, 121 F.4th 70, 78 (10th Cir. 2024) ("When a district court has denied a *successive* motion to modify a preliminary injunction—a motion that raises the same issues or raises issues that could have been raised in a prior motion—we exercise interlocutory jurisdiction only if there was a change in circumstances, evidence, or law since the prior motion." (emphasis added)). Given the case developments since September 2022, there is no reasonable suggestion that the Masts' motion to modify was an abuse of process. So we need not determine whether or when the denial of a motion to modify an injunction made in this Circuit is not appealable despite the language of § 1292(a)(1).

## 2.    The order is appealable under § 1292(a)(1)

Because the appeal of the August 16, 2024 order was timely, we must determine whether that interlocutory order is immediately appealable. This Court has jurisdiction over interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, *or refusing to dissolve or modify* injunctions." 28 U.S.C. § 1292(a)(1) (emphasis added); *Pickle v. Char Lee Seafood, Inc.*, 174 F.3d 444, 448 (4th Cir. 1999) ("It is . . . well established that an order denying a request to modify an injunction is subject to interlocutory appeal under 28 U.S.C. § 1292(a)(1)."). The district court's August 2024 order expressly denied the Masts' motion to vacate or modify the protective order. So it seems to fall within § 1292(a)(1) so long as the underlying September 2022 protective order is an "injunction." It is.

An order need not be formally labeled an "injunction" to be appealable under this section. Instead, we must look to the order's "practical effect." *Abbott v. Perez*, 585 U.S. 579, 594 (2018) ("[W]here an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction."); *Selective Ins. Co. of America v. Westfield Ins. Co.*, 73 F.4th 239, 243 (4th Cir. 2023).[6] At the same

---

[6] *See also Injunction*, Black's Law Dictionary (12th ed. 2024) ("A court order commanding or preventing an action."); 1 Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* § 1, at 2–3 (1909) ("In a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam* by which . . . a party is required to do or refrain from doing a particular thing. An injunction has also been defined as a writ framed according to the circumstances of the case, commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience.").

time, we have made it clear that because "[m]ost court orders are injunctions at some level of generality, . . . Congress did not envision that every interlocutory order restraining a party's actions could be appealable under § 1292(a)(1)." *United States ex rel. Lutz v. United States*, 853 F.3d 131, 139 (4th Cir. 2017). To this end, we have articulated a two-pronged inquiry for resolving the practical-effects test: An order is appealable under § 1292(a)(1) if the order "(1) may have a serious, perhaps irreparable consequence and (2) can only be effectually challenged through immediate appeal, rather than upon final judgment." *Selective Ins.*, 73 F.4th at 243 (internal quotation marks omitted); *see also Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981); *In re Braxton*, 258 F.3d 250, 257 (4th Cir. 2001).

This appeal satisfies both prongs. First, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) ("[I]ndefinite delay of [asserted speech rights] will cause irreparable harm . . . that is intolerable under the First Amendment."); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of first amendment rights constitute per se irreparable injury."); *In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018) (same). Here, the Masts claim a First Amendment right to speak about the Does' identities *now*. Thus—second—forcing the Masts to wait until final judgment would deny that right entirely, because any subsequent appeal could not retroactively restore the speech that was restrained during litigation. So the Masts have alleged an irreparable harm that can only be effectually challenged through immediate appeal. *See Roman Catholic Diocese of*

10

*Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam).  The order therefore has the

practical effect of an injunction, and we have jurisdiction under § 1292(a)(1).[7]

### B.    The Protective Order Survives First Amendment Scrutiny

We turn now to the merits of the Masts' claim that in light of changed circumstances,

the continued enforcement of the protective order violates the First Amendment as a

content-based prior restraint.[8]  While we agree with the Masts that the protective order

constitutes a content-based prior restraint, we nonetheless hold that the order does not

violate the First Amendment.  The record supports the conclusion that the speech enjoined

would undermine the government's compelling national security interests.  *See Near v.*

*Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931).  And it satisfies strict scrutiny, because

it was narrowly tailored to—and the least restrictive means of protecting—the

---

[7] Two of our sister circuits agree.  *See Parker v. Columbia Broad Sys., Inc.*, 320 F.2d 937, 938 (2d Cir. 1963) (holding that an order restricting parties' out-of-court speech was "in the nature of a preliminary injunction, and therefore appealable under 28 U.S.C. § 1292(a)(1)"); *Bailey v. Sys. Innovation, Inc.*, 852 F.2d 93, 96–97 (3d Cir. 1988) (same).

The dissent mistakenly relies on *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988).  *Gulfstream* concerned a stay order that merely governed the sequence of proceedings between two courts, a classic case-management order.  The Court's observation that an order "relat[ing] *only to the conduct or progress of litigation* before that court ordinarily is not considered an injunction," *id.* at 279 (emphasis added), applies to orders whose effect is confined to the litigation itself:  discovery schedules, consolidation orders, and the like.  The 2022 Protective Order is categorically different.  It reaches well beyond this courtroom, prohibiting the Masts from disclosing information about the Does *to any person*, in *any forum*.  An order that restricts a party's out-of-court speech about facts known independently of litigation is not a routine case-management order relating only to the "conduct or progress of litigation"; it is an injunction.

[8] We review the denial of a motion to vacate an injunction for abuse of discretion, *see Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 650 (1961); *Shingara v. Skiles*, 420 F.3d 301, 305 (3d Cir. 2005), while reviewing legal conclusions *de novo*.  *Grimmett v. Freeman*, 59 F.4th 689, 692 (4th Cir. 2023).

11

government's compelling interest in ensuring the Nation's security. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Reno v. ACLU*, 521 U.S. 844, 874 (1997).

### 1.    The protective order is a content-based prior restraint

"Content-based restrictions target 'particular speech because of the topic discussed or the idea or message expressed.'" *Murphy-Brown,* 907 F.3d at 797 (quoting *Reed*, 576 U.S. at 163). Distinctions drawn "based on the message a speaker conveys," whether they regulate speech "by particular subject matter" or "by its function or purpose," are facially content based and presumptively unconstitutional. *Reed*, 576 U.S. at 163–64.

In *Murphy-Brown*, this Court held that an order prohibiting "any extrajudicial statement . . . to any person or persons associated with any public communications media . . . *relating to the trial, the parties or issues in th[e] case* which could interfere with a fair trial or prejudice any plaintiff, the defendant, or the administration of justice" constituted a content-based restriction. 907 F.3d at 792–93, 796–97 (emphasis added). True, that case involved a broad gag order. But in a similar way, the protective order at issue here is a content-based restriction on speech, because it facially singles out and restricts the Masts' ability to speak extrajudicially "to any person" if their message functions to "directly or indirectly" reveal the Does' or their family members' identities. J.A. 51–52.

As the order prohibits speech before it is expressed, it is also a prior restraint.[9] "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain

---

[9] *See also Murphy-Brown*, 907 F.3d at 796–97 (concluding that court order prohibiting the parties, their lawyers, and all potential witnesses from speaking to the media about the trial, parties, or issues is a prior restraint); *Matter of Subpoena 2018R00776*, 947 F.3d 148, 155–59 (3d Cir. 2020) (finding that nondisclosure orders were prior restraints;

communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, *Nimmer on Freedom of Speech* § 4.03, p. 4–14 (1984)) (emphasis in *Alexander*). "[C]ourt orders that actually forbid speech activities are classic examples of prior restraints." *Alexander*, 509 U.S. at 550 (cleaned up).

Importantly, the order does not merely restrict the dissemination of information obtained through court-sanctioned discovery; it prevents the Masts from sharing information learned *independently* of this litigation. That distinction matters. In *Seattle Times Co. v. Rhinehart*, the Supreme Court held that an order limiting dissemination of information gained through discovery "is not the kind of classic prior restraint that requires exacting First Amendment scrutiny," because the restricted party would never have possessed that information if not for the court's coercion-backed processes. 467 U.S. 20, 33 (1984); *see also* Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 Hastings L.J. 1353, 1376 (2022) (explaining that "[w]hen a party learns information through discovery—essentially invoking the coercive power of the court—a court may impose a protective order limiting the publication of this information" so long as *Seattle Times*'s deferential "good cause" standard is satisfied). But "injunctions against parties revealing information that they already knew before filing the case" *are* classic prior restraints. *Id.* Here, the

---

*In re Dan Farr Productions*, 874 F.3d 590, 592–93 (9th Cir. 2017) (finding that protective order prohibiting the defendants from making public statements on certain topics relevant to the merits of the case was a prior restraint). Even though the threatened sanction is not imposed until after the speech has occurred, practically, the protective order operates as an immediate restraint on the Masts' speech. *See* David S. Ardia, *Freedom of Speech, Defamation, and Injunctions*, 55 Wm. & Mary L. Rev. 1, 37–38 (2013).

Masts knew the Does' true identities before this lawsuit was filed, so this knowledge was not "gained through the pretrial discovery process." *See Seattle Times*, 467 U.S. at 22. Indeed, the Masts' knowledge of the Does' identities was obtained independently, through the parties' pre-litigation interactions that gave rise to this suit. The order is not, therefore, a restriction on information that the court coercively compelled the Does to produce. So *Seattle Times*'s more deferential "good cause" standard does not apply.

The district court's attempt to distinguish the order from a prior restraint by characterizing it as a necessary "corollary" to enforce the pseudonym order conflates two distinct inquiries, each designed to protect different rights. J.A. 314. After the district court found that the Does' privacy interests were sufficiently compelling to warrant anonymity under *James*'s balancing test,[10] it concluded that the same test justified the means necessary to make anonymity effective: preventing the Masts (and third parties) from speaking on a particular topic. But the *James* test balances a plaintiff's privacy interests against the public's right of access to judicial proceedings and a defendant's right to fair process. *See James*, 6 F.3d at 238–39; *Doe v. Sidar*, 93 F.4th 241, 246–47 (4th Cir. 2024). It is not—and was never intended to be—a test for justifying a prior restraint on a party's distinct First Amendment right to free speech outside the courthouse. In other words, the *James* test determines whether a plaintiff can shield their identity *in the litigation*; it does not grant the court license to censor the defendant's right to speak about that identity in the public sphere. Therefore, the district court erred in relying on *James*.

---

[10] *See James*, 6 F.3d at 238–39.

*James*'s balancing test cannot justify an order restricting the Masts' ability to speak about information they knew prior to, and independent of, coercion-backed discovery. So to invoke *James* here as a substitute for a proper prior restraint analysis would create an end-run around the First Amendment: Once a plaintiff's privacy interest is deemed sufficient to justify anonymity, the defendant's core speech rights would automatically be extinguished without any further analysis. The correct approach is to treat the two inquiries separately. Once the court determined that pseudonymity was warranted under *James*, it must separately consider whether a prior restraint order is permissible.

Judicial prior restraints on speech are permitted only in "exceptional cases." *Near v. Minnesota*, 283 U.S. 697, 716 (1931). These exceptional circumstances are limited to speech that, for example, threatens national security, is obscene, or incites violence. *Id.*; *S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558–59 (1975) ("In order to be held lawful, [a prior restraint], first, must fit within one of the narrowly defined exceptions to the prohibition against prior restraints."); *see also Times Film Corp. v. City of Chicago*, 365 U.S. 43, 47–49 (1961).[11]

Even if the speech falls within one of the narrowly defined exceptions, a prior restraint of it still carries "a heavy presumption against its constitutional validity." *Bantam*

---

[11] The unique role of the court illustrates one other circumstance that may justify a prior restraint: A court has responsibility to ensure a criminal defendant receives a fair trial and corresponding power to control courtroom proceedings, including, at times, restricting the speech of parties, their counsel, and courtroom officials. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 555, 564 (1976); *Sheppard v. Maxwell*, 384 U.S. 333, 358, 361–62 (1966). But the party seeking such a restraint "carries a heavy burden of showing justification." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (quotation omitted).

*Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also Stuart*, 427 U.S. at 559 (explaining that a judicially imposed prior restraint is "the most serious and the least tolerable infringement on First Amendment rights" because it is backed by an official threat of "immediate and irreversible sanction" and therefore not only "chills" speech but "freezes" it altogether (citing Alexander Bickel, *The Morality of Consent* 61 (1975) ("A criminal statute chills; prior restraint freezes"))); *cf.* 4 W. Blackstone, Commentaries on the Laws of England *151–52 (London, 1765–69) (describing the difference between criminal sanctions and prior restraints).  For that reason, our Court subjects content-based prior restraints to strict scrutiny.  *See Murphy-Brown*, 907 F.3d at 796–97.  So, the district court's order in this case may be upheld only if it is narrowly tailored to—and the least restrictive means of achieving—a compelling government interest that is jeopardized by the restricted speech.  *See Stuart*, 427 U.S. at 562.  We hold that the order satisfies this demanding test.

### 2.    Compelling interest

"It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation," and that "measures to protect the secrecy of our Government's foreign intelligence operations plainly serve these interests."  *Haig v. Agee*, 453 U.S. 280, 307 (1981) (cleaned up); *see also Edgar v. Haines*, 2 F.4th 298, 304 (4th Cir. 2021).  "The Government has a compelling interest in protecting" not only "the secrecy of information important to our national security" but also "the *appearance* of confidentiality so essential to the effective operation of our foreign intelligence service."  *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (per curiam) (emphasis added).  That includes protecting the identity of potential foreign collaborators.  Even the appearance of secrecy is critical for

16

"protecting sensitive sources and methods of gathering information." *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir. 1985). As the Supreme Court explained in *CIA v. Sims*:

> If potentially valuable intelligence sources come to think that the [government] will be unable to maintain the confidentiality of its relationship to them, many could well refuse to supply information . . . in the first place. Even a small chance that some court will order disclosure of a source's identity could well impair intelligence gathering and cause sources to "close up like a clam." To induce some sources to cooperate, the Government must tender as absolute an assurance of confidentiality as it possibly can. . . . We seriously doubt whether a potential intelligence source will rest assured knowing that judges, who have little or no background in the delicate business of intelligence gathering, will order his identity revealed.

471 U.S. 159, 175–76 (1985); *cf. United States v. Zubaydah*, 595 U.S. 195, 207–09 (2022) (explaining that to either confirm or deny the government's confidential relationship with "Country A[] can diminish the extent to which the intelligence services of Countries A, B, C, D, etc., will prove willing to cooperate with our own intelligence services in the future"). Thus, the government's ability to provide credible assurances to potential collaborators that they and their family members will not be endangered by aiding the United States is directly tied to its compelling interest in ensuring the Nation's security.

This interest necessarily encompasses protecting the confidentiality of those who are *perceived* as collaborators, regardless of whether they are actual collaborators. That's because the government's ability to credibly ensure the confidentiality of collaborators, and thus its ability to recruit and retain them,[12] depends in part on avoiding publicly

---

[12] As the Supreme Court explained in *Snepp*, "[t]he continued availability of . . . foreign sources depends upon the [government's] ability to guarantee the security of

17

marking those seen as having assisted the U.S. government. This Nation's adversaries often target suspected collaborators—not just confirmed ones—to create widespread fear and deter assisting the United States. *Cf.* Ben Brandt, *The Taliban's Conduct of Intelligence and Counterintelligence*, 4(6) Combating Terrorism Center Sentinel 19 (June 2011); European Asylum Support Office, *Afghanistan Security Situation Update: Country of Origin Information Report* at 16 (Sept. 2021). If the government only protects the secrecy of information of *actual* collaborators, the Nation's adversaries would be capable of effectively deterring potential collaborators and thereby undermining the government's ability to gather the intelligence necessary to protect the United States' foreign policy and security interests.[13] And to preserve the appearance of confidentiality and thereby retain the trust of *actual* collaborators, the government's interests necessarily encompass protecting those publicly perceived as—and targeted for—having assisted the United States.

The district court concluded that the disclosure of the Does' identities would pose a grave and imminent risk of retaliation against perceived collaborators abroad, undermining the government's compelling interest in safeguarding the Nation's security. We find the record supports that conclusion. As the district court noted, the Does were evacuated from

---

information that might compromise them and even endanger the personal safety of foreign agents" operating abroad. 444 U.S. at 512.

[13] *See Agee*, 453 U.S. at 307 ("Protection of the foreign policy of the United States is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized.").

18

Afghanistan to the United States in late August 2021 and then housed at United States military bases. During this time, Operation Allies Refuge—as the name suggests—sought to support Afghans who worked alongside the United States in Afghanistan by bringing them to the United States. The circumstances and timing of the Does' evacuation and resettlement would predictably (even if mistakenly) lead an outside observer as well as the Taliban to perceive the Does as American collaborators. Indeed, "evidence readily showed the grave safety risks that . . . [the Does'] families in Afghanistan would face if [the Does'] identities became public." J.A. 315. The Taliban would likely "carry out violence against the Does' families remaining in Afghanistan."[14] *See, e.g.*, J.A. 315–18. Nor is this mere conjecture, as the district court found that the "threat" to their families, if the Does' "identities become known, is *anything but speculative*." J.A. 317 (emphasis added); *see* J.A. 316 (noting that there have already been "several instances in which" known family members "appear[ed] to have been directly targeted by shadowy figures alluding to [the Does]").

When United States military and intelligence agencies conduct foreign operations requiring local assistance, potential collaborators naturally assess the risks. Common sense tells us that establishing the trust necessary to recruit actual collaborators requires the United States to protect those perceived as collaborators. *See Snepp*, 444 U.S. at 509 n.3.

---

[14] This risk of retaliation by the Taliban is especially predictable given that "more than 40% of Afghans . . . took significant risks to support [the U.S.] military and civilian personnel in Afghanistan, working for or on behalf of the U.S. government in Afghanistan or [its] coalition forces, or are a family member of someone who did." U.S. Dep't of Homeland Security, *Operation Allies Welcome* (Jan. 22, 2025).

That trust is directly threatened when our government allows those who may be perceived as collaborators—like the Does—to be publicly identified. Indeed, identification of the Does' families abroad would expose them to immediate harm and concretely impair the credibility on which sensitive cooperation depends. Without the protective order, the Masts' ability to freely disclose the Does' identities would impair the government's capacity to recruit and retain cooperating informants, which, in turn, would weaken the United States' foreign policy and national security.[15]

### 3. Narrow tailoring

The protective order's service of a compelling government interest is not alone enough. The order must also be narrowly tailored to that interest and the least restrictive means of achieving it. *See Murphy-Brown*, 907 F.3d at 799. Strict scrutiny does not require a restriction to be "perfectly tailored." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 454 (2015); *Abbott v. Pastides*, 900 F.3d 160, 174 n.7 (4th Cir. 2018). Nevertheless, court-ordered prior restraints "should be a last resort, not a first impulse." *Murphy-Brown*, 907 F.3d at 800.

This protective order—prohibiting "disclosing any information that directly or indirectly identifies Plaintiffs and their family members to any person . . . unless that person first executes a non-disclosure agreement"—is sufficiently narrowly tailored. It is

---

[15] While the district court framed the relevant compelling interest as the personal safety of the Does and their family members in Afghanistan, its undisputed factual findings also implicate the government's compelling interest in national security. These findings establish that disclosure of the Does' identities would undermine the government's ability to protect intelligence sources and maintain credibility necessary for future recruitment.

limited to the Masts as participants in the litigation. *Cf. Stuart*, 427 U.S. at 563. It limits the Masts from disclosing only the Does' identities and information that would reasonably enable someone to determine their identities. And that limitation can be ameliorated by using a non-disclosure agreement.

The district court's protective order does not purport to control the Masts' ability to speak generally about the litigation, about the Does' claims, or about their own defenses. This fact sets the protective order apart from gag orders struck down in cases like *Murphy-Brown*, which prohibited the parties and their lawyers, as well as "all potential witnesses," from:

> giv[ing] or authoriz[ing] any extrajudicial statement or interview to any person or persons associated with any public communications media or that a reasonable person would expect to be communicated to a public communications media relating to the trial, the parties[,] or issues in this case which could interfere with a fair trial or prejudice any plaintiff, the defendant, or the administration of justice and which is not a matter of public record. Statements of information intended to influence public opinion regarding the merits of this case are specifically designated as information which could prejudice a party.

907 F.3d at 792–93. Here, unlike the parties in *Murphy-Brown*, the Masts remain free to discuss the case in the court of public opinion by "giv[ing] or authoriz[ing] any extrajudicial statement or interview . . . relating to the trial, the parties[,] or the issues in this case." *Id.*[16] They simply must not reveal the Does' identities.

---

[16] *Cf. Gag Order*, Merriam-Webster.com Dictionary ("a judicial ruling barring public disclosure or discussion (as by the press) of information related to a case"); *Gagging Order*, Merriam-Webster.com Dictionary ("an order by a judge or court saying that the people involved in a legal case cannot talk about the case or anything related to it in public"); *Gag Order*, Black's Law Dictionary (12th ed. 2024) ("A judge's order directing

Indeed, the Masts have *already* engaged with the media without violating the protective order. After sustaining the protective order's validity, the district court rejected the Does' motion to hold the Masts in civil contempt for giving a televised interview with CBS that even included Baby Doe's photograph. As the court concluded, the Masts did not violate the protective order because the Masts themselves never disclosed the Does' names, did not explain where they found Baby Doe, and did not authorize CBS to show Baby Doe's face.

What's more, the protective order does not issue a categorical prohibition on revealing the Does' identities: So long as they secure a non-disclosure agreement with third parties, the Does' identities can be revealed without violating the order. Finally, we agree with the district court in rejecting the Masts' claim that the protective order will generate a "parade of horribles"—*e.g.*, preventing them from enrolling Baby Doe in school absent teachers and staff signing a non-disclosure agreement. *See* J.A. 326. The order limits only the Masts' identification of the Does *as plaintiffs* in connection with this litigation, and thus cannot be reasonably read to preclude the Masts from telling Baby Doe's teachers, "This is [Baby Doe]."

Nor do we find persuasive the Masts' contention that the district court failed to "consider any less restrictive measures that would permit the Masts to speak about the case and prepare their defense." Appellants' Br. at 36. The Masts suggest, for example, that the court could have limited the order's "speech restrictions to communications that have

parties, attorneys, witnesses, or journalists to refrain from publicly discussing the facts of a case").

a reasonable likelihood of reaching the Taliban, such as communications with media outlets as opposed to communications with private individuals, or to provide a carve out for communications that are necessary for the Masts to prepare their defense." *Id.* at 36–37. For one, as explained above, the order *does* allow the Masts to speak with both the media and private individuals about their case, so long as they do not reveal the Does' identities absent a non-disclosure agreement. And even identifying the Does to a private individual carries with it a risk of eventual publication—and discovery by the Taliban. Furthermore, the Masts fail to explain how one could determine whether there is a "reasonable likelihood" that a communication might reach the Taliban. Strict scrutiny requires restrictions to be meaningfully tailored to the compelling interest, not so perfectly tailored as to eliminate all possible alternatives. *See Williams-Yulee*, 575 U.S. at 454. The district court's order satisfies that standard. So the order survives strict scrutiny.

### C.    The Protective Order Is Not Unconstitutionally Vague

The protective order's speech restrictions still have one more hurdle to clear. The Fifth Amendment's Due Process Clause states that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "The government violates this prohibition when it deprives someone of life, liberty, or property pursuant to a . . . regulation that is [1] 'so vague that it fails to give ordinary people fair notice of the conduct it punishes, or [2] so standardless that it invites arbitrary enforcement.'" *Lumumba v. Kiser*, 116 F.4th 269, 284

23

(4th Cir. 2024) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox Television*, 567 U.S. at 253–54; *see also Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (explaining that where a government directive "interferes with the right of free speech . . ., a more stringent vagueness test should apply").

That said, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)); *see also Recht v. Morrisey*, 32 F.4th 398, 415 (4th Cir. 2022) ("That some smidgen of ambiguity remains is no reason to find a [government action] unconstitutionally vague."). And more ambiguity is tolerated in regulations "with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman Estates*, 455 U.S. at 499. A directive is not unconstitutionally vague as long as it "establishes minimal guidelines to govern" its enforcement and "gives reasonable notice of the proscribed conduct." *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998).

We conclude that the order is not unconstitutionally vague. The Masts contend that the protective order's prohibition against "indirectly" identifying the Plaintiffs is fatally imprecise and provides no objective standard for a person of ordinary intelligence to follow. *See* Appellants' Br. at 39–41; *cf. Murphy-Brown*, 907 F.3d at 800. But this argument is unavailing in light of our precedent. *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 606–07 (1973) (holding that a state statute prohibiting certain employees from

24

"directly or indirectly" soliciting or receiving, "or in any manner be[ing] concerned in soliciting or receiving" political contributions is not unconstitutionally vague); *United States v. Ehsan*, 163 F.3d 855, 859–60 (4th Cir. 1998) (holding that an Executive Order that banned "direct and indirect" exportation to Iran was not unconstitutionally vague); *Dep't of Conservation & Dev. v. Tate*, 231 F.2d 615, 616 (4th Cir. 1956) (holding that a court decree providing that lease of a park must not "directly or indirectly" racially discriminate was not unconstitutionally vague); *Patrick v. Teays Valley Trs., LLC*, 297 F.R.D. 248, 257 (N.D. W. Va. 2013) (holding that an interrogatory asking for the names of employees who communicated with a party "either directly or indirectly" was not impermissibly vague); *cf. Wright v. Heizer Corp.*, 560 F.2d 236, 255–56 (7th Cir. 1977) (holding that an order enjoining the defendant from "directly or indirectly" entering into certain transactions met the injunction-specificity requirement of Federal Rule of Civil Procedure 65(d)).

Our holding in *Ehsan* is particularly instructive. There, we explained that an Executive Order prohibiting "direct and indirect" exportation to Iran "does not undermine the simple, unambiguous bar . . . of all 'exportation . . . to Iran.'" 163 F.3d at 859–60. Similarly, here, the district court's protective order should be straightforwardly read to prohibit disclosing information that gives away the Does' identities unless the person to whom the Masts make the disclosure signs a non-disclosure agreement. For example, the Masts did *in fact* know that sharing Baby Doe's photo to a third-party violated the order: When asked why he could not share a photo, Joshua Mast said, "[b]ecause I was required

25

to do that by the protective order. I could not identify her to other people." Thus, the order is sufficiently clear to pass constitutional muster.[17]

*         *         *

Although the order is a content-based prior restraint, this is the exceptional case in which a prior restraint is permissible. The threat to the government's compelling interest in ensuring our Nation's security is not mere conjecture. The government must be able to credibly guarantee the confidentiality of potential foreign intelligence assets and their families. Absent this guarantee, our military and intelligence agencies' ability to cultivate the trust of potential informants would be seriously undermined, which, in turn, would threaten our Nation's security. And the order satisfies strict scrutiny: It was narrowly tailored to safeguarding that interest and was the least restrictive means of doing so. We therefore uphold the district court's protective order.

*AFFIRMED*

---

[17] We also reject the Masts' argument that the order is impermissibly vague because of the alleged uncertainty concerning who qualifies as one of the Does' "family members." *See* Appellants' Br. at 41. First, the district court required the Does to identify "each biological parent and each paternal or maternal sibling, grandparent, aunt, or uncle of John Doe, Jane Doe, or Baby Doe in Afghanistan." *Doe v. Mast*, 2023 WL 8481049, at *3 (W.D. Va. Dec. 7, 2023) (granting the Masts' motion to compel a response to an interrogatory). Second—as the Does point out—if the Masts do not know that someone is related to the Does, it is difficult to imagine how they could possibly step on the "landmine" of identifying that person as a family member of the Does. *See* Appellees' Br. at 60.

KING, Circuit Judge, dissenting:

Contrary to my good friends in the panel majority, I am of opinion that we lack appellate jurisdiction over this interlocutory appeal from the Western District of Virginia. Specifically, my assessment is that the district court's 2024 Order (the "2024 Order") denying defendants Joshua Mast, Stephanie Mast, and Richard Mast's motion to modify the court's earlier 2022 Protective Order (the "2022 Protective Order") is not a "refus[al]" by the court "to dissolve or modify [an] injunction," *see* 28 U.S.C. § 1292(a)(1), because the 2022 Protective Order is plainly not an injunction, *see, e.g.*, *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988) (explaining that court order "relat[ing] only to the conduct or progress of litigation before that court ordinarily is not considered an injunction"). As such, the 2024 Order is simply not an immediately appealable interlocutory order, pursuant to the well-delineated parameters of § 1292(a)(1).

Nor, for that matter, does the district court's 2024 Order qualify for immediate interlocutory review pursuant to the so-called collateral order doctrine. *See, e.g.*, *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949) (recognizing, inter alia, that collateral order appeal is only permitted when order would "be effectively unreviewable on appeal from a final judgment"). To be sure, both the 2022 Protective Order and the 2024 Order could be adequately reviewed by our Court in the posture of a § 1291 final decision appeal. *See, e.g.*, *Doe v. Pub. Citizen*, 749 F.3d 246, 273-75 (4th Cir. 2014) (reversing — after entry of final judgment — federal court party-pseudonymity order); *but see Doe v. Sidar*, 93 F.4th 241, 245 (4th Cir. 2024) (concluding that non-anonymity orders are immediately

27

appealable under collateral order doctrine); *accord Doe v. Vill. of Deerfield*, 819 F.3d 372, 376 (7th Cir. 2016) (exercising collateral order jurisdiction and explaining that "[i]f parties were required to litigate the case through to a final judgment on the merits utilizing their true names, the question of whether anonymity is proper would be rendered moot"). Accordingly, in these circumstances, there is also no sound basis for invoking the collateral order doctrine to authorize interlocutory review of the propriety of the 2024 Order.

\* \* \*

Pursuant to the foregoing, I would readily grant plaintiff John and Jane Doe's motion to dismiss this improvidently-filed interlocutory appeal for lack of appellate jurisdiction. Because the panel majority has concluded otherwise, I respectfully dissent.[*]

---

[*] If I was of opinion that we possessed appellate jurisdiction in this situation, I might have agreed with the panel majority's assessment that the district court did not at all abuse its discretion. But "[b]ecause I believe we lack [appellate] jurisdiction to do so and my opinion would therefore be purely advisory, I decline to state any conclusive view on the issue." *See Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 95 F.4th 181, 193 n.1 (4th Cir. 2024) (Wynn, J., concurring in judgment in part and dissenting in part).